**Case No. _____**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

In re: COUNTY OF LOS ANGELES

*Petitioner,*

v.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Western Division - Los Angeles)

*Respondent.*

LA ALLIANCE FOR HUMAN RIGHTS, et al.

*Real Parties in Interest.*

_____

On Petition for a Writ of Mandamus in
Case No. 2:20-cv-02291 (C.D.Cal.)

_____

## PETITION FOR WRIT OF MANDAMUS TO THE
## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT
## OF CALIFORNIA AND REQUEST FOR STAY
## OF PROCEEDINGS IN DISTRICT COURT

_____

**OFFICE OF COUNTY COUNSEL**
Dawyn R. Harrison (SBN 173855)
*County Counsel*
Katherine M. Bowser (SBN 230626)
*Acting Assistant County Counsel*
Ana Wai-Kwan Lai (SBN 257931)
*Senior Deputy County Counsel*
alai@counsel.lacounty.gov
500 West Temple Street, Suite 468
Los Angeles, California 90012
Telephone:  (213) 974-1830
Facsimile:  (213) 626-7446

**MILLER BARONDESS, LLP**
Louis R. Miller (SBN 54141)
* Mira Hashmall (SBN 216842)
mhashmall@millerbarondess.com
Nadia A. Sarkis (SBN 227778)
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone:  (310) 552-4400
Facsimile:  (310) 552-8400

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................. 2

TABLE OF AUTHORITIES ....................................................................... 4

INTRODUCTION AND RELIEF SOUGHT ............................................. 9

STATEMENT OF JURISDICTION ......................................................... 11

STATEMENT OF THE ISSUES .............................................................. 11

STATEMENT OF RELEVANT FACTS .................................................. 12

       A.    The Settlement Agreements ................................................... 13

       B.    The Parties Stipulate To Dismiss The Action With
           Prejudice ................................................................................ 15

       C.    The District Court Refuses The County's Request For
           Interlocutory Review And Sets A November 6, 2023
           Trial Date .............................................................................. 21

STANDARD OF REVIEW ....................................................................... 23

REASONS FOR GRANTING THE WRIT .............................................. 25

   I.    The District Court's Order Is Clear Error ................................ 25

       A.    The District Court Clearly Erred By Construing Rule
           41(a)(2) As Empowering It To Condition Dismissal On
           New Settlement Terms ........................................................... 26

       B.    The District Court Clearly Erred By Determining Its
           Discretion To Decline Ancillary Jurisdiction To Enforce
           The Settlement Agreement Gave It The Power To
           Compel Further Litigation ..................................................... 31

       C.    The District Court Clearly Erred By Conditioning
           Dismissal On Its Oversight Over The Executive Branch
           And Forcing The Parties To Trial In The Absence Of A
           Case Or Controversy ............................................................. 34

II. The District Court's Order Demonstrates A Manifest Disregard For Article III And The Boundaries Of Its Discretionary Authority ........ 38

III. Defendants Have No Other Means Of Obtaining Immediate Review And Will Be Prejudiced In A Way Not Correctable On Appeal ........ 40

IV. The Order Raises New And Important Issues Of First Impression ........ 42

V. A Stay Of Proceedings Is Warranted ........ 43

CONCLUSION ........ 44

STATEMENT OF RELATED CASES ........ 46

CERTIFICATE REGARDING COMPLIANCE WITH FRAP 21(D) ........ 47

612491.1

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Ariz. Christian Sch. Tuition Org. v. Winn*,
    563 U.S. 125 (2011) .......................................................... 39

*Bauman v. U.S. Dist. Ct.*,
    557 F.2d 650 (9th Cir. 1977) .............................. 10, 23, 24, 25

*Brass Smith, LLC v. RPI Indus., Inc.*,
    827 F. Supp. 2d 377 (D.N.J. 2011) ................................ 26, 33

*Cheney v. U.S. Dist. Ct. for D.C.*,
    542 U.S. 367 (2004) .......................................... 24, 34, 37, 42

*Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist.
    No. 1*,
    2013 WL 951405 (D. Minn. Mar. 12, 2013) ....................... 33

*Christensen v. U.S. Dist. Ct. for Cent. Dist. of Cal.*,
    844 F.2d 694 (9th Cir. 1988) .............................................. 24

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .......................................................... 37

*Collins v. Thompson*,
    8 F.3d 657 (9th Cir. 1993) ................................................. 32

*Colon-Cabrera v. Esso Standard Oil Co. (P.R.), Inc.*,
    723 F.3d 82 (1st Cir. 2013) ............................................... 28

*Ex parte Republic of Peru*,
    318 U.S. 578 (1943) .......................................................... 38

*Gardiner v. A.H. Robins Co., Inc.*,
    747 F.2d 1180 (8th Cir. 1984) ........................................... 28

*Gator.com Corp. v. L.L. Bean, Inc.*,
    398 F.3d 1125 (9th Cir. 2005) ........................................... 39

*Hamilton v. Firestone Tire & Rubber Co., Inc.*,
    679 F.2d 143 (9th Cir. 1982) ............................................. 26

*Hernandez v. Tanninen*,
　　604 F.3d 1095 (9th Cir. 2010)　　　　　　　　　　　　24

*Hilton v. Braunskill*,
　　481 U.S. 770 (1987)　　　　　　　　　　　　　　　　44

*In re Am. Med. Sys., Inc.*,
　　75 F.3d 1069 (6th Cir. 1996)　　　　　　　　　　　　39

*In re Apple Inc.*,
　　52 F.4th 1360 (Fed. Cir. 2022)　　　　　　　　　　　30

*In re Ashcroft*,
　　888 F.2d 546 (8th Cir. 1989)　　　　　　　　　　　　28

*In re Benvin*,
　　791 F.3d 1096 (9th Cir. 2015)　　　　　　　　　　　41

*In re Canter*,
　　299 F.3d 1150 (9th Cir. 2002)　　　　　　　　　　38, 41

*In re Cement Antitrust Litig. (MDL No. 296)*,
　　688 F.2d 1297 (9th Cir. 1982)　　　　　　　　24, 25, 38

*In re Pruett*,
　　133 F.3d 275 (4th Cir. 1997)　　　　　　　　　　　　42

*In re Sharon Steel Corp.*,
　　918 F.2d 434 (3d Cir. 1990)　　　　　　　　　　　31, 41

*In re Smith*,
　　926 F.2d 1027 (11th Cir. 1991)　　　　　　　　　　　41

*In re U.S. Dep't of Educ.*,
　　25 F.4th 692 (9th Cir. 2022)　　　　　　　　　　　　41

*In re United States*,
　　791 F.3d 945 (9th Cir. 2015)　　　　　　　　　　　24, 36

*In re United States*,
　　884 F.3d 830 (9th Cir. 2018)　　　　　　　　　　　　44

*In re Va. Elec. & Power Co.*,
　　539 F.2d 357 (4th Cir. 1976)　　　　　　　　　　　　43

612491.1

*In re Wolf*,
    842 F.2d 464 (D.C. Cir. 1988) ......... 28

*ITV Direct, Inc. v. Health Sols., LLC*,
    445 F.3d 66 (1st Cir. 2006) ......... 27

*K.C. ex rel. Erica C. v. Torlakson*,
    762 F.3d 963 (9th Cir. 2014) ......... 32

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) ......... 24

*Kay v. Bd. of Educ. v. City of Chicago*,
    547 F.3d 736 (7th Cir. 2008) ......... 34

*Keepseagle v. Perdue*,
    856 F.3d 1039 (D.C. Cir. 2017) ......... 31, 32

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ......... 26

*LA Alliance for Human Rights v. County of Los Angeles*,
    14 F.4th 947 (9th Cir. 2021) ......... 12, 37, 39, 40

*Laird v. Tatum*,
    408 U.S. 1 (1972) ......... 35

*Martin v. Moorhead Metro. Area Transit*,
    971 F. Supp. 414 (D. Minn. 1997) ......... 33

*McCall-Bey v. Franzen*,
    777 F.2d 1178 (7th Cir. 1985) ......... 30

*Mohawk Indus., Inc. v. Carpenter*,
    558 U.S. 100 (2009) ......... 24, 43

*Nken v. Holder*,
    556 U.S. 418 (2009) ......... 44

*Paturzo v. Home Life Ins. Co.*,
    503 F.2d 333 (4th Cir. 1974) ......... 40

*Perry v. Schwarzenegger*,
    591 F.3d 1147 (9th Cir. 2010) ......... 24

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
 758 F.3d 296 (D.C. Cir. 2014)     40

*Ratkovich By & Through Ratkovich v. Smith Kline*,
 951 F.2d 155 (7th Cir. 1991)     27

*Smoot v. Fox*,
 340 F.2d 301 (6th Cir. 1964)     29

*Stein v. KPMG, LLP*,
 486 F.3d 753 (2d Cir. 2007)     10, 32

*Szabo Food Serv., Inc. v. Canteen Corp.*,
 823 F.2d 1073 (7th Cir. 1987)     35

*TransUnion LLC v. Ramirez*,
 141 S. Ct. 2190 (2021)     35

*United States v. Sanchez-Gomez*,
 138 S. Ct. 1532 (2018)     24

*United States v. Sineneng-Smith*,
 140 S. Ct. 1575 (2020)     36

*United States v. U.S. Dist. Ct. for N. Mariana Islands*,
 694 F.3d 1051 (9th Cir. 2012)     28

*Vizcaino v. U.S. Dist. Ct. for W. Dist. of Wash.*,
 173 F.3d 713 (9th Cir. 1999)     25

*Waller v. Fin. Corp. of Am.*,
 828 F.2d 579 (9th Cir. 1987)     26

*Will v. Calvert Fire Ins. Co.*,
 437 U.S. 655 (1978)     29, 31

*Will v. United States*,
 389 U.S. 90 (1967)     10

## **FEDERAL STATUTES**

28 U.S.C. § 1292(b)     21

28 U.S.C. § 1651     11

612491.1

## **FEDERAL RULES**

Fed. R. App. P. 21                                                                                    11

Fed. R. Civ. P. 41                                                                                   28

Fed. R. Civ. P. 41(a)(1)                                                                         35

Fed. R. Civ. P. 41(a)(1)(ii)                                                                 15, 30

Fed. R. Civ. P. 41(a)(2)                           11, 15, 25, 26, 27, 28, 29, 30, 35, 40

## **STATE REGULATIONS**

L.A., Cal., County Charter art. I, § 2                                                       19

L.A., Cal., County Charter art. VI, § 21                                                   19

## **OTHER AUTHORITIES**

9 Arthur R. Miller, *Federal Practice and Procedure*, § 2367 (4th ed. Apr.
    2023 Update)                                                                                      29

U.S. Const. art. III                                                   9, 11, 12, 25, 34, 38, 41, 42

## INTRODUCTION AND RELIEF SOUGHT

The County of Los Angeles reached a comprehensive settlement agreement with Plaintiffs in this litigation, committing up to $850.5 million in new resources to dramatically expand housing, medical and social services to people experiencing homelessness. Plaintiffs and the County stipulated to dismiss the case with prejudice and asked the district court, in its discretion, to maintain ancillary jurisdiction to enforce the settlement agreement in the event of a breach. During three hearings on the parties' joint request for dismissal, no party, intervenor, or third party objected to the dismissal.

The district court nevertheless refused to dismiss the action because the court did not believe the County was doing enough to address homelessness based on its own independent research, did not trust the County would follow through on its contractual commitments, and wanted additional powers of monitoring and enforcement to hold the County "accountable." Refusing to stay the litigation or permit interlocutory appeal, the district court then took the position that its discretion to decline ancillary jurisdiction operated to void the parties' underlying settlement agreement.

To say the least, these rulings and the court's conduct are unprecedented. They are also clearly erroneous and exceed the bounds of the district court's Article III authority. Mandamus relief is not just warranted, it is required in these

9

highly unusual circumstances. As "one of the most potent weapons in the judicial arsenal," the traditional use of a writ of mandamus has been to "confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Will v. United States*, 389 U.S. 90, 95 (1967). The touchstones of mandamus review are "'usurpation of power, clear abuse of discretion and the presence of an issue of first impression.'" *Stein v. KPMG, LLP*, 486 F.3d 753, 759 (2d Cir. 2007). All are present here.

By refusing to approve dismissal, the district court has left the parties the option of bowing to its pressure tactics or proceeding with litigation—at public taxpayer expense—that has already been fully resolved between them, thwarting the possibility of an appealable order. Left in this untenable position, the County's only recourse is a petition for writ of mandamus.

The governing criteria for mandamus relief articulated in *Bauman v. U.S. District Court*, 557 F.2d 650 (9th Cir. 1977), are easily satisfied here. The district court has committed multiple clear errors of law in refusing to dismiss an action that the parties have fully settled between them. Immediate review is needed to prevent the court's unlawful exercise of its jurisdiction. The district court denied the County's motion for interlocutory review, and no other means are available to obtain appellate review.

The County respectfully asks this Court to issue a writ directing the district court to dismiss this action with prejudice, as the parties have already stipulated and agreed. The County also requests that the Court exercise its authority under the All Writs Act to stay proceedings in the district court until the merits of this petition for mandamus are resolved.

The County does not take these steps lightly, but the district court's disregard for the federal rules and the limits of its Article III authority leaves no other choice. The drastic and extraordinary remedy of mandamus is called for here.

## STATEMENT OF JURISDICTION

This Court has authority to issue a writ of mandamus pursuant to 28 U.S.C. § 1651 and Rule 21 of the Federal Rules of Appellate Procedure.

## STATEMENT OF THE ISSUES

Whether the district court committed clear legal error and exceeded its judicial authority by (1) refusing to dismiss this action, pursuant to the parties' voluntary stipulation for dismissal with prejudice under Federal Rule of Civil Procedure 41(a)(2); (2) concluding that its refusal of ancillary jurisdiction to enforce the settlement agreement operated to void the parties' fully-executed settlement agreement; and (3) forcing the parties to litigate a case they have fully resolved between them.

11

## STATEMENT OF RELEVANT FACTS

In March 2020, an organizational plaintiff and eight individuals sued the City and County for harms stemming from the proliferation of encampments in the Skid Row area. (4ER/632-724.) Shortly thereafter, the district court granted a motion to intervene by three nonprofit organizations that advocate for and represent the interests of the unhoused ("Intervenors"). (4ER/625-631.)

If this case sounds familiar, that is because it is. In *LA Alliance for Human Rights v. County of Los Angeles*, 14 F.4th 947, 957-58, 961 (9th Cir. 2021), this Court reversed a preliminary injunction, holding the district court abused its discretion and exceeded its Article III powers when it required, *inter alia*, that the City put $1 billion in escrow with the court and demanded that the City and County provide shelter to everyone in Skid Row within 180 days. This Court held the Plaintiffs lacked standing to bring all but one of their claims[1] and that the district court abused its discretion by relying on its own independent research and extra-record evidence, granting "relief based on claims that Plaintiffs did not allege, supported by novel legal theories that Plaintiffs did not argue." *Id.* at 957.

More than three years into the litigation, these pleading defects—which deprive the district court of subject matter jurisdiction over this action—have never

---

[1] The claim, for violation of the ADA, was withdrawn in the SAC. (2ER/209-289.)

12

been resolved. Instead, the district court delayed ruling on the County's motion to dismiss, repeatedly stayed the litigation, pushed the parties to settle, and engaged in extensive *ex parte* communications with the County's Board of Supervisors to help broker the settlement. (4ER/595-609; 3ER/530; 2ER/205-206; 2ER/172-173; 2ER/160-161; 5ER/844-846.)

## A.     The Settlement Agreements

In May 2022, Plaintiffs reached a settlement agreement with the City of Los Angeles. (3ER/340-369.) The County raised concerns with the court, and Intervenors objected to the agreement. (3ER/324-339; 3ER/295-323; 5ER/888 [Intervenors: (agreement was inadequate to "address the homelessness crisis" and City was not "committing to do more than is already in the pipeline")].) The district court nonetheless agreed to dismiss the City, because while "not a solution for homelessness," the agreement was a "concrete step" in the right direction. (2ER/292.) The court appointed a Special Master to oversee and enforce the agreement. (2ER/293.)

Six months later, Plaintiffs and the County executed a binding settlement agreement. The agreement, originally valued at $236 million, provides much-needed additional resources to increase beds, services, outreach, and interim housing for people experiencing homelessness and builds on the County's massive efforts outside the lawsuit. (2ER/187-204; 2ER/26-44.) In April 2023, the parties

13

executed an addendum to that agreement, increasing new mental health and substance use disorder beds from 300 to 1,000 for the unhoused, among other resources, more than tripling the value of the settlement to up to $850.5 million. (2ER/26-44; 2ER/124-159.)

Through this litigation alone, the County has committed over $1.1 billion in new resources to address the needs of the unhoused, in addition to the hundreds of millions of dollars committed annually from Measure H funds and other sources.[2] (4ER/616-617; 2ER/187-204; 2ER/124-159; 5ER/789.) While there is much more to do, the County's efforts both inside and outside this litigation have had demonstrable success, including the placement of more than 90,000 people in permanent housing and nearly 124,000 in interim housing. (2ER/26-44.)

The agreement and addendum set forth specific commitments and deadlines for the County to meet its obligations and require the County to make quarterly progress reports. (4ER/616-618; 2ER/148-149.) The agreement also includes a judicial enforcement mechanism, but it is different than the one set forth in the City's settlement agreement. (2ER/199.) The County's agreement contemplates

---

[2] In addition to the settlement agreement, the County entered a Memorandum of Understanding with the City earlier in the litigation, committing to pay $293 million to give housing and shelter to vulnerable people experiencing homelessness by freeways and who are 65 or older. (2ER/36-37.)

that if the parties cannot resolve an alleged breach within the cure period, the complaining party "may file a notice of breach and request judicial enforcement," with the district court retaining "jurisdiction, at its discretion" for purposes of enforcement until the end of fiscal year 2026/2027.  (*Id.*)  The City settlement agreement, by contrast, calls for more judicial involvement, providing "the Court shall have continuing jurisdiction to oversee and enforce this Settlement Agreement," and permits the appointment of a Special Master.  (3ER/380.)

The County and Plaintiffs signed the settlement agreement.  The agreement contains a severance clause, providing that "[s]hould any part of this Agreement be declared invalid, void or unenforceable, all remaining parts shall remain in full force and effect."  (2ER/140.)

## B. The Parties Stipulate To Dismiss The Action With Prejudice

Plaintiffs and the County notified the Court that they had reached a settlement agreement that would result in the parties jointly seeking a dismissal with prejudice under Rule 41(a)(2).  The parties proceeded under Rule 41(a)(2) instead of Rule 41(a)(1)(ii)—which does not require a court order—because one plaintiff, Gary Whitter, an unhoused individual, cannot be located.[3]  A few weeks

---

[3] Plaintiffs' counsel filed a motion to withdraw from representing Mr. Whitter in July 2022, and the City and County filed an unopposed joint motion for an Order to Show Cause re dismissal of his claims in October 2022.  The district court ruled

15

later, the parties filed a stipulation for voluntary dismissal of the action in its entirety with prejudice. (2ER/187-204.) The joint stipulation requests that the district court retain jurisdiction to enforce the agreement and asserts "there is no need to impose any conditions to the order granting dismissal." (2ER/190.)

The Court invited "any party and the public to submit comments or objections" to the County settlement agreement and set a hearing for November 14, 2022. (2ER/205-206.) Intervenors filed a statement of non-opposition. (2ER/174-176.) No other comments or objections were filed. The court held three hearings regarding the agreement and the parties' stipulated dismissal before denying it outright.

At the first hearing, the court refused "to endorse" the agreement based on its belief "that we can do much better," though it acknowledged its "unorthodox" approach is "rightfully subject to debate and criticism." (5ER/873.) The court then put the agreement "on hold" for several months, pending the installation of newly elected officials, including the Mayor of the City of Los Angeles. (5ER/879-880.)

---

on Plaintiffs' motion, but let the dismissal request languish, despite the County urging the court to decide the motion. (5ER/870-871; 5ER/743.)

16

At the second hearing, the court requested the presence of City and County elected officials. (2ER/171.) The Mayor of Los Angeles and two members of the County's Board of Supervisors attended. The court criticized the County agreement's reporting provision as inadequate and demanded different terms that would provide greater "judicial supervision." (5ER/836-838 ["What's my sanctioning power? . . . Where is my guarantee in this?"].) According to the court, the settlement agreement without the same "monitoring and accountability" as the City's settlement agreement was "dead on arrival. That's my bottom line." (5ER/849-850 ["if I have to be the bad judge and turn this down, I'm going to turn this down, I minimally have to have the same provisions as the City or don't bring this agreement to me. And that is I want monitoring, and I want accountability, and I want it to the Court"].)

The court also demanded the inclusion of more new subacute beds in a revised agreement, based on a Department of Mental Health report the court introduced into the record based on its own independent research. (5ER/824-825; 5ER/844; 2ER/169 ["(T)he County's offer falls short. . . . How can 300 beds accommodate the need for . . . those suffering from severe mental illness?"].) After taking the elected officials and counsel for Plaintiffs into his chambers (but refusing to allow counsel for the County to join), the parties agreed to negotiate further, which resulted in an addendum to the settlement agreement, providing

17

1,000 new mental health and substance use disorder beds, among other terms. (2ER/124-159.) On April 18, 2023, Plaintiffs and the County resubmitted their Stipulation for Voluntary Dismissal, along with the fully-executed addendum. (*Id.*)

The district court held a third hearing on April 20, 2023, again demanding the presence of elected officials. (2ER/171.) Two members of the County's Board of Supervisors attended. Again, no party or Intervenor advocated for the court to disapprove the parties' stipulation. Plaintiffs presented the settlement agreement as fully agreed and urged dismissal. (5ER/763-764 ["(W)e continue to push for [this settlement], saying not only is this a good agreement for what it is, but it needed to have been done eight months ago. It needed to have been done six months ago. And here we are in April, watching these projects flounder"]; 5ER/783; 5ER/785 [Plaintiffs are "satisfied" with the "Judicial Enforcement Provision" . . . the court has an "extended period of enforcing this agreement with full transparency"]; *see also* 5ER/870 ["we believe this is a very good deal"].)

Plaintiffs admitted their lawsuit was never about "solving homelessness," and Intervenors and the County agreed that it was impossible to fully achieve this objective through litigation. (5ER/757-759 [Intervenors: "You cannot solve homelessness through litigation," but "the County's commitment matches the City of Los Angeles's commitment" and is a "reasonable response under the

18

circumstances to the need"]; 5ER/787 [County: "Homelessness is not going to be solved in any courtroom . . . It is an issue that requires coordination from our elected officials, our community leaders, and our subject matter experts"].)

The district court again conditioned dismissal on changing the terms of the settlement agreement. The court said the Board of Supervisors should be signatories even though it made no such requirement in the City agreement and their signatures are not required for the agreement to be binding.[4] (5ER/766; 5ER/782 ["Step up and put your names on the documents and be responsible"]; 3ER/398.) It decreed the addition of 1,000 mental health and substance use disorder beds was insufficient to solve the needs of the unhoused. (5ER/772-773; 5ER/795.) The court even went so far as to make specific suggestions about how the County should allocate its budget and introduced extra-record evidence, including pictures of unhoused individuals, to suggest the County was misallocating funds. (5ER/778 ["This guy is just walking down the street, shivering with hypothermia. That's gangrene," then commenting on the director of Los Angeles Homeless Services Authority's salary as "twice as much as a federal court judge," concluding "don't throw the lack of money at me from the County's

---

[4] *See* L.A., Cal., County Charter art. I, § 2, art. VI, § 21.

perspective"]; 5ER/779 ["I think the county has, with a $43.5 billion budget, a lot more potentially that you could contribute"].)

Most emphatically, the district court demanded additional powers for itself, calling the settlement agreement "dead on arrival" because it did not provide for the same "judicial oversight" as the City's agreement with Plaintiffs.  (5ER/767-769 ["You give me absolutely no oversight, and you give me no enforcement. . . . I'm giving you the credibility of the federal court . . . ."]; 5ER/772 ["(Y)ou are asking the Court to put my approval on this."]; 5ER/776 ["I have to have accountability" "[b]ecause while I may trust you implicitly, Chairwoman . . . I don't know who your successor is.  And I don't trust that [political] process."]; 5ER/781 ["(J)ust restate the exact provisions in the City agreement . . . ."]; 5ER/784 ["I'm not bargaining with the parties on this.  I said I need the same provisions [as the City agreement]"]; 5ER/786 ["You get me that same paragraph that the City had, oversight and enforcement, let's talk.  But until then, I said it before, and I'm not bargaining with you, I meant it"].)

Ultimately, the district court acknowledged the parties should be able to "settle without me," but characterized the dismissal as a request for "approval" of the settlement agreement that it was unwilling to provide.  (5ER/772; 5ER/797 ["the parties can reach this agreement even without the Court's approval.  You can get me out of the case.  You can have me not watching you anymore."].)  The court

20

acknowledged the agreement is a "private settlement," not a class action settlement or consent decree.  (5ER/772; 2ER/162-170.)

On April 20, 2023, the court issued a minute order denying the Plaintiffs' and County's stipulation to voluntarily dismiss this action with prejudice for the "reasons stated on the record."  (1ER/6-7.)

## C.  The District Court Refuses The County's Request For Interlocutory Review And Sets A November 6, 2023 Trial Date

The County moved the district court to certify its April 20 Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) and requested a stay of litigation pending appeal.  (2ER/ 79-123.)  Plaintiffs never withdrew their stipulation for dismissal or took the position it was the product of fraud or mistake. They nonetheless opposed the stay request on the grounds that language in a fully-executed settlement agreement, making the agreement "effective and operative" on the date of dismissal "subject to the court's continuing enforcement," was an unsatisfied condition precedent.  (2ER/75.)

The district court denied the motion to certify and stay application in its May 2, 2023 minute order.  (1ER/2-5.)  The court characterized its April 20 order as denying dismissal because of "the practical weight of the accelerating homeless crisis" and the court's concern "about the accountability in the proposed settlement."  (1ER/4.)

The May 2 order goes on to state that the court's refusal to enter the parties' stipulated dismissal did "not materially affect the outcome of the case, as the parties can still stipulate to dismissal" on different terms, and there was no "abuse of discretion or clear error" because it was not obligated to retain ancillary jurisdiction over the settlement agreement. (*Id*.) According to the district court, the parties' settlement agreement was nullified by the court's decision not to consent to continuing enforcement. (1ER/5 ["there was no binding stipulation to dismiss after the Court declined to retain jurisdiction"].)

The County filed its motion to dismiss the SAC on May 3, 2023, which Intervenors joined.[5] (2ER/45-74, 2ER/21-25.) On May 9, 2023, the district court set trial for November 6, 2023, and issued a scheduling order requiring the completion of all discovery in five months. (2ER/8-19; 2ER/20; 5ER/742-743.) The court elected to decide all discovery motions itself, despite Judge Carter's prior representation that he would recuse himself "if [the Parties] get to litigation," given his extensive participation in prior *ex parte* communications. (5ER/742; 5ER/965.) Setting deadlines on a highly accelerated schedule, the court reiterated

---

[5] The County's motion to dismiss the FAC was fully briefed in January 2022 and remained pending for six months. (3ER/ 530; 3ER/531-557; 4ER/ 558-594.) After the City settled, the district court granted Plaintiffs' request to file an amended complaint, without ever having ruled on the County's motion to dismiss. (2ER/290.)

22

its concern with the "unaccountability" of the County settlement agreement because Judge Pregerson is "in the middle" of ruling on a contempt motion in different litigation against the County involving "mental health" at the "Los Angeles Jail." (5ER/737.) The court also expressed its view that the County could do "much better" to resolve the "crisis on our hands," but "what that 'much' is, I'm not certain yet." (5ER/738.)

## STANDARD OF REVIEW

This Court considers a petition for writ of mandamus by applying the five guidelines identified in *Bauman*, 557 F.2d at 654-55:

(1)    whether the petitioner has no other means, such as direct appeal, to obtain the desired relief;

(2)    whether the petitioner will be damaged or prejudiced in any way not correctable on appeal;

(3)    whether the district court's order is clearly erroneous as a matter of law;

(4)    whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and

(5)    whether the district court's order raises new and important problems or issues of first impression.

23

*Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010) (citing *Bauman*, 557 F.2d at 654-55).[6]

The *Bauman* factors are not exhaustive and "should not be mechanically applied." *In re United States*, 791 F.3d 945, 955 (9th Cir. 2015); *Hernandez v. Tanninen*, 604 F.3d 1095, 1099 (9th Cir. 2010) ("[R]arely if ever will a case arise where all the guidelines point in the same direction . . . ."). The key factor is whether this Court is "firmly convinced" that the district court erred in issuing the challenged order. *Christensen v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 844 F.2d 694, 697 (9th Cir. 1988); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009) (writs of mandamus can "serve as useful 'safety valve[s]' for promptly correcting serious errors" (alteration in original)).

This Court may also grant mandamus as an exercise of its supervisory authority, to ensure the judicial system operates in an orderly, efficient manner. *See In re Cement Antitrust Litig. (MDL No. 296)*, 688 F.2d 1297, 1307 (9th Cir. 1982); *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1540 (2018). In

---

[6] The three factors the Supreme Court has established for mandamus relief—(1) no other adequate means of relief; (2) the right to relief is clear and undisputable; and (3) issuing the writ is appropriate under the circumstances—overlap substantially with the *Bauman* factors and are also satisfied for the reasons discussed. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004); *Karnoski v. Trump*, 926 F.3d 1180, 1203 (9th Cir. 2019) (*Cheney* factors are "consistent with" *Bauman* guidelines).

supervisory mandamus cases, the *Bauman* factors are less stringently applied. *Vizcaino v. U.S. Dist. Ct. for W. Dist. of Wash.*, 173 F.3d 713, 719 (9th Cir. 1999). A showing of clear error is not a "prerequisite to the granting of mandamus relief"; the petition only needs to demonstrate "an actual injury not correctable on appeal." *In re Cement Antitrust Litig.*, 688 F.2d at 1303, 1307.

The County meets the standard for mandamus relief under both standards.

## **REASONS FOR GRANTING THE WRIT**

### I.    **The District Court's Order Is Clear Error**

The district court's denial of the parties' stipulated dismissal of this action with prejudice, based on a binding settlement agreement, is unprecedented. It is also clearly erroneous. The district court had no authority under Rule 41(a)(2) to condition dismissal upon the addition of settlement terms that the *court* wanted. The court's discretion to accept ancillary jurisdiction to enforce the settlement agreement—or not—likewise does not empower the court to impose unwanted terms on the parties.

But there is something even more fundamental at play. Under Article III and separation of powers, it does not matter that the district court thought the parties should have struck a different or "better" deal. An Article III court's role is to resolve the cases and controversies before it, not to dictate settlement terms,

612491.1

hold politicians accountable, or resolve an issue, such as the homelessness crisis in Los Angeles.

The district court's pointed disregard for essential separation-of-powers limitations on the role of federal courts calls for this Court to exercise its supervisory mandamus powers and direct the district court to dismiss this litigation with prejudice.

### A. The District Court Clearly Erred By Construing Rule 41(a)(2) As Empowering It To Condition Dismissal On New Settlement Terms

Rule 41(a)(2) gives courts limited discretion to enter a stipulated dismissal "on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). But that discretion is not unbounded, and it does not extend jurisdiction over a settlement agreement. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994); *accord Brass Smith, LLC v. RPI Indus., Inc.*, 827 F. Supp. 2d 377, 381 n.1 (D.N.J. 2011).

The court's discretion is limited to evaluating "whether the *defendant* will suffer some plain legal prejudice as a result of the dismissal." *Hamilton v. Firestone Tire & Rubber Co., Inc.*, 679 F.2d 143, 145 (9th Cir. 1982) (emphasis added); *Waller v. Fin. Corp. of Am.*, 828 F.2d 579, 583 (9th Cir. 1987) ("[A] district court should grant a motion for voluntary dismissal unless a defendant can show that it will suffer some plain legal prejudice . . . ."). Such prejudice is categorically absent when a defendant *agrees* and stipulates to dismissal.

26

On rare occasions, courts also impose terms to protect the interests of intervenors or other parties. *Cf. ITV Direct, Inc. v. Health Sols., LLC*, 445 F.3d 66, 69-71 (1st Cir. 2006) (affirming withdrawal of approval of dismissal where intervenors—who obtained a preliminary injunction against cross-plaintiff—had not consented to judgment); *Ratkovich By & Through Ratkovich v. Smith Kline*, 951 F.2d 155, 158 (7th Cir. 1991) (a "district court may impose such terms and conditions as it believes necessary to protect the other parties from prejudice"). Neither is a concern here.

The only other defendant, the City of Los Angeles, has already settled. The City also needs County settlement funds and commitments to make good on its own obligations, which motivated Plaintiffs' decision to settle. (5ER/762 [Plaintiffs: "We entered into this agreement because, frankly, the City told us that's what the City needs"]; 2ER/194-196; 5ER/868 ["the City has no objections"].) Intervenors, who directly represent the interests of the unhoused, have likewise urged the district court to enter the stipulated dismissal. (5ER/757-758.)

Terms and conditions are never imposed under Rule 41(a)(2) because the *court* wants the parties to strike a different deal to settle their dispute. That is antithetical to the court's role as a neutral arbiter of parties' disputes. A district court abuses its discretion when it permits "the information gleaned through its involvement with the settlement talks to exert undue influence over its disposition"

27

of a Rule 41 motion. *Colon-Cabrera v. Esso Standard Oil Co. (P.R.), Inc.*, 723 F.3d 82, 89 (1st Cir. 2013).

Just as the law "does not countenance attempts by courts to coerce settlements," *In re Ashcroft*, 888 F.2d 546, 547 (8th Cir. 1989), a district court oversteps its role when it attempts to dictate the terms of a private settlement agreement. *See Colon-Cabrera*, 723 F.3d at 89 ("[u]sing Rule 41" to penalize appellant for adhering "to his negotiating position" "intruded too heavily into a decisionmaking process that should have been left to the parties"); *United States v. U.S. Dist. Ct. for N. Mariana Islands*, 694 F.3d 1051, 1061-62 (9th Cir. 2012) (district court's improper settlement pressure justified mandamus relief); *Gardiner v. A.H. Robins Co., Inc.*, 747 F.2d 1180, 1183, 1187 (8th Cir. 1984) (granting writ where district court improperly attached "material condition" to judgments of dismissal by notating a private settlement agreement "So Ordered" that it had "no authority to approve or disapprove"); *In re Wolf*, 842 F.2d 464, 466 (D.C. Cir. 1988) (granting writ where district court altered stipulated dismissal without prejudice and dismissed with prejudice).

The County has been unable to locate a *single case* refusing a stipulated dismissal with prejudice under Rule 41(a)(2) where the parties and intervenors have all urged dismissal based on a binding private settlement agreement. And that makes sense because it should never happen. 9 Arthur R. Miller, *Federal*

*Practice and Procedure*, § 2367 (4th ed. Apr. 2023 Update) ("If the plaintiff moves for a voluntary dismissal by court order under Rule 41(a)(2), specifically requesting that it be with prejudice, it has been held that the district court must grant that request.") (collecting cases).

In the case that comes the closest to the upside-down world the County finds itself in, the Sixth Circuit granted mandamus relief, directing the district court to dismiss an action that plaintiff had moved to dismiss with prejudice under Rule 41(a)(2). *Smoot v. Fox*, 340 F.2d 301, 302-03 (6th Cir. 1964). Because voluntary dismissal with prejudice operates as "a complete adjudication of the issues presented by the pleadings" and is "a bar to a further action between the parties," the Sixth Circuit held the district court had no power to force plaintiff to continue the litigation. *Id.* at 303 (granting petition because district court abused its discretion in denying plaintiff's motion for dismissal: "Such a trial with an unwilling plaintiff, even if it could be enforced, would be an expensive luxury. . . . Our district judges have no time to conduct useless trials.").

The "classic example of the proper issuance" of a writ of mandamus is where, as here, the district court's conduct is "utterly unauthorized by the controlling statute." *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 662 n.5 (1978); *United States v. Higdon*, 638 F.3d 233, 246-48 (3d Cir. 2011) (granting mandamus where district court "refused to abide by controlling precedent"; "neither this court,

29

nor any other court, can tolerate a situation where a judge decides to follow his/her own custom and concepts of justice rather than the precedent of the applicable appellate court or the United States Supreme Court. Ours is a nation of laws, not judges."), *abrogated on other grounds by United States v. Adams*, 36 F.4th 137 (3d Cir. 2022).

The district court should not have had *any* say in the parties' decision to dismiss this action. That the parties are proceeding under Rule 41(a)(2) at all is a procedural anomaly. In the normal course, when all parties stipulate to dismissal, they proceed under Rule 41(a)(1)(ii), and dismissal is automatic. *McCall-Bey v. Franzen*, 777 F.2d 1178, 1184 (7th Cir. 1985). Rule 41(a)(2) generally only "comes into play when the parties are unable to agree on the terms of dismissal but the plaintiff wants to dismiss without prejudice, and then the court may want to attach to the dismissal conditions to protect the defendant." *Id.* The parties proceeded under Rule 41(a)(2) because one of the unhoused plaintiffs cannot be located, and the court has not ruled on an unopposed motion to dismiss him. (2ER/177-186.)

This delay alone is grounds for mandamus relief. The district court is effectively reserving power for itself—that it should not have—by failing to rule on the motion to dismiss Mr. Whitter. *In re Apple Inc.*, 52 F.4th 1360, 1361 (Fed. Cir. 2022) (granting mandamus where district court refused to act on longstanding

612491.1

motion to transfer, and failure to act would force defendants to "partake in years of litigation prior to a determination" of that motion); *In re Sharon Steel Corp.*, 918 F.2d 434, 437 (3d Cir. 1990) (granting writ where district court's "inaction" was "an unexplained abdication of judicial power"); *Calvert Fire Ins. Co.*, 437 U.S. at 661-62 ("[t]here can be no doubt that, where a district court persistently and without reason refuses to adjudicate a case properly before it," writ relief is warranted).

**B.     The District Court Clearly Erred By Determining Its Discretion To Decline Ancillary Jurisdiction To Enforce The Settlement Agreement Gave It The Power To Compel Further Litigation**

The district court's May 2, 2023 minute order concedes that Plaintiffs and the County can "stipulate to dismissal." (1ER/4.) It is an odd concession, given that the parties *have* stipulated to dismiss and the district court has refused their request three times. But it brings us to the root of the district court's second clear error, i.e., that there was "no binding stipulation to dismiss" *unless* the court agreed to accept ancillary jurisdiction to enforce the settlement agreement and that the court's discretion in this regard empowered it to dictate the terms of the agreement's enforcement provision. The district court has no such power.

Ancillary jurisdiction does not give district courts "freewheeling jurisdiction to modify settlements." *Keepseagle v. Perdue*, 856 F.3d 1039, 1050 (D.C. Cir. 2017). To the contrary, jurisdiction is "drawn exceedingly narrowly" and "only for

31

specifically delineated, and narrow, circumstances" set forth in the settlement agreement. *Id.*; *see also K.C. ex rel. Erica C. v. Torlakson*, 762 F.3d 963, 969-70 (9th Cir. 2014) (ancillary jurisdiction to enforce settlement agreement is limited to enforcing "the terms of the parties' settlement"). A court's use of ancillary jurisdiction to act outside the scope of its jurisdiction, as the district court did here, is grounds for mandamus relief. *Stein*, 486 F.3d at 760-64 (granting mandamus to preclude district court from exercising ancillary jurisdiction to decide whether accounting firm implicitly promised to pay appellees' criminal defense fees).

To be clear, the County is not asserting the district court was obligated to accept ancillary jurisdiction to enforce the settlement agreement. Because a court's decision to do so—or not—is *always* discretionary, the parties' "agreement" to confer such powers expressed no more than the hope that the district court would agree to take on this role. *Collins v. Thompson*, 8 F.3d 657, 659 (9th Cir. 1993) ("Parties cannot confer jurisdiction by stipulation or consent"). That reality is also reflected in the terms of the County settlement agreement. (2ER/199 ["The District Court retains jurisdiction, at its discretion, for purposes of enforcing this Agreement . . ."]).

Thus, "a term mandating a court's continuing jurisdiction over a matter is not properly considered a term of a settlement," let alone a material term or condition precedent. *Martin v. Moorhead Metro. Area Transit*, 971 F. Supp. 414,

415 (D. Minn. 1997). "Rather, such provision is more akin to a demand that the court, a pure third party to the agreement, become bound by it. Just as the parties lack the power to confer jurisdiction on a court by agreement or mutual consent, the parties cannot, by agreement, compel the Court's continuing jurisdiction." *Id.* (striking jurisdictional provision did not undermine validity of consent decree).

While the district court was free to decline the parties' request to retain ancillary jurisdiction, that decision did *not* give the district court the power to throw out the parties' settlement agreement or refuse their stipulated dismissal. *See Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 2013 WL 951405, at *3 (D. Minn. Mar. 12, 2013) (after court declined to retain ancillary jurisdiction, parties' stipulation of dismissal with prejudice is "now simply a private settlement"); *Brass Smith*, 827 F. Supp. 2d at 383-84 (declining to retain indefinite ancillary jurisdiction over settlement agreement, but acknowledging it could not "unilaterally change" the terms of the parties' agreement).

And that is particularly true where, as here, the Plaintiffs' and County's settlement agreement has a severability clause. To the extent the continuing jurisdiction language in the effective date section of the agreement became "unenforceable" due to the court's decision not to accept such jurisdiction, the

parties *agreed* that "all remaining parts" of the agreement "shall remain in full force and effect and shall in no way be invalidated or affected." (2ER/140.)

That does not mean the parties have no recourse for breach, only that their remedy is in state court, in accordance with ordinary contract principles. *Kay v. Bd. of Educ. v. City of Chicago*, 547 F.3d 736, 737 (7th Cir. 2008) ("normal remedy for a failure to abide by a settlement of federal litigation is a suit on the settlement contract" in state court under state law).

After repeatedly urging dismissal and presenting the settlement agreement as a binding agreement to the court, Plaintiffs appear to have changed course, attempting to leverage the district court's abuse of discretion to negotiate a different deal for themselves. It does not matter. Plaintiffs did not—because they could not—impose any duty on the County to secure ancillary jurisdiction as a condition of settlement. Rather, Plaintiffs signed a binding settlement agreement and urged the district court to dismiss their action based on that agreement, *knowing* all the while that the court had no obligation to retain ancillary jurisdiction. They are bound to that agreement and their stipulation to dismiss.

## C. The District Court Clearly Erred By Conditioning Dismissal On Its Oversight Over The Executive Branch And Forcing The Parties To Trial In The Absence Of A Case Or Controversy

Mandamus is also warranted to confine the district court to the lawful exercise of its Article III authority. *Cheney*, 542 U.S. at 381 (granting mandamus

"to restrain a lower court when its actions would threaten the separation of powers"). There is no longer a Case or Controversy between the parties in this fully settled litigation. The district court cannot force the County to continue litigating because *the court* wants to hold elected officials "accountable" for the homelessness crisis. That is not a federal court's role. When a Rule 41(a)(2) dismissal with prejudice is stipulated by all parties, without objection by intervenors, the district court's role should have the same limits that are operable under Rule 41(a)(1), namely, "[t]he dismissal terminates the case all by itself. There is nothing left to adjudicate." *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1078 (7th Cir. 1987).

Article III does not permit district courts to pursue "broad-scale investigation" into government functions "because "this approach would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action." *Laird v. Tatum*, 408 U.S. 1, 14-15 (1972). This is core to the separation of powers doctrine.

Courts likewise "do not possess a roving commission to publicly opine on every legal question," nor do they "exercise general legal oversight of the Legislative and Executive Branches, or of private entities." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203, 2205 (2021) ("Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power

612491.1

to hold defendants accountable for legal infractions."); *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief'"; courts "do not, or should not, sally forth each day looking for wrongs to right" (alteration in original)).

This Court has granted mandamus relief, even where there is a *suggestion* of interference with the executive branch. *See, e.g.*, *United States*, 791 F.3d at 958 (granting mandamus where court's actions created "the impression that the courts are intruding upon the traditional prerogatives of the political branches" and "risked giving the impression" that the court "was motivated by his disagreement with the enforcement priorities of specific federal agencies").

There is far more than a suggestion of interference here. The district court has vastly overstepped. The court has tried to dictate the County's budget allocations. (5ER/776-779 ["don't throw the lack of money at me from the County's perspective"].) It has instructed that the County's elected officials should be signatories to the settlement agreement, even though it did not make this demand of the City. (5ER/782 ["Step up and put your names on the documents and be responsible"].) Over and over again, it has relied on extra-record evidence

36

to justify its rulings. (ER776-778 ; 5ER/737-739; 5ER/824-827); *LA Alliance*, 14 F.4th at 952, 955, 957, 960.

And the court has come right out and stated—repeatedly—that it will not dismiss this litigation without its preferred judicial monitoring and enforcement powers because the court does not "trust" the County or politicians in general. (5ER/776 ["I have to have accountability" "[b]ecause while I may trust you implicitly, Chairwoman . . . I don't know who your successor is. And I don't trust that [political] process."]; 5ER/838 ["Why am I going to buy into a settlement agreement upon personal relationships? Where are my milestones and goals? Where is my guarantee in this, Matt?"]; 5ER/949 [regarding City settlement agreement: "I've heard more promises broken than you can possibly imagine. And, so, therefore, I don't care what a politician says . . . I won't sign this or even consider it unless there's a monitor"].)

This is not a federal court's prerogative. "The law of Article III standing, which is built on separation-of-powers principles," is intended to "prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). When a court refuses to adhere to these boundaries, mandamus relief is appropriate. *Cheney*, 542 U.S. at 382 ("mandamus standards are broad enough" to "prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional

37

responsibilities"); *Ex parte Republic of Peru*, 318 U.S. 578, 587 (1943) (when State Department elected to "settle claims" by "diplomatic negotiations," "the delay and inconvenience of a prolonged litigation [should] be avoided by prompt termination of the proceedings in the district court").

The County, of course, has every intention of living up to its obligations under the settlement agreement. But the parties are not obligated to obtain the court's approval for their private settlement agreement, and they are not asking for it. The district court had a ministerial act to perform: Enter a stipulated dismissal with prejudice upon the parties' request that fully resolves litigation between them. Because the district court clearly erred by failing to do so, mandamus relief is warranted.

## II. The District Court's Order Demonstrates A Manifest Disregard For Article III And The Boundaries Of Its Discretionary Authority

Even if it were not so plain that the district court committed clear errors in denying the parties' stipulated dismissal, it would be appropriate for this Court to exercise its supervisory mandamus authority over the district court "to ensure that the judicial system operates in an orderly and efficient manner." *In re Cement Antitrust Litig.*, 688 F.2d at 1307. The district court's rulings in this case show a clear and continuing disregard for the limits of its own authority. *See In re Canter*, 299 F.3d 1150, 1154-55 (9th Cir. 2002) (granting mandamus where court manifested "a persistent disregard of the federal rules" and "perpetuated its

38

excursion outside the confines of its lawful jurisdiction"); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1089 (6th Cir. 1996) (granting writ to "avoid repeated errors . . . in applying the Federal Rules of Civil Procedure" where abuse of discretion was "so clear" and the district judge had "a history of such conduct").

As demonstrated in Section I.C., *ante*, the district court has disregarded the most basic limits on its powers, which is to "resolve not questions and issues but 'Cases' or 'Controversies.'" *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011). It should go without saying that there is no case or controversy where a parties' settlement agreement has resolved their dispute. *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1132 (9th Cir. 2005).

The district court's refusal to dismiss this action is just the tip of the iceberg. This Court has already been called upon to rein in the district court, admonishing the court that its order to place $1 billion in City funds in escrow and requiring the City and County to house everyone in Skid Row within 180 days, based on "extra-record evidence" and "legal theories that Plaintiffs did not plead or argue," exceeded its authority. *LA Alliance*, 14 F.4th at 955, 960. And as mentioned, the district court would have *no* authority to refuse the parties' stipulated dismissal if it had ruled on an unopposed joint motion to dismiss Plaintiff Gary Whitter, left undecided for months on end.

A court's "first order of business" should be to satisfy itself of jurisdiction, but the district court has never done that either. *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 307 (D.C. Cir. 2014). The district court's jurisdiction is seriously in doubt, given the problems with standing raised by this Court in *LA Alliance*, 14 F.4th at 957, 958-59, which Plaintiffs have never remedied. After *LA Alliance* was decided, the County moved to dismiss Plaintiffs' claims on several grounds, including that the district court had no subject matter jurisdiction. (4ER/558-594.) But the court never decided the motion, taking it under submission for more than six months, and then gave Plaintiffs leave to file a second amended complaint. (2ER/290.)

The district court's usurpation of power, by forcing the parties to litigate a fully-settled action, failing to rule on the pleadings, and refusing to dismiss an absentee plaintiff, should be corrected by issuance of a writ of mandamus.

## III. Defendants Have No Other Means Of Obtaining Immediate Review And Will Be Prejudiced In A Way Not Correctable On Appeal

The County has no adequate means, other than by a writ of mandamus, to obtain immediate review of the April 20 Order. The County cannot appeal the denial of a Rule 41(a)(2) stipulated dismissal. *Paturzo v. Home Life Ins. Co.*, 503 F.2d 333, 336 (4th Cir. 1974) (denial of Rule 41(a)(2) motion was "interlocutory and unappealable"). The district court denied the County's motion to certify the

April 20 Order for interlocutory appeal a few days after it was filed, without allowing full briefing or a hearing. Mandamus relief is the County's only recourse.

Case law supports that mandamus is appropriate when a district court's refusal to dismiss a lawsuit has left the parties "the option of fashioning a new [settlement agreement] less desirable or proceeding with litigation against their will." *See In re Smith*, 926 F.2d 1027, 1030 (11th Cir. 1991). As in *Smith*, the district court here has "thwarted the possibility of an appealable final order." *Id.* The County is left with the option of bowing to the district court's pressure tactics or proceeding to litigate fully settled claims. Mandamus relief is intended for just these situations. *See In re Benvin*, 791 F.3d 1096, 1103 (9th Cir. 2015) (granting mandamus where district court inserted itself into plea discussions and left defendant to choose between entering a guilty plea on one count or proceeding "to trial on all fifty counts"); *Canter*, 299 F.3d at 1154 (issuing writ of mandamus where district court "needlessly" disrupted bankruptcy court's processing of case and left petitioners "in limbo"); *Sharon Steel Corp.*, 918 F.2d at 437 (granting writ where district court conditioned grant of motion for reconsideration on "mutual consent" and effectively "insulated itself from appellate review").

The district court's acting outside the bounds of its Article III authority cannot be fully remedied on appeal. *In re U.S. Dep't of Educ.*, 25 F.4th 692, 705 (9th Cir. 2022) (no other means of relief beyond mandamus where "[s]erious

repercussions for the relationship between different branches of government could result"); *Cheney*, 542 U.S. at 381 (granting writ relief "to restrain a lower court when its actions would threaten the separation of powers").

## IV. The Order Raises New And Important Issues Of First Impression

To call the district court's ruling unprecedented is an understatement. No court has ever denied the stipulated dismissal of an entire action with prejudice because the court does not "trust" the parties to abide by the terms of their private settlement agreement and wants to involve itself in monitoring their conduct. No court has ever held that its discretion to refuse ancillary jurisdiction to enforce a settlement agreement results in voiding the underlying agreement.

The district court's abuse of its authority, to claim powers for itself that exceed its role as an Article III judge, is egregious. *In re Pruett*, 133 F.3d 275, 281 (4th Cir. 1997) (mandamus warranted where petition presented "issue of first impression that involves the power of the district court").

The stakes are high. The district court views itself as a catalyst for social and political change. *See, e.g.* (5ER/772-775 ["my decision today is based upon not whether you've made some progress, but is that enough"]; 5ER/934, 938 ["this suit started primarily with Skid Row . . . it's now morphed into the entire City and the entire County . . . 'Quit dabbling in bits and pieces.' . . . I want to spend the

42

time on the whole amount because it's no solution in this piecemeal wacamole [sic] approach"].)

But even setting aside for a moment that that is not a federal court's role, the district court's refusal to allow the parties to proceed with a settlement agreement that will provide up to an estimated $850.5 million in new resources to people experiencing homelessness is indefensible. The court is diverting substantial resources, at public taxpayer expense, to litigation that can be better spent on the problems of homelessness. The court's April 20, 2023 Order is an impediment to this essential work and threatens real harm.

This litigation has already gone on for three years. The County should not be forced to litigate fully resolved claims for years longer because the district court wants to monitor and thinks the parties can do "much better," though the court admittedly does not know "[w]hat that 'much' is." (5ER/738); *In re Va. Elec. & Power Co.*, 539 F.2d 357, 365 (4th Cir. 1976) (granting mandamus to prevent "extravagantly wasteful and useless duplication of the time and effort of the federal courts"). The "safety valve[]" of mandamus review is eminently appropriate in these circumstances. *Mohawk Indus.*, 558 U.S. at 111.

## V.   A Stay Of Proceedings Is Warranted

The County also asks this Court to exercise its authority under the All Writs Act to stay district court proceedings while it considers this mandamus petition.

43

*See* 9th Cir. Gen. Order 6.8.a (motions panel "may also issue a stay or injunction pending further consideration of the application").

Whether to issue a stay is "an exercise of judicial discretion" to be "guided by sound legal principles," *Nken v. Holder*, 556 U.S. 418, 433-34 (2009), based on the following factors: (1) the applicant's likely success on the merits; (2) irreparable injury to the applicant absent a stay; (3) substantial injury to the other parties; and (4) the public interest. *Hilton v. Braunskill*, 481 U.S. 770, 776-77 (1987); *In re United States*, 884 F.3d 830, 834 (9th Cir. 2018) (granting stay, pending consideration of writ of mandamus).

The arguments set out above show that the County has a strong likelihood of success in obtaining mandamus. A stay of proceedings does not harm Plaintiffs, given that they have already stipulated to the dismissal of this action with prejudice. Nor will there be any harm to Intervenors, who have urged the district court to dismiss the action. Finally, the public interest strongly favors a stay, because it allows the County to focus its resources on serving the public, including by addressing homelessness, rather than diverting them to litigation.

## **CONCLUSION**

The Court should grant a stay of proceedings in the district court while it considers this petition. The petition should be granted and the district court directed to vacate its April 20, 2023 Order and dismiss the case with prejudice.

44

Respectfully Submitted,

DATED:  May 11, 2023          MILLER BARONDESS, LLP


By:    /s/ Mira Hashmall
       MIRA HASHMALL
       Attorneys for Petitioner
       COUNTY OF LOS ANGELES

612491.1

## STATEMENT OF RELATED CASES

Intervenors' pending appeal in *LA Alliance for Human Rights v. Los Angeles Catholic Worker*, *et al. v. City of Los Angeles, et al.*, No. 22-55687, is related.


DATED:  May 11, 2023                    MILLER BARONDESS, LLP


                                        By:    /s/ Mira Hashmall
                                            MIRA HASHMALL
                                            Attorneys for Petitioner
                                            COUNTY OF LOS ANGELES

612491.1

## <u>CERTIFICATE REGARDING COMPLIANCE WITH</u>

## <u>FRAP 21(d)</u>

This PETITION FOR WRIT OF MANDAMUS TO THE UNITED

STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA AND

REQUEST FOR STAY OF PROCEEDINGS IN DISTRICT COURT contains

8,362 words, exclusive of the material specified in FRAP 32(f).


DATED:  May 11, 2023               MILLER BARONDESS, LLP


                                   By:   /s/ Mira Hashmall
                                         MIRA HASHMALL
                                         Attorneys for Petitioner
                                         COUNTY OF LOS ANGELES

612491.1

No. _____

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

In re: COUNTY OF LOS ANGELES

*Petitioner,*

v.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Western Division - Los Angeles)

*Respondent.*

LA ALLIANCE FOR HUMAN RIGHTS, et al.

*Real Parties in Interest.*

_____

On Petition for a Writ of Mandamus in
Case No. 2:20-cv-02291 (C.D.Cal.)

_____

## EXCERPTS OF RECORD

## INDEX VOLUME

_____

**OFFICE OF COUNTY COUNSEL**
Dawyn R. Harrison (SBN 173855)
*Interim County Counsel*
Katherine M. Bowser (SBN 230626)
*Assistant County Counsel*
Ana Wai-Kwan Lai (SBN 257931)
*Senior Deputy County Counsel*
alai@counsel.lacounty.gov
500 West Temple Street, Suite 468
Los Angeles, California 90012
Telephone: (213) 974-1830
Facsimile: (213) 626-7446

**MILLER BARONDESS, LLP**
Louis R. Miller (SBN 54141)
* Mira Hashmall (SBN 216842)
mhashmall@millerbarondess.com
Nadia A. Sarkis (SBN 227778)
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

| EX. | DATE | DOCUMENT | DKT. | VOL. | PAGE |
|---|---|---|---|---|---|
| 1. | 5/2/23 | Order Denying Motion to Certify and Application to Stay | 551 | 1 | 2 |
| 2. | 4/20/23 | Order re Status Conference | 534 | 1 | 6 |
| 3. | 5/9/23 | Scheduling Order and Order re Pretrial and Trial Procedures | 563 | 2 | 8 |
| 4. | 5/9/23 | Minute Order re Scheduling Conference | 561 | 2 | 20 |
| 5. | 5/3/23 | Intervenors' Joinder in County of Los Angeles's Motion to Dismiss Second Amended Complaint | 556 | 2 | 21 |
| 6. | 5/3/23 | Request for Judicial Notice in Support of Motion to Dismiss Second Amended Complaint | 553 | 2 | 26 |
| 7. | 5/3/23 | Defendant County of Los Angeles' Memorandum of Points and Authorities in Support of Motion to Dismiss Second Amended Complaint | 552-1 | 2 | 45 |
| 8. | 4/29/23 | Plaintiffs' Opposition to Defendant County of Los Angeles's *Ex Parte* Application for Stay | 549 | 2 | 75 |
| 9. | 4/28/230 | Defendant County of Los Angeles' *Ex Parte* Application for Stay and Expedited Briefing Schedule | 545 | 2 | 79 |
| 10. | 4/28/23 | Defendant County of Los Angeles' Motion for Certification of this Court's April 20, 2023 Order Pursuant to 28 U.S.C. § 1292(b) | 544 | 2 | 95 |
| 11. | 4/28/23 | Defendant County of Los Angeles' Notice of Withdrawal of Consent to *Ex Parte* Communications | 543 | 2 | 120 |
| 12. | 4/18/23 | Joint Submission of Addendum to Settlement Agreement | 533 | 2 | 124 |
| 13. | 4/18/23 | Order Granting Joint Stipulation to Extend Time to File Report re Settlement | 532 | 2 | 160 |
| 14. | 1/17/23 | Order re Hearing Regarding County Settlement Agreement | 518 | 2 | 162 |
| 15. | 12/5/22 | Order Continuing Hearing Regarding Settlement Agreement | 508 | 2 | 171 |
| 16. | 11/22/22 | Order Granting Third Stipulation to Stay Litigation | 507 | 2 | 172 |
| 17. | 10/27/22 | Intervenors' Statement of Non-Opposition to Plaintiffs' and Defendant County of Los Angeles's Settlement | 488 | 2 | 174 |

| EX. | DATE | DOCUMENT | DKT. | VOL. | PAGE |
|---|---|---|---|---|---|
| 18. | 10/17/22 | Memorandum of Points and Authorities in Support of Joint Motion for an Order to Show Cause re: Dismissal of Gary Whitter's Claims Pursuant to F.R.C.P. 41(b) and L.R. 41-1, 41-5, and 41-6 | 486-1 | 2 | 177 |
| 19. | 10/17/22 | Stipulation for Voluntary Dismissal with Prejudice Pursuant to Federal Rule of Civil Procedure 41(a)(2) | 485 | 2 | 187 |
| 20. | 9/27/22 | Order Granting Stay and Setting Dates re Settlement Agreement | 473 | 2 | 205 |
| 21. | 7/15/22 | Clarifying Statement Regarding Gary Whitter | 455 | 2 | 207 |
| 22. | 7/15/22 | Second Amended and Supplemental Complaint | 454 | 2 | 209 |
| 23. | 6/23/22 | Minute Order re Amended Complaint | 449 | 2 | 290 |
| 24. | 6/14/22 | Order Approving Stipulated Dismissal and Proposed Settlement | 445 | 2 | 291 |
| 25. | 5/31/22 | Intervenors' Objections to Plaintiffs' and Defendant City of Los Angeles's Stipulated Order of Dismissal | 434 | 3 | 295 |
| 26. | 5/31/22 | The County of Los Angeles' Response to Settlement Between Plaintiffs and City of Los Angeles | 432 | 3 | 324 |
| 27. | 5/24/22 | Amended Notice of Lodging of Fully Executed [Proposed] Stipulated Order of Dismissal as to Defendant City of Los Angeles Only [Fed.R.Civ.P. 41(a)(2] | 429 | 3 | 340 |
| 28. | 5/19/22 | Notice of Lodging [Proposed] Stipulated order of Dismissal as to Defendant City of Los Angeles Only [Fed.R.Civ.P. 41(a)(2) | 421 | 3 | 370 |
| 29. | 3/25/22 | Notice of Withdrawal of Consent to *Ex Parte* Communications | 403 | 3 | 399 |
| 30. | 1/24/22 | Minute Order re Motion to Dismiss | 388 | 3 | 530 |
| 31. | 1/10/22 | Defendant County of Los Angeles' Reply in Support of its Motion to Dismiss First Amended Complaint | 382 | 3 | 531 |
| 32. | 12/3/21 | Defendant County of Los Angeles' Memorandum of Points and Authorities in Support of Motion to Dismiss First Amended Complaint | 370-1 | 4 | 558 |

| EX. | DATE | DOCUMENT | DKT. | VOL. | PAGE |
|------|--------|------------|--------|--------|--------|
| 33. | 4/26/21 | Amended Order Granting in Part and Denying in Part Defendants' *Ex Parte* Applications to Stay | 287 | 4 | 595 |
| 34. | 10/23/20 | Joint Notice to the Court Regarding Memorandum of Understanding for 6,700 Bed Plan from City of Los Angeles and County of Los Angeles | 185 | 4 | 610 |
| 35. | 3/18/20 | Order Granting Intervenors' *Ex Parte* Application to Intervene as of Right | 29 | 4 | 625 |
| 36. | 3/10/20 | Complaint | 1 | 4 | 632 |
| 37. | 5/9/23 | Reporters' Transcript of Proceedings | 565 | 5 | 725 |
| 38. | 4/20/23 | Reporter's Transcript of Proceedings | 540 | 5 | 745 |
| 39. | 1/17/23 | Transcript of Presentation of Final Settlement Objections/Status Conference | 520 | 5 | 813 |
| 40. | 11/14/22 | Transcript of Proceedings of Final Settlement Agreement | 505 | 5 | 862 |
| 41. | 6/9/22 | Transcript of Presentation of Final Settlement Objections/Scheduling Conference | 441 | 5 | 882 |
| 42. | 3/20/20 | Reporter's Transcript of Proceedings – Status Conference Excerpts | 39 | 5 | 957 |
| 43. | N/A | District Court Docket | N/A | 5 | 968 |

No. _____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

In re: COUNTY OF LOS ANGELES

*Petitioner,*

v.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Western Division - Los Angeles)

*Respondent.*

LA ALLIANCE FOR HUMAN RIGHTS, et al.

*Real Parties in Interest.*

_____

On Petition for a Writ of Mandamus in
Case No. 2:20-cv-02291 (C.D.Cal.)

_____

## EXCERPTS OF RECORD

## VOLUME 1

_____

**OFFICE OF COUNTY COUNSEL**
Dawyn R. Harrison (SBN 173855)
*Interim County Counsel*
Katherine M. Bowser (SBN 230626)
*Assistant County Counsel*
Ana Wai-Kwan Lai (SBN 257931)
*Senior Deputy County Counsel*
alai@counsel.lacounty.gov
500 West Temple Street, Suite 468
Los Angeles, California 90012
Telephone:  (213) 974-1830
Facsimile:   (213) 626-7446

**MILLER BARONDESS, LLP**
Louis R. Miller (SBN 54141)
* Mira Hashmall (SBN 216842)
mhashmall@millerbarondess.com
Nadia A. Sarkis (SBN 227778)
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone:  (310) 552-4400
Facsimile:   (310) 552-8400

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                    Date:  May 2, 2023

Title: LA ALLIANCE FOR HUMAN RIGHTS ET AL. v. CITY OF LOS ANGELES ET AL.

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

| Karlen Dubon | Not Present |
|:---:|:---:|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|:---:|:---:|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):   ORDER DENYING MOTION TO CERTIFY AND APPLICATION TO STAY [544], [545]**

Before the Court are Defendant County of Los Angeles's (the "County") Motion to Certify for Interlocutory Appeal ("Mot.") (Dkt. 544) and Ex Parte Application to Expedite Briefing and Stay Case ("App.") (Dkt. 545). The County seeks to expedite briefing and stay proceedings pending appeal of the Court's April 20, 2023 Minute Order ("April 20 Order") denying the parties' joint stipulation to dismiss this action with prejudice pursuant to the terms of a settlement agreement. For the reasons described below, the Court DENIES the County's Motion and Application.

**I.     Background**

The facts of this case have been discussed in-depth in the Court's previous orders. On April 20, 2023, the Court held a status conference regarding the parties' renewed stipulation to dismiss the case with prejudice, pursuant to a proposed settlement agreement. (Dkt. 536).

**ER 2**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                                    Date: May 2, 2023
                                                                   Page 2

    The Court declined to retain jurisdiction to enforce the terms after finding no accountability, and accordingly, denied the stipulation. A week later, the County moved to certify the Court's April 20 order for interlocutory appeal under 28 U.S.C. § 1292(b). ("Mot.") (Dkt. 544). Plaintiffs filed an Opposition on April 29, 2023. ("Opp'n.") (Dkt. 549).

## II.     Legal Standard

    Under 28 U.S.C. § 1292(b), a district court may certify an issue for interlocutory appeal if three elements are met: (1) there is a controlling question of law; (2) there are substantial grounds for differences of opinion; and (3) an immediate appeal may materially advance the ultimate termination of the litigation. *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982). Interlocutory appeals should be granted "only in extraordinary cases," and not "merely to provide review of difficult rulings in hard cases." *U.S. Rubber Co. v. Wright*, 359 F.2d 784, 785 (9th Cir. 1966). *Gibson Brands Inc. v. John Hornby Skewes & Co.*, No. CV 14-00609 (SSX), 2016 WL 7542437, at *1 (C.D. Cal. Dec. 29, 2016). A district court must certify an otherwise non-appealable question of law if its order "involves a controlling question of law as to which there is substantial ground for difference of opinion" and "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The primary purpose of the interlocutory appeal statute is to "avoid protracted and expensive litigation"; appeal is granted only in "extraordinary circumstances." *In re Cement Antitrust Litig.*, 673 F.2d at 1026. The district judge may or may not certify a question depending on whether the statutory requirements are met. *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1338 (9th Cir.1976).

    A question of law is "controlling" if "resolution of the issue on appeal could materially affect the outcome of litigation in the district court." *In re Cement Antitrust Litig.*, 673 F.2d at 1026. "Courts traditionally will find that a substantial ground for difference of opinion exists where the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point . . . or if novel and difficult questions of first impression are presented." *Falco v. Nissan N. Am. Inc.*, 108 F. Supp. 3d 889, 892 (C.D. Cal. 2015). But "just because a court is the first to rule on a particular question or just because counsel contends that one precedent rather than another is controlling does not mean there is such a substantial difference of opinion as will support an interlocutory appeal." *Id.* (citing *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010) (citation and internal quotation marks omitted)).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                                        Date: May 2, 2023
                                                                                          Page 3

## III.    Discussion

The County seeks to certify the Court's April 20 order for appeal because it presents "three controlling questions of law that merit review": (1) "the scope of a district court's discretion to disapprove a stipulated dismissal with prejudice pursuant to Rule 41(a)(2) following the parties' execution of a binding private settlement agreement disposing of all claims between them"; (2) "whether a district court may condition approval of a Rule 41(a)(2) dismissal on the addition of new settlement terms that are neither agreed to by the parties, nor requested by any party or intervenor"; and (3) "whether there remains a justiciable case or controversy between the parties, considering they have settled all claims between them." Mot. at 2.

The Court does not find that any these questions present any "controlling issue of law." The County misconstrues the basis of this Court's April 20 Order denying the joint stipulation to dismiss. The County contends "the Court criticized the settlement agreement and demanded that the parties change its terms." Mot. at 17.

The Court's ruling considered the practical weight of the accelerating homeless crisis. The Court raised its concerns about the accountability in the proposed settlement, particularly the minimal oversight and narrowly drawn dispute resolution. ("Transcript 4/20/23") (Dkt. 540) at 24–25; 47. The Court and the parties discussed the inadequacy of the proposed terms and how they failed to meet the needs of the County.[1]

These considerations do not render the Court's decision an abuse of discretion or clear error. The Court denied the stipulation after declining to continue jurisdiction over the proposed settlement agreement. This decision does not materially affect the outcome of the case, as the parties can still stipulate to dismissal.

Plaintiffs correctly note, moreover, that the County "expressly agreed that the settlement agreement would not become binding unless the Court (i) dismissed the case and (ii) agreed to 'continuing enforcement.'" Opp'n. at 1. It is within the Court's discretion to decline to exercise jurisdiction over terms that provided no accountability. Plaintiffs go on to state that the proposed settlement "was never a private deal. It called for the Court's retention of jurisdiction to enforce the settlement, which the Court was under no obligation to give." Opp'n. at 2–3. "[A] court is under no obligation to retain

---

[1] At the hearing, several parties agreed that the proposed settlement was inadequate. For example, President of the City Council of Los Angeles Paul Krekorian stated in court: "If the question is: Will this be sufficient to meet the moment? I think the answer has to be no." Dkt. 540 at 9. Mr. Krekorian explained that the settlement terms for additional mental health beds would amount to fewer than one bed a day, "which likely won't even keep up with the increase in demand." *Id.* at 9–10.

**ER 4**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                              Date: May 2, 2023
                                                                          Page 4

jurisdiction over a settlement agreement, but may do so if it chooses." *Brass Smith, LLC v. RPI Indus., Inc.*, 827 F. Supp. 2d 377, 381 (2011).

    The Court properly exercised its discretion to decline to retain jurisdiction over enforcing terms the Court deemed inadequate with no accountability. As Plaintiffs contend, "[w]ithout the Court's consent to 'continuing enforcement,' there is no deal and no grounds for a stay or appeal," because a live case or controversy exists. *See* Opp'n at 1.

## IV.   Disposition

    The Court again emphasizes that should the parties come to a private agreement, without the involvement of the Court, the parties may then move to voluntarily dismiss this action.[2] Here, there was no binding stipulation to dismiss after the Court declined to retain jurisdiction.

    The Court finds no "controlling question of law" to justify interlocutory appeal under 28 U.S.C. § 1292(B).  Accordingly, the Court **DENIES** the County's Motion and Application. (Dkts. 544, 545).

    The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                          Initials of Deputy Clerk: kd
CIVIL-GEN

---

[2] The parties' proposed order (Dkt. 485-2) granting the stipulation to dismiss provides that the Court "retains jurisdiction until end of fiscal year 2026/2027 (June 30, 2027) for the purpose of enforcing the Agreement, in accordance with Section P of the parties' settlement agreement." *See* Dkt. 485-2. As the Court previously noted, however, the Court's approval is unnecessary: "This requires no judicial approval. In other words, I understand that you can settle without me.  You can withdraw the complaint.  But you are asking the Court to put my approval on this. And by implication, then, it can go to the taxpayers as approval with the Court's blessings, in a sense." Reporter's Transcript of Proceedings, 4/20/2023 (Dkt. 540) at 373.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No: LA CV 20-02291-DOC-(KESx)                   Date: April 20, 2023

Title:   LA ALLIANCE FOR HUMAN RIGHTS, et al. v. CITY OF LOS ANGELES, et al.

PRESENT:   THE HONORABLE DAVID O. CARTER, UNITED STATES DISTRICT JUDGE

| Karlen Dubon | Court Smart |
|---|---|
| Courtroom Clerk | Court Reporter |

ATTORNEYS PRESENT FOR
PLAINTIFF:
Elizabeth Mitchell
Matthew Umhofer

ATTORNEYS PRESENT FOR
DEFENDANT:
Scott Marcus, L.A. City Attorney's Office
Jennifer Mira Hashmall, L.A. County
Ana Wai-Kwan Lai, L.A. County
Carol A. Sobel, Intervenor
Shayla Renee Myers, Intervenor

**PROCEEDINGS:**         **STATUS CONFERENCE** *(Los Angeles First Street)*

Also Present, Daniel Conway for LA Alliance, Kayla Coats, Mr. Krekonian, Lindsey Honvath, Janice Hahn, and Ivan Sulie.

The case is called. The Court hears the parties' terms of stipulated proposed agreement.

For reasons as stated on the record, the Court DENIES the parties' proposed stipulation.

The Court lifts the stay and reinstates proceedings in this case.

Answer to Second Amended Complaint (Dkt. 454) is due May 3, 2023.

Scheduling Conference is set for May 9, 2023 at L.A. First Street Courthouse.

|  |  | 1 | : | 10 |
|---|---|---|---|---|

Initials of Deputy Clerk: kdu

**ER 6**

No. _____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

In re: COUNTY OF LOS ANGELES

*Petitioner,*

v.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Western Division - Los Angeles)

*Respondent.*

LA ALLIANCE FOR HUMAN RIGHTS, et al.

*Real Parties in Interest.*

_____

On Petition for a Writ of Mandamus in
Case No. 2:20-cv-02291 (C.D.Cal.)

_____

## EXCERPTS OF RECORD

## VOLUME 2

_____

**OFFICE OF COUNTY COUNSEL**
Dawyn R. Harrison (SBN 173855)
*Interim County Counsel*
Katherine M. Bowser (SBN 230626)
*Assistant County Counsel*
Ana Wai-Kwan Lai (SBN 257931)
*Senior Deputy County Counsel*
alai@counsel.lacounty.gov
500 West Temple Street, Suite 468
Los Angeles, California 90012
Telephone: (213) 974-1830
Facsimile: (213) 626-7446

**MILLER BARONDESS, LLP**
Louis R. Miller (SBN 54141)
* Mira Hashmall (SBN 216842)
mhashmall@millerbarondess.com
Nadia A. Sarkis (SBN 227778)
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

614851.1

1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

9  LA ALLIANCE FOR HUMAN RIGHTS , et al.

10              Plaintiff(s),

11       vs.

12  CITY OF LOS ANGELES, et al.

13

14              Defendant(s).

| Case No.: 2:20–cv–02291–DOC–KES |

**SCHEDULING ORDER & ORDER RE: PRETRIAL AND TRIAL PROCEDURES**

**Fact Discovery Cut-Off**:

September 8, 2023

**Motion Cut-Off**:

October 10, 2023 at 08:30 AM

**Final Pretrial Conference**:

October 24, 2023 at 09:00 AM

**Trial**:

November 6, 2023 at 09:00 AM

15
16
17
18
19
20
21
22
23
24

25      This Scheduling Order governs the course of all pretrial and trial proceedings

26  in this case. For further guidance, consult the Federal Rules of Civil Procedure

27  and the Local Rules.

28  \\\

**ER 8**

### I.   Court Appearances

Parties shall be represented at all court appearances by lead counsel, the counsel expected to be in charge of conducting trial on behalf of the parties. The parties (or counsel) must appear in person for hearings and conferences before the Court. The Court does not permit telephonic appearances.

Under no circumstances should counsel, or a party if the party is appearing *pro se*, fail to appear at a court appearance unless their appearance has been waived by prior order of the Court. Even if the parties have reached a settlement, counsel for all parties, or the party if appearing *pro se*, must appear at court appearances until a stipulation of dismissal signed by all parties has been lodged with the Court.

### II.   Settlement

If the parties have agreed to appear before a neutral selected from the Court's Mediation Panel (ADR Procedure No. 2) or to participate in private mediation (ADR Procedure No. 3), the parties shall notify the Court of the name and contact information of the mediator within twenty-one (21) days of this Order if they have not already done so in their Rule 26(f) report.

If settlement is reached at any time in this litigation, the parties shall immediately notify the Court by telephone, email, or by filing a notice of settlement. Local Rule 40-2. The Court's Courtroom Deputy Clerk can be reached at (714) 338-4543. The Court's email address is DOC_Chambers@cacd.uscourts.gov.

### III.   Joinder of Parties and Amendment of Pleadings

All motions to join other parties (including Doe or Roe defendants) or to amend the pleadings shall be filed and served within sixty (60) days of the date of this Order and noticed for hearing within ninety (90) days of this Order.

### IV.   Discovery Cut-Off

The Court has established a cut-off date for discovery in this action. All discovery is to be completed on, or prior to, the cut-off date. Plan now to complete discovery on the schedule set; a continuance is *unlikely*. Accordingly, the

ER 9

1   following discovery schedule shall apply in this Court:

2       (1)  <u>Depositions</u>: All depositions shall be scheduled to commence at least

3             five (5) working days prior to the discovery cut-off date. A deposition

4             which commences five (5) days prior to the discovery cut-off date

5             may continue beyond the cut-off date, as necessary.

6       (2)  <u>Written Discovery</u>: All interrogatories, requests for production of

7             documents, and requests for admissions shall be served at least forty-

8             five (45) days before the discovery cut-off date. The Court will not

9             approve stipulations between counsel that permit responses to be

10             served after the cut-off date except in unusual circumstances and upon

11             a showing of good cause.

12       (3)  <u>Discovery Motions</u>: Any motion regarding the inadequacy of responses

13             to discovery must be filed and served no later than five (5) days after

14             the discovery cut-off date. Routine discovery motions will be referred

15             to the magistrate judge assigned to the case. Whenever possible, the

16             Court expects counsel to resolve discovery disputes among themselves

17             in a courteous, reasonable, and professional manner. Repeated resort to

18             the Court for guidance in discovery is unnecessary and may result in

19             the Court appointing a Special Master at the joint expense of the parties

20             to resolve discovery disputes. The Court expects that counsel will

21             strictly adhere to the Civility and Professional Guidelines adopted by

22             the United States District Court for the Central District of California.

23       (4)  <u>Disclosure of Expert Testimony</u>: The above discovery cut-off date

24             includes expert discovery, unless otherwise ordered by the Court, and the

25             Court orders the sequence of disclosures as provided by Fed. R. Civ.

26             Proc. 26(a)(2)(D), unless the parties otherwise stipulate in writing

27             and obtain the Court's approval.

28   \\\

### V.   Protective Orders and Under Seal Filings

All protective orders are to be noticed before the magistrate judge assigned to your case, unless otherwise ordered by Court.

Stipulated Protective orders or confidentiality orders generally do not control under seal filings. Applications for under seal filings must state with specificity the basis for protection and should not rely exclusively on the existence of a protective order. See Judge Carter's Initial Standing Order for more information.

### VI.   Motions Generally

Counsel should note the timing and service requirements of Local Rules 6 and 7 and its subparts including:

(1)   Rule 6-1: Notice of motion and the moving papers must be filed and served twenty-eight (28) days before the noticed hearing date, unless the notice is served by mail, in which case service is required thirty-one (31) days prior to the noticed hearing date;

(2)   Rule 7-9: Opposing papers shall be filed twenty-one (21) calendar days before the hearing date; and

(3)   Rule 7-10: Reply papers, if any, shall be filed fourteen (14) calendar days before the hearing date.

(4)   Rule 7-11: If the hearing date is continued, the deadlines for filing opposing and reply papers are automatically extended unless the Court orders otherwise.

Counsel must comply with the timing requirements of the Local Rules so that chambers can properly prepare for motion matters.

### VII.   Motions for Summary Judgment

The motion cut-off date is the day that the Court will hear motions for summary judgment. Thus, motions must be filed several weeks in advance of this date as required by Local Rule 6.

In general, the Court will hear only one motion for summary judgment per

–4–

party. Cross motions for summary judgment will all be heard on the same day, after the close of discovery. In other words, the Court will not entertain piecemeal motions for partial summary judgment before the factual record is complete.

All motions (except motions *in limine* dealing with admissibility of evidence) must be disposed of before the Final Pretrial Conference.

### A.   Moving Party's Statement of Uncontroverted Facts and Conclusions of Law

The uncontroverted facts shall be set forth in a two column format. The left hand column shall set forth the allegedly undisputed fact. The right hand column shall set forth the evidence that supports the factual statement. The fact statements shall be set forth in sequentially numbered rows. Each cell should contain a narrowly focused statement of fact, and address a single subject in as concise a manner as possible.

### SUF Example

| SUF #/ Undisputed Fact | Evidence |
|---|---|
| #1 (Moving party's first undisputed fact) | (citations to supporting evidence) |
| #2 (Moving party's second undisputed fact) | (citations to supporting evidence) |

### B.   Opposing Party's Statement of Genuine Disputes of Material Fact

The first part of the opposing party's Statement of Genuine Disputes shall track the moving party's Statement of Uncontroverted Facts. It shall be set forth in a two column format. The left hand column shall restate the allegedly undisputed fact and supporting evidence, and the right hand column shall state either that the fact is undisputed or disputed. The opposing party may dispute all or only a portion of the allegedly undisputed fact, but if disputing only a portion, the opposing party must specify clearly what portion is being disputed.

To demonstrate that a fact is disputed, the opposing party shall briefly state why it disputes the moving party's allegedly undisputed fact, cite to the relevant

exhibit or other evidence controverting the allegedly undisputed fact, and describe what it is in that exhibit or evidence that controverts the allegedly undisputed fact.

If the opposing party objects to the evidence supporting an allegedly undisputed fact, the party shall state in the right hand column the presence of that objection, by simply stating "Evidentiary Objection." The specific grounds of each objection should be included in a separate table.

No legal argument shall be set forth in this document.

The opposing party may also specify additional material facts that bear on or relate to the issues raised by the moving party, which shall follow the same two column format described above for the moving party's Statement of Uncontroverted Facts. These additional facts shall continue in sequentially numbered paragraphs (i.e., if the moving party's last allegedly undisputed fact was set forth as ¶ 30, then the first new allegedly undisputed fact specified by the opposing party shall be set forth as ¶ 31).

The moving party, in its reply, shall respond to the additional allegedly undisputed facts in the same manner and format that the opposing party is required to adhere to in responding to the moving party's Statement of Uncontroverted Facts, as described above.

### SGD Example

| SUF # / Moving Party's Undisputed Fact/Evidence | Reply |
|---|---|
| #1 (Moving party's first undisputed fact)<br><br>(moving party's citations to supporting evidence) | State whether the moving party's fact is disputed or undisputed.<br><br>(citations to supporting evidence)<br><br>(note if there is an evidentiary objection) |
| #2 (Moving party's second undisputed fact)<br><br>(moving party's citations to supporting evidence) | State whether the moving party's fact is disputed or undisputed.<br><br>(citations to supporting evidence)<br><br>(note if there is an evidentiary objection) |

### C.    Supporting Evidence

Evidence in support of or in opposition to a motion shall be presented to the Court in a way that makes it easy for the Court to find cited evidence. For instance, the parties should make generous use of tabs and indices for hard copies of exhibits. The parties should highlight the testimony or portions of exhibits on which they are relying.

If a deposition is cited extensively, the parties should lodge a copy of the deposition transcript with the Court.

### D.    Objections to Evidence

If a party disputes a fact based in whole or in part on an evidentiary objection, the party should file a separate document entitled "Objections to Evidence Offered in Support of [Party's] [Motion/Opposition]." The Objections to Evidence should be filed in conjunction with the opposition or reply brief of the party. The document should be organized to track the row numbers of the other party's separate statement in sequence. It should identify the specific item of evidence to which objection is made, the ground of the objection, and a very brief argument with citation to authority as to why the objection is well taken.

**Evidentiary Objections Example 1**

| Moving Parties Undisputed Fact/Evidence | Evidentiary Objection |
|---|---|
| #1 (Moving party's first undisputed fact)<br><br>Jane Smith Dep. 60:1–10; Lee Decl. Ex. E<br>(Disclosure Agreement § 2) | Objection to the supporting deposition transcript of Jane Smith at 60:1-10 on the ground that the statement constitutes inadmissible hearsay and no exception is applicable. To the extent that the statement is offered to prove her state of mind, it is irrelevant since her state of mind is not in issue. Fed. R. Evid. 801, 802. |

Alternately, if the evidentiary objection(s) is/are particularly lengthy (over 100 words), the party may lodge its objections in a standard memo-format. However, this memorandum must specifically cite the SUF number.

### **Evidentiary Objections Example 2**

Statement of Uncontroverted Facts #3: Objection to the supporting deposition transcript of Jane Smith at 60:1-10 on the ground that the statement constitutes inadmissible hearsay and no exception is applicable.

[Lengthy legal argument]

To the extent that the statement is offered to prove her state of mind, it is irrelevant since her state of mind is not in issue. Fed. R. Evid. 801, 802.

### **E.    Filing Statements of Fact**

In addition to filing statements of fact, the Parties should email the Statement of Uncontroverted Facts and Statement of Genuine Disputes in Word or Excel format to DOC_Chambers@cacd.uscourts.gov.

## **VIII.   Final Pretrial Conference**

A Final Pretrial Conference ("FPTC") has been scheduled in this case pursuant to Federal Rule of Civil Procedure 16 and the Local Rules. Unless excused for good cause, each party appearing in this action shall be represented at the FPTC and all pretrial meetings of counsel by lead counsel.

A continuance of the Final Pretrial Conference at counsel's request or stipulation is *highly unlikely*. Counsel should plan to do the necessary pretrial work on a schedule which will ensure its completion with time to spare before the Final Pretrial Conference. Failure to complete discovery work is not grounds for a continuance. The Court has a crowded docket and to displace another case already set for trial in favor of a case in which counsel have not been diligent in preparing their case would not be just.

### A.   Memoranda of Contentions of Fact and Law and Final Pretrial Conference Order

Compliance with the requirements of Local Rule 16 is required by the Court. Carefully prepared Memoranda of Contentions of Fact and Law (which may also serve as the trial brief) and a proposed Final Pretrial Conference Order ("FPTCO") shall be submitted in accordance with the provisions of Local Rules 16-4 through 16-7. The Memoranda of Contentions of Fact and Law are due twenty-one (21) days before the FPTC and the proposed FPTCO is to be lodged eleven (11) days before the FPTC. The form of the proposed Final Pretrial Conference Order shall be in conformity with the format set forth in Appendix A to Local Rules. Adherence to the time requirements is necessary to provide the Court and its staff time to prepare the matter.

In drafting the FPTCO, the Court expects that counsel will attempt to agree on and set forth as many uncontested facts as possible. The Court will normally read the uncontested facts to the jury at the start of the trial. A carefully drafted and comprehensively stated stipulation of facts will reduce the length of trial and increase jury understanding of the case.

At the FPTC, counsel should be prepared to discuss means of streamlining the trial, including, but not limited to: bifurcation, presentation of non-critical testimony by deposition excerpts, stipulations as to the content of testimony, presentation of testimony on direct examination by declaration subject to cross-examination, and qualification of experts by admitted resumes. In rare cases in which the Court waives the FPTC, counsel must follow Local Rules 16-11.

### B.   Motions in Limine

All motions in limine must be filed eleven (11) days prior to the FPTC. Oppositions to motions in limine must be filed no later than seven (7) days prior to the FPTC. Motions in limine will typically be heard at the FPTC.

\\\

## IX.   Trial

Parties should note that the Court may advance the trial date by up to two weeks.

### A.   Statement of the Case (Jury Trials)

At least seven (7) days prior to trial, the parties shall prepare a joint statement of the case which will be read by the Court to the prospective panel of jurors prior to the commencement of voir dire. The statement should typically be a few sentences in length.

### B.   Voir Dire (Jury Trials)

At least seven (7) days prior to trial, each party shall file and serve on opposing parties any special questions requested to be put to prospective jurors on voir dire.

### C.   Proposed Jury Instructions (Jury Trials)

Proposed jury instructions must be filed seven (7) days prior to trial, in accordance with Local Rule 51. Parties should cite relevant authorities for each instruction, e.g., CACI, Ninth Cir. Model Jury Instructions. The parties should exchange proposed jury instructions and agree as much as possible on the necessary instructions before filing them with the Court. Both parties should submit their proposed jury instructions (preferably in Word format) to the Court at DOC_Chambers@cacd.uscourts.gov. In addition, parties should bring copies of their proposed jury instruction, printed on single-sided paper, with them on the first day of trial.

### D.   Findings of Fact and Conclusions of Law (Bench Trials)

The parties shall serve and lodge proposed findings of fact and conclusions of law at least seven (7) days prior to trial and in accordance with Local Rule 52. The parties should submit their proposed findings of fact and conclusions of law (preferably in Word format) to the Court at DOC_Chambers@cacd.uscourts.gov. \\\

ER 17

### E.   Proposed Verdict Form

At least seven (7) days prior to trial, the parties shall file their proposed verdict forms. The Court typically does not use special verdict forms. The parties should exchange proposed verdict forms and agree as much as possible to the form before filing. The parties should submit the proposed verdict form (in Word format) to the Court at DOC_Chambers@cacd.uscourts.gov.

### F.   Exhibits

A joint exhibit list must be filed at least twenty-one (21) days prior to the Final Pretrial Conference in accordance with Local Rule 16-6.1. Parties should also submit their joint exhibit list (in Word format) to the Court at DOC_Chambers@cacd.uscourts.gov.

Exhibits are to be delivered to the Courtroom Deputy Clerk not later than 8:30 a.m. on the first day of trial. All exhibits will be placed in loose leaf binders which are tabbed down the right side with exhibit numbers. The spine of the binder is to be marked with the case name and number and the numbers of the exhibits contained therein.

Two binders will be prepared: (1) an original for the Clerk, which will be tagged with the appropriate exhibit tags in the upper right-hand corner of the first page of each exhibit, and (2) one copy for the Court. Each binder will contain an index of the exhibits included.

The exhibits are to be numbered in accordance with Local Rule 26-3. Counsel may obtain exhibit tags (yellow for plaintiff and blue for defendant) at the Clerk's Office, Intake Window. Special arrangements for voluminous or oversized exhibits should be made with the Courtroom Deputy Clerk by Wednesday of the week before trial.

\\\

\\\

\\\

ER 18

After the conclusion of trial, parties must take their exhibits with them after signing a release. If the parties do not take their exhibits, the Court will dispose of exhibits after fourteen (14) days.

**IT IS SO ORDERED.**

Dated: May 9, 2023

_____
David O. Carter
United States District Judge

Revised: March 21, 2017

–12–

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No: LA CV 20-02291-DOC-(KESx)                    Date: May 9, 2023

Title:   LA ALLIANCE FOR HUMAN RIGHTS, et al. v. CITY OF LOS ANGELES, et al.

PRESENT:   THE HONORABLE DAVID O. CARTER, UNITED STATES DISTRICT JUDGE

| Karlen Dubon | Deborah Parker |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| Elizabeth Mitchell | Jennifer Mira Hashmall, L.A. County Ana |
| Matthew Umhofer | Shayla Renee Myers, Intervenor |
| Kara Arnold | |

PROCEEDINGS:        **SCHEDULING CONFERENCE** *(Los Angeles First Street)*

The case is called. The Court and counsel confer.

Briefing and trial schedule is set as follows:

   Pretrial Motions: October 10, 2023 at 9:00 AM

   Final Pretrial Conference: October 24, 2023 at 9:00 AM

   Jury Trial: November 6, 2023 at 9:00 AM

All to be held at the Los Angeles First Street Federal Courthouse.

                                                              :        20

                                                Initials of Deputy Clerk: kdu

**ER 20**

1  Carol A. Sobel (SBN 84483)
2  **LAW OFFICE OF CAROL A. SOBEL**
3  725 Arizona Ave.
   Santa Monica, CA 90401
4  Telephone: (310) 393-3055
   Email:  carolsobel@aol.com
5

6  Shayla R. Myers (SBN 264054)          Cathy Sweetser (SBN 271142)
   **LEGAL AID FOUNDATION**              **SCHONBRUN SEPLOW HARRIS**
7  **OF LOS ANGELES**                    **& HOFFMAN, LLP**
8  7000 S. Broadway                      11543 W. Olympic Blvd.
   Los Angeles, CA 90003                 Los Angeles, CA 90064
9  Tel: (213) 640-3983                   Tel: (310) 396-0731
10 Email: smyers@lafla.org               Email: catherine.sdshhh@gmail.com

11 *Attorneys for Intervenors*
12 *Additional Counsel listed on next page*

13            **UNITED STATES DISTRICT COURT**

14    **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

15
   LA ALLIANCE FOR HUMAN           CASE NO.: 20-CV-02291-DOC-KES
16 RIGHTS, et. al.
               Plaintiff(s),       **Assigned to Hon. David O Carter**
17
        v.                         **INTERVENORS' JOINDER IN COUNTY**
18                                 **OF LOS ANGELES'S MOTION TO**
   City of Los Angeles, et. al     **DISMISS PLAINTIFFS' SECOND**
19             Defendant(s).       **AMENDED COMPLAINT**

20                                 Date:        June 5, 2023
                                   Time:        8:30 a.m.
21                                 Courtroom:   10A

22

23

24

25

26

27

28

**ER 21**

*Additional Counsel*

Brook Weitzman (SBN 301037)
William Wise (SBN 109468)
**ELDER LAW AND DISABILITY
RIGHTS CENTER**
1535 E. 17th Street, Suite 110
Santa Ana, California 92705
Tel: (714) 617-5353
Email: bweitzman@eldrcenter.org
Email: bwise@eldrcenter.org

*Attorneys for Orange Catholic Worker*

- ii -

DOCUMENT INTERVENORS' JOINDER IN COUNTY OF LOS ANGELES'S
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

  **PLEASE TAKE NOTICE**, that Intervenors Los Angeles Community Action Network, Los Angeles Catholic Worker, and Orange County Catholic Worker (together, "Intervenors,") join in Defendant County of Los Angeles's Motion to Dismiss Plaintiffs' Second Amended and Supplemental Complaint, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Dkt. 552, as to the following sections:

• Section II
• Section III
• Section IV, Subsection A(2)
• Section IV, Subsection B(3)
• Section IV, Subsection C(2)

  This motion is set for hearing on June 5, 2023 at 8:30 a.m. before the Honorable David O. Carter in the United States District Court, Central District of California, Western Division, located at 411 West Fourth Street, Courtroom 9D, Santa Ana, California 92701-4516.

  Intervenors join LA County's arguments in the above-referenced sections, which contend that 1) Plaintiffs lack standing to bring the claims for the reasons identified by the Ninth Circuit Court of Appeals; 2) Plaintiffs have not stated a takings claim; and 3) Plaintiffs have not stated a claim for nuisance.

  In addition, Intervenors note that, with regards to Plaintiffs' second cause of action for public and private nuisance, Plaintiffs cannot bring nuisance claims against the County for failing to enforce laws that criminalize homelessness or seize unhoused people's belongings. First, Plaintiffs allege that the County is liable for injuries Plaintiffs allege they suffer because of the existence of homeless encampments, but nuisance claims against the City of Los Angeles based on the same theory of liability now alleged against the County have already been rejected in the Central District of California. *See Schonbrun v. Snap, Inc.,* (2:21-cv-07189-PSG (MRW), 2022 WL 2903118 at *9 (March 15, 2022) granting City of Los Angeles's motion to dismiss nuisance claims brought by property owner related to a fire that allegedly started at a homeless encampment on

- 1 -
INTERVENORS' JOINDER IN COUNTY OF LOS ANGELES'S MOTION TO
DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

1  proximate cause grounds).  In addition, governmental immunities prevent the County

2  from being compelled by litigation or the threat of litigation to make specific policy

3  decisions that fall within its discretion, including significantly, which laws to enforce and

4  which municipal services to provide.  *See* Gov't Code § 820.2.  *See also Caldwell v.*

5  *Montoya*,10 Cal.4th 972, 976 (1995) (holding that "the discretionary act immunity

6  extends to basic governmental policy decisions entrusted to broad official judgment")

7  (internal citations omitted).

8      Importantly, "the immunity principle is rooted in the separation of powers doctrine,

9  that the judicial branch should not interfere in the discretionary decisions of the

10  Legislature or the executive branch." *Fuller v. Department of Transportation* (2001) 89

11  Cal.App.4th 1109, 1117; *see Friends of H Street v. City of Sacramento* (1993) 20

12  Cal.App.4th 152, 165 (1993) ("under the separation of powers doctrine, courts lack

13  power to interfere with legislative action at either the state or local level").  This applies

14  to "those '*basic policy decisions* [which have] ... been [expressly] committed to

15  coordinate branches of government,' and as to which judicial interference would thus be

16  'unseemly.'" *Caldwell,* 10 Cal.4th at 976.

17      Federal courts can, and routinely have, prevented the City of Los Angeles and

18  other jurisdictions from violating the constitutional rights of unhoused individuals by

19  enforcing laws against them, *see e.g*., *Jones v. City of Los Angeles*, 444 F.3d 1118 (2006),

20  vacated by *Jones v. City of Los Angeles*, 505 F.3d 1006 (9th Cir. 2007); *Desertrain v. City*

21  *of Los Angeles,* 754 F.3d 1147 (2014); or seizing and destroying their belongings under

22  the guise of providing city services, *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1024

23  (9th Cir. 2012) (upholding a preliminary injunction preventing the City of Los Angeles

24  from seizing and destroying unhoused people's belongings), *Garcia v. City of Los*

25  *Angeles*, 11 F.4th 1113, 1124 (9th Cir. 2021) (same).  However, preventing constitutional

26  violations is fundamentally distinct under both California nuisance law and for purposes

27  of Article III standing, from compelling a governmental entity to enforce a law or provide

28  specific municipal services or finding the entity liable when it chooses not to.  *See*

- 2 -

INTERVENORS' JOINDER IN COUNTY OF LOS ANGELES'S MOTION TO
DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

*Diamond v. Charles*, 476 U.S. 54, 64 (1986) ("a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another").

     For these reasons and the reasons outlined in Sections II, III, and IV, Subsections A(2), B(3), and C(2) and (4) of the County of Los Angeles's Motion to Dismiss, Intervenors respectfully moves this court to dismiss Plaintiffs' Second Amended Complaint for failure to state a claim upon which relief can be granted pursuant Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

| | |
|---|---|
| Dated: May 3, 2023 | Respectfully submitted,<br>Legal Aid Foundation of Los Angeles |
| | /s/ Shayla Myers<br>Attorney for Intervenors |
| | Schonbrun Seplow Harris Hoffman &<br>Zeldes LLP |
| | /s/ Catherine Sweetser<br>Attorneys for Intervenors |
| | Law Office of Carol A. Sobel |
| | /s/ Carol A. Sobel<br>Attorneys for Intervenors |
| | Elder Law and Disability Rights Center |
| | /s/ Brooke Weitzman<br>Attorneys for Intervenors |

INTERVENORS' JOINDER IN COUNTY OF LOS ANGELES'S MOTION TO
DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

ER 25

1  DAWYN R. HARRISON (State Bar No. 173855)
2  *County Counsel*
   KATHERINE M. BOWSER (State Bar No. 230626)
3  *Acting Assistant County Counsel*
   ANA WAI-KWAN LAI (State Bar No. 257931)
4  *Senior Deputy County Counsel*
5  alai@counsel.lacounty.gov
   OFFICE OF COUNTY COUNSEL
6  500 West Temple Street, Suite 648
7  Los Angeles, California 90012
   Telephone: (213) 974-1830
8  Facsimile: (213) 626-7446
9
10 LOUIS R. MILLER (State Bar No. 54141)
   MIRA HASHMALL (State Bar No. 216842)
11 mhashmall@millerbarondess.com
   MILLER BARONDESS, LLP
12 2121 Avenue of the Stars, Suite 2600
13 Los Angeles, California 90067
   Telephone: (310) 552-4400
14 Facsimile: (310) 552-8400
15
16 Attorneys for Defendant
   COUNTY OF LOS ANGELES
17

*Sidebar (vertical):* MILLER BARONDESS, LLP · ATTORNEYS AT LAW · 1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067 · TEL: (310) 552-4400  FAX: (310) 552-8400

18            **UNITED STATES DISTRICT COURT**

19    **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| 20  LA ALLIANCE FOR HUMAN RIGHTS, et al., | **CASE NO. 2:20-cv-02291 DOC-KES** |
| 21              Plaintiffs, | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT** |
| 22  v. | |
| 23  CITY OF LOS ANGELES, et al., | Date:    June 5, 2023 |
| 24              Defendants. | Time:    8:30 a.m. |
| 25 | Place:   Courtroom 10A |
| 26 | |
| 27 | Assigned to the Hon. David O. Carter and Magistrate Judge Karen E. Scott |

28

578576.4

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS SECOND AMENDED COMPLAINT

**ER 26**

1    Defendant County of Los Angeles ("County") hereby submits this Request

2 for Judicial Notice pursuant to Rule 201 of the Federal Rules of Evidence in support

3 of its Motion to Dismiss:

4 **I.     LEGAL STANDARDS**

5    "The court may judicially notice a fact that is not subject to reasonable

6 dispute because it: (1) is generally known within the trial court's territorial

7 jurisdiction; or (2) can be accurately and readily determined from sources whose

8 accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  A court "may

9 take judicial notice at any stage of the proceeding," and "must take judicial notice if

10 a party requests it and the court is supplied with the necessary information."  *Id*. at

11 201(c)(2), (d).

12    In ruling on a motion to dismiss under Rule 12(b)(6), a court may consider

13 "documents incorporated into the complaint by reference, and matters of which a

14 court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

15 U.S. 308, 322 (2007).  A "court may take judicial notice of matters of public record

16 without converting a motion to dismiss into a motion for summary judgment, as

17 long as the facts noticed are not subject to reasonable dispute."  *Skilstaf, Inc. v. CVS

18 Caremark Corp.*, 669 F.3d 1005, 1016 n.9 (9th Cir. 2012) (citation omitted).

19 Similarly, "documents whose contents are alleged in a complaint and whose

20 authenticity no party questions, but which are not physically attached to the

21 pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss," and

22 "[s]uch consideration does 'not convert the motion to dismiss into a motion for

23 summary judgment.'"  *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994) (citation

24 omitted).

25    In addition, when a plaintiff moves to dismiss for lack of subject matter

26 jurisdiction under Rule 12(b)(1), "a court may look beyond the complaint to matters

27 of [which judicial notice is taken] without having to convert the motion into one for

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552 4400   FAX: (310) 552 8400

2

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 27

1  summary judgment.  It also need not presume the truthfulness of the plaintiffs'

2  allegations."  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (citation omitted).

3         Courts may take judicial notice of "matters of public record."  *MGIC Indem.*

4  *Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).  These "matters of public

5  record" include government records and reports.  *Barron v. Reich*, 13 F.3d 1370,

6  1377 (9th Cir. 1994) (holding that the district court properly took judicial notice of a

7  field operations handbook for a regional division of the Department of Labor

8  because the handbook "clearly constitute[d]" judicially noticeable facts); *United*

9  *States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (observing "[c]ourts may take

10  judicial notice of some public records, including the 'records and reports of

11  administrative bodies'" (citation omitted)).

12         This includes records of municipal governments.  *Price v. County of*

13  *Los Angeles*, No. 2:20-cv-04911-SB-KS, 2020 WL 7861975, at *2 (C.D. Cal. Dec.

14  1, 2020) (taking judicial notice of 15 documents submitted by the County of

15  Los Angeles, including the "orders and proclamations made by the Los Angeles

16  County Board of Supervisors and the Governor of the State of California," the

17  Twitter posts from county officials, and records of official motions and votes of the

18  Los Angeles County Board of Supervisors); *Best Supplement Guide, LLC v.*

19  *Newsom*, No. 2:20-cv-00965-JAM-CKD, 2020 WL 2615022, at *2 (E.D. Cal. May

20  22, 2020) (taking judicial notice of "various documents issued by the federal

21  government, the State of California, San Joaquin County, and the City of Lodi");

22  *Bd. of Trs. of Leland Stanford Junior Univ. v. County of Santa Clara*, No. 18-cv-

23  07650-BLF, 2019 WL 5087593, at *4 (N.D. Cal. Oct. 10, 2019) (taking judicial

24  notice of various documents, including official acts of the Board of Supervisors, a

25  transcript of a Board of Supervisors' public hearing, county ordinances, staff reports

26  made public prior to Board of Supervisors' meeting, and other such public records);

27  *Jenkel v. City & County of San Francisco*, No. C 06-2593 MHP, 2006 WL 2053502,

28  at *1 n.3 (N.D. Cal. July 21, 2006) (taking judicial notice of documents found on the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS SECOND AMENDED COMPLAINT

**ER 28**

1  website for the San Francisco Board of Supervisors, including resolutions and

2  agendas for meetings).

3        The documents set forth below are publicly available at Los Angeles County

4  websites, and their accuracy cannot reasonably be questioned.  The documents are

5  relevant to, and offered in support of, the County's Motion to Dismiss Plaintiffs'

6  Second Amended Complaint ("SAC") to show that and how the County is, in fact,

7  exercising its discretion to address people experiencing homelessness ("PEH").

8  **II.    DOCUMENTS SUBJECT TO JUDICIAL NOTICE**

9        Pursuant to the above authority, the County respectfully requests that the

10  Court take judicial notice of the documents submitted with and attached as Exhibits

11  to the Declaration of Mira Hashmall, discussed below:

12        **A.    County Homelessness Services**

13        The County funds programs for housing and social services to individuals and

14  families who are experiencing homelessness, formerly homeless or at-risk of

15  homelessness in Los Angeles County through 10 different County departments—

16  Children and Family Services, Health Services, Mental Health, Public Health,

17  Public Social Services, Sheriff's Department, Probation, Public Defender and the

18  Department of Economic Opportunity and the Aging and Disabilities Department—

19  and the Los Angeles Homeless Services Authority ("LAHSA"), a joint powers

20  authority of the County and the City of Los Angeles ("City").  (Declaration of Mira

21  Hashmall ("Hashmall Decl.") Ex. 1.)  These programs target myriad factors that

22  contribute to homelessness and provide a variety of services, including:

23        • Rapid re-housing for families in the child welfare system where

24          homelessness is the sole barrier to reunification;

25        • Approximately 60 Multidisciplinary Teams ("MDTs") comprised of a

26          health professional, mental health specialist, substance abuse counselor,

27          case manager, and someone with lived experience with homelessness

28          that provide outreach and engagement 7 days a week to connect

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

578576.4                                    4
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 29

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  unsheltered people to housing, supportive services, and sources of
2  income;

3  • Cash rental subsidies and move-in assistance;

4  • Homelessness diversion and re-entry and substance use disorder
5  treatment for unsheltered persons incarcerated in, and exiting, County
6  jails;

7  • Comprehensive job preparation and placement for probationers and
8  formerly incarcerated individuals;

9  • Criminal-record clearing for persons experiencing homelessness;

10  • Housing-related assistance, including short-term financial assistance,
11  legal services, eviction prevention, and landlord mediation for
12  individuals who are homeless or at imminent risk of homelessness; and

13  • Field-based Homeless Outreach & Mobile Engagement ("HOME")
14  teams that provide outreach and engagement services to PEH who have
15  a serious mental illness with the goal of linking them to ongoing mental
16  health services and permanent housing to disrupt the cycle of chronic
17  homelessness in the County.

18  The County requests that the Court take judicial notice of the County's list of

19  "Programs Serving People Experiencing Homelessness."  (Hashmall Decl. Ex. 1

20  [ECF Dkt. No. 189].)  *E.g., Nichols v. Brown*, 859 F. Supp. 2d 1118, 1124 n.2 (C.D.

21  Cal. 2012) (taking judicial notice of court opinions and dockets).  The County

22  further requests that the Court take judicial notice of the County Department of

23  Mental Health's Report to the Los Angeles County Board of Supervisors ("Board"),

24  titled "Disrupting the Cycle of Chronic Homelessness-DMH Homeless Outreach

25  and Mobile Engagement (HOME) Team Pilot (Item 12, Agenda of June 23, 2020)."

26  (Hashmall Decl. Ex. 2.)

27  On July 27, 2021, the Board created a Blue Ribbon Commission on

28  Homelessness to research and analyze various homelessness governance reports,

578576.4                                      5

1  studying models from across the nation and providing feedback to the Board

2  regarding the most relevant and effective models, with the intention of

3  implementing reform to help solve the homelessness crisis in Los Angeles County.

4  (Hashmall Decl. Ex. 3 [July 27, 2021 Statement of Proceedings of the Board].)  On

5  September 15, 2021, the Board also approved the creation of a taskforce chaired by

6  the Executive Director of Racial Equity and comprised of dozens of County

7  departments and partners, called the Los Angeles County Office of Prevention

8  Services.  (Hashmall Decl. Ex. 4 [September 15, 2021 Statement of Proceedings of

9  the Board].)  This taskforce coordinated and effectuated a comprehensive

10  community-based prevention services system—informed by an equity-centered

11  framework—to improve the lives of the most vulnerable County residents, including

12  PEH.  The County requests that the Court take judicial notice of the July 27, 2021

13  and September 15, 2021 Statements of Proceedings.  (Hashmall Decl. Exs. 3, 4.)

14       The County is thus aware of the intersectionality of homelessness and other

15  axis of marginalization and is actively working towards providing targeted aid for

16  PEH who are also otherwise marginalized.  For example, on August 10, 2021, the

17  Board adopted a proposal to issue nearly $38 million in bonds to finance the

18  construction and development of 120 apartments for homeless veterans.  (Hashmall

19  Decl. Ex. 5 [August 10, 2021 Statement of Proceedings of the Board].)  On

20  September 28, 2021, the Board approved the deployment of mobile public health

21  teams to provide testing and treatment of sexually transmitted infections among

22  PEH and, in particular, PEH who are LGBT or pregnant.  (Hashmall Decl. Ex. 6

23  [September 28, 2021 Statement of Proceedings of the Board].)  On October 19,

24  2021, the Board approved a measure to improve outreach and services for

25  undocumented individuals and immigrants experiencing homelessness.  (Hashmall

26  Decl. Ex. 7 [October 19, 2021 Statement of Proceedings of the Board ].)  The

27  County requests that the Court take judicial notice of the Board's August 10, 2021,

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

578576.4

6

1    September 28, 2021, and October 19, 2021 Statements of Proceedings.  (Hashmall

2    Decl. Exs. 5, 6, 7.)

3         **B.**    **Housing for Health**

4         In November 2012, the County Department of Health Services ("DHS")

5    established the Housing for Health ("HFH") division to expand access to supportive

6    housing for DHS patients who are homeless and who have complex medical and

7    behavioral health conditions or are high utilizers of DHS services.  (Hashmall Decl.

8    Ex. 8 [July 19, 2021 Letter from DHS to Board Transmitting HFH Quarterly

9    Report].)  The County requests that the Court take judicial notice of DHS's July 19,

10    2021 Letter to the Board outlining this Quarterly Report.  (*Id*.)

11         HFH utilizes a full range of community-based housing options, including

12    non-profit-owned supportive housing, affordable housing, and private market

13    housing.  (Hashmall Decl., Ex. 8.)  Tenants receive federal rental subsidies such as

14    Section 8 Project Based or Tenant Based Vouchers or a local rental subsidy through

15    the Flexible Housing Subsidy Pool ("FHSP").  (*Id*.)  All individuals who are housed

16    through HFH programs are assigned to a homeless services provider to receive

17    Intensive Case Management Services ("ICMS").  (*Id*.)  These services include

18    outreach and engagement; case management with on-going monitoring and follow-

19    up; linkage to health, mental health, and substance use disorder services; assistance

20    with benefits establishment; assistance with life skills, job skills, and educational

21    and volunteer opportunities; and crisis intervention.  (*Id*.)  ICMS providers provide

22    "whatever it takes" wraparound services to assist clients in regaining stability and

23    improved health.  (*Id*.)

24         Between November 2012 and March 2021, DHS has housed 18,444 clients in

25    permanent supportive housing, with 4,415 placed in existing permanent supportive

26    housing and 14,029 placed in new permanent supportive housing.  (*Id*.)  As of

27    March 31, 2021, 13,450 clients were actively housed in permanent supportive

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552 4400   FAX: (310) 552 8400

578576.4

7

ER 32

1 of 1

1  housing through HFH, 638 of whom were housed during the first three months of

2  2021 alone.  (*Id*.)

3  **C.   Measure H And The Homeless Initiative**

4  On August 17, 2015, the Board launched the Homeless Initiative to combat

5  the homeless crisis in Los Angeles.  The Homeless Initiative was created following

6  18 policy summits on nine topics with 25 County departments, 30 cities and other

7  public agencies, and over 100 community partners and stakeholders.  In

8  February 2016, the Homeless Initiative finalized 47 recommended Strategies (the

9  "2016 HI Report") and submitted it to the Board for approval.  Structured to

10  produce measurable outcomes, the strategies seek to (a) prevent homelessness,

11  (b) expand subsidized housing, (c) increase income among those who are homeless

12  or are at risk of becoming homeless, (d) enhance homeless case management and

13  supportive services, (e) create a coordinated homelessness service system, and

14  (f) expand affordable and homeless housing.  On February 9, 2016, the Board

15  approved the Homeless Initiative's recommendations and nearly $1 billion in

16  funding and instructed the County's Chief Executive Office ("CEO") to report to the

17  Board on a quarterly basis.  The County requests that the Court take judicial notice

18  of the 2016 HI Report and the CEO's first quarterly report.  (Hashmall Decl. Exs. 9,

19  10.)

20  In March 2017, voters approved Measure H, which authorized a 1/4 cent

21  increase to the County's sales tax to provide an ongoing revenue stream to address

22  the homeless crisis.  As it appeared on the ballot, Measure H also required

23  "independent annual audits and citizens' oversight."  (Hashmall Decl. Ex. 11 [Mar.

24  7, 2017 Ballot].)  The County requests that the Court take judicial notice of the

25  March 7, 2017 Countywide Measure known as "Measure H" appearing on the

26  ballot.  (*Id*.)

27  The Homeless Initiative and lead County departments and agencies

28  responsible for implementing each Strategy collaborated and offered

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

578576.4                                          8
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 33

1   recommendations to the Board as to how to allocate the new funds generated by

2   Measure H, which the Board approved.  (Hashmall Decl. Ex. 12 [Sep. 29, 2017

3   CEO Report] at 1.)  The County requests that the Court take judicial notice of the

4   report submitted by the CEO to the Board on September 29, 2017.  (*Id.*)

5       Since its enactment, Measure H has successfully generated hundreds of

6   millions of dollars annually, and has been credited for "accelerat[ing]" the critical

7   work of the Homeless Initiative to "improve the lives of individuals and families

8   experiencing homelessness."  (Hashmall Decl. Ex. 13 [Homeless Initiative Quarterly

9   Report No. 18] at 3.)  All 47 HI Strategies have been fully or partially implemented.

10  (*Id.* at 4.)  The County requests that the Court take judicial notice of the Homeless

11  Initiative Quarterly Report No. 18, submitted to the Board by the CEO on

12  December 3, 2020.  (*Id.*)

13      On February 22, 2021, the CEO submitted the Countywide Homeless

14  Initiative's Year Four performance evaluation prepared by Dr. Halil Toros

15  (Statistical Analytics Consultant, USC Price Center for Social Innovation),

16  Dr. Dennis Culhane (Professor, University of Pennsylvania, Social Policy &

17  Practice), and Dr. Stephen Metraux (Assistant Professor, University of Delaware,

18  Biden School of Public Policy & Administration) of Public Sector Analytics

19  ("PSA").  PSA reported that permanent supportive housing placements were driving

20  reductions in homelessness.  (Hashmall Decl. Ex. 14 [PSA's February 22, 2021

21  Countywide Homeless Initiative's Year Four Performance Evaluation] at 10.)

22  Among other things, PSA considered "the apparent paradox of why LA's homeless

23  population, as per the annual point-in-time count, has grown by 13% in each of the

24  past two years despite the expansion in LA's homeless services and the growth in

25  funded exits from homelessness" and included a "Key Finding[]" that "the growing

26  census is primarily a result of increases in the persistently homeless."  (*Id.* at 11.)

27  PSA also found that the "planned growth" of permanent supporting housing held

28  "promise" for "addressing persistent homelessness," which the report posited

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

9

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS SECOND AMENDED COMPLAINT

**ER 34**

1  "would have the greatest potential impact on the level of homelessness in LA."  (*Id.*)

2  PSA also reported that the number of interim housing placements has steadily risen

3  each year—totally nearly 30,000 in 2019-2020—and stated that "[i]deally, the

4  temporary orientation of these facilities means short stays and placements into

5  longer-term housing arrangements." (*Id.* at 29.)  The County requests that the Court

6  take judicial notice of the February 22, 2021 CEO report to the Board transmitting

7  the Countywide Homeless Initiative's Year Four performance evaluation.  (*Id.*)

8       The Homeless Initiative recently reported additional progress to the Board.

9  As of December 2022, the County's homeless services system has placed more than

10  90,000 people in permanent housing and nearly 124,000 in interim housing.  (*See*

11  Hashmall Decl. Ex. 48 [Homeless Initiative Quarterly Report No. 26] at 5.)  Of

12  those, over 34,000 have been permanently housed because of Measure H strategies,

13  and more than 65,000 entered interim housing funded in whole or in part from

14  Measure H.  (*Id.*)  In the last fiscal year alone, the County's system provided

15  permanent housing to 8,689 people and interim housing to 15,475 people.  (*Id.*)

16  These included 1,916 permanent housing placements and 7,511 interim housing

17  placements through Measure H-funded programs.  (*Id.*)  The County requests that

18  the Court take judicial notice of the Homeless Initiative Quarterly Report No. 26,

19  submitted to the Board by the CEO on April 20, 2023.  (*Id.*)

20       The County is currently evaluating how to use new funding opportunities

21  (such as Homeless, Housing, Assistance and Prevention, the American Rescue Plan,

22  and the Governor's California Comeback Plan) to create up to 1,000 new subsidies

23  to increase turnover of interim housing beds by quickly matching high acuity clients

24  to permanent housing and supporting the exit of clients from interim housing.

25  (Hashmall Decl. Ex. 5 at 13.)  The County is likewise analyzing finance models to

26  develop and operate affordable housing for college students experiencing

27  homelessness, including engaging with local colleges and universities to identify

28  opportunities to partner in the development of housing.  (*Id.* at 29.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

10

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS SECOND AMENDED COMPLAINT

1    Besides investing in programs to prevent and combat homelessness,

2  Homeless Initiative found that the County is continuing to chip away at the

3  affordable housing shortage, one of the primary drivers of homelessness.  (Ex. 15 at

4  23.)  Housing Initiative also reported a funding recommendations total of

5  $532.6 million for Fiscal Year 2022-23, including $466.75 million raised through

6  Measure H.  (Hashmall Decl. Ex. 16 [July 13, 2021 News Release announcing the

7  Homeless Initiative Budget for Fiscal Year 2021-2022].)  On November 16, 2021,

8  the Board approved additional millions of dollars in supplemental funds to be used

9  for Homeless Initiative strategies and an anti-discrimination housing program

10  administered through the U.S. Department of Housing and Urban Development

11  ("HUD").  (Hashmall Decl. Ex. 17 [November 16, 2021 Statement of Proceedings

12  of the Board].)  The County requests that the Court take judicial notice of the

13  May 17, 2022 Press Release announcing the Homeless Initiative Budget for Fiscal

14  Year 2022-2023 and the Board's November 16, 2021 Statement of Proceedings.

15  (Hashmall Decl. Exs. 16, 17.)

16    **D.    The Freeway Plan**

17    On June 16, 2020, the County and the City entered into a binding term sheet

18  whereby the County agreed pay the City $53 million dollars during the first year,

19  and up to $60 million per year for the following four years, to finance the its

20  agreement to provide 6,700 beds for PEH.  (Hashmall Decl. Ex. 18 [ECF Dkt. No.

21  136 (the "Freeway Plan")].)  These 6,700 beds are intended to house and shelter

22  PEH who live within 500 feet of a freeway overpass, and then to give priority

23  housing and shelter to PEH who are 65 or older or who are otherwise vulnerable.

24  (*Id.*)  The County made an initial payment to the City of $17.66 million on

25  September 1, 2020.  (Hashmall Decl. Ex. 19 [ECF Dkt. No. 177].)  On October 9,

26  2020, the County and the City confirmed the Freeway Plan in a Memorandum of

27  Understanding ("MOU"), filed with this Court.  (Hashmall Decl. Ex. 20 [ECF Dkt.

28  No. 185].)  The County requests that the Court take judicial notice of the Freeway

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 36

1   Plan (ECF Dkt. No. 136), the County's September 16, 2020 Notice of Payment

2   (ECF Dkt. No. 177), and the MOU (ECF Dkt. No. 185).  (Hashmall Decl. Exs. 18,

3   19, 20.)  *E.g., Nichols*, 859 F. Supp. 2d at 1124 n.2 (taking judicial notice of court

4   opinions and dockets).

5       To date, the County has contributed $173 million to support the City's PEH

6   population, and it provides a package of mainstream services to PEH residing in

7   facilities established by the City pursuant to the MOU, including on-site outreach

8   and engagement, benefits assistance, as well as mental health and substance abuse

9   services.  (Hashmall Decl. Exs. 21 [ECF Dkt. No. 203], 22 [ECF Dkt. No. 254], 23

10  [ECF Dkt. No. 341], 24 [ECF Dkt. No. 463].)  The County requests that the Court

11  take judicial notice of the County's January 7, 2021 Notice of Payment (ECF Dkt.

12  No. 203), the County's March 29, 2021 Notice of Payment (ECF Dkt. No. 254), the

13  County's July 13, 2021 Notice of Payment and Report Regarding Mainstream

14  Services (ECF Dkt. No. 341), and the County's August 5, 2022 Annual Status

15  Report re Payment (ECF Dkt. No. 463).  (Hashmall Decl. Exs. 21, 22, 23, 24; *see

16  also* the County's Quarterly Reports pursuant to the MOU at ECF Dkt. Nos. 364,

17  392, 417, 463, 464, 489, and 524).)  *E.g., Nichols*, 859 F. Supp. 2d at 1124 n.2

18  (taking judicial notice of court opinions and dockets).

19      **E.      The County's Additional Appropriations For Homeless Services**

20      In addition to its significant contributions pursuant to the MOU, the County is

21  continuing its work to address homelessness and support PEH in other ways.  On

22  August 31, 2021, the Board approved $450,000 in funding towards a tiny-home

23  interim housing project in Torrance.  The County requests that the Court take

24  judicial notice of the August 31, 2021 Statement of Proceedings of the Board.

25  (Hashmall Decl. Ex. 25 [August 31, 2021 Statement of Proceedings of the Board].)

26      In September 2021, LAHSA received a $15 million grant from HUD to

27  address youth homelessness.  (Hashmall Decl. Ex. 26 [September 27, 2021 Press

28  Release from LAHSA].)  In October 2021, the County entered into an agreement

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    with the State of California to receive $3.7 million in Emergency Solutions Grant

2    funds for programs that assist PEH.  (Hashmall Decl. Ex. 27 [October 5, 2021

3    Statement of Proceedings of the Board].)  The County requests that the Court take

4    judicial notice of the September 27, 2021 press release and the October 5, 2021

5    Statement of Proceedings.  (Hashmall Decl. Exs 26, 27.)

6        On November 2, 2021, the Board authorized an additional $10 million in

7    funding for cities and local Councils of Governments who need help paying for

8    supportive services at interim housing sites.  (Hashmall Decl. Ex. 28 [November 2,

9    2021 Statement of Proceedings of the Board].)  Supervisors Hilda Solis and

10    Kathryn Barger, the co-authors of the motion recommending the fund, highlighted a

11    number of new municipal projects that would benefit from the County's provision of

12    financial aid, including "tiny homes" projects in Baldwin Park and Montebello, and

13    two motels El Monte set to house PEH.  (Hashmall Decl. Ex. 29 [November 2, 2021

14    Motion by Supervisors Solis and Barger].)  The County requests that the Court take

15    judicial notice of the November 2, 2021 Statement of Proceedings and Motion by

16    Supervisors Hilda L. Solis and Kathryn Barger, and the August 31, 2021 Statement

17    of Proceedings.  (Hashmall Decl. Exs. 28, 29.)

18      **F.**     **The County's COVID-19 Response**

19        On March 4, 2020, the State of California declared a state of emergency

20    related to COVID-19.  On May 12, 2020, Supervisors Ridley-Thomas and Hahn

21    submitted a motion to the Board requesting that the Board direct the Executive

22    Director of LAHSA, in collaboration with the CEO and other County departments,

23    as well as the City, philanthropy and other key partners, to develop a Homelessness

24    COVID-19 Recovery Plan (the "May 12, 2020 Motion").  The motion explained that

25    the Homelessness COVID-19 Recovery Plan should include "post-pandemic

26    housing plans for homeless older adults," and requested that the Board direct the

27    CEO to identify existing resources, including The CARES Act (H.R. 748)

28    Coronavirus Relief Fund, to support the plan.  The motion further requested that the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL:(310) 552-4400   FAX:(310) 552-8400

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS SECOND AMENDED COMPLAINT

1 Board direct the CEO's Legislative Affairs and Intergovernmental Relations Branch

2 in Washington, D.C. and Sacramento to continue to advocate for federal and state

3 resources to expand housing for the homeless.  The County requests that the Court

4 take judicial notice of the May 12, 2020 Motion.  (Hashmall Decl. Ex. 30.)

5 The Board granted the motion. (Hashmall Decl. Ex. 31 [July 2, 2020 CEO

6 Report] at 1.)  The Board directed the CEO to identify existing resources, including

7 The CARES Act (H.R. 748) Coronavirus Relief Fund, to support the plan and to

8 report back within 45 days.  (*Id.*)  LAHSA created a COVID-19 Recovery Plan,

9 which focuses on five key goals:  (1) no returns from COVID-19 response to the

10 street; (2) rapidly house 15,000 of the most vulnerable people; (3) reduce inflow into

11 homelessness; (4) prepare systems for future crises; and (5) ensure racial equity

12 throughout.  (*Id.*)  LAHSA projected that it would cost $806,595,604 over the next

13 three fiscal years to implement the plan in its entirety.  (*Id.* at 2.)  Of that total,

14 $609,178,112 represents new costs that must be identified from existing or new

15 funding sources.  (*Id.*)  On July 2, 2020, the CEO submitted the LAHSA COVID-19

16 Recovery Plan to the Board.  (*Id.*)  The County requests that the Court take judicial

17 notice of the July 2, 2020 submission by the CEO to the Board and the attached

18 LAHSA COVID-19 Recovery Plan.  (*Id.*)

### 1. Project Roomkey/Homekey

20 In response to COVID-19, the Governor created Project Roomkey to combat

21 the spread of the virus and address the needs of the most vulnerable individuals in

22 the community.  Project Roomkey is a statewide motel/hotel program that seeks to

23 provide asymptomatic people experiencing homelessness with temporary housing.

24 The County, in partnership with the City of Los Angeles and the Los Angeles

25 Homeless Services Authority, facilitated the implementation of Project Roomkey in

26 Los Angeles by finalizing agreements with hotels/motels, working with service

27 providers to staff the hotels/motels, and deploying disaster relief workers to staff the

28 sites.  (Hashmall Decl. Ex. 32 [May 15, 2020 CEO Report].)  On September 15,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

578576.4

14

1  2021, the Board approved $34 million in funding for Project Roomkey in fiscal year

2  2021-22.  (Hashmall Decl. Ex. 4 [September 15, 2021 Statement of Proceedings of

3  the Board].)  In addition, with Project Homekey, the County purchased 10 hotels

4  and motels to shelter about 900 people during the pandemic.  Every Homekey unit

5  will ultimately become permanent supportive housing.  (Hashmall Decl. Ex. 15 at

6  6.)  The County requests that the Court take judicial notice of the May 15, 2020

7  report by the CEO to the Board titled "Piloting a Comprehensive Crisis Response to

8  Ensure Post-COVID-19 Housing for Homeless Older Adults in Los Angeles County

9  (Item No. 8, Agenda of April 14, 2020)."  (*Id.* Ex. 32.)

10       The County, in partnership with the City of Los Angeles and LAHSA,

11  facilitated the implementation of Project Roomkey in Los Angeles by finalizing

12  agreements with hotels/motels, working with service providers to staff the

13  hotels/motels, and deploying disaster relief workers to staff the sites.  (Hashmall

14  Decl. Ex. 32.)  As of September 2021, over 8,700 people experiencing homelessness

15  had been placed in hotels/motels pursuant to Project Roomkey.  (*Id.* Ex. 15 at 3.)

16              **2.      COVID-19 Treatment and Vaccinations**

17       During the pandemic, County departments, partner agencies, and community-

18  based homeless services providers not only continued implementing Homeless

19  Initiative strategies but also facilitated COVID-19 testing and vaccinations.

20  (Hashmall Decl. Ex. 15 at 3.)  The County has provided COVID-19 testing for

21  19,171 people in 2,933 encampments countywide between April 1, 2020 and

22  June 30, 2021.  (*Id.* at 9.)  The County has also directly administered

23  18,125 vaccinations to 12,077 distinct people experiencing homelessness, 5,675 of

24  whom are now fully vaccinated.  (*Id.*)  Cumulatively, about 50,000 total vaccine

25  doses have been administered by various agencies to people experiencing

26  homelessness throughout the County since the start of the pandemic.  (*Id.*)

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

578576.4

15

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 40

**G.**    **Mental Health Services Act**

On November 3, 2020, the County submitted a Status Report explaining how the County allocates and spends MHSA funds.  (Hashmall Decl. Ex. 33 [ECF Dkt. No. 197].)  The Report explained that MHSA funds are allocated pursuant to a three-year expenditure plan that is approved by the California Department of Health Services and the California MHSA Oversight and Accountability Commission.  (*Id.* at 4.)  The County requests that the Court take judicial notice of its November 3, 2020 Status Report.  *E.g., Nichols*, 859 F. Supp. 2d at 1124 n.2 (taking judicial notice of court opinions and dockets).

On May 30, 2017, the Board adopted the MHSA three-year expenditure plan for fiscal years 2017-18, 2018-19 and 2019-20.  Per this plan, MHSA funds are allocated for a variety of programs and services to meet the mental health needs of county residents.  The County requests that the Court take judicial notice of the MHSA three-year expenditure plan adopted by the Board on May 30, 2017. (Hashmall Decl. Ex. 34 [May 2, 2017 report to the Board].)

As a result of the COVID-19 pandemic, the Los Angeles County Department of Mental Health ("DMH") received an extension to continue with its three-year expenditure plan for fiscal year 2020-21.  Per DMH, this "will allow for adequate time to ensure the stakeholder process is fully engaged in preparation of a new Three-Year Plan that reflects 1) a thorough understanding of community needs which are in transition as a result of the ongoing COVID-19 pandemic and civil unrest, and 2) meaningful budget forecasts."  The County requests that the Court take judicial notice of the following statements set forth on DMH's official website, at URL link:  dmh.lacounty.gov/about/mhsa/announcements.  (Hashmall Decl. Ex. 35 [Excerpts from the Los Angeles County Department of Mental Health's website].)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

### H.   Recent County Efforts

On March 30, 2022, after hundreds of hours of research and hundreds of interviews with stakeholders, the Blue Ribbon Commission published its Governance Report and delivered it to the Board of Supervisors.  (*Id.* Ex. 36.)  The Governance Report highlighted several "key concerns" for addressing the homelessness crisis, including, among others, the need to act with urgency and develop flexible solutions; the need to improve communication and focus on diversity, equity, and inclusion; and the need to increase support for small service providers in order to build capacity.  (*Id.*)  The Governance Report delineated seven recommendations to the Board, which the Board voted to adopt.  (*Id.* Ex. 37 [May 3, 2022 Vote to Implement the Blue-Ribbon Commission's Recommendations].)  The County requests that the Court take judicial notice of the Blue Ribbon Commission's Governance Report and the County's Adoption of the Recommendations.

In January 2023, the Board declared a local emergency on homelessness and has fast-tracked solutions—reflecting the County's commitment to immediately improving its ability to quickly and effectively address the complex, multi-faceted issues surrounding homelessness.  These solutions include organizational changes, the addition of up to 20 new staff dedicated solely to addressing the emergency with many more hired to serve PEH across the County's departments, and strategies that prioritize the most urgent needs of PEH.  The County requests that the Court take judicial notice of (1) the Board's January 10, 2023 declaration of a local state of emergency (Ex. 39), (2) the County CEO's January 23, 2023 Report (Ex. 40), (3) the CEO's January 31, 2023 Report (Ex. 41), and (4) the Board's February 7, 2023 revised declaration of a local state of emergency (Ex. 42).

In February 2023, the Board adopted the County CEO's recommended budget for fiscal year 2022-23, which identified the County's top priority as its fight against homelessness, with extensive investments in mental health services, supportive

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  services, and a wide range of housing programs.  (*Id.* Ex. 43 at 1.)  The budget

2  includes $524.5 million to fund Homeless Initiative strategies focused on

3  prevention, outreach, interim housing, permanent housing, and supporting services

4  to serve people at risk of or experiencing homelessness.  (*Id*. at 1-2.)  The County

5  requests that the Court take judicial notice of the Board's Approval of the CEO's

6  Fiscal Year 2023-24 Homeless Initiative Funding Recommendations.  (*Id.*)

7         On February 7, 2023, the Board adopted three strategic missions—

8  Encampment Resolution, Housing, and Mental Health and Substance Use Disorder

9  Services in response to the Declaration of Local Emergency for Homelessness.

10  (Hashmall Decl., Ex. 42.)  The missions will help County departments focus their

11  efforts and prioritize the homeless population in their service delivery, including

12  streamlining contracts and procurements, purchases of goods, hiring, and housing.

13  The County requests that the Court take judicial notice of the Board's February 7,

14  2023 revised declaration of a local state of emergency.  (*Id*.)

15         Following the success of the State's Homekey Program Rounds 1 and 2, on

16  May 2, 2023, the Board authorized the County and its selected co-applicants to

17  apply for the State's Homekey Round 3 funds for the acquisition, development,

18  and/or rehabilitation of 13 properties for permanent supportive housing, youth

19  permanent supportive housing, and youth interim housing.  (Hashmall Decl., Ex. 48)

20  The County requests that the Court take judicial notice of the Board's May 2, 2023

21  Motion to Authorize Joint Application(s) to and Participation in the Homekey

22  Round 3 Program.  (*Id*. Ex. 48.)

23  **III.   CONCLUSION**

24         The above documents are relevant to, and offered in support of, the Motion to

25  Dismiss to show that the County is exercising its discretion to address homelessness.

26  They are public records available at Los Angeles County websites and their

27  accuracy cannot reasonably be questioned.  Thus, the County requests that the Court

28  grant this request and take judicial notice of the documents.

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS SECOND AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

1   DATED:  May 3, 2023            MILLER BARONDESS, LLP

2

3

4                                By: _____/s/ Mira Hashmall_____

5                                    MIRA HASHMALL
                                     Attorneys for Defendant
6                                    COUNTY OF LOS ANGELES

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

578576.4

19

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS SECOND AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

ER 44

DAWYN R. HARRISON (State Bar No. 173855)
*County Counsel*
KATHERINE M. BOWSER (State Bar No. 230626)
*Acting Assistant County Counsel*
ANA WAI-KWAN LAI (State Bar No. 257931)
*Senior Deputy County Counsel*
alai@counsel.lacounty.gov
OFFICE OF COUNTY COUNSEL
500 West Temple Street, Suite 648
Los Angeles, California 90012
Telephone:   (213) 974-1830
Facsimile:    (213) 626-7446

LOUIS R. MILLER (State Bar No. 54141)
MIRA HASHMALL (State Bar No. 216842)
mhashmall@millerbarondess.com
MILLER BARONDESS, LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone:   (310) 552-4400
Facsimile:    (310) 552-8400

Attorneys for Defendant
COUNTY OF LOS ANGELES

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, et al., <br><br> Defendants. | **CASE NO. 2:20-cv-02291 DOC (KES)** <br><br> **DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT** <br><br> Date:   June 5, 2023 <br> Time:   8:30 a.m. <br> Place:   Courtroom 10A <br><br> Assigned to the Hon. David O. Carter and Magistrate Judge Karen E. Scott |

613203.4

ER 45

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................... 9

II.  FACTS ......................................................................................... 10

III. LEGAL STANDARDS ................................................................ 13

IV.  THE COURT SHOULD DISMISS THE SAC IN ITS ENTIRETY ... 13

    A.   Plaintiffs' Claims Are Not Justiciable ............................... 13

        1.   There Is No Case or Controversy ................................. 13

        2.   Plaintiffs Lack Standing ............................................... 15

    B.   Plaintiffs' Constitutional Claims Fail As A Matter Of Law ... 17

        1.   Plaintiffs Have Not Stated a Section 1983 Claim ....... 17

        2.   Plaintiffs Do Not State a Claim Under the "State-Created Danger" Doctrine ...................................... 20

        3.   Plaintiffs Have Not Stated a Takings Claim ............... 23

    C.   Plaintiffs' Remaining State Law Claims Fail As A Matter Of Law ........................................................................... 25

        1.   Plaintiffs Fail to Identify a Mandatory Duty .............. 25

        2.   Plaintiffs Have Not Stated a Claim for Nuisance ....... 26

        3.   Plaintiffs Fail to State a Claim for Waste of Public Resources .................................................................. 27

        4.   Statutory Immunity Bars Plaintiffs' Claims ............... 28

V.   CONCLUSION ............................................................................ 29

613203.4

2

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 46

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Air Pegasus of D.C., Inc. v. United States,*
424 F.3d 1206 (Fed. Cir. 2005) ................................................................ 24, 25

*Ariz. Christian Sch. Tuition Org. v. Winn,*
563 U.S. 125 (2011) ................................................................................. 14

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................. 14

*California v. Texas,*
141 S. Ct. 2104 (2021) ............................................................................. 16, 29

*Campbell v. State of Wash. Dep't of Soc. & Health Servs.,*
671 F.3d 837 (9th Cir. 2011) .................................................................... 22

*Cantrell v. City of Long Beach,*
241 F.3d 674 (9th Cir. 2001) .................................................................... 28

*Casa de Cambio Comdiv S.A. de C.V. v. United States,*
48 Fed. Cl. 137 (Fed. Cl. 2000),
*aff'd,* 291 F.3d 1356 (Fed. Cir. 2002) ...................................................... 25

*Cedar Point Nursery v. Hassid,*
141 S. Ct. 2063 (2021) ............................................................................. 26

*City of Oakland v. Lynch,*
798 F.3d 1159 (9th Cir. 2015) .................................................................. 14

*Connick v. Thompson,*
563 U.S. 51 (2011) ................................................................................... 18

*County of Sacramento v. Lewis,*
523 U.S. 833 (1998) ................................................................................. 19, 24

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,*
489 U.S. 189 (1989) ................................................................................. 19, 21

*Dougherty v. City of Covina,*
654 F.3d 892 (9th Cir. 2011) .................................................................... 18

*Engquist v. Or. Dep't of Agric.,*
478 F.3d 985 (9th Cir. 2007) .................................................................... 24

613203.4

3

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

*Gator.com Corp. v. L.L. Bean, Inc.,*
   398 F.3d 1125 (9th Cir. 2005) ........................................................................... 15

*Herman Family Revocable Tr. v. Teddy Bear,*
   254 F.3d 802 (9th Cir. 2001) ............................................................................. 26

*Hollingsworth v. Perry,*
   570 U.S. 693 (2013) .......................................................................................... 15

*Horne v. Flores,*
   557 U.S. 433 (2009) .......................................................................................... 17

*Johnson v. City of Seattle,*
   474 F.3d 634 (9th Cir. 2007) ............................................................................. 23

*Jones v. City of Los Angeles,*
   444 F.3d 1118 (9th Cir. 2006),
   *vacated following settlement by* 505 F.3d 1006 (9th Cir. 2007) .................... 28

*Juliana v. United States,*
   947 F.3d 1159 (9th Cir. 2020) ........................................................................... 18

*LA All. for Human Rights v. County of Los Angeles,*
   14 F.4th 947 (9th Cir. 2021) ................................................................. 13, 17, 27

*Lavan v. City of Los Angeles,*
   693 F.3d 1022 (9th Cir. 2012) ........................................................................... 28

*Lawrence v. United States,*
   340 F.3d 952 (9th Cir. 2003) ............................................................................. 23

*Lewis v. Casey,*
   518 U.S. 343 (1996) .......................................................................................... 18

*Lindsey v. Normet,*
   405 U.S. 56 (1972) ............................................................................................ 19

*Lingle v. Chevron U.S.A. Inc.,*
   544 U.S. 528 (2005) .......................................................................................... 25

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) .......................................................................................... 17

*Marsh v. County of San Diego,*
   680 F.3d 1148 (9th Cir. 2012) ........................................................................... 19

*Martinez v. City of Clovis,*
   943 F.3d 1260 (9th Cir. 2019) ............................................................... 21, 22, 23

613203.4

4

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 48

*Mendoza v. Blodgett*,
    960 F.2d 1425 (9th Cir. 1992) ........................................................................ 19

*Navajo Nation v. United States*,
    631 F.3d 1268 (Fed. Cir. 2011) ...................................................................... 25

*Pa. Coal Co. v. Mahon*,
    260 U.S. 393 (1922) ........................................................................................ 24

*Raines v. Byrd*,
    521 U.S. 811 (1997) ........................................................................................ 17

*Ridge Line, Inc. v. United States*,
    346 F.3d 1346 (Fed. Cir. 2003) ...................................................................... 25

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ........................................................................................ 18

*Schweiker v. Wilson*,
    450 U.S. 221 (1981) ........................................................................................ 19

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) .......................................................................................... 17

*Sinclair v. City of Seattle*,
    61 F.4th 674 (9th Cir. 2023) ..................................................................... 22, 23

*Skilstaf, Inc. v. CVS Caremark Corp.*,
    669 F.3d 1005 (9th Cir. 2012) ........................................................................ 14

*Smith v. Noonan*,
    992 F.2d 987 (9th Cir. 1993) .......................................................................... 20

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) ........................................................................ 14

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) .................................................................................... 15

*United States v. Sineneng-Smith*,
    140 S. Ct. 1575 (2020) .................................................................................... 16

*Wash. Envtl. Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) ........................................................................ 17

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ........................................................................ 14

*Wilkinson v. Austin*,
    545 U.S. 209 (2005) ........................................................................................ 19

613203.4

5

ER 49

## STATE CASES

*Bd. of Supervisors v. Superior Court*,
    207 Cal. App. 3d 552 (1989)................................................................21

*Citizens for Odor Nuisance Abatement v. City of San Diego*,
    8 Cal. App. 5th 350 (2017)................................................................28

*City of Dublin v. County of Alameda*,
    14 Cal. App. 4th 264 (1993)........................................................14, 17

*Clinton v. Cody*,
    2019 WL 2004842 (Cal. Ct. App. May 7, 2019) ...........................26

*Coshow v. City of Escondido*,
    132 Cal. App. 4th 687 (2005)...........................................................29

*County of San Diego v. State*,
    15 Cal. 4th 68 (1997).......................................................................26

*Cty. Sanitation Dist. No. 2 v. County of Kern*,
    127 Cal. App. 4th 1544 (2005)...................................................25, 28

*Freeny v. City of San Buenaventura*,
    216 Cal. App. 4th 1333 (2013).........................................................30

*HFH, Ltd. v. Superior Court*,
    15 Cal. 3d 508 (1975)......................................................................29

*Hunt v. Superior Court*,
    21 Cal. 4th 984 (1999)...............................................................20, 26

*Marquez v. State Dep't of Health Care Servs.*,
    240 Cal. App. 4th 87 (2015)............................................................27

*Martinez v. Pac. Bell*,
    225 Cal. App. 3d 1557 (1990)..........................................................28

*Resolution Tr. Corp. v. Rossmoor Corp.*,
    34 Cal. App. 4th 93 (1995)..............................................................28

*San Diego Gas & Elec. Co. v. Superior Court*,
    13 Cal. 4th 893 (1996)....................................................................27

*San Remo Hotel L.P. v. City And County of San Francisco*,
    27 Cal. 4th 643 (2002)....................................................................24

*Scates v. Rydingsword*,
    229 Cal. App. 3d 1085 (1991).........................................................26

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

*Schmid v. City & County of San Francisco*,
   60 Cal. App. 5th 470 (2021)................................................................29

*Schooler v. State*,
   85 Cal. App. 4th 1004 (2000)...............................................................30

*Tailfeather v. Bd. of Supervisors*,
   48 Cal. App. 4th 1223 (1996)...............................................................20

*Taylor v. Buff*,
   172 Cal. App. 3d 384 (1985)...........................................................29, 30

**FEDERAL STATUTES**

28 U.S.C. § 1367(a) ...............................................................................26

42 U.S.C. § 1983...................................................................................18

**STATE STATUTES**

Cal. Civ. Code § 3479...........................................................................27

Cal. Civ. Code § 3480...........................................................................27

Cal. Civ. Code § 3481...........................................................................27

Cal. Civ. Proc. Code § 526a ..............................................................28, 29

Cal. Gov't Code § 814 ...........................................................................30

Cal. Gov't Code § 815 ...........................................................................29

Cal. Gov't Code § 818.2 ....................................................................29, 30

Cal. Gov't Code § 820.2 .........................................................................29

Cal. Welf. & Inst. Code §§ 5600 *et seq.*....................................11, 20, 27

Cal. Welf. & Inst. Code § 10000 ...........................................................26

Cal. Welf. & Inst. Code § 13000 ......................................................11, 27

Cal. Welf. & Inst. Code §§ 14000 *et seq.*..................................11, 20, 27

Cal. Welf. & Inst. Code § 17000 .....................................................passim

Cal. Welf. & Inst. Code § 17001 ...........................................................20

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 51

**FEDERAL RULES**

Fed. R. Civ. P. 12(b)(1) ............................................................................... 14

Fed. R. Civ. P. 12(b)(6) .......................................................................... 14, 22

**OTHER AUTHORITIES**

U.S. Const. amend. V ................................................................................... 18

U.S. Const. amend. XIV .............................................................................. 20

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

## I.  __INTRODUCTION__

This motion to dismiss should be uncontroversial, and its resolution simple. Because Plaintiffs and the County of Los Angeles have reached a comprehensive settlement agreement—completely resolving *all* the claims in the Second Amended Complaint ("SAC")—and asked the Court to dismiss this case with prejudice, there is no longer a "case or controversy" to resolve.  In refusing to dismiss the case as the parties have urged because it disagrees with the parties' terms, the Court exceeds its Article III powers.  The Court is forcing the parties to endure unwanted litigation and issuing advisory opinions on a hypothetical, nonexistent dispute—unlawfully intruding into areas squarely committed to other branches of government.

Even if this Court could move past the lack of any justiciable claim, the SAC fails at every turn.  Plaintiffs lack standing to bring any of their claims.  And the claims in the SAC rest on the erroneous premise that the County has somehow violated the Constitution and other law by not allocating its limited fiscal resources to house and support all People Experiencing Homelessness ("PEH") with mental illness or substance use disorders.  The County has no constitutional or statutory obligation to provide universal mental health services.  At bottom, Plaintiffs' lawsuit unlawfully seeks to commandeer the County's discretionary spending.

These are problems that cannot be fixed by amendment.  Plaintiffs have already repeatedly amended their pleadings, but the critical defects cannot be cured.

Despite the fatal defects that have plagued Plaintiffs' claims from the outset, the County has demonstrated its commitment to addressing homelessness, including by *settling this action* and dedicating up to an estimated $850.5 million in new resources to dramatically expand the number of beds, interim and permanent housing, and medical and social services in Los Angeles.  This is in addition to the $293 million in new funding that the County provided earlier in the lawsuit for PEH near freeways and for unhoused seniors.

The Court should dismiss the SAC with prejudice.

## II.   <u>FACTS</u>

In June 2022, following the City of Los Angeles's settlement and dismissal from the case, this Court granted Plaintiffs leave to file a Second Amended Complaint.  The SAC alleges seven claims against the County: (1) Violation of Mandatory Duty; (2) Nuisance; (3) Inverse Condemnation; (4) Waste of Public Funds and Resources; (5) Violation of "Statutorily-Created Liberty Interest"; (6) Violation of Due Process Clause (State-Created Danger Doctrine); and (7) Uncompensated Taking.  Compared with the prior complaint, the SAC removes Plaintiffs' allegations regarding racism and scales back complaints about sidewalk encampments.  The SAC also entirely omits the disability discrimination and negligence claims.

Instead, the SAC focuses on the County's alleged failure to provide purportedly "statutorily required" mental health services.  Plaintiffs allege that state law mandates that the County provide comprehensive mental health and substance use disorder treatment and services to all PEH.  (SAC ¶ 150.)  In addition to Welfare and Institutions Code ("WIC") section 17000, the SAC references the Bronzan-McCorquodale Act (WIC §§ 5600 *et seq.*) and other provisions regarding the administration of federal funding and Medi-Cal (WIC §§ 13000, 14000 *et seq.*).

The SAC is silent as to what the County's obligations are or what specific duties the County purportedly breached.  That is because these statutes do not require the County to house or treat all mentally ill persons.  Instead, Plaintiffs allege (1) the County is "wasting" Measure H funds by spending a majority of it on permanent and interim housing and not mental health services (SAC ¶ 59); (2) only 0.1 percent of the County's general budget is dedicated to the Department of Public Health (*id.*); and (3) there are only 22.7 mental health beds per 100,000 residents, rather than 50 beds, which Plaintiffs allege is the minimum (*id.* ¶ 64).

None of the individual Plaintiffs claim to reside or to have been injured in unincorporated areas of the County.  Seven of the individual Plaintiffs are not

613203.4

10

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 54

1  indigent.  Rather, they are real estate developers and property owners in Skid Row.

2  No Plaintiff alleges they needed and were denied services by the County.

3       Plaintiffs demand that the County make different policy choices about how it

4  allocates resources on the homelessness crisis.  Plaintiffs repeatedly allege "[t]he

5  actions and inactions of the County of Los Angeles were known or should have been

6  known to the policy makers"; and according to the SAC, the County should have

7  made different policy choices.  (*See, e.g*., ¶¶ 155, 161, 167.)

8       The SAC directly contradicts indisputable evidence, as detailed in the

9  County's Request for Judicial notice filed concurrently with this Motion,

10  demonstrating the County's commitment to addressing homelessness:

11       (1) The County's homeless services system has placed more than

12  90,000 people in permanent housing and 124,000 people in interim housing since

13  the implementation of Measure H-funded strategies in July 2017, including

14  18,444 individuals with complex medical and behavioral health conditions.

15  (Declaration of Mira Hashmall ("Hashmall Decl.") Ex. 46, p. 5.)

16       (2) The County is providing 1,000 new mental health and substance use

17  disorder beds for the unhoused and 450 new subsidies for enriched residential care

18  at board and care facilities to help individuals at risk of homelessness.  (*Id.* Ex. 44.)

19       (3) The County has allocated $182.1 million for interim housing and

20  $270.2 million for permanent housing for this fiscal year, on top of $25.5 million for

21  local jurisdictions, more than doubling last year's amount.

22       (4) The County engaged subject matter experts with its Blue Ribbon

23  Commission on Homelessness to analyze and provide feedback on the most relevant

24  effective models to address homelessness, which resulted in a comprehensive

25  Governance Report highlighting key concerns and identifying the most urgent

26  needs.  (Hashmall Decl. Exs. 36-37.)

27       (5) The County funds programs for housing and social services to individuals

28  experiencing homelessness, formerly homeless, or at-risk of homelessness through

613203.4

11

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

10 different County departments.  These programs target myriad factors that contribute to homelessness and provide a variety of services, including Multidisciplinary Teams (MDTs) and Homeless Outreach & Mobile Engagement (HOME) teams.  (*Id.* Ex. 1.)

(6) The County committed $293 million to finance the City and County's Freeway Plan, providing 6,700 beds and other resources for PEH living near freeways and those who are 65 years and older and other vulnerable populations. (*Id.* Exs. 21-24.)

(7) The County has provided transparency on its allocation of resources and its use of Mental Health Services Act (MHSA) funds.  (*Id.* Exs. 33-34).

(8) The County declared a local emergency on homelessness in January 2023, accelerating streamlined creation of housing and expanded services, including health and substance use disorder services to PEH.  (*Id.* Exs. 39-41).

And perhaps most relevant here is (9):  Through its October 2022 settlement agreement with Plaintiffs and the April 2023 addendum, the County pledged an additional estimated $850.5 million in new resources to dramatically expand housing, medical, and social services to PEH.  (*Id.* Exs. 38, 44.)

The SAC also fails to resolve pervasive standing issues that the County raised in its appeal of the Court's preliminary injunction order.  *LA All. for Human Rights v. County of Los Angeles*, 14 F.4th 947, 958-59 (9th Cir. 2021).  Indeed, the Ninth Circuit concluded in relevant part that (1) Plaintiffs had not suffered any "relevant injury-in-fact" for purposes of the state-created danger claim; (2) there was no allegation of a "special relationship" between the County and unhoused residents of Skid Row "sufficient to create an affirmative duty" to act; and (3) Plaintiffs had no standing to bring a section 17000 claim because there were no allegations "that an individual Plaintiff was deprived of medically necessary care or general assistance." The SAC does not—and cannot—solve any of these problems.

There is another fundamental problem that affects nearly all of Plaintiffs'

1    claims.  None of the individual Plaintiffs claims to reside or to have been injured in
2    unincorporated areas of the County, which the County's authority is limited to.  *City*
3    *of Dublin v. County of Alameda*, 14 Cal. App. 4th 264, 274-75 (1993).  Plaintiffs
4    have added the County to their condemnation and takings claims, but the SAC
5    simply substitutes the County in name alone and fails to demonstrate why this claim
6    now applies to the County.  (SAC ¶¶ 163-65.)

7  **III.   LEGAL STANDARDS**

8          A court lacks subject matter jurisdiction under Article III where there is no
9    justiciable "case or controversy" or where the plaintiff lacks standing to bring the
10   claim.  *City of Oakland v. Lynch*, 798 F.3d 1159, 1163 (9th Cir. 2015).  A challenge
11   based on lack of subject matter jurisdiction is properly challenged in a motion to
12   dismiss under Rule 12(b)(1).  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

13         A court should dismiss a claim under Rule 12(b)(6) when the pleading lacks
14   "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"
15   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

16         In ruling on a motion to dismiss under Rules 12(b)(1) and 12(b)(6), the Court
17   properly considers matters subject to judicial notice.  *White*, 227 F.3d at 1242;
18   *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1016 n.9 (9th Cir. 2012).

19  **IV.   THE COURT SHOULD DISMISS THE SAC IN ITS ENTIRETY**

20         **A.    Plaintiffs' Claims Are Not Justiciable**

21               **1.    There Is No Case or Controversy**

22         Article III vests federal courts with "the 'Power' to resolve not questions and
23   issues but 'Cases' or 'Controversies.'"  *Ariz. Christian Sch. Tuition Org. v. Winn*,
24   563 U.S. 125, 132 (2011); *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d
25   1134, 1138 (9th Cir. 2000) (en banc) ("Our role is neither to issue advisory opinions
26   nor to declare rights in hypothetical cases, but to adjudicate live cases or
27   controversies consistent with the powers granted the judiciary in Article III of the
28   Constitution.").  Strict adherence to this requirement ensures that federal courts do

ER 57

1   not intrude into areas committed to the other branches of government:  "Federal

2   courts do not possess a roving commission to publicly opine on every legal question.

3   Federal courts do not exercise general legal oversight of the Legislative and

4   Executive Branches, or of private entities."  *TransUnion LLC v. Ramirez*, 141 S. Ct.

5   2190, 2203 (2021); *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013) ("This is an

6   essential limit on our power: It ensures that we act *as judges*, and do not engage in

7   policymaking properly left to elected representatives.").

8       Here, the parties have entered into a binding settlement agreement in which

9   the County pledges up to an estimated $850.5 million in new resources to

10  dramatically expand housing, medical, and social services to PEH.  (Hashmall Decl.

11  Exs. 38, 44.)  Plaintiffs, the County, and Intervenors all requested that the Court

12  dismiss the action at the April 20, 2023 hearing.  In that hearing, Plaintiffs urged the

13  Court to dismiss, noting that the agreement's terms—including the scope of the

14  Court's oversight authority to "enforc[e] this agreement with full transparency"—

15  achieve *Plaintiffs'* focused goals *in this case*.  (*Id*. Ex. 45, at 19-20 ("(W)e continue

16  to push for [this settlement], saying not only is this a good agreement for what it is,

17  but it needed to have been done eight months ago.  It needed to have been done six

18  months ago.  And here we are in April, watching these projects flounder"], 39, 41

19  [Plaintiffs are "satisfied" with the "Judicial Enforcement Provision" which gives the

20  court "the extended period of enforcing this agreement with full transparency"].)

21  Thus, there is no justiciable "case" or "controversy" and the Court lacks jurisdiction.

22  *Gator.com Corp. v. L.L. Bean, Inc*., 398 F.3d 1125, 1132 (9th Cir. 2005) (no case or

23  controversy where parties' settlement has resolved their dispute).

24      In denying the parties' joint request for dismissal, the Court acknowledges

25  that this is a private settlement agreement and that dismissal is *not* subject to the

26  Court's approval.  (Hashmall Decl., Ex. 47, at 4 & n.2.)  Yet the Court still refuses

27  to dismiss the case as *all* parties have urged, rationalizing that its discretion to refuse

28  ancillary jurisdiction empowers it to impose unwanted terms on the parties.  (*Id*.)

613203.4                              14

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 58

1   As Plaintiffs recently pointed out, in so doing, the Court is forcing unnecessary,

2   costly, and time-consuming litigation—contradicting the parties' interests and

3   diverting critical, urgently-needed resources from PEH.  (*Id.*, Ex. 45, at 16, 20.)

4       In sum, that the Court disagrees with the terms of the agreement because it

5   will not singularly resolve the homelessness crisis or because it does not give the

6   Court its preferred oversight power does not change that there is no longer a

7   justiciable dispute *among the parties* and, thus, that the Court lacks power to opine

8   on the issues implicated in this nonexistent dispute.  In fact, Article III *prohibits*

9   courts from disregarding parties' request to dismiss a case and from forcing the

10  parties to litigate a nonexistent dispute.  *See United States v. Sineneng-Smith*, 140 S.

11  Ct. 1575, 1579 (2020) ("our system 'is designed around the premise that [parties

12  represented by competent counsel] know what is best for them, and are responsible

13  for advancing the facts and argument entitling them to relief'"; "'[C]ourts are

14  essentially passive instruments of government.'  They 'do not, or should not, sally

15  forth each day looking for wrongs to right.'" (citations omitted)).

16           **2.**     **Plaintiffs Lack Standing**

17       Article III requires that each Plaintiff must "allege personal injury fairly

18  traceable to the defendant's allegedly unlawful conduct and likely to be redressed by

19  the requested relief." *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (citation

20  omitted).  Pervasive standing defects require the SAC be dismissed.

21       *First*, other than Plaintiffs' Inverse Condemnation and Taking claims, the

22  SAC purports to state all claims against the County on behalf of undifferentiated

23  "Plaintiffs."  But not every Plaintiff has standing to pursue each claim.  For instance,

24  Shinbane, Bastian, Rich, Burk, Frem, Pinsky, and Tashdjian do not allege they are

25  indigent—most are real estate developers and property owners in Skid Row.  Thus,

26  they cannot assert a claim under WIC section 17000.  Frem alleges injuries to his

27  Mar Vista business miles from Skid Row and thus has no standing to challenge

28  policies or alleged nuisances there.  The SAC's nuisance allegations are based on

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

1   alleged harm to "Plaintiffs who own or rent property"—necessarily excluding all
2   unhoused Plaintiffs or Alliance members.  (SAC ¶ 136.)  Moreover, the named
3   Plaintiffs do not allege that they needed and were denied mental health and
4   substance use disorder treatment and services, so they cannot allege any violation
5   based on the purported denial of such services.  These deficiencies remain despite
6   the Ninth Circuit's decision identifying them. *LA Alli.*, 14 F.4th at 958-59.

7       *Second*, Plaintiffs' alleged injuries are not traceable to the County.  No
8   Plaintiff or representative members reside in unincorporated parts of Los Angeles
9   County, which the County's authority is limited to. *City of Dublin*, 14 Cal. App. 4th
10  at 274-75.  And Plaintiffs have failed to allege a nexus between their injuries and the
11  County's conduct on which their claims are based. *Wash. Envtl. Council v. Bellon*,
12  732 F.3d 1131, 1141-42 (9th Cir. 2013); *Simon v. E. Ky. Welfare Rights Org.*, 426
13  U.S. 26, 44-46 (1976) (speculative or removed links in a causal chain cannot support
14  standing).  To the extent Plaintiffs' injuries are due to increased PEH in Skid Row, it
15  is beyond dispute that countless factors lead to homelessness.  Plaintiffs cannot link
16  their alleged harm and the County's substantial efforts to combat homelessness.

17      *Third*, and most significantly, Plaintiffs' alleged injuries are not redressable.
18  The thrust of the SAC is that Plaintiffs disagree with the County's strategy to
19  address the homelessness crisis.  Such "injuries" are not "capable of resolution
20  through the judicial process." *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (citation
21  omitted).  At most, Plaintiffs raise generalized grievances, not any injury sufficient
22  to confer standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (it must
23  be likely, not merely speculative, that the injury will be redressed by a favorable
24  decision).

25      The Court's Article III power does not permit intervention into legislative
26  prerogatives about how to spend limited resources to serve the public. *Horne v.*
27  *Flores*, 557 U.S. 433, 472 (2009) (regardless of how "vitally important" a goal, a
28  district court could not require state to increase funding in one geographic area);

613203.4                                   16
DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 60

1  *Lewis v. Casey*, 518 U.S. 343, 361-62 (1996) (overturning "inordinately—indeed,

2  wildly—intrusive" order mandating changes to state prisons that "failed to accord

3  adequate deference to the judgment" of local officials); *Rizzo v. Goode*, 423 U.S.

4  362, 366 (1976) (court order that police department implement program to handle

5  grievances constituted "an unwarranted intrusion by the federal judiciary into the

6  discretionary authority committed to [the city officials] by state and local law to

7  perform their official functions"); *Juliana v. United States*, 947 F.3d 1159, 1171-72

8  (9th Cir. 2020) ("[I]t is beyond the power of an Article III court to order, design,

9  supervise, or implement [a] requested remedial plan . . . [that] would necessarily

10  require a host of complex policy decisions entrusted, for better or worse, to the

11  wisdom and discretion of the executive and legislative branches.").

12       In sum, the law is clear: there is no justiciable controversy, the complex issue

13  of homelessness that exists beyond this action cannot be redressed here, and the

14  Court may not engage in policymaking properly left to elected representatives.

15      **B.**    **Plaintiffs' Constitutional Claims Fail As A Matter Of Law**

16          **1.**    **Plaintiffs Have Not Stated a Section 1983 Claim**

17      The County may be liable under 42 U.S.C. section 1983 only for its *own*

18  constitutional violations. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). To state a

19  section 1983 claim, Plaintiffs must allege that: (1) they were deprived of a

20  constitutional right; (2) the County has a municipal policy; (3) the policy amounts to

21  deliberate indifference to their constitutional right; and (4) the policy was the

22  moving force behind the constitutional violation. *Dougherty v. City of Covina*, 654

23  F.3d 892, 900 (9th Cir. 2011).

24      Plaintiffs allege that the County violated the Due Process Clause of the U.S.

25  Constitution by (1) "depriving Plaintiffs of their liberty interest in mandatory care"

26  (SAC ¶ 153)[1] and (2) "affirmatively creat[ing] and/or increas[ing] the risk that

27

28  _____
[1] Plaintiffs' Fifth Cause of Action cites the Fifth Amendment in passing, but the due

17

1    Plaintiffs would be exposed to dangerous conditions" by "contain[ing] homeless

2    people in Skid Row . . . [and] focusing nearly exclusively on so-called permanent

3    housing options" (*id.* ¶ 158).  These claims violate the fundamental tenet of

4    constitutional law: private citizens do not have any due-process right to demand

5    specific actions by their government.  *See DeShaney v. Winnebago Cty. Dep't of*

6    *Soc. Servs.*, 489 U.S. 189, 196-97 (1989) ("[T]he State cannot be held liable under

7    the Clause for injuries that could have been averted had it chosen to provide them.").

8    Moreover, to amount to a *constitutional* violation, government conduct is actionable

9    only if it was "so egregious, so outrageous, that it may fairly be said to shock the

10   contemporary conscience."  *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8

11   (1998).  Plaintiffs do not and cannot allege any such conduct by the County.

12          The Constitution does not confer a fundamental right to housing, *Lindsey v.*

13   *Normet*, 405 U.S. 56, 74 (1972), nor to any "governmental aid," *DeShaney*, 489 U.S.

14   at 196.  Unable to point to any federal rights to the housing and services claimed,

15   Plaintiffs rely exclusively on state law.  Although a liberty interest may arise from

16   an "expectation or interest created by state laws or policies," *Wilkinson v. Austin*,

17   545 U.S. 209, 221 (2005); *Mendoza v. Blodgett*, 960 F.2d 1425, 1428 (9th Cir.

18   1992), state law can create a liberty interest "only if the state law contains

19   '(1) substantive predicates governing official decisionmaking, and (2) explicitly

20   mandatory language specifying the outcome that must be reached if the substantive

21   predicates have been met,'" *Marsh v. County of San Diego*, 680 F.3d 1148, 1155-56

22   (9th Cir. 2012) (citation omitted).  Demonstrating a mandatory state-law duty is

23   extremely difficult.  Even use of words such as "shall" or "will" is insufficient;

24   rather, the "mandatory language [must] expressly require[] the decisionmaker to

25   apply certain substantive predicates."  *Mendoza*, 960 F.2d at 1429 (citation omitted);

26

27   _____

     process and equal protection components thereof only apply to the federal

28   government.  *Schweiker v. Wilson*, 450 U.S. 221, 226 n.6 (1981).

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

1    *see also Smith v. Noonan*, 992 F.2d 987, 989 (9th Cir. 1993) (use of the word "may"
2    cannot create a liberty interest).

3         Plaintiffs do not identify any state-law "rights" to universal housing or
4    comprehensive mental health treatment, let alone any allegation that the County
5    violated such rights in a way that is actionable under the Fourteenth Amendment.
6    Plaintiffs also misstate the state law on which they rely.  For example, the California
7    Supreme Court has made clear that WIC section 17000 "neither requires the County
8    to satisfy all unmet needs, nor mandates universal health care."  *Hunt v. Superior*
9    *Court*, 21 Cal. 4th 984, 1014 (1999).  Section 17000 does not require the County to
10   provide any specific type of care or otherwise dictate its "cho[ice] between a
11   multitude of potential courses of action," as Plaintiffs demand.  *Tailfeather v. Bd. of*
12   *Supervisors*, 48 Cal. App. 4th 1223, 1246 (1996).  To the contrary, section 17000
13   "give[s] the counties a great deal of discretion in determining how best to meet the
14   medical needs of indigent residents in light of the limited resources available," *id.* at
15   1245-46, and the *County* defines the "standards of aid and care," WIC § 17001.

16        Plaintiffs' reliance on the remaining statutes is also misplaced.  *E.g.*, WIC
17   §§ 5600.2 ("*To the extent resources are available*, public mental health services in
18   this state *should be* provided …"), 5600.3 ("*To the extent resources are available*,
19   the primary goal of the use of funds deposited in the mental health account …
20   *should be* to serve the target populations …"), 5600.4 ("Community mental health
21   services *should be* organized to provide an array of treatment options …, *to the*
22   *extent resources are available*."), 14000 ("The intent of the Legislature is to
23   provide, *to the extent practicable*, … for health care for those aged and other
24   persons …")[2] (emphasis added).  These provisions do not create a liberty interest
25   because none specifies any service that must be provided.

26

27   _____
     [2] Effective January 1, 2023, WIC section 14000, setting forth the purpose of the
28   Medi-Cal statutory scheme, was amended with changes not material here.

Plaintiffs' allegation that the County has failed to meet its obligation to provide mental health services also fails. The SAC points to third-party research about ideal standards of care, but not to any *mandatory* statutory duty. (SAC ¶ 64.) Section 17000 does not impose an obligation to provide mental health services as Plaintiffs allege, *Bd. of Supervisors v. Superior Court*, 207 Cal. App. 3d 552, 561-62 (1989); and Plaintiffs do not allege they qualified for and were denied any specific services required by law.

Moreover, Plaintiffs do not allege that the County violated any of the state laws from which their supposed "liberty interest" derives. Rather, the County has met its minimal obligations under state law, but not in a way Plaintiffs find to be "meaningful." (*See* SAC ¶ 124.) This does not meet the stringent test for a due-process violation and confirms that Plaintiffs' complaints are merely political.

Finally, Plaintiffs cannot show that the County's compliance with state law caused them any harm—let alone lost business and insurance opportunities, arson, and "trash and human waste" in "our oceans." (SAC ¶¶ 14–16.)

## 2. <u>Plaintiffs Do Not State a Claim Under the "State-Created Danger" Doctrine</u>

Plaintiffs' substantive due-process claim under the "state-created danger" doctrine fares no better. The SAC includes no new allegations that overcome the deficiencies identified in the County's last motion to dismiss. Nor could it.

The Due Process Clause limits state action; it is not a "guarantee of certain minimal levels of safety and security." *DeShaney*, 489 U.S. at 195. "Simply failing to prevent acts of a private party is insufficient to establish liability." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019). The "state-created danger" doctrine is a narrow exception to the rule that the Constitution "confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests." *DeShaney*, at 196. To satisfy the state-created danger exception, Plaintiffs must allege (1) "affirmative actions" that

613203.4

20

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 64

1    "created or exposed [them] to an actual, particularized danger that [they] would not

2    otherwise have faced"; (2) their injuries were "foreseeable"; and (3) deliberate

3    indifference "to the known danger." *Martinez*, at 1271.  Plaintiffs' allegations,

4    again, fall far short.

5         Plaintiffs do not allege that the County created a *particularized* danger

6    specifically directed at any particular plaintiff.  *Sinclair v. City of Seattle*, 61 F.4th

7    674, 682 (9th Cir. 2023) ("A danger is 'particularized' if it is directed at a specific

8    victim.").  At most, the SAC alleges *generalized* dangers that purportedly exposed

9    all Plaintiffs, generally and equally, to risks and dangerous conditions on Skid Row.

10   (*See* SAC ¶ 158.)  This is not enough: "A 'particularized' danger, naturally,

11   contrasts with a general one." *Sinclair*, at 682.  Where, as here, the dangers that

12   plaintiffs purportedly face as the result of government action are the same as anyone

13   else in the affected area, a claim under the state-created danger doctrine fails as a

14   matter of law. *Id.* at 682-83; *id*. at 684 (where the City created an actual danger of

15   increased crime in Seattle's "CHOP" zone but not one specific to the plaintiffs, no

16   viable claim; affirming dismissal under Rule 12(b)(6)).

17        Nor do Plaintiffs' allegations satisfy the "affirmative act" requirement.

18   Plaintiffs challenge two policies: (1) "a strategy to contain homeless people in Skid

19   Row," and (2) the County's purported "focus[] nearly exclusively on so-called

20   permanent housing options."  (SAC ¶ 158.)

21        First, Plaintiffs cannot hold the County liable for *a City policy* regarding

22   Skid Row.  (*See supra* §IV.A.2.)  The alleged Skid Row containment "policy" also

23   pre-dates Plaintiffs' injuries by several decades.  Thus, Plaintiffs cannot show that

24   any actions by the County "create[d] or expose[d] [them] to a danger which [they]

25   would not have otherwise faced." *Campbell v. State of Wash. Dep't of Soc. &*

26   *Health Servs.*, 671 F.3d 837, 845 (9th Cir. 2011) (citation omitted).

27        Second, the County's efforts to break the cycle of homelessness by

28   prioritizing permanent housing solutions for PEH, as opposed to focusing on

613203.4                          21

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 65

1    "emergency" shelters, do not come close to a state-created danger.  Plaintiffs simply

2    disagree with the County's discretionary policy decisions.  *See Johnson v. City of*

3    *Seattle*, 474 F.3d 634, 641 (9th Cir. 2007) (decision to abandon a more "effective[]"

4    plan did not constitute "affirmative conduct that placed the [plaintiffs] in danger").

5    Moreover, Plaintiffs cannot tie the County's focus on achieving the right proportion

6    of interim housing and permanent housing to greater danger than they would face if

7    PEH were offered only temporary, emergency shelter.  (*See*, *e.g.*, SAC ¶ 12

8    (alleging that there is "inherent danger involved in being unsheltered").)

9         Nor do Plaintiffs' allegations based on housing priorities satisfy the

10   "affirmative action[]" requirement.  The allegations are missing the obvious,

11   immediate, and "particularized danger" to a specific individual that gives rise to a

12   duty of care.  *Martinez*, 943 F.3d at 1271.  And Plaintiffs cannot allege that County

13   policies caused their litany of diffuse injuries.  *Lawrence v. United States*, 340 F.3d

14   952, 957 (9th Cir. 2003) ("[I]n each of the cases in which we have applied the

15   danger-creation exception, ultimate injury to the plaintiff was foreseeable.").

16        The SAC also fails to allege facts establishing the County acted with

17   deliberate indifference.  *Sinclair*, 61 F.4th at 680-81 (deliberate indifference is a

18   "'stringent standard of fault.'  The defendant 'must "recognize[] the unreasonable

19   risk and actually intend[] to expose the plaintiff to such risks without regard to the

20   consequences to the plaintiff"'" (citations omitted); *id.* ("'[O]nly official conduct

21   that "shocks the conscience" is cognizable as a due process violation.'").  To the

22   contrary, as Plaintiffs' acknowledge, the County devotes significant effort and

23   resources to the homelessness crisis.  *Cf. id.* at 681 (deliberate indifference where

24   City officials "knowingly exposed the public to a danger against which the officials

25   *did almost nothing* to protect against" (emphasis added)); *see* SAC ¶ 10 ("Together

26   the City and County spend over a billion dollars annually providing police,

27   emergency, and support services to those living on the streets.").  At most, Plaintiffs

28   allege the County's policy decisions and use of taxpayer funds have not adequately

613203.4                                    22
DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 66

1  addressed the homelessness crisis.  (*See* SAC ¶¶ 157-61.)  The Supreme Court has

2  rejected this as a basis for a due process challenge.  *See County of Sacramento*, 523

3  U.S. at 848-49 ("[L]iability for negligently inflicted harm is categorically beneath

4  the threshold of constitutional due process.").

5                **3.**    __Plaintiffs Have Not Stated a Takings Claim__

6        With respect to the uncompensated taking and inverse condemnation[3] claims,

7  the SAC substitutes the County for the City in name alone and makes no other

8  amendments.  (SAC ¶¶ 163-65.)  This shows how meritless Plaintiffs' claims are.  In

9  any event, the County's discretionary spending decisions cannot be deemed a

10  taking.  *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922) ("Government hardly

11  could go on if to some extent values incident to property could not be diminished

12  without paying for every such change in the general law.").

13        Moreover, to state a taking or inverse condemnation claim, a plaintiff must

14  allege both that (1) the plaintiff has a property interest; and (2) the government has

15  taken that property for which compensation is due.  *See Enqquist v. Or. Dep't of*

16  *Agric.*, 478 F.3d 985, 1002 (9th Cir. 2007).  Plaintiffs' claims fail on both parts.

17        *First*, "'only persons with a valid property interest at the time of the taking are

18  entitled to compensation.'"  *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d

19  1206, 1212 (Fed. Cir. 2005) (citation omitted).  To qualify, a private property

20  interest cannot be "speculative," "uncertain," or "discretionary."  *Engquist*, 478 F.3d

21  at 1003.  But the SAC alleges that PEH are located "on the sidewalks, beaches, and

22  under overpasses" and acknowledges that these locations are *not* on the Plaintiffs'

23  private property.  (*See, e.g.*, SAC ¶¶ 2, 9, 81(i), 83-87, 89-90, 111, 113, 115.)

24  Plaintiffs cannot have a private property interest in public locations.  *See Air*

25  _____

26  [3] Save for a difference not relevant here, the California Supreme Court has held that takings claims under California and U.S. Constitutions are "construed …

27  congruently."  *San Remo Hotel L.P. v. City And County of San Francisco*, 27 Cal.

28  4th 643, 663-64 (2002).

1  *Pegasus*, at 1217-18 (plaintiff has no private property interest in the navigable

2  airspace because it is considered public property).

3       *Second*, even if Plaintiffs could establish the requisite private property

4  interest, their claims still fail.  "[A] property loss compensable as a taking only

5  results when the government intends to invade a protected property interest or the

6  asserted invasion is the 'direct, natural, or probable result of an authorized activity

7  and not the incidental or consequential injury inflicted by the action.'"  *Ridge Line,*

8  *Inc. v. United States*, 346 F.3d 1346, 1355-56 (Fed. Cir. 2003) (citation omitted).

9  Thus, a takings claim must be predicated on actions by government, not third

10 parties.  *See*, *e.g.*, *Navajo Nation v. United States*, 631 F.3d 1268, 1274, 1276 (Fed.

11 Cir. 2011) (rejecting takings claim because no credible evidence showed the

12 government directed or encouraged third parties' conduct, so it could not support a

13 takings claim); *Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 537 (2005) ("The

14 paradigmatic taking requiring just compensation is a direct *government*

15 appropriation … of private property." (emphasis added)).  Even where a government

16 agency engages in action it knows "will pave the way for another to lose property at

17 the hands of a third party," "a taking claim will not lie."  *Casa de Cambio Comdiv*

18 *S.A. de C.V. v. United States*, 48 Fed. Cl. 137, 142 (Fed. Cl. 2000), *aff'd*, 291 F.3d

19 1356 (Fed. Cir. 2002).  Plaintiffs' claims allege only injury caused by third parties—

20 the PEH on public property near Plaintiffs' properties.  This is not "direct, natural,

21 or probable" action by *the County*.

22       Even if both elements are met (they are not), the claims still fail.  For one

23 thing, all of the Plaintiffs and LA Alliance members identified in the SAC own

24 property in the *City of Los Angeles—outside of the County's jurisdiction.  See Cty.*

25 *Sanitation Dist. No. 2 v. County of Kern*, 127 Cal. App. 4th 1544, 1612 (2005)

26 (cities "are necessarily outside the jurisdiction and authority of County; County's

27 authority extends only to the unincorporated areas").  For another, "[i]solated

28 physical invasions, not undertaken pursuant to a granted right of access, are properly

613203.4                                    24
DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 68

1  assessed as individual torts rather than appropriations of a property right." *Cedar*

2  *Point Nursery v. Hassid*, 141 S. Ct. 2063, 2078 (2021).  Thus, to the extent PEH

3  have physically "invaded" Plaintiffs' properties, Plaintiffs' claims lie in tort against

4  those individuals, not the County.

5       **C.**    **Plaintiffs' Remaining State Law Claims Fail As A Matter Of Law**

6       Plaintiffs' federal claims are flawed, so the Court should decline supplemental

7  jurisdiction over the state law claims.  28 U.S.C. § 1367(a).  Indeed, because

8  Plaintiffs lack Article III standing, the Court *cannot* adjudicate the state law claims.

9  *Herman Family Revocable Tr. v. Teddy Bear*, 254 F.3d 802, 805 (9th Cir. 2001).

10       In any event, as explained below, the state law claims are untenable.

11       **1.**    **Plaintiffs Fail to Identify a Mandatory Duty**

12       The SAC alleges the County violated a "mandatory duty" under WIC section

13  17000, which provides that a county "shall relieve and support" indigent residents.

14  (SAC ¶¶ 122-32.)  Section 17000 does not require counties to cover "all unmet

15  needs," *Hunt*, 21 Cal. 4th at 1014, only to provide "last resort" financial assistance

16  and "medically necessary care," *County of San Diego v. State*, 15 Cal. 4th 68, 92,

17  104-05 (1997) (citations omitted).

18       Section 17000 forecloses Plaintiffs' theory that "beds themselves are

19  medically necessary." (SAC ¶ 130.)  WIC confers broad discretion on counties to

20  determine the form and structure of relief they provide.  *Scates v. Rydingsword*, 229

21  Cal. App. 3d 1085, 1089 (1991).  The statute does not mandate particular forms of

22  assistance, such as provision of beds for those not requiring acute inpatient care.[4]

23       Plaintiffs cite to WIC section 10000 (SAC ¶ 127), which is a "general

24  statement of policy" that "aid shall be administered and services provided promptly

25

26

27

28

---

[4] A state appellate court rejected the argument that counties have a mandatory duty
under section 17000 to provide shelter for every homeless person. *See Clinton v.
Cody*, 2019 WL 2004842, at *9 (Cal. Ct. App. May 7, 2019).

613203.4

25

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 69

and humanely." *Marquez v. State Dep't of Health Care Servs*., 240 Cal. App. 4th 87, 120 (2015) (citations omitted). This provision "does not set forth any specific duty or course of conduct an agency must take, but leaves to the agency's discretion how to pursue the policy goal." *Id.*

As discussed above, none of the other WIC provisions give rise to a mandatory duty for the County. (*See supra*, at 19.) Section 5600 describes only objectives the County "should" try to meet "to the extent resources are available." *See* WIC §§ 5600.3, 5600.4, 5600.6. Section 14000 provides for limited services "to the extent practicable." *Id*. § 14000; *see id.* § 14005.36(d) ("This section shall be implemented *only to the extent* that federal financial participation … is available." (emphasis added)).

Likewise, with the exception of funding adult protective services (which Plaintiffs do not claim are at issue), WIC section 13000 merely sets forth goals that the County "may expend" funds to meet. Thus, while the County is working hard to address the homelessness crisis, it is not subject to any mandatory statutory duty.

Moreover, section 17000 only applies when an indigent person is "not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." § 17000. No Plaintiff alleges they are indigent and deprived of medically necessary care or general assistance. Thus, as the Ninth Circuit already held, Plaintiffs lack standing. *LA All.*, 14 F.4th at 958-59. The SAC fails to cure this fatal deficiency. (*See* SAC ¶¶ 122-32.)

## 2. <u>Plaintiffs Have Not Stated a Claim for Nuisance</u>

A nuisance is a non-trespassory invasion of a person's interest in the private use and enjoyment of land. Cal. Civ. Code § 3479; *San Diego Gas & Elec. Co. v. Superior Court*, 13 Cal. 4th 893, 937 (1996). A public nuisance is "one which affects at the same time an entire community or neighborhood, or any considerable number of persons." Cal. Civ. Code § 3480. A private nuisance is any nuisance not otherwise defined as a public nuisance. *Id.* § 3481.

613203.4                                    26

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 70

1    Claims for public and private nuisance must establish causation.  "[T]he

2  critical question is *whether the defendant created or assisted in the creation of the*

3  *nuisance*."  *See Citizens for Odor Nuisance Abatement v. City of San Diego*, 8 Cal.

4  App. 5th 350, 359 (2017) (citation omitted); *Resolution Tr. Corp. v. Rossmoor*

5  *Corp*., 34 Cal. App. 4th 93, 99 (1995) (defendant must be an "active participant" in

6  the nuisance).  Causation requires (a) an act, or (b) a failure to act where the actor is

7  under a duty to take positive action to prevent or abate the nuisance.  *Citizens for*

8  *Odor*, at 359.

9    The SAC alleges that third-party PEH are breaking the law and that their

10 waste, trash, and encampments are harming Plaintiffs' "health and welfare."  (SAC

11 ¶ 136.)  But the County did not create the alleged nuisance—the waste, disease,

12 fires, or crime.  Nuisance liability cannot extend "to damage suffered as a proximate

13 result of the independent intervening acts of others."  *Martinez v. Pac. Bell*, 225 Cal.

14 App. 3d 1557, 1565 (1990).  Moreover, the alleged nuisances caused by PEH

15 entirely within the incorporated boundaries of the City are outside of County

16 jurisdiction.  *See Cty. Sanitation Dist. No. 2*, 127 Cal. App. 4th at 1612.

17   Plaintiffs' theory that PEH are themselves an actionable, area-wide nuisance

18 is baseless: The Ninth Circuit has repeatedly affirmed that PEH have rights to exist

19 in the streets with their personal property.  *E.g.*, *Lavan v. City of Los Angeles*, 693

20 F.3d 1022, 1032 (9th Cir. 2012); *Jones v. City of Los Angeles*, 444 F.3d 1118, 1132-

21 37 (9th Cir. 2006), *vacated following settlement by* 505 F.3d 1006 (9th Cir. 2007).

22   **3.    Plaintiffs Fail to State a Claim for Waste of Public Resources**

23   Plaintiffs lack standing to assert their Sixth Cause of Action under Code of

24 Civil Procedure section 526a for "taxpayer waste."  Section 526a does not

25 automatically confer Article III standing.  *Cantrell v. City of Long Beach*, 241 F.3d

26 674, 683-84 (9th Cir. 2001).  Plaintiffs' theory is that, *if* the County had made better

27 use of its funds, it could have constructed enough homeless shelters such that, *if* the

28 City enforced its anti-vagrancy laws, Skid Row encampments would be eliminated.

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

1    This tenuous, speculative claim is not a legitimate "pocketbook" injury traceable to

2    the County or redressable by the Court.  *California*, 141 S. Ct. at 2114.

3            Moreover, "[a] cause of action under Code of Civil Procedure section 526a

4    will not lie where the challenged governmental conduct is legal."  *Coshow v. City of*

5    *Escondido*, 132 Cal. App. 4th 687, 714 (2005).  The County's expenditures to help

6    PEH are undeniably legal.  Plaintiffs attempt to obtain sweeping injunctive relief

7    based on their belief that the County has "misused and wasted" taxpayer funds on

8    addressing homelessness.  (SAC ¶ 145.)  Yet, Plaintiffs admit the County's budget

9    allocates $466 million in Measure H funds for combatting homelessness through

10   housing and supportive services.  (*Id*. ¶ 59.)  Plaintiffs have no viable waste claim.

11           Plaintiffs' allegation that "alternative available measures" would be more

12   "effective in addressing the crisis" is merely a policy disagreement.  (SAC ¶ 145.)

13   Section 526a is not a tool for private citizens to dictate public policy.  *See Coshow*,

14   132 Cal. App. 4th at 714 ("[A] taxpayer is not entitled to injunctive relief . . . where

15   the real issue is a disagreement with [how] government has chosen to address a

16   problem"); *Schmid v. City & County of San Francisco*, 60 Cal. App. 5th 470, 495-96

17   (2021) ("A claim under [526a] does not lie to attack exercises of administrative

18   discretion and may not be employed to interfere with policymaking.").

19           **4.    Statutory Immunity Bars Plaintiffs' Claims**

20           Under California law, public entities have absolute immunity unless

21   "otherwise provided by statute."  Cal. Gov't Code § 815.  Governmental immunity

22   shields public entities from claims based on "adopting or failing to adopt an

23   enactment" or "failing to enforce any law," *id.* § 818.2, and "exercise[s] of . . .

24   discretion . . ., whether or not such discretion be abused," *id.* § 820.2.  *See Taylor v.*

25   *Buff*, 172 Cal. App. 3d 384, 390 (1985) (budgetary and fiscal policy, allocation of

26   finite resources, and choices between competing policy objectives are

27   "discretionary" activities protected by governmental immunity); *HFH, Ltd. v.*

28   *Superior Court*, 15 Cal. 3d 508, 519 (1975) ("basic policy decisions" immune from

613203.4                                                 28
DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

ER 72

1   "governmental tort liability" (citation omitted)).

2        Plaintiffs' request for injunctive relief does not change the immunity analysis.

3   *See Schooler v. State*, 85 Cal. App. 4th 1004, 1013-15 (2000) (rejecting plaintiff's

4   argument that injunctive relief claims were not subject to immunity).  Although

5   Government Code section 814 states that immunity does not affect "the right to

6   obtain relief other than money or damages," this provision does not "circumvent

7   either its own underlying legislative policy or that of another section in the Tort

8   Claims Act." *Id.* at 1013.  The mandatory injunctive relief Plaintiffs seek would

9   impose substantial financial burdens—hundreds of millions of dollars—on the

10  County as real as money damages; it is thus barred.  *See id.* at 1014-15.

11       Moreover, section 818.2 "recognizes that the wisdom of legislative or quasi-

12  legislative action . . . should not be subject to review" by the courts.  Cal. Gov't

13  Code § 818.2 (Law Revision Comm'n Comments).  The County dedicates

14  tremendous resources to addressing the complex homelessness crisis—which

15  requires that it weigh policy options and carefully allocate limited resources.  These

16  basic policy decisions regarding law enforcement and municipal services are the

17  crux of the immunity doctrine.  *Freeny v. City of San Buenaventura*, 216 Cal. App.

18  4th 1333, 1341 (2013); *see also Taylor*, 172 Cal. App. 3d at 390 ("A decision

19  involving the allocation of limited funds is a purely discretionary one . . . 'and thus

20  immune from liability.'" (citation omitted)).

21       The SAC asks the Court to substitute its judgment for these fundamental

22  County policy choices.  But it is not the Court's role to dictate local policy and

23  budget priorities by usurping the County's discretionary decisions.  Immunity bars

24  Plaintiffs' claims.  *See Schooler*, 85 Cal. App. 4th at 1014 ("[A]ny 'relief' allowed

25  under section 814 cannot create duties that immunity provisions guard against.").

26  **V.**   **<u>CONCLUSION</u>**

27       For the reasons set forth above, the County respectfully requests that the

28  Court grant the Motion in its entirety.

1 | DATED:  May 3, 2023                  MILLER BARONDESS, LLP

2

3

4                                        By:        /s/ Mira Hashmall

5                                             MIRA HASHMALL
                                              Attorneys for Defendant
6                                             COUNTY OF LOS ANGELES

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

613203.4                              30

1    UMHOFER, MITCHELL & KING LLP
     Matthew Donald Umhofer (SBN 206607)
2    Elizabeth A. Mitchell (SBN 251139)
     11766 Wilshire Blvd., Suite 900
3    Los Angeles, California 90025
     Telephone: 213-394-7979
4    Facsimile: 213-529-1027
     Email: matthew@umklaw.com
5    Email: elizabeth@umklaw.com

6
7    *Attorneys for Plaintiffs*

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA
10

11   LA ALLIANCE FOR HUMAN              Case No. 2:20-cv-02291-DOC-KES
12   RIGHTS, *et al.*,

13          Plaintiffs,                 Assigned to Judge David O. Carter

14      v.                              **PLAINTIFFS' OPPOSITION TO
15                                      DEFENDANT COUNTY OF LOS
                                        ANGELES'S EX PARTE
16   CITY OF LOS ANGELES, *et al.*,     APPLICATION FOR STAY**

17
18          Defendants.

19
20
21
22
23
24
25
26
27
28

     _OPPOSITION TO COUNTY OF LOS ANGELES'S EX PARTE APPLICATION_

ER 75

PLEASE TAKE NOTICE that Plaintiffs in this matter hereby oppose the County's *ex parte* application for a stay of this case pending a meritless appeal.[1]

What the County insists is a constitutional question is in fact a simple contract issue.  Plaintiffs and the County sought the court's approval of a Settlement Agreement that contained the following language: "[T]his Agreement shall become effective and operative on the date that the District Court enters an Order dismissing, with prejudice, the Action, subject to the court's continuing enforcement in accordance with Section P of this Agreement."  (ECF No. 485-1, Settlement Agreement, paragraph A(1).)[2]  In other words, the County expressly agreed that the Settlement Agreement would not become binding unless the Court (i) dismissed the case and (ii) agreed to "continuing enforcement."  It is undisputed that the Court did neither.  Because this express condition precedent was not satisfied, the Settlement Agreement never became "effective and operative."  See Roth v. Garcia Marquez, 942 F.2d 617, 626 (9th Cir. 1991) (A contract in which the defendant's "signature was a condition precedent to the forming of a binding contract. Since he never signed, no contract was formed.").  Without the Court's consent to "continuing enforcement," there is no deal, and no grounds for a stay or appeal.

Pretending that this contractual, court-enforcement condition doesn't exist, the County creates an alternative reality where the parties reached a purely private agreement that had no condition precedent and left the Court with no choice but to accept the deal and dismiss this case.  But ignoring reality is not a basis to stay a federal case.

There is no legitimacy to the County's lament that the Court somehow imposed additional terms on a private deal between the parties.  The Settlement Agreement expressly contemplated the Court's retention of jurisdiction to enforce the agreement.

---

[1] The Plaintiffs take no position on the request for expedited briefing.

[2] The plaintiffs and the County later submitted to the Court an addendum to the Settlement Agreement (ECF No. 533-2), which altered certain terms in the original Settlement Agreement but left untouched paragraph A(1).

1

*OPPOSITION TO COUNTY OF LOS ANGELES'S EX PARTE APPLICATION*

The Supreme Court itself has made it clear that under these circumstances,

> [w]hen the dismissal is pursuant to Federal Rule of Civil
> Procedure 41(a)(2), which specifies that the action "shall not be
> dismissed at the plaintiff's instance save upon order of the court
> and upon such terms and conditions as the court deems proper,"
> the parties' compliance with the terms of the settlement contract
> (or the court's "retention of jurisdiction" over the settlement
> contract) may, **in the court's discretion**, be one of the terms set
> forth in the order.

Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381–82 (1994) (emphasis added).[3]  In other words, "a court is under no obligation to retain jurisdiction over a settlement agreement, but may do so if it chooses."  Brass Smith, LLC v. RPI Indus., Inc., 827 F. Supp. 2d 377, 381 (2011).  Contrary to the County's belief,

> Parties, even if they mutually agree, do not have a right to
> incorporation of all their settlement terms in a dismissal order,
> since "nowhere in [Kokkonen] does it say that a court must
> allow such an incorporation."  It is within the Court's discretion
> to decline "the invitation to place the judicial stamp of authority
> on whatever private arrangements have been made between the
> parties."

Id. (quoting Glaxo Grp. Ltd. v. Dr. Reddy's Labs., Ltd., 325 F. Supp. 2d 502, 506 (D.N.J. 2004).  This is what the County misses when it complains that the Court was imposing its own conditions on a purely private deal.  It was never a private deal.  It called for the Court's retention of jurisdiction to enforce the settlement, which the

---

[3] The Ninth Circuit "has long held that the decision to grant a voluntary dismissal under Rule 41(a)(2) is addressed to the sound discretion of the District Court, and its order will not be reversed unless the District Court has abused its discretion." Hamilton v. Firestone Tire & Rubber Co., 679 F.2d 143, 145 (9th Cir. 1982).

1   Court was under no obligation to give.[4]  And the Court acted within the bounds of its

2   discretion in indicating what kind of deal that it might agree to retain jurisdiction over.

3       The County also proclaims that it would be prejudiced without a stay because it

4   would have to defend itself in court, but "it is clear that the mere inconvenience of

5   defending another lawsuit does not constitute plain legal prejudice." Hamilton v.

6   Firestone Tire & Rubber Co., 679 F.2d 143, 145 (9th Cir. 1982).  It is understandable

7   but unfortunate that the County would seek to avoid litigation over its failure to meet

8   the needs of those living and dying on the streets of Los Angeles—particularly those

9   experiencing mental health challenges and substance use disorder.  This case has been

10   pending for three years, and the County still refuses to create the beds and commit to

11   the accountability that would resolve it.  It is time for this case to proceed.

12                  Respectfully submitted,

14   Dated: April 29, 2023             */s/ Matthew Donald Umhofer*

15                          UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer
Elizabeth A. Mitchell

17                          *Attorneys for Plaintiffs*

---

27      [4] In its Motion to Certify, the County evades controlling in-circuit precedent concerning the district court's broad discretion under Rule 41(a)(2), and instead embraces out-of-circuit cases, none of which involved a settlement conditioned on a court's acceptance of continued jurisdiction.

<div align="center">3</div>

*OPPOSITION TO COUNTY OF LOS ANGELES'S EX PARTE APPLICATION*

1  DAWYN R. HARRISON, *County Counsel* (State Bar No. 173855)
   dharrison@counsel.lacounty.gov
2  JENNIFER A.D. LEHMAN, *Assistant County Counsel* (State Bar No. 191477)
   jlehman@counsel.lacounty.gov
3  ANA WAI-KWAN LAI, *Senior Deputy County Counsel* (State Bar No. 257931)
   alai@counsel.lacounty.gov
4  OFFICE OF COUNTY COUNSEL
5  500 West Temple Street, Suite 468
   Los Angeles, California 90012
6  Telephone:   (213) 974-1830
7  Facsimile:    (213) 626-7446

8  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
9  MIRA HASHMALL (State Bar No. 216842)
   mhashmall@millerbarondess.com
10 MILLER BARONDESS, LLP
11 2121 Avenue of the Stars, Suite 2600
   Los Angeles, California 90067
12 Telephone:   (310) 552-4400
   Facsimile:    (310) 552-8400
13
14 Attorneys for Defendant
   COUNTY OF LOS ANGELES
15

16                **UNITED STATES DISTRICT COURT**

17        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

18

19 LA ALLIANCE FOR HUMAN           **CASE NO. 2:20-cv-02291 DOC (KES)**
   RIGHTS, et al.,
20                                 **DEFENDANT COUNTY OF**
21           Plaintiffs,           **LOS ANGELES' *EX PARTE***
                                   **APPLICATION FOR STAY AND**
22      v.                         **EXPEDITED BRIEFING**
                                   **SCHEDULE**
23 CITY OF LOS ANGELES, et al.,
                                   Assigned to the Hon. David O. Carter
24           Defendants.           and Magistrate Judge Karen E. Scott
25

26

27

28

612259.4

DEFENDANT COUNTY OF LOS ANGELES' *EX PARTE* APPLICATION FOR STAY AND
EXPEDITED BRIEFING SCHEDULE

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Defendant County of Los Angeles (the "County") hereby applies to the Court *ex parte* for an order staying the case until the County is able to seek appellate review of the Court's April 20, 2023 Minute Order (the "April 20 Order"). In the April 20 Order, the Court denied the joint stipulation for dismissal with prejudice submitted by the County and Plaintiffs LA Alliance for Human Rights, et al. ("Plaintiffs"). The County is filing a motion to certify the April 20 Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) (the "Motion for Certification"), which the County seeks to have expedited.

Good cause supports this *ex parte* application. The County needs expedited *ex parte* relief because, in the absence of an immediate stay, it will need to respond to Plaintiffs' Second Amended Complaint by the May 3 deadline set by the Court. The County satisfies all four factors considered by courts when evaluating whether to grant a stay of proceedings pending appeal. *First*, the County is likely to succeed on the merits of its appeal because there is no justiciable controversy between the parties, and the Court exceeded its legal and equitable powers by forcing the parties to litigate a case they have already fully resolved. *Second*, the County will be irreparably harmed absent a stay because it will be forced to divert resources to litigating this matter. *Third*, the stay will not injure any other interested parties because all parties urged this Court to approve the stipulated dismissal. *Fourth*, the public interest favors the stay because there is a strong public policy favoring the economic use of judicial resources, and requiring the parties to litigate a matter that has already been settled between them is a waste of valuable judicial resources.

There is also good cause to expedite the resolution of the County's Motion for Certification. By Local Rule, the County's Motion for Certification would ordinarily not be heard until June 5, 2023, over a month from now and after the Rule 16 Scheduling Conference set for May 9, 2023. The County respectfully requests that the Court: (1) set the County's Motion for Certification for hearing on

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 · LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 · FAX: (310) 552-8400

1  May 9, 2023; and (2) provide that any responses to the Motion be filed by May 5,

2  2023.  To expedite the resolution of the Motion, the County will forego an

3  opportunity to file reply papers before the May 9 hearing.

4  This *ex parte* application is based on the Application, the Memorandum of

5  Points and Authorities, the Declaration of Mira Hashmall and exhibits thereto, the

6  pleadings and records on file in this action, and any further evidence or argument

7  received by the Court in connection with the Application.

8  **<u>Local Rule 7-19 Compliance</u>**

9  Pursuant to Local Rule 7-19, on April 25, 2023, the County provided notice

10  of its intent to file this *ex parte* application to Plaintiffs and Intervenors via email.

11  (Declaration of Mira Hashmall ("Hashmall Decl.") ¶ 2 & Ex. A.)  The parties

12  further discussed the *ex parte* application during a teleconference on April 27, 2023.

13  (*Id.* ¶¶ 3-5.)  Plaintiffs indicated that they did not oppose expedited resolution of the

14  County's Motion for Certification and that they opposed the application for a stay.

15  (*Id.* ¶ 3.)  Intervenors stated that they would not oppose the application for a stay or

16  expedited briefing on the County's Motion for Certification.  (*Id.* ¶ 4.)

17  Counsel for Plaintiffs and Intervenors are identified below.

18  Matthew Donald Umhofer
   Elizabeth A. Mitchell
19  UMHOFER, MITCHELL & KING LLP
   11766 Wilshire Blvd., Suite 900
20  Los Angeles, CA 90025
   Tel.:  213-394-7929
21  Email: matthew@umklaw.com
22  Email: elizabeth@umklaw.com

23  Carol A. Sobel
24  Weston C. Rowland
   LAW OFFICE OF CAROL SOBEL
25  725 Arizona Avenue, Suite 300
   Santa Monica, CA 90401
26  Tel.: 310-393-3055
27  Email: carolsobellaw@gmail.com

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

612259.4

3

1  Shayla R. Myers
2  LEGAL AID FOUNDATION OF LOS ANGELES
   7000 South Broadway
3  Los Angeles, CA 90003
   Tel.: 213-640-3983
4  Email: smyers@lafla.org

5  DATED:  April 28, 2023          MILLER BARONDESS, LLP

6

7

8  By:      /s/ Mira Hashmall
            MIRA HASHMALL
9           Attorneys for Defendant
10          COUNTY OF LOS ANGELES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

612259.4                           4

DEFENDANT COUNTY OF LOS ANGELES' *EX PARTE* APPLICATION FOR STAY AND
                     EXPEDITED BRIEFING SCHEDULE

**ER 82**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................ 8

II.    PROCEDURAL HISTORY .............................................................. 9

III.   LEGAL STANDARD ...................................................................... 10

IV.    *EX PARTE* RELIEF IS WARRANTED .......................................... 11

    A.    The County Is Likely To Succeed On The Merits ................................. 11

    B.    The County Will Be Irreparably Harmed Absent A Stay ..................... 12

    C.    A Stay Will Not Prejudice Any Other Interested Parties ..................... 13

    D.    The Public Interest Supports A Stay ....................................................... 14

V.     THE COUNTY REQUESTS AN EXPEDITED HEARING AND BRIEFING SCHEDULE FOR ON ITS MOTION FOR CERTIFICATION ............................................................................ 15

VI.    CONCLUSION ................................................................................ 16

# TABLE OF AUTHORITIES

**Page**

## CASES

*Asis Internet Servs. v. Active Response Grp.*,
   2008 WL 4279695 (N.D. Cal. Sept. 16, 2008) ...................................10, 11, 14

*Ass'n of Irritated Residents v. Fred Schakel Dairy*,
   634 F. Supp. 2d 1081 (E.D. Cal. 2008)................................................8, 11, 14

*Casas v. Victoria's Secret Stores, LLC*,
   2015 WL 13446989 (C.D. Cal. Apr. 9, 2015)......................................10, 11, 14

*CMAX, Inc. v. Hall*,
   300 F.2d 265 (9th Cir. 1962) .......................................................................8, 15

*Envtl. World Watch, Inc. v. Walt Disney Co.*,
   2014 WL 10979864 (C.D. Cal. Apr. 2, 2014)................................................11

*Filtrol Corp. v. Kelleher*,
   467 F.2d 242 (9th Cir. 1972) .......................................................................10

*Finder v. Leprino Foods Co.*,
   2017 WL 1355104 (E.D. Cal. Jan. 20, 2017)................................................13

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
   2015 WL 4397175 (C.D. Cal. June 8, 2015) ....................................10, 13, 14

*Frew ex rel. Frew v. Hawkins*,
   540 U.S. 431 (2004) .......................................................................................15

*Horne v. Flores*,
   557 U.S. 433 (2009) .......................................................................................15

*LA Alliance for Human Rights v. Los Angeles County*,
   14 F.4th 947 (9th Cir. 2021).........................................................................12

*Lair v. Bullock*,
   697 F.3d 1200 (9th Cir. 2012).......................................................................12

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011)....................................................................10, 12

*Leyva v. Certified. Grocers of Cal., Ltd.*,
   593 F.2d 857 (9th Cir. 1979).........................................................................10

*Mediterranean Enters., Inc. v. Ssangyong Corp.*,
   708 F.2d 1458 (9th Cir. 1983)........................................................................10

*Nken v. Holder*,
   556 U.S. 418 (2009) .......................................................................................10

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ............................................................ 14

*Umatilla Waterquality Protective Ass'n, Inc. v. Smith Frozen Foods, Inc*.,
    962 F. Supp. 1312 (D. Or. 1997) ........................................... 11

*United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs*.,
    2019 WL 6973547 (C.D. Cal. Oct. 8, 2019) ........................ 10, 13, 14

## STATUTES

28 U.S.C. § 1292(b) ................................................................. passim

## RULES

Fed. R. Civ. P. 26 ..................................................................... 13

Fed. R. Civ. P. 41(a)(2) ........................................................... 9, 12

## OTHER AUTHORITIES

U.S. Const. art. III ................................................................... 12, 14

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' *EX PARTE* APPLICATION FOR STAY AND
EXPEDITED BRIEFING SCHEDULE

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   <u>INTRODUCTION</u>

On April 20, 2023, the Court denied the Plaintiffs' and County's stipulated dismissal of this action in its entirety based on its characterization of the parties' binding settlement agreement—committing over $1.1 billion in resources to the unhoused—as an "aspirational document" that was undeserving of the "credibility of the federal court." (Declaration of Mira Hashmall Ex. D at 23-25.) Plaintiffs, the County, and Intervenors—nonprofit community organizations advocating on behalf of the unhoused—urged the Court to dismiss the action at the April 20 hearing. Because the Court lacks "trust" in the political "process," it refused to do so, conditioning dismissal on the addition of settlement terms giving the Court powers of monitoring that the *Court* wants. (*Id.* at 32, 42 ["You get me that same paragraph that the City had, oversight and enforcement, let's talk. But until then, I said it before, and I'm not bargaining with you, I meant it."].)

The County requests a stay of proceedings while seeking certification for interlocutory appellate review of the Court's April 20 Order pursuant to 28 U.S.C. § 1292(b), for the reasons outlined in the County's concurrently-filed motion. This Court has broad discretion to grant such a stay, especially in the context of interlocutory appellate review under Section 1292(b). Courts routinely do so for the purpose of promoting "economy of time and effort for [themselves], for counsel, and for litigants." *Ass'n of Irritated Residents v. Fred Schakel Dairy*, 634 F. Supp. 2d 1081, 1094 (E.D. Cal. 2008) (citation omitted); *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962).

Absent a stay, the parties will need to engage in substantial, unrecoverable, and wasteful discovery and motion practice on matters that could be mooted by appellate review. There is no countervailing harm to Plaintiffs or Intervenors, and staying the proceedings would conserve judicial resources and promote the most efficient resolution of this case. Accordingly, the County respectfully requests that

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  the Court enter a stay while the Court considers the County's request for

2  interlocutory appeal and any further related proceedings that take place in the Ninth

3  Circuit Court of Appeals.

4        As this Court is well aware, the County has pledged an unprecedented

5  $1.1 billion in public funds and resources to address and prevent homelessness in

6  connection with this litigation, after reaching a fully-agreed settlement with

7  Plaintiffs more than six months ago, and again this month at the Court's urging.  It is

8  the County's view that this Court exceeded its authority when it rejected the

9  stipulated dismissal of this action with prejudice, and the County intends to pursue

10  all available appellate redress to bring this fully-settled litigation to a close.  The

11  County does not take these steps lightly.

12        The County respectfully requests that this Court (1) set an expedited briefing

13  schedule and hearing on the Motion for Certification of This Court's April 20, 2023

14  Order Pursuant to 28 U.S.C. § 1292(b); and (2) stay this case pending appeal.

15  **II.**    **PROCEDURAL HISTORY**

16        While the procedural history in this litigation is long and complex, the

17  relevant facts for purposes of this application are straightforward.  Plaintiffs and the

18  County entered a settlement agreement and stipulated to dismiss this action with

19  prejudice under Federal Rule of Civil Procedure 41(a)(2) more than six months ago.

20  (Hashmall Decl. Ex. B.)  The parties subsequently agreed to resume negotiations in

21  good faith, which resulted in an addendum to the agreement and a *second* stipulated

22  request to dismiss this action with prejudice in April 2023.  (*Id*. Ex. C.)

23        As detailed in the County's motion to certify the April 20 Order for

24  interlocutory appeal, this Court has repeatedly attempted to condition approval of

25  the stipulated dismissal on the parties adding new terms to their private settlement

26  agreement and has insisted on monitoring powers that are not agreed to by the

27  parties.  (Dkt. 544.)  On April 20, 2023, this Court made good on its threat that any

28  settlement agreement that did not include such terms would be "dead on arrival" and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

612259.4          9

1   denied the parties' stipulated dismissal, setting aggressive deadlines to respond to

2   Plaintiff's second amended complaint and engage in a scheduling conference.

3   (Hashmall Decl. Ex. E; *id*. Ex. D at 53-54.)

4   **III.   LEGAL STANDARD**

5          "A district court has authority to stay proceedings pending a § 1292(b) appeal

6   both under § 1292(b) itself and under the court's inherent authority to manage its

7   docket."  *Casas v. Victoria's Secret Stores, LLC*, 2015 WL 13446989, at *5

8   (C.D. Cal. Apr. 9, 2015).  "When considering a stay pending appeal pursuant to

9   § 1292(b), the Court has broad discretion to decide whether a stay is appropriate to

10  'promote economy of time and effort for itself, for counsel, and for litigants.'"

11  *Asis Internet Servs. v. Active Response Grp.*, 2008 WL 4279695, at *3–4 (N.D. Cal.

12  Sept. 16, 2008) (quoting *Filtrol Corp. v. Kelleher*, 467 F.2d 242, 244 (9th Cir.

13  1972)); *accord Casas*, 2015 WL 13446989, at *5; *see also Mediterranean Enters.,*

14  *Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983) ("[A] trial court may,

15  with propriety, find it is efficient for its own docket and the fairest course for the

16  parties to enter a stay of an action before it, pending resolution of independent

17  proceedings which bear upon the case." (quoting *Leyva v. Certified. Grocers of Cal.,*

18  *Ltd*., 593 F.2d 857, 863–64 (9th Cir. 1979))).

19         In evaluating a stay request, courts are guided by the factors set forth in

20  *Nken v. Holder*, 556 U.S. 418 (2009), which are: "(1) whether the stay applicant has

21  made a strong showing that he is likely to succeed on the merits; (2) whether the

22  applicant will be irreparably injured absent a stay; (3) whether issuance of the stay

23  will substantially injure the other parties interested in the proceeding; and (4) where

24  the public interest lies."  *Leiva-Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011)

25  (per curiam) (quoting *Holder*, 556 U.S. at 434); *accord Flo & Eddie, Inc. v. Sirius*

26  *XM Radio, Inc.*, 2015 WL 4397175, at *1 (C.D. Cal. June 8, 2015); *United States*

27  *ex rel. Integra Med Analytics LLC v. Providence Health & Servs*., 2019 WL

28  6973547, at *6 (C.D. Cal. Oct. 8, 2019).

DEFENDANT COUNTY OF LOS ANGELES' *EX PARTE* APPLICATION FOR STAY AND
EXPEDITED BRIEFING SCHEDULE

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

1   A strict adherence to these factors is not always required in the Section

2   1292(b) context, however; and courts routinely stay proceedings upon finding that a

3   certification under Section 1292(b) is warranted and that efficiency and judicial

4   economy would be best achieved by a stay.  *See Asis*, 2008 WL 4279695, at *4;

5   *Ass'n of Irritated Residents*, 634 F. Supp. 2d at 1094; *Casas*, 2015 WL 13446989, at

6   *5; *Envtl. World Watch, Inc. v. Walt Disney Co*., 2014 WL 10979864, at *4 (C.D.

7   Cal. Apr. 2, 2014); *Umatilla Waterquality Protective Ass'n, Inc. v. Smith Frozen

8   Foods, Inc*., 962 F. Supp. 1312, 1323 (D. Or. 1997).

9   **IV.    *EX PARTE* RELIEF IS WARRANTED**

10   While the County is pursuing all available appellate remedies, this Court

11   should preserve the status quo and issue a stay.  This Court has exercised that power

12   liberally in this litigation already and stayed the action several times; as a result,

13   even though this litigation has been pending for more than three years, the Court has

14   never even resolved motions to dismiss the pleadings.  (Dkt. 287, 384, 388, 449,

15   473, 507.)

16   Here *all* four factors favor a stay, as (1) the County's Motion for Certification

17   raises serious legal questions; (2) proceeding without a stay may result in

18   substantial, unrecoverable, and wasteful motion practice and discovery; (3) neither

19   Plaintiffs nor Intervenors will be injured in any way by a stay; and (4) efficient use

20   of judicial resources would serve the public interest.  Accordingly, the County

21   requests that the Court stay the proceedings while its Certification Motion and

22   related appellate proceedings are resolved.  *Ex parte* relief to decide this application

23   for stay is warranted, given that the Court has set a May 3, 2023 deadline to respond

24   to the Second Amended Complaint.  The parties should not be forced to expend

25   significant resources on dispositive motion practice in a fully-settled action.

26   **A.    The County Is Likely To Succeed On The Merits**

27   The County is likely to succeed on the merits of its appellate challenge for all

28   the reasons stated in its motion to certify the April 20 Order for interlocutory appeal.

Miller Barondess, LLP

ATTORNEYS AT LAW
2121 Avenue of the Stars, Suite 2600  Los Angeles, California 90067
Tel: (310) 552-4400  Fax: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   (Dkt. 544.)  There is no longer a justiciable case or controversy between the parties.

2   Where a stipulated dismissal of a case is with prejudice and does not injure the

3   rights of third-party intervenors, voluntary dismissal under Rule 41(a)(2) is also

4   mandatory.  The Court's Order, attempting to force the parties to litigate a case they

5   have already resolved, indisputably exceeds its legal and equitable powers.  This

6   Court does not have the authority to condition approval of the dismissal on the

7   addition of terms to a private settlement agreement that are not agreed to by the

8   parties.

9        The Court's effort to pressure and force the parties violates the separation of

10  powers doctrine.  (Dkt. 544.)  Federal judges do not have inherent authority (or

11  expertise) to make complex policy decisions about how to manage the public health,

12  public safety, and financial implications of the homelessness crisis.  The Ninth

13  Circuit has already advised the Court, in connection with this matter, that it only has

14  "equitable power to grant relief" on the "case or controversy before it" and must act

15  within the confines of Article III.  *LA Alliance for Human Rights v. Los Angeles*

16  *County*, 14 F.4th 947, 957, 961 (9th Cir. 2021) (citation omitted).  In denying the

17  parties' stipulated dismissal, the Court has not heeded the Ninth Circuit's directive.

18       **B.   The County Will Be Irreparably Harmed Absent A Stay**

19       The County also satisfies the second *Holder* factor, which requires that there

20  be a "*probability* of irreparable injury if the stay is not granted."  *Lair v. Bullock*,

21  697 F.3d 1200, 1214 (9th Cir. 2012); *Leiva-Perez*, 640 F.3d at 968 (noting that the

22  second factor asks courts to "anticipate what would happen as a practical matter

23  following the denial of a stay").  There is no prospect that Los Angeles'

24  homelessness crisis will be comprehensively resolved through litigation.  At this

25  point, this lawsuit is actually an impediment.

26       Here, the County will be irreparably harmed if forced to engage in discovery

27  and motion practice and attend hearings regarding fully-settled claims.  The parties

28  have spent three years working towards this agreement.  The April 20 Order will

1  require all parties to expend massive resources and staff time in litigation that

2  should have been dismissed six months ago.[1]  "[N]eedlessly" or "inefficiently"

3  incurring discovery costs is sufficient to find irreparable harm.  *Integra*, 2019 WL

4  6973547, at *7; *see also Finder v. Leprino Foods Co*., 2017 WL 1355104, at *4

5  (E.D. Cal. Jan. 20, 2017) ("[F]orcing a party to conduct 'substantial, unrecoverable,

6  and wasteful' discovery and pretrial motions practice on matters that could be

7  mooted by a pending appeal may amount to hardship or inequity sufficient to justify

8  a stay." (citation omitted)); *Flo & Eddie*, 2015 WL 4397175, at *3 ("[M]onetary

9  losses can be considered irreparable harm if defendants are forced to incur much of

10  the expense of potentially unnecessary trial-oriented litigation before their appeal is

11  heard.").  Accordingly, the second *Holder* factor also favors a stay.

12      **C.      A Stay Will Not Prejudice Any Other Interested Parties**

13          There is no countervailing burden on Plaintiffs or Intervenors if the Court

14  grants a stay pending resolution of the County's pursuit of all appellate remedies.

15  At the April 20, 2023 conference, the Plaintiffs and Intervenors urged this Court to

16  approve the stipulated dismissal.  (Hashmall Decl. Ex. D at 14 [Intervenors: County

17  settlement agreement is "a reasonable response under the circumstances to the

18  need"], 20 [Plaintiffs: "It needed to have been done six months ago.  And here we

19  are in April, watching these projects flounder. . . . We cannot keep waiting and

20  letting the perfect to be the enemy of the good."].)

21          It should be stating the obvious, but staying litigation that Plaintiffs have

22  already agreed to *dismiss* with prejudice, and that Intervenors have likewise

23  implored this Court to dismiss, does not injure them.  The City settlement agreement

24  _____

25  [1] Further, the May 9, 2023 Scheduling Conference is premature because the

26  pleadings are not closed and it runs afoul of Federal Rule of Civil Procedure 26.
Under Rule 26(f), the parties should have conferred at least 21 days prior to a

27  Scheduling Conference—i.e., on or before April 18—which was impossible because

28  the Court set the Scheduling Conference on April 20.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  also *depends* upon the County's settlement to be effective.  (Hashmall Decl. Ex. D

2  at 18 [Plaintiffs: "[W]e entered into this agreement, frankly, the City told us that's

3  what the City needs"].)  Thus, the third *Holder* factor weighs in favor of a stay as

4  well.

### D.    The Public Interest Supports A Stay

6         The public interest favors a stay.  The County is committed to addressing

7  homelessness regardless of the outcome of this litigation, but there is no getting

8  around that the litigation has become a barrier, rather than a catalyst, in achieving

9  those goals.

10        "[T]he public 'generally has an interest in accuracy of judicial proceedings

11  and in efficient use of government resources.'"  *Flo & Eddie*, 2015 WL 4397175, at

12  *4; *Integra*, 2019 WL 6973547, at *8.  Hence, when courts certify an order for

13  immediate review under Section 1292(b), they routinely stay proceedings pending

14  resolution of the appeal.  *Asis*, 2008 WL 4279695, at *4; *Ass'n of Irritated

15  Residents*, 634 F. Supp. 2d at 1094; *Casas*, 2015 WL 13446989, at *5; *Walt Disney

16  Co.*, 2014 WL 10979864, at *4.  Doing so makes sense, as "[i]t would be a waste of

17  judicial and party resources to proceed with the other claims while the appeal is

18  pending."  *See Ass'n of Irritated Residents*, 634 F. Supp. 2d at 1094.  That is

19  particularly so where, as here, the appellate court's decision should end the litigation

20  altogether.

21        Homelessness will not be solved through motion practice, discovery, and trial.

22  Federal courts also "do not possess a roving commission to publicly opine on every

23  legal question," nor do they "exercise general legal oversight of the Legislative and

24  Executive Branches, or of private entities."  *TransUnion LLC v. Ramirez*, 141 S. Ct.

25  2190, 2205 (2021) ("'Article III grants federal courts the power to redress harms

26  that defendants cause plaintiffs, not a freewheeling power to hold defendants

27  accountable for legal infractions." (citation omitted)).

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    This case is over, and on the parties' terms.  Plaintiffs and the County chose a

2  judicial enforcement mechanism that carefully balances the parties' desire for

3  accountability and effective enforcement, while avoiding the type of expansive

4  judicial supervision that raises "sensitive federalism concerns" (*Horne v. Flores*,

5  557 U.S. 433, 448 (2009)) and risks improperly depriving state officeholders of

6  "their designated legislative and executive powers."  *Frew ex rel. Frew v. Hawkins*,

7  540 U.S. 431, 441 (2004).

8    The Court may have preferred that the parties struck a different balance.  But

9  that is not its prerogative.  The waste of resources and the disruption of public

10  confidence in an unrestrained federal judiciary strongly militate in favor of a stay.

11  **V.    THE COUNTY REQUESTS AN EXPEDITED HEARING AND**

12  **BRIEFING SCHEDULE FOR ON ITS MOTION FOR**

13  **CERTIFICATION**

14    The County further requests that this Court exercise its discretion to set an

15  expedited hearing and briefing schedule to decide the County's Motion for

16  Certification, which it has discretion to do, and no parties oppose.  *CMAX*, 300 F.2d

17  at 268 (a district court has "inherent power to control the disposition of the causes

18  on its docket" in a manner which will "promote economy of time and effort for

19  itself, for counsel, and for litigants").  Resolving whether this lawsuit must be

20  dismissed with prejudice should come *first*, before the parties delve into a flurry of

21  litigation activity that will almost certainly prove to be a waste of the parties' and

22  the Court's resources.

23    By Local Rule, the County's Motion for Certification would ordinarily not be

24  heard until June 5, 2023.  There is good cause to speed things up here.  The County

25  respectfully requests that the Court: (1) set the County's Motion for Certification for

26  hearing on May 9, 2023, and (2) provide that any responses to the Motion be filed

27  by May 5, 2023.  To expedite the resolution of the Motion, the County will forego

28  an opportunity to file reply papers before the May 9 hearing.

612259.4

**15**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**VI.    <u>CONCLUSION</u>**

  For the foregoing reasons, the County respectfully requests that the Court grant the *Ex Parte* Application in its entirety, stay the matter pending appeal, and set an expedited hearing and briefing schedule on the County's Motion for Certification of the Court's April 20, 2023 Order Pursuant to 28 U.S.C. §1292(b).


DATED:  April 28, 2023    MILLER BARONDESS, LLP



        By:   /s/ Mira Hashmall
           MIRA HASHMALL
           Attorneys for Defendant
           COUNTY OF LOS ANGELES

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

612259.4

16

ER 94

1  DAWYN R. HARRISON, *County Counsel* (State Bar No. 173855)
   dharrison@counsel.lacounty.gov
2  JENNIFER A.D. LEHMAN, *Assistant County Counsel* (State Bar No. 191477)
   jlehman@counsel.lacounty.gov
3  ANA WAI-KWAN LAI, *Senior Deputy County Counsel* (State Bar No. 257931)
   alai@counsel.lacounty.gov
4  OFFICE OF COUNTY COUNSEL
5  500 West Temple Street, Suite 468
   Los Angeles, California 90012
6  Telephone:   (213) 974-1830
7  Facsimile:    (213) 626-7446

8  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
9  MIRA HASHMALL (State Bar No. 216842)
   mhashmall@millerbarondess.com
10 MILLER BARONDESS, LLP
11 2121 Avenue of the Stars, Suite 2600
   Los Angeles, California 90067
12 Telephone:   (310) 552-4400
   Facsimile:    (310) 552-8400
13

14 Attorneys for Defendant
   COUNTY OF LOS ANGELES
15

16          **UNITED STATES DISTRICT COURT**

17     **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

18
   LA ALLIANCE FOR HUMAN          **CASE NO. 2:20-cv-02291 DOC (KES)**
19 RIGHTS, et al.,
                                  **DEFENDANT COUNTY OF**
20          Plaintiffs,           **LOS ANGELES' MOTION FOR**
                                  **CERTIFICATION OF THIS**
21     v.                         **COURT'S APRIL 20, 2023 ORDER**
                                  **PURSUANT TO 28 U.S.C. § 1292(b)**
22 CITY OF LOS ANGELES, et al.,
                                  Date:     June 5, 2023
23          Defendants.           Time:     8:30 a.m.
24                                Place:    Courtroom 10A
25
                                  Assigned to the Hon. David O. Carter
26                                and Magistrate Judge Karen E. Scott
27

28

611761.4

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

**ER 95**

1   **TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2      **PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. § 1292(b), Defendant

3 County of Los Angeles (the "County") hereby moves the Court for an order

4 certifying its April 20, 2023 Minute Order (the "April 20 Order") for interlocutory

5 appeal. This Motion is set for hearing on June 5, 2023, at 8:30 a.m. in Courtroom

6 10A at the Ronald Reagan Federal Building and United States Courthouse, located

7 at 411 West Fourth Street, Santa Ana, California 92701-4516, the Honorable David

8 O. Carter presiding.

9      The April 20 Order rejected the Plaintiffs' and the County's joint stipulation

10 to voluntarily dismiss this action in its entirety with prejudice, pursuant to Federal

11 Rule of Civil Procedure 41(a)(2), and presents three controlling questions of law

12 that merit review under Section 1292(b): (1) the scope of a district court's

13 discretion to disapprove a stipulated dismissal with prejudice pursuant to

14 Rule 41(a)(2), following the parties' execution of a binding private settlement

15 agreement disposing of all claims between them; (2) whether a district court may

16 condition approval of a Rule 41(a)(2) dismissal on the addition of new settlement

17 terms that are neither agreed to by the parties, nor requested by any party or

18 intervenor; and (3) whether there remains a justiciable case or controversy between

19 the parties, considering they have settled all claims between them.

20      This Motion is made following the conference of counsel pursuant to Local

21 Rule 7-3. (Declaration of Mira Hashmall ("Hashmall Decl." ¶ 21 & Ex. T.)

22 Counsel for Plaintiffs indicated they had yet to take a position on the County's

23 Motion.

24      This Motion is based on this Notice, the accompanying Memorandum of

25 Points and Authorities, the Declaration of Mira Hashmall and exhibits attached

26 thereto, the pleadings and records on file in this action, and any further evidence or

27 argument in connection with the Motion.

28

611761.4      2

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

ER 96

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 · LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 · FAX: (310) 552-8400

DATED:  April 28, 2023          MILLER BARONDESS, LLP


                                By:    /s/ Mira Hashmall
                                       MIRA HASHMALL
                                       Attorneys for Defendant
                                       COUNTY OF LOS ANGELES

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 · LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400 · FAX (310) 552-8400

611761.4

3

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

ER 97

# <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ........................................................................................ 8

II.  RELEVANT FACTUAL AND PROCEDURAL BACKGROUND .............. 9

    A.  The City/Plaintiffs Settlement Agreement ............................................ 10

    B.  The County/Plaintiffs Settlement Agreement ....................................... 11

    C.  Plaintiffs And The County Jointly Seek Dismissal With
        Prejudice Of All Claims Against The County Under Rule
        41(a)(2) .................................................................................................. 12

III.  THE APRIL 20, 2023 STATUS CONFERENCE AND THE
     COURT'S RULING ................................................................................. 13

IV.  THE ORDER SHOULD BE CERTIFIED FOR IMMEDIATE
     APPELLATE REVIEW .......................................................................... 16

    A.  The Order Involves Controlling Questions Of Law ............................. 17

    B.  An Immediate Appeal Will Likely Resolve The Litigation ................. 19

    C.  This Court's Assertion Of Authority To Deny The Parties' Joint
        Stipulated Dismissal With Prejudice Is Unprecedented ...................... 20

V.  CONCLUSION ........................................................................................ 24

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

4

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

**ER 98**

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ariz. Christian Sch. Tuition Org. v. Winn*,
    563 U.S. 125 (2011) ....................................................................22

*B.R. v. F.C.S.B.*,
    17 F.4th 485 (4th Cir. 2021) ........................................................18

*Bais Yaakov of Spring Valley v. ACT, Inc.*,
    798 F.3d 46 (1st Cir. 2015) ..........................................................18

*Balintulo v. Daimler AG*,
    727 F.3d 174 (2d Cir. 2013) .........................................................16

*Blackman v. Hadron, Inc.*,
    450 F.2d 781 (2d Cir. 1971) .........................................................18

*Bridgeport Music, Inc. v. London Music, U.K.*,
    345 F. Supp. 2d 836 (M.D. Tenn. 2004) .......................................21

*Carbotrade SpA v. Bureau Veritas*,
    1993 WL 60567 (S.D.N.Y. Mar. 2, 1992) ....................................20

*Century Mfg. Co., Inc. v. Cent. Transp. Int'l, Inc.*,
    209 F.R.D. 647 (D. Mass. 2002) ..................................................21

*Coal. For Equity & Excellence In Md. Higher Educ. v. Md. Higher Educ.
    Comm'n*,
    2015 WL 4040425 (D. Md. June 29, 2015) ..................................20

*Core Optical Techs., LLC v. Juniper Networks Inc.*,
    2021 WL 5978761 (N.D. Cal. Dec. 17, 2021) ..............................19

*Frew ex rel. Frew v. Hawkins*,
    540 U.S. 431 (2004) .....................................................................24

*Gardiner v. A.H. Robins Co., Inc.*,
    747 F.2d 1180 (8th Cir. 1984) ......................................................24

*Hamilton v. Firestone Tire & Rubber Co., Inc.*,
    679 F.2d 143 (9th Cir. 1982) ................................................22, 23

*Hawaii ex rel. Louie v. JP Morgan Chase & Co.*,
    921 F. Supp. 2d 1059 (D. Haw. 2013) ..........................................19

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

ER 99

*Horne v. Flores*,
    557 U.S. 433 (2009) ........................................................................ 24

*In re Cement Antitrust Litig.*,
    673 F.2d 1020 (9th Cir. 1981) ....................................... 16, 17, 19

*In re Smith*,
    926 F.2d 1027 (11th Cir. 1991) ....................................................... 24

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) .......................................................... 18

*ITV Direct, Inc. v. Health Sols., LLC*,
    445 F.3d 66 (1st Cir. 2006) ............................................................ 21

*Katz v. Carte Blanche Corp.*,
    496 F.2d 747 (3d Cir. 1974) ........................................................... 18

*Klinghoffer v. S.N.C. Achille Lauro*,
    921 F.2d 21 (2d Cir. 1990) ............................................................. 17

*Kuehner v. Dickinson & Co.*,
    84 F.3d 316 (9th Cir. 1996) ............................................................ 17

*LA All. for Human Rights v. County of Los Angeles*,
    14 F.4th 947 (9th Cir. 2021) ...................................................... 8, 23

*LeCompte v. Mr. Chip, Inc.*,
    528 F.2d 601 (5th Cir. 1976) .......................................................... 23

*McFarlin v. Conseco Servs., LLC*,
    381 F.3d 1251 (11th Cir. 2004) ...................................................... 20

*McLaughlin v. Cheshire*,
    676 F.2d 855 (D.C. Cir. 1982) ....................................................... 23

*Mohawk Indus., Inc. v. Carpenter*,
    558 U.S. 100 (2009) ........................................................................ 16

*Philipp v. Federal Republic of Germany*,
    253 F. Supp. 3d 84 (D.D.C. 2017) ................................................. 18

*Primavera Familienstifung v. Askin*,
    139 F. Supp. 2d 567 (S.D.N.Y. 2001) ........................................... 16

*Puello v. Citifinancial Servs., Inc.*,
    2010 WL 1541503 (D. Mass. Apr. 16, 2010) ................................ 22

*Rodrigues v. CNP of Sanctuary, LLC*,
    2012 WL 12895255 (S.D. Fla. May 9, 2012) ................................ 19

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

611761.4

6

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

ER 100

*Smoot v. Fox*,
  340 F.2d 301 (6th Cir. 1964) .......................................................................... 21

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ................................................................................... 23

*United States v. Sineneng-Smith*,
  140 S. Ct 1575 (2020) .................................................................................... 23


**STATUTES**

28 U.S.C. § 1292(b) ............................................................................... passim


**RULES**

Fed. R. Civ. P. 41(a)(2) ......................................................................... passim

Fed. R. Civ. P. 68 ........................................................................................ 18


**OTHER AUTHORITIES**

16 Edward H. Cooper, *Federal Practice and Procedure* § 3930 (3d ed. Apr.
  2023 Update) .......................................................................................... 17, 20

S.Rep. No. 2434, 85th Cong., 2d Sess. (1958), *reprinted in* [1985]
  U.S.C.C.A.N. 5255, 5257) ................................................................................ 20

U.S. Const. art. III................................................................................. passim

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

ER 101

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   <u>INTRODUCTION</u>

The County's binding settlement agreement with Plaintiffs pledges more than $850.5 million in new resources to dramatically expand the number of beds, supportive housing units, shelter capacity, and medical and social services in Los Angeles for persons experiencing homelessness.  These new resources are in addition to the $293 million in new funding the County committed earlier in the lawsuit to provide 6,700 beds for people experiencing homelessness near freeways and for unhoused seniors.  The County is committed to providing these urgently needed resources, which represent significant progress towards saving and improving the lives of the unhoused.

The County also does not want its time and resources diverted to litigation. Plaintiffs and the County support the terms of this agreement, and they have urged this Court to grant the joint stipulation to dismiss this action with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).  At the April 20, 2023 hearing, the City of Los Angeles and Intervenors[1] did not object to the settlement or the joint stipulation of dismissal, nor did any third parties to this litigation.

With its April 20 Order, this Court refused to dismiss the case, concluding the "County's settlement terms are improper and against the public interest" because they do not give the Court its preferred "oversight and enforcement powers." (Hashmall Decl. Ex. Q; *id.* Ex. P at 51-53.)  This was clear error and exceeds the Court's legal and equitable powers under Article III of the Constitution—which the Ninth Circuit has already admonished this Court must not do.  *LA All. for Human Rights v. County of Los Angeles*, 14 F.4th 947, 961 (9th Cir. 2021) (the district court's "equitable power to remedy legal violations that have contributed to the

[1] Intervenors are Los Angeles Community Action Network, Los Angeles Catholic Worker, and Orange County Catholic Worker, nonprofit community organizations that advocate for the rights of the unhoused.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 · LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 · FAX: (310) 552-8400

611761.4

8

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

ER 102

1  complex problem of homelessness in Los Angeles" "must be exercised consistent

2  with its discretionary authority and Article III").

3      The April 20 Order presents controlling questions of law that merit review

4  under 28 U.S.C. § 1292(b): (1) the scope of a district court's discretion to

5  disapprove a stipulated dismissal with prejudice pursuant to Rule 41(a)(2),

6  following the parties' execution of a binding private settlement agreement disposing

7  of all claims between them; (2) whether a district court may condition approval of a

8  Rule 41(a)(2) dismissal on the addition of new settlement terms that are neither

9  agreed to by the parties, nor requested by any other party or intervenor; and

10  (3) whether there remains a justiciable case or controversy between the parties,

11  considering they have settled all claims between them.

12      Under Section 1292(b), the Court may allow an interlocutory appeal of an

13  order that "involves a controlling question of law as to which there is substantial

14  ground for difference of opinion" if an "immediate appeal . . . may materially

15  advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The

16  controlling questions of law raised in the Order meet these criteria.

17      To the County's knowledge, this Court is the first and only federal court to

18  construe its Article III jurisdiction to condition a stipulated dismissal pursuant to

19  Rule 41(a)(2) on the rewriting of a fully-agreed private settlement agreement to give

20  the Court additional powers of enforcement. Such an unprecedented approach,

21  particularly where, as here, the stakes of protracted litigation are so high, warrants

22  immediate interlocutory review.

23      This Court should amend its April 20 Order and certify it for interlocutory

24  appeal.

25  **II.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

26      Because the Court has repeatedly referenced the City of Los Angeles's

27  settlement agreement with Plaintiffs and demanded that the County's agreement

28  include the same terms, this Background section describes both agreements.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 · LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 · FAX: (310) 552-8400

611761.4                          9

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

ER 103

**A.** **The City/Plaintiffs Settlement Agreement**

Plaintiffs settled with the City of Los Angeles in May 2022.  The City's agreement excluded from its definition of "City Shelter Appropriate" any person experiencing homelessness (PEH) who had a "severe mental illness," "substance use disorder," or "chronic physical illness or disability requiring the need for professional medical care and support," taking the position it was the County's obligation to meet these individuals' needs.  (Hashmall Decl. Ex. A at 8.)  The agreement provides, "the Court shall have continuing jurisdiction to oversee and enforce this Settlement Agreement," and permits the Court to "appoint one or more Special Masters" to assist "in overseeing and enforcing this Agreement."  (*Id.* at 9.)

The City's settlement "agrees" to impose significant obligations on the County—spanning two-and-a-half pages of the agreement—but the County is not a party to, and had no role in negotiating, the City's agreement.  (*Id.* at 17.)  The County filed an objection to the City's settlement agreement.  (*Id*. Ex. B at 4 [To define the "County's 'obligations' under the guise of entering a consent decree between other parties" is "entirely improper, and an egregious violation of the due process of law"].)  So did Intervenors.  (*Id.* Ex. C.)  At the hearing on the City's settlement agreement, Intervenors' counsel objected to the agreement's enforcement provisions, stated the agreement was inadequate to "address the homelessness crisis," and asserted the City was not "committing to do more than is already in the pipeline."  (*Id*. Ex. D at 7-20.)

This Court nonetheless approved the City's settlement agreement as "fair, reasonable, and adequate" because, while "not a solution for homelessness, it is a concrete step toward improving the lives of our neighbors who are currently suffering on the streets."  (*Id*. Ex. E.)  The Court appointed "Special Master Michele Martinez" as the "Monitor of the Settlement Agreement" to assist with oversight and enforcement.  (*Id.*)  The June 14, 2022 Order approving the City's settlement

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**10**

1   agreement states the agreement does not affect "any rights" or impose any

2   "responsibilities" on the County.  (*Id.*)

3        Intervenors have appealed the June 14 Order.  (Dkt. 451.)

4   **B.**     **The County/Plaintiffs Settlement Agreement**

5        The County's historic settlement agreement—which was fully executed more

6   than six months ago in October 2022—ends more than three years of litigation and

7   provides much-needed additional resources within the City and County of Los

8   Angeles to increase beds, services, outreach, and interim housing for the most

9   vulnerable people experiencing homelessness.  (Hashmall Decl. Exs. K, O.)  The

10   settlement builds on the County's massive response to homelessness outside the

11   lawsuit.

12        Over the last five-and-a-half years, the County has placed more than 90,000

13   people in permanent housing, provided nearly 124,000 with temporary shelter, and

14   prevented 22,000 others from falling into homelessness.  The Board of Supervisors

15   also declared a local emergency on homelessness in January 2023 and is fast-

16   tracking encampment resolutions countywide, as well as housing and mental health

17   and substance use disorder services.

18        As detailed in Section II.C., *post*, the Court demanded the parties change the

19   following terms in the County settlement agreement:

20   •    Section D.3, which provides that by the end of fiscal year 2023/2024, the

21   County "shall develop 300 additional substance use and mental health beds
    according to the greatest need as solely determined by the County."  (*Id.* Ex.

22   G at 4.)

23   •    Section D.9, governing the County's reporting obligations, which provides,

24   "The County shall file reports regarding its progress in meeting its obligations
    under this Agreement quarterly.  Each status report shall be provided within

25   30 days of the end of the County's fiscal quarter."  (*Id.* at 5.)

26   •    Section P.1.ii, which governs judicial enforcement if the dispute resolution

27   and right to cure process outlined in the agreement does not resolve an alleged

28   breach of the agreement.  (*Id.* at 9.)  The "Claiming Party may file a notice of

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

611761.4

11

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

ER 105

1    breach and request judicial enforcement in the District Court to remedy such

2    alleged breach." (*Id.*)  The "only relief" available under the agreement for

3    breach is "an order compelling specific performance of the Agreement." (*Id.*)
     No party may seek monetary damages. (*Id.*)

4

5    On April 18, 2023, the parties executed an addendum to the agreement

6    modifying, among other things, the terms of Section D.3.  In the settlement

7    agreement as modified by the addendum, the County is providing 1,000 new mental

8    health and substance use disorder beds for the unhoused, as well as 450 subsidies to

9    provide individuals at risk of homelessness with Enriched Residential Care in Adult

10   Residential Facilities and Residential Care Facilities for the Elderly, commonly

11   called "Board and Care" beds, throughout the County. (*Id.* Ex. O.)

12   **C.      Plaintiffs And The County Jointly Seek Dismissal With Prejudice**

13   **Of All Claims Against The County Under Rule 41(a)(2)**

14   In September 2022, Plaintiffs and the County notified the Court that they had

15   reached a settlement agreement that would result in the parties jointly seeking a

16   dismissal with prejudice under Rule 41(a)(2). (Hashmall Decl. Ex. F.)  A few weeks

17   later, the parties submitted their executed settlement agreement and filed a

18   stipulation for voluntary dismissal of this action in its entirety with prejudice. (*Id.*

19   Ex. G.)  The stipulation requests that the Court retain jurisdiction to enforce the

20   agreement until the end of fiscal year 2026/2027 (i.e., June 30, 2027). (*Id.*)

21   The Court invited "any party and the public to submit comments or

22   objections" to the County settlement agreement and set a hearing for November 14,

23   2022. (Dkt. 473.)  Intervenors filed a statement of non-opposition to the County

24   settlement agreement. (Hashmall Decl. Ex. H.)  No other comments or objections

25   were filed.  At the November hearing, the City expressed "no objections." (*Id.* Ex. I

26   at 7.)  The Intervenors likewise did not object to "any of the substance" of the

27   agreement. (*Id.* at 8.)  But the Court refused "to endorse" the agreement based on its

28   belief "that we can do much better," though it acknowledged its "unorthodox"

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

611761.4                                          12

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

ER 106

1  approach is "rightfully subject to debate and criticism."  (*Id.* at 12.)  The Court then

2  put the agreement "on hold," pending the installation of newly elected officials.  (*Id.*

3  at 18.)

4       The Court requested the presence of Mayor Karen Bass, Los Angeles City

5  Council President Paul Krekorian, and Los Angeles County Supervisor Holly

6  Mitchell at the second hearing on the County settlement agreement, held on

7  January 17, 2023.  (*Id.* Ex. J.)  During this hearing, the Court criticized the

8  agreement's reporting provision as inadequate and demanded different terms that

9  would provide greater "judicial supervision" over the settlement.  (*Id.* Ex. L at 20-

10  24.)  In the Court's words, the settlement agreement "without monitoring and

11  accountability to the Court" was "dead on arrival.  That's my bottom line."  (*Id.* at

12  24, 37-38 ["I want monitoring, and I want accountability, and I want it to the

13  Court"]; *id.* Ex. M [acknowledging the "County Settlement Agreement—as it's

14  written now—is a private settlement"].)

15       The Court also admonished the County to include more new subacute beds in

16  a revised agreement, suggesting at least 3,200 to 4,250 additional beds were needed,

17  on top of the 8,600 existing beds.  (*Id.* Ex. L at 13-15, 32; *id.* Ex. M at 8 ["(T)he

18  County's offer falls short. . . . How can 300 beds accommodate the need for . . .

19  those suffering from severe mental illness?"].)

20       The parties agreed to negotiate further, which resulted in the Addendum to the

21  settlement agreement, providing 1,000 new mental health and substance use disorder

22  beds, among other terms.  (*Id.* Ex. O.)  On April 18, 2023, Plaintiffs and the County

23  resubmitted their Stipulation for Voluntary Dismissal, along with their fully-

24  executed Addendum to Settlement Agreement.  (*Id.*)

25  **III.**  **THE APRIL 20, 2023 STATUS CONFERENCE AND THE COURT'S**

26  **RULING**

27       The Court held a status conference on April 20 regarding the parties' joint

28  stipulation for voluntary dismissal, again demanding the presence of the Mayor,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

13

1    City Council president, and Los Angeles County Supervisor Janice Hahn.

2    (Hashmall Decl. Ex. N.)  No party or Intervenor advocated for the Court to

3    disapprove the parties' stipulation during the hearing:

- City Council President and Acting Mayor Paul Krekorian stated that the City was satisfied with the "monumental change" in its relationship with the County and the "significant progress" that the County's settlement agreement reflects.  (*Id.* Ex. P at 9, 36.)  Though the County settlement agreement is not sufficient, in and of itself, to solve the problem of homelessness, Mr. Krekorian was "absolutely confident" in the County's and its Board of Supervisors' commitment to working with the City.  (*Id.* at 10-11.)

- Counsel for Intervenors, Los Angeles Community Action Network and Los Angeles Catholic Worker ("LA Intervenors"), said "[y]ou cannot solve homelessness through litigation," but that "the County's commitment matches the City of Los Angeles's commitment" and is a "reasonable response under the circumstances to the need." (*Id.* at 12-13.)  LA Intervenors' counsel stated it was inappropriate to "hold the County responsible for a different standard than the City was held" to in its settlement.[2]  (*Id.*)

- Plaintiffs stated their lawsuit was not about "solving homelessness," but the need to divert resources to "immediate crisis control." (*Id.* at 16.)  They emphasized the delay in approving the dismissal and settlement agreement was impeding progress. (*Id.* at 20.)  Plaintiffs characterized the agreement's "judicial enforcement provision" as providing an "extended period of enforcing this agreement with full transparency." (*Id.* at 37-39, 41-42.)

- The County's counsel reiterated that the settlement agreement reflects only "a small piece" of the County's ongoing work to address homelessness. (*Id.* at 43, 46.)  The County clarified the settlement agreement was already fully approved and executed[3] and underscored that its reporting and enforcement provisions provided the necessary accountability.

_____

[2] Other counsel for Intervenors criticized the City settlement agreement and its focus on criminalization of homelessness.  (Hashmall Decl. Ex. P at 15.)

[3] The Court suggested that the settlement agreement was somehow not final because of a provision requiring County approval.  That is incorrect.  The parties to the agreement, the County and the Plaintiffs, *have* signed off on the agreement.  The County's counsel also confirmed that the settlement terms were approved by the Board and duly executed on behalf of the County.  (Hashmall Decl. Ex. P at 45.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

611761.4

14

**ER 108**

1    The Court criticized the settlement agreement and demanded that the parties

2    change its terms.  The Court advised the County that members of the Board of

3    Supervisors, rather than County Counsel, should be signatories to the agreement

4    (although it made no such demand related to the City settlement agreement).  (*Id.* at

5    22, 38.)  It decreed the addition of 1,500 beds was insufficient and expressed the

6    view that approving the parties' stipulated dismissal should not turn on whether the

7    County had made "progress" in increasing the number of beds, but on whether the

8    total number was "enough," suggesting several thousand more were required.  (*Id.* at

9    28-29, 51.)

10   Most emphatically, the Court demanded additional oversight and enforcement

11   powers, again calling the settlement agreement "dead on arrival" because it did not

12   provide for the same "judicial oversight" as the City's agreement with Plaintiffs.

13   (*Id.* at 23-25 ["You give me absolutely no oversight, and you give me no

14   enforcement. . . . I'm giving you the credibility of the federal court . . . ."], 28

15   ["(Y)ou are asking the Court to put my approval on this."], 32 ["I  have to have

16   accountability" "[b]ecause while I may trust you implicitly, Chairwoman Hahn, . . .

17   I don't know who your successor is.  And I don't trust that [political] process."], 37

18   ["(J)ust restate the exact provisions in the City agreement . . . ."], 42 ["You get me

19   that same paragraph that the City had, oversight and enforcement, let's talk.  But

20   until then, I said it before, and I'm not bargaining with you, I meant it."].)

21   The Court also expressed "grave concerns" that its signature on the dismissal

22   would be used as an endorsement of the County agreement, because it could be used

23   to support "new bond money" and a vote for "increased taxes"; made specific

24   suggestions about how the County should better allocate its budget; and introduced

25   extra-record evidence, including pictures of people experiencing homelessness.  (*Id.*

26   at 32-35 ["(D)on't throw the lack of money at me from the County's perspective,"

27   commenting on the salary of the director of Los Angeles Homeless Services

28   Authority as "twice as much as a federal court judge," and concluding "I think the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

611761.4

15

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

1  county has, with a $43.5 billion budget, a lot more potentially that you could

2  contribute"]; *id.* at 38, 49-50.)

3      The April 20 Order denied the Plaintiffs' and the County's stipulation to

4  voluntarily dismiss this action with prejudice under Rule 41(a)(2) for the "reasons

5  stated on the record."  (*Id.* Ex. Q.)

6  **IV.    THE ORDER SHOULD BE CERTIFIED FOR IMMEDIATE**

7  **APPELLATE REVIEW**

8      The Court may certify an order for interlocutory appeal if it involves "[1] a

9  controlling question of law [2] as to which there is substantial ground for difference

10  of opinion and [3] that an immediate appeal from the order may materially advance

11  the ultimate termination of the litigation."  28 U.S.C. § 1292(b); *In re Cement*

12  *Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1981).  The Supreme Court has

13  underscored that discretionary review mechanisms, including Section 1292(b), are

14  "useful 'safety valve[s]' for promptly correcting serious errors" and instructed that

15  district courts "should not hesitate to certify an interlocutory appeal" when a

16  decision "involves a new legal question or is of special consequence."  *Mohawk*

17  *Indus., Inc. v. Carpenter*, 558 U.S. 100, 110-11 (2009) (alteration in original)

18  (citation omitted); *Balintulo v. Daimler AG*, 727 F.3d 174, 186 n.17 (2d Cir. 2013)

19  (permissive interlocutory appeal serves to reduce "the need to develop

20  extraordinary-writ practice to fill the inevitable gaps in provisions for appeal as a

21  matter of right" (citation omitted)).

22      "The institutional efficiency of the federal court system is among the chief

23  concerns underlying Section 1292(b)."  *Primavera Familienstifung v. Askin*, 139 F.

24  Supp. 2d 567, 570 (S.D.N.Y. 2001).  "The advantages of immediate appeal increase

25  with the probabilities of prompt reversal, the length of the district court proceedings

26  saved by reversal of an erroneous ruling, and the substantiality of the burdens

27  imposed on the parties by a wrong ruling."  16 Edward H. Cooper, *Federal Practice*

28

Miller Barondes, LLP
Attorneys at Law
2121 Avenue of the Stars, Suite 2600  Los Angeles, California 90067
Tel: (310) 552-4400   Fax: (310) 552-8400

611761.4

**16**

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

ER 110

1   *and Procedure* § 3930 (3d ed. Apr. 2023 Update).  As explained below, this Court's

2   April 20 Order meets all three elements for Section 1292(b) certification.

3       **A.**    <u>**The Order Involves Controlling Questions Of Law**</u>

4       The April 20 Order presents three controlling questions of law, the resolution

5   of which will materially advance the termination of this case:  (1) the scope of a

6   district court's discretion to disapprove a stipulated dismissal with prejudice

7   pursuant to Rule 41(a)(2), following the parties' execution of a binding private

8   settlement agreement disposing of all claims between them; (2) whether a district

9   court may condition approval of a Rule 41(a)(2) dismissal on the addition of new

10   settlement terms that are neither agreed to by the parties, nor requested by any other

11   party or intervenor; and (3) whether there remains a justiciable case or controversy

12   between the parties, considering they have settled all claims between them.

13       A "controlling" question of law is one which, if decided incorrectly and

14   appealed immediately, would bring an end to the action.  *Klinghoffer v. S.N.C.*

15   *Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990) ("[I]t is clear that a question of law is

16   'controlling' if reversal of the district court's order would terminate the action");

17   *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319 (9th Cir. 1996) (controlling question

18   of law where delaying resolution "could cause the needless expense and delay of

19   litigating an entire case in a forum that has no power to decide the matter").  Indeed,

20   "all that must be shown in order for a question to be 'controlling' is that resolution

21   of the issue on appeal could materially affect the outcome of litigation in the district

22   court."  *In re Cement Antitrust Litig.*, 673 F.2d at 1026.

23       That a question of law concerns the scope of a district court's discretion is not

24   an impediment to Section 1292(b) review.  "The key consideration is not whether

25   the order involves the exercise of discretion, but whether it truly implicates the

26   policies favoring interlocutory appeal," including "the avoidance of harm" from a

27   "possibly erroneous interlocutory order and the avoidance of possibly wasted trial

28   time and litigation expense."  *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 756 (3d

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600 · LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 · FAX: (310) 552-8400

17

611761.4

1    Cir. 1974); *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 626 (7th

2    Cir. 2010) ("Decisions holding that the application of a legal standard is a

3    controlling question of law within the meaning of section 1292(b) are numerous.").

4         Questions of justiciability are controlling questions of law and regularly

5    subject to certification under Section 1292(b).  *Blackman v. Hadron, Inc.*, 450 F.2d

6    781, 782 (2d Cir. 1971) ("[t]he question certified to this court is, in essence, whether

7    there remains a justiciable controversy" between the parties); *Philipp v. Federal

8    Republic of Germany*, 253 F. Supp. 3d 84, 87 (D.D.C. 2017) (certifying for

9    interlocutory appeal "whether Plaintiffs' claims are non-justiciable due to

10   international comity"); *B.R. v. F.C.S.B.*, 17 F.4th 485, 491 (4th Cir. 2021)

11   (certifying whether pseudonymous complaint invokes Article III case-or-

12   controversy jurisdiction); *Bais Yaakov of Spring Valley v. ACT, Inc.*, 798 F.3d 46,

13   47 (1st Cir. 2015) (certifying whether unaccepted offer of judgment under Rule 68

14   moots Plaintiff's entire action).

15        It is similarly straightforward that (1) the scope of the Court's discretion

16   under Rule 41(a)(2) to reject the parties' stipulated dismissal, and (2) whether the

17   Court has the power to condition that approval on the addition of new settlement

18   terms the Court (but no one else) wants are "controlling" questions of law.  They

19   can be decided quickly and cleanly as a matter of law and should bring an end to the

20   action.  There is no need to delve into a factual record to decide them.  And as a

21   practical matter, there is an exceedingly high cost to delaying review.  The parties

22   will be forced to litigate a case they have already fully resolved and in a way that

23   actively harms the public interest.

24        The County wants to focus its resources and energy on carrying out its

25   commitments, both under the settlement agreement, and more broadly, to ameliorate

26   the homelessness crisis.  It should not be forced to divert resources to litigation

27   because this Court (1) wants powers of judicial involvement the parties deem

28   unnecessary; (2) believes the settlement agreement should reflect a more

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

611761.4

**18**

**ER 112**

1  comprehensive solution for homelessness; and (3) thinks the County's Board of

2  Supervisors should sign the settlement agreement.  As highlighted by Plaintiffs'

3  counsel, delaying the parties' settlement agreement will only impede the City's and

4  County's progress.  (Hashmall Decl. Ex. P at 19-20 ["(W)e continue to push for

5  [this settlement], saying not only is this a good agreement for what it is, but it

6  needed to have been done eight months ago.  It needed to have been done six

7  months ago.  And here we are in April, watching these projects flounder."]; *see also*

8  *id*. Ex. R (Intervenors: "[T]he instability caused by this litigation" "is not in the

9  public interest").

10  **B.    An Immediate Appeal Will Likely Resolve The Litigation**

11  Interlocutory review will also materially advance the ultimate resolution of

12  this litigation.  *In re Cement Antitrust Litig.*, 673 F.2d at 1026 (certification

13  materially advances the ultimate termination of litigation when "allowing an

14  interlocutory appeal would avoid protracted and expensive litigation"); *Hawaii ex*

15  *rel. Louie v. JP Morgan Chase & Co.*, 921 F. Supp. 2d 1059, 1067-68 (D. Haw.

16  2013) (material advancement criteria "is directed to the very purpose of §1292(b)—

17  to 'facilitate disposition of the action by getting a final decision on a controlling

18  legal issue sooner'" (citation omitted)).

19  Interlocutory review should end this extraordinarily large and complex

20  litigation altogether, which strongly militates in favor of interlocutory review.  *Core*

21  *Optical Techs., LLC v. Juniper Networks Inc.*, 2021 WL 5978761, at *1 (N.D. Cal.

22  Dec. 17, 2021) (granting immediate appeal would materially advance the litigation

23  where reversal was "likely (if not certain)" to terminate the litigation); *Rodrigues v.*

24  *CNP of Sanctuary, LLC*, 2012 WL 12895255, at *3 (S.D. Fla. May 9, 2012)

25  (granting interlocutory appeal to resolve whether confidentiality clause in FLSA

26  settlement curtailed the public's and the parties' First Amendment rights, noting the

27  "lawsuit will likely end sooner with an interlocutory ruling, than if the case is not

28  settled and the litigation is continued").

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

C.    **This Court's Assertion Of Authority To Deny The Parties' Joint Stipulated Dismissal With Prejudice Is Unprecedented**

Because the Court's actions here are so unprecedented, there is a dearth of precedent within the Ninth Circuit on when (1) a district court has authority to disapprove litigants' joint stipulation to dismiss under Rule 41(a)(2), in the absence of any objection by members of the public or intervenors; (2) whether it is *ever* appropriate to condition such a dismissal on the addition of settlement terms that the Court—but not the parties—want included; and (3) whether there even remains a justiciable controversy in the circumstances presented.  The April 20 Order is clearly erroneous and exceeds the Court's Article III powers, heightening the need for immediate appellate review.

Indeed, discretionary review mechanisms are intended for just these circumstances.  The legislative history of Section 1292(b) "indicates that the statutory prerequisite of 'substantial ground for difference of opinion' is satisfied only when there is '"substantial doubt" that the district court's order was correct.'" *Carbotrade SpA v. Bureau Veritas*, 1993 WL 60567, at *1 (S.D.N.Y. Mar. 2, 1992) (citing S.Rep. No. 2434, 85th Cong., 2d Sess. (1958), *reprinted in* [1985] U.S.C.C.A.N. 5255, 5257); *see also McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004) (interlocutory review is appropriate where there is a "substantial dispute about the correctness of any of the pure law premises the district court actually applied in its reasoning leading to the order sought to be appealed"). "The level of uncertainty required to find a substantial ground for difference of opinion" is also "adjusted to meet the importance of the question in the context of the specific case."  Cooper, *supra*, § 3930; *see, e.g.*, *Coal. For Equity & Excellence In Md. Higher Educ. v. Md. Higher Educ. Comm'n*, 2015 WL 4040425, at *6 (D. Md. June 29, 2015) (granting Section 1292(b) certification in the "context of this extraordinarily important case" where state believed the court misinterpreted governing precedent and the other criteria for interlocutory appeal were satisfied).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    The April 20 Order meets the standard for interlocutory review in this

2  important case.  It is the County's view that the April 20 Order is clearly erroneous

3  and that an appellate court could draw no other conclusion.

4    ***Dismissal is mandatory.***  Ample authority holds that where, as here, the

5  stipulated dismissal of a case is with prejudice and does not injure the rights of

6  third-party intervenors, voluntary dismissal under Rule 41(a)(2) is mandatory.  *See*

7  *Smoot v. Fox*, 340 F.2d 301, 303 (6th Cir. 1964) (granting petition for writ of

8  mandamus, directing district court to grant plaintiff's Rule 41(a)(2) motion for

9  dismissal with prejudice); *Century Mfg. Co., Inc. v. Cent. Transp. Int'l, Inc.*, 209

10  F.R.D. 647, 648 (D. Mass. 2002) (where parties have moved to dismiss third-party

11  complaint with prejudice under Rule 41(a)(2), "courts have found that they are

12  without discretion, and must grant the motion"); *Bridgeport Music, Inc. v. London*

13  *Music, U.K.*, 345 F. Supp. 2d 836, 841 (M.D. Tenn. 2004) (abuse of discretion to

14  refuse to grant Rule 41(a)(2) dismissal with prejudice).

15    At the April 20 hearing, no party, Intervenor, or member of the public has

16  objected to the County settlement agreement or the parties' joint request for

17  dismissal.  *Cf. ITV Direct, Inc. v. Health Sols., LLC*, 445 F.3d 66, 69-71 (1st Cir.

18  2006) (affirming withdrawal of approval of dismissal where intervenors—who

19  obtained a preliminary injunction against cross-plaintiff—had not consented to

20  judgment).  To the contrary, Intervenors' counsel has urged this Court to approve

21  the settlement and asserted the delay in doing so is causing harm.[4]  Plaintiffs'

22  counsel likewise urged dismissal, stating "We cannot keep waiting and letting the

23  perfect be the enemy of the good."  (Hashmall Decl. Ex. P at 20.)  There is simply

24  no precedent for a district court denying a request for stipulated dismissal with

25  prejudice under these circumstances.

26

27    [4] The opposite is true for the City settlement agreement.  Intervenors *have* objected
   to that settlement agreement as prejudicial to their interests.  (Hashmall Decl. Ex.
28  C.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

611761.4

21

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

ER 115

1    There are at least three justifications that dismissal is mandatory under these

2    circumstances.  First, the "'principle [sic] consideration' for a court considering

3    whether to dismiss a case under Rule 41(a)(2) 'is whether dismissal would prejudice

4    the defendant,'" and so "the fact that dismissal with prejudice secures the

5    defendant's interests weighs heavily in support of allowing such a motion."  *Puello*

6    *v. Citifinancial Servs., Inc.*, 2010 WL 1541503, at *3 (D. Mass. Apr. 16, 2010)

7    (citation omitted); *accord Hamilton v. Firestone Tire & Rubber Co., Inc.*, 679 F.2d

8    143, 145 (9th Cir. 1982) (a district court's discretion is typically limited to

9    evaluating "whether the *defendant* will suffer some plain legal prejudice as a result

10   of the dismissal" (emphasis added)).  Here, there is no suggestion that the County

11   will be prejudiced by dismissal.  Thus, in denying dismissal under Rule 41(a)(2), the

12   Court's concerns—focused on its own desired powers of monitoring—address a

13   different, procedurally improper consideration.

14   The second is "based on concerns of practicality and logistics."  *Puello*, 2010

15   WL 1541503, at *3.  If a court denies a plaintiff's request to dismiss a case with

16   prejudice:  "Could the Court force the plaintiff to continue discovery, or offer

17   evidence?  Can or should the Court require plaintiff to litigate a claim" when the

18   plaintiff "has attempted to dismiss it?"  *Id.* (citation omitted).  The parties should not

19   be forced to litigate after they've settled.

20   Third, a case that is fully settled is no longer justiciable because there is no

21   case or controversy between the parties.  Under Article III of the Constitution, the

22   federal judiciary is only vested with power to decide "Cases" or "Controversies"

23   through an adversary process.  *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S.

24   125, 132-33 (2011) ("Continued adherence to the case-or-controversy requirement

25   of Article III maintains the public's confidence in an unelected but restrained

26   Federal Judiciary").

27   This is core to the separation of powers doctrine.  "Federal courts do not

28   possess a roving commission to publicly opine on every legal question," nor do they

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

611761.4

22

ER 116

1  "exercise general legal oversight of the Legislative and Executive Branches, or of

2  private entities." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021)

3  ("Article III grants federal courts the power to redress harms that defendants cause

4  plaintiffs, not a freewheeling power to hold defendants accountable for legal

5  infractions." (citation omitted)); *United States v. Sineneng-Smith*, 140 S. Ct 1575,

6  1579 (2020) ("our system 'is designed around the premise that [parties represented

7  by competent counsel] know what is best for them, and are responsible for

8  advancing the facts and argument entitling them to relief'"; courts "do not, or should

9  not, sally forth each day looking for wrongs to right" (alteration in original)

10  (citations omitted)).

11      As the Ninth Circuit has already instructed, this Court only has "equitable

12  power to grant relief" on the "case or controversy before it." *LA All.*, 14 F.4th at

13  957 (citation omitted).  That controversy has now been resolved (twice), and the

14  case *must* be dismissed.

15      ***This Court improperly conditioned approval of the parties' stipulated***

16  ***dismissal on changing the terms of their settlement agreement.***  This Court's

17  limited power under Rule 41(a)(2) does not permit the Court to rewrite the

18  settlement agreement or condition dismissal on giving the Court additional powers

19  of judicial oversight that are not agreed to by the parties.  Case law *only* supports the

20  imposition of terms "to prevent prejudice to the defendant." *Hamilton*, 679 F.2d at

21  146; *McCall-Bey v. Franzen*, 777 F.2d 1178, 1184 (7th Cir. 1985) ("it has been

22  uniformly assumed" that "the terms and conditions must be for the defendant's

23  benefit"); *McLaughlin v. Cheshire*, 676 F.2d 855, 856 (D.C. Cir. 1982) (the

24  discretion that a court has in imposing terms and conditions in a Rule 41(a)(2)

25  dismissal is "limited to imposing conditions that will alleviate harm (other than

26  tactical disadvantage) that the defendant will suffer if the motion is granted.");

27  *LeCompte v. Mr. Chip, Inc.*, 528 F.2d 601, 604-05 (5th Cir. 1976) (in ruling on

28  motions for voluntary dismissals, the court "should impose only those conditions

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

611761.4

23

1  which will alleviate the harm caused to the defendant"; reversing district court's

2  conditions on Rule 41(a)(2) dismissal where there was no indication "how

3  defendants would be prejudiced by an unconditional dismissal").

4      This Court has acknowledged "this is not a class action settlement."

5  (Hashmall Decl. Ex. P at 50.)  No precedent allows the Court to impose new terms

6  and conditions in the "public interest" in this context, particularly where, as here, the

7  Intervenors have urged the Court to approve the settlement agreement and dismiss

8  the litigation.  *See In re Smith*, 926 F.2d 1027, 1029-30 (11th Cir. 1991) (granting

9  writ of mandamus, directing district court to vacate order disapproving settlement

10  agreement "based on the 'unrepresented interests' of Florida taxpayers"); *Gardiner*

11  *v. A.H. Robins Co., Inc.*, 747 F.2d 1180, 1185-88 (8th Cir. 1984) (district court had

12  no authority to approve settlement agreement underlying stipulated dismissal).

13      The parties chose a judicial enforcement mechanism that carefully balances

14  the parties' desire for accountability and effective enforcement, while avoiding the

15  type of expansive judicial supervision that raises "sensitive federalism concerns"

16  (*Horne v. Flores*, 557 U.S. 433, 448 (2009)) and risks improperly depriving state

17  officeholders of "their designated legislative and executive powers."  *Frew ex rel.*

18  *Frew v. Hawkins*, 540 U.S. 431, 441 (2004).  The Court's conduct here, attempting

19  to dictate the County's budget priorities and policy choices beyond the purview of

20  this fully-settled litigation, proves the County's concerns are well-founded.

21  **V.**    **CONCLUSION**

22      For these reasons, the County respectfully requests that the Court amend its

23  April 20 Order to certify it for interlocutory appeal under 28 U.S.C. § 1292(b).

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

**24**

**ER 118**

DATED:  April 28, 2023          MILLER BARONDESS, LLP


                                By:      /s/ Mira Hashmall
                                      _____
                                      MIRA HASHMALL
                                      Attorneys for Defendant
                                      COUNTY OF LOS ANGELES

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

611761.4

25

DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR CERTIFICATION OF COURT'S
APRIL 20, 2023 ORDER PURSUANT TO 28 U.S.C. § 1292(b)

1  DAWYN R. HARRISON, *County Counsel* (State Bar No. 173855)
   dharrison@counsel.lacounty.gov
2  JENNIFER A.D. LEHMAN, *Assistant County Counsel* (State Bar No. 191477)
   jlehman@counsel.lacounty.gov
3  ANA WAI-KWAN LAI, *Senior Deputy County Counsel* (State Bar No. 257931)
   alai@counsel.lacounty.gov
4  OFFICE OF COUNTY COUNSEL
5  500 West Temple Street, Suite 468
   Los Angeles, California 90012
6  Telephone:  (213) 974-1830
   Facsimile:  (213) 626-7446
7

8  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
9  MIRA HASHMALL (State Bar No. 216842)
   mhashmall@millerbarondess.com
10 MILLER BARONDESS, LLP
11 2121 Avenue of the Stars, Suite 2600
   Los Angeles, California 90067
12 Telephone:  (310) 552-4400
   Facsimile:  (310) 552-8400
13

14 Attorneys for Defendant
   COUNTY OF LOS ANGELES
15

16                **UNITED STATES DISTRICT COURT**

17        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

18

19 LA ALLIANCE FOR HUMAN            **CASE NO. 2:20-cv-02291 DOC (KES)**
   RIGHTS, et al.,
20                                   **DEFENDANT COUNTY OF**
                                     **LOS ANGELES' NOTICE OF**
21         Plaintiffs,               **WITHDRAWAL OF CONSENT TO**
                                     ***EX PARTE* COMMUNICATIONS**
22     v.
                                     Assigned to the Hon. David O. Carter
23 CITY OF LOS ANGELES, et al.,      and Magistrate Judge Karen E. Scott

24         Defendants.

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

612236.2

1  **TO THE COURT, ALL PARTIES, AND THEIR RESPECTIVE COUNSEL**
2  **OF RECORD:**

3      At an emergency status conference conducted on March 19, 2020, the Court
4  requested that the Parties consent to *ex parte* communications between and/or
5  among the Court; other judicial officers in the Central District of California; the
6  Parties (including Intervenors); and relevant non-parties, such as state and local
7  government leaders.  (*See* Dkt. 39 (Tr. of March 19, 2020 Status Conf. at 7:24–8:10,
8  109:8–112:3).)  At the time, the Parties (including Intervenors) agreed to permit *ex*
9  *parte* communications.  (*Id.* at 117:1–22.)  The Court suggested that "if [the Parties]
10  get to litigation," an appropriate course in light of the prior *ex parte* communications
11  would be to solicit the involvement of other "judges who can litigate" the matter, in
12  contrast to this Court's more involved role regarding settlement that justified the
13  need for *ex parte* communications.  (*Id.* at 111:10–11.)

14      This action has been pending for more than three years.  On March 25, 2022,
15  the County withdrew its consent to *ex parte* communications with the Court.
16  (Dkt. 403.)  The Parties then resumed efforts to resolve this matter through
17  settlement.

18      In October 2022, the County and Plaintiffs reached a historic settlement
19  agreement that provides much-needed additional resources within the City and
20  County of Los Angeles to increase beds, services, outreach, and interim housing for
21  the most vulnerable people experiencing homelessness.  (Dkt. 485.)  Accordingly, in
22  light of the settlement, the Parties submitted a joint stipulation for dismissal of the
23  action with prejudice.  (*Id.*)

24      The Court conducted a hearing on November 14, 2022 regarding the
25  County/Plaintiffs settlement.  (Dkt. 473.)  The Court refused "to endorse" the
26  agreement based on its belief "that we can do much better," though it acknowledged
27  its "unorthodox" approach is "rightfully subject to debate and criticism."  (Tr. of
28  November 14, 2022 Settlement Conf. at 12:12-14, 17:21-23.)  The Court then put

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

612236.2                                           2

1  the agreement "on hold," pending the installation of newly elected officials.  (*Id.* at

2  18:21-19:1.)

3          The Court held a second hearing on the County/Plaintiffs settlement on

4  January 17, 2023 and requested the presence of the elected officials.  (Dkt. 508.)  At

5  the hearing, and at the Court's urging, the County, Plaintiffs, and the City agreed

6  that the Court could re-engage in *ex parte* communications.  (Tr. of January 17,

7  2023 Status Conf. at 47:9-25.)  The Parties agreed to negotiate further, and the Court

8  set a conference regarding the County/Plaintiffs settlement on April 20, 2023.  (*Id.*

9  at 40:9-13; Dkt. 530.)

10         On April 18, 2023, the Parties executed an addendum to the agreement.  (Dkt.

11 533.)  The settlement agreement, as modified by the addendum, includes 1,000 new

12 mental health and substance use disorder beds for the unhoused and effectively

13 tripled the value of the resources in the settlement agreement from $236 million to

14 over $850 million.  (*Id.*)

15         At the April 20 hearing, the Court criticized the settlement agreement and

16 demanded that the Parties change its terms.  Ultimately, the Court denied the

17 Parties' joint stipulation for dismissal of the action with prejudice, set May 3 as the

18 County's deadline for responding to the Second Amended Complaint, and set a

19 Rule 16 Scheduling Conference for May 9.  (Dkt. 534.)  Because the Court is

20 forcing the Parties to continue down a litigation path, there should be no more

21 *ex parte* communications with the Court pursuant to Local Rule of Court 83-2.5 for

22 the Central District of California.

23         **PLEASE TAKE NOTICE** that Defendant County of Los Angeles, by and

24 through its counsel of record, hereby withdraws its consent to the Court's *ex parte*

25 communications in the above-captioned matter.

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  DATED:  April 28, 2023          MILLER BARONDESS, LLP

2

3

4                                          By:  _____/s/ Mira Hashmall_____

5                                                    MIRA HASHMALL
                                                     Attorneys for Defendant
6                                                    COUNTY OF LOS ANGELES

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

612236.2                                    4

DEFENDANT COUNTY OF LOS ANGELES' NOTICE OF WITHDRAWAL OF CONSENT TO EX PARTE
COMMUNICATIONS

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

1  MATTHEW D. UMHOFER (State Bar No. 206607)
   matthew@umklaw.com
2  ELIZABETH A. MITCHELL (State Bar No. 251139)
   elizabeth@umklaw.com
3  UMHOFER, MITCHELL & KING LLP
   11766 Wilshire Boulevard, Suite 900
4  Los Angeles, California 90025
   Telephone:   (213) 394-7979
5  Facsimile:    (213) 529-1027
6
7  Attorneys for Plaintiffs

8
   LOUIS R. MILLER (State Bar No. 54141)
9  smiller@millerbarondess.com
   MIRA HASHMALL (State Bar No. 216842)
10 mhashmall@millerbarondess.com
   MILLER BARONDESS, LLP
11 2121 Avenue of the Stars, Suite 2600
   Los Angeles, California 90067
12 Telephone:   (310) 552-4400
   Facsimile:    (310) 552-8400
13
14
   Attorneys for Defendant
15 COUNTY OF LOS ANGELES

16
                    **UNITED STATES DISTRICT COURT**
17
         **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
18
19
   LA ALLIANCE FOR HUMAN              **CASE NO. 2:20-cv-02291 DOC (KES)**
20 RIGHTS, et al.,
                                      **JOINT SUBMISSION OF**
21          Plaintiffs,               **ADDENDUM TO SETTLEMENT**
                                      **AGREEMENT**
22     v.
23
   CITY OF LOS ANGELES, et al.,
24                                    Assigned to the Hon. David O. Carter
            Defendants.              and Magistrate Judge Karen E. Scott
25
26
27
28

611415.2
_____
         JOINT SUBMISSION OF ADDENDUM TO SETTLEMENT AGREEMENT

**ER 124**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

1   **TO THE COURT, ALL PARTIES AND THEIR RESPECTIVE COUNSEL**

2   **OF RECORD:**

3       **PLEASE TAKE NOTICE** that Plaintiffs LA Alliance for Human Rights,

4   Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karen Pinsky, Charles Malow, and

5   George Frem (collectively, "Plaintiffs") and Defendant County of Los Angeles

6   ("County" and together with Plaintiffs, the "Parties") reached a settlement in the

7   above-captioned case, which was submitted to the Court on October 17, 2022.  [Dkt.

8   485.]

9       On January 20, 2023, the Court entered a Scheduling Order Following

10  01/17/2023 Settlement Hearing [Dkt. 519] ordering the Parties to submit their

11  Proposed Settlement Agreement by April 17, 2023.  Thereafter, the Court approved

12  the Parties' request for an additional day to comply with the scheduling order.

13      The Parties dedicated significant time and resources to reaching additional

14  settlement terms.  Attached hereto as **Exhibit A** is the Stipulation for Voluntary

15  Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2) submitted on

16  October 17, 2022 [Dkt. 485].  Attached hereto as **Exhibit B** is the Parties' fully-

17  executed Addendum to Settlement Agreement.  The Addendum will provide

18  substantial new resources, including 1,000 new mental health and substance use

19  disorder beds for the unhoused, as well as 450 subsidies to provide individuals at

20  risk of homelessness with Enriched Residential Care in Adult Residential Facilities

21  and Residential Care Facilities for the Elderly, commonly called "Board and Care"

22  beds, throughout the county.

23      For the reasons set forth herein and in the Stipulation for Voluntary Dismissal

24  pursuant to Federal Rule of Civil Procedure 41(a)(2) submitted on October 17, 2022

25  [Dkt. 485], the Parties hereby respectfully request that the Court enter an order

26  dismissing Plaintiffs' claims against the County with prejudice and retaining

27  jurisdiction for purposes of enforcing their agreement until the end of fiscal year

28  2026-2027 (*i.e.*, June 30, 2027).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1 DATED: April 18, 2023          UMHOFER, MITCHELL & KING LLP

2

3

4                                 By: _____/s/ Elizabeth A. Mitchell_____
                                      ELIZABETH A. MITCHELL
5                                     Attorneys for Plaintiffs

6

7 DATED: April 18, 2023          MILLER BARONDESS, LLP

8

9

10                                By: _____/s/ Mira Hashmall_____
                                      MIRA HASHMALL
11                                    Attorneys for Defendant
                                      COUNTY OF LOS ANGELES
12

13

14                       **ATTORNEY ATTESTATION**

15        The other signatories listed, and on whose behalf the filing is submitted,

16 concur in the filing's content and have authorized the filing.

17

18 DATED: April 18, 2023          MILLER BARONDESS, LLP

19

20

21                                By: _____/s/ Mira Hashmall_____
                                      MIRA HASHMALL
22                                    Attorneys for Defendant
                                      COUNTY OF LOS ANGELES
23

24

25

26

27

28

## INDEX OF EXHIBITS

| Ex. No. | Description | Pg. No. |
|---------|-------------|---------|
| A. | Stipulation for Voluntary Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2) submitted on October 17, 2022 [Dkt. 485] | 5-23 |
| B. | Addendum to Settlement Agreement | 24-36 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

611415.2

4

JOINT SUBMISSION OF ADDENDUM OF SETTLEMENT AGREEMENT

# EXHIBIT A

1  SPERTUS, LANDES & UMHOFER, LLP
2  Matthew Donald Umhofer (SBN 206607)
   Elizabeth A. Mitchell (SBN 251139)
3  617 W. 7th Street, Suite 200
   Los Angeles, California 90017
4  Telephone: (213) 205-6520
   Facsimile: (213) 205-6521
5  mumhofer@spertuslaw.com
   emitchell@spertuslaw.com
6  *Attorneys for Plaintiffs*

7
8  DAWYN R. HARRISON, Acting County Counsel (SBN 173855)
   dharrison@counsel.lacounty.gov
9  JENNIFER A.D. LEHMAN, Assistant County Counsel (SBN 191477)
   jlehman@counsel.lacounty.gov
10 ANA WAI-KWAN LAI, Senior Deputy County Counsel (SBN 257931)
   alai@counsel.lacounty.gov
11 OFFICE OF COUNTY COUNSEL
   500 West Temple Street, Suite 468
12 Los Angeles, California 90012
   Telephone: (213) 974-1830
13 Facsimile: (213) 626-7446

14 [*Additional counsel continued on following page.*]

15
16                UNITED STATES DISTRICT COURT
17                CENTRAL DISTRICT OF CALIFORNIA
18

19 LA ALLIANCE FOR HUMAN          CASE NO. 2:20-CV-02291-DOC-KES
   RIGHTS, *et al.*,
20                                Assigned to Judge David O. Carter
         Plaintiffs,
21
         v.                       **STIPULATION FOR VOLUNTARY**
22                                **DISMISSAL WITH PREJUDICE**
   CITY OF LOS ANGELES, *et al.*, **PURSUANT TO FEDERAL RULE**
23                                **OF CIVIL PROCEDURE 41(a)(2)**
         Defendants.
24
25
26
27
28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   Louis R. Miller (SBN 54141)
    Mira Hashmall (SBN 216842)
2   MILLER | BARONDESS LLP
    1999 Avenue of the Stars, Suite 1000
3   Los Angeles, CA 90067
    Main: 310-552-4400
4   Direct: 310-552-7560
    Fax: 310-552-8400
5   mhashmall@millerbarondess.com

6   *Attorneys for Defendant*
    COUNTY OF LOS ANGELES
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*(vertical left margin:)* Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

STIPULATION FOR VOLUNTARY DISMISSAL WITH PREJUDICE
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 41(a)(2)

**Exhibit A, Page 7**
**ER 130**

**TO THE COURT, ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

    **PLEASE TAKE NOTICE** that Plaintiffs LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karen Pinsky, Charles Malow, and George Frem ("Plaintiffs") and Defendant County of Los Angeles ("County") have reached a settlement in the above-captioned case.  Pursuant to Federal Rule of Civil Procedure 41(a)(2), Plaintiffs hereby request an order dismissing this action against the County with regard to all claims in their entirety, with prejudice, and request this Court retain jurisdiction for purposes of enforcing their agreement until the end of fiscal year 2026/2027 (*i.e.*, June 30, 2027). A copy of the settlement agreement is attached hereto as **Exhibit 1**.

    Rule 41(a)(2) permits a plaintiff to seek a voluntary dismissal by court order if dismissal is no longer available as of right under Rule 41(a)(1)(A)(i).  Because the County has served an answer [Dkt. 320], a court order is required for Plaintiffs to dismiss their claims against the County.  *See* Fed. R. Civ. P. 41(a)(1) (a "plaintiff may dismiss an action without a court order by filing . . . a notice of dismissal before the opposing party serves either an answer" or "a stipulation of dismissal signed by all parties who have appeared").[1]  A request for voluntary dismissal should be denied only when the defendant will suffer "plain legal prejudice."  *Waller v. Financial Corp. of Am.*, 828 F.2d 579, 583 (9th Cir. 1987).  The County will suffer no legal prejudice because the County consents to Plaintiffs' request for dismissal, which is submitted by Plaintiffs as a condition of the settlement reached between the County and Plaintiffs.

    Rule 41(a)(2) provides that the trial court may impose terms and conditions on an order of voluntary dismissal.  Fed. R. Civ. P. 41(a)(2).  The purpose of this rule is

---

[1] The parties are also unable to obtain consent to a stipulated dismissal from Gary Whitter, who has been incommunicable for months, as explained in Plaintiffs' counsel's July 11, 2022 *Ex Parte* Application to Withdraw as Counsel.  [Dkt. 450.]

1

STIPULATION FOR VOLUNTARY DISMISSAL WITH PREJUDICE
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 41(a)(2)

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1  to protect the defendant from prejudice. *See Cross v. Westchester Dev. Corp. V*

2  *Chiulli*, 887 F.2d 431, 432 (2nd Cir. 1989); *McCall-Bey v. Franzen*, 777 F.2d 1178,

3  1183-84 (7th Cir. 1985). Because the County will not be prejudiced in any way by

4  the requested order, there is no need to impose any conditions to the order granting

5  dismissal. Moreover, the parties' settlement agreement provides for the allocation of

6  costs and attorneys' fees.

7  ## CONCLUSION

8       For the foregoing reasons, Plaintiffs and the County respectfully request that

9  the Court enter an order dismissing Plaintiffs' claims against the County with

10  prejudice and retaining jurisdiction for purposes of enforcing their agreement until

11  the end of fiscal year 2026/2027 (*i.e.*, June 30, 2027).

13  Dated: October 17, 2022     Respectfully submitted,

15       */s/ Elizabeth A. Mitchell*
          SPERTUS, LANDES & UMHOFER, LLP
16       Elizabeth A. Mitchell

17       *Attorneys for Plaintiffs*

18       *The other signatories listed, and on whose behalf the*
          *filing is submitted, concur in the filing's content and*
19       *have authorized the filing.*

21  Dated: October 17, 2022     */s/ Louis R. Miller*
          MILLER | BARONDESS LLP
22       Mira Hashmall

23       *Attorneys for Defendant County of Los Angeles*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705

2
STIPULATION FOR VOLUNTARY DISMISSAL WITH PREJUDICE
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 41(a)(2)

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into in connection with the action *LA Alliance for Human Rights et al. v. City of Los Angeles et al.*, U.S. District Court for the Central District of California, Case No. 2:20-cv-02291 (the "Action") by and between the County of Los Angeles ("County"); LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karyn Pinsky, Charles Malow, and George Frem (collectively, "Plaintiffs"); and Spertus, Landes, & Umhofer, LLP ("Plaintiffs' Counsel"), solely with respect to Section B.5 of this Agreement.  Each of the County and Plaintiffs is referred to individually as a "Party" and collectively as the "Parties."

In and through this landmark Agreement, the Parties desire to end the Action and also address the needs of People Experiencing Homelessness ("PEH") by supporting the development of housing units and the provision of a comprehensive and targeted array of supportive services designed to prevent and end homelessness, and by strengthening existing agreements and partnerships between and among relevant stakeholders such as the Parties and the City of Los Angeles ("City").  This Agreement follows over two years of contested litigation involving significant motion practice and an appeal, and months of arduous mediation attended by the Parties and the City.  All Parties have found and determined that this Agreement is entered into for good consideration following a lengthy negotiation and revision process.

## RECITALS

WHEREAS, Plaintiff LA Alliance for Human Rights ("Alliance") is an incorporated non-profit membership association in Los Angeles, California;

WHEREAS, Alliance's members include Plaintiffs Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karyn Pinsky, Charles Malow, George Frem, Charles Van Scoy, Leonard Suarez, all other individual plaintiffs that appeared in the Action, and current and/or former homeless individuals, non-profit organizations, community leaders, employees, residents, business owners, service providers, and community members residing and/or working in the County and/or the City;

WHEREAS, on March 10, 2020, Plaintiffs initiated the Action against the City and the County in the District Court for the Central District of California, where it was assigned to the Honorable David O. Carter ("District Court");

WHEREAS, on April 20, 2021, the District Court entered a preliminary injunction against the City and County, ordering the County to, *inter alia,* cease any sales, transfers or leases of County-owned properties, shelter and provide treatment services to all residents of Skid Row, and prepare numerous audits and reports (ECF No. 277);

WHEREAS, on October 15, 2021, the United States Court of Appeals for the Ninth Circuit vacated the injunction issued by the District Court and remanded the Action to the District Court;

WHEREAS, on November 1, 2021, Plaintiffs filed a First Amended and Supplemental Complaint ("FASC") against the City and the County (ECF No. 361);

WHEREAS, the County denied all claims in the FASC and filed a motion to dismiss the FASC, which was taken under submission by the District Court following a hearing on January 24, 2022 (ECF No. 370);

WHEREAS, while the County's motion to dismiss was pending, Plaintiffs and the City entered into a settlement agreement to which the County is not a party (the "City Settlement"), and also filed a stipulated order of dismissal as to Plaintiffs' claims against the City (ECF Nos. 426-1, 429-1);

WHEREAS, on June 14, 2022, the District Court entered an order approving the settlement agreement between Plaintiffs and the City, and dismissing with prejudice Plaintiffs' claims against the City as alleged in the FASC (ECF No. 445) but retained jurisdiction for purposes of enforcement;

WHEREAS, on July 15, 2022, Plaintiffs filed a Second Amended and Supplemental Complaint ("SASC") against the County (ECF No. 454);

WHEREAS, the County expressly denies all claims alleged in the SASC;

WHEREAS, the Parties have participated in multiple mediation sessions before neutral third parties at which all Parties were represented by sophisticated counsel of their choosing and engaged in arms-length negotiations that resulted in this Agreement;

WHEREAS, Plaintiffs and the County now desire to fully and finally compromise and settle all claims arising out of or relating to all matters alleged or that could have been alleged in the Action with respect to the Parties, without any admission of fault, liability, or wrongdoing, in the interests of avoiding the additional expense and the inherent uncertainties of protracted litigation upon the terms and conditions set forth in this Agreement; and

NOW THEREFORE, in consideration of the promises, covenants, warranties, representations, and conditions contained herein, for good and valuable consideration given hereunder, and with the intent to be legally bound, the Parties hereby agree as follows:

## TERMS

A.    **Effective Date and Duration**:

1.    Subject to the requirements of Sections A.2 and E, this Agreement shall become effective and operative on the date that the District Court enters an Order dismissing, with prejudice, the Action, subject to the court's continuing enforcement in accordance with Section P of this Agreement.

2.    The effectiveness of this Agreement is expressly subject to and contingent upon approval by the County's approval of settlements process, including by the Los Angeles County Claims Board and/or the County Board of Supervisors, and by approval of the individual Plaintiffs.

3.    The County's obligations in Section D.1–9 of this Agreement shall terminate at the end of fiscal year 2026/2027 (*i.e.*, June 30, 2027).

B.    **Representations, Warranties, and Acknowledgements**:

1.    Plaintiffs represent and warrant that they have not assigned, transferred, granted, or purported to assign, transfer, or grant, any of the claims, demands, and causes of action disposed of by this Agreement.

Page **2** of **11**

     **2.**     Each Party represents and warrants that he, she, or it has read this Agreement in its entirety, understands its contents, and is signing this Agreement freely and voluntarily, without duress or undue influence from any other Party.

     **3.**     Each Party represents and warrants that he, she, or it has been represented by independent counsel of his, her, or its own choosing and that, before their execution of this Agreement, each has had an adequate opportunity to conduct an independent investigation of all the facts and circumstances with respect to all matters that are the subject of this Agreement. Each Party further warrants and represents that he, she, or it executes this Agreement freely, knowingly, and voluntarily, that any representative executing this Agreement on behalf of any Party has the full authority of that Party to do so and thereby bind the Party represented, and that each Party is fully aware of and understands the content and effect of this Agreement.

     **4.**     Each Party represents and warrants that he, she, or it is not relying on any statement of fact or opinion made by any Party, or by anyone acting on behalf of any Party, to induce execution of this Agreement, other than those expressly set forth in this Agreement.

     **5.**     Plaintiffs and Plaintiffs' Counsel represent and warrant that they are not aware of any potential plaintiff other than Plaintiffs, or any attorney other than Plaintiffs' Counsel, who intends to make demands or bring litigation against the County relating to the allegations in the Action. Plaintiffs' Counsel represents and warrants that it does not represent any clients, or have knowledge of any potential clients, with claims or potential claims against County relating to those alleged in the Action aside from Plaintiffs.

     **6.**     Each Party acknowledges and agrees that the representations and warranties set forth in this Section are material inducements to the other Party's entering into this Agreement.

**C.**     <u>**Settlement Payment and Attorney's Fees**</u>:

     **1.**     In addition to the County's obligations set forth in Section D below, and further valuable consideration for the promises, representations, warranties, acknowledgements, and releases herein, the County shall pay the sum of $2 million (the "Payment") to the Spertus, Landes, & Umhofer, LLP attorney-client trust account, which shall be inclusive of all claims for attorneys' fees and costs claimed by Plaintiffs in the Action. Plaintiffs' Counsel may enter into a separate distribution agreement at their discretion. The County shall not be responsible for the allocation or payment of any sum between and among any of Plaintiffs, Plaintiffs' counsel, and any of their affiliates, representatives, members, agents, and assigns. Except for the Payment, each Party shall be responsible for and bear its own attorneys' fees and costs incurred in the Action including in connection with the negotiation and execution of this Agreement.

     **2.**     Plaintiffs and Plaintiffs' Counsel acknowledge that no representations have been made by the County regarding the taxability of all or any portion of this Agreement, and that they have had the opportunity to seek independent advice regarding the tax consequences of this Agreement and accept each responsibility for satisfaction of their own tax obligation(s) and/or liabilities, if any, that may result from this Agreement.

**D.**   **County's Obligations**:

   **1.**   **Support for Plaintiffs' Settlement with the City**:

   **i.**   From fiscal year 2022/2023 through fiscal year 2026/2027, the County shall fund and provide supportive services for interim housing and permanent supportive housing units financed by the City as part of the City Settlement, as units are developed by the City and become occupiable, in an amount to be determined solely by County and City in their respective discretion. These supportive services shall include, but shall not be limited to, "mainstream" services including public assistance programs, mental health services, substance use disorder services, and benefits advocacy services to clients who meet eligibility criteria for these services.

   **ii.**   The County shall provide City-funded outreach teams with access to Department of Mental Health ("DMH"), Department of Health Services ("DHS"), Department of Public Social Services ("DPSS"), and Department of Public Health ("DPH") services directly and through coordination with Multi-Disciplinary Teams ("MDTs") and Homeless Outreach & Mobile Engagement ("HOME") teams assigned within the City.

   **iii.**   The Parties acknowledge that the County does not support the enforcement component of the City's street engagement strategy and no funding or services from the County or any County department or affiliated agency committed herein will be used to support the City's street engagement strategy.

   **2.**   **Beds Available to County Outreach Teams**: Throughout the term of this Agreement, the County shall make reasonable best efforts to ensure County outreach teams (including the increased MDT and HOME teams referenced above) have access to County Homeless Initiative-funded high service need interim housing beds for PEH in the City, and that those beds shall either be exclusively for use by, or prioritize, PEH in the City.

   **3.**   **Mental Health/Substance Use Disorder Beds**: By the end of fiscal year 2023/2024 (*i.e.*, June 30, 2024), the County shall develop 300 additional substance use and mental health beds according to the greatest need as solely determined by the County.

   **4.**   **Multi-Disciplinary Teams (MDTs)**: The County shall increase to 34 from 22 (numbers based on what is currently required and could be subject to change based on the latest point-in-time count) the number of MDTs dedicated to conducting outreach exclusively in the City, allocating at least 1 team per Council District and remaining teams assigned where there is the greatest need as informed by the Point-In-Time Count. The County shall increase the number of MDTs from 22 to a minimum of 28 by the end of fiscal year 2022/2023 (*i.e.*, June 30, 2023) and to a minimum of 34 by the end of fiscal year 2023/2024 (*i.e.*, June 30, 2024).

   **5.**   **Homeless Outreach and Mobile Engagement (HOME) Teams**: The County shall increase to 10 from 5.5 (numbers based on what is currently required and could be subject to change based on the latest point-in-time count) the number of HOME teams dedicated to conducting outreach exclusively in the City. The County shall increase the number of HOME teams from 5.5 to a minimum of 8 by the end of fiscal year 2022/2023 (*i.e.*, June 30, 2023) and to a minimum of 10 by the end of fiscal year 2023/2024 (*i.e.*, June 30, 2024).

**6.** **Partnership on City- and County-Owned Land**: Throughout the term of this Agreement, the County shall continue to work with the City in making available to each other appropriate City- and/or County-owned land, located within the City's jurisdiction, to create new interim or permanent housing units as mutually agreed by County and City.

**7.** **PEH with Serious Mental Illness or Substance Use Disorders**: The County acknowledges it has responsibilities under State and federal law to provide services, including but not limited to clinical treatment, to eligible County residents suffering from serious mental illness and/or substance use disorders, including PEH in the City. Throughout the term of this Agreement, County shall work with the City to advocate and apply for additional state and federal funding for this purpose as mutually agreed to by County and City.

**8.** **New Funding**: If the County or City obtains significant new funding from City ballot initiative United to House L.A. or County Measure H extension for the housing and/or services outlined in this Agreement, the County shall consider and may propose potential amendments to this Agreement to enhance housing and services City-wide or County-wide. Such amendments may include (but not be limited to) continuation of operations and supportive services for the permanent and interim units beyond the term of the Agreement, or redeployment of resources to address homelessness in other cities or unincorporated County jurisdictions.

**9.** **Reporting**: The County shall file reports regarding its progress in meeting its obligations under this Agreement quarterly. Each status report shall be provided within 30 days of the end of the County's fiscal quarter. Reports shall include the following:

    **i.** **Support for Plaintiffs' Settlement with the City**:

    (1) Upon receiving information from City at least 30 days before a quarterly report is due, County shall include a status regarding support services for interim and permanent supportive housing units: what units are being supported, what services have been provided, and numbers of PEH accessing services. County shall have no responsibility to confirm or otherwise verify the accuracy or completeness of the information provided to it by City or on behalf of City;

    (2) Upon receiving information from City at least 30 days before a quarterly report is due, County shall include the number of contacts or service support requests by City Outreach worker, and the result of those contacts and/or service support requests, including (a) type or types of service requests, (b) agency or organization to provide/which provided services, (c) number of requests per individual, and (d) location where request was made. County shall have no responsibility to confirm or otherwise verify the accuracy or completeness of the information provided to it by City or on behalf of City.

    **ii.** **Beds Available to County Outreach Teams**:

    (1) The number of referrals to Homeless Initiative-funded high service need interim housing beds, the type of team making the referral, the disposition of the referral, and an explanation for any referrals that are not approved (if any).

Page **5** of **11**

**Exhibit A, Page 14**
**ER 137**

     **iii.**    **Mental Health/Substance Use Disorder Beds**:

     (1)    The number of beds that have been developed (or status thereon) under this agreement, what said beds are being used for, and basis for determining greatest need.

     **iv.**    **Multi-Disciplinary Teams**:

     (1)    The number of MDTs deployed under this agreement, where, and how the greatest need has been evaluated (or re-evaluated).

     **v.**    **Homeless Outreach and Mobile Engagement Teams**:

     (1)    The number of HOME teams deployed under this agreement, where, and how the greatest need has been evaluated (or re-evaluated).

     **vi.**    **Partnership on City- and County-Owned Land**:

     (1)    A status of City/County's land partnership.

     **vii.**    **PEH with Serious Mental Illness or Substance Use Disorders**:

     (1)    Status regarding any advocacy or applications for additional state or federal funding for PEH with serious mental illness or substance use disorders.

**E.**    **Releases:**

     **1.**    Plaintiffs, including each of their heirs, spouses, trustees, successors, assigns, agents, representatives, attorneys, employees, officers, directors, shareholders, members, managers, principals, partners, insurers, and predecessors (collectively, the "Releasing Parties"), hereby absolutely and forever release and discharge the County, including all of its boards, bureaus, departments, elected and appointed officials, representatives, attorneys, administrators, officers, agents, employees, and all persons that acted on behalf of the County, and each of their predecessors, successors, agents, and assigns (the "County Released Parties"), from any and all claims, including claims for damages, damages, demands, actions, causes of action, suits, covenants, settlements, contracts, agreements, and liabilities for personal injuries, property damage, loss, cost or expense of every nature whatsoever, whether known or unknown, contingent or otherwise, at law or in equity, and whether or not expected to exist which the undersigned Plaintiffs to this Agreement had, have, or may have against the County Released Parties, and each of them, that arise out of or are related to the Action, and any allegations, events, transactions or occurrences that were alleged or that could have been alleged therein ("Claims").

     **2.**    The Releasing Parties acknowledge that they are aware that statutes exist that render null and void releases and discharges of any claims, rights, demands, liabilities, actions and causes of action that are unknown to the releasing or discharging parties at the time of execution of those releases and discharges. The Releasing Parties expressly waive, surrender, and agree to forego any protection to which they would otherwise be entitled by virtue of the

existence of any statute in any jurisdiction, including California.  Plaintiffs acknowledge that they are familiar with section 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

It is understood and agreed that all rights under section 1542 of the California Civil Code are expressly waived by the Releasing Parties, to the full extent allowed by law.  The Releasing Parties agree that this Agreement extends and applies to all unknown, unsuspected and unanticipated claims, demands, injuries, or damages within the scope of this Agreement and the releases herein.  The Releasing Parties waive any equivalent provision of any statute of the United States or any other state or jurisdiction with respect to such claims, demands, injuries, or damages within the scope of this Agreement.

The Releasing Parties recognize and acknowledge that factors which have induced each of them to enter into this agreement may turn out to be incorrect or to be different from what they had previously anticipated, and they hereby expressly assume any and all of the risks thereof and further expressly assumes the risks of waiving the rights provided by California Civil Code section 1542.

3.      Releasing Party does not waive future claims, subject to corresponding statute of limitations, after the term of the Agreement ends.  The Releasing Parties agree that the Payment and the County's obligations set forth in Section D, pursuant to, and in accordance with this Agreement, is valuable consideration for the releases in this Section and every other benefit conferred upon them directly or indirectly under this Agreement.

4.      The Releasing Parties acknowledge that their execution and delivery of the releases in this Section is a condition of the County's obligations under this Agreement and that the County is relying on this release in carrying out its obligations under this Agreement.

F.      **Dismissal With Prejudice**:  Within five (5) days of the execution of this Agreement by all Parties, Plaintiffs shall file a Joint Stipulation For Voluntary Dismissal With Prejudice Pursuant to F.R.C.P. 41(a)(2) (the "Stipulation").  In the event that the District Court enters an order granting the Stipulation upon terms and conditions not agreed to by the Parties in this Agreement, the Parties may withdraw their consent to this Agreement and continue the Action if the Agreement and its terms never existed.

G.      **No Prevailing Party**:  The Parties agree that no Party to this Agreement is a prevailing party under any applicable law, including 42 U.S.C. § 1988 or similar fee-shifting statutes.

H.      **No Admission of Liability**:  This Agreement is the result of a compromise and for the purpose of settling disputed claims, and shall not at any time for any purpose constitute or be considered or deemed any admission of liability on the part of any Party hereto. Each Party expressly denies any wrongdoing or liability in connection with any action or omission relating

Page **7** of **11**

to one another.  This Agreement and any document related to this settlement, and the negotiations leading thereto, shall be inadmissible in evidence and shall not be used for any purpose in this or any other proceeding except in an action or proceeding to approve, interpret, implement, or enforce the Agreement.

**I.**    **Entire Agreement**:  This Agreement contains all of the terms and conditions agreed upon by the Parties regarding the subject matter of this Agreement, and supersedes all prior and contemporaneous oral and written agreements and discussions between Plaintiffs and County.

**J.**    **Construction**:  The Parties have collaborated with each other in drafting and preparing this Agreement.  No Party to this Agreement, or any Party's respective counsel, shall be deemed to have drafted this Agreement, and this Agreement shall not be construed as against any Party on such grounds.

**K.**    **No Oral Modifications:**  This Agreement constitutes the entire agreement between Parties hereto, and no oral understanding not incorporated herein shall be binding on any Party. This Agreement may only be modified, altered or revised, as necessary, by mutual consent of the parties hereto by the issuance of a written amendment, signed and dated by the Parties.

**L.**    **Successors**:  The provisions of this Agreement shall be deemed to extend to and inure to the benefit of the Parties' respective transferees, grantees, assigns, successors, heirs, trustees, executors, administrators, and any other person or entity claiming by or through them, and to extend to and obligate the Parties' respective transferees, grantees, assigns, heirs, trustees, executors, and administrators.

**M.**    **No Third Party Beneficiaries:**  Notwithstanding anything in this Agreement to the contrary, there are no intended third-party beneficiaries that may assert rights or defenses under this Agreement, except the Parties to this Agreement and their Counsel.

**N.**    **Severability**:  Should any part of this Agreement be declared invalid, void or unenforceable, all remaining parts shall remain in full force and effect and shall in no way be invalidated or affected.

**O.**    **Choice of Law**:  This Agreement in all respects shall be interpreted, enforced, and governed by and under the laws of the State of California applicable to instruments, persons, and transactions that have legal contracts and relationships solely within the State of California.

**P.**    **Dispute Resolution**:

    **1.**    The Parties agree that the procedures contained in this Section are the required and exclusive steps for resolving any dispute between the Parties arising out of or relating to this Agreement or any Party's rights or obligations hereunder ("Dispute").

        **i.**    Dispute Initiation/Right to Cure:  In the event of any dispute between the Parties arising out of or relating to this Agreement or any Party's rights or obligations hereunder, a Party wishing to raise a claim, demand, or cause of action (the "Claiming Party") against any other Party (the "Responding Party") shall, before taking any other action concerning the dispute, provide to the Responding Party written notice setting out in reasonable detail the nature

Page **8** of **11**

of the dispute and the relief sought ("Notice of Dispute"). The Parties shall meet and confer within a reasonable time in a good-faith effort to resolve the dispute through informal negotiations. Any Party that is alleged in a Notice of Dispute to be in breach of this Agreement, and who, after meeting and conferring, requests an opportunity to cure, shall have up to one hundred twenty (120) days after receipt of the Notice of Dispute to cure such alleged breach, unless otherwise agreed ("Cure Period"). No Party will be considered in breach of this Agreement unless it is alleged that such Party has failed to substantially perform its obligations under this Agreement ("Breach").

        **ii.**    <u>Judicial Enforcement</u>:  If, after exhausting the dispute resolution procedures described in Section (P)(1)(i), the Claiming Party still alleges the Responding Party is in breach of this Agreement, the Claiming Party may file a notice of breach and request for judicial enforcement in the District Court to remedy such alleged breach. The District Court retains jurisdiction, at its discretion, for purposes of enforcing this Agreement until the end of fiscal year 2026/2027 (*i.e.*, June 30, 2027). The only relief that any Party may seek in the event of an alleged Breach of this Agreement will be an order compelling specific performance of the Agreement. No Party may seek monetary damages of any kind as a result of an alleged Breach.

        **2.**    Each Party shall bear his, her, or its own costs and fees in connection with any of the dispute resolution processes under this Section.

**Q.**    <u>**Notices.**</u>  All notices to be sent under this Agreement shall be delivered as follows and shall reference the Action in the subject line of the notice:

        **1.**    *For Plaintiffs*:
        Spertus Landes & Umhofer LLP
        617 W. 7th Street, Suite 200
        Los Angeles, CA 90017
        Attention: Matthew Donald Umhofer, Elizabeth Mitchell
        matthew@spertuslaw.com, emitchell@spertuslaw.com
        **2.**    *For the County*:
        Office of County Counsel
        500 West Temple Street, Suite 648
        Los Angeles, California 90012
        Attention: Ana Lai; Jennifer Lehman
        alai@counsel.lacounty.gov; jlehman@counsel.lacounty.gov

    Any Party may change its notice recipient or address for providing notice to it by notifying the other Party(ies) in writing setting forth such new notice recipient or address.

**R.**    <u>**Force Majeure**</u>: No Party to this Agreement shall be deemed in violation if it is prevented or delayed from performing any of the obligations hereunder by reason of boycotts, labor disputes, embargoes, shortage of material, act of God, strikes, lockouts, inability to procure labor or materials, fire, accident, laws or regulations of general applicability, act of superior governmental authority, weather conditions, sabotage, or any other cause or circumstances for which it is not responsible and beyond its control (financial inability excepted). A Party that is delayed from performing its obligations hereunder shall make reasonable best efforts to perform

Page **9** of **11**

its obligation at the earliest time possible. Any Party intending to assert force majeure shall notify the other Party(ies) in writing as soon as practicable following the date the Party first knew, or by the exercise of reasonable diligence should have known, of the force majeure event.

**S.    Execution in Counterparts and Email/Fax Signatures**:  This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed to be an original and such counterparts shall together constitute one and the same Agreement.  The Parties agree to accept signed pages transmitted by email or facsimile.

AGREED TO AND ACCEPTED.

**COUNTY OF LOS ANGELES**

By:  _ANA LAI_
Title:  _SENIOR DEPUTY COUNTY COUNSEL_

Dated:  _OCTOBER 11, 2022_

**LA ALLIANCE FOR HUMAN RIGHTS**

By:   Don Steier
Title:   Chair

Dated:  October 10, 2022

**JOSEPH BURK**

_____

Dated:  _____

**GEORGE FREM**

_____

Dated:  _____

**WENZIAL JARRELL**

_____

Dated:  _____

**CHARLES MALOW**

_____

Dated:  _____

**KARYN PINSKY**

_____

Dated:  10/10/22

Page **10** of 11

its obligation at the earliest time possible. Any Party intending to assert force majeure shall notify the other Party(ies) in writing as soon as practicable following the date the Party first knew, or by the exercise of reasonable diligence should have known, of the force majeure event.

**S.**    **Execution in Counterparts and Email/Fax Signatures**:  This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed to be an original and such counterparts shall together constitute one and the same Agreement.  The Parties agree to accept signed pages transmitted by email or facsimile.

AGREED TO AND ACCEPTED.

**COUNTY OF LOS ANGELES**

_____    Dated: _____
By:
Title:

**LA ALLIANCE FOR HUMAN RIGHTS**

_____    Dated: _____
By:
Title:

**JOSEPH BURK**

_____    Dated: _____10/10/2022_____

**GEORGE FREM**

_____    Dated: _____

**WENZIAL JARRELL**

_____    Dated: _____

**CHARLES MALOW**

_____    Dated: _____

**KARYN PINSKY**

_____    Dated: _____

Page **10** of **11**

its obligation at the earliest time possible. Any Party intending to assert force majeure shall
notify the other Party(ies) in writing as soon as practicable following the date the Party first
knew, or by the exercise of reasonable diligence should have known, of the force majeure event.

**S.**      **Execution in Counterparts and Email/Fax Signatures**:  This Agreement may be
executed in any number of counterparts, each of which so executed shall be deemed to be an
original and such counterparts shall together constitute one and the same Agreement.  The
Parties agree to accept signed pages transmitted by email or facsimile.

AGREED TO AND ACCEPTED.

**COUNTY OF LOS ANGELES**

_____          Dated: _____
By:
Title:

**LA ALLIANCE FOR HUMAN RIGHTS**

_____          Dated: _____
By:
Title:

**JOSEPH BURK**

_____          Dated: _____

**GEORGE FREM**

_____          Dated: ____10 / 10 / 2022_____

**WENZIAL JARRELL**

_____          Dated: _____

**CHARLES MALOW**

_____          Dated: _____

**KARYN PINSKY**

_____          Dated: _____

Page **10** of **11**

its obligation at the earliest time possible. Any Party intending to assert force majeure shall notify the other Party(ies) in writing as soon as practicable following the date the Party first knew, or by the exercise of reasonable diligence should have known, of the force majeure event.

**S.** **Execution in Counterparts and Email/Fax Signatures**: This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed to be an original and such counterparts shall together constitute one and the same Agreement. The Parties agree to accept signed pages transmitted by email or facsimile.

AGREED TO AND ACCEPTED.

**COUNTY OF LOS ANGELES**

_____     Dated: _____
By:
Title:

**LA ALLIANCE FOR HUMAN RIGHTS**

_____     Dated: _____
By:
Title:

**JOSEPH BURK**

_____     Dated: _____

**GEORGE FREM**

_____     Dated: _____

**WENZIAL JARRELL**

_Wbria Jarhell_     Dated: _10 - 10 - 22_

**CHARLES MALOW**

_Charly Mlw_     Dated: _10 - 10 - 22_

**KARYN PINSKY**

_____     Dated: _____

Page **10** of **11**

**HARRY TASHDJIAN**

_____     Dated: _10 - 10 - 22_____

Plaintiffs' Counsel agrees to be bound by Section B.5 of the Agreement.

Spertus, Landes, & Umhofer, LLP

_____     Dated: ___October 10, 2022_____

By:     Elizabeth A. Mitchell
Title:  Attorney for Plaintiffs

Page 11 of 11

# EXHIBIT B

**|ADDENDUM TO SETTLEMENT AGREEMENT**

This Addendum to Settlement Agreement (the "Addendum") is entered into by and between the County of Los Angeles ("County"); LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karyn Pinsky, Charles Malow, and George Frem (collectively, "Plaintiffs"). Each of the County and Plaintiffs is referred to individually as a "Party" and collectively as the "Parties."

**RECITALS**

WHEREAS, on October 11, 2022, the Parties entered into a Settlement Agreement ("Agreement"), wherein they memorialized their agreement to settle and finally resolve the matter entitled *LA Alliance for Human Rights et al. v. City of Los Angeles et al.*, U.S. District Court for the Central District of California, Case No. 2:20-cv-02291 (the "Action");

WHEREAS, on October 17, 2022, the Parties filed a copy of the Agreement with the Court and jointly requested the Court to dismiss the Action against the County; The Court scheduled a hearing regarding the Agreement;

WHEREAS, on January 17, 2023, the Parties attended the hearing, and in light of the new leadership at the County and City of Los Angeles level, the Parties indicated their interest in reviewing and potentially increasing resources for the People Experiencing Homelessness ("PEH"); and

NOW, THEREFORE, the Parties hereby agree to modify the terms of the Agreement as follow:

**TERMS OF ADDENDUM**

A. Paragraph D, County's Obligations, Subparagraph 3, Mental Health/Substance Use Disorder Beds, shall be deleted in its entirety and replaced with the following:

   3a.　**Mental Health/Substance Use Disorder Beds**: The County shall develop/contract 1,000 additional mental health and substance use disorder beds according to the greatest need as solely determined by the County. The 1,000 beds shall be open and operational on the following timeline: 300 beds by June 30, 2023, 310 beds by December 31, 2023, 90 beds by December 31, 2024, 130 beds by December 31, 2025, and 170 beds by December 31, 2026. The beds herein shall exclude those previously funded in any agreement effective before June 14, 2022 between the County and a provider agency for contracted facilities, and shall exclude beds that the County directly operated and became available before June 14, 2022. Funding shall not include any advance payments for startups.

B.   Paragraph D, County's Obligations, Subparagraph 3b, Enriched Residential Care for Adult Residential Facilities ("ARF") and Residential Care Facilities for the Elderly ("RCFEs") Beds, shall be added to the Agreement as follows:

   3b.   **Enriched Residential Care for Adult Residential Facilities ("ARF") and Residential Care Facilities for the Elderly ("RCFEs") Beds**: The County shall make available 450 new subsidies which includes an enhanced services rate at existing ARF and RCFEs that accept individuals eligible for Department of Mental Health ("DMH") services.  These beds are frequently, but not exclusively, utilized by individuals with Serious Mental Illness who would otherwise be homeless.  The parties recognize that whether there are sufficient third-party providers to accept these funds is not within the County's control and the utilization of these funds is contingent on receipt of 450 eligible referrals over the course of this Agreement.  The County shall make available the subsidies within the following deadlines: 40 by December 31, 2023, 160 by December 31, 2024, 120 by December 31, 2025, and 130 by December 31, 2026.

C.   Paragraph D, County Obligations, Subparagraph 9, Reporting, Section i, Support for Plaintiffs' Settlement with the City, Subsection (3) shall be added to the Agreement as follows:

   (3)   The Parties acknowledge that Paragraph D(9)(i)(1) and D(9)(i)(2), above, shall be contingent upon receipt of information from the City.

D.   Paragraph D, County Obligations, Subparagraph 9, Reporting, Section (iii), Mental Health/Substance Use Disorder Beds, shall be deleted in its entirety and replaced with the following:

   iii.   **Mental Health/Substance Use Disorder Beds:**

   (1)   The number of beds that have been developed/contracted since June 14, 2022 (or status thereon) under this agreement, date said beds became open and operational, and confirmation said beds continue to be open and operational.

E.   Paragraph D, County Obligations, Subparagraph 9, Reporting, Section viii, Enriched Residential Care for ARF and RCFEs Beds, shall be added to the Agreement as follows:

   viii.   **Enriched Residential Care for ARF and RCFEs Beds:**

   (1)   The number of referrals, name of referral sources, number of referrals accepted, date individual moved in, and name and type of facility accepting enhanced rate.

F.  Paragraph Q, Notices, shall be deleted in its entirety and replaced as follows:

    **Q.**  **Notices.**  All notices to be sent under this Agreement shall be delivered as follows and shall reference the Action in the subject line of the notice:

        **1.**    ***For Plaintiffs***:
        Umhofer, Mitchell & King LLP
        11766 Wilshire Blvd, Suite 900
        Los Angeles, CA 90025
        Attn: Matthew Donald Umhofer, Elizabeth A. Mitchell
        matthew@umklaw.com; elizabeth@umklaw.com

        **2.**    ***For the County***:
        Office of County Counsel
        500 West Temple Street, Suite 648
        Los Angeles, California 90012
        Attention: Ana Lai; Jennifer Lehman
        alai@counsel.lacounty.gov; jlehman@counsel.lacounty.gov

    Any Party may change its notice recipient or address for providing notice to it by notifying the other Party(ies) in writing setting forth such new notice recipient or address.

G.  All references to "Spertus, Landes, & Umhofer, LLP", including on Page 1, Paragraph 1, introductory paragraph, Page 3, Paragraph C, Settlement Payment and Attorney's Fees, Subparagraph 1, and Page 11, signature line, of the Agreement, shall be replaced by "Umhofer, Mitchell & King LLP".

//

//

//

//

//

//

//

//

Page **3** of **5**

This Addendum is hereby incorporated into and shall become a part of the Agreement.  In all other respects, the Agreement shall remain unchanged and in full force and effect.

AGREED TO AND ACCEPTED.

**COUNTY OF LOS ANGELES**

By: _ANA LAI_                              Dated: _4-18-2023_
Title: _SENIOR DEPUTY COUNTY COUNSEL_

**LA ALLIANCE FOR HUMAN RIGHTS**

_____          Dated: _____
By:
Title:

**JOSEPH BURK**

_____          Dated: _____

**GEORGE FREM**

_____          Dated: _____

**WENZIAL JARRELL**

_____          Dated: _____

**CHARLES MALOW**

_____          Dated: _____

**KARYN PINSKY**

_____          Dated: _____

**HARRY TASHDJIAN**

_____          Dated: _____

This Addendum is hereby incorporated into and shall become a part of the Agreement. In all other respects, the Agreement shall remain unchanged and in full force and effect.

AGREED TO AND ACCEPTED.

COUNTY OF LOS ANGELES

By: _____      Dated: _____
Title:

LA ALLIANCE FOR HUMAN RIGHTS

By: DONALD STEIER      Dated: 4 | 17 | 2023
Title: CHAIR

JOSEPH BURK

_____      Dated: _____

GEORGE FREM

_____      Dated: _____

WENZIAL JARRELL

_____      Dated: _____

CHARLES MALOW

_____      Dated: _____

KARYN PINSKY

_____      Dated: _____

Page 4 of 5

This Addendum is hereby incorporated into and shall become a part of the Agreement.  In all other respects, the Agreement shall remain unchanged and in full force and effect.


AGREED TO AND ACCEPTED.


**COUNTY OF LOS ANGELES**

_____        Dated: _____
By:
Title:

**LA ALLIANCE FOR HUMAN RIGHTS**

_____        Dated: _____
By:
Title:

**JOSEPH BURK**

_____        Dated: _____04/14/2023_____

**GEORGE FREM**

_____        Dated: _____

**WENZIAL JARRELL**

_____        Dated: _____

**CHARLES MALOW**

_____        Dated: _____

**KARYN PINSKY**

_____        Dated: _____

This Addendum is hereby incorporated into and shall become a part of the Agreement. In all other respects, the Agreement shall remain unchanged and in full force and effect.

AGREED TO AND ACCEPTED.


**COUNTY OF LOS ANGELES**

_____     Dated: _____
By:
Title:

**LA ALLIANCE FOR HUMAN RIGHTS**

_____     Dated: _____
By:
Title:

**JOSEPH BURK**

_____     Dated: _____


**GEORGE FREM**

_____     Dated: _____4/14/2023_____


**WENZIAL JARRELL**

_____     Dated: _____


**CHARLES MALOW**

_____     Dated: _____


**KARYN PINSKY**

_____     Dated: _____


Page 4 of 5

This Addendum is hereby incorporated into and shall become a part of the Agreement. In all other respects, the Agreement shall remain unchanged and in full force and effect.

AGREED TO AND ACCEPTED.

**COUNTY OF LOS ANGELES**

_____          Dated: _____
By:
Title:

**LA ALLIANCE FOR HUMAN RIGHTS**

_____          Dated: _____
By:
Title:

**JOSEPH BURK**

_____          Dated: _____

**GEORGE FREM**

_____          Dated: _____

**WENZIAL JARRELL**

_Wenzial Jarrell_                         Dated: Mon Apr 17

**CHARLES MALOW**

_____          Dated: _____

**KARYN PINSKY**

_____          Dated: _____

Page 4 of 5

This Addendum is hereby incorporated into and shall become a part of the Agreement. In all other respects, the Agreement shall remain unchanged and in full force and effect.

AGREED TO AND ACCEPTED.

COUNTY OF LOS ANGELES

By: _____     Dated: _____
Title:

LA ALLIANCE FOR HUMAN RIGHTS

By: _____     Dated: _____
Title:

JOSEPH BURK

_____          Dated: _____

GEORGE FREM

_____          Dated: _____

WENZIAL JARRELL

_____          Dated: _____

CHARLES MALOW
_____          Dated: 04/14/2023

KARYN PINSKY

_____          Dated: _____

Page 4 of 5

This Addendum is hereby incorporated into and shall become a part of the Agreement.  In all other respects, the Agreement shall remain unchanged and in full force and effect.

AGREED TO AND ACCEPTED.


**COUNTY OF LOS ANGELES**

_____        Dated: _____
By:
Title:

**LA ALLIANCE FOR HUMAN RIGHTS**

_____        Dated: _____
By:
Title:

**JOSEPH BURK**

_____        Dated: _____


**GEORGE FREM**

_____        Dated: _____


**WENZIAL JARRELL**

_____        Dated: _____


**CHARLES MALOW**

_____        Dated: _____


**KARYN PINSKY**

_____        Dated: __04/17/23_____


Page 4 of 5

**HARRY TASHDJIAN**

Dated:  04-14-23

Page **5** of **5**

1
2
3
4
5
6
7
8                      **UNITED STATES DISTRICT COURT**
9        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
10
11   LA ALLIANCE FOR HUMAN          | **CASE NO. 2:20-cv-02291 DOC (KES)**
     RIGHTS, et al.,
12                                  | **ORDER GRANTING JOINT**
13              Plaintiffs,         | **STIPULATION TO EXTEND TIME**
                                    | **TO FILE REPORT RE**
14        v.                        | **SETTLEMENT**
15   CITY OF LOS ANGELES, et al.,   | Assigned to the Hon. David O. Carter
                                    | and Magistrate Judge Karen E. Scott
16              Defendants.
17
18
19
20
21
22
23
24
25
26
27
28

## <u>ORDER</u>

The Court, having read and considered the Joint Stipulation to Extend Time to File Report re Settlement (the "Stipulation") filed on behalf of Plaintiffs LA Alliance for Human Rights, et al. ("Plaintiffs") and Defendant County of Los Angeles ("County" and together with Plaintiffs, the "Parties"), and finding **GOOD CAUSE** thereon, hereby **ORDERS** as follows:

The Stipulation is **GRANTED**.

The Parties' deadline to file and serve their Proposed Settlement Agreement shall hereby be extended one (1) day, from April 17, 2023 to April 18, 2023.

**IT IS SO ORDERED.**

DATED:   April 18, 2023

HON. DAVID O. CARTER
Judge of the United States District Court

2

ER 161

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

<u>**CIVIL MINUTES – GENERAL**</u>

Case No: 2:20-cv-02291-DOC-KES          Date: January 17, 2023

Title:   LA ALLIANCE FOR HUMAN RIGHTS ET AL. V. CITY OF LOS ANGELES ET AL.

PRESENT:   <u>THE HONORABLE DAVID O. CARTER, UNITED STATES DISTRICT JUDGE</u>

| Damon Berry | Court Smart |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| Elizabeth Mitchell | Scott Marcus |
| Matthew Umhofer | Jennifer Mira Hashmall |
|  | Louis "Skip" Miller |

**PROCEEDINGS:**          **HEARING REGARDING COUNTY SETTLEMENT AGREEMENT [485]**

Hearing held in Los Angeles First Street Federal Courthouse, Courtroom 5B. The Court recognizes the presence of Mayor Karen Bass, Los Angeles City Council President Paul Krekorian, and Chairwoman of the Board of Supervisors Janice Hahn. Also present is Judge Andre Birotte, Special Master Michele Martinez, and counsel for intervenor.

The Court made comments, documented below, in open court regarding the County Settlement Agreement (Dkt. 485). Mayor Bass, joined in by Chairwoman Hahn and City Council President Krekorian, subsequently requested a private conference, in which Judge Birotte and Special Master Martinez were present. Plaintiffs also participated.

Following the conference, the parties represented in open court that, in light of the new leadership at the city and county level, they wish to further meet and confer to review and amend the terms of the County Settlement Agreement, particularly in relation to the number of mental health beds and monitoring. The parties requested, and the Court granted, an additional 90 days to do so. The Court's scheduling order is forthcoming.

<u>**Comments regarding the County Settlement Agreement**</u>

The Court recognizes that it should not be the burden of private citizens to sue their elected representatives. Only in times of desperation, anger, and hopelessness are

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

| | |
|---|---|
| Case No. 2:20-cv-02291-DOC-KES | Date: January 17, 2023 |
| | Page 2 |

lawsuits such as this filed. And this lawsuit was filed out of desperation and fury from decades of neglect and inaction.

This case was first filed in March 2020 by L.A. Alliance—a non-profit organization consisting of a broad coalition of Los Angeles stakeholders, including unhoused individuals, property owners, and small businesses. At the time, L.A. Alliance stated in their Amended and Supplemental Complaint that the homelessness crisis "continues and accelerates, with little hope of a City- or County-driven solution. Because of the painful results of current policies, and because of the lack of political and bureaucratic will to undertake effective and proven means to combat it, the Plaintiffs are suffering under the weight of an urgent crisis. Plaintiffs are left with no choice but to resort to the courts for relief." ("Am. & Suppl. Compl.") (Dkt. 361) ¶ 94.

| | |
|---|---|
| 19 | 95.    And so the crisis continues and accelerates, with little hope of a |
| 20 | City- or County-driven solution.  Because of the painful results of current |
| 21 | policies, and because of the lack of political and bureaucratic will to undertake |
| 22 | effective and proven means to combat it, the Plaintiffs are suffering under the |
| 23 | weight of an urgent crisis.  Plaintiffs are left with no choice but to resort to the |
| 24 | courts for relief. |

Through this litigation, Plaintiffs and the City of Los Angeles entered into a settlement agreement in the summer of 2022, without the County joining in. ("City Settlement Agreement") (Dkt. 421-1). The City Settlement Agreement was commendable in a number of ways. It contained approximately 24 provisions, each of which had detailed subdivisions and specifically defined terms. The City promised 2-3 billion dollars to accommodate 12,000 to 14,000 people on the streets.

The City Settlement Agreement was comprehensive and extensive and, notably, held the City accountable by providing that the Court maintain "continuing jurisdiction to oversee and enforce this Settlement Agreement," which included monitoring. City Settlement Agreement § 2.

But there is much more that needs to be done to address the spiraling crisis on our streets. The Court recognized that the City Settlement Agreement alone would not solve homelessness. In fact, Plaintiffs LA Alliance and the City recognized the same when they referenced the County's responsibilities and "agree[d] to cooperate in ensuring the County meets its obligations" of—among other things— "[r]equiring a minimum of 50 mental health beds per 100,000 people in the County, or more as necessary to ensure access to inpatient treatment for PEH in the City and to prevent mentally ill individuals from falling into homelessness due to lack of available inpatient treatment." City Settlement Agreement § 11.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                                 Date: January 17, 2023
                                                                             Page 3

In October 2022, the County filed their settlement agreement ("County Settlement Agreement") (Dkt. 485). The terms of the agreement, as the Court made clear in the last hearing, simply fell short of the County's statutory obligations and the reason that this lawsuit was filed in the first place.

As the newly elected mayor, Mayor Bass is present and making commendable and initial efforts to confront this crisis. These may or may not be successful, and whether the resulting effects are short-term or long-term remain to be seen. But it appears that the inertia is being broken. Efforts are being made in good faith to break down the decades of antagonism and non-cooperation between the City of Los Angeles and the County Board of Supervisors. Mayor Bass declared a state of emergency and, last week, the County Board of Supervisors followed. Hopefully, this will cut bureaucracy, costs, and lead to increased housing.

Mayor Bass also pledged to accommodate 17,000 homeless persons within her first year of office. This is a monumental undertaking. The City Settlement Agreement eventually would accommodate 12,000-14,000 individuals over a five-year period. It is hoped that Mayor Bass and the City Council succeed at a much greater pace than the City Settlement Agreement anticipated.

It has repeatedly been represented to the Court that about 40% of the homeless population suffers from mental illness or substance abuse, or a combination of both. *See e.g.*, County's Response to City Settlement Agreement, Ex. 19, *Homeless Initiative Funding Letter* (Dkt. 433-19).

ENCLOSURE 2

Los Angeles County HHAP Round 3 Local Action Plan Selected Tables

| Table 1. Landscape Analysis of Needs and Demographics | | |
|---|---|---|
| | People Experiencing Homelessness | Source and Date Timeframe of Data |
| **Population and Living Situations** | | |
| TOTAL # OF PEOPLE EXPERIENCING HOMELESSNESS | 63,706 | HUD 2020 PIT Count |
| # of People Who are **Sheltered** (ES, TH, SH) | 17,616 | HUD 2020 PIT Count |
| # of People Who are **Unsheltered** | 46,090 | HUD 2020 PIT Count |
| **Household Composition** | | |
| # of Households without Children | 51,290 | HUD 2020 PIT Count |
| # of Households with **At Least 1 Adult & 1 Child** | 3,907 | HUD 2020 PIT Count |
| # of Households with **Only Children** | 589 | HUD 2020 PIT Count |
| **Sub-Populations and Other Characteristics** | | |
| # of Adults Who are Experiencing **Chronic** Homelessness | 24,482 | HUD 2020 PIT Count |
| # of Adults Who are Experiencing **Significant Mental Illness** | 14,125 | HUD 2020 PIT Count |
| # of Adults Who are Experiencing **Substance Abuse** Disorders | 15,203 | HUD 2020 PIT Count |

This division of responsibility for mental health and substance abuse falls to two County agencies. The Los Angeles County Department of Mental Health (DMH), with

**ER 164**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                                              Date: January 17, 2023
                                                                                                    Page 4

interim director Lisa Wong, has responsibility for the County's mental health needs. The
Los Angeles County Department of Public Health, under the direction of Dr. Barbara
Ferrer, has responsibility for substance abuse.

In the County's proposal, the County states that "[b]y the end of fiscal year
2023/2024 (i.e., June 30, 2024), the County shall develop 300 additional substance use
and mental health beds according to the greatest need as solely determined by the
County." County Settlement Agreement § 3.

**D.**   **County's Obligations:**

   **1.**   **Support for Plaintiffs' Settlement with the City:**

      **i.**   From fiscal year 2022/2023 through fiscal year 2026/2027, the County
shall fund and provide supportive services for interim housing and permanent supportive housing
units financed by the City as part of the City Settlement, as units are developed by the City and
become occupiable, in an amount to be determined solely by County and City in their respective
discretion. These supportive services shall include, but shall not be limited to, "mainstream"
services including public assistance programs, mental health services, substance use disorder
services, and benefits advocacy services to clients who meet eligibility criteria for these services.

      **ii.**   The County shall provide City-funded outreach teams with access to
Department of Mental Health ("DMH"), Department of Health Services ("DHS"), Department of
Public Social Services ("DPSS"), and Department of Public Health ("DPH") services directly
and through coordination with Multi-Disciplinary Teams ("MDTs") and Homeless Outreach &
Mobile Engagement ("HOME") teams assigned within the City.

      **iii.**   The Parties acknowledge that the County does not support the
enforcement component of the City's street engagement strategy and no funding or services from
the County or any County department or affiliated agency committed herein will be used to
support the City's street engagement strategy.

   **2.**   **Beds Available to County Outreach Teams:** Throughout the term of this
Agreement, the County shall make reasonable best efforts to ensure County outreach teams
(including the increased MDT and HOME teams referenced above) have access to County
Homeless Initiative-funded high service need interim housing beds for PEH in the City, and that
those beds shall either be exclusively for use by, or prioritize, PEH in the City.

   **3.**   **Mental Health/Substance Use Disorder Beds:** By the end of fiscal year
2023/2024 (i.e., June 30, 2024), the County shall develop 300 additional substance use and
mental health beds according to the greatest need as solely determined by the County.

In the County's Statement in Support of its Settlement Agreement, filed this past
Friday, the County states that its 300 beds "are in addition to the County's existing supply
of approximately 8,600 mental health/substance use disorder beds." County Statement in
Support of Settlement Agreement ("County Statement") (Dkt. 514), at 9. The County
does not cite a source for this "8,600" number.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                                    Date: January 17, 2023
                                                                  Page 5

In 2019, Dr. Jonathan Sherin, Director of DMH, submitted to the Los Angeles County Board of Supervisors a 178-page report addressing the shortage of mental health hospital beds in L.A. County. Jonathan E. Sherin, REPORT RESPONSE TO ADDRESSING THE SHORTAGE OF MENTAL HEALTH HOSPITAL BEDS (ITEM 8, AGENDA OF JANUARY 22, 2019), Department of Mental Health (Oct. 29, 2019) ("Report"), http://file.lacounty.gov/SDSInter/bos/supdocs/132696.pdf.



**DEPARTMENT OF MENTAL HEALTH**
hope. recovery. wellbeing.

JONATHAN E. SHERIN, M.D., Ph.D.
Director

Curley L. Bonds, M.D.                                   Gregory C. Polk, M.P.A.
Chief Medical Officer                                   Chief Deputy Director
Clinical Operations                                     Administrative Operations

October 29, 2019

TO:        Supervisor Janice Hahn, Chair
           Supervisor Hilda L. Solis
           Supervisor Mark Ridley-Thomas
           Supervisor Sheila Kuehl
           Supervisor Kathryn Barger

FROM:      Jonathan E. Sherin, M.D., Ph.D.
           Director

SUBJECT:   **REPORT RESPONSE TO ADDRESSING THE SHORTAGE OF MENTAL HEALTH HOSPITAL BEDS (ITEM 8, AGENDA OF JANUARY 22, 2019)**

On January 22, 2019, the Board of Supervisors (Board) directed the Department of Mental Health (DMH), in coordination with Chief Executive Office (CEO), the Sheriff's Department, and the Health Departments, to assess how to address the shortage of mental health hospital beds in Los Angeles County. DMH was directed to provide the Board with a report to include the following information:

a. A plan for the creation of mental health hospital beds to include potential sites, funding options, patient population, and all other pertinent details;
b. The current and future need for mental health hospital beds that support the jail population;
c. An assessment of all contracted mental health hospital beds and make recommendations that allow the County to maintain and/or increase the number of beds available; and
d. An assessment of the current and future need for stepdown mental health beds and services, and draft a plan for the creation of both directly operated and contracted stepdown beds and services.

The attached report "Addressing the Shortage of Mental Health Hospital Beds" serves to fulfill the directives of the Board. In addition, we have attached a separate relevant report developed by an outside consultant, Mercer Health & Benefits LLC. This Mercer report assesses needs in Los Angeles County's mental health and substance use disorder

550 S. VERMONT AVENUE, LOS ANGELES, CA 90020  |  HTTP://DMH.LACOUNTY.GOV  |  (213) 738-4601

**ER 166**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                              Date: January 17, 2023
                                                            Page 6

  The Report is cited in the Amended and Supplemental Complaint. *See* Am. &
Suppl. Compl. ¶ 89 & n. 142.

1  while positive, lack focus and fail to solve the most pressing problems presented

2  by the homelessness crisis.

3    89. In addition, the County has failed to meet its statutory obligation to

4  provide appropriate mental health services. The County Board of Supervisors

5  recognizes the "minimum number of beds required to appropriately meet the

6  [community's mental health] need is 50 public mental health beds per 100,000

7  individuals. In Los Angeles County there are only 22.7 beds per 100,000

8  individuals."[141]  In response, the Department of Mental Health (DMH) conducted

9  an investigation and identified "significant gaps in inpatient treatment beds,

10  residential beds, shelter beds, and respite homes across all ages" including an

11  "estimate of 3,000 additional subacute beds needed," "significant gaps in

12  assisting people when they are leaving inpatient care, especially for those with

13  co-occurring disorders," "no SUD (substance use disorder) residential treatment

14  for all ages," "no local children's inpatient psychiatric beds," "not enough

15  inpatient beds for patients eligible for conservatorship…with waiting periods of

16  up to a year to access secure inpatient care, resulting in people being discharged

17  to the street and perpetuating homelessness."[142]  In short, courts are reticent to

18  declare a person conserved because there's nowhere for them to go, and the

19  system designed to address these issues is massively overburdened. At Olive

20  View Hospital in north Los Angeles County, the 72-hour crisis ward at times has

21  over half of its 16 beds dedicated to patients waiting up to a year for a residential

22  inpatient bed, leaving only a handful of other beds available for emergency 5150

23  _____

24  [141] Motion By Supervisors Kathryn Barger and Hilda Solis, *Addressing the Shortage of Mental Health Hospital Beds* (Jan. 22, 2019),

25  http://file.lacounty.gov/SDSInter/bos/supdocs/131546.pdf.; *see also* E. Fuller Torrey, M.D., Kurt Entsminger, J.D., et al., *The Shortage of Public Hospital Beds*

26  *for Mentally Ill Persons: A Report of the Treatment Advocacy Center*, Mental Illness Policy.org (2004-2005), https://mentalillnesspolicy.org/imd/shortage-hospital-beds.html.

27  [142] Jonathan E. Sherin, *REPORT RESPONSE TO ADDRESSING THE SHORTAGE OF MENTAL HEALTH HOSPITAL BEDS (ITEM 8, AGENDA OF*

28  *JANUARY 22, 2019)*, Department of Mental Health 30, 134 (Oct. 29, 2019), http://file.lacounty.gov/SDSInter/bos/supdocs/132696.pdf.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

Case No. 2:20-cv-02291-DOC-KES                              Date: January 17, 2023
                                                                        Page 7

Dr. Sherin concluded and recommended to the Board of Supervisors in 2019 a pilot program of 500 state-licensed mental health beds mixed between acute and subacute. Report at 4.

Recommended Actions for the Board of Supervisors

To help us move quickly to begin implementing the recommended system changes detailed throughout this report, the Department of Mental Health (DMH) is recommending that the Board of Supervisors take the following actions:

1. Authorize the Director of the Department of Mental Health (DMH), or his designee, to conduct a pilot to expand mental health bed capacity and improve existing capacity in the DMH network, within the following parameters:
   a. The pilot will last for two years from the date of Board approval; and
   b. DMH will seek to procure up to 500 State-licensed, approved, or exempt mental health beds of whichever type and mix will help meet the needs of the DMH network, derived through contracting for additional beds using DMH available ongoing funding.

Dr. Sherin also stated the "need to develop nearly 3,000 new subacute beds. And if there are unmet needs of the homeless population which are not reflected in these estimates, we may need to develop more subacute beds." Report at 20.

Thus, if current resource and utilization patterns among the non-jail population with SMI persist, and if we are able to increase diversion of the jail population with SMI to the theoretical maximum, the Mercer and ODR analyses suggest we may need to develop nearly 3,000 new subacute beds. And if there are unmet needs for subacute care among the homeless population which are not reflected in these estimates, we may need to develop even more subacute beds.

Dr. Sherin once again stated in the Report: "The estimate of 3,000 additional subacute beds needed, for example, is under the status quo scenario where most of these factors remain the same." Report at 27.

The estimate of 3,000 additional subacute beds needed, for example, is under the status quo scenario where most of these factors remain the same. However, if we can improve these factors, we would likely need fewer subacute beds.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                                    Date: January 17, 2023
                                                                                    Page 8

Moreover, Dr. Sherin found that "[r]oughly 25% of adult homeless individuals in LA County have a serious mental illness and need care." Report at 6.

> - The Department of Health Services' psychiatric emergency rooms are severely overcrowded, with patients sometimes having to stay several days while they wait for a hospital bed.
> - On any given day, four to five thousand individuals with serious mental illness and often co-occurring substance use disorder are incarcerated in LA County justice systems and need care. Many of their incarcerations could have been prevented entirely had they received needed treatment.
> - Roughly 25% of adult homeless individuals in LA County have a serious mental illness and need care. These individuals often cycle in and out of hospitals and justice systems without ever being put on a sustainable path to recovery.

Whether we're dealing with Mayor Bass's efforts to accommodate 17,000 individuals or the agreement between LA Alliance and the City of Los Angeles to accommodate 12,800 individuals, the County's offer falls short.

How can 300 beds accommodate the need for 25% of Mayor Bass's figure—which is approximately 4,250 beds for those suffering from severe mental illness? Or accommodate 25% of the City Agreement's figure—which is 3,200 beds? Moreover, the County's offer of 300 beds is over two years and is meant to cover *both* mental health and substance abuse needs.

The Court is concerned that the County Settlement Agreement lacks concrete milestones and accountability. The question of government accountability was first raised by Plaintiffs and has been a driving force of this lawsuit. *See* Am. & Suppl. Compl. ¶ 17 ("Measure H . . . is spread so thin it serves more to feed the County's own bureaucracy than to make any significant dent in the crisis."); *id.* ¶ 83 ("The County also faces tough questions about its management of homelessness-related funds."); *id.* ¶ 84 ("The problem is outpacing the solution and the County has failed to utilize the funds in a manner that would effectuate the goal."); *id.* ¶ 94 ("[T]he actual result is an astonishing lack of progress in addressing the crisis, and continued expansion of the crisis despite such efforts and resources, because each is being used in ways that will never solve the problem.").

The County Settlement Agreement—as it's written now—is a private settlement. *See* County Settlement Agreement § 9(P)(ii) (providing that, in the event of "breach of this Agreement, the Claiming Party may file a notice of breach and request for judicial enforcement in the District Court to remedy such alleged breach."). The County has since made clear that the terms are not subject to independent enforcement by the Court. *See* County Statement at 17–18.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                          Date: January 17, 2023
                                                                                  Page 9

What is happening out there is a crisis of all kinds—a public safety crisis, a health crisis, and a humanitarian crisis—for the homeless, for residents, and for the police and sheriff department personnel who are put in a dangerous position when forced to respond to circumstances that are not theirs to handle. They are not psychiatrists; they are not mental health professionals.

At the hearing,[1] the parties represented to the Court that, in light of the new leadership at the city and county level, they wish to further meet and confer to review and amend the proposed settlement agreement between the County and Plaintiffs. The parties requested, and the Court granted, an additional 90 days to do so.

:          58

Initials of Deputy Clerk: DBE

---

[1] A transcript of these proceedings has been ordered and will be docketed when available.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                    Date:  December 5, 2022

Title: LA ALLIANCE FOR HUMAN RIGHTS ET AL. v. CITY OF LOS ANGELES ET AL.

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

| Karlen Dubon | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):   ORDER CONTINUING HEARING**
**REGARDING SETTLEMENT**
**AGREEMENT**

During the November 14, 2022 hearing, the Court indicated it would continue the hearing regarding the settlement agreement. (Dkt. 502). Accordingly, the Court **CONTINUES** the hearing to Tuesday, January 17, 2023, at 9:00 a.m. The Court requests the presence of Mayor-elect Karen Bass, Los Angeles City Council President Paul Krekorian, and Los Angeles County Supervisor Holly Mitchell.

The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                        Initials of Deputy Clerk: kdu

CIVIL-GEN

**ER 171**

1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

| | |
|---|---|
| 11  LA ALLIANCE FOR HUMAN RIGHTS, et al., | **CASE NO. 2:20-cv-02291 DOC (KES)** |
| 12  Plaintiffs, | **ORDER GRANTING THIRD STIPULATION TO STAY LITIGATION** |
| 13 | |
| 14  v. | Assigned to the Hon. David O. Carter and Magistrate Judge Karen E. Scott |
| 15  CITY OF LOS ANGELES, et al., | |
| 16  Defendants. | |

17

18

19

20

21

22

23

24

25

26

27

28

1 **ORDER**

2     The Court, having read and considered the Third Stipulation to Stay

3 Litigation ("Stipulation") filed on behalf of LA Alliance for Human Rights, Joseph

4 Burk, Harry Tashdjian, Wenzial Jarrell, Karen Pinsky, Charles Malow and George

5 Frem (collectively, "Plaintiffs") and Defendant County of Los Angeles ("County"),

6 and finding **GOOD CAUSE** thereon, hereby **GRANTS** the Stipulation.

7     The Court **ORDERS** as follows:

8     All proceedings are hereby stayed and all deadlines continued until February

9 1, 2023.

10

11 **IT IS SO ORDERED.**

12

13

14 DATED:   November 22, 2022

15                                        HON. DAVID O. CARTER
                                          Judge of the United States District Court
16

17

18

19

20

21

22

23

24

25

26

27

28

2

Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Ave.
Santa Monica, California 90401
Tel:  (31) 393-3055
Email: carolsobel@aol.com

Shayla R. Myers (SBN 264054)
**LEGAL AID FOUNDATION
OF LOS ANGELES**
7000 S. Broadway
Los Angeles, CA 90003
Tel: (213) 640-3983
Email: smyers@lafla.org

Catherine Sweetser (SBN 271142)
**SCHONBRUN SEPLOW HARRIS
& HOFFMAN, LLP**
11543 W. Olympic Blvd.
Los Angeles, CA 90064
Tel:  (310) 396-0731
Email: catherine.sdshhh@gmail.com

*Attorneys for Intervenors Los Angeles Community Action Network and Los
Angeles Catholic Worker*

*Additional Counsel Listed Below*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

|  |  |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br>              Plaintiff(s),<br><br>          vs.<br><br>City of Los Angeles, et. al.<br>              Defendant(s). | CASE NO. 20-CV-02291-DOC-KES<br><br>Hon. David O. Carter<br>Courtroom 1<br><br>INTERVENORS' STATEMENT OF NON-OPPOSITION TO PLAINTIFFS' AND DEFENDANT COUNTY OF LOS ANGELES'S SETTLEMENT (Dkt. 485)<br><br>Date: November 14, 2022<br>Time: 9:00 a.m.<br><br>Complaint Filed:  March 10, 2020 |

1 | *Additional Counsel*

2

3 | **BROOKE WEITZMAN** SBN 301037
**WILLIAM WISE** SBN 109468

4 | ELDER LAW AND DISABILITY

5 | RIGHTS CENTER
1535 E 17th Street, Suite 110

6 | Santa Ana, California 92705

7 | t. 714-617–5353
e. bweitzman@eldrcenter.org

8 | e. bwise@eldrcenter.org

9

10 | *Attorneys for Orange County Catholic Worker*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INTERVENORS' STATEMENT OF NON-OBJECTION TO PROPOSED SETTLEMENT

**ER 175**

Pursuant to this Court's Order Granting Stay and Setting Dates re: Settlement Agreement (Dkt. 473), Intervenors Los Angeles Community Action Network, Los Angeles Catholic Worker, and Orange County Catholic Worker respectfully submit the following statement regarding the proposed "Order granting Stipulation for Voluntary Dismissal with Prejudice Pursuant to Federal Rule of Civil Procedure 41(a)(2)" (Dkt. 485-2).

Intervenors played no part in the negotiations regarding the final terms of the settlement agreement between Los Angeles County and Plaintiffs and express no views about the veracity of the parties' recitals regarding those negotiations or this litigation.  Intervenors do not object to the substantive terms of the settlement agreement.[1]

Dated: October 27, 2022                    Respectfully submitted,

                                           Legal Aid Foundation of Los Angeles
                                           Schonbrun Seplow Harris & Hoffman LLP
                                           Law Office of Carol A. Sobel
                                           Elder Law & Disability Rights Center


                                           _____/s/ Shayla Myers_____
                                           Attorneys for Intervenors

_____

[1] Although the parties attempt to characterize the requested order as "granting Stipulation for Voluntary Dismissal with Prejudice Pursuant to Federal Rule of Civil Procedure 41(a)(2)," the parties request the Court retain jurisdiction to enforce the terms of the settlement agreement.  *See* Dkt. 485-2.  As the County of Los Angeles itself previously noted, "[t]o obtain judicial oversight and jurisdiction over that settlement, as Plaintiffs seek, the Court must enter a consent decree." County's Response to Settlement Between Plaintiffs and the City of Los Angeles, Dkt. 432 at 4 (citing *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990)). Likewise, the parties must therefore be requesting the Court enter a consent decree.

_____

INTERVENORS' STATEMENT OF NON-OBJECTION TO PROPOSED SETTLEMENT

1  DAWYN R. HARRISON, Acting County Counsel (SBN 173855)
   dharrison@counsel.lacounty.gov
2  JENNIFER A.D. LEHMAN, Assistant County Counsel (SBN 191477)
   jlehman@counsel.lacounty.gov
3  ANA WAI-KWAN LAI, Senior Deputy County Counsel (SBN 257931)
   alai@counsel.lacounty.gov
4  OFFICE OF COUNTY COUNSEL
5  500 West Temple Street, Suite 468
   Los Angeles, California 90012
6  Telephone: (213) 974-1830
7  Facsimile: (213) 626-7446

8  LOUIS R. MILLER (SBN 54141)
   MIRA HASHMALL (SBN 216842)
9  mhashmall@millerbarondess.com
10 MILLER BARONDESS, LLP
   1999 Avenue of the Stars, Suite 1000
11 Los Angeles, California 90067
   Telephone:  (310) 552-4400
12 Facsimile:  (310) 552-8400

13 Attorneys for Defendant
14 COUNTY OF LOS ANGELES

15 [*Additional counsel continued on following page.*]

16              **UNITED STATES DISTRICT COURT**

17       **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

18

19 LA ALLIANCE FOR HUMAN          **CASE NO. 2:20-cv-02291 DOC (KES)**
20 RIGHTS, et al.,
                                  **MEMORANDUM OF POINTS AND**
21              Plaintiffs,       **AUTHORITIES IN SUPPORT**
                                  **JOINT MOTION FOR AN ORDER**
22         v.                     **TO SHOW CAUSE RE: DISMISSAL**
                                  **OF GARY WHITTER'S CLAIMS**
23 CITY OF LOS ANGELES, et al.,   **PURSUANT TO F.R.C.P. 41(B) AND**
                                  **L.R. 41-1, 41-5, AND 41-6**
24              Defendants.
25                                Date:    November 14, 2022
                                  Time:    8:30 a.m.
26
                                  Assigned to the Hon. David O. Carter
27                                and Magistrate Judge Karen E. Scott
28

577785.4
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT JOINT MOTION FOR AN ORDER TO
SHOW CAUSE RE: DISMISSAL OF GARY WHITTER'S CLAIMS

1    [*Additional counsel, continued from previous page:*]

2

3    MICHAEL N. FEUER, City Attorney (SBN 111529)
SCOTT MARCUS, Chief Assistant City Attorney (SBN 184980)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)

4    arlene.hoang@lacity.org
RYAN SALSIG, Deputy City Attorney (SBN 250830)

5    200 North Main Street, City Hall East, 6th Floor
Los Angeles, California 90012

6    Telephone:  (213) 978-7508
Facsimile:  (213) 978-7011

7

8    Attorneys for Defendant
CITY OF LOS ANGELES

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT JOINT MOTION FOR AN ORDER TO
SHOW CAUSE RE: DISMISSAL OF GARY WHITTER'S CLAIMS

ER 178

## I.    **INTRODUCTION**

The County of Los Angeles ("County") and City of Los Angeles ("City" and, together with County, "Defendants") have entered into case-dispositive settlement agreements with all of the Plaintiffs in this action except Gary Whitter.  Mr. Whitter has been *pro se* since July 22, 2022 when the Court granted Spertus, Landes & Umhofer, LLP's ("Plaintiffs' counsel") *ex parte* application to withdraw as Mr. Whitter's attorney due to a prolonged inability to communicate with him.  [Dkt. 458.]  Since the withdrawal of Plaintiffs' counsel, Mr. Whitter has not appeared or otherwise participated in this action.  [*See* Dkts. 369, 370.]  As all of the other parties have resolved the claims asserted, the interests of finality and the conservation of court resources and public funds favor the dismissal of Mr. Whitter's claims against Defendants (which are also subject to pending Motions to Dismiss).  Defendants therefore respectfully request that the Court exercise its authority under Federal Rule of Civil Procedure 41(b) and Local Rules 41-1, 41-5, and 41-6, order Mr. Whitter to show cause within 30 days why his claims should not be dismissed for lack of prosecution, and, if Mr. Whitter fails to show cause within the time allotted, dismiss his claims and enter final judgment in this case.

## II.    **MR. WHITTER'S LACK OF PROSECUTION**

In Plaintiffs' First Amended and Supplemental Complaint ("FAC") [Dkt. 358], Mr. Whitter was party to eight of the thirteen claims alleged against the City and County, which the City and County moved to dismiss in full.[1]  [*See* Dkts. 369, 370.]  Defendants' motions are fully briefed and were argued in January 2022.  [Dkt. 390.]

---

[1] Two additional claims were brought by Plaintiff LA Alliance for Human Rights, of which Mr. Whitter is a member.  [*See* FAC ¶ 96 ("All individual plaintiffs herein are members of the Alliance.").]

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT JOINT MOTION FOR AN ORDER TO SHOW CAUSE RE: DISMISSAL OF GARY WHITTER'S CLAIMS

1    In April 2022, Plaintiffs and the City notified the Court that they had reached

2    a preliminary settlement agreement that they intended to "fully resolve this case as

3    to [the] City." [Dkt. 408.]  However, Mr. Whitter never joined the settlement

4    agreement that the other Plaintiffs finalized with the City.  [Dkt. 429-1.]  The Court

5    dismissed the claims of all Plaintiffs except for Mr. Whitter against the City

6    pursuant to that agreement.  [Dkt. 445.]

7    However, it was revealed shortly thereafter that Plaintiffs' counsel had been

8    unable to obtain Mr. Whitter's consent to the agreement because Mr. Whitter had

9    ceased contact with his attorneys.  Following the City settlement, Plaintiffs' counsel

10   filed an *ex parte* application for an order to withdraw as Mr. Whitter's counsel of

11   record.  [Dkt. 450.]  As "good cause" for the application, Plaintiffs' counsel

12   explained that its representation of Mr. Whitter was "compromised by [counsel's]

13   inability to communicate with Mr. Whitter," who "failed to provide [Plaintiffs'

14   counsel] with his current phone number or address" and "made no efforts to keep

15   [Plaintiffs' counsel] informed of his whereabouts." [*Id.*]  In the accompanying

16   declarations submitted by Plaintiffs' counsel in support of the application, Plaintiffs'

17   counsel detailed the efforts she undertook to contact Mr. Whitter, including:

18   • "call[ing] Mr. Whitter at least 20 times, and le[aving] voicemails" at "a
19     number that [she] . . . previously used to talk to him";

     • "email[ing] him several times" at his "last known email address and all
20     other email addresses that could be found";

21   • "contact[ing] Mr. Whitter's last known address";

22   • sending "hard copy letters" to "two new addresses" located by
23     Plaintiffs' counsel through "a People search on Westlaw" as potentially
       affiliated with Mr. Whitter;

24   • "conduct[ing] a search on the Los Angeles County Sheriff's
25     Department and Coroner's websites"; and

26   • "messag[ing] Mr. Whitter" through an "account belonging to Mr.
       Whitter on a social media site"; and

27   • "engag[ing] . . . a private investigator."

28

577785.4                                      4
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT JOINT MOTION FOR AN ORDER TO
SHOW CAUSE RE: DISMISSAL OF GARY WHITTER'S CLAIMS

ER 180

1  [Dkt. 450-1 ¶¶ 3–8 (Declaration of Elizabeth A. Mitchell in Support of Ex Parte

2  Application to Withdraw as Counsel).]  Mr. Whitter never responded to Plaintiffs'

3  counsel's calls, e-mails, letters, or messages.  [*Id.* ¶¶ 4–6, 8.]  Mr. Whitter had not

4  otherwise communicated with Plaintiffs' counsel about his whereabouts nor were

5  Plaintiffs' counsel or the private investigator successful in contacting Mr. Whitter.

6  [*Id.* ¶¶ 5, 7, 9.; Dkt 450-2 (Declaration of Paul Bonin) (explaining private

7  investigators' unsuccessful efforts to locate Mr. Whitter through exhaustive research

8  or by contacting associates and family members).]

9        The Plaintiffs other than Mr. Whitter filed a Second Amended Complaint

10  against the County [Dkt. 454] before reaching a settlement with the County that

11  resolves their claims.  [Dkt. 467.]  Both the City and County settlements were

12  covered by local news.  (Declaration of Mira Hashmall ¶ 5.)  The only thing that

13  will remain pending after the Court dismisses the remaining Plaintiffs' claims

14  against the County pursuant to their settlement are Mr. Whitter's claims against the

15  City and County from the FAC, which are subject to pending motions to dismiss.

16  **III.    THE COURT SHOULD DISMISS THIS CASE**

17        Courts have the inherent power to control their dockets, including by

18  dismissing cases where a plaintiff has refused to prosecute or to comply with

19  procedural rules or the court's orders.  *Pagtalunan v. Galaza*, 291 F.3d 639, 640

20  (9th Cir. 2002); *see Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–32 (1962) (the

21  "authority of a federal trial court to dismiss a plaintiff's action with prejudice

22  because of his failure to prosecute cannot seriously be doubted").  Federal Rule of

23  Civil Procedure 41(b) states that "[i]f [a] plaintiff fails to prosecute or comply with

24  these rules or a court order, a defendant may move to dismiss the action or any

25  claim against it."  The Local Rules for this District also authorize courts to dismiss

26  for "want of prosecution" (a) "[c]ivil suits which have been pending for an

27  unreasonable period of time without any action having been taken therein . . . , after

28  notice"; (b) "[i]f a party, without notice to the Court, fails to appear at [a] noticed

call of any action or proceeding," and (c) where a "*pro se* party has not filed a notice of change of address within 14 days of the service date of the order or other Court document."  L.R. 41-1, 41-5, & 41-6.

Dismissal of unprosecuted cases is considered "necessary in order to prevent undue delays in the disposition of pending cases and to avoid congestion in the calendars of the District Courts." *Link*, 370 U.S. at 629-30.  In determining whether dismissal is appropriate, courts consider "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to defendants/respondents; (4) the availability of less drastic alternatives; and (5) the public policy favoring disposition of cases on their merits." *Pagtalunan*, 291 F.3d at 642.

A district court should dismiss "where at least four factors support dismissal, … or where at least three factors 'strongly' support dismissal. *Yourish v. California Amplifier*, 191 F.3d 983, 990 (9th Cir. 1999).  Here, however, all factors support dismissal.

1. **Public Interest**:  "[T]he public's interest in expeditious resolution of litigation always favors dismissal" of unprosecuted claims, particularly where public entities are involved. *Id.*  The Ninth Circuit has held that this factor favors dismissal where the plaintiff has failed to pursue a case for four months. *Pagtalunan*, 291 F.3d at 642.  Here, Mr. Whitter has been incommunicable for at least six months, during which time all other parties have settled the case.  This factor therefore favors the dismissal of Mr. Whitter's claims.

2. **Court Docket**:  A plaintiff's "inaction hinders the Court's ability to move th[e] case toward disposition and indicates that Plaintiff does not intend to litigate th[e] action diligently." *Croaker v. Hsing*, 2016 WL 3135652, at *3 (C.D. Cal. Apr. 25, 2016), *report and recommendation adopted*, 2016 WL 3129606 (C.D. Cal. May 31, 2016); *Sanders v. AHMS Inc.*, 2012 WL 13005957, at *2 (C.D. Cal. Feb. 28, 2012).  Where a plaintiff is inattentive or nonresponsive, this factor also

577785.4                                          6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT JOINT MOTION FOR AN ORDER TO SHOW CAUSE RE: DISMISSAL OF GARY WHITTER'S CLAIMS

ER 182

1   weighs in favor of dismissal.  *Sanders*, 2012 WL 13005957, at *2; *Curten v. Quality*

2   *Loan Serv. Co*., No. CV1407934MMMPJWX, 2015 WL 13915781, at *3 (C.D. Cal.

3   Oct. 7, 2015).

4          Here, continuing this case would not serve the Court's interests in judicial

5   economy and management of its docket.  This case has already been pending for

6   over two years.  Should the case proceed after all other Parties reached settlement

7   agreements, the Court would have to expend its limited resources resolving

8   Defendants' Motions to Dismiss and holding conferences related to discovery.

9   Those resources are not well spent in an action where the only remaining plaintiff

10  has been nonresponsive for over six months and has never indicated an intent to

11  prosecute this case *pro se*.  This factor, too, thus weighs in favor of dismissal.

12         3.     **Prejudice to Defendants**:  "A defendant suffers prejudice if the

13  plaintiff's actions impair the defendant's ability to go to trial or threaten to interfere

14  with the rightful decision of the case." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d

15  1406, 1412 (9th Cir. 1990).  Prejudice may consist of loss of evidence and memory,

16  as well as the costs or burdens of litigation.  *In re Phenylpropanolamine (PPA)*

17  *Prod. Liab. Litig*., 460 F.3d 1217, 1228 (9th Cir. 2006).  A plaintiff's failure to

18  prosecute gives rise to a presumption of prejudice to the defendant that "is sufficient

19  by itself to justify dismissal, even in the absence of a showing of actual prejudice to

20  the defendant from the failure." *In re Eisen*, 31 F.3d 1447, 1452 (9th Cir. 1994)

21  (quoting *Anderson v. Air W., Inc*., 542 F.2d 522, 524 (9th Cir. 1976)).

22         Mr. Whitter's failure to prosecute this action significantly hampers

23  Defendants' ability to defend themselves in this case.  From the allegations in the

24  FAC, Mr. Whitter is challenging allegedly wrongful conduct and injuries that

25  occurred decades ago, before he was admitted into housing at the Union Rescue

26  Mission in March 2019.  (FAC ¶ 149.)  Mr. Whitter's allegations of ongoing harm

27  include encountering sidewalk blockages, crime, and harassment in or near

28  Skid Row.  (*Id.* ¶ 150.)  Defendants are already in the difficult position of locating

577785.4                                    7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT JOINT MOTION FOR AN ORDER TO
SHOW CAUSE RE: DISMISSAL OF GARY WHITTER'S CLAIMS

ER 183

1   witnesses who may be unavailable, but that difficulty is compounded exponentially

2   by the inherently transient nature of the activity Mr. Whitter claims damaged him.

3   Meanwhile, Defendants are public entities and have already incurred significant fees

4   and costs in connection with this litigation.  Defendants have entered into case-

5   dispositive settlement agreements with the other Plaintiffs.  Defendants have no

6   reason to believe Mr. Whitter would not have joined those agreements had he been

7   in communication with his counsel.

8        4.   **Availability of Alternatives**:  A court's warning to a party that his

9   failure to obey the court's order will result in dismissal satisfies the "consideration

10  of alternatives" requirement.  *Ferdik*, 963 F.2d at 1262; *Malone v. U.S. Postal Serv*.,

11  833 F.2d 128, 131 (9th Cir. 1987); *Henderson v. Duncan*, 779 F.2d 1421, 1424 (9th

12  Cir. 1986).  The Court's issuance of an order to show cause, following Defendants'

13  motion for such relief, discharges the Court's obligation to consider alternatives

14  prior to dismissing Mr. Whitter's claims.  *In re PPA Prod. Liab.*, 460 F.3d at 1228-

15  29.

16       5.   **Public Policy**:  Although the public policy favoring disposition of

17  cases on their merits generally weighs against dismissal, "this factor 'lends little

18  support' to a party whose responsibility it is to move a case toward disposition on

19  the merits but whose conduct impedes progress in that direction."  *In re PPA Prod.*

20  *Liab.*, 460 F.3d 1217 (citing *In re Exxon Valdez*, 102 F.3d 429, 433 (9th Cir. 1996)).

21  This is because "it is the responsibility of the moving party to move towards [a]

22  disposition at a reasonable pace."  *Morris v. Morgan Stanley & Co*., 942 F.2d 648,

23  652 (9th Cir. 1991).

24       Mr. Whitter has been absent from this litigation for at least six months.  He

25  has never appeared in this case other than through the attorneys who have since

26  withdrawn from representation due to their inability to communicate with him.

27  Since the City and County have settled with all other Plaintiffs, Mr. Whitter's lack

28  of communication or participation will prevent this case from proceeding and force

577785.4                                  8
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT JOINT MOTION FOR AN ORDER TO
SHOW CAUSE RE: DISMISSAL OF GARY WHITTER'S CLAIMS

ER 184

1 | this Court to expend resources resolving Defendants' motions to dismiss.

2 | Therefore, the Court should find this factor also favors dismissal.

3 | **IV.** __**CONCLUSION**__

4 | For the foregoing reasons, Defendants respectfully request that the Court

5 | issue an Order (a) requiring Mr. Whitter to show cause within 30 days why the

6 | instant action should not be dismissed with prejudice for lack of prosecution, and

7 | (b) if no cause is shown within 30 days, dismissing Mr. Whitter's claims against

8 | Defendants and directing the Clerk to promptly enter judgment and close this case.

10 | DATED:  October 17, 2022          MILLER BARONDESS, LLP

13 | By:    /s/ Mira Hashmall

MIRA HASHMALL
Attorneys for Defendant
COUNTY OF LOS ANGELES

17 | DATED:  October 17, 2022          CITY ATTORNEY'S OFFICE

20 | By:    /s/ Scott Marcus

SCOTT MARCUS
Attorneys for Defendant
CITY OF LOS ANGELES

577785.4                                        9

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT JOINT MOTION FOR AN ORDER TO
SHOW CAUSE RE: DISMISSAL OF GARY WHITTER'S CLAIMS

1

## **ATTESTATION**

2        I attest that concurrence in the filing of this document has been obtained from

3 each of the other signatories who are listed on the signature pages.

4

5 DATED:  October 17, 2022          MILLER BARONDESS, LLP

6

7

8                              By:    /s/ Mira Hashmall

9                                     MIRA HASHMALL
                                      Attorneys for Defendant
10                                    COUNTY OF LOS ANGELES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

577785.4                          10
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT JOINT MOTION FOR AN ORDER TO
SHOW CAUSE RE: DISMISSAL OF GARY WHITTER'S CLAIMS

ER 186

1   SPERTUS, LANDES & UMHOFER, LLP
    Matthew Donald Umhofer (SBN 206607)
2   Elizabeth A. Mitchell (SBN 251139)
    617 W. 7th Street, Suite 200
3   Los Angeles, California 90017
    Telephone: (213) 205-6520
4   Facsimile: (213) 205-6521
    mumhofer@spertuslaw.com
5   emitchell@spertuslaw.com

6   *Attorneys for Plaintiffs*

7

8   DAWYN R. HARRISON, Acting County Counsel (SBN 173855)
    dharrison@counsel.lacounty.gov
9   JENNIFER A.D. LEHMAN, Assistant County Counsel (SBN 191477)
    jlehman@counsel.lacounty.gov
10  ANA WAI-KWAN LAI, Senior Deputy County Counsel (SBN 257931)
    alai@counsel.lacounty.gov
11  OFFICE OF COUNTY COUNSEL
    500 West Temple Street, Suite 468
12  Los Angeles, California 90012
    Telephone: (213) 974-1830
13  Facsimile: (213) 626-7446

14  [*Additional counsel continued on following page.*]

15

16                  UNITED STATES DISTRICT COURT

17                  CENTRAL DISTRICT OF CALIFORNIA

18

19  LA ALLIANCE FOR HUMAN            CASE NO. 2:20-CV-02291-DOC-KES
    RIGHTS, *et al.*,
20                                   Assigned to Judge David O. Carter
              Plaintiffs,
21
         v.                          **STIPULATION FOR VOLUNTARY
22                                   DISMISSAL WITH PREJUDICE
    CITY OF LOS ANGELES, *et al.*,   PURSUANT TO FEDERAL RULE
23                                   OF CIVIL PROCEDURE 41(a)(2)**
              Defendants.
24

25

26

27

28

*(Left margin vertical text:)* Spertus, Landes & Umhofer, LLP   1990 South Bundy Dr., Suite 705   Los Angeles, CA 90025   Telephone 310-826-4700; Facsimile 310-826-4711

1  Louis R. Miller (SBN 54141)
   Mira Hashmall (SBN 216842)
2  MILLER | BARONDESS LLP
   1999 Avenue of the Stars, Suite 1000
3  Los Angeles, CA 90067
   Main: 310-552-4400
4  Direct: 310-552-7560
   Fax: 310-552-8400
5  mhashmall@millerbarondess.com

6  *Attorneys for Defendant*
   COUNTY OF LOS ANGELES
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Spertus, Landes & Umhofer, LLP*
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

STIPULATION FOR VOLUNTARY DISMISSAL WITH PREJUDICE
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 41(a)(2)

**TO THE COURT, ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiffs LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karen Pinsky, Charles Malow, and George Frem ("Plaintiffs") and Defendant County of Los Angeles ("County") have reached a settlement in the above-captioned case.  Pursuant to Federal Rule of Civil Procedure 41(a)(2), Plaintiffs hereby request an order dismissing this action against the County with regard to all claims in their entirety, with prejudice, and request this Court retain jurisdiction for purposes of enforcing their agreement until the end of fiscal year 2026/2027 (*i.e.*, June 30, 2027). A copy of the settlement agreement is attached hereto as **Exhibit 1**.

Rule 41(a)(2) permits a plaintiff to seek a voluntary dismissal by court order if dismissal is no longer available as of right under Rule 41(a)(1)(A)(i).  Because the County has served an answer [Dkt. 320], a court order is required for Plaintiffs to dismiss their claims against the County.  *See* Fed. R. Civ. P. 41(a)(1) (a "plaintiff may dismiss an action without a court order by filing . . . a notice of dismissal before the opposing party serves either an answer" or "a stipulation of dismissal signed by all parties who have appeared").[1]  A request for voluntary dismissal should be denied only when the defendant will suffer "plain legal prejudice." *Waller v. Financial Corp. of Am.*, 828 F.2d 579, 583 (9th Cir. 1987).  The County will suffer no legal prejudice because the County consents to Plaintiffs' request for dismissal, which is submitted by Plaintiffs as a condition of the settlement reached between the County and Plaintiffs.

Rule 41(a)(2) provides that the trial court may impose terms and conditions on an order of voluntary dismissal.  Fed. R. Civ. P. 41(a)(2).  The purpose of this rule is

---

[1] The parties are also unable to obtain consent to a stipulated dismissal from Gary Whitter, who has been incommunicable for months, as explained in Plaintiffs' counsel's July 11, 2022 *Ex Parte* Application to Withdraw as Counsel.  [Dkt. 450.]

1

STIPULATION FOR VOLUNTARY DISMISSAL WITH PREJUDICE
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 41(a)(2)

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1  to protect the defendant from prejudice.  *See Cross v. Westchester Dev. Corp. V*

2  *Chiulli*, 887 F.2d 431, 432 (2nd Cir. 1989); *McCall-Bey v. Franzen*, 777 F.2d 1178,

3  1183-84 (7th Cir. 1985).  Because the County will not be prejudiced in any way by

4  the requested order, there is no need to impose any conditions to the order granting

5  dismissal.  Moreover, the parties' settlement agreement provides for the allocation of

6  costs and attorneys' fees.

7                                 <u>**CONCLUSION**</u>

8          For the foregoing reasons, Plaintiffs and the County respectfully request that

9  the Court enter an order dismissing Plaintiffs' claims against the County with

10  prejudice and retaining jurisdiction for purposes of enforcing their agreement until

11  the end of fiscal year 2026/2027 (*i.e.*, June 30, 2027).

12

13  Dated: October 17, 2022          Respectfully submitted,

14

15                                   */s/ Elizabeth A. Mitchell*
                                     SPERTUS, LANDES & UMHOFER, LLP
16                                   Elizabeth A. Mitchell

17                                   *Attorneys for Plaintiffs*

18                                   *The other signatories listed, and on whose behalf the
                                     filing is submitted, concur in the filing's content and*
19                                   *have authorized the filing.*

20

21  Dated: October 17, 2022          */s/ Louis R. Miller*
                                     MILLER | BARONDESS LLP
22                                   Mira Hashmall

23                                   *Attorneys for Defendant County of Los Angeles*

24

25

26

27

28

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705

2
STIPULATION FOR VOLUNTARY DISMISSAL WITH PREJUDICE
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 41(a)(2)

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into in connection with the action *LA Alliance for Human Rights et al. v. City of Los Angeles et al.*, U.S. District Court for the Central District of California, Case No. 2:20-cv-02291 (the "Action") by and between the County of Los Angeles ("County"); LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karyn Pinsky, Charles Malow, and George Frem (collectively, "Plaintiffs"); and Spertus, Landes, & Umhofer, LLP ("Plaintiffs' Counsel"), solely with respect to Section B.5 of this Agreement.  Each of the County and Plaintiffs is referred to individually as a "Party" and collectively as the "Parties."

In and through this landmark Agreement, the Parties desire to end the Action and also address the needs of People Experiencing Homelessness ("PEH") by supporting the development of housing units and the provision of a comprehensive and targeted array of supportive services designed to prevent and end homelessness, and by strengthening existing agreements and partnerships between and among relevant stakeholders such as the Parties and the City of Los Angeles ("City").  This Agreement follows over two years of contested litigation involving significant motion practice and an appeal, and months of arduous mediation attended by the Parties and the City.  All Parties have found and determined that this Agreement is entered into for good consideration following a lengthy negotiation and revision process.

## RECITALS

WHEREAS, Plaintiff LA Alliance for Human Rights ("Alliance") is an incorporated non-profit membership association in Los Angeles, California;

WHEREAS, Alliance's members include Plaintiffs Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karyn Pinsky, Charles Malow, George Frem, Charles Van Scoy, Leonard Suarez, all other individual plaintiffs that appeared in the Action, and current and/or former homeless individuals, non-profit organizations, community leaders, employees, residents, business owners, service providers, and community members residing and/or working in the County and/or the City;

WHEREAS, on March 10, 2020, Plaintiffs initiated the Action against the City and the County in the District Court for the Central District of California, where it was assigned to the Honorable David O. Carter ("District Court");

WHEREAS, on April 20, 2021, the District Court entered a preliminary injunction against the City and County, ordering the County to, *inter alia,* cease any sales, transfers or leases of County-owned properties, shelter and provide treatment services to all residents of Skid Row, and prepare numerous audits and reports (ECF No. 277);

WHEREAS, on October 15, 2021, the United States Court of Appeals for the Ninth Circuit vacated the injunction issued by the District Court and remanded the Action to the District Court;

WHEREAS, on November 1, 2021, Plaintiffs filed a First Amended and Supplemental Complaint ("FASC") against the City and the County (ECF No. 361);

WHEREAS, the County denied all claims in the FASC and filed a motion to dismiss the FASC, which was taken under submission by the District Court following a hearing on January 24, 2022 (ECF No. 370);

Page **1** of **11**

WHEREAS, while the County's motion to dismiss was pending, Plaintiffs and the City entered into a settlement agreement to which the County is not a party (the "City Settlement"), and also filed a stipulated order of dismissal as to Plaintiffs' claims against the City (ECF Nos. 426-1, 429-1);

WHEREAS, on June 14, 2022, the District Court entered an order approving the settlement agreement between Plaintiffs and the City, and dismissing with prejudice Plaintiffs' claims against the City as alleged in the FASC (ECF No. 445) but retained jurisdiction for purposes of enforcement;

WHEREAS, on July 15, 2022, Plaintiffs filed a Second Amended and Supplemental Complaint ("SASC") against the County (ECF No. 454);

WHEREAS, the County expressly denies all claims alleged in the SASC;

WHEREAS, the Parties have participated in multiple mediation sessions before neutral third parties at which all Parties were represented by sophisticated counsel of their choosing and engaged in arms-length negotiations that resulted in this Agreement;

WHEREAS, Plaintiffs and the County now desire to fully and finally compromise and settle all claims arising out of or relating to all matters alleged or that could have been alleged in the Action with respect to the Parties, without any admission of fault, liability, or wrongdoing, in the interests of avoiding the additional expense and the inherent uncertainties of protracted litigation upon the terms and conditions set forth in this Agreement; and

NOW THEREFORE, in consideration of the promises, covenants, warranties, representations, and conditions contained herein, for good and valuable consideration given hereunder, and with the intent to be legally bound, the Parties hereby agree as follows:

## TERMS

A.   **Effective Date and Duration**:

1.   Subject to the requirements of Sections A.2 and E, this Agreement shall become effective and operative on the date that the District Court enters an Order dismissing, with prejudice, the Action, subject to the court's continuing enforcement in accordance with Section P of this Agreement.

2.   The effectiveness of this Agreement is expressly subject to and contingent upon approval by the County's approval of settlements process, including by the Los Angeles County Claims Board and/or the County Board of Supervisors, and by approval of the individual Plaintiffs.

3.   The County's obligations in Section D.1–9 of this Agreement shall terminate at the end of fiscal year 2026/2027 (*i.e.*, June 30, 2027).

B.   **Representations, Warranties, and Acknowledgements**:

1.   Plaintiffs represent and warrant that they have not assigned, transferred, granted, or purported to assign, transfer, or grant, any of the claims, demands, and causes of action disposed of by this Agreement.

Page **2** of **11**

**2.**      Each Party represents and warrants that he, she, or it has read this Agreement in its entirety, understands its contents, and is signing this Agreement freely and voluntarily, without duress or undue influence from any other Party.

**3.**      Each Party represents and warrants that he, she, or it has been represented by independent counsel of his, her, or its own choosing and that, before their execution of this Agreement, each has had an adequate opportunity to conduct an independent investigation of all the facts and circumstances with respect to all matters that are the subject of this Agreement. Each Party further warrants and represents that he, she, or it executes this Agreement freely, knowingly, and voluntarily, that any representative executing this Agreement on behalf of any Party has the full authority of that Party to do so and thereby bind the Party represented, and that each Party is fully aware of and understands the content and effect of this Agreement.

**4.**      Each Party represents and warrants that he, she, or it is not relying on any statement of fact or opinion made by any Party, or by anyone acting on behalf of any Party, to induce execution of this Agreement, other than those expressly set forth in this Agreement.

**5.**      Plaintiffs and Plaintiffs' Counsel represent and warrant that they are not aware of any potential plaintiff other than Plaintiffs, or any attorney other than Plaintiffs' Counsel, who intends to make demands or bring litigation against the County relating to the allegations in the Action.  Plaintiffs' Counsel represents and warrants that it does not represent any clients, or have knowledge of any potential clients, with claims or potential claims against County relating to those alleged in the Action aside from Plaintiffs.

**6.**      Each Party acknowledges and agrees that the representations and warranties set forth in this Section are material inducements to the other Party's entering into this Agreement.

**C.**      <u>Settlement Payment and Attorney's Fees</u>:

**1.**      In addition to the County's obligations set forth in Section D below, and further valuable consideration for the promises, representations, warranties, acknowledgements, and releases herein, the County shall pay the sum of $2 million (the "Payment") to the Spertus, Landes, & Umhofer, LLP attorney-client trust account, which shall be inclusive of all claims for attorneys' fees and costs claimed by Plaintiffs in the Action.  Plaintiffs' Counsel may enter into a separate distribution agreement at their discretion.  The County shall not be responsible for the allocation or payment of any sum between and among any of Plaintiffs, Plaintiffs' counsel, and any of their affiliates, representatives, members, agents, and assigns.  Except for the Payment, each Party shall be responsible for and bear its own attorneys' fees and costs incurred in the Action including in connection with the negotiation and execution of this Agreement.

**2.**      Plaintiffs and Plaintiffs' Counsel acknowledge that no representations have been made by the County regarding the taxability of all or any portion of this Agreement, and that they have had the opportunity to seek independent advice regarding the tax consequences of this Agreement and accept each responsibility for satisfaction of their own tax obligation(s) and/or liabilities, if any, that may result from this Agreement.

ER 193

**D.   County's Obligations**:

    **1.   Support for Plaintiffs' Settlement with the City**:

        **i.** From fiscal year 2022/2023 through fiscal year 2026/2027, the County shall fund and provide supportive services for interim housing and permanent supportive housing units financed by the City as part of the City Settlement, as units are developed by the City and become occupiable, in an amount to be determined solely by County and City in their respective discretion. These supportive services shall include, but shall not be limited to, "mainstream" services including public assistance programs, mental health services, substance use disorder services, and benefits advocacy services to clients who meet eligibility criteria for these services.

        **ii.** The County shall provide City-funded outreach teams with access to Department of Mental Health ("DMH"), Department of Health Services ("DHS"), Department of Public Social Services ("DPSS"), and Department of Public Health ("DPH") services directly and through coordination with Multi-Disciplinary Teams ("MDTs") and Homeless Outreach & Mobile Engagement ("HOME") teams assigned within the City.

        **iii.** The Parties acknowledge that the County does not support the enforcement component of the City's street engagement strategy and no funding or services from the County or any County department or affiliated agency committed herein will be used to support the City's street engagement strategy.

    **2.   Beds Available to County Outreach Teams**: Throughout the term of this Agreement, the County shall make reasonable best efforts to ensure County outreach teams (including the increased MDT and HOME teams referenced above) have access to County Homeless Initiative-funded high service need interim housing beds for PEH in the City, and that those beds shall either be exclusively for use by, or prioritize, PEH in the City.

    **3.   Mental Health/Substance Use Disorder Beds**: By the end of fiscal year 2023/2024 (*i.e.*, June 30, 2024), the County shall develop 300 additional substance use and mental health beds according to the greatest need as solely determined by the County.

    **4.   Multi-Disciplinary Teams (MDTs)**: The County shall increase to 34 from 22 (numbers based on what is currently required and could be subject to change based on the latest point-in-time count) the number of MDTs dedicated to conducting outreach exclusively in the City, allocating at least 1 team per Council District and remaining teams assigned where there is the greatest need as informed by the Point-In-Time Count. The County shall increase the number of MDTs from 22 to a minimum of 28 by the end of fiscal year 2022/2023 (*i.e.*, June 30, 2023) and to a minimum of 34 by the end of fiscal year 2023/2024 (*i.e.*, June 30, 2024).

    **5.   Homeless Outreach and Mobile Engagement (HOME) Teams**: The County shall increase to 10 from 5.5 (numbers based on what is currently required and could be subject to change based on the latest point-in-time count) the number of HOME teams dedicated to conducting outreach exclusively in the City. The County shall increase the number of HOME teams from 5.5 to a minimum of 8 by the end of fiscal year 2022/2023 (*i.e.*, June 30, 2023) and to a minimum of 10 by the end of fiscal year 2023/2024 (*i.e.*, June 30, 2024).

**6.**    **Partnership on City- and County-Owned Land**: Throughout the term of this Agreement, the County shall continue to work with the City in making available to each other appropriate City- and/or County-owned land, located within the City's jurisdiction, to create new interim or permanent housing units as mutually agreed by County and City.

**7.**    **PEH with Serious Mental Illness or Substance Use Disorders**: The County acknowledges it has responsibilities under State and federal law to provide services, including but not limited to clinical treatment, to eligible County residents suffering from serious mental illness and/or substance use disorders, including PEH in the City. Throughout the term of this Agreement, County shall work with the City to advocate and apply for additional state and federal funding for this purpose as mutually agreed to by County and City.

**8.**    **New Funding**: If the County or City obtains significant new funding from City ballot initiative United to House L.A. or County Measure H extension for the housing and/or services outlined in this Agreement, the County shall consider and may propose potential amendments to this Agreement to enhance housing and services City-wide or County-wide. Such amendments may include (but not be limited to) continuation of operations and supportive services for the permanent and interim units beyond the term of the Agreement, or redeployment of resources to address homelessness in other cities or unincorporated County jurisdictions.

**9.**    **Reporting**: The County shall file reports regarding its progress in meeting its obligations under this Agreement quarterly. Each status report shall be provided within 30 days of the end of the County's fiscal quarter. Reports shall include the following:

    **i.**    **Support for Plaintiffs' Settlement with the City**:

       (1)    Upon receiving information from City at least 30 days before a quarterly report is due, County shall include a status regarding support services for interim and permanent supportive housing units: what units are being supported, what services have been provided, and numbers of PEH accessing services. County shall have no responsibility to confirm or otherwise verify the accuracy or completeness of the information provided to it by City or on behalf of City;

       (2)    Upon receiving information from City at least 30 days before a quarterly report is due, County shall include the number of contacts or service support requests by City Outreach worker, and the result of those contacts and/or service support requests, including (a) type or types of service requests, (b) agency or organization to provide/which provided services, (c) number of requests per individual, and (d) location where request was made. County shall have no responsibility to confirm or otherwise verify the accuracy or completeness of the information provided to it by City or on behalf of City.

    **ii.**    **Beds Available to County Outreach Teams**:

       (1)    The number of referrals to Homeless Initiative-funded high service need interim housing beds, the type of team making the referral, the disposition of the referral, and an explanation for any referrals that are not approved (if any).

     **iii.**    **Mental Health/Substance Use Disorder Beds**:

     (1)    The number of beds that have been developed (or status thereon) under this agreement, what said beds are being used for, and basis for determining greatest need.

     **iv.**    **Multi-Disciplinary Teams**:

     (1)    The number of MDTs deployed under this agreement, where, and how the greatest need has been evaluated (or re-evaluated).

     **v.**    **Homeless Outreach and Mobile Engagement Teams**:

     (1)    The number of HOME teams deployed under this agreement, where, and how the greatest need has been evaluated (or re-evaluated).

     **vi.**    **Partnership on City- and County-Owned Land**:

     (1)    A status of City/County's land partnership.

     **vii.**    **PEH with Serious Mental Illness or Substance Use Disorders**:

     (1)    Status regarding any advocacy or applications for additional state or federal funding for PEH with serious mental illness or substance use disorders.

**E.**    **Releases:**

    **1.**    Plaintiffs, including each of their heirs, spouses, trustees, successors, assigns, agents, representatives, attorneys, employees, officers, directors, shareholders, members, managers, principals, partners, insurers, and predecessors (collectively, the "Releasing Parties"), hereby absolutely and forever release and discharge the County, including all of its boards, bureaus, departments, elected and appointed officials, representatives, attorneys, administrators, officers, agents, employees, and all persons that acted on behalf of the County, and each of their predecessors, successors, agents, and assigns (the "County Released Parties"), from any and all claims, including claims for damages, damages, demands, actions, causes of action, suits, covenants, settlements, contracts, agreements, and liabilities for personal injuries, property damage, loss, cost or expense of every nature whatsoever, whether known or unknown, contingent or otherwise, at law or in equity, and whether or not expected to exist which the undersigned Plaintiffs to this Agreement had, have, or may have against the County Released Parties, and each of them, that arise out of or are related to the Action, and any allegations, events, transactions or occurrences that were alleged or that could have been alleged therein ("Claims").

    **2.**    The Releasing Parties acknowledge that they are aware that statutes exist that render null and void releases and discharges of any claims, rights, demands, liabilities, actions and causes of action that are unknown to the releasing or discharging parties at the time of execution of those releases and discharges. The Releasing Parties expressly waive, surrender, and agree to forego any protection to which they would otherwise be entitled by virtue of the

existence of any statute in any jurisdiction, including California.  Plaintiffs acknowledge that
they are familiar with section 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> THAT THE CREDITOR OR RELEASING PARTY DOES NOT
> KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT
> THE TIME OF EXECUTING THE RELEASE AND THAT, IF
> KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY
> AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR
> OR RELEASED PARTY.

It is understood and agreed that all rights under section 1542 of the California Civil Code
are expressly waived by the Releasing Parties, to the full extent allowed by law.  The Releasing
Parties agree that this Agreement extends and applies to all unknown, unsuspected and
unanticipated claims, demands, injuries, or damages within the scope of this Agreement and the
releases herein.  The Releasing Parties waive any equivalent provision of any statute of the United
States or any other state or jurisdiction with respect to such claims, demands, injuries, or damages
within the scope of this Agreement.

The Releasing Parties recognize and acknowledge that factors which have induced each of
them to enter into this agreement may turn out to be incorrect or to be different from what they had
previously anticipated, and they hereby expressly assume any and all of the risks thereof and further
expressly assumes the risks of waiving the rights provided by California Civil Code section 1542.

    **3.**      Releasing Party does not waive future claims, subject to corresponding statute of
limitations, after the term of the Agreement ends.  The Releasing Parties agree that the Payment
and the County's obligations set forth in Section D, pursuant to, and in accordance with this
Agreement, is valuable consideration for the releases in this Section and every other benefit
conferred upon them directly or indirectly under this Agreement.

    **4.**      The Releasing Parties acknowledge that their execution and delivery of the
releases in this Section is a condition of the County's obligations under this Agreement and that
the County is relying on this release in carrying out its obligations under this Agreement.

**F.**     **Dismissal With Prejudice**:  Within five (5) days of the execution of this Agreement by
all Parties, Plaintiffs shall file a Joint Stipulation For Voluntary Dismissal With Prejudice
Pursuant to F.R.C.P. 41(a)(2) (the "Stipulation").  In the event that the District Court enters an
order granting the Stipulation upon terms and conditions not agreed to by the Parties in this
Agreement, the Parties may withdraw their consent to this Agreement and continue the Action if
the Agreement and its terms never existed.

**G.**     **No Prevailing Party**:  The Parties agree that no Party to this Agreement is a prevailing
party under any applicable law, including 42 U.S.C. § 1988 or similar fee-shifting statutes.

**H.**     **No Admission of Liability**:  This Agreement is the result of a compromise and for the
purpose of settling disputed claims, and shall not at any time for any purpose constitute or be
considered or deemed any admission of liability on the part of any Party hereto. Each Party
expressly denies any wrongdoing or liability in connection with any action or omission relating

Page **7** of **11**

to one another.  This Agreement and any document related to this settlement, and the
negotiations leading thereto, shall be inadmissible in evidence and shall not be used for any
purpose in this or any other proceeding except in an action or proceeding to approve, interpret,
implement, or enforce the Agreement.

**I.**      **Entire Agreement**:  This Agreement contains all of the terms and conditions agreed
upon by the Parties regarding the subject matter of this Agreement, and supersedes all prior and
contemporaneous oral and written agreements and discussions between Plaintiffs and County.

**J.**      **Construction**:  The Parties have collaborated with each other in drafting and preparing
this Agreement.  No Party to this Agreement, or any Party's respective counsel, shall be deemed
to have drafted this Agreement, and this Agreement shall not be construed as against any Party
on such grounds.

**K.**      **No Oral Modifications:**  This Agreement constitutes the entire agreement between
Parties hereto, and no oral understanding not incorporated herein shall be binding on any Party.
This Agreement may only be modified, altered or revised, as necessary, by mutual consent of the
parties hereto by the issuance of a written amendment, signed and dated by the Parties.

**L.**      **Successors**:  The provisions of this Agreement shall be deemed to extend to and inure to
the benefit of the Parties' respective transferees, grantees, assigns, successors, heirs, trustees,
executors, administrators, and any other person or entity claiming by or through them, and to
extend to and obligate the Parties' respective transferees, grantees, assigns, heirs, trustees,
executors, and administrators.

**M.**      **No Third Party Beneficiaries:**  Notwithstanding anything in this Agreement to the
contrary, there are no intended third-party beneficiaries that may assert rights or defenses under
this Agreement, except the Parties to this Agreement and their Counsel.

**N.**      **Severability**:  Should any part of this Agreement be declared invalid, void or
unenforceable, all remaining parts shall remain in full force and effect and shall in no way be
invalidated or affected.

**O.**      **Choice of Law**:  This Agreement in all respects shall be interpreted, enforced, and
governed by and under the laws of the State of California applicable to instruments, persons, and
transactions that have legal contracts and relationships solely within the State of California.

**P.**      **Dispute Resolution**:

          **1.**      The Parties agree that the procedures contained in this Section are the required
and exclusive steps for resolving any dispute between the Parties arising out of or relating to this
Agreement or any Party's rights or obligations hereunder ("Dispute").

                    **i.**      Dispute Initiation/Right to Cure:  In the event of any dispute between the
Parties arising out of or relating to this Agreement or any Party's rights or obligations hereunder,
a Party wishing to raise a claim, demand, or cause of action (the "Claiming Party") against any
other Party (the "Responding Party") shall, before taking any other action concerning the
dispute, provide to the Responding Party written notice setting out in reasonable detail the nature

Page **8** of **11**

of the dispute and the relief sought ("Notice of Dispute").  The Parties shall meet and confer within a reasonable time in a good-faith effort to resolve the dispute through informal negotiations.  Any Party that is alleged in a Notice of Dispute to be in breach of this Agreement, and who, after meeting and conferring, requests an opportunity to cure, shall have up to one hundred twenty (120) days after receipt of the Notice of Dispute to cure such alleged breach, unless otherwise agreed ("Cure Period").  No Party will be considered in breach of this Agreement unless it is alleged that such Party has failed to substantially perform its obligations under this Agreement ("Breach").

        **ii.**    <u>Judicial Enforcement</u>:  If, after exhausting the dispute resolution procedures described in Section (P)(1)(i), the Claiming Party still alleges the Responding Party is in breach of this Agreement, the Claiming Party may file a notice of breach and request for judicial enforcement in the District Court to remedy such alleged breach.  The District Court retains jurisdiction, at its discretion, for purposes of enforcing this Agreement until the end of fiscal year 2026/2027 (*i.e.*, June 30, 2027).  The only relief that any Party may seek in the event of an alleged Breach of this Agreement will be an order compelling specific performance of the Agreement.  No Party may seek monetary damages of any kind as a result of an alleged Breach.

        **2.**    Each Party shall bear his, her, or its own costs and fees in connection with any of the dispute resolution processes under this Section.

**Q.**    <u>**Notices.**</u>  All notices to be sent under this Agreement shall be delivered as follows and shall reference the Action in the subject line of the notice:

        **1.**    *For Plaintiffs***:**
             Spertus Landes & Umhofer LLP
             617 W. 7th Street, Suite 200
             Los Angeles, CA 90017
             Attention: Matthew Donald Umhofer, Elizabeth Mitchell
             matthew@spertuslaw.com, emitchell@spertuslaw.com
        **2.**    *For the County***:**
             Office of County Counsel
             500 West Temple Street, Suite 648
             Los Angeles, California 90012
             Attention: Ana Lai; Jennifer Lehman
             alai@counsel.lacounty.gov; jlehman@counsel.lacounty.gov

        Any Party may change its notice recipient or address for providing notice to it by notifying the other Party(ies) in writing setting forth such new notice recipient or address.

**R.**    <u>**Force Majeure**</u>: No Party to this Agreement shall be deemed in violation if it is prevented or delayed from performing any of the obligations hereunder by reason of boycotts, labor disputes, embargos, shortage of material, act of God, strikes, lockouts, inability to procure labor or materials, fire, accident, laws or regulations of general applicability, act of superior governmental authority, weather conditions, sabotage, or any other cause or circumstances for which it is not responsible and beyond its control (financial inability excepted).  A Party that is delayed from performing its obligations hereunder shall make reasonable best efforts to perform

its obligation at the earliest time possible. Any Party intending to assert force majeure shall notify the other Party(ies) in writing as soon as practicable following the date the Party first knew, or by the exercise of reasonable diligence should have known, of the force majeure event.

**S.** **Execution in Counterparts and Email/Fax Signatures**: This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed to be an original and such counterparts shall together constitute one and the same Agreement. The Parties agree to accept signed pages transmitted by email or facsimile.

AGREED TO AND ACCEPTED.

**COUNTY OF LOS ANGELES**

_____     Dated: _OCTOBER 11, 2022_____
By: ANA LAI
Title: SENIOR DEPUTY COUNTY COUNSEL

**LA ALLIANCE FOR HUMAN RIGHTS**

_____     Dated: October 10, 2022_____
By:   Don Steier
Title:  Chair

**JOSEPH BURK**

_____     Dated: _____

**GEORGE FREM**

_____     Dated: _____

**WENZIAL JARRELL**

_____     Dated: _____

**CHARLES MALOW**

_____     Dated: _____

**KARYN PINSKY**

_____     Dated: 10/10/22_____

Page **10** of 11

its obligation at the earliest time possible. Any Party intending to assert force majeure shall notify the other Party(ies) in writing as soon as practicable following the date the Party first knew, or by the exercise of reasonable diligence should have known, of the force majeure event.

**S.**     **Execution in Counterparts and Email/Fax Signatures**:  This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed to be an original and such counterparts shall together constitute one and the same Agreement.  The Parties agree to accept signed pages transmitted by email or facsimile.

AGREED TO AND ACCEPTED.

**COUNTY OF LOS ANGELES**

_____     Dated: _____
By:
Title:

**LA ALLIANCE FOR HUMAN RIGHTS**

_____     Dated: _____
By:
Title:

**JOSEPH BURK**

_____     Dated: _____ 10/10/2022 _____

**GEORGE FREM**

_____     Dated: _____

**WENZIAL JARRELL**

_____     Dated: _____

**CHARLES MALOW**

_____     Dated: _____

**KARYN PINSKY**

_____     Dated: _____

its obligation at the earliest time possible. Any Party intending to assert force majeure shall notify the other Party(ies) in writing as soon as practicable following the date the Party first knew, or by the exercise of reasonable diligence should have known, of the force majeure event.

**S.**     **Execution in Counterparts and Email/Fax Signatures**:  This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed to be an original and such counterparts shall together constitute one and the same Agreement.  The Parties agree to accept signed pages transmitted by email or facsimile.

AGREED TO AND ACCEPTED.

**COUNTY OF LOS ANGELES**

_____     Dated: _____
By:
Title:

**LA ALLIANCE FOR HUMAN RIGHTS**

_____     Dated: _____
By:
Title:

**JOSEPH BURK**

_____     Dated: _____

**GEORGE FREM**

_____     Dated: ____10_/_10_/_2022_____

**WENZIAL JARRELL**

_____     Dated: _____

**CHARLES MALOW**

_____     Dated: _____

**KARYN PINSKY**

_____     Dated: _____

Page **10** of **11**

its obligation at the earliest time possible. Any Party intending to assert force majeure shall notify the other Party(ies) in writing as soon as practicable following the date the Party first knew, or by the exercise of reasonable diligence should have known, of the force majeure event.

**S.    Execution in Counterparts and Email/Fax Signatures**: This Agreement may be executed in any number of counterparts, each of which so executed shall be deemed to be an original and such counterparts shall together constitute one and the same Agreement.  The Parties agree to accept signed pages transmitted by email or facsimile.

AGREED TO AND ACCEPTED.

**COUNTY OF LOS ANGELES**

_____          Dated: _____
By:
Title:

**LA ALLIANCE FOR HUMAN RIGHTS**

_____          Dated: _____
By:
Title:

**JOSEPH BURK**

_____          Dated: _____

**GEORGE FREM**

_____          Dated: _____

**WENZIAL JARRELL**

_Wbria / Jarrell_                         Dated: _10 - 10 - 22_

**CHARLES MALOW**

_(signature)_                             Dated: _10 - 10 - 22_

**KARYN PINSKY**

_____          Dated: _____

Page **10** of **11**

**HARRY TASHDJIAN**

Dated: 10-10-22

Plaintiffs' Counsel agrees to be bound by Section B.5 of the Agreement.

Spertus, Landes, & Umhofer, LLP

Dated: October 10, 2022

By:   Elizabeth A. Mitchell
Title:   Attorney for Plaintiffs

Page 11 of 11

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. LA CV 20-02291-DOC-KES                    Date:  September 27, 2022

Title: LA ALLIANCE FOR HUMAN RIGHTS ET AL. v. CITY OF LOS ANGELES ET AL.

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

|  Karlen Dubon  |  Not Present  |
| :---: | :---: |
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
| :---: | :---: |
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):   ORDER GRANTING STAY AND SETTING DATES RESETTLEMENT AGREEMENT**

On September 26, 2022, the parties submitted a Second Stipulation to Stay Proceedings Due to Settlement, along with a preliminary settlement terms sheet. (Dkt. 471). In this renewed request, the parties ask the Court to "continue all deadlines and stay proceedings through November 15, 2022" so that they may "draft their agreement and obtain all necessary client approvals." (Dkt. 471).

Having read and considered the parties' request, and to ensure the efficient and expedient resolution of this matter, the Court hereby **ORDERS** the parties to submit a proposed settlement agreement by October 17, 2022—thirty (30) days from the date the parties originally notified the Court of their pending settlement (Dkt. 467).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                    Date: September 27, 2022

                                                                          Page 2

      The Court further **GRANTS** the request to stay proceedings through November 15, 2022, and **SETS** the following dates regarding the settlement agreement:

> The Court invites any party and the public to submit comments or objections to the settlement agreement by October 27, 2022.
>
> Responses are due November 2, 2022.
>
> Hearing regarding the settlement agreement is set for November 14, 2022, at 9:00 AM.

The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                        Initials of Deputy Clerk: kdu

CIVIL-GEN

SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
mumhofer@spertuslaw.com
emitchell@spertuslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, *et al.*, <br><br> Defendants. | CASE NO. 2:20-CV-02291-DOC-KES <br><br> Assigned to Judge David O. Carter <br><br> **CLARIFYING STATEMENT REGARDING GARY WHITTER** |

TO THE HONORABLE COURT, AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

On June 23, 2022 this court issued an order requiring Plaintiffs to file an amended complaint, if any, on or before July 15, 2022. (ECF No. 449.)

On July 11, 2022, counsel for Plaintiffs, Spertus, Landes, and Umhofer LLP (SLU) filed an ex parte application to be relieved as counsel for Plaintiff Gary Whitter because Mr. Whitter has failed to keep in contact with SLU, and SLU, despite best efforts, cannot locate Mr. Whitter. This has prevented SLU from effectively representing Mr. Whitter. (ECF No. 450.) The court has not yet ruled on this ex parte application.

1

CLARIFYING STATEMENT REGARDING GARY WHITTER

On July 15, 2022 Plaintiffs LA Alliance, Joseph Burk, George Frem, Wenzial Jarrell, Charles Malow, Karyn Pinsky, and Harry Tashdjian filed their Second Amended and Supplemental Complaint pursuant to this court's order.  This complaint was not filed on behalf of Plaintiff Gary Whitter because counsel for Plaintiffs has still had no contact from Mr. Whitter and therefore cannot file an amended complaint on his behalf.  (ECF No. 454.)

Spertus, Landes, and Umhofer LLP continues to act to the best of its ability to protect Mr. Whitter's interests until such time as they are relieved as counsel. Should Mr. Whitter contact SLU, SLU will notify the court immediately.

Respectfully submitted,

Dated: July 15, 2022

/s/ Elizabeth A. Mitchell
SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)

*Attorneys for Plaintiffs*

2
CLARIFYING STATEMENT REGARDING GARY WHITTER

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
mumhofer@spertuslaw.com
emitchell@spertuslaw.com

*Attorneys for Plaintiffs LA ALLIANCE, JOSEPH BURK, GEORGE FREM, WENZIAL JARRELL, CHARLES MALOW, KARYN PINSKY, AND HARRY TASHDJIAN*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, a non-profit corporation, JOSEPH BURK, GEORGE FREM, WENZIAL JARRELL, CHARLES MALOW, KARYN PINSKY, LEANDRO SUAREZ, HARRY TASHDJIAN, CHARLES VAN SCOY, and GARY WHITTER, individuals,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, a municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 200 inclusive,<br><br>Defendants. | Case No. 2:20-cv-02291<br><br>**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR:**<br><br>**(1) Violation of Mandatory Duty (Cal. Gov't Code § 815.6; Welf. & Inst. Code § 17000)**<br>**(2) Violation of Cal. Civ. Code § 3490, *et seq.*; 3501, *et seq.***<br>**(3) Inverse Condemnation/Violation of Art. I § 19 of California Constitution**<br>**(4) Waste of Public Funds and Resources (Cal. Civ. Proc. Code § 526a)**<br>**(5) Violation of Due Process and Equal Protection (42 U.S.C. § 1983; U.S. Const. amend. V/XIV)**<br>**(6) Violation of Due Process – State Created Danger Doctrine (42 U.S.C. § 1983; U.S. Const. amend XIV)**<br>**(7) Uncompensated Taking (42 U.S.C. § 1983; U.S. Const. amend. V/XIV)** |

*(left margin, vertical)* Spertus, Landes & Umhofer, LLP 1990 South Bundy Dr., Suite 705 Los Angeles, CA 90025 Telephone 310-826-4700; Facsimile 310-826-4711

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

# INTRODUCTION

1. Over two years after this case was filed, and after hundreds of millions of dollars have poured into Los Angeles through federal and state pandemic relief, the devastation on the streets and the impact on both the housed and unhoused communities have only gotten worse.  LA Alliance for Human Rights—of which both housed and unhoused are members—and Plaintiffs named herein filed this lawsuit to change the trajectory of the homelessness for the benefit of both communities.

2. In the face of this lawsuit challenging its handling of the homeless crisis, the City has stepped up—it has agreed to provide shelter and housing to thousands of desperate people living on the street on a judicially-enforced, deadline-driven schedule, while at the same time increasing street engagement and meeting milestones for encampment reduction across the City.  This means relief is coming for both those suffering on the streets, as well as businesses and residents throughout the City facing the fallout from the crisis: crime, fire, disease, blocked sidewalks, and unusable public spaces.  But what the City cannot do is exactly what the County is statutorily required to do: provide services and treatment to unsheltered persons suffering under the crushing weight of drug addiction and mental illness.  The County is sadly, horrifically failing in this responsibility, resulting in thousands of the most vulnerable deteriorating on the sidewalks, beaches, and under overpasses. Unless the County steps up as the City has and fulfills its obligations to provide services to those experiencing homelessness, a comprehensive solution to the homelessness crisis will remain unrealized.

3. Legal counsel maintains the County is "doing everything possible to address homelessness" and that "[a]ny assertion that the county has failed on this

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

obligation is utterly baseless."[1]  Yet County Supervisor Kathryn Barger has

candidly and commendably admitted: "[W]hat we're doing in LA County is

failing.  Our rising homeless count numbers prove that.  The tents that line our

streets prove that.  Thousands of individuals in distress prove that.  We have

more than a hundred public, community-based, faith-based, and non-profit

organizations dedicated to providing services to people experiencing

homelessness, and millions of Measure H dollars in our coffers to fund the work,

but our region continues to fall short."[2]

4.     Supervisor Barger is right: the mortality rate of people experiencing

homelessness who die on the streets has leapt to *5.5 per day*.[3]  The last point-in-

time count numbers that have been released (2020) showed 66,436 persons

experiencing homelessness in Los Angeles County (a rise of 12.7 percent from

2019), 41,290 of whom live in the City of Los Angeles (16.1 percent increase).[4]

This is in addition to 12 and 14 percent respective increases from the year

before.[5]  Using the 2020 PIT numbers, there has been an increase in homelessness

by approximately 60 percent since 2013 in both City and County, with the

numbers of unsheltered homeless *doubling*.[6]  And the rates of mortality for the

unhoused are increasing faster than the numbers of unhoused themselves.  Dr.

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[1] https://www.latimes.com/homeless-housing/story/2022-04-01/los-angeles-homeless-lawsuit-settlement-judge-carter
[2] https://kathrynbarger.lacounty.gov/barger-and-stakeholders-respond-to-recommendations-from-blue-ribbon-commission-on-homelessness/
[3] County of Los Angeles, Public Health, *Mortality among People Experiencing Homelessness in Los Angeles County: One Year Before and After the Start of the COVID-19 Pandemic* (April 2022), http://publichealth.lacounty.gov/chie/reports/Homeless_Mortality_Report_2022.pdf
[4] Los Angeles Homeless Services Authority ("LAHSA"), *2020 Greater Los Angeles Homeless Count Results* (Sept. 3, 2020), https://www.lahsa.org/news?article=726-2020-greater-los-angeles-homeless-count-results.
[5] LAHSA, *2019 Greater Los Angeles Homeless Count* – Data Summary Total Point-In-Time Homeless Population by Geographic Areas (June 16, 2020), https://www.lahsa.org/documents?id=3467-2019-greater-los-angeles-homeless-count-total-point-in-time-homeless-population-by-geographic-areas.pdf.
[6] Los Angeles Almanac, *Homelessness in Los Angeles County 2020*, http://www.laalmanac.com/social/so14.php (last visited June 22, 2022).

3

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Barbara Ferrer, director of DPH admits: "Homeless people are in fact dying at a higher rate because they're homeless."[7]

5.     The streets tell a sad story: the mentally ill and addicted visibly suffer in intersections, parks, and sidewalks.  Without medical supervision or treatment, the most severely affected cannot hold jobs or housing, and are left to wander and fend for themselves in a horrific cycle of degradation.  And the number of those suffering has climbed with the increased prevalence of illegal narcotics, which are being used to self-medicate or are the cause of the mental decline in the first place.  Available drug treatment beds are woefully unobtainable while the drug addiction crisis rages, and our communities are ravaged.  The County's silos of care make it nearly impossible for anyone with a comorbidity (that is, suffering from more than one ailment—for example mental illness and drug addiction) to obtain help.  Los Angeles is one of only two counties in the state that does not have an integrated administration to address individuals suffering with both mental health and substance use disorders.  This is particularly bad news given that a recent California Policy Lab study reported 50 percent of unsheltered individuals suffer from a *trimorbidity* of physical health, mental health, *and* substance abuse conditions.[8]  The County has the obligation to provide for indigent and low-income mental and public healthcare and is woefully failing in its obligations.

6.     For years, the City struggled—and failed—to balance the needs of the housed and unhoused.  The near-exclusive focus on building permanent supportive housing through Proposition HHH ("HHH") in the last five years has led to lethal under-funding of emergency and interim shelter solutions which has

---

[7] Jessica Flores, *Homeless deaths in LA County doubled between 2013 and 2018*, Curbed Los Angeles (Oct. 30, 2019, 3:50 PM), https://la.curbed.com/2019/10/30/20940369/homeless-deaths-los-angeles-county.
[8] Janey Rountree, Nathan Less, & Austin Lyke, *Health Conditions Among Unsheltered Adults in the U.S.* 4, California Policy Lab (Oct. 2019), https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

4

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

in turn left thousands to decline and die on the streets without support from County services.  Those individuals in turn, without services or shelter, languish and decline, ultimately requiring increased long-term services as a result of unnecessary years spent subject to the horrors of the street.

7.     As a result of an early, partial agreement reached in this case between the City and County, in what all parties hoped was a sign of future cooperation, an additional 9,633 beds have been funded according to a recent court filing, with shared operating costs and provision of mainstream services.[9] 1,100 of these beds were already in the works through the Mayor's "A Bridge Housing" program, 834 of these beds are permanent supportive housing projects which had been long-planned, and an undefined number (likely over one thousand) are "rapid rehousing" vouchers which don't add to the bed inventory (but do help prevent homelessness).  Still, this agreement undisputedly added thousands of much-needed interim beds to the inventory.  Yet while this agreement was a welcome departure from the City and County's historical squabbling over responsibility and blame, and a needed infusion of interim shelter opportunities, it still did not lead to a comprehensive agreement which would relieve the suffering on the streets in a meaningful way.  Shelter remains unattainable for most, services are inaccessible for most, and streets are unbearable for all.

8.     In a further effort to back away from the County's liability, counsel repeatedly claims "This is a Skid Row lawsuit.  Skid Row is in the city of L.A.  Skid Row is the focal point of this whole lawsuit." But this has never been only about Skid Row: Skid Row is the epicenter of homelessness—and not just homelessness, but in unhoused drug addiction and mental illness—in the United

---

[9] Def. City of Los Angeles' Quarterly Status Report Pursuant to the Mem. of Understanding Between the County of Los Angeles and the City of Los Angeles at 64-71, ECF No. 342.

5

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

States, but the crisis has spread beyond the confines of Skid Row and into every corner in Los Angeles.

9.      Homeless encampments are entrenched throughout the City and County.  With increased population density, unlimited property accumulation has fostered a proliferation of flea-infested rats and other vermin, which are largely responsible for the recent outbreaks of medieval diseases.  Large items obstruct the free passage and use of the streets and sidewalks.  Encampments have brought with them rampant drug sales and use, which in turn provide a platform for violent assaults and property crimes.  Crime both on and by homeless residents has intensified.[10]  A homeless individual is eight times more likely to be a victim or suspect of a crime than a housed person.  In the City of Los Angeles, 42 crimes involving homeless individuals are reported per day, over half of which are violent.  80-90 percent of crimes reported at a homeless encampment are violent.[11]  In Central Bureau Homicide (which encompasses Skid Row area), 40 percent of the homicides as of October, 2021 have been "transient-related" both as suspects and victims.[12]

10.      The multiplication of makeshift structures, garbage, human waste, and other detritus has created circumstances throughout the City and County that

---

[10] Joel Grover & Amy Corral, *A Homeless Man Punched Two People in the Face, But Was Cited and Released*, NBC Los Angeles, (Nov. 13, 2019, 1:10 PM), https://www.nbclosangeles.com/news/local/hollywood-violent-homeless-attacks-increase-video-564682831.html; Eric Leonard, *Homeless Crime Jumps Nearly 50 Percent in Los Angeles, LAPD Says*, NBC Los Angeles (Dec. 10, 2018, 8:19 PM), https://www.nbclosangeles.com/news/local/LAPD-Reports-Spike-in-Homeless-Crime-502407861.html; Zoie Matthew, *Crimes Against the Homeless Have Risen, and Advocates are Searching for Answers*, Los Angeles Magazine (Oct. 15, 2019), https://www.lamag.com/citythinkblog/homeless-crime/.

[11] Sophie Flay & Grace Manthey, *What is really going on with homeless crime? We crunched the numbers*, ABC Eyewitness News, https://abc7.com/feature/homeless-crime-los-angeles-data-response/10827722/ (last visited June 22, 2022).

[12] Kevin Rector, *On front lines of L.A.'s homicide spike, these detectives race to solve mounting caseloads* (Oct. 22, 2021, 5:00 AM), https://www.latimes.com/california/story/2021-10-22/l-a-homicide-detectives-face-mounting-caseloads.

6

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

are crippling for local businesses, unlivable for residents, and deadly for those on the streets.  The environmental impact from power-washing human waste and used needles into our oceans is unassessed and untold.  Together the City and County spend over a billion dollars annually providing police, emergency, and support services to those living on the streets.  And still, the tragedy unfolds.

11.     As mental health affliction and drug addiction rates have soared over the last several decades, so has the cost of housing.  Support structures for those on the streets have been stretched to the breaking point by burgeoning demands and insufficient funding by local, state, and federal governments.  The population of people experiencing homelessness has nearly doubled since 2012 while sustainable short- and long-term solutions have been in short supply.  Los Angeles County Department of Public Health has repeatedly warned the City that basic hygiene services are needed to maintain public health in or near homeless encampments—but those critical services have been in short supply.[13]  With the start of the pandemic, there was a tremendous push to place bathrooms and sanitation stations near encampments to maintain hygiene, but those are rarely serviced and are now down to only 1/3 of their previous number at a time when homelessness continues to increase.[14]

12.     Advocates have pressured the City and County for years to permit public camping, allow the accumulation of personal property on the streets, and generally make it more comfortable for people to live on the streets.  But street-living is by no means more "comfortable," because of significant health issues and inherent danger involved in being unsheltered.  Enforcement of homeless-related crimes has been reduced, or in some cases eliminated, in the name of

---

[13] Matt Stiles, *As Homeless Crisis Worsens in L.A., The County Leans On City Officials To Act*, Los Angeles Times (June 8, 2019, 5:04 PM), https://www.latimes.com/local/lanow/la-me-homeless-county-letter-20190608-story.html.
[14] Lexis-Olivier Ray, *City Reverses Decision to Remove Washing Stations From Encampments Following L.A. Taco Investigation,* L.A. Taco (Aug. 5, 2021), https://www.lataco.com/bathroom-stations-encampments-la-city/.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1  compassion.  But allowing people to die on the streets isn't compassionate; it's

2  cruel.

3      13.    The massive build-up of property and tents has made sidewalks

4  unpassable.  Business owners have suffered as well—customers cannot access

5  stores and are declining to patronize them due to conditions on the streets, and

6  business owners are spending hundreds of thousands of dollars on increased

7  sanitation and security measures and cannot maintain employees.  Residents and

8  workers throughout the Skid Row area are confronted daily by disease, illicit

9  drug sales and use, prostitution, and general filth and squalor.  People are openly

10  using drugs, urinating, and defecating in public.

11      14.    Residential and commercial buildings alike have endured fires from

12  homeless camps, where makeshift heaters are used to keep people warm, open air

13  fires are used to cook food, utility wiring is tampered with to provide electricity,

14  and arsons arise out of drug or property disputes.[15]  Businesses are losing

15  insurance because of the fire risk associated with homeless encampments next to

16  their buildings.[16]  Shockingly, more than 50 percent of the fires responded to by

17  Los Angeles Fire Department are homeless-related, and one-third of those are

18  intentionally started (arson).

19      15.    The frequency of criminal conduct has increased so dramatically in

20  some areas that law enforcement officials can respond only to the most egregious

21  crimes—and often only after serious damage has been done.  And those who are

22

23      [15] James Queally, *Firecrackers. Molotov cocktails. Fire attacks have
24  shaken L.A.'s homeless community*, Los Angeles Times (Oct. 18, 2019, 7:00
    AM), https://www.latimes.com/california/story/2019-10-18/homeless-population-
    attacks-fire; Joel Grover & Amy Corral, *Los Angeles Homeless Illegally Use Fire
25  Hydrants to Fill Water Balloons, Bathe, Shave*, NBC Los Angeles (Aug. 24,
    2019, 1:00 AM), https://www.nbclosangeles.com/investigations/Los-Angeles-
26  Homeless-Illegally-Use-Fire-Hydrants-to-Fill-Water-Balloons-Bathe-Shave-
    558051461.html.
27      [16] Joel Grover & Amy Corral, *Your Insurance Is Canceled Because of
    Homeless Tent Fires*, NBC Los Angeles (Sept. 23, 2019, 8:39 AM),
28  https://www.nbclosangeles.com/news/local/LA-Homeless-Encampment-Fires-
    Insurance-Rates-Tents-Homelessness-561145811.html.

8
SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

experiencing homelessness pay the highest price for this lawlessness.  Violent
assaults at encampments have doubled and robberies have increased 144
percent.[17]  As Rev. Andy Bales of Union Rescue Mission notes, "The crime on
Skid Row has skyrocketed . . . we used to have a rare occurrence of shootings.
Now we have them every week.  People are suffering from robberies, rape,
hunger, the cold or heat – you name it.  I don't know if there's a place anyone can
suffer more.  It's an absolute disaster." [18] Year after year, assaults against
homeless victims have increased, as the number of vulnerable subject to
predators increases.  In 2020, nearly 20 percent of homicides in Los Angeles
were on unhoused individuals.[19]  Crime involving homeless individuals (as either
victim or suspect) is 8 percent of the crime in Los Angeles (11 percent of violent
crime), but homeless people only make up about 1 percent percent of the
population.  Random violent attacks by unhoused individuals have increased
significantly, often due to drug consumption.[20]  Starbucks just this week
announced closure of several of its stores, citing safety concerns for its customers
and employees.[21]

16.    Humans living on the streets and in their cars have no regular access
to sanitation facilities, so trash and human waste end up in public spaces and
ultimately our oceans.  Businesses are regularly cleaning used syringes out of

---

[17] Ethan Ward, *Crime at tent encampments rises during the pandemic year*, Crosstown (May 4, 2021), https://xtown.la/2021/05/04/crime-homeless-individuals/.

[18] *Id.*

[19] Eric Leonard, *LA's Staggering Murder Rate Linked to Gang Shootings and Violence Against Homeless*, NBC Los Angeles (Nov. 23, 2020, 8:01 PM), https://www.nbclosangeles.com/news/local/las-staggering-murder-rate-linked-to-gang-shootings-and-violence-against-homeless/2469360/.

[20] *LAPD Says Random, Violent Attacks By Unhoused Residents Are on The Rise*, CBS Los Angeles (May 19, 2021, 11:32 PM), https://losangeles.cbslocal.com/2021/05/19/lapd-says-random-violent-attacks-by-unhoused-residents-are-on-the-rise/.

[21] Christian Martinez, *Starbucks to close six Los Angeles-are stores it calls 'unsafe to continue to operate'*, Los Angeles Times (July 12, 2022, 6:34 PM), https://www.latimes.com/california/story/2022-07-12/starbucks-to-close-six-los-angeles-stores-10-others-around-country-due-to-safety-issues.

9

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1  their drains; an untold number are washed into our waterways.  The

2  environmental impact of the homelessness crisis was recently underscored in a

3  letter from the Environmental Protection Agency.[22]  Yet the governmental

4  policies and inaction that perpetuate these pollutants continue unabated.

5      17.    Measure H—a county-wide tax increase that was originally

6  estimated to net $355 million in homeless-relief funding available per year but

7  now brings in over half a billion dollars yearly—is spread so thin it serves more

8  to feed the County's own bureaucracy than to make any significant dent in the

9  crisis.[23]  And the original focus of the measure—supporting the City's HHH

10 projects and providing increased intensive services and treatment—isn't even

11 mentioned in its annual budget.  Meanwhile the County does the bare minimum

12 to support the Department of Mental Health, which in turn is holding somewhere

13 between $500 million and a billion dollars in its account unspent.

14     18.    Despite the magnitude of the problem, a major course correction

15 can be made without breaking municipal budgets.  Steps could be taken to

16 provide safe sleeping spaces for the entire homeless population for a fraction of

17 the funds currently devoted to the homelessness crisis—if the City and County

18 were to work together.  Reno recently build an emergency and transitional shelter

19 community in less than 60 days that holds 600 beds at the cost of only $11,203

20 per bed .[24]  Union Rescue Mission built a Sprung structure (a large membrane

21 tent) in a matter of months—the single tent houses more than 100 people at a cost

22 of only $10,000 per bed (including a six-month stay, security, and social

23

24     [22] Letter from Andrew Wheeler, Administrator, U.S. Environmental
   Protection Agency, to Gavin C. Newsom, Governor of California (Sept. 26,
25 2019), https://www.epa.gov/sites/production/files/2019-
   09/documents/9.26.19_letter-epa.pdf.
26     [23] LAHSA, *LAHSA Releases 2019 Housing Inventory Count* (Sept. 19,
   2019), https://www.lahsa.org/news?article=584-lahsa-releases-2019-housing-
27 inventory-count ("On our present course, it will take far too long to build far too
   few units of housing to effectively end this crisis." – Peter Lynn, executive
28 director LAHSA).
       [24] Renard Decl. at 1, LA Alliance for Human Rights v. City of Los
   Angeles, Case No. 21-55395, ECF 13-2.

10

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1    services).[25]  The City has actually utilized this same structure in several places—

2    yet the City's cost was <u>quadruple</u> Union Rescue Missions', at $42,000 per bed.[26]

3    In Hawaii, the city of Honolulu is putting up large military-grade inflatable tents

4    in select parks to quickly and effectively provide shelter when the demand

5    exceeds supply, at a cost of $6,000 per bed which also includes a 90-day stay,

6    security, and social services.[27]  Tiny houses are being used in Seattle for $6,000

7    to $10,000 per house to create micro-villages as bridge housing.[28]  Entire kits can

8    be purchased to house a family of 4 in a large tent complete with furniture,

9    refrigerator, heater, and electrical generator for a little more than $2,000 ($500

10   per bed).[29]  Large tents that can be purchased for $400 are being used by the city

11   of Modesto to address its own homelessness crisis.[30] 3D printed 400-square foot

12
13
14

15   [25] Rev. Andy Bales and J. Michael Arnold, *When it Comes to
     Homelessness, We Must Do More and We Must Do it Now*, Los Angeles
16   Downtown News (Aug. 5, 2019),
     http://www.ladowntownnews.com/opinion/when-it-comes-to-homelessness-we-
17   must-do-more-and/article_6b08711a-b57e-11e9-850e-670a231aefa4.html.
     [26] Joel Grover and Amy Corral, *Inside the Massive Tent That Might be a
18   Partial Solution Homelessness in LA,* NBC Los Angeles (Sept. 18, 2019, 11:55
     AM), https://www.nbclosangeles.com/news/local/los-angeles-la-homeless-
19   encampments-sprung-tents-shelter-skid-row/1965408/.
     [27] Dan Nakaso, *Pilot project aimed at reducing Oahu's homeless will start
20   in Waipahu*, Star Advertiser (Oct. 20, 2019, 5:28 PM),
     https://www.staradvertiser.com/2019/10/20/hawaii-news/pilot-project-aimed-at-
21   reducing-oahus-homeless-will-start-in-waipahu/; Allyson Blair, *Giant inflatable
     tents for the homeless could be coming to a park near you*, Hawaii News Now
22   (Nov. 27, 2018, 3:19 PM), https://www.hawaiinewsnow.com/2018/11/28/giant-
     inflatable-tents-homeless-could-be-coming-an-oahu-park-near-you/; Ashley
23   Mizuo, *Honolulu opens short-term homeless shelter in Wahiawa*, The Honolulu
     Star-Advertiser (May 14, 2021), https://www.yahoo.com/entertainment/honolulu-
24   opens-short-term-homeless-161100501.html.
     [28] *See* Sharon Lee, *Tiny House Villages in Seattle: An Efficient Response to
25   Our Homelessness Crisis*, SHELTERFORCE: The Original Voice of Community
     Development (Mar. 15, 2019), https://shelterforce.org/2019/03/15/tiny-house-
26   villages-in-seattle-an-efficient-response-to-our-homelessness-crisis/.
     [29] Relief ShelterKits, *Relief Tents: Concept Designs*,
27   https://www.relieftents.com/relief-tents/shelterkit-living-supportkit/ (last visited
     June 22, 2022).
28   [30] Kevin Valine, *Modesto homeless camp is filling up, but officials adapt to
     find room for more*, The Modesto Bee (May 13, 2019, 4:58 PM),
     https://www.modbee.com/news/local/article230345544.html.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

ER 219

homes can be built in less than 24 hours and cost only $4,000 to construct.[31] Connect Homes produces fully integrated off-the-grid modular shelters for $20,000 to $30,000 per bed, with two-story options to densify.[32]  Pallet shelters, small "tiny home" type emergency structures which can be built in less than an hour, only cost approximately $8,000 per two-bed unit, but the City of Los Angeles spent an astonishing $130,000 to place such units due to over-engineering and over-regulation; comparatively Sonoma County spent only $21,817 per unit, the City of Riverside spent only $17,000 per cabin, and Tacoma only $12,000, all for the same structure.[33]

19.    The County's General Hospital (LAC+USC) Building, with 1.5 million square feet of space in the heart of East L.A., has been vacant for over a decade—the County at one point considered utilizing it for homeless assistance but is now evaluating it as a "mixed use" property.[34]  83 acres of County-owned property exist at the old County "poor farm," Rancho Los Amigos, a brilliant 19th-century solution whereby homeless housing and medical care was combined with a working farm to both feed the residents and sell for profit to support the

---

[31] Aria Bendix, *These 3D-printed homes can be built for less than $4,000 in just 24 hours*, Business Insider (Mar. 12, 2019, 2:09 PM), https://www.businessinsider.com/3d-homes-that-take-24-hours-and-less-than-4000-to-print-2018-9; Sharon Jayson, *3-D-pringed homes a concept turns into something solid*, The Washington Post (Mar. 6, 2020, 6:00 AM), https://www.washingtonpost.com/realestate/3d-printed-homes-a-concept-turns-into-something-solid/2020/03/05/61c8b0d2-36e4-11ea-bf30-ad313e4ec754_story.html.

[32] Connect Shelters, https://www.connect-shelters.com/ (last visited June 22, 2022).

[33] Doug Smith, *$130,0000 for an 8-foot-by-8-foot shed? That's what L.A. is paying in a bid to house the homeless*, Los Angeles Times (Dec. 12, 2020, 5:51 PM), https://www.latimes.com/california/story/2020-12-12/los-angeles-tiny-homes-homeless.

[34] Jacqueline Ramírez, *Second community meeting explores future of former County Hospital*, Boyle Heights Beat (Sept. 18, 2019), https://boyleheightsbeat.com/second-community-meeting-explores-future-of-former-county-hospital/; Alex Medina, *Community meeting to explore former County Hospital re-use*, Boyle Heights Beat (June 12, 2019), https://boyleheightsbeat.com/community-meeting-to-explore-former-county-hospital-re-use/.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

project.[35]  The unused acreage has been approved for a new County office-park rather than repurpose it for its original intent.[36]  The County owns over 200 acres of the Los Angeles County Fairgrounds ("Fairplex") in Pomona which, while currently leased to the non-profit Los Angeles County Fair Association, may be negotiated to support shelters.  The L.A. City Controller has identified 13,948 separate properties within the City owned by various public entities, many of which are vacant or underutilized.[37]  Even small lots could support pallet houses individual tents, or "tiny home" communities with shared bathroom facilities. Plaintiffs have identified 166.58 acres of usable City- or County-owned property that could quickly be used for these very projects.[38]

20.     Board-and-care facilities—which offer housing, meals, and basic assistance for those who need supportive care—are closing all over California at rapid rates because it is becoming economically infeasible to remain open.[39]

[35] *See* Historic American Buildings Survey, *Los Angeles County Poor Farm (Rancho Los Amigos, Los Angeles County) Rancho Los Amigos Medical Center*, http://lcweb2.loc.gov/master/pnp/habshaer/ca/ca3500/ca3509/data/ca3509data.pdf (last visited June 22, 2022).

[36] Steven Sharp, *Historic Rancho Los Amigos Campus Slated for Redevelopment*, URBANIZE Los Angeles (June 24, 2020, 9:55 AM), https://urbanize.city/la/post/historic-rancho-los-amigos-campus-slated-redevelopment.

[37] Los Angeles City Controller, *Publicly-Owned Properties*, https://controllerdata.lacity.org/dataset/Publicly-Owned-Properties/bawf-ixme/data (last visited June 22, 2022); Los Angeles City Controller, *Property Panel: A guide to publicly-owned properties in the City of Los Angeles*, https://lacontroller.maps.arcgis.com/apps/Cascade/index.html?appid=b6d7907c118d4ea2a1dd96bc0425633d (last visited June 22, 2022); Natalie Hoberman, *Despite housing crisis, LA lags in building its own sprawling land portfolio*, TheRealDeal (May 28, 2019, 1:00 PM), https://therealdeal.com/la/2019/05/28/despite-housing-crisis-la-lags-in-building-on-its-own-sprawling-land-portfolio/.

[38] Mitchell Decl. Ex. D, at 104, ECF No. 239-1.

[39] Jocelyn Wiener, *Overlooked mental health "catastrophe:" Vanishing board-and-care-homes leave residents with few options*, CalMatters: Projects (Apr. 15, 2019), https://calmatters.org/projects/board-and-care-homes-closing-in-california-mental-health-crisis/; *Loss of Board and Care Facilities is at Crisis Level: Undermines California Counties' Efforts to Support Individuals with Serious Mental Illness, Older Adults and Persons with Disabilities at Risk of Homelessness*, Steinberg Institute, County of Los Angles, County Behavioral

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

"Los Angeles County has lost more than 1,200 board and care placements for people with mental illness since 2016."[40] The recent LA Times article cites higher statistics, with 1,687 beds for persons with serious mental illness closing since 2016.[41]  Those facilities—which are paid only $40 per-night-per-guest by government entities—could be subsidized by the County (known as "patch funding") to prevent closures and encourage more to open.  No infrastructure need be built, and the property owners would have greater financial incentive to stay open or open anew to provide beds, meals, and basic care.  Similarly, the shared/collaborative housing model supported by organizations like SHARE!, Haaven, and others, boasts zero infrastructure costs with the added benefit of self-sustenance after a one-time $4,000-per-bed investment.[42]

21.    While this is not a natural disaster, it is a disaster nonetheless, and it should be treated that way.  The *only* way to address this crisis with the urgency it deserves is an emergency response—providing immediate shelter for all, increasing necessary outreach, services, and treatment, and abating the degradation of our cities and communities, for the good of everyone.  The City saw the success of this very model at multiple locations in Los Angeles so far, including, *inter alia*, the Venice Boardwalk, Echo Park (though the clearance could have been handled far better), McArthur Park, Rose/Penmar, and CD 3

---

Health Directors Association, https://namisantaclara.org/wp-content/uploads/2020/11/Loss-of-Board-and-Care-Facilities-is-at-Crisis-Level-2.28.20.pdf (last visited June 22, 2022).
[40] Letter from Ann Sewill, General Manager, Los Angeles Housing Department, to City Counsel, February 4, 2022, https://clkrep.lacity.org/onlinedocs/2020/20-1203_misc_2-4-22.pdf.
[41] Lila Seidman, *Homes for people with severe mental illness are rapidly closing. Will help come fast enough?* Los Angeles Times (July 12, 2022, 4:00 AM), https://www.latimes.com/california/story/2022-07-12/board-and-cares-closing-amid-homelessness-crisis-los-angeles-county.
[42] *See* para. 70 *infra*.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

underpasses.  It can be done effectively, quickly, and compassionately, and it must be done now.[43]

## I.   JURISDICTION AND VENUE

22.   This action is brought pursuant to 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments of the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 2201 and 2202.

23.   This court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as it arises from the same case or controversy as Plaintiffs' federal claims.

24.   All of the actions and omissions complained of occurred in the Central District of California.  Therefore, venue is proper in this District.  28 U.S.C. §1331.

## II.   GENERAL ALLEGATIONS

25.   Plaintiffs are informed and believe, and thereon allege, that, at all times herein mentioned, Defendant County and Does 1-200 inclusive were the agent, employee, and co-conspirator of each of the remaining Defendants, and in participating in the acts alleged in this Complaint, acted within the scope of such agency and employment, in furtherance of the conspiracy, and with the permission and consent of the co-conspirator Defendants.

26.   All causes of action brought under California statutory law are for equitable and injunctive relief only.  Therefore, no tort claim was necessary prior

---

[43] Plaintiffs file this amended complaint after the Ninth Circuit vacated this Court's April 20, 2021 preliminary injunction.  Specifically the Ninth Circuit noted a delta between the Court's order and Plaintiffs' allegations and facts: Plaintiffs had not demonstrated evidence that Plaintiffs and members of the Alliance are Black because Plaintiffs had not moved on any issues that were based on race, had no unsheltered homeless individuals named in the original complaint, had not alleged existence of a Special Relationship or shown they are confined to Skid Row, or were deprived of medically necessary care.  Plaintiffs have amended this complaint to add Wenzial Jarrell, an unsheltered Black man living in Skid Row, as a Plaintiff, and added a number of named Alliance members who are also unsheltered and persons of color.  Plaintiffs have supplemented their Equal Protection, Due Process allegations and 17000 claims to address the Ninth Circuit's concerns.

15

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

1   to filing this suit.  *See* Cal. Gov. Code § 905 (West 2019); *Qwest Commc'ns*

2   *Corp. v. City of Berkeley,* 146 F. Supp. 2d 1081 (N.D. Cal. 2001); *Hart v. County*

3   *of Alameda*, 76 Cal. App. 4th 766 (1999). For the single cause of action for

4   damages brought under the California Constitution, a Tort Claim was filed July

5   15, 2022. When and if the claim is rejected, Plaintiffs may seek to amend this

6   complaint to so-allege if necessary.

7          27.    Each paragraph of this Complaint is expressly incorporated into each

8   cause of action set forth below.

9                          **III.  FACTUAL ALLEGATIONS**

10  **A.**    **History of Homeless Treatment in Los Angeles**

11         28.    What is now known as Skid Row began in the late 1800s as a

12  concentration of day-rate hotels, bars, and brothels catering to the "rail riders"

13  (transients riding the trains) due to its proximity to where the trains terminated at

14  Los Angeles.[44]  Service providers like the Union Rescue Mission opened their

15  doors to help the indigent who congregated there.  Decades later, when the 1970s,

16  brought a push for "de-institutionalization" of those suffering from mental

17  illnesses, Skid Row became a beacon of hope for those needing services and

18  shelter.[45]  At the same time, Downtown LA experienced an economic resurgence

19  and developers began restoring the Skid Row area.  Activists (fearful of losing

20  housing) and downtown interests (fearful of homeless individuals wandering into

21  the wealthier areas), together, pushed back and fought for a policy of

22  "containment" with the goal of centralizing missions, charities, and other

23  homeless services within the 50-square block area, encouraging "undesirable

24

25         [44] Sebastin Kempkens, *L.A.'s Homelessness Crisis: How Did We Get*
    *Here?*, LA Weekly (Nov. 21, 2018), https://www.laweekly.com/l-a-s-
26  homelessness-crisis-how-did-we-get-here/; *99% Invisible: The Containment*
    *Plan*, Radiotopia (Oct. 10, 2017), https://99percentinvisible.org/episode/the-
27  containment-plan/; Union Rescue Mission, *About Skid Row*,
    https://urm.org/about/faqs/about-skid-row/ (last visited Mar. 9, 2020).
28         [45] *See* Kempkens, *supra* note 48, https://www.laweekly.com/l-a-s-
    homelessness-crisis-how-did-we-get-here/.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

16

population elements" to stay within the boundaries, in return for an agreement with the City to keep redevelopment out of it.[46]

29.    The drafters of the Containment Policy were concerned that PEH and other "undesirables" could spread to other parts of the City; to combat this "people problem" the City implemented

> a **containment approach** that starts by defining an area in which Skid Row activities would be allowed, but outside of which no disruptive Skid Row activity would be tolerated . . . new borders were drawn that define a potential area of containment that would pull Skid Row activities away from other land uses without significant relocation of housing.

(Declaration of Elizabeth Mitchell ("Mitchell Decl.") Ex. A at 143, ECF 265-1.) (emphasis added).  The "containment approach" had four pillars to it: (a) "a deliberate control of housing stock, its allocation and location" to condense the homeless within a smaller area of downtown Los Angeles, (b) businesses catering to Skid Row "undesirables" would be discouraged outside of the containment area, (c) services to the homeless would be centralized in the area of containment to keep the homeless there, and (d) "amenities" that attract the homeless, such as parks and public restrooms, would be centralized in the contained area.  *Id.*  The Containment Policy (the "Containment" or "Policy") included specific maps that defined where "undesirables" would be concentrated, and also included "buffers" to further isolate the "undesirables" from others.  *Id.*  The County contributed to and benefited from Containment by concentrating its statutorily-required social services within the Containment Zone.  In this way it drew in those who were in the greatest need into the Containment Zone where they were effectively prevented from leaving.   This appalling Containment Policy remained until it

---

[46] Rich Connell, *SKID ROW: 'Containment Strategy' of Aiding Residents, Easing Impact on Business District Is Slow and Frustrating*, Los Angeles Times (Aug. 5, 1985, 12:00 AM), https://www.latimes.com/archives/la-xpm-1985-08-05-me-3525-story.html; 99% Invisible, *Episode 279:The Containment Plan*, (Oct. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

17

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

was formally denounced in 2016, but in fact the Policy persists to this day, as evidenced by the new DTLA2040 plan.

30.   The 1980s and 1990s, with the crack epidemic and simultaneous cuts to the welfare system, brought in true and enduring homelessness, with encampments springing up on sidewalks and criminals preying on the vulnerable.[47]  Then-mayor Tom Bradley opened an urban campground along the L.A. River, but it was soon closed due to terrible living conditions.  At various times groups have placed portable toilets in key encampment locations, only to have the city remove them when they became magnets for prostitution and drug use.  In the early 1990s, as a settlement of litigation between the City and County, Los Angeles Homeless Services Authority ("LAHSA"), a joint-powers authority, was created to oversee the City and County's homeless response.  The aim was more accountability, but ultimately it has resulted in an accountability deficit.

31.   That deficit is particularly apparent in the litigious history of two Los Angeles Municipal Code provisions ("L.A.M.C."), section 41.18 and section 56.11, that regulate behavior in public rights-of-way.  Section 41.18(d) has recently been amended to prohibit sitting, sleeping, or lying in public rights of way in sensitive areas or other areas marked by signage but only after full consideration and vote by City Council in every single area designated as such and only, for non-sensitive areas, after proof of serious injury, crime, or fires.[48]  LAMC section 56.11 prohibits, among other things, storage of "excess personal property" meaning property which cumulatively exceeds 60 gallons in a public area.[49]

---

[47] *See* Kempkens, *supra* note 48, https://www.laweekly.com/l-a-s-homelessness-crisis-how-did-we-get-here/.
[48] Los Angeles Mun. Code ("LAMC") 41.18 (2021), https://clkrep.lacity.org/onlinedocs/2020/20-1376-S1_ord_draft_7-02-21.pdf.
[49] LAMC 56.11 was amended in 2016 in direct response to *Lavan v. City of Los Angeles*, discussed *infra*.  Its express stated purpose was to "balance the needs of the residents and public at large to access clean and sanitary public areas

32.     In 2006, the City settled a case brought by several activists, *Jones v. City of Los Angeles*, agreeing not to enforce section 41.18(d)'s then-restrictions on tents and people sleeping in public areas between the hours of 9 p.m. and 6 a.m.  As part of the agreement, the parties concurred that a published court decision would be de-published and would no longer be binding authority. According to the *Los Angeles Times*, "The [Jones] agreement set the stage for today's encampment explosion."[50]  And ironically, the de-published *Jones* decision was still oft-cited by districts courts and resurrected in the 2018 published decision of *Martin v. City of Boise*.

33.     In 2012, the Ninth Circuit upheld an injunction in *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012), that prohibited the City from seizing unattended property without notice absent objectively reasonable belief that it is abandoned, evidence of crime, contraband, or presents an "immediate threat to public health or safety." *Id*. at 1026. Unfortunately, it is difficult to determine when property is "abandoned" as opposed to momentarily "unattended" when there are tens of thousands of people living unsheltered in our public spaces.  The result is a massive build-up of property, which harbors significant health and safety risks that mostly go undetected until too late.

---

consistent with the intended uses for the public areas with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited of personal property in public areas." LAMC § 56.11. Unsurprisingly, unhappy activists have challenged the new amendment, first as applied to those living in Skid Row (*Mitchell v. City of Los Angeles,* Case No. CV 16-01750, 2016 WL 11519288 (C.D. Cal. Apr. 13, 2016) and now city-wide (*Garcia v. City of Los Angeles*, 19-CV-06182).  The *Garcia* court issued an injunction against its enforcement, recently upheld by the Ninth Circuit.  *Garcia v. City of Los Angeles*, 11 F.4th 1113 (9th Cir. Sept. 2, 2021).  56.11 was recently amended to refer only to "personal property" and eliminated the 60-gallon requirement.

[50] Gale Holland, *Why L.A. County's homelessness crisis has been decades in the making*, Los Angeles Times (June 5, 2019, 11:10 AM), https://www.latimes.com/local/california/la-me-ln-homeless-housing-crisis-count-history-skid-row-20190605-story.html ("'We are dealing with historical consequences of bad decisions made 10 years ago to guarantee a right to sidewalks instead of a right to shelter,' said Westside Councilman Mike Bonin.").

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

34.     Eight years after the Ninth Circuit upheld the *Lavan* injunction, the City entered into a settlement in the case of *Mitchell v. City of Los Angeles*. Under the terms of that settlement, the City bound its own hands in agreeing to significantly limit the enforcement of LAMC section 56.11, permitting the accumulation of personal property beyond the code section's limits, and relegating enforcement to only certain bulky items such as couches, mattresses, refrigerators, and wooden pallets within a designated area known as "Skid Row and surrounding areas" (thus increasing the boundaries of what was traditionally considered Skid Row). The *Mitchell* agreement led to a sharp decline in health and safety for housed and unhoused alike not just in Skid Row but throughout downtown.  The *Mitchell* agreement has expired, but the court in *Garcia* enjoined the City of Los Angeles in similar fashion.  It is unclear why, after litigating this issue for decades, the City cannot manage to draft an ordinance that is workable, practical, and will pass constitutional muster.

35.     *Mitchell* was settled in the wake of the sweeping Ninth Circuit decision addressing homeless regulation: *Martin v. City of Boise*, based almost entirely on the reasoning published (then de-published) in *Jones*.  *Martin* held that "so long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters" a person may not be prosecuted for sitting, lying, or sleeping in public.  *Martin*, 920 F.3d at 617 (original alterations omitted) (citation omitted).  The language in *Martin* does not provide clear guidance for cities struggling with sizable homeless populations—in some passages, *Martin* suggests that there must be enough beds for <u>everyone</u> before <u>anyone</u> is cited for sleeping on a sidewalk, while other aspects of *Martin* indicate that <u>individuals</u> "who *do* have access to adequate temporary shelter" but "choose not to use it" may be prosecuted without reference to the community.  *Id.* at n.8.

36.     Regardless of how *Martin* is interpreted, its clear effect is to tie enforcement of public regulation ordinances to the provision of shelter.  And

20

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1   most people agree that the balanced approach is exactly that: provision of safe,

2   humane, dignified, and healthy shelters with a path out of homelessness, along

3   with regulation of our public spaces.  But instead, the City's and County's

4   approach to the *Martin* decision has been a lack of both shelters and regulation.

5        37.    While homelessness has now exploded beyond the boundaries of

6   Skid Row—resulting in public outcry at encampments, crime, and squalor in

7   neighborhoods which previously could ignore the devastation—the most heavily

8   impacted area is still without a doubt the area of Containment.  City and County

9   policies continue to concentrate persons experiencing homelessness in Skid Row,

10  creating horribly dangerous conditions for unhoused individuals and others living

11  in the area.  Affordable housing and services are still heavily concentrated in Skid

12  Row, while development of these housing or services in other areas can take

13  years, even for by-right projects.  To this day, Skid Row is an enforcement-free

14  zone, effectively exempt from laws against drug use and sales, weapons

15  trafficking, human trafficking, gang activity, and public intoxication; reinforcing

16  the concentration of human tragedy in a half-square-mile area.

17       38.    The most obvious and overt example of the continuing Containment

18  Policy is the DTLA2040 plan, recently approved by the Planning Commission

19  and formally recommended to City Council, again with significant advocacy and

20  support from groups like Los Angeles Community Action Network (LACAN).[51]

21  In creating the new plan for Downtown Los Angeles, the City created an entirely

22  new zoning designation just for the Skid Row area, permitting *only* homeless

23  housing developments.  This the only such area zoned for this specific purpose in

24  the entire City and County (and in fact the nation).  This plan re-codifies the

25  Containment Policy and flies in the face of decades of research demonstrating the

26

27

28

[51] Department of City Planning Recommendation Report (June 17, 2021), https://planning.lacity.org/odocument/04ca2a68-c5fd-4a26-90c2-8128910239f7/DRAFT_DTLA_CPC_Staff_Recommendation_Report.pdf.

21

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

harmful effects of centralizing poverty.[52] Under both Federal and California law, cities are required to "Affirmatively Further Fair Housing" which includes "Replacing Segregated Living Patterns with Truly Integrated and Balanced Living Patterns" and "Transforming Racially and Ethnically Concentrated Areas of Poverty (R/ECAP) into Areas of Opportunity" such as providing "economic development strategies," "prioritizing investment," and "promoting mixed-income development coupled with strong anti-displacement protections."[53] Instead the DTLA2040 plan maintains the segregated living pattern of Skid Row and reinforces the most racially and ethnically concentrated area of poverty in the entire county (and likely the nation).  Because of the Containment Policy, there has been an obvious disinvestment in the area with extremely limited or no access to grocery stores, pharmacies, drug stores, restaurants, transit, retail, and job opportunities, and an abundance of crime, violence, fires, death, and disease. With DTLA2040 the Containment Policy is reinforced, and homeless people are corralled and contained into a specified area of the city where they are effectively abandoned.

39.     The lack of affordable housing in Los Angeles is no doubt one of the drivers of homelessness.  In 2015, the City declared a housing emergency and in 2018 the County did as well and both remain in place.  *See* Sept. 22 Motion (we "face an emergency today that requires strong and immediate action by the City of Los Angeles.")[54]; Resolution of the Board of Supervisors of the County of Los Angeles Declaring a Shelter Crisis, October 30, 2018.  The County has done little

---

[52] *See, e.g.* Understanding Neighborhood Effects of Concentrated Poverty, Office of Policy Development and Research (Winter 2011), https://www.huduser.gov/portal/periodicals/em/winter11/highlight2.html.

[53] California Department of Housing and Community Development, Affirmatively Furthering Fair Housing Guidance for All Public Entities and for Housing Elements 4, 17 (Apr. 2021), https://www.hcd.ca.gov/community-development/affh/docs/affh_document_final_4-27-2021.pdf

[54] City Councilmembers Gilbert Cedillo and Mike Bonin, Motion: State of Emergency (Sept. 22, 2015), https://clkrep.lacity.org/onlinedocs/2015/15-1138_mot_09-22-2015.pdf

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

ER 230

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1  to facilitate the needed expansion housing in the very low- or low-income

2  categories.  For example, in the last reporting period by the County (all

3  unincorporated areas), from 2014 to 2019 it produced a paltry 891 units of very

4  low- and low-income housing in an unincorporated area of over 1 million

5  residents.  In fact, in the entire unincorporated county only 6,157 housing units in

6  total were produced.  Los Angeles is now ranked as the most unaffordable city in

7  the country, with over 60 percent of tenants paying more than 30 percent of their

8  household income for rent and over 30 percent of tenants severely rent-burdened,

9  paying more than 50 percent of their income for rent.  Both City and County have

10  failed to meet their housing requirements for very low, low, and moderate-

11  income permits.  The County only permitted 22.5 percent of its required very

12  low-income projects, 24.1 percent of its low-income projects, 14 percent of its

13  moderate-income projects, and 190.2 percent of its above-moderate income

14  projects.  This was an intentional, affirmative choice made year-after-year,

15  knowing the implications on people experiencing homelessness and the

16  disproportionate impact on Black Angelenos.

17  **B.**     **Crime and Fire Incidents Have Rocketed**

18       40.      The crisis of so many unsheltered individuals in a wealthy City and

19  County is a tragedy in and of itself.  But the tragedy has been exacerbated by a

20  severe spike in crime both on and by homeless persons, particularly in violent

21  attacks.[55]  Los Angeles Police Department ("LAPD") citywide data from 2016 to

22  2020 shows a 200 percent increase in crime against persons experiencing

23  homelessness,[56] and an increase of 354 percent of suspects experiencing

24

25       [55] Leonard, *supra* note 7,
    https://www.nbclosangeles.com/news/local/LAPD-Reports-Spike-in-Homeless-
26  Crime-502407861.html; Matthew, *supra* note 7,
    https://www.lamag.com/citythinkblog/homeless-crime/.
27       [56] It must be noted this statistic is only available for persons who *reported*
    the crime; an untold number of crimes are perpetrated on persons experiencing
28  homelessness which go unreported because the victim lacks agency, awareness,
    hope, or fears retribution.

homelessness.  The top three crimes reported for both suspects and victims
experiencing homelessness were assault with a deadly weapon, battery, and
robbery.[57]

41.     In addressing the rise in crime within the homeless community, one
City official accurately noted, "[T]here are certainly tensions that are rising
within the homeless population. . . the connective tissue between them all is the
increase in the concentration.  As the homeless encampments increase, so do
fights over territory, over property, over intangibles, as well as domestic
violence."[58]  "Personal Security Tips" have been given to County employees
walking to and from civil and mental health courts, advising them "remain
vigilant," "travel in numbers," and "drive in a middle or left lane" due to the
criminal element rising out of surrounding homeless encampments.

42.     Crime against homeless women in particular has become a "crisis
within a crisis" with 60 percent of homeless women reporting violence in the last
year and 25 percent experiencing it "often" or "always."[59]  More than a quarter
have experienced sexual assault in the last twelve months, and 37 percent report
having experienced domestic violence in the same time period.[60]

43.     As crime has increased, so have fires.  There were 2,500 fires just
involving the homeless community in Los Angeles in 2018, which is double the

---

[57] Nisha Venkat, *LA's homeless crime epidemic*, Crosstown (June 23, 2020), https://xtown.la/2020/06/23/homeless-crime-los-angeles/.
[58] *See* Queally, *supra* note 12, https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.
[59] Elijah Chiland, *For women, 'living on the streets in Los Angeles is dangerous and traumatic'*, Curbed Los Angeles (Jan. 30, 2020, 2:25 PM), https://la.curbed.com/2020/1/30/21115700/downtown-womens-center-homeless-report.
[60] Downtown Women's Center, 2019 Los Angeles City Women's Needs Assessment, https://www.downtownwomenscenter.org/wp-content/uploads/2020/01/DWC-2019-Los-Angeles-Womens-Needs-Assessment.pdf (last visited June 22, 2022).

24

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

number of such fires in 2017.[61]  That number jumped to 3,285 in 2019 and 6,151 in 2020.[62]  53.87 percent of all fires in the City of Los Angeles are homeless-related; nearly 20 percent of all fires in the city are homeless-related arson fires. This represents a 245 percent increase in all homeless-related fires and 240 percent increase in all homeless-related arson fires since 2018.[63]  The industrial buildings and businesses downtown regularly experience fires from adjacent encampments, whether from heaters, food preparation, or arson.  Businesses are being dropped by insurance companies because of the fire risks due to the homeless living on their sidewalks.[64]  Fire hydrants are being repurposed by homeless individuals for drinking, bathing, and washing clothes and personal items, compromising fire-readiness and putting an untold number of lives and structures at greater risk in the event of a fire.[65]  There have been no observable efforts to curb the use of open flames, despite fire code provisions that prohibit them and the frequent use of open flames in homeless encampments.[66]  In fact, the *Mitchell* settlement specifically permits violations of the fire code by allowing "open-flame cooking devices" as long as they have fuel containers under a certain size.  *See* Stipulated Order of Dismissal at 11, *Mitchell v. City of Los Angeles*, Case No. CV16-01750 (C.D. Cal. May 31, 2019), ECF No. 119.

44.     Fires originating in homeless encampments are now a regular occurrence in Los Angeles County.  One of the most destructive fires in Los Angeles over the last 10 years, the Skirball Fire, was caused by a cooking fire at a

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

---

[61] *See* Queally, *supra* note 12, https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.
[62] Mitchell Decl. Ex. C, at 188, ECF No. 265-1.
[63] *Id.*
[64] Grover, *supra* note 13, https://www.nbclosangeles.com/news/local/LA-Homeless-Encampment-Fires-Insurance-Rates-Tents-Homelessness-561145811.html.
[65] Joel Grover and Amy Corral, *Firefighters Lose Critical Tool to Battle Rise in Homeless Fires*, NBC Los Angeles (July 25, 2019, 10:53 AM), https://www.nbclosangeles.com/investigations/Firefighters-Lose-Critical-Tool-to-Battle-Rise-in-Homeless-Fires-513057481.html.
[66] *Id.*

25

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

homeless encampment in the hills of Bel Air in 2017—which caused thousands to evacuate and destroyed several houses.[67]  In July 2019, a fire broke out in a homeless encampment in the Sepulveda Basin, where homeless residents report they put out "multiple fires daily," burning 6 acres and destroying the encampment.[68]  This unchecked chaos in the County is directly linked to and as a result of the County's failure to address homelessness system-wide.

## C.  Public Health is Compromised

45.   Beyond crime and fire, the homelessness crisis presents a pressing public health predicament.  The Covid-19 pandemic drew attention to the inability of the unsheltered community to maintain a sanitary environment without regular access to restrooms or running water, and the potential health implications for the rest of the housed community.  But even before Covid existed, homelessness created significant health hazards.  The accumulation of property and food storage in tents by homeless individuals has made Skid Row and other areas hotbeds for flea-infested rats and other disease-carrying vermin, making some areas nearly unlivable.[69]  Los Angeles declared Skid Row a "typhus zone" and at least one Deputy City Attorney contracted typhus apparently from

---

[67] Gale Holland, Laura J. Nelson, et al., *Fire at a homeless encampment sparked Bel-Air blaze that destroyed homes, officials say*, Los Angeles Times (Dec. 12, 2017, 5:55 PM), https://www.latimes.com/local/lanow/la-me-skirball-fire-cause-20171212-story.html.

[68] Ariella Plachta and Elizabeth Chou, *A Sepulveda basin encampment fire left dozens of homeless people displaced but service providers have little to offer them*, Los Angeles Daily News (May 2, 2020, 11:01 AM), https://www.dailynews.com/2019/07/31/a-sepulveda-basin-encampment-fire-left-dozens-of-homeless-people-displaced-but-service-providers-have-little-to-offer-them/.

[69] Lauren Fruen, *Collapse of a City That's Lost Control: Shocking New Pictures From Downtown LA Capture The Huge Problem it Faces With Trash and Rats Amid Fear of Typhoid Fever Outbreak Among LAPD*, Daily Mail and Associated Press, (June 2, 2019, 1:32 PM), https://www.dailymail.co.uk/news/article-7095533/Pictures-downtown-LA-capture-problem-faces-trash-tries-rodents.html.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

ER 234

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

the conditions surrounding her office building in Downtown Los Angeles.[70]
LAPD Officers working Central Division downtown contracted typhoid fever,
caused by contamination of human fecal matter.[71]  The United Nations noted
"Los Angeles failed to meet even the minimum standards the United Nations
High Commissioner for Refugees sets for refugee camps in the Syrian Arab
Republic and other emergency situations."[72]  The City Controller reported that in
2017 City officials had removed 8 tons of solid waste, including 40 pounds of
urine and feces from homeless encampments in **one** cleanup of **one**
encampment.[73]  Los Angeles Sanitation (LASAN) estimated that its program,
Operation Healthy Streets, cleared an average of 5 tons of solid waste *per day* at
encampments in the City.[74]  While shelter is a good start to move people inside,
without services and treatment many of those for whom shelter isn't an option
continue the unhealthy behaviors on the street.

46.     In addition to the societal implications associated with unsanitary
conditions related to unsheltered homelessness, it has been well-documented that
the physical and mental health of unsheltered persons is significantly worse than
those of their sheltered or housed counterparts.[75]  According to a report from the

[70] Harriet Ryan, *'Absolutely terrifying': Deputy city attorney says she contracted typhus at City Hall*, Los Angeles Times, (Feb. 9, 2019, 5:45 PM), https://www.latimes.com/local/lanow/la-me-ln-city-hall-typhus-20190209-story.html.
[71] Jaclyn Cosgrove, *LAPD employee contracts bacteria that causes typhoid fever,* Los Angeles Times, *(*May 29, 2019, 8:44 PM), https://www.latimes.com/local/lanow/la-me-ln-lapd-typhoid-fever-20190529-story.html.
[72] Report of the Special Rapporteur on extreme poverty and human rights on his mission to the United States of America, U.N. Doc. A/HRC/38/33/Add.1 (May 4, 2018), https://documents-dds-ny.un.org/doc/UNDOC/GEN/G18/125/30/PDF/G1812530.pdf.
[73] Ron Galperin, Los Angeles City Controller, *Report on Homeless Encampments*, Office of the Controller (Sept. 27, 2017), https://lacontroller.org/audits-and-reports/homeless-encampments/.
[74] *Id.*
[75] Adeline M. Nyamathi and Barbara Leake, et al., *Sheltered versus nonsheltered homeless women*, J. Gen. Intern. Med. vol. 15, issue 8, at pp. 565-72 (Aug. 2000), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495574/;

27
SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Los Angeles County Department of Public Health ("DPH"), homeless-related deaths have nearly tripled from 2014 to 2021.[76]  On average, a homeless person in Los Angeles will die 22 years earlier than the general population.[77]  An earlier homeless mortality report noted:

> A principal finding is that the overall homeless mortality rate has steadily increased over the past six years.  This means that increases in the number of homeless deaths recently reported in the media cannot be attributed solely to the fact that the total number of homeless people has also been increasing.  **Put simply, being homeless in LA County is becoming increasingly deadly.[78]**

47.   Dr. Barbara Ferrer, director of DPH conceded: "Homeless people are in fact dying at a higher rate because they're homeless."[79]  Meaning, while the PIT count increases year-after-year, the mortality rate of the unsheltered population is increasing at an even faster rate.  Below is a chart of both homeless deaths and *rates* of homeless deaths over the last several years, both of which are increasing.  Alarmingly, the deaths of people experiencing homelessness jumped 56 percent in one year, reflected by the most recent calculations.  Even removing Covid-related deaths, the increase was a shocking 42 percent.[80]

---

Rountree, *supra* note 8, https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

[76] County of Los Angeles, Public Health, *Mortality among People Experiencing Homelessness in Los Angeles County: One Year Before and After the Start of the COVID-19 Pandemic* (April 2022), http://publichealth.lacounty.gov/chie/reports/Homeless_Mortality_Report_2022.pdf.

[77] County of Los Angeles, Public Health, Center for Health Impact Evaluation, *Recent Trends in Mortality Rates and Causes of Death Among People Experiencing Homelessness in Los Angeles County* (October 2019), http://publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf at 5 ("The average age at death was 51 among the homeless and 73 among the general population.").

[78] *Id*. (emphasis added).

[79] Jessica Flores, *Homeless deaths in LA County doubled between 2013 and 2018*, Curbed Los Angeles (Oct. 30, 2019, 3:50 PM), https://la.curbed.com/2019/10/30/20940369/homeless-deaths-los-angeles-county.

[80] County of Los Angeles, Public Health, *supra* note 79, http://publichealth.lacounty.gov/chie/reports/Homeless_Mortality_Report_2022.pdf.

28

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT



Figure A: LA County PEH Deaths and Mortality Rates, 2014-2020

48.     Yet in New York City, where the number of people experiencing homelessness is high but the rate of *unsheltered* homelessness is low (5 percent compared to Los Angeles' 75 percent), the mortality rates of homeless persons compared to general population low-income adults is nearly identical.[81] Where "[m]ortality is a key health indicator" and unsheltered homeless die at a significantly faster rate than persons experience homelessness who are at least sheltered, there is no doubt unsheltered homelessness both causes and exacerbates physical and mental health problems.[82]

[81] Bonnie D. Kerker, PhD, Jay Bainbridge, PhD, et al., *A Population-Based Assessment of the Health of Homeless Families in New York City, 2001–2003*, American Journal of Public Health (Sept. 20, 2011), https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2010.193102.

[82] County of Los Angeles, *supra* note 80, http://publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf; Seena Fazel, MD, John R. Geddes, MD, et al., *The health of homeless*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

29

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

49.     Los Angeles County has acknowledged this, and in 2012 the Department of Health Services launched a program called Housing for Health, observing "[a]ccess to community based housing options is an important element of our evolving county healthcare system, particularly in response to the homelessness crisis."[83]  A study conducted by the RAND Corporation on the first 890 participants enrolled found that the cost of providing health care per participant decreased by 40 percent (from an average of $38,146 to $15,358) because there was less need for the patients to access the system.[84]

**D.      Crowded and Blocked Sidewalks Put Everyone at Risk**

50.     The homelessness crisis has also impeded the use of a critical element of city life: sidewalks.  While it is true that public sidewalks exist for the benefit of all—and blocked sidewalks harm everyone who needs to use them and cannot, the harm felt by all members of society is not identical.  Free and clear sidewalks are critical for individuals using mobility devices like walkers and wheelchairs.  Municipalities have an obligation to ensure that public sidewalks are usable and compliant with ADA requirements, such as providing a minimum of 36 inches of clearance for wheelchair users, yet the City had regularly ignored its obligations and failed to provide such clearance.  Encampments throughout

---

*people in high-income countries: descriptive epidemiology, health consequences, and clinical and policy recommendations*, The Lancet, vol. 382, issue 9953, pp. 1529-40  (Oct. 25, 2014), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(14)61132-6/fulltext; County of Los Angeles, *supra* note 79, http://publichealth.lacounty.gov/chie/reports/Homeless_Mortality_Report_2022.pdf.

[83] Health Services of Los Angeles County, *Housing for Health,* https://dhs.lacounty.gov/lacusc/our-services/housing/ (last visited June 23, 2022).

[84] Sarah B. Hunter, Housing for Health; Los Angeles County's Department of health Tackles Homelessness with an Innovative Housing Program That Saves Money, The Rand Blog (Jan. 18, 2018), https://www.rand.org/blog/2018/01/housing-for-health-los-angeles-countys-department-of.html (Notably the County experienced a net savings of 20% even taking the costs of housing into consideration (from an average of $38,146 per participant to $30,646). Of course, this number doesn't take into consideration the additional savings from other departments such as reduced law enforcement contacts.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

ER 238

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

the City and County block sidewalks and public rights-of-way.  Those encampments will be significantly reduced under this new agreement.

**E.    Environmental Impact**

51.    The unhealthiness of the homelessness crisis extends to the environment.  There appears to be no environmental impact study of the kind of widespread and systemic homelessness in Los Angeles.  Yet all indications show the impact has been significant.[85]  Every day, businesses and residents find used needles in their drains, on sidewalks, and in gutters.  Los Angeles County has far more unsheltered people than Orange County, and officials there recovered over 14,000 hypodermic needles, plus over 5,000 pounds of "hazardous waste" including human waste, and toxic chemicals such as propane, pesticides, solvents, and paint during a clean-up of a homeless encampment in the Santa Ana Riverbed consisting of approximately 1400 people. [86]  While City sanitation workers are deployed to identify and discard toxic waste, only 30 teams are working to cover 500 square miles,  human waste, and other toxic substances is regularly making its way into our ecosystems.

52.    The Environmental Protection Agency recognized this issue in a letter addressed to Governor Gavin Newsom:

> The EPA is aware of the growing homelessness crisis developing in major California cities, including Los Angeles and San Francisco, and the impact of this crisis on the environment.  Indeed, press reports indicate that "piles of human feces" on sidewalks and streets in these cities are becoming all too common.  The EPA is concerned about the potential water quality impacts from pathogens and other contaminants from untreated human waste entering nearby waters.  San Francisco,

[85] Courtenay White, *Environmental Impacts of Homeless Encampments in the Guadalupe River Riparian Zone*, School of Environment and Sustainability, Royal Roads University (Nov. 19, 2013), https://viurrspace.ca/bitstream/handle/10170/665/white_courtenay.pdf?sequence=1&isAllowed=y.

[86] Anh Do, *'Eye-popping' number of hypodermic needles, pounds of waste cleared from Orange County riverbed homeless encampment*, Los Angeles Times (Mar. 10, 2018, 4:30 PM), https://www.latimes.com/local/lanow/la-me-ln-riverbed-debris-20180310-story.html.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

<div style="text-align: right">Spertus, Landes & Umhofer, LLP<br>1990 SOUTH BUNDY DR., SUITE 705<br>LOS ANGELES, CA 90025<br>TELEPHONE 310-826-4700; FACSIMILE 310-826-4711</div>

> Los Angeles and the state do not appear to be acting with urgency to mitigate the risks to human health and the environment that may result from the homelessness crisis.[87]

53.     Thousands of people camp in or near the Los Angeles River basin, without access to toilets and sanitation services.  The amount of related toxic and human waste making its way into our environment is, upon information and belief, substantial, but its full scope is unknown.[88]  The Ballona Wetlands have been ravaged by nearby encampments through raw sewage dumps, needles, and fires.[89]

54.     The environmental impact of fires arising out of homelessness is also of great concern.  Fires originating in homeless encampments are not just a potential threat—they have actually destroyed thousands of acres of brush and wildlife.  The sweeping footprints of the County of Los Angeles encompass vast amounts of undeveloped land, full of dry brush and other readily combustible material.  Such areas are an attractive location for many people experiencing homelessness wishing to reside "off the grid" and the combination of propane-fueled cooking fires and bootlegged electricity in untended conditions is a recipe for, and indeed has already resulted in, massively destructive fires.

F.     **Property Values and Businesses are Affected**

55.     Another casualty of the homelessness crisis is the value of property and businesses.  Downtown Los Angeles has experienced a renaissance over the last 20 years with loft conversions, hundreds of new restaurants, and until

---

[87] Letter to Governor Gavin C. Newsom from Andrew R. Wheeler, September 26, 2019, https://www.epa.gov/sites/production/files/2019-09/documents/9.26.19_letter-epa.pdf.

[88] Anna Almendrala, *Fecal Bacteria in California Waterways Increases With Homelessness crisis*, CaliforniaHealthline.org (Jan. 6, 2020), https://californiahealthline.org/news/fecal-bacteria-in-californias-waterways-increases-with-homeless-crisis/.

[89] Erika D. Smith, *Trash, needles and fire. He's watching homelessness destroy the Ballona Wetlands*, Los Angeles Times (June 17, 2021, 5:00 AM), https://www.latimes.com/california/story/2021-06-17/hes-watching-la-homelessness-destroy-ballona-wetlands.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   recently over 3,000,000 square feet of office space under construction.[90]  That

2   renaissance is now in jeopardy due to the homelessness crisis.  Businesses are

3   suffering and property values have been affected.  The average apartment

4   occupancy rate, rent pricing, number of sales, and sale price per square foot

5   downtown have all decreased from 2018 numbers correlating with a rise in

6   homelessness at the same time.  Businesses throughout Los Angeles, such as

7   Desuar Spa on 5th Street, owned by Deisy Suarez, and Exclusive Motors on

8   Venice Boulevard, owned by George Frem, both described *infra*, have customers

9   declining to utilize their services due to nearby encampments.  A recent article

10  describes in detail Venice's inability to keep pace with the property market due in

11  large part to the homelessness crisis.[91]

12      56.    Nowhere is the impact felt more strongly than on Skid Row itself,

13  where encampments are visibly choking out local property owners and

14  businesses.  Plaintiff Joseph Burk can no longer maintain tenants in his building

15  and production companies are declining to work there due to the surrounding

16  environment.  He has been trying to sell the property but the offers he receives

17  have been less than half of what other comparable properties receive in

18  neighboring areas and even then buyers have dropped out of escrow due to

19  concerns about the area.  He has been trying to rent the property, but no one will

20  rent it.  He and his wife had been living there, but due to the conditions on the

21  sidewalk outside his home, it is unlivable.  He is now saddled with what should

22  be a valuable building that is near-impossible to sell, rent, live in, or use for

23

24      [90] Vivian Marino, *Revitalization Projects Reawaken Downtown Los Angeles*, The New York Times (Mar. 5, 2019),

25  https://www.nytimes.com/2019/03/05/business/revitalization-projects-reawaken-downtown-los-angeles.html; Andrea Lo, *How downtown Los Angeles made a*

26  *stunning comeback*, CNN.com (Feb. 16, 2017, 9:09 PM), https://www.cnn.com/2017/02/15/architecture/downtown-la-revival/index.html.

27  [91] Katy McLaughlin, *The Venice Real-Estate Market Is Unstoppable No More*, The Wall Street Journal (Mar. 4, 2021, 12:45 PM),

28  https://www.wsj.com/articles/the-venice-real-estate-market-is-unstoppable-no-more-11614879936

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

business purposes—all due to conditions outside his property that are beyond his control, but *are* directly within the City's control.

57.     Alliance member Lisa Rich's family has owned commercial property in the Skid Row area for decades, but she is now having to heavily discount the rents she charges, repair at least one building damaged by fires at a cost of $80,000, and pay four times her prior premiums for fire insurance. These burdens have her considering abandoning all financial dealings in the area. Alliance member Mark Shinbane has difficulty hiring and retaining employees, has had to replace doors and fences, has to clean the perimeter of the building multiple times per day, and has had to hire additional staff to handle cleaning and maintenance, all at economic cost. Plaintiff Harry Tashdjian has been forced to spend over $100,000 on upgraded fire and security systems and pest control just in the last few years while simultaneously losing customers due to the property's surroundings.

## G.     The Homelessness Crisis Harms Society

58.     The County, as the provider of last resort, has the obligation to "relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident . . . when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." Cal. Welf. & Inst. Code § 17000. The purpose animating section 17000 is to "provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed." Cal. Welf. & Inst. Code § 10000. The County is also the entity who oversees and implements Medi-Cal and now CalAIM and is under the obligation to provide mental and physical healthcare to all who qualify for MediCal (which is just about everyone who is experiencing homeless) but fails to do so. The "incompetent, poor, [and]

34

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

indigent persons" are not being relieved and supported, nor is "protection, care, and assistance" being given to those who desperately need it.  The result is readily observable: squalor, lawlessness, disease, and death.

**H.**    **The County is Wasting Crucial Funds that Could Alleviate this Man-Made Disaster**

59.    The County has squandered massive amounts of homelessness-related funds, using its substantial revenue from Measure H and state and federal funds together to fund homeless-relief projects which have no chance of achieving the goal for which they are intended.   For the 2022-2023 fiscal year, the County is proposing a $38.5 billion budget, which includes a $532.6 million "Homeless Initiative" spending plan, $466 million of which comes from Measure H, and another $65.86 million came from the state.  Measure H was described as a tax voted for by county residents in 2017 to "fund mental health, substance abuse treatment, health care, education, job training, rental subsidies, emergency and affordable housing, transportation, outreach, prevention, and supportive services for homeless children, families, foster youth, veterans, battered women, seniors, disabled individuals, and other homeless adults."[92]  Of the 12 areas of homeless support articulated by Measure H and approved by the voters, LA County is unilaterally choosing to spend nearly all of its substantial funds (73.4 percent) on permanent and interim housing, and very little on anything else.  The LA County Homeless Initiative—which plans for and spends Measure H dollars—describes the focus of the spending plan as one "that significantly expands permanent and interim housing solutions and increasing funding for

---

[92]Los Angeles County, California, Sales Tax for Homeless Services and Prevention, Measure H, Ballotpedia.org (March 2017), https://ballotpedia.org/Los_Angeles_County,_California,_Sales_Tax_for_Homeless_Services_and_Prevention,_Measure_H_(March_2017).

35

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

local cities."[93]  Yet that's not what the voters approved: "mental health, substance use treatment, healthcare, education, and job training" don't even make an appearance on the County's Homeless Initiative budget, which instead includes line-items like "justice reform" which are not found in the voter-approved ballot. The Final Adopted Budget of the Department of Mental Health for FY 2021-2022 reported only $12.3 million of its allotted funds coming from Measure H which represents only 0.4 percent of DMH's budget, and only 2.3 percent of Measure H funds.  And there is nothing at all about substance abuse treatment. Measure H promised the voters real, significant services in specific areas that the public saw as valuable; once the County had the initiative locked, it took those dollars and used them for whatever *it* wanted to.  Such a bait-and-switch is not only unlawful, but also an anathema to our democratic process.

60.    Los Angeles County's Department of Mental Health (DMH) is also quite literally leaving money on the table by failing to apply for reimbursement for Mental Health Medi-Cal Administrative Activities (MH-MAA).  Alameda County was able to increase its receipt of these funds by millions of dollars, whereas Los Angeles County's claims actually decreased in the 2019-2020 year, barely taking advantage of this fee-for-service opportunity.[94]

61.    And of DMH's $3 billion budget, only 1 percent comes from the County itself, with the remaining funds coming from various taxes and grants. That 1 percent is the absolute minimum the County must do as a "maintenance of effort" to continue to receive state and federal funds.  Which means out of the County's nearly $40 billion general fund budget, only 0.1 percent is dedicated to

---

[93] The Los Angeles County Homeless Initiative, $532.6M Homeless Initiative Spending Plan for FY 2022-23 (May 17, 2022), https://homeless.lacounty.gov/news/la-county-prepares-to-intensify-and-refocus-its-fight-against-homelessness-as-board-of-supervisors-approves-532-6m-spending-plan-for-fy-2022-23/.

[94] Claudia Boyd-Barrett, *As Need for Mental Health Care Surges, A Funding Program Remains Underused*, California Health Report (Feb. 9, 2021), https://www.calhealthreport.org/2021/02/09/as-need-for-mental-health-care-surges-a-funding-program-remains-underused/

36
SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

the Department of Mental Health.  Given the massive crisis and lip-service desire to address that crisis, that sort of spending is both shameful and constitutionally deficient.

62.     Since the passage of Measure H and its concomitant additional hundreds of millions of dollars for housing and services, the homeless population in LA County has **risen** from 57,794 to 66,436 (a 13 percent increase, as of the 2020 point-in-time count).  The problem is outpacing the solution and the County has failed to utilize the funds in a manner that would effectuate the goal. [95]

## I.    LA County Is Failing to Meet its Statutory Mandate, Directly Resulting in the Death and Destruction on the Street of Los Angeles

63.     The County has failed to meet its statutory obligation to properly administer and provide mental and healthcare services.[96]  Outreach workers and service providers report that drug rehabilitation treatment and accessible and appropriate mental health services are nearly impossible to come by.  This is catastrophic news in light of California Policy Lab's finding that 78 percent report mental health conditions and 75 percent report substance conditions.[97]

64.     The County Board of Supervisors recognizes the "minimum number of beds required to appropriately meet the [community's mental health] need is

---

[95] County of Los Angeles, *County develops action plan for homelessness prevention* (Dec. 16, 2019), https://homeless.lacounty.gov/news/county-develops-action-plan-for-homelessness-prevention/ (approximately 133 people per day are finding some sort of housing, while an estimate 150 people per day are entering homelessness); Erika D. Smith, *In 2019, homelessness truly felt like a crisis in every corner of L.A.*, Los Angeles Times (Dec. 20, 2019, 3:00 AM), https://www.latimes.com/california/story/2019-12-10/homeless-housing-crisis-los-angeles.

[96] *See* Cal. Welf. & Inst. Code § 13000-13008; 14000 *et seq.*, 5600 *et seq.*, and 17000 *et seq.*

[97] *See* Rountree, *supra* note 8, https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1  50 public mental health beds per 100,000 individuals.  In Los Angeles County

2  there are only 22.7 beds per 100,000 individuals."[98]

3        65.    The Department of Mental Health (DMH) conducted an

4  investigation and issued a report that summarized the capacity issue:

> [There is a] serious deficit in LA County's mental health system of care. Our system is not delivering enough highquality mental health hospital services to meet the need, and the effects of this deficit are dire:
> • The Department of Health Services' psychiatric emergency rooms are severely overcrowded, with patients sometimes having to stay several days while they wait for a hospital bed.
> • On any given day, four to five thousand individuals with serious mental illness and often cooccurring substance use disorder are incarcerated in LA County justice systems and need care. Many of their incarcerations could have been prevented entirely had they received needed treatment.
> • Roughly 25 percent of adult homeless individuals in LA County have a serious mental illness and need care. These individuals often cycle in and out of hospitals and justice systems without ever being put on a sustainable path to recovery.
> • Readmission rates at our mental health hospitals are far too high. According to a recent analysis by an outside consultant, our Medi-Cal fee-for-service hospital network in LA County has an average 30-day readmission rate of 37.8 percent. The national average is closer to 20 percent.
> • Too many clients are getting stuck in our hospitals because there aren't enough post-hospital beds and services. Waitlists to transition to the next level of care are long and getting longer, especially for hospital clients on a mental health (LPS) conservatorship. Special populations, such as those who are currently or formerly justice-involved, those with co-occurring substance use disorder or co-morbid physical health conditions, those older than 65, and the developmentally disabled, are especially difficult to place.
> [. . .]
> These experts come from different backgrounds and parts of the system, and they didn't always agree on

[98]Motion By Supervisors Kathryn Barger and Hilda Solis, *Addressing the Shortage of Mental Health Hospital Beds* (Jan. 22, 2019), http://file.lacounty.gov/SDSInter/bos/supdocs/131546.pdf; *see also* E. Fuller Torrey, M.D., Kurt Entsminger, J.D., et al., *The Shortage of Public Hospital Beds for Mentally Ill Persons: A Report of the Treatment Advocacy Center*, Mental Illness Policy.org (2004-2005), https://mentalillnesspolicy.org/imd/shortage-hospital-beds.html.

38

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

the nuances of the problems or ideal solutions to address them. But there was general agreement on three things:
- There is indeed a shortage of mental health hospital services for those who truly need them.
- Creating new hospital beds is unlikely, on its own, to resolve this shortage.
- The only way we can sustainably address this problem is to look at the whole system of mental health beds and services, including those that play a role prior, during, and after hospital stays, and address all of the factors (e.g. capacity and service quality) across this continuum which in combination act to constrain the availability of mental health hospital beds.

66. The report went on to identify "significant gaps in inpatient treatment beds, residential beds, shelter beds, and respite homes across all ages" including an "estimate of 3,000 additional subacute beds needed," "significant gaps in assisting people when they are leaving inpatient care, especially for those with co-occurring disorders," "no SUD (substance use disorder) residential treatment for all ages," "no local children's inpatient psychiatric beds," "not enough inpatient beds for patients eligible for conservatorship…with waiting periods of up to a year to access secure inpatient care, resulting in people being discharged to the street and perpetuating homelessness."[99]

67. Because of this considerable shortage, courts are unable to declare many persons conserved because there's nowhere for them to go, and the system designed to address these issues is massively overburdened. At Olive View Hospital in north Los Angeles County, the 72-hour crisis ward often has over half of its 16 beds dedicated to patients waiting up to a year for a residential inpatient bed, leaving only a handful of other beds available for emergency 5150 holds; Olive View is the only crisis facility in north Los Angeles County and meant to serve millions of people. If a person is brought in while in crisis but there are no

---

[99] Jonathan E. Sherin, *Report Response to Addressing the Shortage of Mental Health Hospital Beds (Item 8, Agenda of January 22, 2019)*, Department of Mental Health 30, 134 (Oct. 29, 2019), http://file.lacounty.gov/SDSInter/bos/supdocs/132696.pdf.

39

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

beds for them, often they are released back on the street. This dynamic repeats itself throughout Los Angeles. The report goes on to document "limited access to urgent care for MH (mental health), SUD and services to people with co-occurring disorders at all levels of care," "MH and SUD treatment is not integrated" (the so-called "silos of care"), and "to access care you have to 'win the lottery,' have a chronic level of need that requires hospitalization, or become incarcerated. **Mild cases become severe while people are trying to connect to care.**"[100] Critically: "A lack of housing options contributes to homelessness."[101] As of December, 2020, only 156 of the proposed (minimal pilot) 500 additional beds had been procured.[102]

68.     As of 2018 the County had almost $1 billion in unused funds allocated to it through the Mental Health Services Act (MHSA), and while there has been some expenditure since, there has been no clarity about how much remains in the fund unspent.[103] According to data released earlier this year from the Mental Health Services Oversight and Accountability Commission—an entity run by the State of California—Los Angeles County's MHSA account closing balance at the end of the FY 2020-2021 year was $1,040,422,091.[104] The County of Los Angeles identified the remaining funds at the end of the 2021-2022 fiscal year to be $537,463,000 plus a canceled obligated fund balance of $361,513,000 for a total of $898,976,000.[105] Of course some of that might be encumbered, which is unreported, but however the pie is sliced the resulting conclusion is the

---

[100] *Id*. at 135.
[101] *Id*. at 141.
[102] *Id*. at 180-85.
[103] Thomas Curwen, *With an epidemic of mental illness on the streets, counties struggle to spend huge cash reserves*, Los Angeles Times (Aug. 19, 2018, 5:00 AM), https://www.latimes.com/local/california/la-me-mhsa-unspent-balance-20180819-story.html.
[104] Mental Health Services Oversight and Accountability Commission, Fiscal Transparency Dashboard, https://mhsoac.ca.gov/transparency-suite/fiscal-transparency-dashboard/.
[105] County of Los Angeles, 2022-2021 Recommended Budget, Volume Two (April 2022), https://ceo.lacounty.gov/wp-content/uploads/2022/04/2022-23-Recommended-Budget-Volume-II-Final-with-AC-Edit-Online-Version.pdf.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

same: there are hundreds of millions of dollars available specifically for mental health treatment and residential facilities, yet year-after-year the County fails to utilize these funds for their intended purpose. And that money goes to waste while those desperate for treatment get sicker on the street.

69.     The County points to the state's antiquated and restrictive conservatorship laws and the Federal government's refusal to permit Medicaid finances for mental health beds for facilities of more than 16 beds, both of which need to be addressed. Yet even under the existing scheme, help would be available to those who desperately need it, were there is sufficient capacity at all levels. Local courts could conserve many severely mentally ill persons who are unable to care for themselves, were there sufficient beds available. The blame for insufficient placement rests squarely on the County's shoulders. And people suffering from very serious mental diseases decline, living on the street instead, many of whom pay the ultimate price.[106]

70.     Together, the County and City fund LAHSA, which has been totally ineffective at stemming the growing tide of homelessness. LAHSA takes direction from the City and the County. Among LAHSA's shortcomings is the failure to move people up and out from emergency shelters and bridge shelters to permanent housing. The agency has been so disorganized, it apparently recently discovered 3,000 units they "didn't know about" in their system.[107] An audit conducted by LA City Controller Ron Galperin found LAHSA outreach workers fell far short of their goals, placing only 4 percent of people assessed into

---

[106] Dennis McDougal, *Op-Ed: My daughter was murdered, but it was misguided mental health laws that put her in danger,* Los Angeles Times (Jan. 26, 2020, 3:00 AM), https://www.latimes.com/opinion/story/2020-01-26/i-hope-police-catch-my-daughters-killer-but-i-know-her-mental-illness-also-played-a-role-in-her-death.

[107] Elijah Chiland, *Agency responsible for housing LA's homeless discovers 3,000 units it 'didn't know about',* Curbed Los Angeles (Feb. 20, 2020, 2:25 PM), https://la.curbed.com/2020/2/20/21145578/lahsa-units-homeless-housing.

41

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

1  permanent housing and 14 percent into shelters, only 6 percent for SUD

2  treatment and only 4 percent for mental health treatment.[108]

3  **J.      The County Has Not Proffered Workable Comprehensive Solutions**

4          71.      The State of California has transferred the responsibility for the

5  social safety net directly onto the County's shoulders, and provides money to

6  accomplish that obligation.  Indeed, the County spends vast sums of money but

7  the result is an astonishing lack of progress in addressing the crisis, and continued

8  expansion of the crisis despite such exorbitant expenditures, because the funds

9  are being used in ways that will never solve nor even substantively address the

10  problem.

11          72.      And so the crisis continues and accelerates, with little hope of a

12  resolution.  Because of the painful results of current policies, and because of the

13  lack of political and bureaucratic will to undertake effective and proven means to

14  combat it, the Plaintiffs are suffering under the weight of an urgent crisis.

15  Plaintiffs are left with no choice but to resort to the courts for relief.

16  **K.      The City Has Stepped Up But the County Refuses To Do the Same**

17          73.      Plaintiffs filed this case in March, 2020, with the goal of aligning

18  City and County efforts into one comprehensive approach to unsheltered

19  homelessness in a manner which would at minimum triage the crisis to help

20  people off the street and stay off the street, for the health and safety of both the

21  housed and unhoused communities.

22          74.      After two years, the City is now making significant efforts to

23  ameliorate this crisis by entering into an agreement with the Plaintiffs to rapidly

24  provide shelter and housing for the unhoused which is desperately needed, and

25  judicial supervision for five years to make certain that goal is realized.  It has also

26

27  ───────────────

28  [108] Ron Galperin, LA Controller, *Strategy on the Streets: Improving Los Angeles Homeless Services Authority's Outreach Program*, Ron Galperin LA Controller (Aug. 28, 2019), https://lacontroller.org/audits-and-reports/strategy-on-the-streets/#1566867736032-c107d667-baf7.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

42

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1  agreed to deadlines and mandates for creation of shelter and housing, as well as

2  encampment engagement, cleaning, and reduction.

3      75.    However, providing housing alone without supportive services to

4  assist people experiencing homelessness address any underlying issues that

5  caused or resulted from the person's homelessness, is not going to help the person

6  stay housed.  And some services—in particular clinical services such as mental

7  health and drug rehabilitation treatment—are the sole province of the County and

8  represent the most significant need for the homeless population.

9      76.    As noted previously, California Policy Lab has reported that 78

10 percent of unsheltered individuals suffer from mental health conditions, and 75

11 percent suffer from substance use, compared to 50 percent and 13 percent

12 sheltered individuals respectively.[109]  Recently the Policy Lab cross-referenced

13 records between LAHSA and DMH to discover that a full 10 percent of

14 individuals who were unsheltered between 2019-2020 had been diagnosed with

15 Psychotic Spectrum Disorder in the prior five years, and another 7 percent had

16 been diagnosed with a serious mental illness.[110]  The LA Times reports that 67

17 percent of homeless individuals suffer from mental illness or a substance

18 disorder.[111]  Addressing these two issues is crucial for helping people who have

19 experienced homelessness to become healthy again.  And only the County can do

20 so.

21      77.    Substance Use Disorder has been the number one driver of homeless

22 deaths since the County Coroner's Office began tracking the issue. In the 2020-

23

24      [109] *See* Rountree, *supra* note 8, https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

25      [110] Colin Caprara, Dean Obermark, et al., *Serious Mental Illness among People who are Unsheltered in Los Angeles*, California Policy Lab (May 2022), https://www.capolicylab.org/wp- /uploads/2022/05/Serious-Mental-Illness-Among-People-who-are- content Unsheltered-in-Los-Angeles.pdf.

27      [111] Doug Smith, Benjamin Oreskes, *Are many homeless people in L.A. mentally ill? New findings back the public's perception*, Los Angeles Times (Oct. 7, 2019, 3:00 AM), https://www.latimes.com/california/story/2019-10-07/homeless-population-mental-illness-disability.

28

43

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

ER 251

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

2021 year (the latest Homeless Mortality Report to be released), homeless deaths surged 56 percent compared to the year before.  Overdose deaths increased by a shocking 78 percent.  County Supervisor Hilda Solis noted "The findings in this report reflect a true state of emergency on the streets across our County.  In a civil society, it is unacceptable for any of us to not be profoundly disturbed by the shocking needs documented in this year's homeless mortality report."[112] Yet no one at the County—including Supervisor Solis—has responded as if in an emergency. Instead, it's business as usual.

78.     The County has the obligation to provide for mental health and substance use disorder treatment as mandated by California Welfare and Institutions Code sections 5600 *et seq.*, 13000 *et seq.*, 14000 *et seq.* and 17000, all of which together require counties to provide comprehensive residential and non-residential mental health and substance use treatment.  Yet the County fails to do its job at every step.

79.     As Council President Martinez noted during the press conference announcing the City/LA Alliance settlement: "Mental healthcare, substance abuse treatment, outpatient rehab beds. That is the county's responsibility. We need you. We can't do this alone, and quite frankly, we shouldn't have to. . . . We need to prevent people from falling into homelessness because right now we're in triage mode.  We need to focus on how to prevent the people from ending up on our streets. People need help. People need services, and that's how you fix the crisis. And what good is building housing if you can't provide the services that people need? The county is the one with the $3 billion mental health department. What good is that if you're not using it to help the most vulnerable, those that are living in our streets with mental health issues?"  And as Councilmember DeLeon

---

[112] Christian Martinez, Rong-Gong Lin II, *L.A. County homeless deaths surged 56% in pandemic's first year. Overdoses are largely to blame*, Los Angeles Times (Apr. 22, 2022, 7:06 PM), https://www.latimes.com/california/story/2022-04-22/la-county-homeless-deaths-surge-pandemic-overdoses.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

summarized: "Those individuals suffering from severe mental illnesses and substance abuse will be the sole responsibility of the County because they always have been the sole responsibility of L.A. County."

80.     The picture that results is undeniable: the County has the obligation to provide mental health and substance use disorder treatment, it has the resources to do so, and its leaders have acknowledged it is failing in its obligation to provide that treatment and related services, and because of its abject failure, there is desperation and devastation on the streets.

### IV.  THE PARTIES

### <u>PLAINTIFFS AND INDIVIDUALIZED HARMS</u>

81.     **LA ALLIANCE FOR HUMAN RIGHTS** (the "Alliance") is an incorporated non-profit membership association consisting of a broad coalition of Los Angeles stakeholders who understand that homelessness in LA is a human rights crisis and are working towards solutions to address the crisis and its related impact on health and safety issues throughout the region.  Each of its members is a resident of Los Angeles City which is within Los Angeles County.  All individual plaintiffs herein are members of the Alliance and the following are representative of the membership:

a.     **MARIA DIAZ** is a Hispanic woman who was until recently living in a tent in Skid Row, where she had been for the last 5 years.  Over the past five years, Ms. Diaz regularly witnessed individuals selling drugs, stealing belongings, and attacking others for no apparent reason.  She has also seen a number of young women harassed, attacked, raped, and ultimately succumb to drug addictions due to the conditions of Skid Row.  Harassment for women on Skid Row is a certainty, and Ms. Diaz herself experienced it.  The trauma she has experienced while living on skid row has caused her pain, suffering, and psychological damage.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

45

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

b.   **CHESTINA EVANS** is a Black woman who has lived on Skid Row for over a year.   Ms. Evans has been mostly homeless after aging out of the foster care system.  She did not have access to any transitional program and did not have any resources or know where to go, so she found herself homeless fighting for survival.  Ms. Evans left the bay area for Skid Row because she believed there was more opportunity to receive resources and exit homelessness on Skid Row.

Living on the streets in Skid Row has been incredibly hard for Ms. Evans. She is frequently assaulted and attacked.  Soon after arriving in Skid Row, Ms. Evans was attacked by a homeless man.  He wrongly accused her of taking his belonging and hit her hard in the face, knocking her onto the ground.  Ms. Evans doesn't feel she has any recourse; calling the police will have little consequence since they rarely do anything about attacks on Skid Row.  Ms. Evans has also been sexually assaulted while living on Skid Row by men who prey on women. Her time on the streets has exacerbated her severe mental health issues.  She suffers from depression, anxiety, uncontrolled anger and fear, and paranoia. Perhaps most taxing is that despite whatever internal turmoil she feels, Ms. Evans feels like she cannot break down or address her emotions because showing weakness on the streets puts her life in danger.  Ms. Evans has sought help for her mental health issues but continues to be stone-walled.  She has accessed Department of Mental Health, but the wait times between appointments makes them completely useless.  She needs a place where she can go that will address her mental health issues while inside.  She does not think her mental health issues can possibly be addressed while living on the street.  She takes illegal narcotics to try to treat her mental issues and to stay up all night because she fears attacks at night.  Her behavior is erratic and unpredictable due to her mental illness and drug use.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

46

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Ms. Evans has been in two shelters.  She first stayed at the Union Rescue Mission but left for Weingart Center where she shared a room with another woman.  She was asked to leave following an altercation with her roommate. Ms. Evans and her roommate argued over her roommate's continued use of drugs in their shared living space, as well as her use of loud music at all hours. At the time she was trying to stop taking drugs, and her roommate's continued use of narcotics made that impossible.  She has been told she has a "dual diagnosis" of serious mental illness and drug addiction, but she doesn't even remember which one came first. She would love an opportunity to stay at another shelter, but she knows that without addressing her underlying mental health issues she won't be successful.  She can't control herself and will get in trouble.  She needs a place where she can also address her ongoing serious mental health issues at the same time.  Ms. Evans' experience living on the streets has caused her physical, emotional, and mental harm.

c.    **SHINAE OWSLEY** is a Black woman recently homeless and unsheltered in Skid Row.  She is originally from South Central and after high school attended California State Dominguez Hills.  Unfortunately, her serious mental health issues lead to drug abuse, which led to prison.  Ten years ago, Ms. Owsley was released from prison.  Following her release, Ms. Owsley began receiving SSI for her anxiety and other mental health concerns.  Ms. Owsley is a hard worker and seeks to get off SSI soon.  And she recognizes that having reliable shelter is essential to this goal.  Ms. Owsley has had a difficult time living on Skid Row.  She is sexually harassed by men regularly and was recently attacked by another female.  She witnesses crime and violence daily and is terrified of living in the streets.  She wants to get clean and sober, but it is impossible to do so while living unsheltered in Skid Row.  She needs help but has no idea where to start.  Since she has lived on Skid Row, not a single social worker or County or City worker has approached Ms. Owsley offering to assist

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

47

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

ER 255

her in obtaining services or housing.  If she had the opportunity for shelter anywhere, she would jump at that opportunity.  But she knows that she desperately needs treatment as well.

d.  **CHRISTOPHER ROPER** is a Black man living in Skid Row.  He has been homeless for two years.  He has a traumatic brain injury, so it is hard to keep a job.  He first began experiencing homelessness when he lost his job and was unable to pay his rent.  Before living in Skid Row he lived in Long Beach, Santa Monica, and Venice.  He eventually made his way to Skid Row because he knew resources for those experiencing homelessness were supposed to be available there, like food and showers.  Homelessness has been hard for Mr. Roper physically and mentally.  He does not have a tent and sleeps directly on the street, exposed to the elements.  He is freezing during the winter and it affects his health.  Living on Skid Row has exacerbated his brain injury, which he first suffered in 1992.  A side effect of that trauma is a shortened memory, which has only worsened since living in Skid Row.  He can't keep track of his paperwork and loses things often, which makes it more difficult to get shelter and services.  But there is no one to help him.  Mr. Roper also suffers from depression and anxiety which is so much worse in Skid Row due to the horrific environment.  He tries to stay away from the violence and fires, but he sees it often.  He is hopeful that the Department of Mental Health will help him find housing, so he keeps asking but is told it isn't available.

e.  **MILTON MILES SMITH** is a sixty-year-old unhoused Black male living in Skid Row.  Mr. Smith was born and raised in the Hollywood area.  Mr. Smith has been living in Skid Row since 2018 after being released from prison.  After initially becoming homeless, Milton went to The Center in Hollywood.  He met his friend Albert Albarran at The Center.  They eventually made their way to Skid Row together to try to get housing.  Mr. Smith is on SSI.  While in prison, Mr. Smith was attacked, and his lung almost collapsed.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

48
SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Mr. Smith has several mental health issues including post-traumatic stress disorder, schizophrenia, paranoia, anxiety, and a learning disability.   He is scared every day that he is forced to stay on the streets.  He is afraid that if he sleeps at night he will be killed.  He sometimes takes drugs to deal with the stress and to keep himself awake, but he does not like using drugs and is trying to stop.  It's impossible for him to address his substance use disorder or mental health issues while unhoused in Skid Row.

f.   **ALBERT ALBARRAN** is a Hispanic male currently living in an SRO called Rainbow Apartments, located in Skid Row.  His friend, Milton Miles Smith, helped him apply for and secure this housing.  Albert was previously homeless.  He met his friend Mr. Smith at The Center in Hollywood, they both eventually came to Skid Row because there are more opportunities for housing in this area.  He does not feel safe living in Skid Row and wants to leave but does not have an opportunity anywhere else.

Mr. Albarran has several physical issues that began after he was hit by a car when he was fifteen years old.  He suffered a traumatic brain injury which has resulted in a short-term memory issue and has a metal rod in his leg.  This memory problem increases his danger living in Skid Row, as Mr. Albarran often forgets what street he lives on and is terrorized by gangs and violent drug users in the area.  The stress of living in Skid Row has also made his short-term memory issue worse.  Mr. Albarran suffers from depression, post-traumatic stress disorder, and anxiety.  Despite these physical and mental problems, Mr. Albarran was cut-off from mental health services because he was deemed "too high-functioning."

g.   **MARK SHINBANE** is the President and part-owner of Ore-Cal Corporation which is a family-owned business in the Skid Row area.  He has also been the Chairman of Central City East Association (CCEA) for several years.  Ore-Cal Corporation is an international seafood importer, processor, and

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

49

distributor.  It is a second-generation family-owned-business and they have owned property in the general area since 1961.  Ore-Cal has been located on 634 Crocker Street since 1971.  Four years ago, Crocker Street and other streets in that vicinity—such as 6th Street, 7th Street and Towne Avenue—were clear.  Mr. Shinbane recalls small homeless encampments west of San Pedro Street on San Julian Street and Wall Street in the past, but personal possessions were generally kept contained, crime was generally addressed, and the sidewalks were usable.

In 2016, immediately after the injunction issued in *Mitchell v. City of Los Angeles*, the neighborhood surrounding Ore-Cal rapidly filled with tents and encampments, inundating the area, which coincided with an increase in violence and an inability to traverse the sidewalks.  Individuals loiter at all times of the day, and the encampments block sidewalks, doorways, driveways, and streets.  Mr. Shinbane regularly observes open drug use and people walking in a perpetual drug-induced state, and bodies lying on the sidewalks or doorways near his building.  There has been an increase of used needles on the streets, sidewalks, and inside drains located on the business' property.

Mr. Shinbane's conversations with LAPD officers and detectives in the area indicate that gang members are supplying narcotics to homeless individuals in the vicinity.  Mr. Shinbane and his employees now deal with the inability to traverse the sidewalks.  Encampments often block sidewalks, doorways, driveways, and streets.  Illegal entry onto their property, car break-ins, and thefts are now a common occurrence.

Ore-Cal and its employees are subject to an increased risk of fire because of the encampment fires that surround the property.  This danger is made worse by the huge quantities of trash and debris that litter their street and surrounding neighborhood.  These conditions have made it difficult to hire new workers and they have lost many well-qualified candidates (approximately 30 percent) due to

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

50

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

the nature of the neighborhood and environment.  This makes the hiring process longer, and more difficult than it ever used to be.

To combat some of the deteriorating conditions, Mr. Shinbane's business has completely fenced its property to prevent individuals from camping on their grounds and to keep the used needles from the rampant narcotics use from being fed into their exterior drains. Mr. Shinbane was forced to replace roll up doors and add sections of fence due to individuals constantly urinating on them, a cost of $25,000.

Ore-Cal has also had to significantly increase its exterior maintenance by washing and sanitizing the perimeter of their facility daily.  In some cases, it is necessary to clean multiple times a day to maintain cleanliness.  He now spends $15,000 a year—a new expense—on supplies and staff dedicated to maintaining the perimeter and external areas of their facility.

       h.    **HAL BASTIAN,** a commercial real estate professional in Los Angeles for 38 years and has been one of the leaders of the Downtown Los Angeles Renaissance for the last 27 years.  From 2001 to 2014, he served as the Director of Economic Development for the Downtown Center Business Improvement District (DCBID), and eventually, its Executive Vice President. During this time, Mr. Bastian facilitated the construction of over 22,000 housing units, leading tours and producing special events that recruited thousands of new residents and resulted in the construction of dozens of new commercial and mixed-used developments, and attracting over 300 new businesses to the downtown area, including Ralphs, Fresh Fare, Bottega Louie and Whole Foods Market.  He lives in Downtown Los Angeles.

Mr. Bastian's extensive experience in Downtown Los Angeles has made it clear to him that both action and inaction by the City has been a substantial contributing factor in the current homelessness crisis.  In particular, the City's response to a series of federal lawsuits has coincided with this crisis, which

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

affects the homeless and housed alike, and he joins this lawsuit to bring about a substantial change in the deteriorating conditions of Downtown Los Angeles.

i.     **LISA RICH** owns several buildings in Skid Row, which she rents out to various businesses.  Her family has been running the properties for over 40 years and has brought significant numbers of jobs to the area.  Over the past several years, the number of homeless persons on the sidewalk in front of the buildings has dramatically increased, as has the amount of personal possessions.  Frequently, tents and belongings block the sidewalks for days at a time, bringing with them refuse, criminal activity, and unhygienic conditions.  At times, the buildup of property has physically prevented tenants and patrons from accessing the buildings.  Tenants have complained and requested rent reductions due to the effect the homeless encampments are having on their business.  Recently a mobile lab engaged by her environmental consultants refused to come to the properties due to the danger of the area.

Ms. Rich attempted twice to contact LAPD for assistance in moving the property but received no help.  When she asked why LAPD had not moved homeless persons or their property, she was informed that there was nothing LAPD could do.  After learning the City would not help, Ms. Rich attempted to install fencing around some of her higher risk properties to keep tents from being propped directly against the buildings.  But the City warned her that the fencing was unlawful and would lead to fines.  Before she could remove the fencing at issue, an unknown person or entity removed the chain link, and tents returned, gathering around the bare fence poles.

In late 2017, a fire at a homeless encampment burned out of control and set one of Ms. Rich's buildings on fire.  The blaze significantly damaged the building's offices and electrical system, requiring more than $80,000 worth of repairs.  The fire and repair process disrupted her tenant's business for significant time.  At her next policy renewal period, her fire insurer refused to renew the

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

52

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1  policy covering all of her buildings, claiming her buildings could no longer be
2  insured because of the risks posed by the adjacent homeless encampments.  Ms.
3  Rich then approached 24 other insurers—of those, 23 insurers outright refused to
4  insure her buildings at any rate.  Eventually, one insurer offered to cover her
5  buildings at a premium more than four times her original rate.  As a result of
6  these developments, she is actively considering selling her family's business and
7  abandoning the Skid Row area.

8         j.    **Robert P.**[113] is an unsheltered Black man living in Skid Row.
9  He was born in Los Angeles, California, and prior to becoming homeless had a
10  successful career, and had a family and a house in Carson.  He lost his job due to
11  downsizing, and ended up holding a number of dead-end jobs and eventually lost
12  his home.  After several brushes with the law, made worse by his mental illness,
13  he became homeless and came to live on the streets of Skid Row.  He has been
14  diagnosed with paranoid schizophrenia and has been told he has "dual diagnosis"
15  of paranoid schizophrenia and substance use disorder.

16       His mental health issues are a defining point of his homelessness.  He
17  needs more than just shelter; he needs shelter and treatment. He is afraid that
18  going into a shelter without receiving proper treatment, would result in him
19  hurting someone or himself. He suffers from anger issues that he cannot control
20  and that build up and eventually explode.  He has tried to seek help but the
21  institutions that provide the much-needed services, including mental health
22  treatment and drug rehabilitation treatment, had to close due to lack of financial
23  support.  Without proper medications, he tries to treat his mental illness with
24  alcohol or other drugs that he can get.

25       Despite his own serious issues, he goes out of his way to help other people,
26  especially unsheltered women who are vulnerable and in severe danger in Skid

27

28        [113] Robert's full last name has been redacted for privacy due to the public
nature of this filing.

53
SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Row.  When volunteers distribute donations and hygiene products, he asks for products for women first because he finds they are largely ignored.  Mr. Porcha's schizophrenia makes being homeless more difficult, as interacting with people is hard for him.  He believes that people are involved in conspiracies and that they are watching him.  Mr. Porcha would like to obtain housing, but he knows that he would not be successful without treatment.  He will "regress" which he describes as all his issues facing him at once.

82.    **JOSEPH BURK** owns a significant building utilized for a company he created called Location 606, Inc.  His property is primarily rented for film, television, commercial and music video production.  Until 2017, he rented part of the property to tenants, but since then, due to the conditions in the area, he could not find a tenant to occupy the property and moved in along with his wife.  After his wife became pregnant with their child, they decided to move out of the property for their safety and mental well-being.  Mr. Burk is regularly at the property and remains apprised of and impacted by the situation, and the challenges it presents, surrounding his property.

83.    He pays property taxes but cannot use the public sidewalks around his own property.  Mr. Burk's residence became unlivable due to surrounding conditions, and his business has been destroyed.  Production companies have stopped using his building for film shoots, and he has gotten countless rejection emails and letters citing the conditions around his property.  He has lost hundreds of thousands of dollars because production companies cannot use Mr. Burk's property because they need accessible driveways and sidewalks for heavy equipment, lighting and sound items, and costume trucks, and the exits and entrances to his property are often fully blocked by shelters and possessions.  On at least one occasion when his property was to be used for filming, the crew was unable to bring their equipment inside his building and demanded its money back.  His property has been on the market for years without an acceptable offer,

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

54

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

and he has experienced a significant decline in his own quality of life because of the increased filth, violence, and drug use in the surrounding areas.

84.     Since his tenants moved out, Mr. Burk has struggled to find a full-time tenant for the property.  People are not interested in renting his property as a home or living space because of the surrounding area.  LAPD officers have told Mr. Burk that they have been instructed by their superiors not to ask homeless individuals to move their belongings from the sidewalks or from his property.  Because of this, when he has asked people to move their belongings from blocking the entrance to his home, he has been threatened, spit on, and verbally attacked.  Weekly, he witnesses public sex, prostitution, and/or nudity on 6th Street and Crocker Street.  His security cameras often catch violent encounters, including shootings and other murders, right across the street from the building.  In the last two months his property was broken into with thousands in equipment stolen, he has paid more money to upgrade his system, and had another attempted break-in but the new alarms, barricaded doors, and additional security camera thwarted the theft. Recently a man from an adjacent tent random began throwing bricks at his building which broke 6 windows.  On Sunday July 3, 2022, a person was murdered in a tent across the street by rival drug dealers.  On July 6, 2022, a woman who sleeps outside his property was beaten and robbed, including her new wheelchair.  There is no end to the atrocities committed and experienced right outside his door.

85.     The building across from him has caught on fire from a homeless encampment's open flame five times in the last year.  He was dropped by several insurance companies and was declined new insurance on multiple occasions.  He was without insurance for two months before he finally found a non-admitted insurance company to insure his property, at significantly higher cost than buildings in other areas of Downtown.  He has difficulty receiving mail or packages.  The mail carrier will not deliver his mail if his mailbox is blocked and

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

55
SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

will not get out of his truck to deliver mail or packages to his front door because he has said it is not safe. Food delivery services will no longer deliver food to his property after dark. Rideshare drivers such as Lyft or Uber refuse to pick up or drop off there.

86.    Every day he finds used needles on the sidewalks and on his property. Clothes and trash are thrown over his fence and onto his property daily. On days when the sidewalks around his property are clear, support groups use the sidewalk to hand out food and clothing which results in mounds of trash being left behind. His property fence is regularly used as a restroom since there are minimal facilities for the number of people living in front of his property. He must make sure the urine and feces are washed off his property on a daily basis. The unmanaged urine and feces on his property, as well as the rat and bug infestations, create significant health risk. His fence has been damaged from people pushing large bulky items, such as a couch and a refrigerator, against it and tying tents and tarps to it. Most days he cannot use the sidewalk around his building and the entrances to his property have been blocked by debris.

87.    The conditions around his property have worsened beyond his control, and he can no longer invite friends or family to his property, or reasonably enjoy and use his property.

88.    Mr. Burk has been trying to sell the property since early 2018. There have been several interested buyers, yet the property has not sold, as the conditions surrounding the building and the recent and widely reported typhus and hepatitis outbreaks in the area have scared off potential buyers. His property has dropped out of escrow multiple times. All potential buyers have cited the dangerous conditions on the surrounding streets and sidewalks as the reason they would not purchase the property.

89.    **GEORGE FREM** owns a luxury auto-shop in Mar Vista California, which primarily services high-end vehicles. In 2015, a few homeless individuals,

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

56

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1  and others who were not homeless but pretended to be to sell narcotics, set up
2  tents under the 405 freeway adjacent to his business.  Since then, the population
3  of the encampment has continually increased, and he currently estimates that
4  more than 80 people live there.  The residents have brought a variety of goods
5  with them including tents, mattresses, wardrobes, and more.  The encampment
6  effectively fully covers the sidewalk on one side of the road, and the other side of
7  the same street—controlled by Culver City—is now completely blocked as well.
8  Mr. Frem now sees drug use, prostitution, violence, and public indecency on a
9  regular basis.

10      90.    Additionally, a few times a week LAHSA representatives set up a
11  mobile help desk, food giveaway station, and/or mobile shower station (where
12  the City built a special mobile shower drainage system) directly in front of Mr.
13  Frem's business, resulting in lines of people on the sidewalk for hours as they
14  wait for the showers to be available.  When this occurs, customers frequently
15  question whether their vehicles are safe in the lot and whether they will be stored
16  inside overnight.

17      91.    There have been shootings under the bridge multiple times, at least
18  three were caught on Mr. Frem's security video: July 26, 2018, April 1, 2019,
19  and October 14, 2020.  In just the last two years there have been seven separate
20  fires under or near the bridge: October 28, 2020, December 27, 2020, January 20,
21  2021, April 16, 2021, April 29, 2021, May 10, 2021, and May 22, 2021.  Below
22  is a single photograph that shows the horror and danger to life and property when
23  people live, cook, and try to warm themselves in places not made for human
24  habitation.  That risk grows even greater when considering the criminal element
25  that preys on the vulnerable and often, sadly, intentionally light fires in revenge
26  or madness:

27

28

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT



92.     Before the encampment was in place in 2015, Mr. Frem received significant business from studios wanting to rent his location or other auto shops who would sub-contract to him for repairs.  The encampment and related activity caused those shops to doubt the safety of their vehicles while at Mr. Frem's shop, and has caused them to stop using him for sub-contract work.  Prior to 2015, Mr. Frem would get significant walk-in business from his prime location on a major arterial road, but now long-time customers tell Mr. Frem that they do not feel safe picking up their vehicles late at night and potential customers turn away when they see the conditions outside of the shop.

93.     This has decreased the number of service orders the shop has every year since the encampment arose.  Before the encampment was in place, Mr. Frem's shop consistently showed an increase of repair orders and performed over 1000 repairs per year.  But the numbers have declined year on year, and now, the shop draws less than 50 percent of repair order jobs compared to 2013.

94.     **WENZIAL JARRELL** is a Black man who has been homeless and living on Skid Row for the past several years.  Prior to becoming homeless, Mr.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Jarrell served in the Air Force, including 8 years in Iraq, before getting injured in combat. As a result of his service, he now suffers from post-traumatic stress disorder ("PTSD"), which causes him great distress and prevents him from entering a congregate shelter where he cannot be around a lot of people. Living on the streets with his issues is incredibly difficult. The area is violent, he hears gun shots often and it triggers his PTSD. He has physical injuries as a result of his service which are exacerbated by living on the street.

95.    Mr. Jarrell came to Skid Row after the death of his first wife because he was told he could find housing and services there. But Mr. Jarrell has yet to receive either housing or services. The health benefits, general relief, and food stamps he received upon his arrival stopped because a person who he thought was a County worker asked him to sign a contract, and his identity was subsequently stolen. The process for obtaining services he needs like SSI, general relief, and mental health treatment is arduous and he is frequently told to wait, come back later, or that he must contact someone different. These complications to getting services are incredibly frustrating and due to his PTSD causes him to withdraw, preventing him from completing the application process and frustrating his prior efforts. He is eligible for SSI and a veteran affairs ("VA") pension, but due to his identity theft issues he hasn't been able to work through the barriers to receiving it. He often feels hopeless and like it is not even worth trying. For months at a time, he accepts that he will never leave Skid Row and find a better life for him and his second wife, with whom he shares a tent.

96.    Mr. Jarrell's search for help has been further complicated by how functional he is and how well he has adapted to being homeless. In his experience, services are reserved for those suffering from severe addiction or mental or physical health issues. He finds he is not "homeless enough" or "sick enough" and gets put in the back of the line for help. Because he can manage his often-debilitating PTSD and does not have a severe drug addiction or physical

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

health issue, he has a much harder time getting help.  Mr. Jarrell is frustrated that the City's and County's focus is on those in the direst circumstances, leaving him, and many others like him, who are most likely to escape homelessness, without help or services.

97.     Mr. Jarrell has witnessed first-hand how hard it can be to obtain services even when a person visibly needs help.  For example, Mr. Jarrell once came across a 19-year-old girl who was blind, walking the streets of Skid Row. It was clear to Mr. Jarrell that she would not be able to survive on Skid Row, so he brought her to a county social worker that he knows.  The county services worker initially told him there was nothing they could do for the girl.  Mr. Jarrell demanded to speak with the county manager's supervisor and subsequently learned that the worker was incorrect and should have been providing help to the girl.  For Mr. Jarrell, this experience demonstrates two things.  First, that many homeless people on Skid Row are unable to attain the services they need due to their own limitations and the complicated system that the City and County have designed.  Second the workers running these systems are often barriers rather than facilitators of the care that individuals living on Skid Row need.

98.     Mr. Jarrell was living on Skid Row during the Covid-19 crisis.  It was months before anyone from the city informed Mr. Jarrell and others about the pandemic or how to protect themselves.  As a result, Covid-19 moved quickly through the homeless population while little to no aid was offered.  He saw many people sick, coughing, and even dying.  As a population, they felt ignored, and it was clear that the rate of sickness and death far exceeded what was being reported.  This experience exemplified how little the City and County care about a population that is already struggling just to survive.

99.     These examples paint a picture of what life on Skid Row is like. Services are regularly denied or terminated for unreasonable or unrelated issues. The workers responsible for this irrational behavior are not held accountable,

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

sweeping the issues under the rug to avoid blame and responsibility. Individuals, like Mr. Jarrell, were directed to Skid Row with promises of assistance and services, but instead they are turned away and abandoned; left to get worse instead of better.

100.   The services that are provided (frequently by private organizations) fail to stop homelessness itself. While Mr. Jarrell appreciates the food, clothes, tents, and other provisions provided, these items do little to help him get off the streets. While these provisions make life on the street more comfortable, they do not provide a stable housing environment.

101.   He has tried sleeping in congregate shelters when he's been able to get a bed, but due to his experiences in Iraq, his PTSD worsens when he is surrounded by large numbers of people. A couple times he has been able to find individual housing, but it's only for single people and he does not want to be separated from his wife who he cares for, and who cares for him. And under no circumstances will he leave his wife alone in Skid Row. It is far too dangerous.

102.   Mr. Jarrell is a selfless, caring individual who works hard to help others get out of the black hole that is Skid Row. He prioritizes helping those who he thinks clearly do not belong, or should have a home to go back to, because he does not want them to get attacked or left to fend for themselves. According to Mr. Jarrell, there is nothing worse than getting stuck in the system of Skid Row and realizing you cannot escape. If he were able to get a stable housing environment with any semblance of personal space, he would jump at the opportunity, but it needs to come with mental health treatment or he will not be successful. Mr. Jarrell knows he is more likely to die because he lives on Skid Row.

103.   **CHARLES MALOW** has been living at Union Rescue Mission, within the Skid Row area, since 2012. Prior to 2008, he worked as a garage door installer for 29 years, and from 2000 to 2006 he worked part-time as a security

61
SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

guard.  He became homeless in 2008 when the economy crashed.  From 2010 to 2012, he lived on the streets of Glendora, California.  In the winter of 2011 and 2012, he stayed at a Glendora Winter Shelter and then decided to seek help at the Union Rescue Mission ("URM") located on 545 San Pedro St., Los Angeles, CA 90013.  When he first arrived at URM in 2012, police officers would come by in the morning, and wake-up the people sleeping on the streets.  They were required to pack up their belongings and stow them, so the sidewalks were not blocked.  This also allowed illegal activity such as narcotics and weapons sales to be more easily discovered and therefore addressed.  At that time, there were no tents in front of URM.

104.  For about five years, Mr. Malow has been an Ambassador at URM. The Ambassador program allows a small group of men to live at URM indefinitely.  Since living at URM, he has worked at Home Depot and in URM's janitorial department, known as the EVS team.  He knows that diseases such as typhus have made a resurgence on Skid Row, and this makes him extremely concerned that his work with the EVS team puts him at greater risk of contracting a disease.

105.  In the last several years Mr. Malow has seen a big increase in the volume of tents and belongings on the streets.  This has greatly affected his daily life.  He has observed a dramatic increase in the rodent problem on Skid Row and has seen rats running in and out of tents when he sweeps the sidewalks and gutters outside of URM.  A major cause of this rodent problem is the volume of trash disposed of on the streets—because individuals living on the streets throw food and trash in the streets, rats have more than enough food to flourish.  There has also been a huge increase in the amount of human feces on the street which carries with it the significant risk of disease, not to mention the odors.

106.  There is absolutely no room to walk on the sidewalk, so if he leaves URM, Mr. Malow is forced to walk in the street.  Even in places where he could

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

physically walk between the encampment and the wall, he still must walk on the streets or risk violent confrontation from people who accuse him of invading their "space." When he leaves URM, he must plan his route carefully even if traveling by public transportation. Due to an increase in crime, including narcotics sales and violent activity, he must use a car service to get back from the metro or bus station after visiting his mother in Anaheim. He always has the car drop him off directly in front of URM to avoid dangerous encounters on the street.

107. Mr. Malow does not leave URM between the hours of 4 p.m. and 6 a.m., because he is concerned for his safety on the streets. When he does leave, he is incessantly approached and offered illegal drugs for sale. He regularly sees people just outside his home using illegal narcotics in the form of pills or smoking or injecting themselves. He sees people lying motionless in gutters, often without clothes or shoes, and is constantly looking to see if that person is dead or merely unconscious from drugs or alcohol. As a person who has struggled with drug and alcohol use, it is particularly painful to watch and experience.

108. The excessive build-up of tents and debris over the last few years is directly responsible for this significant increase in crime because it allows criminals to operate in relative anonymity. This increase in debris, tents, and personal items on the streets also makes it impossible for health and safety workers to identify public health risks, causing disease and unsafe conditions to spread right outside his home. As a formerly homeless individual, Malow knows first-hand the difficulties that come from living on the street and is deeply troubled by both the City and County's actions and inaction in the face of the homelessness crisis.

109. **KARYN PINSKY** works in DTLA and lives there with her husband and their young son. She and her husband moved to DTLA in 2010 because they were drawn to the architecture, history, and walkability of the area. Unhoused

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

63

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

individuals have always been present near their home, but in far fewer numbers. In 2010, the only tents west of Skid Row were on Broadway, and they were erected every night and removed shortly after sunrise. From 2010 to 2016, Ms. Pinsky and her husband, and later her son, were able to enjoy many wonderful features of DTLA—they regularly walked their dog along Main Street, and they felt comfortable walking to the many wonderful establishments and restaurants that were nearby.

110.    All this has changed dramatically over the past several years as the homelessness crisis has deepened. Now, due to many recent experiences and the crime and concentration levels in Downtown, Ms. Pinsky is fearful that either she or her son will be the subject of some random act of violence. Once, while sitting outside at a café on Spring Street, a homeless woman screamed and became violent towards her because she thought Ms. Pinsky was "judging" her—only when her husband and others intervened was the situation defused. On another occasion, her husband saw the aftermath of a violent encounter between a neighbor and a homeless, mentally ill individual—the individual hit their neighbor in the face with a 2x4 that had a nail in it. Earlier this year, a homeless man seated outside a café on 6th Street near Broadway, a block from their house, randomly pushed a stranger into the street in front of an oncoming bus. The man was struck by the bus and ultimately died. Another neighbor on a different floor was attacked in the middle of the night by someone who gained access through a fire escape window. Now, as a result, she no longer feels safe sleeping with her window cracked even a little at night because of its proximity to the fire escape.

111.    Sexual assaults on women also have increased significantly in the last several years, and as a result, Ms. Pinsky is terrified of being assaulted while running errands or just walking to or from a restaurant. The conditions immediately surrounding their home have gotten so dangerous that neither she nor her husband will leave the house by foot at all. They drive into the garage

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

and stay in their home; if they need to run errands, they drive.  She does not walk at all, due to the violent criminals that are using the tents as cover immediately outside her building.  She once was able to take her son to enjoy the various activities Downtown Los Angeles offers, like the library story time, parks such as Pershing Square, and museums.  Now they avoid those altogether.  Family and friends are so fearful of the disease and violence in the area that they will no longer come to visit Ms. Pinsky.  The area was not always like this, but the City's failure to address this crisis in a way that is balanced for both the housed and unhoused communities has fundamentally altered the neighborhood and her experience of it.  Ms. Pinsky has been greatly affected and has a very real interest in remediating this issue insofar as her quality of life and basic enjoyment of her property have been severely diminished.  At the same time, she also has compassion and empathy for those on the streets who are subject to the assaults (particularly women), the elements, the drug pushers, the gang members, the rats, filth, and disease.  For Ms. Pinsky, this is no way for a society to treat its most helpless members.

112.   **HARRY TASHDJIAN** owns an upholstery supply business in the industrial area of DTLA, and the property surrounding the business location.  Mr. Tashdjian's building typically houses millions of dollars' worth of inventory.  When he purchased the building in 2013, tents were not allowed on the streets during the day.  Because his business operates during traditional business hours, he believed that the location would not hinder business, which generally has between 70 and 100 will-call orders per day through which customers order product and then come into the business shop to pick it up.

113.   In mid-2016, Mr. Tashdjian saw an immediate increase in tents on the streets and sidewalks outside of his business.  Today, tents occupy the sidewalks at all hours, and it is difficult for him and his customers to access his business due to the piles of property and people loitering on the sidewalk and in

65

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

the street.  Customers constantly tell him how difficult it is to get into the building or the adjacent parking lot without hitting people.  Mr. Tashdjian has been repeatedly told that customers prefer to do business with competitors to avoid the hassle and inconvenience of trying to access his store.

114.   Vendors from all over the world—Italy, Germany, United Kingdom, China, etc.—visit Mr. Tashdjian's shop and express shock and dismay that such horrendous conditions exist in Los Angeles.  His business is now at a much greater risk for vandalism, violence, and fire damage.  Homeless individuals frequently urinate into or onto his building or the adjacent parking lot, and there has been an increase in graffiti on his building.  The number of tents immediately outside of his building puts his business at risk of fire damage—indeed, the fire department responds at least once a year to a tent fire that has started immediately outside his building.  Sometimes it is an innocent accident from an open flame; other times, it is intentional due to some drug dealers' disagreement.  His security cameras have recorded these acts of arson.

115.   The conditions surrounding his property have cost Mr. Tashdjian a great deal of money.  Because of the immediate fire danger posed by the tents outside his building, he has been forced to upgrade his fire monitoring system which cost approximately $40,000.  He has also had to spend approximately $37,000 on a new security surveillance system to protect the building.  The LAPD frequently seeks footage caught on this security system during investigations.  Theft is also a major concern—pallets are constantly stolen from their building and car batteries are frequently stolen from inside people's cars.

116.   There has also been a significant uptick in the population of rats surrounding his building, and as a result, rat feces coat all three fences surrounding his property.  To address the increase in fecal matter on his property, as well as the proliferation in cockroaches, he has hired a pest control company and had the health department visit the property multiple times.  The gate

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

66

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

surrounding his property has been repeatedly damaged, costing him thousands of
dollars in repairs.

117.   Over the last few years, as the City and County have permitted the
homelessness crisis to grow, the risk to his property from fire damage and
vandalism has increased exponentially—the business constantly replaces gates
and other property, cleans the facilities, and sometimes pays security to safeguard
its property.  His business has had to spend over $100,000 in upgrades to their
system and increased monitoring and pest control just as a result of the increased
homeless persons and property in the area.  Mr. Tashdjian and his employees
cannot walk anywhere in the area and are constantly subject to risk of disease due
to the putrid conditions outside the business.

118.   The City and the County have offered no assistance to Mr. Tashdjian
and have taken no steps to address the impact of the homelessness crisis on his
business or to enforce the laws that are broken daily in the area around his
business.

## **DEFENDANTS**

119.   **COUNTY OF LOS ANGELES** ("County") is a municipal entity
existing under the laws of the State of California, with the capacity to sue and be
sued.  The departments of the County include but are not limited to the Los
Angeles Sheriff's Department (LASD), the Department of Mental Health
(DMH), the Department of Public Health (DPH), and the Department of Public
Social Services (DPSS).

120.   The **COUNTY**, along with the City of Los Angeles, jointly funds,
manages, and administers the Los Angeles Homeless Service Authority
(LAHSA), an independent joint powers authority.  According to its website,
"LAHSA is the lead agency in the Los Angeles Continuum of Care, which is the
regional planning body that coordinates housing and services for homeless
families and individuals in Los Angeles County.  LAHSA coordinates and

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

manages over $300 million annually in federal, state, county, and city funds for programs that provide shelter, housing, and services to people experiencing homelessness."[114]

121.   Does 1 through 200, inclusive, are persons, entities, government bodies, municipal employees, the names and identifies of which are currently unknown.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of Mandatory Duty

### Cal. Gov't Code § 815.6; Welf & Inst. Code §§5600 *et seq*, 13000 *et seq*, 14000 *et seq.*, 17000

122.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 121 of this Complaint as though set forth fully herein.

123.   Defendant County of Los Angeles is liable under California Government Code section 815.6 and common law negligence theory for violation of a statutorily mandated duty to provide mental health and medical care for the indigent and those eligible for Medi-Cal.

124.   According to the California Welfare and Institutions Code section 5600.1, "[t]he mission of California's mental health system shall be to enable persons  experiencing severe and disabling mental illnesses… to access services and programs that assist them, in a manner tailored to each individual, to better control their illness, to achieve their personal goals, and to develop skills and supports leading to their living the most constructive and satisfying lives possible in the least restrictive available settings.  Under California Welfare and Institutions Code 5600.3, counties have an obligation to use their mental health

---

[114] LAHSA, *About LAHSA*, https://www.lahsa.org/about (last visited June 23, 2022).

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

"to the extent resources are available" to treat "homeless persons who are mentally ill." Cal. Welf. and Inst. Code §§ 5600.3(b)(4)(A).  The minimum array of services that must be offered to this target population are: (a) precrisis and crisis services, (b) assessment, (c) comprehensive evaluation and assessment, (d) an individual service plan, (e) medication education and management, (f) case management, (g) twenty-four hour treatment services, (h) rehabilitation and support services, (i) vocation rehabilitation, and (j) residential services. Welf. and Inst. Code § 5600.5.  Additionally they should be offered:  services for homeless persons, and group services Welf. and Inst. Code § 5600.4 (k)-(j).  Each of these sections provides the caveat that such services must be offered "to the extent resources are available." But resources *are* available.  As detailed *supra*, the County has hundreds of millions of dollars sitting in its MHSA fund, a $40 **billion** budget (of which only 0.1 percent funds the department of mental health, the minimum necessary to receive state and federal funds), and hundreds of millions of dollars in Measure H funds which told voters it would go towards "mental health" but fails to do so in any meaningful way.  And the County is quite literally leaving money on the table by not applying for reimbursable costs from the federal government.

125.   Under Welfare and Institutions Code sections 13000 *et seq.* and 14000*, et seq*.  Medi-Cal services must be provided by Counties, or cause to be provided by counties, for all services that are "medically necessary" which is defined as "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain."  Cal. Welf. & Inst. Code § 14059.5(a).  For Med-Cal members who are under 21 years of age, this includes any service "necessary to correct or ameliorate health conditions, including

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

69

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1  "behavioral health conditions."[115]  For members over the age of 21, this means

2  provision of specialty mental health services "who have significant impairment or

3  reasonable probability of functional deterioration due to a diagnosed or suspected

4  mental health disorder."[116] Counties must "provide or arrange for the provision"

5  of, *inter alia*, evaluation, testing, drug therapy, medication, and psychiatric

6  consultations.[117] Counties must also provide "psychiatric inpatient hospital

7  services and psychiatric health facility services" where the member has a

8  "[s]ignificant impairment" defined as "distress, disability, or dysfunction in

9  social, occupational, or other important activities" or "a reasonable probability of

10  significant deterioration in an important area of life functioning" and a

11  "diagnosed" or "suspected" mental health disorder.[118]  Its obligations for

12  members under the age of 21 are even higher.[119]  Additionally, Counties, as the

13  provider and administrator of Medi-Cal also has the obligation to provide

14  substance use treatment, including residential treatment and inpatient services

15  "when medically necessary" after evaluation and diagnosis.[120]  And Counties

16

17  [115] Memorandum from Dana Durham, Chief of the Managed Care Quality
18  and Monitoring Division of the State of California-Health and Human Services,
    Department of Health Care Services on Medi-Cal Managed Care Health Plan
    Responsibilities for Non-Specialty Mental Health Services to All MediCal
19  Managed Care Health Plans (Apr. 8, 2022),
20  https://www.dhcs.ca.gov/formsandpubs/Documents/MMCDAPLsandPolicyLette
    rs/APL2022/APL22-006.pdf.
    [116] *Id.*
21  [117] *Id.*
    [118] Memorandum from Shaina Zurlin, Medi-Cal Behavior Health of the
22  State of California Health and Human Services, Department of Health Care
    Services on Criteria for beneficiary access to Specialty Mental Health Services
23  (SMHS), medical necessity and other coverage requirements to California
    Alliance of Child and Family Services, *et al.* (Dec. 10, 2021),
24  https://www.dhcs.ca.gov/Documents/BHIN-21-073-Criteria-for-Beneficiary-to-
    Specialty-MHS-Medical-Necessity-and-Other-Coverage-Req.pdf.
25  [119] *Id.*
    [120] Memorandum from Shaina Zurlin, Medi-Cal Behavior Health of the
26  State of California Health and Human Services, Department of Health Care
    Services on Drug Medi-Cal Organized Delivery System (DMC-ODS)
27  Requirements for the Period of 2022 – 2026 to california Alliance of Child and
    Family Services, *et al.* (Dec. 17, 2021),
28  https://www.dhcs.ca.gov/Documents/BHIN-21-075-DMC-ODS-Requirements-
    for-the-Period-2022-2026.pdf.

70

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

1   have an obligation to "undertake outreach efforts to beneficiaries" to maintain

2   contact information and ensure continued enrollment.  Cal. Welf. & Inst. Code §

3   14005.36.

4       126.   In addition to its obligations as the provider and administrator of

5   Medi-Cal, California Welfare and Institutions Code section 17000 provides:

6   "Every county and every city and county shall relieve and support all

7   incompetent, poor, indigent persons, and those incapacitated by age, disease, or

8   accident, lawfully resident therein, when such persons are not supported and

9   relieved by their relatives or friends, by their own means, or by state hospitals or

10  other state or private institutions."

11      127.   Section 10000 clarifies and defines the purpose of these obligations

12  as follows:

> The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed.  It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life, and without discrimination on account of ancestry, marital status, political affiliation, or any characteristic listed or defined in Section 11135 of the Government Code. That aid shall be so administered and services so provided, to the extent not in conflict with federal law, as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society.

21  Cal. Welf. & Inst. Code § 10000.

22      128.   Sections 17000 and 10000 taken together mandate that "medical

23  care be provided to indigents . . . promptly and humanely."  *Tailfeather v. Board*

24  *of Supervisors*, 48 Cal. App. 4th 1223, 1245 (1996).  This means counties must

25  provide medical care to the poor "at a level which does not lead to unnecessary

26  suffering or endanger life or health."  *Id.* at 1240.  The California Supreme

27  Court has held that "subsistence medical services" must be provided. *Hunt v.*

28  *Superior Court*, 21 Cal. 4th 984, 1014 (1999) ("Section 10000 imposes a

71

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

minimum standard of care—one requiring that subsistence medical services be provided promptly and humanely.") Counties have an obligation to provide "'medically necessary care,' not just emergency care." *County of Alameda v. State Bd. of Control*, 14 Cal. App. 4th 1096, 1108 (1993) (citation omitted).  That includes care "sufficient to avoid substantial pain and infection." *Hunt*, 21 Cal. 4th at 1014.  Importantly, a county's obligation to provide medically necessary care must be fulfilled "without regard to its fiscal plight." *Fuchino v. Edwards-Buckley*, 196 Cal. App. 4th 1128, 1134 (2011) (citation omitted).

129.   Given the facts and circumstances, and significant studies, statistics, and reports including those set forth *supra*, and other such evidence as may be provided, it cannot be doubted that a person's status as an unsheltered homeless individual both causes and exacerbates physical and mental health problems, ultimately causing much higher rates of infection, disease, decay, pain, and death. As Dr. Barbara Ferrer, director of the LA County Department of Public Health, admitted: "Homeless people are in fact dying at a higher rate because they're homeless."[121]  Recognizing this, the LA County Department of Health Services has implemented limited program to provide housing as part of its larger healthcare obligation which has been wildly successful.  But unfortunately, it has not gone far enough to address the homeless crisis, which is ravaging the city and county, such that over 48,000 persons remain unsheltered in the County as of January 2019.

130.   Basic shelter is "medically necessary" insofar as it is "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain" and the County's failure to provide the same to its homeless population constitutes a breach of its duty under California Welfare & Institution Code sections 17000 and 10000.  Plaintiffs allege that

---

[121] Flores, *supra* note 82, https://la.curbed.com/2019/10/30/20940369/homeless-deaths-los-angeles-county.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

provision of shelter, in and of itself, would alleviate significant physical and mental health issues and prevent existing or pre-existing physical and mental health issues from worsening.  In other words, the beds themselves are medically necessary.

131.   Mental Health and Substance Use Disorder Treatment is further "medically necessary" and the failure to provide such treatment, particularly residentially treatment for those for whom shelter is not practically available to them because of their serious mental health or substance use disorder, in any reasonably accessible manner is a violation of the County's obligation under the Welfare & Institution Code.

132.   Defendant County is undoubtedly failing to provide the necessary mental health and substance use treatment, both outpatient and inpatient. Plaintiffs, and each of them, have been damaged by the County's failure to provide shelter and treatment, as described in detail *supra*.

## SECOND CAUSE OF ACTION

### Nuisance (Public and Private)

133.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 132 of this Complaint as though set forth fully herein.

134.   California has defined nuisance as

> [a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.

Cal. Civ. Code § 3479.

135.   As described above, the County, by its failure to provide the housing and services necessary to assist people experiencing homelessness, including

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

73

plaintiffs named herein, is perpetuating and facilitating nuisance violations. The Plaintiff and Alliance members own, lease, occupy, or otherwise control all or a portion of the home or business identified. By Defendant County's actions and inactions, it has created a condition or permitted a condition to exist that is harmful to the health, indecent and offensive to the senses, obstructs the free passage and use of public parks, squares, streets, highway, and sidewalks, permits unlawful sales of illicit narcotics, and constitutes a fire hazard, as described *supra*.

136. All Plaintiffs who own or rent property have experienced a substantial and unreasonable interference with the enjoyment of their property, whether that be a building owned or room rented; each have suffered and continue to be threatened with respect to their health and welfare, by reason of the constant threat of disease and the experience of human waste, trash, and encampments outside their property.

137. Defendant's conduct has been and is intentional and unreasonable, unintentional but negligent or reckless, and/or the condition permitted to exist was the result of abnormally dangerous activity which substantially interfered with each individual's use or enjoyment of his or her land that an ordinary person would reasonably be annoyed or disturbed by. No plaintiff or Alliance member consented to Defendants' conduct; each was harmed, Defendants' conduct was a substantial factor in causing the harm, and the seriousness of the harm outweighs any public benefit of such conduct (which is none). Each plaintiff and Alliance member has been damaged in his or her own right, in a manner specially injurious to him or herself.

138. Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only. As such the County is not entitled to any claims of immunity pursuant to California Government Code section 814.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

**THIRD CAUSE OF ACTION**

**Inverse Condemnation/Cal. Const. art. I § 19**

**(Plaintiffs Alliance, Burk, Tashdjian, and Frem)**

139.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 138 of this Complaint as though set forth fully herein.

140.   California Constitution, article I § 19 provides in relevant part: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."  The actions by the County in failing to treat those with mental illness and substance use disorder, and/or provide the necessary social services as required by law, have limited, damaged, and/or burdened the owners' property and/or business so substantially they rise to the level of a regulatory taking, yet no compensation has been provided.

141.   Plaintiffs seek compensation according to each of their separate damages, in addition to injunctive relief and any other relief accorded to Plaintiffs as appropriate in this case.

**FOURTH CAUSE OF ACTION**

**Waste of Public Funds and Resources**

**Cal. Civ. Proc. Code § 526a**

142.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 141 of this Complaint as though set forth fully herein.

143.   California Code of Civil Procedure section 526a permits private individuals or entities to bring an action to "obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency."

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

75

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

144. Plaintiffs and Alliance members, each of them, are residents of the County of Los Angeles and/or own property and/or businesses therein and pay income tax, sales tax, property tax, and/or business license taxes and therefore having standing to bring an action under section 526a. Payment of these taxes have been significant, and a hardship, but Plaintiffs continue to do so. In particular payment of Measure H's quarter-cent sales tax has impacted business and quality of life, but Plaintiffs continue to do so.

145. As described more fully *supra*, taxpayer funds have been misused and wasted by the County of Los Angeles, such they are incapable of achieving the ostensible goal of addressing the homelessness crisis in any significant way, much less "ending" it. Such expenditures, particularly when taken in the aggregate, cost several factors more than alternative available measures which are demonstrably effective in addressing the crisis.

146. Measure H was promoted as complimentary to the City's Proposition HHH, and passed by the electorate to address the homelessness crisis to provide mostly services in a comprehensive and effective way. Instead, the County uses its dollars mostly to fund housing, and the promised services are nowhere to be found. And homelessness has steadily increased in the County.

147. Hundreds of millions of dollars sits unused in the County's MHSA account while the mentally ill—for whom the special tax was created—go untreated on the street. The County Mental health department is unsupported and underfunded by the County, and the County's MH-MAA reimbursement rates remains far too low. As further detailed *supra*, the County has spent enormous amounts of public funds on the homelessness crisis in ways that have had little or no effect on the crisis, and thereby wasted those public funds.

148. Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only. As such the County is not entitled to any claims of immunity pursuant to California Government Code section 814.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

76

# FIFTH CAUSE OF ACTION

## Violation of Statutorily-Created Liberty Interest

## 42 U.S.C. § 1983; U.S. Const. amend. V/XIV

149.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 148 of this Complaint as though set forth fully herein.

150.   As described in detail *supra*, the County has numerous statutory obligations which require it to provide health, mental health, and substance use disorder services and treatment, including inpatient, residential, and outpatient treatment, and shelter where medically necessary.

151.   Through these statutes, the State of California has created a liberty interest in adequate and available substance use disorder treatment, mental health treatment and shelter.  These statutes set forth substantive predicates to govern official decision-making and contain explicitly mandatory language, are mandatory, and place substantive limitations on official discretion.

152.   Moreover, the County has intentionally and explicitly accepted responsibility for providing services and treatment to persons experiencing homelessness and has created specific taxes and holds specific accounts for such a person as detailed *supra*.

153.   The County of Los Angeles, by depriving Plaintiffs of their liberty interest in mandatory care contemplated under the aforementioned statutes and by failing to offer or provide a reasonable means by which persons experiencing homelessness in need of such care may seek or receive it, has violated the Due Process clause of the United States Constitution.

154.   Plaintiffs are informed, believe and allege that, at all times herein mentioned, Defendant County of Los Angeles and its respective agents, with deliberate indifference, and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiffs, engaged in the

1    unconstitutional conduct and omissions set forth above, all pursuant to policy,

2    procedure, or customs held by the County of Los Angeles.

3        155.   The actions and inactions of the County of Los Angeles were known

4    or should have been known to the policy makers responsible for that agency and

5    occurred with deliberate indifference to the constitutional violations set forth

6    above, and/or to the strong likelihood that constitutional rights would be violated

7    as a result of its customs and/or policies.

8        156.   Plaintiffs seek an award of compensatory damages, injunctive relief,

9    and the cost of attorneys' fees in bringing this action.

### SIXTH CAUSE OF ACTION

### Violation of Due Process Clause (State-Created Danger Doctrines)

### 42 U.S.C. § 1983; U.S. Const. Amend. 14

13       157.   Plaintiffs re-allege and incorporate herein by this reference each and

14   every allegation set forth in paragraphs 1 through 156 of this Complaint as

15   though set forth fully herein.

16       158.   By the acts and omissions described above, Defendant has

17   affirmatively created and/or increased the risk that Plaintiffs would be exposed to

18   dangerous conditions, which placed Plaintiffs specifically at risk, and Plaintiffs

19   were harmed as a result.  The County created and/or contributed to the danger to

20   them and others like them by adopting and maintaining various policies and laws,

21   including but not limited to concentrating services in known dangerous areas,

22   coalescing in a strategy to contain homeless people in Skid Row which

23   specifically endangered Plaintiffs and were deliberately indifferent thereto.  The

24   County created a further danger by focusing nearly exclusively on so-called

25   permanent housing options without balancing interim and emergency needs,

26   which could not ever meet the ostensible goal, and caused more people to remain

27   unsheltered, exacerbating or causing significant mental and physical decline at

28   such a rate that outpaces the building and provision of such units.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

78

159.    Defendant knew or should have known that its acts or omissions specifically endangered Plaintiffs and were deliberately indifferent thereto.

160.    Plaintiffs are informed, believe and allege that, at all times herein mentioned, Defendant County of Los Angeles and its respective agents, with deliberate indifference, and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiffs, engaged in the unconstitutional conduct and omissions set forth above, all pursuant to policy, procedure, or customs held by the County of Los Angeles.

161.    The actions and inactions of the County of Los Angeles were known or should have been known to the policy makers responsible for that agency and occurred with deliberate indifference to the constitutional violations set forth above, and/or to the strong likelihood that constitutional rights would be violated as a result of its customs and/or policies.

162.    Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

**SEVENTH CAUSE OF ACTION**

**Uncompensated Taking**

**U.S.C. § 1983; U.S. Const. Amend. V/XIV**

**(Plaintiffs Alliance, Burk, Tashdjian, and Frem)**

163.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 161 of this Complaint as though set forth fully herein.

164.    The Fifth Amendment mandates, in relevant part, that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.  The Fifth Amendment is applied to the states through the Fourteenth Amendment. *Chicago, Burlington, & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226 (1897).  The actions by the County, as described in detail *supra,* have limited, damaged, and/or burdened the property owners' so

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

79

substantially they rise to the level of a regulatory taking, yet no compensation has been provided.

165.   Upon information and belief, this was done with deliberate intent and/or reckless disregard of Plaintiffs' rights.  Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

166.   Plaintiffs are informed, believe and allege that, at all times herein mentioned, Defendant County of Los Angeles and its respective agents, with deliberate indifference, and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiffs, engaged in the unconstitutional conduct and omissions set forth above, all pursuant to policy, procedure, or customs held by the County of Los Angeles.

167.   The actions and inactions of the County of Los Angeles were known or should have been known to the policy makers responsible for that agency and occurred with deliberate indifference to the constitutional violations set forth above, and/or to the strong likelihood that constitutional rights would be violated as a result of its customs and/or policies.

168.   Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

## VI.  PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendant as follows:

1.   Injunctive/equitable relief in a manner to be determined by law;

2.   As to the federal claims and claims under the California constitution only, compensatory damages and other special, general and consequential damages according to proof;

3.   An award of costs of suit, including attorneys' fees; and

4.   Such other and further relief as this Court deems just and proper.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

1

## VII.  DEMAND FOR JURY TRIAL

2       Plaintiffs hereby demand a jury trial.

3    Dated: July 15, 2022          */s/ Elizabeth A. Mitchell*
                                    SPERTUS, LANDES & UMHOFER, LLP
4                                   Matthew Donald Umhofer (SBN 206607)
                                    Elizabeth A. Mitchell (SBN 251139)
5                                   *Attorneys for Plaintiffs*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

ER 289

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                     Date:  June 23, 2022

Title: LA ALLIANCE FOR HUMAN RIGHTS et al. v. CITY OF LOS ANGELES et al.

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

| Karlen Dubon | Not Present |
|:---:|:---:|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|:---:|:---:|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):   ORDER RE: AMENDED COMPLAINT**

On June 14, 2022, the Court approved the Stipulated Dismissal and Proposed Settlement between Defendant City of Los Angeles and Plaintiffs LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karyn Pinsky, Charles Malow, Charles Van Scoy, George Frem, and Leandro Suarez (collectively "Plaintiffs") (Dkt. 445). Plaintiffs previously represented to the Court their intention to file an amended complaint after the stipulated dismissal was finalized (Dkt. 437). Accordingly, if Plaintiffs intend to file an amended complaint, that filing is due by Friday, July 15, 2022.

The Clerk shall serve this minute order on the parties.

Initials of Deputy Clerk: kdu

MINUTES FORM 11
CIVIL-GEN

**ER 290**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS ET AL., | Case No. LA CV 20-02291-DOC-KES |
| Plaintiff, | |
| vs. | ORDER APPROVING STIPULATED |
| | DISMISSAL AND PROPOSED |
| CITY OF LOS ANGELES ET AL., | SETTLEMENT [421] |
| Defendants. | |

-1-

On May 19, 2022, Defendant City of Los Angeles ("City") and Plaintiffs LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karyn Pinsky, Charles Malow, Charles Van Scoy, George Frem, and Leandro Suarez (collectively "Plaintiffs") filed a Stipulated Order of Dismissal and Exhibit 1, their Settlement Agreement (Dkt. 421). In their Stipulated Order, the parties informed the Court that they had reached a Settlement subject to the Court's approval of the terms; and dismissal with prejudice as to Defendant City of Los Angeles. The parties have requested that the Court retain jurisdiction to enforce the terms of the Settlement Agreement for a period of five years.

The parties have been aggressively litigating this case for over two years. In the process, they have generated a voluminous record comprised of several pre-trial hearings, orders, and a preliminary injunction. In the first year of litigation, the parties participated in multiple mediation sessions, including on June 12, 2020 (Dkt. 133); June 25, 2020 (Dkt. 141); September 10, 2020 (Dkt. 170); September 24, 2020 (Dkt. 179); and October 8, 2020 (Dkt. 184). These sessions resulted in a partial Memorandum of Understanding between the City and County of Los Angeles, with the City committing to create 6,700 beds in 18 months to prioritize sheltering unhoused people living by highways (Dkts. 136, 138). Just this year, the parties went to mediation sessions on February 15 (Dkt. 388), February 16 (Dkt. 394), February 22 (Dkt. 395), March 1 (Dkt. 397), and March 29, 2022 (Dkt. 401).

The agreement before the Court was not achieved in haste—it was the result of long and deliberate good-faith negotiations. In fact, the City and Plaintiffs have worked diligently to expand the barebones framework articulated in their Preliminary Settlement Agreement (Dkt. 408) to a more fleshed-out plan to partially combat homelessness in Los Angeles.

The Settlement Agreement creates a structure and enforcement mechanism for the City to create a substantial number of new beds for people experiencing homelessness. While this Agreement is not a solution to homelessness, it is a concrete step toward improving the lives of our neighbors who are currently suffering on the streets.

Procedurally, the Settlement Agreement does not affect the rights or obligations of non-settling parties or non-parties. As the City confirmed in its Reply, "nothing in the Court's order

affects any rights of the County or the Intervenors," and it does not prejudice the rights of other non-parties with respect to future challenges to City ordinances or suits on related issues. *See* City Reply (Dkt. 438) at 5. In particular, the Section titled, "County Obligations" imposes no responsibilities on the County of Los Angeles because they are not party to this Agreement—as the City notes, "[t]hese agreements are nothing more than Plaintiffs and the City's expressions of (a) their beliefs concerning the County, and (b) their intent to cooperate regarding their opined County's obligations." *Id.* at 7. In addition, the Settlement Agreement does not affect the parties' obligations under state or federal law, including state or federal disability law.

Having reviewed the Settlement Agreement and the parties' briefing, the Court finds that the Settlement Agreement is fair, reasonable, and adequate. Accordingly, the Court now approves the Settlement Agreement executed by the parties and attached as Exhibit 1, which is now incorporated in full into the Court's Order as though fully set forth herein. The Court shall retain jurisdiction for a period of five years to enforce the terms of the Settlement Agreement. Per the parties' agreement, the Court appoints Special Master Michele Martinez as the Monitor of the Settlement Agreement to assist the Court in overseeing and enforcing this Agreement.

Plaintiffs' claims against the City only, as alleged in the First Amended and Supplemental Complaint, are hereby dismissed with prejudice as to the City only, subject to the Court's retention of jurisdiction as set forth in Exhibit 1. This Action shall proceed against the County and no claims alleged by Plaintiff Gary Whitter are dismissed by this Order. Except as expressly provided otherwise in the Settlement Agreement, Plaintiffs and the City shall bear their own fees and costs in this Action.

The Clerk shall serve this minute order on the parties.

DATED: June 14, 2022

_David O. Carter_

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

-3-

ER 293

No. _____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

In re: COUNTY OF LOS ANGELES

*Petitioner,*

v.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Western Division - Los Angeles)

*Respondent.*

LA ALLIANCE FOR HUMAN RIGHTS, et al.

*Real Parties in Interest.*

_____

On Petition for a Writ of Mandamus in
Case No. 2:20-cv-02291 (C.D.Cal.)

_____

## EXCERPTS OF RECORD

## VOLUME 3
_____

**OFFICE OF COUNTY COUNSEL**
Dawyn R. Harrison (SBN 173855)
*Interim County Counsel*
Katherine M. Bowser (SBN 230626)
*Assistant County Counsel*
Ana Wai-Kwan Lai (SBN 257931)
*Senior Deputy County Counsel*
alai@counsel.lacounty.gov
500 West Temple Street, Suite 468
Los Angeles, California 90012
Telephone: (213) 974-1830
Facsimile: (213) 626-7446

**MILLER BARONDESS, LLP**
Louis R. Miller (SBN 54141)
* Mira Hashmall (SBN 216842)
mhashmall@millerbarondess.com
Nadia A. Sarkis (SBN 227778)
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Ave.
Santa Monica, California 90401
Tel:  (31) 393-3055
Email: carolsobel@aol.com

Shayla R. Myers (SBN 264054)           Catherine Sweetser (SBN 271142)
**LEGAL AID FOUNDATION**               **SCHONBRUN SEPLOW HARRIS**
**OF LOS ANGELES**                     **& HOFFMAN, LLP**
7000 S. Broadway                       11543 W. Olympic Blvd.
Los Angeles, CA 90003                  Los Angeles, CA 90064
Tel: (213) 640-3983                    Tel:  (310) 396-0731
Email: smyers@lafla.org                Email: catherine.sdshhh@gmail.com

*Attorneys for Intervenors Los Angeles Community Action Network and Los
Angeles Catholic Worker*

*Additional Counsel Listed Below*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al. <br><br>          Plaintiff(s), <br><br>      vs. <br><br> City of Los Angeles, et. al. <br><br>          Defendant(s). | CASE NO. 20-CV-02291-DOC-KES <br><br> Hon. David O. Carter <br> Courtroom 1 <br><br> INTERVENORS' OBJECTIONS TO PLAINTIFFS' AND DEFENDANT CITY OF LOS ANGELES'S STIPULATED ORDER OF DISMISSAL <br><br> Date: June 11, 2022 <br> Time: 9:00 a.m. <br><br> Complaint Filed:  March 10, 2020 |

_ INTERVENOR'S OBJECTIONS TO PROPOSED ORDER OF DISMISSAL

*Additional Counsel*

**BROOKE WEITZMAN** SBN 301037
**WILLIAM WISE** SBN 109468
ELDER LAW AND DISABILITY
RIGHTS CENTER
1535 E 17th Street, Suite 110
Santa Ana, California 92705
t. 714-617–5353
e. bweitzman@eldrcenter.org
e. bwise@eldrcenter.org

*Attorneys for Orange County Catholic Worker*

2

## <u>Table of Contents</u>

I.    INTRODUCTION ................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND ......................................2

III.  LEGAL STANDARD ..........................................................................5

a.   The "Stipulated Order" is a Consent Decree ....................................5

b.   Legal Standard for Entering Orders That Maintain Jurisdiction to Enforce
Settlement Agreements (or Consent Degrees) .........................................5

IV.  ARGUMENT ...................................................................................7

a.   The Court Lacks Jurisdiction to Approve the Consent Decree .......................7

b.   The Proposed Consent Decree Impermissibly Infringes on the Rights of
Third Parties, Including Intervenor ......................................................13

c.   The Proposed Agreement Is Procedurally Unfair Because Section Four Was
Not Negotiated at Arms Length ........................................................16

d.   The Settlement Agreement Allows Discrimination on the Basis of Disability
in Violation of the Federal and State Anti-Discrimination Law .........................17

e.   The Settlement Agreement is Incomprehensible and Too Vague to be
Enforceable ...............................................................................20

V.   CONCLUSION ...............................................................................24

i

---

**Intervenors' Objections to Proposed Order of Dismissal**

# TABLE OF AUTHORITIES

**Federal Cases**

*Ashwander v. Tennessee Valley Authority*, 297 U.S. 288 (1936) ........................ 12

*Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of*
  *Health and Human Resources*, 532 U.S. 598 (2001) ............................................ 5

*Baker v. Carr*, 369 U.S. 186 (1962) ...................................................................... 11

*Conservation Northwest v. Sherman*, 715 F.3d 1181 (9th Cir. 2013) ............... 6, 20

*E.E.O.C. v. Pan Am. World Airways, Inc.,* 897 F.2d 1499 (9th Cir. 1990) ........... 14

*Garcia v. City of Los Angeles*, 2:19-cv-06182-DSF-PLA ..................................... 8

*Hansberry v. Lee*, 311 U.S. 32 (1940) ................................................................... 14

*LA Alliance for Human Rights v. City of Los Angeles,*
  14 F.4th 947 (9th Cir. 2021) ................................................................................ 12

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
  478 U.S. 501 (1986) ...................................................... 6, 7, 10, 11, 13

*Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019) .................................... 9, 12

*Martin v. Wilks*, 490 U.S. 755 (1989) ..................................................................... 6

*Mitchell v. City of Los Angeles*, 16-CV-01760-SJO (JPR) ................................... 15

*Moore v. Charlottte-Mecklenburg Board of Education,* 402 U.S. 47 (1971) ........ 11

*Orange County Catholic Worker v. County of Orange,* 18-CV-00155-DOC-JDE ..2

*Perkins v. City of Chicago Heights*, 47 F.3d 212 (7th Cir. 1995) ......................... 19

*Raines v. Byrd*, 521 U.S. 811 (1997) ..................................................................... 11

*San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121 (9th Cir. 1996) ........ 9

*SEC v. Randolph*, 736 F.2d 525 (9th Cir. 1984) .................................................. 6, 7

*Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350 (9th Cir.1990) ..... 6,

*Sierra Club v. McCarthy*, 2015 WL 889142, at *5 (N.D.Cal., 2015) ................... 16

*Sierra Club v. North Dakota*, 868 F.3d 1062 (9th Cir. 2017) ............................... 13

*Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134 (9th Cir. 2000) ..10,12

*U.S. v. City of Miami*, 664 F.2d 435 (5th Cir. 1981) .............................................. 6.

ii

*U.S. v. Colorado*, 937 F.2d 505 (10th Cir. 1991) ...................................................16

*U.S. v. Montrose Chem. Corp. of Ca.,* 50 F.3d 741 (9th Cir. 1995) ......................,5

*U.S. v. New York City Housing Authority,* 347 F. Supp.3d. 182

   (S.D.N.Y. 2018) ..........................................................................................21

*U.S. v. State of Or.*, 913 F.3d 576 (9th Cir. 1990) ................................5, 6,7,16, 17

*U.S. v. Telluride Co.*, 849 F. Supp. 1400 (D.Colo.1994) ......................................16

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983)..............................................5

**Federal Statutes**

29 U.S.C. § 794(a) .................................................................................................19

42 U.S.C. § 3604(f)(1)...........................................................................................18

42 U.S.C. § 12131 .................................................................................................18

**State Statutes**

Cal. Civ. Code §§ 51 et seq 2 ................................................................................19

Cal. Gov't Code § 11135(b) ..................................................................................19

Cal. Gov't Code  § 12926.1 ...................................................................................19

 **Ordinances**

Los Angeles Municipal Code, Chapter IV, Article 1, Disorderly Conduct,

   Places and Publications.......................................................................................8

Los Angeles Municipal Code, Chapter V, Article 6,

   Public Hazards....................................................................................................8

Los Angeles Municipal Code Section 41.18 ............................................................9

Los Angeles Municipal Code Section 51.03 ..........................................................19

Los Angeles Municipal Code Section 56.11 ............................................................8

**Rules**

Fed. R. Civ. Pro. 24 ...............................................................................................13

iii

**Intervenors' Objections to Proposed Order of Dismissal**

## I.    INTRODUCTION

The City of Los Angeles, which has been repeatedly enjoined by federal courts from violating the constitutional rights of people experiencing homelessness, and a private group of property owners and residents, who have long decried these court decisions and brought this case in part to undermine those rulings, have now reached an agreement that, unsurprisingly, attempts to obtain judicial approval to do just that. Intevenors Los Angeles Community Action Network (LA CAN), LA Catholic Worker, and Orange County Catholic Worker object to the Court's entry of the proposed "stipulated order of dismissal."  The agreement, which was negotiated only by the City and the Plaintiffs, to the exclusion of all other parties to the case, purports to trade the creation of an as-of-yet undetermined number of shelter beds, by an as-of-yet undetermined deadline, for this Court's permission to enforce as-of-yet unwritten and otherwise undefined regulations and ordinances against unhoused residents, including LA CAN members intervenors, none of whom are parties to this agreement.

As outlined below, this agreement cannot be approved by this Court. The agreement runs afoul of numerous requirements that must be met before a court can enter a consent decree.  First, and most importantly, the agreement does not fall within the Court's subject matter jurisdiction. Plaintiffs do not have standing to seek the relief proposed in the agreement, the basis for the relief is too hypothetical and abstract, and there is no case or controversy between the parties that would give the Court jurisdiction to enter the proposed agreement.  Second, the agreement impermissibly impacts the rights of third parties who are not a party to the agreement, and relatedly, the agreement is procedurally unfair because the parties' agreement was not forged as part of an adversarial proceeding.  Third, the agreement runs afoul of federal, state, and even local disability law.  And finally, the agreement is so vague and ambiguous that it would effectively be unenforceable if it was entered as drafted.  For all of these reasons, the agreement as drafted cannot be approved by the Court.

**Intervenors' Objections to Proposed Order of Dismissal**

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The LA Alliance filed this lawsuit in March 2020, after reaching out to the City because it believed the parties "interests [were] aligned" and the City may be a "willing party" to the suit because "[i]mpact litigation can go far in providing political cover or breaking down barriers to get things done."  Request for Judicial Notice (RJN), Exh. 1.  Within three months, the LA Alliance filed this lawsuit, alleging claims for public and private nuisance and related constitutional violations.  Dkt. 1.  Plaintiffs "sought out" this Court to preside over the litigation[1] and although Plaintiffs did not bring any constitutional challenges to the enforcement of quality of life ordinances or even, at that point, represent people experiencing homelessness, they still related the case to *Orange County Catholic Worker, et al. v. County of Orange*, 18-CV-00155-DOC-JDE ("OCCW"), asserting that it was appropriate given the Court's experience in deciding issues such as "the sufficiency of number of beds needed to resume enforcement of certain quality of life laws under *Martin v. Boise.*"  Dkt. 10 at 3.

Almost immediately after the case was filed, Orange County Catholic Worker, Los Angeles Community Action Network, and Los Angeles Catholic Worker moved to intervene as a matter of right under Federal Rule of Civil Procedure 24(a) as well as under 24(b).The Court granted both motions.  *See* Dkt. 18 (granting Orange County Catholic Worker's motion to intervene); Dkt. 29 (granting Los Angeles Catholic Worker and Los Angeles Community Action Network's (LA CAN)'s motion to intervene).  In granting LA CAN and LA Catholic Worker's motion, the Court found that LA CAN's unhoused members "have a protectable interest to be free from

---

[1]Oreskes, Benjamin, Alpert Reyes, Emily, and Smith, Doug, "Judge Orders L.A. city and count ot offer shelter to everyone on skid row by fall," LA Times, April 20. 2021, available at https://www.latimes.com/homeless-housing/story/2021-04-20/judge-carter-la-city-county-shelter-skid-row-homeless-fall.  Instead of relating the case to other litigation already filed against the City of Los Angeles related to the enforcement of "public space regulations,".  Neither the City nor the County objected to the relation.

**Intervenors' Objections to Proposed Order of Dismissal**

1   increased enforcement and the violation of their constitutional rights," and that there
2   was "no other representation of unsheltered homeless people in Los Angeles, who are
3   most likely to be impacted by any proposed remedies in this case."  Dkt. 29 at 4, n. 1.

4           Even before the defendants were served, this Court began holding hearings
5   related to homelessness and COVID-19, and in the course of those hearings, the parties
6   immediately agreed to stay litigation and enter into settlement negotiations.  *See* Dkt.
7   39 at 116.  From the beginning, those negotiations focused on setting a threshold
8   number of housing and shelter units that the City would need to create in order for the
9   City to be obtain the Court's blessing to begin enforcing "quality of life" offenses like
10  anti-camping bans; and in doing so, circumvent existing litigation and prevent future
11  litigation.  *See e.g.,* Dkt. 39 at 69 (describing the 60% threshold and discussing how
12  consent decrees entered in other cities related to the Orange County litigation had
13  "absolutely flattened the litigation").  Although Intervenors attempted to participate in
14  the settlement negotiations to advocate for policy solutions that would address the
15  homelessness crisis, Intervenors objected to the parties' attempt to use the litigation to
16  secure judicial permission to enforce quality of life ordinances that were not actually
17  before the Court or to undermine judicial rulings that protected unhoused people's
18  constitutional rights.  Intervenors were quickly excluded from negotiations between
19  the City and the Plaintiffs.  Even after the parties were ordered to attend mandatory
20  settlement conferences earlier this year, the negotiations between Plaintiffs and the City
21  remained behind closed doors.

22          On April 1, 2022, Intervenors learned that the City and Plaintiffs had reached a
23  settlement agreement, only after the parties announced an invitation-only press
24  conference at City Hall.  Intervenors were excluded from even attending, and unlike
25  every other closed door press conference held during COVID-19, the City did not even
26  live-stream the press conference on its social media channels.  That afternoon, the City
27  filed a "term sheet" related to the proposed settlement.  *See* Dkt. 408-1.

28

3

**Intervenors' Objections to Proposed Order of Dismissal**

On May 10, 2022, after the City Council agenized the case for another closed session, Intervenors reached out to Plaintiffs and the City to inquire about the timing of the settlement and briefing on the approval of the agreement, including meeting and conferring pursuant to Local Rule 7.3. *See* Myers Dec. ¶ 2. Neither party even acknowledged the communication for over a week. At the end of the day on May 19, 2022, the day before Plaintiffs' and the City's deadline to submit the final agreement, counsel for the City responded that the were not obligated to even meet and confer with Intervenors and would not be filing a motion seeking approval; instead, the parties would simply be stipulating for the dismissal of the City from the case. *Id.,* ¶ 3. At 9:46 p.m., Plaintiffs filed a notice of lodging and lodged a document titled a "[Proposed] Stipulated Order of Dismissal under Federal Rule of Civil Procedure . *See* Dkt. 421, 421-1 ("Agreement"). This was the first time Intervenors received a copy of the proposed order or settlement agreement *Id.* ¶ 4.

Just as the City and Plaintiffs had telegraphed when the case was filed over two years ago, the agreement mirrors the settlement agreements in the Orange County litigation, even though the facts, legal claims, and basis for Article III jurisdiction in this case do not. The proposed agreement provides that 1) the City "agrees to create a Required Number of housing or shelter solutions, which is equal to . . . the shelter and/or capacity shelter solutions needed to accommodate sixty percent of the unsheltered City Shelter appropriate PEH within the City based on LAHSA's 2022 Point in Time Count" and 2) "once there are sufficient shelter or housing solutions to accommodate 60% of unsheltered City Shelter appropriate PEH" in a given council district or citywide, the agreement gives the City permission to enforce "public space regulations and ordinances" throughout the district or the city. Agreement at 5, 6, 7. Under the agreement, this Court retains jurisdiction to both enforce the agreement and to provide oversight over its implementation. Agreement at 4. Section 4.2 and 4.3 provide a mechanism for Plaintiffs, and only Plaintiffs, to challenge the City's

determination that it may enforce "public space regulations and ordinances." Agreement at 7, 8.

### III.   LEGAL STANDARD

#### a.   The "Stipulated Order" is a Consent Decree

Regardless of the name given to it by the parties, the "[Proposed] Stipulated Order of Dismissal," lodged by Plaintiffs on May 19, 2022 is a consent decree. "A consent decree is 'essentially a settlement agreement subject to judicial policing,'" *United States v. State of Or.*, 913 F.3d 576, 580 (9th Cir. 1990) quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983).  The parties request this Court, as a condition of dismissal, to incorporate the settlement into the "order of dismissal,"  Dkt. 421-1 at 2, and to "retain[] exclusive jurisdiction" for five years to enforce it.  *See e.g.*, *Oregon*, 913 F.3d at 580 (noting that "[c]onsent decrees are often designed to be carried out over a number of years").  The agreement also gives the Court significant oversight of the City's compliance with the order.  *See e.g.,* Agreement at 4 (providing that the Court will maintain continuing jurisdiction to "oversee and enforce" the agreement, including to appoint "at its sole discretion" a Special Mater responsible for "overseeing and Enforcing this Agreement); 11 and 12 (creating a mechanism for the Court to approve the City's implementation of "public space regulations and ordinances" in a given City Council District or City-wide); 18 (giving the Court oversight over whether the consent decree conflicts with orders issued by other courts); 23 (giving the Court oversight to decide disputes between the parties).  These are hallmarks of a consent decree, judicial approval and ongoing judicial oversight, are present in the agreement. *See Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 604 n. 7 (2001) ("Private settlements do not entail the judicial approval and oversight involved in consent decrees").

#### b.  Legal Standard for Entering Orders That Maintain Jurisdiction to Enforce Settlement Agreements (or Consent Degrees)

Because the parties request the Court enter an order incorporating the terms of the settlement and retain jurisdiction to enforce it (i.e., enter a consent decree), the

5

---

Court may not simply "rubber stamp" the agreement, *U.S. v. Montrose Chem. Corp. of Ca.,* 50 F.3d 741, 747 (9th Cir. 1995) or enter the order of dismissal without reviewing the terms of the agreement.  "[A] federal court is more than a recorder of contracts from whom parties can purchase injunctions; it is an organ of government constituted to make judicial decisions." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986) (citations and quotations omitted)).  Because the parties are requesting the court retain jurisdiction to enforce the terms of the agreement and oversee its implementation, the proposed agreement must "spring from and serve to resolve a dispute within the court's subject matter jurisdiction.  Furthermore, consistent with this requirement, the consent decree must come within the general scope of the case made by the pleadings." *Id*.

    If the agreement falls within the Court's Article III jurisdiction, the Court must still determine that the decree is "fair, reasonable and equitable and does not violate the law or public policy." *Sierra Club, Inc. v. Elec. Controls Design, Inc*., 909 F.2d 1350, 1355 (9th Cir.1990).  *See also Martin v. Wilks*, 490 U.S. 755, 787 n. 26 (1989) (J. Stevens, dissenting) ("The court reviews the consent decree to determine whether it is lawful, reasonable, and equitable.").  When determining whether an agreement is fair, the Court must look at both substantive fairness and procedural fairness, including ensuring that the "consent decree was the product of good faith, arms-length negotiations." *Oregon*, 913 F.3d at 581 (citing *United States v. City of Miami*, 664 F.2d 435, 439, 441 (5th Cir. 1981)(en banc)(per curiam)(Rubin, J., concurring).  Moreover, "a district court may not approve a consent decree that 'conflicts with or violates' an applicable statute." *Conservation Northwest v. Sherman*, 715 F.3d 1181, 1185 (9th Cir. 2013) (quoting *Local 93*, 478 U.S. at 526).  *See also SEC v. Randolph*, 736 F.2d 525, 528 (9th Cir. 1984)(citing *Miami*, 664 F.2d at 435 with approval) ("because it is a form of judgment, a consent decree must conform to applicable laws").

    Finally, as is the case here, "a consent decree that affects the public interest or third parties imposes a heightened responsibility on the court to protect those interests,"

6

---

**Intervenors' Objections to Proposed Order of Dismissal**

and while the decree must not be "in the public's *best* interest," the Ninth Circuit has been clear that "this requirement is intended to protect those who did *not* participate in negotiating the compromise." *Oregon*, 913 F.2d at 581 (internal citations omitted) (emphasis in original); *cf Randolph*, 736 F.2d at 529 (affirming that consent decrees must be in the public interest but remanding after the denial of an agreement because the District Court set too high a standard for its review).

## IV.   ARGUMENT

### a.  The Court Lacks Jurisdiction to Approve the Consent Decree

Because federal courts are courts of limited jurisdiction, a court that maintains jurisdiction over a settlement agreement may do so only when the agreement falls within the Court's limited jurisdiction. As the Supreme Court held in *Local No. 93*, a "consent decree must spring from and serve to resolve a dispute within the court's subject matter jurisdiction." \478 U.S. at 525 (internal citation omitted).

Despite this longstanding rule, the City and Plaintiffs seek judicial approval of a provision of the agreement that explicitly grants permission to the City to implement and enforce undefined and theoretical municipal ordinances against third parties (including Intervenor's members), in a case where no one has alleged that the City is actually enforcing the ordinances, and certainly not that the City has enforced or even threatened enforcement of any regulations or ordinances against any of the Plaintiffs.[2] There is no basis under Article III for doing so.

Section Four of the Agreement purports to give the City permission to implement and enforce euphemistically-entitled "public space regulations and

---

[2] It remains an open question whether Plaintiffs even have standing to bring any claims on behalf of anyone experiencing homelessness. Both the City and the County raised the question of Plaintiffs' standing in Motions to Dismiss that were filed in January 2022 and which are currently pending before this Court. The County requested permission to begin discovery, and Intervenors requested the Court allow the parties to do limited discovery regarding Plaintiffs' standing before filing objections to the proposed consent decree. Both requests were denied. *See* Myers Decl., Exh. A.

7

---

**Intervenors' Objections to Proposed Order of Dismissal**

ordinances" against people experiencing homelessness. The settlement states that, following the creation of some currently unknown number of "shelter or housing solutions," which includes congregate shelter beds, family unification, and safe camping sites, the City "may implement and enforce public space regulations and ordinances" first in individual council districts and then throughout the City, "as to individuals who decline an offer of shelter or housing and/or decline to move to an alternative location where they may legally reside." Agreement at 5, 6. For a number of reasons, this section does not relate to or revolve a dispute within the subject matter of the Court, and therefore, the agreement cannot be approved.

As an initial matter, the term "public space regulations and ordinances" is meaningless. Although the settlement agreement has a defined terms section, the agreement does not spell out what this term means, let alone what provisions of the municipal code constitute "public space regulations and ordinances." As the City is quick to point out, the City has a whole host of municipal ordinances that fit this description.[3] *See e.g.,* Request for Judicial Notice (RJN), Exh 2, Los Angeles Municipal Code (LAMC) Chapter IV, Article 1, Disorderly Conduct, Places and Publications; RJN, Exh. 3, LAMC Chapter V, Article 6, Public Hazards. Certainly the agreement cannot be read as limiting the enforcement of these ordinances until the City builds the "Required Number" of shelter beds. Yet the agreement provided no further hint in the language of the settlement agreement about which public space regulations

---

[3] As the parties and this Court are aware, one of the City's public space regulations, Los Angeles Municipal Code Section 56.11, is the subject of other federal litigation pending in this district. That litigation, *Garcia v. City of Los Angeles*, 2: 2:19-cv-06182-DSF-PLA, was filed almost a year before this case and neither the City nor Plaintiffs identified that case as related. This court has repeatedly made clear that the ordinance at issue in *Garcia* and the challenges to that ordinance do not fall within this Court's jurisdiction, *see e.g.*, Myers Decl., Exh A at 18. Yet the draft agreement is written so broadly that it could be interpreted as including LAMC 56.11 in the broad grant of approval of the enforcement of "public space regulations and ordinances."

**Intervenors' Objections to Proposed Order of Dismissal**

1   are government by the agreement.   And the First Amended and Supplemental

2   Complaint provides no clear guidance either, because the lawsuit does not challenge

3   the enforcement of any of these regulations.   In fact, it does not challenge the

4   enforcement of *any* regulation or ordinance.

5         Even if the undefined term is read in the context of this case to apply narrowly

6   to quality of life offenses that target people experiencing homelessness, the City's

7   ability to enforce "public space regulations and ordinances" does not fall within the

8   court's subject matter jurisdiction because no plaintiff in this case alleges they were

9   subjected to enforcement of any "public space regulation and ordinances."   This

10  includes the current version of LAMC 41.18, which is one specific ordinance that the

11  agreement references.   The agreement refers to this as a "time/manner/place

12  regulation" (ostensibly distinguishing it from other "public space regulations and

13  ordinances" that can be enforced at any time) and with no factual or legal support, gives

14  judicial approval of the ordinance and its enforcement.  *See* Agreement at 7, 8 (stating

15  that LAMC 41.18 (and all other time/manner/place restrictions) "may be enforced

16  immediately and without such notice at any time").

17        Yet, unlike the Orange County litigation upon which the settlement is modeled,

18  this case was not brought by people who were subjected to enforcement of the

19  "challenged" municipal code. None of the plaintiffs in this case challenge the

20  enforcement of LAMC 41.18, nor do any of the Plaintiffs have standing to do so.  None

21  of the plaintiffs allege that LAMC 41.18 was enforced against them or even that they

22  were at risk of having the ordinance enforced against them—a requirement for standing

23  to bring a federal challenge regarding the enforceability of the ordinance.  *See San*

24  *Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126-27 (9th Cir. 1996) ("the

25  mere existence of a statute  . . . is not sufficient to create a case or controversy within

26  the meaning of Article III").  *See also Martin v. City of Boise*, 920 F.3d 584, 608-09

27  (9th Cir. 2019) (Plaintiffs have standing to challenge the enforcement of an ordinance

28  only when the ordinance has been enforced against them or Plaintiffs have alleged an

<div align="center">9</div>

---

**Intervenors' Objections to Proposed Order of Dismissal**

intention to engage in a course of conduct arguably affected by a constitutional interest, but proscribed by a statute, and "there exist[ed] a credible threat of prosecution thereunder"). In fact, there is only one mention of LAMC 41.18 in Plaintiffs' sprawling 113 page Amended and Supplemental Complaint. *See* Dkt. 361 at ¶ 33. Far from challenging 41.18 and arguing that it cannot be enforced, Plaintiffs argue that LAMC 41.18 *must* be enforced.

As for the rest of Section Four, to the extent that the phrase "public regulations and ordinances" is a euphemism for a ban on camping or "sitting, sleeping, lying in the public right of way" and the agreement intends to settle when and under what conditions such a ban can be enforced, this too is far outside the Court's jurisdiction in this case. Not only do Plaintiffs not have standing to bring a challenge that could result in this agreement, no one in Los Angles has such standing. No one has been subjected to enforcement or threat of enforcement for the simple reason that there is currently no such ordinance in the Municipal Code. The parties are seeking approval from the Court to enforce ordinances that have not even been written yet. Judicial approval now of a theoretical ordinance that could be drafted in the future cannot possibly be said to "spring from and serve to resolve a dispute within the court's subject matter jurisdiction" *Local No. 93*, 478 U.S. at 521. The court has no subject matter jurisdiction because no challenge to the ordinance would be even remotely ripe for review. Such a challenge would definitionally be "hypothetical and abstract," *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (holding that the challenge to an actual ordinance on the books was not ripe when there was no threat of enforcement). Nothing in Article III gives the Court jurisdiction to give its judicial stamp of approval for the enforcement of an ordinance that does not exist.

Approval of this provision is also outside the Court's Article III jurisdiction because no party to this agreement is actually contending that the City *cannot* enforce these provisions, such that a settlement term that allows the City to do so based on its

**Intervenors' Objections to Proposed Order of Dismissal**

1   fulfillment of a condition precedent resolves an actual dispute.  Far from arguing that

2   the municipal codes are unconstitutional or otherwise unenforceable, Plaintiffs allege

3   instead that the City has not enforced ordinances against people experiencing

4   homelessness.  *See e.g*., Dkt. 361 at 33-37, 59-60.  Plaintiffs argue not only that the

5   City can enforce these regulations, but also that they must. The City likewise agrees

6   that it should be able to enforce these ordinances.  The only disagreement between the

7   parties is the extent to which the City has discretion to enforce the ordinances.  But the

8   proposed agreement does not resolve that dispute.  The agreement states explicitly that

9   the City may "at its sole discretion" enforce the "public space regulations and

10  ordinances." Agreement at 7, 8.  The only work the provision in the settlement does is

11  give judicial approval to a position that both the Plaintiffs and the City share: the City

12  may enforce "public space regulations and ordinances" against people experiencing

13  homelessness. There is simply no "case or controversy" between the parties to this

14  agreement as to whether the City can enforce any public space regulations. *See Moore*

15  *v. Charlottte-Mecklenburg Board of Education,* 402 U.S. 47, 47-48 (1971) (dismissing

16  a case before the Court where both parties argue that a statute was constitutional

17  because there was no "case or controversy" under Article III).  Absent a "case or

18  controversy," this provision does not fall within the Court's subject matter jurisdiction,

19  which is required of any agreement for which the parties seek judicial approval and

20  enforcement.  *Local No. 93*, 478 U.S. at 521.

21       The requirement that there be an actual dispute between the parties is a

22  foundational principal of Federal Court jurisdiction.  *See Raines v. Byrd*, 521 U.S. 811,

23  818 (1997) ("No principle is more fundamental to the judiciary's proper role in our

24  system of government than the constitutional limitation of federal-court jurisdiction to

25  actual cases or controversies").  That is no more true than when the dispute rises to the

26  level of constitutional significance, as it does here. *See Baker v. Carr*, 369 U.S. 186,

27  204 (1962) (question of standing in constitutional questions is whether parties "alleged

28  such a personal stake in the outcome of the controversy as to assure that concrete

11

**Intervenors' Objections to Proposed Order of Dismissal**

1  adverseness which sharpens the presentation of issues upon which the court so largely

2  depends for illumination of difficult constitutional questions").

3        Both Plaintiffs and the City contend that the Ninth Circuit's decision in *Martin*

4  *v. Boise*, 920 F.3d 584 (9th Cir. 2019) is internally inconsistent and fails to provide

5  sufficient guidance regarding when and under what circumstances the City may

6  enforce a ban on camping in public.  Plaintiffs criticized the Ninth Circuit decision for

7  its failure to "provide clear guidance for cities struggling with sizable homeless

8  populations."  *See* Dkt. 361 at 23; *see also LA Alliance for Human Rights v. City of Los*

9  *Angeles,* 14 F.4th 947, 953 n. 7 (9th Cir. 2021) (noting that Plaintiffs "take issue with

10  our holding *in Martin v. City of Boise* that municipalities cannot 'prosecute people

11  criminally for sleeping outside on public property when those people have no home o

12  rother shelter to go to'"). This is the exact same critique offered by the City of Los

13  Angeles of the decision. *See* RJN, Exh. 6, Brief of Amicus Curiae, City of Los Angeles,

14  in Support of Grant of Petition for Certiorari, *Boise v. Martin*, 19-247 at 3 (seeking

15  Supreme Court review because "*Boise* does not give that requisite guidance").  But the

16  parties' view that the decision lacks clarity does not give the parties standing to enter

17  into a settlement that determines when the ordinance can be enforced, let alone to seek

18  approval and ongoing enforcement of that agreement by this Court. That is simply not

19  the role of the federal court. "The Court will not pass upon the constitutionality of

20  legislation in a friendly nonadversary proceeding because to decide such questions is

21  legitimate only in the last resort, and as necessity in the determination of real, earnest,

22  and vital controversy between individuals." *Ashwander v. Tennessee Valley Authority*,

23  297 U.S. 288, 346 (1936) (Brandeis J., concurring*).  Nor will the Court "anticipate a

24  question of constitutional law in advance of the necessity of deciding it." *Id; see also*

25  *Thomas,* 220 F.3d at 1139.  Here, signing the settlement agreement would grant

26  permission to the City to enforce an ordinance that has not even been drafted, let alone

27  before the ordinance has been enforced, simply because the advocates of the ordinance

28

**Intervenors' Objections to Proposed Order of Dismissal**

asked the Court to do so.  That has never been the proper role of the federal court, and it is not the Court's role here.

### b. The Proposed Consent Decree Impermissibly Infringes on the Rights of Third Parties, Including Intervenor

The City and Plaintiffs also cannot use the promise of a judicial imprimatur on their agreement as a bargaining chip where, as here, the principle purpose of the agreement is to enforce an ordinance against third parties and third parties alone. Parties do not have the authority to enter into agreements that impact the rights of third parties, especially against the objection of those parties, yet that is exactly what the parties are attempting to do here.  The agreement directly impacts people experiencing homelessness who, under this agreement, would be subjected to court-sanctioned enforcement of "public space regulations and ordinances."  This includes intervenor LA CAN, which was granted intervention in this case precisely because enforcement of ordinances would impact their members' rights.  There can be no greater interest at stake than the liberty interests that are implicated by this agreement.

The direct impact on third parties' rights makes this case different from other cases in which courts have held that an intervenor cannot prevent the parties from entering into an agreement and dismissing a defendant.  For example, in *Local No. 93*, the Supreme Court held that an intervenor could not prevent plaintiffs and defendants from settling a case or preventing the Court from entering a consent decree because the agreement did not implicate their rights.  Similarly, in *Sierra Club v. North Dakota*, 868 F.3d 1062, 1067 (9th Cir. 2017), the court approved a consent decree over the objections of intervenors because "[n]owhere in the Consent Decree are the States' claims or grievances identified or even referenced."  The Ninth Circuit was very clear that the agreement was effectively a nonsuit between Plaintiffs and defendants, and the parties to the agreement went out of their way to clarify that it would not implicate the rights of third parties or intervenors.  *Id.*

Here, on the other hand, the paties have done just the opposite.  The stated purpose of Section Four of the proposed agreement is to implicate third party interests,

13

---

**Intervenors' Objections to Proposed Order of Dismissal**

1 including Intervenors.  The agreement literally states that, upon the creation of an

2 unspecified number of shelter and housing "solutions," the City may enforce "public

3 space regulations and ordinances," which as discussed above will almost certainly

4 mean anti-camping ordinances. These ordinances will be enforced exclusively against

5 third parties, including members of LA CAN.  *See* Dkt. 26. What is worse, there is no

6 suggestion that the business owners and residents who are the Plaintiffs in this case

7 will be subjected to the enforcement that Plaintiffs so readily agree can occur.

8 　　　To be sure, under current Ninth Circuit and Supreme Court precedent, this

9 agreement cannot be used to preclude individuals, including Intervenors, from

10 challenging any ordinances or enforcement regimes the City attempts to implement

11 pursuant to this agreement.  *See E.E.O.C. v. Pan Am. World Airways, Inc.,* 897 F.2d

12 1499, 1506 (9th Cir. 1990) ("It is fundamental to our notions of due process that a

13 consent decree cannot prejudice the rights of a third party who fails to consent to it");

14 *Local No. 93* ("A court's approval of a consent decree between some of the

15 parties…cannot dispose of the valid claims of nonconsenting intervenors"). In fact, the

16 actions taken by Plaintiffs and the City closely resemble the facts in *Hansberry v. Lee*,

17 311 U.S. 32 (1940), in which white homeowners obtained a judgment validating a

18 racially-restrictive covenant, and the Supreme Court held that Black homeowners who

19 were not a party to the case were not bound by the agreement because  giving preclusive

20 effect to such an agreement would violate Black homeowners' due process rights.  311

21 U.S. at 35 ("Apart from the opportunities it would afford for the fraudulent and

22 collusive sacrifice of the rights of absent parties, we think that the representation in this

23 case no more satisfies the requirements of due process than a trial by a judicial officer

24 who is in such a situation that he may have an interest in the outcome of the litigation

25 in conflict with that of the litigants").  Likewise here, an agreement between property

26 owners and residents and the City of Los Angeles that an ordinance is enforceable,

27 cannot be construed as actually binding on individuals who could otherwise challenge

28 the ordinances (once drafted) that may be enforced against them.

**Intervenors' Objections to Proposed Order of Dismissal**

1    But just as racially-restrictive covenants, though unenforceable, are still harmful,

2    the fact that the provision of the agreement would be unenforceable in court if

3    challenged by the targets of the City's enforcement, does not render the provision

4    harmless.  On the contrary, it underscores why the inclusion of this term is patently

5    unfair, unequal, and unreasonable. Even though decades of Supreme Court precedent

6    have clarified that a provision like this is unenforceable against third parties, the

7    provision was not simply drafted as a private agreement between two parties.  In fact,

8    nothing in the agreement acknowledges that the provision explicitly allowing the City

9    to enforce theoretical anti-camping ordinances in the future is nothing more than an

10   agreement that Plaintiffs, and only the Plaintiffs, will not challenge the City's

11   enforcement of an anti-camping ban if the City reaches its goal. Nor does any part of

12   the agreement suggest that this is the Court's intention either.

13   In fact, from the beginning, the parties have been clear that it is their intent to

14   enter into this agreement *because* it will stifle future litigation by people experiencing

15   homelessness, who are subjected to enforcement of the City's ordinances.  *See* e.g.,

16   Dkt. 39 at 69 (Council member Kevin De Leon discussing the need for a settlement

17   that can prevent future litigation like *Boise* and *Mitchell v. City of Los Angeles*); Dkt.

18   94 at 13-15 (Council member Buscaino criticizing court rulings protecting unhoused

19   people's civil rights and notifying the Court that the City Council had agreed to enter

20   into settlement negotiations to obtain a court-approved settlement agreement in order

21   to "stop this endless cycle of litigation" by people experiencing homelessness); RJN,

22   Exh. 4 (post by Council Member Blumenfield on his official council website

23   explaining that "Judge Carter offered [that] . . . [a]s a federal judge he can settle the

24   pending court case by helping forge a consent decree, a negotiated settlement that

25   would supersede all of the prior court rulings" and that the "legally binding bargain"

26   that would exchange shelter beds for "the ability to enforce anti-camping, bulky item

27   removal, and other laws").

28

15

Intervenors' Objections to Proposed Order of Dismissal

Moreover, the agreement is purposefully drafted to give the City the greatest possible protection against challenges by individuals actually impacted by the ordinances in the future. That is the very purpose of continuing court oversight over the agreement. The agreement sets up a mechanism by which the Court will continue to oversee the enforcement of any ordinances drafted in the future, consistent with this agreement. *See* Agreement at 7, 8 (outlining the procedure for the City to begin enforcing ordinances after the City has met the Required Number of shelter beds in a given district or city-wide). Under the enforcement mechanism created by the parties, Plaintiffs (and only Plaintiffs) are notified of the City's plan to begin enforcement, and they alone may object or simply let enforcement begin. If they do not object, the City can proceed with enforcement, with the full approval of this Court. Only if Plaintiffs choose to object, will the Court have an opportunity to provide any oversight, but even then, the oversight is limited only to whether the City has met its obligation under the agreement. Of course, the LA Alliance has made it explicitly clear that their goal is for the City to be able to enforce anti-camping ordinances; the parties have effectively set up a system by which the proverbial fox is the only one guarding the henhouse, and the rights of people experiencing homelessness are left in the hands of a group of property owners and residents who have long decried the Federal Court's protection of those rights. This is unreasonable, unequitable, and unfair, and on this ground alone, the agreement cannot be approved.

### c. The Proposed Agreement Is Procedurally Unfair Because Section Four Was Not Negotiated at Arms Length

Consent degrees must not only be substantively fair and reasonable, they must be procedurally fair as well. "With regard to procedural fairness, courts determine whether the negotiation process was fair and full of adversarial *vigor.*" *Sierra Club v. McCarthy*, 2015 WL 889142, at \*5 (N.D.Cal., 2015) (quoting *United States v. Telluride Co*., 849 F.Supp. 1400, 1402 (D.Colo.1994) (citations and internal quotations omitted). The "district court must ensure that the agreement is not ... a product of collusion . . . ," *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir.1991) and only

16

ER 315

1   "if the decree was the product of good faith, arms-length negotiations" is the agreement

2   entitled to deference. *Oregon,* 913 F.2d at 581.

3          In this case, the unreasonableness and lack of fairness of Section Four of the

4   agreement is underscored by parties' negotiation of the terms of the settlement in this

5   case.  From the beginning, the City and Plaintiffs expressed agreement that this case

6   could be used as a vehicle to enter into court-approved consent decree that would allow

7   the City to enforce a camping ban if the City provided shelter to sixty percent of the

8   City's homeless population, and the value of that agreement would be to supercede

9   prior settlement agreements and stifle litigation in the future.  Intervenors, who were

10  parties to earlier litigation and whose rights the Court had already found would be

11  impacted by any increase in enforcement, were excluded from these negotiations.   The

12  purpose of this agreement was, as both Plaintiffs, City Council members, and the Court

13  made clear, to supercede prior litigation and to stifle future litigation by people

14  experiencing homelessness.  The parties agreed at the outset of the litigation what the

15  end result should be.  Although the City and Plaintiffs may have disagreed on the

16  margins about other provisions in the agreement, for example, exactly how to calculate

17  the Required Number or the amount of money the City would pay Plaintiffs for

18  bringing this case, the parties' fundamental goals were aligned from the outset of this

19  litigation. This agreement is not entitled to deference.  *Oregon*, 913 F.2d at 581.

20          **d.  The Settlement Agreement Allows Discrimination on the Basis of
                 Disability in Violation of the Federal and State Anti-
21               Discrimination Law**

22          In an attempt to force the County of Los Angeles, which is not a party to this

23  agreement, to take on the obligation of providing services to PEH with disabilities (and

24  what appears to be an attempt to decrease the number of shelter and housing solutions

25  the City must provide while still maintaining the "60%" threshold, Plaintiffs and the

26  City have created a new term of art:  "City Shelter Appropriate," which excludes from

27  the City's 60% obligation, anyone who 1) has a serious mental illness, 2) is chronically

28  homeless and has a substance use disorder; or 3) is chronically homeless and have a

17

---

**Intervenors' Objections to Proposed Order of Dismissal**

1   chronic physical illness or disability requiring the need for professional medical care
2   and support to perform various activities of daily life.

3          The settlement agreement clarifies that "the fact that an individual....is not
4   included in the definition of City Shelter Appropriate, will not preclude the City from
5   making an offer of shelter or housing to that individual if the City can reasonably assist
6   that individual." Settlement at 8-9.  While this is an improvement from the term sheet
7   filed on April 1, 2022, which provided simply that the City would not provide housing
8   or shelter to individuals who were not "City Shelter Appropriate,"—a provision that is
9   patently illegal under numerous federal and state anti-discrimination statutes and the
10  City's own municipal code—the provision that appears in the parties' final settlement
11  agreement still runs afoul of these statutes. [4]

12         First, the agreement still purports to allow the City to refuse to offer shelter or
13  housing based on a person's disabilities.  Specifically, the agreement states that a
14  person's disability will not preclude the City from making an offer of shelter or housing
15  only "if the City can reasonably assist that individual."  Settlement at 8-9.  But this
16  turns disability law on its head, suggesting that the City may withhold an offer of
17  shelter, housing, or other assistance because a person has a disability if the City
18  determines it cannot "reasonably assist" the individual, as opposed to what is actually
19  required by anti-discrimination laws, namely to offer housing and services without
20  consideration of a person's disability. The Americans with Disabilities Act, the Fair
21  Housing Act, and state law requires the City to provide housing to people with
22  disabilities without regard for their disabilities.  *See e.g.,* 42 U.S.C. § 3604(f)(1)

23  
24  _____
    [4]Page 11 of the settlement agreement states that "City will continue to offer shelter or
25  housing to City Shelter Appropriate PEH within the City."  To the extent this provision
    evidences the City's practice or intent to provide housing or services only to people
26  experiencing homelessness that do not "have a severe mental illness" and/or "is not
    chronically homeless and has a substance abuse disorder" or "a chronic physical illness
27  or disability requiring the need for professional medical care and support...," this
    would violate state and federal law. *See infra* note 5.
28  
                                              18
    _____
                  **Intervenors' Objections to Proposed Order of Dismissal**

1   (making it illegal to "discriminate against any person . . . in the provision of services

2   of facilities" or to "make unavailable . . . a dwelling . . . because of a handicap"); 42

3   U.S.C. § 12131 (prohibiting entities from "exclud[ing] from participation in or

4   [denying] the benefits of services, programs, or activities of a public entity," including

5   withholding "aid, benefits, and services" like transitional and emergency shelters and

6   public accommodations,   29 C.F.R. § 35.310); 29 U.S.C. § 794(a) (preventing

7   individuals with disabilities from "be[ing] excluded from the participation in, be denied

8   the benefits of, or be subjected to discrimination under any program or activity

9   receiving Federal financial assistance . . .  solely by reason of her or his disability");

10  Ca. Gov't Code Gov. Code §§ 12920, 12927, 12955 (Ca. Fair Employment and

11  Housing Act); Ca. Gov't Code §11135(b) (incorporating ADA protections for state-

12  funded programs); Ca. Civ. Code §§ 51 *et seq.* The ADA and state disability law

13  requires the City to make reasonable accommodations and modifications to its

14  programs to ensure an individual has equal access to services; none of these laws allow

15  the City to withhold services if the City determines it cannot reasonably assist an

16  individual because of their disability.

17       Second, the agreement provides that "accommodations shall be made for those

18  who qualify as disabled under the Americans with Disabilities Act," but this ignores

19  the fact that the definition of disability under state law is broader than federal law. *See*

20  Cal. Gov't Code  § 12926.1 (explicitly stating that the definition of disability is broader

21  than under federal law and that "[t]his distinction is intended to result in broader

22  coverage under the law of this state than under" the ADA); Cal. Gov't Code 11135(b)

23  (incorporating stronger provisions under state law).   Accommodating only those

24  individuals with disabilities under the ADA, as the agreement expressly provides,

25  excludes individuals who meet the definition under state, but not federal law.

26       The Court cannot approve a settlement agreement, where, as here, the terms of

27  the agreement allows one party to simply disregard its obligation under otherwise valid

28  laws. *Conservation Northwest,* 715 F.3d at 1188 (reversing a district court's decision

**Intervenors' Objections to Proposed Order of Dismissal**

1   to approve a consent decree which allowed the defendant to promulgate regulations in

2   violation of law); *Perkins v. City of Chicago Heights*, 47 F.3d 212, 216 (7th Cir. 1995)

3   ("While parties can settle their litigation with consent decrees, they cannot agree to

4   disregard valid state laws") (internal quotations removed). That is particularly true

5   where, as here, the laws the agreement runs afoul of is the very statutory regime that

6   gave rise to the litigation.  *See Conservation Northwest*, 715 F.3d at 1188.

7          **e.  The Settlement Agreement is Incomprehensible and Too Vague to be Enforceable**

8

9         Finally, the settlement agreement contains a number of provisions that, as

10  drafted, undermine the enforceability of the agreement. As discussed above, the

11  agreement includes two major substantive provisions:  Section 3 that requires the City

12  to create a Required number of housing or shelter solutions and Section 4 that allows

13  the City to enforce "public space regulations and ordinances" when there are enough

14  beds or units in any given district or city-wide. The agreement appears at first blush to

15  maintain the basic framework of the settlement agreement adopted by numerous cities

16  in the Orange County homelessness litigation:  the creation of enough shelter and

17  housing for 60% of the City's unsheltered "City Shelter appropriate" homeless

18  population, in exchange for the ability to enforce a City's anti-camping ban.  Yet the

19  parties here also made changes on the margins of the agreement that significantly

20  undermine both the enforceability and the reasonableness of the agreement. Whether

21  these changes were made because the agreement was not negotiated at arms length or

22  because the parties were less interested in creating housing than they were in obtaining

23  permission to enforce the City's camping ban, or for some other reason entirely, the

24  end result is the same:  the key provisions of the agreement are so vague that the

25  agreement is effectively a nullity before it is even approved.

26          **i.  The agreement is vague and ambiguous as to key terms, making enforceability impossible**

27        Although the settlement agreement is 27 pages and contains a definitions

28  section, many of the provisions contain terms that are undefined.  The ambiguity left

**Intervenors' Objections to Proposed Order of Dismissal**

by these terms renders the agreement so vague and ambiguous that it would be impossible for the Court, Plaintiffs, or anyone else to hold the City to any obligation to create an appreciable amount of new housing or shelter.

First, the agreement states that "[t] City agrees to create a Required Number of housing or shelter solutions."  Settlement 10.  The agreement, however, contains no explanation of what it means for the City to "create" an intervention. The agreement provides no threshold level of City involvement to count a unit towards the Required Number.  The ambiguity of the term is elucidated further by section 3.2, which provides that "[t]he housing or shelter solutions may be government- and/or privately-funded. . . ."  By including "privately-funded" housing and shelter solutions, it begs the question what role, if any, the City must have in a "solution" in order for it to count towards the Required Number.  It also suggests there is no standards by which the Court can judge whether the City has fulfilled its obligations under the agreement.  *See United States v. New York City Housing Authority,* 347 F.Supp.3d. 182 (S.D.N.Y. 2018) (declining to enter a consent decree when the terms were too vague to be enforceable).

Similarly, the agreement speaks to the euphemistically-named "housing or shelter solution," but it provides no guidance as to what constitutes a "solution." Section 3.2 is explicit that the City has "sole discretion" to choose what it counts as a "solution" and includes a non-exhaustive list of options, including "permanent supportive housing" and "tiny homes," but also family reunification, shared housing, and rental assistance. By allowing the City to count minor subsidies (like family unification expenses), the City could fulfill its obligation by funding the least effective, least expensive interventions possible, and there is no basis for holding the City accountable if this is what it decides to do.

### ii. The agreement's lack of parallel construction between Sections 3 and 4 could allow the City to count existing beds towards the threshold for enforcement

This is not the only ambiguity in the agreement.  Although Section 3 speaks to the City's obligation to "create" the Required Number of housing or shelter

**Intervenors' Objections to Proposed Order of Dismissal**

"solutions," the enforcement provisions in Sections 4.2 and 4.3 provides that the City may begin enforcement of the City's anti-camping ordinances "once there are sufficient shelter or housing solutions to accommodate 60% of unsheltered City Shelter Appropriate PEH in a Council District as determined by the Required Number." The difference between having a Required Number of shelter beds and creating new shelter beds to meet the Required Number is significant, given that each council district already has shelter beds, including those beds created under the Freeway agreement. The difference in language between Section 3 and Section 4 leaves open the possibility that the City could count existing shelter beds or housing units towards the number of shelter beds needed to reach the 60% threshold.

Of course, such an interpretation of the agreement would be incredibly disengenous, since the vast majority of these beds are already occupied by *sheltered* PEH, who are excluded from the Required Number because that number is based only on *unsheltered* PEH. Such an interpretation of the agreement would allow the City to count the "housing and shelter solutions" that currently exist towards the 60% threshold, without counting the people who currently occupy them. Yet the language of the agreement, as drafted, allows for such an interpretation.

Even if the agreement is to be understood as counting only the new "housing and shelter solutions" created pursuant to Section 3 of the agreement towards the 60% threshold in Section 4, there is nothing in the agreement that requires the City to maintain the number of shelter beds throughout Los Angeles that currently exist. If the City closes shelters, which it may do under the agreement (and in some instances, must do because of ground lease restrictions related to the creation of ABH beds), there is no obligation for the City to replace those beds, since existing   beds are not counted towards the Required Number.  This is highly problematic, since the vast majority of those beds are occupied by PEH, but are not included in the baseline number, which counts only "unsheltered" PEH.

**Intervenors' Objections to Proposed Order of Dismissal**

1        In either event, the agreement is drafted in such a way that could allow the City

2 to count existing shelter beds towards the 60% threshold for enforcement or remove

3 the beds without accounting for increases in the number of PEH in its base calculations.

### iii. Likely pandemic-related impacts on the 2022 Homeless Count render the use of the count unreasonable

        The parties' definition of the Required Number of beds is, at first glance, an attempt to align the an attempt to align this agreement with other settlement agreements entered into as part of the Orange County litigation, but in this case, the parties made numerous adjustments to the 60% threshold, which significant decrease the City's obligation to provide shelter and housing "solutions."  What will likely prove to be the most significant impact on threshold number is the parties' agreement to tie the baseline number to the 2022 homeless count, and to use that number for the next five years.  As an initial matter, it is unreasonable for the City to tie the enforcement of a camping ban to a static number based on a count of people experiencing homelessness during a three day period in January 2022, for five years into the future. The number of people experiencing homelessness is an dynamic number, to say nothing of the fact that the PIT count is an imperfect approximation of the number of people experiencing homelessness.

        Even if it were a good approximation, the number of PEH has gone up almost every year for the past decade.  A fixed Required Number will not take into account any increases in homelessness that will occur in the next five years.  This problem is exacerbated by the fact that the parties have chosen to use the 2022 point in time count (which has yet to be released), given that, for the past two years, the City and the world have been dealing with the COVID-19 pandemic.  And in response to the pandemic, there have been  unprecedented eviction protections in place, including eviction moratoria in both the City and County of Los Angeles. As a direct result of these eviction protections, one of the largest drivers of people entering homelessness, evictions, have decreased dramatically--in 2019, there were  40,572 evictions filed in Los Angeles Superior Court; in 2021, the number was reduced by more than 65 percent.

**Intervenors' Objections to Proposed Order of Dismissal**

Myers Decl., Exh. B at p. 2. And the formal filing of unlawful detainer actions constitute only a fraction of the number of people who actually leave their units, either because of self-evictions, lockouts, etc. Research has shown that for every person facing a formal eviction, more than five people leave their homes as a result of more informal evictions. *Id.* (citing Gromis, A., & Desmond, M., Estimating the Prevalence of Eviction in the United States: New Data from the 2017 American Housing Survey (2021) Cityscape, 23(2), 279–290.) Given the protections in place, which not only prevented filings, but in Los Angeles County, prevented the service of an eviction notice, it is likely that the significant decrease in formal evictions signifies a far more significant decrease in people becoming homeless, since there is little disagreement that evictions are one of the largest drivers of homelessness in Los Angeles County.

This likely decrease, which may be reflected in the 2022 PIT Count, will not be replicated in subsequent years if the COVID-19 protections are allowed to sunset. Once eviction protections are removed, the rates of homelessness will likely return to pre-pandemic numbers. The 2022 PIT count will prove to be a significant deviation from the City's rate of homelessness, yet it will remain the baseline for the next five years.

## V.  CONCLUSION

For the foregoing reasons, Intervenors object to the proposed consent decree submitted by Plaintiffs and the City of Los Angeles and respectfully request this Court decline to enter the parties' order, as requested.

Dated: May 31, 2022                    Respectfully submitted,
                                       Legal Aid Foundation of Los Angeles
                                       Schonbrun Seplow Harris & Hoffman LLP
                                       Law Office of Carol A. Sobel
                                       Elder Law & Disability Rights Center


                                       _____/s/ Shayla Myers_____
                                       Attorneys for Intervenors

24

**Intervenors' Objections to Proposed Order of Dismissal**

ER 323

DAWYN R. HARRISON, *Acting County Counsel* (State Bar No. 173855)
dharrison@counsel.lacounty.gov
JENNIFER A.D. LEHMAN, *Assistant County Counsel* (State Bar No. 191477)
jlehman@counsel.lacounty.gov
ANA WAI-KWAN LAI, *Senior Deputy County Counsel* (State Bar No. 257931)
alai@counsel.lacounty.gov
OFFICE OF COUNTY COUNSEL
500 West Temple Street, Suite 468
Los Angeles, California 90012
Telephone:   (213) 974-1830
Facsimile:   (213) 626-7446

LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
MIRA HASHMALL (State Bar No. 216842)
mhashmall@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 552-4400
Facsimile:   (310) 552-8400

Attorneys for Defendant
COUNTY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>                  Plaintiffs,<br><br>        v.<br><br>CITY OF LOS ANGELES, et al.,<br><br>                  Defendants. | **CASE NO. 2:20-cv-02291 DOC (KES)**<br><br>**THE COUNTY OF LOS ANGELES' RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES**<br><br>Assigned to the Hon. David O. Carter and Magistrate Judge Karen E. Scott |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................. 1

II.   OVERVIEW OF THE PROPOSED SETTLEMENT ..................................... 2

III.  THE SETTLEMENT CANNOT BE APPROVED UNLESS IT IS
      FAIR, ADEQUATE, AND REASONABLE ....................................... 4

IV.   THE SETTLEMENT PREJUDGES THE ONGOING CASE ......................... 5

V.    THE PROPOSED SETTLEMENT MATERIALLY MISSTATES THE
      COUNTY'S SIGNIFICANT AID FOR PEH ................................... 7

      A.   The County's Ongoing Work To Address Homelessness .................... 8

      B.   The County's Fiscal Year 2022-23 Budget Proposal ......................... 10

      C.   The Board's Adoption Of The Blue Ribbon Commission's
           Recommendations ................................................. 11

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*E.E.O.C. v. Pan Am. World Airways, Inc.,*
  897 F.2d 1499 (9th Cir. 1990)..........................................................................5

*E.E.O.C. v. Waffle House, Inc.,*
  534 U.S. 279 (2002) ........................................................................................5

*LA All. for Human Rights v. County of Los Angeles,*
  14 F.4th 947 (9th Cir. 2021).........................................................................6, 7

*Thompson v. Enomoto,*
  815 F.2d 1323 (9th Cir. 1987)..........................................................................5

*United States v. Oregon,*
  913 F.2d 576 (9th Cir. 1990).........................................................................4, 5

*Waller v. Fin. Corp. of Am.,*
  828 F.2d 579 (9th Cir. 1987)............................................................................5

### STATE STATUTES

Cal. Welf. & Inst. Code § 17000 .........................................................................7

### FEDERAL RULES

Fed. R. Civ. P. 41(a)(1)........................................................................................4

### OTHER AUTHORITIES

U.S. Const. art. III...............................................................................................6

# I.   __INTRODUCTION__

The County of Los Angeles (the "County") respectfully submits this response to the settlement agreement that has been submitted to the Court for approval between and among LA Alliance for Human Rights ("Alliance"), eight of the nine individual Plaintiffs, and the City of Los Angeles (the "City").

The County has long shared the Plaintiffs' and the Court's interest in solving the homelessness crisis and has always believed those solutions should take place outside of litigation.  It is the County's hope that, if the Court approves the City's proposed settlement agreement, it will bring needed relief to people experiencing homelessness ("PEH").  As Plaintiffs' Amended and Supplemental Complaint ("First Amended Complaint") acknowledged, it is the City "who has the primary land-use obligation" with respect to the area's PEH (FAC ¶ 5), although the County has been a frequent partner to the City in providing aid.  For example, in this very case, in a historic Memorandum of Understanding ("MOU"), the County agreed to provide up to $300 million in funds and more in services toward the City's creation of 6,700 beds or shelter opportunities to house high-risk PEH.

A settlement agreement reflects the obligations of the parties who agree to it.  Here, however, in addition to describing the obligations of Plaintiffs and the City, the proposed settlement agreement improperly seeks to impose nearly two and a half pages of supposed "County Obligations," even though the County is not a party to the agreement.  These "responsibilities" have no basis in law, and the Settling Parties make no effort to identify one.  The Court cannot approve a private agreement between Plaintiffs and the City that imposes "responsibilities" on the County, without usurping the role of the Legislature in determining the County's fiscal and social policies.  Nor can the Court properly determine the County's "obligations" under the guise of entering a consent decree between other parties.  This would be entirely improper, and an egregious violation of due process of law.

The "obligations" and "responsibilities" assigned to the County in the

1  proposed agreement are also a distraction from the myriad ways the County has

2  committed to addressing homelessness, including dedicating countless hours and

3  billions of dollars to housing, shelter, services and other resources for PEH.  In the

4  last fiscal year alone, 20,477 people received permanent housing, and 26,760 people

5  received interim housing, in the County.  The County's proposed budget for the next

6  fiscal year includes $532.6 million in additional funding to combat homelessness,

7  and the County is actively working to ensure those funds are used in the most

8  efficient and effective ways possible.

9  **II.    OVERVIEW OF THE PROPOSED SETTLEMENT**

10         Plaintiffs filed this lawsuit against the City and County allegedly "to change

11  the trajectory of the homelessness [crisis]" in Los Angeles.  (FAC ¶ 1.)  Early in

12  their 226-paragraph, 100-page, First Amended Complaint (Dkt. # 361), Plaintiffs

13  call particular attention to "the mentally ill visibly suffer[ing] in intersections, parks,

14  and sidewalks" and "the increased prevalence of illegal narcotics" among PEH.

15  (FAC ¶ 4.)  Plaintiffs also allege that "the most heavily impacted area is still without

16  a doubt" Skid Row, which comprises a half-square-mile area in the City near

17  Downtown Los Angeles, where most of the individual Plaintiffs live and/or work.

18  (*Id.* ¶ 39.)  Yet, the proposed settlement agreement falls woefully short of aiding the

19  very PEH to which Plaintiffs call attention.

20         The proposed settlement agreement is between Alliance, eight of the nine

21  individual Plaintiffs, and the City.  Under the proposed settlement, the City agrees,

22  within five years, to create sufficient housing or shelter to accommodate 60% of

23  "unsheltered City Shelter Appropriate PEH within the City," which the Agreement

24  defines as PEH who "do[] not have a severe mental illness, and/or" are "not

25  chronically homeless" and have neither "a substance use disorder" or "chronic

26  physical illness or disability requiring the need for professional medical care and

27  support."  (Agmt §§ 1.4, 3.1.)

28         Plaintiffs and the City have agreed to wait for the results of the 2022

565290.6

2

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES

ER 328

1  homeless Point-In-Time count to confirm the number of new beds/shelter
2  opportunities the City is required to build under the settlement.  However, the
3  County shares the concerns expressed by the objectors that this limitation appears to
4  exclude a large number of the most vulnerable PEH.  For example, according to the
5  2020 Point-In-Time data, which was cited in Plaintiffs' motion for a preliminary
6  injunction (Dkt. # 265 at 21 & n. 21), 38% of PEH in Skid Row had a serious
7  mental illness,[1] 40% of PEH in Skid Row were characterized as chronically
8  homeless, 35% had a substance use disorder, 26% had a physical disability, and
9  18% had a developmental disability.  The vast majority of the chronically homeless
10 individuals were unsheltered.

11         It is vague, at best, how many PEH will benefit from this agreement.  At
12 worst, it appears that the PEH most in need of shelter may not benefit at all.  The
13 City has stated that the 60% goal is in addition to the 6,700 beds it has already
14 created under the historic MOU with the County.  (Tr. of May 20, 2022 Hr'g at
15 11:19–23.)  However, the proposed agreement allows the City to count toward its
16 settlement obligation the HHH pipeline beds it already committed to building, which
17 calls into question what additional benefit PEH will gain from the agreement.  City
18 Council President Nury Martinez has said, "[t]he city has committed to building a
19 minimum of 14,000 beds and has over 13,000 beds in process already."[2]  The City
20 has an obligation to prove to this Court that recounting these beds towards its
21 "commitment" under the settlement agreement is not illusory.

22         This is consistent with the agreement's specification that the City has sole

23

24 [1] 2020 Greater Los Angeles Homeless Count – Skid Row,
25 https://www.lahsa.org/documents?id=4700-2020-greater-los-angeles-homeless-countskid-row.
26 [2] *See* John Antzak, "Los Angeles Agrees to Settle Lawsuit Over Homeless Crisis,"
27 US NEWS (April 1, 2022), https://www.usnews.com/news/best-states/california/articles/2022-04-01/los-angeles-agrees-to-settle-lawsuit-over-homeless-crisis.
28

1    discretion to determine the kind of housing or shelter to build to fulfill that

2    obligation.  Other than the pipeline beds the City committed to prior to and

3    independent of the settlement, the agreement appears to contemplate that the City

4    will predominantly focus on interim housing or shelters (such as shared housing,

5    congregate shelters, sprung structures or tents, safe parking, safe sleeping/camping,

6    and A Bridge Home beds) rather than permanent supportive housing.  (*Id.* § 3.2)

7         Last, further clarification is needed as to whether Plaintiffs believe this

8    settlement affects or narrows the claims that they have asserted in this litigation.

9    Plaintiffs have stated that they intend to file a Second Amended Complaint if the

10   Court approves their settlement with the City, but the settlement agreement does not

11   resolve all of Plaintiffs' claims against the City.  Plaintiff Gary Whitter is not a party

12   to the settlement agreement.  (Agmt n.3.)  The Court previously indicated it was

13   inclined to grant Plaintiffs leave to amend because the amended pleading "will

14   narrow the issues and focus on the county" (Tr. at 18:19–22), but, at this time,

15   Plaintiffs have not proffered a proposed amended pleading, and the agreement is

16   unclear as to whether Mr. Whitter's lack of participation means the City will remain

17   a defendant in this litigation.

18   **III.   THE SETTLEMENT CANNOT BE APPROVED UNLESS IT IS FAIR,**

19   **ADEQUATE, AND REASONABLE**

20        Plaintiffs do not need a court order to voluntarily dismiss their claims against

21   the City.  *See* Fed. R. Civ. P. 41(a)(1).  To obtain judicial oversight and jurisdiction

22   over that settlement, as Plaintiffs seek, the Court must enter a consent decree.

23   *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) ("a settlement agreement

24   subject to continued judicial policing" is "[a] consent decree" (citation omitted)).

25   To do so, the Court has an independent obligation to confirm the agreement is

26   "fundamentally fair, adequate and reasonable" and "conform[s] to applicable laws."

27   *Id.* at 580-81.  Where, as here, the requested consent decree "affects the public

28   interest or third parties" that "did *not* participate in negotiating," the Court has a

1  "heightened responsibility . . . to protect those interests." *Id.* at 581; *see also Waller*

2  *v. Fin. Corp. of Am.*, 828 F.2d 579, 583 (9th Cir. 1987) (a non-settling defendant has

3  standing to object to a settlement entered into by other parties if it will suffer some

4  formal legal prejudice as a result).

5  **IV.   THE SETTLEMENT PREJUDGES THE ONGOING CASE**

6         "It is fundamental to our notions of due process that a consent decree cannot

7  prejudice the rights of a third party who fails to consent to it." *E.E.O.C. v. Pan Am.*

8  *World Airways, Inc.*, 897 F.2d 1499, 1506 (9th Cir. 1990).  The Court should not

9  enter Plaintiffs' proposed order because the settlement includes several pages

10 imposing purported "obligations" and "responsibilities" on the County, which is not

11 a party to the agreement.  (*See* Agmt § 9.)  This would be entirely improper and

12 illegal—a violation of due process of law.  *See Pan Am.*, 897 F.2d at 1506 (a

13 consent decree that prejudiced the rights of non-settling parties violates "deep-

14 rooted historic tradition that everyone should have his own day in court" (citation

15 omitted)).

16        As a non-settling party, the County is not bound by any agreement between

17 the Plaintiffs and the City.  *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294

18 (2002) ("It goes without saying that a contract cannot bind a nonparty.").  It would

19 violate this well-settled principle for the Court to enter an order that, on its face,

20 assigns legal obligations to the County that were only "agree[d]" to by the Settling

21 Parties in a contract to which the County is not a signatory.  (Agmt § 9); *see*

22 *Thompson v. Enomoto*, 815 F.2d 1323, 1326 (9th Cir. 1987) (holding a consent

23 decree is a kind of injunction, which are orders "enforceable by contempt, and

24 designed to accord or protect 'some or all of the substantive relief sought by a

25 complaint'" (citation omitted)).

26        Entering the proposed settlement raises acute concerns because the alleged

27 "responsibilities" run contrary to the County's legal arguments in this litigation,

28 including those set forth in its fully briefed Motion to Dismiss the First Amended

1   Complaint.  (Dkt. # 370.)  The Court cannot enter the settlement as drafted without

2   pre-judging the existence of the County's "obligations" described therein, which the

3   County is disputing in the ongoing case, and which the County contends have no

4   merit.

5        For example, all of Plaintiffs' claims against the County are based on the

6   County's alleged failure to house PEH in or near Skid Row, and the County has

7   argued those claims must be dismissed because Skid Row is within the incorporated

8   territory of the City and under its exclusive jurisdiction.  However, the settlement

9   declares it to be the County's responsibility to provide services and/or housing to

10  PEH in the City who have a severe mental illness and/or are chronically homeless

11  and suffer from a substance abuse disorder or chronic disability, including Skid

12  Row.  (*See* Agmt § 1.4 (defining "City Shelter Appropriate" PEH); *id.* § 9 (the

13  "County responsibilities include, but are not limited to . . . [p]roviding housing and

14  treatment services for all unsheltered PEH within the City who are not City Shelter

15  Appropriate").  There is no legal basis for this; the County has no general

16  responsibility to provide housing or mental health services under Welfare and

17  Institutions Code section 17000.

18       To issue the settlement as a consent decree would also be inconsistent with a

19  keystone argument in the County's pending motion, that the Plaintiffs have not met

20  their burden of establishing Article III standing.  (*Id.* at 13–15); *see LA All. for*

21  *Human Rights v. County of Los Angeles*, 14 F.4th 947, 956-57 (9th Cir. 2021)

22  (*Alliance*) (a plaintiff must demonstrate Article III standing to obtain injunctive

23  relief).  Entering a consent decree, including one that purports to define the

24  County's obligations as including Skid Row, would give the appearance that the

25  Court had already resolved the merits of the Plaintiffs' claims against the County

26  before the County has been able to undertake any discovery.

27       The absence of factual support for the settlement's proffered

28  "responsibilities" of the County is particularly troubling because some of them were

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES

lifted directly from the Court's April 2021 preliminary injunction order, which the Ninth Circuit Court of Appeals reversed on the grounds that the Court had impermissibly "relied on its own independent research and cited material not subject to judicial notice." *Alliance*, 14 F.4th at 957; (*see* FAC ¶¶ 89, 167–74 (alleging that "the County has failed to meet its statutory obligation" under California Welfare & Institutions Code ("WIC") section 17000 "to provide appropriate mental health services," which Plaintiffs insist includes shelter); Dkt. 277 at 87 ("the County has also failed to meet its minimal duties" under the WIC because "the County comes nowhere close to . . . 50 public mental health beds per 100,000 individuals"); Agmt § 9 (the "County responsibilities include, but are not limited to . . . [r]equiring a minimum of 50 mental health beds per 100,000 people in the County").) There has still been no evidentiary development that would support a finding that the County has the obligations that have been assigned to it by the Settling Parties.

If the Court approves the settlement, it should remove section 9 and make clear in its order that the agreement between the Plaintiffs and the City has no bearing on the County's case or any of the County's defenses. The Plaintiffs and the City have stated that it is their intent to resolve their case "without any admission of fault, liability, or wrongdoing." (Agmt at 2.) It is imperative that the County is likewise entitled to continue its defense unprejudiced by their settlement.

## V. THE PROPOSED SETTLEMENT MATERIALLY MISSTATES THE COUNTY'S SIGNIFICANT AID FOR PEH

The "County Obligations" section of the proposed settlement not only improperly seeks to bind a non-settling party, it also suffers from the same fatal flaw as all of Plaintiffs' claims—it improperly seeks to usurp the County's legislative authority by dictating County policy.

Moreover, the City and Plaintiffs' agreement that they will "ensur[e] the County meets its obligations to provide adequate services to PEH" and "foster[] County-developed or County-funded housing, shelters, and treatment services,"

1  necessarily implies that the County is not already doing this work.  (*See* ECF No.

2  429-1 at 10.)  Nothing could be further from the truth.  As set forth in the County's

3  Motion to Dismiss and corresponding Request for Judicial Notice, the County's

4  commitment to combatting homelessness and serving PEH is undisputed, well-

5  documented, and massive.  (*See* ECF Nos. 370-1, 371, 371-1.)

6      **A.**    **The County's Ongoing Work To Address Homelessness**

7         On August 17, 2015, the County Board of Supervisors ("Board") launched the

8  Homeless Initiative; and, on February 9, 2016, the Board approved nearly

9  $100 million in funding to implement 47 strategies recommended by the Homeless

10  Initiative to (a) prevent homelessness, (b) expand subsidized housing, (c) increase

11  income among those who are homeless or are at risk of becoming homeless,

12  (d) enhance homeless case management and supportive services, (e) create a

13  coordinated homelessness service system, and (f) expand affordable and homeless

14  housing.  (Appendix of Evidence ("AOE") Exs. 1-2.)  All 47 strategies have now

15  been fully or partially implemented.  (*Id*. Ex. 6.)

16         Since its enactment in March 2017, Measure H has also successfully

17  generated hundreds of millions of dollars annually and provides an ongoing revenue

18  stream to fund the County's work to address the homeless crisis.  (*Id*. Exs. 3, 4, 6.)

19  Indeed, Measure H has been credited for "accelerat[ing]" the critical work of the

20  Homeless Initiative to "improve the lives of individuals and families experiencing

21  homelessness."  (*Id*. Ex. 6.)

22         The County has continued to expand its efforts to combat homelessness in

23  recent years and currently funds a variety of housing and services to individuals and

24  families experiencing homelessness, formerly homeless, or at risk of homelessness.

25  (*Id*. Ex. 5.)  Among other things, these programs and services include: (1) rapid re-

26  housing; (2) Multidisciplinary and Homeless Outreach & Mobile Engagement teams

27  that provide outreach and engagement; (3) housing assistance, including cash

28  subsidies, legal services, eviction prevention, and other tenant-related assistance;

565290.6

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES

1    and (4) assistance for current and formerly incarcerated individuals.  (*Id.* Exs. 5, 7.)

2        In addition to the services it was already providing, and the expanded

3    services it is contributing pursuant to the MOU, the County has also been working

4    diligently to house and shelter PEH.  The Homeless Initiative reported that since the

5    passage of Measure H in 2017, the County's homeless services system had placed

6    nearly 81,000 people in permanent housing and 110,000 people in interim housing.[3]

7    Between November 2012 and March 2021, the Housing for Health division of the

8    County Department of Health Services housed 18,444 clients who are homeless and

9    who have complex medical and behavioral health conditions in permanent

10   supportive housing.  (AOE Ex. 8.)  This includes 4,415 people placed in existing

11   permanent supportive housing and 14,029 placed in new permanent supportive

12   housing.  (*Id.*)

13       The County has also been working to develop long-term strategies to tackle

14   the complex problem of homelessness, while simultaneously pursuing innovative

15   interim solutions.  (*See, e.g.*, Exs. 10–12.)  For example, on September 15, 2021, the

16   Board approved the creation of a taskforce to coordinate and effectuate a

17   comprehensive community-based prevention services system, informed by an

18   equity-centered framework, to improve the lives of the most vulnerable County

19   residents, including PEH.  (*Id.* Ex. 13).  At the same time, the Board also approved

20   an additional $34 million in funding for Project Roomkey in fiscal year 2021-22.

21   (*Id.*)  And on November 2, 2021, the Board authorized another $10 million in

22   funding for cities and local Councils of Governments in need of supportive services

23   at interim housing sites.  (*Id.* Ex. 14.)

24       Through Project Homekey, the County has received over $100 million from

25   the State to acquire 10 properties for use as housing for PEH.  Nine of the 10

26   _____

27   [3] Homeless Initiative Impact Dashboard, https://homeless.lacounty.gov/dashboard-
     2/.

28

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES

1   properties are currently operating as interim housing and will be converted to

2   permanent supportive housing beginning in 2023.  To date, nearly 1,500 PEH have

3   been served at the County's Homekey sites.[4]  Although Project Homekey was

4   originally conceived in July 2020 as a way to provide housing for PEH who were

5   impacted by COVID-19, the State subsequently announced the availability of an

6   additional $250 million in funding for Homekey.  The County has since applied to

7   the State for additional grants to support the acquisition of several new properties.

8   The County has already received awards for at least 12 new projects, including a 40-

9   room housing facility located in Boyle Heights that the County intends to use to

10   provide interim housing for transition aged youth experiencing or at-risk of

11   homelessness.  (*Id.*)

12       In total, for fiscal year 2021-22, the County approved over *$1 billion* in its

13   fight against homelessness, including one-time grants from state and federal entities.

14   Half of this money is going towards creating approximately 11,000 beds for PEH

15   (including those created pursuant to the MOU).  The remainder went towards

16   services, including homelessness prevention, outreach and engagement services,

17   interim and permanent housing services, employment services, justice reform for

18   PEH, and services relating to transition-age youth.

19       **B.    The County's Fiscal Year 2022-23 Budget Proposal**

20       On April 19, 2022, the County's Chief Executive Office ("CEO") submitted

21   its recommended budget for fiscal year 2022-23 to the Board, which identified the

22   County's top priority as its fight against homelessness, with "extensive investments"

23   in mental health services, supportive services, and a wide range of housing

24   programs.  (AOE Ex. 16 at 1.)

25       The recommended budget includes $532.6 million to fund Homeless Initiative

26

27   _____
    [4] *See* April 19, 2022 Motion by Supervisor Hilda L. Solis, *available at*
28   http://file.lacounty.gov/SDSInter/bos/supdocs/168208.pdf.

strategies focused on prevention, outreach, interim housing, permanent housing, and supportive services to serve people at risk of or experiencing homelessness. (*Id*. at 5-6; Ex. 19, Encl. 1 at 6.) In addition, the County has allocated funding for the following: (1) $4.3 million to augment homeless mental healthcare teams, enhance crisis intervention, and provide transportation; (2) $1.2 million for treatment authorization, care coordination, and service navigation for the most intensive mental health services; (3) $3.9 million to establish mobile clinics to provide medical care to PEH in the County; (4) $26.6 million for the development and preservation of affordable housing; and (5) $15.1 million to the Department of Public Social Services to cover projected expenditures by Los Angeles Homeless Services Authority ("LAHSA"). (AOE Ex. 16 at 5-6.)

The budget also reflects the County's many other goals to address homelessness, including continuing its collaboration with justice partners and community-based organizations to reduce the number of PEH by promoting local resources and assisting with referrals to homelessness assistance programs (*id*. at 7.1); coordinating the prioritization of housing and services (*id*. at 32.1); and partnering with cities, service providers, philanthropy and faith-based organizations, and the business community in an effort to develop and implement innovative solutions to combat homelessness (*id*.).

**C.**     **The Board's Adoption Of The Blue Ribbon Commission's Recommendations**

The County is also actively working with its partners to carefully examine how best to allocate the hundreds of millions of dollars it has committed to fighting homelessness. On July 27, 2021, the Board created a Blue Ribbon Commission on Homelessness (the "Commission") to research and analyze various homelessness governance reports, study models from across the nation, and provide feedback on the most relevant and effective models, with the intention of implementing reform to help solve the homelessness crisis in the County. (AOE Ex. 9.)

On March 30, 2022, after hundreds of hours of research and hundreds of interviews with stakeholders, the Commission published its Governance Report (the "Report") and delivered it to the Board.  (*Id.* Ex. 15.)  The Report highlighted several "key concerns" for addressing the homelessness crisis, including, among others, the need to act with urgency and develop flexible solutions; the need to improve communication and focus on diversity, equity, and inclusion; and the need to increase support for small service providers in order to build capacity.  (*Id.* at 5, 8-12.)

In response to these and other concerns, the Report delineated seven recommendations to the Board, including: (1) creating an appropriately-resourced County entity to cut across County departments and take charge to ensure the departments are working together; (2) establishing a local solutions fund within Measure H to allocate amounts to smaller cities and unincorporated areas within the County; (3) simplifying and streamlining LAHSA to lead rehousing efforts in light of the new entity formation; (4) consolidating the LAHSA Commission, Continuum of Care ("CoC") Board, and Coordinated Entry Systems Policy Council into a single entity; (5) improving LAHSA's operations by defining its decision-making responsibilities and ensuring it has the appropriate staff and expertise to manage its budget of over $700 million and staff of over 600 employees through the creation of an "Ops Team"; (6) requiring access to, sharing of, and tracking of data, conducting comprehensive reports on how monies are spent, and developing common definitions and metrics to measure success; and (7) creating a forum for convening decision-makers from across the region to set goals and discuss policy, funding, fundraising, initiatives, and resources.  (*Id.* at 7, 13-27.)  On May 3, 2022, the Board voted to adopt all seven recommendations.  (*Id.* Ex. 18.)

The County's commitment to combatting homelessness cannot be disputed.  It has already allocated $527 million for Homeless Initiative services for the current fiscal year, and is poised to allocate hundreds of millions of dollars in additional

12

1   funding for fiscal year 2022-23.  By adopting the Commission's recommendations,

2   the Board has also demonstrated its resolve to look critically at how those funds

3   should be allocated and to ensure that its significant resources are used efficiently to

4   develop meaningful and effective solutions to address the homelessness crisis and

5   support PEH.

6        The County recognizes there is more work to be done and is committed to

7   continuing to partner with the City and other stakeholders to do that important work.

8   But it is not appropriate for the Court to approve a Settlement Agreement between

9   Plaintiffs and the City that seeks to define the County's obligations and dictate its

10  policy choices.

11

12  DATED:  May 31, 2022              MILLER BARONDESS, LLP

13

14

15                          By:     /s/ Louis R. Miller

16                                  LOUIS R. MILLER
                                    Attorneys for Defendant
17                                  COUNTY OF LOS ANGELES

18

19

20

21

22

23

24

25

26

27

28

565290.6

13

SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
Email: mumhofer@spertuslaw.com
Email: emitchell@spertuslaw.com

*Attorneys for Plaintiffs*

MICHAEL N. FEUER, City Attorney (SBN 111529)
SCOTT MARCUS, Chief Assistant City Attorney (SBN 184980)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
JESSICA MARIANI, Deputy City Attorney (SBN 280748)
RYAN SALSIG, Deputy City Attorney (SBN 250830)
200 North Main Street, City Hall East, 7th Floor
Los Angeles, California 90012
Telephone: 213-978-4681
Facsimile: 213-978-7011
Email: Scott.Marcus@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, *et al.*,<br><br>Defendants. | CASE NO. 2:20-CV-02291-DOC-KES<br><br>Assigned to Judge David O. Carter<br><br>***AMENDED* NOTICE OF LODGING OF FULLY EXECUTED [PROPOSED] STIPULATED ORDER OF DISMISSAL AS TO DEFENDANT CITY OF LOS ANGELES ONLY [Fed. R. Civ. P. 41(a)(2)]** |

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1

*AMENDED NOTICE OF LODGING OF FULLY EXECUTED [PROPOSED]*
*STIPULATED ORDER OF DISMISSAL AS TO DEF. CITY OF LOS ANGELES ONLY*

1

2    TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF

3  RECORD:

4    PLEASE TAKE NOTICE that pursuant to L.R. 5-4.4 and Rule 41(a)(2) of the

5  Federal Rules of Civil Procedure, Plaintiffs LA Alliance for Human Rights, *et al.,*

6  and Defendant City of Los Angeles hereby lodge for the Court's signature a Fully

7  Executed [Proposed] Stipulated Order of Dismissal as to Defendant City of Los

8  Angeles only.

9  DATED:  May 24, 2022          Respectfully submitted,

10

11                               */s/ Elizabeth A. Mitchell*
                                SPERTUS, LANDES & UMHOFER, LLP
12                               Matthew Donald Umhofer
                                Elizabeth A. Mitchell
13                               *Attorneys for Plaintiffs*

14  DATED:  May 24, 2022          MICHAEL N. FEUER, City Attorney

15                               SCOTT MARCUS, Chief Assistant City Attorney
                                ARLENE N. HOANG, Deputy City Attorney
16                               JESSICA MARIANI, Deputy City Attorney
                                RYAN SALSIG, Deputy City Attorney

17

18                               By: */s/ Scott Marcus*
                                Scott Marcus, Chief Assistant City Attorney
19                               Counsel for Defendant City of Los Angeles

20  Pursuant to L.R. 5-4.3.4(a)(2)(i), all other signatories listed, and on whose behalf the

21  filing is submitted, concur in the filing's content and have authorized the filing.

22

23

24

25

26

27

28

<div style="writing-mode: vertical">Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705</div>

2
*AMENDED NOTICE OF LODGING OF FULLY EXECUTED [PROPOSED]
STIPULATED ORDER OF DISMISSAL AS TO DEF. CITY OF LOS ANGELES ONLY*

1   SPERTUS, LANDES & UMHOFER, LLP
    Matthew Donald Umhofer (SBN 206607)
2   Elizabeth A. Mitchell (SBN 251139)
    617 W. 7th Street, Suite 200
3   Los Angeles, California 90017
    Telephone: (213) 205-6520
4   Facsimile: (213) 205-6521
    Email: mumhofer@spertuslaw.com
5   Email: emitchell@spertuslaw.com

6   *Attorneys for Plaintiffs*

7   MICHAEL N. FEUER, City Attorney (SBN 111529)
    SCOTT MARCUS, Chief Assistant City Attorney (SBN 184980)
8   ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
    JESSICA MARIANI, Deputy City Attorney (SBN 280748)
9   RYAN SALSIG, Deputy City Attorney (SBN 250830)
    200 North Main Street, City Hall East, 7th Floor
10  Los Angeles, California 90012
    Telephone: 213-978-4681
11  Facsimile: 213-978-7011
    Email: Scott.Marcus@lacity.org
12
    *Attorneys for Defendant*
13  *CITY OF LOS ANGELES*

14

15              UNITED STATES DISTRICT COURT

16              CENTRAL DISTRICT OF CALIFORNIA

17

18  LA ALLIANCE FOR HUMAN          CASE NO. 2:20-CV-02291-DOC-KES
    RIGHTS, *et al.*,
19                                 Assigned to Judge David O. Carter
            Plaintiffs,
20
                                   *AMENDED* FULLY EXECUTED
21      v.                         [PROPOSED] STIPULATED
                                   ORDER OF DISMISSAL AS TO
22  CITY OF LOS ANGELES, *et al.*, DEFENDANT CITY OF LOS
                                   ANGELES ONLY [Fed. R. Civ. P.
23          Defendants.            41(a)(2)]

24

25

26

27

28

                                   1
    *AMENDED FULLY EXECUTED [PROPOSED] STIPULATED ORDER OF
    DISMISSAL AS TO DEFENDANT CITY OF LOS ANGELES ONLY*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1    On March 10, 2020, Plaintiff LA Alliance for Human Rights, *et al.* filed the

2    above-captioned against the City of Los Angeles ("City") and the County of Los

3    Angeles ("County") [ECF No. 1].  On November 1, 2021, Plaintiffs LA Alliance for

4    Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karen Pinsky, Charles

5    Malow, Charles van Scoy, George Frem, Gary Whitter, and Leandro Suarez

6    (collectively "Plaintiffs") filed a First Amended and Supplemental Complaint against

7    the City and the County ("FASC") [ECF No. 361].

8    In the FASC, Plaintiffs alleged thirteen separate claims for relief concerning

9    the City and County's handling of the homelessness crisis, and contended the City

10   and County violated, among other things, the Due Process and Equal Protection

11   Clauses of the United State Constitution, the State Created Danger doctrine, state and

12   federal disability laws, were negligent, created nuisances, and engaged in inverse

13   condemnation and takings of real property.  *Id.*  The City and County each separately

14   filed a motion to dismiss the FASC [ECF No. 369, 370], which were taken under

15   submission on January 24, 2022, and all parties were Ordered to participate in a

16   mediation [ECF Nos. 388, 391].

17   Following extensive discussions and multiple mediation sessions, Plaintiffs[1]

18   and the City reached a settlement resolving the disputed claims in this Action as to

19   the City only.  A copy of the executed Settlement Agreement between Plaintiffs and

20   the City ("Settlement Agreement") is attached hereto as Exhibit 1, the terms of which

21   are expressly incorporated herein by reference.

22   NOW THEREFORE, pursuant to Federal Rule of Civil Procedure 41(a)(2), and

23   good cause appearing therefore, the Court HEREBY ORDERS AND DECREES the

24   following:

25   1.    The Court expressly incorporates all of the terms of the Settlement

26   Agreement, attached as Exhibit 1, into this Order.

27

28

_____

[1] Plaintiff Gary Whitter is not participating in this agreement.

2

*AMENDED FULLY EXECUTED [PROPOSED] STIPULATED ORDER OF*
*DISMISSAL AS TO DEFENDANT CITY OF LOS ANGELES ONLY*

2.      The Court expressly retains exclusive jurisdiction for a period of five (5) years from the date of this Order to enforce the Settlement Agreement, and to resolve any future disputes regarding interpretation, performance, or enforcement of the Agreement.  See *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994); *Flanagan v. Arnaiz*, 143 F.3d 540, 544 (9th Cir. 1998).

3.      Except as expressly provided otherwise in the Settlement Agreement, Plaintiffs and the City shall bear their own fees and costs in this Action.

4.      Plaintiffs' claims against the City only, as alleged in the First Amended and Supplemental Complaint are hereby dismissed with prejudice as to the City only. This Action shall proceed against the County and no claims alleged by Plaintiff Gary Whitter are dismissed by this Order.


    IT IS SO ORDERED.


Dated: May ___ 2022

_____
Hon. David O. Carter,
United States District Judge

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

3
*AMENDED FULLY EXECUTED [PROPOSED] STIPULATED ORDER OF*
*DISMISSAL AS TO DEFENDANT CITY OF LOS ANGELES ONLY*

1  APPROVED AS TO FORM.

2  DATED:  May 24, 2022          Respectfully submitted,

3
                                */s/ Elizabeth A. Mitchell*
4                                SPERTUS, LANDES & UMHOFER, LLP
                                Matthew Donald Umhofer
5                                Elizabeth A. Mitchell
                                *Attorneys for Plaintiffs*
6

7  DATED:  May 24, 2022          MICHAEL N. FEUER, City Attorney
                                SCOTT MARCUS, Chief Assistant City Attorney
8                                ARLENE N. HOANG, Deputy City Attorney
                                JESSICA MARIANI, Deputy City Attorney
9                                RYAN SALSIG, Deputy City Attorney

10

11                               By: */s/ Scott Marcus*
                                Scott Marcus, Chief Assistant City Attorney
12                               Counsel for Defendant City of Los Angeles

13  Pursuant to L.R. 5-4.3.4(a)(2)(i), all other signatories listed, and on whose behalf the

14  filing is submitted, concur in the filing's content and have authorized the filing.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4
*AMENDED FULLY EXECUTED [PROPOSED] STIPULATED ORDER OF
DISMISSAL AS TO DEFENDANT CITY OF LOS ANGELES ONLY*

# Exhibit 1

## SETTLEMENT AGREEMENT

This Settlement Agreement is entered into by and between the following Parties:

1)      Plaintiffs LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karyn Pinsky, Charles Malow, Charles Van Scoy, George Frem, and Leandro Suarez ("Plaintiffs"); and

2)      Defendant City of Los Angeles ("City").

## RECITALS

WHEREAS, Plaintiffs filed a Complaint on March 10, 2020 in the Central District of California, Case No. Case 2:20-cv-02291-DOC-KES (the "Action") naming the City and the County of Los Angeles (the "County") as co-defendants in fourteen separate claims, including three that allege violations of 42 U.S.C. § 1983, concerning the City and County's handling of the homelessness crisis, and contended the City and County violated, among other things, the Due Process and Equal Protection Clauses of the United State Constitution, the State Created Danger doctrine, state and federal disability laws, were negligent, created or maintained nuisances, and engaged in inverse condemnation and takings of real property;

WHEREAS, the City expressly denies all claims alleged in the Action (and did so via a motion to dismiss), and further denies that the City and any of its officers, employees, or agents violated any laws, committed any wrongful acts or omissions, or are liable to the Plaintiffs as alleged in the Action;

WHEREAS, on April 20, 2021, the District Court entered a preliminary injunction against the City and County, ordering, among other things, the City to escrow $1 billion, cease any sales, transfers or leases of City-owned properties, shelter all residents of Skid Row, and prepare numerous audits and reports;

WHEREAS, on October 15, 2021, the United States Court of Appeals for the Ninth Circuit vacated the injunction issued by the District Court;

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1

SETTLEMENT AGREEMENT

ER 347

WHEREAS, on November 1, 2021, Plaintiffs filed a First Amended and Supplemental Complaint, the allegations and claims within which the City also expressly denies, and has filed a motion to dismiss them;

WHEREAS, the Plaintiffs and the City desire to fully and finally compromise and settle all claims arising out of or relating to all matters alleged or that could have been alleged in the Action with respect to the Parties, without any admission of fault, liability, or wrongdoing, in the interests of avoiding the additional expense and the inherent uncertainties of protracted litigation upon the terms and conditions set forth in this Agreement; and

WHEREAS, the purpose of this Agreement is to substantially increase the number of housing and shelter opportunities in the City of Los Angeles, and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelenos, to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles.

## **TERMS**

**1.**  **Definitions**

1.1.  Agreement.  The term "Agreement" as used herein shall refer to this Settlement Agreement and all associated documents, including all necessary orders and stipulations referred to herein.

1.2.  LAHSA.  "LAHSA" as used herein shall mean and refer to the Los Angeles Homeless Services Authority.

1.3.  PEH.  "PEH" as used herein shall mean persons experiencing homelessness.

1.4.  City Shelter Appropriate.  The term "City Shelter Appropriate" as used herein shall include any PEH within the City whom the City can reasonably assist, meaning the individual:

(A)  does not have a severe mental illness, and/or

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1       (B)    is not chronically homeless and has

2            (i)    a substance use disorder, or

3            (ii)    a chronic physical illness or disability requiring the

4                 need for professional medical care and support,

5       such that the individual (a) is unable to perform activities of daily

6    living, including bathing, dressing, grooming, toileting, transferring

7    between bed and chair, and feeding oneself, and/or (b) lacks medical

8    and/or mental health care decision-making capacity, and/or (c) is a danger

9    to themselves or others.

10       PEH who meet the definition of City Shelter Appropriate are typically, but

11  not always, those with low- or medium-acuity needs according to accepted

12  industry standards, including, but not limited to, through the use of an assessment

13  tool, such as the Vulnerability Index-Service Prioritization Decision Assistance

14  Tool (VI-SPDAT) or other similar assessment tool such as the CES Survey

15  Packet or Next Step Tool as evaluated by a qualified outreach or clinical staff

16  member.

17       The City will use its best efforts to engage the appropriate County entity,

18  including, but not limited to, the Department of Mental Health (DMH),

19  Department of Health Services (DHS), Department of Public Social Services

20  (DPSS), or Department of Public Health (DPH), for intervention, treatment,

21  services, and/or housing as appropriate for PEH who are not City Shelter

22  Appropriate.

23       Moreover, the fact that an individual meets the criteria of "high acuity"

24  according to accepted industry standards, has a severe mental illness, substance

25  use disorder, chronic physical illness or disability, or otherwise is not included in

26  the definition of City Shelter Appropriate, will not preclude the City from making

27  an offer of shelter or housing to that individual if the City can reasonably assist

28  that individual.

---

SETTLEMENT AGREEMENT

1.5.   <u>Parties</u>.  The word "Parties" as used herein shall refer only to the parties to this Agreement, specifically the City of Los Angeles and Plaintiffs. The word "Parties" shall not refer to any individual or entity that is not a party to this agreement. The County of Los Angeles and Intervenors are not Parties to this Agreement at this time, but may be added with written consent from the Parties.

1.6.   <u>Required Number</u>.  The term "Required Number" as used herein is the number of housing or shelter solutions which is equal to the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH in the City based on LAHSA's 2022 Point in Time (PIT) Count.[1]

## 2.   **Term and Continuing Jurisdiction**

The Parties agree that the duration of the Agreement shall be five (5) years, during which point the Court shall have continuing jurisdiction to oversee and enforce this Settlement Agreement.  The obligations of the Parties in the remaining sections of this Agreement, and the releases contained herein, shall become effective and operative on the date(s) on which the respective Order approving this Agreement and dismissing the Action ("Order") is fully executed and entered by the Court, and shall be contingent upon the Court's executing and entry of the Order.  The Parties acknowledge that the Court may, in its sole discretion, appoint one or more Special Masters to assist the Court in overseeing and enforcing this Agreement.  If the Order is not executed and entered, this Agreement shall not become operative, and this litigation shall continue as if the proposed Agreement and its terms never existed.

---

[1] LAHSA's 2022 PIT Count is still in progress.  Once the 2022 PIT Count is confirmed by LAHSA and released, Defendant City will calculate the number of housing and shelter solutions needed to accommodate 60% of unsheltered City Shelter Appropriate PEH in the City and submit a report setting forth the Required Number under Section 2 and Milestones and Deadlines under Section 4. The Parties may submit a revised Agreement that includes the specific Required Number and Milestones and Deadlines.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

**3.** **Housing and Shelter for City Shelter Appropriate Individuals**

3.1.    The City agrees to create a Required Number of housing or shelter solutions, which is equal to, but (in the City's discretion) may be greater than, the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH within the City based on LAHSA's 2022 Point in Time count.

3.2.    Subject to Constitutional requirements and legal mandates, the City may choose, at its sole discretion, any housing or shelter solution, including but not limited to tiny homes, shared housing, purchased or master-leased apartments, hotels/motels, or other buildings, congregate shelters, permanent supportive housing, rental assistance/rapid rehousing, family reunification, sprung structures or tents, safe parking, safe sleeping/camping, affordable housing, and interim housing (including A Bridge Home beds), as long as the Milestones are met.  The housing or shelter solutions may be government- and/or privately-funded as long as each offer is adequate for the individual. Accommodations shall be made for those who qualify as disabled under the Americans with Disabilities Act.

3.3.    City agrees to implement an approach of equitably distributing housing and shelter solutions throughout the City.  The Required Number and 60% threshold is the minimum required by the Agreement, and the City is encouraged to and may provide (at its sole discretion) incentives and/or benefits for Council Districts that create more housing or shelter solutions beyond those required to accommodate 60% of the City Shelter Appropriate PEH in their district.

**4.** **Street Engagement**

4.1.    City will continue to offer shelter or housing to City Shelter Appropriate PEH within the City and enforce public space regulations and health and safety laws consistent with its own protocol (Street Engagement Strategy)

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

5

SETTLEMENT AGREEMENT

1    and constitutional requirements.  No enforcement of public space regulations
2    shall be taken against any individual unless that individual has first been offered
3    an opportunity for housing or shelter or to relocate consistent with applicable
4    laws.  City reserves the right, in its sole discretion, to revise or amend its Street
5    Engagement Strategy, Los Angeles Municipal Code 41.18, or any similar
6    ordinance, regulation, or protocol consistent with applicable constitutional
7    requirements and is consistent with and meets the requirements of terms of this
8    Agreement.
9         4.2.   Council District-wide Engagement
10         Once there are sufficient shelter or housing solutions to accommodate 60%
11   of unsheltered City Shelter Appropriate PEH in a Council District as determined
12   by the Required Number, the City, in its sole discretion, may implement and
13   enforce public space regulations and ordinances within that entire Council
14   District as to those individuals who refuse an offer of shelter or housing and/or
15   decline to move to an alternative location where they may legally reside.  The
16   City must provide notice to the Plaintiffs of its intention to implement and
17   enforce District-wide.  If a Party to this Agreement files a written objection with
18   the Court (or Special Master, if one is appointed by the Court for this purpose)
19   within five court days of the notice, the Court (or Special Master) shall schedule
20   a status conference to take place within court two days, or as soon as is
21   practicable, to resolve the objection.  If no objection is filed, or if the Court (or
22   Special Master) resolves the objection in favor of the City, City may implement
23   and enforce public space regulations and ordinances throughout that District
24   consistent with this Agreement.  Even after the City creates adequate and
25   appropriate housing and shelter opportunities for 60% of unsheltered City Shelter
26   Appropriate PEH in a Council District, no enforcement action shall be taken
27   against any individual suspected of violating a public space regulation or
28   ordinance unless that individual has first been offered adequate and appropriate

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

6

SETTLEMENT AGREEMENT

ER 352

shelter or housing and/or to relocate to an alternative location consistent with applicable laws and this Agreement, except for time/manner/place regulations (such as LAMC 41.18 or similar ordinances) which may be enforced immediately and without such notice at any time.

4.3. <u>City-wide Engagement</u>

Once there are sufficient shelter or housing solutions to accommodate 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number, the City, in its sole discretion, may implement and enforce public space regulations and ordinances throughout the City as to individuals who decline an offer of shelter or housing and/or decline to move to an alternative location where they may legally reside.  The City must provide notice to the Plaintiffs of its intention to implement and enforce City-wide.  If any Party to this Agreement files a written objection with the Court (or Special Master, if one is appointed by the Court for this purpose) within five court days of the notice, the Court (or Special Master) shall schedule a status conference to take place within two court days, or as soon as is practicable, to resolve the objection.  If no objection is filed, or if the Court (or Special Master) resolves the objection in favor of City, City may implement and enforce public space regulations and ordinances throughout the City, consistent with this Agreement.  Even after the City creates adequate and appropriate housing and shelter opportunities for 60% of the number of unsheltered City Shelter Appropriate PEH within the City, no enforcement action shall be taken against any individual suspected of violating a public space regulation or ordinance unless that individual has first been offered adequate and appropriate shelter or housing and/or to relocate to an alternative location consistent with applicable laws and this Agreement, except for time/manner/place regulations (such as LAMC 41.18 or similar ordinances) which may be enforced immediately and without such notice at any time.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

4.4.    Nothing in this Agreement shall prohibit or prevent the City from enforcing laws otherwise applicable in the City that are not inconsistent with this Agreement.

**5.**     <u>**Milestones and Deadlines**</u>

5.1.    Within 30 days from the date information from the 2022 PIT Count is confirmed by LAHSA and released, the City will calculate the Required Number and provide its calculation with the Plaintiffs.  The Parties agree to meet and confer in good faith to resolve any objections to the calculation of the Required Number raised by Plaintiffs.  Any objection that cannot be resolved by the Parties may be heard by the Court if necessary.

5.2.    Thereafter the City will create plans and develop milestones and deadlines for: (i) the City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in each Council District as determined by the Required Number; (ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District; (iii) the City's creation of shelter and/or housing to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number; and (iv) the City's plan for encampment engagement, cleaning, and reduction in the City.  The City will provide the plans, milestones and deadlines to Plaintiffs, and the City and Plaintiffs agree to work together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines, and will consult with the Court for resolution, if necessary.  The City will provide a report setting forth the milestones and deadlines.  The Parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines.

**6.**     <u>**Street Engagement Dispute Resolution Process**</u>

The Parties agree to design, in conjunction with the Court and/or Special Master, a dispute resolution process for individuals who are subject to the City's

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Street Engagement Strategy in connection with the City's performance of this Agreement, pursuant to paragraph 4.

**7.**   **Status Updates**

7.1.   The City will provide quarterly status updates to the Court regarding its progress with this Agreement, including the number of housing or shelter opportunities created or otherwise obtained, the number of beds or opportunities offered, and the number of beds or opportunities currently available in each Council District.  The City will work with LAHSA to include in the quarterly status updates, to the extent possible: the number of PEH engaged, the number of PEH who have accepted offers of shelter or housing, the number of PEH who have rejected offers of shelter or housing and why offers were rejected, and the number of encampments in each Council District.

7.2.   The Parties will engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of this Agreement. The City shall be responsible for paying all fees, if any, or for obtaining grants or other private funding, if needed.

**8.**   **Funding**

8.1.   Funding of housing and shelter opportunities created by the City shall be at the City's sole discretion.  The City agrees to: (i) Petition county, state, and federal government for additional funding, as may be available; (ii) Consider expediting public/private partnerships that utilize private capital and which require no up-front costs to the City; and (iii) Consider other possible funding mechanisms to pay for future housing or shelter, facilities, and services solutions for PEH.

8.2.   In the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences; terrorist acts, insurrections or other large scale civil disturbances; or any local or fiscal emergency declared

1   by the Mayor of Los Angeles and the Los Angeles City Council under the

2   authority vested in them by the Los Angeles City Charter and Los Angeles

3   Administrative Code (or other applicable ordinances, resolutions, or laws), the

4   obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall

5   be paused, and the Parties agree to meet and confer on any necessary and

6   appropriate amendments to those obligations.

7   **9.   County Obligations**

8          The Parties agree that Defendant County of Los Angeles, who is not a

9   party to this Agreement, is obligated to provide certain services to all PEH in the

10  County, including PEH located within the City.  The Parties agree to cooperate in

11  ensuring the County meets its obligations to provide adequate services to PEH

12  within the City, and in fostering County-developed or County-funded housing,

13  shelters, and treatment services for PEH who are not City Shelter Appropriate.

14  These County responsibilities include, but are not limited to:

15  - Funding and providing wrap-around and supportive services[2] for PEH

16    in housing or shelter established by the City.  Supportive services

17    funded and provided by the County will include, but not be limited to,

18    Department of Mental Health, Department of Health Services,

19    Department of Public Health, and Department of Public Social

20    Services, for intervention, services, and housing, as appropriate;

21  - Providing housing and treatment services for all unsheltered PEH

22    within the City who are not City Shelter Appropriate;

23  - Providing and funding the Intensive Case Management Services

24    (ICMS) and integrated health services necessary to ensure appropriate

25

26  [2] "Supportive services" as used herein refers to mental health and substance use
    disorder treatment, and other services, including mainstream services, which are
27  traditionally funded by the County of Los Angeles.  City agrees to ensure each
    project will include case management, housing placement services, and
28  homelessness reduction assistance or will work with appropriate agencies to do
    so.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

10

medical, mental health, substance use, and other services and treatment for permanent supportive units financed by the City;

- Requiring that permanent supportive housing (PSH) placements into units within City limits will prioritize PEH that are homeless in the City first (consistent with applicable constitutional and statutory laws), including units funded and operated by the County if they are within City limits;

- Increasing to at least 34 (from 22; numbers based on what is currently required and could be subject to change after the 2022 PIT Count results are released and analyzed) the number of Multi-Disciplinary Teams (MDTs) dedicated to conducting outreach exclusively in the City, allocating at least 1 team per Council District, coordinated by the City's outreach staff in the Office of the City Administrative Officer (CAO) and/or the Unified Homelessness Response Center (UHRC);

- Increasing to at least 10 (from 5.5; numbers based on what is currently required and could be subject to change after the 2022 PIT Count results are released and analyzed) the number of Homeless Outreach and Mobile Engagement (HOME) teams dedicated to conducting outreach exclusively in the City, allocating at least 1 team per two Council Districts, coordinated by the CAO and/or UHRC;

- Requiring outreach teams (including the increased number of teams referenced above) have direct access to sufficient County-funded licensed and unlicensed high service need beds necessary to provide housing and treatment services for PEH in the City, and require that these beds will either be exclusively for use by, or prioritize use by, PEH in the City.  In order to effectuate this access, the County will, in collaboration with LAHSA, County departments, and other relevant agencies and partners, establish a centralized, County-wide bed

Spertus, Landes & Umhofer, LLP
1900 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

11
SETTLEMENT AGREEMENT

management system that is inclusive of all types of shelter, housing, and care beds, and which will identify specific, available, and appropriate high service need beds for PEH in the City;

- Requiring a minimum of 50 mental health beds per 100,000 people in the County, or more as necessary to ensure access to inpatient treatment for PEH in the City and to prevent mentally ill individuals from falling into homelessness due to lack of available inpatient treatment;

- Increasing the number of high acuity public health (SUD/detox/drug rehabilitation) beds to specified level, and priority access for PEH regardless of the availability of insurance coverage;

- Providing City-directed outreach teams with direct access to Department of Mental Health, Department of Health Services, Department of Public Social Services, and Department of Public Health during outreach and other Street Engagement Strategy activities;

- Identify and make available sufficient County-owned land to other County jurisdictions, including City, for homeless housing on a $1 per year lease and allowing by right development; and

- Securing County commitment to prevention of inflow of new PEH in the City of Los Angeles, including commitment to registering individuals for SSI and Social Security, and other local (e.g., General Relief), state, and federal entitlement programs.

**10.   Affordable Housing**

The Parties agree to cooperate to identify and reduce barriers to building more affordable housing.

**11.   No Third Party Beneficiaries**

Notwithstanding anything in this Agreement to the contrary, there are no intended third-party beneficiaries that may assert rights or defenses under this Agreement, except the Parties to this Agreement.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

12

SETTLEMENT AGREEMENT

ER 358

**12.**    **Modification By Judicial Action**

If a court issues an order or judgment regarding the constitutionality of, or the City's ability to enforce, any law, code, ordinance, or regulation governing public spaces in the City (including but not limited to LAMC § 41.18), or any other part of this Agreement, and that order or judgment conflicts with or is inconsistent with any part of the terms of this Agreement, the Parties agree that the conflicting or inconsistent part(s) of this Agreement shall no longer be in effect, but all other terms of this Agreement that are not inconsistent with the order or judgment shall still remain in effect.  In the event a Party asserts that an order or judgment conflicts with or is inconsistent with a part of this Agreement, the Party shall notify the other Parties in writing.  If the Parties disagree as to whether a conflict or inconsistency exists, the question of whether a conflict or inconsistency exists shall be resolved according to Section 24 of this Agreement.

**13.**    **Releases and Waiver of California Civil Code Section 1542**

13.1.  The undersigned Plaintiffs to this Agreement, each on behalf of themselves, and their respective heirs, spouses, trustees, successors, assigns, agents, representatives, attorneys, employees, officers, directors, shareholders, members, managers, principals, partners, insurers, and predecessors do hereby forever release, acquit, and discharge the City and all of its boards, bureaus, departments, elected and appointed officials, administrators, officers, agents, employees, and all persons that acted on behalf of the City (collectively the "City Released Parties") from any and all claims, demands, actions, causes of action, suits, covenants, settlements, contracts, agreements, and liabilities for personal injuries, property damage, loss, cost or expense of every nature whatsoever, whether known or unknown, contingent or otherwise, at law or in equity, and whether or not expected to exist which the undersigned Plaintiffs to this Agreement had, have, or may have against the City Released Parties, and each of them, that arise out of or are related to the Action, and any allegations, events,

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

transactions or occurrences that were alleged or that could have been alleged therein (the "City Released Claims").

Nothing in this release and waiver is intended to include Plaintiffs' claims against the County, including for attorneys' fees, which Plaintiffs will continue to litigate against the County to judgment or settlement consistent with the terms of this Agreement.

13.2.  Plaintiffs acknowledge that they are familiar with the provisions of California Civil Code section 1542 and, except as otherwise provided herein, expressly waive and relinquish any and all rights or benefits that they may have under said section to the fullest extent permitted by law concerning any matters relating to the Parties' Actions.

California Civil Code section 1542 states:

**A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

Plaintiffs declare that they understand the full nature, extent and import of section 1542 of the California Civil Code and have been so advised by their attorneys.

13.3.  Plaintiffs warrant and represent that they have made no assignment, and will make no assignment, of any claim, chose in action, right of action, or any right, of any kind whatsoever, within the scope of the City Released Claims, and that no other person or entity of any kind had or has any interest in any of the demands, obligations, actions, causes of action, debts, liabilities, rights, contracts, damages, attorneys' fees, costs, expenses, losses, or claims within the scope of the City Released Claims.

SETTLEMENT AGREEMENT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

**14.** **Dismissal of the Action**

Upon approval of this Agreement by the City Council and Mayor, which approvals are required for this Agreement to be final and binding, and after execution of this Agreement by all Parties and their respective counsel, Plaintiffs and the City shall jointly file a Stipulated Order of Dismissal, to which this Agreement will be attached as Exhibit 1.  At the conclusion of the Court's retained jurisdiction, subject to the City's compliance, Plaintiffs will take all additional actions and file all additional documents to effectuate dismissal of the Action as to the City with prejudice, if necessary.

**15.** **Settlement Payments and Attorneys' Fees**

This City shall pay a total amount of $1,800,000, which shall be inclusive of all claims for damages, attorneys' fees, and/or costs claimed by Plaintiffs in the action.[3]  Such payment shall be made to the Spertus, Landes, & Umhofer, LLP, attorney-client trust account for distribution by Spertus, Landes, & Umhofer, LLP, as approved by Plaintiffs.  The Parties agree that nothing in this Agreement, including the City's payment of $1,800,000, will affect the Plaintiffs' right to pursue all damages, costs, and attorney's fees from the County or any other party other than the City.  Should the County ever seek contribution from the City for fees, costs, or damages awarded against the County through the date on which the order as entered, such contribution claims are solely between the City and the County and do not affect the terms of this Agreement nor involve Plaintiffs in any manner.  Plaintiffs agree not to oppose any motion by the City for a good faith settlement determination from the Court that may extinguish the County's potential claims for contribution from the City.

---

[3] Plaintiff Gary Whitter is not participating in this Agreement.  LA Alliance for Human Rights agrees to indemnify the City against any damages, attorneys' fees, and/or costs incurred by the City in the event Plaintiff Whitter pursues his claims against the City.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

15
SETTLEMENT AGREEMENT

**ER 361**

**16.**   <u>**Non-Admission of Liability**</u>

By entering into this Agreement, the City does not admit any liability, and explicitly denies any liability or wrongdoing of any kind arising out of or relating to any of the claims alleged in the Action.  Nothing herein constitutes an admission by the Parties as to any interpretation of laws, or as to the merits, validity, or accuracy of any of the claims or legal contentions made or which could be made in the Action.  Plaintiffs and the City have entered into this Agreement solely to avoid the time, expense, and risk of litigation.  The Parties agree that an express condition of this settlement is that there has been no finding of liability on the merits, and that this settlement and any document related to this settlement, including this Agreement and Order, and the confidential negotiations leading up to this settlement, shall be inadmissible in evidence and shall not be used for any purpose in this or any other proceeding except in an action or proceeding to approve, interpret, implement, or enforce the Agreement.

**17.**   <u>**Knowing and Voluntary Agreement**</u>

This Agreement is an important legal document that has been voluntarily and knowingly executed by the Parties.  The Parties, and each of them, specifically represent that, prior to signing this Agreement, (a) they have each been provided a reasonable period of time within which to consider whether to accept this Agreement, (b) they have each carefully read and fully understand all of the provisions of this Agreement, and (c) they are voluntarily, knowingly, and without coercion entering into this Agreement based upon their own judgment.  Plaintiffs, and each of them, further specifically represent that, prior to signing this Agreement, they have conferred with counsel of their choice to the extent desired concerning the legal effect of this Agreement, and that the legal effect of this Agreement has been adequately explained to them.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

16
SETTLEMENT AGREEMENT

ER 362

**18.**    **Entire Agreement; No Other Reliance**

This Agreement constitutes the entire agreement between the Plaintiffs and the City regarding the subject matter discussed hereof and supersedes any and all other agreements, understandings, negotiations, or discussions, either oral or in writing, express or implied, between or among the Parties relating to the subject matter hereof. The Parties acknowledge that no representations, inducements, promises, agreements, or warranties, oral or otherwise, have been made by them, or anyone acting on their behalf, which are not embodied in the Agreement, that they have not executed this Agreement in reliance on any such representation, inducement, promise, agreement, or warranty, and that no representation, inducement, promise, agreement, or warranty not contained in this Agreement including, but not limited to, any purported supplements, modifications, waivers, or terminations of this Agreement, shall be valid or binding, unless executed in writing by all of the Parties to this Agreement. Any alteration, change, or modification of or to this Agreement shall be made by written instrument executed by each party hereto in order to become effective.

**19.**    **Warranty of Authority**

Each individual or entity that executes this Agreement represents and warrants, in his, her, or its personal capacity, that he, she, or it is duly authorized and empowered to enter into this Agreement on behalf of the party it purports to represent.

**20.**    **Counterparts**

This Agreement may be executed in multiple counterparts, each of which shall be considered an original but all of which shall constitute one agreement.

**21.**    **Representation by Counsel and Understanding**

The Parties acknowledge that each of them has been represented in the settlement of the matter by its own counsel and represent that each of them has received independent legal advice from their respective attorneys and has been

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1  fully advised of the nature of the Agreement and the possible rights and

2  obligations released herein.  Defendant City acknowledges it has the power and

3  right to enter into, agree, and comply with this Agreement.  The rule of

4  construction that any ambiguities are to be resolved against the drafting part shall

5  not be employed in the interpretation of the Agreement.  The Parties further

6  acknowledge that each of them has carefully read and fully understands all of the

7  provisions of the Agreement, and that each of them is voluntarily entering into

8  the Agreement.

9  **22.    No Waiver of Terms of Agreement**

10        The failure to insist upon compliance with any term, covenant or condition

11  contained in the Agreement shall not be deemed a waiver of that term, covenant

12  or condition, nor shall any waiver or relinquishment of any right or power

13  contained in the Agreement at any one time or more times be deemed a waiver or

14  relinquishment of any right or power at any other time or times.

15  **23.    Governing Law**

16        This Agreement shall be construed in accordance with the laws of the State

17  of California.

18  **24.    Duty to Meet and Confer**

19        If a dispute arises between the Plaintiffs and the City regarding the

20  interpretation, performance, or enforcement of this Agreement, the Party raising

21  the dispute shall provide written notice of the dispute to all other Parties, and all

22  Parties agree to meet and confer within a reasonable time in a good faith effort to

23  resolve any dispute.  In the event that the Parties are unable to resolve the dispute

24  within a reasonable time after the meeting, Plaintiffs or the City may, pursuant to

25  the Order, submit the matter to the Court for review and decision.

26  DATED: **5/19/2022**            By: _____

27                                                  Don Steier, Chairman, for Plaintiff

28                                                  LA Alliance for Human Rights

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

18

SETTLEMENT AGREEMENT

1   DATED:_____ 05-19-2022 ___   _____

2                                   Plaintiff Joseph Burk

3

4   DATED:_____   _____

5                                   Plaintiff George Frem

6

7   DATED:_____   _____

8                                   Plaintiff Wenzial Jarrell

9

10  DATED:_____   _____

11                                  Plaintiff Charles Malow

12

13  DATED:_____   _____

14                                  Plaintiff Karyn Pinsky

15

16  DATED:_____   _____

17                                  Plaintiff Leandro Suarez

18

19  DATED:_____   _____

20                                  Plaintiff Harry Tashdjian

21

22  DATED:_____   _____

23                                  Plaintiff Charles Van Scoy

24

25

26

27

28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

19

SETTLEMENT AGREEMENT

ER 365

DATED:_____

_____
Plaintiff Joseph Burk

DATED: 5/19/22

_____
Plaintiff George Frem

DATED:_____

_____
Plaintiff Wenzial Jarrell

DATED:_____

_____
Plaintiff Charles Malow

DATED:_____

_____
Plaintiff Karyn Pinsky

DATED:_____

_____
Plaintiff Leandro Suarez

DATED:_____

_____
Plaintiff Harry Tashdjian

DATED:_____

_____
Plaintiff Charles Van Scoy

19

**ER 366**

1

DATED:_____

2

Plaintiff Joseph Burk

3

4

DATED:_____

5

Plaintiff George Frem

6

7

DATED:___05-19-22_____

Plaintiff Wenzial Jarrell

8

9

10

DATED:_____

11

Plaintiff Charles Malow

12

13

DATED:___05-19-22____

14

Plaintiff Karyn Pinsky

15

16

DATED:_____

17

Plaintiff Leandro Suarez

18

19

DATED:_____

20

Plaintiff Harry Tashdjian

21

22

DATED:_____

23

Plaintiff Charles Van Scoy

24

25

26

27

28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

19

SETTLEMENT AGREEMENT

1    DATED:_____          _____

2                                    Plaintiff Joseph Burk

3

4    DATED:_____          _____

5                                    Plaintiff George Frem

6                                              .

7    DATED:_____          _____

8                                    Plaintiff Wenzial Jarrell

9

10   DATED: 5/23/2022                _____

11                                   Plaintiff Charles Malow

12

13   DATED:_____          _____

14                                   Plaintiff Karyn Pinsky

15

16   DATED: 23 May 2022              _____

17                                   Plaintiff Leandro Suarez

18

19   DATED: 05-23-22                 _____

20                                   Plaintiff Harry Tashdjian

21

22   DATED: 5/23/22                  _____

23                                   Plaintiff Charles Van Scoy

24

25

26

27

28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

19
SETTLEMENT AGREEMENT

1   DATED:  May 19, 2022          MATTHEW W. SZABO

2

3                                 By: _____

4   **Approved as to Form**:       City Administrative Officer, City of Los Angeles

5

6   DATED:  May 19, 2022          SPERTUS, LANDES & UMHOFER, LLP

7

8                                 By: _____

9                                 Elizabeth A. Mitchell
                                  Counsel for Plaintiffs LA Alliance for Human
10                                Rights, et al.

11  DATED:  May 19, 2022          MICHAEL N. FEUER, City Attorney

12

13                                By: _Scott Marcus_____

14                                Scott Marcus, Chief Assistant City Attorney
                                  Counsel for Defendant City of Los Angeles
15

16

17

18

19

20

21

22

23

24

25

26

27

28

20

SETTLEMENT AGREEMENT

ER 369

SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
Email: mumhofer@spertuslaw.com
Email: emitchell@spertuslaw.com

*Attorneys for Plaintiffs*

MICHAEL N. FEUER, City Attorney (SBN 111529)
SCOTT MARCUS, Chief Assistant City Attorney (SBN 184980)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
JESSICA MARIANI, Deputy City Attorney (SBN 280748)
RYAN SALSIG, Deputy City Attorney (SBN 250830)
200 North Main Street, City Hall East, 7th Floor
Los Angeles, California 90012
Telephone: 213-978-4681
Facsimile: 213-978-7011
Email: Scott.Marcus@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, *et al.*,<br><br>Defendants. | CASE NO. 2:20-CV-02291-DOC-KES<br><br>Assigned to Judge David O. Carter<br><br>**NOTICE OF LODGING [PROPOSED] STIPULATED ORDER OF DISMISSAL AS TO DEFENDANT CITY OF LOS ANGELES ONLY [Fed.R.Civ.P. 41(a)(2)]** |

*Attorneys for Plaintiffs sidebar:* Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1

ER 370

1    TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF

2  RECORD:

3    PLEASE TAKE NOTICE that pursuant to L.R. 5-4.4 and Rule 41(a)(2) of the

4  Federal Rules of Civil Procedure, Plaintiffs LA Alliance for Human Rights, *et al.,*

5  and Defendant City of Los Angeles hereby lodge for the Court's signature a

6  [Proposed] Stipulated Order of Dismissal as to Defendant City of Los Angeles only.

7  DATED:  May 19, 2022          Respectfully submitted,

8

9                               */s/ Elizabeth A. Mitchell*
                                SPERTUS, LANDES & UMHOFER, LLP
10                              Matthew Donald Umhofer
                                Elizabeth A. Mitchell
11                              *Attorneys for Plaintiffs*

12  DATED:  May 19, 2022          MICHAEL N. FEUER, City Attorney
                                SCOTT MARCUS, Chief Assistant City Attorney
13                              ARLENE N. HOANG, Deputy City Attorney
                                JESSICA MARIANI, Deputy City Attorney
14                              RYAN SALSIG, Deputy City Attorney

15

16                              By: */s/ Scott Marcus*
                                Scott Marcus, Chief Assistant City Attorney
17                              Counsel for Defendant City of Los Angeles

18  Pursuant to L.R. 5-4.3.4(a)(2)(i), all other signatories listed, and on whose behalf the

19  filing is submitted, concur in the filing's content and have authorized the filing.

20

21

22

23

24

25

26

27

28

*NOTICE OF LODGING [PROPOSED] STIPULATED ORDER OF DISMISSAL AS
TO DEFENDANT CITY OF LOS ANGELES ONLY [Fed.R.Civ.P. 41(a)(2)]*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705

1  SPERTUS, LANDES & UMHOFER, LLP
   Matthew Donald Umhofer (SBN 206607)
2  Elizabeth A. Mitchell (SBN 251139)
   617 W. 7th Street, Suite 200
3  Los Angeles, California 90017
   Telephone: (213) 205-6520
4  Facsimile: (213) 205-6521
   Email: mumhofer@spertuslaw.com
5  Email: emitchell@spertuslaw.com

6  *Attorneys for Plaintiffs*

7  MICHAEL N. FEUER, City Attorney (SBN 111529)
   SCOTT MARCUS, Chief Assistant City Attorney (SBN 184980)
8  ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
   JESSICA MARIANI, Deputy City Attorney (SBN 280748)
9  RYAN SALSIG, Deputy City Attorney (SBN 250830)
   200 North Main Street, City Hall East, 7th Floor
10 Los Angeles, California 90012
   Telephone: 213-978-4681
11 Facsimile: 213-978-7011
   Email: Scott.Marcus@lacity.org

12
   *Attorneys for Defendant*
13 *CITY OF LOS ANGELES*

14

15              UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

17

18 LA ALLIANCE FOR HUMAN          CASE NO. 2:20-CV-02291-DOC-KES
   RIGHTS, *et al.*,
19                                Assigned to Judge David O. Carter
           Plaintiffs,
20                                **[PROPOSED] STIPULATED**
       v.                         **ORDER OF DISMISSAL AS TO**
21                                **DEFENDANT CITY OF LOS**
   CITY OF LOS ANGELES, *et al.*, **ANGELES ONLY [Fed.R.Civ.P.**
22                                **41(a)(2)]**
           Defendants.
23

24

25

26

27

28

*[PROPOSED] STIPULATED ORDER OF DISMISSAL AS TO DEFENDANT CITY OF LOS ANGELES ONLY [Fed.R.Civ.P. 41(a)(2)]*

**ER 372**

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1        On March 10, 2020, Plaintiff LA Alliance for Human Rights, *et al.* filed the

2  above-captioned against the City of Los Angeles ("City") and the County of Los

3  Angeles ("County") [ECF No. 1].  On November 1, 2021, Plaintiffs LA Alliance for

4  Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karen Pinsky, Charles

5  Malow, Charles van Scoy, George Frem, Gary Whitter, and Leandro Suarez

6  (collectively "Plaintiffs") filed a First Amended and Supplemental Complaint against

7  the City and the County ("FASC") [ECF No. 361].

8        In the FASC, Plaintiffs alleged thirteen separate claims for relief concerning

9  the City and County's handling of the homelessness crisis, and contended the City

10  and County violated, among other things, the Due Process and Equal Protection

11  Clauses of the United State Constitution, the State Created Danger doctrine, state and

12  federal disability laws, were negligent, created nuisances, and engaged in inverse

13  condemnation and takings of real property.  *Id.*  The City and County each separately

14  filed a motion to dismiss the FASC [ECF No. 369, 370], which were taken under

15  submission on January 24, 2022, and all parties were Ordered to participate in a

16  mediation [ECF Nos. 388, 391].

17        Following extensive discussions and multiple mediation sessions, Plaintiffs[1]

18  and the City reached a settlement resolving the disputed claims in this Action as to

19  the City only.  A copy of the executed Settlement Agreement between Plaintiffs and

20  the City ("Settlement Agreement") is attached hereto as Exhibit 1, the terms of which

21  are expressly incorporated herein by reference.

22        NOW THEREFORE, pursuant to Federal Rule of Civil Procedure 41(a)(2), and

23  good cause appearing therefore, the Court HEREBY ORDERS AND DECREES the

24  following:

25        1.     The Court expressly incorporates all of the terms of the Settlement

26  Agreement, attached as Exhibit 1, into this Order.

27

28

[1] Plaintiff Gary Whitter is not participating in this agreement.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

2

*[PROPOSED] STIPULATED ORDER OF DISMISSAL AS TO DEFENDANT CITY
OF LOS ANGELES ONLY [Fed.R.Civ.P. 41(a)(2)]*

2.     The Court expressly retains exclusive jurisdiction for a period of five (5) years from the date of this Order to enforce the Settlement Agreement, and to resolve any future disputes regarding interpretation, performance, or enforcement of the Agreement.  See *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994); *Flanagan v. Arnaiz*, 143 F.3d 540, 544 (9th Cir. 1998).

3.     Except as expressly provided otherwise in the Settlement Agreement, Plaintiffs and the City shall bear their own fees and costs in this Action.

4.     Plaintiffs' claims against the City only, as alleged in the First Amended and Supplemental Complaint are hereby dismissed with prejudice as to the City only. This Action shall proceed against the County and no claims alleged by Plaintiff Gary Whitter are dismissed by this Order.

IT IS SO ORDERED.

Dated: May ___ 2022

_____
Hon. David O. Carter,
United States District Judge

*[PROPOSED] STIPULATED ORDER OF DISMISSAL AS TO DEFENDANT CITY OF LOS ANGELES ONLY [Fed.R.Civ.P. 41(a)(2)]*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

ER 374

1    APPROVED AS TO FORM.

2    DATED:  May 19, 2022          Respectfully submitted,

3

4                                  */s/ Elizabeth A. Mitchell*
                                   SPERTUS, LANDES & UMHOFER, LLP
5                                  Matthew Donald Umhofer
                                   Elizabeth A. Mitchell
6                                  *Attorneys for Plaintiffs*

7    DATED:  May 19, 2022          MICHAEL N. FEUER, City Attorney
                                   SCOTT MARCUS, Chief Assistant City Attorney
8                                  ARLENE N. HOANG, Deputy City Attorney
                                   JESSICA MARIANI, Deputy City Attorney
9                                  RYAN SALSIG, Deputy City Attorney

10

11                                 By: */s/ Scott Marcus*
                                   Scott Marcus, Chief Assistant City Attorney
12                                 Counsel for Defendant City of Los Angeles

13   Pursuant to L.R. 5-4.3.4(a)(2)(i), all other signatories listed, and on whose behalf the

14   filing is submitted, concur in the filing's content and have authorized the filing.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

*[PROPOSED] STIPULATED ORDER OF DISMISSAL AS TO DEFENDANT CITY*
*OF LOS ANGELES ONLY [Fed.R.Civ.P. 41(a)(2)]*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
S ANGELES, CA 90025
826-4700; FACSIMILE 310-826-4711

# Exhibit 1

## **SETTLEMENT AGREEMENT**

This Settlement Agreement is entered into by and between the following Parties:

1)      Plaintiffs LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karyn Pinsky, Charles Malow, Charles Van Scoy, George Frem, and Leandro Suarez ("Plaintiffs"); and

2)      Defendant City of Los Angeles ("City").

## **RECITALS**

WHEREAS, Plaintiffs filed a Complaint on March 10, 2020 in the Central District of California, Case No. Case 2:20-cv-02291-DOC-KES (the "Action") naming the City and the County of Los Angeles (the "County") as co-defendants in fourteen separate claims, including three that allege violations of 42 U.S.C. § 1983, concerning the City and County's handling of the homelessness crisis, and contended the City and County violated, among other things, the Due Process and Equal Protection Clauses of the United State Constitution, the State Created Danger doctrine, state and federal disability laws, were negligent, created or maintained nuisances, and engaged in inverse condemnation and takings of real property;

WHEREAS, the City expressly denies all claims alleged in the Action (and did so via a motion to dismiss), and further denies that the City and any of its officers, employees, or agents violated any laws, committed any wrongful acts or omissions, or are liable to the Plaintiffs as alleged in the Action;

WHEREAS, on April 20, 2021, the District Court entered a preliminary injunction against the City and County, ordering, among other things, the City to escrow $1 billion, cease any sales, transfers or leases of City-owned properties, shelter all residents of Skid Row, and prepare numerous audits and reports;

WHEREAS, on October 15, 2021, the United States Court of Appeals for the Ninth Circuit vacated the injunction issued by the District Court;

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1    WHEREAS, on November 1, 2021, Plaintiffs filed a First Amended and
2    Supplemental Complaint, the allegations and claims within which the City also
3    expressly denies, and has filed a motion to dismiss them;

4    WHEREAS, the Plaintiffs and the City desire to fully and finally
5    compromise and settle all claims arising out of or relating to all matters alleged or
6    that could have been alleged in the Action with respect to the Parties, without any
7    admission of fault, liability, or wrongdoing, in the interests of avoiding the
8    additional expense and the inherent uncertainties of protracted litigation upon the
9    terms and conditions set forth in this Agreement; and

10   WHEREAS, the purpose of this Agreement is to substantially increase the
11   number of housing and shelter opportunities in the City of Los Angeles, and to
12   address the needs of everyone who shares public spaces and rights of way in the
13   City of Los Angeles, including both housed and unhoused Angelenos, to achieve
14   a substantial and meaningful reduction in unsheltered homelessness in the City of
15   Los Angeles.

**TERMS**

**1.**   **Definitions**

1.1.   <u>Agreement</u>.  The term "Agreement" as used herein shall refer to this
Settlement Agreement and all associated documents, including all necessary
orders and stipulations referred to herein.

1.2.   <u>LAHSA</u>.  "LAHSA" as used herein shall mean and refer to the Los
Angeles Homeless Services Authority.

1.3.   <u>PEH</u>.  "PEH" as used herein shall mean persons experiencing
homelessness.

1.4.   <u>City Shelter Appropriate</u>.   The term "City Shelter Appropriate" as
used herein shall include any PEH within the City whom the City can reasonably
assist, meaning the individual:

(A)    does not have a severe mental illness, and/or

<div align="center">2</div>

<div align="center">SETTLEMENT AGREEMENT</div>

<div align="right">ER 378</div>

*Spertus, Landes & Umhofer, LLP*
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

(B)    is not chronically homeless and has

       (i)    a substance use disorder, or

       (ii)    a chronic physical illness or disability requiring the

           need for professional medical care and support,

such that the individual (a) is unable to perform activities of daily living, including bathing, dressing, grooming, toileting, transferring between bed and chair, and feeding oneself, and/or (b) lacks medical and/or mental health care decision-making capacity, and/or (c) is a danger to themselves or others.

PEH who meet the definition of City Shelter Appropriate are typically, but not always, those with low- or medium-acuity needs according to accepted industry standards, including, but not limited to, through the use of an assessment tool, such as the Vulnerability Index-Service Prioritization Decision Assistance Tool (VI-SPDAT) or other similar assessment tool such as the CES Survey Packet or Next Step Tool as evaluated by a qualified outreach or clinical staff member.

The City will use its best efforts to engage the appropriate County entity, including, but not limited to, the Department of Mental Health (DMH), Department of Health Services (DHS), Department of Public Social Services (DPSS), or Department of Public Health (DPH), for intervention, treatment, services, and/or housing as appropriate for PEH who are not City Shelter Appropriate.

Moreover, the fact that an individual meets the criteria of "high acuity" according to accepted industry standards, has a severe mental illness, substance use disorder, chronic physical illness or disability, or otherwise is not included in the definition of City Shelter Appropriate, will not preclude the City from making

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

3

SETTLEMENT AGREEMENT

an offer of shelter or housing to that individual if the City can reasonably assist that individual.

　　1.5.　Parties.　The word "Parties" as used herein shall refer only to the parties to this Agreement, specifically the City of Los Angeles and Plaintiffs. The word "Parties" shall not refer to any individual or entity that is not a party to this agreement. The County of Los Angeles and Intervenors are not Parties to this Agreement at this time, but may be added with written consent from the Parties.

　　1.6.　Required Number.　The term "Required Number" as used herein is the number of housing or shelter solutions which is equal to the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH in the City based on LAHSA's 2022 Point in Time (PIT) Count. [1]

**2.　Term and Continuing Jurisdiction**

　　The Parties agree that the duration of the Agreement shall be five (5) years, during which point the Court shall have continuing jurisdiction to oversee and enforce this Settlement Agreement.　The obligations of the Parties in the remaining sections of this Agreement, and the releases contained herein, shall become effective and operative on the date(s) on which the respective Order approving this Agreement and dismissing the Action ("Order") is fully executed and entered by the Court, and shall be contingent upon the Court's executing and entry of the Order.　The Parties acknowledge that the Court may, in its sole discretion, appoint one or more Special Masters to assist the Court in overseeing and enforcing this Agreement.　If the Order is not executed and entered, this

---

[1] LAHSA's 2022 PIT Count is still in progress.　Once the 2022 PIT Count is confirmed by LAHSA and released, Defendant City will calculate the number of housing and shelter solutions needed to accommodate 60% of unsheltered City Shelter Appropriate PEH in the City and submit a report setting forth the Required Number under Section 2 and Milestones and Deadlines under Section 4. The Parties may submit a revised Agreement that includes the specific Required Number and Milestones and Deadlines.

SETTLEMENT AGREEMENT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1    Agreement shall not become operative, and this litigation shall continue as if the

2    proposed Agreement and its terms never existed.

3    **3.**       **Housing and Shelter for City Shelter Appropriate Individuals**

4            3.1.    The City agrees to create a Required Number of housing or shelter

5    solutions, which is equal to, but (in the City's discretion) may be greater than, the

6    shelter and/or housing capacity needed to accommodate sixty percent (60%) of

7    unsheltered City Shelter Appropriate PEH within the City based on LAHSA's

8    2022 Point in Time count.

9            3.2.    Subject to Constitutional requirements and legal mandates, the City

10   may choose, at its sole discretion, any housing or shelter solution, including but

11   not limited to tiny homes, shared housing, purchased or master-leased

12   apartments, hotels/motels, or other buildings, congregate shelters, permanent

13   supportive housing, rental assistance/rapid rehousing, family reunification,

14   sprung structures or tents, safe parking, safe sleeping/camping, affordable

15   housing, and interim housing (including A Bridge Home beds), as long as the

16   Milestones are met.  The housing or shelter solutions may be government- and/or

17   privately-funded as long as each offer is adequate for the individual.

18   Accommodations shall be made for those who qualify as disabled under the

19   Americans with Disabilities Act.

20           3.3.    City agrees to implement an approach of equitably distributing

21   housing and shelter solutions throughout the City.  The Required Number and

22   60% threshold is the minimum required by the Agreement, and the City is

23   encouraged to and may provide (at its sole discretion) incentives and/or benefits

24   for Council Districts that create more housing or shelter solutions beyond those

25   required to accommodate 60% of the City Shelter Appropriate PEH in their

26   district.

27

28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

5

SETTLEMENT AGREEMENT

**4.**   **Street Engagement**

4.1.   City will continue to offer shelter or housing to City Shelter Appropriate PEH within the City and enforce public space regulations and health and safety laws consistent with its own protocol (Street Engagement Strategy) and constitutional requirements.  No enforcement of public space regulations shall be taken against any individual unless that individual has first been offered an opportunity for housing or shelter or to relocate consistent with applicable laws.  City reserves the right, in its sole discretion, to revise or amend its Street Engagement Strategy, Los Angeles Municipal Code 41.18, or any similar ordinance, regulation, or protocol consistent with applicable constitutional requirements and is consistent with and meets the requirements of terms of this Agreement.

4.2.   Council District-wide Engagement

Once there are sufficient shelter or housing solutions to accommodate 60% of unsheltered City Shelter Appropriate PEH in a Council District as determined by the Required Number, the City, in its sole discretion, may implement and enforce public space regulations and ordinances within that entire Council District as to those individuals who refuse an offer of shelter or housing and/or decline to move to an alternative location where they may legally reside.  The City must provide notice to the Plaintiffs of its intention to implement and enforce District-wide.  If a Party to this Agreement files a written objection with the Court (or Special Master, if one is appointed by the Court for this purpose) within five court days of the notice, the Court (or Special Master) shall schedule a status conference to take place within court two days, or as soon as is practicable, to resolve the objection.  If no objection is filed, or if the Court (or Special Master) resolves the objection in favor of the City, City may implement and enforce public space regulations and ordinances throughout that District consistent with this Agreement.  Even after the City creates adequate and

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

appropriate housing and shelter opportunities for 60% of unsheltered City Shelter Appropriate PEH in a Council District, no enforcement action shall be taken against any individual suspected of violating a public space regulation or ordinance unless that individual has first been offered adequate and appropriate shelter or housing and/or to relocate to an alternative location consistent with applicable laws and this Agreement, except for time/manner/place regulations (such as LAMC 41.18 or similar ordinances) which may be enforced immediately and without such notice at any time.

4.3.   City-wide Engagement

Once there are sufficient shelter or housing solutions to accommodate 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number, the City, in its sole discretion, may implement and enforce public space regulations and ordinances throughout the City as to individuals who decline an offer of shelter or housing and/or decline to move to an alternative location where they may legally reside.  The City must provide notice to the Plaintiffs of its intention to implement and enforce City-wide.  If any Party to this Agreement files a written objection with the Court (or Special Master, if one is appointed by the Court for this purpose) within five court days of the notice, the Court (or Special Master) shall schedule a status conference to take place within two court days, or as soon as is practicable, to resolve the objection. If no objection is filed, or if the Court (or Special Master) resolves the objection in favor of City, City may implement and enforce public space regulations and ordinances throughout the City, consistent with this Agreement.  Even after the City creates adequate and appropriate housing and shelter opportunities for 60% of the number of unsheltered City Shelter Appropriate PEH within the City, no enforcement action shall be taken against any individual suspected of violating a public space regulation or ordinance unless that individual has first been offered adequate and appropriate shelter or housing and/or to relocate to an alternative

location consistent with applicable laws and this Agreement, except for time/manner/place regulations (such as LAMC 41.18 or similar ordinances) which may be enforced immediately and without such notice at any time.

4.4.    Nothing in this Agreement shall prohibit or prevent the City from enforcing laws otherwise applicable in the City that are not inconsistent with this Agreement.

**5.    Milestones and Deadlines**

5.1.    Within 30 days from the date information from the 2022 PIT Count is confirmed by LAHSA and released, the City will calculate the Required Number and provide its calculation with the Plaintiffs.  The Parties agree to meet and confer in good faith to resolve any objections to the calculation of the Required Number raised by Plaintiffs.  Any objection that cannot be resolved by the Parties may be heard by the Court if necessary.

5.2.    Thereafter the City will create plans and develop milestones and deadlines for: (i) the City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in each Council District as determined by the Required Number; (ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District; (iii) the City's creation of shelter and/or housing to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number; and (iv) the City's plan for encampment engagement, cleaning, and reduction in the City.  The City will provide the plans, milestones and deadlines to Plaintiffs, and the City and Plaintiffs agree to work together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines, and will consult with the Court for resolution, if necessary.  The City will provide a report setting forth the milestones and deadlines.  The Parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

**6.** **Street Engagement Dispute Resolution Process**

The Parties agree to design, in conjunction with the Court and/or Special Master, a dispute resolution process for individuals who are subject to the City's Street Engagement Strategy in connection with the City's performance of this Agreement, pursuant to paragraph 4.

**7.** **Status Updates**

7.1.    The City will provide quarterly status updates to the Court regarding its progress with this Agreement, including the number of housing or shelter opportunities created or otherwise obtained, the number of beds or opportunities offered, and the number of beds or opportunities currently available in each Council District.  The City will work with LAHSA to include in the quarterly status updates, to the extent possible: the number of PEH engaged, the number of PEH who have accepted offers of shelter or housing, the number of PEH who have rejected offers of shelter or housing and why offers were rejected, and the number of encampments in each Council District.

7.2.    The Parties will engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of this Agreement. The City shall be responsible for paying all fees, if any, or for obtaining grants or other private funding, if needed.

**8.** **Funding**

8.1.    Funding of housing and shelter opportunities created by the City shall be at the City's sole discretion.  The City agrees to: (i) Petition county, state, and federal government for additional funding, as may be available; (ii) Consider expediting public/private partnerships that utilize private capital and which require no up-front costs to the City; and (iii) Consider other possible funding mechanisms to pay for future housing or shelter, facilities, and services solutions for PEH.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

9

SETTLEMENT AGREEMENT

8.2.    In the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences; terrorist acts, insurrections or other large scale civil disturbances; or any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council under the authority vested in them by the Los Angeles City Charter and Los Angeles Administrative Code (or other applicable ordinances, resolutions, or laws), the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations.

**9.**    **County Obligations**

The Parties agree that Defendant County of Los Angeles, who is not a party to this Agreement, is obligated to provide certain services to all PEH in the County, including PEH located within the City.  The Parties agree to cooperate in ensuring the County meets its obligations to provide adequate services to PEH within the City, and in fostering County-developed or County-funded housing, shelters, and treatment services for PEH who are not City Shelter Appropriate. These County responsibilities include, but are not limited to:

- Funding and providing wrap-around and supportive services[2] for PEH in housing or shelter established by the City.  Supportive services funded and provided by the County will include, but not be limited to, Department of Mental Health, Department of Health Services, Department of Public Health, and Department of Public Social Services, for intervention, services, and housing, as appropriate;

---

[2] "Supportive services" as used herein refers to mental health and substance use disorder treatment, and other services, including mainstream services, which are traditionally funded by the County of Los Angeles.  City agrees to ensure each project will include case management, housing placement services, and homelessness reduction assistance or will work with appropriate agencies to do so.

SETTLEMENT AGREEMENT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

- Providing housing and treatment services for all unsheltered PEH within the City who are not City Shelter Appropriate;
- Providing and funding the Intensive Case Management Services (ICMS) and integrated health services necessary to ensure appropriate medical, mental health, substance use, and other services and treatment for permanent supportive units financed by the City;
- Requiring that permanent supportive housing (PSH) placements into units within City limits will prioritize PEH that are homeless in the City first (consistent with applicable constitutional and statutory laws), including units funded and operated by the County if they are within City limits;
- Increasing to at least 34 (from 22; numbers based on what is currently required and could be subject to change after the 2022 PIT Count results are released and analyzed) the number of Multi-Disciplinary Teams (MDTs) dedicated to conducting outreach exclusively in the City, allocating at least 1 team per Council District, coordinated by the City's outreach staff in the Office of the City Administrative Officer (CAO) and/or the Unified Homelessness Response Center (UHRC);
- Increasing to at least 10 (from 5.5; numbers based on what is currently required and could be subject to change after the 2022 PIT Count results are released and analyzed) the number of Homeless Outreach and Mobile Engagement (HOME) teams dedicated to conducting outreach exclusively in the City, allocating at least 1 team per two Council Districts, coordinated by the CAO and/or UHRC;
- Requiring outreach teams (including the increased number of teams referenced above) have direct access to sufficient County-funded licensed and unlicensed high service need beds necessary to provide housing and treatment services for PEH in the City, and require that

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

11

SETTLEMENT AGREEMENT

these beds will either be exclusively for use by, or prioritize use by, PEH in the City.  In order to effectuate this access, the County will, in collaboration with LAHSA, County departments, and other relevant agencies and partners, establish a centralized, County-wide bed management system that is inclusive of all types of shelter, housing, and care beds, and which will identify specific, available, and appropriate high service need beds for PEH in the City;

- Requiring a minimum of 50 mental health beds per 100,000 people in the County, or more as necessary to ensure access to inpatient treatment for PEH in the City and to prevent mentally ill individuals from falling into homelessness due to lack of available inpatient treatment;

- Increasing the number of high acuity public health (SUD/detox/drug rehabilitation) beds to specified level, and priority access for PEH regardless of the availability of insurance coverage;

- Providing City-directed outreach teams with direct access to Department of Mental Health, Department of Health Services, Department of Public Social Services, and Department of Public Health during outreach and other Street Engagement Strategy activities;

- Identify and make available sufficient County-owned land to other County jurisdictions, including City, for homeless housing on a $1 per year lease and allowing by right development; and

- Securing County commitment to prevention of inflow of new PEH in the City of Los Angeles, including commitment to registering individuals for SSI and Social Security, and other local (e.g., General Relief), state, and federal entitlement programs.

**10.   Affordable Housing**

The Parties agree to cooperate to identify and reduce barriers to building more affordable housing.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

**11.**   <u>**No Third Party Beneficiaries**</u>

Notwithstanding anything in this Agreement to the contrary, there are no intended third-party beneficiaries that may assert rights or defenses under this Agreement, except the Parties to this Agreement.

**12.**   <u>**Modification By Judicial Action**</u>

If a court issues an order or judgment regarding the constitutionality of, or the City's ability to enforce, any law, code, ordinance, or regulation governing public spaces in the City (including but not limited to LAMC § 41.18), or any other part of this Agreement, and that order or judgment conflicts with or is inconsistent with any part of the terms of this Agreement, the Parties agree that the conflicting or inconsistent part(s) of this Agreement shall no longer be in effect, but all other terms of this Agreement that are not inconsistent with the order or judgment shall still remain in effect.  In the event a Party asserts that an order or judgment conflicts with or is inconsistent with a part of this Agreement, the Party shall notify the other Parties in writing.  If the Parties disagree as to whether a conflict or inconsistency exists, the question of whether a conflict or inconsistency exists shall be resolved according to Section 24 of this Agreement.

**13.**   <u>**Releases and Waiver of California Civil Code Section 1542**</u>

13.1.  The undersigned Plaintiffs to this Agreement, each on behalf of themselves, and their respective heirs, spouses, trustees, successors, assigns, agents, representatives, attorneys, employees, officers, directors, shareholders, members, managers, principals, partners, insurers, and predecessors do hereby forever release, acquit, and discharge the City and all of its boards, bureaus, departments, elected and appointed officials, administrators, officers, agents, employees, and all persons that acted on behalf of the City (collectively the "City Released Parties") from any and all claims, demands, actions, causes of action, suits, covenants, settlements, contracts, agreements, and liabilities for personal injuries, property damage, loss, cost or expense of every nature whatsoever,

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1    whether known or unknown, contingent or otherwise, at law or in equity, and

2    whether or not expected to exist which the undersigned Plaintiffs to this

3    Agreement had, have, or may have against the City Released Parties, and each of

4    them, that arise out of or are related to the Action, and any allegations, events,

5    transactions or occurrences that were alleged or that could have been alleged

6    therein (the "City Released Claims").

7          Nothing in this release and waiver is intended to include Plaintiffs' claims

8    against the County, including for attorneys' fees, which Plaintiffs will continue to

9    litigate against the County to judgment or settlement consistent with the terms of

10   this Agreement.

11         13.2.  Plaintiffs acknowledge that they are familiar with the provisions of

12   California Civil Code section 1542 and, except as otherwise provided herein,

13   expressly waive and relinquish any and all rights or benefits that they may have

14   under said section to the fullest extent permitted by law concerning any matters

15   relating to the Parties' Actions.

16         California Civil Code section 1542 states:

17         **A general release does not extend to claims that the
           creditor or releasing party does not know or suspect
18         to exist in his or her favor at the time of executing
           the release and that, if known by him or her, would
19         have materially affected his or her settlement with
           the debtor or released party.**

20         Plaintiffs declare that they understand the full nature, extent and import of

21   section 1542 of the California Civil Code and have been so advised by their

22   attorneys.

23         13.3.  Plaintiffs warrant and represent that they have made no assignment,

24   and will make no assignment, of any claim, chose in action, right of action, or

25   any right, of any kind whatsoever, within the scope of the City Released Claims,

26   and that no other person or entity of any kind had or has any interest in any of the

27   demands, obligations, actions, causes of action, debts, liabilities, rights, contracts,

28

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

14
SETTLEMENT AGREEMENT

1  damages, attorneys' fees, costs, expenses, losses, or claims within the scope of the

2  City Released Claims.

3  **14.     Dismissal of the Action**

4          Upon approval of this Agreement by the City Council and Mayor, which

5  approvals are required for this Agreement to be final and binding, and after

6  execution of this Agreement by all Parties and their respective counsel, Plaintiffs

7  and the City shall jointly file a Stipulated Order of Dismissal, to which this

8  Agreement will be attached as Exhibit 1.  At the conclusion of the Court's

9  retained jurisdiction, subject to the City's compliance, Plaintiffs will take all

10 additional actions and file all additional documents to effectuate dismissal of the

11 Action as to the City with prejudice, if necessary.

12 **15.     Settlement Payments and Attorneys' Fees**

13         This City shall pay a total amount of $1,800,000, which shall be inclusive

14 of all claims for damages, attorneys' fees, and/or costs claimed by Plaintiffs in

15 the action.[3]  Such payment shall be made to the Spertus, Landes, & Umhofer,

16 LLP, attorney-client trust account for distribution by Spertus, Landes, &

17 Umhofer, LLP, as approved by Plaintiffs.  The Parties agree that nothing in this

18 Agreement, including the City's payment of $1,800,000, will affect the Plaintiffs'

19 right to pursue all damages, costs, and attorney's fees from the County or any

20 other party other than the City.  Should the County ever seek contribution from

21 the City for fees, costs, or damages awarded against the County through the date

22 on which the order as entered, such contribution claims are solely between the

23 City and the County and do not affect the terms of this Agreement nor involve

24 Plaintiffs in any manner.  Plaintiffs agree not to oppose any motion by the City

25

26

27

28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

---

[3] Plaintiff Gary Whitter is not participating in this Agreement.  LA Alliance for Human Rights agrees to indemnify the City against any damages, attorneys' fees, and/or costs incurred by the City in the event Plaintiff Whitter pursues his claims against the City.

15
SETTLEMENT AGREEMENT

**ER 391**

1  for a good faith settlement determination from the Court that may extinguish the

2  County's potential claims for contribution from the City.

3  **16.    Non-Admission of Liability**

4  By entering into this Agreement, the City does not admit any liability, and

5  explicitly denies any liability or wrongdoing of any kind arising out of or relating

6  to any of the claims alleged in the Action.  Nothing herein constitutes an

7  admission by the Parties as to any interpretation of laws, or as to the merits,

8  validity, or accuracy of any of the claims or legal contentions made or which

9  could be made in the Action.  Plaintiffs and the City have entered into this

10 Agreement solely to avoid the time, expense, and risk of litigation.  The Parties

11 agree that an express condition of this settlement is that there has been no finding

12 of liability on the merits, and that this settlement and any document related to this

13 settlement, including this Agreement and Order, and the confidential negotiations

14 leading up to this settlement, shall be inadmissible in evidence and shall not be

15 used for any purpose in this or any other proceeding except in an action or

16 proceeding to approve, interpret, implement, or enforce the Agreement.

17 **17.    Knowing and Voluntary Agreement**

18 This Agreement is an important legal document that has been voluntarily

19 and knowingly executed by the Parties.  The Parties, and each of them,

20 specifically represent that, prior to signing this Agreement, (a) they have each

21 been provided a reasonable period of time within which to consider whether to

22 accept this Agreement, (b) they have each carefully read and fully understand all

23 of the provisions of this Agreement, and (c) they are voluntarily, knowingly, and

24 without coercion entering into this Agreement based upon their own judgment.

25 Plaintiffs, and each of them, further specifically represent that, prior to signing

26 this Agreement, they have conferred with counsel of their choice to the extent

27 desired concerning the legal effect of this Agreement, and that the legal effect of

28 this Agreement has been adequately explained to them.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

16

SETTLEMENT AGREEMENT

**18.** **Entire Agreement; No Other Reliance**

This Agreement constitutes the entire agreement between the Plaintiffs and the City regarding the subject matter discussed hereof and supersedes any and all other agreements, understandings, negotiations, or discussions, either oral or in writing, express or implied, between or among the Parties relating to the subject matter hereof.  The Parties acknowledge that no representations, inducements, promises, agreements, or warranties, oral or otherwise, have been made by them, or anyone acting on their behalf, which are not embodied in the Agreement, that they have not executed this Agreement in reliance on any such representation, inducement, promise, agreement, or warranty, and that no representation, inducement, promise, agreement, or warranty not contained in this Agreement including, but not limited to, any purported supplements, modifications, waivers, or terminations of this Agreement, shall be valid or binding, unless executed in writing by all of the Parties to this Agreement.  Any alteration, change, or modification of or to this Agreement shall be made by written instrument executed by each party hereto in order to become effective.

**19.** **Warranty of Authority**

Each individual or entity that executes this Agreement represents and warrants, in his, her, or its personal capacity, that he, she, or it is duly authorized and empowered to enter into this Agreement on behalf of the party it purports to represent.

**20.** **Counterparts**

This Agreement may be executed in multiple counterparts, each of which shall be considered an original but all of which shall constitute one agreement.

**21.** **Representation by Counsel and Understanding**

The Parties acknowledge that each of them has been represented in the settlement of the matter by its own counsel and represent that each of them has received independent legal advice from their respective attorneys and has been

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

17

SETTLEMENT AGREEMENT

ER 393

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1  fully advised of the nature of the Agreement and the possible rights and

2  obligations released herein.  Defendant City acknowledges it has the power and

3  right to enter into, agree, and comply with this Agreement.  The rule of

4  construction that any ambiguities are to be resolved against the drafting part shall

5  not be employed in the interpretation of the Agreement.  The Parties further

6  acknowledge that each of them has carefully read and fully understands all of the

7  provisions of the Agreement, and that each of them is voluntarily entering into

8  the Agreement.

9  **22.**   **No Waiver of Terms of Agreement**

10      The failure to insist upon compliance with any term, covenant or condition

11  contained in the Agreement shall not be deemed a waiver of that term, covenant

12  or condition, nor shall any waiver or relinquishment of any right or power

13  contained in the Agreement at any one time or more times be deemed a waiver or

14  relinquishment of any right or power at any other time or times.

15  **23.**   **Governing Law**

16      This Agreement shall be construed in accordance with the laws of the State

17  of California.

18  **24.**   **Duty to Meet and Confer**

19      If a dispute arises between the Plaintiffs and the City regarding the

20  interpretation, performance, or enforcement of this Agreement, the Party raising

21  the dispute shall provide written notice of the dispute to all other Parties, and all

22  Parties agree to meet and confer within a reasonable time in a good faith effort to

23  resolve any dispute.  In the event that the Parties are unable to resolve the dispute

24  within a reasonable time after the meeting, Plaintiffs or the City may, pursuant to

25  the Order, submit the matter to the Court for review and decision.

26  DATED: **5/19/2022**          By: _____

27                                      Don Steier, Chairman, for Plaintiff

28                                      LA Alliance for Human Rights

18

SETTLEMENT AGREEMENT

1   DATED:_____ 05-19-2022                    _____

2                                                     Plaintiff Joseph Burk

3

4   DATED:_____                               _____

5                                                     Plaintiff George Frem

6

7   DATED:_____                               _____

8                                                     Plaintiff Wenzial Jarrell

9

10  DATED:_____                               _____

11                                                    Plaintiff Charles Malow

12

13  DATED:_____                               _____

14                                                    Plaintiff Karyn Pinsky

15

16  DATED:_____                               _____

17                                                    Plaintiff Leandro Suarez

18

19  DATED:_____                               _____

20                                                    Plaintiff Harry Tashdjian

21

22  DATED:_____                               _____

23                                                    Plaintiff Charles Van Scoy

24

25

26

27

28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

19
SETTLEMENT AGREEMENT

ER 395

DATED:_____

_____
Plaintiff Joseph Burk

DATED: 5/19/22

_____
Plaintiff George Frem

DATED:_____

_____
Plaintiff Wenzial Jarrell

DATED:_____

_____
Plaintiff Charles Malow

DATED:_____

_____
Plaintiff Karyn Pinsky

DATED:_____

_____
Plaintiff Leandro Suarez

DATED:_____

_____
Plaintiff Harry Tashdjian

DATED:_____

_____
Plaintiff Charles Van Scoy

19

**ER 396**

1   DATED:_____          _____

2                                  Plaintiff Joseph Burk

3

4   DATED:_____          _____

5                                  Plaintiff George Frem

6

7   DATED: 05-19-22                 _Wenzial Jarrell_

8                                  Plaintiff Wenzial Jarrell

9                                  BY ELIZABETH MITCHELL, SIGNED WITH
                                   APPROVAL AT 2:15PM - WET
10  DATED: 5/19/22                 SIGNATURE FORTHCOMING

11                                 Plaintiff Charles Malow

12

13  DATED: 05-19-22                _____

14                                 Plaintiff Karyn Pinsky

15                                 BY ELIZABETH MITCHELL, SIGNED
                                   WITH APPROVAL AT 4:27PM
16  DATED: 5/19/22                 WET SIGNATURE FORTHCOMING

17                                 Plaintiff Leandro Suarez

18                                 BY ELIZABETH MITCHELL, SIGNED
                                   WITH APPROVAL AT 2:26PM
19  DATED: 5/19/22                 WET SIGNATURE FORTHCOMING

20                                 Plaintiff Harry Tashdjian

21                                 BY ELIZABETH MITCHELL, SIGNED
                                   WITH APPROVAL AT 3:18PM
22  DATED: 5/19/22                 WET SIGNATURE FORTHCOMING

23                                 Plaintiff Charles Van Scoy

24

25

26

27

28

SETTLEMENT AGREEMENT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

DATED:  May 19, 2022          MATTHEW W. SZABO

By: _____

City Administrative Officer, City of Los Angeles

**Approved as to Form**:

DATED:  May 19, 2022          SPERTUS, LANDES & UMHOFER, LLP

By: _____

Elizabeth A. Mitchell
Counsel for Plaintiffs LA Alliance for Human
Rights, et al.

DATED:  May 19, 2022          MICHAEL N. FEUER, City Attorney

By: _____

Scott Marcus, Chief Assistant City Attorney
Counsel for Defendant City of Los Angeles

1  RODRIGO A. CASTRO-SILVA (SBN 185251), *County Counsel*
2  rcastro-silva@counsel.lacounty.gov
   LAUREN M. BLACK (SBN 192302), *Assistant County Counsel*
3  ANA WAI-KWAN LAI (State Bar No. 257931), *Senior Deputy County Counsel*
   500 West Temple Street, Suite 468
4  Los Angeles, California 90012
   Tel.: (213) 974-1830 | Fax: (213) 626-7446
5
6  LOUIS R. MILLER (SBN 54141)
   smiller@millerbarondess.com
7  MIRA HASHMALL (SBN 216842)
   MILLER BARONDESS, LLP
8  1999 Avenue of the Stars, Suite 1000
   Los Angeles, California 90067
9  Tel.: (310) 552-4400 | Fax: (310) 552-8400
10
11 Attorneys for Defendant
   COUNTY OF LOS ANGELES
12
13              **UNITED STATES DISTRICT COURT**
14       **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**
15
16 LA ALLIANCE FOR HUMAN          **CASE NO. 2:20-cv-02291 DOC-KES**
   RIGHTS, et al.,
17                                **NOTICE OF WITHDRAWAL OF**
                                  **CONSENT TO *EX PARTE***
18         Plaintiffs,            **COMMUNICATIONS**
19    v.                          Assigned to the Hon. David O. Carter
20 CITY OF LOS ANGELES, et al.,   and Magistrate Judge Karen E. Scott
21         Defendants.
22
23
24
25
26
27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL:(310) 552-4400   FAX:(310) 552-8400

556797.9

NOTICE OF WITHDRAWAL OF CONSENT TO *EX PARTE* COMMUNICATIONS

**ER 399**

**TO THE COURT, ALL PARTIES, AND THEIR RESPECTIVE COUNSEL OF RECORD:**

At an emergency status conference conducted on March 19, 2020, the Court requested that the Parties consent to *ex parte* communications between and/or among the Court, other judicial officers in the Central District of California, the Parties (including Intervenors), and relevant non-parties, such as state and local government leaders. (*See* **Exhibit A** (Tr. of March 19, 2020 Status Conf. at 7:24–8:20, 109:8– 112:3, ECF No. 39).)  At the time, the Parties (including Intervenors) agreed to permit *ex parte* communications. (*Id.* at 117:1–22.)

This action is now entering its third year.  While the County will continue to pursue settlement, the County believes this litigation should return to the normal process and that there should be no more *ex parte* communications with the Court pursuant to Local Rule of Court 83-2.5 for the Central District of California.

When the aforementioned *ex parte* communication agreement was reached on March 19, 2020, the Court suggested that "if [the Parties] get to litigation," an appropriate course in light of the prior *ex parte* communications would be to solicit the involvement of other "judges who can litigate" the matter, in contrast to this Court's more involved role that justified the need for *ex parte* communications. (*Id.* at 111:10–11.)

Thus, at the outset of this case two years ago, the Court recognized the importance of this issue, as follows:

> And you've got to trust me in those *ex parte* conversations. Because they're going to be more valuable,  I hope, than litigation.  And if you get to litigation,  I've got great judges who can litigate.  And they can probably be much more collaborative than even I am. (*Id.* at 111:7–12.)

The Court's statement above is consistent with 28 U.S.C. § 455(a), which requires recusal "in any proceeding in which [a judge's] impartiality might reasonably be questioned." *Preston v. United States*, 923 F.2d 731, 734 (9th Cir.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 · LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552 4400 · FAX: (310) 552 8400

1 | 1991); *see, e.g., Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 861
2 | (1988) (courts must "take the steps necessary to maintain public confidence in the
3 | impartiality of the judiciary").
4 |     We are now in litigation, so based on the foregoing we request that the
5 | Court assign this case to another Judge for the purpose of litigation.
6 |     **PLEASE TAKE NOTICE** that Defendant County of Los Angeles, by and
7 | through its counsel of record, hereby withdraws its consent to the Court's *ex parte*
8 | communications in the above-captioned matter.
9 |
10 | DATED:  March 25, 2022

MILLER BARONDESS, LLP

By:  _____

Louis R. Miller
Attorneys for Defendant
COUNTY OF LOS ANGELES

556797.9

3

NOTICE OF WITHDRAWAL OF CONSENT TO *EX PARTE* COMMUNICATIONS

**ER 401**

# Exhibit A

1

```
 1                UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3          HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE

 4
    LA ALLIANCE FOR HUMAN              )
 5  RIGHTS, an unincorporated         )
    Association, JOSEPH BURK,          )
 6  HARRY TASHDJIAN, KARYN            )
    PINSKY, CHARLES MALOW,            )
 7  CHARLES VAN SCOY, GEORGE          )
    FREM, GARY WHITTER, and           )   Certified Transcript
 8  LEANDRO SUAREZ, individuals,      )
                                      )
 9                 Plaintiffs,        )
                                      )
10        vs.                         )   Case No.
                                      )   2:20-cv-02291 DOC (KES)
11  CITY OF LOS ANGELES, a            )
    Municipal entity; COUNTY OF       )
12  LOS ANGELES, a municipal entity;  )
    and DOES 1 through 200 inclusive, )
13                                    )
                   Defendants.        )
14  _____)

15

16

17            REPORTER'S TRANSCRIPT OF PROCEEDINGS
                     STATUS CONFERENCE
18              THURSDAY, MARCH 19, 2020
                       10:00 A.M.
19              LOS ANGELES, CALIFORNIA

20

21

22  _____

23          DEBBIE HINO-SPAAN, CSR 7953, CRR
                FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, SUITE 4455
                 LOS ANGELES, CA 90012-4565
25                   dhinospaan@yahoo.com
```

UNITED STATES DISTRICT COURT

2

```
1                    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFFS:

4              SPERTUS LANDES & UMHOFER LLP
               BY:  MATTHEW DONALD UMHOFER, ESQ.
5                  ELIZABETH ANNE MITCHELL, ATTORNEY AT LAW
               617 West 7th Street
6              Suite 200
               Los Angeles, California 90017
7              213-205-6520

8    FOR THE DEFENDANT CITY OF LOS ANGELES:

9              LOS ANGELES CITY ATTORNEY'S OFFICE
               BY:  SCOTT D. MARCUS, ESQ.
10             200 North Main Street
               7th Floor, Room 675
11             Los Angeles, California 90012
               213-978-7558
12
     FOR THE DEFENDANT COUNTY OF LOS ANGELES:
13
               FOLEY & LARDNER LLP
14             BY:  BYRON J. McLAIN, ESQ.
               555 South Flower Street
15             Suite 3300
               Los Angeles, California 90071-2411
16             213-972-4500

17   FOR THE INTERVENOR ORANGE COUNTY CATHOLIC WORKER:

18             CAROL A. SOBEL LAW OFFICES
               BY:  CAROL A. SOBEL, ATTORNEY AT LAW
19             725 Arizona Avenue
               Suite 300
20             Santa Monica, California 90401
               310-393-3055
21

22

23

24

25
```

UNITED STATES DISTRICT COURT

3

```
 1                      APPEARANCES OF COUNSEL:
                            (Continued:)
 2

 3   FOR THE INTERVENOR LOS ANGELES CATHOLIC WORKER:

 4           SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP
             BY:  CATHERINE ELIZABETH SWEETSER, ATTORNEY AT LAW
 5           11543 West Olympic Boulevard
             Los Angeles, California 90064
 6           310-396-0731

 7   FOR THE LEGAL AID FOUNDATION OF LOS ANGELES ON
     BEHALF OF INTERVENOR L.A. CATHOLIC WORKER AND LOS ANGELES
 8   COMMUNITY ACTION NETWORK:

 9           LEGAL AID FOUNDATION OF LOS ANGELES
             BY:  SHAYLA RENEE MYERS, ATTORNEY AT LAW
10           7000 South Broadway
             Los Angeles, California 90003
11           213-640-3983

12   ALSO PRESENT:

13           Honorable Judge Andre Birotte, Federal Judge

14           Honorable Judge Philip S. Gutierrez, Federal Judge

15           Honorable Judge James Smith - Special Master

16           Thomas Fawn - Senior Assistant County Counsel, County
             of Los Angeles
17
             Brooke Weitzman - Intervenor Orange County Catholic
18           Worker

19           Scott Marcus - Los Angeles City Attorney's Office

20           Jessica Mariani - Los Angeles City Attorney's Office

21           Mike Feuer - Los Angeles City Attorney's Office

22           Kevin de Leon - Los Angeles City Council

23

24

25
```

4

```
 1                    APPEARANCES OF COUNSEL:
                           (Continued:)
 2

 3   ALSO PRESENT:

 4          Michele Martinez - Chief Dot Connector

 5          Juan Garza - Mayor of Bellflower

 6          Miguel A. Pulido - Mayor of Santa Ana

 7          Yvette Ahlstrom - Elimination Foundation

 8          Paul Cho - Elimination Foundation

 9          Paul Leon - CEO of Elimination Foundation

10          Gary Kranker - Whittier City Attorney

11          Joe Vinatieri - Mayor of Whittier

12          Kathryn Barger - Los Angeles County Supervisor

13          Heidi Marsdon - Interim LAHSA

14          Aleen Langton - LAHSA

15          Nury Martinez - Los Angeles City Council President

16          Ken Price

17          Jackie Lacey - Los Angeles County District Attorney

18          Robert Cartwright - Assistant Los Angeles County
            Counsel
19
            Gabriel Dermer - Los Angeles City Attorney's Office
20
            Brandon Young - Manatt, Phelps & Phillips
21

22

23

24

25
```

5

1                          **APPEARANCES:**
                            **(Continued:)**

2

3  **ALSO PRESENT:**

4          Byron McLain - Foley & Lardner

5          Rodrigo Castro-Silva - Los Angeles County Counsel

6          Mark Ridley-Thomas - Los Angeles County Supervisor

7          Michel Moore - Los Angeles Police Chief

8          Ralph Terrazas - Los Angeles Fire Chief

9          Commissioner Kenneth Hodder - The Salvation Army

10         Lieutenant Colonel John Chamness - The Salvation Army

11         Miguel Santiago - California Assemblyman

12         Bill Taormina

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

ER 407

6

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, MARCH 19, 2020

 2                            10:00 A.M.

 3                             - - -

 4         THE COURT:  Well, first, good morning.  If you would

 5    try to find a seat and be as distant as you can from normally

 6    our wonderful and collegial executive and legislative and court

 7    family, it would be appreciated.

 8              So it's a huge courtroom.  We planned it that way.

 9    But if you can get six feet apart, we would actually appreciate

10    it.  Okay?  There's plenty of room.  That's not quite six feet,

11    but we're working on it.  Okay.  And there's -- we tried to

12    supply sanitary, you know, for you as best we can.

13              A couple of general thoughts.  I'm going to get

14    right into business.  And for counsel, I'm calling the matter

15    of L.A. First Alliance for Human Rights versus City of

16    Los Angeles.  But believe it or not, I don't even want your

17    appearances at this time, although I'm going to spend a good

18    part of the day with you.  We're going to get our elected

19    officials back doing what they do best in this critical time.

20    That's making good decisions on all of our part.

21              And although we've called you together concerning

22    the homeless, whatever happens concerning the homeless

23    community, they're not a socially acceptable distance right

24    now, and I think we're all on the same page collaboratively,

25    and that is, you know, if we can do something through your good
```

7

```
 1  graces, and if the Court can be of a benefit and not a

 2  hindrance in this matter, then we're working together,

 3  hopefully saving time.

 4          The other thing is this is eventually,

 5  unfortunately, going to probably affect our citizens who are

 6  able to socially distance, which our homeless community is not.

 7  If it breaks out in the homeless community, I don't think any

 8  of the socially distanced community is going to be safe in any

 9  way, shape, or form.  And from whatever I read, this may come

10  in waves over a long period of time.  So at some point most of

11  us are going to be exposed and hopefully survive.

12          I'm not going to stand on further ado.  I'm going to

13  call on Mayor Garcetti.  I'm going to call you Eric from now

14  on.  Okay?  I'm Dave or whoever you want to call me when you're

15  done.

16          And Kathryn Barger, I'm going to call on you next.

17          And then we've got a little bit of a program.  Let

18  me give you an overlay.  With transparency, we're going to talk

19  about our phone call last night, who was on it, and I'm going

20  to ask at the end of the day for the plaintiffs' and defense

21  counsel -- and by the way, you can use your cell phones at any

22  time.  Okay?  Keep those conversations going.  Because I don't

23  want to hold another one of these.

24          But I'm going to ask the parties, if eventually you

25  trust this Court or another member of the Court as the other
```

8

```
          1    community that we've been involved in has trusted us, I need
          2    the following from you.  If not a settlement, I need the
          3    ability to reach out in an ex parte situation and make a call
          4    to Eric or to Kathryn or to you or to you, but share that
10:02AM   5    transparently and get you together as a court family as we work
          6    together, because together we accomplished a tremendous amount
          7    before.  But if I don't have that ex parte ability to
          8    communicate, I can't hold these kinds of meetings timely enough
          9    for this wave that's about to hit us.  The same thing, that
10:03AM  10    means you have to trust me.
         11            We can do it in two ways.  You can enter into a
         12    temporary settlement for a month setting out those parameters
         13    or three months but not -- certainly not a consent decree and
         14    not over a period of time.  These issues have to be worked out.
10:03AM  15            So at the end of the day I'm going to spend quite a
         16    bit of time with you, but we're getting folks on the way.
         17            So, Mayor Garcetti, the lectern is yours.  You can
         18    remain seated.  If you have notes, you can go to the lectern.
         19    There's --
10:03AM  20            MAYOR GARCETTI:  What's best for you?  Is it best
         21    for me to go there?
         22            THE COURT:  Whatever is good for you.
         23            MAYOR GARCETTI:  I'll go up there.
         24            THE COURT:  I think our goal is the same.  Let's get
10:03AM  25    collaborative.  If the courts can help you, let's save some
```

```
  1   lives as fast as we can.

  2            MAYOR GARCETTI:  Thank you so much, Your Honor.  And

  3   it's great to be here at the first convening of the

  4   Judge Carter Fan Club meeting, Los Angeles chapter.

10:03AM  5            THE COURT:  Tell me that in a couple weeks.

  6            MAYOR GARCETTI:  Yeah, exactly.  Appreciate you and

  7   appreciate the energy you've brought to the most pressing

  8   humanitarian crisis of our time, certainly in Southern

  9   California, across California, and too much of America.

10:04AM 10            As you're well aware, overlaid on this right now is

 11   the most existential crisis we have, which is the coronavirus

 12   spread and COVID-19.  And I want to thank Kathryn Barger and

 13   our County and our other fellow mayors, not just in the County

 14   of Los Angeles but across the counties of Southern California,

10:04AM 15   for really acting more as a single organism that I've ever seen

 16   in my life.  When it comes to homelessness, I think it's a

 17   pretty fitting model, too, that it's about breaking down all

 18   the boundaries that have separated us, all those borders that

 19   distinguish us.

10:04AM 20            But we're in the midst of a global emergency

 21   unprecedented in recent modern history.  We know that the novel

 22   Coronavirus is now in 150 different countries of the world.

 23   It's only a matter of time before every corner of the globe has

 24   it.

10:04AM 25            And I think there's considerable fear and anxiety,
```

10

```
         1   especially for those of us who have a deep caring for those who

         2   are not only the most vulnerable but the most susceptible; most

         3   vulnerable because they're much more likely to have underlying

         4   health conditions which the public health officials, of course,

10:05AM  5   tell us makes them more likely to die, and most susceptible

         6   because of the way they're living right now and where they're

         7   clustered together.

         8           So the City and the County have been working around

         9   the clock really hand in glove in a County that already has

10:05AM 10   good relationships between City and County.  I know that's not

        11   always the case.  But here we do, and it's been even closer.

        12   But we know that our homeless neighbors that are out there

        13   today with the underlying health conditions that I described

        14   and living in environments that put them at a higher risk, we

10:05AM 15   have a special obligation.

        16           So let me thank you for letting me go back to the

        17   rest of the work shortly.  But between testing, bed capacity,

        18   restrictions on people's movements right now, closures of

        19   businesses, this is one of the five, I would say, equal pillars

10:05AM 20   of our fight right now against coronavirus and its spread.

        21           We had the first death of somebody who is homeless

        22   in Northern California from COVID-19.  We have no confirmed

        23   cases here of anybody homeless.  But we know, of course, like

        24   all of us that the actual number of cases is dozens above -- by

10:06AM 25   a factor of dozens above what we are officially reporting.
```

11

| | |
|---|---|
| 1 | So to protect the unhoused population during this |
| 2 | public health emergency, at the beginning of this I asked my |
| 3 | team to start drawing up what sort of plans we could do in this |
| 4 | emergency.  And I want to be clear, I took that direction first |
| 10:06AM 5 | from Dr. Barbara Ferrer.  Really had some pushes back and forth |
| 6 | about what is the public health advice and -- because there was |
| 7 | some service providers, others who said, "No, maybe keeping |
| 8 | people on the street is better."  She has been, at least with |
| 9 | me, and I think the county's direction has been crystal clear, |
| 10:06AM 10 | that this is best prevented and treated indoors, not outdoors. |
| 11 | That's the first principle. |
| 12 | And so the City of Los Angeles, I asked what would |
| 13 | it take for us to take decisive action, to be not looking at |
| 14 | dozens as we usually do when we celebrate the opening of a |
| 10:06AM 15 | shelter or even hundreds but thousands of people off of our |
| 16 | streets. |
| 17 | So we're increasing in advance of that outreach |
| 18 | together LAHSA, the City, the County, and other cities to |
| 19 | educate those Angelenos experiencing homelessness about the |
| 10:07AM 20 | disease.  They, like anybody who is housed, want to save their |
| 21 | lives and want to be healthy.  When people ask, "How are you |
| 22 | going to get them off the streets?" everybody wants to care for |
| 23 | themselves, whether they are lucky enough to be in housing or |
| 24 | not. |
| 10:07AM 25 | And so we added critical resources right away.  I |

12

```
 1    think there's over 250 new handwashing stations already

 2    deployed, another 60 on the way or deployed as well for a total

 3    of 310.  120 mobile bathrooms on the way in addition to the

 4    many mobile bathrooms that we put up in encampment sites months

 5    before this as well.

 6              And these interventions may sound basic, but whether

 7    it's that or continuing street sweeping even as we relax

 8    ticketing for that, these things are critical to public health

 9    around and in encampments as well to improve hygiene, to

10    flatten the curve of local infections, and to prepare the

11    County and the health system better for the onslaught of beds

12    that will be taken.

13              And, also, in coordination with the County, we've

14    made plans to isolate and quarantine unhoused individuals,

15    either at and/or away from shelters.  Nobody will go into a

16    shelter who's exhibiting those symptoms.  That vetting will

17    happen with County public health officials before anybody

18    boards a bus and is transported to these areas.

19              And our preparation to isolate and quarantine

20    unhoused patients is happening several levels of government.

21    County led, as of yesterday -- or two days ago, excuse me, 34

22    RVs have been placed by the County for isolation units for

23    COVID-confirmed cases.  124 motel rooms have been acquired by

24    the County for symptomatic COVID-unconfirmed cases.

25              And the County, with assistance from the City, has
```

10:07AM  5
10:07AM 10
10:08AM 15
10:08AM 20
10:08AM 25

1  been engaging hotel and motel owners who are about to go out of

2  business, so it's actually a good time to help them and help

3  this crisis, to begin designating rooms with bathrooms with

4  quarantine and isolation.

10:08AM 5          To be clear, the County has to do that

6  simultaneously for housed people and unhoused people.  But

7  there's no discrimination on that, and the highest priority

8  goes to those most at risk.  That is disproportionately going

9  to help those who are unhoused given their underlying health

10:09AM 10 conditions.

11          Second, city-led efforts, we've acquired 50 pallet

12 shelters that will be delivered Friday.  We got 50 of, I think,

13 the last 75 left in America from this company.  We're looking

14 at the potential placement of these pallet shelters in parking

10:09AM 15 lots in City Council District 13, Mitch O'Farrell, who asked if

16 we could put them there.  We're considering them for quarantine

17 and isolation use.  So, if somebody has symptoms, immediately

18 be able to take them into essentially their own housing, almost

19 like a mini-home for them to be able to be in for the period of

10:09AM 20 quarantine and then take the direction from public health.

21          One of the reasons we were advised by public health

22 also to look at this with proper spacing using the 35 tenets of

23 the CDC's recommendations for homeless shelters is because --

24 everything from making sure people are head to toe properly

10:09AM 25 spaced, we're looking at whether there can be even partitions.

14

```
 1  But we took that advice because the public health officials

 2  said this is a place where we can monitor better.  We cannot

 3  monitor very well on the street.  Of course, this is right now

 4  voluntary.

 5          And we know that our homeless neighbors, like the

 6  rest of us, are safer and healthier when they're indoors.  So

 7  I've exercised my emergency authority under the City Charter

 8  and our administrative code to extend the winter shelter period

 9  which would be ending just next week on March 21st until this

10  crisis is over.  So indefinitely.

11          THE COURT:  Okay.

12          MAYOR GARCETTI:  And then a couple last notes.  Over

13  the past 19 months before this crisis hit, we had been part of

14  a historic surge of bridge-housing shelters.  These are

15  shelters that have your own little area, pets, partners,

16  possessions, all those things can come in, low barrier.  You

17  stay there.  You're not kicked out during the day.

18          So today we have 12 of those open with 813 beds.  We

19  had 14 due to open by July 1st.  And I can tell you we're

20  pressing the accelerator on that so that we will have over

21  2,200 beds that didn't exist just 18 months ago on top of our

22  plans to take 1600 people, we believe, or have capacity for

23  1600 people by the end of this weekend.

24          Think about that.  18 months to get 2200.  When this

25  happens, it will be in four or five days, 1,600 additional
```

10:10AM 5
10:10AM 10
10:10AM 15
10:10AM 20
10:11AM 25

15

```
 1   beds.  And then a second phase will go to 29 additional
 2   recreation centers and have a full capacity when we're done of
 3   6,006 beds.
 4         So we're working to identify with LAHSA who's
 5   prioritized the 4,000 most vulnerable folks that are in their
 6   system to make sure that we're making the contact with them and
 7   offering these beds to them first.  This will make it easier
 8   for the at-risk population to practice safe social distancing,
 9   to remain visible to outreach workers who are focused on
10   getting them crucial services.
11         And we'll also work to relocate vulnerable Angelenos
12   indoors into low barrier congregate settings.  So this isn't
13   just something that we'll probably be doing over the long term
14   for those that are unhoused.  As our hospital beds are
15   overwhelmed, we can expect that those of us that live in
16   housing will need to go to those low barrier settings as well
17   and isolation in hotels, motels, et cetera, if they cannot stay
18   at home in a safe space.
19         And with our partners at LAHSA, as I mentioned, this
20   is really -- I want to thank our rec and parks, our emergency
21   operations center -- I've never seen this before -- and the Red
22   Cross, we have obtained, you know, 6,000 beds -- actually 7,000
23   cots, all the blankets.  We've put in the orders for everything
24   we need for sanitation.  Not every rec center is equal.  They
25   don't all have showers.  But our Department of Transportation
```

The timestamps in the left margin read: 10:11AM (line 5), 10:11AM (line 10), 10:11AM (line 15), 10:12AM (line 20), 10:12AM (line 25).

Case 2:20-cv-02892-DOCKES Document 8940 Filed 08/20/25 Page 20 of 129 Page ID #:11332
#:11507

16

```
 1   buses will take people for their showers to those rec centers
 2   that have them if they're staying at one that doesn't.  And
 3   this will be paid for through City dollars, state aid, and
 4   federal dollars, we believe, through FEMA reimbursements now
 5   that I've mobilized emergency workers.
 6            So this means together with the existing shelters
 7   and ones opening, we can bring 7,000 unhoused Angelenos off the
 8   streets and into emergency housing.
 9            One last note, which is not about COVID but is, I
10   think, very important, up and down the state, Mayor Pulido and
11   I are part of the big 13 mayors, we've been talking every
12   single night, and we appreciated the contact as well from you
13   last night.  We need to plan for the moment this crisis winds
14   down to make sure that folks that we bring in aren't just
15   thrown back out on the streets.
16            THE COURT:  Right.
17            MAYOR GARCETTI:  And whether that federal aid will
18   be there, whether the state dollars that have been promised
19   from the legislature and Governor Newsom yesterday can be used
20   for that, we're going to have to look everywhere, but this is
21   an opportunity to not let this crisis go to waste and to say
22   not only did we save lives during this crisis, but we finally
23   healed those lives and brought people home.
24            So I'm encouraged that that money is coming.  It's
25   $100 million directly to local governments and $50 million in
```

1   trailers and to lease rooms in hotels and motels. And whether

2   it's leads you've given us from North Dakota, oil and gas

3   employee housing, whether it is the trailers, the tiny homes,

4   we have to look all over to be able to make sure at a time of

10:13AM 5   scarce resources that we can make this happen.

6         So in closing, let me say as the mayor of

7   Los Angeles, I can assure the Court that the City is committed

8   before this crisis, during this crisis, and after this crisis

9   to doing everything that we can to listen and to bring together

10:14AM 10   a coalition of folks. You never make 100 percent of people

11   happy.

12         THE COURT: Right.

13         MAYOR GARCETTI: But for those who will say, "You're

14   never doing anything right," and for those who say, "I never

10:14AM 15   want anything in my neighborhood," there is a huge wide berth

16   in between of, I think, you've seen in our actions and our

17   willingness to stand up on both sides to be able to say let's

18   keep moving forward.

19         Never stop listening to people no matter how they

10:14AM 20   communicate, because often there's kernels of truth to what

21   everybody is saying. But we're very excited. Your

22   coalition-building powers are part of this and your wide

23   shoulders, as you said, to be able to say from a federal court

24   perspective that this needs to keep going. I would only ask

10:14AM 25   that of you, help us keep momentum, help us keep momentum, help

18

```
 1    us keep momentum.  These are trying days for our city, but we

 2    will get through them together.

 3             THE COURT:  Don't go away.  And I can't tell you how

 4    much you're appreciated.  Let's have a conversation

10:14AM 5  transparently.  And I'm not going to allow counsel to enter

 6    into this.

 7             MAYOR GARCETTI:  Okay.

 8             THE COURT:  It's just -- it's a very complimentary

 9    conversation, by the way.

10:15AM 10            First of all, I want all counsel to know that we

11    started ex parte communications immediately when a wonderful

12    colleague of mine, Steve Wolfson, and I had a conversation last

13    Friday.  This was actually Judge Wolfson's case.  We go back

14    for many, many years.  We had a collegial conversation about

10:15AM 15  who's going to take this case.  And so let me tell you how this

16    ended up.  And by the way, if you get rid of me, it's no

17    problem at all.

18             MAYOR GARCETTI:  We don't want that.

19             THE COURT:  First of all, in Orange County we had

10:15AM 20  what's perceived to be a modicum of success.  And I want to lay

21    out how that was to the parties so we discuss this later on.

22    First of all, Boise is a decent and good case, but when

23    Judge Berzon wrote this, you can read Boise as requiring 100

24    percent.

10:15AM 25            So let's say we have 35- to 38,000 homeless in
```

```
 1   Los Angeles with Juan Garza, the president of the League of

 2   Cities will tell me we have probably another 20,000 in the

 3   surrounding cities.  Well, Boise could be read that we take

 4   100 percent of that, Mayor, and we say you have to build 38,000

 5   shelters.

 6            I'm not certain if I'm going against Boise, but in

 7   working with Carol and Brooke down in our part of the world and

 8   other folks who are involved on the plaintiff and defendant's

 9   side, we came together and came up with this thought and idea;

10   that all of your homeless aren't going to go into shelters.  In

11   fact, some are going to avoid it.  Whether they're using

12   narcotics, et cetera, you're not going to save every soul,

13   although we're going to try.

14            And, therefore, in the Santa Ana River we had

15   this -- and you need to hear why we're at these numbers.  We

16   took the unheard of step of walking down the river before it

17   was cleared, and there weren't a thousand people on the river,

18   there were about 1400.  And when we put out two-weeks' notice,

19   we saw people walking away.

20            So in a good faith, the plaintiffs' counsel came and

21   said to us, "Look, the number is about 81 percent because we

22   have 1,000 people on the river and 810 wanted shelter."  There

23   was also a different number, and that is for weeks 3- or 400

24   people had walked away.  So I took the lowest number.  That's

25   the first time I thought I was in trouble with one of the
```

20

```
        1   parties.  I took the 60 percent.  So, therefore, it was, in a

        2   sense, a defendant's number at the time.  And we held pretty

        3   close to 60 percent in the 11 or 12 encampments that we've gone

        4   out.

10:17AM 5           Now, I want to tell you and share with you how many

        6   mistakes I've made and how many times I've tried to back up and

        7   get it right.  It's very humbling.  I didn't recognize the

        8   number of women.  I didn't recognize the number of people who

        9   had lost their homes.  I didn't recognize the number of

10:17AM 10  veterans.  I probably started off with the perception that most

       11   of these were criminals.  But what I found was a huge degree of

       12   mental illness.  And I found an awful lot of people who had

       13   lost their homes from UCI -- UCI students and dock workers and,

       14   I'll name it, Disneyland workers and Angel workers and just

10:17AM 15  good people out there also.

       16           And then the multitude, I also found, quite frankly,

       17   that most of those were homegrown.  They didn't come from

       18   Los Angeles or from another state, they came from Orange

       19   County.  And I was surprised.

10:18AM 20          That's why the 60 percent number.  And what I find

       21   fault with me about is this:  If I write an order, you folks

       22   are stuck with that for ten years.  That's a federal order, and

       23   some other case has to go along with that; otherwise, you have

       24   this order.  So I've taken a 60 percent figure, right or wrong.

10:18AM 25          But in working with my cities -- and I'll tell you
```

Case 2:20-cv-02291-DOC-KES Document 594-3 Filed 03/20/25 Page 25 of 129 Page ID #:11512

21

10:18AM

10:18AM

10:19AM

10:19AM

10:19AM

```
 1    about the L.A. supervisor in just a moment also, because you've
 2    been very helpful with this -- what we're finding is that we're
 3    holding not only to about 60 percent of the number, but what
 4    happens in a year, Mayor, if you and the supervisor have been
 5    successful and you've swept your city and the people who want
 6    to go into shelter have gone into shelter?  And now we're done
 7    to 30 percent.
 8             I shouldn't be at that 60 percent.  I need you to
 9    come back to me working together and say, "You know, Dave,
10    we're about 30 to 40 percent we're showing in this last year,
11    and we don't need 30 to 40 percent emergency shelter.  It's
12    badly spent money."  So, therefore, I want that continuing
13    interplay in negotiations so we're spending your money wisely
14    and quickly from the Court's perspective and you don't have
15    that hindsight of our wisdom that you're stuck with as a bright
16    line duty.  So that's what I'm offering back to you.  That
17    collaboration is absolutely critical that our courts are
18    flexible.
19             Second, I want to introduce you to two wonderful
20    colleagues.  Well, first of all, Judge Smith who's been with me
21    from the beginning, he's my former friend because he's probably
22    given over $1.5 million of free time that he would normally
23    charge, so I call him my former friend.
24             But Andre Birotte, who is my colleague, and Phil
25    Gutierrez, would you folks stand up.  I personally asked these
```

22

| | |
|---|---|
| 1 | jurists to become involved.  And in the finishing colloquy I |
| 2 | have with the mayor, Phil, if you have any questions, just |
| 3 | blurt them out.  Fair enough?  Okay. |
| 4 | We only have jurisdiction over three cases.  18 |
| 10:20AM 5 | other cases have come in voluntarily who were never going to be |
| 6 | sued and held up their hand and said, "Judge, I want to be |
| 7 | sued," because they want to be tucked under the federal |
| 8 | umbrella, and they wanted to know going forward what they could |
| 9 | do, not what they couldn't do.  Because the end result working |
| 10:20AM 10 | all together, we came up with some parameter and some ability |
| 11 | to move forward.  Because otherwise, it's a chilling effect. |
| 12 | And it's a chilling effect that five or six judges are making a |
| 13 | decision, because which judge's decision do you start playing |
| 14 | to?  So you are always chilled. |
| 10:20AM 15 | I think our courts are offering you a real |
| 16 | opportunity for collaboration from our point of view and a real |
| 17 | good discussion with both these parties later today to try to |
| 18 | either reach a negotiation or hammer one out that will give us |
| 19 | all some guidelines so you're not chilled in any way and you do |
| 10:20AM 20 | that in record time. |
| 21 | I think the last thing I'd say is that the reason |
| 22 | you came to me was, frankly, we're negotiating with 16 other |
| 23 | cities in Los Angeles at the present time.  It's a slow walk, |
| 24 | but Bellflower has settled.  We were just talking to Whittier |
| 10:20AM 25 | today, not quite certain where they're at, but I think they're |

23

1    the next ones up.  And I'll say to Joe -- Mayor Joe is here.  I

2    just know Joe by "Joe" because we call each other all the time.

3              But there's 14 or 15 other cities who have been into

4    my chambers.  And what's happening is this is starting to speed

10:21AM  5    along.  So whatever happens in Downtown L.A., we've got to be

6    careful with our surrounding cities, which you well know, which

7    is why Juan Garza is here, and a lot of other mayors who wanted

8    to come that we turned away because we didn't want over 50.

9    Because if, in fact, folks migrate, they're going to go out to

10:21AM 10   your residential areas, your surrounding cities.  So whatever

11   we're doing, hopefully we're containing it here, we're getting

12   some things to you much needed.

13             Finally, let me say this:  You've done a fabulous

14   job.  Judges aren't supposed to say that.  Thank you very much.

10:21AM 15            MAYOR GARCETTI:  Thank you.

16             THE COURT:  And the next thing I would say to you is

17   this:  I think you're going to see us in a few moments, and

18   your staff can make the decision because I want to get you out

19   of here, along with the supervisor, if you leave somebody to

10:21AM 20   listen to this presentation, I think we're going to be able to

21   augment, if you choose, a huge amount of resources.

22             Now, let me disclose to all parties, I can't tell

23   you the number of phone calls, but I'll tell you the last one.

24   They got my home number through some colleagues.  I got a call

10:22AM 25   at 8:15.  I thought it was just Rusty Bailey, the mayor of

Case 2:20-cv-02291-DOC-KES Document 804 Filed 03/22/22 Page 81 of 129 Page ID #:11515

```
 1   Riverside, who we've talked, but it was the mayor from

 2   Los Angeles, Stockton, Oakland, San Diego --

 3              MAYOR GARCETTI:  The 13 most popular cities.

 4              THE COURT:  -- 13, yeah, all on the phone.  And I

 5   thought --

 6              MAYOR GARCETTI:  Your Honor, I didn't call because I

 7   don't know what these rules are, I'm not a lawyer, but

 8   Mayor Pulido brought him in.

 9              THE COURT:  So I want to disclose to the parties

10   that that's the way I've got to be able to operate.  If the

11   mayors want to call me individually or collectively, or

12   Kathryn, you want to call me, I have to have that ability or I

13   can't function.  And just go litigate, which is wasteful.  We

14   need to hammer this out.

15              So at the end of the day, you have got to give me

16   that consent or just go litigate.  The phone's open to you,

17   period.

18              MAYOR GARCETTI:  Thank you.

19              THE COURT:  And I think this:  I think that your

20   cities are going to come running with consent decrees and tuck

21   under the federal umbrella, but they need help.  We're paying

22   attention, and we should, to Los Angeles and San Francisco.

23   It's our smaller cities right now who don't have that financial

24   backing but the supervisors, quite frankly, have been very

25   helpful in getting.
```

25

| | |
|---|---|
| 1 | Janice Hahn and your colleague and you, Kathryn, |
| 2 | have stepped forward and tried to step forward with funding. |
| 3 | But they need a funding source also, and we need to get that |
| 4 | message out to the governor who, by the way, had his staff on |
| 10:23AM 5 | the phone at 10:00 o'clock after the call. |
| 6 | Lastly, help me, I've got 14 to 20 percent of folks |
| 7 | out there who have done nothing with women who have to dress up |
| 8 | over the top of their head. |
| 9 | Jimmy, what time did we go out in the morning?  What |
| 10:23AM 10 | time did we appear on the scene? |
| 11 | JUDGE SMITH:  4:30, 4:45, 5:30. |
| 12 | THE COURT:  4:30 a.m. because your homeless are |
| 13 | moving.  They're not working on County hours or my hours. |
| 14 | They're moving at 4:30.  And by 6:00 o'clock you're not finding |
| 10:23AM 15 | the homeless.  They're scattering. |
| 16 | So what are we going to do with that 14 to 20 |
| 17 | percent who are truly bipolar when we closed our mental |
| 18 | hospitals, who I can't put inside a shelter because they'll |
| 19 | tear it apart and they've done absolutely nothing wrong?  And |
| 10:24AM 20 | that I'm going to ask you -- and I think Gavin's fully on board |
| 21 | with our conversations last night, so I'm paying compliments |
| 22 | today, I think he's recognizing that whether it's Norwalk, |
| 23 | Fairview, Sonoma, those hospitals have to be opened up in some |
| 24 | form to contain these people.  I want to ask your help because |
| 10:24AM 25 | I've been on that bandwagon from day one. |

**UNITED STATES DISTRICT COURT**

26

```
         1              And number two, if we get these for the local folks
         2   here in the state of California, maybe we're not getting people
         3   shipped in off Princess Cruise -- I'm just kidding you -- but
         4   we need those facilities anyway for our own state, and we're
10:24AM  5   going to have to have them sooner or later.  Sooner is better.
         6              I'm going to ask you to leave a staff member here.
         7              MAYOR GARCETTI:  Yes.
         8              THE COURT:  I want to compliment you on these motel
         9   rooms.  I have the personal opinion that they're transitory,
10:24AM 10   but their transitional in the sense -- and I think we're going
        11   to be able to offer you 20,000 units really quick out of
        12   North Dakota.  And if anybody doesn't like them, I'm going to
        13   invite today, give me a better solution.  Show me the pop-up
        14   tents that are supposed to be coming, show me the spring tents,
10:25AM 15   tell me why the price is wrong, et cetera.  And if you don't
        16   like this alternative, just give me an alternative.
        17              Number two, Michelle Martinez in Santa Ana hammered
        18   out and knocked down all of the barriers because she put a
        19   building inspector onsite.  So when we went for a permit, we
10:25AM 20   didn't go into an office and wait for a good person who was
        21   doing their job to take 24 to 36 hours or two weeks.  They're
        22   well-intentioned people.  But I'm encouraging you, if we get
        23   some trucks down here that we're going to talk about, we've got
        24   40 trucks ready to roll, if you'd like it.
10:25AM 25              The last thing I'll disclose to counsel is this:  If
```

Case 2:20-cv-02291-DOC-KES Document 904 Filed 03/03/25 Page 31 of 129 Page ID #:11518

27

```
 1   L.A. doesn't want it, Dave, you're the mayor of Stanton, you

 2   want some?  Joe, you want some out in Anaheim?  Sure.  I just

 3   got off the phone with Harry Sidhu.  He wants some.

 4          Here's my concern:  Can we transition these trailers

 5   fast enough to help our Los Angeles community?  Because if

 6   we're going to a hookup with a sewer system and you can't

 7   accomplish it quickly, as I said to the mayors last night, we

 8   can't wait with that valuable resource.  I want to get them up

 9   to Oakland for the governor or whatever.  And so, therefore,

10   please leave somebody here for this presentation.

11          MAYOR GARCETTI:  We'll have somebody here

12   throughout.  And if you'll permit me 15 seconds, we appreciate

13   that.  Our goal, also, is not to have an order but to have a

14   collaboration.

15          THE COURT:  Exactly.

16          MAYOR GARCETTI:  Second, the flexibility we greatly

17   appreciate.  And know that even though I was presenting on our

18   plan amidst this crisis, you will hear from the City what we're

19   doing -- permanent housing, special services, working with

20   veterans -- which I know is near and dear to our hearts, and

21   we've reduced by 80 percent in this city.

22          There's a lot of other aspects of this that I know

23   will be in the larger case, but you asked us to come today

24   because of COVID-19.

25          THE COURT:  Yeah.
```

28

|   |   |
|---|---|
| 1 | MAYOR GARCETTI:  And Council President Nury Martinez |
| 2 | is here representing incredible City Council. |
| 3 | THE COURT:  Right. |
| 4 | MAYOR GARCETTI:  Beautiful leadership.  And we'd |
| 10:26AM 5 | love other cities to be involved if they want to be in this. |
| 6 | So we are not in any way -- we know that this problem has no |
| 7 | borders, and the solutions need to have no borders as well.  We |
| 8 | very much appreciate you. |
| 9 | THE COURT:  Okay.  Mayor, just a moment. |
| 10:27AM 10 | Jimmy, any thoughts?  Any thoughts on your part? |
| 11 | JUDGE SMITH:  No. |
| 12 | THE COURT:  Okay.  Let's do this:  I have no |
| 13 | jurisdiction right now.  Understand? |
| 14 | MAYOR GARCETTI:  Yes. |
| 10:27AM 15 | THE COURT:  The defendants are here by choice.  They |
| 16 | haven't even been served.  But I couldn't wait for the 60 days |
| 17 | and the answer.  So you were invited today.  I really |
| 18 | appreciate your courtesy.  I promise that we're going to have |
| 19 | uniformity back from the courts from all of us as colleagues |
| 10:27AM 20 | trying to be cooperative and collaborative within reason as we |
| 21 | talk to the parties today to get some reasonableness, which is |
| 22 | why I have allowed the intervention on the plaintiffs' side of |
| 23 | every potential plaintiff we can get here, because there will |
| 24 | be disputes between the plaintiffs, and they're going to have |
| 10:27AM 25 | to come to some agreement basically to give us some guidance. |

UNITED STATES DISTRICT COURT

29

```
 1    Fair enough?
 2              MAYOR GARCETTI:  Thank you.
 3              THE COURT:  Okay.  We can work together.
 4              MAYOR GARCETTI:  My sister, I'm sitting down.
10:27AM  5    You're smart to do that.
 6              THE COURT:  And Mayor, listen, would you designate
 7    somebody by name, because I'd like to be able to call you as
 8    early as tonight and as late as tomorrow morning.
 9              MAYOR GARCETTI:  Could you stay?
10:27AM 10             THE COURT:  Okay.  Could one of you stay --
11             MAYOR GARCETTI:  So Christina Miller, who's deputy
12    mayor of City Homelessness Initiatives, our first deputy mayor,
13    and my deputy chief of staff, one of them will always be here.
14             THE COURT:  Perfect.  Let's get you back.  That way
10:28AM 15    you're reporting back to the mayor, not through my eyes
16    tonight.  And we'll talk as early as tonight or as late as
17    tomorrow.  Okay?  But you're reporting back through your eyes.
18    And I want you to listen to this presentation and keep
19    asking -- we're not necessarily in favor or disfavor of what
10:28AM 20    you're about to hear, but what else is out there.  And if we
21    can get 20- and maybe 30,000 units down here -- we got 40
22    trucks up there ready to roll.  It depends upon how fast we can
23    sequence.  And if we can't, then just tell me.  Let's get these
24    up to Oakland if they're interested with some of the other
10:28AM 25    mayors.  Okay?  Fair enough?
```

Case 2:20-cv-02291-DOC-KES Document 89-3 Filed 03/25/22 Page 34 of 129 Page ID #:11521

```
 1              Mayor, I can't thank you enough.  Stay as long or as

 2     little as you'd like.  You're socially distanced.  Go take good

 3     care of yourself and make great decisions for us.

 4              Kathryn, please.

10:28AM 5        MS. BARGER:  Thank you.  First of all, I want to

 6     thank Mayor Garcetti, because this is about all hands on deck.

 7              THE COURT:  Yeah.

 8              MS. BARGER:  And while L.A. city is probably ground

 9     zero for where the greatest number of homeless are located, the

10:29AM 10     impact it has throughout all of L.A. County -- Whittier,

11     Bellflower, Pasadena -- it's still really a humanitarian

12     crisis.  And I view being in this court today not as

13     adversarial, but actually, I think we're all on the same page.

14              THE COURT:  We are.

10:29AM 15        MS. BARGER:  And the plaintiffs, quite frankly, have

16     been in our office, and we've talked to them, and we wanted to

17     work toward addressing this issue.  So I don't view this as us

18     against them because we're all in this together.  And working

19     with all of our 87 other cities along with L.A. city is what

10:29AM 20     L.A. County is committed to do.

21              And I believe that the challenges that we have

22     before us as it relates to the Coronavirus are going to present

23     opportunities.  Because while we're looking right now short

24     term and we've got 2,000 isolation beds set aside, 4200 County

10:30AM 25     property beds also ready to go right now, and we're moving that
```

```
  1  out.  And our team at the County will really outline what

  2  exactly our plan is for the Coronavirus.  But this is only the

  3  beginning of what we are doing.

  4         And as Mayor Garcetti said last night, I watch every

  5  briefing you have every night.  But what is being done at the

  6  City level and the County level was already in the works.

  7  Coronavirus just accelerated and actually broke down barriers

  8  that we recognize were in place, whether it be CEQA and/or

  9  other issues that, quite frankly, given this virus, we have to

 10  think outside the box and recognize that asking for permission

 11  is not necessary -- sorry, lawyers -- but we're going to ask

 12  for forgiveness because we have to get this done and we have

 13  got to get it down now.  And we recognize that prevention is

 14  the key.

 15         And to your point, the homeless population is very

 16  good at moving early morning and are oftentimes invisible.  And

 17  we need to be aggressive in how we do outreach.

 18  Sheriff Villanueva has got his host team boots on the ground

 19  out there working very aggressively to try to convince people

 20  to come in.  Because many of them do not understand how at risk

 21  they are right now.  And many do not understand what this

 22  Coronavirus means or could mean.

 23         And so when we hear the number of one death already

 24  amongst the homeless, my biggest concern is that that is going

 25  to rise because we all know that healthwise they are
```

Case 2:20-cv-02291-DOC-KES Document 94-3 Filed 03/25/22 Page 36 of 129 Page ID #:11523

32

          1   compromised.  They are not in the best of health.  And we know

          2   that the studies show that the elderly and those with

          3   compromised immune systems are at greatest risk.

          4            And when we talk about slowing the spread, it's done

10:32AM   5   so that we do not overwhelm our hospitals.  Because right now,

          6   you know, what's keeping me up at night is making sure that we

          7   have the inventory of beds across the County should we need

          8   them, especially the ICU beds, for those that are going to be

          9   presenting themselves in the emergency rooms.

10:32AM  10            So, you know, Judge Carter, I have admired the work

         11   you did in Orange County, and you keep saying it's going to

         12   change.  It won't change.  Because I know where your heart is,

         13   and I know where my fellow colleagues on the board of

         14   supervisors' heart is, and that is we have to do better.

10:32AM  15            And Measure H gave us an opportunity to put new

         16   money into addressing the homeless population.  So money really

         17   prior to the Coronavirus wasn't our issue.  Post Coronavirus it

         18   may be because we don't know what the implication is going to

         19   be as it relates to jobs that are being lost, people that are

10:33AM  20   presenting themselves as possibly homeless.

         21            I know we did exactly what the City did in terms of

         22   eviction notices and putting a stay on that because that is

         23   another issue for those that can't pay.  We're trying to get

         24   the ones that are currently on the street off the street.  God

10:33AM  25   forbid we add more.  So we are looking at that, and we don't

1    know what the implication would be financially.

2            But prior to this, Measure H provided us with an

3    infusion of money.  We projected 355 million.  In fact, it came

4    in over 400 million thanks to the hard work of people like

10:33AM  5    Supervisor Mark Ridley-Thomas, who saw this as a crisis long

6    before we even came into this court, long before you were

7    dealing with the Orange County.

8            So I know that money is not necessarily the issue,

9    it's about leadership.  And I will tell you that I know in my

10:33AM 10    cities -- and I look at Juan Garza.  Is he here?  You keep

11    saying "Juan."

12            THE COURT:  He is.  Come on, Juan.  Come on up here.

13            MS. BARGER:  Okay.  There he is.  I look at people

14    like Juan Garza, who I had the honor of meeting last year and

10:34AM 15    heard him speak, and listened to his vision about wanting to

16    understand who the homeless are.  And then I flash forward,

17    read about how he's entered into the consent decree within

18    Bellflower to address the homeless within his population --

19            THE COURT:  Kathryn, on May 5th, Bellflower got

10:34AM 20    swept.

21            MS. BARGER:  Yeah -- no, but I mean -- my point

22    being Bellflower was ahead of the curve as it relates to

23    recognizing that they could do it if given the opportunity, but

24    they actually wanted to enter into the consent decree to give

10:34AM 25    them coverage so that they could be compassionate.  Because

34

1  it's not about criminalizing the homeless, but also being firm.

2  And I know Whittier is looking at doing the same.

3        We have an opportunity, both the plaintiffs, the

4  counties, and the cities to get this right.  And I am

10:35AM  5  committed, along with my colleagues.  And you referenced

6  Supervisor Janice Hahn who took a lot of heat for pushing to

7  San Pedro.  But what I tell people is they're already in our

8  community.  If left to their own device, not great neighbors.

9  But if provided the supportive services and the help that they

10:35AM 10  need, I'd be proud to have them as my neighbor.

11        So as a board, we are committed to moving forward,

12  Your Honor.  And I want you to know that, again, I don't view

13  the people that got us here today in an adversarial way.  In

14  fact, I admire their courage for stepping forward and saying,

10:35AM 15  "We want to be a part of the solution as well."

16        Because you will in the end be a part of the

17  solution, because it's going to be a give and take and it's

18  going to impact neighborhoods and people that you may know that

19  are going to say, "We want you to fix it.  But by the way, do

10:35AM 20  it over there, don't do it over here," which I'm sure

21  Mayor Garcetti's heard, I'm sure a lot of my colleagues have

22  heard that are elected officials.

23        So we have to have the political will and the

24  leadership to get it done.  And we're going to be looking to

10:36AM 25  you, Judge Carter, to help us navigate those waters.  So thank

35

       1   you for having us here today.

       2           THE COURT:  Well, thank you.  And let me be a safe

       3   forum because I've got heroes and heroines out there, and our

       4   job is to create that for you as elected officials and let you

10:36AM 5   proceed as quickly as possible without being an impediment.

       6           Now I'm going to ask the following of you

       7   specifically:  You're so well thought of in so many circles, so

       8   I'm going to toss out some names, Robert O'Brien, okay, and Joe

       9   Grogan, they're a phone call away.  All right?

10:36AM 10          You know that I went back -- Ben Cardin wanted to

      11   come out and see our program.  I went back to DC because nobody

      12   cares about a federal judge in DC or most places, by the way,

      13   but certainly not in DC.  And that was too big a story having

      14   him come out.  If they're going to produce, this is the

10:36AM 15  collaborative effort, but I'm going to be asking the tough

      16   questions in the future on behalf of our city, and that is if

      17   they're going to produce and help you, maybe you can't say it,

      18   but I can.  So right now, love to all, best wishes,

      19   collaborative effect.  But the federal government, if they're

10:37AM 20  going to step up, Mayor, and they're not, this is going to be a

      21   much different session in the future.  Okay?  And that's not a

      22   threat, that's just a promise.

      23          Now, sharpen your pencils.  You don't have to stay.

      24   You've got decisions to make.  But in a moment we're going to

10:37AM 25  try to give you a presentation because since Steve was kind

Case 2:20-cv-02291-DOC-KES Document 804-3 Filed 08/23/25 Page 40 of 112 Page ID #:11527

36

```
 1   enough to accede to me taking this case, I think folks have

 2   been working night and day.  I don't know many folks who have

 3   slept since last Friday.

 4          And we're going to see if there's 20,000 to 30,000

10:37AM  5   units that you're interested in and how you would sequence them

 6   and what permitting would take place, et cetera, and how

 7   quickly.  Because if not, then let's get on the phone.  I want

 8   you to have my number.  Okay?  If I can't communicate with you,

 9   then -- and I don't want the whole public to know it, because

10:37AM 10   I'm going to make a transcript, and I'm going to ship it out to

11   everybody.  We're going to get a transcript out because we had

12   to limit this today.  But you've got to be able to call me, and

13   I've got to be able to call you.

14          But most importantly, Andre Birotte is a great

10:38AM 15   admirer of you.  Judge Birotte speaks nothing but praise.  I'd

16   like you to coordinate with Andre Birotte and work though him

17   on all occasions, okay, that are possible.  You've always got

18   my number.  But we're such close friends.  Okay.

19          Now, I want to show you one picture on the way out.

10:38AM 20          Eddie, put up a picture of someplace called Georgia.

21   And I want to show you what our country can do.  So anybody

22   tells us that they can't build a shelter within 28 days, then

23   go talk to Michelle Martinez or the mayor in Anaheim --

24          MAYOR PULIDO:  And Santa Ana.

10:38AM 25          THE COURT:  And Santa Ana, yeah.  Thanks, Miguel.
```

37

```
         1              -- and go talk to Michelle Martinez.  They put a

         2     shelter up in 28 days.  Anaheim matched them.  And right now

         3     you're looking at America.  This is a place called Georgia

         4     right after the war, right after the debacle called genocide

10:39AM  5     had taken place.  And this is South Ascension coming across the

         6     border into Georgia.

         7              By the way, this gentleman was born a short place

         8     from here.  That's your money.  They may call it UN money, but

         9     that's United States money, and these were put up overnight by

10:39AM 10     USAID.  So anybody who tells you from the federal or state

        11     government that America can't do this, well, I'll just show

        12     them this picture.

        13              Now, would you take me over to where I just sat in

        14     Saipan.  They got hit by a god-awful typhoon.  It destroyed it.

10:39AM 15     If you don't like those kind of shelters, then I'm all for

        16     tents.  Because if we're going to get them off the street, it's

        17     not going to be pretty.  Some people are going to get hurt.

        18     But we're trying to move as many people as quickly and save

        19     their lives.

10:39AM 20              And they're not going to be the optimum conditions,

        21     plaintiffs' counsel.  They're not going to have all the ADA.

        22     We're going to try.  We don't want a paraplegic on the second

        23     floor of a motel without whatever, an elevator.  And so we're

        24     going to try.  But this is not going to be perfect.  In fact,

10:40AM 25     don't let the --
```

38

```
 1              What is it, Jim?  Get a --
 2              JUDGE SMITH:  Don't let the perfect be the enemy of
 3     the good.
 4              THE COURT:  Yeah.  So if we're going to move, then
10:40AM 5     there's going to be a lot of criticism for everybody.  Well,
 6     these are tents.  Guess what, they've been going to school now
 7     for five and a half months over there, and these kids are going
 8     to be going to school over there in these tents for probably
 9     another year and a half to two years.
10:40AM 10              If a country is doing that this quickly and we've
11     got a crisis involving death on Skid Row -- hey, tents, I love
12     tents.  So you're not getting any pushback from this court or
13     from my colleagues in terms of getting structure up because I'm
14     going to say this:  We are losing more people right now to
10:40AM 15     hypothermia, pneumonia, and other disease than possibly this
16     COVID crisis is going to cause in increased deaths.
17              In Orange County alone, we've lost 240 without the
18     crisis hitting.  Well, God help us, I hope it doesn't add
19     substantially.  But with those kinds of numbers, if you could
10:41AM 20     give me these in every city in Orange County and Riverside and
21     Los Angeles immediately -- so if you don't like the following
22     presentation, great, I'm going to ask everybody what's better.
23              So without further ado, Paul Leon, come up here, and
24     I'm going to get a pencil and step off of the bench, and we're
10:41AM 25     going to get numbers.  And you're going to start taking down
```

39

1   numbers for me. Because if this doesn't make sense, tell me

2   what does.

3         Eric, thank you. I'll call you tonight.

4         MR. LEON: Good morning. My name is Paul Leon. I

10:41AM 5   am a public health nurse and CEO of Elimination Foundation.

6   And we currently are working in Orange County, L.A. County, and

7   Inland Empire.

8         So Judge Carter asked me to present real quickly on

9   what we were doing prior to COVID-19 hitting, and that was we

10:42AM 10   ran recuperative care, medical recuperative care. We're the

11   largest recuperative care currently in the nation. And we had

12   already started looking at supply and emergency housing, bridge

13   housing, and then permanent supportive housing.

14         And about a month ago, Mr. Ken Rice [sic] came to us

10:42AM 15   with these units. We had already talked to him about

16   purchasing these units at cost. They were in North Dakota, and

17   they were assembled for oil derricks and oil derrick workers.

18   When we saw these units, we realized that we could not only

19   assemble them quickly, but they could serve as recuperative

10:42AM 20   care medical respite units for our clients that were homeless

21   and were really increasing.

22         You could see the beds are complete. They come with

23   all the soft items needed to run. You know, they can be

24   stacked. They could get here -- they could start coming. They

10:43AM 25   have full kitchens that could be set up. And they could also

Case 2:20-cv-02291-DOC-KES Document 804-3 Filed 03/25/22 Page 44 of 129 Page ID
#:11531

40

```
 1   be assembled and serve 300 meals three times a day.

 2          We -- they can be configured any way.  They have

 3   full washrooms.  And on the right you'll see they have complete

 4   generator systems if they need to be brought in and they can't

 5   be hooked up to a grid.  Full-on washing machines, pretty much

 6   everything similar to -- these are the generators -- to what

 7   we're doing now.

 8          Now, again, these are at cost.  It's a

 9   public/private partnership that we were going to do in

10   Orange County, and our nonprofit was going to bring in 78 beds

11   as a stepdown facility for COVID-19.  So we had already talked

12   to Ken about having them on the way.  And, again, we could go

13   over the prices with you.

14          My colleague in just a second -- these are the

15   Caltrans places that we identified that we were already looking

16   at putting LifeArk -- and I'll show you LifeArk in a second --

17   but we were already looking at acquiring some of these places

18   in L.A., Orange County, and we were already on our way to

19   filling out the applications to put up LifeArk.

20          And, again, LifeArk, for those of you who don't

21   know, Mayor Garcetti's office had a challenge for innovative

22   housing.  We actually won that housing challenge.  And we won

23   the challenge for services.  LifeArk, again, will take a little

24   bit longer to set up, about 90 days.  90 days to six months.

25          The first facility is going to be set up --
```

```
 1                    Paul, is that Monterey Park?

 2              THE COURT:  No, no, too long.  Move on.

 3              MR. LEON:  Okay.  So, again, these are the units.

 4       We could have 7,000 of the first units here in 90 days to six

10:45AM  5       months max.  So, again, Judge Carter wanted us to present.

 6              THE COURT:  You presented that.  Still too long.

 7              MR. LEON:  7,000 beds, 11,000 per bed, and that's a

 8       total of 4,648 units.  We showed you the Caltrans sites that

 9       we're able to apply to put them on that.

10:45AM 10             As far as services, both Elimination Foundation,

11       Salvation Army, we in Orange County run probably the two

12       biggest shelters, and we have capacity to scale up.

13              THE COURT:  Okay.  Now, let's have a conversation.

14       That's excellent for the long term.  But our conversation was

10:46AM 15       also about 1.9 million --

16              Come on up, Ken.

17              -- about 1.9 million for 70 beds.  Right, Paul?  No,

18       Paul, stay there.  About 1.9 million for 70 bedrooms; right?

19              MR. LEON:  Yes.

10:46AM 20             THE COURT:  But on my discussion, and I want all of

21       you to be clear, I don't care if these are purchased or not.

22       You could put up tents.  You could put up Tuff Sheds if you

23       could save lives.  But the end result is that if you double

24       bunk these, then you move from 70 to 140.

10:46AM 25             And the problem facing us right now is we don't know
```

Case 2:20-cv-02291-DOC-KES Document 904 Filed 03/25/22 Page 46 of 117 Page ID #:11533

42

```
 1  the standard.  Can 50 of us assemble under the present

 2  guidelines or shortly are we at 10?  And so, therefore,

 3  wherever we're doing, we need the flexibility to make certain

 4  we're not spending money and backing up and having to do it

 5  again.

 6           The next thing is we need these now, which is why

 7  I'm going to call on Kevin De Leon in just a moment.  And so I

 8  want to talk about what we could do now as we transition in,

 9  because if Los Angeles can't absorb this, then, Joe, I want a

10  couple hundred out in Whittier.  Dave, in Stanton, I want 100

11  out there.  In Anaheim, Harry wants some.  I think Mayor Silva

12  is here.  But I want to give this opportunity, if it is an

13  opportunity, right here because we're the most impacted in

14  Los Angeles.  So let's see if this makes sense monetarily.  And

15  if it doesn't, okay.

16           So if we -- remember, I can't add, so you're going

17  to help me in the audience.  Are you ready for this?  And

18  multiply.  How many trucks can you use for transportation?  And

19  I informed you my dad was a long-haul truck driver.  How many

20  trucks can you put on the road?

21           MR. PRICE:  Right now I have a commitment for 240.

22           THE COURT:  Trucks?

23           MR. PRICE:  Trucks.

24           THE COURT:  Okay.  On each truck, I'm going to call

25  one of these units of 70 bedrooms holding 140 people -- what do
```

The timestamps in the left margin read: 10:47AM (line 5), 10:47AM (line 10), 10:47AM (line 15), 10:48AM (line 20), 10:48AM (line 25).

```
 1    you want to call this?

 2              MR. PRICE:  That's a facility.

 3              THE COURT:  A facility.

 4              So I want to just take 40 trucks.  And would

 5    somebody multiply for me in the audience 40 times 140 and tell

 6    me what the answer is.

 7              UNIDENTIFIED SPEAKER:  5,600.

 8              THE COURT:  5,600.

 9              Now, when the Saudis got in a fight with Russia over

10    oil prices -- if you're not broke by now, something's wrong --

11    but it went down into the 50s, and now if you check, it's in

12    the high 30s or low 20s.  He's having to stash these up in

13    Canada probably.

14              So you say you're selling at cost, I don't know.

15    Check it out.  Not in favor or disfavor, but if that's the

16    case --

17              Eddie, start flipping up the first photo of what one

18    of these looks like.

19              Without the bureaucracy of well-intentioned permits

20    and going into offices, if you put 40 trucks on the road, Ken,

21    how quick could you have them here?

22              MR. PRICE:  We've worked it out for the 70-bed

23    facility --

24              THE COURT:  Not set up.  Just how soon can you get

25    to the outskirts of L.A.?
```

44

```
            1                  MR. PRICE:  A little less than a week.

            2                  THE COURT:  Okay.  Let's say eight days to be sure,

            3       a little more.  As we put up these pictures --

            4                  And blow that up, Eddie, if you can.

10:50AM     5                  Let's go to the interior of what one of these looks

            6       like.  Because, folks, I'll represent I haven't seen these in

            7       person.  I'm only giving you alternatives about adding to a

            8       supply, if we can add to the supply, and then getting a cost

            9       figure and seeing if we can beat that cost figure or negotiate

10:50AM    10       it or do something else as an alternative instead of what are

           11       we going to do next.  So all I'm doing is laying out for you a

           12       possibility that I don't necessarily subscribe to.

           13                  Let's just start with 40 trucks; right?  Eight days.

           14       5,600 -- what do we call them?  Bedrooms?

10:50AM    15                  UNIDENTIFIED SPEAKER:  Facilities.

           16                  THE COURT:  Facilities?  Well, whatever they are.

           17                  Is that 5,600 if I double-bunk those rooms?

           18                  MR. PRICE:  We're looking at -- right now I think we

           19       have nine facilities on the offer.  The first unit is the

10:51AM    20       70-bed complex.

           21                  THE COURT:  Right.  We're right here.

           22                  MR. PRICE:  And that we can have --

           23                  THE COURT:  140 capacity.

           24                  MR. PRICE:  That we can have here and operational in

10:51AM    25       three weeks.
```

```
 1              THE COURT:  So if we -- now, not operational because
 2     the City is about to help you.  Part of the problem with
 3     operation is are these the four units that operate off of a
 4     septic tank where we don't have to hook into a main sewer line,
 5     and that's 640 you can supply that I know about?  Or are these
 6     units that we have to hook into a sewer line?
 7              MR. PRICE:  This unit is built to connect into the
 8     local utilities.
 9              THE COURT:  Okay.  In a sewer line or electricity.
10     So the question would become for the mayor and the City, where
11     do they go and how many do you want, if you even want these?
12     And how do we shorten that permit process and do it as the City
13     of Santa Ana just did it, that is, put an inspector onsite with
14     these and sign off as we go, because every time we had to go
15     back to the office in my cities in Orange County, it took a
16     long time because folks were doing what they were supposed to
17     be doing.  But when we got them out in the street, we were able
18     to build shelters in 28 days.  Okay?
19              How many of these do you have?
20              MR. PRICE:  Right now I've set aside for Paul 20,000
21     beds.
22              THE COURT:  How many do you and Paul have under
23     contract that he's trying to tie you up with?
24              MR. LEON:  4,000.
25              THE COURT:  4,000.  So if I had a population in
```

46

```
 1   Los Angeles, according to "Los Angeles Times" -- and who's here

 2   from the "Times"?  Anybody?  Yeah.  So you wrote in yesterday's

 3   article 38- to 37,000 homeless people in Los Angeles.  That's

 4   what you said.  I'll read it to you.  And if I took 60 percent

 5   of that, what's that?

 6            UNIDENTIFIED SPEAKER:  I'm sorry?

 7            THE COURT:  What's 60 percent of 37,000?

 8            UNIDENTIFIED SPEAKER:  I didn't write it.

 9            THE COURT:  How much?  25,000.  25,000.  So at

10   60 percent, you've already got 4,000, and you have it under

11   contract.

12            MR. LEON:  For Orange County.

13            THE COURT:  For Orange County, right.  But I might

14   be asking you -- well, we'll see.  You got it under contract;

15   right?  Yeah, show me the money.  Put up your contract for me.

16            MR. LEON:  We actually don't own it, but we have the

17   purchase agreements.

18            THE COURT:  You agree?  You've got a purchase

19   agreement?

20            MR. PRICE:  We have a purchase agreement.

21            THE COURT:  So I won't have to do the drama of

22   putting up the contract.  We can believe that.  Okay.

23            Now, that's going to leave -- what's your capacity

24   here?  You said 20,000?

25            MR. PRICE:  We have set aside 20-.
```

The timestamps in the left margin: 10:53AM on lines 5, 10, 15, 20, 25.

Case 2:20-cv-02291-DOC-KES Document 694 Filed 03/26/22 Page 51 of 129 Page ID #:11538

47

```
 1              THE COURT:  20,000?

 2              MR. PRICE:  Since this hit, we're getting demands

 3      from all across the country now.

 4              THE COURT:  Exactly.  So if you're going to jump on

 5      this, you better jump on it if it's being true to cost, because

 6      otherwise, in our discussion with the mayors last night, we're

 7      quite willing to ship them right up to Oakland as we dawdle and

 8      discuss this and try to get perfect instead of good.

 9              Because my input to the governor and staff last

10      night was as follows:  If we can't absorb them here in

11      Los Angeles with a need, we're not going to wait for

12      Los Angeles.  We're going to get them up to Oakland, et cetera.

13      So you got first opportunity or nonopportunity.  And the longer

14      you take -- and by the way, it's okay to reject it.  In other

15      words, if it doesn't fit, just tell me no and let somebody else

16      take a shot at it.  But you have got about 24 hours to make up

17      your mind.  And we're going to do that today.  Back to your

18      office.  And I'm going to stay here until I get it.  Fair

19      enough?

20              Now, Eddie, what are my court hours?

21              MR. NUGENT:  We've been on the record until 1:30 in

22      the morning.

23              THE COURT:  1:30 in the morning, no problem.  I'll

24      just sit here.

25              So I believe that we're collaborative, but I also
```

48

```
 1   believe that when we get back to our offices, we have got a

 2   thousand things to do.  And just tell me you don't want them.

 3   Because 13 other mayors were on the line last night, right,

 4   Miguel?  Miguel's gone.  Yeah.  But, Joe, et cetera, and other

10:55AM  5   folks.  Kevin, you said you wanted some.  Come on up for a

 6   moment.  Kevin, come on up.  Don't be shy.  How many you want?

 7   If the price is right.

 8           MR. DE LEON:  We'll negotiate.  One thing I want to

 9   make sure it's clear, these are not just beds.  When these

10:55AM 10   facilities drop in, you have a full commercial kitchen.  We

11   have one complex that is 330 beds.  It has a full commercial

12   kitchen that will serve breakfast, lunch, and dinner for over

13   700 people a day.

14           THE COURT:  Eddie, show them the kitchen.

10:56AM 15           Now, remember, this may be pie in the sky.  Okay?

16   Just tell me what else you got going that's better, or even

17   less better, whatever that means, that you think is acceptable.

18           MR. DE LEON:  These all have laundry facilities.

19   They all have dining halls.  They all have commissaries.  We

10:56AM 20   have meeting rooms.  We have treatment rooms.  We have

21   examination rooms.  We have boardrooms.  We have fitness

22   centers that can work as rehab centers.

23           THE COURT:  So for the mayor, the Board, we

24   obviously have an opportunity far beyond homelessness.  We

10:56AM 25   actually have an opportunity in this crisis to set up, if you
```

49

```
 1   will, intake centers and isolation centers in the same module.

 2   Now that's a lot different than a motel room that we're putting

 3   folks in and asking a doctor to go to.

 4            And the question is how fast in talking to City

10:57AM 5   Manager Rick from Santa Monica yesterday, he said, "Watch out,

 6   Judge, because we may not be able to sequence these fast

 7   enough."  And if we can't sequence these fast enough, then I

 8   think that there's a general agreement that we don't want to

 9   wait while they sit there for a period of time because then

10:57AM 10  another city can use them.

11            So my last question is I want to do some fancy

12   calculations, okay.  I calculated that 140 into 1.9 million is

13   how much?  Would somebody calculate that for me in the

14   audience?

10:57AM 15            "L.A. Times," you're doing real well.  How much?

16            UNIDENTIFIED SPEAKER:  It's about 13.5, Judge.

17            THE COURT:  I would know the answer, but we'll see

18   how he does.  13,500.  Okay.  Good.

19            All right.  13,500 to serve one homeless person in a

10:57AM 20  two-person separated --

21            I'll be right with you, I promise you.

22            -- separated unit.  So you don't have to worry about

23   whether there's 10 or 50 as the CDC gives direction to us.  And

24   they haven't given direction yet.

10:58AM 25            Hold on, I'll get to you.  But if I let you in, I
```

50

```
 1   let everybody in.  So hold on.

 2           Now take what's the cost of 27,000 units or -- or

 3   27,000 people on the streets of Los Angeles?  In other words,

 4   if you supplied 60 percent of the 37- or 38,000, I want

 5   everybody in this room to come up with a bottom-line number

 6   that should scare the heck out of us.

 7           MS. SOBEL:  The current budget, it is around 50

 8   million just for the cleanups.

 9           THE COURT:  Okay.  Just hold on.  I just want to

10   know what these units are going to cost for a moment.  Come on.

11           UNIDENTIFIED SPEAKER:  350 million.

12           UNIDENTIFIED SPEAKER:  350 million, Your Honor.

13           THE COURT:  350.  Do it again.  Remember, we're

14   double-bunking.  So really, one module of 70 is 140; right?  So

15   how many modules do we need?  140 into 27,000, let's say,

16   times -- and we'll take the smaller modules because they get

17   less expensive, the larger modules --

18           And you've got much larger modules; right?

19           UNIDENTIFIED SPEAKER:  Up to 1800 beds.

20           THE COURT:  So let's get the worst figure possible.

21   Do it one more time.  You may be right.

22           UNIDENTIFIED SPEAKER:  It's around 340 million.

23           THE COURT:  Okay.  340 million.  That's our bottom

24   line with other costs, of course, with hookup.  Now that's a

25   scary number, but at least it's a number to work with; right?
```

10:58AM (line 5)
10:58AM (line 10)
10:59AM (line 15)
10:59AM (line 20)
11:00AM (line 25)

Case 2:20-cv-02291-DOC-KES Document 804-3 Filed 03/25/22 Page 55 of 129 Page ID #:11542

```
 1    That's a number to decide if there's a more quicker -- if

 2    there's a quicker, more economical, more humane way.  But

 3    eventually, you're going to go to some kind of transitional or

 4    long-term supportive housing.  And what I'm suggesting is this

 5    may be the jump right now with the crisis that gets you into

 6    one bedroom, two people per bedroom, et cetera.  But law

 7    enforcement's here and I'd like to speak to LAPD.

 8              UNIDENTIFIED SPEAKER:  Chief Moore is here.

 9              THE COURT:  Chief, thank you.  The first concern

10    would be, Chief, hey, why am I putting a bunch of folks into a

11    room where I can't see them?  I can't see them.  Because I've

12    got these folks coming in and some are using narcotics who want

13    shelter.  And so at least in our part of the world, we were

14    putting them into larger rooms for supervision until they gave

15    us some degree of, let's say, of getting off of narcotics for

16    those who were on narcotics or psychiatric issues.

17              So our experience was we put you into a little bit

18    larger facility, or tried to, and then you kind of earned your

19    way out because law enforcement couldn't see unless they were

20    in more of a dormitory style.  And we don't know if we're going

21    to 10 or 50 yet.  CDC hasn't told us that yet.

22              And, number two, you've got a tough call to make,

23    and I really respect you, and that is, do you even want these

24    folks in jail if they're loitering, et cetera, or they're going

25    to carry the Coronavirus in, and my guess is that's the last
```

The timestamps shown in the left margin: 11:00AM (line 5), 11:00AM (line 10), 11:01AM (line 15), 11:01AM (line 20), 11:01AM (line 25).

Case 2:20-cv-02291-DOC-KES Document 804 Filed 03/22/25 Page 56 of 129 Page ID
#:11543

52

```
 1   thing you want to do.
 2         CHIEF MOORE:  Well, Your Honor, thank you for the
 3   opportunity to appear before you.  And I appreciate your energy
 4   and even more importantly your authority on this critical
 5   issue.  This is an organization as a local government that is
 6   trying to work feverishly to provide needed services for
 7   individuals that are in -- terribly at risk, and this pandemic
 8   is only amplifying the crisis that we have before us.  And
 9   frankly, this is also an organization of County and City
10   officials that have worked tirelessly in order to get through
11   red tape and bureaucracy and seemingly endless counts of
12   obstacles.
13         And I'm -- it's my hope by being here today that I'm
14   witnessing an opportunity to break through that, and that
15   you'll have the authority and the ability to actually allow us
16   to work in a common-sense manner that can provide shelter for
17   those that are in need as well as care and treatment for people
18   who are experiencing mental health crises, substance abuse
19   problems, and that the complexity of this is not simply the
20   establishment of a large shelter or individual beds.  But the
21   real care of this is not the construction of the units, but
22   also the augmenting it with staffing that can provide.
23         The worst-case scenario is a barrack setting with
24   law enforcement on gun post, looking at this population as if
25   it's somehow an offender or somehow the enemy.  The best-case
```

Case 2:20-cv-02291-DOC-KES Document 804-3 Filed 03/20/25 Page 57 of 129 Page ID #:11544

53

```
         1    scenario is mental health workers, medical personnel, outreach

         2    and engagement of social workers that are present 24/7, 365.

         3    That has been a challenge for this region and it is across

         4    America.

11:03AM  5            So I look forward to you working with us in this

         6    coalition, working in support of our joint endeavor here, which

         7    is to provide affordable, realistic, resilient housing

         8    immediately for people who are in crisis because they're in an

         9    environment in a public setting that exposes them to this

11:03AM 10    Coronavirus as only the latest chapter of the risk to their

        11    safety and their welfare.

        12            And so, secondly, as is perhaps is a moment that can

        13    transition us into a more lasting solution, I -- we all share

        14    that ambition.  But as law enforcement, what I would first ask

11:03AM 15    is that we find the means to build and locate and establish

        16    immediate shelters so that we have ample opportunity for people

        17    who are willing or able to provide, then to take advantage of

        18    that shelter.

        19            THE COURT:  Absolutely.  In other words, let's get

11:04AM 20    folks under shelter as quickly as possible, supervise them as

        21    best we can.

        22            Okay.  A couple things.  This won't work unless it

        23    works for law enforcement.  It's just as simple as that.  And

        24    historically, when I started, the cities wanted to sweep the

11:04AM 25    City from a law enforcement perspective, but we didn't have the
```

54

```
 1   same kind of help, impetus, and push.  I don't think people
 2   really cared about that as much in the community.  That's
 3   transitioning now because the community is terrified of this
 4   COVID-19.  So health has really risen to the top of the ladder.
 5        I want you to tell me and educate me what the best
 6   scenario for law enforcement is and repeat that to me.  So if
 7   we were going down, let's say, Broadway, and we were cleaning
 8   encampments and we just started -- I mean, street to street --
 9   you took in a thousand people, tell me the module that you'd
10   like that initial thousand people, what that module would look
11   like for you.
12        CHIEF MOORE:  Well, the worst-case scenario is the
13   one you just described.  The clearing of streets by law
14   enforcement in Los Angeles would, in my view, as a professional
15   of nearly four decades of service, lose the very trust of the
16   community in which we're attempting to maintain.
17        THE COURT:  Everybody hear that?
18        Now, here's what I got from the governor's office.
19   They're right on board.  They're expecting that they may get
20   from CDC as of 10:00 o'clock last night in the conversation,
21   "Hey, hold these encampments in place because the scattering is
22   going to cause chaos and mayhem.  And, Judge, what do you think
23   about that?"
24        I said, well, I would never interfere with the input
25   of a professional like CDC, but why aren't we increasing, then,
```

11:04AM (line 5)
11:05AM (line 10)
11:05AM (line 15)
11:05AM (line 20)
11:05AM (line 25)

55

```
 1   the health of these people in that very area by supplying these

 2   tents or trailers or whatever you decide because they're not

 3   social distancing themselves now, Chief, they're all rubbing

 4   elbows and using subway and I don't care about our social

 5   distancing.  It's just not going to work in the gate-guarded

 6   communities even.  So I'm right on board with you.

 7        CHIEF MOORE:  So we join with you, the -- the

 8   sheltering system, the 13 that are being established starting

 9   tomorrow as part of a 42 overall outreach effort will also have

10   challenges in regards to social distancing.  And I do not

11   intend for LAPD to be the enforcers of social distancing.

12   We're not carrying tape measures around nor do we expect to use

13   them.

14        THE COURT:  Listen closely as we discuss these

15   trailers or tents today from your perspective.  And jump in at

16   any time because this must work for law enforcement in the

17   community and the citizens.  Because although we're focusing on

18   homelessness, it's really the whole community.  Okay?

19        UNIDENTIFIED SPEAKER:  Yes.

20        THE COURT:  Any input, just step forward.  All

21   right?

22        Okay, Ken, we're almost done.  So there's your price

23   tag.  Are you going to flimflam us and negotiate and drive that

24   price up or are you going to hold your word --

25        CHIEF MOORE:  Excuse me, Your Honor.  I'm going to
```

56

```
 1    excuse myself.

 2              THE COURT:  -- to that cost?

 3              CHIEF MOORE:  Your Honor, absent other direction or

 4    desire, I'm going to excuse myself.  I do have staff here --

11:07AM 5         THE COURT:  Excellent.

 6              CHIEF MOORE:  -- that will continue to monitor this

 7    and be a party to our efforts.

 8              THE COURT:  And by the way, you'll have my phone

 9    number.

11:07AM 10        CHIEF MOORE:  Very good, sir.

11              THE COURT:  And I'll reach out.

12              So Ken, here, now we're going to test you.  I get

13    input as of two days ago that we're going to go with cost.

14    You're going to stay with cost?

11:07AM 15        MR. PRICE:  Yes.

16              THE COURT:  Okay.  There's the commitment.  He's not

17    going to flimflam you or raise it.  Those were the numbers that

18    we were given.  Take it or leave it or take a portion of it,

19    but please let the governor, let me, and let other people know

11:07AM 20   what our needs are in Los Angeles.  And please let us work

21    together from the City perspective if we can sequence these in,

22    if you want some of these, Kevin, quickly enough so that we're

23    not wasting time by either finding professionals who we don't

24    have to get in here, because then let's get some up to Oakland

11:08AM 25   and help the governor.  Okay?  Let's not let them sit for six
```

```
         1    months.
         2              Now, anybody in the audience, this is -- come on
         3    down.  You tell me and give me a better price for units of this
         4    type.
11:08AM  5              MS. SOBEL:  I have a question.
         6              THE COURT:  Okay.  Now, hang on, Carol, I promise
         7    you you'll have all day and night.  I want to hear from the
         8    audience.  I want to even hear from the press.  You guys are
         9    covering this, and gals.  Give me a better price.
11:08AM 10              Okay.  Then either go with trailers or they come
        11    back with some alternative or cheaper solution.  Tell me why
        12    it's better.  Tell me why hotel rooms are going to work.  While
        13    they might in the interim, how in the heck are we going to
        14    eventually service those hotel rooms with professionals going
11:08AM 15    place to place?  And aren't we wasting money in the long run by
        16    not having transitional and long-term supportive centers that
        17    we need anyway?  So for God's sake, if the governor's helpful
        18    and going to give away money, and if President Trump -- can
        19    somebody get him on the line?  No, call Joe Grogan.  I tried
11:09AM 20    this morning.  I'm not kidding you.  Call him.  Then if they're
        21    serious about this, then let's take advantage of this god-awful
        22    situation and do something.
        23              So, Ken, I'm going to come back to you.  Anything
        24    else you want to say?  Because you got about 30 more seconds.
11:09AM 25    You did great.
```

58

```
                     MR. PRICE:  Oh, I just think this is a full-service
 1

 2    offering.  So you're not just throwing people into beds, you're

 3    getting them fed, you're making them secure, you're getting

 4    them treatment all on-site.  So this is a total solution, not

11:09AM 5    just a throw-them-in-a-bed solution.

 6                     UNIDENTIFIED SPEAKER:  Ken, what's your last name?

 7                     MR. PRICE:  Price.

 8                     THE COURT:  Okay.  Paul.

 9                     And by the way, we've got lots of photos.  I'm

11:09AM 10    not -- trust me, I'm going to remain a judge for the rest of my

11    life.  I don't care if you take it or not.  Just give me a

12    better alternative that works better for Los Angeles.  Ears

13    open.

14                     Carol, you had one question?

11:10AM 15                     MS. SOBEL:  One question.  Can we tell what the

16    square footage of each unit is?

17                     MR. LEON:  Yes.  We have that.  We've got it.  We

18    have the footprint.

19                     But I want to just clarify, Judge, that we're the

11:10AM 20    service providers.  So although Ken seems like a nice guy, we

21    said this is the price.  We've got to show its at cost because

22    we have contracts with DHS, L.A. Care, Orange County Health

23    Care Agency.  We're already at the front line and our beds

24    are -- DHS cleared some out because they're going to bring some

11:10AM 25    other people to our recuperative cares, but we've already been
```

Case 2:20-cv-02291-DOC-KES Document 90-3 Filed 03/22/23 Page 63 of 129 Page ID #:11550

59

```
 1    in contact with hospitals.  We anticipate by the weekend
 2    they're going to be full.
 3            And I used to be a critical care director at
 4    Saddleback and Orange County.  I already know their biggest
 5    need right now is to clear the people that are healthy.  And
 6    this could be an option.  LifeArk could be an option.  Because
 7    this is going to be for months, to clear the hospital so then
 8    they can really use their ICU beds.  So far we've sent about 50
 9    people that we deemed -- and remember, we're medical
10    personnel -- that we deemed are significant.  They met the
11    criteria.  And probably about 40 of them came back roughly as
12    nonCOVID-19.  So it's just a huge problem we're going to have
13    continuing forward.
14            And as a provider, we're seeing both those as the
15    immediate answer to -- that we really need.  We're telling as a
16    provider that not only can we use them now moving forward,
17    December, January next year, we would have needed similar units
18    like this to house, you know, roughly, give or take, 16,000 in
19    L.A. and about 10,000 in Orange County.  So --
20            THE COURT:  Thank you very much.  In fact, there are
21    schematics of the space, et cetera.  Remember, I don't care if
22    you accept these or reject them.  Just make a decision, and
23    then let's move on, if you want some of these or not.
24            So now I want to turn to Nury Martinez.  You're the
25    council president.  It's a pleasure.  I wanted to --
```

11:10AM (line 5)
11:11AM (line 10)
11:11AM (line 15)
11:12AM (line 20)
11:12AM (line 25)

60

1    And thank you for letting me get that presentation

2  on.

3           Let me turn to you.

4           MS. MARTINEZ:  Thank you very much, Judge.  One

11:12AM 5  thing about me, and I hope through this whole process you and I

6  can become friends, I don't mince words and I'm very direct in

7  terms of not only what I believe the leadership of this council

8  is trying to do with this homeless crisis, but also to give you

9  an indication of how our neighborhoods and our communities are

11:12AM 10  heavily impacted by this crisis that's been going over the last

11  couple of years.

12           And so for me, I think the mayor has already covered

13  what the City is doing.  These -- two days ago when we had a

14  council meeting, we appropriated $20 million for our COVID-19

11:13AM 15  crisis.  Over the last couple of years through the commitment

16  of this council and the voters of the City, we voted on

17  Measure HHH, which you are well aware about, and we have now --

18  our goal is to build almost 10,000 units of housing.  I want to

19  say that 10 out of the 15 council districts have already met,

11:13AM 20  if not exceeded the 222 pledge, which basically we took 10,000

21  units of housing, divided it by 15, and that was our pledge to

22  at least build 222 units of housing in each council district.

23           I am adamant -- and I don't mince words -- I am

24  adamant that all communities need to provide a homeless

11:13AM 25  solution.  Historically, some parts of our city have not shared

```
 1   the same responsibility and we are overwhelmed.  Particularly,

 2   those communities or districts -- communities of color and

 3   districts that -- who have historically have had to deal with

 4   environmental justice issues.  Basically, every and any other

11:14AM  5   facility that no one else wanted in the City, it gets built in

 6   these communities.  So if we are going to do this, we need to

 7   do it fair and we need to do it equitable for everyone to share

 8   in the responsibility.

 9          We are in an era of NIMBYism, and I have to say that

11:14AM 10   my colleagues on the City Council have dealt with opposition,

11   with community pushback, and they have stood up to some of

12   those oppositions and moved forward with some of these

13   permanent supporting housing projects and their district.  That

14   needs to be recognized.  We need to do more of that and we need

11:14AM 15   to ensure that as a city, we're committed to doing this and

16   sharing the responsibility of solving this crisis.  You know,

17   it's a decent thing to do and we're up to the obligations to

18   make sure that we fulfill those commitments.

19          THE COURT:  I want to thank you.  And that equitable

11:14AM 20   responsibility is critical.  No community can feel that they're

21   being disproportionately harmed.  By the same token, if

22   everybody does whatever they've got there, then if one

23   community has more, that's the problem.  If another community

24   has less, that may be good for that community.  But unless they

11:15AM 25   cooperate, there's going to be an unintended consequence of
```

Case 2:20-cv-02291-DOC-KES Document 304 Filed 03/25/22 Page 66 of 129 Page ID #:11553

62

```
 1   migration for some of these communities who so far have felt

 2   relatively distant, and we're seeing that in some portions of

 3   Orange County where there's been an influx towards our beaches

 4   and some other locations that have been unintended by some of

 5   those communities that didn't step up as quickly, let's say, as

 6   others.

 7           MS. MARTINEZ:  That's correct.

 8           THE COURT:  And so I want to thank you.

 9           I want to turn really quickly to The Salvation Army.

10           MS. MARTINEZ:  One more thing, Judge, if I may.  I

11   know that Chief Terrazas is also here in the audience --

12           THE COURT:  Oh, thank you.

13           MS. MARTINEZ:  -- from our fire department.  They

14   need to get back to deal with our Coronavirus crisis --

15           THE COURT:  Chief, I want to recognize you --

16           MS. MARTINEZ:  -- so I want to recognize him if he

17   has anything.

18           Chief, do you want to come up?  Because I know our

19   first responders are heavily being impacted by this crisis, and

20   I want to recognize him and give him the ability to be able to

21   go back to work because I know you have a full plate.

22           THE COURT:  Chief, we're getting you back to work

23   right now.

24           MS. MARTINEZ:  Thank you, sir.

25           CHIEF TERRAZAS:  Thank you, President Martinez.
```

Case 2:20-cv-02291-DOC-KES Document 894-3 Filed 03/25/22 Page 67 of 129 Page ID #:11554

63

 1    Thank you, Your Honor, for allowing me to be here.

 2              I think public safety has an important role in this

 3    whole effort.  Just to give you an idea of the numbers that we

 4    deal with on a regular basis, we run 1350 emergency incidents

11:16AM 5    every 24 hours in the City of Los Angeles.  Of that 1350, about

 6    11 percent is to our homeless population.  We transport about

 7    600 people to the hospital every 24 hours.  Of that number, we

 8    transport about 14 percent of our homeless population to the

 9    hospitals.

11:16AM 10             I think bringing the homeless into shelters is going

 11   to help us.  They're going to be protected from the elements.

 12   They're going to be congregated together instead of spread out

 13   throughout the city.  And we should have a healthcare component

 14   on-site at these shelters so we can catch these issues, these

11:17AM 15   medical emergencies while they're still minor.  So we're here

 16   to do whatever is necessary to support the effort.

 17             THE COURT:  And we're going to extend that courtesy

 18   back from the bench.  I don't want you to be chilled.  I think

 19   you're the first responders and it's amazing that I'm capable

11:17AM 20   of social distancing.  I'm privileged and lucky and fortunate,

 21   but that homeless population isn't.  And guess who's responding

 22   to it?

 23             CHIEF TERRAZAS:  We are, Your Honor.

 24             THE COURT:  Yeah, just like the military, you're

11:17AM 25   right on the front line.

64

```
 1              CHIEF TERRAZAS:  Yes, sir.

 2              THE COURT:  And so, you know, anything that we can

 3         do, you've got that pledge right back.  We're not going to be

 4         an obstacle.  We're going to give you hopefully a parameter so

11:17AM 5  the plaintiffs and defendants here can operate in good faith

 6         within that parameter, and you get the necessary nonimpediment

 7         and nonchilling effect just immediately.  Okay.  And the same

 8         thing to the police chief.

 9              But I want to follow with Kevin De Leon for just a

11:17AM 10 moment because he's got a -- and I apologize to The Salvation

 11        Army because he's got the most impacted area, which you

 12        commonly refer to as Skid Row.  So Kevin?

 13             CHIEF TERRAZAS:  Yes, sir.  Am I excused,

 14        Your Honor, or would you like me to --

11:18AM 15      THE COURT:  Listen.  A long time ago.  I humbly

 16        can't thank you enough.  You've got really important things to

 17        do.  Let me hammer this out with the plaintiffs and defendants

 18        later tonight.

 19             CHIEF TERRAZAS:  Yes, sir.

11:18AM 20      THE COURT:  And phone's open, okay?

 21             CHIEF TERRAZAS:  Thank you very much.

 22             THE COURT:  Pleasure.

 23             CHIEF TERRAZAS:  Thank you.

 24             MR. DE LEON:  Thank you very much, Judge David

11:18AM 25 Carter, Judge Birotte, as well as the fellow judges here
```

65

```
 1    present today, I want to thank everyone who's had the

 2    opportunity to present to you.

 3              Judge Carter, it was indeed an honor and pleasure,

 4    quite a kick, actually, a few years ago to work with you and

11:18AM 5    the dilemma in Orange County with regards to the housing

 6    homeless crisis.  But it was a real honor -- it was a real

 7    honor, once again, to touch base with you again.

 8              I am a senate president emeritus of the California

 9    State Senate.  I am an aspirant to say that hopefully sometime

11:19AM 10    soon within the next few weeks I can call myself council

11    member-elect of CD 14.  And CD 14 is also the epicenter of the

12    homelessness crisis not in the City of Los Angeles, but

13    actually in the United States of America.  There's not one city

14    in America that can claim the most number of unhoused

11:19AM 15    individuals, any particular geographical area, than Skid Row

16    specifically in CD 14.  If we walk out this U.S. federal

17    building, this beautiful brand-new federal building, just down

18    the street past Little Tokyo, we will be in Skid Row, and it's

19    unlike anything we have ever seen there.  In fact, let me say

11:19AM 20    this --

21              THE COURT:  In fact, you're going to take me down

22    there, aren't you?

23              MR. DE LEON:  We're going to go together.

24              THE COURT:  That's right.

11:19AM 25              MR. DE LEON:  And you said you wanted to go at 4:00
```

Case 2:20-cv-02291-DOC-KES Document 804-3 Filed 03/23/25 Page 70 of 129 Page ID #:11557

66

```
 1    or 5:00 in the morning, so...

 2            Let me say that a few months ago I took some family

 3    members down to Skid Row purposefully.  And as we were driving,

 4    my family members said, who are not from Los Angeles --

11:20AM  5            (Speaking in Spanish.)

 6            "This cannot be.  This is incredible.  This is the

 7    City of Los Angeles."  Which to another relative in the van

 8    said --

 9            (Speaking in Spanish.)

11:20AM 10            "This looks like the third world."

11            To another family member corrected that family

12    member and said, "That's an insult to Third World nations to

13    say something like this.  In one of the wealthiest cities,

14    clearly in the wealthiest state, in the wealthiest nation in

11:20AM 15    the world, obviously, this leaves an indelible mark of shame

16    and it wounds our civic pride as Angelenos, as Californians,

17    and as Americans.  And I think as Kathy Barger, who just said a

18    few moments ago before she left, "This is all hands on deck."

19            I appreciate our great mayor, Eric Garcetti, who I

11:20AM 20    know him and his staff have been on this 24/7 as well as our

21    new council president, Nury Martinez.  And before I want to

22    just share a few -- just a couple minutes, but I do want to

23    emphasize what Council President Nury Martinez just mentioned a

24    few moments ago.

11:21AM 25            This is about equity.  And those communities that
```

67

| | |
|---|---|
| 1 | have been disproportionately impacted by poverty, lack of |
| 2 | parks, lack of open space, a dearth of supermarkets, fresh |
| 3 | food, freeways, deep-entrenched poverty, gentrification |
| 4 | displacement, these communities also to -- through Council |
| 11:21AM 5 | President Nury Martinez's comments have to be treated through |
| 6 | the lens of equity, and how we distribute this issue throughout |
| 7 | the City and County of Los Angeles. So therefore, I say it is |
| 8 | all hands on deck. |
| 9 | Let me say the following, Judge Carter, is one is -- |
| 11:21AM 10 | and I think it was mentioned here a few moments ago. This is |
| 11 | about leadership and accountability. And the reason why I say |
| 12 | leadership and accountability is that taxpayer dollars are |
| 13 | finite. HHH, I'm the author of "No Place Like Home." That's |
| 14 | $2 billion that are coming down the pipeline to build permanent |
| 11:22AM 15 | housing solutions. Those are finite dollars. |
| 16 | It is ultimately up to the citizens of the City, the |
| 17 | County, and the state of California to make that determination |
| 18 | if, in fact, they'll continue to fund housing programs. We |
| 19 | need value to get volume because the crisis that we have. You |
| 11:22AM 20 | cannot have extraordinary amounts of dollars being spent, |
| 21 | therefore, politically, you have an electorate saying if we're |
| 22 | spending 500-, 600-, $700,000 per unit on permanent housing |
| 23 | solutions, I can't afford to purchase with a great FICO score |
| 24 | with any capital to put down as a down payment to get into a |
| 11:22AM 25 | condominium or a townhouse. |

Case 2:20-cv-02291-DOC-KES Document 804-3 Filed 03/03/25 Page 3 of 101 Page ID #:11559

68

```
          1              So you run the risk of alienating the electorate.
          2    Because as mayors know, as our great council member Nury
          3    Martinez, and our Mayor Eric Garcetti knows, budgets are tied
          4    up for fire and police, Department of Transportation, city
11:23AM   5    parks, after-school programs, and so forth.  So your wiggle
          6    room is limited to nonexistent.  Therefore, you have to go to
          7    the electorate to ask for money, whether it's a government
          8    bond, whether it's an enhancement on a tax revenue.
          9              And if the electorate themselves are saying, "I'm
11:23AM  10    done, that's it," then we're going to be in a heap of trouble,
         11    even more so, than the current situation today.
         12              I would differ with regards to the chief when he
         13    said -- when he described the worst-case scenario.  The
         14    worst-case scenario is what is happening today present in
11:23AM  15    realtime.  That is the worst-case scenario.  We have tens of
         16    thousands of men and women, increasingly children, who are
         17    living on our streets every single night.
         18              To that, I want to say the following:  The question
         19    is, can we build what I authored, Senate Bill 100 RPS,
11:24AM  20    Renewable Portfolio Standard, which clearly says to utility
         21    companies you must by a certain year have X amount procurement
         22    of renewable energy.  I think for leadership and
         23    accountability, and to have the teeth that's built in, city
         24    governments throughout California, especially in Southern
11:24AM  25    California, have to have a legal mandate.  We will build X
```

```
 1   amount of housing units, and the question is by when.
 2          THE COURT:  By when.  Okay.
 3          MR. DE LEON:  How many units and by when which is
 4   absolutely critical.  Because if we don't have the legal teeth,
11:24AM 5   then we'll be in litigation after litigation after litigation.
 6   The Boise decision, the Mitchell decision, all of these
 7   lawsuits that are coming down the pipeline today right now.  If
 8   we're all hands on deck by using the money that we have today
 9   in the most prudent manner, we can resolve this crisis.
11:24AM 10          THE COURT:  And let me share something with you.
11   One of the best things that's happened through the settlements
12   and the consent decrees with the 21 cities is that in 18
13   months, we've had two issues that were resolved by Judge Smith
14   that took 15 to 30 minutes each.  And that wasn't necessarily
11:25AM 15   satisfactory to all parties, but we have absolutely flattened
16   the litigation.  That is money that you can be spending that
17   normally goes out for litigation purposes that's devastating
18   and, quite frankly, could be better spent in other ways.
19          So that's one of the good things.  Maybe a city
11:25AM 20   attorney or law firm might not be as appreciative of that, but
21   we have flattened the litigation in our part of the world.  And
22   it's caused two things, our ability to move forward.
23          Kevin, hypothetically, I'm going to offer you 4,000
24   trailers.
11:25AM 25          MR. DE LEON:  I will say this --
```

70

```
 1              THE COURT:  No, hold on.  Hypothetically, I want you

 2    to walk me through that.  How are you going to get the permits?

 3    How are you going to hook them up?  And how long would it --

 4    and you don't have these answers yet, so you don't have to

11:25AM 5    respond today, but are you interested?

 6              MR. DE LEON:  I am absolutely interested.  I don't

 7    have the legal or political authority to accept these units,

 8    but I do have the moral authority as a constituent of CD 14 and

 9    as a constituent --

11:26AM 10             THE COURT:  So if we can get them here

11    hypothetically in seven days and without the City's help, if it

12    took 30, 60, 90 days to hook up, but hypothetically, if my dad

13    were still alive and he got in his long-haul rig and he drove

14    down here -- see, he used to go from Portland to Detroit down

11:26AM 15    to L.A. to deliver cars -- back to see mom and me, and made

16    that circle.  Okay?  So North Dakota, no big deal.

17             All right.  Now, you arrive with 4,000 units out

18    here at the -- either the train station or you arrive -- if

19    they're overland.  I think it's become a real problem in terms

11:26AM 20    of well-intended bureaucracy because we take it to an office,

21    the person does a good job looking at it, but the one miracle

22    that I saw with Michele Martinez in Santa Ana and Anaheim and

23    the rest of these cities was they actually took that

24    inspectorate and put it right on-site.  And it didn't go to an

11:27AM 25    office.  They signed off as they went if it was appropriate.
```

71

```
 1   And if not, they corrected it.  That's the realtime action we
 2   need because this doesn't have to take 90 days.
 3              And that's why I kind of rudely, and I apologize to
 4   Ken and Paul, cut them off when I said 90 days is too much.
 5   Because we've talked about a much shorter period, if we get the
 6   cooperation of the City, because we watched it work before.  So
 7   it's nothing new.  We're not inventing something.  We've just
 8   sat there and watched the time cut in two-thirds, just slashed.
 9              MR. DE LEON:  Well, I would say, Judge Carter, in
10   that I think that city/local governments have to identify
11   city-owned real estate portfolio assets that are
12   underappreciated, undervalued, underused.  So those are real
13   estate locations where we can immediately --
14              THE COURT:  Okay.
15              MR. DE LEON:  -- find the housings.  And
16   specifically, I think when it comes to planning departments, we
17   have to cut the red tape and roll out the red carpet.
18              THE COURT:  I have to depend upon you to do that.  I
19   don't want to tell folks the date we're going out there.  Call
20   me at home again.
21              MR. DE LEON:  I'll give you a call.
22              THE COURT:  Okay.  4:30, 5:00, 5:00 o'clock, and
23   we're out there; right?
24              MR. DE LEON:  We'll do it together.
25              THE COURT:  In a very short period.  Because I don't
```

Time stamps in left margin: 11:27AM (lines 5, 10, 15, 20), 11:28AM (line 25)

Case 2:20-cv-02291-DOC-KES Document 89-3 Filed 08/03/25 Page 76 of 129 Page ID #:11563

72

```
 1    want the press with us or anybody else.  We'll just quietly go

 2    out there.

 3              MR. DE LEON:  We'll go out there in cognito.

 4              THE COURT:  By the way, I used to be here in the

11:28AM 5    Mexican Mafia case for two years so I used to run down through

 6    Skid Row every day.  So I know it.  I just want to relook at it

 7    again.  I wasn't -- haven't been there for a while.

 8              MR. DE LEON:  Okay.

 9              THE COURT:  Kevin, thank you very much.

11:28AM 10             MR. DE LEON:  Thank you very much.

11             THE COURT:  Give me a call.

12             MR. DE LEON:  Just one last -- I will take those

13    units right there, as many as we can --

14             THE COURT:  Okay.

11:28AM 15             MR. DE LEON:  -- for CD 14 at least.

16             THE COURT:  Okay.  Then we'll work out the

17    sequencing and stuff.

18             MR. DE LEON:  Okay.

19             THE COURT:  Fair enough, Kevin.  Thanks a lot.

11:28AM 20             Okay.  I want to call on Salvation Army for a

21    moment.  General, you've come down.  I know you don't go by

22    "general," I just promoted you.  Thank you.  Introduce yourself

23    to the audience really quick, tell me your capacity, and then

24    get back to the front line as a first responder.

11:28AM 25             COMMISSIONER HODDER:  Thank you very much, Your
```

Case 2:20-cv-02291-DOC-KES Document 604-3 Filed 08/05/22 Page 77 of 129 Page ID #:11564

73

```
 1   Honor.  It's a privilege to appear before you today.  My name

 2   is Commissioner Kenneth Hodder.  I'm privileged to serve as the

 3   territorial commander for The Salvation Army USA Western

 4   Territory, all of its operations from the eastern border of

11:28AM 5   Colorado to Guam and Saipan.

 6           I'm accompanied today by Lieutenant Colonel John

 7   Chamness, who is the divisional commander for the California

 8   South Division, and by Captain Nursen Keyston (phonetic) with

 9   whom I know you had the opportunity to work when you were doing

11:29AM 10   your fine work in Orange County.

11           Your Honor, as you know, The Salvation Army has been

12   passionate about the issue of homelessness since its founding

13   in 1865.  We have 155 years of experience in this area.  It is

14   at the very core of what The Salvation Army does.  In the last

11:29AM 15   few years, of course, we've hit an explosion in this problem.

16   We determined, therefore, last year that we were going to

17   double our capacity to improve the lives of the homeless around

18   the Western United States within five years.

19           THE COURT:  Now, just a moment.  My colleagues in

11:29AM 20   Portland, Seattle, and San Francisco are very interested in

21   what's happening in court today.

22           COMMISSIONER HODDER:  Yes, sir.

23           THE COURT:  So you're about to speak far beyond

24   Los Angeles for a moment.  There's a network of judges out

11:29AM 25   there who want to be, let's say, helpful.  And that may be best
```

74

1   in a collaborative sense, as long as it's within reason and the

2   parties being involved, instead of you guessing what we're

3   about to do a year from now.  Can you add to this capacity?

4   You've heard today some representations that were made, you've

11:30AM 5   heard the issues and problems about sequencing, et cetera.  Can

6   you add to the capacity in Los Angeles?  And if so, tell me

7   how.

8           COMMISSIONER HODDER:  Your Honor, within 24 hours,

9   we can add 80,000 square feet of facility available in Bell for

11:30AM 10   triage purposes.  Within 24 hours under your direction, we'll

11   have an additional 27 properties which are closed Salvation

12   Army thrift stores.  By instruction, I closed all of them

13   yesterday and repurposed them for purposes of serving the

14   homeless and those who are vulnerable in the Coronavirus

11:30AM 15   crisis.

16           THE COURT:  Okay.  Repeat that very quickly.  And

17   then Mike and certainly our district attorney, Jackie, I'd like

18   to call on you.  I'll get you back on the front lines.

19           Okay.  I want you to repeat that.

11:30AM 20           COMMISSIONER HODDER:  Certainly, sir.  Subject to

21   appropriate governmental approvals and the necessary funding,

22   we can make available 80,000 square feet in Bell for purposes

23   of indoor sheltering, for isolation purposes, or for triage.

24   In 24 hours, we can also make two of our camps available in the

11:31AM 25   Calabasas area that will provide recuperative recovery care and

Case 2:20-cv-02291-DOC-KES Document 90-3 Filed 03/03/25 Page 75 of 129 Page ID #:11566

75

```
 1   it will also provide isolation services for those who perhaps

 2   have already tested positive for Coronavirus, again, within 24

 3   hours.

 4          We have more than 60 properties here in Los Angeles

11:31AM 5   County that The Salvation Army will make available for any use

 6   that any municipality feels is most appropriate to respond to

 7   the crisis.  We can have all of those ready in 24 hours.  Store

 8   personnel that have been working in Salvation Army stores will

 9   be available to provide additional personnel.

11:31AM 10          THE COURT:  So you're going to switch those out of

11   the stores into the field?

12          COMMISSIONER HODDER:  Yes, sir.  We'll just bring

13   them right in.  And all of those facilities, sir, will be led

14   by trained Salvation Army officers.

11:32AM 15          THE COURT:  Okay.  You've done an outstanding job in

16   Anaheim, first, is where we've been working with you.  And on

17   every occasion, I want to pay a compliment to you.  The

18   homeless have actually come to believe that you're one of the

19   premiere, if not primary programs, that they tend to stay in.

11:32AM 20   And that's quite frankly because of some of your rules and

21   rigidity, which they're not rejecting.

22          Now, I want to walk through this again.  80,000

23   square feet.  Give me specifics.  Who do you need to talk to?

24   What do you need?  How do you get this up and running?

11:32AM 25          COMMISSIONER HODDER:  We would like to work through
```

76

```
 1    LAHSA so as to --
 2              THE COURT:  Hold on.  Where's LAHSA?
 3              UNIDENTIFIED SPEAKER:  Right here.
 4              THE COURT:  Thank you.  Come on up.  LAHSA's coming
11:32AM 5    up.  There she is.  Hold on.  Have we have a chance to talk
 6    yet?  And that's not fault finding because I want to see a big
 7    hug -- just kidding you.  Get six feet apart.
 8              COMMISSIONER HODDER:  It's a pleasure to meet her
 9    this morning.
11:32AM 10             THE COURT:  Well, there's no problem.  That's why
11    we're here.  Say hi to each other.
12             COMMISSIONER HODDER:  Good morning.
13             UNIDENTIFIED SPEAKER:  Good morning.
14             THE COURT:  Good.  Now give each other your phone
11:33AM 15   numbers.  Write down your phone number.  Write down your phone
16    number for each other.
17             COMMISSIONER HODDER:  We will, indeed.
18             THE COURT:  Yeah, right now.  Good.  Now exchange
19    the phone number.  Now, hold on.
11:33AM 20             So we don't know when, but I would love to be able
21    to go out and see these 80,000 feet, so would you and so would
22    the public, although they can't go, operational; right.
23             COMMISSIONER HODDER:  Yes, sir.  At the present time
24    on that site, we already have one of the largest shelters in
11:33AM 25   L.A. County.  The Bell --
```

77

```
 1              THE COURT:  I know about it.  Harry Pregerson, I
 2    think, was involved.
 3              COMMISSIONER HODDER:  Yes, sir.
 4              THE COURT:  Yeah, he took me down there years ago
11:33AM 5    and I wish Harry was with us now.  He would be a fabulous
 6    asset.
 7              Okay.  I don't know what you have to do and I'm not
 8    going to take the time to hammer that out.  But I would like to
 9    get back to you not in a huge setting like this, but on a phone
11:33AM 10   call.  Okay?  If I could be of help, great.  If I can't be of
11    help, get me out of the way.  In other words, you don't need a
12    lookie-loo coming in and interfering with professionals.
13    You're on the front line shooting bullets right now.
14              But by the same token, I'm going to be asking why
11:34AM 15   that isn't up and running.  And so I don't want to get into the
16    particulars, I don't have time.  I need my first responders
17    back.  But the next meeting will be why isn't this up and
18    running?  And I want names of why it's not.  Okay?  But today,
19    we're all happy.  Next time, I'm not sure we're happy.  Okay.
11:34AM 20              Now, what else are you going to do for us?  You've
21    got 80,000 feet.  I want to hear the next one.
22              COMMISSIONER HODDER:  Next place, sir, would be the
23    repurposing of all of our closed Salvation Army thrift stores.
24    We will be ready to clear those out so as to make them
11:34AM 25   available for --
```

78

```
 1              THE COURT:  Give me an idea of capacity.  In other

 2    words, what am I talking about?  Am I talking about a hundred

 3    people or am I talking about a thousand people?  A rough

 4    guesstimate.  And I'm not holding you to exactness, but tell

 5    Eric and his staff what kind of capacity we have out here in

 6    our communities.

 7              COMMISSIONER HODDER:  Each store would have

 8    approximately 12- to 15,000 square feet of area.

 9              THE COURT:  Wow.  Time out.  Now, if you made that

10    available and I was in a smaller city like La Puente or

11    Rosemead or hypothetically some city who might have come in,

12    and I don't have any money and I heard that I could get a

13    Salvation Army site that I formerly couldn't afford, then I

14    need to go to somebody for provider services, because in the

15    past our smaller cities are afraid to put in a building,

16    because after they spend their 1 or 2 million -- right, Joe? --

17    out in Whittier or 3 million, they have no guarantee of

18    provider services, so they're searching for 1.5 or $1.2 million

19    each of the succeeding years.  They can't get started.

20              If you could do that, the end result would be a lot

21    of these cities would now cut their costs in half, and they

22    just have to go back to whomever for provider services.  I

23    mean, that would be a huge benefit to kick start these for the

24    cities because you're everywhere.  I drop off stuff at

25    Salvation Army a lot of times.  So does my wife.
```

**UNITED STATES DISTRICT COURT**

Case 2:20-cv-02291-DOC-KES Document 89-03 Filed 03/03/25 Page 83 of 129 Page ID #:11570

79

```
 1              Okay.  So how do we get these locations?  How do we
 2    know at least in the Southern California area, let's just say
 3    Los Angeles, let's say the southern cities of Los Angeles or
 4    the valley, I don't care, how can we get these sites to LAHSA,
11:36AM  5    and then how could we coordinate --
 6              Where's Juan Garza?  Juan?
 7              -- how could we coordinate as the president of the
 8    League of Cities --
 9              Come on up.
11:36AM 10              -- and how could we coordinate, Nury, through your
11    agencies getting our cities, these individually scattered small
12    cities who have a hard time, together with these potential
13    sites that they're offering for free and maybe even some
14    professional intake help because we're transitioning -- you
11:36AM 15    know, Salvation Army, I mean, this -- if this worked, this
16    would be a godsend.  You'd have immediate structures up and
17    ready to go with some kind of professional.  Even if we don't
18    have the nursing staff we need, it's better than what's
19    happening now.
11:36AM 20              MS. MARTINEZ:  Do you have a number of Salvation
21    Army stores?  How many are there?  Do you know where they're
22    located?
23              COMMISSIONER HODDER:  In Los Angeles County we have
24    17.  In Orange County we have 10.  We have approximately -- and
11:36AM 25    speaking to those in Portland and Seattle, we have about
```

80

```
 1   another 100 stores that would be available.
 2            THE COURT:  I'll be on the phone with my colleagues
 3   after this up in Portland and Seattle.  But right now, 17 L.A.?
 4            COMMISSIONER HODDER:  17 L.A.
 5            THE COURT:  And we can give those designations to
 6   Nury?
 7            MS. MARTINEZ:  17 L.A. City or L.A. County?
 8            COMMISSIONER HODDER:  They're L.A. County.
 9            THE COURT:  That's why I've got Juan up here also on
10   behalf of the cities.  We need to find out where these are.
11   And if we can really transition these into dropping off, you
12   know, things for the folks and transition these, we'd have 17
13   new locations.
14            I don't care whether we call it city or -- cities or
15   the Downtown L.A. area, it's got to be a benefit to all of us
16   in breaking down these barriers; right?
17            COMMISSIONER HODDER:  Yes, sir.
18            THE COURT:  Now, how do we get what you want to call
19   a tickle date, what I call a drop-dead date where we just don't
20   talk about it but we're responsible by phone or in person in a
21   much smaller group getting back together in a timeline that
22   either gives us a yes or a no?  How do we make that progress?
23            Okay.  Time out.  Go talk about that for a moment.
24   The next presentation, come back with a plan in a few moments
25   about some schematic of getting us together in a time frame
```

11:37AM (line 5)
11:37AM (line 10)
11:37AM (line 15)
11:37AM (line 20)
11:38AM (line 25)

```
 1   that's reasonable to make that kind of decision so we don't go

 2   back to our offices and just kind of, you know, do our job, but

 3   we don't get together.  There's a wonderful corner.  Stay six

 4   feet apart or jump in there with the press.  They'll love that.
```
11:38AM
```
 5            COMMISSIONER HODDER:  Thank you, Your Honor.  We

 6   will do so.

 7            THE COURT:  Okay.  Here we go.

 8            Okay.  District Attorney Jackie and whatever you'd

 9   like to say, please.
```
11:38AM
```
10            MS. LACEY:  Thank you.  First of all, just from an

11   entertainment point of view, it's great to see a federal judge

12   cut elected officials off.  I've never smiled so much.

13            THE COURT:  Well, usually my attorneys cut me off,

14   and so --
```
11:38AM
```
15            MS. LACEY:  Only you can do that, so that's really

16   good, because you're making people get to the point.

17            Here's just a brief thing I want to say.  Does the

18   340 million number include services?  Because without

19   services --
```
11:38AM
```
20            THE COURT:  Great.  I don't think it does.

21            MS. LACEY:  I don't think it does either.

22            THE COURT:  Hold on.  But Paul and Ken, come on up

23   here.

24            Jackie, let's get those answers.  That's a great
```
11:38AM
```
25   question.  I didn't think it does.  Just what's the bottom line
```

82

| | |
|---|---|
| 1 | to get X amount?  If we can't afford it, can we do half of it? |
| 2 | MS. LACEY:  Right, Your Honor, because we don't need |
| 3 | a timeshare presentation.  We need to get down to brass tacks. |
| 4 | THE COURT:  Let's find out.  There they are.  What's |
| 11:39AM 5 | real and what's not? |
| 6 | MR. LEON:  So our services, we are already working |
| 7 | with DHS.  We're just looking for capacity.  And so we already |
| 8 | provide services.  So they're already paid for in different, |
| 9 | you know, venues by different contracts. |
| 11:39AM 10 | So the problem that we have is that we have clients |
| 11 | or patients that are funded, but we don't have anywhere to put |
| 12 | them or for our nurses and our case managers to work.  So... |
| 13 | THE COURT:  So the funding -- I keep hearing, |
| 14 | Jackie, that we've actually got the funding out there. |
| 11:39AM 15 | MS. LACEY:  Yeah. |
| 16 | THE COURT:  What we don't have is let's get together |
| 17 | because we're so large, quite frankly and, you know -- |
| 18 | THE WITNESS:  Right.  Right.  My next question is |
| 19 | will they house people who are infected? |
| 11:39AM 20 | THE COURT:  Well, let's find out. |
| 21 | MS. LACEY:  That's fine. |
| 22 | THE COURT:  Because that's one of the things I like |
| 23 | about the trailers is that we can separate out with the |
| 24 | trailers so I could use them for two purposes. |
| 11:39AM 25 | MS. LACEY:  Right. |

83

```
 1            THE COURT:  Not homelessness, but I could also get

 2    those over to the medical community where we were sorting out.

 3    And maybe we had one trailer with OVID [sic] whatever, and I

 4    also like the fact that we weren't putting 10 or 15 people in

 5    the same room whenever CDC gives us direction.

 6            MS. LACEY:  Right.

 7            THE COURT:  Can somebody call CDC and get some

 8    direction?  I'm just kidding.

 9            MR. LEON:  They can be converted any way.  And

10    they're actually perfect because the fact that you could use it

11    isolation, we could do triage, we could break them apart.

12            THE COURT:  Yeah.  Come on up.

13            MR. LEON:  And again, they're temporary.  However,

14    once they're done, we can continue to use them in different

15    capacities.  That's the difference from having just a trailer.

16    They're temporary.  And then we already have permanent

17    supportive housing coming in the back of ours.

18            THE COURT:  Jackie, I promise you, it's a lot of

19    money, but the money really isn't the problem.

20            MS. LACEY:  Right.  No, I agree.

21            THE COURT:  Long term it's not really the money,

22    believe it or not.

23            MS. LACEY:  Well, so is it the RFP process?  Can

24    these things be done --

25            THE COURT:  Well, let's find out, Jackie.  Hold on.
```

11:40AM (lines 5, 10, 15, 20, 25)

84

```
         1   Come on back up here.
         2           MS. LACEY:  The request for proposal, does it have
         3   to be competitive bidding for the City to accept?
         4           THE COURT:  Mike, do we have to spend a whole lot of
11:41AM  5   time spending out for 30 people -- you know, 30 days or 60 days
         6   while people die?
         7           MR. FEUER:  In the emergency, competitive bidding is
         8   not required.
         9           THE COURT:  Bingo.
11:41AM 10           Jackie, see what I mean?  We've got an answer now.
        11   Mike is not going to stand in our way with competitive bidding
        12   because we've got an emergency so we don't have to take that
        13   normal 30-, 60-day timeline.
        14           Mike, thanks.
11:41AM 15           MS. LACEY:  Right.  Right.  So hypothetically
        16   speaking, let's say L.A. County was getting ready to release a
        17   certain percentage of inmates in response to this emergency.
        18   Okay?  Some of those people are going to be homeless.  So we're
        19   getting them out of the jail.  Will we be able to get them into
11:41AM 20   some of this housing?  Is there going to be housing set aside
        21   for the justice involved?
        22           THE COURT:  Great question.  That's why I asked the
        23   police chief to come over today.  Look, they've got a tough
        24   decision to make, and that's a decision I'd love to hear
11:41AM 25   between you and the police chief, and I don't want to put you
```

85

```
 1    on the spot.

 2              MS. LACEY:  Right.

 3              THE COURT:  Because as the jails are down loaded

 4    because they're worried about taking in a COVID-19, by the same

11:42AM 5    token, where are they going to go?

 6              MS. LACEY:  That's right.

 7              THE COURT:  And then the public's going to say, and

 8    they should, "Hey, I've got all these homeless running around

 9    down here."  And by the way, you downloaded the jails, and why

11:42AM 10   aren't they in jail because they're loitering, camping,

11    defecating and, by the way, committing some robberies and

12    shooting some dope?  And now the police chiefs is really in a

13    tough bind as he's trying to keep his jail population pure.

14              Come on up, representative.

11:42AM 15             MR. LEON:  I just want to mention that --

16              THE COURT:  Hold on.  Hold on.  Hold on.

17              Jackie --

18              Hold on.  Hold on.  Wait.  Paul, you got it.

19              So, Jackie, that's a really hard, tough question.

11:42AM 20   And the second thing is the courts.  Hey, are the courts going

21    to do, what I would think from the plaintiffs' perspective,

22    what I call a turnaround?  If somebody was arrested and they,

23    you know, were loitering or being homeless, then the end result

24    is if we had these old loitering laws, do you really take them

11:42AM 25   into custody for two days and let them out?
```

86

```
 1            MS. LACEY:  No.

 2            THE COURT:  See, the courts are going to have a very

 3       difficult -- because I used to be a state court judge.  Jim was

 4       my presiding judge.  We're going to have a very tough problem

11:43AM 5  back, Phil, on the state court side if we were still there.

 6       Andre, you know, we're going to turn these people right back?

 7       I mean, it's a heck of a problem.  So I leave that to the

 8       professionals because I don't have the answer to that.

 9            MS. LACEY:  Right.  So like I said, hypothetically

11:43AM 10 speaking, there may actually be more homeless people next week

11       out there, so...

12            THE COURT:  Absolutely, with no place to go, by the

13       way.

14            MS. LACEY:  So as a prosecutor who's concerned about

11:43AM 15 public safety, I would love it if these people had someplace to

16       live because that would cut down on them being rearrested.

17            THE COURT:  Have you asked the police how many

18       they're going to release?

19            MS. LACEY:  We're working on it.

11:43AM 20           THE COURT:  No, just go ask her.  She knows.  Just

21       step over and ask her.  No.  Quietly, not in front of me.

22            MS. LACEY:  She doesn't represent the sheriff.

23            UNIDENTIFIED SPEAKER:  I don't represent the

24       sheriff, Your Honor.  So the police only have a very short

11:43AM 25 term, and then they go into County jail.
```

**UNITED STATES DISTRICT COURT**

```
 1                    THE COURT:  Oh, and you're not the County?

 2                    UNIDENTIFIED SPEAKER:  Sorry.

 3                    MS. LACEY:  Right.  Yeah.

 4                    THE COURT:  Is the County here?

11:44AM 5             MS. LACEY:  So I think the sheriff might have a rep

 6       here.  But I know they've identified 2,000 people who are in

 7       there are nonserious, nonviolent that may be able to be

 8       released.  So we're talking about that now.  So in terms of --

 9                    THE COURT:  Jackie, I'm going to leave that alone

11:44AM 10      for the time being.  Because I -- that's something to you

11       uniquely and there's -- you'll have to work out.

12                    MS. LACEY:  Right.  Right.  Exactly.  So my only

13       comment is we just need to ask more questions.

14                    THE COURT:  Get back and do your job.  But thank you

11:44AM 15      for the courtesy.  Okay?

16                    And let me turn -- because I'm going to conclude

17       court in just a moment -- to Mike.  You've been very patient

18       with me.  Thank you for that wisdom concerning the emergency

19       and not having to go through an RFP.

11:44AM 20             And then, Bill, I want to get to you for a moment,

21       and then we're going to disband court.

22                    MR. FEUER:  Your Honor, thank you very much for

23       convening this extraordinary session today.  As the Court

24       probably knows, I came to public life having directed that side

11:44AM 25      of legal services that provides free legal work to tens of
```

88

```
 1    thousands of people.  And we emphasized for the first time in

 2    the history of the organization reaching out to homeless

 3    people.  I also served as a state legislature and a city

 4    council member.

11:45AM  5           The roles there are different than the role I occupy

 6    here, but the values remain the same.  So our office has a

 7    program which is focused on in the "L.A. Times" over the

 8    weekend that -- where we send a nurse, a substance abuse

 9    expert, a mental health expert, and formerly incarcerated

11:45AM 10    caseworkers to the street to locations where homelessness and

11    drug possession offenses intersect to direct people to services

12    before they commit an offense.

13           We have a program we competed for and won a grant to

14    take over the County's homeless court program.  So we now have

11:45AM 15    convened dozens and dozens and dozens of sessions where we help

16    people, principally homeless people, eliminate outstanding

17    fines and citations and warrants in exchange for them agreeing

18    to connect to services to lift them out of homelessness.

19           We have been very aggressive on what's called

11:46AM 20    patient dumping, unlawful discharge of homeless patients to the

21    street, not only going after --

22           THE COURT:  Just a moment.  Thank you.

23           MR. FEUER:  For what it's worth, the principal goal

24    we have is not to be punitive.  The goal is to change medical

11:46AM 25    facility protocols so that no homeless patient is ever
```

Case 2:20-cv-02291-DOC-KES Document 804-3 Filed 03/23/25 Page 93 of 129 Page ID #:11580

89

```
        1   unlawfully discharged.  And now we're collaborating with the

        2   hospital association to achieve that.

        3          We have a program in conjunction with the public

        4   defender in courts where the offenders have serious mental

11:46AM 5   health issues to divert them immediately in a collaborative way

        6   working across the lines of prosecutor and defense counsel to

        7   get people the services they need rather than have them

        8   languish in an incarcerated setting.

        9          I could go on a number of very important programs,

11:46AM 10  many of which transcend the traditional role of a city

        11  attorney.  But the crisis demands, as you pointed out, that we

        12  transcend our traditional roles.  So for purposes --

        13         THE COURT:  By the way, Mike, as uncomfortable as it

        14  is, it's uncomfortable, in coming out of these traditional

11:46AM 15  roles, everybody's going to have to get uncomfortable in this

        16  process.

        17         MR. FEUER:  The least comfortable people are people

        18  who have Coronavirus and/or homeless at the same time, the

        19  numbers for which we do not know at this moment.

11:47AM 20         So -- but for today, the Court's focus today is on

        21  the intersection between Coronavirus and homelessness.  And

        22  it's not as though I stand here with a ready solution to deal

        23  with that confluence, but I do want to say that our office has

        24  been deeply involved in both collaboration with the mayor's

11:47AM 25  office and the City Council on an array of emergency measures.
```

```
 1              We continue to be there for this particular purpose:

 2      To eliminate where possible impediments to action, to be sure

 3      that rules that may otherwise seem appropriate, if they can be

 4      circumvented in order to achieve the result of getting services

11:47AM  5      to people who desperately need them, we will try to find a way

 6      to do that.  Our role is in this crisis, with regard to our

 7      partners on the policy-making side, to get to the point of

 8      providing services as rapidly as possible with as few

 9      impediments as possible.

11:48AM 10              And so in addition to the outreach programs we

11      engage in on the affirmative side to try to lift people out of

12      homelessness in our purely legal capacity as the lawyers for

13      the City Council and the mayor, we're going to working as we

14      did over the past weekend day and night.

11:48AM 15              So, Your Honor, having said that, if you have

16      requests of me and of my office --

17              THE COURT:  I'm making one right now.

18              MR. FEUER:  Yeah.

19              THE COURT:  In the past, historically, I'm really

11:48AM 20      good at telling you what you did wrong two years from now

21      because I've got the hindsight and the wisdom of looking back

22      at people who are struggling on the front line making tough

23      decisions and making value choices that actually the courts

24      might not agree with.

11:48AM 25              This whole scenario is changing in realtime because
```

Case 2:20-cv-02291-DOC-KES Document 804 Filed 03/03/25 Page 95 of 129 Page ID #:11582

91

```
 1  if you wait for the courts, we have a chilling effect on you.

 2  You don't know what injunctive relief we're going to assign.

 3  You don't know what we're going to do.  You haven't seen the

 4  parties get together this afternoon.

 5         I'm going to toss back to you that we need to be

 6  more helpful in going forward in this new dynamic so that the

 7  parties and the Court hammer out and get together with you so

 8  that you don't have a chilling effect.  You can move forward.

 9  You know what you can do within reason and you have input about

10  that.

11         And if you wait, Mike, that the problem's going to

12  be -- that the Courts are going -- or at least this Court's

13  going to have to change its shallow thinking to some degree and

14  be a little bit more listening to both parties, but a little

15  bit more demanding on them to really get together for the

16  public good and hammer this out and take off the litigation.

17         And I will pay a compliment to plaintiffs on both

18  sides.  I was told that -- and I told plaintiffs' counsel when

19  you go down the riverbed in L.A., we're going to have 20 1983

20  cases.  There's going to be a battle going on and a couple of

21  my litigants down in Orange County.  He said, "No, Judge,

22  there's not going to be."

23         And what they did is actually put down their sword,

24  and they went into the tents.  They got out in front of the

25  health workers followed by the police.  We didn't have one
```

92

```
      1    incident in five days.  Let me repeat that.  I was astounded

      2    and absolutely wrong.  And it was a great lesson about a

      3    cooperative effort when the council finally got together.

      4    Because unless they can get together today, I'm going to go

11:50AM 5    back to Orange County and do what I do best, and that is deal

      6    with my cities down there.  But in a few moments, I'm going to

      7    ask them if they want us involved, fine.  If they don't, just

      8    go litigate and have a great day.

      9              So I think if we're still involved, we're going to

11:50AM 10   be getting together, but probably by phone, because I'm not

     11    going to have another big tent meeting like this.  In fact,

     12    knowing now, you know, we limited it to 50.  Let's get you back

     13    to work.  Okay?

     14              MR. FEUER:  No, we'll trade you -- we'll trade cell

11:50AM 15   phone numbers, Your Honor.

     16              THE COURT:  Yeah.  Then they got to give me

     17    permission and you permission to talk and trust, and then I'll

     18    disclose to you what we're saying.  And we have to do that in

     19    realtime, Mike.

11:50AM 20             MR. FEUER:  Yeah.  And let me conclude with this --

     21              THE COURT:  Oh, and I'll give you Judge Smith's

     22    number.  No, I'm just kidding.

     23              MR. FEUER:  I already know Judge Birotte's phone

     24    number.  And Judge Gutierrez is trying to shield his phone

11:51AM 25   number from me.
```

93

```
 1              THE COURT:  Let me give you both of them, then.

 2              MR. FEUER:  There you go.  But seriously for a

 3      second, the one -- you know, a couple key revelations that

 4      emerge from a conversation as broad as this.  One is there

11:51AM 5      needs to be region-wide collaboration because homeless people

 6      don't know where the boundary is between Beverly Hills and

 7      Los Angeles and so on; right?

 8              THE COURT:  Right.

 9              MR. FEUER:  And region-wide sharing of obligation as

11:51AM 10      well.  You know, Ms. Martinez alluded to the importance within

11      the City of Los Angeles of shared commitments across council

12      district lines, across neighborhood lines.  The same argument

13      pertain with even more force with regard to the cities in the

14      broader region here, and that's going to require several

11:51AM 15      things.

16              And one thing is, as I conclude here, with regard to

17      the various proposals for -- I'll call them putting beds on the

18      street right now -- we do have to work collaboratively in the

19      larger system including with the state and ideally the federal

11:52AM 20      government, because if you crossed out $340 million for those

21      beds, for example, I have no idea what the service provision

22      costs are associated with that, let alone -- what the mayor's

23      office is doing right now is redirecting staff members from

24      throughout the City whose roles have been changed --

11:52AM 25              THE COURT:  Right.
```

1        MR. FEUER:  -- because of the emergency and putting

2   them for the first time in settings to assist homeless people.

3        THE COURT:  And we just heard that about the

4   Salvation Army which I didn't know until I heard this

11:52AM  5   presentation.

6        MR. FEUER:  Right.  But there is going to be a need

7   to assure that there is a supply of people to provide the

8   services of the police chief and what others have said are

9   necessary concomitants of this location of this housing.

11:52AM 10        So let's -- if we're going to think about working

11  together across jurisdictional lines, it has to be with real

12  common sense in a practical way, saying what's real in terms of

13  actually delivering an array of services in a setting that's

14  helping --

11:53AM 15        THE COURT:  Hold on.

16        Come on up, Salvation Army.  If you've had a

17  meeting.

18        Mike --

19        MR. FEUER:  Ken and I are law school classmates.

11:53AM 20        THE COURT:  No, I know.  But, folks, come on down

21  from LAHSA, whatever -- whoever wants to participate.  Colonel,

22  Captain, come on up.

23        Now, hold on, Mike.

24        Let's find out real quick, what's our solution here?

11:53AM 25  How are we doing?

         1            COMMISSIONER HODDER:  Based upon the conversations

         2    we've been having, Your Honor, we will have a final plan in

         3    place by Tuesday.

         4            THE COURT:  Excellent.  And who do I call to verify

11:53AM  5    that?  I believe you.

         6            COMMISSIONER HODDER:  The man here (indicating).

         7            THE COURT:  Okay.  So I'll see you in my court

         8    Tuesday at what time?

         9            UNIDENTIFIED SPEAKER:  What time do you want me?

11:53AM 10            THE COURT:  No.  You know my hours.  5:00 in the

        11    morning, 10:00 o'clock?  You name the time.

        12            UNIDENTIFIED SPEAKER:  10:00 a.m.

        13            THE COURT:  I'll see you at 10:00 a.m. along with

        14    the captain.  Fair enough.  Now, you don't have to drive all

11:53AM 15    the way down.  We'll get you by phone.  I'm not trying to get

        16    folks down.  Okay?  I just want to know that if we're setting

        17    dates, that those are kind of dates that we're really working

        18    towards.  So thank you.  Every day, everything -- we have 17

        19    maybe, places.

11:54AM 20            UNIDENTIFIED SPEAKER:  Yes, sir.

        21            THE COURT:  Wow.  Yeah, I can't tell you how much --

        22            Michele, isn't that going to help our cities?  Yeah.

        23            Juan -- I mean, Nury, isn't that going to help our

        24    cities?

11:54AM 25            MS. MARTINEZ:  Absolutely.

```
 1            THE COURT:  No matter how you call it.  And if
 2  they're going to transition, I mean, just -- that was worth it
 3  for me to drive down just today to hear that.  I had no idea
 4  about that.  I had no idea when I talked to you by phone and
 5  asked you to come down that you were in the process of actually
 6  taking Salvation Army personnel and willing to give up your
 7  storefront and the drop-offs, which by the way, I'm still going
 8  to do, okay.  But then transition those folks into people
 9  trying to help.  We just now need to get to the medical folks.
10  Let's work on that, because maybe we can get our healthy folks
11  in there.
12            And so for the mayor's office, you're hearing
13  something I never heard.  This is a gift.  And if it's
14  happening in Los Angeles, you know -- so we need their number
15  also; right?  We certainly need Nury's number; right?  We're
16  going to need the litigants.  We're going to have to talk about
17  this today as we run with it.  I know there are problems, but
18  you just overcame those problems.  Thank you.  They're not now
19  problems.  There are no problems.  All right.  Good.
20            MR. FEUER:  Can I ask a question?  Just for my
21  edification --
22            Ken, good to see you.  Is -- are you offering these
23  locations free of charge to the City, or would there be some
24  compensation you'd be asking for?
25            COMMISSIONER HODDER:  We are asking for no rent of
```

97

```
 1   any kind.

 2               THE COURT:  Hold on.

 3               Did you hear that, everybody?

 4               MS. SOBEL:  Zero rent.

 5               THE COURT:  Zero rent.

 6               COMMISSIONER HODDER:  We would ask for assistance in

 7   operational funding, but no rent.

 8               THE COURT:  Sure.  That's fair enough.  And Carol's

 9   saying that that's really high, but we'll get it lower; right?

10               COMMISSIONER HODDER:  We're willing to work with all

11   involved.

12               THE COURT:  Okay.  So at least we can get the

13   establishments which we didn't have before.  And wherever the

14   negotiations are now, it's over the servicing, Carol, that's

15   going to take place.  And so you might say it's too high, and

16   you might say it's too low, and you might say we're not going

17   to pay for it, but at least we have something we never had

18   before, and that is 17 different locations with personnel.

19   That's worth just having this meeting in and of itself.

20               Okay.  Mike, get back to work.  Thanks.  Blessing.

21               UNIDENTIFIED SPEAKER:  Judge, can we be excused or

22   would you --

23               THE COURT:  Oh, no, absolutely.  Get back and do

24   what you do best.

25               Nury, do you want -- do you need to go?
```

98

```
 1              MS. MARTINEZ:  Yeah, I need to leave.

 2              THE COURT:  Yeah, please.  Don't stand up in the

 3   gallery.  Just walk out.  We have got just a few more

 4   presentations, and I'm going to disband also.

 5              MS. MARTINEZ:  Thank you, Judge.

 6              THE COURT:  Thank you very much.

 7              Okay.  Mayor, I'm going to -- Mayor Joe -- and I

 8   just know Mayor Joe as Mayor Joe.  So, Mayor, would you

 9   introduce yourself on behalf of Whittier.

10              And by the way, I expressed some -- I got it.  I

11   expressed -- where's Miguel?  Ask Miguel to come up.

12              Miguel, my apologies.  Where's Miguel?  Yeah, come

13   on up here.

14              Join with the mayor.  He's going to be just a

15   moment, Miguel.  I saw you.  I thought you'd left.  Come on up

16   or just a moment.

17              But, Joe, tell me your thoughts in a couple minutes.

18   Then I want to talk to Miguel.

19              MAYOR VINATIERI:  Your Honor, thank you very much.

20   I'm in court all the time.  This is an -- I've never seen a

21   court hearing like this.  Thank you.  There is hope.  I'm

22   hearing hope this morning.  And thank you that the Court's

23   making something happen, that there's accountability.  That's

24   very important.

25              I'm Joe Vinatieri.  I'm the mayor of the City of
```

11:56AM — line 5
11:56AM — line 10
11:56AM — line 15
11:57AM — line 20
11:57AM — line 25

99

 1  Whittier.  We have 88,000 people.  We've been talking about

 2  L.A. County and the City of Los Angeles.  We're a small city,

 3  somewhat small, 80,000 in Southeast L.A. County, and we border

 4  Orange County.  We also have --

11:57AM  5          THE COURT:  Thanks again, Mike.  And, Nury, thank

 6  you very much.  And tell your staff thank you.

 7          MAYOR VINATIERI:  As you know, we have 231 homeless,

 8  and we've done our City Net survey.  There are three things I

 9  just want to say.  The City of Whittier, we have the City

11:57AM 10  council-approved settlement agreement has been sent to

11  plaintiffs' counsel.

12          THE COURT:  Let me say this in complete

13  transparency.  I expressed frustration with both of you out in

14  the hallway.  My apologies.  This just arrived last night.  So

11:58AM 15  although the council's approved it, I put you both in a

16  position of making the decision, and I think I growled.  My

17  apologies to both of you.  Isn't that nice to hear apologize?

18  I apologize.  But I was growling at both of you.

19          She needs time to look at that.  So we probably have

11:58AM 20  a good chance of a settlement that we could have put on record

21  today or modification, Carol, if you looked at it and didn't

22  see something you like.  But it's not fair to you to lay out

23  that settlement now.  But I know that Whittier is going to

24  settle.  And I know that, Carol, whatever those modifications

11:58AM 25  is, we'll get back in a reasonable period of time.  But I don't

100

```
 1   expect you to stress over that today.  She got that last night,
 2   okay?
 3            MAYOR VINATIERI:  We are very motivated, Your Honor,
 4   and to join with the City of Bellflower and the other cities in
11:58AM 5   Los Angeles County, the smaller cities.
 6            Secondly, we're very concerned, of course, about the
 7   mental health aspects of what is going on.  There's been lots
 8   of discussion.  And you've talked about Fairview and Costa
 9   Mesa, Metropolitan State Hospital in Norwalk.  From our
11:59AM 10   perspective, at least in the southeast area, and with the
11   governor's order relative to state facilities, we're working
12   with Juan Garza, and we're hopeful of getting here very shortly
13   with the City of Norwalk and talk about how we can work some
14   things through because you have lots of space, and I saw it, I
11:59AM 15   think, indicated on one of the screens we saw just earlier.
16            So we think it's very important for the regional
17   approach to homelessness to make things happen that way also.
18            THE COURT:  Eddie, you want to put up Fairview?
19            MAYOR VINATIERI:  Yeah.  We had all those, I think,
11:59AM 20   various properties that are properties within Los Angeles
21   County.
22            THE COURT:  Now, a lot of the cities have expressed
23   this.  So, Joe, here's what I need.  And I would -- I know my
24   colleagues may be interested.  And, in fact, I think Andre or
11:59AM 25   Phil orchestrated all of this.  And I want to thank you for
```

101

```
 1   bearing with me for so long just humbly as colleagues.  So
 2   appreciative.
 3          I've been on the bandwagon about what do I do with
 4   that 10 to 14 percent and some people say 20 percent of just
12:00PM 5   the poor people out there who are just so schizophrenic and
 6   bipolar.  Guess what, they got downloaded a long time ago.  And
 7   the governor's not going to bring them onboard.  Maybe you
 8   ought to know that.  So we're sharing courts --
 9          It's all my -- my fault.  Would you get on the
12:00PM 10  phone, just apologize.  Doing my best.  It's L.A.; right.
11          She's been expressing that a long time.  If the
12   governor is going to open them, great.  And if he's not, just
13   tell us that, bottom line.
14          MAYOR VINATIERI:  We're going to find out.  We're
12:00PM 15  working on it.  It needs to be done.  It's a major issue in
16   Whittier.  I know it is everywhere else.
17          THE COURT:  But if we're not going to put it -- if
18   we're not going to put them on the grounds at Norwalk or
19   Fairview or Sonoma or whatever, hey, just bottom line it, maybe
12:00PM 20  you sell it, maybe you do something else.  But right now we
21   have got to find a way to get those 10 or 14 or 20 percent off
22   those streets because I can't get them into a shelter.  And I'm
23   watching them close so --
24          MAYOR VINATIERI:  It's a major issue in our
12:01PM 25  jurisdiction.
```

102

```
 1              THE COURT:  Okay.  Let me talk jointly with the

 2    assembly person.  So would you introduce yourself.  By the way,

 3    I disclosed to both parties that members of the California

 4    Assembly called, they got on FaceTime, I think there was six or

12:01PM  5    seven of us, maybe more dropping by.  I was in court.  And we

 6    had a conversation about you being here.  So I want that fully

 7    disclosed to the parties that I didn't wait for this meeting

 8    today to take place.

 9              MR. SANTIAGO:  And I want to thank you, Judge.

12:01PM 10    We're here at your discretion to expedite and facilitate

11    anything that we can do.  I know the questions that you had

12    asked at the time were what sort of funds had the state

13    expended and what sort of ideas or facilities do we have.

14              I don't want to take the Court's time -- too much of

12:01PM 15    your time.  But I do want to say I want to thank you for making

16    this happen because I think otherwise we'd be waiting a little

17    bit longer to get some of this stuff online.  In terms of state

18    dollars, those that expended had already had been HEAP dollars,

19    and they're close to about 86 million for L.A. city continuum

12:02PM 20    of care.  About 81 million HAP dollars, to my knowledge, have

21    not been expended but will be released.

22              THE COURT:  How much?

23              MR. SANTIAGO:  So it's my knowledge that the -- for

24    this region alone, about 81 million to the continuums of care,

12:02PM 25    about 118 million to the City, and L.A. County about 194
```

```
 1   million.  If I have erred, I will correct myself to you.

 2             THE COURT:  Don't worry.  It's a good faith.  Okay.

 3             MR. SANTIAGO:  It is.  We were jotting this down.

 4             And when the governor asked us for -- about

 5   authority, we passed $1 billion in emergency funding that gave

 6   the governor the authority to use at his discretion.

 7             A day ago yesterday, as you know, the governor

 8   released $150 million.  Of that approximately 19 million is

 9   going to the City of Los Angeles and to the region, these are

10   approximate numbers, 37 million to the region in total.  So we

11   expect that money to be used as fast as possible.

12             THE COURT:  Now, let me tell you the content of the

13   conversation without the -- with the governor's office last

14   night.  The governor's not on the phone.  I don't think it's

15   good that we communicate.  But I told them that the Court was

16   going to be very supportive if I had jurisdiction over this

17   case in terms of moving forward.

18             But the one thing was going to be absolute

19   consistency, and that is that I was going to ask the tough

20   question and, I didn't want them to feel slighted as everybody

21   left with a very warm hospitable phone call about 10:00 last

22   night, that I wasn't going to say time and time again what we

23   were going to do with that 10, 14, or 20 percent of these

24   hopeless schizophrenic/bipolar men and women who have done

25   absolutely nothing wrong.  And so you don't have the answer to
```

12:02PM (line 5)
12:03PM (line 10)
12:03PM (line 15)
12:03PM (line 20)
12:04PM (line 25)

```
 1   that.
 2            MR. SANTIAGO:  But I think you should ask the tough
 3   questions because it will force immediate action.
 4            THE COURT:  Oh, I am.  And I'm going to trust you to
12:04PM 5   take that back to the governor's office, to Williams.  Okay?
 6            MR. SANTIAGO:  I will.
 7            THE COURT:  Okay.  Real quick.  I mean, please.
 8            MR. SANTIAGO:  I will call.  Absolutely.
 9            THE COURT:  And I'm wide open tonight for another
12:04PM 10   phone call because we -- we said we would get on the phone with
11   his chief, et cetera, and they know that I'm asking that tough
12   question again, why aren't these hospitals open?  If not, what
13   are you going to do with this percentage of people that are in
14   our cities that the co-op person just can't cope with?
12:04PM 15            MR. SANTIAGO:  I will note, Judge, if I may, that
16   the governor took an extraordinary step to -- in exempting CEQA
17   for emergency shelters.
18            THE COURT:  I was very complimentary last night
19   about that, both for municipality --
12:04PM 20            MR. SANTIAGO:  That was my bill so I know very well
21   about it.  But to local municipalities, it really does cut down
22   the time that they need to go through that process.  So that --
23   and L.A. already has that.  But for other municipalities up and
24   down the stat for the region, they no longer have to wait for
12:05PM 25   that.
```

105

```
 1                I would ask you as another piece to take a look at,
 2       too, would be the conservatorship or Lanterman Act
 3       conversations.
 4                THE COURT:  Right.
12:05PM  5                MR. SANTIAGO:  Because there are going to be a
 6       series of populations who are going to be hard to press to get
 7       off the street.  But I would ask the Court in a future late,
 8       maybe take a look at that as well.
 9                THE COURT:  Other than, you know, having this
12:05PM 10       pulpit, that's the legislative function.  I understand that.  I
11       can growl.  But I have no power in a sense to implement what
12       you can implement.  But I don't care whether it's Norwalk or
13       Fairview or Sonoma or whatever, we seem to have the federal
14       government on one occasion saying that we can bring people off
12:05PM 15       the Princess Cruise, and I'm just wondering when I saw that why
16       aren't we handling our own California people who we have to
17       deal with at some point anyway and providing those services
18       that are so needed?
19                Because every police chief tells me, "You know,
12:06PM 20       Judge, if I could get 10 or 15 people just out of my community
21       who are just bipolar and schizophrenic and they've done nothing
22       wrong, I take my violence level down.  I take" -- I leave that
23       with you.  But next session I'm going to be asking the same
24       question.  So please tell Darrel that.  Please convey that to
12:06PM 25       the governor.  And I'll convey that tonight.
```

106

```
          1              MR. SANTIAGO:  I will make that call when I leave

          2    here.

          3              THE REPORTER:  Excuse me, can I have your

          4    appearance.

12:06PM   5              MR. SANTIAGO:  Sure.  Miguel Santiago.

          6              THE COURT:  Okay.  Thank you very much.  All right.

          7    And I appreciate your patience.  I love Sharon Quirk-Silva.

          8    I -- would you apologize, and I'll text her later on.  I just

          9    had Los Angeles folks I wanted to get to immediately.  So no

12:06PM  10    disrespect intended.

         11              So, Joe, do you want any of these trailers?

         12              MAYOR VINATIERI:  Yes, Your Honor.

         13              Just one last thing.  Trailers, looks great.  I

         14    haven't talked to my council about it.

12:06PM  15              THE COURT:  Right.

         16              MAYOR VINATIERI:  But the mayor of Whittier wants to

         17    make it happen.  So put us in line.

         18              THE COURT:  Okay.  So check the price.  I mean, get

         19    involved.  If you don't want them, fine.  I don't care.  But if

12:07PM  20    they are of any value, so be it.  If they're not, just reject

         21    them.  I don't care.  You know, we can get tents.  We can get

         22    other trailers, et cetera.  I just want to come up with

         23    something concrete, Joe, that's on the table.  If people don't

         24    like it, reject it, but if it's going to go, then make it go.

12:07PM  25    Okay?  And if you want some of these and L.A. doesn't want
```

```
 1   them, let's feed them out to Oakland, let's get them over to
 2   Whittier.
 3             MAYOR VINATIERI:  My suspicion is with this
 4   information that you've elicited today, I think there will be a
 5   lot of people interested.
 6             THE COURT:  Oh, I've gotten calls.  In fact, we
 7   asked some mayors not to come who are going to make the same
 8   statement, that they wanted these trailers.
 9             Michele, you've been extraordinary helpful as usual.
10             Bill, I invite you to come up for a moment.
11             And I want to thank Miguel and Christine for
12   remaining also.
13             MR. TAORMINA:  Good afternoon, sir.
14             THE COURT:  Hi, Bill.
15             MR. TAORMINA:  Bill Taormina.  I am here to add to
16   your arsenal to avoid anarchy.  I'm from the private sector.
17   I'm not an elected official, nor will I ever be one.  I need 90
18   seconds of the Court's time.
19             THE COURT:  Take it.
20             MR. TAORMINA:  I need six points to tell to you
21   right now.
22             Number one, I'm the private sector.  I represent
23   numerous families in Orange and Los Angeles County that are
24   ready to move forward on this.  We are a catalyst.  We are a
25   catalyst to make action.  We are not driven by profit.  We are
```

108

```
         1  driven by the preservation of the quality of life and life

         2  itself.

         3          Point two, the funding is ready.  We need zero

         4  dollars from any government.  We are ready to buy these

12:08PM  5  trailers today.  In a moment I'm going to hand my credit card

         6  to Mr. Price for whatever deposit he wants.  We're going to tie

         7  these trailers up today.

         8          Number three, logistics, the shipping and the

         9  installation is ready.  We are ready to move forward.

12:08PM 10          Number four, our nonprofit operators are sitting in

        11  the front row.  They're ready to move forward.

        12          Number five, what we need -- the gentleman from

        13  Whittier just said we need locations.  We need government

        14  property.  We need private property.  We need -- we just need

12:08PM 15  locations.  We need to break a few rules relative to zoning and

        16  land entitlements.  That should be easy because your other

        17  choice is anarchy.  Let's be honest here.  This thing is out of

        18  control and we need to fix it.

        19          Point six, this is a solution for both homelessness

12:09PM 20  and to control this virus.  Thank you for your time.  I'm going

        21  to hand my --

        22          THE COURT:  Oh, no, don't go away.  I love this

        23  credit card.  Could I -- no, I'm just kidding.

        24          MR. TAORMINA:  It has unlimited credit amount, and

12:09PM 25  I'm here to give this to Mr. Price.  I'm going to walk back
```

109

```
        1   there and hand him my business card and the credit card number

        2   is on the back.  And I'm dead serious.

        3          THE COURT:  By the way, I know his worth, and he has

        4   got a substantial limit, trust me.

12:09PM  5          MR. TAORMINA:  It doesn't matter.  It's time for

        6   action.  Thanks to you for this Court for making it happen.  So

        7   let's do it.

        8          THE COURT:  Okay.  Now, here is a strong ally for

        9   some portion of the plaintiffs.  They're your business

12:09PM 10   community.  In my part of the world, before I came to this part

       11   of the world and now I'm part of our world here in Los Angeles,

       12   I may be getting a shelter up here, okay, I'm going to start

       13   living up here thanks to Judge Carney and his being so gracious

       14   about maybe getting me some hotel space -- he's what I call the

12:10PM 15   police league side.  He's what I call the business side.

       16          If you don't know who he is -- and by the way some

       17   of the other major families, who he's going to probably

       18   privately disclose to you, trust me, he's probably very much in

       19   line with the First Alliance Group, because I perceive you as

12:10PM 20   more business oriented in a sense than maybe some of the other

       21   groups that might be -- there's going to be an accord.

       22          So he's speaking your language.  Okay?  In fact, he

       23   actually sued the railroads to clean up the mess on the

       24   railroads behind his multiple properties.  So talk to him.

12:10PM 25   Okay.
```

110

```
 1              Bill, I want to thank you for stepping up.  I had no
 2    idea you were going to do that.  I'm actually a little stunned.
 3              Okay.  I'm ready to suspend this Court except for my
 4    esteemed and incredibly wonderful counsel.  And here's the
12:11PM 5    bottom line.  You've heard today -- and I've asked nothing of
 6    you -- if you want the Court not to be involved, that's just
 7    great.  We will litigate for the next ten years, and I could
 8    care less.
 9              And Andre and -- Birotte, thank you for being here
12:11PM 10    for this wonderful opportunity to meet all these good folks.
11              But if you want us involved, we can give you a
12    shelter and parameter to operate within, I hope, with a lot of
13    disagreements on occasion, a lot of disagreements on occasion.
14    Okay?  But the point is we moved forward in our part of the
12:11PM 15    world to an extent that I never expected before I got involved.
16    It's not been pretty.  It's not been perfect.  People have
17    gotten hurt.  But by God we moved forward.
18              And I know that we can move forward on this.  So you
19    tell me what time you want me to be back here.  I'm going to go
12:11PM 20    walk around and get a cup of coffee for a moment and visit with
21    some of the folks who've remained, just because they're friends
22    and I'd like to meet some of the other people in the audience
23    who have been so patiently sitting here with us that I haven't
24    had a chance to talk to.
12:12PM 25              If you want the Court involved, I want you to tell
```

111

```
         1   me that, but you have to give me the following or I won't be

         2   involved:  One, I must be able not to gather a group like this

         3   again.  I have to be able to reach out to Eric.  I have to get

         4   on the phone with the governor's office tonight.  I've got to

12:12PM  5   be able to talk to Bill about trailers or call Ken, you know,

         6   and Paul.  I've got to be able to talk to Carol.  I've got to

         7   be able talk to you.  And you've got to trust me in those

         8   ex parte conversations.  Because they're going to be more

         9   valuable, I hope, than litigation.

12:12PM 10            And if you get to litigation, I've got great judges

        11   who can litigate.  And they can probably be much more

        12   collaborative than even I am.  So I'm reaching out to you

        13   choosing two of what I think are the finest colleagues that I

        14   could possibly find on the bench to participate in this,

12:12PM 15   because you should have a tremendous -- you should have a

        16   tremendous sense of confidence that when you talk about people

        17   like Judge Birotte -- in fact, our entire bench here and

        18   Judge Gutierrez, that you're talking about people that are the

        19   middle of the road, that don't have an axe to grind, liberal or

12:13PM 20   conservative or however you toss those silly labels around, who

        21   will get down to work with you, and by God, we're going to get

        22   criticized for the lives we didn't save.  We're never going to

        23   be accountable or known for the lives we did save.

        24            But you have got a chance for us to save an awful

12:13PM 25   lot of lives.  And if we act quickly -- and if not, we came
```

112

```
      1   here for the homelessness and COVID, right, the community right

      2   now distancing themselves who have that benefit, and God bless

      3   them.  Thank you.  It's coming.  It's just going to delay.

      4            So what time would you like me to meet?  Because

12:13PM 5   you're going to be ordered to meet and confer.

      6            Carol, you've been through this before.  Okay?  And

      7   you know that I have to be able to communicate with you early

      8   in the morning or late at night and share with the other side.

      9   And I've made a lot of mistakes.

12:13PM 10           But you have got to give me an answer today.  And

     11   I'm going to sit here until I get "yes" or "no."  And then

     12   you're going to sign up and you're going to give me some

     13   limited jurisdiction for a limited period of time so you're not

     14   trapped.  Because I don't want a three-year consent decree.  I

12:14PM 15   don't want a settlement.  You don't even have to call it a

     16   settlement.  You just have to call it an agreement of some kind

     17   so you're not trapped.  And then let's get going.  Okay?

     18            Now --

     19            MR. UMHOFER:  Your Honor, we want you involved.

12:14PM 20           THE COURT:  Wait, wait, wait.  Not so fast.  You

     21   talk to those people over there, and you talk to the defendants

     22   sitting there.  They're not here, et cetera.  Get on the phone.

     23   But I'm going to sit here until I get an answer "yes" or "no."

     24   Okay?

12:14PM 25           So get together.  I'll be back at what time?  How
```

**UNITED STATES DISTRICT COURT**

113

```
        1   about 1:30?  Because she's got some defendants here also.  I
        2   mean, you need to have a conference back in that room, just
        3   like Salvation Army.  Be certain -- because I'm a complete
        4   nightmare.  Smiling, but I'm a nightmare.
12:14PM  5           MR. UMHOFER:  It's the nightmare we need, Your
        6   Honor.
        7           THE COURT:  Well, we'll see.  Okay.  So 1:30 then.
        8           For all you folks outside, let me come out and just
        9   humbly thank you for a moment because you've stayed and sat
12:14PM 10  through this.
       11           (Lunch recess from 12:14 p.m. to 3:08 p.m.)
       12           THE COURT:  We're on the record.  We're on the
       13   record.  We're on the record.
       14           And now I will have the parties identify themselves.
03:08PM 15  So just please identify who you are and who you represent.
       16           MR. UMHOFER:  Good afternoon, Your Honor.  Matthew
       17   Umhofer on behalf of the plaintiffs.  With me at counsel table
       18   is Elizabeth Mitchell.  We're both with the law firm of
       19   Spertus, Landes & Umhofer.
03:09PM 20          THE COURT:  Just introduce -- I know both of you
       21   gentlemen, but let me make a record of who's here.
       22           MR. FAWN:  Yes.  Thomas Fawn, senior assistant
       23   county counsel on behalf of the County of Los Angeles.
       24           MR. CARTWRIGHT:  Bob Cartwright, assistant county
03:09PM 25  counsel on behalf of the County of Los Angeles.
```

114

```
 1              THE COURT:  Thank you.  Let's go down -- well, let
 2    me see.  Let's take the other plaintiffs, in a sense.
 3    Plaintiffs.
 4              MS. WEITZMAN:  Brooke Weitzman on behalf of
 5    intervenor Orange County Catholic Worker.
 6              MS. SOBEL:  Carol Sobel on behalf of intervenor
 7    Orange County Catholic Worker and also on behalf of intervenor
 8    Los Angeles Catholic Worker and Los Angeles Community Action
 9    Network.
10              MS. MYERS:  Shayla Myers with the Legal Aid
11    Foundation of Los Angeles on behalf of intervenor L.A. Catholic
12    Worker and Los Angeles Community Action Network.
13              MS. SWEETSER:  Catherine Sweetser on behalf of all
14    intervenors.
15              THE COURT:  Now, for the other parties, I want it
16    clear that the parties who are about to identify themselves
17    were invited to come to the court, because the Court had no
18    legal ability to order you into court.  So please.
19              MR. CASTRO-SILVA:  Thank you, Your Honor.  Rodrigo
20    Castro-Silva for the County of Los Angeles.  I'm from the
21    Office of County Counsel.
22              MR. MCLAIN:  Byron McLain on behalf of Los Angeles
23    County from Foley & Lardner.
24              MR. YOUNG:  Brandon Young on behalf of the County of
25    Los Angeles from the law firm of Manatt, Phelps & Phillips.
```

03:09PM (line 5)
03:09PM (line 10)
03:10PM (line 15)
03:10PM (line 20)
03:10PM (line 25)

**UNITED STATES DISTRICT COURT**

115

```
  1              MR. DERMER:  Gabriel Dermer from the Los Angeles
  2    City Attorney's Office on behalf of the defendant City of
  3    Los Angeles.
  4              MR. MARCUS:  Scott Marcus from the Los Angeles City
03:10PM  5    Attorney's Office on behalf of the City of Los Angeles.
  6              THE COURT:  First, there's an agreement that we will
  7    convene next Tuesday at --
  8              MR. UMHOFER:  10:00 in the morning.
  9              UNIDENTIFIED SPEAKER:  10:00 a.m.
03:10PM 10              THE COURT:  -- 10:00 a.m.  Not p.m., 10:00 a.m.  At
 11    the location of?
 12              MR. UMHOFER:  The Alexandria Building in Pershing
 13    Square.  We'll provide details to all the parties and the
 14    Court.
03:11PM 15              THE COURT:  And it's my intent to exclude the public
 16    but not the press because I'm going to make the same order, and
 17    I'm not quite certain how I'm going to control that, you
 18    understand, in an outside facility.  So one of the things I
 19    want you to take into account is I can control excluding the
03:11PM 20    public in the court, but that's because of the emergency health
 21    issue.  So we're going to try this, though, next week at this
 22    location to see if it works.  I think we can control it.
 23              Is that correct, Counsel?
 24              MS. MITCHELL:  Yes.  The address is 501 South
03:11PM 25    Spring.
```

```
 1              THE COURT:  501 South Spring.

 2              JUDGE SMITH:  It seems to me it's not a problem.  If

 3     it's a private-owned building, you have the right to exclude

 4     anybody.  If you decide that you're not going to let the public

03:12PM 5     in, it's not a court order, it's the parties.  If other parties

 6     don't want to participate under those circumstances, that's

 7     their decision.

 8              MR. UMHOFER:  Right.  And, Your Honor, in the

 9     interim, should I put the agreement that we talked about off

03:12PM 10     the record on the record; that is, the agreement to suspend

11     litigation deadlines and things along those lines?

12              MS. MITCHELL:  The original agreement when we first

13     came into the court this afternoon, Your Honor.

14              MR. UMHOFER:  So, Your Honor, I'll put this on the

03:12PM 15     record.  The parties during lunch --

16              THE COURT:  Oh, I'm sorry.  Put that on the record

17     for me.  I thought we were back in the settlements.

18              MR. UMHOFER:  No, no, no, no.  I apologize.

19              So we have a limited agreement that we reached over

03:12PM 20     the -- over the lunch break.  That agreement was to suspend

21     litigation deadlines, including the 21 days that the City and

22     County have to respond, because they have been served, so it's

23     21, not 60, to permit the Court and the parties to engage in

24     settlement discussions and in efforts to address the underlying

03:13PM 25     problems that occasioned this hearing today.
```

117

```
 1              The parties have no objection to the Court's

 2    ex parte communications with other relevant parties.  And at

 3    the service of trying to get both resolution and action on the

 4    underlying issues of the Coronavirus and the homelessness

03:13PM  5    crisis, the parties stand ready to support and assist the

 6    Court.  And the parties have no objection to the involvement of

 7    Judges Birotte and Gutierrez in the process.

 8              MS. SOBEL:  And Judge Smith.

 9              MR. UMHOFER:  And Judge Smith as well.

03:14PM 10              THE COURT:  Who's earning nothing.

11              MR. UMHOFER:  Yes.  Yes.

12              THE COURT:  Would you state who you are and if this

13    is acceptable as stated by counsel.

14              MR. CASTRO-SILVA:  So this is Rodrigo Castro-Silva

03:14PM 15    on behalf of the County of Los Angeles.  We're in agreement.

16              MR. MARCUS:  On behalf of the City of Los Angeles,

17    this is Scott Marcus from the City Attorney's Office, that's

18    acceptable.

19              MS. MYERS:  On behalf of the intervenors LA CAN and

03:14PM 20    LA Catholic Worker, that's acceptable.

21              MS. SOBEL:  And on behalf of intervenor Orange

22    County Catholic Worker, that is acceptable.

23              MR. UMHOFER:  Your Honor, one more thing, Mr. McLain

24    just pointed out to me that -- we just wanted to make it

03:14PM 25    clear -- I think the Court has already issued orders on this
```

```
 1   point that the intervenors are allowed to -- or their motions
 2   to intervene have been granted and that they're allowed to --
 3            THE COURT:  And the other motion you brought to me
 4   is --
 5            MR. UMHOFER:  Well, we haven't brought any other
 6   motions.  They've all been over there.
 7            THE COURT:  Okay.  Let's anticipate two things, and
 8   that is, we're trying to give access to the public through the
 9   press.  And you've heard that we're going to start with
10   transparency until it's called to my attention that there's a
11   reason for going in camera.  But you're different entities.
12   You're the printed press.  Then we might have the audio or
13   radio station, and then we might have the television.
14            The difficulty is in federal court with our rules,
15   we would not allow television.  And what I can't have is moving
16   off-site and then perceiving that I'm treating one area of the
17   public access television unfairly.  I think that they would be
18   saying, "Golly, gosh, what's happening here?"  But I'm not
19   really comfortable having a televised off-site because it's
20   violating our local rules.
21            I need to go to my chief judge here.  I need to have
22   a court meeting to abrogate those rules.  And there's just no
23   way to do that.  The judges are all over the place and they're
24   not going to have a special meeting in that regard.  So help
25   me.
```

119

```
 1              MS. SOBEL:  I have a suggestion to amend the

 2      stipulation or add to it, which is that because of the court

 3      closures for dealing with the pandemic, that the parties agree

 4      that meetings that are scheduled with the Court off-site are to

03:16PM 5      be held under the same rules as if the meeting were occurring

 6      in the federal courthouse.

 7              THE COURT:  I think my colleagues would appreciate

 8      that.

 9              MR. UMHOFER:  No objection.

03:16PM 10              THE COURT:  Because we're not going against our

11      time-honored rules otherwise.

12              MR. UMHOFER:  No objection.

13              THE COURT:  Would that be acceptable, Counsel?

14              MR. UMHOFER:  No objection.

03:16PM 15              THE COURT:  Counsel, acceptable?

16              (Counsel collectively responded "No objection.")

17              THE COURT:  I think that will allow us to honor the

18      decorum and the tradition of the federal court regardless.  But

19      I'll have to get an explanation from some of you folks who can

03:16PM 20      come in from the printed press about what's happened here.

21      Because if I was the television station, I'd be concerned and

22      wonder why I would be treated differently.  But those are the

23      federal rules.

24              Is there anything else today?  Otherwise, I want to

03:16PM 25      thank you very much and see you next Tuesday at 10:00 o'clock.
```

120



```
 1              (Proceedings concluded at 3:16 p.m.)

 2                          --oOo--

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

121

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3   COUNTY OF LOS ANGELES   )
                             )
 4   STATE OF CALIFORNIA     )

 5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, in and for the United States District Court for

 7   the Central District of California, do hereby certify that

 8   pursuant to Section 753, Title 28, United States Code that the

 9   foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   Date:  March 20, 2020

16

17

18

19                          /S/ DEBBIE HINO-SPAAN

20                          Debbie Hino-Spaan, CSR No. 7953
                            Federal Official Court Reporter
21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

## CERTIFICATE OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of . My business address is 1999 Avenue of the Stars, Suite 1000, Los Angeles, CA 90067.

On March 25, 2022, I served true copies of the following document(s) described as:

**NOTICE OF WITHDRAWAL OF CONSENT TO EX PARTE COMMUNICATIONS**

on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 25, 2022, at Los Angeles, California.

_____
Brian Binns

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

# SERVICE LIST
### *LA Alliance for Human Rights, et al. v. City of Los Angeles, et al.*
### Case No. 2:20-cv-02291

| | |
|---|---|
| Matthew Donald Umhofer<br>Elizabeth A. Mitchell<br>SPERTUS, LANDES & UMHOFER,<br>LLP<br>617 West 7th Street, Suite 200<br>Los Angeles, CA 90017 | Attorneys for Plaintiffs<br>*LA ALLIANCE FOR HUMAN RIGHTS,*<br>*JOSEPH BURK, HARRY TASHDJIAN,*<br>*KARYN PINSKY, CHARLES MALOW,*<br>*CHARLES VAN SCOY, GEORGE*<br>*FREM, GARY WHITTER and*<br>*LEANDRO SUAREZ* |
| | Telephone:  213-205-6520<br>Facsimile:   213-205-6521<br>Email: matthew@spertuslaw.com;<br>emitchell@spertuslaw.com;<br>jon@spertuslaw.com;<br>calendaring@spertuslaw.com |
| Rodrigo A. Castro-Silva, County<br>Counsel<br>Lauren M. Black, Assistant County<br>Counsel<br>Ana Wai-Kwan Lai, Senior Deputy<br>County Counsel<br>OFFICE OF COUNTY COUNSEL<br>500 West Temple Street, Suite 468<br>Los Angeles, CA 90012 | Attorneys for Defendant<br>*COUNTY OF LOS ANGELES*<br><br>Telephone:  213-974-1830<br>Facsimile:   213-626-7446<br>Email:<br>rcastro-silva@counsel.lacounty.gov;<br>lblack@counsel.lacounty.gov;<br>alai@counsel.lacounty.gov |
| Byron J. McLain<br>FOLEY & LARDNER, LLP<br>555 South Flower Street, Suite 3300<br>Los Angeles, CA 90071 | Attorneys for Defendant<br>*COUNTY OF LOS ANGELES*<br><br>Telephone:  310-972-4500<br>Facsimile:   213-486-0065<br>Email: bmclain@foley.com |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

556797.9

127

NOTICE OF WITHDRAWAL OF CONSENT TO *EX PARTE* COMMUNICATIONS

Scott D. Marcus, Senior Assistant City Attorney
Arlene N. Hoang, Deputy City Attorney
Jessica Mariani, Deputy City Attorney
Ryan Salsig, Deputy City Attorney
LOS ANGELES CITY ATTORNEY'S OFFICE
200 North Main Street, City Hall East, 6th Floor
Los Angeles, CA 90012

Attorneys for Defendant
*CITY OF LOS ANGELES*

Telephone:  213-978-6952
Facsimile:  213-978-7011
Email: scott.marcus@lacity.org;
arlene.hoang@lacity.org;
jessica.mariani@lacity.org;
ryan.salsig@lacity.org

Brooke Alyson Weitzman
William R. Wise
ELDER LAW AND DISABILITY RIGHTS CENTER
1535 East 17th Street, Suite 110
Santa Ana, CA 92705

Attorneys for Intervenor
*ORANGE COUNTY CATHOLIC WORKER*

Telephone:  714-617-5353
Email: bweitzman@eldrcenter.org;
bwise@eldrcenter.org

Paul L. Hoffman
Catherine E. Sweetser
SCHONBRUN SEPLOW HARRIS & HOFFMAN, LLP
11543 West Olympic Boulevard
Los Angeles, CA 90064

Attorneys for Intervenors
*ORANGE COUNTY CATHOLIC WORKER, LOS ANGELES COMMUNITY ACTION NETWORK, LOS ANGELES CATHOLIC WORKER and CANGRESS*

Telephone:  310-396-0731
Facsimile:   310-399-7040
Email: hoffpaul@aol.com;
csweetser@sshhlaw.com

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

1   Carol A. Sobel                            Attorneys for Intervenors
2   Weston C. Rowland                         *LOS ANGELES COMMUNITY*
    LAW OFFICE OF CAROL SOBEL                 *ACTION NETWORK, LOS ANGELES*
3   725 Arizona Avenue, Suite 300             *CATHOLIC WORKER, ORANGE*
4   Santa Monica, CA 90401                    *COUNTY CATHOLIC WORKER and*
                                              *CANGRESS*
5
6                                             Telephone:   310-393-3055
                                              Facsimile:   310-451-3858
7                                             Email: carolsobellaw@gmail.com;
                                              rowland.weston@gmail.com
8
9   Shayla R. Myers                           Attorneys for Intervenors
10  LEGAL AID FOUNDATION OF LOS               *LOS ANGELES COMMUNITY*
    ANGELES                                   *ACTION NETWORK, LOS ANGELES*
11  7000 South Broadway                       *CATHOLIC WORKER and CANGRESS*
    Los Angeles, CA 90003
12
13                                            Telephone:   213-640-3983
                                              Facsimile:   213-640-3988
14                                            Email: smyers@lafla.org
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

556797.9

129

# Notices

[2:20-cv-02291-DOC-KES LA Alliance for Human Rights et al v. City of Los Angeles et al](#)

ACCO,(KESx),DISCOVERY,MANADR,RELATED-G,SM

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**

The following transaction was entered by Miller, Louis on 3/25/2022 at 4:42 PM PDT and filed on 3/25/2022
**Case Name:**      LA Alliance for Human Rights et al v. City of Los Angeles et al
**Case Number:**     [2:20-cv-02291-DOC-KES](#)
**Filer:**          County of Los Angeles
**Document Number:** [403](#)

**Docket Text:**
**NOTICE Notice of Withdrawal of Consent to Ex Parte Communications filed by Defendant County of Los Angeles. (Miller, Louis)**

**2:20-cv-02291-DOC-KES Notice has been electronically mailed to:**

Amie S Park     apark@counsel.lacounty.gov, egomez@counsel.lacounty.gov

Ana Wai-Kwan Lai     alai@counsel.lacounty.gov

Arlene Nancy Hoang     arlene.hoang@lacity.org, evelyn.rodriguez@lacity.org

Bradley Joseph Hamburger     bhamburger@gibsondunn.com

Brandon D Young     bdyoung@manatt.com, lgarcete@manatt.com

Brooke Alyson Weitzman     bweitzman@eldrcenter.org, arahgoshay@eldrcenter.org

Byron J McLain     bmclain@foley.com, byron-mclain-5906@ecf.pacerpro.com, vhong@foley.com

Carol A. Sobel     carolsobel@aol.com, carolsobellaw@gmail.com

Catherine Elizabeth Sweetser     csweetser@sshhzlaw.com, cgallegos@sshhzlaw.com

Christian M Contreras     cc@thechristianfirm.com, ccontreras@ghclegal.com

Elizabeth Anne Mitchell     emitchell@spertuslaw.com, sluecf@spertuslaw.com

Jeffrey Lewis     jeff@jefflewislaw.com, jason@jefflewislaw.com

Jennifer Mira Hashmall     mhashmall@millerbarondess.com, aransom@millerbarondess.com, bbinns@millerbarondess.com, docket@millerbarondess.com

Jessica Mariani     jessica.mariani@lacity.org, ava.smith@lacity.org

Lauren M Black     lblack@counsel.lacounty.gov, lauren_black@yahoo.com

Louis R. Miller     smiller@millerbarondess.com, docket@millerbarondess.com, oashcroft@millerbarondess.com

Manuel A. Abascal     manny.abascal@lw.com, manuel-abascal-7112@ecf.pacerpro.com

Mark S Ravis     mravis99@gmail.com

Matthew Donald Umhofer     matthew@spertuslaw.com, docketing@spertuslaw.com, mumhofer@spertuslaw.com, sluecf@spertuslaw.com

Paul L Hoffman     hoffpaul@aol.com, jwashington@sshhzlaw.com, sshhwilliam@gmail.com

Ryan Salsig     ryan.salsig@lacity.org, evelyn.rodriguez@lacity.org

Scott D Marcus     scott.marcus@lacity.org, guadalupe.lopez@lacity.org, irene.m.perez@lacity.org

Sean Christopher Rotstan     sean@jefflewislaw.com

Shayla Renee Myers     smyers@lafla.org, amcnair@lafla.org, bschultz@lafla.org, dgonzalez@lafla.org, rmoreno@lafla.org, sbodden@lafla.org

Theano Evangelis Kapur     tevangelis@gibsondunn.com, , cperez@gibsondunn.com

Weston C Rowland     rowland.weston@gmail.com

William R Wise , Jr     bwise@eldrcenter.org

**2:20-cv-02291-DOC-KES Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

David H Martin
Law Office of Mark Ravis and Associates
26565 West Agoura Raod Suite 200
Calabasas, CA 91302

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\NOTICE - Defendant County's Notice of Withdrawal of Consent [Final].pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=3/25/2022] [FileNumber=33640768-0
] [a216f44ed2b48d320c51a46c4e7a2ced7b65048bb8b088122fcbe63bc485d5b6e61
87e91eee262f362c0ede8c8846b02848339633eeac2e85beae59f421af127]]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
<u>**CIVIL MINUTES – GENERAL**</u>

Case No. <u>LA CV 20-02291-DOC (KESx)</u>          Date: <u>January 24, 2022</u>

Title:     <u>LA Alliance for Human Rights, et al. v. City of Los Angeles, et al.</u>

PRESENT:     <u>THE HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE</u>

|  |  |
|---|---|
| <u>Karlen Dubon</u> | <u>Court Smart</u> |
| Courtroom Deputy | Court Reporter |

| <u>**Attorneys Present for Plaintiff:**</u> | <u>**Attorneys Present for Defendant:**</u> |
|---|---|
| Elizabeth Mitchell | Scott Marcus |
| Matthew Umhofer | Jennifer Hashmall |
| Carol Sobel | Louis "Skip" Miller |
| Shayla Myers | Ryan Salaig |
| Brooke Weitzman | Arlene Hoang |

**PROCEEDINGS** (via Zoom):     **CITY OF LOS ANGELES' MOTION TO DISMISS [369]**

     **CITY OF LOS ANGELES' MOTION TO DISMISS FAC [370]**

     Case is called. The Court hears oral arguments.

     The Court orders the parties to attend a mandatory settlement conference on Tuesday, February 15, 2022 at 8:30 a.m. at the First Street U.S. Courthouse, 350 W. 1st Street, Los Angeles, CA 90012.

     The Court orders the transcript for the hearing date above be made available on the docket forthwith free of charge to all ordering parties.

     The Court orders the transcript of this hearing designated as the official court record. The Court further orders the transcript be produced at Government expense and billed at the 7-day rate.

     The Court orders original transcript and notes be submitted to Transcripts_cacd@cacd.uscourts.gov no later than Monday, January 31, 2022, for immediate uploading on the Court's CM/ECF document filing system.

cc:  Alberto_Ortiz@cacd.uscourts.gov
cc:  DebbieGalecsr@gmail.com

                                         1:   00

MINUTES FORM 11
CIVIL-GEN                              Initials of Deputy Clerk:  kdu

1  RODRIGO A. CASTRO-SILVA (SBN 185251), *County Counsel*
   rcastro-silva@counsel.lacounty.gov
2  LAUREN M. BLACK (SBN 192302), *Assistant County Counsel*
3  ANA WAI-KWAN LAI (State Bar No. 257931), *Senior Deputy County Counsel*
   500 West Temple Street, Suite 468
4  Los Angeles, California 90012
   Tel.: (213) 974-1830 | Fax: (213) 626-7446
5
6  BYRON J. MCLAIN (SBN 257191)
   bmclain@foley.com
7  FOLEY & LARDNER, LLP
   555 South Flower Street, Suite 3300
8  Los Angeles, California 90071
   Tel.: (310) 972-4500 | Fax: (213) 486-0065
9
10 LOUIS R. MILLER (SBN 54141)
   smiller@millerbarondess.com
11 MIRA HASHMALL (SBN 216842)
   MILLER BARONDESS, LLP
12 1999 Avenue of the Stars, Suite 1000
   Los Angeles, California 90067
13 Tel.: (310) 552-4400 | Fax: (310) 552-8400
14
   Attorneys for Defendant
15 COUNTY OF LOS ANGELES

16

## UNITED STATES DISTRICT COURT

17

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

18

| | |
|---|---|
| 19 LA ALLIANCE FOR HUMAN RIGHTS, et al., | **CASE NO. 2:20-cv-02291 DOC-KES** |
| 20 | |
| 21 Plaintiffs, | **DEFENDANT COUNTY OF LOS ANGELES' REPLY IN SUPPORT OF ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| 22 v. | |
| 23 CITY OF LOS ANGELES, et al., | |
| 24 Defendants. | Hearing:   January 24, 2022 |
| 25 | Time:      8:30 a.m. |
| 26 | Place:     Courtroom: 9D |
| 27 | Assigned to the Hon. David O. Carter and Magistrate Judge Karen E. Scott |
| 28 | |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION .................................................................. 7

II.  PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE ........................ 8

     A.   Standing Is Not Satisfied For Every Claim ............................ 9

     B.   Plaintiffs' Alleged Injuries Are Not Traceable To The County ............ 9

     C.   Plaintiffs Have Not Pleaded Redressability ........................... 11

III. PLAINTIFFS DO NOT PLEAD A CONSTITUTIONAL VIOLATION ...... 12

     A.   Plaintiffs Have Not Stated A Substantive Due Process Claim ............ 12

          1.   There Was No State-Created Danger ........................ 12

          2.   Plaintiffs Have No Special Relationship to the County ............. 15

     B.   Plaintiffs Have Not Stated A Procedural Due Process Violation ......... 16

     C.   Plaintiffs Have Not Stated An Equal Protection Claim ................. 17

          1.   Plaintiffs Fail to Allege the County Discriminated Against
               Them Because of Geography ...................................... 17

          2.   Plaintiffs Do Not Allege Racial Discrimination by the
               County ........................................................... 18

     D.   Plaintiffs' Conclusory "Municipal Liability" Claim Fails .................. 19

IV.  PLAINTIFFS DO NOT PLEAD DISABILITY DISCRIMINATION .......... 19

V.   THE REMAINING STATE-LAW CLAIMS ARE FATALLY
     FLAWED ........................................................................... 20

     A.   Plaintiffs Cannot Plead Around Governmental Immunity ................. 20

     B.   Plaintiffs Fail To Allege The Existence Of A State-Law Duty To
          Provide Emergency Shelters To All PEH ............................... 23

          1.   Plaintiffs Fail to State a Section 17000 Claim ........................ 23

          2.   Plaintiffs Fail to State a Negligence Claim ............................. 24

          3.   Plaintiffs Fail to State a Nuisance Claim ............................... 25

     C.   Plaintiffs Fail To State A Waste Claim ................................... 26

VI.  CONCLUSION ..................................................................... 26

DEFENDANT COUNTY OF LOS ANGELES' REPLY IN SUPPORT OF
ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

### <u>FEDERAL CASES</u>

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................ 19

*BAM Historic Dist. Ass'n v. Koch*,
    723 F.2d 233 (2d Cir. 1983) ............................................................. 16

*Bennett v. Spear*,
    520 U.S. 154 (1997) .......................................................................... 9

*County of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ........................................................................ 12

*Crowder v. Kitagawa*,
    81 F.3d 1480 (9th Cir. 1996) ...................................................... 19, 20

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ..................................................................... 9, 11

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989) ........................................................... 12, 15, 16

*Engquist v. Or. Dep't of Agric.*,
    553 U.S. 591 (2008) ........................................................................ 17

*Excel Fitness Fair Oaks, LLC v. Newsom*,
    2021 WL 795670 (E.D. Cal. Mar. 2, 2021) ............................... 17, 24

*Gomillion v. Lightfoot*,
    364 U.S. 339 (1960) ........................................................................ 18

*Halverson v. Skagit County*,
    42 F.3d 1257 (9th Cir. 1994) ........................................................... 16

*Heraldez v. Bayview Loan Servicing, LLC*,
    2016 WL 10834101 (C.D. Cal. Dec. 15, 2016),
    *aff'd*, 719 F. App'x 663 (9th Cir. 2018) (mem.) ................... 9, 17, 24

*Hernandez v. City of San Jose*,
    897 F.3d 1125 (9th Cir. 2018) ......................................................... 14

*Horne v. Flores*,
    557 U.S. 433 (2009) ........................................................................ 11

*Huffman v. County of Los Angeles*,
    147 F.3d 1054 (9th Cir. 1998) ......................................................... 14

*Johnson v. City of Seattle*,
    474 F.3d 634 (9th Cir. 2007) ........................................................... 13

3

ER 533

*Juliana v. United States*,
    947 F.3d 1159 (9th Cir. 2020) ................................................................... 11, 15

*Kennedy v. City of Ridgefield*,
    439 F.3d 1055 (9th Cir. 2006) .......................................................................... 14

*LA All. for Human Rights v. County of Los Angeles*,
    14 F.4th 947 (9th Cir. 2021) ............................................................................... 8

*Lewis v. Casey*,
    518 U.S. 343 (1996) ................................................................................... 9, 11

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................ 9

*M.S. v. Brown*,
    902 F.3d 1076 (9th Cir. 2018) .......................................................................... 11

*Martinez v. City of Clovis*,
    943 F.3d 1260 (9th Cir. 2019) ..................................................................... 13, 14

*Mateos-Sandoval v. County of Sonoma*,
    942 F. Supp. 2d 890 (N.D. Cal. 2013) ............................................................. 19

*McCleskey v. Kemp*,
    481 U.S. 279 (1987) ......................................................................................... 18

*Patel v. Kent Sch. Dist.*,
    648 F.3d 965 (9th Cir. 2011) ....................................................................... 14, 15

*Pauluk v. Savage*,
    836 F.3d 1117 (9th Cir. 2016) .......................................................................... 12

*Pierce v. County of Orange*,
    2004 WL 7340113 (C.D. Cal. June 4, 2004) ............................................... 22, 23

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ......................................................................................... 11

*Rogers v. Lodge*,
    458 U.S. 613 (1982) ......................................................................................... 18

*Santa Cruz Homeless Union v. Bernal*,
    514 F. Supp. 3d 1136 (N.D. Cal. 2021) ........................................................... 15

*Sausalito/Marin Cty. Chapter of Cal. Homeless Union v. City of Sausalito*,
    2021 WL 2141323 (N.D. Cal. May 26, 2021) .................................................. 15

*Schneider v. Cal. Dep't of Corr.*,
    151 F.3d 1194 (9th Cir. 1998) .......................................................................... 16

*Schneider v. State of New Jersey, Town of Irvington*,
    308 U.S. 147 (1939) ................................................................................... 25, 26

DEFENDANT COUNTY OF LOS ANGELES' REPLY IN SUPPORT OF
ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT

*Snowden v. Hughes*,
  321 U.S. 1 (1944) ................................................................................................ 18

*Tyler v. Cuomo*,
  236 F.3d 1124 (9th Cir. 2000) ....................................................................... 9, 10

*United States v. Lazarenko*,
  476 F.3d 642 (9th Cir. 2007) ............................................................................. 11

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ........................................................................................... 18

*Warth v. Seldin*,
  422 U.S. 490 (1975) ............................................................................................. 9

*Wood v. Ostrander*,
  879 F.2d 583 (9th Cir. 1989) ............................................................................. 14

*Yick v. Hopkins*,
  118 U.S. 356 (1886) ........................................................................................... 18

*Young v. City of Visalia*,
  687 F. Supp. 2d 1141 (E.D. Cal. 2009) .............................................................. 19


**STATE CASES**

*Brenneman v. State*,
  208 Cal. App. 3d 812 (1989) ............................................................................. 25

*Connelly v. State*,
  3 Cal. App. 3d 744 (1970) ............................................................................ 21, 22

*Haggis v. City of Los Angeles*,
  22 Cal. 4th 490 (2000) ....................................................................................... 25

*Hunt v. Superior Court*,
  21 Cal. 4th 984 (1999) .................................................................................. 23, 24

*Lucas v. Santa Maria Pub. Airport Dist.*,
  39 Cal. App. 4th 1017 (1995) ............................................................................ 22

*Masters v. San Bernardino Cty. Emps. Ret. Ass'n*,
  32 Cal. App. 4th 30 (1995) ................................................................................ 21

*Schooler v. State*,
  85 Cal. App. 4th 1004 (2000) ................................................................. 20, 21, 22

*Sundance v. Municipal Court*,
  42 Cal. 3d 1101 (1986) ...................................................................................... 26

*Tailfeather v. Bd. of Supervisors*,
  48 Cal. App. 4th 1223 (1996) ............................................................................ 24

DEFENDANT COUNTY OF LOS ANGELES' REPLY IN SUPPORT OF
ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT

*Thompson v. City of Petaluma*,
   231 Cal. App. 4th 101 (2014)............................................................22

**STATE STATUTES**

Cal. Civ. Proc. Code § 526a ............................................................26

Cal. Gov't Code § 814 ....................................................................21

Cal. Gov't Code § 815 ....................................................................20

Cal. Gov't Code § 815.2 .................................................................21

Cal. Gov't Code § 815.2(b) ............................................................21

Cal. Gov't Code § 818.2 .................................................................23

Cal. Gov't Code § 820.2 ......................................................21, 22, 23

Cal. Gov't Code § 831.25 ...............................................................21

Cal. Welf. & Inst. Code § 17000 ...............................................23, 24, 25

Cal. Welf. & Inst. Code § 17001 ....................................................24

**OTHER AUTHORITIES**

U.S. Const. amend. XIV .................................................................15

U.S. Const. art. III.........................................................................8, 9

DEFENDANT COUNTY OF LOS ANGELES' REPLY IN SUPPORT OF
ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 536

## I. __INTRODUCTION__

Plaintiffs' Opposition is more notable for what it omits than what it says.  As a matter of law, the County cannot be liable for Plaintiffs' injuries caused by PEH in Skid Row because Skid Row is located entirely within the incorporated territory of the City of Los Angeles—outside of the County's jurisdiction or control.[1]  Plaintiffs allege discrimination and violations of due process, but the FAC fails to allege any unequal treatment by the County, or any specific, affirmative conduct by the County that placed Plaintiffs in harm's way.  Plaintiffs plead their state law claims in only conclusory terms, and do not identify an express statutory duty that was breached.

In their Opposition, Plaintiffs do not respond to any of these arguments.  This alone constitutes a waiver of the issues and warrants dismissal.  All they really do is attach the Court's preliminary injunction order and rely on it.  But this obvious pandering to the Court doesn't work—the preliminary injunction order was overturned by the Court of Appeals and is no longer in effect.

Plaintiffs' claims fail for another reason: the gravamen of the FAC is that "[t]he County . . . has not done *enough*" to end homelessness.  (Opp. at 1.)  This "theory" is neither judicially cognizable nor a plausible ground for relief.

In effect, Plaintiffs argue the County violated the law by spending hundreds of millions of dollars to prioritize permanent housing solutions instead.  This theory of municipal liability is dead on arrival.  As the Motion makes clear, citizens cannot sue their local government in federal court to commandeer the government's discretionary spending and re-direct taxpayer funds according to their individual prerogatives.  Yet that is exactly what Plaintiffs attempt here.

Although they acknowledge—repeatedly—that the County provides significant social services and aid to PEH, Plaintiffs insist that such aid affirmatively infringed on their rights.  Remarkably, Plaintiffs now argue that the County *violated*

---

[1] The Reply uses the same defined terms as in the County's Motion.

DEFENDANT COUNTY OF LOS ANGELES' REPLY IN SUPPORT OF
ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 537

*the Constitution* by offering aid to PEH because it allegedly drew people from all over the world, who fell into homelessness for any number of reasons, into the City, where they disturbed Plaintiffs.  They ask the Court to usurp the County's lawful authority by mandating that the County reallocate millions of taxpayer dollars to implement Plaintiffs' policy agenda.  Such a drastic and unprecedented remedy far exceed the limits of the Court's Article III power.

In reversing the prior preliminary injunction, the Ninth Circuit noted that the Court has "equitable power to remedy *legal violations* that have contributed to the complex problem of homelessness in Los Angeles." *LA All. for Human Rights v. County of Los Angeles*, 14 F.4th 947, 961 (9th Cir. 2021) (emphasis added).  The FAC fails to identify any such violations of law.

Of course, the County shares the goal of providing shelter to all PEH and is admittedly doing a great deal to that end.  But Plaintiffs' policy disagreements with how the County is working to achieve that goal are not a basis for judicial intrusion into local affairs.  It is simply not the Court's role to dictate local policy and budget priorities by usurping the County's discretionary decisions.

## II.   PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE

Plaintiffs agree that, to survive the County's Motion, they must establish the triad of standing requirements: (1) an "injury in fact" (2) that is "fairly traceable" to the County, and (3) that a favorable court decision is "likely" to redress that injury.  (Opp. at 5; Mot. at 13.)  Plaintiffs have not done so.

Plaintiffs' FAC suffers from a fatal flaw: Plaintiffs lack standing because they fail to allege a concrete, particularized harm that is traceable to the County or capable of being redressed by the injunctive relief they seek.  (Mot. at 13-15.)  In the Opposition, Plaintiffs (1) stress district courts' "broad power to order equitable relief"; (2) cloak themselves in the Court's prior order; (3) downplay standing as a "low bar"; and (4) regurgitate their legal claims in boilerplate terms.  (Opp. at 4-7.)

8

A.   **Standing Is Not Satisfied For Every Claim**

Standing is claim-specific.  (Mot. at 13; *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("a plaintiff must demonstrate standing for each claim he seeks to press" and "for each form of relief sought" (citation omitted)).)  Plaintiffs have not established standing where they allege claims against the County on behalf of undifferentiated "Plaintiffs" because they have not shown that each has suffered each alleged injury.  (Mot. at 13.)  Plaintiffs do not respond to the County's argument.  This alone "constitutes a waiver or abandonment of the issue." *Heraldez v. Bayview Loan Servicing, LLC*, 2016 WL 10834101, at *2 (C.D. Cal. Dec. 15, 2016), *aff'd*, 719 F. App'x 663 (9th Cir. 2018) (mem.).

Standing "is not dispensed in gross," and pleading standing as a collective— as Plaintiffs do—violates Article III.  *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *see Warth v. Seldin*, 422 U.S. 490, 501 (1975) (complaint must show that each plaintiff suffered "a distinct and palpable injury to himself").  Other than Plaintiffs' disability claims, this requirement is not met.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992) (court must be able to determine "that the injury" conferring standing "affect[ed] [each] plaintiff in a personal and individual way").

B.   **Plaintiffs' Alleged Injuries Are Not Traceable To The County**

Plaintiffs' alleged injuries are traceable, if at all, to the City, which has exclusive jurisdiction over Skid Row, and to recent federal court orders in litigation that did not involve the County.  (Mot. at 13-14.)  Standing is not satisfied where "the injury complained of" is only "th[e] result [of] the *independent* action of some third party." *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (alterations in original) (citation omitted).

Plaintiffs' reliance on *Tyler v. Cuomo*, 236 F.3d 1124 (9th Cir. 2000), is misplaced.  (Opp. at 5.)  There, the plaintiff homeowners sued the City of San Francisco, the U.S. Department of Housing and Urban Development ("HUD"), and a developer for approving a low-income housing project over their objections.  *Id.* at

9

1128. The Ninth Circuit ruled they had standing as to the City because it was bound

by an agreement to consult with the plaintiffs. *See id*. at 1133-35. But the court

held the plaintiffs lacked standing to sue the other defendants because they had no

duty to respond to their objections and, thus, there was no causal connection

between the challenged conduct and plaintiffs' alleged injury. *Id.* at 1136-37.

The County is in the same position as the dismissed defendants in *Tyler*.

Plaintiffs allege they have suffered economic injuries because of the lack of

enforcement in Skid Row, but the County has no authority over PEH there. (Mot. at

14-15.) As in *Tyler*, there is no causal link between the claimed injuries and the

County's conduct.

There is also no causation because Plaintiffs' theory of liability involves

numerous third parties whose independent decisions, collectively, have led to

Plaintiffs' claimed injuries. (*See* Mot. at 14.) The County actions that Plaintiffs

challenge include allegedly focusing on "permanent housing" over "interim" options

and "complicity . . . in . . . institutional racism." (FAC ¶ 217; *see* Opp. at 6-7.)

Plaintiffs assert that in combination with, *inter alia*, mental health affliction, drug

addiction, litigation settlements, federal welfare cuts, arson fires, pressure from

homeless advocates, limits on federal expenditures, "redlining" policies of the City,

and more, there are now a significant number of PEH in the County and more trash

and waste from tent encampments, causing Plaintiffs to have higher insurance

premiums, employee retention issues, and misdelivered mail. (FAC ¶¶ 9, 10, 12, 50,

69, 90, 92.) This kind of diffuse causal chain is insufficient. (Mot. at 14.)

Plaintiffs cannot overcome these standing deficiencies with conclusory and

circular allegations of fault. (Opp. at 6-7.) Plaintiffs assert that they "have properly

alleged their injuries are traceable to the . . . County" and that the County is "either

causing the number of persons experiencing homelessness to increase or causing the

conditions in which they live to worsen." (*Id.*) But as for *how*, the Opposition is

mum on details. Plaintiffs do not even cite to the FAC in arguing they have met the

10

1    traceability element, because this element is *not alleged in the FAC*.

2           Plaintiffs argue the County has "waste[d] . . . Measure H funds" and helps

3    fund and direct LAHSA, which Plaintiffs believe is "ineffective in several ways."

4    (Opp. at 6.)  These conclusory assertions do not establish that Plaintiffs suffered

5    cognizable harm.  The remaining "actions"—focusing on permanent housing,

6    concentrating services in Skid Row, and being "complicit[]" "in the long history of

7    institutional racism"—are similarly unsupported, vague and lack a causal nexus to

8    Plaintiffs' injuries.  Plaintiffs' generalized grievances against the County are not

9    actionable.  *United States v. Lazarenko*, 476 F.3d 642, 649-50 (9th Cir. 2007).

10          **C.    Plaintiffs Have Not Pleaded Redressability**

11          Plaintiffs' focus on courts' equitable power to fashion injunctive relief puts

12   the cart before the horse.  (*See* Opp. at 4-5.)  Standing is a prerequisite to *any* relief.

13   Plaintiffs must demonstrate that the requested injunction would redress alleged

14   injuries attributable to the County, not just that the Court (obviously) has the power

15   to grant injunctions.  *DaimlerChrysler*, 547 U.S. at 352.

16          The Court's equitable powers do *not* include the intrusive intervention into

17   legislative prerogatives.  Plaintiffs seek an order requiring the County to spend

18   hundreds of millions of taxpayer dollars on emergency housing for all PEH in Skid

19   Row.  (*See, e.g.*, FAC ¶ 23 ("The *only* way to address this crisis" is "providing

20   immediate shelter for all").)

21          There are multiple U.S. Supreme Court and Ninth Circuit decisions that

22   prohibit this type of legislation from the bench.  (Mot. at 14-15 (citing *Rizzo v.*

23   *Goode*, 423 U.S. 362 (1976); *Lewis v. Casey*, 518 U.S. 343 (1996); *Horne v. Flores*,

24   557 U.S. 433 (2009); *Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020).)

25   These cases hold that the Court's equitable powers have limits.  *See M.S. v. Brown*,

26   902 F.3d 1076, 1090 (9th Cir. 2018) (plaintiffs lacked standing for injunction

27   requiring state to issue drivers' licenses since such "intrusive affirmative relief"

28   would be "incompatible with democratic principles" and violates federalism

---

11

1  principles).  Plaintiffs fail to acknowledge these cases, let alone distinguish them.

**III.   PLAINTIFFS DO NOT PLEAD A CONSTITUTIONAL VIOLATION**

### A.   Plaintiffs Have Not Stated A Substantive Due Process Claim

The "state-created danger" and "special relationship" doctrines are narrow exceptions to the rule that the Constitution "confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).  Conduct is actionable only if it was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).

Plaintiffs do not—and cannot—state a claim under these circumstances.  Per the materials in the RJN (Dkt. 370-2), the County is doing a lot—spending hundreds of millions of dollars annually—to address homelessness.  To say that this is "outrageous" or that it "shocks the conscious" is ridiculous.

### 1.   There Was No State-Created Danger

Plaintiffs argue the County has "adopt[ed] and maintain[ed] policies and laws" that have "placed its homeless and housed constituents in danger." (Opp. at 7.)  None of the County's "policies and laws" constitute a state-created danger.

Plaintiffs criticize the County for "centralizing services in the Skid Row area" and "focusing heavily" on permanent housing rather than "emergency and interim" shelters.[2] (Opp. at 7.)  This is nonsensical.  Providing services and permanent housing is not a state-created danger; it is not a danger at all.

Plaintiffs must allege that the County "placed [them] in a 'worse position'" than they "would have been had [it] not acted at all." *Pauluk v. Savage*, 836 F.3d 1117, 1124-25 (9th Cir. 2016) (citation omitted).  Plaintiffs cannot plausibly claim

_____

[2] Plaintiffs say the County "misus[ed] . . . tax funds" (Opp. 7), but they admit the County used Measure H funds "on a host of programs" that have had a "positive" effect on the difficult problem of homelessness.  (*See* FAC ¶ 88.)

1   that they are in a worse position than they would be if the County provided no

2   services or housing.  Plaintiffs cannot mask their policy disagreements as

3   constitutional violations.

4         Plaintiffs also cannot establish a state-created danger by alleging that the

5   County is "failing in its obligation to 'relieve and support' the poor."  (*See* Opp. at

6   7.)  First, Plaintiffs have not identified any obligation the County is failing to satisfy.

7   Indeed, the County has dedicated hundreds of millions of dollars annually to

8   housing, shelter, services, and other resources for PEH.  (*E.g.*, Hashmall Decl. Ex.

9   13 [Homeless Initiative Quarterly Report No. 18] at 3, Dkt. 371; *id.* Ex. 16 [July 13,

10  2021 Press Release announcing the Homeless Initiative Budget for Fiscal Year

11  2021-2022].)  Plaintiffs admit this.[3]  (*See, e.g.,* FAC ¶¶ 88, 93-94.)

12        Moreover, Plaintiffs must allege *affirmative conduct* by the County because

13  the state-created danger doctrine is an exception to "[t]he general rule" that "a state

14  is not liable for its omissions."  *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th

15  Cir. 2019) (citation omitted).  Plaintiffs cannot state a due process claim based on

16  their belief that the County "has not done *enough*."  (Opp. at 1; Mot. at 20-21.)  *See*

17  *Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007) (failure to protect

18  someone from unsafe environment cannot give rise to liability under the state-

19  created danger doctrine).

20        Plaintiffs' allegation that the County has a "long history" of "racist policies

21  and practices" similarly fails.  (*See* Opp. at 7.)  Plaintiffs do not specify any alleged

22  racist County policy that resulted in a state-created danger.  Instead, they cite

23

24  _____

[3] Plaintiffs' legal standard argument is a red herring.  (*See* Opp. at 3.)  The County's
25  Motion is both facial and factual.  The County submitted an RJN detailing its
    extensive work to shelter PEH and address homelessness (Dkt. 370-2), which
26  confirms why the Court lacks jurisdiction to direct the County's legislative actions.
    Plaintiffs cannot satisfy their pleading burden by simply ignoring the facts.  Whether
27  the County's Motion is viewed as a facial or factual challenge, Plaintiffs' claims are
28  untenable.

DEFENDANT COUNTY OF LOS ANGELES' REPLY IN SUPPORT OF
ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT

1  allegations in the FAC about the *City's* historical containment policy and its zoning

2  designations under its DTLA2040 plan.  (*See id*. (citing FAC ¶¶ 40-45).)  Plaintiffs'

3  conclusory allegation of unspecified historical racist policies cannot satisfy their

4  burden to plead that the County's affirmative conduct placed them in "an actual,

5  particularized danger."  *Martinez*, 943 F.3d at 1271.

6      Plaintiffs do not identify *any* "actual, particularized danger."  Instead, they

7  argue the County is "exacerbating or causing significant mental and physical

8  decline" of its constituents.  (*See* Opp. at 7 (citing FAC ¶ 217).)  But conclusory

9  allegations about the generalized risks attendant to being homeless do not satisfy the

10  state-created danger doctrine.  *See Huffman v. County of Los Angeles*, 147 F.3d

11  1054, 1061 (9th Cir. 1998); *Patel v. Kent Sch. Dist*., 648 F.3d 965, 974 (9th Cir.

12  2011) (plaintiffs must identify a "known, immediate" threat of harm).

13      Plaintiffs cite cases that are inapposite.  In *Kennedy v. City of Ridgefield*, the

14  Ninth Circuit affirmed the denial of qualified immunity to a police officer who had

15  informed the plaintiff's neighbor—an individual with known violent tendencies and

16  against whom the plaintiff had made allegations of child abuse—that he was being

17  investigated for molesting the plaintiff's daughter.  439 F.3d 1055, 1057, 1067 (9th

18  Cir. 2006).  The officer had promised, but failed, to warn the plaintiff before

19  approaching her neighbor, who later broke into the plaintiff's house and shot and

20  wounded plaintiff and shot and killed her husband.  *Id*. at 1058.

21      In *Hernandez v. City of San Jose*, police officers "actively prevented"

22  attendees of a political protest from exiting a rally, forcing them into contact with

23  known violent counter-protesters who attacked them.  897 F.3d 1125, 1133 (9th Cir.

24  2018).  And in *Wood v. Ostrander*, the Court denied qualified immunity to an

25  officer who impounded a vehicle, stranding the female passenger in a high-crime

26  area at 2:30 a.m. where she was subsequently assaulted.  879 F.2d 583, 586, 596

27  (9th Cir. 1989).  These cases share common elements notably absent from the FAC:

28  an acute danger to the plaintiff known to municipal officers, temporal closeness

14

between the challenged action and the injury, and a direct line of causation between the conduct and the injury.

Plaintiffs' COVID cases further undercut their arguments.  (Opp. at 8-9 (citing *Santa Cruz Homeless Union v. Bernal*, 514 F. Supp. 3d 1136 (N.D. Cal. 2021), and *Sausalito/Marin Cty. Chapter of Cal. Homeless Union v. City of Sausalito*, 2021 WL 2141323 (N.D. Cal. May 26, 2021).)  There, courts enjoined the forced relocation of PEH out of public encampments because of the particularized risk that doing so would increase their exposure to COVID-19.  Thus, those cases held that the exact relief Plaintiffs seek here was likely unconstitutional.

Plaintiffs also fail to show the County acted with "deliberate indifference" to their health and safety.  *Patel*, 648 F.3d at 974.  Plaintiffs *do not* allege the County's deliberate indifference in the FAC.  To the contrary, Plaintiffs concede the County provides services to PEH throughout the County.  The efficacy of the County's policy decisions is an issue for the political process—not a federal lawsuit.  *Juliana*, 947 F.3d at 1175.

### 2. Plaintiffs Have No Special Relationship to the County

Plaintiffs concede they were "not physically behind bars" when their alleged injuries occurred.  (Opp. at 10.)  This is fatal to Plaintiffs' claim—as a matter of law, "[t]he special-relationship exception does not apply when a state fails to protect a person who is not in custody."  *Patel*, 648 F.3d at 972.

Plaintiffs cannot establish a constitutional violation by arguing that "there is nowhere else for [PEH] to go with a better chance of help."  (Opp. at 10.)  There is no support for this theory.  *DeShaney* affirmed that the Fourteenth Amendment "confer[s] no affirmative right to governmental aid" nor "minimal levels of safety and security," even if "necessary to secure life, liberty, or property interests."  489 U.S. at 195-96.  If it is not a constitutional violation for the government to provide *no* aid to PEH, then it is certainly not a constitutional violation to provide some aid as here.  (*See* Mot. at 23-24.)

15

1    Plaintiffs' attempt to equate the County's provision of services to

2    "incarceration" or "institutionalization" is nonsensical.  (Opp. at 10 (quoting

3    *DeShaney*, 489 U.S. at 200).)  Plaintiffs cannot allege deliberate indifference.  They

4    admit the County spends hundreds of millions of dollars each year on housing,

5    shelter, services, and other resources for PEH.  Their own admissions defeat their

6    claim.

7    **B.**      **Plaintiffs Have Not Stated A Procedural Due Process Violation**

8    Plaintiffs argue they were denied procedural due process based on an alleged

9    Skid Row "containment" policy.  (Opp. at 11.)  This argument fails.

10   First, Skid Row is within the City and under its jurisdiction.  Plaintiffs cannot

11   maintain a constitutional claim against the County based on an alleged *City* policy.

12   (*See* Mot. at 19-20.)  Second, Plaintiffs have no individual procedural due process

13   right to weigh in on the City's policy.  (*See id.*)  *See also Halverson v. Skagit*

14   *County*, 42 F.3d 1257, 1261 (9th Cir. 1994) ("[G]overnmental decisions which

15   affect large areas and are not directed at one or a few individuals do not give rise to

16   the constitutional procedural due process requirements of individual notice and

17   hearing; general notice as provided by law is sufficient.").

18   Instead, Plaintiffs claim the County "exact[ed] a taking . . . without

19   justification."  (Opp. at 11.)  But Plaintiffs have not alleged a taking claim against

20   the County; and they cannot raise a new, unpleaded claim in opposition to a motion

21   to dismiss.  *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir.

22   1998).  Moreover, any such taking claim would fail.  *See*, *e.g.*, *BAM Historic Dist.*

23   *Ass'n v. Koch*, 723 F.2d 233, 237 (2d Cir. 1983) ("plaintiffs have no cognizable

24   liberty interest in preventing the location of a shelter for the homeless in their

25   neighborhood" because the rights protected by the Due Process Clause "do[] not

26   include the maintenance of transient levels of the quality of neighborhood life").

27

28

DEFENDANT COUNTY OF LOS ANGELES' REPLY IN SUPPORT OF
ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT

1    **C.**      **Plaintiffs Have Not Stated An Equal Protection Claim**

2         **1.**      **Plaintiffs Fail to Allege the County Discriminated Against**

3             **Them Because of Geography**

4         The County identified several fatal flaws in Plaintiffs' equal protection claim,

5    including that the FAC is devoid of any allegation that the County intentionally

6    discriminated against Plaintiffs because of their geographic location, let alone for an

7    impermissible reason.  Plaintiffs do not respond to any of the County's arguments,

8    which is a concession that their claim fails.  *Heraldez*, 2016 WL 10834101, at *2;

9    *Excel Fitness Fair Oaks, LLC v. Newsom*, 2021 WL 795670, at *4 (E.D. Cal.

10   Mar. 2, 2021) ("Failure to oppose an argument raised in a motion to dismiss

11   constitutes waiver of that argument." (citation omitted)).

12        Instead, Plaintiffs again point to the *City's* alleged containment policy and its

13   unequal enforcement of its own ordinances in Skid Row and under one freeway

14   overpass near Mar Vista.  (Opp. at 11-12; *see also* FAC ¶¶ 30-39 (alleging the City

15   has a containment policy in Skid Row); FAC ¶ 111 ("Mr. Frem . . . was admonished

16   by *the City*" (emphasis added)); *id.* ¶ 114 ("*The City's* homelessness policies have

17   caused serious economic damage to Mr. Frem's business . . . ." (emphasis added)).)

18   As a matter of law, the City's conduct cannot support an equal protection claim

19   against the *County*.  (*See* Mot. at 16.)  The FAC alleges only that the County is

20   providing aid to PEH, not engaging in intentional discrimination against Mr. Frem.

21   (*Id.*)

22        Plaintiffs also offer no support for their "class-of-one" selective enforcement

23   argument.  (*See* Opp. at 12.)  Plaintiffs cite to *Enquist v. Or. Dep't of Agric.*, 553

24   U.S. 591 (2008), but, as the County explained, that case supports dismissal.  (*See*

25   Mot. at 16.)  All of the allegations in the FAC "involve discretionary

26   decisionmaking based on a vast array of subjective, individualized assessments" that

27   cannot support a selective enforcement claim as a matter of law.  *Engquist*, 553 U.S.

28   at 603.

**2.**     <u>**Plaintiffs Do Not Allege Racial Discrimination by the County**</u>

The County pointed out that Plaintiffs do not plead any alleged injuries caused by invidious discrimination by the County.  (Mot. at 18-19.)  Plaintiffs respond that facially neutral laws can still be discriminatory.  (Opp. at 13.)  But this argument does not save Plaintiffs' claim because the FAC does not allege that the County is actually enforcing a race-neutral law in a discriminatory way.  Thus, all of Plaintiffs' cases are distinguishable.  Unlike the permitting scheme in *Yick v. Hopkins*, 118 U.S. 356 (1886), the redistricting of electoral districts in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), or the at-large voting system in *Rogers v. Lodge*, 458 U.S. 613 (1982), Plaintiffs do not identify *any* specific County law that has a disparate impact on people of color.

Moreover, these cases do not alter the rule that unequal application of a facially neutral law "is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination."  *Snowden v. Hughes*, 321 U.S. 1, 8 (1944) (distinguishing *Yick*); *see Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977) (same).[4]

Plaintiffs contend the alleged discrimination "is so blatant and invidious as to infer improper discriminatory intent by race," and that "[t]he City and County" have "made affirmative decisions and adopted policies and laws which has furthered th[e] disparate treatment, knowing the result would have a continued and intensified disparate impact."  (FAC ¶ 214.)  These vague, conclusory allegations fail as a matter of law.  *Snowden*, 321 U.S. at 10 (purposeful discrimination requires more

---

[4] The Supreme Court has cautioned that discriminatory intent cannot be inferred from statistical proof of disparate impact except in "rare" situations that require "a pattern as stark as that in Gomillion," where a city was re-shaped into a 28-sided figure that removed 4/5 of Black voters from a district—"or Yick Wo," where all but one Chinese business was denied a permit.  *Arlington Heights*, 429 U.S. at 266; *accord McCleskey v. Kemp*, 481 U.S. 279, 293-94, 293 n.12 (1987).

18

1   than "epithets" like "'willful' and 'malicious'" or "characterizing [a] failure as an

2   unequal, unjust, and oppressive administration of the laws").

3       **D.**   **Plaintiffs' Conclusory "Municipal Liability" Claim Fails**

4         Plaintiffs must "specify the content of the policies, customs, or practices" that

5   "gave rise to [their] Constitutional injuries." *Mateos-Sandoval v. County of*

6   *Sonoma*, 942 F. Supp. 2d 890, 899 (N.D. Cal. 2013).  They have failed to do so.

7   (*See* Mot. at 24-25.)

8         In their Opposition, Plaintiffs say they "properly allege all actions were taken

9   by County agents pursuant to official 'policy, procedure, or customs held by the . . .

10  County.'"  (Opp. at 14 (citing FAC ¶ 224).)  But these are boilerplate allegations

11  that cannot survive dismissal.  *Ashcroft v. Iqbal*, 556 U.S. 662, 680-83 (2009)

12  (affirming dismissal because plaintiff relied only on conclusory allegations that

13  federal officials purposefully adopted an unconstitutional policy of arresting

14  detainees after September 11, 2001 because of race, religion or national origin);

15  *Young v. City of Visalia*, 687 F. Supp. 2d 1141, 1149 (E.D. Cal. 2009) (holding that,

16  in "light of *Iqbal*," the Ninth Circuit's "pleading standard for *Monell* claims (i.e.

17  'bare allegations') is no longer viable").

18        Plaintiffs insist that somewhere in the FAC's 226 unspecified paragraphs,

19  "Plaintiffs have identified the specific policies alleged and acted upon . . . which,

20  taken together, entitle Plaintiffs to relief."  (Opp. at 14.)  This is plainly insufficient.

21  **IV.**   **PLAINTIFFS DO NOT PLEAD DISABILITY DISCRIMINATION**

22        Plaintiffs admit "the City is responsible for ensuring sidewalks within its

23  jurisdiction . . . meet the requirements of the ADA," and do not dispute that the

24  sidewalks of Skid Row are under the City's jurisdiction.  (Opp. at 15.)  This alone

25  requires dismissal of their new disability discrimination claims against the County.

26        But the claims fail on the merits too.  Plaintiffs rely on *Crowder v. Kitagawa*,

27  81 F.3d 1480 (9th Cir. 1996), to argue that Suarez and Van Scoy are prevented from

28  using the sidewalks "'by reason' of their disabilities."  (Opp. at 16.)  But *Crowder*

1  supports the County's argument.  There, the visually impaired plaintiffs claimed that

2  Hawaii's quarantine on dogs entering the state discriminated against them on the

3  basis of their disability because they relied on guide dogs to "negotiat[e] public

4  streets and us[e] transportation systems."  81 F.3d at 1482.  The Ninth Circuit held

5  the quarantine violated the ADA because, due to their "unique dependence" on

6  guide dogs, it denied plaintiffs access to state services, while those services

7  "*remain[ed] open and easily accessible by others*."  *Id.* 1484 (emphasis added).

8      Here, by contrast, Plaintiffs claim the "[s]idewalks . . . are completely blocked

9  and impassible."  (Opp. at 15.)  They do not allege the sidewalks are "open and

10  easily accessible" to anyone.  Instead, Plaintiffs argue that the burden on Suarez and

11  Van Scoy is greater because they cannot "simply step down and around an

12  encampment."  (*Id*. at 16.)  But *Crowder* did not establish a blanket rule that a

13  "different or greater" burden on disabled individuals is sufficient to state an ADA

14  claim.  That Suarez and Van Scoy "must turn around" to go "back to the other side

15  of the street," instead of "walk[ing] through the street to the other side" does not

16  constitute unequal access to the sidewalks "because of" their disability.  (*See id*.)

## V.     THE REMAINING STATE-LAW CLAIMS ARE FATALLY FLAWED

### A.     Plaintiffs Cannot Plead Around Governmental Immunity

19      Under California law, public entities have absolute immunity unless

20  "otherwise provided by statute."  Cal. Gov't Code § 815.  Plaintiffs argue that

21  governmental immunity does not bar their claims for injunctive relief.  (Opp. at 20-

22  22.)  Their attempt to circumvent the County's statutory immunity fails as a matter

23  of law.  (*See* Mot. at 28-30.)

24      Plaintiffs quote *Schooler v. State*, 85 Cal. App. 4th 1004, 1013 (2000), for the

25  proposition that "[u]nder section 814, Government Code immunities extend only to

26  tort actions that seek money damages."  (Opp. at 21.)  But Plaintiffs omit the key

27  holding in *Schooler*.  There, plaintiff's home was on top of a state-owned bluff that

28  was adjacent to a state-owned beach.  The plaintiff sought an injunction against the

20

1  state in connection with structural damage to his home caused by erosion of the

2  bluff, and relied on section 814 to argue that immunity did not bar his claim for

3  injunctive relief.  85 Cal. App. 4th at 1013.

4      The court rejected this argument because Government Code section 831.25

5  "*relieves public entities of the responsibility*" to protect adjacent property from land

6  failures caused by natural conditions (85 Cal. App. 4th at 1012 (emphasis added)),

7  and the injunctive relief plaintiff sought was merely an end-run around immunity

8  and undermined the legislative intent to reduce the state's financial burden for

9  injuries from natural conditions on public land (*id*. at 1012-14).  Section 814

10  "cannot be applied in such a way as to circumvent either its own underlying

11  legislative policy or that of another section in the Tort Claims Act," and "*any 'relief'*

12  *allowed under section 814 cannot create duties that immunity provisions guard*

13  *against*."  *Id*. at 1013-14 (emphasis added).  The same is true here.

14      Government Code section 815.2 provides that "a public entity is not liable for

15  an injury resulting from an act or omission of an employee of the public entity

16  where the employee is immune from liability."  Cal. Gov't Code § 815.2(b).  And

17  section 820.2 provides that "a public employee is not liable for an injury resulting

18  from his act or omission where the act or omission was the result of the exercise of

19  the discretion vested in him, whether or not such discretion be abused."  *Id*. § 820.2.

20      Under section 820.2, public employees cannot be held liable for basic policy

21  or planning decisions.  *Masters v. San Bernardino Cty. Emps. Ret. Ass'n*, 32 Cal.

22  App. 4th 30, 45-46 (1995).  A fundamental purpose of discretionary immunity is the

23  need to fix duties and attain finality of governmental decisions.  *Connelly v. State*, 3

24  Cal. App. 3d 744, 766 (1970).  If a trier of fact "is permitted to redetermine what [a

25  public employee] should have done under a given set of circumstances where he had

26  judgment and discretion, the ultimate power of decision is transferred to those not

27  responsible," and the result of each suit would become a redefinition of his duty.  *Id*.

28      The County's decisions about how to allocate funds for the purpose of

21

1  addressing homelessness is a legislative policy decision and quintessential

2  discretionary act.  Since a fundamental purpose of discretionary immunity is the

3  need to fix responsibilities and to attain finality of [governmental] decision[s],"

4  allowing "a court-imposed duty would be inconsistent with the legislative intent"

5  underlying section 820.2 that public employees cannot be held liable for basic

6  policy or planning decisions.  *See Connelly*, 3 Cal. App. 3d at 766; *Schooler*, 85 Cal.

7  App. 4th at 1011; *see also Pierce v. County of Orange*, 2004 WL 7340113, at *2

8  (C.D. Cal. June 4, 2004) ("[A] plaintiff cannot use a claim for equitable and

9  injunctive relief to circumvent the financial protections immunity provides a

10  governmental entity."); *Thompson v. City of Petaluma*, 231 Cal. App. 4th 101, 106

11  (2014) ("Courts should not interfere with a local government's legislative judgment

12  on the ground that its funds could be spent more efficiently."); *Lucas v. Santa Maria*

13  *Pub. Airport Dist.*, 39 Cal. App. 4th 1017, 1026 (1995) ("Thus, the courts should not

14  take judicial cognizance of disputes which are primarily political in nature, nor

15  should they attempt to enjoin every expenditure which does not meet with a

16  taxpayer's approval.").

17      Plaintiffs rely on a single unpublished district court case, *Pierce v. County of*

18  *Orange*, to argue that immunity does not apply because they "are not seeking to

19  impose additional financial burdens the County would not already have, had it

20  properly fulfilled its constitutional and statutory obligations."  (Opp. at 21).  *Pierce*

21  is distinguishable.  There, the court recognized that *Schooler* precludes a plaintiff

22  from "us[ing] equitable and injunctive relief to impose a duty . . . the state did not

23  otherwise have a duty to maintain," but held that governmental immunities did not

24  apply because the plaintiffs sought to enjoin the county's operation of its jails *in an*

25  *unlawful manner*, such as depriving pre-trial detainees the ability to practice

26  religion, or denying disabled inmates access to programs and services.  *Pierce*, 2004

27  WL 7340113, at *2.  The court reasoned that the county was already under the legal

28  obligation to comply with the Constitution and ADA, and had failed to do so, so an

injunction compelling compliance imposed no new burdens on the county that would be barred by governmental immunity.  *Id.*

*Pierce* stands for the unremarkable principle that where a party has the legal right to specifically enforce an obligation, governmental immunity does not bar the claim.  But that is not the issue here.  Rather, Plaintiffs do not identify any legal right (under WIC section 17000 or otherwise) to require the County to build emergency shelters or expend funds based on Plaintiffs' policy preferences.  (Mot. at 28-29.)  Thus, an injunction requiring the County to redirect funds allocated for services or housing to build emergency shelters *would* impose a new duty on the County, with new fiscal burdens not contemplated by California law.  This would directly conflict with the legislative intent behind the immunity statutes relieving public entities of responsibility for "adopting or failing to adopt an enactment," "failing to enforce any law," and "exercis[ing] . . . discretion."  (Mot. at 28 (citing Cal. Gov't Code §§ 818.2, 820.2).)  *See also Schooler*, 85 Cal. App. 4th at 1013-15.

## B.  Plaintiffs Fail To Allege The Existence Of A State-Law Duty To Provide Emergency Shelters To All PEH

Plaintiffs' remaining claims all require Plaintiffs to allege a statutory duty that the County breached, causing Plaintiffs' injuries.  They have not done so.

### 1.  Plaintiffs Fail to State a Section 17000 Claim

Plaintiffs contend that, under WIC section 17000, the County owes a mandatory duty to provide housing to the unhoused because "'subsistence' medical care includes basic shelter."  (Opp. at 19.)  Plaintiffs misrepresent what section 17000 requires.  The County embraces its obligations under the statute: (i) to provide general assistance to the indigent, and (ii) to provide medically necessary care to "medically indigent persons."  *Hunt v. Superior Court*, 21 Cal. 4th 984, 1002-03 (1999).

Even assuming, *arguendo*, that provision of beds could constitute medical care of some kind, such aid would not constitute subsistence medical care mandated

23

1   by section 17000.  The medical care obligation "neither requires the County to

2   satisfy all unmet needs, nor mandates universal health care."  *Hunt*, 21 Cal. 4th at

3   1014.  Moreover, nothing in the plain language of section 17000 requires the County

4   to provide care in the form of temporary emergency shelters or otherwise dictates its

5   "cho[ice] between a multitude of potential courses of action," as Plaintiffs demand.

6   *Tailfeather v. Bd. of Supervisors*, 48 Cal. App. 4th 1223, 1246 (1996).  To the

7   contrary, section 17000 "give[s] the counties a great deal of discretion in

8   determining how best to meet the medical needs of indigent residents in light of the

9   limited resources available," *id*. at 1245-46, and it is up to the County to define the

10  "standards of aid and care," Cal. Welf. & Inst. Code § 17001.

11         The County has exercised its discretion and determined how to support its

12  indigent residents.  Plaintiffs acknowledge as much in the FAC.  (*E.g.*, FAC ¶¶ 83,

13  171.)  Thus, Plaintiffs *cannot allege* the County has failed to discharge a mandatory

14  obligation.  Instead, they argue the County was required to discharge its obligations

15  in a *different way*.  (*Id*. ¶¶ 171-72.)  The Court's inquiry can end there.  The County

16  has discharged its mandatory duty by exercising its discretion.  *Tailfeather*, 48 Cal.

17  App. 4th at 1246 (because counties have discretion to determine the type of relief

18  they provide under WIC sections 17000 and 17001, a court's role is limited to

19  determining "whether the County has abused or exceeded its discretion under the

20  governing statutes—not to dictate how that discretion must be exercised").

21  Plaintiffs' own allegations defeat their claim.

22              **2.    Plaintiffs Fail to State a Negligence Claim**

23         Plaintiffs do not respond to the County's arguments for why their negligence

24  claim fails.  (*See* Mot. at 31-33.)  Again, this alone is grounds for dismissal.

25  *Heraldez*, 2016 WL 10834101, at *2; *Excel Fitness*, 2021 WL 795670, at *4.

26  Instead, they argue in a footnote that their negligence claim must survive because it

27  is predicated on a breach of section 17000.  (Opp. at 17 n.4.)

28         Plaintiffs' attempt to tie their negligence claim to section 17000 contradicts

24

1   the FAC, which alleges the County breached a duty to maintain public rights of way,

2   abate harmful or offensive conditions, and implement Measure H.  (*See* FAC

3   ¶¶ 161-64; Mot. at 31-32.)  It is also inconsistent with Plaintiffs' new *respondeat*

4   *superior* theory of liability.  (*See* FAC ¶¶ 161, 165.)

5         In any event, it does not work because section 17000 does not impose a duty

6   to provide temporary shelter.  The County cannot be liable in negligence for

7   breaching a duty that does not exist.[5]

8                  **3.    Plaintiffs Fail to State a Nuisance Claim**

9         Plaintiffs fail to identify a statute giving rise to a duty by *the County* to

10  affirmatively act to prevent the alleged waste, fires and crime caused by PEH in *the*

11  *City*.  This dooms their public and private nuisance claims.  (*See* Mot. at 33-34.)

12  Indeed, Plaintiffs do not dispute this is required to state a claim.  (*See* Opp. at 23

13  ("[T]he "substantial factor" test for nuisance may be met by a *failure to act* when

14  the defendant has a duty to take a positive action to prevent or abate the

15  interference.").)

16        *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147 (1939), is

17  inapposite.  (*See* Opp. at 23-24.)  There, the Supreme Court struck down a municipal

18  ordinance that banned the distribution of leaflets on certain city land on First

19  Amendment grounds.  308 U.S. at 165.  The Supreme Court noted that while

20  municipalities "may lawfully regulate the conduct of those using the streets," such

21

22  _____

23  [5] Plaintiffs contend that, under *Brenneman v. State*, governmental entities may be
    liable under a negligence *per se* theory for breaching a statute that creates a

24  "legislatively prescribed standard of care."  (Opp. at 17 n.4 (citing 208 Cal. App. 3d
    812, 817 n.2 (1989)).)  But that case affirmed the dismissal of a complaint for failure

25  to plead the breach of *any* recognized duty.  Moreover, section 17000 confers

26  discretion on counties, and therefore *cannot* support a negligence claim.  *See Haggis*
    *v. City of Los Angeles*, 22 Cal. 4th 490, 498 (2000) ("[T]he enactment at issue

27  [must] be *obligatory*, rather than merely discretionary or permissive, in its directions
    to the public entity . . . .").

28

DEFENDANT COUNTY OF LOS ANGELES' REPLY IN SUPPORT OF
ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT

**ER 555**

1  as enacting and enforcing "traffic regulations," "the public convenience in respect of

2  cleanliness of the streets does not justify an exertion of the police power which

3  invades the free communication of information and opinion secured by the

4  Constitution." *Id.* at 160-61, 163. *Schneider* does not support Plaintiffs' argument

5  that the County owes a legal duty to remove PEH from City streets near Plaintiffs'

6  private property.

7       **C.    Plaintiffs Fail To State A Waste Claim**

8       Plaintiffs' theory of liability under section 526a is that the County negligently

9  spent taxpayer money.  (Opp. at 20.)  That does not work.  *Sundance v. Municipal*

10 *Court*, 42 Cal. 3d 1101, 1138-39 (1986) ("[T]he term 'waste' as used in section

11 526a means something more than an alleged mistake by public officials in matters

12 involving the exercise of judgment or wide discretion.  To hold otherwise would

13 invite constant harassment of city and county officers by disgruntled citizens and

14 could seriously hamper our representative form of government at the local level."

15 (alteration in original) (citation omitted)).  The waste claim must be dismissed.

16 **VI.    CONCLUSION**

17      Plaintiffs' Opposition is heavy on rhetoric and critiques, but devoid of any

18 legal basis to allow their claims against the County to proceed.  Each claim fails

19 under Plaintiffs' own admissions and well-settled law.  The County respectfully

20 requests that the Court dismiss it from this lawsuit.

21

22 DATED:  January 10, 2021          MILLER BARONDESS, LLP

23

24

25                                 By:    /s/ Mira Hashmall

26                                        MIRA HASHMALL
                                          Attorneys for Defendant
27                                        COUNTY OF LOS ANGELES

28

DEFENDANT COUNTY OF LOS ANGELES' REPLY IN SUPPORT OF
ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT

No. _____

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

In re: COUNTY OF LOS ANGELES

*Petitioner,*

v.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Western Division - Los Angeles)

*Respondent.*

LA ALLIANCE FOR HUMAN RIGHTS, et al.

*Real Parties in Interest.*

On Petition for a Writ of Mandamus in
Case No. 2:20-cv-02291 (C.D.Cal.)

# EXCERPTS OF RECORD

# VOLUME 4

**OFFICE OF COUNTY COUNSEL**
Dawyn R. Harrison (SBN 173855)
*Interim County Counsel*
Katherine M. Bowser (SBN 230626)
*Assistant County Counsel*
Ana Wai-Kwan Lai (SBN 257931)
*Senior Deputy County Counsel*
alai@counsel.lacounty.gov
500 West Temple Street, Suite 468
Los Angeles, California 90012
Telephone:  (213) 974-1830
Facsimile:   (213) 626-7446

**MILLER BARONDESS, LLP**
Louis R. Miller (SBN 54141)
* Mira Hashmall (SBN 216842)
mhashmall@millerbarondess.com
Nadia A. Sarkis (SBN 227778)
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone:  (310) 552-4400
Facsimile:   (310) 552-8400

1   RODRIGO A. CASTRO-SILVA (SBN 185251), *County Counsel*
    rcastro-silva@counsel.lacounty.gov
2   LAUREN M. BLACK (SBN 192302), *Assistant County Counsel*
3   ANA WAI-KWAN LAI (State Bar No. 257931), *Senior Deputy County Counsel*
    500 West Temple Street, Suite 468
4   Los Angeles, California 90012
    Tel.: (213) 974-1830 | Fax: (213) 626-7446
5
6   BYRON J. MCLAIN (SBN 257191)
    bmclain@foley.com
7   FOLEY & LARDNER, LLP
    555 South Flower Street, Suite 3300
8   Los Angeles, California 90071
    Tel.: (310) 972-4500 | Fax: (213) 486-0065
9
10  LOUIS R. MILLER (SBN 54141)
    smiller@millerbarondess.com
11  MIRA HASHMALL (SBN 216842)
    MILLER BARONDESS, LLP
12  1999 Avenue of the Stars, Suite 1000
    Los Angeles, California 90067
13  Tel.: (310) 552-4400 | Fax: (310) 552-8400
14
    Attorneys for Defendant
15  COUNTY OF LOS ANGELES
16
17          **UNITED STATES DISTRICT COURT**

18      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

19  LA ALLIANCE FOR HUMAN                    **CASE NO. 2:20-cv-02291 DOC-KES**
    RIGHTS, et al.,
20                                           **DEFENDANT COUNTY OF**
21              Plaintiffs,                  **LOS ANGELES' MEMORANDUM**
                                             **OF POINTS AND AUTHORITIES**
22          v.                               **IN SUPPORT OF MOTION TO**
                                             **DISMISS FIRST AMENDED**
23  CITY OF LOS ANGELES, et al.,             **COMPLAINT**
24              Defendants.                  Date:    January 24, 2022
25                                           Time:    8:30 a.m.
                                             Place:   Courtroom 9D
26
27                                           Assigned to the Hon. David O. Carter
28                                           and Magistrate Judge Karen E. Scott

*(Left margin, vertical text)* MILLER BARONDESS, LLP / ATTORNEYS AT LAW / 1999 AVENUE OF THE STARS, SUITE 1000, LOS ANGELES, CALIFORNIA 90067 / TEL: (310) 552-4400  FAX: (310) 552-8400

542539.9

Case No. 2:20-cv-02291 DOC-KES

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 558

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ........................................................................... 10

II.     FACTS ........................................................................................... 11

III.    LEGAL STANDARD .................................................................... 12

IV.     THERE IS NO JUSTICIABLE CASE OR CONTROVERSY BETWEEN PLAINTIFFS AND THE COUNTY ........................... 13

    A.      Plaintiffs' Claims Are Not Justiciable ............................... 13

V.      PLAINTIFFS' CLAIMS AGAINST THE COUNTY FAIL .......................... 15

    A.      Plaintiffs' Section 1983 Claims Fail As A Matter Of Law .................. 15

        1.      Plaintiffs Have Not Stated an Equal Protection Claim.............. 16

            (a)     Plaintiffs' Geographic Discrimination Claim Fails ......... 16

            (b)     Homelessness in Los Angeles Is Not Traceable to a Policy of Racial Discrimination by the County .............. 18

        2.      The FAC Does Not State a Procedural Due Process Claim ....... 19

        3.      Plaintiffs Have Not Alleged a Substantive Due Process Claim...... 20

            (a)     The County Did Not Put Plaintiffs in Danger ................. 20

            (b)     The Special Relationship Exception Is Inapplicable........ 23

        4.      Plaintiffs' "Municipal Liability" Claim Necessarily Fails ......... 24

    B.      Plaintiffs' Accessibility Claims Fail ..................................... 25

    C.      Plaintiffs' Remaining State Law Claims Fail As A Matter of Law...... 27

        1.      Plaintiffs Have Not Stated a Claim for Taxpayer Waste........... 27

        2.      Statutory Immunity Bars Plaintiffs' Remaining Claims .......... 28

        3.      The State Law Claims Suffer from Other Fatal Flaws.............. 30

            (a)     Plaintiffs Have Not Stated a Section 17000 Claim .......... 30

            (b)     Plaintiffs Have Not Stated a Negligence Claim.............. 31

            (c)     Plaintiffs Have Not Stated a Nuisance Claim ................. 33

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

VI.    CONCLUSION ................................................................ 34

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ER 560

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*AE ex rel. Hernandez v. County of Tulare*,
666 F.3d 631 (9th Cir. 2012)..................................................25

*Americopters, LLC v. F.A.A.*,
441 F.3d 726 (9th Cir. 2006) ................................................ 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................13, 25

*California v. Texas*,
141 S. Ct. 2104 (2021) ..............................................13, 28

*Campbell v. State of Wash. Dep't of Soc. & Health Servs.*,
671 F.3d 837 (9th Cir. 2011).........................................21, 23, 24

*Cantrell v. City of Long Beach*,
241 F.3d 674 (9th Cir. 2001)..........................................27

*City of Los Angeles v. San Pedro Boat Works*,
635 F.3d 440 (9th Cir. 2011) ..........................................34

*Collins v. City of Harker Heights, Tex.*,
503 U.S. 115 (1992) .................................................23

*Country Classic Dairies, Inc. v. State of Mont., Dep't of Commerce Milk
Control Bureau*,
847 F.2d 593 (9th Cir. 1988) ..........................................16

*County of Sacramento v. Lewis*,
523 U.S. 833 (1998) ..............................................20, 22

*Culinary Studios, Inc. v. Newsom*,
517 F. Supp. 3d 1042 (E.D. Cal. 2021).................................17

*Dalehite v. United States*,
346 U.S. 15 (1953) ..................................................32

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989).............................................20, 21, 23, 24

*Dougherty v. City of Covina*,
654 F.3d 892 (9th Cir. 2011) .......................................18, 24

*Engquist v. Or. Dep't of Agric.*,
553 U.S. 591 (2008) .................................................16

*Estate of Amos ex rel. Amos v. City of Page, Ariz.*,
257 F.3d 1086 (9th Cir. 2001).........................................23

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

*F.C.C. v. Beach Commc'ns, Inc.*,
   508 U.S. 307 (1993) ................................................................................... 17

*Herman Family Revocable Tr. v. Teddy Bear*,
   254 F.3d 802 (9th Cir. 2001) ...................................................................... 27

*Horne v. Flores*,
   557 U.S. 433 (2009) ................................................................................... 15

*In re Tourism Assessment Fee Litig.*,
   2009 WL 10185458 (S.D. Cal. Feb. 19, 2009) ........................................... 17

*Johnson v. City of Seattle*,
   474 F.3d 634 (9th Cir. 2007) ...................................................................... 21

*Jones v. City of Los Angeles*,
   444 F.3d 1118 (9th Cir. 2006),
   *vacated following settlement by* 505 F.3d 1006 (9th Cir. 2007) .................... 34

*Juliana v. United States*,
   947 F.3d 1159 (9th Cir. 2020) .................................................................... 15

*LA All. for Human Rights v. County of Los Angeles*,
   14 F.4th 947 (9th Cir. 2021) ...................................................................... 27

*Langer v. Badger Co., LLC*,
   2020 WL 7181076 (S.D. Cal. Dec. 7, 2020) ............................................. 26

*Lavan v. City of Los Angeles*,
   693 F.3d 1022 (9th Cir. 2012) .................................................................... 34

*Lawrence v. United States*,
   340 F.3d 952 (9th Cir. 2003) ...................................................................... 22

*Lee v. City of Los Angeles*,
   250 F.3d 668 (9th Cir. 2001) ................................................................ 16, 17

*Lewis v. Casey*,
   518 U.S. 343 (1996) ................................................................................... 15

*Lindsey v. Normet*,
   405 U.S. 56 (1972) ..................................................................................... 20

*Martin v. City of Boise*,
   920 F.3d 584 (9th Cir. 2019),
   *cert. denied*, 140 S. Ct. 674 (mem.) (2019) ................................................ 17

*Martinez v. City of Clovis*,
   943 F.3d 1260 (9th Cir. 2019) ........................................................ 20, 21, 22

*Mateos-Sandoval v. County of Sonoma*,
   942 F. Supp. 2d 890 (N.D. Cal. 2013) ....................................................... 25

*Monell v. Dep't of Soc. Servs. of City of N.Y.*,
   436 U.S. 658 (1978) ........................................................................ 18, 21, 24

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

*Patel v. Kent Sch. Dist.*,
    648 F.3d 965 (9th Cir. 2011) ................................................................ 21, 23, 24

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ...................................................................................... 17

*Raines v. Byrd*,
    521 U.S. 811 (1997) ...................................................................................... 14

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ...................................................................................... 15

*Roberts v. County of Riverside*,
    2020 WL 3965027 (C.D. Cal. June 5, 2020) ................................................ 18

*Schneider v. State of New Jersey, Town of Irvington*,
    308 U.S. 147 (1939) ...................................................................................... 31

*Schweiker v. Wilson*,
    450 U.S. 221 (1981) ...................................................................................... 15

*Shanks v. Dressel*,
    540 F.3d 1082 (9th Cir. 2008) ...................................................................... 19

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ........................................................................................ 14

*Terrell v. Samuel, Son & Co. (USA), Inc.*,
    2020 WL 5372107 (C.D. Cal. Apr. 23, 2020) .............................................. 19

*Town of Castle Rock, Colo. v. Gonzales*,
    545 U.S. 748 (2005) ...................................................................................... 20

*Turner v. City & County of San Francisco*,
    892 F. Supp. 2d 1188 (N.D. Cal. 2012),
    *aff'd* 617 F. App'x 674 (9th Cir. 2015) ........................................................ 27

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ...................................................................................... 19

*Wash. Envtl. Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) ...................................................................... 14

*Weinreich v. L.A. Cty. Metro. Transp. Auth.*,
    114 F.3d 976 (9th Cir. 1997) ........................................................................ 27

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ...................................................................... 12


**STATE CASES**

*Bd. of Supervisors v. Superior Court*,
    207 Cal. App. 3d 552 (1989) ........................................................................ 31

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 563

*Chiatello v. City & County of San Francisco,*
189 Cal. App. 4th 472 (2010)..................................................................28

*Citizens for Odor Nuisance Abatement v. City of San Diego,*
8 Cal. App. 5th 350 (2017).............................................................33, 34

*City of Dublin v. County of Alameda,*
14 Cal. App. 4th 264 (1993)..................................................................14

*Clinton v. Cody,*
2019 WL 2004842 (Cal. Ct. App. May 7, 2019) ...........................30

*Coshow v. City of Escondido,*
132 Cal. App. 4th 687 (2005)..................................................................28

*County of San Diego v. State,*
15 Cal. 4th 68 (1997)..................................................................30

*Cty. Sanitation Dist. No. 2 v. County of Kern,*
127 Cal. App. 4th 1544 (2005)..................................................................19

*Freeny v. City of San Buenaventura,*
216 Cal. App. 4th 1333 (2013)..................................................................29

*HFH, Ltd. v. Superior Court,*
15 Cal. 3d 508 (1975)..................................................................29

*Hunt v. Superior Court,*
21 Cal. 4th 984 (1999)..................................................................30

*Marquez v. State Dep't of Health Care Servs.,*
240 Cal. App. 4th 87 (2015)..................................................................30

*Martinez v. Pac. Bell,*
225 Cal. App. 3d 1557 (1990)..................................................................33

*Mendoza v. City of Los Angeles,*
66 Cal. App. 4th 1333 (1998)..............................................................31, 32

*Michenfelder v. City of Torrance,*
28 Cal. App. 3d 202 (1972)..................................................................29

*Peter W. v. S.F. Unified Sch. Dist.,*
60 Cal. App. 3d 814 (1976)..................................................................33

*Resolution Tr. Corp. v. Rossmoor Corp.,*
34 Cal. App. 4th 93 (1995)..................................................................33

*Reycraft v. Lee,*
177 Cal. App. 4th 1211 (2009)..................................................................26

*Richeson v. Helal,*
158 Cal. App. 4th 268 (2007)..................................................................14

542539.9          7          Case No. 2:20-cv-02291 DOC-KES
DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 564

*San Diego Gas & Elec. Co. v. Superior Court,*
    13 Cal. 4th 893 (1996)..................................................................33

*Scates v. Rydingsword,*
    229 Cal. App. 3d 1085 (1991).....................................................30

*Schmid v. City & County of San Francisco,*
    60 Cal. App. 5th 470 (2021).........................................................28

*Schooler v. State,*
    85 Cal. App. 4th 1004 (2000)..................................................29, 30

*Searcy v. Hemet Unified Sch. Dist.,*
    177 Cal. App. 3d 792 (1986)........................................................31

*Taylor v. Buff,*
    172 Cal. App. 3d 384 (1985)........................................................29

*Vanderhurst v. Tholcke,*
    113 Cal. 147 (1896).....................................................................31

*Zelig v. County of Los Angeles,*
    27 Cal. 4th 1112 (2002)...............................................................32


**FEDERAL STATUTES**

28 U.S.C. § 1367(a)...........................................................................27

29 U.S.C. § 794(a)............................................................................26

42 U.S.C. § 12132.............................................................................25

42 U.S.C. § 1983.........................................................................15, 24

Rehabilitation Act of 1973, Pub. L. No. 93-112, § 504, 87 Stat. 355 (1973)11, 25, 26


**STATE STATUTES**

Cal. Civ. Code § 3479......................................................................33

Cal. Civ. Code § 3480......................................................................33

Cal. Civ. Code § 3481......................................................................33

Cal. Civ. Code § 54(a).....................................................................25

Cal. Civ. Code § 54(c).....................................................................25

Cal. Civ. Proc. Code § 526a ...................................................11, 27, 28

Cal. Gov't Code § 814.....................................................................29

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 565

Cal. Gov't Code § 815 ........................................................................... 28

Cal. Gov't Code § 815(a) ...................................................................... 31

Cal. Gov't Code § 818.2 ....................................................................28, 29

Cal. Gov't Code § 820.2 ......................................................................... 28

Cal. Welf. & Inst. Code § 10000 ........................................................... 30

Cal. Welf. & Inst. Code § 17000 ....................................................11, 13, 30, 31

**FEDERAL RULES**

Fed. R. Civ. P. 12(b)(1) ......................................................................... 12

Fed. R. Civ. P. 12(b)(6) ......................................................................... 13

Fed. R. Civ. P. 8.............................................................................11, 26

**OTHER AUTHORITIES**

Cal. Const. art. XI, §§ 5(a)-(b), 7 .......................................................... 14

L.A., Cal., County Code tit. 1, ch. 1.12, § 1.12.010 .............................. 26

L.A., Cal., Mun. Code ch. IV, art. 1, § 41.18 ........................................ 11

L.A., Cal., Mun. Code Ch. VI, art. 2, § 62.01 ........................................ 26

U.S. Const. amend. V .............................................................................. 15

U.S. Const. amend. XIV .......................................................................... 16

U.S. Const. art. III...........................................................................passim

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 566

# I.    __INTRODUCTION__

Plaintiffs are local residents and business owners, several persons experiencing homelessness ("PEH"), and an organization formed to pursue this litigation. But nearly two years after filing suit, Plaintiffs still cannot point to any violation of law or harm traceable to the County of Los Angeles ("County"). Plaintiffs brought this action to compel the County to spend hundreds of millions of dollars pursuant to their own agenda because, at the core, Plaintiffs disagree with the County's policies and allocation of funds, and believe they know better how to address homelessness.

The County shares Plaintiffs' desire to house and shelter PEH and address the complex and critically important issue of homelessness. As laid out in the concurrently-filed Request for Judicial Notice ("RJN"), the County has dedicated billions of dollars to housing, shelter, services, and other resources for PEH. As Plaintiffs acknowledge, the County's efforts, particularly in recent years, have been laudable. In 2015, the County created its Homeless Initiative with 47 strategies and $100 million. In 2016, it declared a local emergency on homelessness and set the stage for Measure H. In 2017, Measure H was adopted, generating over $350 million annually and dramatically increasing services to PEH.

There is, of course, more work to be done. The County and its partners are doing that work. In its budget for Fiscal Year (FY) 2021-22, the County allocated $527 million for Homeless Initiative services alone. This represents a $62 million increase over FY 2020-21 and is in addition to the millions of dollars in federal and State funds the County has earmarked for homelessness services. The County is committed to addressing homelessness and strives to develop effective long-term strategies and well-proven solutions.

However, identifying and implementing those solutions is a quintessential legislative function incapable of being redressed by a federal court order dictating County policy. Plaintiffs' action is misguided and fails on numerous grounds. It

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**10**

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

1    should be dismissed.

2    **II.    FACTS**

3         In the First Amended Complaint ("FAC"), Plaintiffs allege homelessness has

4    negatively impacted Plaintiffs and their residential and commercial property near

5    Skid Row and other places in the City of Los Angeles ("City").  The FAC updates

6    statistics about homelessness generally, crime involving PEH, and responsive efforts

7    undertaken by various municipalities (FAC ¶¶ 46, 50-54, 64, 72-84, 89-93), as well

8    as expands on the history of Skid Row and alleged exclusionary zoning during

9    depression-era Los Angeles (*id.* ¶¶ 31, 39-45).[1]

10        The FAC alleges 11 claims against the County.  Compared to the Complaint,

11   the FAC: (1) revises Plaintiffs' theory of negligence to *respondeat superior* (*id.*

12   ¶ 161); (2) contends that "beds themselves are medically necessary" under

13   California Welfare & Institutions Code ("WIC") section 17000 (*id.* ¶ 172); (3) adds

14   a race-based equal protection claim on behalf of new individual Plaintiffs that

15   identify as Black and unhoused in the City (¶¶ 96(b)-(d), 96(h), 214); and (4) alleges

16   a new theory of liability based on the "special relationship" doctrine to its

17   substantive due process claim (*id.* ¶¶ 217-18).  Plaintiffs have also added the County

18   to their claims of disability discrimination under the California Disabled Persons

19   Act, Americans with Disabilities Act and Section 504 of the Rehabilitation Act,

20   although there are no new allegations against the County to support any of those

21   claims.  (*Id.* ¶¶ 194-210.)  Plaintiffs' claims for public and private nuisance,

22   taxpayer waste (California Code of Civil Procedure § 526a), and "Municipal

23   Liability" are identical to the Complaint.[2]

24   _____

25   [1] Plaintiffs purport to "incorporate[]" the Court's entire preliminary injunction order
     in the FAC, which violates Rule 8 and Article III principles.  (*See* FAC ¶ 45.)

26   Moreover, the preliminary injunction was overturned on appeal and vacated.

27   [2] The only new "law" or policy alleged is a new *City* ordinance (L.A., Cal., Mun.

28   Code ch. IV, art. 1, § 41.18) that bans sitting, lying down and sleeping on sidewalks.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

542539.9                                                    11                    Case No. 2:20-cv-02291 DOC-KES
DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 568

1       The County's commitment to combatting homelessness and serving PEH is
2  undisputed.  (*See id.* ¶ 94 (noting the County's "significant" efforts).)  The public
3  record of the County's extensive work on homelessness is set forth in the RJN.

4       Since the implementation of Measure H-funded strategies in July 2017, the
5  County's homeless services system has placed nearly 72,000 people in permanent
6  housing, of which more than 30,000 received funding through Measure H.
7  (Declaration of Mira Hashmall ("Hashmall Decl.") Ex. 15, p. 15; Ex. 14, pp. 1-2.)
8  Over the 2020-2021 fiscal year alone, 20,477 people were placed in permanent
9  housing, with 7,702 of these placements funded through Measure H.  (*Id.*, Ex. 15, p.
10  15.)  The County Board of Supervisors approved an unprecedented $527.1 million
11  in 2021-2022 for PEH.  (*Id.*, Ex. 16.)

12       Plaintiffs' criticism of the County's short-term and emergency housing
13  placements ignores the facts.  More than 92,000 PEH have been placed in interim
14  housing, with more than half of the placements funded in whole or in part by
15  Measure H.  (*Id.*, Ex. 15, p. 3; Ex. 14, pp. 1-2, 75.)  Project Roomkey, a coordinated
16  effort to house PEH in unused hotel rooms, has provided temporary shelter to over
17  8,500 people.  (*Id.*, Ex. 15, p. 3.)  The Board has allocated nearly equal funding for
18  interim and permanent housing over the next fiscal year, in addition to $89 million
19  for rapid rehousing and $50 million in street outreach and prevention.  (*Id.*, Ex. 16.)
20  Thus, Plaintiffs' allegations that the County is indifferent and not effectively
21  utilizing Measure H funds are baseless.

22  **III.   LEGAL STANDARD**

23       Standing pertains to subject-matter jurisdiction under Article III and is
24  properly challenged in a motion to dismiss under Rule 12(b)(1).  *White v. Lee*, 227
25  F.3d 1214, 1242 (9th Cir. 2000).  In a challenge to subject-matter jurisdiction, "the
26  district court is not confined by the facts contained in the four corners of the

27  _____

28  (FAC ¶¶ 33, 59.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

542539.9                                        12                    Case No. 2:20-cv-02291 DOC-KES
DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 569

1    complaint—it may consider facts and need *not* assume the truthfulness of the

2    complaint." *Americopters, LLC v. F.A.A.*, 441 F.3d 726, 732 n.4 (9th Cir. 2006).

3    A court should dismiss a claim under Rule 12(b)(6) when the pleading lacks

4    "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"

5    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

6    **IV.   THERE IS NO JUSTICIABLE CASE OR CONTROVERSY BETWEEN**

7    **PLAINTIFFS AND THE COUNTY**

8    **A.    Plaintiffs' Claims Are Not Justiciable**

9    Under Article III, each Plaintiff asserting a claim must "allege personal injury

10   fairly traceable to the defendant's allegedly unlawful conduct and likely to be

11   redressed by the requested relief." *California v. Texas*, 141 S. Ct. 2104, 2113

12   (2021) (citation omitted).  There are standing defects that pervade the FAC.

13   *First*, other than Plaintiffs' disability discrimination claims, the FAC purports

14   to state all claims against the County on behalf of undifferentiated "Plaintiffs."  But

15   not every Plaintiff has standing to pursue each claim.  Plaintiffs Smiland, Shinbane,

16   Bastian, Shaw, Rich, Leandro Suarez, Deisy Suarez, Burk, Frem, Pinsky, and

17   Tashdjian do not allege they are Black/African-American, or members of any other

18   racial group that has been discriminated against.  Nor do they allege they are

19   indigent—most are prominent real estate developers and property owners in Skid

20   Row.  Thus, they cannot assert a claim under WIC section 17000 or for race-based

21   discrimination.  Frem alleges injuries to his Mar Vista business miles from Skid

22   Row and thus has no standing to challenge policies or alleged nuisances there.  And

23   the nuisance allegations based on interference with property that "[e]ach

24   Plaintiff . . . owns, leases, occupies, or otherwise controls" necessarily excludes the

25   unhoused Plaintiffs.  (FAC ¶ 182.)  These deficiencies are evident throughout the

26   FAC—by their own admission, some number of Plaintiffs are not eligible to assert

27   the claim or have not suffered the injury alleged.

28   *Second*, Plaintiffs' alleged injuries are not traceable to the County.  The FAC

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 570

1  focuses on conduct by the City, and on court orders and settlements reached in

2  litigation to which the County was not a party.  (*See, e.g., id.* ¶¶ 36-37.)  Likewise,

3  Skid Row is within the incorporated territory of the City of Los Angeles.  The City

4  has authority over, and responsibility for, municipal affairs within its borders,

5  including the general safety and welfare of its residents.  Cal. Const. art. XI, §§ 5(a)-

6  (b), 7; *Richeson v. Helal*, 158 Cal. App. 4th 268, 277 (2007).  The County's

7  authority is limited to the *unincorporated* areas.  *City of Dublin v. County of*

8  *Alameda*, 14 Cal. App. 4th 264, 274-75 (1993).

9       The links in the causal chain are also far too tenuous to support standing.

10  *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1141-42 (9th Cir. 2013); *Simon v. E.*

11  *Ky. Welfare Rights Org.*, 426 U.S. 26, 44-46 (1976) (speculative or removed links in

12  a causal chain cannot support standing).  Plaintiffs have failed to allege a nexus

13  between their injuries and the County actions that they challenge.  *See, e.g.*, *Simon*,

14  426 U.S. at 42-44 (plaintiffs lacked standing to challenge new tax-exempt rule for

15  charitable hospitals where it was speculative that change would increase access to

16  private hospitals).  Moreover, to the extent Plaintiffs' injuries are due to increased

17  PEH in Skid Row, there are countless factors that lead to homelessness.  Plaintiffs

18  cannot allege a causal link between their harm and the County's efforts to address

19  homelessness.  The County has dedicated numerous resources to combat and

20  prevent homelessness and assist PEH.

21       *Third*, and the starkest standing defect, Plaintiffs' alleged injuries are not

22  redressable.  The gravamen of the FAC is that there is a significant homelessness

23  crisis, and Plaintiffs disagree with the County's strategy to address it.  Such

24  "injuries" are not "capable of resolution through the judicial process."  *Raines v.*

25  *Byrd*, 521 U.S. 811, 819 (1997) (citation omitted).  Plaintiffs raise generalized

26  grievances, not an injury sufficient to confer standing.

27       The Court's Article III power does not permit intrusive intervention into

28  legislative prerogatives about how to spend limited resources to serve the public.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

542539.9                                    **14**                    Case No. 2:20-cv-02291 DOC-KES
DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 571

1    *See*, *e.g.*, *Horne v. Flores*, 557 U.S. 433, 472 (2009) (regardless of how "vitally

2    important" a goal, a district court could not require state to increase funding in one

3    geographic area); *Lewis v. Casey*, 518 U.S. 343, 362 (1996) (overturning

4    "inordinately—indeed, wildly—intrusive" order mandating changes to state prisons

5    that "failed to accord adequate deference to the judgment" of local officials); *Rizzo*

6    *v. Goode*, 423 U.S. 362, 366 (1976) (court order that police department implement

7    program to handle grievances constituted an "an unwarranted intrusion by the

8    federal judiciary into the discretionary authority committed to [the city officials] by

9    state and local law to perform their official functions").

10        "It is beyond the power of an Article III court to order, design, supervise, or

11   implement [a] requested remedial plan . . . [that] would necessarily require a host of

12   complex policy decisions entrusted, for better or worse, to the wisdom and

13   discretion of the executive and legislative branches." *Juliana v. United States*, 947

14   F.3d 1159, 1171-72 (9th Cir. 2020) (court could not compel a comprehensive

15   climate-change scheme even though there was "much to recommend").

16        The law is clear.  The complex issue of homelessness is simply not capable of

17   being redressed by a federal court order that dictates County policy and mandates

18   the expenditure of hundreds of millions of dollars in a specific manner.

19   **V.    PLAINTIFFS' CLAIMS AGAINST THE COUNTY FAIL**

20        **A.    Plaintiffs' Section 1983 Claims Fail As A Matter Of Law**

21        In their Tenth, Eleventh, and Thirteenth Causes of Action, Plaintiffs allege the

22   County violated section 1983 by: (1) infringing on Plaintiffs' equal protection and

23   procedural due process rights;[3] (2) violating their substantive due process rights; and

24   (3) maintaining an "Unconstitutional Custom or Policy."  The claims are untenable.

25

26   _____

27   [3] Plaintiffs' Twelfth Cause of Action also cites the Fifth Amendment in passing, but
     the due process and equal protection components thereof only apply to the federal

28   government.  *Schweiker v. Wilson*, 450 U.S. 221, 226 n.6 (1981).

Miller Barondess, LLP
Attorneys at Law
1999 Avenue of The Stars, Suite 1000  Los Angeles, California 90067
Tel: (310) 552-4400   Fax: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

1.     **Plaintiffs Have Not Stated an Equal Protection Claim**

To state an equal protection claim, Plaintiffs must first "identify the [defendant's] classification of groups" that were purportedly treated differently. *Country Classic Dairies, Inc. v. State of Mont., Dep't of Commerce Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988). "[P]roof" that a government act has a "disproportionate impact on an identifiable group" is not enough; Plaintiffs must also plausibly show "the defendants acted with an intent or purpose to discriminate" and that the challenged classification cannot withstand the relevant level of scrutiny. *Lee v. City of Los Angeles*, 250 F.3d 668, 686-87 (9th Cir. 2001) (citation omitted).

Plaintiffs allege two equal protection violations: (1) geographic discrimination against people near "homeless encampments" (FAC ¶ 212); and (2) racial discrimination against African-Americans (*id.* ¶ 214).

    **(a)**     **Plaintiffs' Geographic Discrimination Claim Fails**

The FAC alleges that "by enforcing the law in some areas" and not in others, Defendants "have arbitrarily determined where homeless encampments may or may not be located," and disproportionately burdened "some persons, communities, and businesses over others." (FAC ¶ 212.) This "selective enforcement" theory does not support an equal protection claim.

*First*, Plaintiffs are not members of any class that was targeted by government action. Their proposed "class" is comprised of businesses and housed individuals who were incidentally affected by allegedly selective enforcement against third parties (PEH). *Lee*, 250 F.3d at 686 (discrimination must be "based upon membership in a protected class" (citation omitted)). Moreover, the Supreme Court has recognized that perfection in law enforcement is not possible, and "complaining that one has been singled out" because of the state's exercise of its "discretionary authority" in light of those practical limits does not trigger the Fourteenth Amendment. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 602-03, 604 (2008).

*Second*, because geographic location is not a protected class, Plaintiffs' claim

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400    FAX (310) 552-8400

542539.9                 16                 Case No. 2:20-cv-02291 DOC-KES
DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 573

1  is subject to rational basis review, and Plaintiffs cannot plausibly allege the City's

2  enforcement actions are not "rationally related to legitimate legislative goals." *Lee*,

3  250 F.3d at 687 (citation omitted); *e.g.*, *Culinary Studios, Inc. v. Newsom*, 517 F.

4  Supp. 3d 1042, 1053 (E.D. Cal. 2021) (rational basis test governed equal protection

5  challenge based on physical location of businesses); *In re Tourism Assessment Fee*

6  *Litig.*, 2009 WL 10185458, at *15 (S.D. Cal. Feb. 19, 2009) (discrimination against

7  people renting cars at airports versus other locations subject to rational basis test).

8      Government conduct is entitled to a "strong presumption of validity," and the

9  Court's review must be "a paradigm of judicial restraint." *F.C.C. v. Beach*

10 *Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993). "[E]qual protection is not a license

11 for courts to judge the wisdom, fairness, or logic of legislative choices," and the

12 challenged conduct, even if "improvident" in the Court's view, "must be upheld

13 against equal protection challenge if there is any reasonably conceivable state of

14 facts that could provide a rational basis." *Id.* at 313-14 (citation omitted). Here,

15 Plaintiffs explicitly link their injury to the Ninth Circuit's "sweeping" decision in

16 *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 674

17 (mem.) (2019), which precipitated a settlement by "the City" that "significantly

18 limit[s]" the City's "enforcement" of its anti-vagrancy law. (FAC ¶¶ 36, 37, 213.)

19 The City's compliance with *Martin* cannot be deemed "irrational."

20     *Third*, the FAC also fails to allege how discretionary enforcement of City

21 laws equates to an intent by *the County* to treat Plaintiffs differently than other

22 businesses and residents throughout the City. *See Lee*, 250 F.3d at 686 (the

23 defendant must have "acted with an intent or purpose to discriminate against the

24 plaintiff" (citation omitted)). "Discriminatory purpose" requires that "the

25 decisionmaker . . . selected or reaffirmed a particular course of action at least in part

26 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

27 *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Plaintiffs' alleged

28 "disproportionate burden" is insufficient to support an equal protection claim. *Id.*

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

1    *Fourth*, Plaintiffs tie their claim to the anti-vagrancy provisions of the

2    "Los Angeles Municipal Code," which is a City law.  (FAC ¶ 33.)  The County has

3    no authority to alter the City's enforcement decisions.  The *City*'s enforcement of

4    the *City*'s law is not—and cannot be—an unconstitutional *County* policy.  Thus,

5    Plaintiffs cannot show that a County policy was the "moving force" behind their

6    injuries.  *See Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

7            **(b)      Homelessness in Los Angeles Is Not Traceable to a**

8                       **Policy of Racial Discrimination by the County**

9            Plaintiffs added a race-based equal protection claim, citing the higher rate at

10   which African-Americans experience homelessness.  (FAC ¶ 214.)  The FAC

11   alleges that "[t]he City and County have repeatedly made affirmative decisions and

12   adopted policies and laws which has furthered this disparate treatment, knowing the

13   result would have a continued and intensified disparate impact."  (*Id*.)

14           Plaintiffs also added individual plaintiffs who identify as Black, but that does

15   not cure the deficiencies in the equal protection claim.  Membership in a protected

16   class, alone, does not demonstrate a violation of equal protection.  The FAC fails to

17   allege any facts showing *the County* treated Plaintiffs differently, let alone

18   intentionally *and* because of their race.  Plaintiffs do not identify any County

19   program or benefit to which they were excluded, or any County policy that classifies

20   people by race or has been applied differently based on race.  (*See Id.* ¶¶ 41, 43

21   (referencing "redlining policies" of "the City" and unnamed "federal, state, and

22   local policies . . . in post-war Los Angeles").)  To the contrary, the FAC alleges that

23   the Los Angeles Homeless Services Authority ("LAHSA," a joint agency) enrolls

24   Black clients in equal proportion to their representation among PEH.  (*Id*. ¶ 42.)

25           Plaintiffs' reliance on the Skid Row containment "policy" is also misplaced.

26   Plaintiffs lump the County together with the City, which alone is grounds for

27   dismissal.  *Roberts v. County of Riverside*, 2020 WL 3965027, at *4 (C.D. Cal.

28   June 5, 2020) (dismissing *Monell* claim where plaintiff lumped together municipal

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

1  defendants); *Terrell v. Samuel, Son & Co. (USA), Inc.*, 2020 WL 5372107, at *3

2  (C.D. Cal. Apr. 23, 2020) ("[A] lack of differentiation in the allegations against

3  multiple defendants is typically cause for dismissal in any context.").

4      Skid Row is within the City's incorporated territory and under its exclusive

5  jurisdiction. *See Cty. Sanitation Dist. No. 2 v. County of Kern*, 127 Cal. App. 4th

6  1544, 1612 (2005) (cities "are necessarily outside the jurisdiction and authority of

7  County; County's authority extends only to the unincorporated areas"). The FAC

8  asserts "the City implemented" the containment policy in the 1970s and that it has

9  since denounced it. (FAC ¶¶ 30–31, 43.) Plaintiffs suggest that "City and County

10  policies continue to concentrate [PEH]" in Skid Row, but point only to recent

11  conduct by the City, such as the "DTLA2040 plan" that was "recommended to City

12  Council." (*Id.* ¶¶ 39-40.) Plaintiffs also expressly complain throughout the FAC

13  that homelessness is *not* contained. (*E.g.*, *id.* ¶¶ 23, 39, 51, 60, 67, 204, 213.)

14      The FAC alleges that Black/African American people are disproportionately

15  at risk for homelessness. (*Id.* ¶¶ 41-44, 214.) However, disproportionate impact is

16  not enough to state an equal protection claim or show discriminatory purpose.

17  *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65

18  (1977). Plaintiffs' own allegations regarding the County, as well as statements by

19  LAHSA's executive director, indicate both an awareness and desire to "dismantle[]"

20  any "legacies of systemic racism"—the opposite of discriminatory intent. (*See, e.g.*,

21  FAC ¶ 42.) In the absence of a discriminatory County policy or custom, the County

22  cannot be the "moving force" behind any of Plaintiffs' alleged injuries.

23          **2.    The FAC Does Not State a Procedural Due Process Claim**

24      Plaintiffs assert a due process claim based on "allowing encampments in

25  some areas and not others without review, public comment, vote, or other

26  appropriate process." (FAC ¶ 213.) This claim fails because Plaintiffs have not

27  alleged any "substantive property interest entitled to constitutional protection."

28  *Shanks v. Dressel*, 540 F.3d 1082, 1091 (9th Cir. 2008). Plaintiffs had no

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552 4400   FAX: (310) 552 8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

**ER 576**

1   constitutional right to weigh in on discretionary enforcement of municipal laws, nor

2   the City's legal settlements.  *See Town of Castle Rock, Colo. v. Gonzales*, 545 U.S.

3   748, 768 (2005) ("[T]he benefit that a third party may receive from having someone

4   else arrested for a crime generally does not trigger protections under the Due

5   Process Clause.").  Moreover, the FAC addresses the City's actions.  (FAC ¶ 213.)

6   It does not allege a due process violation by *the County*.

7           **3.      Plaintiffs Have Not Alleged a Substantive Due Process Claim**

8           There is no fundamental right to housing.  *Lindsey v. Normet*, 405 U.S. 56, 74

9   (1972).  Nor do private citizens have a constitutional right to specific actions by

10  their government.  *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S.

11  189, 196-97 (1989) ("[T]he State cannot be held liable under the Clause for injuries

12  that could have been averted had it chosen to provide them.").

13          The "state-created danger" and "special relationship" doctrines are narrow

14  exceptions to the rule that the Constitution "confer[s] no affirmative right to

15  governmental aid, even where such aid may be necessary to secure life, liberty, or

16  property interests."  489 U.S. at 196.  Even if conduct falls within an exception, it is

17  actionable only if it was "so egregious, so outrageous, that it may fairly be said to

18  shock the contemporary conscience."  *County of Sacramento v. Lewis*, 523 U.S. 833,

19  847 n.8 (1998).  Plaintiffs do not and cannot allege any such conduct by the County.

20          **(a)      The County Did Not Put Plaintiffs in Danger**

21          The Due Process Clause limits state action; it is not a "guarantee of certain

22  minimal levels of safety and security."  *DeShaney*, 489 U.S. at 195.  "Simply failing

23  to prevent acts of a private party is insufficient to establish liability."  *Martinez v.*

24  *City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019).  To satisfy the state-created

25  danger exception, Plaintiffs must allege (1) "affirmative actions" that "created or

26  exposed [them] to an actual, particularized danger that [they] would not otherwise

27  have faced"; (2) their injuries were "foreseeable"; and (3) deliberate indifference "to

28  the known danger."  *Id.*

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

1    As an initial matter, the Ninth Circuit has only applied this exception to

2    conduct by individual defendants, not government policies.  *See, e.g.*, 943 F.3d at

3    1271 (law enforcement officer); *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir.

4    2011) (teacher); *Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007) (rule

5    applies when "members of the public . . . sue state actors who fail to protect them

6    from harm inflicted by third parties"); *see also Johnson*, 474 F.3d at 639 (separately

7    analyzing *Monell* claim and holding that the city "had no constitutional duty to

8    protect" plaintiffs and thus "its failure to do so . . . simply does not constitute a

9    violation of the Due Process Clause" (citation omitted)).  *DeShaney* and its progeny

10   foreclose a mandate that the government always adopt the "least dangerous" policy.

11   Even assuming, *arguendo*, that the state-created danger doctrine could apply

12   to County policies (it cannot), Plaintiffs' claim still fails.  Plaintiffs challenge two

13   "affirmative[]" policies: (1) "a strategy to contain homeless people in Skid Row,"

14   and (2) "focusing nearly exclusively on so-called permanent housing options."

15   (FAC ¶ 217.)  Neither satisfies the "affirmative act" requirement.

16   First, Plaintiffs cannot hold the County liable for *a City policy* with respect to

17   Skid Row.  (*See supra* V.A.1.(b).)  The alleged Skid Row containment "policy" also

18   pre-dates Plaintiffs' injuries by several decades.  Plaintiffs therefore cannot show

19   that any actions by the County "create[d] or expose[d] [them] to a danger which

20   [they] would not have otherwise faced." *Campbell v. State of Wash. Dep't of Soc. &*

21   *Health Servs.*, 671 F.3d 837, 845 (9th Cir. 2011) (citation omitted).

22   Second, the County's efforts to break the cycle of homelessness by

23   prioritizing permanent housing solutions for PEH, as opposed to focusing on

24   "emergency" shelters, do not remotely amount to a state-created danger.  Plaintiffs

25   disagree with the County's policy decisions and want a "quick fix."  This is not

26   enough. *See Johnson*, 474 F.3d at 641 (decision to abandon a more "effective[]"

27   plan did not constitute "affirmative conduct that placed the [plaintiffs] in danger").

28   Moreover, Plaintiffs cannot tie the County's focus on achieving the right proportion

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

1  of interim housing and permanent housing to greater danger than they would face if

2  PEH were offered only temporary, emergency shelter.  (*See, e.g.*, FAC ¶ 10

3  (alleging that there is "inherent danger involved in being unsheltered").

4      Plaintiffs' allegations of systemic racism also do not satisfy the "affirmative

5  action[]" requirement because they are missing the kind of obvious, immediate, and

6  "particularized danger" to a specific individual that gives rise to a duty of care.

7  *Martinez*, 943 F.3d at 1271.  And Plaintiffs have not alleged—and cannot allege—

8  that systemic racism by the County caused their alleged injuries, which range from

9  obstructed sidewalks to denials of insurance coverage.  *Lawrence v. United States*,

10  340 F.3d 952, 957 (9th Cir. 2003) ("[I]n each of the cases in which we have applied

11  the danger-creation exception, ultimate injury to the plaintiff was foreseeable.").

12      The County also did not act with deliberate indifference.  The County devotes

13  "significant" effort and resources to the homelessness crisis.  (FAC ¶ 94; *see also id.*

14  ¶ 83 (County budget includes half a billion dollars "dedicated to addressing

15  homelessness . . . wholly separate from, and <u>in addition</u> to, the significant

16  percentage of County funds allotted to departments to address issues of

17  homelessness, . . . not to mention funding General Relief and other myriad social

18  services").

19      At most, Plaintiffs allege the County's use of taxpayer funds has not

20  adequately addressed the homelessness crisis.  But the Supreme Court has rejected

21  this as a viable basis for a due process challenge.  *See County of Sacramento*, 523

22  U.S. at 848-49 ("[L]iability for negligently inflicted harm is categorically beneath

23  the threshold of constitutional due process.").  Plaintiffs' claim also runs afoul of the

24  "presumption that the administration of government programs is based on a rational

25  decision making process that takes account of competing forces," and "decisions

26  concerning the allocation of resources to individual programs . . . and to particular

27  aspects of those programs . . . involve a host of policy choices that must be made by

28  locally elected representatives, rather than by federal judges."  *Collins v. City of*

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

**ER 579**

1  *Harker Heights, Tex.*, 503 U.S. 115, 116 (1992).

2  **(b)     The Special Relationship Exception Is Inapplicable**

3  "The special-relationship exception does not apply when a state fails to

4  protect a person who is not in custody."  *Patel*, 648 F.3d at 972 (citing *DeShaney*,

5  489 U.S. at 195-202).  Involuntary restraint is the linchpin of this exception.  *See*

6  *Campbell*, 671 F.3d at 842 (custody must be "*against [plaintiff's] will*" (citation

7  omitted)).  The FAC does not allege a single interaction between Plaintiffs and the

8  County, let alone that they were taken into County custody or restrained in any way.

9  Plaintiffs base their claim on the alleged "restraint on personal liberty

10  exercised to draw in and contain homeless individuals in and near Skid Row."

11  (FAC ¶ 218.)  But, once again, Plaintiffs fail to allege the County's responsibility

12  for any policy of containment with respect to Skid Row.  (*See supra* V.A.1.(b).)

13  Moreover, the centralization of municipal services in Skid Row is not equivalent to

14  "custody" that gives rise to a special relationship.  The Ninth Circuit has expressly

15  rejected the notion that the government exerts "'de facto custody' . . . by exercising

16  geographic control" over the place of the plaintiff's injury.  *Estate of Amos ex rel.*

17  *Amos v. City of Page, Ariz.*, 257 F.3d 1086, 1090-91 (9th Cir. 2001).

18  Plaintiffs' unsupported allegation that the City and County have "caused

19  and/or exacerbated homelessness" (FAC ¶ 218) does not plead a custodial

20  relationship akin to "incarceration, institutionalization, or other similar restraint of

21  personal liberty" necessary to trigger the special relationship exception.  *Patel*, 648

22  F.3d at 972 (quoting *DeShaney*, 489 U.S. at 200).

23  Plaintiffs cannot base a due process violation on allegations that the County

24  "ha[s] acknowledged and recognized the role [it] has played in the crisis" and "the

25  vulnerability of unhoused individuals to both the criminal and natural elements."

26  (FAC ¶ 218; *see also id.* ¶¶ 41–42); *DeShaney*, 489 U.S. at 201 (no special

27  relationship even though state "may have been aware of the dangers that [the child]

28  faced in the free world"); *Campbell*, 671 F.3d at 843 ("In the special relationship

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

**ER 580**

1    situation, the state's affirmative duty to protect . . . does *not* arise 'from the State's

2    knowledge of the individual's predicament . . . .'" (citation omitted)).

3         Plaintiffs' allegation that the County has "assumed responsibility" for

4    providing supportive services to PEH also does not create a "special relationship."

5    (*See* FAC ¶ 218.)  *See DeShaney*, 489 U.S. at 201 ("[T]he State does not become the

6    permanent guarantor of an individual's safety by having once offered him shelter.");

7    *Campbell*, 671 F.3d at 843 ("expressions of intent to help" do not create a special

8    relationship (citation omitted)); *cf. Patel*, 648 F.3d at 973 ("[A] state-law obligation

9    does not necessarily create a duty of care under the Fourteenth Amendment.").[4]

### 4.   Plaintiffs' "Municipal Liability" Claim Necessarily Fails

11        To state a claim under section 1983, Plaintiffs must allege: (1) they were

12   deprived of a constitutional right; (2) a municipal policy; (3) the policy amounts to

13   deliberate indifference to their constitutional right; and (4) the policy was the

14   moving force behind the constitutional violation.  *Dougherty*, 654 F.3d at 900;

15   *accord Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

16   Plaintiffs' claim for "Municipal Liability for Unconstitutional Custom or Policy" is

17   redundant of their deficient Tenth and Eleventh Causes of Action.  Moreover,

18   because Plaintiffs fail to state a cognizable constitutional claim, the Thirteenth

19   Cause of Action likewise fails.  *Dougherty*, 654 F.3d at 900.

20        Indeed, the "Municipal Liability" claim contains no new allegations.  (FAC

21   ¶¶ 223-26.)  This "claim" does not challenge any policy or custom.  It merely "re-

22   allege[s] and incorporate[s] by . . . reference" Plaintiffs' earlier allegations, and

23   asserts the County and its "agents, with deliberate indifference, and conscious and

24   reckless disregard to the safety, security, and constitutional and statutory rights of

25   Plaintiffs, engaged in the unconstitutional conduct and omissions set forth above, all

26

27   [4] Plaintiffs also cannot satisfy the "deliberate indifference" element.  (*See supra*
28   V.A.3.(a).)

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

**ER 581**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   pursuant to policy, procedure, or customs held by the . . . County."  (*Id.* ¶¶ 223-24.)

2   That is not enough.

3       A plaintiff must "specify the content of the policies, customs, or practices"

4   that "gave rise to [their] Constitutional injuries."  *Mateos-Sandoval v. County of*

5   *Sonoma*, 942 F. Supp. 2d 890, 899 (N.D. Cal. 2013).  The FAC's contention that the

6   County engaged in "unconstitutional conduct and omissions set forth above, all

7   pursuant to policy, procedure, or customs" mirrors allegations the Ninth Circuit

8   deemed insufficient to survive dismissal.  *AE ex rel. Hernandez v. County of Tulare*,

9   666 F.3d 631, 637 (9th Cir. 2012) (allegation that county "'maintained or permitted

10  an official policy, custom or practice of knowingly permitting the occurrence of the

11  type of wrongs' that [plaintiff] elsewhere alleged" failed to state a claim); *Iqbal*, 556

12  U.S. at 678 (pleadings that offer "labels and conclusions" or "naked assertion[s]"

13  devoid of "further factual enhancement" must be dismissed (citation omitted)).

14      **B.**       **Plaintiffs' Accessibility Claims Fail**

15      The FAC added the County to discrimination claims under the California

16  Disabled Persons Act ("CDPA") (Count Seven), the Americans with Disabilities

17  Act ("ADA") (Count Eight), and Section 504 of the Rehabilitation Act (Count

18  Nine), all stemming from sidewalk blockages by homeless encampments that

19  allegedly impeded Plaintiffs Van Scoy and Suarez's free passage by wheelchair.

20      The CDPA creates a right to "full and free use of the streets, highways,

21  sidewalks, walkways, public buildings, medical facilities, . . . public facilities, and

22  other public places" for "[i]ndividuals with disabilities."  Cal. Civ. Code § 54(a).  A

23  plaintiff can also state a CDPA claim by pleading an ADA violation.  *Id.* § 54(c).

24  To plead an ADA claim, a plaintiff must allege (1) he was a "qualified individual

25  with a disability," (2) who was "excluded from participation in or . . . denied the

26  benefits of the services, programs, or activities of a public entity, or [otherwise]

27  subjected to discrimination," and (3) that exclusion, denial, or discrimination was

28  "by reason of such disability."  42 U.S.C. § 12132.  Section 504 of the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

542539.9                                                25                    Case No. 2:20-cv-02291 DOC-KES
DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 582

1    Rehabilitation Act similarly precludes discrimination in programs or activities

2    funded by federal grants "solely by reason of . . . disability." 29 U.S.C. § 794(a).

3       Plaintiffs added the County to their disability discrimination claims, but they

4    allege *no facts* showing sidewalk obstruction on County property. To the contrary,

5    Suarez and Van Scoy both allege they have encountered obstructions due to

6    encampments near their homes in Downtown Los Angeles. (FAC ¶¶ 133-38, 151-

7    53.) These are City sidewalks over which the County has no jurisdiction, duty, or

8    control. (L.A., Cal., Mun. Code Ch. VI, art. 2, § 62.01; L.A., Cal., County Code tit.

9    1, ch. 1.12, § 1.12.010.) Indeed, Plaintiffs attribute responsibility for the obstructed

10   sidewalks to the City. (*See* FAC ¶ 59 ("[T]he City is consistently failing to ensure

11   the minimum clearance (36 inches) under the ADA.); *id.* ¶ 60 ("In the Skid Row

12   area . . . the City agreed to allow nearly unlimited property accumulation on the

13   public sidewalks . . . ."); *id.* ¶ 196 (alleging Van Scoy and Suarez "are being denied

14   full and equal access to . . . public sidewalks, by the policies and practices of the

15   City of Los Angeles"); (*id.* ¶ 204 (alleging "discrimination and denial of access to

16   the City's rights-of-way").)

17       Plaintiffs' conclusory allegation that "[t]hroughout Los Angeles, the City and

18   County are failing to uphold their obligations to maintain clear and accessible

19   sidewalks" (*id.* ¶ 202) fails under Rule 8. *See Langer v. Badger Co., LLC*, 2020 WL

20   7181076, at *3 (S.D. Cal. Dec. 7, 2020) (dismissing ADA claim for failure to allege

21   locations of purported violations); *Reycraft v. Lee*, 177 Cal. App. 4th 1211, 1224

22   (2009) (plaintiff must actually present himself to the public place to state a CDPA

23   claim). The FAC also fails to allege the obstructed City sidewalks constitute a

24   County "program or activity receiving Federal financial assistance," as required to

25   state a Section 504 claim. 29 U.S.C. § 794(a). (*See* FAC ¶ 209 ("The City is a

26   recipient of federal financial assistance and therefore subject to Section 504.").) Nor

27   could it.

28       The federal claims also fail for the independent reason that Van Scoy and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

   **26**    Case No. 2:20-cv-02291 DOC-KES

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

1   Suarez have not alleged that they were prevented from using sidewalks "by reason

2   of" their disabilities.  By their own allegations, "blocked sidewalks harm everyone

3   who needs to use them and cannot," and the burden on Van Scoy and Suarez from

4   blocked sidewalks is felt equally by other plaintiffs with no disability.  (FAC, Part

5   III.D; *id.* ¶¶ 11, 58, 96(n).)  As the Ninth Circuit held, these allegations do not "offer

6   sufficient evidence to make the required showing for Van Scoy and Suarez to

7   succeed on [their] claim[s] at this stage."  *LA All. for Human Rights v. County of Los*

8   *Angeles*, 14 F.4th 947, 960 (9th Cir. 2021) (Plaintiffs not likely to prove denial of

9   benefits was "by reason of their disabilities" where "allegations centered on the fact

10  that blocked sidewalks '[p]ut [e]veryone at [r]isk'" (alterations in original)); *see also*

11  *Weinreich v. L.A. Cty. Metro. Transp. Auth.*, 114 F.3d 976, 978-79 (9th Cir. 1997)

12  ("[A] plaintiff proceeding under Title II of the ADA must, similar to a Section 504

13  plaintiff, prove that the exclusion from participation in the program was 'solely by

14  reason of disability.'" (alteration in original) (citation omitted)).

15      **C.      Plaintiffs' Remaining State Law Claims Fail As A Matter of Law**

16          Plaintiffs' federal claims are flawed, so the Court should decline supplemental

17  jurisdiction over the state law claims.  28 U.S.C. § 1367(a).  Indeed, because

18  Plaintiffs lack Article III standing, the Court *cannot* adjudicate the state law claims.

19  *Herman Family Revocable Tr. v. Teddy Bear*, 254 F.3d 802, 805 (9th Cir. 2001).

20          Moreover, as explained below, the state law claims are untenable.

21          **1.      Plaintiffs Have Not Stated a Claim for Taxpayer Waste**

22          Plaintiffs lack standing to assert their Sixth Cause of Action under Code of

23  Civil Procedure section 526a for "taxpayer waste."  Section 526a does not

24  automatically confer Article III standing.  *Cantrell v. City of Long Beach*, 241 F.3d

25  674, 683-84 (9th Cir. 2001); *Turner v. City & County of San Francisco*, 892 F.

26  Supp. 2d 1188, 1197 (N.D. Cal. 2012), *aff'd* 617 F. App'x 674 (9th Cir. 2015).

27  Plaintiffs' claim is based on the theory that, *if* the County had made better use of its

28  funds, it could have constructed enough homeless shelters such that, *if* the City

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**ER 584**

1  enforced its anti-vagrancy laws, Skid Row encampments would be eliminated.  This
2  tenuous, speculative sort of claim is not a legitimate "pocketbook" injury traceable
3  to the County or redressable by the Court.  *California*, 141 S. Ct. at 2113.

4       A claim "under Code of Civil Procedure section 526a will not lie where the
5  challenged governmental conduct is legal."  *Coshow v. City of Escondido*, 132 Cal.
6  App. 4th 687, 714 (2005).  The County's expenditures to help PEH are undeniably
7  legal.  And Plaintiffs' attempt to obtain sweeping injunctive relief based on their
8  belief that the City and County have "misused and wasted" taxpayer funds on
9  addressing homelessness (FAC ¶ 190) does not work.  Section 526a "should not be
10  applied to principally 'political' issues or issues involving the exercise of the
11  discretion of either the legislative or executive branches of government."  *Schmid v.*
12  *City & County of San Francisco*, 60 Cal. App. 5th 470, 495-96 (2021) (citation
13  omitted).  "A claim under [526a] does not lie to attack exercises of administrative
14  discretion and may not be employed to interfere with policymaking."  *Id.*; *Chiatello*
15  *v. City & County of San Francisco*, 189 Cal. App. 4th 472, 483 (2010) (courts
16  should not enjoin every expenditure that does not meet with a taxpayer's approval).

17       Plaintiffs' policy disagreement with the County's funding decisions as
18  compared to "alternative available measures" that they believe would be more
19  "effective in addressing the crisis" is insufficient.  (FAC ¶ 190.)  Section 526a is not
20  a tool for private citizens to dictate public policy.  *See Coshow*, 132 Cal. App. 4th at
21  714 ("[A] taxpayer is not entitled to injunctive relief . . . where the real issue is a
22  disagreement with [how] government has chosen to address a problem . . . .").

23       **2.    Statutory Immunity Bars Plaintiffs' Remaining Claims**

24       Under California law, public entities have absolute immunity unless
25  "otherwise provided by statute."  Cal. Gov't Code § 815.  Governmental immunity
26  shields public entities from claims based on "adopting or failing to adopt an
27  enactment" or "failing to enforce any law," *id.* § 818.2, and "exercise[s] of . . .
28  discretion . . ., whether or not such discretion be abused," *id.* § 820.2.  *See also*

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

**ER 585**

1   *Taylor v. Buff*, 172 Cal. App. 3d 384, 390 (1985) (budgetary and fiscal policy,

2   allocation of finite resources, and choices between competing policy objectives are

3   "discretionary" activities protected by governmental immunity); *HFH, Ltd. v.*

4   *Superior Court*, 15 Cal. 3d 508, 519 (1975) ("basic policy decisions" immune from

5   "governmental tort liability" (citation omitted)); *Michenfelder v. City of Torrance*,

6   28 Cal. App. 3d 202, 206-07 (1972) (same for law-enforcement decisions).

7       Plaintiffs' request for injunctive relief does not change the immunity analysis.

8   *See Schooler v. State*, 85 Cal. App. 4th 1004, 1013-15 (2000) (rejecting plaintiff's

9   argument that injunctive relief claims were not subject to immunity). Although

10  Government Code section 814 states that immunity does not affect "the right to

11  obtain relief other than money or damages," this provision does not "circumvent

12  either its own underlying legislative policy or that of another section in the Tort

13  Claims Act." *Id.* at 1013. The mandatory injunctive relief Plaintiffs seek would

14  impose financial burdens on the County as real as money damages, and is therefore

15  barred. *See id.* at 1014-15. Plaintiffs cannot plead around immunity.

16      Section 818.2 "recognizes that the wisdom of legislative or quasi-legislative

17  action . . . should not be subject to review" by the courts. Cal. Gov't Code § 818.2

18  (Law Revision Comm'n Comments). Homelessness is a complex problem for

19  which there is no easy fix. The County dedicates tremendous resources to

20  developing strategies to address the crisis and house PEH. And it remains

21  committed to this work, which requires that it weigh available policy options and

22  carefully allocate resources. These sorts of basic policy decisions regarding law

23  enforcement and municipal services are the crux of the immunity doctrine. *Freeny*

24  *v. City of San Buenaventura*, 216 Cal. App. 4th 1333, 1341 (2013); *see also Taylor*,

25  172 Cal. App. 3d at 390 ("A decision involving the allocation of limited funds is a

26  purely discretionary one . . . 'and thus immune from liability.'" (citation omitted)).

27      Plaintiffs ask the Court to substitute its judgment for these fundamental

28  County policy choices. But it is not the Court's role to dictate local policy and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

ER 586

1   budget priorities by usurping the County's discretionary decisions.  Immunity bars

2   Plaintiffs' claims.  *See Schooler*, 85 Cal. App. 4th at 1014 ("[A]ny 'relief' allowed

3   under section 814 cannot create duties that immunity provisions guard against.").

### 3.   The State Law Claims Suffer from Other Fatal Flaws

#### (a)   Plaintiffs Have Not Stated a Section 17000 Claim

6   The FAC alleges the County violated a "mandatory duty" under WIC

7   section 17000, which provides that a county "shall relieve and support" indigent

8   residents.  (FAC ¶¶ 167-74.)  Counties are not required to cover "all unmet needs"

9   under section 17000, *Hunt v. Superior Court*, 21 Cal. 4th 984, 1014 (1999), only to

10  provide "last resort" financial assistance and "medically necessary care," *County of*

11  *San Diego v. State*, 15 Cal. 4th 68, 92, 104-05 (1997) (citations omitted).

12  Section 17000 forecloses Plaintiffs' theory that "beds themselves are

13  medically necessary" within the meaning of section 17000.  (FAC ¶ 172.)  WIC

14  confers broad discretion on counties to determine the form and structure of relief

15  they provide.  *Scates v. Rydingsword*, 229 Cal. App. 3d 1085, 1089 (1991).  The

16  statute does not mandate particular forms of assistance, such as provision of beds.[5]

17  Plaintiffs cite to section 10000 (FAC ¶ 169), which is a "general statement of

18  policy" that "aid shall be administered and services provided promptly and

19  humanely." *Marquez v. State Dep't of Health Care Servs*., 240 Cal. App. 4th 87,

20  120 (2015) (citation omitted).  This provision "does not set forth any specific duty

21  or course of conduct an agency must take, but leaves to the agency's discretion how

22  to pursue the policy goal." *Id.*  Accordingly, while the County is working hard to

23  shelter PEH, neither section 17000 nor section 10000 creates a duty to provide beds.

24  Plaintiffs have not alleged that the County failed to provide any other required

25  services.  (FAC ¶¶ 88, 93-94 (acknowledging the County provides significant health

---

[5] A state appellate court recently rejected the argument that counties have a mandatory duty under section 17000 to provide shelter for every homeless person. *See Clinton v. Cody*, 2019 WL 2004842, at *9 (Cal. Ct. App. May 7, 2019).

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

**ER 587**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  services and aid to PEH).)  Nor have Plaintiffs alleged that an individual Plaintiff is

2  indigent and was deprived of medically necessary care or general assistance.  Thus,

3  Plaintiffs cannot plead a violation of section 17000, which only applies when an

4  indigent person is "not supported and relieved by their relatives or friends, by their

5  own means, or by state hospitals or other state or private institutions."

6      Plaintiffs' allegation that "the County has failed to meet its statutory

7  obligation to provide appropriate mental health services" also fails.  (*See* FAC ¶ 89.)

8  The FAC points only to third-party research, not any mandatory statutory duty.  (*See*

9  *id.*)  The County's duty to provide mental health services under section 17000 is

10  limited to services required by California's Short-Doyle law, and Plaintiffs do not

11  allege they were qualified for and denied such services.  *Bd. of Supervisors v.*

12  *Superior Court*, 207 Cal. App. 3d 552, 561-62 (1989).

13          **(b)   Plaintiffs Have Not Stated a Negligence Claim**

14      To state a claim for negligence, Plaintiffs must allege (1) "a legal duty to use

15  reasonable care," (2) breach, (3) "but for" and proximate cause, and (4) "injury."

16  *Mendoza v. City of Los Angeles*, 66 Cal. App. 4th 1333, 1339, 1342 (1998).  As a

17  public entity, the County's liability must be based on a statute giving rise to a

18  specific duty, and the statute "claimed to establish the duty must at the very least be

19  identified" in the pleading.  *Searcy v. Hemet Unified Sch. Dist.*, 177 Cal. App. 3d

20  792, 802 (1986); Cal. Gov't Code § 815(a).

21      The FAC alleges the County has an obligation to "control, maintain, and keep

22  safe and clean the public and public-right-of-way areas," "make and enforce" health

23  and safety laws, and "address[] and alleviate[]" harmful or offensive "conditions."

24  (*See* FAC ¶ 161.)  But Plaintiffs identify no statute to support these allegations.[6]

25  _____

26  [6] Plaintiffs' cited authority is inapposite.  (*See* FAC ¶ 162 citing *Vanderhurst v.*

27  *Tholcke*, 113 Cal. 147, 152 (1896), and *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 160-61 (1939).)  *Vanderhurst* and *Schneider* pre-date the

28  Government Code and dealt only with the power of particular municipalities—

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

1   Plaintiffs contend the County was "obligat[ed] . . . to implement" Measure H (*id.*

2   ¶ 164), but Measure H merely authorized the County to raise the sales tax and

3   earmark revenue for supportive services for PEH (*id*. ¶ 83).  Even if Measure H

4   could be interpreted as imposing a "duty of care" (it cannot), the FAC admits the

5   County uses "hundreds of millions of dollars" in Measure H funds to aid PEH.  (*Id.*

6   ¶ 84.)  Plaintiffs' criticism about Measure H programs is not actionable.

7        The County is committed to public transparency and accountability regarding

8   the use of Measure H funding.  (Hashmall Decl. Ex. 14, p. 6.)  Plaintiffs cannot

9   impose tort liability based on their policy disagreements.  *See Zelig v. County of*

10  *Los Angeles*, 27 Cal. 4th 1112, 1132 (2002) ("[P]ublic entities—and their

11  employees—generally are not liable for failure to protect individuals against

12  crime."); *Dalehite v. United States*, 346 U.S. 15, 26-38 (1953) (government's

13  allocation of limited resources is an exercise of discretion not subject to challenge

14  by a negligence suit).  Further, Plaintiffs have not pleaded, and cannot plead, a

15  causal relationship between their alleged injuries and any statutory duty.  *See*

16  *Mendoza*, 66 Cal. App. 4th at 1333 ("[P]rivate act[s] br[eak] the chain of proximate

17  cause.").

18       Plaintiffs' attempt to circumvent these deficiencies by characterizing their

19  theory of liability as *respondeat superior* goes nowhere.  (FAC ¶ 161.)  The FAC

20  does not allege any conduct by an agent or employee, let alone a duty breached by

21  such conduct or a causal relationship between that breach and Plaintiffs' claimed

22  injuries.  (*See id.* (alleging "Defendants, by and through their agents and employees"

23  have failed to maintain undifferentiated "parks, sidewalks, streets, public buildings,

24  and certain undeveloped areas such as alongside freeways and other transportation

25  routes").)  A public entity may be held vicariously liable under *respondeat superior*

26

27  notably, not the County—to exercise control on municipal streets.  Further,

28  Plaintiffs attribute "the duty to keep sidewalks open" to the *City* alone.  (*Id.*)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

**ER 589**

1    principles "only if it is established that the employee would be personally liable for

2    the conduct upon some 'acceptable theory of liability.'"  *Peter W. v. S.F. Unified*

3    *Sch. Dist.*, 60 Cal. App. 3d 814, 819 (1976) (citation omitted).  Plaintiffs allege no

4    such conduct.  *Id.* (*respondeat superior* does not "relieve [plaintiffs] of the pleading

5    requirements [they] must meet for this purpose").

6              **(c)      Plaintiffs Have Not Stated a Nuisance Claim**

7              A nuisance is a non-trespassory invasion of a person's interest in the private

8    use and enjoyment of land.  Cal. Civ. Code § 3479; *San Diego Gas & Elec. Co. v.*

9    *Superior Court*, 13 Cal. 4th 893, 937 (1996).  A public nuisance (Count Three) is

10   "one which affects at the same time an entire community or neighborhood, or any

11   considerable number of persons."  Cal. Civ. Code § 3480.  A private nuisance

12   (Count Four) is any nuisance not otherwise defined as a public nuisance.  *Id.* § 3481.

13             Causation is an essential element of public and private nuisance claims.

14   "[T]he critical question is *whether the defendant created or assisted in the creation*

15   *of the nuisance*.'"  *See Citizens for Odor Nuisance Abatement v. City of San Diego*,

16   8 Cal. App. 5th 350, 359 (2017) (citation omitted); *Resolution Tr. Corp. v.*

17   *Rossmoor Corp.*, 34 Cal. App. 4th 93, 99 (1995) (defendant must be an "active

18   participant" in the nuisance).  Causation requires (a) an act, or (b) a failure to act

19   under circumstances in which the actor is under a duty to take positive action to

20   prevent or abate the nuisance.  *Citizens for Odor*, 8 Cal. App. 5th at 359.

21             The FAC alleges that third-party PEH are breaking the law and that their

22   waste, trash, and encampments are harming Plaintiffs' "property values," as well as

23   "health and welfare."  (FAC ¶¶ 177, 179.)  But the County did not create the alleged

24   nuisance—the waste, fires, or crime.  Nuisance liability cannot extend "to damage

25   suffered as a proximate result of the independent intervening acts of others."

26   *Martinez v. Pac. Bell*, 225 Cal. App. 3d 1557, 1565 (1990).

27             Plaintiffs point to alleged nuisances caused by PEH entirely within the

28   incorporated boundaries of the City (not County jurisdiction).  Moreover, Plaintiffs

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

1  admit the County has made significant efforts to abate the issues where it has

2  authority to do so.  (FAC ¶¶ 88, 93-94.)  *See Citizens for Odor*, 8 Cal. App. 5th at

3  364 (rejecting nuisance claim against city relating to odors from animal droppings

4  because the fact that city "might have considered alternative approaches did not"

5  show "the City caused the alleged nuisance by *failing to act*").

6       Nuisance law is limited by inherent principles of reasonableness.  *See City of*

7  *Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 452 (9th Cir. 2011) (nuisance

8  must be substantial and unreasonable).  Plaintiffs' theory that PEH are themselves

9  an actionable, area-wide nuisance is baseless.  The Ninth Circuit has repeatedly

10 affirmed that PEH have rights to exist in the streets with their personal property.

11 *E.g.*, *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1032 (9th Cir. 2012); *Jones v.*

12 *City of Los Angeles,* 444 F.3d 1118, 1132-37 (9th Cir. 2006), *vacated following*

13 *settlement by* 505 F.3d 1006 (9th Cir. 2007).

14 **VI.   CONCLUSION**

15       For the reasons set forth above, the County respectfully requests that the

16 Court grant the Motion in its entirety.

17

18 DATED:  December 3, 2021          MILLER BARONDESS, LLP

19

20

21                                   By:    /s/ Mira Hashmall

22                                        MIRA HASHMALL
                                          Attorneys for Defendant
23                                        COUNTY OF LOS ANGELES

24

25

26

27

28

DEFENDANT COUNTY OF LOS ANGELES' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

**ER 591**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

# Applications/Ex Parte Applications/Motions/Petitions/Requests

2:20-cv-02291-DOC-KES LA Alliance for Human Rights et al v. City of Los Angeles et al

ACCO,(KESx),DISCOVERY,MANADR,RELATED-G,SM

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**

The following transaction was entered by Hashmall, Jennifer on 12/3/2021 at 6:35 PM PST and filed on 12/3/2021

| | |
|---|---|
| **Case Name:** | LA Alliance for Human Rights et al v. City of Los Angeles et al |
| **Case Number:** | 2:20-cv-02291-DOC-KES |
| **Filer:** | County of Los Angeles |
| **Document Number:** | 370 |

**Docket Text:**
**NOTICE OF MOTION AND MOTION to Dismiss First Amended Complaint filed by Defendant County of Los Angeles. Motion set for hearing on 1/24/2022 at 08:30 AM before Judge David O. Carter. (Attachments: # (1) Memorandum of Points and Authorities, # (2) Request for Judicial Notice, # (3) Notice of Lodging [Proposed] Order Granting Request for Judicial Notice, # (4) Notice of Lodging [Proposed] Order Granting Motion to Dismiss) (Hashmall, Jennifer)**

**2:20-cv-02291-DOC-KES Notice has been electronically mailed to:**

Amie S Park     apark@counsel.lacounty.gov, egomez@counsel.lacounty.gov

Ana Wai-Kwan Lai     alai@counsel.lacounty.gov

Arlene Nancy Hoang     arlene.hoang@lacity.org, evelyn.rodriguez@lacity.org

Bradley Joseph Hamburger     bhamburger@gibsondunn.com

Brandon D Young     bdyoung@manatt.com, lgarcete@manatt.com

Brooke Alyson Weitzman     bweitzman@eldrcenter.org, murias@eldrcenter.org

Byron J McLain     bmclain@foley.com, byron-mclain-5906@ecf.pacerpro.com, vhong@foley.com

Carol A. Sobel     carolsobel@aol.com, carolsobellaw@gmail.com

Catherine Elizabeth Sweetser     csweetser@sshhzlaw.com, cgallegos@sshhzlaw.com, prosales@sshhzlaw.com

Christian M Contreras     cc@thechristianfirm.com, ccontreras@ghclegal.com

Elizabeth Anne Mitchell     emitchell@spertuslaw.com, sluecf@spertuslaw.com

Emily A Rodriguez-Sanchirico     esanchirico@millerbarondess.com, jbain@millerbarondess.com

Jeffrey Lewis     jeff@jefflewislaw.com, jason@jefflewislaw.com

Jennifer Mira Hashmall    mhashmall@millerbarondess.com, aransom@millerbarondess.com, docket@millerbarondess.com

Jessica Mariani    jessica.mariani@lacity.org, ava.smith@lacity.org

Lauren M Black    lblack@counsel.lacounty.gov, lauren_black@yahoo.com

Louis R. Miller    smiller@millerbarondess.com, docket@millerbarondess.com, oashcroft@millerbarondess.com

Manuel A. Abascal    manny.abascal@lw.com, manuel-abascal-7112@ecf.pacerpro.com

Mark S Ravis    mravis99@gmail.com

Matthew Donald Umhofer    matthew@spertuslaw.com, docketing@spertuslaw.com, mumhofer@spertuslaw.com, sluecf@spertuslaw.com

Paul L Hoffman    hoffpaul@aol.com, jwashington@sshhzlaw.com, sshhwilliam@gmail.com

Ryan Salsig    ryan.salsig@lacity.org, evelyn.rodriguez@lacity.org

Scott D Marcus    scott.marcus@lacity.org, guadalupe.lopez@lacity.org, irene.m.perez@lacity.org

Sean Christopher Rotstan    sean@jefflewislaw.com

Shayla Renee Myers    smyers@lafla.org, amcnair@lafla.org, bschultz@lafla.org, dgonzalez@lafla.org, rmoreno@lafla.org, sbodden@lafla.org

Theano Evangelis Kapur    tevangelis@gibsondunn.com, , cperez@gibsondunn.com

Weston C Rowland    rowland.weston@gmail.com

William R Wise , Jr    bwise@eldrcenter.org

**2:20-cv-02291-DOC-KES Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

David H Martin
Law Office of Mark Ravis and Associates
26565 West Agoura Raod Suite 200
Calabasas, CA 91302

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\Notice of Motion and Motion to Dismiss.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=12/3/2021] [FileNumber=33059241-0
] [acbb53fcf8eef4ecc434bcde9e6fedb726f440d517b7432a426c5852987d23f050b
95aec294fd5e96b7f3690a9b0d01753ec9aefa212caaec0e23affcf94f7f4]]
**Document description:** Memorandum of Points and Authorities
**Original filename:**C:\fakepath\Memorandum of Points and Authorities.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=12/3/2021] [FileNumber=33059241-1

**ER 593**

] [b8d0adb5983395ad3fb2e4f9e335ce41ab76a98e8f1325dc4360b7af5c73aa68a85
b4d0a81a4d679b43f4ff046927356f7e941d093f40b28ab960a9173bac917]]

**Document description:** Request for Judicial Notice
**Original filename:** C:\fakepath\Request for Judicial Notice.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=12/3/2021] [FileNumber=33059241-2
] [09b703422a1491b91a1a986c3e1f262eaa551c34259e791eea42126bde6dfda17e4
fef7d8227d0a699532d90e6502aafdf853d8fb59e23ec1f94da2ba5234f06]]

**Document description:** Notice of Lodging [Proposed] Order Granting Request for Judicial Notice
**Original filename:** C:\fakepath\N otice of Lodging [Proposed] Order Granting Request for Judicial Notice.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=12/3/2021] [FileNumber=33059241-3
] [19e2950f1018d4462dc068d00ba2d6654c97aa0e87b85552a96eff4c4f1b7e5ce75
0f263dd40e9f85dc1d2c04c1abce0bc3439ca87d0e9d7ada36d5e4bbc4eba]]

**Document description:** Notice of Lodging [Proposed] Order Granting Motion to Dismiss
**Original filename:** C:\fakepath\Notice of Lodging [Proposed] Order Granting Motion to Dismiss.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=12/3/2021] [FileNumber=33059241-4
] [9449a00abd04fb20b756f391b9029af607887b9a6fb0008bbfbbbfcb9559c5ce7ce
1fe2210fab5403959971d778682b449266223ef37459c2fe0fbf8dded7d9c]]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC (KESx)                    Date: April 26, 2021

Title: **LA ALLIANCE FOR HUMAN RIGHTS, et al v. CITY OF LOS ANGELES, et al**

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

| Deborah Lewman | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

---

**PROCEEDINGS (IN CHAMBERS):   AMENDED  ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' EX PARTE APPLICATIONS TO STAY [282, 284]**

   Before the Court is Defendant County's Ex Parte Application to Stay (Dkt. 282) and Defendant City's Ex Parte Application to Stay (Dkt. 284). The Court finds the matter appropriate for resolution without oral argument. Fed. R. Civ. P. 78; C.D. Cal. R. 7–15. Having reviewed the moving papers and considered the parties' arguments, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion.

   The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                        Initials of Deputy Clerk djl
CIVIL-GEN

## TABLE OF CONTENTS

I.     PROCEDURAL HISTORY ................................................................................ 2

II.    LEGAL STANDARD ..................................................................................... 2

III.   STANDING .................................................................................................. 2

IV.   LIKELIHOOD OF SUCCESS ON THE MERITS ............................................... 6

   A.  IRREPARABLE HARM TO PLAINTIFFS ..................................................... 6

   B.  PUBLIC INTEREST – PRELIMINARY INJUNCTION...................................... 6

   C.  PRELIMINARY INJUNCTION AS A MATTER OF LAW .................................. 7

      i.   State-Created Danger Doctrine ..................................................... 7

      ii.  Substantive Due Process ................................................................ 7

      iii. Brown v. Board of Education ......................................................... 8

      iv. Cal. Welf. & Inst. Code § 17000 ................................................. 8

V.    IRREPARABLE HARM TO DEFENDANTS ..................................................... 8

VI.   ISSUANCE OF STAY WILL SUBSTANTIALLY INJURE INTERESTED PARTIES ............................ 9

VII.  PUBLIC INTEREST – STAY ......................................................................... 9

VIII. PROVISIONS OF THE STAY ..................................................................... 10

   A.  SKID ROW ............................................................................................ 10

   B.  ACCOUNTABILITY OF FUNDS DEDICATED TO HOMELESSNESS ................. 11

   C.  AVAILABILITY OF CITY PROPERTY ....................................................... 13

      i.   Cessation of Transfer of Property ................................................. 13

      ii.  Creation of Report on Property ..................................................... 13

## I.       Procedural History

On April 20, 2021, the Court issued a preliminary injunction. Dkt. 277. Defendant County appealed this order on April 21, 2021. Dkt. 278. On April 23, 2021, Defendant City appealed this order, as did Intervenor Cangress. Dkt. 281; Dkt. 283. Also on April 23, 2021, Defendants County and City filed separate Ex Parte Applications to Stay. Dkts. 282, 284. Plaintiffs opposed the ex parte applications on April 24, 2021. Dkt. 285.

## II.      Legal Standard

Supreme Court precedent has "distilled" the legal principles for issuing stays pending appeal into consideration of four factors: (1) whether the stay applicant has made a strong showing of likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776, (1987)). "The first two factors of the traditional standard are the most critical." Id. In applying these factors, the Ninth Circuit employs a "sliding scale" approach. The factors are balanced such that a stronger showing of one element may offset a weaker showing of another. *Leiva-Perez v. Holder*, 640 F.3d 962, 964-66 (9th Cir. 2011). In other words, "the required degree of irreparable harm increases as the probability of success decreases." *Nat. Res. Def. Council, Inc. v. Winter*, 502 F.3d 859, 862 (9th Cir. 2007); *see Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) ("We first consider the government's showing on irreparable harm, then discuss the likelihood of success on the merits under the sliding scale approach").

## III.     Standing

Defendants assert that the Plaintiffs lack standing because they cannot allege injuries to third parties—homeless persons on Skid Row—to support Article III standing for themselves. Dkt. 282 at 9–10; Dkt. 284 at 14. In response, Plaintiffs' point to their Declarations, Dkt. 265-2, that show that there is a plethora of homeless persons amongst the Plaintiffs. Dkt. 285 at 3.

Standing is an essential and unchanging part of the case-or-controversy requirement of Article III. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546–47 (2016), *as rev'd* (May 24, 2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992))

Because "[t]he party invoking federal jurisdiction bears the burden of establishing these elements," they are "an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Accordingly, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.

Defendants argue that Plaintiffs lack standing to bring the preliminary injunction in question. Dkt. 265; Dkt. 284 at 14. because injury to homeless persons is the basis for the preliminary injunction order, Dkt. 277, and "Plaintiffs are not [persons suffering homelessness]." Dkt. 282 at 10. As stated in the Declarations attached to the Plaintiffs' motion for preliminary injunction, however, there are numerous homeless persons amongst the Plaintiffs. *See, e.g.* Dkt 265-2, Declarations of Mary Brannon, Maria Diaz, Gregory Gibson, Javier Gonzales, Ann Jackson, Wenzial Jarrell, and Luis Zaldivar, all of whom are members of LA Alliance and are currently experiencing homelessness in and around Skid Row. The following examples, drawn from their declarations, demonstrate that Plaintiffs have carried their burden to show standing at this stage of the litigation.

"I did not go to war for our country to be afforded such sorry circumstances for self-sufficiency," states Wenzial Jarrell, a veteran who served for years in the Air Force before being injured in combat, a plaintiff to this suit, and a homeless person. *Id.* Jarrell suffers from post-traumatic stress disorder from years of serving in war, which has made it difficult for him to survive on the streets. *Id.* Since moving to Skid Row, however, Jarrell has realized that "service providers offer little to no substantive support for the people living in Skid Row." *Id.* Jarrell mentions how he found a 19-year-old girl who was blind, walking the streets of Skid Row; "[i]t was clear that she would be unable to survive there by herself." *Id.* He brought her to the county

3

services worker who told him that there was nothing they could do for the girl. *Id.* Jarrell prides himself on helping countless others to "get out of the black hole that is Skid Row." *Id.* Because there is nothing worse than "getting stuck in the system of Skid Row and finding you cannot escape." *Id.* Unfortunately, he himself has not been able to escape the system. Concluding his declaration, Jarrell states that he "would jump at [a] chance" for stable housing, a chance for life. *Id.* "The world doesn't know how bad it really is to live on Skid Row. I know I am more likely to die because I live on Skid Row. It is a desperate situation." *Id.*

"L.A.'s public services are not just inefficient—they are killing us," says Gregory Gibson, a plaintiff to this suit who has suffered homelessness for the past 15 years. *Id.*  While dealing with the difficulties of living on the street, he says, "we fight for necessities like identification and housing." "Drug use is rampant because it is an escape from reality," Gibson continues. "I never did drugs before becoming homeless, but now I do them just to deal with the pain of living on the street." *Id.* Gibson laments that "[t]ackling issues through public services is so difficult that, in the fixing one problem, ten more pop up." *Id.* Gibson concludes his statement with a cry for help. *Id.* "I want to break this vicious cycle of living on the streets, fighting for survival;" "I need help." *Id.*

"I have lived on Skid Row for five years" and "have seen a number of young women harassed, attacked, raped, and ultimately succumb to drug addiction due to the conditions of Skid Row," states Maria Diaz, a homeless woman and a plaintiff to this suit. *Id.* Diaz states that it is women like her who suffer the most on Skid Row. "Harassment of women in Skid row is a certainty, and they need to learn fast how to deal with the constant onslaught of issues they will face." *Id.* Furthermore, "[p]eople are always trying to sell drugs, steal belongings, or just hassle those trying to make it through this troubling time." *Id.*  She wishes that resources were "more accessible to those living on the street because [she believes] the first step in escaping homelessness is finding a safe and stable place to rebuild your life." *Id.*

"I . . . experienced much violence and fear after moving here," states Mary Brannon, a plaintiff to this suit and a sixty-year-old woman suffering homelessness in Skid Row. *Id.* "I am scared," Brannon continues; "every day on the streets hurts more." When she reached out to authorities for help, Brannon was told that she "must wait six months to be assigned a caseworker," and "not a single City or County employee offered [her] a room through Project Roomkey." *Id.*

"Originally, I was sent to Skid Row by a judge to participate in a program . . . but the decision ended up putting me in the epicenter of the homeless crisis," asserts Ann Jackson, a plaintiff to this suit and a woman who has suffered homelessness on Skid Row for the past eight years. *Id.* "The stress of my life in Skid Row caused me to have a stroke 18 months ago," she continues. *Id.* Because of this stroke and her case manager's unhelpfulness, Jackson states that she has "not been able to obtain the section 8 housing that [she is] entitled to." *Id.* Jackson prays to the Court for relief, stating, "I desperately want to change and to get housing away from Skid Row where I can put my life back together and recover from my stroke in safety." *Id.*

"The circumstances of Skid Row actively harm people's chances of escaping a life of homelessness," states Javier Gonzales, a plaintiff to this suit and a homeless person. *Id.* "Robberies and assaults are a part of daily life," he asserts. *Id.* Gonzales is forced to take amphetamines to stay awake "during the most dangerous hours." *Id.* The lack of services to house himself or maintain his condition, Gibson continues, "has essentially trapped [him] at Skid Row." *Id.* In his prayer for relief, Gibson says that "what those on Skid Row need isn't sympathy, pandering, or handouts, but access to the resources to get ourselves back on our feet." *Id.*

"I have been living on Skid Row for approximately the last 25 years," states Luis Zaldivar, a plaintiff to this suit and a homeless person. *Id.* "I have seen murders, arson, gang activity, and violent attacks," Zaldivar continues. *Id.* "The crime seems to be getting worse, and there are more people than I have ever seen living on the street. I worry that the longer I stay, the more likely I am to become a victim." *Id.*

These are a few of the numerous realities laid out in Plaintiffs' declarations. *See generally id.* In Plaintiffs' own words, Plaintiffs "are current and formerly unhoused individuals, residents, community members, businesses, non-profit, and service providers all coming together to fight against what has become the accepted standard of death and despair in Los Angeles." Dkt. 285 at 3; Dkt. 265-2. Plaintiffs therefore have shown that they have suffered injury-in-fact. And as laid out in detail in the Court's preliminary injunction order (Dkt. 277) Plaintiffs' injuries are fairly traceable to the challenged conduct of the City and County, and are likely to be redressed by a favorable judicial decision.

Plaintiffs have fulfilled their burden of establishing standing.

## IV.    Likelihood of Success on the Merits

### A.  Irreparable Harm to Plaintiffs

The Defendants argue that the Plaintiffs cannot show irreparable harm, and therefore cannot satisfy the requirements of a preliminary injunction. Dkt. 282 at 20.

An injunction requires a showing that irreparable harm will likely result without the injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (finding that plaintiffs must show that "irreparable injury is likely in the absence of an injunction"). Defendants argue that the irreparable harm must be to the plaintiffs and not to third parties, i.e. homeless persons. Dkt. 282 at 20–21. The Plaintiffs, however, do consist of homeless persons. As stated in the Declarations attached to the Plaintiffs' motion for preliminary injunction, there are numerous homeless persons amongst the Plaintiffs. *See, e.g.* Dkt 265-2, Declarations of Mary Brannon, Maria Diaz, Gregory Gibson, Javier Gonzales, Ann Jackson, Wenzial Jarrell, and Luis Zaldivar, all of whom are members of LA Alliance and are currently experiencing homelessness in and around Skid Row.

And there is clear irreparable harm to these Plaintiffs—"[b]y the time briefing is finished in Defendants' interlocutory appeal, 385 people will have perished." Dkt. 285 at 2. There can be no harm more grave or irreparable than the loss of life, and with each passing day, five homeless persons die in Skid Row and the streets of Los Angeles.

### B.  Public Interest - Preliminary Injunction

Similarly, Defendants argue that the Plaintiffs have made no showing of public interest, to meet the standard for a preliminary injunction. As mentioned in the Court's preliminary injunction order, however, the "public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution," and the constitutional rights of homeless persons—who are a part of the Plaintiffs—are being violated. Dkt. 277 at 93.

ER 601

### C.  Preliminary Injunction as a Matter of Law

#### i.  State-Created Danger Doctrine

The Defendants argue that a lengthy history of structural racism defined by deliberately discriminatory state acts like redlining and eminent domain does not constitute a state-created danger. Dkt. 284 at 16–17 . As the Court stated in its preliminary injunction, "[e]ven if this Court ignored the entire history of conscious decisions by the government that led to the creation of Skid Row and the rampant depravity before us today, there is still incontrovertible evidence that the danger of living on the streets . . . is state-made." Dkt. 277 at 73. The Court went on to say that "pursuing housing at the expense of shelter, suspending HHH deadlines (and thereby evading accountability), and ramping down Project Roomkey despite the availability of federal funds to support it were all political choices that created this crisis." *Id*. It is clear that the Court did not base its state-created danger doctrine decision solely, or even primarily, on a history of structural racism.

#### ii.  Substantive Due Process

Defendants assert that the right to family integrity is reviewed under rational basis review. The Supreme Court has held that "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."[1] Under substantive due process, courts review intrusions on fundamental rights under strict scrutiny. Many family-related issues have been considered fundamental rights. *See Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1928); *Loving v. Virginia*, 388 U.S. 1, 12 (1967). Furthermore, there is a constitutional right to live together with one's family, and this right is not limited to the nuclear family. "If a State were to attempt to force the breakup of a natural family . . . I should have little doubt that the State would have intruded impermissibly on 'the private realm of family life which the state cannot enter.'" *Smith v. Organization of Foster Families*, 431 U.S. 816, 862–63 (1977) (J. Stewart, concurring). Given the numerous opinions finding that rights related to the family should be afforded strict scrutiny

---

[1] *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality).

as fundamental rights, the Court disagrees with Defendants' argument that they should instead be afforded mere rational basis review.

### iii.  Brown v. Board of Education

Defendants argue that the Court's reference to *Brown* is improper and that the Court itself, previously, recognized this. Dkt. 282 at 18. Defendants quote the Court stating that the constitutional violations in *Brown* were of a different sort. *Id.* This, however, is only a part of the Court's statement. To be precise the Court stated that *Brown* represented constitutional violations of a different sort, but "increasingly it is obvious that the impact of homelessness on communities of color is so immense that to call it other than intentional is to ask the Court to blind itself to apparent reality." Dkt. 205 at 4.

### iv.  Cal. Welf. & Inst. Code § 17000

Defendants argue that they are not liable under Cal. Welf & Inst. Code § 17000 because § 17000 imposes a discretionary rather than a mandatory duty of care. As stated in its preliminary injunction, the Court agrees with Defendants that Defendants have discretion in discharging their obligations under § 17000. Dkt. 277 at 87. However, the Defendants' arguments fail in that that discretion is not limitless. There are certain minimum standards that Defendants must meet in order to meet the burden imposed by § 17000. To hold otherwise and to say that Defendants have absolute freedom to act, or not act, as they see fit in meeting the needs of indigent constituents would be to render §17000 moot. The Court declines to do so.

### V.      Irreparable Harm to Defendants

Defendants argue that the preliminary injunction harms the Defendants irreparably because it interferes with government function and imposes burdens. Dkt. 282 at 22; Dkt 284 at 20–21. The Court, however, has not interfered with any government function. Rather, the Court has set up goal posts for the purpose of accountability. Accountability measures are not irreparable harms.

## VI.     Issuance of Stay Will Substantially Injure Interested Parties

Defendants argue that the issuance of a stay would not injure any interested parties. Dkt. 282 at 23–24; Dkt. 284 at 21–22. Not so. As previously mentioned, there are numerous homeless persons amongst the Plaintiffs. The Court has previously found that five homeless Angelenos die on our streets each day. Dkt. 241-1 at 1. This is not to mention the litany of health issues caused by the forced proximity of Homeless to pollution. *See* Dkt. 103-1 at 3. Therefore, the Court finds that at the very least, some parties will be harmed by the issuance of a stay.

## VII.    Public Interest - Stay

Similarly, the Defendants argue that the public interest favors a stay. Dkt. 282 at 25; Dkt. 284 at 21–23. Defendants continue that the relief would have a significantly negative impact on the homeless Angelenos in Skid Row, because the relief calls for interim shelter over "real housing solutions." Dkt. 282 at 25. The Court disagrees.

As emphasized previously, the Court's preliminary injunction calls for both interim shelter and long-term housing. Homeless Angelenos cannot be left to die while long-term housing is in progress—no harm could be more grave or irreparable than the loss of life. Accordingly, the Court finds that the public interest requires both the short- and long-term relief provided for in the preliminary injunction.

## VIII.   Provisions of the Stay

The Court has carefully considered the parties' Applications to Stay Pending Appeal. The Court recognizes the need for flexibility in determining the best way forward to help the homeless population.

The failure of settlement negotiations over the last few months has been a source of concern for the Court. The City and County continue to squabble over financial responsibility for addressing the homelessness crisis. Monetary commitments alone do not fulfill the parties' obligations to their constituents. As action and accountability continue to stagnate, the homeless population and number of deaths increase.

The Court believes that increasing the availability of long-term housing is critical, and we cannot let our homeless die in the streets while we build it. The Court thus welcomes any effort to provide temporary relief while simultaneously building abundant and sustainable long-term housing.

The Court invites the Mayor of Los Angeles, the President of the Los Angeles City Council, and the Chairman of the County Board of Supervisors to meet with the Court pursuant to settlement discussions. Without a global settlement, the Court will continue to impose its April 20, 2021 preliminary injunction, subject to certain modifications in response to the City and County's Applications to Stay Pending Appeal (Dkts. 282, 284):

### A.  Skid Row

With respect to Skid Row, the Court is mindful of the impact that decompression of Skid Row would have on neighboring districts and has DENIED without prejudice Plaintiffs' request for 50% decompression. Rather, the Court's order mandates that the City *offer* housing options to Skid Row residents within 90 days in the case of unaccompanied women and children; within 120 days in the case of families; and within 180 days in the case of the general population. The Court notes that under the terms of the preliminary injunction, while the City is ordered to *offer* housing options on this timeline, Skid Row residents are not required to accept and may decline these offers.

Therefore, the Court DENIES the request to stay with respect to this provision.

### B. Accountability of Funds Dedicated to Homelessness

On April 20, 2021, the Court ordered the following:

> Pursuant to the Mayor's announcement[2] of a 'justice budget'[3] on Monday, April 19, 2021, the Court ORDERS that $1 billion, as represented by Mayor Garcetti, will be placed in escrow forthwith, with funding streams accounted for and reported to the Court within 7 days.

Dkt. 277 at 106.

The Court included this provision in response to the City's "justice budget," which purportedly allocated $1 billion to address the homelessness crisis, including an unused $164 million dedicated to homeless relief that remains available as a roll-over from the previous year's budget. Rather than directing the City's homelessness spending, the Court's order for escrow was intended to make certain that this promised money would in fact be set aside for homelessness. Reports have alleged that the distribution of Proposition HHH funds has been corrupted by "everything from fake not-for-profits to contractors with zero employees and multi-million dollar development fees, and lucrative guaranteed management fees that support zero-risk development."[4] Repeated concerns such as this are the basis for the Court's ordered audits.

Further, City Controller Ron Galperin cited a balance of "10-ish billion dollars available in the City treasury" and stated that "the point I've made repeatedly to others in the City is that if the issue is cash flow . . . we can solve that cash flow issue. That should not be the impediment."[5] The Court was troubled by the apparent incongruity between the available "cash flow" and the severe conditions of homelessness in Los Angeles. The Court was also concerned

---

[2] Benjamin Oreskes & David Zahniser, *L.A. Plans Nearly $1 Billion in Spending to Address Homelessness Under Garcetti Plan*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/homeless-housing/story/2021-04-19/los-angeles-will-increase-budget-for-addressing-homelessness.

[3] David Zahniser, Dakota Smith & Emily Alpert Reyes, *Garcetti Seeks to Stem Poverty, Boost Social Justice in Vision for L.A.'s Recovery*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/california/story/2021-04-19/garcetti-los-angeles-state-of-the-city.

[4] Letter from Ron Miller, Exec. Sec'y, L.A./Orange Cntys. Bldg. & Constr. Trades Council, to Mike Feuer, L.A. City Att'y (Dec. 17, 2020).

[5] People's City Council – Los Angeles (@PplsCityCouncil), TWITTER (Apr. 15, 2021, 6:33 PM), https://twitter.com/pplscitycouncil/status/1382869701852729348?s=21.

by the City's failure to apply for 100% reimbursement from FEMA for funds spent on Project Roomkey in light of purported budget concerns.

However, on April 21, 2021, the City represented that the billion dollars allocated for homelessness in the justice budget is not available to put in escrow.[6] Los Angeles City Administrative Officer Richard Llewellyn further stated that "the great majority of these funds are not currently in the City's possession."[7] Given this new information, the Court agrees that a modification of this provision is appropriate. Therefore, the Court STAYS provision 1(a) of the preliminary injunction for 60 days in order to hear testimony from the City regarding details of the $1 billion and asks the parties to create a *Binding Commitment and Implementation Plan* (the "Plan"):

1. The City shall draft the Plan within 60 days to ensure that the full $1 billion is spent city-wide.
2. The Plan shall provide the Court with a detailed breakdown of funding sources, uses, objectives, methods, and means so that the Court can monitor the Plan's implementation.
3. The Plan shall further provide specific information about the number of homeless individuals who will be housed and by when.
4. The Plan shall also provide details on the 89 pending projects with timeframes for completion and move-in dates.
5. Finally, the Plan shall provide details on how the funding will be used to address racial disparities in housing and homelessness.
6. The objectives and deadlines established in response to items 3 through 5 above shall be binding on the City.

---

[6] Christopher Weber, *Judge Orders LA to Offer Shelter for Homeless on Skid Row*, YAHOO! NEWS (Apr. 20, 2021), https://www.yahoo.com/news/judge-orders-la-offer-shelter-213848366.html. *But see* Benjamin Oreskes & David Zahniser, *L.A. Plans Nearly $1 Billion in Spending to Address Homelessness Under Garcetti Plan*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/homeless-housing/story/2021-04-19/los-angeles-will-increase-budget-for-addressing-homelessness.
[7] Dkt. 284-1, ¶ 10 (Richard H. Llewellyn, Jr. Declaration).

ER 607

### C.  Availability of City Property

#### i.    *Cessation of Transfer of Property*

On April 20, 2021, the Court ordered the following:

> The Court ORDERS the cessation of sales, transfers by lease or covenant, of the over 14,000 City properties pending the report by the Controller Ron Galperin to the Court, and all similarly situated properties held by the County pending the report by the County counsel.

Dkt. 277 at 107.

The Court will not impede any progress toward programs the City is proposing to help homelessness, including Proposition HHH. In a clarifying order issued last week, the Court emphasized that the Court's order will not apply to projects that are already in progress.[8] To ensure no further confusion regarding what qualifies as projects in progress, the Court hereby STAYS provision 2(a)(ii) of the preliminary injunction until May 27, 2021, when an evidentiary hearing will be held to determine what properties exist and are available for homelessness relief.

#### ii.   *Creation of Report on Property*

On April 20, 2021, the Court also ordered the following:

> Within 30 days, City Controller Ron Galperin shall oversee the creation of a report on all land potentially available within each district for housing and sheltering the homeless of each district. The homeless have been left no other place to turn to but our beaches, parks, libraries, and sidewalks, and it is pivotal that they no longer rely on spaces that enhance quality of life for all citizens.

Dkt. 277 at 107. This order was based on the City's report to the Court that "[t]he City Controller [Ron Galperin] compiled a list of nearly 14,000 properties in the City owned by six major public entities, including over 7,500 properties owned by the City." Dkt. 149 at 6. The City maintained

---

[8] *See* Dkt. 279 ("Second, the provision regarding the cessation of sales and transfers by lease or covenant under Section 2(a)(ii) does not apply to projects in progress as of the date of the order, April 20, 2021.").

that "the City does not have any property for sale, nor does it own or possess vacant properties, that are immediately available and suitable for use for interim housing or shelter purposes." Dkt. 149 at 8.

The Court was deeply troubled that despite the City's representation of access to over 14,000 properties, the City committed not one of these properties to building additional long-term sustainable housing or interim housing.[9] The City explained that these conclusions are based on a process of "constant evaluation"; however, this "constant evaluation" has constantly led to no options for housing.

As mentioned above, the Court recognizes a need for all housing options, including long-term housing. The property identified in the ordered report must be used for both long-term and interim housing. The alternative is to leave our homeless no place but the sidewalks while we build long-term units. There is no plan brought before this Court to accommodate all 66,000 homeless individuals in long-term housing, at a cost of $531,000 per unit.[10] Such a plan would cost in excess of $30 billion. Further, while long-term housing is vital, its construction is long-term, and the interim period has lasted decades. Accountability cannot always be on the horizon—people are dying on the streets now.

Therefore, given the urgent need to understand the inventory of available properties, the Court DENIES the request to stay with respect to this provision.

The Court DENIES the City and County's Applications to Stay the remaining provisions of the Court's April 20, 2021 preliminary injunction.

Finally, the Court SCHEDULES a hearing for Thursday, May 27, 2021 at 9:00 a.m. At the hearing, the Court will receive evidence as to what properties are available for homelessness relief, as detailed in section VII(C)(i) above. In addition, the City and County have requested to be heard concerning the Court's findings on structural racism in its April 20, 2021 preliminary injunction. At the May 27, 2021 hearing, the Court will therefore receive testimony from the City and County on these findings. The Court additionally invites all interested parties to notify the Court if they would also like to be heard in this regard. The Court hereby SCHEDULES a hearing for Thursday, May 27, 2021 at 9:00 a.m. IT IS SO ORDERED.

---

[9] The City stated that it "does not have any property for sale, nor does it own or possess vacant properties, that are immediately available and suitable for use for interim housing or shelter purposes." Dkt. 149 at 6, 8.

[10] Ron Galperin, *It's Time for Los Angeles to Pivot on HHH: Ron Galperin*, L.A. DAILY NEWS (Mar. 14, 2021), https://www.dailynews.com/2021/03/14/its-time-for-los-angeles-to-pivot-on-hhh-ron-galperin/.

MARY C. WICKHAM (Bar No. 145664)
*County Counsel*
RODRIGO A. CASTRO-SILVA (Bar No. 185251)
*Acting Chief Deputy County Counsel*
LAUREN M. BLACK (Bar No. 192302)
*Assistant County Counsel*
AMIE S. PARK (Bar No. 273346)
*Deputy County Counsel*
500 West Temple Street, Suite 468
Los Angeles, CA 90012
Tel: 213.974.1830  Fax: 213.626.7446
Email: apark@counsel.lacounty.gov

BYRON J. MCLAIN (Bar No. 257191)
FOLEY & LARDNER LLP
555 South Flower Street, Suite 3300
Los Angeles, CA 90071-2411
Tel: 213.972.4500  Fax: 213.486.0065
Email: bmclain@foley.com

Attorneys for Defendant
COUNTY OF LOS ANGELES

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.A. ALLIANCE FOR HUMAN RIGHTS, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LOS ANGELES, et al., <br><br> Defendants. | Case No. 2:20-cv-02291 DOC-KES <br><br> **JOINT NOTICE TO THE COURT REGARDING MEMORANDUM OF UNDERSTANDING FOR 6,700 BED PLAN FROM CITY OF LOS ANGELES AND COUNTY OF LOS ANGELES** |

JOINT NOTICE TO COURT REGARDING MEMORANDUM OF
UNDERSTANDING
Case No. 2:20-cv-02291 DOC-KES

LOUIS R. MILLER (SBN 54141)
MIRA HASHMALL (SBN 216842)
EMILY A. SANCHIRICO (SBN 311294)
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Tel.: (310) 552-4400 | Fax: (310) 552-8400
Email: esanchirico@millerbarondess.com

Attorneys for Defendant
COUNTY OF LOS ANGELES

MICHAEL N. FEUER, Bar No. 111529
City Attorney
KATHLEEN A. KENEALY, Bar No. 212289
Chief Assistant City Attorney
SCOTT MARCUS, Bar No. 184980
    scott.marcus@lacity.org
Senior Assistant City Attorney
200 N. Main St., City Hall East, 7th Floor
Los Angeles, CA 90012
Tel:  213.978.4681  Fax:  213.978.7011

Attorneys for Defendant
CITY OF LOS ANGELES

JOINT NOTICE TO COURT REGARDING MEMORANDUM OF UNDERSTANDING
-2-        Case No. 2:20-cv-02291 DOC-KES

**TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 9, 2020, the City of Los Angeles ("City") and the County of Los Angeles ("County") reached an agreement on a Memorandum of Understanding ("MOU").  This MOU clarifies the historic agreement between the City and County to provide a total of 6,700 beds and services for people experiencing homelessness (PEH") in the City of Los Angeles within 18 months.  (*See* Dkt. 136, Binding Term Sheet at ¶ 1.)

Attached hereto is the MOU with its associated Binding Term Sheet as Exhibit 1.

DATED:  October 12, 2020          FOLEY & LARDNER LLP
                                  Byron J. McLain


                                   */s/ Byron J. McLain*
                                  Byron J. McLain
                                  Attorneys for Defendant
                                  COUNTY OF LOS ANGELES


DATED: October 12, 2020           MICHAEL N. FEUER, City Attorney


                                   */s/ Scott Marcus*
                                  Scott Marcus
                                  Senior Assistant City Attorney
                                  CITY OF LOS ANGELES

## MEMORANDUM OF UNDERSTANDING
## BETWEEN
## THE COUNTY OF LOS ANGELES and
## THE CITY OF LOS ANGELES

This Memorandum of Understanding ("MOU") is entered into this 9th day of October 2020 by and between the County of Los Angeles, a subdivision of the State of California ("COUNTY"), and the City of Los Angeles, a municipal corporation ("CITY"), for purposes of establishing roles, responsibilities, and financial relationships necessary to create housing or shelter for (i) people experiencing homelessness ("PEH") living within 500 feet of freeway overpasses, underpasses and ramps within the City of Los Angeles, (ii) PEH age 65 and over within the City of Los Angeles, and (iii) other vulnerable PEH within the City of Los Angeles.  COUNTY and CITY will be referred to herein individually as "PARTY" and together as "PARTIES."

PARTIES agree to the following for purposes of this MOU only:

I.   TERM OF MOU

The term of this MOU will begin on the date of signature of PARTIES, and will end on June 30, 2025, unless extended upon mutual agreement of PARTIES.

II.   RECITALS

A.   COUNTY

1.   The County has long recognized that a comprehensive crisis response is required to counteract the myriad causes of homelessness and has taken several constructive steps towards meeting this challenge.

2.   On August 17, 2015, the Los Angeles County Board of Supervisors ("Board") launched the Homeless Initiative to combat the homeless crisis that pervades our communities. The primary initial objective of the Homeless Initiative was to develop a coordinated set of recommended strategies.  To achieve this objective, the Homeless Initiative convened 18 policy summits on nine topics from October 1 to December 3, 2015, which brought together County departments, cities and other public agencies, and a wide range of community partners and stakeholders.

3.   On February 9, 2016, the Board approved 47 strategies that reach across government and community boundaries to forge effective partnerships and get results.  On the same day, the Los Angeles City Council approved the first-ever Los Angeles City Comprehensive Homeless Strategy which was developed in collaboration with the County.

4.   In March 2017, voters resoundingly approved Measure H, the landmark ¼ percent increase to the County's sales tax to provide an ongoing revenue stream – an estimated $355 million per year for ten years – to fund

ER 613

services, rental subsidies and housing.  It is designed to fund a
comprehensive regional approach encompassing 21 interconnected
strategies in six areas to combat homelessness: (i) prevent homelessness;
(ii) subsidize housing; (iii) increase income; (iv) provide case management
and services; (v) create a coordinated system; and (vi) increase
affordable/homeless housing.

5.   The County began efforts to alleviate homelessness even before passage of
Measure H by infusing $100 million to launch these strategies in 2016.

6.   On January 21, 2020, the Board approved a motion proposed by
Supervisors Mark Ridley-Thomas and Janice Hahn entitled "Establishing a
Comprehensive Homelessness Crisis Response Strategy in Los Angeles,"
with a goal of establishing an accountability framework for providing
shelter or housing for PEH in Los Angeles County.

7.   On April 14, 2020, the Board unanimously approved a motion entitled
"Piloting a Comprehensive Crisis Response to Ensure Post-COVID-19
Housing for Homeless Older Adults in Los Angeles County," directing its
Chief Executive Officer ("CEO") to develop a pilot program to provide
long-term housing options and services to PEH who are aged 65 years or
older including those who were provided emergency housing in response to
the COVID-19 public health crisis.  The motion further directed all County
departments to take appropriate action to implement 16 recommendations
for changes in state law or policy to achieve three goals: (i) addressing and
preventing street homelessness; (ii) reducing barriers to building more
housing; and (iii) getting more people into treatment.

B.   CITY

1.   The City has taken unprecedented action to end street homelessness in Los
Angeles, and continues to act to address both the crisis of homelessness in
the city and the increased risk that COVID-19 creates for persons
experiencing homelessness in Los Angeles.

2.   In February 2016, the Mayor and City Council adopted the City's
Comprehensive Homeless Strategy.  It is meant to be a comprehensive
approach to address short- and long-term homelessness issues and is
adopted in tandem with the Homeless Initiative approved concurrently by
the County of Los Angeles Board of Supervisors.  The City Council also
adopted 14 Guiding Principles which are incorporated in the
Comprehensive Homeless Strategy.

3.   In November 2016, Los Angelenos overwhelmingly approved Proposition
HHH.  Proposition HHH authorized the City to issue up to $1.2 billion in
general obligation bonds to partially subsidize the development of up
to 10,000 supportive housing units for individuals and families who are
experiencing homelessness or are at risk of becoming homeless.  As of

ER 614

September 30, 2019, the City has allocated nearly the entire amount authorized by the Proposition HHH ballot measure, on its way to securing the development of up to 10,000 supportive housing units.  City and County also entered into a memorandum of understanding securing County's provision of services to tenants of City-created permanent supportive housing opportunities, including intensive case management, integrated health services, and rental assistance.

4.    In April 2018, the Mayor and the City Council declared an emergency shelter crisis and took advantage of a new state law that enables cities to construct bridge housing more quickly on land owned or leased by the City.  The A Bridge Home (ABH) shelter program seeks to create 100 shelter beds in each of the City's 15 Council Districts.

5.    In April 2018, the City also formed the Unified Homelessness Response Center ("UHRC") in the City's Emergency Operations Center, bringing City Departments and partners under one roof to respond to the crisis together and deliver every possible resource to help Angelenos experiencing homelessness get the help they need to move indoors.

6.    On March 19, 2020, the City declared a state of emergency and issued the Safer at Home orders in response to the coronavirus pandemic.  The City took several emergency measures to help protect homeless Angelenos and slow the spread of COVID-19, including opening more than 20 emergency shelters at City recreation centers to provide emergency shelter for over 1,000 people.  The City also worked with the County and the State to provide shelter through Project Roomkey.  These emergency shelters are temporary, however, and persons experiencing homelessness who were brought inside these shelters must be relocated to longer term interim or permanent housing solutions.

7.    The City continues to make addressing homelessness a top priority, even during the financial crisis caused by COVID-19.  In Fiscal Year 2020-2021, the City has committed over $460 million in supportive housing, bridge housing, services, and facilities to help homeless Angelenos find their way off the streets.

C.    THE COURT

1.    COUNTY and CITY are parties to *LA Alliance for Human Rights, et al. v. City of Los Angeles, et al.*, Civil Action No. 2:20-cv-02291 (the "Action"), in the United States District Court for the Central District of California, Judge David O. Carter presiding (the "Court").

2.    In addition to individuals over 65, those with preexisting medical conditions, and those otherwise vulnerable to coronavirus, the Court has expressed concerns about the health and safety of people experiencing homelessness living within 500 feet of freeway overpasses, underpasses

and ramps.  On June 18, 2020, the Parties submitted a binding term sheet in the Action to address the Court's concerns (Dkt. 136) ("Binding Term Sheet").

III.    PARTIES' RESPONSIBILITIES

PARTIES agree to the following responsibilities in connection with this MOU.  This MOU does not arise from a legal obligation, does not resolve the Action or any other litigation, and further defines and incorporates the PARTIES' Binding Term Sheet, attached as Exhibit 1 to this MOU.

A.    During the term of this MOU, the CITY will provide a total of 6,000 New Beds, and 700 Other Beds, for housing or shelter for (i) PEH within 500 feet of freeway overpasses, underpasses and ramps within the City of Los Angeles, and then give priority to (ii) PEH who are aged 65 years or older within the City of Los Angeles and (iii) other vulnerable PEH within the City of Los Angeles.  CITY will provide 5,300 New Beds within ten (10) months of June 16, 2020, and an additional 700 New Beds within eighteen (18) months of June 16, 2020 ("6,000 New Beds").  CITY will provide 700 Other Beds within ten (10) months of June 16, 2020 ("700 Other Beds").

1.    "New Beds" provided under this MOU shall be defined as beds (i) not previously captured in any agreement or plan between the PARTIES, and (ii) opened on or after the date of the Binding Term Sheet (*i.e.,* June 16, 2020).  New Beds may include any combination of the following: (i) purchased and/or leased motel/hotel rooms by the City; (ii) rental assistance, including rapid rehousing, but only for the duration of the assistance; (iii) sprung structures or tents; (iv) safe parking; (v) safe sleeping; (vi) scattered site or permanent supportive housing; (vii) ABH beds; and (viii) other innovative modes of housing or shelter.  Family reunification is not included as a New Bed under this MOU.

2.    "Other Beds" provided under this MOU may be beds previously captured in an agreement or plan between CITY and COUNTY.

B.    To assist CITY with funding services for the 6,000 New Beds, COUNTY shall contribute up to $53 million for the first year and up to $60 million for years two through five, as set forth in more detail below:

1.    For the period from execution of this MOU until June 30, 2021 ("Year One"), COUNTY shall pay to CITY the amount of (i) $17.66 million on September 1, 2020; (ii) $17.67 million on January 1, 2021; and (iii) $17.67 million on April 1, 2021.

2.    For the period from July 1, 2021 to June 30, 2022 ("Year Two"), COUNTY shall pay to CITY the amount of $60 million on July 1, 2021; however, if the 6,000 New Beds from CITY are not open and occupiable by July 1, 2021, COUNTY may prorate payment equal to $10,000 per new bed that exists or will be open and occupiable within 60 days of the Year Two payment date.

ER 616

3. For the period from July 1, 2022 to June 30, 2023 ("Year Three"), COUNTY shall pay to CITY the amount of $60 million on July 1, 2022; however, if the 6,000 New Beds from CITY are not open and occupiable by July 1, 2022, COUNTY may prorate payment equal to $10,000 per new bed that exists or will be open and occupiable within 60 days of the Year Three payment date.

4. For the period from July 1, 2023 to June 30, 2024 ("Year Four"), COUNTY shall pay to CITY the amount of $60 million on July 1, 2023; however, if the 6,000 New Beds from CITY are not open and occupiable by July 1, 2023, COUNTY may prorate payment equal to $10,000 per new bed that exists or be will open and occupiable within 60 days of the Year Four payment date.

5. For the period from July 1, 2024 to June 30, 2025 ("Year Five"), COUNTY shall pay to CITY the amount of $60 million on July 1, 2024; however, if the 6,000 New Beds from CITY are not open and occupiable by July 1, 2024, COUNTY may prorate payment equal to $10,000 per new bed that exists or will be open and occupiable within 60 days of the Year Five payment date.

C. COUNTY will pay to CITY a one-time bonus of $8 million if 5,300 New Beds are open and occupiable within ten months from June 16, 2020.

D. The Los Angeles Homeless Services Authority ("LAHSA") facilitates the coordination and management of resources and services in order to efficiently and effectively connect PEH in the community to available housing and supportive services equitably. To leverage resources and efficiency, services provided to PEH who are sheltered or housed under this MOU may be facilitated and supported by LAHSA in coordination with relevant community-based providers, but City may, in its sole discretion, contract with service providers directly, and such services may be consistent with LAHSA's service standards. City may also utilize its own staff to deliver certain services (i.e. maintenance, sanitation, supplies, etc.) where appropriate.

E. Except as otherwise stated in this MOU, or to the extent COUNTY is responsible for costs in an agreement or plan between the PARTIES other than this MOU, CITY is responsible for all costs, including capital costs, operating costs, and/or other expenses associated with the 6,000 New Beds and 700 Other Beds described herein.

F. The precise mix and location of New Beds and Other Beds will be determined at CITY's sole discretion. CITY will use all reasonable efforts to utilize, on an ongoing and regular basis, all the New Beds for PEH in the City of Los Angeles for which COUNTY is contributing a portion of the funding for services.

G. The funding obligation of COUNTY under this MOU is exclusive. COUNTY will continue to allocate Measure H funding by Service Planning Area (SPA) based on the Homeless Count conducted by LAHSA and, where applicable, the Homeless Population Estimate, consistent with Board policy.

ER 617

H.    COUNTY will take action to provide a package of the following mainstream services to PEH residing in facilities established by CITY pursuant to this MOU at the scale and availability deemed appropriate by the County: mental health and substance-use disorder outreach and disability benefit advocacy services through COUNTY's Departments of Health Services, Mental Health, and Public Health; and assistance to apply for and obtain public assistance, including Electronic Benefits Transfer ("EBT") benefits to purchase food, temporary financial assistance and employment-focused services for families with minor children, Medi-Cal enrollment, and general relief (i.e., temporary financial assistance for indigent adults who are otherwise ineligible for state- or federally-funded benefits) through COUNTY's Department of Public Social Services. In addition, the County will continue to provide these mainstream services at its County Department offices and other locations, as applicable, to all eligible PEH in the City of Los Angeles, including to PEH assisted through family reunification.

IV.    COMPLIANCE AND REPORTING

PARTIES agree to the following reporting requirements; provided, however, if the Court requires different and more extensive reporting than what is set forth below, then the PARTIES agree to provide reporting as required by the Court and not in this MOU.   PARTIES agree that:

CITY shall submit to COUNTY and the Court the following:

A.    BED PLAN.

1.    By August 1, 2020, CITY shall provide each Council District's current plan describing how CITY will establish New Beds and Other Beds specified herein ("Bed Plan").  The CITY's Bed Plan shall include, at a minimum, the following information:

a)    Identification of New Beds and Other Beds in development to be provided under this MOU, categorized by type, number, and location (if not tenant-based), and the expected opening dates for each intervention;  and

b)    Identification of additional New Beds and Other Beds being considered or proposed for development, categorized by type, number, and location (if not tenant-based), and the status of the proposed intervention.

ER 618

B.      STATUS REPORTS.

1.      Quarterly Reports.  During the term of this MOU, CITY shall provide written quarterly status reports, starting at least by October 15, 2020, to report on CITY's progress in providing New Beds, Other Beds, and services pursuant to this MOU ("Status Report").  Each Status Report shall include information for the most recent three-month period, and will be provided within 30 days of the end of the quarter, and shall include at least the following:

a)      Updates to the Bed Plan;

b)      Number and location of New Beds and Other Beds then existing, as well as the current status of beds being created, and additional interventions being considered pursuant to this MOU; and

c)      Number of PEH provided New Beds and Other Beds, identified by the three target PEH populations: (i) PEH within 500 feet of freeway overpasses, underpasses and ramps within the City of Los Angeles; (ii) PEH who are aged 65 years or older within the City of Los Angeles; and (iii) other vulnerable PEH within the City of Los Angeles.

2.      Bed Count.  At least 90 days prior to the annual payment date for Years Two through Five, CITY shall provide information regarding the number of existing beds and the number of beds that will be open within 60 days of the payment date.

3.      Annual Report.  At least annually, City shall report the cumulative amount of City funding provided to fund services during the preceding fiscal year for New Beds established under this MOU.  The City's and County's contribution are each expected to cover 50% of the average cost of providing services to PEH in New Beds established by the City under this MOU.

COUNTY shall submit to CITY and the Court the following:

C.      STATUS REPORTS.

1.      Payment Report.  COUNTY shall report the amounts paid to CITY in Year One pursuant to this MOU by September 30, 2020, January 31, 2021, and April 30, 2021, and shall thereafter report the amounts paid to CITY in Years Two through Five on or before September 30 of each respective Year (or earlier if requested by the Court).

ER 619

2.     Payment After City Reporting.  COUNTY's scheduled payments to the CITY as identified in this MOU shall occur (i) as identified in Section III.B.1 or (ii) within 30 days after the CITY has met its reporting obligations (i.e., Status Reports) immediately preceding that payment as specified in this Compliance and Reporting section (whichever date is latest).

3.     Mainstream Services.  During the term of this MOU, COUNTY shall provide written quarterly status reports on COUNTY's provision of mainstream services for PEH in facilities established by CITY pursuant to this MOU.  Each Status Report will be provided within 30 days of the end of the fiscal quarter.

## V.     MODIFICATIONS AND REVISIONS

This MOU constitutes the entire agreement between PARTIES hereto, and no oral understanding not incorporated herein will be binding on any PARTY.  This MOU may only be modified, altered or revised, as necessary, by mutual consent of PARTIES hereto by the issuance of a written amendment, signed and dated by PARTIES.

## VI.    DISPUTE RESOLUTION

PARTIES agree to implement good faith efforts and promptly meet and confer to resolve disputes arising from this MOU.  If, after such efforts, the PARTIES cannot resolve disputes, the PARTIES shall seek resolution from the Court.

## VII.   COURT ENFORCEMENT

This MOU is subject to enforcement by the Court.  Promptly upon execution, PARTIES agree to submit this MOU to the Court.

## VIII.  PRESS RELEASES AND COMMUNICATIONS

To the extent feasible, both PARTIES shall be invited to participate when communicating with the press, television, radio or any other form of media regarding duties or performance under this MOU.  Participation of each PARTY in press/media presentations will be determined by each PARTY's public relations policies.  Unless a PARTY directs otherwise, each PARTY shall make specific reference to both PARTIES in all communications regarding this MOU.

## IX.    INDEMNIFICATION

Pursuant to the provisions of Section 895.4 of the California Government Code, PARTIES agree to indemnify and hold the other PARTY harmless from all liability for damage, actual or alleged, to person or property arising out of or resulting from indemnifying PARTY's acts or omissions in the performance of this MOU.  In the event of third-party loss caused by negligence, wrongful act or omission of PARTIES, each PARTY shall bear financial responsibility in proportion to its percentage of fault as may be mutually agreed or judicially determined.  The provisions of California Civil Code Section 2778 regarding interpretation of indemnity agreements are hereby incorporated.

X.    MISCELLANEOUS PROVISIONS

This MOU is governed by and shall be interpreted in accordance with the laws of the State of California, excluding its conflict of law rules.  PARTIES agree that any action relating to any dispute, claim, or controversy regarding the validity, enforcement, interpretation, or breach of this MOU shall only be commenced in and maintained in, and PARTIES hereby stipulate to the jurisdiction only of, the United States District Court for the Central District of California.

If any part of this MOU is found to be illegal, invalid, or unenforceable by a court of competent jurisdiction, the legality, validity, and enforceability of the remaining parts, terms, or provisions of this MOU shall not be affected thereby, and shall remain in full force and effect.  The illegal, unenforceable, or invalid part, term, or provision shall no longer be deemed to be part of this MOU.  It is the desire and intent of the PARTIES that the provisions of this MOU be enforced to the fullest extent permissible under applicable laws.

This MOU may be executed in counterparts, each of which so executed will be deemed to be an original and will together constitute one and the same agreement.  Manual signatures may be provided by facsimile, or digitally scanned and provided by electronic mail.

Each PARTY shall be responsible for and bear its own attorneys' fees and costs incurred in connection with this MOU.


The City of Los Angeles


By: _____
        Richard H. Llewellyn, Jr
        City Administrative Officer

                                        Date___October 9, 2020____



The County of Los Angeles


By:_____
        Fesia Davenport
        Acting Chief Executive Officer

                                        Date:_10/12/2020_


HOA.103025439.1                    9

ER 621

# EXHIBIT 1

**EXHIBIT 1**

LA 20-CV-02291-DOC

Confidential
Binding term sheet

LA Alliance for Human Rights v. City of Los Angeles

> 1.   City agrees to provide 6,700 beds within 18 months to house or shelter (i) PEH living within 500 feet of freeway overpasses, underpasses and ramps within the City of Los Angeles, and then to give priority to providing housing or shelter to (ii) PEH 65+ within the City of Los Angeles and (iii) other vulnerable PEH within the City of Los Angeles.

> The schedule will be as follows:

>> New beds (not in existing agreements):  6000
>> 5300 within 10 months (bonus of $8 million if 10 month target date met)
>> 700 within 18 months

>> Beds in existing agreements
>> 700 beds within 10 months

> TOTAL:  6700 beds established within 18 months

> 5,300 of the 6,700 beds will be new beds and will be created within 10 months, and the 700 additional new beds created within 18 months, must be beds not previously captured in any agreement or plan between the City and County; 700 of the 6,000 beds created within 10 months may be beds previously captured in an agreement or plan between the City and County.

> 2.   To assist in funding services for the 6,000 new beds, County shall pay City up to $60 million per year for 5 years.  In the first year, County shall pay City $53 million: $17.66 million on 9/1/20; $17.67 million on 1/1/21; and $17.67 million on 4/1/21.  In the second through fifth years, County shall pay City $60 million on July 1; however, if 6,000 new beds have not been created by the July 1 payment date, County can prorate payment equal to $10,000 per new bed that exists or will open within 60 days of the payment date.

> The funding under this agreement is exclusive and the County will continue to allocate Measure H funding by Service Planning Are (SPA) based on LAHSA's Homeless Count and, where applicable, the Homeless Population Estimate, consistent with Board policy.

> 3.   County will pay to City a one-time bonus of $8 million if the 5,300 new bed target is reached within 10 months from execution of agreement.

FILED
CLERK, U.S. DISTRICT COURT

June 18, 2020

CENTRAL DISTRICT OF CALIFORNIA
BY:      KD      DEPUTY

SDM
6-16-2020

MCW
6-16-2020

4.  County will take action to provide a package of mainstream services for PEH residing in facilities established by the City pursuant to this Agreement.

5.  Agreement subject to court approval, monitoring, and enforcement.

6.  Agreement subject to City and County approval.

7.  The parties will submit this term sheet to the Court.  Upon approval of this term sheet by the City and County, the parties will respectfully request the Court to entertain an oral motion coupled with a joint stipulation from the City and County that the Preliminary Injunction dated May 22, 2020 be vacated without prejudice, subject to the Court's later consideration of reinstatement of the Preliminary Injunction should the parties fail to comply with the terms identified above.

County Counsel Los Angeles County
Mary C. Wickham
6-16-2020

Senior Assistant City Attorney
6-16-2020

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16                          **UNITED STATES DISTRICT COURT**

17            **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

18                                         )   CASE NO. 20-02291-DOC
                                           )
19                                         )   Hon. David O. Carter
   LA ALLIANCE FOR HUMAN                   )   Courtroom 1
20 RIGHTS, et al.                          )
                    Plaintiff(s),          )
21                                         )
                                           )   ORDER GRANTING INTERVENORS'
22        vs.                              )   EX PARTE APPLICATION TO
                                           )   INTERVENE AS OF RIGHT
23 City of Los Angeles, et. al.            )
                    Defendant(s).          )
24                                         )
                                           )   Complaint Filed:  March 10, 2020
25                                         )
                                           )
26                                         )
                                           )
27 _____        )

28

                                           1

_____

               ORDER GRANTING EX PARTE APPLICATION TO INTERVENE

**ER 625**

1    Pursuant to Federal Rule of Procedure 24, Plaintiffs LA CAN and LACW have
2  moved to intervene as of right or, in the alternative, for permissive intervention in
3  this case.
4    Proposed Intervenor LA CAN is a grassroots, non-profit organization that has
5  operated in Skid Row and throughout Los Angeles for approximately two decades.
6  The primary purpose of the organization is to organize and empower community
7  residents to work collectively to address systemic poverty and oppression in the
8  community.  For example, in 2016, LA CAN was a supporter of Measure HHH and
9  since then, has spent considerable resources working to ensure accountability in the
10 spending of Measure HHH funds, including threatening litigation in 2016 to prevent
11 the expenditure of funds on projects that were not authorized by the proposition.  LA
12 CAN is a membership organization with unhoused members who are currently
13 unsheltered on the streets of Los Angeles.  LA CAN moves to intervene in this
14 lawsuit on its own behalf and on behalf of its members who are unsheltered in Skid
15 Row and throughout Los Angeles.
16   Proposed Intervenor Los Angeles Catholic Worker, ("LACW"), founded in
17 1970, is an unincorporated lay Catholic community of women and men that operate a
18 free soup kitchen, hospitality house for the homeless, hospice care for the dying and
19 by-monthly newspaper.  In furtherance of its mission, the Hippie Kitchen provides
20 food and other services, including access to dental care, over-the-counter
21 medications, podiatry services, toiletries and other personal items, including
22 shopping carts.
23   Both LA CAN and LACW were plaintiffs in *Mitchell v. City of Los Angeles*,
24 along with four homeless individuals who lived on the streets in Skid Row, and who
25 were arrested for incredibly minor quality of life offenses or subjected to street
26 cleanings, and had all of their belongings seized and destroyed or otherwise stored in
27 a location that was completely inaccessible to them.  The individual plaintiffs in the
28 action assigned their rights to enforce the settlement to LA CAN and LACW.

2
ORDER GRANTING EX PARTE APPLICATION TO INTERVENE

1     In *Mitchell v. City of Los Angeles*, the parties entered into significant

2   negotiations and finally reached a tentative settlement.  The Court retained

3   jurisdiction to enforce the settlement, and the Court dismissed the case. After the

4   settlement was finalized, the Plaintiffs in this case, then operating under the name

5   Downtown Alliance for Human Rights, filed a motion to intervene, which was denied

6   as untimely. The Plaintiffs filed a notice of appeal, but subsequently dismissed that

7   appeal and simultaneously filed this instant lawsuit, making the same allegations as

8   those outlined in Plaintiffs' Motion to Intervene and as discussed below, seeking in

9   part to invalidate the settlement agreement in *Mitchell*.

10    **I.**  **PROPOSED INTERVENORS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT**

11    Federal Rules of Civil Procedure 24(a) provides that a party "who claims an

12  interest relating to the property or transaction that is the subject of the action, and is

13  so situated that disposing of the action may as a practical matter impair or impede the

14  movant's ability to protect its interest" must be allowed to intervene in a case "unless

15  existing parties adequately represent that interest." Fed. R. of Civ. Proc. 24(a)(2).

16    To be granted intervention as a matter of right, Proposed Intervenors must

17  demonstrate that 1) they have a "significant protectable interest" relating to the

18  matter that is the subject of the action; 2) a decision in the action may, as a practical

19  matter, impair or impede Proposed Intervenors' ability to protect its interest; 3) the

20  request to intervene is timely; and 4) the existing parties may not adequately

21  represent proposed Intervenors' interest. *Donnelly v. Glickman*, 159 F.3d 405, 409

22  (9th Cir. 1998).  "Though the applicant bears the burden of establishing these

23  elements, we have repeatedly instructed that 'the requirements for intervention are [to

24  be] broadly interpreted in favor of intervention.'" *Smith v. Los Angeles Unified

25  School District*, 830 F.3d 843, 853 (9th Cir. 2016). Proposed Intervenors easily

26  satisfy each of these prongs.

27    Proposed Intervenors have a significant protectable interest in this litigation.

28  Rule 24(a) does not require that the protectable interest at stake in the litigation be a

1  specific legal or equitable interest. *In re Estate of Ferdinand E. Marcos Human*
2  *Rights Litigation*, 536 F.3d 980, 984–85 (9th Cir. 2008)( quoting *S. Cal. Edison Co. v.*
3  *Lynch,* 307 F.3d 794, 802 (9th Cir.2002).  Proposed Intervenors have a legally
4  protectable interest in the settlement in *Mitchell v. City of Los Angeles*, which
5  Plaintiffs explicitly and implicitly challenge in this lawsuit.  Plaintiffs allege in the
6  seventh cause of action that the settlement in *Mitchell* was a project under CEQA, for
7  which an environmental review was required.  *See* Comp., ¶ 165.  The eleventh cause
8  of action challenges the settlement on due process and equal protection grounds,
9  namely that the settlement distinguished between Skid Row and the rest of the City
10 without a rational reason for doing so.  In addition to those causes of action that
11 explicitly mention the *Mitchell* settlement, other causes of action, including the first,
12 third through fourth, and seventh causes of action for negligence, nuisance, and
13 violations of substantive due process, relate to conditions in Skid Row that Plaintiffs
14 allege throughout the complaint were caused by the *Mitchell* injunction and
15 settlement*. See e.g*., Comp., ¶¶ 30, 37, 48; Comp., Pg. 47. [1]

16      To satisfy the second prong of the test for intervention as a matter of right,
17 Proposed Intervenors must show that "the disposition of this case will, as a practical
18 matter, affect" the interest at stake.  *California ex rel Lockyer v. U.S*., 450 F.3d 436,
19 442 (9th Cir. 2006).  Again, as with all of the factors, the proposed intervenors "need
20 not demonstrate that their interest would be impaired in a legal sense, only that their

---

22      [1] Proposed Intervenors also have legally protected interests stemming from
23 advocacy to pass and subsequently to protect the integrity of Measure HHH, *see*
24 *Washington State Building & Construction Trades v. Spellman*, 684 F.2d 627 (9th
   Cir. 982), as well as on behalf of their members, who have a protectable interest to
25 be free from increased enforcement and the violation of their constitutional rights.
26 Although less concrete than the right to protect their settlement, Courts have
   recognized these as sufficient interests to support intervention, particularly where,
27 as here, there is no other representation of unsheltered homeless people in Los
28 Angeles, who are most likely to be impacted by any proposed remedies in this
   case.

4

ORDER GRANTING EX PARTE APPLICATION TO INTERVENE

ER 628

1  interest 'would be substantially affected in a practical sense." *Sw. Ctf. for Biological*
2  *Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir.) (quoting Fed. R. Civ. P. 24, Advisory
3  Committee Notes).

4      Here, the remedy sought by the Plaintiffs could have the effect of undermining or
5  even invalidating Proposed Intervenors' settlement with the City of Los Angeles.
6  Indeed, Plaintiffs are seeking to do so here, just Plaintiffs explicitly sought to do
7  when they moved to intervene in the *Mitchell*, and they intended to object to and
8  ultimately aimed to invalidate the settlement.  This is a more than sufficient showing
9  for intervention.  *See e.g., Idaho Farm Bureau Fed. v. Babbit*, 58 F.3d 1392, 1398
10 (1995) (decision in another case that could result in a legal decision undermining the
11 result of another case is sufficient showing of impairment to support intervention). In
12 addition, however, the settlement could also result in orders related to the
13 expenditures of Measure HHH funds and changes in the allocation of resources, as
14 well as the increased criminalization and enforcement of laws against LA CAN's
15 members. All of these potential outcomes, contemplated by the sweeping complaint
16 filed by Plaintiffs, could impact Proposed Intervenors' rights.

17     Third, as the City of Los Angeles has not yet answered, the request is timely. A
18 request made "at an early stage of the proceedings" will generally satisfy the
19 timeliness requirement. *See Citizens for Balanced Use v. Mont.Wilderness Ass'n*, 647
20 F.3d 893, 897 (9th Cir. 2011).

21         Finally, the parties in this case have distinct interests to those of the Proposed
22 Intervenors and cannot adequately represent the Proposed Intervenors' interests.
23 *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 (1972).  Proposed
24 Intervenors are the only party that represent the interests of unhoused persons.
25 Proposed Intervenors easily show they have a protectable interest that could be
26 affected by the resolution in this case, that they were timely in seeking to intervene,
27 and that none of the parties can protect their interests.   As such, Proposed
28 Intervenors are entitled to intervene as a matter of right.

<div align="center">5</div>

---

<div align="center">ORDER GRANTING EX PARTE APPLICATION TO INTERVENE</div>

## II.   LA CAN AND LACW SHOULD BE ALLOWED PERMISSIVE INTERVENTION

In the alternative, this court finds that the Proposed Intervenors have also met the requirements of Rule 24(b), which allows permissive intervention when "an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b)(1)(B).  Permissive intervention is in the "broad discretion of the trial court." *GOJO Indus., Inc. v. Barough*, ("*GOJO*"), No. SACV171382DOCJDEX, 2018 WL 5880829, at *3 (C.D. Cal. Apr. 2, 2018). LACAN and LACW represent important interests in this case that are otherwise not represented and as such, should be allowed to permissively intervene.

As noted above, none of the parties currently in the case, include any individual who is currently unsheltered in Los Angeles.  On the other hand, LA CAN and LACW have members and clients who live on the streets. Moreover, organizers and staff of LA CAN and LACW monitor what is happening on the streets, not just in Skid Row, but throughout Los Angeles. For example, the complaint alleges that the encampment under the overpass at Venice and the 405 is blocking the sidewalk.  LA CAN has organizers and members that regularly visit that encampment and are familiar with the conditions there.  The sweeps and property seizures at the overpass at Venice and the 405 divert LA CAN's resources; yet this lawsuit is alleging the need for increased sweeps and enforcement. Complaint at 177.

Similarly, LA CAN, as mentioned above, has unhoused members that reside on Skid Row and would be impacted by increased sweeps and enforcement. Not only are their interests affected, their participation will aid the court in determining the factual context of the litigation and in proving or disproving the parties' statements about accessibility and state-created danger.  It will also aid the court to hear from un-sheltered individuals, as the only unhoused individual who is a Plaintiff  became sheltered prior to the lawsuit beginning.

The Court finds that LA CAN and LACW have meet the standard for

6

ER 630

1  intervention as of right, as this litigation has significant potential to impact the

2  settlement reached in the *Mitchell* case.  It is so ORDERED.

3

4  Dated: March __18__, 2020

5  _____

6  The Honorable David O. Carter
   United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ER 631

1  SPERTUS, LANDES & UMHOFER, LLP
   Matthew Donald Umhofer (SBN 206607)
2  Elizabeth A. Mitchell (SBN 251139)
   617 W. 7th Street, Suite 200
3  Los Angeles, California 90017
   Telephone: (213) 205-6520
4  Facsimile: (213) 205-6521
   mumhofer@spertuslaw.com
5  emitchell@spertuslaw.com

6

7  *Attorneys for Plaintiffs*

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11 LA ALLIANCE FOR HUMAN                Case No. 2:20-cv-02291
   RIGHTS, an unincorporated
12 association, JOSEPH BURK,
   HARRY TASHDJIAN, KARYN             **COMPLAINT FOR:**
13 PINSKY, CHARLES MALOW,
   CHARLES VAN SCOY, GEORGE           **(1) Negligence**
14 FREM, GARY WHITTER, and            **(2) Violation of Mandatory Duty
   LEANDRO SUAREZ, individuals,           (Cal. Gov't Code § 815.6; Welf.
15                                         & Inst. Code § 17000)**
                Plaintiffs,           **(3) Violation of Cal. Civ. Code §
16                                         3490, *et seq.***
       v.                             **(4) Violation of Cal. Civ. Code §
17                                         3501 *et seq.***
   CITY OF LOS ANGELES, a             **(5) Inverse Condemnation/Violation
18 municipal entity; COUNTY OF LOS        of Art. I § 19 of California
   ANGELES, a municipal entity; and       Constitution**
19 DOES 1 through 200 inclusive,      **(6) Waste of Public Funds and
                                           Resources (Cal. Civ. Proc. Code
20              Defendants.                § 526a)**
                                      **(7) Violation of California
21                                         Environmental Quality Act
                                           ("CEQA") (Cal. Pub. Res. Code
22                                         § 21000 *et seq.*)**
                                      **(8) Violation of California Disabled
23                                         Persons Act (Cal. Civ. Code § 54,
                                           *et seq.*)**
24                                    **(9) Violation of TITLE II of the
                                           Americans with Disabilities Act,
25                                         42 U.S.C. §§ 12131 *et seq.***
                                      **(10)  Violation of Section 504 of the
26                                         Rehabilitation Act, 29 U.S.C. §§
                                           791 *et seq.***
27                                    **(11)  Violation of Due Process and
                                           Equal Protection (42 U.S.C. §
28                                         1983; U.S. Const. amend.
                                           V/XIV)**

_____
                        COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**(12) Violation of Due Process – State Created Danger Doctrine (42 U.S.C. § 1983; U.S. Const. amend XIV)**

**(13) Uncompensated Taking (42 U.S.C. § 1983; U.S. Const. amend. V/XIV)**

**(14) Municipal Liability for Unconstitutional Custom or Policy (42 U.S.C. §1983)**

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

COMPLAINT

ER 633

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

# INTRODUCTION

1.      People are perishing in the streets at a rate of *three per day* while the City and County of Los Angeles have tried but failed to stem this tide of human tragedy.[1]  The numbers alone are staggering.  There are 58,936 homeless individuals in Los Angeles County ("County") and 36,300 in the City of Los Angeles' ("City")—an increase of 12 percent and 16 percent from just the prior year's count, respectively.[2]  The City's homeless population has nearly doubled in the last three years.  Some 75 percent of these are unsheltered persons who lack regular access to basic hygiene care such as toilets, running water to wash hands, showers, sinks, kitchen, laundry which has led to filthy (and unhealthy) conditions.  Los Angeles bears the dishonorable distinction of hosting the largest unsheltered population in the country.[3]

2.      In both the City and County, homeless encampments are becoming entrenched.  With increased population density, unlimited property accumulation has fostered a proliferation of flea-infested rats and other vermin, which are largely responsible for the recent outbreaks of medieval diseases.  Large items obstruct the free passage and use of the streets and sidewalks.  Encampments have brought with them rampant drug sales and use, which in turn provide a platform for violent assaults and property crimes.  Crime both on and by our

---

[1] County of Los Angeles, Public Health, Center for Health Impact Evaluation, *Recent Trends in Mortality Rates and Causes of Death Among People Experiencing Homelessness in Los Angeles County* (October 2019), http://publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf.

[2] Los Angeles Homeless Services Authority ("LAHSA"), *2019 Greater Los Angeles Homeless Count* (Sept. 5, 2019), https://www.lahsa.org/documents?id=3467-2019-greater-los-angeles-homeless-count-total-point-in-time-homeless-population-by-geographic-areas.pdf.

[3] U.S. Dep't of Housing and Urban Development ("HUD"), *The 2018 Annual Homeless Assessment Report (AHAR) to Congress* (December 2018), https://files.hudexchange.info/resources/documents/2018-AHAR-Part-1.pdf.

homeless residents has intensified.[4]  The multiplication of makeshift structures, garbage, human waste, and other detritus has created circumstances throughout the City that are crippling for local businesses, unlivable for residents, and deadly for those on the streets.  The environmental impact from power-washing human waste and used needles into our oceans is unassessed and untold.  The City and County combined spend over a billion dollars annually providing police, emergency, and support services to those living on the streets.  And still, the tragedy unfolds.

3.      This crisis has been building for decades, as mental health affliction and drug addiction rates have risen, so has the cost of housing, and support structures for those on the streets have been stretched to the breaking point by burgeoning demands and insufficient funding by local, state, and federal governments.  The population of people experiencing homelessness has surged 75 percent since 2012 while sustainable short- and long-term solutions have been in short supply.  Los Angeles County Department of Public Health has repeatedly warned the City that basic hygiene services were needed to maintain public health in or near homeless encampments—but those critical services have been in short supply.[5]

---

[4] Joel Grover and Amy Corral, *A Homeless Man Punched Two People in the Face, But Was Cited and Released*, NBC Los Angeles, (Nov. 11, 2019, 4:00 PM), https://www.nbclosangeles.com/news/local/hollywood-violent-homeless-attacks-increase-video-564682831.html; Eric Leonard, *Homeless Crime Jumps Nearly 50 Percent in Los Angeles, LAPD Says*, NBC Los Angeles (Dec. 10, 2018, 4:52 PM), https://www.nbclosangeles.com/news/local/LAPD-Reports-Spike-in-Homeless-Crime-502407861.html; Zoie Matthew, *Crimes Against the Homeless Have Risen, and Advocates are Searching for Answers*, Los Angeles Magazine (Oct. 15, 2019), https://www.lamag.com/citythinkblog/homeless-crime/.

[5] Matt Stiles, *As Homeless Crisis Worsens in L.A., The County Leans On City Officials To Act*, Los Angeles Times (June 8, 2019, 5:04 PM), https://www.latimes.com/local/lanow/la-me-homeless-county-letter-20190608-story.html.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

4.      Homeless advocates have put pressure on the City and County for years to permit public camping, allow the accumulation of piles of personal property on the streets, and generally make it more comfortable for people to live on the streets.  But street-living is by no means more "comfortable," because of significant health issues and inherent danger involved in being unsheltered. Enforcement of homeless-related crimes has been reduced, or in some cases eliminated, in the name of compassion.  But allowing people to die on the streets isn't compassionate; it's cruel.

5.      The massive build-up of property and tents has made the sidewalks unpassable: Charles Van Scoy, restricted to a wheelchair, is trapped in his own home; Karyn Pinsky must walk with her young son in a stroller in the middle of traffic.  The Inner-City Arts Center must hire security to walk with students and staff to and from campus.  Business owners have suffered as well—customers cannot access stores and are declining to patronize them due to conditions on the street, and business owners are spending hundreds of thousands of dollars on increased sanitation and security measures and cannot maintain employees. Joseph Burk has lost tenants and hundreds of thousands of dollars in client accounts.  Residents and workers throughout the area are confronted daily by disease, illicit drug sales and use, prostitution, and general filth and squalor. People are openly using drugs, urinating, and defecating in public.

6.      Residential and commercial buildings alike have endured fires from homeless camps, where makeshift heaters are used to keep people warm, open air fires are used to cook food, utility wiring is tampered with to provide electricity, and arsons arise out of drug or property disputes.[6]  Businesses are being dropped

_____

[6] James Queally, *Firecrackers. Molotov cocktails. Fire attacks have shaken L.A.'s homeless community*, Los Angeles Times (Oct. 18, 2019, 7:00 AM), https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire; Joel Grover and Amy Corral, *Los Angeles Homeless Illegally Use Fire Hydrants to Fill Water Balloons, Bathe, Shave*, NBC Los Angeles (Aug. 23,

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700/ FACSIMILE 310-826-4711

ER 636

by insurance companies because of the fire risks associated with the homeless living on their sidewalks.[7]

7.     The frequency of criminal conduct has increased so dramatically in some areas that law enforcement officials can respond only to the most egregious crimes—and often only after serious damage has been done.  And those who are experiencing homelessness pay the highest price for this lawlessness. Aggravated assaults against homeless victims rose 57 percent from 2017 to 2018; crimes with a homeless suspect increased by 28.5 percent.  Those percentages are set to increase again in 2019: in Central Division alone, the percentage of Part I (serious) crimes involving a transient victim year-to-date has risen 51.4 percent from 2018 and the percentage of Part I crimes involving a transient suspect has risen 45.1 percent (although the overall Part I crime rate has only increased 3.2 percent).  And as these crimes increase, recidivism is also on the rise as even the few arrested quickly return to the streets.[8]

8.     Humans living on the streets and in their cars have no regular access to sanitation facilities, so trash and human waste end up in public spaces and ultimately our oceans.  Businesses are regularly cleaning used syringes out of their drains; an untold number are washed into our waterways.  The environmental impact of the homelessness crisis was recently underscored in a

2019, 5:11 PM), https://www.nbclosangeles.com/investigations/Los-Angeles-Homeless-Illegally-Use-Fire-Hydrants-to-Fill-Water-Balloons-Bathe-Shave-558051461.html.

[7] Joel Grover and Amy Corral, *Your Insurance Is Canceled Because of Homeless Tent Fires*, NBC Los Angeles (Sept. 23, 2019, 11:55 AM), https://www.nbclosangeles.com/news/local/LA-Homeless-Encampment-Fires-Insurance-Rates-Tents-Homelessness-561145811.html.

[8] Grover, *supra* note 4, https://www.nbclosangeles.com/news/local/hollywood-violent-homeless-attacks-increase-video-564682831.html.

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700/ Facsimile 310-826-4711

1   letter from the Environmental Protection Agency.[9] Yet the governmental policies

2   and inaction that perpetuate these pollutants continue unabated.

3        9.     The City of LA's Bureau of Sanitation regularly power-washes

4   streets, sidewalks, and other public spaces that have been occupied by

5   unsheltered individuals; but those clean-ups cost millions of dollars and are

6   ineffective in proactively addressing the crisis.[10]  In 2018, it cost over $35 million

7   to conduct almost 15,000 clean-ups of homeless encampments, yet the ultimate

8   benefits both to the encampment residents and to surrounding community are

9   minimal at best.  The residents of the encampments are permitted to retain most

10  of their belongings (health hazards included) back into the exact same area after

11  the clean-up is conducted. Trash and human waste are often permitted to remain

12  or are pushed into surrounding streets.  *Id*.  Yet the City's 2019-2020 budget has

13  actually increased funding for these ineffective programs by $6.45 million.[11]

14       10.    The mentally ill in this City and County are visibly suffering in the

15  street, IMD (Institute for Mental Disease) facilities are overfilled, and even the

16  antiquated conservatorship laws can't work as they were meant to when there is

17  nowhere for conserved persons to go. Without medical supervision, the most

18  severely affected cannot hold jobs or housing, and are left to wander and fend for

19  themselves in a horrific cycle of degradation. And the number of those suffering

20

21

22       [9] Letter from Andrew Wheeler, Administrator, U.S. Environmental
Protection Agency, to Gavin C. Newsom, Governor of California (Sept. 26,
23  2019), https://www.epa.gov/sites/production/files/2019-
09/documents/9.26.19_letter-epa.pdf.

24       [10] Joel Grover and Amy Corral, *Homeless Encampment Cleanups: Are
Millions of Tax Dollars Being Wasted?*, NBC Los Angeles, (May 13, 2019, 8:44
25  AM), https://www.nbclosangeles.com/news/local/Los-Angeles-Homeless-
Encampments-Tent-City-Trash-Garbage-Waste-Cleanup-509849151.html.

26

27       [11] Emily Alpert Reyes and Benjamin Oreskes, *L.A. expands cleanup teams
for homeless encampments, vowing to be 'less reactive'*, Los Angeles Times
(June 28, 2019, 1:18 PM), https://www.latimes.com/local/lanow/la-me-ln-
28  homeless-encampment-cleanups-plan-20190628-story.html.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

ER 638

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1  has climbed with the increased prevalence of illegal narcotics, which are being

2  used to self-medicate or are the cause of the mental decline in the first place.

3      11.   The solutions currently under official consideration are too few, too

4  expensive, and take too long.  There is no plan in place or being considered to

5  provide shelter for a majority of the region's significant homeless population. In

6  2018 Mayor Garcetti unveiled his "A Bridge Home" initiative, which

7  commendably would up to 2,000 shelter beds to the City's inventory.  Yet due to

8  protests, legal challenges, construction costs, and location waffling, only 673

9  beds have opened to-date.  Even if all 2,000 beds were available today, they

10  would barely scratch the surface of the 27,221 beds needed in the City to house

11  its unsheltered population. An additional burden is placed on the defendants by

12  many of the smaller neighboring municipalities, which have done very little to

13  address their own crises and instead rely on the City and County to pick up their

14  slack.  Yet instead of addressing these issues head-on, defendants maintain their

15  inadequate trajectory.  And the problem continues to outpace the solutions.

16      12.   Proposition HHH, a $1.2 billion City project, is now expected to net

17  only 5,873 supportive units and 1,767 affordable units, at a staggering cost of

18  $531,000 to $700,000 *per bed*.[12]  Likewise Measure H—a county-wide tax

19  increase that was originally estimated to net $355 million in homeless-relief

20  funding available per year—is spread so thin that it has failed to make any

21  significant dent in the crisis.[13]

22

23

24      [12] Ron Galpern, Los Angeles Controller, *Report: The High Cost of
Homeless Housing: Review of Proposition HHH* (Oct. 8, 2019),
25  https://lacontroller.org/audits-and-reports/high-cost-of-homeless-housing-hhh/.

26      [13] LAHSA, *LAHSA Releases 2019 Housing Inventory Count* (Sept. 19,
2019), https://www.lahsa.org/news?article=584-lahsa-releases-2019-housing-
27  inventory-count ("On our present course, it will take far too long to build far too
few units of housing to effectively end this crisis" – Peter Lynn, executive
28  director LAHSA).

13.     Despite the magnitude of the problem, there is hope.  Steps could be taken to provide safe sleeping spaces for the entire homeless population for a fraction of the funds currently devoted the homelessness crisis.  Union Rescue Mission recently built a Sprung structure (large membrane tent) in a matter of months—the single tent houses more than 100 people at a cost of only $10,000 per bed (including a six-month stay, security, and social services).[14]  The City has actually utilized this same structure in several places—yet for a variety of reasons, the City's cost was quadruple Union Rescue Missions', at $42,000 per bed.[15]  In Hawaii, the city of Honolulu is putting up large military-grade inflatable tents in select parks to quickly and effectively provide shelter when the demand exceeds supply, at a cost of $6,000 per bed which also includes a 90-day stay, security, and social services.[16]  Sacramento has purchased small Pallet shelters for $2,000 per bed.[17]  Tiny houses are being used in Seattle to create micro-villages as bridge housing.[18] Entire kits can be purchased to house a family

---

[14] Rev. Andy Bales and J. Michael Arnold, *When it Comes to Homelessness, We Must Do More and We Must Do it Now*, Los Angeles Downtown News (Aug. 5, 2019), http://www.ladowntownnews.com/opinion/when-it-comes-to-homelessness-we-must-do-more-and/article_6b08711a-b57e-11e9-850e-670a231aefa4.html.

[15] Joel Grover and Amy Corral, *Inside the Massive Tent That Might be a Partial Solution Homelessness in LA*, NBC Los Angeles (Sept. 11, 2019, 1:45 PM), https://www.nbclosangeles.com/news/local/los-angeles-la-homeless-encampments-sprung-tents-shelter-skid-row/1965408/.

[16] Dan Nakaso, *Pilot project aimed at reducing Oahu's homeless will start in Waipahu*, Star Advertiser (Oct. 20, 2019, 5:28 PM), https://www.staradvertiser.com/2019/10/20/hawaii-news/pilot-project-aimed-at-reducing-oahus-homeless-will-start-in-waipahu/; Allyson Blair, *Giant inflatable tents for the homeless could be coming to a park near you*, Hawaii News Now (Nov. 27, 2018), https://www.hawaiinewsnow.com/2018/11/28/giant-inflatable-tents-homeless-could-be-coming-an-oahu-park-near-you/.

[17] Theresa Clift, *These small homeless shelters can be built in 20 minutes. Sacramento may buy dozens of them*, The Sacramento Bee (Nov. 13, 2019, 4:50 PM), https://www.sacbee.com/news/local/article237332039.html.

[18] Sharon Lee, *Tiny House Villages in Seattle: An Efficient Response to Our Homelessness Crisis* (March 15, 2019),

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

ER 640

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

of 4 in a large tent complete with furniture, refrigerator, heater, and electrical generator for a little more than $2,000 ($500 per bed).[19]  Large "festival" tents that can be purchased for $400 are being used by the city of Modesto to address its own homelessness crisis.[20] 3D printed 400-square foot homes can be built in less than 24 hours and cost only $4,000 to construct.[21]

14.     Even using the $10,000-per-bed number and extrapolating, it would cost roughly $272 million to provide a bed for every unsheltered person in the City, and an extra $170 million to provide a bed for every unhoused person in the rest of the County.[22]  In other words, just one-quarter of the Proposition HHH funds could provide a bed for every unsheltered homeless person in the City. And using only 1.2 percent of the County's $36.1 billion annual budget (less than this year's Measure H funds allocated to "combat homelessness") the County

---

https://shelterforce.org/2019/03/15/tiny-house-villages-in-seattle-an-efficient-response-to-our-homelessness-crisis/.

[19] Relief ShelterKits, *Relief Tents: Concept Designs*, https://www.relieftents.com/relief-tents/shelterkit-living-supportkit/ (last visited Mar. 9, 2020).

[20]  Kevin Valine, *Modesto homeless camp is filling up, but officials adapt to find room for more*, The Modesto Bee (May 13, 2019, 4:58 PM), https://www.modbee.com/news/local/article230345544.html; QAMP, Qamp Tent, https://qamp.com/products/qamp-tent?variant=35987893763 (last visited on Mar. 9, 2020).

[21] Aria Bendix, These 3D-printed homes can be built for less than $4,000 in just 24 hours, Business Insider (Mar. 12, 2019, 2:09 PM), https://www.businessinsider.com/3d-homes-that-take-24-hours-and-less-than-4000-to-print-2018-9; Sharon Jayson, *3-D-pringed homes a concept turns into something solid*, The Washington Post (Mar. 6, 2020, 3:00 AM), https://www.washingtonpost.com/realestate/3d-printed-homes-a-concept-turns-into-something-solid/2020/03/05/61c8b0d2-36e4-11ea-bf30-ad313e4ec754_story.html.

[22] *See* LAHSA, *supra* note 2, https://www.lahsa.org/documents?id=3467-2019-greater-los-angeles-homeless-count-total-point-in-time-homeless-population-by-geographic-areas.pdf.

---

8

COMPLAINT

1  could provide a bed for every homeless person in its entire jurisdiction.[23]  When

2  considering tent or pallet options, that amount is reduced even further.

3        15.    And there are places to put these kinds of shelters.  Hundreds of

4  acres adjacent to LAX are owned and controlled by the City and could support

5  thousands of beds.[24]  Under Title V of the McKinney-Vento Homeless Assistance

6  Act[25], the federal government is obligated to lease or deed underutilized federal

7  property to local governments for the specific purpose of homeless assistance,

8  such as the abandoned Federal Aviation Administration (FAA) building in

9  Hawthorne, toured by a White House delegation in September.[26] The County's

10  General Hospital (LAC+USC) Building, with 1.5 million square feet of space in

11  the heart of East L.A., has been vacant for over a decade—the County at one

12  point considered utilizing it for homeless assistance but is now evaluating it as a

13  "mixed use" property.[27]  St. Vincent Medical Center, a 366-bed facility, is

14  closing and both the City and County are in talks about purchasing it (though the

15  extent to which either could or would use the infrastructure to capitalize on the

16

17        [23] County of Los Angeles, *2019-2020 Los Angeles County Budget: LA County budget process concludes with adoption of $36.1 billion supplemental budget*, https://www.lacounty.gov/budget/ (last visited on Mar. 9, 2020).

18

19        [24] Rob Eshman, *Opinion: Imagine if L.A. put the same effort into housing the homeless that it does Olympic athletes*, Los Angeles Times: Opinion (Nov. 10, 2019, 4:00 AM), https://www.latimes.com/opinion/story/2019-11-10/homeless-crisis-housing-2028-olympics-los-angeles.

20

21        [25] 42 U.S.C. § 11411.

22        [26] Jeff Stein, *Trump officials tour unused FAA facility in California in search for place to relocate homeless people*, The Washington Post (Sept. 11, 2019, 5:49 PM), https://www.washingtonpost.com/business/2019/09/12/trump-officials-tour-unused-faa-facility-california-search-place-relocate-homeless-people/.

23

24

25        [27] Jacqueline Ramírez, *Second community meeting explores future of former County Hospital*, Boyle Heights Beat (Sept. 18, 2019), https://boyleheightsbeat.com/second-community-meeting-explores-future-of-former-county-hospital/; Alex Medina, *Community meeting to explore former County Hospital re-use*, Boyle Heights Beat (June 12, 2019), https://boyleheightsbeat.com/community-meeting-to-explore-former-county-hospital-re-use/.

26

27

28

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

9

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   property to house exponentially more than 366 is yet to be seen).[28]  The County

2   owns over 200 acres of the Los Angeles County Fairgrounds ("Fairplex") in

3   Pomona which, while currently leased to the non-profit Los Angeles County Fair

4   Association, may be negotiated to support shelters. The L.A. City Controller has

5   recently identified 13,948 separate properties within the City owned by various

6   public entities, many of which are vacant or underutilized.[29]  Even small lots

7   could support pallet houses individual tents, or "tiny home" communities with

8   shared bathroom facilities.

9        16.     Board-and-care facilities—which offer housing, meals, and basic

10  assistance for those who need supportive care—could also be part of the solution.

11  But they are closing all over California at rapid rates because it is becoming

12  economically infeasible to remain open.[30]  This has resulted in an estimated 1,000

13  individuals becoming homeless in Los Angeles County in the last couple years—

14  and without such supportive care, their conditions inevitably decline.  Those

15  same facilities—which are paid only $35 per-night-per-guest by government

16  entities—could be utilized as temporary shelters with higher per-guest

17  compensation ($60 per night).  No infrastructure would need to be built, and the

18  _____

19  [28] Eric Heinz, *LA County bids to purchase St. Vincent Medical Center for homeless aid*, Los Angeles Daily News, (Feb. 7, 2020, 8:24 AM),

20  https://www.dailynews.com/2020/02/07/la-county-bids-to-purchase-st-vincent-medical-center-for-homeless-aid/.

21  [29] Los Angeles City Controller, *Publicly-Owned Properties*,

22  https://controllerdata.lacity.org/dataset/Publicly-Owned-Properties/bawf-ixme/data (last visited Mar. 9, 2020); Los Angeles City Controller, *Property Panel: A guide to publicly-owned properties in the City of Los Angeles*,

23  https://lacontroller.maps.arcgis.com/apps/Cascade/index.html?appid=b6d7907c1

24  18d4ea2a1dd96bc0425633d (last visited Mar. 9, 2020); Natalie Hoberman, *Despite housing crisis, LA lags in building its own sprawling land portfolio*, TheRealDeal (May 28, 2019, 1:00 PM),

25  https://therealdeal.com/la/2019/05/28/despite-housing-crisis-la-lags-in-building-on-its-own-sprawling-land-portfolio/.

26

27  [30] Jocelyn Wiener, *Overlooked mental health "catastrophe:" Vanishing board-and-care-homes leave residents with few options*, CalMatters: Projects

28  (Apr. 15, 2019), https://calmatters.org/projects/board-and-care-homes-closing-in-california-mental-health-crisis/.

property owners would have greater financial incentive to stay open to provide beds, meals, and basic care. Similarly, the shared housing model supported by SHARE!, Haaven, and others, boasts zero infrastructure costs with the added benefit of self-sustenance after a one-time $4,000-per-bed investment.[31]

17.     For decades, the City and County have failed to dedicate the necessary funds or build the infrastructure to support the significant numbers of unhoused persons.  This failure of public will has been exacerbated by recent legal decisions, including *Martin v. City of Boise*, in which the Ninth Circuit held, "'[S]o long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters,' the jurisdiction cannot prosecute homeless individuals for 'involuntarily sitting, lying, and sleeping in public.'"  *Martin v. City of Boise*, 920 F.3d 584, 617 (9th Cir. 2019) (alterations in original omitted) (citation omitted), *cert. denied*, 140 S. Ct. 674 (2019).  In December 2019, the Supreme Court declined to take up the *Martin* case on review.  Despite the sweeping ruling in *Martin*, and huge increase in numbers of unsheltered in the City and County, neither entity has been able to pivot their strategy to address the decision, and the crisis has increased exponentially.  This has had a profoundly negative affect on both the homeless and the community as a whole.

18.     While this is not a natural disaster, it is a disaster nonetheless, and it should be treated that way.  Officials in both the County and City have gone to great lengths in the last couple years to address this crisis, and their efforts are impressive and commendable; yet much more needs to be done.  The *only* way to address this crisis with the urgency it deserves is an emergency response— providing immediate shelter for all and abating the degradation of our cities and

---

[31] *See* para. 70 *infra.*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

11

COMPLAINT

communities, for the good of everyone.  It can be done cheaply and quickly, and it must be done now.

## I.    JURISDICTION AND VENUE

19.    This action is brought pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act (42 USC §§12131 *et seq*.) ("ADA"), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 *et seq*.) ("Section 504"), and the Fifth, and Fourteenth Amendments of the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 2201 and 2202.

20.    This court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as it arises from the same case or controversy as Plaintiffs' federal claims.

21.    All of the actions and omissions complained of occurred in the Central District of California.  Therefore, venue is proper in this District.  28 U.S.C. §1331.

## II.    GENERAL ALLEGATIONS

22.    Plaintiffs are informed and believe, and thereon allege, that, at all times herein mentioned, each of the Defendants and Does 1-20 inclusive was the agent, employee, and co-conspirator of each of the remaining Defendants, and in participating in the acts alleged in this Complaint, acted within the scope of such agency and employment,  in furtherance of the conspiracy, and with the permission and consent of the co-conspirator Defendants.

23.    All causes of action brought under California law are for equitable and injunctive relief only.  Therefore, no tort claim was necessary prior to filing this suit.  *See* Cal. Gov. Code § 905 (West, 2019); *Qwest Commc'ns Corp. v. City of Berkeley,* 146 F. Supp. 2d 1081 (N.D. Cal. 2001); *Hart v. County of Alameda*, 76 Cal. App. 4th 766 (1999).

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

12

24.     Each paragraph of this Complaint is expressly incorporated into each cause of action set forth below.

## III.     FACTUAL ALLEGATIONS

### A.     History of Homeless Treatment in Los Angeles

25.     What is now known as Skid Row began in the late 1800s as a concentration of day-rate hotels, bars, and brothels catering to the "rail riders" (transients riding the trains) due to its proximity to where the trains terminated at Los Angeles.[32]  Service providers like the Union Rescue Mission opened their doors to help the indigent who congregated there.  Decades later, when the 1970s, brought a push for "de-institutionalization" of those suffering from mental illnesses, Skid Row became a beacon of hope for those needing services and shelter.[33]  At the same time, DTLA experienced an economic resurgence and developers began restoring the Skid Row area.  Activists pushed back and fought for a policy of "containment" with the goal of centralizing missions, charities, and other homeless services within the 50-square block area, encouraging "undesirable population elements" to stay within the boundaries, in return for an agreement with the City to keep redevelopment out of it.[34]  In one interview, the Reverend Andy Bales, who runs Union Rescue Mission, noted the containment

---

[32] Sebastin Kempkens, *L.A.'s Homelessness Crisis: How Did We Get Here?*, LA Weekly (Nov. 21, 2018), https://www.laweekly.com/l-a-s-homelessness-crisis-how-did-we-get-here/; *99% Invisible: The Containment Plan*, Radiotopia (Oct. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/; Union Rescue Mission, *About Skid Row*, https://urm.org/about/faqs/about-skid-row/ (last visited Mar. 9, 2020).

[33] *See* Kempkens, *supra* note 32, https://www.laweekly.com/l-a-s-homelessness-crisis-how-did-we-get-here/.

[34] Rich Connell, *SKID ROW: 'Containment Strategy' of Aiding Residents, Easing Impact on Business District Is Slow and Frustrating*, Los Angeles Times (Aug. 5, 1985, 12:00 AM), https://www.latimes.com/archives/la-xpm-1985-08-05-me-3525-story.html; 99% Invisible, *supra* note 32, https://99percentinvisible.org/episode/the-containment-plan/.

13
COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

policy "basically said 'Let's send everybody who's struggling in all of L.A. to Skid Row and then let's turn our back on it."[35]  The policy is now widely considered a failure, yet unofficially continues today.

26.     The 1980 and 1990s, with the crack epidemic and simultaneous cuts to the welfare system, brought in true and enduring homelessness, with encampments springing up on sidewalks and criminals preying on the vulnerable.[36]  Then-mayor Tom Bradley opened an urban campground along the L.A. River, but it was soon closed due to terrible living conditions.  At various times groups have placed portable toilets in key encampment locations, only to have the city remove them when they became magnets for prostitution and drug use.  In the early 1990s, as a settlement of litigation between the City and County, Los Angeles Homeless Services Authority ("LAHSA"), a joint-powers authority, was created to oversee the City and County's homeless response.  The aim was more accountability, but ultimately it has resulted in an accountability deficit.

27.     That deficit is particularly apparent in the litigious history of two Los Angeles Municipal Code provisions ("L.A.M.C.")—section 41.18 and 56.11—that regulate behavior in public rights-of-way.  Section 41.18(d) provides "No person shall sit, lie or sleep in or upon any street, sidewalk or other public way."[37]  56.11 prohibits, among other things, storage of "excess personal

---

[35] *See* Kempkens, *supra* note 32, https://www.laweekly.com/l-a-s-homelessness-crisis-how-did-we-get-here/.

[36] *Id.*

[37] The Los Angeles City Council is currently considering an amendment to 41.18(d) that would permit persons to sit, lie, or sleep in non-sensitive public areas (500 feet away from schools, parks, and day care facilities, out of tunnels, etc.) Emily Alpert Reyes, *L.A. is again considering limits on where homeless people can sleep — this time by schools and parks*, Los Angeles Times (Aug. 22, 2019, 5:25 PM), https://www.latimes.com/california/story/2019-08-22/homeless-sidewalk-sleeping-ban-restrictions-boise-case-shelter.

---

14
COMPLAINT

property" meaning property which cumulatively exceeds 60 gallons in a public area.[38]

28.     In 2006, the City settled a case brought by several activists, *Jones v. City of Los Angeles*, agreeing not to enforce Section 41.18(d)'s restrictions on tents and people sleeping in public areas between the hours of 9 p.m. and 6 a.m. As part of the agreement, the parties concurred that a published court decision would be de-published and would no longer be binding authority.  According to the *Los Angeles Times*, "The [Jones] agreement set the stage for today's encampment explosion."[39]  And ironically, the de-published *Jones* decision was still oft-cited and essentially resurrected in the 2018 published decision of *Martin v. City of Boise*.

29.     In 2011, the Ninth Circuit upheld an injunction in *Lavan v. City of Los Angeles* that prohibited the City from seizing unattended property without notice absent objectively reasonable belief that it is abandoned, evidence of crime, contraband, or presents an "immediate threat to public health or safety." Unfortunately, it is difficult to determine when property is "abandoned" as opposed to momentarily "unattended" when there are tens of thousands of people living unsheltered in our public spaces.  The result is a massive build-up of

---

[38] LAMC 56.11 was amended in 2016 in direct response to *Lavan v. City of Los Angeles*, discussed *infra*.  Its express stated purpose was to "balance the needs of the residents and public at large to access clean and sanitary public areas with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited of personal property in public areas."  Unsurprisingly, unhappy advocates have challenged the new amendment, first as applied to those living in Skid Row (*Mitchell v. City of Los Angeles,* 16-CV-01750 SJO JPR) and now city-wide (*Garcia v. City of Los Angeles*, 2:19-CV-06182 DSF PLA).

[39] Gale Holland, *Why L.A. County's homelessness crisis has been decades in the making*, Los Angeles Times (June 5, 2019, 11:10 AM), https://www.latimes.com/local/california/la-me-ln-homeless-housing-crisis-count-history-skid-row-20190605-story.html ( "'We are dealing with historical consequences of bad decisions made 10 years ago to guarantee a right to sidewalks instead of a right to shelter,' said Westside Councilman Mike Bonin.").

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700/ FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

property, which harbors significant health and safety risks that mostly go undetected until too late.

30.     Eight years after the Ninth Circuit upheld the *Lavan* injunction, the City entered into a settlement in the case of *Mitchell v. City of Los Angeles*. Under the terms of that settlement, the City bound its own hands in agreeing to significantly limit the enforcement of L.A.M.C. Section 56.11, permitting the accumulation of personal property beyond the code section's limits, and relegating enforcement to only certain bulky items such as couches, mattresses, refrigerators, and wooden pallets within a designated area known as "Skid Row and surrounding areas."  The *Mitchell* agreement has led to a sharp decline in health and safety for housed and unhoused alike not just in Skid Row but throughout downtown.  The agreement promotes and authorizes violation of a valid city ordinance and suffers from significant legal flaws.  *League of Residential Neighborhood Advocates v. City of Los Angeles*, 498 F.3d 1052, 1055 (9th Cir. 2007) ("A federal consent decree or settlement agreement cannot be a means for state officials to evade state law."); *City of Glendale v. Superior Court,* 18 Cal. App. 4th 1768, 1778-79 (1993) ("It is well established that governments cannot divest themselves by contract of the right to exert their governmental authority 'in matters which from their very nature so concern that authority that to restrain its exercise by contract would be a renunciation of power to legislate for the preservation of society or to secure the performance of essential governmental duties.'").[40]

31.     *Mitchell* was settled in the wake of a recent, broadly-sweeping decision addressing homeless regulation: *Martin v. City of Boise*, based almost entirely on the reasoning published (then de-published) in *Jones*.  *Martin* held

---

[40] *See* [Proposed] Intervenors' Notice of Motion and Motion for Relief from Order or Modification thereof, *Mitchell v. City of Los Angeles*, Case No. CV16-01750 SJO (JPRx) (C.D. Cal. June 24, 2019), ECF No. 120-1.

ER 649

that "so long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters" a person may not be prosecuted for sitting, lying, or sleeping in public. *Martin*, 920 F.3d at 617 (original alterations omitted) (citation omitted).  The language in the *Martin* does not provide clear guidance for cities struggling with sizable homeless populations--in some passages, *Martin* suggests that there must be enough beds for <u>everyone</u> before <u>anyone</u> may be cited for sleeping on a sidewalk, while other aspects of *Martin* indicate that <u>individuals</u> "who do have access to adequate temporary shelter" but "choose not to use it" may be prosecuted without reference to the community. *Id.* at n.8.

32.     Regardless of how the *Martin* case is interpreted, it is clear the only way out of the current crisis is to provide beds to the unsheltered.  That will not be easy.  The homelessness crisis has now reached the highest numbers we have ever seen, with 58,936 homeless individuals in Los Angeles County and 36,300 homeless individuals in the City.  Approximately 75 percent of these are unsheltered, meaning living and sleeping in a place not meant for human habitation, including streets, parks, tents, and cars.  The task of finding beds for so many people is daunting, but it must be done if Los Angeles is to find its way clear of this crisis.

**B.     Crime and Fire Incidents Have Escalated**

33.     The crisis of so many unsheltered individuals in a wealthy City is a tragedy in and of itself.  But the tragedy has been exacerbated by a severe spike in crime both on and by homeless persons, particularly in violent attacks.[41] LAPD citywide data from 2017 to 2018 shows a 36 percent increase in crimes against homeless victims, aggravated assault increased 57 percent, and crimes

---

[41] Leonard, *supra* note 4, https://www.nbclosangeles.com/news/local/LAPD-Reports-Spike-in-Homeless-Crime-502407861.html; Matthew, *supra* note 4, https://www.lamag.com/citythinkblog/homeless-crime/.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

with a homeless suspect rose 28.5 percent.  The statistics from 2018 to 2019 are even worse:

- The homicide rate citywide rose 5 percent last year yet homicides against a homeless victim in Central Bureau rose 33 percent.

- Violent crimes against a homeless person increased 18.9 percent citywide while property crimes identifying a homeless victim rose 43.8 percent.

- Violent crimes with an identified homeless suspect rose 22.5 percent citywide (48.1 percent in Central Division) and property crimes with an identified homeless suspect rose 18 percent citywide (27.9 percent in Central Division).

- Homicides in Central Division with an identified homeless suspect increased by a shocking 175 percent from 2018 to 2019.

34.    Drugs are being sold and used openly on streets and sidewalks. Public urination and defection have become the norm. LA Metro spent $36 million on a bike-share program, but those bikes go missing daily and many have been recovered, repainted or otherwise vandalized, in homeless encampments throughout the city.[42]  As the ranks of the desperate and downtrodden have grown exponentially in Skid Row and throughout the City and County, and quality-of-life laws are left unenforced, public order has deteriorated.

35.    In addressing the rise in crime within the homeless community, one City official accurately noted, "[T]here are certainly tensions that are rising within the homeless population. . . the connective tissue between them all is the increase in the concentration.  As the homeless encampments increase, so do fights over territory, over property, over intangibles, as well as domestic

---

[42] David Goldstein, *Goldstein Investigation: Hundreds Of Taxpayer-Funded Metro Bikes Stolen, Stripped*, CBS Los Angeles (Nov. 7, 2019, 11:59 PM), https://losangeles.cbslocal.com/2019/11/07/goldstein-investigation-taxpayer-funded-metro-bikes-stolen-stripped/.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

violence."[43] "Personal Security Tips" have been given to County employees walking to and from civil and mental health courts, advising them "remain vigilant," "travel in numbers," and "drive in a middle or left lane" due to the criminal element rising out of surrounding homeless encampments.

36.     Crime against homeless women in particular has become a "crisis within a crisis" with 60 percent of homeless women reporting violence in the last year and 25 percent experiencing it "often" or "always."[44] More than a quarter have experienced sexual assault in the last twelve months, and 37 percent report having experienced domestic violence in the same time period.[45]

37.     As crime has increased, so have fires.  There were 2,500 fires just involving the homeless community in Los Angeles in 2018, which is double the number of such fires in 2017.[46]  And the statistics for 2019, while not yet released were on track to far outpace 2018's record number.[47]  The industrial buildings and businesses downtown regularly experience fires from adjacent encampments, whether from heaters, food preparation, or arson.  In the first six months of 2019, there were 65 fires just in this one small area.  Businesses are being dropped by

---

[43] *See* Queally, *supra* note 6, https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.

[44] Elijah Chiland, *For women, 'living on the streets in Los Angeles is dangerous and traumatic'*, Curbed Los Angeles (Jan. 30, 2020, 2:25 PM), https://la.curbed.com/2020/1/30/21115700/downtown-womens-center-homeless-report.

[45] Downtown Women's Center, 2019 Los Angeles City Women's Needs Assessment, https://www.downtownwomenscenter.org/wp-content/uploads/2020/01/DWC-2019-Los-Angeles-Womens-Needs-Assessment.pdf (last visited Mar. 9, 2020).

[46] *See* Queally, *supra note 6*, https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.

[47] *Id.*; Marc Brown, Leanne Suter, et al., *LAFD incidents involving the homeless disproportionately high, data shows*, ABC Eyewitness News (Feb. 11, 2020, 11:15 AM), https://abc7.com/5919386/.

19
COMPLAINT

insurance companies because of the fire risks due to the homeless living on their sidewalks.[48]  Fire hydrants are being repurposed by homeless for drinking, bathing, and washing clothes and personal items, compromising fire-readiness and putting an untold number of lives and structures at greater risk in the event of a fire.[49]  There have been no observable efforts to curb the use of open flames, despite fire code provisions that prohibit them and the frequent use of open flames in homeless encampments.[50]  In fact, the *Mitchell* settlement specifically permits violations of the fire code by allowing "open-flame cooking devices" as long as they have fuel containers under a certain size.  *See* Stipulated Order of Dismissal at 11, *Mitchell v. City of Los Angeles*, Case No. CV16-01750 SJO (JPRx) (C.D. Cal. May 31, 2019), ECF No. 119.

38.    Fires originating in homeless encampments are now a regular occurrence in Los Angeles County.  One of the most destructive fires in Los Angeles over the last 10 years, the Skirball Fire, was caused by a cooking fire at a homeless encampment in the hills of Bel Air in 2017—that fire caused thousands to evacuate and destroyed several houses.[51]  In July 2019, a fire broke out in a homeless encampment in the Sepulveda Basin, where homeless residents report

---

[48] Joel Grover and Amy Corral, *Your Insurance is Canceled Because of Homeless Tent Fires*, NBC Los Angeles (Sept. 23, 2019, 11:55 AM), https://www.nbclosangeles.com/news/local/LA-Homeless-Encampment-Fires-Insurance-Rates-Tents-Homelessness-561145811.html.

[49] Joel Grover and Amy Corral, *Firefighters Lose Critical Tool to Battle Rise in Homeless Fires*, NBC Los Angeles (July 22, 2019, 3:17 PM), https://www.nbclosangeles.com/investigations/Firefighters-Lose-Critical-Tool-to-Battle-Rise-in-Homeless-Fires-513057481.html.

[50] *See* Grover and Corral, *supra* note 49, https://www.nbclosangeles.com/investigations/Firefighters-Lose-Critical-Tool-to-Battle-Rise-in-Homeless-Fires-513057481.html; County of Los Angeles, Ordinance re Open Fires § 307.6 (2017), http://lacounty-ca.elaws.us/code/coor_title32.

[51] Gale Holland, Laura J. Nelson, et al., *Fire at a homeless encampment sparked Bel-Air blaze that destroyed homes, officials say*, Los Angeles Times (Dec. 12, 2017, 5:55 PM), https://www.latimes.com/local/lanow/la-me-skirball-fire-cause-20171212-story.html.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

20

COMPLAINT

1  they put out "multiple fires daily," burning 6 acres and destroying the

2  encampment.[52]

3  **C.      Public Health is Compromised**

4        39.    Beyond crime and fire, the homelessness crisis presents a pressing

5  public health predicament.  The accumulation of property and food storage in

6  tents by homeless individuals has made Skid Row and other areas hotbeds for

7  flea-infested rats and other disease-carrying vermin, making some areas nearly

8  unlivable.[53]  Los Angeles has declared Skid Row a "typhus zone" and at least one

9  Deputy City Attorney has contracted typhus apparently from the conditions

10 surrounding her office building in Downtown Los Angeles.[54]  LAPD Officers

11 working Central Division downtown contracted typhoid fever, caused by

12 contamination of human fecal matter.[55]  LA City was recently cited by

13 Cal/OSHA for the homeless encampments outside City Hall East for exposing its

14

15

16

17        [52] Ariella Plachta and Elizabeth Chou, *A Sepulveda basin encampment fire*
18 *left dozens of homeless people displaced but service providers have little to offer*
   *them*, Los Angeles Daily News (July 31, 2019, 1:23 PM),
19 https://www.dailynews.com/2019/07/31/a-sepulveda-basin-encampment-fire-left-
   dozens-of-homeless-people-displaced-but-service-providers-have-little-to-offer-
20 them/.

21        [53] Lauren Fruen, *Collapse of a City That's Lost Control: Shocking New*
   *Pictures From Downtown LA Capture The Huge Problem it Faces With Trash*
22 *and Rats Amid Fear of Typhoid Fever Outbreak Among LAPD*, Daily Mail and
   Associated Press, (June 2, 2019, 2:03 PM),
23 https://www.dailymail.co.uk/news/article-7095533/Pictures-downtown-LA-
   capture-problem-faces-trash-tries-rodents.html.

24        [54] Harriet Ryan, *'Absolutely terrifying': Deputy city attorney says she*
25 *contracted typhus at City Hall*, Los Angeles Times, (Feb. 9, 2019, 5:45 PM),
   https://www.latimes.com/local/lanow/la-me-ln-city-hall-typhus-20190209-
26 story.html.

27        [55] Jaclyn Cosgrove, *LAPD employee contracts bacteria that causes typhoid*
   *fever,* Los Angeles Times, (May 29, 2019, 8:44 PM),
28 https://www.latimes.com/local/lanow/la-me-ln-lapd-typhoid-fever-20190529-
   story.html.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

21

COMPLAINT

1   workers to trash and bodily fluids.[56]  Experts have predicted a "major infectious

2   disease epidemic" outbreak in DTLA, including measles and/or tuberculosis.[57]

3   The United Nations noted "Los Angeles failed to meet even the minimum

4   standards the United Nations High Commissioner for Refugees sets for refugee

5   camps in the Syrian Arab Republic and other emergency situations."[58]

6         40.     Beyond the societal implications associated with unsanitary

7   conditions related to unsheltered homelessness, it has been well-documented that

8   the physical and mental health of unsheltered persons is significantly worse than

9   those of their sheltered or housed counterparts.[59]  According to a recent report

10   from the Los Angeles County Department of Public Health ("DPH"), homeless-

11   related deaths doubled from 2013 to 2018.[60]  On average, a homeless person in

---

[56] California News Wire Services, *State Slaps City Of LA Over Unsanitary Conditions,* Los Angeles, CA Patch.com (Aug. 16, 2019, 1:31 PM), https://patch.com/california/los-angeles/state-slaps-city-la-over-unsanitary-conditions.

[57] Victor Garcia, *Dr. Drew Pinsky Warns Los Angeles Could be at Risk of a Deadly Epidemic This Summer*, Fox News, (May 23, 2019), https://www.foxnews.com/us/dr-drew-pinsky-major-epidemic-los-angeles-kill-thousands.

[58] Report of the Special Rapporteur on extreme poverty and human rights on his mission to the United States of America, U.N. Doc. A/HRC/38/33/Add.1 (May 4, 2018), https://documents-dds-ny.un.org/doc/UNDOC/GEN/G18/125/30/PDF/G1812530.pdf.

[59] Adeline M. Nyamathi and Barbara Leake, et al., *Sheltered versus nonsheltered homeless women*, J. Gen. Intern. Med. vol. 15, issue 8, at pp. 565-72 (Aug. 2000), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495574/; Janey Rountree, Nathan Hess, and Austin Lyke, *Health Conditions Among Unsheltered Adults in the U.S.*, California Policy Lab (October 2019), https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

[60] County of Los Angeles, Public Health, *supra* note 1, http://publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf.

22
COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   Los Angeles will die 22 years earlier than the general population.[61]  Importantly,

2   the report noted:

3   A principal finding is that the overall homeless mortality rate has steadily

4   increased over the past six years.  This means that increases in the number of

5   homeless deaths recently reported in the media cannot be attributed solely to

6   the fact that the total number of homeless people has also been increasing.

7   **Put simply, being homeless in LA County is becoming increasingly**

8   **deadly.[62]**

9        41.   Dr. Barbara Ferrer, director of DPH conceded: "Homeless people

10  are in fact dying at a higher rate because they're homeless."[63]  Yet in New York

11  City, where the number of people experiencing homelessness is high (91,897

12  persons) but the rate of *unsheltered* homelessness is low (5 percent compared to

13  Los Angeles' 75 percent), the mortality rates of homeless persons compared to

14  general population low-income adults is nearly identical.[64]  Unsheltered

15  homelessness both causes and exacerbates physical and mental health problems.[65]

16

17

18   [61] *Id*. at 5 ("The average age at death was 51 among the homeless and 73 among the general population.").

19   [62] *Id*. (emphasis added).

20   [63] Jessica Flores, *Homeless deaths in LA County doubled between 2013
21   and 2018*, Curbed Los Angeles (Oct. 30, 2019, 3:50 PM),
     https://la.curbed.com/2019/10/30/20940369/homeless-deaths-los-angeles-county.

22   [64] Bonnie D. Kerker, PhD, Jay Bainbridge, PhD, et al., *A Population-Based
23   Assessment of the Health of Homeless Families in New York City, 2001–2003*,
     American Journal of Public Health (Sept. 20, 2011),
24   https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2010.193102.

25   [65] County of Los Angeles, *supra* note 1,
     http://publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Fin
26   al.pdf; Seena Fazel, MD, John R. Geddes, MD, et al., *The health of homeless
     people in high-income countries: descriptive epidemiology, health consequences,
27   and clinical and policy recommendations*, The Lancet, vol. 382, issue 9953, pp.
     1529-40  (Oct. 25, 2014),
28   https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(14)61132-
     6/fulltext.

42.   Los Angeles County has recognized this, and in 2012 the Department of Health Services launched a program called Housing for Health, observing "[a]ccess to community based housing options is an important element of our evolving county healthcare system, particularly in response to the homelessness crisis."[66] A study conducted by the RAND Corporation on the first 890 participants enrolled found that the cost of providing health care per participant decreased by 40 percent (from an average of $38,146 to $15,358) because there was less need for the patients to access the system.[67]

**D.   Crowded and Blocked Sidewalks Put Everyone at Risk**

43.   The homelessness crisis has also impeded the use of a critical element of city life: sidewalks.  Municipalities have an obligation to keep sidewalks clear for use by the public.  The City itself recognized this in its recent Motion to Dismiss filed in the ongoing litigation in *Garcia v. City of Los Angeles*:

> Sidewalks serve numerous functions and implicate a myriad of
> individual interests.  Children on field trips, persons with disabilities,
> mail carriers with delivery carts, free-speech demonstrators, shop
> owners, travelers, and the many thousands of other persons that live,
> work, and visit Los Angeles—all have legitimate claims to use these
> narrow strips of public property.  As courts have long recognized,

[66] Health Services of Los Angeles County, *Housing for Health,* http://dhs.lacounty.gov/wps/portal/dhs/housingforhealth (last visited Mar. 9, 2020).

[67] Sarah B. Hunter, *Housing for Health; Los Angeles County's Department of health Tackles Homelessness with an Innovative Housing Program That Saves Money,* The Rand Blog (Jan. 18, 2018), https://www.rand.org/blog/2018/01/housing-for-health-los-angeles-countys-department-of.html (Notably the County experienced a net savings of 20% even taking the costs of housing into consideration (from an average of $38,146 per participant to $30,646).  Of course, this number doesn't take into consideration the additional savings from other departments such as reduced law enforcement contacts.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

24

COMPLAINT

ER 657

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

"[t]he public is entitled to the free and unobstructed use of the entire streets and sidewalks . . . " *Vanderhurst* v. *Tholcke*, 113 Cal. 147, 152 (1896).  To balance among the many, often competing uses, cities have been designated as trustees of these public spaces.  In this capacity, they have not only the power but "the *duty* to keep their communities' streets open and available for movement of people and property."  *Schneider v. State*, 308 U.S. 147, 160-61 (1939) (emphasis added); *see also Smith v. Corp. of Wash.*, 61 U.S. (20 How.) 135, 146 (1858); Cal. Gov. Code § 37359 ("the legislative body having control of any property owned or controlled by the city may at any time withdraw…or limit the access or use in area or time or in any other reasonable manner deemed necessary.").

Def. City of Los Angeles' Mot. to Dismiss Suppl. Compl. at 2, *Garcia v. City of Los Angeles,* Case No.: 2:19-cv-6182-DSF-PLA (C.D. Cal. Oct. 21, 2019), ECF No. 22.

44.     Public sidewalks and the maintenance of them constitutes a "program, service, or activity within the meaning of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973."[68] Municipalities have an obligation to ensure that public sidewalks are usable and compliant with ADA requirements, such as providing a minimum of 36 inches of clearance for wheelchair users, yet the City regularly ignores its obligations and fails to provide such clearance.

45.     Encampments throughout the City and County block sidewalks and public rights-of-way.  Local governments, as explained by the City, have an obligation to balance the needs of all citizens to access sidewalks, particularly for those with disabilities who have no alternative like stepping around a blockage.

---

[68] *Willits v. City of Los Angeles*, 925 F. Supp. 2d 1089, 1093 (C.D. Cal. 2013).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Yet the City is consistently failing to do so.  Disabled persons in wheelchairs such as plaintiffs Charles Van Scoy and Leandro Suarez must choose daily whether to stay in their homes or walk into the middle of the street with oncoming traffic.  Mothers with young children in strollers, like plaintiffs Deisy Suarez and Karyn Pinsky, do the same.  Children on their way to and from school daily risk injury by car where sidewalks are impassable.

46.   Citizens are calling 311 to request cleanup of sidewalk encampments at a skyrocketing rate—increasing 167 percent between 2016 and 2018.[69]  Yet if City officials even respond, it is to simply power-wash the sidewalk and then allow encampments to resume.[70]

47.   After *Martin v. Boise* was decided, Los Angeles Police Department's Office of the Chief of Police issued an order suspending all enforcement of L.A.M.C 41.18 except to provided "minimum clearance of a continuous three-foot wide pathway as required under the Americans with Disabilities Act" or "When a person is sitting, sleeping, or lying within ten (10) feet of any operational and utilizable entrance or exit of a building, driveway, or loading dock."

48.   The prevalent and virtually permanent nature of these encampments—unimpeded by any meaningful City enforcement or cleanup efforts despite notice to the City—reflects an unambiguous official City policy to permit usurpation of public sidewalks in certain areas.  For example, on Venice Boulevard under the 405 freeway, a large-scale encampment has been been

---

[69] Emily Alpert Reyes, Benjamin Oreskes, Doug Smith, *L.A. is swamped with 311 complaints over homeless camps. But are the cleanups pointless?*, Los Angeles Times (June 7, 2019, 5:00 AM), https://www.latimes.com/local/lanow/la-me-ln-homeless-cleanups-accelerate-20190607-htmlstory.html.

[70] *Id.*; Matt Tinoco, *LA /wukk Spend $30M This Year on Homeless Sweeps. Do They Even Work?*, LAist (Apr. 10, 2019, 6:00 AM), https://laist.com/2019/04/10/homeless_sweeps_los_angeles_public_health.php.

1  allowed to persist for over a year.  City workers have actively encouraged
2  homeless persons in nearby areas to move to this encampment.  In the Skid Row
3  area, as part of the *Mitchell v. City of Los Angeles* settlement, the City agreed to
4  allow nearly unlimited property accumulation on the public sidewalks while
5  providing little comfort to the ADA-based concerns regarding the navigational
6  impediments to those with disabilities.  The freeway overpasses near the Los
7  Angeles Civic Center now are so packed that it is difficult for an able-bodied
8  individual to walk past without stepping in the street, and impossible for those
9  who need the assistance of wheelchairs and walkers.

10      49.    The sidewalk problem directly affects businesses that are accessed
11  by sidewalks.  This prevents disabled customers from reaching businesses, but
12  also deters able-bodied customers who seek to access their businesses or abandon
13  some businesses in favor of more accessible ones.  As discussed above,
14  businesses are collectively spending hundreds of thousands of dollars on
15  increased sanitation and security measures while struggling to maintain
16  employees and tenants.  Both business owners and residents of the area are thus
17  subject to substantial and unreasonable interference with their enjoyment of their
18  property.  Indeed, the streets and sidewalks of Skid Row have been rendered
19  unusable because of human waste, garbage, and encampments that the City has
20  allowed to persist.

21  **F.**    **Environmental Impact**

22      50.    The unhealthy aspects of the homelessness crisis extend to the
23  environment.  There appears to be no environmental impact study of the kind of
24  widespread and systemic homelessness in Los Angeles.  Yet all indications show
25  the impact has been significant.[71]  Every day, businesses and residents find used

26

27        [71] Courtenay White, *Environmental Impacts of Homeless Encampments in*
28  *the Guadalupe River Riparian Zone*, School of Environment and Sustainability,
    Royal Roads University (Jan. 9, 2014),

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

27
COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

needles in their drains, on sidewalks, and in gutters.  Los Angeles County has far more unsheltered people than Orange County, and officials there recovered over 14,000 hypodermic needles, plus over 5,000 pounds of "hazardous waste" including human waste, and toxic chemicals such as propane, pesticides, solvents, and paint during a clean-up of a homeless encampment in the Santa Ana Riverbed consisting of approximately 700 people. [72]  While City sanitation workers are deployed to identify and discard toxic waste, only 30 teams are working to cover 500 square miles, missing countless numbers of needles, human waste, and other toxic substances making its way into our ecosystems.

51.    The Environmental Protection Agency recently recognized this issue in a letter addressed to Governor Gavin Newsom:

> The EPA is aware of the growing homelessness crisis developing in major California cities, including Los Angeles and San Francisco, and the impact of this crisis on the environment.  Indeed, press reports indicate that "piles of human feces" on sidewalks and streets in these cities are becoming all too common.  The EPA is concerned about the potential water quality impacts from pathogens and other contaminants from untreated human waste entering nearby waters.  San Francisco, Los Angeles and the state do not appear to be acting with urgency to mitigate the risks to human health and the environment that may result from the homelessness crisis. [73]

---

https://viurrspace.ca/bitstream/handle/10170/665/white_courtenay.pdf?sequence=1&isAllowed=y.

[72] Anh Do, *'Eye-popping' number of hypodermic needles, pounds of waste cleared from Orange County riverbed homeless encampment*, Los Angeles Times (Mar. 10, 2018, 4:30 PM), https://www.latimes.com/local/lanow/la-me-ln-riverbed-debris-20180310-story.html.

[73] Letter to Governor Gavin C. Newsom from Andrew R. Wheeler, September 26, 2019, https://www.epa.gov/sites/production/files/2019-09/documents/9.26.19_letter-epa.pdf.

28
COMPLAINT

52.     Thousands of people camp in or near the Los Angeles River basin, without access to toilets and sanitation services.  The amount of related toxic and human waste making its way into our environment is, upon information and belief, substantial, but its full scope is unknown.[74]

53.     The power-washing scheme takes place daily throughout the City, and uses likely millions of gallons of water yearly to clean refuse and filth from the streets and into our drains and ultimately, oceans. In a city and state facing water shortages, just on the other side of a devastating eight-year drought, such water usage, particularly without any kind of review taking place, is shameful and ultimately threatening to the water systems of the City and County.

54.     The environmental impact of fires arising out of homelessness is also of great concern.  Fires originating in homeless encampments are not just a potential threat—they have actually destroyed thousands of acres of brush and wildlife.  The sweeping footprints of the City and County of Los Angeles encompass vast amounts of undeveloped land, full of dry brush and other readily combustible material.  Such areas are an attractive location for many homeless persons wishing to reside "off the grid" and the combination of propane-fueled cooking fires and bootlegged electricity in untended conditions is a recipe for, and indeed has already resulted in, massively destructive fires.

## G.     Property Values and Businesses are Affected

55.     Another casualty of the homelessness crisis is the value of property and businesses.  Downtown Los Angeles has experienced a renaissance over the last 20 years with loft conversions, hundreds of new restaurants, and currently

---

[74] Anna Almendrala, *Fecal Bacteria in California Waterways Increases With Homelessness crisis*, CaliforniaHealthline.org (Jan. 6, 2020), https://californiahealthline.org/news/fecal-bacteria-in-californias-waterways-increases-with-homeless-crisis/.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

over three million square feet of office space under construction.[75]  That renaissance is now in jeopardy due to the homelessness crisis.  Businesses are suffering and property values have been affected.  The average apartment occupancy rate, rent pricing, number of sales, and sale price per square foot downtown have all decreased from 2018 numbers correlating with a rise in homelessness at the same time. Businesses throughout Los Angeles, such as Desuar Spa on 5th Street, owned by Deisy Suarez, and Exclusive Motors on Venice Boulevard, owned by George Frem, both described *infra*, have customers declining to utilize their services due to nearby encampments.

56.     Nowhere is the impact felt more strongly than on Skid Row itself, where encampments are visibly choking out local property owners and businesses.  As discussed in further detail *infra*, Plaintiff Joseph Burk can no longer maintain tenants in his building and production companies are declining to work there due to the surrounding environment.  He has been trying to sell the property but the offers he receives have been less than half of what other comparable properties receive in neighboring areas. The offers he has accepted have dropped out of escrow due to concerns about the area.  He has been trying to rent the property, but no one will rent it. He and his wife have been living there, but due to the conditions on the sidewalk outside his home, it is becoming nearly unlivable.  He is now saddled with what should be a valuable building that is near-impossible to sell, rent, live in, or use for business purposes—all due to conditions outside his property that are beyond his control, but *are* directly within the City's control.

---

[75] Vivian Marino, *Revitalization Projects Reawaken Downtown Los Angeles*, The New York Times (Mar. 5, 2019), https://www.nytimes.com/2019/03/05/business/revitalization-projects-reawaken-downtown-los-angeles.html; Andrea Lo, *How downtown Los Angeles made a stunning comeback*, CNN.com (Feb. 16, 2017, 3:50 PM), https://www.cnn.com/2017/02/15/architecture/downtown-la-revival/index.html.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

ER 663

57. As detailed *infra,* Alliance member Lisa Rich's family has owned commercial property in the Skid Row area for decades, but she is now having to heavily discount the rents she charges, repair at least one building damaged by fires at a cost of $80,000, and pay four times her prior premiums for fire insurance. These burdens have her to consider abandoning all financial dealings in the area. Alliance member Mark Shinbane has difficulty hiring and retaining employees, has had to replace doors and fences, has to clean the perimeter of the building multiple times per day, and hire additional staff to handle cleaning and maintenance, all at economic cost. Alliance member Larry Rauch has doubled his spending on security and cleaning to keep employees and maintain certifications, all at economic cost. Plaintiff Harry Tashdjian has been forced to spend over $100,000 on upgraded fire and security systems and pest control just in the last few years while simultaneously losing customers due to the property's surroundings.

## H. The Homelessness Crisis Harms Society

58. The City and County have basic obligations to its citizens—all its citizens—to preserve the public health, to ensure a semblance of law and order, to maintain public areas and infrastructure for the use and enjoyment of all its residents. Yet the homelessness crisis persists and threatens all of these: general public welfare and health threatened by disease, rats, and toxic waste permeating public areas. Law and public order are being threatened by the increased crime both on and by homeless, driven by rampant drug addiction and its concomitant gang and property-related crimes. Unchecked waste and disease affect the sheltered and unsheltered alike living in or near these areas.

59. The County, as the provider of last resort, has the additional obligation to "relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident . . . when such persons are not supported and relieved by their relatives or friends, by their own means, or by

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

state hospitals or other state or private institutions." Cal. Welf. & Inst. Code §17000. The purpose animating Section 17000 is to "provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed." Cal. Welf. & Inst. Code §10000. Yet the "incompetent, poor, [and] indigent persons" are not being relieved and supported, nor is "protection, care, and assistance" being given to those who desperately need it. The result is readily observable: squalor, lawlessness, disease, and death.

## I.   Crucial Funds That Could Alleviate This Man-Made Disaster Are Used In a Manner Unable to Achieve the Ostensible Goal

60.   The challenges presented by the homelessness crisis persist despite massive expenditures of taxpayer dollars. For the 2019/2020 fiscal year, the City of Los Angeles has approved a $10 billion budget that includes approximately $176 million in homeless assistance (including $85 million in HEAP grants from the state), roughly 1.7 percent of the budget.[76] This doesn't include money received and allocated pursuant to Proposition HHH. This also doesn't include the portions of the various department budgets dedicated to homelessness (such as police and fire response), estimated in 2015 to be over $100 million—and the number of unsheltered homeless Angelenos has nearly doubled in that time, from 14,968 to 27,221.[77]

61.   In 2016, City residents voted overwhelmingly to increase their property taxes and issue general obligation bonds to generate a total of $1.2

---

[76] City of Los Angeles, Budget Summary (2019-2020), http://cao.lacity.org/budget19-20/2019-20Budget_Summary.pdf.

[77] Los Angeles Almanac, *Homelessness in Los Angeles County 2019* (2019), http://www.laalmanac.com/social/so14.php; Office of the City Administrative Officer, Miguel A. Santana, *Homelessness and the City of Los Angeles* (Apr. 16, 2015), https://clkrep.lacity.org/onlinedocs/2015/15-0211_rpt_CAO_04-21-2015.pdf.

billion over a ten-year period with the claimed goal of building 10,000 units of Permanent Supportive Housing ("PSH").[78]  The City of Los Angeles has now allocated nearly all of that $1.2 billion, for a slated total of "5,873 supportive units for homeless residents and another 1,767 affordable units" presumably for low-income (but not yet homeless) persons.[79]  While permanent housing is certainly a valuable piece of the puzzle, the median cost of HHH housing is now an astonishing $531,000 per unit, greater than many market-rate homes for sale in Los Angeles County.  "An unusually high 35 to 40 percent of costs are so-called 'soft costs' (development fees, consultants, financing, etc.) compared to just 11 percent for actual land costs."[80]  Part of the high cost is due to the "elongated approval and construction timelines"—three to six years—which is "plainly out of step with the City's urgent need to bring tens of thousands of people off the streets and into housing."[81]  The purpose of HHH was to provide a significant solution to address the increasing homelessness crisis.  Yet for less than a quarter of the $1.2 billion price tag, the City of Los Angeles could provide a bed for

---

[78] The Proposition HHH ballot described it thus:

> To provide safe, clean affordable housing for the homeless and for those in danger of becoming homeless, such as battered women and their children, veterans, seniors, foster youth, and the disabled; and provide facilities to increase access to mental health care, drug and alcohol treatment, and other services; shall the City of Los Angeles issue $1,200,000,000 in general obligation bonds, with citizen oversight and annual financial audits?

City of Los Angeles, City Clerk, Voter Information Pamphlet at 7 (Nov. 8, 2016), http://clerk.cityofla.acsitefactory.com/sites/g/files/wph606/f/2016%20November%20County%20WEB_English.pdf.

[79] Ron Galperin, LA Controller, *High Cost of Homeless Housing: Review of Proposition HHH*, (Oct. 8, 2019), https://lacontroller.org/wp-content/uploads/2019/10/The-High-Cost-of-Homeless-Housing_Review-of-Prop-HHH_10.8.19.pdf.

[80] *Id.*

[81] *Id.*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

33
COMPLAINT

every unsheltered Angeleno.[82]  Instead, year after year, the point-in-time count has increased and to date, over three years since Proposition HHH was passed, only 46 PSH units have been opened.  In focusing almost exclusively on PSH, a solution which is laudable but alone takes too long, is too expensive, and provides less than 20 percent of the beds actually needed, the City has wasted its best opportunity to address this crisis and failed to accomplish its stated goal as promised to the voters in 2016.

62.     While most of the HHH money has been committed (though many have not even broken ground yet), there have been several opportunities to pivot strategies and claw-back some of the funding. For example, on December 10, 2019 City Council voted to give an extension to several developers who have missed deadlines.[83]  That extension represented $225 Million that could have been pulled back from Permanent Supportive Housing and used to provide shelter approximately **20,000** homeless individuals. As it is, these projects only fund **410 units**, of which 284 are for supportive housing for chronic homeless and 126 for low-income families.

63.     Another significant source of waste is found in the City's encampment clean-up strategy.  In July 2019 the City Council approved an increase of $6.45 million on top of $26.5 million already in the budget for both noticed and "rapid response" clean-ups consisting of Sanitation workers and LAPD Officers responding to particular areas of homeless encampments, having

---

[82] HHH is funded using General Obligation (G.O.) bonds, which are limited by the California Constitution to fund "the acquisition or improvement of real property."  Cal. Const. art. 13A § 1(b)(2).  The phrase "acquisition or improvement of real property" is not defined by legal authority.  There are many options presented herein which could easily fall within this category, including tiny home structures, 3D printed homes, or modification of existing structures such as the abandoned L.A. County hospital.

[83] City of Los Angeles, City Clerk, LACityClerk Connect, Council File: 17-0090-S2, https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=ccfi.viewrecord&cfnumber=17-0090-S2 (last visited Mar. 9, 2020).

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1  camp residents move their property, process what is left (dumping literally
2  thousands of tons of needles and toxic waste yearly), and then permitting the
3  same encampments to return to the same location.[84]  The cycle repeats itself with
4  no ultimate change or real net positive benefit for the campers or society.  As one
5  person noted about the plan: "This, while well-intentioned, is housekeeping
6  service for encampments."[85]  Mayor Garcetti apparently agrees this program is a
7  waste: "We can't sweep or move homelessness away. . . We're not going to wash
8  down sidewalks one day, only to see an encampment return the next, and people
9  not helped. It doesn't get any single person off the street with that strategy."[86]

10      64.    The County also faces tough questions about its management of
11  homelessness-related funds.  This fiscal year, the County passed a $36.1 billion
12  budget for this fiscal year, which includes $532.8 million raised by Measure H
13  dedicated to addressing homelessness.  Measure H was described as a tax voted
14  for county residents in 2017 to "fund mental health, substance abuse treatment,
15  health care, education, job training, rental subsidies, emergency and affordable
16  housing, transportation, outreach, prevention, and supportive services for
17  homeless children, families, foster youth, veterans, battered women, seniors,
18  disabled individuals, and other homeless adults."[87]  This amount is wholly

19

20      [84] City of Los Angeles, Mayor Eric Garcetti, *Mayor Garcetti Announces New Plan to Deploy New Sanitation Teams, Deliver Services to Homeless*
21  *Encampments* (June 19, 2019), https://www.lamayor.org/mayor-garcetti-announces-new-plan-deploy-new-sanitation-teams-deliver-services-homeless-
22  encampments.

23      [85] Emily Alpert Reyes, *L.A. could overhaul how homeless encampments are cleaned*, Los Angeles Times (June 19, 2019, 3:00 AM),
24  https://www.latimes.com/local/lanow/la-me-ln-homeless-encampment-cleanup-dumping-bathrooms-trash-20190619-story.html.

25

26      [86] Aaron Schrank, *LA seeks permanent solution to homeless encampments*, Marketplace (Apr. 26, 2018), https://www.marketplace.org/2018/04/26/la-seeks-
    permanent-solution-homeless-encampments/.

27

28      [87] County of Los Angeles, *LA County budget process concludes with adoption of $36.1 billion supplemental budget* (2019-2020),

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

35
COMPLAINT

separate from, and in addition to, the significant percentage of County funds allotted to departments to address issues of homelessness, including those housed and treated in County jails, emergency treatment and transport, Department of Mental Health, LA County Fire Department, medical treatment through various hospitals and treatment centers, and criminal prosecution and defense costs, not to mention funding General Relief and other myriad social services.

65.    Measure H has generated a significant amount of money, yet a substantial portion of these funds are wasted through a failure to spend the funds. In the 2017/2018 fiscal year, $258,937,000 was allocated for homeless services under Measure H and astonishingly $86,727,737 was left unspent at the end of the year.  For the 2018/2019 fiscal year the County of Los Angeles allocated $412,241,000 for homeless services through Measure H; $39,323,000 remained unused.[88]  In this time of critical emergency, for any funds to be left unspent is a tragedy.  Moreover, there is little indication that the funds spent have actually reduced the homelessness crisis.  The problem is outpacing the solution, and the goal of Measure H—reducing and preventing homelessness—remains largely unrealized.[89]

_____

https://lacounty.gov/budget/; Los Angeles County, California, Sales Tax for Homeless Services and Prevention, Measure H, Ballotpedia.org (March 2017), https://ballotpedia.org/Los_Angeles_County,_California,_Sales_Tax_for_Homeless_Services_and_Prevention,_Measure_H_(March_2017).

[88] County of Los Angeles, FY 2018-2019 Actuals Measure H Expenditures (Aug. 30, 2019), http://file.lacounty.gov/SDSInter/lac/1060405_COAB-MeasureH18-19Expenditures.pdf.

[89] County of Los Angeles, *County develops action plan for homelessness prevention* (Dec. 16, 2019), https://homeless.lacounty.gov/news/county-develops-action-plan-for-homelessness-prevention/ (approximately 133 people per day are finding some sort of housing, while an estimate 150 people per day are entering homelessness); Erika D. Smith, *In 2019, homelessness truly felt like a crisis in every corner of L.A.*, Los Angeles Times (Dec. 20, 2019, 3:00 AM), https://www.latimes.com/california/story/2019-12-10/homeless-housing-crisis-los-angeles.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

36

COMPLAINT

ER 669

66.    In addition, the County has failed to meet its statutory obligation to provide appropriate mental health services.  A healthy community will have 50 IMD (Institute for Mental Disease) beds per 100,000 people; Los Angeles only has 23.[90] Courts are reticent to declare a person conserved because there's nowhere for them to go, and the system designed to address these issues is massively overburdened.  As of 2019 the County had almost $1 billion in funds allocated to it through the Mental Health Services Act, and while there has been some discussion about what to do with these funds, to date no reported expenditure has been made.[91]  The County points to the state's antiquated and restrictive conservatorship laws and the Federal government's refusal to permit Medicaid finances for IMD beds, both of which do need to be addressed. Yet even under the existing scheme, local courts could conserve many severely mentally ill persons were there sufficient beds available. The blame for insufficient placement rests squarely on the County's shoulders.  And people suffering from very serious mental diseases decline living on the street instead, many of whom pay the ultimate price.[92]

67.    Both the County and City have hundreds of millions of dollars in emergency funds to be used for disaster relief.  This homelessness crisis is

---

[90] E. Fuller Torrey, M.D., Kurt Entsminger, J.D., et al., *The Shortage of Public Hospital Beds for Mentally Ill Persons: A Report of the Treatment Advocacy Center*, Mental Illness Policy.org (2004-2005), https://mentalillnesspolicy.org/imd/shortage-hospital-beds.html.

[91] Thomas Curwen, *With an epidemic of mental illness on the streets, counties struggle to spend huge cash reserves*, Los Angeles Times (Aug. 19, 2018, 5:00 AM), https://www.latimes.com/local/california/la-me-mhsa-unspent-balance-20180819-story.html.

[92] Dennis McDougal, *Op-Ed: My daughter was murdered, but it was misguided mental health laws that put her in danger*, Los Angeles Times (Jan. 26, 2020, 3:00 AM), https://www.latimes.com/opinion/story/2020-01-26/i-hope-police-catch-my-daughters-killer-but-i-know-her-mental-illness-also-played-a-role-in-her-death.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700/ FACSIMILE 310-826-4711

nothing short of a disaster, with thousands of casualties and massive collateral consequences, yet emergency funds remain untapped.

68.     Together, the County and City fund LAHSA, which has been totally ineffective at stemming the growing tide of homelessness.  Among LAHSA's shortcomings is the failure to move people up and out from emergency shelters and bridge shelters to permanent housing.  One woman at the Downtown Women's Center has been there for five years as she waits for housing; unfortunately those deemed "sickest" get priority for housing and women like her who are more capable of caring for themselves get pushed down the list.  The agency has been so disorganized, it apparently just discovered 3,000 units they "didn't know about" in their system.[93]

69.     Solutions exist that would meet the articulated program goals in a time- and cost-effective manner, including Sprung structures (already being used in many places in Los Angeles), military-grade inflatable tents (being utilized in Honolulu), pallet shelters (being used in Sacramento), and festival tents (utilized in Modesto), discussed in para. 13 *supra*.  Board and care facilities could be utilized as bridge shelters.  The City of Seattle has created small "villages" of tiny houses which don't require a lot of property (6,000 to 30,000 square feet) and can be built in a matter of months, with building cost of $1,500-$7,500 per unit (depending on utility connections) and run on an annual budget of $3,000-$7,000 depending on services provided.[94]  Hundreds of smaller properties

---

[93]  Elijah Chiland, *Agency responsible for housing LA's homeless discoverys 3,000 units it 'didn't know about*, Curbed Los Angeles (Feb. 20, 2020), https://la.curbed.com/2020/2/20/21145578/lahsa-units-homeless-housing.

[94] Lee, *supra* note 18, https://shelterforce.org/2019/03/15/tiny-house-villages-in-seattle-an-efficient-response-to-our-homelessness-crisis/.

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

throughout the City and County of Los Angeles fit the bill and could be utilized in a large-scale way to provide an "enhanced shelter" option.[95]

70.     One of the most promising solutions to this crisis already exists in the form of collaborative housing, yet LAHSA refuses to refer homeless persons to the program, calling it "undignified" because it houses two to a room (like college dormitories or sober living facilities), and doesn't permit alcohol and drug use within the houses (even though LAHSA purports to encourage a life style of recovery).[96]  SHARE! collaborative housing provides affordable permanent supportive housing in single-family houses and duplexes throughout Los Angeles County.  It utilizes a shared housing model, wherein existing single family homes are purchased or leased, or new homes or duplexes are constructed, the home is furnished with low-cost basic furniture, and persons are housed two-to-a-room forming a sense of community and kinship, and supported by peer advocate counselors. Residents pay rent averaging $600 per month (sufficiently low that it is covered SSI, SSDI, or low wage jobs with enough left over for food and other basics of life); no security deposit is required and all bedding, cleaning supplies, and utilities are provided. It costs roughly $4,000 per person to get started, and thereafter is self-sustaining; no infrastructure is required as it relies on existing homes for sale or rent (over 30,000 currently listed in the County).  A proposal was made to the LA City Council in October of 2017 to house and

---

[95]Examples cited in one private study include 3.6 acres of empty, county-owned property located at Soto and E. Cesar Chavez, 13.5 acres of underutilized county-owned property located at Adams and Grand, 1.3 acres of empty state-owned property at 1616 Maple Ave, 20,000 square feet of City-owned property at 5800 S. Figueroa Street, a 15,000 square foot empty lot located at 2301 San Pedro Street, 1.4 acres of unoccupied city-owned property at 4521 Browne Ave., a combined 3 acres of city and county owned property at Alpine and Spring in Chinatown, 2.7 acres of city-owned property at 9413 S. Spring, and 8 useable acres adjacent to Hope Gardens Family Center in Sylmar which is unable to expand due to conditional use permits.

[96] Share!, History & Vision, https://shareselfhelp.org/about-share-the-self-help-and-recovery-exchange/history-vision-share-the-self-help-and-recovery-exchange/ (last visited Mar. 9, 2020).

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   provide peer services to 2,000 people for the minimal cost of $8 million. This

2   evidence based, housing-first program for chronically and other homeless

3   individuals with proven outcomes of success has yet to be funded.

4   　　　71.　　Another promising option is 3D-printed homes, currently being built

5   in Austin, Texas and Tabasco, Mexico, which come in various square foot

6   models (400-800 square feet), cost around $4,000 per unit, and take only 24

7   hours to build.[97]  The company that innovated this model is willing to sell their

8   upgraded printer, the Vulcan II, which would expedite building and potentially

9   reduce costs.  More land is needed than some of the more temporary options

10  described *supra*, and several hundred acres of land are available in less populated

11  areas of the City and County.  When paired with wrap-around services, and

12  transportation to facilitate job accessibility, the County and City could develop

13  nearly self-sustaining communities that have been successful in other cities.[98]

14  　　　72.　　Utilizing any of the options described in the preceding paragraphs,

15  or a combination, in a large-scale manner would be an effective way of spending

16  taxpayer funds that would actually accomplish the goals identified by the

17  programs.  Yet still the City focuses on funding exorbitantly expensive PSH units

18  and wasting taxpayer dollars on "housekeeping services" for encampments,

19  neither of which are addressing the immediate crisis on the ground. And the

20  County spends massive amounts on a host of programs that, while positive, lack

21  focus and fail to solve the most pressing problems presented by the homelessness

22  crisis.

23  **J.　　Neither City nor County Has Proffered Workable Holistic Solutions**

24

25  　　　[97] Jayson, *supra* note 21, https://www.washingtonpost.com/realestate/3d-printed-homes-a-concept-turns-into-something-solid/2020/03/05/61c8b0d2-36e4-11ea-bf30-ad313e4ec754_story.html; Aria Bendix, *supra* note 21,

26  https://www.businessinsider.com/3d-homes-that-take-24-hours-and-less-than-4000-to-print-2018-9.

27

28  　　　[98] Mobile Loaves & Fishes, *Community First! Village,* https://mlf.org/community-first/ (last visited Mar. 9, 2020).

73.     While the City and County have made efforts to address this crisis, they are at best scattered and neither has developed comprehensive plans to solve it.  The new County mapping tool shows a total of 4,506 interim housing units coming online in the next two years (which includes beds within the City of Los Angeles and other locations), and 9,960 supportive housing units in the "pipeline" (the majority of which are funded through HHH and will not be ready for another several years).[99] That is less than 15,000 new beds becoming available when there are more than 44,000 people in the County without a safe place to sleep on a nightly basis, and many of those beds that are planned won't be available for years.

74.     Plaintiffs do not suggest the City and County are doing nothing; the amount of effort and resources that have been devoted to addressing this issue is considerable and admirable.  But the actual result is an astonishing lack of progress in addressing the crisis, and continued expansion of the crisis despite such efforts and resources.

75.     Without beds to offer, the City and County's efforts are stymied and destined to fail under *Martin v. City of Boise*.  And so the crisis continues and accelerates, with little hope of a City- or County-driven solution.  Because of the painful results of current policies, and because of the lack of political and bureaucratic will to undertake effective and proven means to combat it, the Plaintiffs and the entire City and County are suffering under the weight of an urgent crisis.  Plaintiffs are left with no choice but to resort to the Courts for relief.

---

[99] County of Los Angeles, Los Angeles County Homelessness & Housing Map: A Data Driven GIS Map of Interim and Supportive Housing (Dec. 12, 2019), https://storymaps.arcgis.com/stories/400d7b75f18747c4ae1ad22d662781a3.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

**IV.     THE PARTIES**

**PLAINTIFFS AND INDIVIDUALIZED HARMS**

76.     **LA ALLIANCE FOR HUMAN RIGHTS** (the "Alliance") is an unincorporated association consisting of a broad coalition of Los Angeles stakeholders who understand that homelessness in LA is a human rights crisis and are working towards solutions to address the crisis and its related impact on health and safety issues throughout the region.  Each of its members is a resident of Los Angeles City and Los Angeles County, and pays municipal taxes to each.  All individual plaintiffs herein are members of the Alliance.  Additionally, the following individuals are representative of the membership:

a.     **BOB SMILAND** is the President and chief executive officer of Inner-City Arts—a non-profit organization dedicated to providing elementary, middle, and high school students instruction in a range of subject areas within the visual, performing, and media arts.  The organization serves almost 10,000 students per year and is open 6 days a week from 7:30 a.m. to 9:30 p.m.  As the CEO and President, he is directly responsible for the safety of the students and staff.  He both lives and works in the Skid Row area.  The increase in squalor, disease, and violence over the last several years has threatened not only his personal well-being, but that of his co-workers, and the hundreds of students he works with on a daily basis.

Mr. Smiland's apartment building, which houses 53 residents, experiences at least one break-in a week, and neither he nor his visitors can safely leave their cars parked on the street overnight, as cars left overnight are frequently vandalized.  Ambulances appear at all times of the day and night outside the building, and the last two years have brought an increase of gun shots, and other violent noises in the area.

The explosion in in the number of tents, people, and personal belongings stored on the sidewalks in the area creates regular blockades, preventing Inner-

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

42

COMPLAINT

ER 675

1    City Arts staff and students from walking to the school.  Because of this
2    blockade, those staff members that rely on the 7th and San Pedro bus stop,
3    roughly 6 blocks away, are forced to walk in the street the entire way.  Staff
4    members no longer walk to work out of fear that they will be attacked.  It is no
5    longer safe for students to walk between their schools alone—they must be
6    escorted by staff members of the Central City East Association.  Mr. Smiland—
7    an imposing man at 6 feet, 5 inches—does not feel safe walking the 40 yards
8    from the school to the post office during the day.  Each time he makes this walk,
9    he is confronted by multiple people whose conduct poses a threat to his safety.

10        Inner-City Arts has experienced a sharp increase in vandalization.  Graffiti,
11   once a rare occurrence, appears weekly on the organization's buildings.  There
12   has also been a sharp rise in break-ins to the campus over the past year.  These
13   break-ins are a major safety concern for the school, its staff, and its students.
14   Because of the increased danger, violence, and vandalization, the school's
15   security costs have risen from minimal to over $80,000 per year.  The school has
16   also been forced to install a fence for protection, a large capital expense that
17   impedes the carefully designed architectural aesthetic of the property.  These
18   expenses have diverted resources away from the core work of the organization.

19        As someone who both lives and works within the Skid Row area, Mr.
20   Smiland has been treated differently than other similarly situated individuals
21   living and working outside of this area.  He is subjected to violence, garbage,
22   narcotics use, offensive odors and sounds, forced to walk in the middle of the
23   street, and lacks police enforcement of the laws protecting his safety and security,
24   different from individuals living and working outside of this geographic area and
25   not subject to these same conditions at the same rate. This unfair, unequal
26   treatment funnels these problems into the area where he lives and works,
27   increasing the homeless population density and exacerbating existing problems.
28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

43
COMPLAINT

b.   **DONALD SHAW** has lived in or near Skid Row for the last 25 years.  He was in and out of jail for much of that time but has been free, clean and sober since 2013.  He is now the residential manager of security at the Midnight Mission (the "Mission"), located at 601 San Pedro Street, in the heart of Skid Row, where he lives and oversees a one-year drug and alcohol program that helps 150 men get clean each year. While working as the assistant manager, he became the liaison between the Mission and the Los Angeles Police Department ("LAPD").  He represented the Mission at all LAPD meetings.  In attending these meetings, he began to understand the challenges the LAPD has in the Skid Row area, and he informed the LAPD how concerned the Mission's security team was about the hazards personal property created outside the Mission.  He also asked LAPD officers multiple times if they could help get people to move their possessions off the Mission's walls or keep their property from blocking entrances.  The officers seemed sympathetic to his plight but explained there was nothing the LAPD could or is allowed to do to alleviate such conditions.

When he walks to work, he is forced to walk in the street due to the blocked sidewalks, and as a result, he was nearly hit twice by passing cars. He has also witnessed and experienced the significant increase in drugs and violence in the Skid Row over the last several years arising out of the increase in unsheltered homeless persons living in encampments on the sidewalks in the area.  The conditions surround Mr. Shaw and those at the Mission is such that going out at night is too big a risk, so he doesn't.

c.   **GALVESTER GAULDING** has struggled with drug and alcohol abuse for the past 20 years, and in 2005 became homeless and ended up in jail due to drug-related issues.  From 2007 to 2008, he lived in a halfway house, and, during this time, started attending meetings and battling his addiction, constantly alternating between rehab and the hospital. Mr. Gaulding suffers from

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

**ER 677**

both mental and physical health issues, including bipolar disorder, severe depression, and hypertension.  The time he spent without regular shelter exacerbated those issues: he rarely was able to sleep more than a few hours at a time, he was exposed to the heat in summer and the cold and rain in winter. He took illegal drugs to self-medicate, both for his mental health issues and to cope with the stress of living on the streets; the narcotics further intensified his chronic illnesses. It wasn't until he finally entered the Union Rescue Mission approximately two years ago that he began to heal: he was able to sleep without fear of attack or exposure to the elements and began to take his medication regularly.  But he will never be the same.

When he arrived at the Mission, he was told that if he finished the one-year drug and alcohol program, they would give him the resources he needed to find a place to live.  He was successful and received a Section 8 voucher for permanent housing.  But the only available housing was on Skid Row, which is rife with conditions threaten his sobriety and safety.  He was terrified to take the offered housing on Skid Row and waited an extra year until he was finally able to find housing out of the area. He received his keys and moved in three weeks ago.

In the last two years while living in Skid Row, he was physically attacked, witnessed multiple stabbings, and saw multiple dead bodies.  As a former addict who has struggled with this disease for his entire life, he it was nearly impossible to stay clean on Skid Row; he mostly chose to avoid going outside at all because the moment he did, someone offered him drugs.

d.     **KYLE HARPT** is formerly homeless and on July 5, 2016, he enrolled in a program at the Mission.  He came to the Mission because of the facilities and the programs it offered and stayed at the Mission for a year and a half.  He has remained sober since then.  After graduating from the Mission, he moved to 5th and Main Street, adjacent to Skid Row.  He began to see the dire circumstances afflicting Skid Row on a daily basis, and was fearful of the

ER 678

1   increase in violence, unchecked drug use, and exploding sanitation and disease

2   problems that continue to plague the area.  Concerned for his health, he got

3   various vaccinations, including the vaccine for Hepatitis A.

4        Mr. Harpt has observed people openly using drugs on the street and the

5   prevalent absence of police enforcement.  Walking down the street, he has seen

6   people smoking meth out of glass pipes or smoking crack, and he is regularly

7   accosted by individuals offering to sell him drugs.  Mr. Harpt observed no effort

8   by city officials, including the police, to stem this flagrant use of drugs.

9        From 2016-2019 he worked at the Mission doing data base work.  To

10  avoid dangerous areas and altercations in Skid Row, Mr. Harpt used a set path

11  well out of his way to get to and from work. A couple years ago, he was robbed

12  outside of his house in broad daylight—the offender pulled a knife and stole his

13  bicycle.  This incident and the violent altercations he observed on the streets of

14  Skid Row caused Mr. Harpt to fear for his own safety. In late 2019 Mr. Harpt

15  changed jobs and left the area; he would like to return to downtown if conditions

16  change for the better.

17        e.    **MARK SHINBANE** is the President and part-owner of Ore-

18  Cal Corporation which is a family-owned business in the Skid Row area.  He has

19  also been the Chairman of Central City East Association (CCEA) for several

20  years.  Ore-Cal Corporation is an international seafood importer, processor, and

21  distributor.  It is a second-generation family-owned-business and they have

22  owned property in the general area since 1961.  Ore-Cal has been located on 634

23  Crocker Street since 1971.  Four years ago, Crocker Street and other streets in

24  that vicinity—such as 6th Street, 7th Street and Towne Avenue—were free of

25  encampments.  Mr. Shinbane recalls small homeless encampments west of San

26  Pedro Street on San Julian Street and Wall Street in the past, but personal

27  possessions were generally kept contained, crime was generally addressed, and

28  the sidewalks were usable.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

46
COMPLAINT

ER 679

1   In 2016, immediately after the injunction issued in *Mitchell v. City of Los
2   Angeles*, Crocker Street, the neighborhood surrounding Ore-Cal became a haven
3   for homeless individuals. The streets rapidly filled with tents and encampments,
4   inundating the area, which coincided with an increase in violence and an inability
5   to traverse the sidewalks. Individuals loiter at all times of the day, and the
6   growing encampments block sidewalks, doorways, driveways, and streets. Mr.
7   Shinbane regularly observes open drug use and people walking in a perpetual
8   drug-induced state, and bodies lying on the sidewalks or doorways near his
9   business. There has been an increase of used needles on the streets, sidewalks,
10  and inside drains located on the business' property.

11   Mr. Shinbane's conversations with LAPD Officers and Detectives in the
12  area indicate that gang members are supplying narcotics to homeless individuals
13  right outside of Ore-Cal. There has been an increase in violence with both
14  homeless (as victims and perpetrators) and gang members. His employees and
15  transportation drivers are frequently assaulted or threatened by homeless
16  individuals. Illegal entry onto their property, car break-ins, and thefts are now a
17  common occurrence.

18   Ore-Cal and its employees are subject to an increased risk of fire because
19  of the encampment fires that surround the property. This danger is made worse
20  by the huge quantities of trash and debris that litter their street and surrounding
21  neighborhood. The conditions on the street are worsening and there has been a
22  significant increase in rats and vermin as well as urine and feces in their gutters
23  and on their property. These conditions have made it extremely difficult for Mr.
24  Shinbane to hire new workers, and his company has lost many well qualified
25  candidates due to the unpleasant neighborhood and environment—at least 10
26  candidates for administrative or managerial roles declined an offer because of
27  concern for their safety or the conditions in the area. Approximately 25 to 40
28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700/Facsimile 310-826-4711

47
COMPLAINT

1   percent of candidates decline offers or interviews based solely on the location.

2   This never used to be the case.

3        To combat some of the deteriorating conditions, Mr. Shinbane's business

4   has completely fenced its property to prevent individuals from camping on their

5   grounds and to keep the used needles from being fed into their exterior drains

6   from the rampant narcotics use.  He was forced to replace roll up doors and add

7   sections of fence due to individuals constantly urinating on them, a cost of

8   $25,000.

9        Ore-Cal has also had to significantly increase its exterior maintenance by

10   washing and sanitizing the perimeter of their facility daily.  In some cases, it is

11   necessary to clean multiple times a day, in order to maintain cleanliness.  He now

12   spends $15,000 a year—a new expense—on supplies and staff dedicated to

13   maintaining the perimeter and external areas of their facility.

14        His company's property has appeared in footage taken recently by a

15   reporter for a local television affiliate that accurately captures the conditions in

16   Skid Row.  (*See* Chris Cristi, *L.A.'s homeless: Aerial tour of Skid Row, epicenter*

17   *of crisis*, ABC7.com (June 13, 2019), https://abc7.com/society/las-homeless-

18   aerial-tour-of-skid-row-epicenter-of-crisis/5344680/.)  The video shows mounds

19   of trash with tents, structures, and other property completely blocking sidewalks

20   and spilling into the streets at the corner of 6th and Crocker, just yards away from

21   the Ore-Cal building.

22        Mr. Shinbane has observed no meaningful efforts by the City to address

23   these issues and has noted a lack of law enforcement activity in the area

24   surrounding his business despite the prevailing state of lawlessness.

25        f.    **LARRY RAUCH** is the president of Los Angeles Cold

26   Storage Company located at 400 South Central Avenue within the Skid Row

27   area.  Los Angeles Cold Storage is a public refrigerated warehouse that stores

28   frozen and refrigerated foods for hundreds of customers.  It is owned by Standard

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

48
COMPLAINT

Southern Corporation, which Mr. Rauch's family owns.  He has worked for Los Angeles Cold Storage for over 45 years.

Mr. Rauch is one of the founding members of CCEA, has been Chairman twice and has also sat on the Finance and Executive Committees. He is also the past Chairman of both the International Association of Refrigerated Warehouses and the World Food Logistics Organization, both of which are international organizations representing his industry.  He is a past Chairman of the Jewish Family Service, the oldest Jewish social service agency in Los Angeles.  He is also a past Chairman of the Jewish Community Foundation.

Over the past three years, there has been an explosion in the numbers of people living on the streets near Los Angeles Cold Storage.  This rapid increase in the population has resulted in dangerously unhealthy living conditions and a sharp decrease in sanitation.  With the increase in individuals has come an increase in personal property, trash, and human feces, all of which line the streets that he, his employees, and his customers depend on daily. Given the nature of their business, sanitation and health conditions in the immediate area surrounding the facility are a high priority for them.

Los Angeles Cold Storage is inspected by a variety of government agencies including: the Food and Drug Administration (FDA), the United States Department of Agriculture (USDA), the United States Department of Commerce (USDC), the Los Angeles City Public Works (Sanitation), the Occupational and Safety Administration (CAL OSHA), the Los Angeles County Health Department (Environmental Health), the Los Angeles City Fire Department, departments: 1) Fire Safety and 2) CAL/ARP, Los Angeles County Fire Department (HAZMAT), the City of Los Angeles Public Works (Watershed Protection Division and Industrial Waste Management Division), and the State of California Department of Public Health (Food and Drug branch).  Their ability to remain operational and profitable as a business depends on their compliance with

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

49

COMPLAINT

the rules and regulations of each of the organizations listed above. The increase in squalor, feces, and trash has required the company to wash their sidewalks down every morning before 6 a.m. to maintain the necessary certifications certification and ensure the employees and truck drivers do not bring the unsanitary conditions from the street into the warehouses or offices.  Efforts to remain sanitary are made even more difficult by the rodent infestation on the nearby streets.  Trash left out by those on the streets ensures that the rodents are well fed each day and continue to maintain a home on the streets, which in turn creates health risks for those living on the street and working and living in the area, including Los Angeles Cold Storage employees.

Some Los Angeles Cold Storage customers require that the company be audited and certified by the British Retail Consortium ("BRC"), a global safety and sanitation program.  While Los Angeles Cold Storage holds an AA certification, the highest possible level, with BRC, their customers expect them to maintain this high-level certification.  The lack of sanitation, and accumulation of trash and human waste outside constantly poses an imminent risk of failing BRC audits, which would result in the loss of valuable customers.

The company continues to incur significant additional security costs to protect their property and avoid graffiti, and has installed extra cameras and lighting to protect its buildings, as well as employing a security guard to escort employees to company vehicles and monitor the safety of the building throughout the night.  Annual security costs for Los Angeles Cold Storage have skyrocketed by nearly 100 percent to a current level of $150,000.

Los Angeles Cold Storage employees are often endangered on their commute to work.  Because the sidewalks are often completely blocked with individuals, personal belongings, and tents, employees have been forced to walk in the middle of the street to access the parking lot.  Employees have experienced harassment on multiple occasions in the forms of panhandling or individuals

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1  exposing themselves.  These panhandlers create even greater danger for those

2  forced to walk in the street, because when they approach cars for money the cars

3  swerve to avoid them.  The number of individuals in the street causes a great

4  danger to vehicles passing through, and for vehicles entering and leaving their

5  facility.

6      The high concentration of desperate people has led to an increase in

7  violence in the area.  Now, his employees must be escorted to and from their cars

8  in order to avoid harassment.  Employees have also experienced an increase in

9  theft and physical damage done to their cars.

10      Mr. Rauch's daily observation of the human tragedy in Skid Row both

11  saddens and frustrates him—he is sobered by the squalor in which unsheltered

12  individuals live, and irked by the inaction of the City in the face of this crisis.

13      g.    **HAL BASTIAN,** a commercial real estate professional in Los

14  Angeles for 37 years, has been one of the leaders of the Downtown Los Angeles

15  Renaissance for the last 26 years. He began working as a retail broker for

16  Cushman & Wakefield in Downtown Los Angeles ("DTLA") in 1994.  He later

17  transitioned to the role of leasing director for The Old Bank District—the first

18  adaptive reuse project in downtown that converted historical office buildings into

19  loft apartments.  From 2001 to 2014, he served as the Director of Economic

20  Development for the Downtown Center Business Improvement District

21  (DCBID), and eventually, its Executive Vice President.  During this time, Mr.

22  Bastian facilitated the construction of over 22,000 housing units, leading tours

23  and producing special events that recruited thousands of new residents and

24  resulted in the construction of dozens of new commercial and mixed-used

25  developments, and attracting over 300 new businesses to the downtown area,

26  including Ralphs, Fresh Fare, Bottega Louie and Whole Foods Market.  He lives

27  in DTLA.

28

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Mr. Bastian's extensive experience in DTLA has made it clear to him that both action and inaction by the City has been a substantial contributing factor in the current homelessness crisis.  In particular, the City's response to a series of federal lawsuits has coincided with this crisis, which affects the homeless and housed alike, and he joins this lawsuit to bring about a substantial change in the deteriorating conditions of DTLA.

h.   **LISA RICH** owns several buildings in Skid Row, which she rents out to various businesses.  Her family has been running the properties for over 40 years and has brought significant numbers of jobs to the area.  Over the past several years, the number of homeless persons on the sidewalk in front of the buildings has dramatically increased, as has the amount of personal possessions.  Frequently, tents and belongings block the sidewalks for days at a time, bringing with them refuse, criminal activity, and unhygienic conditions.  At times, the buildup of property has physically prevented tenants and patrons from accessing the buildings.  Tenants have complained and requested rent reductions due to the effect the homeless encampments are having on their business.

 Ms. Rich attempted twice to contact LAPD for assistance in moving the property, but received no help.  When she asked why the LAPD had not moved homeless persons or their property, she was informed that there was nothing LAPD could do.  After learning the City would not help, Ms. Rich attempted to install fencing around some of her higher risk properties to keep tents from being propped directly against the buildings.  However, for one of the buildings, the City warned her that the fencing was unlawful and would lead to fines.  Before she could remove the fencing at issue, an unknown person or entity removed the chain link, and tents returned, gathering around the bare fence poles.

In late 2017, a campfire at a homeless encampment burned out of control and set one of Ms. Rich's buildings on fire.  The blaze significantly damaged the building's offices and electrical system, requiring more than $80,000 worth of

repairs.  The fire and repair process disrupted her tenant's business for significant time.  At her next policy renewal period, her fire insurer refused to renew the policy covering <u>all</u> of her buildings, claiming her buildings could no longer be insured because of the risks posed by the adjacent homeless encampments.  Ms. Rich then approached 24 other insurers—of those, 23 insurers outright refused to insure her buildings at any rate.  Eventually, one insurer offered to cover her buildings at a premium more than four times her original rate.  As a result of these developments, she is actively considering selling her family's business and abandoning the Skid Row area.

i.     **DEISY SUAREZ** is a resident of and business owner in Downtown Los Angeles.  She lives and works on 5th Street ("5th") and Broadway Street ("Broadway").  Ms. Suarez is the proud mother of two young children, both under two.  Due to the violence and disease surrounding the encampments throughout downtown, Ms. Suarez fears for her and her children's safety each time they leave their home.  In fact, this fear has become almost paralyzing, often preventing Ms. Suarez from leaving the building by foot.

Given her children's young age, Ms. Suarez uses a stroller when traveling by foot.  The increase in homeless persons and their property on the streets hinders Ms. Suarez's ability to freely travel the public sidewalks and regularly puts her and her children's lives in danger.  She finds it difficult to travel 3rd Street and Main Street, between 7th and 8th Street along Maple Street, along the east side of Los Angeles Street between Winston and 5th Street, between 5th and 6th Street on Los Angeles Street, and along Main Street between 6th and 7th Street.

Some of these routes are blocked by street vendors who become extremely aggressive, and whose belongings and "shops" take up the entire sidewalk.  On other streets, tents and personal belongings fill the sidewalk, making it difficult or impossible for a person with a stroller or someone in a wheelchair to pass.  When

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1  she asks individuals to move themselves or their belongings so that she can use
2  the sidewalk, she is often met with aggression.  As a result, Ms. Suarez is
3  frequently forced to walk, with her children in their strollers, in the street with
4  moving cars, to reach her destination because the streets are blocked with
5  individuals and belongings.  As a mother of young children, Ms. Suarez feels
6  extremely vulnerable walking on the streets.

7       Ms. Suarez's business has also been negatively impacted by the homeless
8  crisis in Downtown Los Angeles.  She owns Desuar Spa, a day spa, that is
9  located in the same building where she and her family live.  At least a few times a
10  month, she and her staff receive phone calls from clients canceling their
11  appointments because they are afraid of getting out of the car or walking to the
12  building.  The hotel concierges at the Intercontinental and the Weston have
13  expressed safety concerns for guests looking to visit the day spa.  Sometimes,
14  there are individuals asleep on the sidewalk in front her business, making it
15  difficult, and unnerving for individuals to enter the building.  The increase in
16  homeless persons living and sleeping outside of her business has made it difficult
17  for her to retain staff.  Multiple staff members have quit as a direct result of
18  frightening interactions with the homeless individuals.  And Ms. Suarez has
19  struggled to recruit new staff members because of the danger the location of the
20  spa poses.

21       77.  **JOSEPH BURK** owns an historic building utilized for a company
22  he created called Location 606, Inc.  His property is primarily rented for film,
23  television, commercial and music video production.  Until 2017, he rented part of
24  the property to tenants, but since then, due to the conditions in the area, he can no
25  longer get a tenant to occupy the property, and he now lives there with his wife.
26  He pays property taxes, but cannot use the public sidewalks around his own
27  property.  Mr. Burk's residence has become unlivable due to surrounding
28  conditions, and his business has been destroyed.  Production companies have

<center>54</center>
<center>COMPLAINT</center>

1   stopped using his building for film shoots, and he has gotten countless rejection

2   emails and letters citing the conditions around his property.  He has lost hundreds

3   of thousands of dollars because production companies cannot use Mr. Burk's

4   property since they need accessible driveways and sidewalks for heavy

5   equipment, lighting and sound items, and costume trucks, and the exits and

6   entrances to his property are often fully blocked by shelters and possessions.  On

7   at least one occasion when his property was to be used for filming, the crew was

8   unable able to bring their equipment inside his building and demanded its money

9   back.  His property has been on the market for years without an acceptable offer,

10  and he has experienced a significant decline in his own quality of life as a result

11  of the increased filth, violence, and drug use in the surrounding areas.

12        78.    Over the past three years, Mr. Burk has received the following

13  communications from production companies considering his property for filming:

14        a.  October 11, 2016 email: "After driving past your place on 6th and

15            Crocker yesterday I can no longer present your property for

16            upcoming commercial shoots.  The homeless condition directly

17            around your property is out of control and I wouldn't feel safe

18            bringing any film crew into that area."

19        b.  October 24, 2016 email: "Sorry the scout left before going inside to

20            see your space today.  He told me that when he showed up, he could

21            barely walk down the street because there were so many homeless

22            tents and people around.  He said it would be a nightmare to try and

23            film there and didn't want to put the option in front of the director.

24            Also, wouldn't be appealing to bring the client there due to all the

25            homeless people."

26        c.  February 7, 2017 email: "Thank you for showing [interested client]

27            your place.  She really liked it.  But she is concerned about the

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

28

55
COMPLAINT

ER 688

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

neighborhood because her show has a big star attached.  Thanks again."

    d.  June 27, 2017 email: "When the location manager showed up with the director, his instant reaction was 'I won't shoot here, because I won't get out of the car[.]'  Due to the severity of the homelessness in your area, I fear you are losing out on a lot of shoots.  I know it[']s out of your hands, but thanks for all your help today."

79.    From 2003 to 2017, two full-time tenants, a married couple, lived in the building, but they moved out due to the declining quality of life arising out of the homelessness crisis.  The amount of noise and trash coming from the encampments had become too much for them.  The wife was harassed repeatedly and the husband had his bike stolen numerous times.  People would (and still do) urinate and defecate on the property's fence, which would run down toward the front door.  The tenants frequently came across used needles which were left behind from people in the encampments, and called 911 several times to report individuals overdosing on drugs.

80.    Since those tenants moved out, Mr. Burk has struggled to find a full-time tenant for the property.  People are not interested in renting his property as a home or living space because of the surrounding area.  LAPD officers have told Mr. Burk that they have been instructed by their superiors not to ask the homeless to move their belongings from the sidewalks or from his property.  Because of this, when he has asked people to move their belongings from blocking the entrance to his home, he has been threatened, spit on, and verbally attacked.  Weekly, he witnesses public sex, prostitution, and/or nudity on 6th Street and Crocker street.  His security cameras often catch violent encounters, like a shooting that occurred in the end of January across the street from his building.

81.    Insurance premiums on his property are significantly higher than on properties in other areas of DTLA due to the increased danger surrounding him

daily.  The building across from him caught on fire from a homeless encampment's open flame; the building down the street recently caught on fire for the same reason.  He has difficulty receiving mail or packages.  The mail carrier will not deliver his mail if his mailbox is blocked and will not get out of his truck to deliver mail or packages to his front door because he has said it is not safe.  He regularly receives his neighbors' mail because the carrier simply chooses the mailbox that is not blocked that day to put the entire block's mail in.  If everyone's mailboxes are blocked, mail is not delivered.  Food delivery services will no longer deliver food to his property after dark.  Rideshare drivers such as Lyft or Uber will refuse to pick up or drop off there.

82.     Mr. Burk has been trying to sell the property since early 2018.  There have been several interested buyers, yet the property has not sold, as the conditions surrounding the building and the recent and widely reported typhus and hepatitis outbreaks in the area have scared off potential buyers.  His property has dropped out of escrow multiple times.  All potential buyers have cited the dangerous conditions on the surrounding streets and sidewalks as the reason they would not purchase the property.

a. For example, on January 17, 2018, he received an email from a potential buyer stating, in part, "Just wondering how you're planning to sell it when the homeless are 3 tents deep all around that.  I know that DTLA is working on the problem but isn't the skid row development company super close? . . . [W]hat precautions and what actions can be taken regarding the sidewalks around the property as owners[,] if we were to buy it?"  The email also included a text message screen shot from a potential buyer stating, "Thanks for letting me know about the sidewalk directly around the building.  I just know that it will make it awfully hard for pedestrians to walk over from the arts district . . . if no one will venture over because the

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

57
COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

rest of the surrounding streets look like a scene from Mad Max then that could be a hiccup."

83.     In 2018, the City of Los Angeles inquired about acquisition of Mr. Burk's property.  The City would not tell him why they were interested in his property, but in January 2019, he found out from an article in the *Los Angeles Times* that the City was looking to turn his property into a Homeless Hygiene Center.  The City has not made an offer on the property but has made matters worse by releasing his address to the public.

84.     Last year, Mr. Burk spoke to some young men who told him they came to Skid Row from the Valley because they knew they could pitch a tent, buy and use drugs, without any repercussions.  To be clear, they were not homeless, they were simply capitalizing on the drug-haven Skid Row has become.  This is just one example of the "attractive nuisance" of Skid Row as a result of the City and County's current lax enforcement policies.

85.     The homelessness crisis right outside Mr. Burk's building is heartbreaking, but what is even more heartbreaking is that the City is allowing it to get worse.

86.     **HARRY TASHDJIAN** owns an upholstery supplier in the industrial area of DTLA, and the property surrounding the business location.  Mr. Tashdjian's building typically houses millions of dollars' worth of inventory.  When he purchased the building in 2013, tents were not allowed on the streets during the day.  Because his business operates during traditional business hours, he believed that the location would not hinder business, which generally has between 70 and 100 will-call orders per day through which customers order product then come into the business shop to pick it up.

87.     In mid-2016, Mr. Tashdjian saw an immediate increase in tents on the streets and sidewalks outside of his business.  Today, tents occupy the sidewalks at all hours, and it is difficult for him and his customers to access his

business due to the piles of property and people loitering on the sidewalk and in the street.  Customers constantly tell him how difficult it is to get into the building or the adjacent parking lot without hitting people.  Mr. Tashdjian has been repeatedly told that customers prefer to do business with competitors to avoid the hassle and inconvenience of trying to access his store.

88.     Vendors from all over the world—Italy, Germany, United Kingdom, China, etc.—visit Mr. Tashdjian's shop and express shock and dismay that such horrendous conditions exist in Los Angeles.  His business is now at a much greater risk for vandalism, violence, and fire damage.  Homeless individuals frequently urinate into or onto his building or the adjacent parking lot, and there has been an increase in graffiti on his building.  The number of tents immediately outside of his building puts his business at risk of fire damage—indeed, the fire department responds at least once a year to a tent fire that has started immediately outside his building.  Sometimes it is an innocent accident from an open flame; other times, it is intentional due to some drug dealers' disagreement.  His security has caught these arsons on camera.

89.     The conditions surrounding his property have cost Mr. Tashdjian a great deal of money.  Because of the immediate fire danger posed by the tents outside his building, he has been forced to upgrade his fire monitoring system which cost approximately $40,000.  He has also had to spend approximately $37,000 on a new security surveillance system to protect the building.  The LAPD frequently seeks footage caught on this security system during investigations.  Theft is also a major concern—pallets are constantly stolen from their building and car batteries are frequently stolen from inside people's cars.

90.     There has also been a significant uptick in the population of rats surrounding his building, and as a result, rat feces coat all three fences surrounding his property.  To address the increase in fecal matter on his property, as well as the proliferation in cockroaches, he has hired a pest control company

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

59
COMPLAINT

and had the health department visit the property multiple times.  The gate surrounding is property has been repeatedly damaged, costing him thousands of dollars in repairs.

91.     Over the last few years, as the City and County have permitted the homelessness crisis to grow, the risk to his property from fire damage and vandalism has increased exponentially—the business constantly replaces gates and other property, cleans the facilities, and pays security to safeguard its property.  They have had to spend over $100,000 in upgrades to their system and increased monitoring and pest control just as a result of the increased homeless persons and property in the area.  He and his employees cannot walk anywhere in the area and are constantly subject to risk of disease due to the putrid conditions outside the business.

92.     The City and the County have offered no assistance to Mr. Tashdjian and have taken no steps to address the impact of the homelessness crisis on his business or to enforce the laws that are broken daily in the area around his business.

93.     **KARYN PINSKY** works in DTLA and lives there with her husband and their three-year-old son.  She and her husband moved to DTLA in 2010 because they were drawn to the architecture, history, and walkability of the area. Homeless people have always been present near their home, but in far fewer numbers.  In 2010, the only tents west of Skid Row were on Broadway, and they were erected every night and removed shortly after sunrise.  From 2010 to 2016, Ms. Pinsky and her husband, and later her son, were able to enjoy many wonderful features of DTLA—they regularly walked their dog along Main Street, and they felt comfortable walking to the many wonderful establishments and restaurants that were nearby.

94.     All this has changed dramatically over the past several years as the homelessness crisis has deepened.  When walking outside, Ms. Pinsky is fearful

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

that either she or her son will be the subject of some random act of violence. This fear stems from dangerous encounters either she or her husband have had with individuals on the streets.  Once, while sitting outside at a café on Spring Street, a homeless woman screamed and became violent towards her because she thought Ms. Pinsky was "judging" her—only when her husband and others intervened was the situation defused.  On another occasion, her husband saw the aftermath of a violent encounter between a neighbor and a homeless, mentally ill individual—the individual hit their neighbor in the face with a 2x4 that had a nail in it.  Earlier this year, a homeless man seated outside a café on 6th Street near Broadway, a block from their house, randomly pushed a stranger into the street in front of an oncoming bus.  The man was struck by the bus and ultimately died. Another neighbor on a different floor was attacked in the middle of the night by someone who gained access through a fire escape window.  Now, as a result, she no longer feels safe sleeping with her window cracked even a little at night because of its proximity to the fire escape.

95.     Sexual assaults on women also have increased significantly in the last several years, and as a result, Ms. Pinsky is terrified of being assaulted while running errands or just walking to or from a restaurant.  The conditions immediately surrounding their home have gotten so dangerous that neither she nor her husband will leave the house late at night, even to let their elderly dog out.  A woman in their building was attacked twice near the building while walking her dog at night.  Since then, she and her husband decided to put a diaper on their dog to avoid going out.

96.     Each time she takes her son outside, she's afraid that he will contract one of the many diseases that are plaguing the area—typhus, tuberculosis, typhoid, hepatitis, or the plague.  To avoid disease and violence, she's stopped allowing her son to play at the park in Pershing Square, and she's stopped taking him to Story Time at the Central Library.  Family and friends are so fearful of the

COMPLAINT

disease and violence in the area that they will no longer come to visit Ms. Pinsky. The area was not always like this, but the City's failure to limit the goods accumulated on sidewalks or remove tents during the day has fundamentally altered the neighborhood and her experience of it.  Ms. Pinsky has been greatly affected and has a very real interest in remediating this issue insofar as her quality of life and basic enjoyment of her property has been severely diminished. At the same time, she also has compassion and empathy for those on the streets who are subject to the assaults (particularly women), the elements, the drug pushers, the gang members, the rats, filth, and disease.  For Ms. Pinsky, this is no way for a society to treat its most helpless members.

97.    **CHARLES MALOW** has been living at Union Rescue Mission, within the Skid Row area, since 2012.  Prior to 2008, he worked as a garage door installer for 29 years, and from 2000 to 2006 he worked part-time as a security guard.  He became homeless in 2008 when the economy tanked.  From 2010 to 2012, he lived on the streets of Glendora, California.  In the winter of 2011 and 2012, he stayed at a Glendora Winter Shelter and then decided to seek help at the Union Rescue Mission ("URM") located on 545 San Pedro St., Los Angeles, CA 90013.  When he first arrived at URM in 2012, police officers would come by in the morning, and wake-up the people sleeping on the streets.  They were required to pack up their belongings and stow them, so the sidewalks were not blocked. This also allowed illegal activity such as narcotics and weapons sales to be more easily discovered and therefore addressed.  At that time, there were no tents in front of URM.

98.    For a little over two years, Mr. Malow has been an Ambassador at URM.  The Ambassador program allows a small group of men to live at URM indefinitely.  Since living at URM, he has worked at Home Depot and in URM's janitorial department, known as the EVS team.  He knows that diseases such as typhus have made a resurgence on Skid Row, and this makes him extremely

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1   concerned that his work with the EVS team puts him at greater risk of contracting
2   a disease.

3        99.    In the last several years Mr. Malow has seen a big increase in the
4   volume of tents and belongings on the streets.  This has greatly affected his daily
5   life.  He has observed a dramatic increase in the rodent problem on Skid Row and
6   has seen rats running in and out of tents when he sweeps the sidewalks and
7   gutters outside of URM.  A major cause of this rodent problem is the volume of
8   trash disposed of on the streets—because individuals living on the streets throw
9   food and trash in the streets, rats have more than enough food to flourish.  There
10  has also been a huge increase in the amount of human feces on the street which
11  carries with it the significant risk of disease, not to mention the odors.

12       100.   There is absolutely no room to walk on the sidewalk, so if he leaves
13  URM, Mr. Malow is forced to walk in the street.  Even in places where he could
14  physically walk between the encampment and the wall, he still must walk on the
15  streets or risk violent confrontation from people who accuse him of invading their
16  "space."  When he leaves URM, he must plan his route carefully even if traveling
17  by public transportation.  Due to an increase in crime, including narcotics sales
18  and violent activity, he must use a car service to get back from the metro or bus
19  station after visiting his mother in Anaheim.  He always has the car drop him off
20  directly in front of URM to avoid dangerous encounters on the street.

21       101.   Mr. Malow does not leave URM between the hours of 4 p.m. and 6
22  a.m., because he is concerned for his safety on the streets.  When he does leave,
23  he is incessantly approached and offered illegal drugs for sale.  He regularly sees
24  people just outside his home using illegal narcotics in the form of pills or
25  smoking or injecting themselves. He sees people lying motionless in gutters,
26  often without clothes or shoes, and is constantly looking to see if that person is
27  dead or merely unconscious from drugs or alcohol.  As a person who has

28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   struggled with drug and alcohol use, it is particularly painful to watch and

2   experience.

3       102.   The excessive build-up of tents and debris over the last few years is

4   directly responsible for this significant increase in crime because it allows

5   criminals to operate in relative anonymity.  This increase in debris, tents, and

6   personal items on the streets also makes it impossible for health and safety

7   workers to identify public health risks, causing disease and unsafe conditions to

8   spread right outside his home.  As a formerly homeless individual, Malow knows

9   first-hand the difficulties that come from living on the street and is deeply

10  troubled by both the City's actions and inaction in the face of the homelessness

11  crisis.

12      103.   **CHARLES VAN SCOY** also lives at Union Rescue Mission and

13  has been homeless or lived in shelters at various points in time over the last three

14  decades.  Sometime after 2010, he moved to Long Beach Rescue Mission, where

15  he lived for two or three years.  He has been living at the URM for three years

16  and is part of its Ambassador program.

17      104.   Due to various illnesses, Mr. Van Scoy is confined to a wheelchair.

18  He depends on Access Services ("Access"), Los Angeles County's Paratransit

19  program, when traveling further distances within the city. Sometimes Access is

20  available to him, but sometimes it is not—it is a limited program and he is

21  regularly in danger of losing qualification for its services.  Because of the

22  homelessness crisis, it is presently impossible for Mr. Van Scoy to navigate the

23  sidewalks surrounding the URM, and so he must choose every day to stay inside

24  or risk traversing busy streets in a wheelchair and risking accident and injury—

25  indeed, the risk is even greater for him on the streets because the massive

26  amounts of trash and property (and sometimes unconscious bodies) in the gutters

27  require him edge closer to the center of the streets.  When he asks people to move

28  their belongings on the sidewalk to make a path for his 32-inch wheelchair, he is

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

64

COMPLAINT

met with threats and aggression, so he doesn't even ask anymore.  He has missed important doctors' appointments and meetings because it is so difficult for him to move along public sidewalks.

105.   Every time Mr. Van Scoy leaves URM, people approach him to buy or sell drugs.  As a recovering addict, it feels like walking into a firestorm.  So many of the tents and enclosures are used by gang members to sell drugs and weapons that people who come to Skid Row looking for services frequently find themselves targets for drug pushers.

106.   Mr. Van Scoy has observed that the increase in debris on the streets has been accompanied by a rodent infestation that carries with it the high risk of disease.  The lack of sanitation and accumulation of trash and human waste have made the streets increasingly dangerous for him.  He knows of one individual who came into contact with human feces and developed an infection that led to the amputation of a leg. Van Scoy's medical conditions make him particularly vulnerable to the spread of bacteria and disease.

107.   All these circumstances combine to render Mr. Van Scoy a prisoner in his own home.

108.   **GEORGE FREM** owns a luxury auto-shop in Mar Vista California, which primarily services high-end vehicles.  In 2015, a few homeless individuals set up tents under the 405 freeway adjacent to his business.  Since then, the population of the encampment has continually increased, and he currently estimates that more than 80 people live there.  The residents have brought a variety of goods with them including tents, mattresses, wardrobes, and more.  The encampment effectively fully covers the sidewalk on one side of the road.  Mr. Frem now sees drug use, prostitution, violence, and public indecency on a regular basis.  In the summer, the scent of urine and feces permeates the air, causing Mr. Frem and his patrons to question whether the area is safe to occupy.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

109.    The City conducts weekly sanitary cleanups of the camp.  When they do so, the City tells the homeless persons that any property left within a designated zone will be considered abandoned and disposed of accordingly.  This causes the unsheltered persons to move themselves and all of their belongings to the area immediately outside of the cleanup area and directly in front of Mr. Frem's business.  Additionally, every Friday LAHSA representatives set up a mobile shower station directly in front of Mr. Frem's business, resulting in lines of people on the sidewalk for hours as they wait for the showers to be available.  When this occurs, customers frequently question whether their vehicles are safe in the lot and whether they will be stored inside overnight.

110.    Before the encampment was in place, Mr. Frem received significant business from other auto shops who would sub-contract to him for repairs.  The encampment and related activity, especially the presence of homeless persons immediately outside of the property, caused those shops to doubt the safety of their vehicles while at Mr. Frem's shop, and has caused them to stop using him for sub-contract work.  Prior to 2015, Mr. Frem would get significant walk-in business from his prime location on a major arterial road, but now long-time customers tell Mr. Frem that they do not feel safe picking up their vehicles late at night and potential customers turn away when they see the conditions outside of the shop.

111.    This has decreased the number of service orders the shop has every year since the encampment arose.  Before the encampment was in place, Mr. Frem's shop consistently performed over 1000 repairs per year.  But, because of the City's policies effectively maintaining and promoting the camp, the numbers have declined year on year, and now, the shop can only draw around 600 repair jobs per year.  The City's homelessness policies have caused serious economic damage to Mr. Frem's business and have effectively destroyed the value of his enterprise.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

112.  **LEANDRO SUAREZ** is chief petty officer ("CPO") in the United States Navy and has served for over 22 years.  He resides with his sister, Deisy Suarez, at Fifth Street and Broadway four days of the week.  While stationed off the coast of Southern California, he was involved in an accident that resulted in the amputation of his right leg and his left big toe.  It took him nearly two years to be healthy enough to use a prosthetic leg.  He also suffers from lower back problems and problems with his toes, knees, and feet.  Currently, he can only walk for five to eight minutes at a time with the assistance of two crutches.  Because of his limited mobility with the prosthetic, CPO Suarez relies on an electric wheelchair for most daily activities, *e.g.* walking the dog, grocery shopping, or going "long" distances.

113.  Navigating the streets of Downtown Los Angeles is nearly impossible for CPO Suarez, and he is often confined on his block at Fifth and Broadway.  The swelling number of persons living on the streets with their possessions severely limit Mr. Suarez's ability to travel by wheelchair throughout DTLA.

114.  Streets that contain businesses with outdoor patios, chairs, or other decorative materials pose a particularly difficult problem for CPO Suarez.  While the law requires businesses to ensure a certain portion of the sidewalk remain clear, homeless persons openly camp in front of these establishments, effectively blocking the entire sidewalk.  CPO Suarez cannot get around these persons, and because he is in a wheelchair, he must go back to the corner so he can use the ramp to access the street and cross to the other side.  This is a laborious, time-consuming, and dangerous process.  And the constant backtracking limits CPO Suarez's ability to travel within the city because his wheelchair is not made for long distances.

115.  When CPO Suarez asks homeless persons to move themselves or their belongings, they often become aggressive with him, demanding that he

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

**ER 700**

1   prove he "owns the sidewalk," or that he give them cigarettes or other

2   paraphernalia as a "tax." More often than not, people simply refuse to move,

3   again, forcing Mr. Suarez to find a curb, cross to the other side of the street, and

4   hope that there will be enough public walkway for his wheelchair to fit through

5   so that he can complete a simple errand, task, or outing.

6       116.   The buildup of goods and persons on the streets prevents CPO

7   Suarez from freely traveling throughout the city. He is limited in the distance

8   and the places he can travel because his electric wheelchair has a limited battery

9   life. When streets are blocked with property and people, CPO Suarez is forced to

10  find a different, unobstructed, route to his destination. And sometimes, because

11  CPO Suarez's wheelchair has limited battery life, he is prevented from even

12  reaching his destination. In fact, at times the idea of traveling outside is so

13  daunting that Mr. Suarez is forced to remain indoors.

14      117.   Mr. Suarez's difficulties are exacerbated when construction projects

15  limit the sidewalk further. A construction project between 4th and 5th Street has

16  made it is nearly impossible for Mr. Suarez to travel down Broadway because

17  while a makeshift walkway exists, the walkway is often blocked by homeless

18  persons or their property. Mr. Suarez's request that the individuals move is often

19  rebuffed, preventing him from descending down the ramp or having full and free

20  access to public sidewalks or the ability to travel the streets.

21      118.   Mr. Suarez regularly endures verbal abuse from the individuals he

22  asks to move so that he can access the public walkway. Already physically

23  vulnerable, this constant beratement has left Mr. Suarez fearful of traveling

24  outside.

25      119.   **GARY WHITTER** has been homeless on and off in the Los

26  Angeles area for the last 13 years. He struggles with alcoholism, depression,

27  bipolar disorder, chronic back pain, and hypertension. While he was living on

28  the streets, he would sleep wrapped up in a blanket, usually on hard cement or a

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

blanket. He could not get more than an hour or two of sleep at a time because of fear of attacks, noise, people asking him to move, physical pain, or exposure to the elements. Sleep deprivation caused his mental state to spiral, exacerbating his depression, bipolar, and hypertension conditions. The hard sleeping conditions and constantly carrying all his belongings everywhere he went lead to severe back pain.

120.   The stress of the stigma of being homeless was also significant, adding to his depression and hypertension. As hard as he tried, he understood that he always looked and smelled terrible. It was impossible to keep his hygiene up and as a result he was constantly sick. Due to his unpredictable living and sleeping conditions, he lacked regular medical and dental care. He frequently encountered persons attempting to scam him or victimize him in some way. All of this caused his mental and physical state to further decline.

121.   In the middle of March, 2019, he entered into a program at the Union Rescue Mission, and has now been there for almost a year. He is able to get a full night's sleep which has significantly increased his mental stability and reduced his hypertension. Sleeping on a bed, and not having to carry his worldly possessions on his back, has helped his back pain tremendously and he can move uninhibited which has itself improved his mental stability and hypertension. He now has regular access to medical and mental health clinics, and his mental and physical health has improved markedly. This is the third time he has been through Union Rescue Mission's program and he is unsure about what will happen in the future once he graduates. He is aware that permanent housing is difficult to find, but he is fearful of living on Skid Row or returning to living on the streets.

122.   Staying on Skid Row has its own dangers. He often has to walk on the street because the sidewalks are completely blocked with tents and possessions. Even when there is room to walk on the sidewalk, he often must

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   walk in the street anyway or risk harassment for walking in a person's

2   "backyard" (the area in front of the tent).  Other than walking to Rite-Aid to pick

3   up his prescriptions or to the Department of Public Social Services office to get

4   his General Relief check, he stays inside because he is too afraid to leave the

5   building.  At night he can hear gunshots and sirens all night long, and on the roof,

6   it isn't uncommon to witness people getting attacked on the street, including

7   women getting beaten or raped.

8

9                                              **DEFENDANTS**

10      123.   **CITY OF LOS ANGELES** ("City") is a municipal entity existing

11   under the laws of the State of California, with the capacity to sue and be sued.

12   The departments of the City include the Los Angeles Department of Public

13   Works with its various sub-departments include the Los Angeles Department of

14   Sanitation (LASAN), and the Los Angeles Police Department (LAPD).

15      124.   **COUNTY OF LOS ANGELES** ("County") is a municipal entity

16   existing under the laws of the State of California, with the capacity to sue and be

17   sued.  The departments of the County include the Los Angeles Sheriff's

18   Department (LASD), the Department of Mental Health (DMH), the Department

19   of Public Health (DPH), and the Department of Public Social Services (DPSS).

20      125.   The **CITY** and **COUNTY** jointly fund, manage, and administer the

21   Los Angeles Homeless Service Authority (LAHSA), an independent joint powers

22   authority.  According to its website, "LAHSA is the lead agency in the Los

23   Angeles Continuum of Care, which is the regional planning body that coordinates

24   housing and services for homeless families and individuals in Los Angeles

25   County.  LAHSA coordinates and manages over $300 million annually in federal,

26

27

28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

                                              70
                                         COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   state, county, and city funds for programs that provide shelter, housing, and

2   services to people experiencing homelessness."[100]

3   126.   Does 1 through 200, inclusive, are persons, entities, government

4   bodies, municipal employees, the names and identifies of which are currently

5   unknown.

6

7   **V.     CAUSES OF ACTION**

8   **FIRST CAUSE OF ACTION**

9   **Negligence**

10   **(Against all Defendants)**

11   127.   Plaintiffs re-allege and incorporate herein by this reference each and

12   every allegation set forth in paragraphs 1 through 126 of this Complaint as

13   though set forth fully herein.

14   128.   Defendants, by and through their agents and employees, have sole

15   right and responsibility to control, maintain, and keep safe and clean the public

16   and public-right-of-way areas in the City and unincorporated parts of the County,

17   including parks, sidewalks, streets, public buildings, and certain undeveloped

18   areas such as alongside freeways and other transportation routes, and to make and

19   enforce laws assuring the public health and safety thereof for its citizens and their

20   guests.  Among other things, Defendants have the duty to maintain these areas in

21   a manner which does not unreasonably interfere with the free passage or use by

22   plaintiffs, and which addresses and alleviates conditions which are harmful to

23   health, or indecent or offensive to the senses, and which create a fire hazard or

24   permit crime to occur unabated including the illegal sale of controlled substances.

25   129.   As controlling law makes clear, "The public is entitled to the free

26   and unobstructed use of the entire streets and sidewalks. . ." *Vanderhurst*, 113

27   _____

28   [100] LAHSA, *About LAHSA*, https://www.lahsa.org/about (last visited Mar.
9. 2020).

71
COMPLAINT

Cal. at 152. Indeed, municipalities have "the duty to keep their communities' streets open and available for movement of people and property." *Schneider*, 308 U.S. at 160-61.

130.   In 2016, the City sponsored and supported a ballot measure which promised to "provide safe, clean affordable housing for the homeless, and … to provide facilities to increase access to mental health care, drug, and alcohol treatment and other services" if its citizens authorized the issuance of $1,200,000,000 in general obligation bonds for that purpose.[101]  Proposition HHH passed overwhelmingly and became law in 2017, thereby obligating and creating a duty of the City to implement it in a manner to achieve its purposes.

131.   In 2017, the County sponsored a ballot measure which promised to "fund mental health, substance abuse treatment, health care, education, job training, rental subsidies, emergency and affordable housing, transportation, outreach, prevention, and supportive services for homeless children, families, foster youth, veterans, battered women, seniors, disabled individuals, and other homeless adults" if its citizens authorized a ¼ cent sales tax for ten years to be used for that purpose.  Proposition H passed overwhelming and became law, thereby obligating the County to implement it in a manner to achieve its purposes.

132.   Defendants and their agents have breached their duty to its citizens, including and specifically to plaintiffs and Alliance members, and each plaintiff and Alliance member has suffered damages as a result, as described more fully *supra*.  The bases of this cause of action is the conduct, acts, and omissions of individual responsible officials, including Does 1-150, inclusive, based on the theory of *respondeat superior*.

---

[101] City of Los Angeles, City Clerk, Voter Information Pamphlet at 7 (Nov. 8, 2016), http://clerk.cityofla.acsitefactory.com/sites/g/files/wph606/f/2016%20November%20County%20WEB_English.pdf.

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

133.   Plaintiffs seek no damages hereunder and seek equitable and injunctive relief only.  As such neither the City nor County are entitled to any claims of immunity pursuant to California Government Code section 814.

**SECOND CAUSE OF ACTION**

**Violation of Mandatory Duty**

**Cal. Gov't Code § 815.6; Welf & Inst. Code § 17000**

**(Against Defendant County of Los Angeles)**

134.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 133 of this Complaint as though set forth fully herein.

135.   Defendant County of Los Angeles is liable under California Government Code section 815.6 and common law negligence theory for violation of a statutorily mandated duty to provide medical care for the indigent. California Welfare and Institutions Code section 17000 provides: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."

136.   Section 10000 clarifies and defines the purpose of these obligations as follows:

> The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed.  It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

73

COMPLAINT

**ER 706**

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   the preservation of family life, and without discrimination on

2   account of ancestry, marital status, political affiliation, or any

3   characteristic listed or defined in Section 11135 of the Government

4   Code.  That aid shall be so administered and services so provided,

5   to the extent not in conflict with federal law, as to encourage self-

6   respect, self-reliance, and the desire to be a good citizen, useful to

7   society.

8   Cal. Welf. & Inst. Code § 10000.

9       137.   Sections 17000 and 10000 taken together mandate that "medical

10   care be provided to indigents. . . promptly and humanely." *Tailfeather v. Board*

11   *of Supervisors*, 48 Cal. App. 4th 1223, 1245 (1996). This means counties must

12   provide medical care to the poor "at a level which does not lead to unnecessary

13   suffering or endanger life and health." *Id.* at 1240.  The California Supreme

14   Court has held that "subsistence medical services" must be provided. *Hunt v.*

15   *Superior Court*, 21 Cal. 4th 984, 1014-15 ("Section 10000 imposes a minimum

16   standard of care—one requiring that subsistence medical services be provided

17   promptly and humanely.")  Counties have an obligation to provide "medically

18   necessary care, not just emergency care." *County of Alameda v. State Bd. of*

19   *Control*, 14 Cal. App. 4th 1096, 1108 (1993) (citation omitted).  That includes

20   care "sufficient to avoid substantial pain and infection." *Hunt*, 21 Cal. 4th at 1014

21   (citing *Cooke v. Superior Court*, 213 Cal. App. 3d 401, 413-15 (1989)).

22   Importantly, a county's obligation to provide medically necessary care must be

23   fulfilled "without regard to its fiscal plight." *Fuchino v. Edwards-Buckley*, 196

24   Cal. App. 4th 1128, 1134 (2011) (citation omitted). "Medically necessary" for

25   adults is defined in California Welfare & Institutions Code section 14059.5(a):

26   "[A] service is 'medically necessary' or a 'medical necessity' when it is

27   reasonable and necessary to protect life, to prevent significant illness or

28

1  significant disability, or to alleviate severe pain." Cal. Welf. & Inst. Code §

2  14059.5(a).

3      138.  Given the above described facts and circumstances, and significant

4  studies, statistics, and reports including those set forth *supra*, and other such

5  evidence as may be provided, it cannot be doubted that a person's status as an

6  unsheltered homeless individual both causes and exacerbates physical and mental

7  health problems, ultimately causing much higher rates of infection, disease,

8  decay, pain, and death. As Dr. Barbara Ferrer, director of the LA County

9  Department of Public Health, admitted: "Homeless people are in fact dying at a

10 higher rate because they're homeless."[102] Recognizing this, the LA County

11 Department of Health Services has implemented limited program to provide

12 housing as part of its larger healthcare obligation which has been wildly

13 successful. But unfortunately, it has not gone far enough to address the homeless

14 crisis which is ravaging the city and county, such that approximately 44,000

15 persons remain unsheltered in the County as of January 2019.

16     139.  Basic shelter is "medically necessary" insofar as it is "reasonable

17 and necessary to protect life, to prevent significant illness or significant

18 disability, or to alleviate severe pain" and the City and County's failure to

19 provide the same to its homeless population constitutes a breach of its duty under

20 California Welfare & Institution Code Sections 17000 and 10000.

21     140.  Plaintiffs, and each of them, have been damaged by the County's

22 failure to provide beds, as described in detail *supra*.

23     141.  Plaintiffs seek no damages hereunder and submit this claim for

24 equitable and injunctive relief only. As such neither the City nor County are

25 entitled to any claims of immunity pursuant Cal. Gov. Code § 814.

26

27 _____

28 [102] Flores, *supra* note 63,
https://la.curbed.com/2019/10/30/20940369/homeless-deaths-los-angeles-county.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

75

COMPLAINT

**THIRD CAUSE OF ACTION**

**Violation of Cal. Civ. Code § 3490, *et seq*.  (Public Nuisance)**

**(Against all Defendants)**

142.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 141 of this Complaint as though set forth fully herein.

143.   California has defined nuisance as

[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.

Cal. Civ. Code § 3479.

144.   A nuisance cause of action "is plainly aimed at protecting the public from the hazards created by public nuisances*." People v. ConAgra Grocery Prod. Co*., 17 Cal. App. 5th 51, 136 (2017).  In addition to health and safety hazards, "[a] reduction in property values caused by activities on a . . . piece of land, and an assault on the senses by noise, dust, and odors, are just the kinds of harm that common law suits to abate a nuisance are designed to redress*." Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 505 (7th Cir. 1996).  A public nuisance is the substantial and unreasonable interference with a public right.  *San Diego Gas & Elec. Co. v. Superior Court*, 13 Cal. 4th 893, 938-39 (1996).

145.   As described above, the City, by its failure to maintain the public property under its control, and to enforce the laws requiring the same, is perpetuating and facilitating nuisance violations.

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

146.   All Plaintiffs have experienced a substantial and unreasonable interference with the enjoyment of their property, whether that be a building owned or room rented; each have suffered and continue to be threatened with respect to their health and welfare, by reason of the constant threat of disease and the experience of human waste, trash, and encampments outside their property.

147.   Each plaintiff and Alliance member has been damaged in his or her own right, in a manner specially injurious to him or herself.  No plaintiff or Alliance member consented to defendants' conduct.

### FOURTH CAUSE OF ACTION

### Violation of Cal. Civ. Code § 3501, *et seq*. (Private Nuisance)

### (Against all Defendants)

148.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 147 of this Complaint as though set forth fully herein.

149.   Each Plaintiff and Alliance member identified owns, leases, occupies, or otherwise controls all of a portion of the home or business identified. By Defendants' actions and inactions, each has created a condition or permitted a condition to exist that is harmful to the health, indecent and offensive to the senses, obstructs the free passage and use of public parks, squares, streets, highway, and sidewalks, permits unlawful sales of illicit narcotics, and constitutes a fire hazard, as described *supra*.

150.   Defendants' conduct has been and is intentional and unreasonable, unintentional but negligent or reckless, and/or the condition permitted to exist was the result of abnormally dangerous activity which substantially interfered with each plaintiff's and Alliance member's use or enjoyment of his or her land that an ordinary person would reasonably be annoyed or disturbed by.  No plaintiff or Alliance member consented to Defendants' conduct; each was

ER 710

harmed, Defendants' conduct was a substantial factor in causing the harm, and the seriousness of the harm outweighs any public benefit of such conduct (which is none).

151.   Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only.  As such neither the City nor County are entitled to any claims of immunity pursuant to California Government Code section 814.

**FIFTH CAUSE OF ACTION**

**Inverse Condemnation/Cal. Const. art. I § 19**

**(Plaintiffs Alliance, Burk, and Frem against City)**

152.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 151 of this Complaint as though set forth fully herein.

153.   California Constitution, article I § 19 provides in relevant part: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."  The actions by the City have limited, damaged, and/or burdened the owners' property and/or business so substantially they rise to the level of a regulatory taking, yet no compensation has been provided.

154.   Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only.

//
//
//
//
//
//

78

COMPLAINT

ER 711

# SIXTH CAUSE OF ACTION

## Waste of Public Funds and Resources

## Cal. Civ. Proc. Code § 526a

## (Against All Defendants)

155.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 154 of this Complaint as though set forth fully herein.

156.   California Code of Civil Procedure section 526a permits private individuals or entities to bring an action to "obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency."

157.   Plaintiffs and Alliance members, each of them, are residents of the City of Los Angeles and/or County of Los Angeles and/or own property and/or businesses therein and pay income tax, sales tax, property tax, and/or business license taxes and therefore having standing to bring an action under section 526a.

158.   As described more fully in paragraphs 59 through 69 *supra*, taxpayer funds have been misused and wasted by the City and County of Los Angeles, such they are incapable of achieving the ostensible goal of addressing the homelessness crisis in any significant way, much less "ending" it.  Such expenditures, particularly when taken in the aggregate, cost several factors more than alternative available measures which are demonstrably effective in addressing the crisis.

159.   Proposition HHH and Measure H were promoted and passed by the electorate to address the homelessness crisis in a comprehensive and effective way.  Instead, homelessness has steadily increased in this City and County.

160.   As detailed above the City and the County have spent enormous amounts of public funds on the homelessness crisis in ways that have had little or no effect on the crisis, and thereby wasted those public funds.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

161.   Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only.  As such neither the City nor County are entitled to any claims of immunity pursuant to California Government Code section 814.

**SEVENTH CAUSE OF ACTION**

**Violation of California Environmental Quality Act ("CEQA")**

**Cal. Public. Res. Code § 21000 *et seq***

**(Against All Defendants)**

162.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 161 of this Complaint as though set forth fully herein.

163.   The California Environmental Quality Act requires local governments to consider the environmental implications of their actions to "[e]nsure that long term protection of the environment. . . shall be the guiding criterion in public decisions." Cal. Pub. Res. Code § 21001(d).  Before any agency commences a "project", environmental analysis must be complete. "Project" is defined as an "activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment. . ." Cal. Pub. Res. Code § 21065; *see also*, Cal. Code Regs. tit. 14, § 15378(a).  "Activity," for this purpose, includes "[a]n activity directly undertaken by any public agency," (Cal. Pub. Res. Code § 21065(a)), as well as "[a]n activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."  Cal. Pub. Res. Code § 21065(c).

164.   The adoption of a rule or regulation can be a project subject to CEQA.  *Plastic Pipe & Fittings Ass'n  v. California Bldg. Standards Comm'n*, 124 Cal. App. 4th 1390, 1412 (2004); *Wildlife Alive v. Chickering*, 18 Cal. 3d

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

190, 206 (1976). "A direct physical change in the environment is a physical change in the environment which is caused by and immediately related to the project. Examples of direct physical changes in the environment are the dust, noise, and traffic of heavy equipment that would result from construction of a sewage treatment plant and possible odors from operation of the plant." Cal. Code Regs. tit. 14 § 15064(d)(1).

165.   Numerous acts by the City constitute a "project", including the power-washing scheme which flushes thousands of tons per year of toxic substances into our oceans.  The City's decision to settle *Mitchell v. City of Los Angeles* is another example of a "project" in the Skid Row area; permitting unlimited property accumulation in the area has caused untold amounts of human waste, trash, debris, and toxic substances to wash into our waterways. Substantial evidence exists, as discussed *supra*, that the growing homelessness crisis may have a significant effect on the environment.[103] Yet no review has ever been done prior to adopting these projects, in violation of the California Environmental Quality Act.

166.   Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only.  As such neither the City nor County are entitled to any claims of immunity pursuant to California Government Code section 814.

//
//
//
//
//
//

---

[103] *See* para. 49-53, *supra*.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

81
COMPLAINT

**EIGHTH CAUSE OF ACTION**

**Violation of California Disabled Persons Act**

**Cal. Civ. Code § 54, *et seq***

**(Plaintiffs Charles Van Scoy and Leandro Suarez Against Defendant City)**

167.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 166 of this Complaint as though set forth fully herein.

168.   California's Disabled Persons Act codifies requirements that ensure equal and full access to individuals with disabilities.  That Act provides, in part:

> Individuals with disabilities or medical conditions have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities, and other public places.

Cal. Civ. Code § 54 (a).

> Individuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities, medical facilities, including hospitals, clinics, and physicians' offices . . . and other places to which the general public is invited, subject only to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons.

Cal. Civ. Code § 54.1(a)(1).

169.   As detailed above, Plaintiffs Charles Van Scoy and Leandro Suarez are individuals with disabilities as defined by the Disabled Persons Act, and are being denied full and equal access to places to which the general public is invited, including "free and full use" of public sidewalks, by the policies and

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

82

COMPLAINT

ER 715

practices of the City of Los Angeles, including its failure to regularly maintain its sidewalks in a manner which permits wheelchair-bound individuals "full and free use" thereof.

170.   Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only.  As such neither the City nor County are entitled to any claims of immunity pursuant to California Government Code section 814.

**NINTH CAUSE OF ACTION**

**Violation of Title II of the Americans with Disabilities Act**

**42 U.S.C. § 12131,** *et seq.*

**(Plaintiffs Charles Van Scoy and Leandro Suarez against Defendant City)**

171.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 170 of this Complaint as though set forth fully herein.

172.   The Americans with Disabilities Act ("ADA") provides that people with disabilities be afforded "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation …"  42 U.S.C. § 12182(a).  Further, the ADA ensures that transportation facilities are constructed to a set of standards that ensures accessibility for the disabled.  Sidewalks are the most common element of transportation infrastructure, yet if they are not accessible, they pose great challenges and dangers to anyone in a wheelchair or who has other mobility restrictions.

173.   Sidewalks are subject to the access requirements of Title II of the ADA and § 504 of the Rehabilitation Act.  42 U.S.C. § 12101(1); *Willits*, 925 F. Supp. 2d at 1093 ("Any public sidewalk over which the City of Los Angeles has responsibility to inspect and notify property owners of repair needs is a 'program,

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700/ FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

service, or activity' within the meaning of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973."). Accordingly, sidewalk width requirements ensure that sidewalks are accessible for use by wheelchair-bound individuals.

174.   The minimum width for an ADA-compliant sidewalk is 36 inches. 36 C.F.R. § 1191, app. D, § 403.5.1 (2014) ("the clear width of walking surfaces shall be 36 inches (915 mm) minimum").  Where obstructions such as telephone poles, traffic signal cabinets, or other utilities exist, the sidewalk must be constructed to allow the minimum width requirement of 36 inches between the edge of the obstruction and the edge of the sidewalk.  *Id.*  "A public entity shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part."  28 C.F.R § 35.133(a) (2011).

175.   Throughout Los Angeles, the City and County are failing to uphold their obligations to maintain clear and accessible sidewalks and public rights-of-way for its disabled residents and visitors, resulting in regular violations of the Americans with Disabilities Act.  These ADA violations are obvious and known to the City and County both through its own inspections and various reports of blocked sidewalks due to encampments through its own reporting mechanisms, such as 311.  Defendants and its agents and employees have failed and continue to fail to provide reasonable accommodations for disabled persons using public sidewalks.

176.   Defendants are obligated to operate the "service, program, or activity" "so that . . ., when viewed in its entirety, it is readily accessible to and useable by individuals with disabilities.  28 C.F.R. § 35.150(a) (2012).  Yet when "viewed in its entirety" public rights-of-way are not provided by Defendants to be "readily accessible to and useable" by individuals bound to wheelchairs.

177.   The discrimination and denial of access to the City's rights-of-way for persons with disabilities is the direct result of Defendants' policies and practices of deliberately permitting encampments to proliferate, particularly in certain areas such as Skid Row or on Venice Blvd under the 405 freeway, and the failure to adopt or implement any adequate procedure for regularly inspecting and maintaining the pedestrian rights-of-way clear of obstructions.

178.   As a direct and proximate result of the aforementioned acts, including but not limited to Defendants' deliberate indifference to the violation of Mr. Van Scoy and Mr. Suarez's federally protected rights, both have suffered pain, humiliation, hardship, anxiety, indignity, and severe mental and emotional anguish.  This causes each of them to be deprived of their independence and prevents each from accessing the services and benefits of public establishments.

179.   Pursuant to 42 U.S.C. § 12133, Plaintiffs Van Scoy and Suarez are entitled to recover compensatory damages and reasonable attorneys' fees and costs incurred in bringing this action.

## TENTH CAUSE OF ACTION
### Violation of Section 504 of the Rehabilitation Act
### 29 U.S.C. § 791 *et seq*.
### (Plaintiffs Charles Van Scoy and Leandro Suarez against Defendant City)

180.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 179 of this Complaint as though set forth fully herein.

181.   Section 504 of the Rehabilitation Act of 1973 provides in relevant part: "[N]o otherwise qualified individual with a disability. . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . ." 29 U.S.C. § 794(a) (2016).

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

ER 718

182.   Plaintiffs are otherwise qualified to participate in the services, programs, or activities that are provided to individuals in the City.  The City is a recipient of federal financial assistance and therefore subject to Section 504. Upon information and belief, Defendants and their agents and employees have and continue to violate Section 504 of the Rehabilitation Act by excluding Plaintiffs Van Scoy and Suarez from participation in, denying them the benefits of, and subjecting them to discrimination regarding the benefits and services involved in utilizing public rights-of-way based solely on their disability

183.   Upon information and belief, said discrimination occurred with deliberate intent and/or reckless disregard of Plaintiffs' rights.  Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

**ELEVENTH CAUSE OF ACTION**
**Violation of Due Process and Equal Protection**
**42 U.S.C. § 1983; U.S. Const. amend. V/XIV**
**(Against all Defendants)**

184.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 183 of this Complaint as though set forth fully herein.

185.   Defendants, by enforcing the law in some areas and declining to enforce the law in others, and by abdicating their duties under the law, have arbitrarily determined where homeless encampments may or may not be located and what communities should be affected, without following their own respective procedures and in violation of both state and federal law. This has placed a disproportionate burden on some persons, communities, and businesses over others.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

186.   Upon information and belief, City and County officials have within the last year affirmatively notified and/or instructed homeless individuals that some areas (for example, Skid Row, certain areas in Venice, or under the 405 freeway) were locations where camps would be allowed to exist and persist.  This policy of allowing encampments in some areas and not others without review, public comment, vote, or other appropriate process is in direct violation of the Fifth and Fourteenth Amendments' prohibitions against deprivation without due process and unequal protection of the law.  When the City entered into the *Mitchell* settlement providing for the foregoing it agreed by its very terms, and implicitly, to treat a segment of the population (those living, working, and owning property within the "Designated Area" known as Skid Row and the surrounding blocks), including many Plaintiffs herein differently than those outside the "Designated Area."  The City had no rational basis for doing so.

187.   Upon information and belief, this was done with deliberate intent and/or reckless disregard of Plaintiffs' rights.  Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

## TWELFTH CAUSE OF ACTION

### Violation of Due Process Clause (State-Created Danger Doctrine)

### 42 U.S.C. § 1983; U.S. Const. Amend. 14

### (All Plaintiffs against All Defendants)

188.  Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 187 of this Complaint as though set forth fully herein.

189.  By the acts and omissions described above, Defendants have affirmatively created or increased the risk that Plaintiffs would be exposed to

1  dangerous conditions, which placed Plaintiffs specifically at risk, and Plaintiffs

2  were harmed as a result

3      190.  Defendants knew or should have known that their acts or omissions

4  specifically endangered Plaintiffs, and were deliberately indifferent thereto.

5

6                    **THIRTEENTH CAUSE OF ACTION**

7                          **Uncompensated Taking**

8              **42.U.S.C. § 1983**; **U.S. Const. Amend. V/XIV**

9          **(Plaintiffs Alliance, Burk, and Frem Against City)**

10      191.   Plaintiffs re-allege and incorporate herein by this reference each and

11  every allegation set forth in paragraphs 1 through 190 of this Complaint as

12  though set forth fully herein.

13      192.   The Fifth Amendment mandates, in relevant part, that "private

14  property [shall not] be taken for public use, without just compensation."  U.S.

15  Const. amend. V.  The Fifth Amendment is applied to the states through the

16  Fourteenth Amendment.  *Chicago, Burlington, & Quincy R.R. Co. v. City of*

17  *Chicago*, 166 U.S. 226 (1897).  The actions by the City, as described in detail

18  *supra,* have limited, damaged, and/or burdened the property owners' so

19  substantially they rise to the level of a regulatory taking, yet no compensation has

20  been provided.

21      193.   Upon information and belief, this was done with deliberate intent

22  and/or reckless disregard of Plaintiffs' rights.  Plaintiffs seek an award of

23  compensatory damages, injunctive relief, and the cost of attorneys' fees in

24  bringing this action.

25  //

26  //

27  //

28  //

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

ER 721

**FOURTEENTH CAUSE OF ACTION**

**Municipal Liability for Unconstitutional Custom or Policy (42 U.S.C. § 1983)**

**(Against All Defendants)**

194.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 193 of this Complaint as though set forth fully herein.

195.   Plaintiffs are informed, believe and allege that, at all times herein mentioned, Defendants City of Los Angeles and County of Los Angeles and their respective agents, with deliberate indifference, and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiffs, engaged in the unconstitutional conduct and omissions set forth above, all pursuant to policy, procedure, or customs held by the City and County of Los Angeles.

196.   The actions and inactions of the City of Los Angeles and County of Los Angeles were known or should have been known to the policy makers responsible for that agency and occurred with deliberate indifference to the constitutional violations set forth above, and/or to the strong likelihood that constitutional rights would be violated as a result of its customs and/or policies.

197.   Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

WHEREFORE, Plaintiffs pray for judgment against all Defendants, and each of them, as more fully set forth below.

//
//
//
//
//
//

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

ER 722

## VI.   PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants as follows:

1.     Injunctive/equitable relief in a manner to be determined by law;

2.     As to the federal claims and claims under the California constitution only, compensatory damages and other special, general and consequential damages according to proof;

3.     An award of costs of suit, including attorneys' fees; and

4.     Such other and further relief as this Court deems just and proper.

## VII.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

Dated: March 10, 2020              */s/ Elizabeth A. Mitchell*
                                   SPERTUS, LANDES & UMHOFER, LLP
                                   Matthew Donald Umhofer (SBN 206607)
                                   Elizabeth A. Mitchell (SBN 251139)

                                   *Attorneys for Plaintiffs*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

90
COMPLAINT

**ER 723**

No. _____

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

In re: COUNTY OF LOS ANGELES

*Petitioner,*

v.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Western Division - Los Angeles)

*Respondent.*

LA ALLIANCE FOR HUMAN RIGHTS, et al.

*Real Parties in Interest.*

_____

On Petition for a Writ of Mandamus in
Case No. 2:20-cv-02291 (C.D.Cal.)

_____

## EXCERPTS OF RECORD

## VOLUME 5 (TRANSCRIPT VOLUME)

_____

**OFFICE OF COUNTY COUNSEL**
Dawyn R. Harrison (SBN 173855)
*Interim County Counsel*
Katherine M. Bowser (SBN 230626)
*Assistant County Counsel*
Ana Wai-Kwan Lai (SBN 257931)
*Senior Deputy County Counsel*
alai@counsel.lacounty.gov
500 West Temple Street, Suite 468
Los Angeles, California 90012
Telephone:  (213) 974-1830
Facsimile:   (213) 626-7446

**MILLER BARONDESS, LLP**
Louis R. Miller (SBN 54141)
* Mira Hashmall (SBN 216842)
mhashmall@millerbarondess.com
Nadia A. Sarkis (SBN 227778)
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone:  (310) 552-4400
Facsimile:   (310) 552-8400

614859.1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION AT LOS ANGELES

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

LA ALLIANCE FOR HUMAN RIGHTS,    )
et al.,                          )
                                 )
          PLAINTIFFS,            )
                                 )
       vs.                       )  LACV NO. 20-02291-DOC
                                 )
CITY OF LOS ANGELES, et al.,     )
                                 )
          DEFENDANTS.            )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

TUESDAY, APRIL 20, 2023

9:07 A.M.

DEBORAH D. PARKER, CSR 10342
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
350 WEST 1st STREET
SUITE 4455
LOS ANGELES, CALIFORNIA 90012
(657) 229-4305
transcripts@ddparker.com

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFFS, LA ALLIANCE FOR HUMAN RIGHTS, et al.:

                     ELIZABETH ANNE MITCHELL
                     UMHOFER, MITCHELL & KING LLP
                     11766 WILSHIRE BOULEVARD
                     SUITE 900
                     LOS ANGELES, CALIFORNIA 90025
                     (213) 394-7979
                     elizabeth@umklaw.com

                     MATTHEW DONALD UMHOFER
                     UMHOFER, MITCHELL & KING LLP
                     11766 WILSHIRE BOULEVARD
                     SUITE 900
                     LOS ANGELES, CALIFORNIA 90025
                     (213) 394-7979
                     matthew@umklaw.com

                     CARA M. ARNOLD
                     UMHOFER, MITCHELL & KING LLP
                     11766 WILSHIRE BOULEVARD
                     SUITE 900
                     LOS ANGELES, CALIFORNIA 90025
                     (213) 394-7979
                     cara@umklaw.com

FOR THE DEFENDANT, COUNTY OF LOS ANGELES, an municipal entity:

                     MIRA HASHMALL
                     MILLER BARONDESS LLP
                     2121 AVENUE OF THE STARS
                     SUITE 2600
                     LOS ANGELES, CALIFORNIA 90067
                     (310) 552-4400
                     mhashmall@millerbarondess.com

FOR THE INTERVENOR, LOS ANGELES CATHOLIC WORKER:

                     SHAYLA RENEE MYERS
                     LEGAL AID FOUNDATION OF LOS ANGELES
                     7000 SOUTH BROADWAY
                     LOS ANGELES, CALIFORNIA 90003
                     (213) 640-3983
                     smyers.lafla.org

4

| | |
|---|---|
| 1 | **LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 20, 2023; 9:07 A.M.** |
| 2 | -o0o- |
| 3 | THE COURT:  We're on the record in L.A. Alliance |
| 4 | versus the County of Los Angeles. |
| 5 | Counsel, just remain seated, but your appearances, |
| 6 | please. |
| 7 | MS. MITCHELL:  Good morning, Your Honor. |
| 8 | Elizabeth Mitchell, on behalf of plaintiffs. |
| 9 | THE COURT:  Nice meeting you. |
| 09:07:03 10 | MR. UMHOFER:  Good morning, Your Honor. |
| 11 | Matthew Umhofer and also Cara Arnold –– |
| 12 | THE COURT:  Just a little bit louder. |
| 13 | MR. UMHOFER:  Yes. |
| 14 | Good morning, Your Honor. |
| 09:07:08 15 | Matthew Umhofer also for the plaintiffs. |
| 16 | And Cara Arnold is making her first appearance in |
| 17 | the case.  She's an attorney at our firm. |
| 18 | THE COURT:  It's a pleasure.  It's nice meeting |
| 19 | you. |
| 09:07:15 20 | MS. ARNOLD:  Thank you. |
| 21 | THE COURT:  And then on behalf of the County, |
| 22 | please. |
| 23 | MS. HASHMALL:  Good morning, Your Honor. |
| 24 | Mira Hashmall for the County of Los Angeles. |
| 09:07:20 25 | THE COURT:  Okay.  And I think we finally have |

*Deborah D. Parker, U.S. Court Reporter*

**ER 728**

5

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 09:07:22 | 1  | power, so if you want to turn on the mic.                     |
|          | 2  | MS. MYERS:  Yes, Your Honor.  Good morning.                  |
|          | 3  | Shayla Myers, on behalf of the intervenors.                  |
|          | 4  | THE COURT:  It should be a very short discussion             |
| 09:07:31 | 5  | today.  And I was going to simply send out trial dates, but   |
|          | 6  | I wanted to be courteous.  I wanted to ask you your best      |
|          | 7  | thoughts about the -- setting dates, so let me start with     |
|          | 8  | LA Alliance for just a moment.                               |
|          | 9  | MS. MITCHELL:  Your Honor, just looking at the               |
| 09:07:46 | 10 | discovery that needs to be done --                           |
|          | 11 | *(Court Reporter requests clarification for the*             |
|          | 12 | *record.)*                                                    |
|          | 13 | MS. MITCHELL:  Thank you.                                     |
|          | 14 | Just looking at the discovery that has to be done,           |
| 09:07:58 | 15 | I think a lot of it is going to depend on how difficult the   |
|          | 16 | County is here and what kind of discovery fights that we're  |
|          | 17 | going to be getting into.  But we think a reasonable date is  |
|          | 18 | probably -- for trial is probably in October.  We think we    |
|          | 19 | can get it done that quickly.                                 |
| 09:08:13 | 20 | THE COURT:  Okay.  Anything you would like to add?           |
|          | 21 | MR. UMHOFER:  No, Your Honor.                                 |
|          | 22 | THE COURT:  And --                                            |
|          | 23 | MS. ARNOLD:  No.                                              |
|          | 24 | THE COURT:  Let me turn to the County.                        |
| 09:08:21 | 25 | What are your thoughts?                                       |

6

09:08:21   1             MS. HASHMALL:  Thank you, Your Honor.

           2             Well, first, as you know, the County believes

           3     there's a binding settlement agreement between the parties.

           4             THE COURT:  I think we discussed that.  And I've

09:08:28   5     sent out an order.

           6             MS. HASHMALL:  Yes.

           7             THE COURT:  Now, let's move through that, because

           8     I tried to get dates and information from you.  I was just

           9     going to -- so I'm trying to get your best input.

09:08:37  10             MS. HASHMALL:  The next sort of threshold issue is

          11     whether the plaintiffs -- viable claims.  We have filed a

          12     motion to dismiss which is set for hearing on June 5th.

          13             THE COURT:  I'm aware of that.

          14             MS. HASHMALL:  As the Court may recall, we've done

09:08:50  15     prior pleading challenges but have not received a ruling

          16     from the Court.  And so the scope of potential claims,

          17     particularly because the plaintiffs have not been able to

          18     establish standing -- a fact noted by the Ninth Circuit in

          19     its ruling in this matter and raised again in connection

09:09:05  20     with our pending motion to dismiss -- is going to

          21     significantly affect whether claims can go forward and what

          22     the nature and scope of discovery appropriate in the matter

          23     would be.

          24             THE COURT:  And having heard all that, what's your

09:09:17  25     best suggestion concerning a trial date?

*Deborah D. Parker, U.S. Court Reporter*

**ER 730**

09:09:18  1          MS. HASHMALL:  My experience is typically a year
        2   from the scheduling conference is appropriate.
        3          THE COURT:  What's your input on behalf of the
        4   intervenors?
09:09:30  5          MS. MYERS:  We've obviously joined the motion to
        6   dismiss, particularly --
        7      *(Court Reporter requests clarification for the*
        8      *record.)*
        9          MS. MYERS:  So we've joined the motion to dismiss
09:09:39 10   with regards to the standing issues and the nuance issues.
       11   What the claims are, I think, will shape dramatically what
       12   the discovery is.  So we think a year is probably closer in
       13   light of what, I assume, will be the disputes between the
       14   plaintiffs and the County with discovery.
09:09:57 15          THE COURT:  Say that again.
       16          MS. MYERS:  A year would be appropriate, given
       17   what we assume will be the disputes between the plaintiffs
       18   and the County on discovery.  And we don't know how
       19   plaintiffs are going to respond to any discovery request
09:10:08 20   related to standing, too.
       21          THE COURT:  Let me ask both of you, what -- just
       22   your guesstimate, not holding you to the length of the
       23   trial.  What I don't want to do is have a jury around, let's
       24   say, the Jewish/Christian holidays, for instance, in
09:10:28 25   December, because you've got trouble then holding that jury

09:10:31  1   together.

2        So what's your thought?  And I'm not holding you

3   to this representation at all.  I'm just trying to get a --

4   kind of guesstimate about what your time frame would be.

09:10:44  5        MS. MITCHELL:  Your Honor, given what we know

6   about how the Court conducts trials and how much we can get

7   done in those days, we think that two weeks is probably

8   sufficient for plaintiffs.

9        THE COURT:  What are your best -- I'm not holding

09:10:57  10  you to this trial length.

11        MS. HASHMALL:  Well, I think very few claims

12  should survive Rule 56 motion practice, if they survive the

13  Rule 12 motion; but if we're there, I would say five to

14  seven days.

09:11:13  15        MS. MYERS:  We don't have an opinion on that.

16        THE COURT:  Okay.  So let's just take the outside

17  parameter of two weeks.  It could be longer.  Has there been

18  any preliminary discussion concerning discovery between the

19  parties?  In other words, since our last meeting, has there

09:11:32  20  been some informal discussion?  And I don't want to know

21  what that is, but you anticipate running into some

22  obstacles, you say, from the County.  I don't know if that's

23  true or not.  I don't know what might be privileged.  I

24  don't know --

09:11:46  25        MS. MITCHELL:  Sure.  Your Honor, at the outset,

9

09:11:47   1   we anticipate needing e-mails.  We anticipate needing --

2   harvesting cell phones certainly of supervisors and senior

3   staff.  So when we look at those significant issues -- and

4   we expect a lot of pushback from the County -- we are

09:12:02   5   looking at probably a lot of motion practice, which is going

6   to take some time.

7              We reached out to the County to have the initial

8   Rule 26 conference.  They would not engage with us, so we

9   have not discussed it amongst the parties.  But looking at

09:12:16   10  what we are looking at, I do think there's going to be some

11  discovery disputes.

12             THE COURT:  Okay.  I'm not too concerned about

13  participation or nonparticipation at this point in a formal

14  26 scheduling conference.  But I think your input today is

09:12:39   15  going to be valuable, because I will set dates, and I

16  started to set dates without input from you.  I re-thought

17  that, trying to get the best, you know, thought you have and

18  to share transparently what my concerns are.

19             If there's going to be difficulty between the two

09:12:54   20  of you in terms of discovery, I'd like to know what that is

21  as quickly as possible.  I agree with you to some extent

22  that perhaps January might be the best date, but I'm not

23  going to set that date.  I'm probably going to set an

24  October date, but I want to go back and think about that for

09:13:14   25  five or 10 minutes.  And what that will do is, it will put

10

09:13:18  1   all of you in a position of responding quickly to discovery

2   or not responding to discovery.  So if I'm running into

3   discovery problems, I might as well know that between the

4   two of you just as quickly as possible.

09:13:35  5        Do you have any more input?  If not, the motion to

6   dismiss has been filed, noted by the Court.  The opposition

7   is due.  There are prior rulings handed down.  I want to

8   look at those prior rulings in addition to whatever

9   additional claims that have been brought.

09:13:58  10       And do you have any further input?  I'd just like

11  about five or 10 minutes to sort out what would be

12  appropriate.

13       L.A. Alliance?

14       MS. MITCHELL:  No, I don't think so, Your Honor.

09:14:10  15  I think beyond the discovery dispute, there's likely to be

16  Rule 56 practice, as -- raised and plaintiffs are likely to

17  bring that as well.  And so, I think that's the only other

18  consideration.

19       There's likely to be expert discovery.  We think

09:14:25  20  that if we move quickly -- and we do think we should move

21  quickly on this -- that we can get all of that done, but

22  it's going to take dedication.

23       THE COURT:  Let me turn to the County.

24       MS. HASHMALL:  Your Honor, I do think we should

09:14:37  25  clarify exactly what has happened and not happened in

09:14:41  1    connection with discovery in this matter.

2                    Back in 2021, we tried to engage with plaintiffs'

3         counsel with regards to the Rule 26 process.  We even

4         initiated written discovery because many of the local rules

09:14:51  5    in the Central District actually encourage the parties to

6         move expeditiously.  They balked at that.  We've not engaged

7         on the Rule 26 process.  It would be requested and obtained

8         a stay of the proceeding.  So it is not accurate to suggest

9         that any intransigeance on our part is why the parties have

09:15:10 10    not conducted discovery.

11                   The reason there was no Rule 26 conference is

12        because the Court set this scheduling conference at the

13        April 20th hearing on a time frame where the parties had

14        already missed the scheduling time frame for conducting that

09:15:28 15    Rule 26 conference.

16                   THE COURT:  I understand that concern.

17                   MS. HASHMALL:  And with regard to discovery, you

18        got to establish standing before you can do discovery in a

19        case where you're attempting to legislate executive

09:15:38 20    decision-making about the County's resources in the absence

21        of any cognizable injury under federal law.  You know, we do

22        believe the Rule 12 motion is critical and --

23                   THE COURT:  Waiting for the opposition.  And I

24        think that's due in a week or so.  I didn't look at the date

09:16:00 25    before I came out.  So that will be resolved, one way or the

12

09:16:03  1  other, rather quickly, okay?

2         Ms. Myers.

3         MS. MYERS:  I do think October, given the dates

4  that have been articulated and given what I think is already

09:16:13  5  clear about the intransigence between the two parties -- the

6  two primary parties related to this.  I expect that there

7  will be significant motion practice, and I would hate to

8  waste the Court's time with a date that is unreasonable,

9  literally given the timelines for motion practice in order

09:16:30  10  to get rulings and those kinds of things.  And so I would

11  just -- I would just say that January seems like a more

12  reasonable date under the circumstances, but --

13         THE COURT:  When Mayor Bass and chairwoman --

14  Supervisor Hahn and President Paul Krekorian with counsel

09:16:53  15  asked for a recess -- not on the last hearing, but the prior

16  hearing, none of you as counsel were present.

17         I think it's widely known now that the Court was

18  requested to recess for 90 days, while Mayor Bass went back

19  to Washington, and there was some other discussion that will

09:17:17  20  remain private.

21         I think the Court was very gracious.  I was

22  inclined not to grant that.  I listened to the parties,

23  thought that that was a reasonable effort and agreed with

24  Mayor Bass to that 90 days.

09:17:28  25         You know, my main concern here, amongst others, is

*Deborah D. Parker, U.S. Court Reporter*

ER 736

13

09:17:31  1   the unaccountability of the settlement offered to the Court.

2   And it's that report -- a simple report to the Court,

3   amongst other things -- that's causing me great concern.

4        My colleague, Judge Pregerson, I haven't spoken to

09:17:52  5   him recently.  He's in the middle of a contempt proceeding

6   fairly soon with the County where there is actually a

7   consent decree.  And whatever that ruling is, that's going

8   to before maybe -- I don't know if your law firm is

9   representing that or Bob Dugdale, maybe Todale [phonetic]

09:18:10  10  is.

11       Are you involved in that?

12       MS. HASHMALL:  I am not.

13       THE COURT:  Well, let me make you aware of it.

14  Apparently, five years ago, a consent decree was signed

09:18:20  15  concerning mental health at the Orange County -- strike

16  "Orange County" -- at the Los Angeles Jail.

17       Judge Pregerson now has undertaken a contempt

18  proceeding in that matter.  And my concern transparently

19  with all of you is:  If the County was in contempt, if that

09:18:35  20  wasn't fulfilled, let alone with a consent decree given by

21  the County -- and I don't know when Judge Pregerson is going

22  to rule -- why would this Court ever accept a simple report

23  to the Court with no accountability in this matter?

24       I think we've been through that discussion a

09:18:51  25  number of times.  You chose to raise it again today.  I give

*Deborah D. Parker, U.S. Court Reporter*

**ER 737**

14

09:18:55  1    that back to you as simply not accountability and that's why

2    the settlement amongst other reasons has been turned down.

3            You also have the power, regardless of your public

4    positions, to resolve this at any time.  You both know that.

09:19:13  5    So this idea that you can't resolve it, you can resolve

6    this.

7            And I ask this one question for all of you:  Can't

8    we do much better?  I mean, with this crisis on our hands,

9    can't all us just do much better?

09:19:29  10           What that "much" is, I'm not certain yet.  I don't

11   want to dictate terms.  I don't think it's appropriate for

12   me to give you a number, but I think it's pretty widely

13   known, and I keep going back to Dr. Sherin's report.  And in

14   2019, Dr. Sherin says, *I need 3,000 subacute spaces*, and he

09:19:47  15   undertakes a pilot program and the County undertakes a study

16   called the "Mercer Report."  I wrote about that in my

17   opinion.  It's in a footnote, for goodness sakes.  You're

18   all aware of that.  There were initially 500 acute spaces.

19   He was given 164.  Go back and check the history of this.

09:20:05  20           Then later on there was a little bit of a fill-in

21   by the County.  But if you talk to Jon Sherin, when I could

22   talk to him, that was a very difficult place for the

23   Department of Mental Health to be in this kind of

24   incremental need.  Now, I don't know if he deserved 3,000

09:20:22  25   subacute bed spaces.  I don't if he deserved 500, but it was

15

09:20:26   1   clear in the report that was actually put forward by the

2   County.

3          So while it's not the reason, you know, my concern

4   is -- and I'm praising you for the progress.  I want you to

09:20:37   5   hear that.  I recognize you got 300.  Probably the Court is

6   badgering up to 1,000.  But if, in fact, you have the need

7   of 1,000 or 1,500, if you count the 500 for the seniors, and

8   that's in 2019, which is one-half of what John Mercer is

9   asking.  And then you're asking the Court to also approve

09:21:02  10   four years later, on a five-year program, which means

11   nine years, half of what your Department of Mental Health is

12   asking in 2019:  1,500?

13          Well, I could probably get through that if there's

14   accountability, but there's got to be accountability here.

09:21:25  15   This document you submitted to me doesn't have

16   accountability, and I'm not going to accept a simple report.

17   I've alluded to the City -- I've been, I think, working very

18   well with the City.  Haven't interfered in one way or

19   intruded with the City, including Mayor Bass, you know,

09:21:41  20   making her best efforts.

21          So you can quite frankly settle if you chose to

22   without me, but you know that the Court doesn't have the

23   approval for the settlement.  I think it's inadequate, and I

24   think there's no accountability here.

09:21:54  25          And so with that in mind, I'm inclined -- but I

*Deborah D. Parker, U.S. Court Reporter*

16

| | | |
|---|---|---|
| 09:21:57 | 1 | want to take a few moments and finish this cup of coffee -- |
| | 2 | to October, because if I set a date in October, that puts |
| | 3 | tremendous pressure on you, but I know two things:  Are you |
| | 4 | really going to settle outside the Court's bailiwick?  And |
| 09:22:14 | 5 | if you're not and I've got discovery problems, I'll handle |
| | 6 | those discovery problems.  Those won't go to a |
| | 7 | Special Master.  And so I'll know very quickly what the |
| | 8 | problem is, if there is a problem between the two of you. |
| | 9 | Now, I can delay this with a scheduled 26 and give |
| 09:22:30 | 10 | you more time.  And I think if we can work together, we can |
| | 11 | come up with some dates today.  And, quite frankly, I think |
| | 12 | that 90 days that I granted before was extraordinarily |
| | 13 | gracious.  And I regret it, quite frankly.  I should have |
| | 14 | set it two weeks after that initial meeting. |
| 09:22:47 | 15 | I'll be back with you in about 15 minutes or |
| | 16 | 20 minutes.  If you want to go downstairs and get a cup of |
| | 17 | coffee, why don't we just say at 9:45, okay?  I'll have you |
| | 18 | out of here.  Thank you. |
| | 19 | MS. MITCHELL:  Thank you. |
| 09:22:58 | 20 | MS. HASHMALL:  Thank you, Your Honor. |
| | 21 | *(Recess taken from 9:23 a.m. to 9:44 a.m.)* |
| | 22 | THE COURT:  These will be the dates, and I'll be |
| | 23 | transparent concerning my reasoning with both of you, |
| | 24 | whether you agree with it or not. |
| 09:45:10 | 25 | First, the trial date will be on Monday, |

09:45:19  1   November 6th.  I'll check with the Clerk of the Court to

2   make certain jurors are available on Monday, but Kiry will

3   be, I think, very cooperative.  If it's a two-week estimate,

4   you'll probably finish by the 16th; if not, I understand

09:45:42  5   that that's Thanksgiving week.  We would have to go over a

6   week and we would resume on the 27th or the 28th, depending

7   upon jurors.  Because in 40-some-years now, I've never been

8   able to hold a jury together over Thanksgiving.  They're

9   catching good fares on a Friday night; because on a Friday

09:46:01  10  night, they're $300.  Thanksgiving week, they're three times

11  that amount.

12         So I would expect, if we don't finish, that you

13  should plan that we would be in recess through -- the

14  20th through the 24th, because Thanksgiving is on the 23rd.

09:46:16  15  If we do finish, hopefully, the jury can go into

16  deliberations.  Now, that assumes two weeks, and I'm not

17  holding you to it.  It may be longer.

18         The pretrial will be on October 24th.  The motion

19  cut-off date, which is the actual day that we will hear

09:46:34  20  motions, will be on October 10th.  That means you're filing

21  30 days prior.

22         Your discovery cut-off date will be September 8th.

23  It's a Friday.

24         Now, let me be completely transparent with you.

09:46:49  25  You've raised, regardless of who's correct, that there might

09:46:52   1   be some difficulty during discovery between the two of you.

2   This is going to flesh out the problems concerning discovery

3   immediately.  And so if there is a problem, I'm going to

4   know about it literally within a month or two.

09:47:08   5         If we delay until January, we're not treating this

6   as the emergency that it is, but I'm flexible.  Along the

7   way, I do expect all parties to cooperate in discovery.  And

8   the reason for that is, the Court has the power of adverse

9   inferences in front of the jury.  And I'll remind you both

09:47:26   10   of that.  So I'm encouraging your cooperation so that I

11   don't get into a position potentially of an adverse

12   inference in front of the jury.

13         I will resolve all discovery disputes in my court

14   and it will not go to a Special Master, so I'll know the

09:47:42   15   cooperative level very quickly between the two of you.

16         I don't need a formal write up.  I'll simply put

17   this in the docket to get this case moving.  I think this

18   has "emergency" written all over it.  I think I've delayed

19   further or long enough concerning listening to the parties

09:47:56   20   ask the Court for additional time, and I've been cooperative

21   in terms of those 90 days, but it ends here.

22         So November 6th for your trial; October 24th,

23   pretrial.  Motion cutoff, which is the day I'm hearing

24   motions, on October 10th.

09:48:10   25         September 8th is discovery cutoff, and that's for

19

| | |
|---|---|
| 09:48:12 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:48:30 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 09:48:39 | 10 |

09:48:12   1   experts and laypeople.  And the reason for that is, I'm not

2   going to push your discovery with your experts earlier in

3   case you decide to settle outside the Court's -- from

4   outside this Court's -- well, in case you decide to settle

09:48:30  5   privately.  I don't want to run up the costs, in terms of

6   the experts, okay?

7          All right.  We'll put that out in a minute order.

8   I want to thank you very much for your courtesy.

9          MS. HASHMALL:  Your Honor, may I raise one more

09:48:39 10   thing, please?

11          THE COURT:  Please.  Certainly.

12          MS. HASHMALL:  It's been a year or maybe more

13   since the plaintiffs withdrew as counsel for one of the

14   individual plaintiffs, Gary Whitter.  The County and the

09:48:49 15   City moved jointly for an OSC re Dismissal regarding that

16   individual.

17          THE COURT:  Do I have that on my docket?

18          MS. HASHMALL:  It was filed in October and it has

19   not been ruled on.

09:48:57 20          THE COURT:  You know, I've neglected it.  I'll go

21   back and look at that.  Thank you.  It's probably sitting

22   there.  I didn't see it, okay.  I'll resolve it for you.

23          MS. HASHMALL:  Thank you.

24          THE COURT:  Thank you very much for your courtesy.

09:49:07 25

20

09:49:07

1        *(At 9:49 a.m., proceedings were adjourned.)*

2                                    -oOo-

3                               CERTIFICATE

4           I hereby certify that pursuant to Section 753,

5    Title 28, United States Code, the foregoing is a true and

6    correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10

11   Date:  May 9, 2023

12

13

14                          _____/s/DEBORAH D. PARKER_____
                            DEBORAH D. PARKER, OFFICIAL REPORTER

15

16

17

18

19

20

21

22

23

24

25

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                         WESTERN DIVISION

4          THE HON. DAVID O. CARTER, JUDGE PRESIDING

5

6    LA ALLIANCE FOR HUMAN RIGHTS,      )
     et al.,                            )
7                                       )
                           Plaintiffs,  )
8                                       )
                 vs.                    ) No. LA CV 20-022291-DOC
9                                       )
     CITY OF LOS ANGELES, et al.,       )
10                                      )
                           Defendants.  )
11   _____)

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  Los Angeles, California

16                 Thursday, April 20, 2023

17

18

19

20

21              Wil S. Wilcox, CSR 9178
            Official U.S. District Court Reporter
22                 350 West 1st Street
             Los Angeles, California 90012
23                wil.wilcox@gmail.com

24

25

2

```
 1    APPEARANCES OF COUNSEL:

 2
      FOR THE PLAINTIFF LA ALLIANCE FOR HUMAN RIGHTS:
 3
              Elizabeth Anne Mitchell, Attorney at Law
 4            Umhofer, Mitchell and King LLP
              11766 Wilshire Boulevard, Suite 900
 5            Los Angeles, CA 90025
              213-394-7979
 6            Fax: 213-529-1027
              Email: elizabeth@umklaw.com
 7
              Matthew Donald Umhofer, Attorney at Law
 8            Umhofer, Mitchell and King LLP
              11766 Wilshire Boulevard, Suite 900
 9            Los Angeles, CA 90025
              213-394-7979
10            Fax: 213-529-1027
              Email: matthew@umklaw.com
11

12    FOR THE DEFENDANT CITY OF LOS ANGELES:

13            Arlene Nancy Hoang
              Los Angeles City Attorneys Office
14            City Hall East
              200 North Main Street Room 675
15            Los Angeles, CA 90012
              213-978-6952
16            Fax: 213-978-7011
              Email: arlene.hoang@lacity.org
17
              Scott D. Marcus
18            Los Angeles City Attorneys Office
              200 North Main Street 7th Floor Room 675
19            Los Angeles, CA 90012
              213-978-7558
20            Fax: 213-978-8216
              Email: scott.marcus@lacity.org
21
      FOR THE DEFENDANT COUNTY OF LOS ANGELES:
22
              Jennifer Mira Hashmall, Attorney at Law
23            Miller Barondess LLP
              2121 Avenue of the Stars, Suite 2600
24            Los Angeles, CA 90067
              310-552-4400
25            Email: mhashmall@millerbarondess.com
```

```
 1   Appearances (Continued):

 2   FOR THE DEFENDANT COUNTY OF LOS ANGELES:

 3            Ana Wai-Kwan Lai
              Los Angeles County Counsel Office
 4            350 South Figueroa Street Suite 601
              Los Angeles, CA 90071
 5            213-974-0061
              Fax: 213-617-6785
 6            Email: alai@counsel.lacounty.gov

 7   INTERVENOR LOS ANGELES CATHOLIC WORKER:

 8            Shayla Renee Myers
              Legal Aid Foundation of Los Angeles
 9            7000 S Broadway
              Los Angeles, CA 90003
10            213-640-3983
              Fax: 213-640-3988
11            Email: smyers@lafla.org

12   INTERVENOR CANGRESS:

13            Carol A. Sobel, Attorney at Law
              Law Office of Carol A. Sobel
14            1158 26th Street Suite 552
              Santa Monica, CA 90403
15            310-393-3055
              Email: carolsobellaw@gmail.com

16

17   ALSO PRESENT:

18            Supervisor Janice Hahn

19            Supervisor Lindsey Horvath

20            Paul Krekorian, Acting Mayor

21            Dave Michaelson, Counsel for the Mayor

22            Cheri Todoroff, Director

23            Special Master Michele Martinez
              Daniel Conway, LA Alliance
24

25
```

4

```
 1              LOS ANGELES, CA.; THURSDAY, APRIL 20, 2023; 9:09 AM
 2                              -oOo-
 3              THE COURT:  We're on the record.  First of all,
 4      once again, good morning.
 5              And Deb, are you okay?  Okay.  If there's any
 6      issues at all, just stop me.
 7              COURT REPORTER:  Wil is writing, Your Honor.
 8              THE COURT:  Thank you very much.
 9              And I'd like to begin with the appearance of the
10      parties with a little bit more formality today.  And that
11      is, on behalf of the Plaintiff, Ms. Mitchell and Matt, would
12      introduce yourselves, please, for the record.
13              MS. MITCHELL:  Elizabeth Mitchell on behalf of
14      LA Alliance.  With us is also Daniel Conway, representing
15      LA Alliance for Human Rights today as well as the individual
16      Plaintiffs.  And we have Matthew Umhofer here as well.
17              THE COURT:  Thank you very much.  It's a pleasure.
18              And Chairwoman Hahn, would you begin, and then
19      whoever's with you.  And I know the names, but I need a good
20      record.  And then I want to recognize the president.
21              MS. HAHN:  Yes.  Good morning, Judge Carter.  I'm
22      Supervisor Janice Hahn, and I'm currently the chair of the
23      Los Angeles County Board of Supervisors.
24              And here's our newest supervisor.
25              MS. HORVATH:  Good morning, Your Honor.
```

5

```
 1              THE COURT:  Good morning.
 2              MS. HORVATH:  Lindsey Horvath, I am the newest
 3   supervisor for the 3rd District, vice chair of the board.
 4              THE COURT:  It's a pleasure to meet you.
 5              MS. HORVATH:  Nice to meet you.
 6              MS. LAI:  Good morning, Your Honor.  Ana Lai here
 7   on behalf of the County of Los Angeles from county counsel.
 8              THE COURT:  Thank you.  It's a pleasure.
 9              MS. HASHMALL:  Good morning, Your Honor.
10   Mira Hashmall here from Miller Barondess for the County of
11   Los Angeles.
12              THE COURT:  It's a pleasure.  Nice to see you
13   again.
14              I'm honored to have you here once again,
15   President of Los Angeles Council.  And I understand from my
16   clerks that you're the acting mayor today.
17              MR. KREKORIAN:  As of the moment, yes, Your Honor.
18              THE COURT:  It's a pleasure.
19              MR. KREKORIAN:  I'm wearing both hats.  It's good
20   to be with you.
21              THE COURT:  It's good to be with you.
22              And also, this is Paul Krekorian, acting mayor
23   today in the absence of Mayor Hahn.
24              The Intervenors, please.  And I mean -- I'm sorry,
25   Mayor Bass.  We gave you two positions today, Mayor Bass.
```

6

1               (Laughter.)

2          MR. KREKORIAN:  And, of course, in addition to

3     Mr. Marcus, Dave Michaelson is here as counsel for the

4     mayor.

5          THE COURT:  It's a pleasure.  And you're more than

6     welcome to come up and join us closer at any time with

7     participation.

8          Okay.  Any other council members here who might be

9     recognized?

10         MS. MYERS:  Yes, Your Honor.  Shayla Myers from

11    the Legal Aid Foundation of Los Angeles on behalf of the

12    Intervenors, Los Angeles Community Action Network and

13    Los Angeles Catholic Worker.

14         THE COURT:  It's a pleasure.

15         And Ms. Sobel.

16         MS. SOBEL:  Carol Sobel on behalf of all of the

17    Intervenors.

18         MS. HAHN:  Judge, I forgot to introduce

19    Cheri Todoroff, who is the director of our Homeless

20    Initiative.

21         THE COURT:  It's a pleasure.  You're more than

22    welcome to approach any of your clients or consult with them

23    at any time during the process.

24         MS. HAHN:  Thank you.

25         THE COURT:  First, I want to express the

7

1   appreciation for the numerous mediation and continued

2   mediation efforts of Special Master Michele Martinez who's

3   here today and Judge André Birotte.

4           It's been 90 days since I last saw you when the

5   parties asked for a continuance.  Mayor Bass wanted to talk

6   to President Biden and all the parties in agreement that

7   they wanted this 90 days to discuss the matter.  So your

8   courtesy is appreciated in attending today.  And I hope you

9   got through the security downstairs.  I didn't get a last --

10  I didn't get the call till the last moment.  So I waived the

11  searches, except there are no weapons allowed.

12          And for the -- if there are press members here,

13  you are more than welcome to use a computer.  Apparently,

14  there was some confusion last time.  It's my understanding

15  that your generation doesn't write cursively anymore.

16                          *(Laughter.)*

17          THE COURT:  I'm just kidding you.  But use the

18  computer, but please don't take pictures and no recording.

19  But beyond that, you're than welcome to use the computer.

20          We return today after the parties requested this

21  90-day continuance for the hearing held on January 17th,

22  2023.  And at that hearing, the Court considered the

23  County's proposed settlement agreement submitted October of

24  2022, which, for my record, is Docket 485.

25          The Court traced the history of this litigation

1    and the state of homelessness in Los Angeles pursuant to

2    Docket 518, and Mayor Karen Bass, Chairwoman Janice Hahn and

3    City Council President Paul Krekorian were present on behalf

4    of the City and County of Los Angeles.

5           After the Court made comments, the parties

6    subsequently requested a private conference in which

7    Judge Birotte and Special Master Martinez were present.  The

8    Court was not.  Plaintiffs also participated.

9           And following that conference, the parties

10   represented in open court that in light of the new

11   leadership at the city and county level, they will meet and

12   confer to review and amend the terms of the County's

13   settlement agreement, particularly in relation to the number

14   of mental health beds and monitoring, which is also

15   contained in Docket 518.

16          And the parties requested and the Court granted an

17   additional 90 days to do so.  And on April 18th, 2023, after

18   a request for an extension of time, which the Court granted

19   two days ago, during the evening hours, the parties

20   submitted an addendum to the proposed settlement agreement

21   at Docket 533.

22          I represent to you I've read all of your documents

23   and gone over them thoroughly during the evening hours.

24   We've spent the last 48 hours nonstop since those were

25   filed.

```
 1            For the purposes of transparency, the Court
 2    will make available the transcript of today's proceedings
 3    after court today.  And in recognizing
 4    City Council President Paul Krekorian as a representative
 5    and the acting mayor of Los Angeles, Mr. Krekorian, the
 6    first question is to you.
 7            Is the City of Los Angeles satisfied with the
 8    terms of the proposed settlement?
 9            MR. KREKORIAN:  Well, thank you, Your Honor.  And
10    let me say first how satisfied the City of Los Angeles is in
11    our new relationship with the County and how important it is
12    that we continue to work together locking arms, as
13    Mayor Bass and Chair Hahn declared during the State of the
14    City this week.
15            And that was, I think, a monumental change in this
16    relationship.  And I think the settlement agreement reflects
17    certainly significant progress since the last time that we
18    were here.  And thanks to Your Honor's intervention, the
19    increase in the number of beds that are being proposed in
20    the settlement agreement are welcome and will make a
21    difference.
22            If the question is will this be sufficient to meet
23    the moment, I think the answer has to be "no."  The addition
24    of a thousand beds over the course of three and a half years
25    means an addition of fewer than one bed a day, which likely
```

10

1   won't even keep up with the increase in demand.

2        The additional 450 vouchers that are provided

3   under the settlement agreement, I have concerns about

4   because of the fact that they are for RCFEs and adult care

5   facilities, and there's no guarantee that those facilities

6   will even be available to be used.

7        It is, as I understand it, the trend in that area

8   of care that RCFEs are actually tending to close now, rather

9   than open new facilities.

10        So and that's not within the County's control, of

11   course.  But it is a question that we as -- we collectively

12   have to address, whether there will be sufficient capacity

13   to be able to use those vouchers.

14        So I'm concerned that while this definitely shows

15   progress and it's consistent with the progress that we've

16   made in this relationship, if you're asking me whether this

17   will be a transformative agreement, it will not be.  It will

18   an incremental improvement.  But I can't see that this,

19   standing by itself, will meet the needs that we have now for

20   the seriously mentally ill.

21        That's not to say that we will not continue to do

22   this work.  And I have -- I'm absolutely confident in all

23   five supervisors' commitment to this work and commitment to

24   working with the City and commitment to expanding

25   significantly the capacity that's available for those who

1   are in need of mental health care.

2          This agreement simply is, I hope, only one small

3   part of that larger effort.  In my view, it's hard to image

4   that the claims presented by the Plaintiffs are sufficiently

5   met by the settlement.

6          THE COURT:  Okay.

7          MR. KREKORIAN:  The Plaintiffs have a different

8   view, apparently.  But I think if we -- if we are going to

9   meet this moment, it's going to take transformative change,

10  and this agreement does not reflect transformative change.

11         THE COURT:  I may come back to you in just a

12  moment.

13         I'm going to turn to the Interveners and then I'll

14  turn back to the respective parties with the proposed

15  settlement.

16         So either Ms. Myers or Ms. Sobel, if you care to

17  enter into this discussion; if not, I'll move on.

18         MS. MYERS:  Sure, Your Honor.

19         THE COURT:  And the same question that I've asked

20  the council president.

21         MS. MYERS:  Yeah.  Obviously, and we just want to

22  be clear on the record, that the Intervenors had no part in

23  the negotiations of any the settlements and agreements in

24  this.  Despite the Intervenors always being willing to come

25  the table, the LA Alliance and the -- and the County and the

 1   City made the decision to do that without the presence of

 2   homeless service organizations at the table.  So just to be

 3   clear on that, the first time we saw this was the same time

 4   the Court saw this.

 5            THE COURT:  About 7:00 or 8:00 on Wednesday night?

 6            MS. MYERS:  Yeah.  And --

 7            THE COURT:  I'm sorry.  On Tuesday night.

 8            MS. SPEAKER:  I mean, obviously, I agree with

 9   Council President Krekorian that this is not sufficient to

10   solve the problem.  Obviously, no resources that are

11   available in the County or the City right now are available

12   to solve this problem.  I think the County's commitment

13   matches the City of Los Angeles's commitment, though, and

14   the settlement that was put forward months and months ago

15   approved by this Court.

16            I think it is very clear that the City Council, in

17   approving their settlement that was present, in no way met

18   the moment.  And so I think it's challenging to sit here and

19   attempt to hold the County responsible for a different

20   standard than the City was held in committing largely

21   resources that were already committed by the City of

22   Los Angeles to build shelter beds and housing.

23            The reality is, is the City of Los Angeles's

24   agreement to build approximately 12,000 new beds was only

25   60 percent of an exclusion of the population that I think

1  the County is struggling to provide services to.

2           THE COURT:  And another 40 percent of substance

3  and mental health.

4           MS. SPEAKER:  Exactly, Your Honor.  And it's not

5  just excluding the 40 percent.  I think it's excluding

6  people with mental health issues and substance abuse issues

7  from the number, and then taking 60 percent of that number.

8           In no way is that meeting the moment we're in.  I

9  think President Krekorian made it clear last year that he

10 was meeting the moment as it was last year.  We're in a very

11 different time.  And certainly, the settlement agreement,

12 which Interveners objected to strenuously, in no way met

13 that moment because it locked in time the point in time

14 count from a year ago.

15          So the reality is, this case is not going to solve

16 homelessness.  I think Your Honor has been clear about that.

17 I think the council has been clear about that.  I think the

18 board of supervisors have been clear about that.  I think

19 the press has been clear about that.  I think the public has

20 been clear about that.  You cannot solve homelessness

21 through litigation.  What you can do is you can solve it

22 through dramatic political leadership and those sorts of

23 things.

24          I think this settlement agreement, while it is by

25 no means perfect, certainly matches the commitment that the

```
 1   City of Los Angeles made last year.  And I think it's a --
 2   it's a reasonable response under the circumstances to the
 3   need, and it certainly matches the commitment to increase
 4   the number of beds.  It's not going to solve the problem.
 5   This problem is not going to be solved in this courthouse.
 6   So that's the Intervenors' position on that.
 7           The last thing that I want to express, though, is
 8   the Intervenors' ongoing concern with the lack of
 9   transparency with these proceedings related to the public.
10   The reality is, much of the -- much of the process in this
11   case has been pulled back into the back chambers of this
12   courthouse through ex parte communications, which the
13   Interveners continue to object to.
14           The reality is, these are incredibly important
15   issues that deserve public airing.  They deserve public
16   communications.  Whether it's about the enforcement of
17   Los Angeles Municipal Code 41.18, whether it's about the
18   city street strategies, whether it's about the increase in
19   beds, those sorts of things.
20           We have a political process and groups like the
21   Interveners and all of the other organizations and unhoused
22   folks deserve a right and the ability to participate in that
23   process.  When everything is being shoe-horned into
24   monitoring through a special master or through procedures
25   that are outside of the political process, it takes away the
```

1    political accountability.  And we continue to have

2    significant concerns with that.

3              That's all I would say at this point.  Thank you.

4              THE COURT:  I may have some questions back to you

5    in just a moment.

6              MS. SPEAKER:  Yes, Your Honor.

7              THE COURT:  Ms. Sobel.  And would you pull the

8    microphone just a little bit closer because we are on

9    CourtSmart.

10             MS. SOBEL:  I fully agree with

11   Council President Krekorian that this doesn't meet the

12   moment.  I think it's incredibly disappointing.

13             It's almost exactly 20 years ago that I filed the

14   *Jones* case.  And, to me, it is just remarkable that we are

15   talking about a settlement that is anchored in a threat

16   still of criminalization, that we have not moved forward,

17   that it took the City 16 years -- not 16 years -- 13 years

18   to build -- to increase the available beds for people who

19   were unhoused to 1250, and that included private builders.

20             There is no -- the focus of the City is wrong.

21   It's been wrong since the beginning.  It was wrong when the

22   economic roundtable told them 20 years ago that they needed

23   to do certain things to cut off the feeder pools into

24   homelessness.  And we are now at a point where the feeder

25   pools are increasing at a rate that is far greater than

16

```
 1   anything the City can imagine.

 2            I'm not suggesting that this isn't it a resolvable

 3   problem; I believe it is.  But is not resolvable through

 4   expanding shelter beds.

 5            THE COURT:  All right.  Let me turn to either --

 6   it doesn't matter -- either LA Alliance or to the County.

 7   Because this is really centered over the County, not the

 8   City at this time.

 9            MS. MITCHELL:  I'm happy to talk, Your Honor.

10            THE COURT:  So Ms. Mitchell.

11            MS. MITCHELL:  Here, I'll go ahead and move up

12   here since there's a microphone.

13            We don't disagree with Ms. Myers that this has

14   never been about solving homelessness.  It's always been

15   about addressing the immediate crisis on the street.  The

16   emergency needs to be addressed.

17            And when we filed this back in 2020, were going

18   the speed of a turtle, right.  We were -- we were focused

19   exclusively on permanent supportive housing.  All of our

20   resources were going to permanent supportive housing.  And

21   the County, to be quite frank, was floundering through

22   Measure H, was not matching any of that.

23            And so we filed this to say we need to re-divert

24   some of those resources to immediate crisis control.

25   Because as the crisis spins out of control further and
```

1   further and further down the rabbit hole, more and more

2   people are dying, more and more people are getting sick,

3   right.  We have to fill that basin.

4        You cannot treat a broken leg on a surgeon's table

5   without treating the gunshot wound first.  And we've always

6   said we first have to address the gunshot wound.  Let's

7   address the crisis on the street, and then we can talk about

8   the long-term issues.  And that's what this has always been

9   about.  And I think that the City did a great job stepping

10  that up last year, which is what the settlement was.

11       This year what we're looking at right now, this

12  agreement, I think is largely -- the forest is being lost

13  for the trees, Your Honor.

14       We don't disagree that 1500 beds is not going to

15  solve this.  I don't think the County disagrees that 1500

16  beds is not going to solve this, right.  We probably are

17  looking at this point maybe 8,000 beds.  If we're talking

18  about mental health, if we're talking about substance use

19  disorder, if we're talking about board and care patches,

20  that's probably what we're looking at.

21       But I think the County will also say the resources

22  are not available, and the County can do what the County can

23  do.  And in stepping up to 1500 beds, it's five times better

24  than we've ever seen before.  And so something like that is

25  significant, and should be observed.

1          But what I want to do is take a step back from

2     just the bed count, because we've been so focused on the bed

3     count, and look at the rest of the agreement.  Because

4     that's why LA Alliance ultimately agreed to this.  And I'm

5     looking at the agreement right now.  But that's why

6     LA Alliance ultimately agreed to this.  It was not because

7     of the bed count, which has gotten significantly better.

8     And thank you to, Your Honor, for -- for putting that

9     pressure on.  There's no doubt about that.

10         But if you look at the shelter agreements, you

11    look at the services agreements, you look at the home teams,

12    you look at all of that crisis that's being stepped up, we

13    cannot discount that.

14         We entered into this agreement because, frankly,

15    the City told us that's what the City needs.  And I want to

16    look at the shelter projects that are being stood up right

17    now, all of the Project Roomkey and the Project Homekey,

18    they're being stood up right now.  There is no shelter

19    agreement that's in place, Your Honor.

20         For eight months, the City has been doing this,

21    and the County has been coming alongside without a shelter

22    agreement.  And all the Court has to do is walk into these

23    projects to see the problem with that.  You have people that

24    are going into these projects with mental illness, with drug

25    addiction, that are not being assessed for days, weeks,

```
 1  months that are not getting services --

 2          THE COURT:  Let me help you.  I am in those

 3  projects.

 4          MS. MITCHELL:  So Your Honor understands.  There

 5  is no services agreement with those projects.

 6          And so when we entered into this agreement with

 7  the City last year, we knew that, and we were all concerned

 8  about that.  But the City stepped up and did it anyway

 9  because they needed to meet the moment.  And the County is

10  ready to partner with the City on that.  And that is too

11  much of an emergency to throw out the window.

12          So when you look at all of the rest of it, you

13  look at the high-needs beds that are actually being

14  addressed, the number's not in here, but I'm told it's about

15  1,000 beds, that are being produced, unlicensed, high-needs

16  beds that the City is being given access to as they're going

17  through this encampment reduction process.

18          THE COURT:  The numbers are in the addendum.

19          MS. MITCHELL:  No, Your Honor.  The high-needs

20  beds.  I'm talking about the unlicensed, high-needs beds.

21          THE COURT:  Oh, I'm sorry.  Thank you.

22          MS. MITCHELL:  So if you look at this in the

23  totality, and you look at the dramatic situation we have on

24  the streets now, that is why we signed off on this.  That is

25  why we agree to it.  And that is why we continue to push for
```

1   it, saying not only is this a good agreement for what it is,

2   but it needed to have been done eight months ago.  It needed

3   to have been done six months ago.  And here we are in April,

4   watching these projects flounder.

5           And I'm hearing it from service providers.  I'm

6   hearing it from residents, about the crisis that we're

7   facing right now.  And we can't keep going.

8           Because sure, we can fight, Your Honor.  And I'm

9   happy to fight.  The Court has always known that.  We have

10  done a lot of business together in the past.  But what

11  you're looking at, at that point, is three years down the

12  road, Ninth Circuit arguments, and how bad is the crisis

13  going to be then?

14          So from our perspective -- and I can't speak to

15  the County's perspective, I'll let the County do that about

16  whether there's the sufficient funding available and that

17  kind of thing.  But from the Alliance's perspective, we need

18  to be clear that we need to move forward now.  We cannot

19  keep waiting and letting the perfect be the enemy of the

20  good.  So we've heard that a lot in this court.  And this is

21  what we're trying not to do here.

22          So with that, I will step back.  I'm happy to

23  answer any questions that the Court has.

24          THE COURT:  And I may come back to you as well.

25          Also to either Matt Umhofer or Darryl -- I'm sorry

```
 1   Daniel.  My apologies.  I know that the mayor of Sacramento
 2   was down here for a while also participating.
 3          Let me turn to any of you as counsel or the
 4   chairman of the board.  But the first question I have,
 5   regardless, is to Chairwoman Hahn.
 6          And first of all, let me continually express my
 7   appreciation in terms of your leadership or attempted
 8   leadership throughout the process.
 9          In Section A2 of this proposal -- and somebody's
10   going to help put that in front of you.  You shouldn't have
11   to do that.
12          MS. HAHN:  Thank you, Your Honor.
13          THE COURT:  You've got lots of staff here.
14          Proposal, Settlement Proposal 2A, if you put that
15   in front of the Supervisor.
16          MS. HAHN:  I see it.
17          THE COURT:  The effectiveness of this agreement is
18   expressly subject to and contingent upon approval by the
19   County's approval of settlement process, including by the
20   Los Angeles County Claims Board and the County Board of
21   Supervisors and by approval of the individual Plaintiffs.
22          You'll find that at Docket, for my record, 533-1
23   at 7, Section A2.
24          When does the County Board of Supervisors plan to
25   hold its public meeting regarding the approval of this
```

1   proposed settlement agreement?

2         MS. HAHN:  Your Honor, my understanding is that we

3   would be approving that at our next -- if it's signed off

4   today by you, Judge Carter, then we would officially approve

5   it at our next open County Board of Supervisors meeting.

6         THE COURT:  Let me -- in my 25 years on the

7   federal bench dealing with the SEC, the FTC, any government

8   agency, this Court has never approved a settlement until the

9   parties have signed off on that settlement.  Let me repeat

10  that.

11        So what I find unique in this is that you don't

12  have an approved settlement from your parties on the

13  County's side, and you're asking the Court, then, to sign

14  off on no vote.

15        The second thing is, when I look at this proposed

16  settlement, I'm somewhat stunned in terms of who has signed

17  this settlement.  If I'm dealing with the principals, I

18  expect your name on the settlement.  I expect you to be

19  responsible, not somebody who is able counsel in the County

20  Counsel's office signing off so in the future, if something

21  goes sideways, elected officials can then take the position

22  that the signatures were with a very competent attorney.

23        Now, hold on.

24        I'm going to express some concerns so you can

25  respond to them when I take the bench in just a moment.

1    Excuse me.

2          You seek dismissal with prejudice of Plaintiffs'

3    claims against the County pursuant to Federal Rule of Civil

4    Procedure 41(a)(2).  And 41(a)(2) provides that "An action

5    may be dismissed on terms that the court considers proper,"

6    quote, unquote.

7          And I've got some questions and some concerns, and

8    I want you to discuss those amongst yourselves in just a

9    moment.

10          First, in this proposal, there is still, in my

11   opinion, subject to your arguments, no oversight.  I stated,

12   and I was clear, at the last hearing that this is just

13   another document, aspirational that we're chasing in three

14   or four years, as many of my colleagues have had to do in

15   other consent decrees -- and this is not a consent decree; I

16   know, transparently, that the board is concerned about that

17   wording.  You don't have to say that, but I know that.

18          So if you'd be so kind, Diali, Julian, would you

19   put up the terms and conditions of the settlement with the

20   City.  And I'm going to point out stark differences.  And I

21   said last time -- and I think I used the word "dead on

22   arrival."

23          This is the City settlement.  This is where the

24   City trusts the Court to work with the City in good faith --

25   and if you noticed, I haven't interfered with Mayor Bass at

1    all.  In fact, we've had a number of meetings.  She's got

2    the latitude to carry out her program.  The Court's not

3    going to be an obstacle unless there's a constitutional

4    violation.  No intermeddling.  A working relationship,

5    hopefully.

6            This is what the City gives the Court.  And I give

7    them back the same trust.

8            The parties agree that the duration of the

9    agreement shall be five years.

10           And by the way, in the future, I'm going to be

11   concerned about five years because any time I see a

12   five-year agreement, I'm absolutely concerned now because

13   the politicians who made that agreement are now out of

14   office and don't have to respond to it.  So I'm concerned.

15           But in five years, during which point the Court

16   shall have continuing jurisdiction to oversee -- circle that

17   for a moment -- and enforce the settlement agreement.

18           Now, if you'd be so kind, would you put up the

19   City -- or the County, this is the County's proposal.

20           You give me absolutely no oversight, and you give

21   me no enforcement.  Your proposal is reporting the County

22   shall file reports regarding its progress in meeting its

23   obligations under this agreement quarterly.

24           That means that if I sign off on this agreement,

25   I'm simply getting a quarterly report with absolutely no

1   power of oversight, monitoring to hold you to your

2   milestones and representations.  I'm giving you the

3   credibility of the federal court to go out to the public and

4   ask for more monies without any accountability.

5           The judicial enforcement, if after exhausting the

6   dispute resolution -- and this only pertains to dispute

7   resolution.  Your main portion is nine.

8           Procedures described in section P1I, the claiming

9   party still alleges the responding party is in breach of

10  this agreement.  The claiming party may file a notice of

11  breach and request for judicial enforcement of the district

12  court to remedy such breach.

13          That's just a contractual breach.  So I see a huge

14  difference and tried to put everybody on notice concerning

15  this at the last hearing.  And I used -- I think I used the

16  dramatic words of "dead on arrival."  I apologize for the

17  drama involved in that, but I don't in terms of the meeting.

18  I don't see any remedy to this so far.

19          Let me then turn to accountability for just a

20  moment.  If you turn to the next section.  And these are my

21  concerns in the early morning hours with my law clerks.

22          And I want to thank each of you humbly for the

23  incredible hours you're keeping.

24          When I come back, I want you to respond to

25  accountability.  And I have grave concerns about this.

1          The question of the government accountability was

2     first raised -- and by the way, for Mr. Umhofer and for you,

3     Ms. Mitchell, I have nothing but praise.

4          In fact, in bringing this lawsuit, it did cause a

5     breaking of absolute inertia in the city.  And at some

6     point, I don't think you bargained -- and I'm joking with

7     you -- to go citywide and now countywide.  I don't know that

8     that was ever your original -- but in a sense, you've acted

9     as a buffer, and the County has been fortunate and so is the

10    City, because this has become the center of the litigation

11    including Venice Homeowners who came into court, issues

12    involving recreational trailers.

13         And once this lawsuit either settles or goes to

14    litigation or whatever happens, there's nothing that

15    precludes a multitude of lawsuits coming forward.  And

16    that's what this Court's been trying to avoid to center

17    these lawsuits amongst the judges here, so seven different

18    judges didn't decide the same or related issues in the same

19    way.

20         And at least when we started we were successful

21    with that.  I'm worried about this turning into massive

22    litigation, spread out to the court again, more lawsuits

23    Chairwoman, than you could possibly imagine.  Back to the

24    good old days of the Wild West with how do you govern not

25    knowing what the federal court's going to do.  But let's get

27

1    some parameter.

2            So in a sense, this has protected you from

3    lawsuits.  But if this settles or goes to litigation or

4    whatever, you're back right in what I call the litigation.

5    And it may not be you, Mr. Umhofer.  It may be an entirely

6    different firm or three different firms or four different

7    issues.

8            So accountability.  First of all, you stated in

9    your complaint:  "Measure H is spread so thin that it serves

10   more to feed the County's own bureaucracy than to make any

11   significant dent in the crisis," end of quote.

12           You go on to say that the County also faces tough

13   questions about its management of homelessness-related

14   issues.  The other point at the last hearing is the problem

15   is outpacing the solution, and the County has failed to

16   utilize the funds in a manner that would effectuate the

17   goal.

18           The next was the actual result is an astonishing

19   lack of progress at addressing the crisis, continuing

20   expansion of the crisis despite such efforts and resources

21   because each being used in ways that will never solve the

22   problem.

23           I understand that the Court cannot exercise its

24   jurisdiction to enforce terms that are against the public

25   policy and public interest.  And I've stated that at the

 1  last hearing so you know I'm absolutely consistent in this,
 2  and your counsel heard this.
 3          Could you put up that portion on Page 4 for a
 4  moment.  I want to read this to him.
 5          Quote, from the last hearing:  "But because the
 6  settlement as written is really a private settlement, I want
 7  to stress that for a moment, this is portrayed to the Court
 8  as a private settlement with no judicial oversight, no
 9  accounting, no monitoring, and the LA City gave the Court
10  that trust to at least monitor.  LA City gave the Court that
11  trust, and the Court gave you that trust back so that we had
12  a check and balance and that we're able to accommodate each
13  other along the way."
14          And the next paragraph that I pulled out just so
15  they can address.
16          This requires no judicial approval.
17          In other words, I understand that you can settle
18  without me.  You can withdraw the complaint.  But you are
19  asking the Court to put my approval on this.  And by
20  implication, then, it can go to the taxpayers as approval
21  with the Court's blessings, in a sense.
22          And what is astounding to me is that whatever this
23  matter is, and I want to compliment the County for moving
24  from the 300 to the 1500.  I want to compliment you again.
25  That's progress.

1          But my decision today is based upon not whether

2     you've made some progress, but is that enough.  And so I

3     want to go back to what I said at the last hearing like a

4     "Rocky Horror Picture Show" and do this one more time.

5          You are going to develop 1000 additional mental

6     health substance, disorder use -- or disorder beds, as well

7     as 450 subsidy beds in adult residential facilities.  This

8     adds additional beds, and it sets up those milestones in the

9     settlement.  However, I'm concerned that the numbers may

10    fall far short.  And when I come back after that recess,

11    because I want to go over my notes, I'd like you to pull up

12    Dr. Sherin.

13         Go to Page 5 for a moment.

14         And I want to remind you what our own mental

15    health director said in 2019.  And we can up pull up the

16    first page again.

17         And Dr. Sherin said:  The Mercer and ODR analysis

18    suggests we may need to develop nearly 3,000 new subacute

19    beds.  And if there are unmet needs for subacute care among

20    the homeless population which are not reflected in these

21    estimates, we may need to develop even more subacute beds.

22    And while some uncertainty is unacceptable -- or is

23    acceptable, inaction is not.  The problems mentioned

24    throughout this report due to a lack of post-hospital beds

25    and services are real and serious.

1          Now, go back and read those reports.  I'm falling
2     asleep reading these reports.  And he also had a project of
3     500.  And instead of 500, the County, if you read carefully,
4     only came forward with 167.  This is in 2019, folks.  This
5     is four years ago.
6          And so what I'm astounded about on one hand is I
7     pay you the compliment of moving forward.  And I pay you the
8     compliment again and again.
9          This 1500 shouldn't even be negotiable between
10    you.  This shouldn't even be a bargaining chip between the
11    two of you.  The County should have done this years ago
12    without even coming in front of the federal court.  And yet,
13    this is used as a bargaining chip of 1500 beds out of 3,000
14    needed, out of 167 beds given out of 1500.
15         For goodness sakes, this comes from your own
16    mental health director.  Now, Kathryn Barger, who you know I
17    have great respect for, I want to put that on the record,
18    she made a statement couple of days ago.  She said
19    39 percent.  Go back and read her own statement in the
20    press.  39 percent of the folks out there have severe mental
21    health issues and/or substance abuse or a combination.
22         I asked the question last time, and I ask you to
23    address it again.  If Mayor Bass is going to fulfill her
24    commitment of 17,000 off the street, and if we have a
25    40 percent substance abuse and particularly mental health

1   problem, you do the math.  Is that 300 beds that you

2   initially offered to me?  Is that 1500 beds that you

3   initially offered now?  You do the math.  I don't have to.

4        If you just take the agreement that we entered

5   into between the City and the Court of 12,000 to 14,000,

6   take any number in between, is 40 percent of that 300

7   initially offered to the Court or 1500?  Excuse me.  I'm

8   sorry.

9        Go back and read your own report.  It's in the

10  footnote in the briefing that I wrote to you.  It's at

11  Page 20.  It's your own shortage of mental health hospital

12  beds in the LA County.  And that has not been addressed in

13  this.

14       So today you need much more than the 3,000 beds.

15  So it's less than half of what was even proposed four years

16  ago, and your population has grown disproportionally.

17       Finally, this accountability issue.  We held a

18  hearing, if you remember, in April of 2021.  And we got into

19  some really, really finite concerns about where's the money

20  going, $13 billion thus far.

21       The governor seems committed.  I'm not a

22  politician.  But if -- I took note that in the best of times

23  with a $100 billion budget, he put in a lot of money; and in

24  the worst of times, when he doesn't have the budget, he's

25  still putting in the money for homelessness.  In fact, he's

 1   looking for some kind of success.

 2            But despite the huge amounts of public spending,

 3   our numbers keep rising and the conditions on the ground

 4   appear to get even worse.  And I'm wondering where the

 5   accountability is here.

 6            So I'm going to joke with you -- sit down.  Thank

 7   you.  I'll address you, I promise you.  I'll give you all

 8   the courtesy in the world in just a moment, I promise you.

 9   But not when I'm speaking.  And I won't interrupt you.

10            I'm going to joke with you.  I don't think you

11   would want me on this case.  And the reason for that is if

12   I'm going to sign off on this, I have to have

13   accountability.  Let me repeat that.  I have to have

14   accountability to sign off on this.

15            At least not looking over your shoulder, but

16   making certain that the representations you make are not

17   once again aspirational.

18            Because while I may trust you implicitly,

19   Chairwoman Hahn, and I put that on the record, I don't know

20   who your successor is.  And I don't trust that process.

21            And finally, could you put up a couple pictures

22   that I just took.  You know, I don't live down there at

23   Skid Row, but I get down there.

24            And it's nice to have Pete White here, I want to

25   recognize you.

1    And there's two people I want to pay tribute

2    today.  And along the journey, I think I've talked to what,

3    Michele, 400 to 600 people?  At least.

4    One of those is ^Tom LaBonge, a former Mr. LA.

5    And Tom -- you don't know this, but he was secretly behind

6    the scenes when I could talk to anybody, helping the Court

7    immensely.  I've got some pictures of him driving down the

8    riverbed.  Incredible memories of some the great people I've

9    met on this journey.

10    And Tom said something very wise I didn't

11    understand.  "Judge, the board of supervisors will only do

12    what the board of supervisors is made to do."

13    And how many times did he repeat that to us,

14    Michele?  Forever.

15    Now, I don't know if that's true or not.  But it

16    seems to me when we start with 300 and we get to 1500, that

17    we keep doing kind of the bare minimum along the way.  And

18    then we have a press conference.

19    And the second thing is -- well, who I call the

20    mayor and that is -- well, a very wise man came into my

21    court, and he one time described this as "the homeless

22    industrial complex."  And I don't know if that's true or

23    not.  It's a dramatic word.

24    But he said one thing to me.  He said, "Judge, why

25    don't you take a walk with me, and let me show you my area."

34

1   And I think that's the first time I'd met Pete White, who's

2   here.  And I think that's the -- Pastor Q followed.  "And

3   now I don't go with you because you're an advocate in this

4   matter."

5          So I want to put up two pictures a week or so ago.

6   And these are two little girls coming out of the rescue

7   mission on the way to school with a guard.  And you have to

8   ask, what are they doing there?

9          And if you put up the next picture.  This guy is

10  just walking down the street, shivering with hypothermia.

11  That's gangrene.

12         And then the next picture.  So I took off his

13  face -- take off his face.  Go up there.  Boom.  No.  Remove

14  his face.  Thank you.  My apologies.  I thought we'd edited

15  that out.  He's going to lose his foot.

16         My problem is that we, as elected officials, and

17  the Court -- I blame myself -- we're not getting down there.

18  And it makes me wonder -- and I toss this back to you with

19  no criticism of Dr. Adam.  She's terrific.  $438,000.

20         When you get up here and address me and you tell

21  me you don't have money, I will never go in the LAHSA

22  offices again in a downtown hotel with that kind of rent.

23  And so don't throw the lack of money at me from the County's

24  perspective.  And don't throw this budget of now

25  $800 million at me as "We don't have money."

```
 1              And I do agree with the former director.  I'm
 2    really concerned about the president of the United States
 3    earning less than the LASA director.  And twice as much a
 4    federal court judge, by the way, so I'm envious.  I'm joking
 5    with you, but not.  How we justify that in dealing with
 6    poverty.  And how we also justify the low wage for these
 7    wonderful kids going out to the street, paying that kind of
 8    staff salary.
 9              So when you address me, be careful if we get into
10    a discussion of how money is being spent.  Because I think
11    the county has, with a $43.5 billion budget, a lot more
12    potentially that you could contribute.
13              And my tough call is this.  I don't want to deter
14    you.  I'm willing to settle for the good and not the
15    perfect.  I've got grave reservations if this is the good.
16              So I'm going to take a recess for just a moment.
17    And we'll be back in about 20 minutes.  I want to look at
18    some more notes.  Thank you.  The court will be in recess.
19                        (Recess taken.)
20              THE COURT:  We're back on the record.  All parties
21    are present.  Thank you for your courtesy.
22              All right.  One more time around, then.  And I
23    promise you I'll be with you, but not in that order.
24              On behalf of the City of Los Angeles, do you have
25    any further comments, Mr. Councilperson -- or
```

36

 1    President Krekorian?

 2           MR. KREKORIAN:  The one thing I do want to say,

 3    which I'm -- I apologize that I didn't say earlier, is I

 4    really want to stress, especially Chair Hahn's leadership

 5    that she demonstrated in the last hearing and throughout

 6    this process in moving the ball forward.

 7           THE COURT:  And let me echo that and join you.

 8    And, in fact, I'll represent that we had a conversation

 9    literally in an airport and from your office recently.  So I

10    commend her as well, trying to move this forward.

11           MR. KREKORIAN:  None of this would have happened

12    without the persistent advocacy that she has demonstrated

13    throughout.  And I didn't want to leave that unsaid in my

14    comments earlier.

15           And I want to, again, just stress that I think as

16    a number of the speakers had mentioned and I want to

17    reiterate too, this is a tiny slice of the discussion that

18    we're having as a society, and certainly between the City

19    and the County.  So I didn't want to overemphasize.  I was

20    trying to respond to your question, Your Honor.  But there's

21    much to do that will continue -- and that work will continue

22    regardless of what the parties agree to today.

23           THE COURT:  Okay.  Good.  Then I think the

24    Interveners were next.  And if you have anything you would

25    like to add.

 1          MS. MYERS:  No, Your Honor.  I think we made our
 2    comments previously.
 3          THE COURT:  Okay.  Then I think LA Alliance was
 4    next.  Anything you'd like to add?
 5          MR. UMHOFER:  Matthew Umhofer, Your Honor, for the
 6    Alliance.
 7          I want to just focus on one piece that I
 8    understand to be the Court's central concern, which is
 9    enforcement.
10          THE COURT:  No.  I have three pieces.
11    Accountability, in terms of money.  "Enforcement" is a bad
12    word.  You can call it "oversight."  But how -- and, quite
13    frankly, this reporting to the Court, which is nonsensical.
14          MR. UMHOFER:  And so, Your Honor, my view is
15    that -- I'm just using the language in the agreement --
16    enforcement encompasses -- I mean enforcement in my
17    discussion of enforcement to encompass all of those things.
18          And all I would to, Your Honor, is point out that
19    when the Court says that there is no enforcement, that there
20    is no accountability, that's not consistent with the
21    agreement that we've entered into.
22          THE COURT:  Then just restate the exact provisions
23    in the City agreement with the County, and we might be
24    getting someplace.  And I told you that before.  I couldn't
25    have been more clear.

 1          MR. UMHOFER:  I understand that, Your Honor.  And

 2   we pushed for that.  We did push for that.

 3          THE COURT:  I know you did.  And I'm not -- once

 4   again, let me commend you.

 5          Let me commend all the parties here.

 6          In fact, I represented to Janice Hahn that I'd

 7   like to be not a thorn in your side, but I'd like to join

 8   together at some point, all of us would.  But I've got some

 9   grave concerns when I put my signature on this.  By the way,

10   none of your signatures are on this as politicians.  And

11   then we go out to the public and ask for more money or more

12   bond issue, and the federal court is now being fronted as

13   approving this.

14          No.  You come to me.  And you come to me with your

15   signatures on this -- not from counsel -- so that we know

16   two or three or five years from now if there's a failure,

17   who exactly we point to.  And that's some of the

18   gamesmanship that I've objected to and stated that

19   privately, and now I'm saying that publicly.  Step up and

20   put your names on these documents and be responsible.

21          Now, that has nothing to do with you.

22          But, no.  You give me the exact language that the

23   City had in terms of oversight and enforcement because I'm

24   not going to get into a gray channeling area five years from

25   now, arguing about what the Court's powers are.  Because the

```
 1   one thing I hope the parties understand is I will hold them
 2   accountable.  I will do that gently.  I will work with them.
 3   Mayor Bass may not get to 17,000, she may get to 12,000.
 4   Guess what.  She's trying.  She's trying.  Good enough.  I'm
 5   not getting that same thing from the County.
 6           And you have been unsuccessful in getting that
 7   language.  Thank you for trying.
 8           MR. UMHOFER:  Your Honor, let me point to the
 9   language we did have, which we are satisfied with.  Which is
10   P, Subsection 11, Subsection 2, which is the Judicial
11   Enforcement Provision.  That provision empowers this
12   Court -- if I could just finish, Your Honor.
13           THE COURT:  You can.
14           MR. UMHOFER:  I really appreciate it.
15           That provision empowers this Court to enforce this
16   agreement.  And then if you go up to Section D, which is the
17   county's obligations.  Those are meaningful obligations all
18   the way through support to the City's agreement.  Very
19   detailed.  And you go all the way down, that includes the
20   number of beds we have here.
21           And without this agreement, the Court has no
22   ability to enforce the County's efforts with any bed.  We're
23   just in litigation for the next year or two or three.  And
24   meanwhile, we don't have a floor set on what a floor -- and
25   let's all call it a floor -- for what the county needs to do
```

1   on mental health and substance use disorder.

2          THE COURT:  Well, maybe the public needs the

3   transparency if we can't reach a decent settlement

4   concerning discovery about where these funds went.  Maybe

5   the public needs to have a voice transparently in terms of

6   the number of beds that are made.  What is wrong with

7   litigation.

8          Now, I've been trying to settle this, as well as

9   Judge Birotte, into the frustration level --

10         How many evenings, Michele?  I can't even count

11  them.

12         And when I'm clear about what the Court expects on

13  the last hearing, I'm not bargaining with the parties on

14  this.  I said I need the same provisions.  Everybody heard

15  that.  And you've chosen to ignore it.

16         MR. UMHOFER:  Well, Plaintiffs definitely didn't

17  ignore it, Your Honor.

18         The final thing I would say on this, Your Honor,

19  is in terms of transparency, there are two paths here.  One,

20  is litigation where money that could be spent in more

21  productive ways is spent on litigation, which we're not

22  afraid of.

23         THE COURT:  I've got ways you can cut back the

24  budget.  You want to hear them?  I'm just joking with you,

25  but I'm not.  I pointed out a couple of them right to begin

```
 1    with.
 2              MR. UMHOFER:  I understand, Your Honor.
 3              But litigation doesn't end with this settlement.
 4    You have the extended period of enforcing this agreement
 5    with full transparency.
 6              You can still demand accountability and
 7    transparency about the spending of the County and the City
 8    on these issues.  Going backwards, the Court can look
 9    through, in great detail, what's under the County's
10    obligations and continue to push the County even where there
11    isn't a number.
12              The Court can bring the County in here and ask
13    them if they're doing everything they can do on these issues
14    and continue to shine a light with full transparency, with
15    being held accountable by the media and by the different
16    parties in this case, by the Special Master who's overseeing
17    the City agreement.  And the City agreement is particularly
18    referenced here in this agreement.  So you have a special
19    master who's actually monitoring many of the terms of this
20    agreement already under the City, which the County has an
21    obligation, under this agreement, to support.
22              And that is why we think that there is
23    sufficient -- we wouldn't have signed off on this if we
24    didn't believe that the Court had sufficient purchase to be
25    able to continue to shine a light on this issue, to continue
```

```
 1   to bring transparency to this issue and continue to push the
 2   County beyond even the minimums that they are agreeing to in
 3   this agreement that --
 4           THE COURT:  I respect that, Matt.  But I don't
 5   intend to shine a light on this issue.  I intend to have
 6   people live up to their word when they sign a document.  I
 7   intend to have the ability for accountability.  And I intend
 8   to not have all of these aspirational pledges that build
 9   public confidence, only to find out three or four years or
10   five years later that we failed.
11           So you and I both know you made a magnificent
12   effort, and I'll put that on the record.  But we know that
13   there was a failure to reach an agreement.  I know that the
14   County's concerned about just the word "consent decree."
15   Who wouldn't be?
16           But we've had so many consent decrees that are
17   absolutely meaningless with federal courts trying to change
18   and what that means three and four years into litigation.
19   There's going to be absolute clarity here.  You get me that
20   same paragraph that the City had, oversight and enforcement,
21   let's talk.
22           But until then, I said it before, and I'm not
23   bargaining with you, I meant it.
24           MR. UMHOFER:  I understand, Your Honor.
25           THE COURT:  Okay.  Thank you very much for your
```

1    courtesy.

2         And now, uninterrupted, I promise you, on behalf

3    of the County.  And it's a pleasure.  And just reintroduce

4    yourself.  And I'm sorry for telling you to sit down

5    abruptly, but that's my pet peeve.

6         MS. HASHMALL:  Thank you, Your Honor.

7    Mira Hashmall for the County.

8         I want to start with echoing what I think everyone

9    in this room has agreed is an undeniable truth.

10   Homelessness is not going to be solved in any courtroom;

11   this one, or in any other courthouse.  It is an issue that

12   requires coordination from our elected officials, our

13   community leaders, and our subject matter experts.

14        The other undeniable truth is that what the County

15   is doing on homelessness goes far beyond any settlement with

16   the Plaintiffs, any settlement with the City.  It is a

17   significant commitment, hundreds and hundreds of

18   millions dollars spent annually to address this crisis.

19        We had a binding settlement agreement with the

20   Plaintiffs in October.  And we came before Your Honor, and

21   you asked the County to do more.  And our County leadership

22   stepped up, and we did more.  And we now have an addendum, a

23   binding settlement agreement between these parties, that

24   provides significant new resources, a thousand new mental

25   health and substance abuse disorder beds, 450 subsidies for

1  facilities that we call board and care, in shorthand.

2          But what they are, are residential facilities for

3  individuals who are on the brink of potentially falling into

4  homelessness.  And the enhanced services that those

5  resources will provide are going to incentivize those

6  facilities to stay open, motivate additional providers to do

7  that work.

8          That is on top of the significant wraparound

9  services, the mental health, the social services that are

10  going to be there for the city and supporting the City's

11  settlement.

12          And, Your Honor, just to be clear, the County is

13  already doing that work.  Our enhanced outreach teams are

14  there side by side with helping the City bring individuals

15  inside safe.

16          Our County teams are coordinating with the

17  providers at those new city shelters, and they are also

18  available and reaching out and connecting individuals to the

19  services they need, whether it's through DPSS to get

20  financial resources or mental health to get medical and

21  mental health care.

22          This is on top of outreach teams, both home and

23  multidisciplinary teams, that are making a difference every

24  day.

25          And, in addition, this agreement, this binding

1   agreement between these parties provides for the County to

2   make property available for new development.  We all know

3   that the need for more housing is at the core of this issue

4   for the City and the County.  And working together to get

5   more funding.  Yes, this is a significant financial

6   commitment.

7          The County already, in connection with the City

8   and County MOU, devoted nearly $300 million to providing new

9   resources, 6700 beds for individuals near the freeways, and

10  seniors experiencing homelessness.  When you add this

11  settlement, the binding settlement reached with the

12  Plaintiff, that's over $850 million in additional resources.

13         And make no mistake, that this settlement -- I

14  want to clarify, these terms were approved by the board.

15  They stand by this agreement.  They stand by the County's

16  commitment in connection with this settlement as well as

17  everything the County is doing on homelessness.

18         It's not typical for elected officials to sign

19  settlement agreements.  I didn't see any City officials sign

20  the City Plaintiff settlement agreement that the Court

21  approved.  But that doesn't mean that they don't stand

22  behind it, because they do.

23         Now, you've referenced accountability, Your Honor.

24  The County is accountable to the public and to this Court

25  and to its constituents.  And that's why this agreement

46

1   builds in significant reporting obligations.  That

2   transparency is available to every Angeleno who'd like to

3   see where the County resources are working and the change

4   that's being made.

5        And we do not believe the Court would ever be

6   called upon to address a failure by the County under this

7   agreement because the County is going to do the work.  But

8   if that ever happens, the Court is authorized to enforce

9   this settlement agreement.  And that is exactly, I think,

10  the Court's concern:  Will the county do what its agreed to

11  do?  Yes, is the answer.  But so, too, does this provision

12  provide a mechanism for the Court to enforce those

13  obligations if they're not met.

14       And so the parties have now several times jointly

15  requested that this matter be dismissed with prejudice

16  pursuant to the settlement.  And I want to reiterate that

17  request again.  And also to reiterate this is just a small

18  piece of the puzzle, and the County is continuing to work

19  outside of this settlement before this case, during this

20  case, and after this case.

21       So for all those reasons, Your Honor, we do

22  request that the Court approve the request for dismissal

23  submitted by the parties.  And, again, never doubt that the

24  County intends to live up to these obligations and to keep

25  doing more.

```
 1          THE COURT:  I'm never going to question your

 2   credibility.  Understood?

 3          MS. HASHMALL:  Thank you, Your Honor.

 4          THE COURT:  I'm going to read something back you

 5   that you filed.  And the Docket No. is 553-1 -- I'm sorry

 6   514 at 17.

 7          "It provides for the Court to retain ancillary

 8   jurisdiction only if there is a breach of the agreement and

 9   only in the manner prescribed by the parties."

10          That directly contradicts what you just stated.

11          MS. HASHMALL:  No, Your Honor.  Respectfully, I

12   don't think it does.  This settlement has robust terms that

13   provide for new additional county resources, support for the

14   City Plaintiff settlement, outreach teams, a thousand new

15   mental health and substance disorder beds, 450 new

16   opportunities to support board and care placements and

17   additional provisions, all subject to reporting and all

18   subject to the Court's enforcement if those provisions

19   aren't met.  That is accountability, Your Honor.  That is

20   transparency.  And that is part of the County's commitment

21   to publicly report its successes to the entire community on

22   a regular basis pursuant to the settlement terms.

23          THE COURT:  All right.  Counsel, thank you very

24   much.

25          MS. HASHMALL:  Thank you, Your Honor.
```

48

1      THE COURT:  Well, first let me say that I

2  neglected, because I got a little bit choked up, but I want

3  to mention General Jeff for a moment.  In the same breath as

4  Tom LaBonge, two entirely different individuals amongst the

5  400 to 600 people.  And I just really had a lot of faith.  I

6  have to tell you, he said there was a homeless industrial

7  complex.  He literally took me around and I watched the

8  double counting going on.  And I'll say it.

9      Be careful how you spend your money because these

10  figures of 22,000 are fictional.  Go down to the Wellesley

11  Clinic.  Go down and sit some places and watch people check

12  in and sign up.  And the folks are doing a great job down

13  there.  But that person, after they signed up, goes next

14  door because they just didn't get service fast enough or

15  they're having a mental episode.

16      So you, in good faith, believe you've got 22,000

17  or 24,000.  No, you don't.  You've got sign-ups down there.

18  And sometimes multiple times.

19      So the second thing is, we went through this whole

20  double counting with the freeway of Paul Remembers,

21  et cetera, not with the City, but a whole set of double

22  counting going on.

23      And I just caution you in the future, although

24  it's none of my business, watch the Skid Row Housing Trust.

25  If 2,000 people are now coming out, are we now going to

1    count 2,000 people going in and claiming that against the

2    17,000 in the future?  I'm just -- not my concern.  But just

3    tossing out to you how much fiction is out there when we

4    throw out these numbers to the public.  And that's causing

5    me grave concern, signing a document with the federal

6    court's preemptor and signature on this.

7          Well, then the public believes that the federal

8    court is signing off in a document it believes, and we're

9    out asking for a new bond money, which I hope you do.  I'd

10   love to be supportive of that.  But I've got grave, grave

11   concerns that the federal court's going to sign off on a

12   document such as this, and then have that as one of the many

13   reasons that the public should vote for increased taxes,

14   when I'm not seeing the accountability.  And by the way,

15   neither is the governor.  Let me repeat that.  I think he's

16   looking for success right now.

17         So with General Jeff, it was really a journey.  I

18   didn't have to take the police into the community.  And I

19   just want to pay tribute to Tom LaBonge and General Jeff,

20   not to signal out any others of the 4 to 600, but I've got

21   tell you, if you have faith and confidence, those were two

22   really good representatives of the respective communities

23   out there.  And for whatever agreements or disagreements,

24   there was complete transparency and candidness between us.

25         I'm not deminimizing your argument concerning the

```
 1   funds devoted by the County.  Understood?  I'll put that on
 2   the record.
 3        But I did raise a couple thoughts about this
 4   homeless industrial complex.  And that phraseology is well
 5   taken.  It's not hitting the streets.  Let me repeat that.
 6   And it's not hitting the streets in the degree that the
 7   public is paying this money.  And there is not the
 8   accountability out there.  And that's been repeatedly said
 9   by the state treasurer.  And I can read those reports back
10   to you, but you sat through that, and you know it.
11        So the Court recognizes that this is not a class
12   action settlement.  And the terms of settlement are
13   contingent upon the public's very approval through the
14   board.  But as the board I know is aware, it's meetings
15   regarding approval of this agreement must be consistent with
16   the published constitutional rights and the Brown Act's
17   requirement that the board provide quote, "an opportunity
18   for public comment on each specific agenda item as it's
19   taken up," end of quote.
20        I agree with the Intervenors' concerns.  I'm not
21   going to decline to assert the public power or the public's
22   power in this regard in terms of transparency and putting
23   this before the public for approval or not by the board.
24        But the settlement agreement unequivocally states
25   that its terms are contingent on the board's approval, not
```

1    the Court's.  And that's a Docket 485-1 at 2.

2            The's effectiveness of this agreement is expressly

3    subject to and contingent upon approval by the County's

4    approval of settlement process, including by the Los Angeles

5    County Claims Board and/or the County Board of Supervisors

6    and by approval of the individual Plaintiffs.  Whether it's

7    Mayor Bass or the settlement for the 12- to 14,000 or the

8    freeway settlement for 6,000 individuals, that number alone,

9    that 17,000, is of a concern.

10           And it's hard if there's 40 percent of our mental

11   and substance abuse folks, at least 25 percent of those

12   being severely mentally impaired, it really highlights, I

13   think, the County's lack of substantial and satisfactory

14   action in this matter.

15           And I convey back to my friends and colleagues on

16   the board, you have the power to reduce the number of

17   deaths.  You have the power to improve inhumane conditions

18   on our streets.  And you have the power to safeguard the

19   public.  And I don't believe that this is commensurate with

20   the City settlement at all.

21           And by the County not using this power, the

22   proposal for settlement lacks significant measures to hold

23   accountable the enormous amounts of public funds being

24   spent.  And I find that this lack of oversight and

25   accountability harms the public interest.

52

1          And Matt, you said it yourself, you didn't
2     personally fail, but that procedural morass you've gotten
3     the Court into interpretation applies if you bring a breach
4     to the Court.  It does not give the oversight and
5     enforcement powers as set forth in the City agreement.
6          So I think that the subtlety of this from what I
7     heard on the County's argument is, Judge, you know if you
8     don't approve this, somehow all of this 1500's going to
9     disappear.
10         Judge, if you don't approve this settlement
11    agreement, gosh, what are we going do with this thousand
12    beds?
13         You had a duty back in 2019 to get 3,000 of these
14    beds on.  And that implied concern or threat on your part
15    that somehow you're not going to settle and back out of the
16    1500 beds that you already have on power, shame on you if
17    you do that.  Those beds should have been given right now
18    without bargaining with human lives as a bargaining chip in
19    a settlement, and that 1500 should be an agreement whether
20    you have an agreement or not that should have been done
21    yesterday, let alone today.
22         So any implication that a nonability to settle
23    takes away those 1500 beds, shame on you.  And I mean that.
24    You get those 1500 beds on the table whether the Court
25    approves this or not, and you quit using this as a

1  bargaining chip in human lives.  And I find that affronting,

2  quite frankly.

3          So finally, I'll make the legal ruling in this

4  matter.  What the Court does today in no way takes away from

5  the proposed private agreement already given to the public.

6  And I recognize that the County has committed, and I'll say

7  it again, at least 1450 beds, and, once again, thank you for

8  the progress.

9          But I further recognize that the parties can reach

10 this agreement even without the Court's approval.  You can

11 get me out of the case.  You can have me not watching you

12 anymore.  You can have me not pushing you.  You can have me

13 not holding you accountable.  And you can go back to

14 litigating with a lot more lawsuits in the future.

15         But today, however, because the County's

16 settlement terms are improper and against the public

17 interest, and I quote that, and because the board has not

18 signed off, I'm going to deny the parties' stipulation.  I'm

19 now lifting the stay in this matter.  I am reinstating these

20 proceedings at this time.

21         Defendant's deadline to respond to Plaintiff's

22 second amended complaint is due in two weeks on May 3rd,

23 2023.

24         I'm going to set a scheduling conference on this

25 matter on May 9th of 2023, and at that time, set this matter

```
 1   for litigation.  And I'll discuss those dates with you.
 2          I want to humbly thank you again.  I want to thank
 3   you for the phone calls, reaching out, the communication, at
 4   least with you, and at least one other member of the board.
 5   Whether we agree or disagree, we need that kind of
 6   communication.  And I humbly thank you.
 7          I want to thank all of you for your patience.  I
 8   leave that now to your best devices.  The Court's now in
 9   recess.
10          (At 10:40 a.m. proceedings were adjourned.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                          --oOo--

2                        CERTIFICATE

3

4

5         I hereby certify that pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true and

7    correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date:  April 21, 2023

13

14

15                      /S/    WIL S. WILCOX

16                      U.S. COURT REPORTER
                             CSR NO. 9178
17

18

19

20

21

22

23

24

25
```

**COURT REPORTER: [1]**
4/7
**MR. KREKORIAN: [7]**
**MR. UMHOFER: [8]**
**MS. HAHN: [6]**
**MS. HASHMALL: [5]**
5/9 43/6 47/3 47/11
47/25
**MS. HORVATH: [3]**
4/25 5/2 5/5
**MS. LAI: [1]**   5/6
**MS. MITCHELL: [6]**
**MS. MYERS: [5]**   6/10
11/18 11/21 12/6 37/1
**MS. SOBEL: [2]**   6/16
15/10
**MS. SPEAKER: [3]**
12/8 13/4 15/6
**THE COURT: [47]**

---

**$**

**$100 [1]**   31/23
**$100 billion [1]**
31/23
**$13 [1]**   31/20
**$13 billion [1]**   31/20
**$300 [1]**   45/8
**$300 million [1]**   45/8
**$43.5 [1]**   35/11
**$43.5 billion [1]**
35/11
**$438,000 [1]**   34/19
**$800 [1]**   34/25
**$800 million [1]**
34/25
**$850 [1]**   45/12
**$850 million [1]**
45/12

---

**-**

**--oOo [1]**   54/11
**-oOo [1]**   4/2

---

**/**

**/S [1]**   55/15

---

**0**

**0061 [1]**   3/5

---

**1**

**1,000 [1]**   19/15
**1000 [1]**   29/5
**1027 [2]**   2/6 2/10

---

**10:40 [1]**   54/10
**11 [1]**   33/10
**1158 [1]**   3/14
**11766 [2]**   2/4 2/8
**12 [1]**   51/7
**12,000 [3]**   12/24 31/5
39/3
**1250 [1]**   15/19
**13 years [1]**   15/17
**14,000 [2]**   31/5 51/7
**1450 [1]**   53/7
**1500 [14]**
**1500's [1]**   52/8
**16 years [2]**   15/17
15/17
**167 [2]**   30/4 30/14
**17 [1]**   47/6
**17,000 [4]**   30/24 39/3
49/2 51/9
**17th [1]**   7/21
**18th [1]**   8/17
**1st [1]**   1/22

---

**2**

**2,000 [2]**   48/25 49/1
**20 [3]**   1/16 4/1 31/11
**20 minutes [1]**   35/17
**20 years [2]**   15/13
15/22
**20-022291-DOC [1]**   1/8
**200 [2]**   2/14 2/18
**2019 [3]**   29/15 30/4
52/13
**2020 [1]**   16/17
**2021 [1]**   31/18
**2022 [1]**   7/24
**2023 [7]**
**21 [1]**   55/12
**2121 [1]**   2/23
**213-394-7979 [2]**   2/5
2/9
**213-529-1027 [2]**   2/6
2/10
**213-617-6785 [1]**   3/5
**213-640-3983 [1]**   3/10
**213-640-3988 [1]**   3/10
**213-974-0061 [1]**   3/5
**213-978-6952 [1]**   2/15
**213-978-7011 [1]**   2/16
**213-978-7558 [1]**   2/19
**213-978-8216 [1]**   2/20
**22,000 [2]**   48/10
48/16

---

**24,000 [1]**   48/17
**25 percent [1]**   51/11
**25 years [1]**   22/6
**2600 [1]**   2/23
**26th [1]**   3/14
**28 [1]**   55/6
**2A [1]**   21/14

---

**3**

**3,000 [4]**   29/18 30/13
31/14 52/13
**300 [4]**   28/24 31/1
31/6 33/16
**3055 [1]**   3/15
**310-393-3055 [1]**   3/15
**310-552-4400 [1]**   2/24
**350 [2]**   1/22 3/4
**39 percent [2]**   30/19
30/20
**3983 [1]**   3/10
**3988 [1]**   3/10
**3rd [1]**   53/22
**3rd District [1]**   5/3

---

**4**

**40 percent [5]**   13/2
13/5 30/25 31/6 51/10
**400 [2]**   33/3 48/5
**41 [2]**   23/4 23/4
**41.18 [1]**   14/17
**4400 [1]**   2/24
**450 [4]**   10/2 29/7
43/25 47/15
**48 hours [1]**   8/24
**485 [1]**   7/24
**485-1 [1]**   51/1

---

**5**

**500 [2]**   30/3 30/3
**514 [1]**   47/6
**518 [2]**   8/2 8/15
**533 [1]**   8/21
**533-1 [1]**   21/22
**552 [1]**   3/14
**553-1 [1]**   47/5

---

**6**

**6,000 [1]**   51/8
**60 percent [2]**   12/25
13/7
**600 [3]**   33/3 48/5
49/20
**601 [1]**   3/4
**6700 [1]**   45/9

Case 2:20-cv-02291-DOC-KES   Document 340   Filed 04/21/23   Page 37 of 68   Page ID
#:9962

**6**

675 [2]   2/14 2/18
6785 [1]   3/5
6952 [1]   2/15

**7**

7000 [1]   3/9
7011 [1]   2/16
753 [1]   55/5
7558 [1]   2/19
7979 [2]   2/5 2/9
7:00 [1]   12/5
7th [1]   2/18

**8**

8,000 [1]   17/17
8216 [1]   2/20
8:00 [1]   12/5

**9**

90 days [3]   7/4 7/7
 8/17
90-day [1]   7/21
900 [2]   2/4 2/8
90003 [1]   3/9
90012 [3]   1/22 2/15
 2/19
90025 [2]   2/5 2/9
90067 [1]   2/24
90071 [1]   3/4
90403 [1]   3/14
9178 [2]   1/21 55/16
9:09 [1]   4/1
9th [1]   53/25

**A**

a.m [1]   54/10
A2 [2]   21/9 21/23
ability [3]   14/22
 39/22 42/7
above [1]   55/8
above-entitled [1]
 55/8
abruptly [1]   43/5
absence [1]   5/23
absolute [2]   26/5
 42/19
absolutely [6]
abuse [5]   13/6 30/21
 30/25 43/25 51/11
acceptable [1]   29/23
access [1]   19/16
accommodate [1]   28/12

accountability [19]
accountable [5]   39/2
 41/15 45/24 51/23
 53/13
accounting [1]   28/9
Act's [1]   50/16
acted [1]   26/8
acting [4]   3/20 5/16
 5/22 9/5
action [4]   6/12 23/4
 50/12 51/14
Adam [1]   34/19
add [3]   36/25 37/4
 45/10
addendum [3]   8/20
 19/18 43/22
addiction [1]   18/25
addition [4]   6/2 9/23
 9/25 44/25
address [10]
adds [1]   29/8
adjourned [1]   54/10
adult [2]   10/4 29/7
advocacy [1]   36/12
advocate [1]   34/3
affronting [1]   53/1
afraid [1]   40/22
after court [1]   9/3
agency [1]   22/8
agenda [1]   50/18
agreement [65]
agreements [5]   11/23
 18/10 18/11 45/19
 49/23
Aid [2]   3/8 6/11
airing [1]   14/15
airport [1]   36/9
al [2]   1/6 1/9
alai [1]   3/6
alleges [1]   25/9
ALLIANCE [11]
Alliance's [1]   20/17
allowed [1]   7/11
almost [1]   15/13
alone [2]   51/8 52/21
alongside [1]   18/21
although [1]   48/23
amend [1]   8/12
amended [1]   53/22
amongst [3]   23/8
 26/17 48/4
amounts [2]   32/2
 51/23

Ana Lai [1]   5/6
analysis [1]   29/17
anchored [1]   15/15
ancillary [1]   47/7
André [1]   7/3
Angeleno [1]   46/2
ANGELES [37]
Angeles's [2]   12/13
 12/23
Anne [1]   2/3
annually [1]   43/18
answer [3]   9/23 20/23
 46/11
anymore [2]   7/15
 53/12
apologies [2]   21/1
 34/14
apologize [2]   25/16
 36/3
appearance [1]   4/9
APPEARANCES [2]   1/23
 3/1
applies [1]   52/3
appreciate [1]   39/14
appreciated [1]   7/8
appreciation [2]   7/1
 21/7
approach [1]   6/22
approval [15]
approve [4]   22/4
 46/22 52/8 52/10
approved [5]   12/15
 22/8 22/12 45/14
 45/21
approves [1]   52/25
approving [3]   12/17
 22/3 38/13
April [6]
April 18th [1]   8/17
area [3]   10/7 33/25
 38/24
aren't [1]   47/19
arguing [1]   38/25
argument [2]   49/25
 52/7
arguments [2]   20/12
 23/11
Arlene [1]   2/13
arlene.hoang [1]   2/16
arms [1]   9/12
arrival [2]   23/22
 25/16

**A**

**asleep [1]**   30/2
**aspirational [3]**
  23/13 32/17 42/8
**assert [1]**   50/21
**assessed [1]**   18/25
**astonishing [1]**   27/18
**astounded [1]**   30/6
**astounding [1]**   28/22
**attempt [1]**   12/19
**attempted [1]**   21/7
**attending [1]**   7/8
**attorney [5]**   2/3 2/7
  2/22 3/13 22/22
**Attorneys [2]**   2/13
  2/18
**authorized [1]**   46/8
**Avenue [1]**   2/23
**avoid [1]**   26/16

**B**

**backwards [1]**   41/8
**balance [1]**   28/12
**ball [1]**   36/6
**bare [1]**   33/17
**bargained [1]**   26/6
**bargaining [7]**
**Barger [1]**   30/16
**Barondess [2]**   2/23
  5/10
**basin [1]**   17/3
**basis [1]**   47/22
**Bass [9]**
**bed [5]**   9/25 18/2
  18/2 18/7 39/22
**beds [42]**
**behind [2]**   33/5 45/22
**bench [2]**   22/7 22/25
**beyond [3]**   7/19 42/2
  43/15
**Biden [1]**   7/6
**billion [3]**   31/20
  31/23 35/11
**binding [4]**   43/19
  43/23 44/25 45/11
**Birotte [3]**   7/3 8/7
  40/9
**blame [1]**   34/17
**blessings [1]**   28/21
**board [24]**
**board's [1]**   50/25
**bond [2]**   38/12 49/9
**Boom [1]**   34/13

**Boulevard [2]**   2/4 2/8
**breach [1]**   15/23
**breath [1]**   48/3
**briefing [1]**   31/10
**brink [1]**   44/3
**Broadway [1]**   3/9
**broken [1]**   17/4
**Brown [1]**   50/16
**budget [5]**   31/23
  31/24 34/24 35/11
  40/24
**buffer [1]**   26/9
**build [4]**   12/22 12/24
  15/18 42/8
**builders [1]**   15/19
**builds [1]**   46/1
**bureaucracy [1]**   27/10
**business [2]**   20/10
  48/24

**C**

**CA [9]**
**CALIFORNIA [3]**   1/2
  1/15 1/22
**candidness [1]**   49/24
**CANGRESS [1]**   3/12
**capacity [2]**   10/12
  10/25
**careful [2]**   35/9 48/9
**carefully [1]**   30/3
**Carol [3]**   3/13 3/13
  6/16
**Carol Sobel [1]**   6/16
**carolsobellaw [1]**
  3/15
**carry [1]**   24/2
**CARTER [3]**   1/4 4/21
  22/4
**CATHOLIC [2]**   3/7 6/13
**caution [1]**   48/23
**center [2]**   26/10
  26/16
**centered [1]**   16/7
**central [2]**   1/2 37/8
**CERTIFICATE [1]**   55/2
**certify [1]**   55/5
**cetera [1]**   48/21
**chair [4]**   4/22 5/3
  9/13 36/4
**Chair Hahn [1]**   9/13
**Chair Hahn's [1]**   36/4
**chairman [1]**   21/4
**Chairwoman [5]**   4/18

**Chairwoman Hahn [3]**
  4/18 21/5 32/19
**Chairwoman Janice Hahn
  [1]**   8/2
**challenging [1]**   12/18
**chambers [1]**   14/11
**channeling [1]**   38/24
**chasing [1]**   23/13
**Cheri [2]**   3/22 6/19
**Cheri Todoroff [2]**
  3/22 6/19
**chip [4]**   30/10 30/13
  52/18 53/1
**choked [1]**   48/2
**chosen [1]**   40/15
**circle [1]**   24/16
**Circuit [1]**   20/12
**circumstances [1]**
  14/2
**city [66]**
**City Council President
  Paul Krekorian [1]**
  9/4
**City's [2]**   39/18
  44/10
**citywide [1]**   26/7
**Civil [1]**   23/3
**claiming [3]**   25/8
  25/10 49/1
**claims [4]**   11/4 21/20
  23/3 51/5
**clarify [1]**   45/14
**clarity [1]**   42/19
**class [1]**   50/11
**clear [14]**
**clerks [2]**   5/16 25/21
**clients [1]**   6/22
**Clinic [1]**   48/11
**close [1]**   10/8
**closer [2]**   6/6 15/8
**Code [2]**   14/17 55/6
**Code 41.18 [1]**   14/17
**colleagues [2]**   23/14
  51/15
**collectively [1]**
  10/11
**combination [1]**   30/21
**commend [3]**   36/10
  38/4 38/5
**commensurate [1]**
  51/19
**comment [1]**   50/18

**C**
comments [4]   8/5
35/25 36/14 37/2
commitment [12]
committed [3]   12/21
31/21 53/6
committing [1]   12/20
communication [2]
54/3 54/6
communications [2]
14/12 14/16
communities [1]   49/22
community [4]   6/12
43/13 47/21 49/18
competent [1]   22/22
complaint [3]   27/9
28/18 53/22
complete [1]   49/24
complex [3]   33/22
48/7 50/4
compliment [4]   28/23
28/24 30/7 30/8
computer [3]   7/13
7/18 7/19
concern [7]
concerns [10]
conditions [3]   23/19
32/3 51/17
confer [1]   8/12
conference [5]   8/6
8/9 33/18 53/24 55/10
confidence [2]   42/9
49/21
confident [1]   10/22
conformance [1]   55/9
confusion [1]   7/14
connecting [1]   44/18
connection [2]   45/7
45/16
consent [4]   23/15
23/15 42/14 42/16
consistent [4]   10/15
28/1 37/2 50/15
constituents [1]
45/25
constitutional [2]
24/3 50/16
consult [1]   6/22
contained [1]   8/15
contingent [4]   21/18
50/13 50/25 51/3
continually [1]   21/6
continuance [2]   7/5

continued [2]   3/1 7/1
continuing [3]   24/16
27/19 46/18
contractual [1]   25/13
contradicts [1]   47/10
contribute [1]   35/12
control [3]   10/10
16/24 16/25
convey [1]   51/15
Conway [2]   3/23 4/14
coordinating [1]
44/16
coordination [1]
43/12
core [1]   45/3
council [9]
Council President
Krekorian [1]   15/11
Councilperson [1]
35/25
Counsel's [1]   22/20
counsel.lacounty.gov
[1]   3/6
count [6]
county [74]
County Claims [1]
21/20
county's [20]
countywide [1]   26/7
court [65]
court's [13]
courtesy [4]   7/8 32/8
35/21 43/1
courthouse [3]   14/5
14/12 43/11
courtroom [1]   43/10
courts [1]   42/17
CourtSmart [1]   15/9
credibility [2]   25/3
47/2
criminalization [1]
15/16
crisis [11]
criticism [1]   34/19
CSR [2]   1/21 55/16
cursively [1]   7/15
cut [2]   15/23 40/23
CV [1]   1/8

**D**
Daniel [3]   3/23 4/14
21/1

Darryl [1]   29/25
Dave [2]   3/21 6/3
DAVID [1]   1/4
dead [2]   23/21 25/16
deadline [1]   53/21
deaths [1]   51/17
Deb [1]   4/5
decent [1]   40/3
decide [1]   26/18
decision [2]   12/1
29/1
declared [1]   9/13
decline [1]   50/21
decree [2]   23/15
42/14
decrees [2]   23/15
42/16
DEFENDANT [3]   2/12
2/21 3/2
Defendant's [1]   53/21
Defendants [1]   1/10
demand [2]   10/1 41/6
deminimizing [1]
49/25
demonstrated [2]   36/5
36/12
dent [1]   27/11
deny [1]   53/18
deserve [3]   14/15
14/15 14/22
despite [3]   11/24
27/20 32/2
detail [1]   41/9
detailed [1]   39/19
deter [1]   35/13
develop [3]   29/5
29/18 29/21
development [1]   45/2
devices [1]   54/8
devoted [2]   45/8 50/1
Diali [1]   23/18
difference [3]   9/21
25/14 44/23
differences [1]   23/20
director [6]
disagree [3]   16/13
17/14 54/5
disagreements [1]
49/23
disagrees [1]   17/15
disappointing [1]
15/12
discount [1]   18/13

**D**

discovery [1]   40/4
discussion [4]   11/17
 35/10 36/17 37/17
dismissal [2]   23/2
 46/22
dismissed [2]   23/5
 46/15
disorder [6]
disproportionally [1]
 31/16
dispute [2]   25/6 25/6
district [5]   1/1 1/2
 1/21 5/3 25/11
divert [1]   16/23
DIVISION [1]   1/3
DOC [1]   1/8
Docket [7]
Docket 485 [1]   7/24
Docket 518 [2]   8/2
 8/15
Docket 533 [1]   8/21
document [5]   23/13
 42/6 49/5 49/8 49/12
documents [2]   8/22
 38/20
dollars [1]   43/18
Donald [1]   2/7
double [3]   48/8 48/20
 48/21
doubt [2]   18/9 46/23
downstairs [1]   7/9
downtown [1]   34/22
DPSS [1]   44/19
Dr. [3]   29/12 29/17
 34/19
Dr. Adam [1]   34/19
Dr. Sherin [2]   29/12
 29/17
drama [1]   25/17
dramatic [4]   13/22
 19/23 25/16 33/23
drug [1]   18/24
duration [1]   24/8
duty [1]   52/13
dying [1]   17/2

**E**

early [1]   25/21
earning [1]   35/3
East [1]   2/14
echo [1]   36/7
echoing [1]   43/8

economic [1]   15/22
edited [1]   34/14
effectiveness [2]
 21/17 51/2
effectuate [1]   27/16
effort [2]   11/3 42/12
efforts [3]   7/2 27/20
 39/22
eight [2]   18/20 20/2
eight months [2]
 18/20 20/2
elected [4]   22/21
 34/16 43/12 45/18
elizabeth [3]   2/3 2/6
 4/13
Email [8]
emergency [2]   16/16
 19/11
empowers [2]   39/11
 39/15
encampment [1]   19/17
encompass [1]   37/17
encompasses [1]   37/16
enemy [1]   20/19
enforce [6]
enforcement [15]
enforcing [1]   41/4
enhanced [2]   44/4
 44/13
enormous [1]   51/23
enter [1]   11/17
entirely [2]   27/5
 48/4
entitled [1]   55/8
envious [1]   35/4
episode [1]   48/15
especially [1]   36/4
estimates [1]   29/21
et [3]   1/6 1/9 48/21
et al [1]   1/6
et cetera [1]   48/21
evening [2]   8/19 8/23
evenings [1]   40/10
everybody [2]   25/14
 40/14
everyone [1]   43/8
ex [1]   14/12
ex parte [1]   14/12
excluding [2]   13/5
 13/5
exclusion [1]   12/25
exclusively [1]   16/19
Excuse [2]   23/1 31/7

exercise [1]   27/23
exhausting [1]   25/5
expanding [2]   10/24
 16/4
expansion [1]   27/20
experts [1]   43/13
express [4]   6/25 14/7
 21/6 22/24
expressly [2]   21/18
 51/2
extended [1]   41/4
extension [1]   8/18

**F**

face [3]   34/13 34/13
 34/14
faces [1]   27/12
facilities [7]
facing [1]   20/7
fact [6]
fail [1]   52/2
failed [2]   27/15
 42/10
failure [3]   38/16
 42/13 46/6
faith [4]   23/24 48/5
 48/16 49/21
fall [1]   29/10
falling [2]   30/1 44/3
fast [1]   48/14
Fax [6]
federal [11]
feed [1]   27/10
feeder [2]   15/23
 15/24
fewer [1]   9/25
fiction [1]   49/3
fictional [1]   48/10
fight [2]   20/8 20/9
Figueroa [1]   3/4
figures [1]   48/10
file [2]   24/22 25/10
fill [1]   17/3
final [1]   40/18
finally [3]   31/17
 32/21 53/3
financial [2]   44/20
 45/5
finish [1]   39/12
finite [1]   31/19
firms [1]   27/6
five years [6]
five-year [1]   24/12

**floor [4]**   2/18 39/24 39/24 39/25

**flounder [1]**   20/4

**floundering [1]**   16/21

**focus [2]**   15/20 37/7

**focused [2]**   16/18 18/2

**folks [5]**   14/22 30/4 30/20 48/12 51/11

**foot [1]**   34/15

**footnote [1]**   31/10

**foregoing [1]**   55/6

**forest [1]**   17/12

**forgot [1]**   6/18

**formality [1]**   4/10

**format [1]**   55/9

**former [2]**   33/4 35/1

**fortunate [1]**   26/9

**Foundation [2]**   3/8 6/11

**four years [5]**   23/14 30/5 31/15 42/9 42/18

**frank [1]**   16/21

**frankly [3]**   18/14 37/13 53/2

**freeway [2]**   48/20 51/8

**freeways [1]**   45/9

**friends [1]**   51/15

**front [3]**   21/10 21/15 30/12

**frustration [1]**   40/9

**FTC [1]**   22/7

**fulfill [1]**   30/23

**funding [2]**   20/16 45/5

**funds [4]**   27/16 40/4 50/1 51/23**

**G**

**gamesmanship [1]**   38/18

**gangrene [1]**   34/11

**General [3]**   48/3 49/17 49/19

**General Jeff [3]**   48/3 49/17 49/19

**generation [1]**   7/15

**gently [1]**   39/2

**girls [1]**   34/6

**gives [1]**   24/6

**gmail.com [2]**   1/23

**goal [1]**   33/17

**goodness [1]**   30/15

**gosh [1]**   52/11

**gotten [2]**   18/7 52/2

**govern [1]**   26/24

**government [2]**   22/7 26/1

**governor [2]**   31/21 49/15

**granted [2]**   8/16 8/18

**grave [6]**

**gray [1]**   38/24

**great [5]**   17/9 30/17 33/8 41/9 48/12

**greater [1]**   15/25

**ground [1]**   32/3

**groups [1]**   14/20

**grown [1]**   31/16

**guarantee [1]**   10/5

**guard [1]**   34/7

**gunshot [2]**   17/5 17/6

**H**

**Hahn [9]**

**Hahn's [1]**   36/4

**half years [1]**   9/24

**Hall [1]**   2/14

**happy [3]**   16/9 20/9 20/22

**harms [1]**   51/25

**Hashmall [3]**   2/22 5/10 43/7

**hats [1]**   5/19

**health [17]**

**hearing [13]**

**here's [1]**   4/24

**hereby [1]**   55/5

**high-needs [4]**   19/13 19/15 19/19 19/20

**highlights [1]**   51/12

**history [1]**   7/25

**hitting [2]**   50/5 50/6

**Hoang [1]**   2/13

**hold [6]**

**holding [1]**   53/13

**home [2]**   18/11 44/22

**Homekey [1]**   18/17

**homeless [6]**

**homelessness [12]**

**homelessness-related [1]**   27/13

**Homeowners [1]**   26/11

**Honor [41]**

**Honor's [1]**   9/18

**honored [1]**   5/14

**hope [4]**   7/8 11/2 39/1 49/9

**hopefully [1]**   24/5

**horned [1]**   14/23

**Horror [1]**   29/4

**Horvath [2]**   3/19 5/2

**hospital [2]**   29/24 31/11

**hotel [1]**   34/22

**hours [5]**   8/19 8/23 8/24 25/21 25/23

**housing [5]**   12/22 16/19 16/20 45/3 48/24

**huge [2]**   25/13 32/2

**human [5]**   1/6 2/2 4/15 52/18 53/1

**humbly [3]**   25/22 54/2 54/6

**hundreds [2]**   43/17 43/17

**hypothermia [1]**   34/10

**I**

**I'd [6]**

**I'll [14]**

**I'm [70]**

**I've [14]**

**ignore [2]**   40/15 40/17

**ill [1]**   10/20

**illness [1]**   18/24

**image [1]**   11/3

**imagine [2]**   16/1 26/23

**immediate [2]**   16/15 16/24

**immensely [1]**   33/7

**impaired [1]**   51/12

**implication [2]**   28/20 52/22

**implicitly [1]**   32/18

**implied [1]**   52/14

**improper [1]**   53/16

**improve [1]**   51/17

**improvement [1]**   10/18

**inaction [1]**   29/23

**incentivize [1]**   44/5

**increase [5]**   9/19

**I**

increase... [4]   10/1
14/3 14/18 15/18
increased [1]   49/13
increasing [1]   15/25
incredible [2]   25/23
33/8
incredibly [2]   14/14
15/12
incremental [1]   10/18
individual [3]   4/15
21/21 51/6
individuals [6]
industrial [3]   33/22
48/6 50/4
inertia [1]   26/5
inhumane [1]   51/17
initially [3]   31/2
31/3 31/7
Initiative [1]   6/20
instead [1]   30/3
intend [4]   42/5 42/5
42/7 42/7
intends [1]   46/24
interest [3]   27/25
51/25 53/17
interfered [1]   23/25
intermeddling [1]
24/4
interpretation [1]
52/3
interrupt [1]   32/9
Interveners [5]   11/13
13/12 14/13 14/21
36/24
INTERVENOR [2]   3/7
3/12
Intervenors [5]   5/24
6/12 6/17 11/22 11/24
Intervenors' [3]   14/6
14/8 50/20
intervention [1]   9/18
introduce [2]   4/12
6/18
issue [7]
issues [12]
item [1]   50/18

**J**

Janice [4]   3/18 4/22
8/2 38/6
January [1]   7/21
January 17th [1]   7/21

Jeff [3]   48/3 49/17
49/19
Jennifer [1]   2/22
job [2]   17/9 48/12
join [3]   6/6 36/7
38/7
jointly [1]   46/14
joke [2]   32/6 32/10
joking [3]   26/6 35/4
40/24
Jones [1]   15/14
journey [3]   33/2 33/9
49/17
judge [12]
Judge André Birotte
[1]   7/3
Judge Birotte [2]   8/7
40/9
Judge Carter [2]   4/21
22/4
judges [2]   26/17
26/18
judicial [6]
Julian [1]   23/18
jurisdiction [3]
24/16 27/24 47/8
justify [2]   35/5 35/6

**K**

Karen [1]   8/2
Kathryn [1]   30/16
Kathryn Barger [1]
30/16
kidding [1]   7/17
kids [1]   35/7
King [2]   2/4 2/8
knowing [1]   26/25
Krekorian [9]
Kwan [1]   3/3

**L**

LA [15]
LA Alliance [5]   4/14
4/15 18/4 18/6 37/3
LA County [1]   31/12
LaBonge [3]   33/4 48/4
49/19
lacity.org [2]   2/16
2/20
lack [6]
lacks [1]   51/22
lafla.org [1]   3/11
LAHSA [1]   34/21
Lai [2]   3/3 5/6

language [4]   37/15
38/22 39/7 39/9
largely [2]   12/20
17/12
larger [1]   11/3
LASA [1]   35/3
latitude [1]   24/2
Laughter [2]   6/1 7/16
law [6]
lawsuit [2]   26/4
26/13
lawsuits [5]   26/15
26/17 26/22 27/3
53/14
leaders [1]   43/13
leadership [6]
leg [1]   17/4
legal [3]   3/8 6/11
53/3
letting [1]   20/19
lifting [1]   53/19
light [4]   8/10 41/14
41/25 42/5
Lindsey [2]   3/19 5/2
Lindsey Horvath [1]
5/2
literally [2]   36/9
48/7
litigating [1]   53/14
litigation [14]
LLP [3]   2/4 2/8 2/23
locked [1]   13/13
locking [1]   9/12
long-term [1]   17/8
LOS [39]
Los Angeles [18]
Los Angeles's [2]
12/13 12/23
love [1]   49/10

**M**

magnificent [1]   42/11
main [3]   2/14 2/18
25/7
man [1]   33/20
management [1]   27/13
manner [2]   27/16 47/9
Marcus [2]   2/17 6/3
Martinez [3]   3/23 7/2
8/7
massive [1]   26/21
master [6]
matches [3]   12/13

**M**

matches... [2]   13/25
 14/3
matching [1]   16/22
math [2]   31/1 31/3
Matt [4]   4/11 20/25
 42/4 52/1
Matt Umhofer [1]
 20/25
matter [12]
matthew [4]   2/7 2/10
 4/16 37/5
May 3rd [1]   53/22
May 9th [1]   53/25
mayor [18]
Mayor Bass [7]
Mayor Hahn [1]   5/23
Mayor Karen Bass [1]
 8/2
meaningful [1]   39/17
meaningless [1]   42/17
meanwhile [1]   39/24
Measure [2]   16/22
 27/9
Measure H [2]   16/22
 27/9
measures [1]   51/22
mechanism [1]   46/12
media [1]   41/15
mediation [2]   7/1 7/2
medical [1]   44/20
meeting [6]
meetings [2]   24/1
 50/14
member [1]   54/4
members [2]   6/8 7/12
memories [1]   33/8
mental [20]
mentally [2]   10/20
 51/12
Mercer [1]   29/17
mhashmall [1]   2/25
Michaelson [2]   3/21
 6/3
Michele [5]   3/23 7/2
 33/3 33/14 40/10
microphone [2]   15/8
 16/12
milestones [2]   25/2
 29/8
Miller [2]   2/23 5/10
millerbarondess.com
 [1]   2/25

**N**

million [3]   34/25
 45/8 45/18
millions [1]   43/18
millions dollars [1]
 43/18
minimum [1]   33/17
minimums [1]   42/2
Mira [3]   2/22 5/10
 43/7
Mira Hashmall [2]
 5/10 43/7
mission [1]   34/7
mistake [1]   45/13
Mitchell [7]
moment [22]
Monica [1]   3/14
monies [1]   25/4
monitor [1]   28/10
monitoring [5]   8/14
 14/24 25/1 28/9 41/19
months [6]
monumental [1]   9/15
morass [1]   52/2
motivate [1]   44/6
MOU [1]   45/8
Mr. [6]
Mr. Councilperson [1]
 35/25
Mr. Krekorian [1]   9/5
Mr. LA [1]   33/4
Mr. Marcus [1]   6/3
Mr. Umhofer [2]   26/2
 27/5
Ms [1]   11/16
Ms. [7]
Ms. Mitchell [3]   4/11
 16/10 26/3
Ms. Myers [1]   16/13
Ms. Sobel [3]   6/15
 11/16 15/7
multidisciplinary [1]
 44/23
multiple [1]   48/18
multitude [1]   26/15
Municipal [1]   14/17
Myers [4]   3/8 6/10
 11/16 16/13

**N**

Nancy [1]   2/13
near [1]   45/9
nearly [2]   29/18 45/8
neglected [1]   48/2

negotiable [1]   30/9
negotiations [1]
 11/23
neither [1]   49/15
Network [1]   6/12
newest [2]   4/24 5/2
nice [3]   5/5 5/12
 32/24
nine [1]   25/7
Ninth [1]   20/12
Ninth Circuit [1]
 20/12
nonability [1]   52/22
none [3]   36/11 38/10
 48/24
nonsensical [1]   37/13
nonstop [1]   8/24
North [2]   2/14 2/18
notice [2]   25/10
 25/14
noticed [1]   23/25
number [13]
number's [1]   19/14
numbers [4]   19/18
 29/9 32/3 49/4
numerous [1]   7/1

**O**

object [1]   14/13
objected [2]   13/12
 38/18
obligation [1]   41/21
obligations [7]
observed [1]   17/25
obstacle [1]   24/3
October [2]   7/23
 43/20
ODR [1]   29/17
office [7]
offices [1]   34/22
Official [1]   1/21
officially [1]   22/4
officials [5]   22/21
 34/16 43/12 45/18
 45/19
Oh [1]   19/21
ongoing [1]   14/8
oOo [2]   4/2 54/11
open [4]   8/10 10/9
 22/5 44/6
opinion [1]   23/11
opportunities [1]
 47/16

**Q**

opportunity [1]   50/17
order [1]   35/23
organizations [2]
 12/2 14/21
original [1]   26/8
outpacing [1]   27/15
outreach [3]   44/13
 44/22 47/14
overemphasize [1]
 36/19
oversee [1]   24/16
overseeing [1]   41/16
oversight [9]

**P**

P1I [1]   25/8
page [5]   28/3 29/13
 29/16 31/11 55/9
Page 20 [1]   31/11
Page 4 [1]   28/3
Page 5 [1]   29/13
paragraph [2]   28/14
 42/20
parameter [1]   27/1
part [4]   11/3 11/22
 47/20 52/14
parte [1]   14/12
participate [1]   14/22
participated [1]   8/8
participating [1]
 21/2
participation [1]   6/7
parties [24]
parties' [1]   53/18
partner [1]   19/10
party [3]   25/9 25/9
 25/10
Pastor [1]   34/2
Pastor Q [1]   34/2
patches [1]   17/19
paths [1]   40/19
patience [1]   54/7
Paul [5]   3/20 5/22
 8/3 9/4 48/20
pay [4]   30/7 30/7
 33/1 49/19
peeve [1]   43/5
people [13]
perfect [3]   13/25
 20/19 35/15
period [1]   41/4
permanent [2]   16/19

persistent [1]   36/12
person [1]   48/13
perspective [4]   20/14
 20/15 20/17 34/24
pertains [1]   25/6
pet [1]   43/5
Pete [2]   32/24 34/1
Pete White [1]   34/1
phone [1]   54/3
phraseology [1]   50/4
picture [3]   29/4 34/9
 34/12
pictures [4]   7/18
 32/21 33/7 34/5
piece [2]   37/7 46/18
pieces [1]   37/10
place [1]   18/19
placements [1]   47/16
PLAINTIFF [5]   2/2
 4/11 45/12 45/20
 47/14
Plaintiff's [1]   53/21
Plaintiffs [10]
Plaintiffs' [1]   23/2
plan [1]   21/24
pleasure [9]
pledges [1]   42/8
point [13]
police [1]   49/18
policy [1]   27/25
political [4]   13/22
 14/20 14/25 15/1
politician [1]   31/22
politicians [2]   24/13
 38/10
pools [2]   15/23 15/25
population [3]   12/25
 29/20 31/16
portrayed [1]   28/7
position [2]   14/6
 22/21
positions [1]   5/25
post [1]   29/24
post-hospital [1]
 29/24
potentially [2]   35/12
 44/3
poverty [1]   35/6
power [8]
powers [2]   38/25 52/5
praise [1]   26/3
precludes [1]   26/15

preemptor [1]   49/6
prejudice [2]   23/2
 46/15
prescribed [1]   47/9
presence [1]   12/1
present [5]   3/17 8/3
 8/7 12/17 35/21
president [11]
President Biden [1]
 7/6
President Krekorian
 [3]   12/9 13/9 36/1
President of [1]   5/15
President Paul [1]
 8/3
PRESIDING [1]   1/4
press [4]   7/12 13/19
 30/20 33/18
pressure [1]   18/9
principals [1]   22/17
private [5]   8/6 15/19
 28/6 28/8 53/5
privately [1]   38/19
problem [10]
problems [1]   29/23
procedural [1]   52/2
Procedure [1]   23/4
Procedure 41 [1]   23/4
procedures [2]   14/24
 25/8
proceedings [6]
process [11]
productive [1]   40/21
program [1]   24/2
progress [8]
project [3]   18/17
 18/17 30/2
Project Homekey [1]
 18/17
projects [6]
promise [4]   32/7 32/8
 35/23 43/2
proper [1]   23/5
property [1]   45/2
proposal [7]
Proposal 2A [1]   21/14
proposed [9]
protected [1]   27/2
providers [3]   20/5
 44/6 44/17
provision [4]   39/11
 39/11 39/15 46/11
provisions [4]   37/22

**P**

provisions... [3]
40/14 47/17 47/18
public [26]
public's [2]   50/13
50/21
publicly [2]   38/19
47/21
published [1]   50/16
pull [3]   15/7 29/11
29/15
pulled [2]   14/11
28/14
purchase [1]   41/24
purposes [1]   9/1
pursuant [5]   8/1 23/3
46/16 47/22 55/5
push [4]   19/25 38/2
41/10 42/1
pushed [1]   38/2
pushing [1]   53/12
puzzle [1]   46/18

**Q**

quarterly [2]   24/23
24/25
question [9]
questions [4]   15/4
20/23 23/7 27/13
quit [1]   52/25
quote [6]

**R**

rabbit [1]   17/1
raise [1]   50/3
raised [1]   26/2
rate [1]   15/25
RCFEs [2]   10/4 10/8
re [1]   16/23
re-divert [1]   16/23
reach [3]   40/3 42/13
53/9
reached [1]   45/11
reaching [2]   44/18
54/3
ready [1]   19/10
reality [4]   12/23
13/15 14/10 14/14
recently [1]   36/9
recess [5]   29/10
35/16 35/18 35/19
54/9
recognize [4]   4/20

recognized [1]   6/9
recognizes [1]   50/11
recognizing [1]   9/3
record [11]
recording [1]   7/18
recreational [1]
26/12
reduce [1]   51/16
reduction [1]   19/17
referenced [2]   41/18
45/23
reflect [1]   11/10
reflected [1]   29/20
reflects [1]   9/16
regular [1]   47/22
regulations [1]   55/10
reinstating [1]   53/19
reintroduce [1]   43/3
reiterate [3]   36/17
46/16 46/17
relation [1]   8/13
relationship [4]   9/11
9/16 10/10 24/4
remarkable [1]   15/14
remedy [2]   25/12
25/18
remind [1]   29/14
Remove [1]   34/13
Renee [1]   3/8
report [4]   24/25
29/24 31/9 47/21
Reporter [2]   1/21
55/16
REPORTER'S [1]   1/14
reporting [4]   24/21
37/13 46/1 47/17
reports [4]   24/22
30/1 30/2 50/9
representations [2]
25/2 32/16
representative [1]
9/4
representatives [1]
49/22
request [5]   8/18
25/11 46/17 46/22
46/22
requested [4]   7/20
8/6 8/16 46/15
requirement [1]   50/17
rescue [1]   34/6
reservations [1]

residential [2]   29/7
44/2
residents [1]   20/6
resolution [2]   25/6
25/7
resolvable [2]   16/2
16/3
resources [13]
Respectfully [1]
47/11
respective [2]   11/14
49/22
response [1]   14/2
rest [2]   18/3 19/12
restate [1]   37/22
result [1]   27/18
retain [1]   47/7
return [1]   7/20
review [1]   8/12
rights [4]   1/6 2/2
4/15 50/16
rising [1]   32/3
riverbed [1]   33/8
road [1]   20/12
robust [1]   47/12
Rocky [1]   29/4
room [3]   2/14 2/18
43/9
Roomkey [1]   18/17
roundtable [1]   15/22
Row [2]   32/23 48/24
Rule [1]   23/3
ruling [1]   53/3

**S**

Sacramento [1]   21/1
safe [1]   44/15
safeguard [1]   51/18
sakes [1]   30/15
salary [1]   35/8
Santa [1]   3/14
sat [1]   50/10
satisfactory [1]
51/13
satisfied [3]   9/7
9/10 39/9
scenes [1]   33/6
scheduling [1]   53/24
school [1]   34/7
Scott [1]   2/17
scott.marcus [1]   2/20
searches [1]   7/11

**S**

**SEC [1]**  22/7
**second [4]**  22/15
  33/19 48/19 53/22
**secretly [1]**  33/5
**section [6]**
**Section A2 [2]**  21/9
  21/23
**Section D [1]**  39/16
**security [1]**  7/9
**seek [1]**  23/2
**seniors [1]**  45/10
**sense [3]**  26/8 27/2
  28/21
**serious [1]**  29/25
**seriously [1]**  10/20
**serves [1]**  27/9
**service [3]**  12/2 20/5
  48/14
**services [9]**
**settle [5]**  28/17
  35/14 40/8 52/15
  52/22
**settlement [61]**
**settlements [1]**  11/23
**settles [2]**  26/13
  27/3
**seven [1]**  26/17
**severe [1]**  30/20
**severely [1]**  51/12
**shall [3]**  24/9 24/16
  24/22
**shame [2]**  52/16 52/23
**Shayla [2]**  3/8 6/10
**Shayla Myers [1]**  6/10
**shelter [6]**
**shelters [1]**  44/17
**Sherin [2]**  29/12
  29/17
**shine [3]**  41/14 41/25
  42/5
**shivering [1]**  34/10
**shoe [1]**  14/23
**shoe-horned [1]**  14/23
**short [1]**  29/10
**shortage [1]**  31/11
**shorthand [1]**  44/1
**shoulder [1]**  32/15
**sick [1]**  17/2
**side [4]**  22/13 38/7
  44/14 44/14
**sideways [1]**  22/21
**sign [10]**

**sign-ups [1]**  48/17
**signal [1]**  49/20
**signature [2]**  38/9
  49/6
**signatures [3]**  22/22
  38/10 38/15
**signed [7]**
**situation [1]**  19/23
**six months [1]**  20/3
**Skid [2]**  32/23 48/24
**Skid Row [1]**  32/23
**slice [1]**  36/17
**small [2]**  11/2 46/17
**smyers [1]**  3/11
**Sobel [6]**
**social [1]**  44/9
**society [1]**  36/18
**solution [1]**  27/15
**solve [9]**
**solved [2]**  14/5 43/10
**solving [1]**  16/14
**somebody's [1]**  21/9
**someplace [1]**  37/24
**sorts [2]**  13/22 14/19
**South [1]**  3/4
**speakers [1]**  36/16
**special [6]**
**Special Master
  Martinez [1]**  8/7
**specific [1]**  50/18
**speed [1]**  16/18
**spend [1]**  48/9
**spending [2]**  32/2
  41/7
**spent [6]**
**spins [1]**  16/25
**spread [2]**  26/22 27/9
**staff [2]**  21/13 35/8
**stand [3]**  45/15 45/15
  45/21
**standard [1]**  12/20
**standing [1]**  10/19
**stark [1]**  23/20
**Stars [1]**  2/23
**state [3]**  8/1 9/13
  50/9
**stated [5]**  23/11 27/8
  27/25 38/18 47/10
**statement [2]**  30/18
  30/19
**states [5]**  1/1 35/2
  50/24 55/6 55/10
**stay [2]**  44/6 53/19

**stenographically [1]**
  55/7
**step [3]**  18/1 20/22
  38/19
**stepped [3]**  18/12
  19/8 43/22
**stepping [2]**  17/9
  17/23
**stipulation [1]**  53/18
**stood [2]**  18/16 18/18
**strategies [1]**  14/18
**street [11]**
**streets [4]**  19/24
  50/5 50/6 51/18
**strenuously [1]**  13/12
**stress [3]**  28/7 36/4
  36/15
**struggling [1]**  13/1
**stunned [1]**  22/16
**subacute [2]**  29/18
  29/19 29/21
**submitted [3]**  7/23
  8/20 46/23
**Subsection [2]**  39/10
  39/10
**Subsection 11 [1]**
  39/10
**Subsection 2 [1]**
  39/10
**subsidies [1]**  43/25
**subsidy [1]**  29/7
**substance [10]**
**substantial [1]**  51/13
**subtlety [1]**  52/6
**success [2]**  32/1
  49/16
**successes [1]**  47/21
**successful [1]**  26/20
**successor [1]**  32/20
**sufficient [6]**
**sufficiently [1]**  11/4
**suggesting [1]**  16/2
**suggests [1]**  29/18
**Suite [5]**  2/4 2/8
  2/23 3/4 3/14
**supervisor [6]**
**Supervisor Janice Hahn
  [1]**  4/22
**supervisors [8]**
**supervisors' [1]**
  10/23
**support [4]**  39/18
  41/21 47/13 47/16

## S

supporting [1]   44/10
supportive [3]   16/19
 16/20 49/10
surgeon's [1]   17/4

## T

table [4]   11/25 12/2
 17/4 52/24
taxes [1]   49/13
taxpayers [1]   28/20
teams [6]
tending [1]   10/8
term [1]   17/8
terms [20]
terrific [1]   34/19
thank [25]
thanks [1]   9/18
The's [1]   51/2
thin [1]   27/9
thorn [1]   38/7
thoroughly [1]   8/23
thought [1]   34/14
thoughts [1]   50/3
thousand [4]   9/24
 43/24 47/14 52/11
threat [2]   15/15
 52/14
three years [1]   20/11
throw [4]   19/11 34/23
 34/24 49/4
Thursday [2]   1/16 4/1
thus [1]   31/20
till [1]   7/10
time [20]
times [6]
tiny [1]   36/17
Title [1]   55/6
today's [1]   9/2
Todoroff [2]   3/22
 6/19
Tom [5]   33/4 33/5
 33/10 48/4 49/19
Tom LaBonge [2]   33/4
 48/4
toss [1]   34/18
tossing [1]   49/3
totality [1]   19/23
tough [2]   27/12 35/13
traced [1]   7/25
trailers [1]   26/12
transcript [4]   1/14
 9/2 55/7 55/9

transformative [3]
 10/17 11/5 11/10
transparency [12]
transparently [2]
 23/16 40/5
treasurer [1]   50/9
treat [1]   17/4
treating [1]   17/5
trees [1]   17/13
trend [1]   10/7
tribute [2]   33/1
 49/19
trust [7]
trusts [1]   23/24
truth [2]   43/9 43/14
Tuesday [1]   12/7
turning [1]   26/21
turtle [1]   16/18
twice [1]   35/3
two days [1]   8/19
two weeks [1]   53/22
typical [1]   45/18

## U

U.S [2]   1/21 55/16
ultimately [2]   18/4
 18/6
Umhofer [8]
umklaw.com [2]   2/6
 2/10
unacceptable [1]
 29/22
uncertainty [1]   29/22
undeniable [2]   43/9
 43/14
understanding [2]
 7/14 22/2
unequivocally [1]
 50/24
unhoused [2]   14/21
 15/19
uninterrupted [1]
 43/2
unique [1]   22/11
UNITED [4]   1/1 35/2
 55/6 55/10
unless [1]   24/3
unlicensed [2]   19/15
 19/20
unmet [1]   29/19
unquote [1]   23/6
unsaid [1]   36/13
unsuccessful [1]   39/6

ups [1]   18/17
us [6]
utilize [1]   27/16

## V

Venice [1]   26/11
vice [1]   5/3
violation [1]   24/4
voice [1]   40/5
vote [2]   22/14 49/13
vouchers [2]   10/2
 10/13
vs [1]   1/8

## W

wage [1]   35/6
Wai [1]   3/3
Wai-Kwan [1]   3/3
waived [1]   7/10
walk [2]   18/22 33/25
walking [1]   34/10
watch [2]   48/11 48/24
watched [1]   48/7
watching [2]   20/4
 53/11
we'd [1]   34/14
weapons [1]   7/11
wearing [1]   5/19
Wednesday [1]   12/5
welcome [5]   6/6 6/22
 7/13 7/19 9/20
Wellesley [1]   48/10
West [2]   1/22 26/24
WESTERN [1]   1/3
where's [1]   31/19
White [2]   32/24 34/1
who'd [1]   46/2
who's [4]   7/2 34/1
 41/16 41/19
whoever's [1]   4/19
Wil [3]   1/21 4/7
 55/15
wil.wilcox [1]   1/23
Wilcox [2]   1/21 55/15
Wild [1]   26/24
will make [1]   9/2
willing [2]   11/24
 35/14
Wilshire [2]   2/4 2/8
window [1]   19/11
wise [2]   33/10 33/20
withdraw [1]   28/18
wonder [1]   34/18
wonderful [1]   35/7

**W**

**wondering [1]**   32/4
**WORKER [2]**   3/7 6/13
**world [1]**   32/8
**worried [1]**   26/21
**worse [1]**   32/4
**worst [1]**   31/24
**wound [2]**   17/5 17/6
**wraparound [1]**   44/8

**Y**

**you'd [3]**   23/18 24/18
  37/4

```
 1                    UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3

 4   LA ALLIANCE FOR HUMAN RIGHTS, ) Case No. LA CV 20-02291-DOC-
     et al.,                       )                    (KESx)
 5                                 )
                                   )
 6          Plaintiffs,            )
                                   )
 7   vs.                           ) Los Angeles, California
                                   )
 8   CITY OF LOS ANGELES, et al.,  ) Tuesday, January 17, 2023
                                   )
 9          Defendants.            ) (9:05 a.m. to 10:52 a.m.)
     _____)

10

11          TRANSCRIPT OF PRESENTATION OF FINAL SETTLEMENT
                   OBJECTIONS/STATUS CONFERENCE
12           BEFORE THE HONORABLE DAVID O. CARTER
                   UNITED STATES DISTRICT JUDGE

13

14   Appearances:               See next page.

15   Court Reporter:            Recorded; CourtSmart

16   Courtroom Deputy:          Karlen Dubon

17   Transcribed by:            Jordan Keilty
                                Echo Reporting, Inc.
18                              9711 Cactus Street, Suite B
                                Lakeside, California 92040
19                              (858) 453-7590

20

21

22

23

24

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
```

```
                                                                    2

 1   APPEARANCES:

 2   For the Plaintiffs:            ELIZABETH A.  MITCHELL, ESQ.
                                    Spertus Landes & Umhofer, LLP
 3                                  617 West 7th Street, Suite 200
                                    Los Angeles, California 90017
 4                                  (213) 205-6520

 5                                  MATTHEW D. UMHOFER, ESQ.
                                    Spertus, Landes & Umhofer, LLP
 6                                  1990 South Bundy Drive
                                    Suite 705
 7                                  Los Angeles, California 90025
                                    (310) 826-4700
 8
     For the City of Los Angeles:   SCOTT D. MARCUS, ESQ.
 9                                  Los Angeles City Attorney's
                                      Office
10                                  200 North Main Street
                                    7th Floor, Room 675
11                                  Los Angeles, California 90012
                                    (213) 978-7558
12
     For the County of Los          JENNIFER MIRA HASHMALL, ESQ.
13     Los Angeles:                 LOUIS R. MILLER, ESQ.
                                    Miller Barondess, LLP
14                                  1999 Avenue of the Stars
                                    Suite 1000
15                                  Los Angeles, California 90067
                                    (310) 552-4400
16

17

18

19

20

21

22

23

24

25
```

3

1   <u>Los Angeles, California; Tuesday, January 17, 2023 9:05 a.m.</u>

2                           --o0o--

3                    (Call to Order)

4           THE CLERK:  Now calling item number one case

5   number LA CV 20-2291, LA Alliance for Human Rights, et al,

6   versus the City of Los Angeles, et al.

7           Counsel, please stand and state your appearances.

8           MR. UMHOFER:  Good morning, your Honor.  Matthew

9   Umhofer and Elizabeth Mitchell on behalf of the Plaintiffs.

10          MS. MITCHELL:  Good morning, your Honor.

11          MR. MILLER:  Good morning, your Honor.  Skip

12  Miller and Mira Hashmall for the County of L.A.  And I'd

13  like the record to reflect that two of the supervisors are

14  here today, the Chair, Janice Hahn, and Supervisor Hilda

15  Solis.

16          THE COURT:  I'm going to publicly thank them in

17  just a moment.

18          MR. MOON:  Good morning, your Honor.  Adrian D.

19  Moon offering glory to the Almighty Creator in the mighty

20  name of Jesus Christ, the Messiah.  I believe I'm a

21  Defendant Intervenor, but you haven't --

22          THE COURT:  Mr. Moon, you are more than welcome.

23  I'd like you to be seated in the audience.

24          MR. MOON:  Thank you, your Honor.

25          THE COURT:  Mr. Moon, I'd like you to be seated in

*Echo Reporting, Inc.*

4

1   the audience.

2           MR. MOON:  I can't appear in --

3           THE COURT:  I'd like you to be seated in the

4   audience immediately.  Thank you.  You've caused past

5   disruptions.  I'm aware of that, but you're more than

6   welcome to be here.  Have the gentleman seated in the

7   audience.

8           MR. MOON:  I --

9           THE COURT:  You're welcome to be here.

10          MR. MOON:  -- can --

11          THE COURT:  Otherwise I'm going to remove you,

12  sir.

13          MR. MOON:  -- make an appearance.

14          THE COURT:  Thank you very much.  Mr. Moon, you're

15  going to be welcome at all times, but I'm going to invite

16  you not to speak today.

17      (Pause.)

18          THE COURT:  First of all, good morning.  I want to

19  thank all of you for being here, and I want to specially

20  recognize Mayor Bass.  Mayor Bass, good morning.  Very

21  gracious of you.

22          MAYOR BASS:  Good morning.

23          THE COURT:  Also, City County present, Paul

24  Krekorian.  Paul, I'd like to thank you for being here as

25  well.  Very gracious of you.

*Echo Reporting, Inc.*

5

1        And Supervisor Cho, a member of the Board,

2   Supervisor Janice Hahn, it's a pleasure to see all of you

3   again.  And, also, Hilda Solis, Supervisor, it's a pleasure

4   to see you.  Monica Rodriguez, it's a pleasure to see you.

5   Matt Szabo.

6        And are there any other Council persons present

7   that I may have neglected or that I can't see through the

8   screens, and other members of the Board of Supervisors?

9        Okay.  Let me begin on a very positive note, and

10  that is your courtesy in attending today was a request by

11  the Court, but I do believe it's a strong commitment on each

12  of you parts, and, once again, a hopeful willingness to

13  solve this homeless crisis.

14        For the sake of transparency, I'm going to document

15  -- docket the comments I'm about to make today in the record

16  as well as the transcript.  There'll be no recording.  Only

17  the Chief Judge of the District can make that waiver, and

18  that is not being made.

19        There's a number of screens in front of you today,

20  and I'm going to make some initial comments and invite

21  comments by the elected officials but first the attorneys in

22  a few moments.

23        This case was first filed in March of 2020 by LA

24  Alliance, a nonprofit organization consisting of a broad

25  coalition of Los Angeles stakeholders, including unhoused

6

1  individuals, property owners, small businesses, and

2  eventually larger businesses in the downtown area.  It has

3  since grown into a much larger lawsuit.  And at the time of

4  the second amended complaint, LA Alliance stated in their

5  amended and supplemental complaint in paragraph 94 that:

6          "The homeless crisis continues and

7          accelerates with little hope of a city

8          or county-driven solution because of the

9          painful results of current policies and

10         because of the lack of political and

11         bureaucratic will to undertake effective

12         and proven means to combat it.  The

13         Plaintiffs are suffering under the

14         weight of an urgent crisis.  The

15         Plaintiffs are left with no choice but

16         to resort to the courts for relief."

17         This Court recognizes that it should not be the

18 burden of private citizens to sue their elected

19 representatives, and only in times of desperation, anger and

20 hopelessness are lawsuits such as this filed.  Apparently

21 this lawsuit came before the Court out of desperation and

22 fury over decades of neglect and inaction.

23         But through this litigation, the Plaintiffs and

24 the City of Los Angeles entered into a settlement agreement

25 in the summer of 2022 without the County joining in.  This

7

1  agreement by the City was commendable in a number of ways.

2  It contained approximately 24 provisions, each of which had

3  detailed subdivisions and specifically defined terms.   The

4  agreement promised two to three billion dollars to

5  accommodate the 12 to 14 thousand people on the streets.   It

6  was comprehensive and extensive and, notably, held the City

7  accountable by providing that the Court maintain "continuing

8  jurisdiction" to oversee and enforce this settlement

9  agreement which included monitoring.

10         Could this agreement have gone further?   In

11  November I stated, yes, it could.   It did not solve

12  homelessness, and absolutely, it could have gone further.

13  But -- and there's much more that needs to be done obviously

14  to address the spiraling crisis on our streets.

15         This Court recognized that this agreement alone

16  would not sole homelessness.   In fact, Plaintiffs, LA

17  Alliance, and the City, recognized the same when they

18  referenced the County's responsibilities and "agreed to

19  cooperate in assuring the County meets its obligations of,

20  among other things, requiring a minimum of 50 mental health

21  beds per 100,000 people in the County or more, as necessary

22  to ensure access to inpatient treatment for PEH in the City

23  and to prevent mentally ill individuals from falling into

24  homelessness due to lack of inpatient treatment."

25         That's in the City's settlement agreement, Docket

*Echo Reporting, Inc.*

Case: 23-70076, 05/11/2023, ID: 12714476, DktEntry: 1-2, Page 871 of 1079

Case 2:20-cv-02291-DOC-KES   Document 520   Filed 01/20/23   Page 8 of 49   Page ID
#:15320

8

1   421-1 at page 11.

2           In October of 2022, the County filed their

3   settlement proposal.  The terms of the agreement, as I made

4   clear in the last hearing, simply fell short of the County's

5   statutory obligations and the very reason that this lawsuit

6   was filed in the first place, and I asked the simple

7   question, "Could we do better?"  I did not outright reject

8   that agreement at that time, hoping that there would be an

9   additional agreement coming before the Court.

10          You're back here present, and you're making

11  commendable and initial efforts to confront this crisis.

12  These may be successful or nonsuccessful, but it appears

13  that you've broken the inertia and, as such, whether the

14  resulting efforts are short term or long term remains to be

15  seen, but your efforts are being made in good faith to break

16  down some of the barriers of antagonism and noncooperation

17  between the City of Los Angeles and the County of Board of

18  Supervisors which apparently goes back decades.

19          You've declared an emergency.  Last week the

20  County Board of Supervisors, through Chairperson Hahn,

21  joined you, and hopefully this will cut bureaucracy cost and

22  lead to increased housing.  So, I start with all -- all of

23  you with a compliment today.

24          But Mayor Bass has pledged to accommodate 17

25  homeless persons within her first year of office.  This is a

*Echo Reporting, Inc.*

**ER 820**

9

1  monumental undertaking, Mayor.  It's bold, and it's needed.

2  And the settlement reached between the City of Los Angeles

3  and LA Alliance eventually would accommodate 12 to 14

4  thousand individuals over a five-year period.  It's hoped,

5  Mayor, that the City Council through you and the President,

6  Paul Krekorian, will go at a much greater pace of this

7  agreement entered into before you were in office by LA

8  Alliance and the City of Los Angeles.

9          It's repeatedly been represented to this Court

10  that 40 percent of the homeless population suffers from

11  mental illness or substance abuse or a combination of both.

12  This started with Carol Sobel's representations to me,

13  Brooke Weitzman's representations, and your representations

14  to me.  So, when we talk for just the next few moments, I

15  want you to keep that 40 percent figure in mind.

16          The division of responsibility for mental health

17  and substance abuse falls to two County agencies.  The Los

18  Angeles County Department of Mental Health, DMH, with

19  interim -- with an interim Director, Lisa Wong, has the

20  responsibility for the County's mental health needs.

21          The Los Angeles County Department of Public

22  Health, under the direction of Barbara Ferrer, has

23  responsibility for substance abuse.  Please keep that in

24  mind in the next few moments.

25          So, Dale, if you'd be kind enough to put up on the

10

1   screen page four of the County proposal for a moment.  And I

2   can't see that screen, but is it on the -- is it up, Dale?

3            UNIDENTIFIED SPEAKER:  You don't see it?

4            THE COURT:  No.  On my screen, I can see the --

5            MR. UMHOFER:  We're seeing -- we're seeing

6   something on this screen which is I think what you want,

7   your Honor and -- and something different on the screens in

8   front of us.

9            THE COURT:  Yeah.  We tried to arrange the

10  screens, but this is -- would be the County proposal page

11  four, paragraph three.  That would be on this screen,

12  correct?

13           So, folks in the audience, it may be difficult to

14  see, and I don't know what you're seeing.  You're seeing --

15  you're seeing a split screen.  In a moment we're going to

16  put other documents on the screens closest to you.  So,

17  don't pay attention to those for a moment.  It is this

18  screen over here.

19           Okay.  And I'm going to invite the Mayor to come

20  closer.  I really wish you would so you can see this.  I

21  know you as Hilda and Janice.  For goodness sakes,

22  Supervisors, please come forward so you can actually see

23  this.  And, as the President, Paul Krekorian, it's just

24  critical.  I'd like to get this into the leaders' hands and,

25  quite frankly, have the leaders of our community, so that I

11

1  know you're really getting the information that you need.

2      Okay.  So, in front of you should be page four of

3  the proposed County settlement.

4      Paul, can you see that?  Hilda, can you see that?

5  And, Hilda, by the way, my apologies.  I couldn't talk to

6  you.  I had to go through the formality because that

7  permission was withdrawn.  Also, I had a Chairperson at the

8  time, Holly, who was the Chair.  So, I didn't have a chance

9  to sit down.  I know you called.  I returned.  I couldn't

10  talk.  The County hasn't given me permission to.  If that's

11  lifted at any time, I'd love to -- I'd love to engage you in

12  conversation.  But right now I've got a blanket over me.

13      Okay.  In the County's proposal at page four,

14  paragraph three:

15          "Mental health substance use

16          disorder beds:  The County states that

17          'By the end of Fiscal Year 2023/2024'"

18          -- which would be June 30th of 2024 --

19          "'the County shall develop 300

20          additional substance use and mental

21          health beds according to the greatest

22          need as solely determined by the

23          County.'"

24      Now, those are my handwritten notes.  I hope that

25  that reflects what I'm seeing on the screen.  You have to

*Echo Reporting, Inc.*

12

1  follow this closely for a moment.

2          I'm being offered 300 beds, but notice that those

3  beds are divided between two different agencies.  So, is

4  this 150 with Public Health, is this 150 with Mental Health?

5  And I'm just going to assume for a moment and give all the

6  credit and say all 300 hypothetically are going to go to

7  mental health.  Let's just take the best scenario for all of

8  us in the room.

9          Now, if you go to the screen and put up the first

10 page of the DMH report, which is Doctor Robert Sherin's

11 report, Director of DMH, to the Los Angeles County Board of

12 Supervisors -- it should be October 2019, and that I should

13 be able to see on my screen Diella (phonetic).

14      (Pause.)

15          THE COURT:  You just had it up a moment ago, so --

16 and, folks, bear with us because we've been trying through

17 the miracles of modern electronics, which I don't

18 understand, to set this up for you, and it's been hard.  But

19 I really want you to see what's happening here and then help

20 the Court to see if you can further help our citizens.

21          It would just be page to begin with.  I want to

22 verify what you're looking at right now.  It's actually the

23 second amended complaint.  It's in a footnote it's a public

24 document, and on the first page it refers to the report by

25 Doctor Jonathan Sherin, Mental Health 2019 to the Board of

13

1  Supervisors.

2          Now, if you go to page four -- and we should be on

3  page four of the same report.  Now, Doctor Sherin clear back

4  in 2019, wanted to start a pilot project.  And his pilot

5  project he wants to start is for 500 beds.  He's very wise.

6  What he's saying is I want 500 beds of acute and subacute.

7  And I, Doctor Sherin, want to be able to vary those beds

8  because I recognize that somebody might be acute for a week

9  or two -- and that's for all the people.  You understand

10  this.  But I might go into a subacute category.  So, I,

11  Doctor Sherin, want to be able to mix and match these, and I

12  want a pilot program.

13          Now, if you'd go to page 20 on the screen and drop

14  down to the second paragraph.  Now, in addition, he wants

15  3,000 subacute beds at the time.  He wants 500 plus 3,000.

16  And what he's saying is, because of the Mercer Report that's

17  been submitted to the Board, we need 3,000 new subacute

18  beds, and these are in addition to the 500 pilot program

19  beds going between acute and subacute for the homeless

20  population.  And in just a moment he's going to further

21  break that down for the Board.

22          So, go to page 27.  I hope I have this memorized.

23  I want you to go to paragraph nine, Diella, and we should

24  see a quote at the bottom:

25              "The estimate of 3,000 additional

14

1          subacute beds needed, for example, is

2          under the status quo scenario."

3          In other words, in 2019, where most of these

4   factors remain the same -- this is dealing with our 13 or

5   more percent increase.

6          So, now, whether we're dealing, Mayor Bass, with

7   either your efforts regarding the 17,000 individuals or the

8   present agreement that I've approved between the City and LA

9   Alliance, where we have 12 to 14 thousand beds, the County

10  offer may fall far short.

11         So, would you put up page six on the screen

12  Diella.  And, so, it's not the Judge making this up, to

13  quote from Doctor Sherin:

14             "Roughly 25 percent of adult

15             homeless individuals in L.A. have

16             serious mental illness and need care."

17         And remember the 40 percent figure?  That

18  potentially was mental illness and substance abuse or a

19  combination of both.  But here Doctor Sherin is getting us

20  the statistic of 25 percent.  All right.  We're almost

21  there.

22         How can this Court approve and accommodate the

23  need for 25 percent of May Bass's figure, which is

24  approximately 4,250 beds, for those suffering from mental

25  severe illness or accommodate even 25 percent of the City's

15

1   agreement figure, which is 3,200 beds, when the Court's

2   being offered 300 beds and asked to sign off on a settlement

3   agreement.  I don't see how this could lead to any success,

4   Mayor Bass, other than clearing out encampments.  The human

5   factor leaves us the people who desperately need it are

6   sitting on the street crying for help, and our citizens

7   aren't protected.

8           Now, Doctor Sherin's recommendation to the Board

9   in 2019 is cited in paragraph 89, LA Alliance, at their

10  first amended and supplemental complaint.  So, if you'd be

11  so kind, Diella, put up paragraph 89, and I'm going to show

12  you internally why LA Alliance's figures are absolutely

13  correct.

14          "In addition, the County has failed

15          to meet its statutory obligation to

16          provide appropriate mental health

17          services."

18          Well, that's for litigation.  This is a statement

19  by the Plaintiff, okay.  But:

20          "The County Board of Supervisors

21          recognizes the minimum number of beds

22          required to appropriately meet the

23          community mental health need is 50

24          public mental health beds per 100

25          thousand individuals."

16

1        And that's right in the Mercer Report.  It's right

2   in the County documents submitted to the Board in 2019.

3            "In Los Angeles County, there are

4            only 22.7 beds per 100,000 individuals."

5        Now, take the County of about 4 million to 500

6   million people, and you'll find out that these internal

7   factors absolutely overlay Doctor Sherin.  We've got about

8   minimally 2500 beds if you reach the 50 per thousand from

9   the 22.7, and Doctor Sherin's saying about 3,000 beds.

10           "In response, the Department of

11           Mental Health, DMH, conducted an

12           investigation and identified an estimate

13           of 3,000 additional subacute beds

14           needed.  As of December 2020, only 156

15           of the proposed minimal pilot of the 500

16           additional beds had been procured."

17       In the County's statement in support of its

18   settlement agreement which was filed on Friday -- and I

19   doubt that many of you read it.  It was filed late.  We

20   spent the weekend with it -- the County states that its 300

21   beds are in -- "in addition to the County's existing supply

22   of approximately 8,600 mental health substance abuse

23   disorder beds."  That's Docket 5149, but there's no cite for

24   the source of this number to the Court, and that's what your

25   litigation's all about.  There's no audit at the present

17

1  time.

2         I'm concerned about accountability, and I'm

3  further concerned that the agreement lacks concrete

4  milestones and accountability.

5         The question of government accountability has been

6  a driving force of this lawsuit and, again, as stated by LA

7  Alliance in the first amended complaint, for example -- and

8  go to paragraph 17, Measure H, Diella:

9              "A countywide increase that was

10             originally estimated to net $355 million

11             in homeless relief funding available per

12             year is spread so thin it serves more to

13             feed the County's own bureaucracy than

14             to make any significant debt in the

15             crisis."

16        Well, that's a litigator talking.  Disregard that

17 for just a moment, but don't disregard the amount of Measure

18 H funds plus the additional moneys that we all know are

19 coming in.  And, if we're successful, there's going to be

20 more money.  So, it's really a chance to reset and restart

21 for all of us.

22        In paragraph 83:

23             "The County faces tough questions

24             about its management of homeless related

25             funds.  This fiscal year, the County

18

1          passed a $36.2 billion budget for this

2          fiscal year, which includes an estimated

3          $465,090,000 raised by Measure H

4          dedicated to addressing homelessness.

5          Measure H was described as a tax voted

6          for by County residents in 2017 to fund

7          mental health/substance abuse treatment,

8          healthcare, education, job training,

9          rental subsidies, emergency and

10         affordable housing, transportation,

11         outreach, prevention, and supportive

12         services for homeless children,

13         families, foster youth, veterans,

14         battered women, seniors, disabled

15         individuals and other homeless

16         individuals."

17         This amount is wholly separate from and in

18   addition to the significant percentage of County funds

19   allotted to departments to address issues of homelessness,

20   including those housed and treated in County jails,

21   emergency treatment and transport, Department of Mental

22   Health, L.A. County Fire Department, medical treatment

23   through various hospitals and treatment centers, and

24   criminal prosecution and defense costs, not to mention

25   funding the general relief and other myriad social

19

1   services."

2           Paragraph 84:

3               "Since the passage of Measure H and

4           its concomitant additional hundreds of

5           millions of dollars for housing and

6           services, the homeless population in

7           L.A. County has risen from 57,794 to

8           66,436."

9           And we know it's -- it's greater than that.  It's

10  up to 69,000 some.

11              "The problem is outpacing the

12          solution, and the County has failed to

13          utilize the funds in a manner that would

14          effectuate the goal."

15          Paragraph 94:

16              "The amount of effort and resources

17          devoted to addressing this issue is

18          significant, but the actual result is an

19          astonishing lack of progress in

20          addressing the crisis and continued

21          expansion of the crisis despite such

22          efforts and resources, because each is

23          being used in ways that will never solve

24          the problem."

25          Now, these were the Plaintiffs' allegations when

*Echo Reporting, Inc.*

ER 831

20

1  the lawsuit was filed.  The County settlement as written now

2  is that the terms are not subject to independent enforcement

3  or monitoring, and this is going to be my bottom line before

4  I will ever consider accepting a settlement in just a few

5  moments.

6          This point is laid out in the County's settlement

7  agreement, and the County once again pressed this point to

8  the Court in the filing on Friday afternoon.

9          What's happening out there is a crisis of all

10  times, the public safety crisis, a health crisis, a

11  humanitarian crisis for the homeless, for residents, and for

12  our police and Sheriff's Department personnel who respond to

13  calls and are put in a dangerous position when forced to

14  respond to circumstances that are not theirs to handle.

15  They are not psychiatrists.  They are not mental health

16  professionals, and the homeless are put in the same

17  dangerous position.

18          But because the settlement as written is really a

19  private settlement, I want to stress that for a moment.

20  This is portrayed to the Court as a private settlement with

21  no judicial oversight, no accounting, no monitoring, and the

22  L.A. City gave the Court that trust to at least monitor.

23  L.A. City gave the Court that trust, and the Court gave you

24  that trust back so that we had a check and balance and that

25  we were able to accommodate each other along the way.

21

1    This requires no -- no judicial approval.  And if

2  you've reached a private settlement, I'm forced to dismiss

3  this case because this is a private settlement between the

4  parties.

5    So, I'll turn to Plaintiffs LA Council first.  I

6  wanted to give you time.  Now, have a seat for a moment,

7  ma'am.

8    In November I sent a message.  I don't think it

9  was heard by many first of all.  I pointed specifically to

10  paragraph nine.  I was specific and warned you and Mr.

11  Miller about that paragraph.  I tried to point out the

12  inadequacies, and I've received nothing in the interim

13  period of time.  So, I'm going to put you on the spot.

14    After careful consideration and the Court raising

15  these concerns after the last hearing to today, do you agree

16  with the settlement, and is this in the best interests of

17  the City of Los Angeles?

18    MR. UMHOFER:  Thank you, your Honor.  Almost three

19  years ago now, we brought this case --

20    THE COURT:  Why don't you just sit down and use

21  the microphone.

22    MR. UMHOFER:  That's fine, your Honor.

23    THE COURT:  That way we can hear you.

24    MR. UMHOFER:  Almost three years ago now we

25  brought this case because the City and the County weren't

*Echo Reporting, Inc.*

22

1   working together on this issue.  We wanted this case not to

2   be a fight but an opportunity for the City and the County to

3   come together finally on this with judicial supervision.

4           THE COURT:  There's no judicial supervision in

5   this settlement.

6           MR. UMHOFER:  There is.  So, if you look, your

7   Honor, under the terms, the --

8           THE COURT:  No, under those terms -- Matt, I'm

9   going to be very direct with you.  It's getting played both

10  ways.  Judge, sign off on this.  There's no monitoring.

11  We're going to write you a report every three months.

12  Absolutely worthless.

13          MR. UMHOFER:  Your Honor, I -- it's -- let's focus

14  on that, because I think this is really important.  This is

15  what we insisted on.  We insisted on this Court having

16  continued ability to enforce this agreement.  It's on -- on

17  page 2(a)(1), subject to the requirements of (a)(2), with

18  the -- and subject to the Court's continuing enforcement in

19  accordance with Section (p) of this agreement, and Section

20  (p), as we go down to that section, has specific reference

21  to whenever the parties -- so, if we go down to Section

22  (p)(1)(2), judicial enforcement section, there's a dispute

23  resolution process.  Any claiming party can come to this

24  Court and seek enforcement of anything in this agreement.

25  That's five years of this -- this party here being able to

*Echo Reporting, Inc.*

23

1   bring to the Court any issues that arise.

2           Now, I want to add to that.

3           THE COURT:  So, let's be clear then.  This is a

4   consent decree.

5           MR. UMHOFER:  So, your Honor --

6           THE COURT:  It can only be one of two things, a

7   contractual agreement between the two of you or a consent

8   decree.  In other words, you can't put a tuxedo on a pig.

9   What is this?

10          MR. UMHOFER:  We had this discussion with the City

11  agreement.  Everybody wants to use different terms.  It is

12  what it says it is.

13          THE COURT:  Is it a consent degree or is it a

14  private contractual agreement, Matt?

15          MR. UMHOFER:  Your Honor, I don't have the

16  definition of a consent decree in mind.  But you and I are

17  aligned in one thing, that for the next five years, this

18  Court can go through this entire agreement, all the

19  commitments made, including, by the way, your Honor, several

20  pieces that -- that the Court didn't mention, including we

21  got specifically in paragraph seven of Section (d) a

22  specific acknowledgment by the County that they have

23  responsibilities under federal and state law to provide

24  clinical treatment to people suffering from serious mental

25  illness and substance abuse, substance use disorders,

24

1   including persons experiencing homelessness.

2           Now, your Honor, what that means is that for the

3   next five years, this Court can hold the County to that, ask

4   hard questions.  We can ask hard questions.

5           THE COURT:  What's my sanctioning power, Matt?

6   Right now you're writing me a report every three months.

7   What's my power of accountability here?

8           MR. UMHOFER:  The Court has its inherent power to

9   enforce this agreement.

10          THE COURT:  No.  I'm going to get resistance,

11  Matt, because somebody will point back to this agreement and

12  say, "Judge, in paragraph nine, we just get to write you a

13  report.  You have no sanctioning power."

14          MR. UMHOFER:  But that's not true, because the

15  continuing enforcement of this agreement is explicit --

16          THE COURT:  Okay.

17          MR. UMHOFER:  -- in the agreement.  So, I just --

18  so, I -- but, your Honor, if I could speak to a few more --

19  a few more pieces here.

20          THE COURT:  And I'd like to know about this

21  ability with 300 beds, Matt, divided out between the public

22  health and the mental health, how we're going to accommodate

23  25 percent of just the mental health needs from our street.

24  Are you in agreement with this?

25          MR. UMHOFER:  Your Honor, we believe and have

25

1  believed from the beginning that what Mr. Sherin's report
2  called for is what is needed.  That's what we pushed for in
3  this --
4          THE COURT:  So, I'm asking the question.  You're
5  not answering it.  Is this an adequate settlement to
6  accommodate that number of mentally severe -- serious
7  mentally ill people on the street?  You put this in your
8  paragraph 89, Matt.
9          MR. UMHOFER:  I understand, your Honor.  And my --
10 my direct answer to that is it's not enough, but this is a
11 good deal, and I will tell you why this is still a good
12 deal, okay, because I think it's really important for -- the
13 mental health piece was something we pushed very hard for,
14 and this is -- we didn't want to stop here.  Okay.  I want
15 to be very clear about that.  But, when we worked through
16 this issue with the City and the County -- and you'll hear
17 from the City.  Matt Szabo is here.  I think he can
18 articulate very effectively, along with the County as well
19 and Mayor Bass and the Supervisors as well, Ms. Solis, and
20 -- and Supervisor Solis and Supervisor Hahn.
21         I think it's really important to focus on the fact
22 that the City -- we finally brought the City and the County
23 together --
24         THE COURT:  And, Matt, just a moment.  Why does a
25 lawsuit have to bring the City and the County together?

26

1   Most of this agreement is simply aspirational.  It's a

2   promise to do something in the future.  Why did we have to

3   get to this point, including the creation of loss, quite

4   frankly, to stop the bickering between the County and the

5   City?  And why should I trust that I don't lose Mayor Bass

6   some day, I don't lose Janice Hahn, I don't lose Hilda

7   Solis, all of which who I have great admiration for and

8   things change?  Why am I going to buy into a settlement

9   based upon personal relationships?  Where are my milestones

10  and goals?  Where is my guarantee in this, Matt?

11          MR. UMHOFER:  Milestones and goals are set forth

12  in the County's obligations.

13          THE COURT:  No, they're not, Matt.  Look at the

14  proposal.  Go back to paragraph three.  Go back to paragraph

15  four.  Go back to your own complaint.  There's a minimum of

16  3,000 to 3,500 acute and subacute beds who should be out

17  there as of 2019, and they're offering me 300.

18          MR. UMHOFER:  Your Honor, I think the bed numbers

19  are better, and I want the County to speak to this.  I think

20  the -- the bed --

21          THE COURT:  I want you to speak to it.  You

22  brought this lawsuit.

23          MR. UMHOFER:  You're right, your Honor.  We did.

24          THE COURT:  Three hundred beds out of 25 percent,

25  are you going to take that position, Matt?  And, if so, I

*Echo Reporting, Inc.*

27

1  really want to hear that.

2          MR. UMHOFER:  There are more beds underneath that

3  300, your Honor.

4          THE COURT:  I don't see that, Matt.

5          MR. UMHOFER:  There -- I'm -- what I'm telling you

6  is that they exist.

7          THE COURT:  Where?

8          MR. UMHOFER:  It's not in the -- it's not here

9  because this is the additional commitment that the County is

10  making.  So, your Honor, I -- but I -- I --

11          THE COURT:  I can't force you to proceed.  I know

12  that there's a $2 million fee that's going to be awarded.

13  Quite frankly, I think that's a di minimus amount.  You

14  probably deserve three or four times the amount of that fee,

15  but I'm having a tremendously difficult time with accepting

16  your representation that this is good for the citizens of

17  Los Angeles.

18          MR. UMHOFER:  Your Honor, I'll let Ms. Mitchell

19  speak because she --

20          THE COURT:  No.  I think I'm going to turn now to

21  the City.  I've heard you.

22          On behalf of the City?

23          MR. MARCUS:  Good morning, your Honor.  Scott

24  Marcus --

25          THE COURT:  Have a seat for a moment, Scott, so we

28

1   can hear you.

2         MR. MARCUS:  Good morning, your Honor.  Thank you.

3   As you know, the City is not a party to this particular

4   agreement between the County and the LA Alliance.  But, as

5   we indicated earlier today, a lot has happened since this

6   agreement was reached back in the fall or summer of last

7   year.  The City has a new Mayor.  The City has a new Council

8   President.  There is a new Board comprised at the -- at the

9   County with a new Chair.

10         THE COURT:  And is your position going to be that

11   these 300 bed spaces are adequate to accommodate the 17,000

12   people, 25 percent who are SMI, severely mentally ill, or

13   are we setting Mayor Bass up for failure right at the

14   beginning?

15         MR. MARCUS:  Again, your Honor, the City is not a

16   party to this agreement.

17         THE COURT:  Okay.  Then you'll remain silent then.

18         Mayor Bass, I'll -- I didn't want to put --

19   between you and the County because maybe I need to be the

20   one, but I don't want to spoil the relationship.  So, let me

21   repeat to you and Janice Hahn, I really appreciate that all

22   of you are getting together.  I recognize that.  I don't

23   want to cause harm to that relationship.  But, by the same

24   token, I don't see how you can possibly be successful, and

25   I'm not willing to accept an aspirational promise after 30

*Echo Reporting, Inc.*

29

1  years of bickering.  So, I see right in the own report,

2  Mayor, 3,000 to 3500.  I'm going to say you fall short,

3  still applaud you, a thousand but not 300, 1500 but not 300.

4          So, if you want to speak, so be it.  If Janice

5  Hahn wants to speak for the Board, so be it.  But I really

6  don't want to hear from the attorneys now.  I want to hear

7  from the leadership.  So, if you want to, Paul Krekorian,

8  you're the President.  You don't have to say a word.  I

9  don't want to put you on the spot, but I'm having a very

10  difficult time with this agreement on behalf of the citizens

11  of Los Angeles.

12          MAYOR BASS:  Your Honor, first, I -- I would

13  appreciate the opportunity if we had to speak to you in

14  chambers privately.

15          THE COURT:  If you'd like to.  If we can make

16  progress -- you know that you and I are very much attuned,

17  and I've been attuned with Janice in the past and with

18  Hilda.  I've got a great amount of respect for you.  But I'm

19  taking the attorneys out of this now.  And if you want to

20  speak to me, I want to speak to you as leaders, and I want

21  to speak to you without the attorneys, and I'd like to

22  include Paul Krekorian, and that has to be stipulated to,

23  and I want to speak to the leadership first before I include

24  -- allow LA Alliance and the Intervenors.

25          Before we do that -- Mr. Miller, sit down -- I'd

*Echo Reporting, Inc.*

30

1   like to speak to the Intervenors for just a moment.

2           Ultimately, I pointed you -- and we've had some

3   disagreements over shelter and housing.  I understand that.

4   We'll always be in disagreement over that mix, et cetera.

5   But this involves a Court's great concern of how do we

6   accommodate the SMI on the street if Mayor Bass is really

7   going to undertake 17,000 or even fall short with 15,000 or

8   even if we take the agreement of 12,000.  The inhumanitarian

9   problem that occurs is I don't see how we're matching that

10  with provider services, getting more robustness out of our

11  providers, quite frankly, and the money is there if we're

12  successful.  The Governor's trying to step up if we're

13  successful.  I just don't see why we can't be, and I think

14  it's a real reset with the last election, with no

15  denigration of the past administration, but it's like

16  changing the Supreme Court.  One new Justice changes the

17  Court.  We've got a chance to reset this, we really do, on

18  behalf of these citizens.

19          Explain to me how 300 beds divided between the

20  public health and mental health accommodates 25 percent of

21  17,000 people.  Just a couple of sentences.

22          MS. SOBEL:  I mean no disrespect, but that's an

23  unfair question.

24          THE COURT:  Okay.  We're done.  Thank you very

25  much, and I won't put you on the spot because I'm trying not

*Echo Reporting, Inc.*

31

1  to get any disagreement between the County and the City as

2  they've entered into this relationship.  So, if you want to

3  speak to me privately, then I want a waiver from LA

4  Alliance.

5           MR. UMHOFER:  Your Honor, subject to our ability

6  to --

7           THE COURT:  Do I have that waiver to speak to the

8  leadership of this County and the City?

9           MR. UMHOFER:  You do have --

10          THE COURT:  Mr. Miller, do I have that

11 accommodation?

12          MR. MILLER:  I would like to speak and answer some

13 of the questions.

14          THE COURT:  I'm not interested right now.  I want

15 to speak to the leadership.  Thank you very much.

16          MR. MILLER:  Subject to my statement the other

17 lawyers got to talk, I would greatly appreciate just a

18 couple of --

19          THE COURT:  Mr. Miller, thank you.

20          MR. MILLER:  Can I?

21          THE COURT:  Please.

22          MR. MILLER:  Okay.  Thank you, your Honor.  I'll

23 be very -- I'll be brief.

24          THE COURT:  Brief.

25          MR. MILLER:  First of all, I want to thank your

32

1  Honor and thank this Court --

2          THE COURT:  Have a seat.

3          MR. MILLER:  -- for bringing this massive problem

4  to the fore.

5          THE COURT:  You and I have had this discussion

6  before, Mr. Miller.  This isn't the first time.

7          MR. MILLER:  Yes.  I just want to say that.  Thank

8  you.  Okay.

9          As far as the 8600 beds -- as far as the 300 beds,

10 there are 8600 -- and I apologize.  We -- your Honor raised

11 this issue before.  So, what we did from the last hearing,

12 we went around to figure out how many additional beds there

13 are, subacute, acute beds for substance abuse and -- and for

14 mental health.  And I have a spreadsheet.  I didn't -- we're

15 not winging it.  We're not coming up with 8600.  I have a

16 spreadsheet with addresses and locations of the 8600 that

17 are already on the books.  And this is -- this is the real

18 thing, and I'll give it to the Court.  I probably should

19 have attached it to our brief.

20         But the 300 is on top of the 8600 that are already

21 out there.  So, that's 8900.  It's not enough --

22         THE COURT:  You can't -- Mr. Miller, you can't

23 accommodate right now with the 8600, even if that figure is

24 correct, and I think that there's a lot of litigation behind

25 that figure and counting, quite frankly.  And you're

33

1  offering 300 for 17,000 people.

2          MR. MILLER:  No.  There's 8600.  We're offering

3  300 more, and I have the details and the locations, the

4  specifics of that.  It's not enough, but --

5          THE COURT:  Show me your proposal.  Show me that

6  proposal.

7          MR. MILLER:  I agree it's not enough.  If I can

8  hand this up to your Honor --

9          THE COURT:  So, if we can do better, then, are you

10  going to waive and let me talk with the leadership of this

11  County and the City?

12          MR. MILLER:  I am, but I want to finish what I

13  have to say.

14          THE COURT:  All right.  Finish.

15          MR. MILLER:  I want to just clarify, and then I'm

16  going to waive, yes, your Honor.  It's fine.

17          The other point I want to --

18          THE COURT:  And are you going to permanently waive

19  since the County withdrew the permission of me to talk, for

20  instance, when Hilda Solis calls my home?  I couldn't

21  respond to her.  I had to be discourteous and refer her.

22  When Janice calls my home, can I speak to her?  Can I get

23  that waiver back from the County so that we can have some

24  good conversations literally at midnight if we want to?

25          MR. MILLER:  If it's all right with Janice Hahn

*Echo Reporting, Inc.*

34

1    and Hilda Solis, it's fine with me.

2            THE COURT:  You're the one that withdrew this on

3    behalf of the County.  Are you revoking that?

4            MR. MILLER:  I'm revoking it if that's what my

5    clients --

6            THE COURT:  For all purposes?  Then go talk to

7    your clients for a moment.

8            MR. MILLER:  Okay.  Can I --

9            THE COURT:  No.  Go talk to your clients for a

10   moment.  That's an order.  Go talk to your clients.  I want

11   to do this one at a time.

12           MR. MILLER:  All right.

13           UNIDENTIFIED SPEAKER:  Your Honor --

14           MR. MILLER:  Okay.

15           UNIDENTIFIED SPEAKER:  -- to talk to --

16           MR. MILLER:  They said okay.

17           THE COURT:  Okay.

18           MR. MILLER:  I revoke it.

19           THE COURT:  So, Janice, if you call the house, I'm

20   happy to talk to you and vice versa.  And, Hilda, if you

21   call -- but I'll always go to the Chairperson of the Board

22   first, Hilda, which is why I was afraid to talk to you.

23   Now, you and I have had two meetings already.  The phone is

24   open and vice versa.  Okay.

25           All right.  Now, finish your --

35

1    MR. MILLER:  Okay.  One other point, your Honor.

2 I thank the Court for -- you know, for instigating, having

3 us all coalesce.

4    My other point -- I have two other points.  We're

5 never going to be able to do enough.  The County

6 acknowledges that.

7    THE COURT:  I -- I --

8    MR. MILLER:  The Court's right, okay.  It's a

9 massive problem.  It's an intractable problem.  It's going

10 to take time, and the County -- you'll hear it directly from

11 the policy makers, the elected officials, they're all over

12 it.  They're doing a lot more than the settlement of just

13 this lawsuit.

14    THE COURT:  Show me in the proposal you gave me

15 where that is.

16    MR. MILLER:  They'll tell you.

17    THE COURT:  Show me in that proposal that you

18 submitted to the Court with no additional conferences, no

19 communication, where that is.

20    MR. MILLER:  It's -- we set forth in our brief the

21 additional things we're doing.

22    THE COURT:  That's not part of the settlement

23 submitted to the Court for my signature.

24    MR. MILLER:  No, it's not part of the settlement.

25 It's being done above and beyond the settlement of this

*Echo Reporting, Inc.*

36

1   case.  There's only so much a court can do.  The -- the --
2   the County, the City, the elected officials have a
3   responsibility above and beyond just this lawsuit.
4          Now, let me -- let me just last point, your Honor.
5   Then I'll sit down and your Honor can talk to my clients
6   directly.  As far as enforcement and supervision, I'm going
7   to read directly page nine, subparagraph (ii).  It's
8   entitled "Judicial Enforcement."  It says:
9              "If, after exhausting the dispute
10             resolution procedures described above
11             the claiming party still alleges the
12             responding party" -- that's us, the
13             County -- "is in breach of the
14             agreement, the claiming party may file a
15             notice of breach and request for
16             judicial enforcement" -- by your Honor
17             -- "judicial enforcement in the District
18             Court to remedy such alleged breach."
19             And this is the key part:
20             "The District Court retains
21             jurisdiction at its discretion" --
22             That means your Honor obviously retains
23   jurisdiction in case it doesn't go away for purposes of
24   enforcement.
25             "The District Court retains

37

1          jurisdiction at its discretion for

2          purposes of enforcing this agreement

3          until the end of Fiscal Year 2026/2027,

4          i.e., June 30th, 2027."

5          So, for the next four and a half years, if we

6   don't do -- by the way, the County's going to meet its

7   commitments.  The County of Los Angeles doesn't breach

8   contracts.  We're going to do what we say we're going to do.

9   But if -- if we don't, we're going to be hauled into court

10  before your Honor, and we're going to have to perform.  I'm

11  quite sure this Court will -- will order it.

12          So, to say that there's on accountability or no

13  enforcement mechanism is incorrect.  There is.  And it's

14  before Judge Carter, and everybody in this courtroom knows

15  that Judge Carter doesn't mess around.

16          So, on that basis, your Honor, I'm going to -- I'm

17  going to file -- I have to redact some of the addresses of

18  some of these beds for privacy, but I'm going to file this

19  -- the detail behind the 8600 beds that are already the

20  acute mental health and the substance abuse beds.  They're

21  already out there, not enough, but it's a lot more than 300.

22          THE COURT:  Okay.  I tried to send a gentle signal

23  last time about this paragraph nine, and without monitoring

24  and accountability to the Court, this is dead on arrival.

25  That's my bottom line.

38

1       Now, eventually, we can talk about the bed space.
2  I need your wisdom in terms of how that's divided out.  I'd
3  like to get Doctor Sherin involved again or whoever you
4  choose.  I'd like to work with you and increase this, and
5  I'm not asking for the perfect.  I'm just asking for the
6  good, but I know that 300 bed spaces is not it.
7       And we've got a reset right now with the new
8  Mayor, the new Chairperson, and you weren't part of this
9  agreement when it was signed, and yet you're bearing the
10 responsibility.  And I feel that we're setting up the
11 citizens of Los Angeles for a tremendous letdown in our
12 mental health area with the most severe on the street and
13 all those entities that I named.
14       And, so, if I have to be the bad judge and turn
15 this down, I'm going to turn this down, I minimally have to
16 have the same provisions as the City or don't bring this
17 agreement to me.  And that is I want monitoring, and I want
18 accountability, and I want it to the Court, and you can call
19 it whatever you want to, a consent decree or not, but I want
20 that responsibility and trust that the City gave me back
21 from the Count.  And, if not, then you'll have to enter into
22 a private contractual agreement.  You bear the
23 responsibility of that, and you can get around me, quite
24 frankly.  You can take me out of the lawsuit, but I will now
25 participate in something that I don't have power to actually

*Echo Reporting, Inc.*

39

1  monitor and hold people accountable for.  The Governor's

2  saying it and everybody else is saying it now for decades.

3        All right.  Now, I'm going to come back to you.

4  You chose not to speak.  I would like to speak to the

5  Chairperson for the Board, the Mayor.  You can accommodate,

6  but no counsel are present by waiver.  If you want to bring

7  Supervisor Solis, that's fine.  If you want to bring Monica

8  Rodriguez, Paul, that's fine.  But you're the person.  And I

9  think -- if there's another Council -- but I leave that to

10 you as President of the L.A. Council.  Okay.  I'll see you

11 in chambers.  Thank you.

12        MS. MYERS:  Your Honor, before you -- the

13 Intervenors were not given an opportunity to speak, and

14 we've not withdrawn our objection to --

15        THE COURT:  I understand.

16        MS. MYERS:  I just want to be explicitly clear on

17 the record that the Intervenors withdrew consent to ex parte

18 communications, have never been asked to nor have we waived

19 that.  We are concerned with the lack of transparency that

20 continues to exist related to the --

21        THE COURT:  Yeah.  I -- Shayla, I am too.  In

22 other words, you and I have had some disagreements, but

23 we've been able to talk to each other, and I've been able to

24 talk to the City.  And even though we disagree, we know what

25 those disagreements are.  The County is the one that

40

1   withdrew this ability for me to talk, okay, about this.

2   And, so, therefore, this has to be a waiver for all time so

3   I can literally have these conversations along the way.

4   That's what I'm hearing so far.

5           So, Folks, come on back, and let me extend my

6   hospitality.  But we'll be as transparent as we can now with

7   the public.

8       (Proceedings recessed briefly.)

9           THE COURT:  Thank you for your courtesy.

10          After our discussions in chambers, the parties

11  have represented to the Court that they're willing to

12  renegotiate the terms, including accountability and

13  monitoring, but I'm going to turn that over to -- to Mayor

14  Bass initially for her comments.

15          MAYOR BASS:  First of all, Judge, let me just

16  thank you for giving us the opportunity to meet with you in

17  your chambers.  And, essentially, what our request is is

18  that the City and the County have 90 days.  We do think that

19  the word that you used describes it in essence, which is a

20  reset.  We think this is a new day.  We think that the stars

21  are aligning in a way that we haven't seen before and that

22  we have the potential to align each level of government.

23          And, so, for example, the Biden administration

24  announced a month ago that they want to reduce homelessness

25  by 25 percent in the nation in the next two years.  We

41

1  appeal to them that if you simply address homelessness in

2  Los Angeles and in California, you can meet your national

3  goal.  The President responded by sending Susan Rice,

4  Ambassador Susan Rice, the Head of the Domestic Policy

5  Council, here on Friday, and she is examining including Los

6  Angeles in their first cohort, which would result in a

7  memorandum of understanding in the next couple of months.

8          Governor Newsom reached out to Chair Hahn and

9  myself to see if Los Angeles would be willing to be one of

10  the first cohorts in the CARE Court, and I know that the

11  Board of Supervisors will be discussing that today.  But

12  there is the potential there to really increase the number

13  of mental health beds.  We will make the case to the

14  Governor that -- that if we are in the cohort, that has to

15  come with resources.  But we also know that one of the

16  reasons why the County is not able to access resources that

17  they have is because of the entanglement caused by

18  Proposition 63, but now is the time to examine that so that

19  the County actually can increase the number of beds

20  significantly.

21          So, the bottom line is that we feel if we had 90

22  days, we could come back with a much better agreement.  The

23  County and the City are working hand in glove right now.  We

24  believe that that will continue.  We have new leadership in

25  our City Council, new leadership at the Board, and in the

*Echo Reporting, Inc.*

42

1    Mayor's office, and we would like that opportunity.

2              THE COURT:  Thank you, Mayor.

3              Let me turn to the Superwoman -- Supervisor and

4    Chairwoman of the --

5              MAYOR BASS:  I kind of like superwoman.

6              THE COURT:  Superwoman is a great title.

7              MAYOR BASS:  I like that.

8              SUPERVISOR HAHN:  Thank you, Judge Carter, for

9    bringing us together this morning.  And I echo everything

10   that my -- my friend, my former colleague in Congress, the

11   new Mayor of Los Angeles said.  It is a new day.  We are

12   pressing the reset button on -- on addressing the

13   homelessness crisis in Los Angeles County.

14             It breaks my heart that we still have close to

15   70,000 people who are sleeping on our streets.  I woke up in

16   the middle of the night freezing in my own house and with my

17   own blankets on my bed, and I thought surely there is

18   someone who is not going to make it last night who is

19   sleeping on our streets.  So, it breaks my heart that --

20   that we had to have a lawsuit on behalf of the most

21   vulnerable in our County and City to get us to this point.

22   But here we are, and it is a new day.

23             I have a feeling that we are going to work

24   differently from this day forward because, honestly, I

25   believe what we've been trying all these years has not

*Echo Reporting, Inc.*

43

1 worked, and will -- will this settlement of this agreement

2 get us there?  You know, it is in the right direction, and

3 we want to solve this problem.  The hearts and souls of the

4 three women sitting here and one good man are with you,

5 Judge Carter, in taking this in a different direction.

6        And, to that, also, you know, Karen Bass on day

7 one of -- of her mayorship declared a state of emergency.

8 The County of Los Angeles last Tuesday unanimously voted to

9 declare a state of emergency for this crisis.  I think that

10 speaks volumes of where we are and what we want to do

11 differently, and we concur -- well, Janice Hahn and -- and

12 Hilda Solis -- we have three other colleagues that we hope

13 will agree, but we concur that the County's new language in

14 an agreement would mirror the provisions for monitoring that

15 the City of Los Angeles agreement has in theirs.

16        We want accountability.  We want transparency.  I

17 believe it is about relationships, and that's what we have.

18 But you made a good point, what if these relationships don't

19 exist in the future?  But I think this is going to be

20 successful because of our relationships, both at the state

21 level, the federal level, and between the City and the

22 County.

23        Thank you.

24        THE COURT:  Supervisor, thank you.

25        Let me turn to the one good man known, member of

*Echo Reporting, Inc.*

44

1  the Council President, Mr. Paul Krekorian.

2        MR. KREKORIAN:  Thank you very much, Judge.  And

3  thank you for your diligence throughout this process.  I

4  think it's remarkable how much progress has been made since

5  the time this litigation was filed until today.  And what

6  you're seeing today here is accelerating that progress even

7  more.  This is a time of new leadership, of new resources,

8  of new commitments by both the City and the County and,

9  hopefully, our partners at other levels of government soon.

10 And, so, I think that what Supervisor Hahn just described is

11 important in moving forward to ensure that the relationship

12 between the County and the City remains unified in this is

13 to have unified accountability, you know, in -- in this

14 settlement agreement as well with -- with your Honor.

15        So, that makes complete sense to me with the

16 90-day extension.  I can assure you that the Council, as

17 well as our Mayor, will use that time vigorously to try to

18 work with our -- our friends and colleagues at the County to

19 -- to make sure that we have workable solutions that will be

20 even better than what's on the table before us today.  So,

21 for that, I thank you, your Honor.

22        THE COURT:  Well, thank you.  Let me turn to First

23 Alliance.

24        MS. MITCHELL:  Thank you, your Honor.  So --

25        THE COURT:  I said First Alliance.  I mean LA

*Echo Reporting, Inc.*

45

1  Alliance.

2          MS. MITCHELL:  That's okay.  We --

3          THE COURT:  No.  Thirty years ago I had a case

4  called First Alliance, which has nothing to do with this.

5  So, LA Alliance.  My apologies.

6          MS. MITCHELL:  Thank you, your Honor.  You've been

7  calling us First Alliance for three years.

8          THE COURT:  For a long time, yeah.

9          MS. MITCHELL:  I just respond to it automatically.

10          Thank you, your Honor.  We appreciate this.  I

11  think highlighting these deficiencies has been eye opening I

12  think for -- for a lot of folks.  We have -- have been

13  pushing for 3,000 plus beds this entire time, mental health

14  beds.  And, to get us there, I'm excited to be able to work

15  with what seems like a newly invigored government on the

16  other side.  So, we're very excited to see what progress we

17  can make in 90 days.  I think the accountability piece is

18  absolutely key, without sacrificing the support for city

19  projects and things that -- that we all know and agree is

20  absolutely necessary.

21          So, we're excited.  We agree to the 90 days.  We

22  are happy to agree to ex parte communications across the

23  board so that we can really see the progress being made and

24  being able to talk very clearly and directly I think is --

25  is very appropriate in the circumstance.  So -- so, we agree

*Echo Reporting, Inc.*

46

1  to that continuance if the Court is in agreement as well.

2         THE COURT:  I'm -- as I expressed to you in

3  chambers and I express to you now transparently in open

4  court, I'm excited about this possibility, very

5  complimentary the willing to renegotiate and at least relook

6  at this agreement.  I agree it's time to reset, and we have

7  a wonderful opportunity here on behalf of all of the

8  citizens, the homeless, the community, the police, everyone,

9  and let's seize it.

10         So, let's go in good faith.  And, with your

11  permission, instead of setting a specific date today, why

12  don't I reach out through Michelle Martinez and Judge

13  Birotte to Mercedes and all of you folks about a convenient

14  date instead of arbitrarily setting one.  That way, in case

15  there's other business, et cetera, we're not having to reset

16  those dates, and we'll do that within the next week with

17  Alliance and the Intervenors.

18         And, Ms. Sobel, please be here also on that date.

19  I need you.  Okay.

20         MS. SOBEL:  (Indiscernible).

21         THE COURT:  Oh, never mind.  Okay.

22         MS. SOBEL:  Oh, no, no.  I'm so sorry, your Honor.

23  I didn't hear the -- the --

24         THE COURT:  We're going to set this in 90 days.

25  So, we're going to be reaching out to you and Shayla also.

*Echo Reporting, Inc.*

47

1          MS. SOBEL:  Thank you, your Honor.

2          THE COURT:  All right.  For all that, let's not

3    waste any more time in terms of going back to the Council,

4    and I saw a number of other council members here.  So,

5    extend my best wishes to the Council also.

6          UNIDENTIFIED SPEAKER:  Thank you, your Honor.

7          THE COURT:  And, Michelle, a couple of things,

8    because I wasn't in the room for part of the --

9          UNIDENTIFIED SPEAKER:  I may just comment very

10   briefly, we also would like for the State and the County to

11   allow ex parte communications to allow for ex parte

12   communications --

13         THE COURT:  Oh, I want to be absolutely certain of

14   this as discussed, and that's having to come to you.  Do I

15   have the ability to go back to ex parte communications, et

16   cetera, and I want to know that on the County's part because

17   the County was the one that withdrew this.

18         MR. MILLER:  Yes, your Honor, you do.

19         THE COURT:  Across the board.

20         MR. MILLER:  We agree.

21         THE COURT:  Across the board?

22         MR. MILLER:  Yes.

23         THE COURT:  And the phone's open.  Okay.

24         MR. MILLER:  The phone is open.

25         THE COURT:  The phone is open.  Fair enough.

*Echo Reporting, Inc.*

48

1   Okay.

2          MR. MILLER:  Likewise, my clients, the Chair of

3   the Board of Supervisors said yes.

4          THE COURT:  Okay.  All right.

5          All right.  Then, is there anything further?

6      (No response.)

7          THE COURT:  Thank you very much.  Go have a

8   wonderful day.  Let's get this done.

9          ALL:  Thank you, your Honor.

10     (Proceedings concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          I certify that the foregoing is a correct

49

1  transcript from the electronic sound recording of the

2  proceedings in the above-entitled matter.

3

4  /s/Jordan Keilty_____        1/20/2023_____
   Transcriber                       Date

5

6  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

7  /s/L.L. Francisco_____
   L.L. Francisco, President
8  Echo Reporting, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3

 4   LA ALLIANCE FOR HUMAN RIGHTS, ) Case No. LA CV 20-02291-DOC
     et al.,                       )                    (KESx)
 5                                 )
              Plaintiffs,          ) Los Angeles, California
 6                                 )
     vs.                           ) Monday, November 14, 2022
 7                                 )
     CITY OF LOS ANGELES, et al.,  ) (9:03 a.m. to 9:48 a.m.)
 8                                 )
              Defendants.          )
 9   _____)

10

11    TRANSCRIPT OF PRESENTATION OF FINAL SETTLEMENT AGREEMENT
              BEFORE THE HONORABLE DAVID O. CARTER
12                 UNITED STATES DISTRICT JUDGE

13

14   Appearances:              See next page.

15   Court Reporter:           Courtsmart

16   Courtroom Deputy:         Karlen Dubon

17   Transcribed by:           Jordan Keilty
                               Echo Reporting, Inc.
18                             9711 Cactus Street, Suite B
                               Lakeside, California 92040
19                             (858) 453-7590

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

```
                                                              2
 1  APPEARANCES:

 2  For the Plaintiffs:            ELIZABETH A. MITCHELL, ESQ.
                                   Spertus, Landes & Umhofer, LLP
 3                                 617 West 7th Street, Suite 200
                                   Los Angeles, California 90017
 4                                 (213) 205-6520

 5  For the City of Los Angeles:   SCOTT D. MARCUS, ESQ.
                                   Los Angeles City Attorney's
 6                                    Office
                                   200 North Main Street
 7                                 7th Floor, Room 675
                                   Los Angeles, California 90012
 8                                 (213) 978-8216

 9  For the County of Los          LOUIS "SKIP" MILLER, ESQ.
      Angeles:                     JENNIFER MIRA HASHMALL, ESQ.
10                                 Miller Barondess, LLP
                                   1999 Avenue of the Stars
11                                 Suite 1000
                                   Los Angeles, California 90067
12                                 (310) 552-8400

13  For Los Angeles Catholic       SHAYLA RENEE MYERS, ESQ.
      Worker:                      Legal Aid Foundation of Los
14                                    Angeles
                                   7000 South Broadway
15                                 Los Angeles, California 90003
                                   (213) 640-3983
16

17

18

19

20

21

22

23

24

25
```

3

1  Los Angeles, California; Monday, November 14, 2022 9:03 a.m.

2                          --o0o--

3                    (Call to Order)

4          THE COURT:  All right.  We're on the record in the

5  matter of First Alliance versus the County.

6          And, Counsel, if you'd be kind enough to make your

7  appearances and, first, good morning to each of you.

8          MR. MARCUS:  Go ahead.

9          MS. MITCHELL:  Good morning, your Honor.

10 Elizabeth Mitchell on behalf of Plaintiffs.  My co-counsel,

11 Matt Umhofer, is at another hearing.  He will be here

12 shortly.

13         THE COURT:  I'd like to wait for him.  How soon?

14         MS. MITCHELL:  It's -- he's in a hearing right

15 now.  I don't know.  We can -- I think he -- he asked me to

16 go ahead and proceed without him.

17         THE COURT:  Okay.  Fine.

18         Counsel on behalf of the City then?

19         MR. MARCUS:  Scott Marcus on behalf of the City of

20 Los Angeles.

21         THE COURT:  And on behalf of the County?

22         MR. MILLER:  Good morning, your Honor.  Skip

23 Miller and Mira Hashmall for the County.

24         THE COURT:  Thank you.  Good morning.

25         Have a seat please, and thank you for your

4

1   courtesy.

2           Ms. Myers, on behalf of the Intervenors.

3           MS. MYERS:  Shayla Myers on behalf of the

4   Intervenors.  Thank you.

5           THE COURT:  All right.  Thank you very much,

6   Counsel.

7           There's a tentative settlement before the Court.

8   I'm welcome to hear any input beginning with any of the

9   parties.

10          MR. MILLER:  I'll start, your Honor, if that's all

11  right.  Thank you, your Honor.  I guess the first thing I'd

12  -- I'd ask the Court is there any particular concern or

13  question the Court may have?

14          THE COURT:  I'd like to listen to the parties

15  first.

16          MR. MILLER:  Okay.  I'll -- I'll be relatively

17  brief.  No objections.  This was thoroughly negotiated over

18  a long period of time.  It's a very substantial settlement.

19  The -- to me, the most important component -- there are

20  several components which pretty much speak for themselves,

21  but the most important thing is following the City's

22  settlement and the provision therein to build I think it's

23  around 14,000 new beds, we engaged, re-engaged, continue to

24  engage with the City because our services at the County are

25  critical to building those beds.  In other words, these two

5

1  settlements really go hand in glove, and that's a major

2  component.  It's something that we're stepping up to do.

3  We're going to fund a suite of wraparound services for the

4  14,000 new interim beds and shelter.  The services will

5  include public assistance, welfare, mental health, substance

6  use disorder, advocacy benefits.  It's all spelled out in

7  the agreement.

8        So, we're -- we're happy to do that.  That's what

9  we do.  That's what the County does, and we're stepping up.

10       And then the other terms are also equally, you

11  know, close, if not equally significant.  We're providing

12  access to -- directly to City homeless people for high-

13  acuity beds.  We're providing 400 new mental health

14  substance use -- substance use disorder beds.  We're

15  increasing the number of multi-disciplinary and home teams.

16  We're furthering our partnership to find land to build

17  shelter on.  And, so, it's a very substantial, heavily

18  negotiated deal.

19       And, your Honor, I want to say it's in addition to

20  everything else the County's doing.  This settlement of this

21  lawsuit is -- is important.  It's a milestone.  It's an

22  indicia of cooperation between these two entities, the City

23  and the County.  But we're continuing with everything else.

24  We're continuing with the -- the shelter.  We're continuing

25  with the Measure H and all the other things that are outside

6

1  of this lawsuit.  None of that is being abated.  And any --

2  or affected in any way, shape, or form.

3         So, that's an overview of the settlement itself.

4  As far as the agreement provides for specific milestones,

5  which we have every intention of meeting.  The County meets

6  its obligations.  We're going to report quarterly to the

7  Court.  There's a mechanism for enforcement, which I don't

8  think will ever be necessary, but it's -- it's spelled out

9  in there, and I'm sure if there's any issue, that the

10 Plaintiffs will utilize that enforcement mechanism.  And

11 this Court has continuing jurisdiction for purposes of

12 enforcement over a period of five years.

13        So, on that basis, your Honor, I would submit that

14 the -- the settlement is -- it's good.  It's good for --

15 it's good for homeless people.  It's better than spending

16 money on litigation, okay, which is a major driver of that.

17 And we would ask that the Court approval the dismissal.  We

18 have to get the Court's approval of the dismissal because an

19 answer was filed, and under the Rule -- under -- under Rule

20 41, once an answer's filed, the Court has to grant approval.

21 I don't think there's any basis to deny the approval.  I

22 mean, the only basis would be if there's prejudice to the

23 Defendant, like if we had a summary judgment motion pending

24 or something like that and the Plaintiff tried to sneak in a

25 -- a dismissal.

7

1          We have a consensual settlement agreement.  So,

2   there -- there shouldn't be any issue at all about that.

3   So, on that basis, your Honor, I would submit it subject to

4   any questions or concerns the Court may have.

5          THE COURT:  Mr. Miller, thank you very much.

6          MS. MITCHELL:  Thank you.

7          THE COURT:  On behalf of the City, any comments?

8          MR. MARCUS:  Thank you, your Honor.  Scott Marcus

9   for the City.  It's interesting.  The Court may remember

10  when the City and the Plaintiffs reached a resolution, the

11  County voiced strong objections to our settlement, and Mr.

12  Miller stood up in court here trying to convince you not to

13  grant the order of dismissal at that time.

14         The City is happy to see, however, that the County

15  has stepped up with this settlement agreement.  We are happy

16  to see that the County is committing to providing the

17  necessary services to deal with the homeless issue in a --

18  in a manner enforceable by this Court.  So, the City has no

19  objections.

20         THE COURT:  All right.  Thank you very much.

21         Ms. Myers on behalf of the Intervenors, do you

22  have any comments?

23         MS. MYERS:  Your Honor, as we said in our

24  statement of nonobjection, we don't object to the substance

25  of the settlement agreement at all.  We think that to the

8

1 extent that the County is providing services, that's

2 incredibly important, and we -- I do just want to make just

3 a quick reference to the games that the City and the County

4 and the Plaintiffs seem to be playing with what the Court is

5 actually entering in this instance.

6            As Mr. Marcus pointed out, as did Mr. Miller, the

7 City, the County and the Plaintiffs are asking for the Court

8 to keep continuing jurisdiction to enforce the settlement

9 agreement.  That is effectively a consent decree, and,

10 therefore, the standard for approving a consent decree is

11 what applies here.

12           We do not object, though, to any of the substance

13 of it, just with the ways in which the parties are

14 attempting to frame what's going on in the court today.  So,

15 thank you.

16           THE COURT:  Thank you, Ms. Myers.

17           And counsel on behalf of the Plaintiff?

18           MS. MITCHELL:  Thank you and good morning, your

19 Honor.

20           THE COURT:  Good morning.

21           MS. MITCHELL:  This -- this settlement was reached

22 after months and really years of negotiation.  It -- it

23 really is a triangular agreement.  We had the Plaintiff/City

24 agreement earlier.  We had -- this is now the

25 Plaintiff/County agreement, and the City and the County have

9

1  their own separate agreement which largely tracks what we're

2  doing here today.

3        There -- there is no doubt in Plaintiffs' mind

4  that the County can and should do more.  But, given the

5  significant concessions that have been made, the cooperation

6  between the City and the County that we have not seen in the

7  past, which is largely addressed by this agreement and given

8  the necessity of the -- the supportive services here to

9  support the City agreement and the projects that are being

10 built, we believe that this is a very good deal.

11        I'm happy to address any other -- any other

12 concerns that the Court has now or in the future.

13        THE COURT:  All right.  I want to thank you very

14 much.

15        Any comments from any persons in the audience who

16 are interested parties in this matter?

17     (No response.)

18        THE COURT:  All right.  Counsel, give me a -- a

19 few moments, and I'll be back with possibly some questions

20 that I think you can readily answer for me.  The ELMO's

21 working.  So, if you have a copy of the settlement

22 agreement, it might be easy to put that up when I ask these

23 questions.  Okay.

24        MR. MILLER:  Judge, there is -- there is one other

25 issue.  That is the -- there's a -- we're going to need a

10

1  dismissal of one of the Plaintiffs, Gary Whitter.

2          THE COURT:  Okay.  Got that.

3          MR. MILLER:  He's the guy who's in the wind.

4          THE COURT:  Thank you.

5          MR. MILLER:  Okay.

6      (Proceedings recessed briefly.)

7          THE COURT:  Mr. Umhofer, is he -- in other words,

8  I don't want to be discourteous, but he's more than welcome.

9  If you need me to wait a few moments, I'm happy to.

10         Also, Carol Sabel, if she wanted -- or Sobel, if

11 she wanted to be present or Brooke.  Shayla?

12         MS. MYERS:  I don't believe --

13         THE COURT:  Okay.  No problem.  I'm happy to go

14 forward, but I want to pay that courtesy to Brooke and Carol

15 and Matt if he wants to be here.  Okay.

16     (Pause.)

17         THE COURT:  Okay.  I represent to you I can't

18 count the number of times that I have read both the initial

19 City settlement agreement, reread it, as well as the initial

20 City settlement agreement, reread it, as well as the

21 tentative agreement between the two of you.  So, bear with

22 me.

23         It should not be the burden of private citizens to

24 sue their local elected representatives as First Alliance

25 has done in this case.  Only in times of desperation, anger,

11

1 hopelessness, do lawsuits strike or come forth such as this

2 case, and this case has expanded from what I viewed

3 initially as a downtown, Skid Row, geographical lawsuit that

4 now is a citywide lawsuit and a countywide lawsuit.  And,

5 therefore, this Court's perspective has changed along the

6 way.

7        If I were to believe it was born out of

8 desperation and fury from decades of neglect -- it's a

9 beautiful vibrant city, and it's been crying out for relief

10 for citizens for a long time.

11        Somehow, even in the settlement discussions but

12 long before, the homeless are spoken of as a separate group.

13 Some say they are all addicted or all mentally ill or drug

14 abusers or criminals, and others categorize homeless as the

15 evicted, poor, beaten abused women, children living on our

16 streets or huddled in cars, workers who cannot afford the

17 City of Los Angeles.  And the truth is that the homeless are

18 all of us, and they and us cannot put them into these echo

19 chambers of oneness.

20        I've watched the City and the County over the last

21 two and a half years perform their duty and work well

22 together occasionally when self-interest was the motivator.

23 I've watched the clearing of routes to the Academy Awards a

24 short distance from here, the homeless swept from the

25 highways to the World Cup, and I have no doubts that this

12

1  City will clear, by force if necessary, for the Olympic

2  Games in 2028.  And I'd ask you to ask the question I've

3  been asking myself is if these efforts can't -- are taking

4  place, why aren't they taking place in these interim periods

5  of time on behalf of the entire City instead of these

6  specialized occasions.  Massive budgets through public

7  trusts were created, but the results have been

8  disappointing.  I have no criticism of the initial pioneers

9  who at least tried.  Better for them to have tried and

10 fallen short than the fear and hopelessness that has brought

11 forth the inertia that this Court witnessed.

12      I'm the first to admit that this Court has done

13 unorthodox things that are rightfully subject to debate and

14 criticism.  The creation of a freeway overpass and underpass

15 injunctive order, an injunctive order requiring and ordering

16 sequenced shelter and mandates for women and children first

17 in Skid Row, followed by the entire Row within 90 to 180

18 days.  I'm please, though, and now I want to turn the corner

19 with you.

20      I'm pleased that the 6,000 shelters were created.

21 You've represented to me those have been created.  I've

22 taken that at face value.  I'm pleased that the City moved

23 forward with the 12 to 14 thousand units, and I'd like that

24 conveyed back to the City Attorney, Mr. Feuer.

25      But these injunctions and settlements, from this

13

1  Court's perspective, were just the beginning, and I'll be

2  the first to tell you now I've always believed that they

3  were inadequate.  I have to share with you transparently

4  that I thought it was irresponsible on my part, though, not

5  to accept meaningful efforts by the City to try to turn that

6  corner with your budget limitations and turn down the two to

7  three billion dollars that was being represented to the

8  Court that the City was going to spend.  I thought it was

9  irresponsible of the Court to turn from perfect and not

10 accept the good in those efforts by the City.

11        And, so, I'm the first to tell you publically and

12 privately that I have always believed that the City's

13 settlement was inadequate to resolve the homeless problem in

14 Los Angeles, but it was a meaningful genuine effort between

15 First alliance and the City to move forward.  And, so, I

16 didn't want to turn down 12 to 14 thousand new units.  I

17 didn't want to turn down your two to three million dollars.

18 But we all know that it's a mark on the way hopefully to

19 even more that -- whether it's Rick Caruso or Karen Bass,

20 whoever that next Mayor is, fulfills their campaign promises

21 to move it forward in a much more substantial way than these

22 settlements.

23        The settlement requested today would ask for the

24 Court's blessing and signature and approval, and I watched

25 the Youtube of your meeting at City Hall.  And, first, there

14

1  was the statement made by politicians that there was $750

2  million that came from this settlement.  I'd ask you to ask

3  yourselves is that true, because in the same breath that

4  there's $750 million, $500 million of that were already

5  committed H funds.  It wasn't new money.  And, so, the

6  calculation that I came out with was there was about $256 to

7  $257 million by the County, which is substantial.

8         The second question that I'd ask you in terms of

9  can we do better is that the shelter and housing

10 architecturally in this divided bureaucracy and area of

11 responsibility is the City's, but this is not completely

12 accurate.  When we're dealing with mental illness, when

13 we're dealing with drug rehabilitation, when we're dealing

14 with transitional youth and minors under our government

15 agency care, then the responsibility is the County's.  And

16 six years ago when I started with Carol Sobel, who I truly

17 wish was here today, and Brook Weitzman, I've constantly

18 been quoted a figure that 40 percent of the homeless that

19 you deal with on the streets, Judge, will be narcotics

20 addicted, that needs rehab centers or will have mental

21 illness or a combination of both.  Now, as an aside, that

22 doesn't account need for couples beds, dogs, caring,

23 animals, et cetera, being a support group for the homeless,

24 which has nothing to do right now with what I'm about to say

25 to you about these 300 beds.

15

1       If it's estimated on the City's part, Scott, that

2  12,000 people are coming in and we're going to achieve that

3  goal working together, then 40 percent or take even a lower

4  number of 12,000, and I'm taking the lowest number, hoping

5  for 14,000, but taking the lowest number, it's about 4800

6  people.  I'm going to ask if 300 beds resolves that need for

7  mental illness on our streets.  I'm going to ask you to ask

8  that question of yourselves and ask yourselves can we do

9  better.

10       The second thing is what are we doing with the

11 remaining 12,000 minus 42,000, which is about 30,000 people

12 that we're leaving on the streets?  They haven't been

13 adequately serviced.  Where does this agreement lead with

14 300 promised beds, by the way, sequenced over two years, in

15 terms of dealing with this tragedy on the streets and the

16 spiraling death rate?

17       I want to applaud you, Skip, because I think

18 you're right.  The City and the County have a newfound

19 spirit of working together.  That's partially through your

20 efforts.

21       But, with that breakthrough, we now have newly

22 elected leaders, and none of us know if it's Karen Bass or

23 Rick Caruso as we sit in court today.  We have a brand new

24 council in the sense that many members are returning, but

25 many members -- it's like the Supreme Court.  You change one

16

1  member, you change the entire court.  Will these newly

2  elected leaders feel confident in this document, this

3  settlement created by an old administration?  Are they going

4  to feel comfortable being tied to a settlement agreement

5  that they didn't have any part in?  Because the political

6  promises have raised from 15,000 units with Karen Bass to

7  30,000 units with Rick Caruso.  Who knows what reality is?

8  It's ranged from declaring an emergency and, if you recall,

9  the Court wrote in February of 2021 asking the City to

10 declare an emergency.  Both candidates now seem to be

11 willing to finally declare an emergency.  Those are

12 incredibly important steps.

13         And a lot of these provisions in the agreement are

14 aspirational.  I know that they're taken in good faith.  I'd

15 like to turn that corner in terms of trust, but if they're

16 aspirational, then I need to know that this new mayor is

17 committed to going forward for four years and that this new

18 council and that the board president, the chairperson,

19 Hawley, is willing to go forward in four years because

20 you're right, these are absolutely intertwined.

21         And, finally, I want to turn back to you, Scott.

22 In the City settlement, there's accountability.  You created

23 a monitoring provision.  It didn't leave the Court at the

24 whim of not being able to check either the good faith

25 accuracy or just the accuracy by having a monitor.  They

17

1  gave me the confidence that I could spot check, et cetera,

2  and know that those numbers were credible.  I took that as a

3  tremendous breakthrough in terms of the trust between us

4  because there it seems that you were not only giving the

5  Court the power to monitor but you were absolutely accepting

6  accountability, and that's what I -- what I perceived for so

7  long was missing in all of these aspirational promises that

8  were being made to the public and to the Court.  And,

9  therefore, I was heartened by the provision of the

10 monitoring.  Here in the County agreement, I won't go

11 further, but I'm just going to ask can't we do much better

12 in terms of accountability if you look at provision number

13 nine?

14          Now, Elizabeth, I want to turn to you for a

15 moment.  Look, it's not fair.  If I turn down this

16 agreement, you and your firm are grossly underpaid.  Let me

17 put that on the record .  I won't go further with that, but

18 you are grossly underpaid from moving from a downtown to a

19 citywide lawsuit, and it cannot be your responsibility to

20 take on future pro bono efforts that the County may be

21 responsible for.  So, I'm going to ask you this.  I'm not

22 prepared to endorse this agreement today.  I really believe

23 that we can do much better.  I really believe that most of

24 these provisions should have already been enacted, I mean,

25 just immediately without a settlement agreement.  I really

18

1  believe that the two of you are working together and should

2  have been working together 30 years ago.  So, maybe this

3  lawsuit brought us to this point, but I want to look the

4  mayor in the eye and the chairman and get some kind of --

5  not through counsel, Skip, but no denigration at all, but

6  some kind of, you know, good faith relationship where I know

7  going forward I've got the present administration onboard

8  with what they may perceive to be an outdated agreement that

9  is not beneficial to the new administration and the City.

10 In other words, we need to try and make this better if we

11 can.  And then if we can't, I'll be faced with a tough

12 decision.

13         So, I'm not prepared to endorse this today.  I'm

14 going to suggest to you the following.  I think that through

15 December, we still have that transitional time with a new

16 mayor, a new council, but the same board members as I

17 understand it, subject to one.  I understand there's a very

18 close race out there.  I have no comment politically, but

19 change one member of the board, you'll potentially change

20 the board.

21         I'd like to see those new administrations in place

22 in January with their swearing-in ceremonies, et cetera.

23 But I'd like to schedule this sometime the third week in

24 January.  I'd like to put this on hold.  I'd like to see

25 what the mayor's input is, the council's input is, what the

19

1  relationship is with the chair and with the board.  And, so,

2  my unwillingness to endorse this right now is simply this.

3  I'd ask you to institute these measures in good faith, Skip,

4  right now, for the benefit of the City.

5          And, number two, I'd like to schedule another

6  meeting some place in the third week of January, but I'll

7  look at the schedule for both the board and I'll look at the

8  schedule for the council, and I'd like them to go through

9  their ceremonial inductions and their administration to be

10 in place.

11         All right.  I have nothing further today except to

12 thank all of you.

13         Michelle, do you have anything further?

14     (No response.)

15         THE COURT:  All right.  Then we're in recess.

16 Thank you very much.

17     (Proceedings concluded.)

18

19

20

21

22

23

24

25

20

1          I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    /s/Jordan Keilty                        11/17/2022
     Transcriber                             Date
6
     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
     /s/L.L. Francisco
9    L.L. Francisco, President
     Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4   LA ALLIANCE FOR HUMAN RIGHTS, ) Case No. LA CV 20-02291-DOC
    et al.,                       )                    (KESx)
5                                 )
             Plaintiffs,          ) Los Angeles, California
6                                 )
    vs.                           ) Thursday, June 9, 2022
7                                 )
    CITY OF LOS ANGELES, et al.,  ) (9:20 a.m. to 11:38 a.m.)
8                                 )
             Defendants.          )
9   _____)

10

11   TRANSCRIPT OF PRESENTATION OF FINAL SETTLEMENT OBJECTIONS/
                        SCHEDULING CONFERENCE
12            BEFORE THE HONORABLE DAVID O. CARTER
                  UNITED STATES DISTRICT JUDGE

13

14
    Appearances:                    See next page.
15
    Court Reporter:                 Recorded; CourtSmart
16
    Courtroom Deputy:               Karlen Dubon
17
    Transcribed by:                 Jordan Keilty
18                                   Echo Reporting, Inc.
                                     9711 Cactus Street, Suite B
19                                   Lakeside, California 92040
                                     (858) 453-7590
20

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

2

1   APPEARANCES:

2   For the Plaintiffs:            ELIZABETH A. MITCHELL, ESQ.
                                   Spertus, Landes & Umhofer, LLP
3                                  617 West 7th Street, Suite 200
                                   Los Angeles, California 90017
4                                  (213) 205-6520

5                                  MATTHEW D. UMHOFER, ESQ.
                                   Spertus, Landes & Umhofer, LLP
6                                  1990 South Bundy Drive
                                   Suite 705
7                                  Los Angeles, California 90025
                                   (310) 826-4722

8
    For the City of Los Angeles:   SCOTT D. MARCUS, ESQ.
9                                  ARLENE N. HOANG, ESQ.
                                   JESSICA MARIANA, ESQ.
10                                 GITA O'NEILL, ESQ.
                                   Los Angeles City Attorney's
11                                   Office
                                   200 North Main Street
12                                 7th Floor, Room 675
                                   Los Angeles, California 90012
13                                 (213) 978-8216

14  For the County of Los          LOUIS "SKIP" MILLER, ESQ.
      Angeles:                     JENNIFER HASHMALL, ESQ.
15                                 Miller Barondess, LLP
                                   1999 Avenue of the Stars
16                                 Suite 1000
                                   Los Angeles, California 90067
17                                 (310) 552-8400

18                                 ANA WAI-KWAN LAI, ESQ.
                                   Los Angeles County Counsel
19                                   Office
                                   350 South Figueroa Street
20                                 Suite 601
                                   Los Angeles, California 90071
21                                 (213) 974-0061

22

23

24

25

*Echo Reporting, Inc.*

**ER 883**

3

```
 1   APPEARANCES:   (Cont'd.):

 2   For the County of Los        AMIE S. PARK, ESQ.
        Angeles:                  LAUREN BLACK, ESQ.
 3                                Los Angeles County Counsel
                                     Office
 4                                500 West Temple Street
                                  6th Floor
 5                                Los Angeles, California 90012
                                  (213) 626-2105
 6
                                  BRANDON YOUNG, ESQ.
 7                                Manatt Phelps & Phillips, LLP
                                  2049 Century Park East
 8                                Suite 1700
                                  Los Angeles, California 90067
 9                                (310) 312-4181

10                                BYRON J. MCLAIN, ESQ.
                                  Foley & Lardner, LLP
11                                555 South Flower Street
                                  Suite 3300
12                                Los Angeles, California 90071
                                  (213) 972-4500
13
                                  EMILY A. RODRIGUEZ-SANCHIRICO,
14                                   ESQ.
                                  Wilkie Farr & Gallagher, LLP
15                                2029 Century Park East
                                  Suite 3400
16                                Los Angeles, California 90067
                                  (310) 855-3106
17
     For the Intervenors Los      SHAYLA R. MYERS, ESQ.
18      Angeles Community Action  Legal Aid Foundation of
        Network & Los Angeles        Los Angeles
19      Catholic Worker:          7000 South Broadway
                                  Los Angeles, California 90003
20                                (213) 640-3983

21   For the Intervenors Orange   CAROL A. SOBEL, ESQ.
        County Catholic Worker,   WESTON C. ROLAND, ESQ.
22      Los Angeles Catholic      Law Office of Carol A. Sobel
        Workers & the County of   1158 26th Street, Suite 552
23      Los Angeles:              Santa Monica, California 90403
                                  (310) 393-3055
24

25
```

4

1   APPEARANCES:   (Cont'd.)

2   For the Intervenors Orange          CATHERINE E. SWEETSER, ESQ.
      County Catholic Worker,           Schonbrun Seplow Harris
3     Los Angeles Catholic              Hoffman & Zelders, LLP
      Workers & the County of           9415 Culver Boulevard
4     Los Angeles:                      Suite 115
                                        Culver City, California
5                                       (310) 396-0731

6                                       BROOKE A. WEITZMAN, ESQ.
                                        WILLIAM R. WISE, JR., ESQ.
7                                       Elder Law and Disability
                                          Rights Center
8                                       1535 East 17th Street
                                        Suite 110
9                                       Santa Ana, California 92705
                                        (714) 617-5353
10
                                        PAUL L. HOFFMAN, ESQ.
11                                      Schonbrun Seplow Harris
                                          Hoffman & Zeldes, LLP
12                                      200 Pier Avenue, Suite 226
                                        Hermosa Beach, California
13                                        90254
                                        (310) 717-7373
14

15

16

17

18

19

20

21

22

23

24

25

5

1    Los Angeles, California; Thursday, June 9, 2022 9:20 a.m.

2                          --o0o--

3                     (Call to Order)

4           THE COURT:  Then, we're in session on case number

5    20-02291, entitled LA Alliance for Human Rights, et al.

6    versus Plaintiff, City of Los Angeles, a municipal entity.

7           We'll be a little bit more formal today.  So, I

8    would like the appearances beginning with the respective

9    parties.  And let me begin with Plaintiffs' counsel, please.

10          MS. MITCHELL:  Good morning, your Honor.

11   Elizabeth Mitchell and Matt Umhofer on behalf of Plaintiffs.

12          THE COURT:  Thank you.

13          Let me turn to the City, please.

14          MR. MARCUS:  Good morning, your Honor.  Scott

15   Marcus on behalf of the City of Los Angeles.

16          THE COURT:  All right.  Thank you.

17          And let me turn to the County.

18          MR. MILLER:  Good morning, your Honor.  Skip

19   Miller and Mira Hashmall on behalf of the County of L.A.

20          THE COURT:  And the Intervenors, please.

21          MS. SOBEL:  Good morning, your Honor.  Carol Sobel

22   on behalf of all of the Intervenors.

23          MS. MYERS:  And Shayla Myers on behalf of

24   Intervenor Los Angeles Community Action Network and Los

25   Angeles Catholic Worker.

6

1          THE COURT:  I represent to you I've read the

2   briefing on numbers occasions.  I may have a few questions,

3   but at the beginning of this process, I'd like to hear from

4   the Intervenors to begin with.  You had substantial

5   concerns, and I'd like you to address the Court concerning

6   those.

7          MS. MYERS:  Thank you, your Honor.  Shayla Myers

8   on behalf of the Intervenors.  I don't think it's an

9   exaggeration to say that we have substantial concerns with

10  this gentleman agreement.

11         From the beginning of this case, the LA Alliance

12  and the City of Los Angeles have sought from this Court an

13  order that would allow the City to enforce an anti-camping

14  ban in the City of Los Angeles.  They have not been quiet

15  about that, and two years after this case was -- was filed,

16  that's the agreement that was presented to the Court.

17  Certainly not surprised that that's the agreement that was

18  presented to the Court.

19         THE COURT:  A little slower.

20         MS. MYERS:  We're not surprised that that's the

21  settlement agreement that was presented to the Court, but

22  this Court simply does not have jurisdiction to enter that

23  settlement agreement.

24         We want to be clear about what Intervenors'

25  objections are in this case because I think both the LA

7

1  Alliance and the City have attempted to present our

2  objections as something other than they are.

3        Part of the City and the Intervene -- or in the

4  Plaintiffs' agreement provides for the creation of shelter

5  beds.

6        THE COURT:  Just a little slower.

7        MS. MYERS:  Part of the agreement provides for the

8  creation of shelter beds, housing solutions.  And, while it

9  is certainly the case that Intervenors have significant

10 policy objections to that, we do not think that it will

11 address the homelessness crisis.  We do not believe that the

12 City is actually committing to do more than is already in

13 the pipeline, and we do not believe that the agreement

14 provides the type of certainty that an agreement like this

15 should provide about the City's obligations in exchange for

16 this Court's approval.

17        But those aren't the -- those aren't the arguments

18 that we're making here today from a legal standpoint.  What

19 we are arguing today with regards -- is with regards to

20 sections four and sections five of the settlement agreement.

21 And, in those provisions, the City of Los Angeles and the LA

22 Alliance are attempting to gain this Court's approval for

23 enforcement of ordinances that are not challenged in the

24 court, that no one on the LA Alliance side has standing to

25 challenge.  There are no allegations that there's been any

8

1 enforcement that they could challenge.  And, your Honor,

2 they're seeking pre-enforcement approval for ordinances that

3 haven't even been written, and there's certainly no basis

4 under Article 3 for the Court to enter an agreement like

5 this.

6        We do want to raise a couple of specific

7 arguments.  First of all, procedurally, we just want to say

8 the City and the LA Alliance made the choice not to file a

9 motion for approval.  So, any arguments that they raised for

10 the first time on reply we think are waived, and they simply

11 didn't give us an opportunity to respond to them.

12        They also failed to put forth any evidence in

13 support of the agreement.  The LA Alliance puts forth a

14 number of statements about the -- the agreements -- a

15 similar agreement in Orange County but puts forth absolutely

16 no evidence in support of that.  And I know my co-counsel,

17 Ms. Sobel, is going to address that.  But we just want to be

18 clear that the record is devoid of any factual support

19 related to this.

20        I do want to make one quick point about the -- the

21 fight that seems to be going on in the pleadings -- or in

22 the papers about what this agreement is called.  We refer to

23 it as a consent decree, as does the County.

24        The City has taken the position, as has the LA

25 Alliance that it's not a consent decree.  I think that

9

1  issue, your Honor, is a red herring.  The City doesn't

2  explain why they take objection to the term "consent decree"

3  and actually go so far as to say if your Honor finds it to

4  be a consent decree, they want the opportunity to reconsider

5  the agreement.

6          The consent decree is -- is not a term of art.  It

7  simply means a settlement agreement with judicial approval.

8  That's exactly what they're seeking here.  So, this is a

9  consent decree.  And the City hasn't put forth any argument

10 to suggest why there's a problem with referring to it as a

11 consent decree.

12         We want to -- I want to just make a couple of

13 points about the substance of the agreement itself, as I

14 said, with regards to Section 3.  From a legal standpoint,

15 we don't object to it.  But, obviously, with regards to

16 Section 4 and Section 5, we have significant -- a

17 significant objections.

18         The City of Los Angeles and the LA Alliance are

19 asking for not only approval of an agreement for which there

20 is no standing, they are asking for continued jurisdiction

21 for this Court for five years to enforce an agreement over

22 which the Court does not have standing.  They're asking for

23 continuing jurisdiction from the Federal Court to enforce a

24 provision that says that the City may enforce public safety

25 regulations throughout Los Angeles once it reaches a

10

1  condition precedent.  But there is no basis and Article 3

2  standing for such an agreement.

3       The LA Alliance argues that provisions and

4  guardrails in the settlement agreement provide for the Court

5  to have continuing jurisdiction.  The City makes the same

6  argument.  They suggest that because objections can be

7  raised later on, that the Court should continue to have

8  jurisdiction over this.  But the reality is who is allowed

9  to make the objections in this case is limited entirely to

10  the LA Alliance and the City of Los Angeles related to an

11  enforcement -- to the enforcement of an ordinance that both

12  the City and the LA Alliance have been advocating since this

13  case started should be enforced.  Because of that, there is

14  simply no case or controversy between the City and the LA

15  Alliance over which this Court has jurisdiction.

16       And then I just want to make a couple of other

17  points to address some of the representations that the City

18  made related to the specifics of the agreement.

19       Your Honor, we took issue with the term "creates

20  housing".  And I think --

21       THE COURT:  Repeat that slowly.

22       MS. MYERS:  We took issue with and raised concerns

23  about the agreement and the fact that it says that the City

24  must create housing and shelter beds.

25       THE COURT:  Is that page nine, the last paragraph

11

1  on page nine of Docket 438?  Look at that to make certain

2  that that's what you're referring to.

3          MS. MYERS:  Do you mean as -- as opposed to the

4  City's objections?

5          THE COURT:  Docket 438, look at page nine, the

6  last paragraph.  You'll see some numbers there, 9,000,

7  approximately 1,000, and that's one of the areas that this

8  issue's raised in as well as what does it mean to create --

9  and when there's in "the pipeline".

10         MS. MYERS:  Sure.  And, your Honor, I think we're

11  making a --

12         THE COURT:  Respond to my question now.  Is that

13  the correct area that you're looking at?

14         MS. MYERS:  No.  I'm looking -- I am looking at

15  that, but I'm making a different argument.  That is where

16  the City purports to address our argument, but I think they

17  misrepresent what our argument actually is.

18         So, there's a number of issues that we think would

19  raise concerns for your Honor related to -- to approving the

20  settlement agreement that we raised.  The first is -- is the

21  issue of creates.  There's no doubt that Section 3 of the

22  agreement requires that the City of Los Angeles create

23  housing and shelter solutions.  But, again, the term

24  "create" is not defined.  The agreement suggests that they

25  can count shelter beds and other housing solutions that are

12

1  funded entirely by third parties.  So, there's no threshold

2  participation for which the City gets to count a bed towards

3  the threshold.  There's absolutely nothing.  So, the City

4  could fund a plane ticket home for an individual, and that

5  would count towards the 60 percent, and I think that's

6  explicit in the agreement.

7       Your Honor, we're making a second agreement -- a

8  second argument, though, related to the use of the term

9  "create" as it relates to Section 4 of the agreement, which

10 is where the Court -- where the parties refer to having

11 shelter beds, and I think this is where the City's papers

12 misrepresent what our argument is.

13      Section 3 requires the City to create a threshold

14 number of housing solutions.  It's a floor, not a ceiling.

15 And, again, if that were where the agreement stopped, we may

16 think it's bad policy, but we wouldn't be here.  But Section

17 3 speaks to creating.  Section 4, which is the section that

18 speaks to enforcement, does not make reference to the beds

19 that are created under Section 3.  It simply says when they

20 have enough shelter beds to reach 60 percent of the

21 unsheltered population.

22      The lack of parallel construction there leaves

23 open the suggestion -- and -- and we have seen -- and I

24 think your Honor raised these concerns.  We've seen the ways

25 in which those terms can be manipulated.

13

1              THE COURT:  Excuse me a moment.  Slower.

2              MS. MYERS:  We've seen the way those terms can be

3    manipulated by -- by the parties when seeking judicial

4    approval for things.

5              So, the City -- the City and the LA Alliance say

6    when the City has enough shelter beds, which doesn't

7    preclude counting the existing shelter beds, including the

8    6700 beds that were created as a result of the agreement

9    between the City and the County.  When the City has enough

10   shelter beds, then it can enforce the order.

11             So, that's the argument that we're making.  That's

12   the argument that the City did not address, and we don't

13   think on the face of the settlement agreement they actually

14   can address because that -- that ambiguity is really

15   significant, your Honor.

16             And then I also just want to make another point

17   related to the 60 percent, and I think -- Ms. Sobel is going

18   to address this more in detail, but I just want to make this

19   point related to the 60 percent as a number.

20             The LA Alliance and the City of Los Angeles keep

21   saying this is like the Orange County Catholic Worker case.

22   It's -- because it provides that the City may enforce public

23   safety ordinances upon the creation of beds for 60 percent

24   of the population.  It's not actually like the Orange County

25   Catholic Worker case insomuch as the City has made

14

1  significant mathematical calculations that reduced the

2  number far below the 60 percent threshold that was set based

3  on a factual record in the Orange County Catholic Worker.

4  And, your Honor, the City -- the City concedes that point in

5  its objections.

6          So, the 60 percent -- the 60 percent number is 60

7  percent of the unsheltered population that is City shelter

8  appropriate.  And by the City's own calculation, that

9  reduces the number of people within that 60 percent by

10 roughly 9,000 is our understanding.

11         But, the City then concedes, as they must based on

12 disability law, that it's not that they're not going to

13 provide shelter beds and offers of shelter to people they

14 deem City shelter inappropriate.  Not offering shelter beds

15 would be a blatant violation of -- of anti-discrimination

16 law.

17         So, the City says, We're going to offer shelter

18 beds to that 60 -- to those individuals who are City shelter

19 inappropriate, but we're just not going to count them to get

20 to our threshold.  So, that's a significant reduction that I

21 think the parties aren't conceding to as they talk about the

22 settlement agreements, but it actually makes it

23 substantially different from the numbers that were at issue

24 in the Orange County Catholic Worker case.  And then, your

25 Honor, of course, there is the issue of the homeless count.

15

1  The fact that the City and the -- the City and the

2  Plaintiffs want to be bound by a homeless count that is

3  being calculated this year I think speaks volumes about what

4  -- about the ways in which they view this 60 percent

5  threshold.  As we put in our papers, there's significant

6  evidence that the housing -- that the housing -- or, I'm

7  sorry -- the homeless count number may go down as a result

8  of tenant protections that have been in place for the past

9  two years --

10          THE COURT:  Just a little slower.

11          MS. MYERS:  -- with no indication whatsoever, your

12  Honor, that those tenant protections are going to be in

13  place going forward.

14          We don't know what the homeless count number is.

15  It's possible the City actually does know what the homeless

16  count number is.  It's possible they know what the top line

17  number is and that they know that the number is going to go

18  down and that they've already met their 60 percent threshold

19  in some of the council districts.  We have no idea.  But

20  approving the agreement and holding the City to that number

21  for five years and approving enforcement is simply

22  unreasonable.

23          But, of course, your Honor, all of those points

24  are beside the point that the Intervenors are really

25  stressing here.  The City of Los Angeles wants to walk out

16

of this courtroom with an agreement and with an order signed
by your Honor that says that they can enforce Los Angeles
Municipal Code 4118.  That's what the agreement says.

4118 is not at issue in this case.  There's no one
on the Plaintiffs' side that has been arrested, even alleged
that they have been subject to enforcement under Los Angeles
Municipal Code 4118.  And yet the agreement that they handed
you today says explicitly that you're entering an order that
says that they may enforce it and that the only -- the only
entities that have the ability to challenge that going
forward are the very parties who believe that Los Angeles
Municipal Code 4118 should be enforced.

THE COURT:  On page five, if you'd look at that,
the City proposes to make certain that you have the right to
sue.  In other words, one of the things that I read in your
response was that you were concerned that you were being
shut out and precluded from future lawsuits.

The City represents and tells the Court that I can
even modify this so that you always have access to the
courts.  How do you respond to page five?

MS. MYERS:  It's not simply, your Honor, about the
Intervenors' ability to sue.  It's about -- as you know,
Intervenors are here on behalf -- Los Angeles Community
Action Network is here on behalf of their members.

THE COURT:  How are they precluded from bringing a

17

1  suit?  The City is -- and the Court would be reluctant to

2  adopt and take away your ability to sue.  One of the values

3  of the Orange County settlements were that there was still

4  access to suit, but it decreased the number of lawsuits.  It

5  decreased because of the informal ability of Judge Smith,

6  Michel Martinez and others to intervene.  And, quite

7  frankly, there's no representation that there's not going to

8  be access to the courts when I read this, from the City's

9  perspective.  And my past dealings in this, the benefit to

10  this was that we took away a huge amount of the lawsuits, in

11  fact, two within the last month that would have cost

12  millions of dollars.

13          So, I'm having trouble with that argument, and I

14  want to say that to you.

15          MS. MYERS:  But, your Honor, it's not the Federal

16  Court's role to take away legitimate lawsuits and

17  opportunities for individuals to come into the court in a

18  case where the issues were not raised.  And I think that is

19  a fundamental difference that I think the LA Alliance and

20  the City have just never addressed.  LA Alliance does not

21  sit in the same shoes as Orange County Catholic Worker

22  because no one in Orange County Catholic -- because no one

23  in the LA Alliance has standing to challenge the Municipal

24  Codes.  And the City doesn't stand in the shoes of Orange

25  County, Santa Ana, Anaheim, any of the other municipalities

18

1 because they're asking for not only a pre-enforcement.

2 They're not enforcing the Municipal Code.  That wasn't why

3 this lawsuit was brought was to challenge those Municipal

4 Codes.

5          They're asking for an ordinance that permits them

6 to enforce some unknown ordinance that is not even

7 referenced in the pleadings, that hasn't even been passed

8 yet, your Honor.  And that's -- that's the problem is that

9 it's continued jurisdiction for this Court to oversee the

10 enforcement of ordinances that have never been drafted, let

11 alone have been enforced.  And it's simply not right, nor

12 does the Court have Article 3 standing for that.

13          And, your Honor, I just want to say the -- the

14 last point that I will make related to this.  As you point

15 out, as drafted, there are no guardrails to protect

16 intervenors.  There are no guardrails at all to -- to

17 dictate how this agreement should be enforced going forward

18 five years into the future.  There's no guardrails to

19 prevent the City of Los Angeles or the LA Alliance from

20 making the arguments that this agreement doesn't mean

21 exactly what it says, i.e., that they may enforce these

22 ordinances.  They're asking for a Federal Court to approve

23 this ordinance saying that they may enforce the ordinance

24 without any clarification whatsoever that at the end of the

25 day, what this really is is an agreement that the LA

19

1  Alliance will drop the case in exchange for an agreement

2  that they -- they will not sue going forward.  No third

3  party can be bound by this at all, and the fact that it

4  exists in this agreement and it's unenforceable gives

5  another justification for why it's unfair, unequitable and

6  unreasonable for the Court to enforce going forward.

7       And I think that that's -- at the end of the day,

8  that is the critical aspect of the settlement agreement is

9  that there is no case or controversy between the LA Alliance

10  and the City of Los Angeles that would give rise to this

11  type of agreement.

12       And the only last thing that I will say, your

13  Honor, is that both the Intervenors and the -- and the City

14  sprinkled in -- did not actually make arguments about this

15  but sprinkled in the fact that the Intervenors had not filed

16  a complaint in intervention or an answer in intervention.

17       THE COURT:  No, no, slower.  I want you to repeat

18  that, slowly.  Okay.

19       MS. MYERS:  Both the -- both the Plaintiff in the

20  -- in a footnote and the City in its factual statement

21  sprinkle in the fact that the Intervenors did not file a

22  complaint nor answer an intervention.  That's a technical

23  deficit that we believe the Court already addressed by

24  granting intervention.  The purpose of it is to spell out

25  the basis of intervention.  The order issued by the Court

20

1  spells out explicitly the basis for standing and

2  intervention.  So, it's a technical deficit that's already

3  been addressed, and they waived in the past two years any

4  suggestion that this is a problem, and they waived it by not

5  raising it in the first instance and raising it only in a

6  factual statement in the reply.

7          But, in the interests of caution, to the extent

8  that your Honor feels that a pleading would be necessary at

9  this point, we're happy to file one.

10          THE COURT:  I may be back to you with questions

11  but not at the present time.

12          MS. MYERS:  Thank you, your Honor.

13          THE COURT:  Ms. Sobel.

14          MS. SOBEL:  I'm going to try to be brief, which is

15  hard for me to do.

16          Following up on -- on Ms. Myers' argument about

17  there not being set time goals, et cetera, for the Court's

18  information, it took 13 years for the City of Los Angeles to

19  meet the settlement in Jones.  And during that time

20  period --

21          THE COURT:  Took 13 years?

22          MS. SOBEL:  Thirteen years to -- to -- to get

23  1,250 units of permanent supportive housing, half of

24  which --

25          THE COURT:  Would you repeat that more slowly?

21

1          MS. SOBEL:  So, the settlement was 1,250 units.

2          THE COURT:  Just a moment.  One thousand two

3    hundred and fifty units in Jones, and it took 13 years.

4          MS. SOBEL:  It took 13 years, and they didn't --

5    they were allowed to count private entities, and they were

6    allowed to count -- half the units could be outside of Skid

7    Row.  Still, it took 13 years.  And, quite frankly, your

8    Honor, where it took the most time was on Skid Row.  And

9    part of the problem -- and I'm -- I'm -- you know, I can

10   send the Court the letters that I sent to the Housing

11   Committee and to Mayor Garcetti and others over --

12         THE COURT:  Just make the representation.  I

13   believe you.

14         MS. SOBEL:  Okay.  Part of the problem is that the

15   City counted units that previously existed or that had been

16   downgraded, and the reason that we had this measure is

17   because there is another lawsuit against the City, the

18   Wiggins case, to maintain the housing stock in downtown Los

19   Angeles.  Legal Aid brought the case, and they have been to

20   court many times since 2006 when the Wiggins agreement was

21   put into place because the City has repeatedly attempted to

22   allow developers to take out low-cost housing on skid row.

23   So, that's number one.

24         Number two, I have a different understanding of

25   the Orange County settlement than the Court does about the

22

1   access to sue.  There was only an access to sue with two

2   specific entities, because we could not agree on the terms,

3   and they insisted on wanting to do enforcement at an earlier

4   time.  So, there is -- as the Court knows, there was a

5   cutout with Stanton, and we are now in litigation with

6   Stanton in State Court.  There was a cutout with Costa Mesa,

7   and Costa Mesa has stopped the policy that we were

8   challenging, which was the lawyering policy in particular.

9          We have threatened to sue Santa Ana, which has not

10  a single shelter bed at present, even --

11         THE COURT:  Yes, they do.  They moved 78 people in

12  on Monday, and they now have 28 families moved in yesterday,

13  and there are over 100 today.

14         MS. SOBEL:  Okay.

15         THE COURT:  Carnegie is open.

16         MS. SOBEL:  Okay.  And in our agreement with Santa

17  Ana, they were supposed to have 450 units because 250 were

18  going to be at Yale Street.

19         THE COURT:  They have 125 at Yale.  They have 200

20  with a capacity of 400 at the new Carnegie Shelter.  Plus,

21  they have additional space.

22         MS. SOBEL:  Okay.

23         THE COURT:  They're way over their count.

24         MS. SOBEL:  Well, they're not way over their

25  count, your Honor.

23

 1          THE COURT:  Counsel, they're way over their count.

 2          MS. SOBEL:  But here's the issue, your Honor.  For

 3   five years, they've been under their count, four years.  And

 4   they've had no beds whatsoever.  So, I just want to make

 5   that clear, because in Orange County, the point in time

 6   count was something referenced by Ms. Mitchell in her -- in

 7   her reply papers.  Everyone in Orange County who looked at

 8   the point in time count has different views about it, and

 9   there is a significant view that the point in time count is

10   down in Orange County for a couple of reasons, one of which

11   is that they had fewer people to go out and count people.

12   If you don't have people to count people, you're not going

13   to count people.  So, that was one.

14          Two, the difference between the 2022 point in time

15   count in Orange County and the 2019 point in time count is

16   almost exactly equal to the number of people Father Kriz

17   documented as dying.  So, it isn't -- you know, I don't

18   think that our goal in trying to address homelessness is to

19   have death -- you know, attrition by death as a solution to

20   this issue.

21          And then I -- I want to be really clear.  We have

22   been from the outset clear that the 60 percent number was

23   not something we supported.  We supported it originally when

24   the Court asked us to agree to it for a test with Anaheim.

25   It was to be a short-term test.  It has now become

24

1  institutionalized.

2         When the Court and the special master came to

3  speak with Intervenors before the first hearing in this

4  matter and the special master raised the 60 percent number,

5  frankly, I cut her off and said we will never accept the 60

6  percent number and especially not in Los Angeles, because

7  here's what happened on the point in time count.  Several

8  council people conduct -- had sweeps in their district the

9  week or so before the point in time count so that people

10 would be moved out and they would have a lower threshold

11 number.  Where did those people go?  They went to a

12 different council district, and those numbers went up in

13 that council district.

14        So, when we take 60 percent and we apply it as if

15 this were 15 fiefdoms rather than a city, we wind up with

16 all of this artificial construct about who can -- who can

17 reach 60 percent and then start enforcement in their area,

18 and that is particularly problematic for this -- for this

19 City.

20        So, I think those are the -- the major points that

21 I wanted to -- to raise with the Court, and I know that the

22 Court in the Orange County hearing this week raised with my

23 co-counsel, Ms. Weitzman, that we don't have an agreement in

24 Huntington Beach.

25        The Court -- well, the -- the reason we don't have

25

1  the agreement in Huntington Beach is we will not accept 60

2  percent anymore.  So, thank you, your Honor.

3          THE COURT:  Thank you.  I may have questions but

4  not at this time.

5          Mr. Miller on behalf -- or co-counsel on behalf of

6  the County.

7          MR. MILLER:  Good morning, your Honor.  I'll be

8  brief.  I have a couple of points that I want to raise.

9  We're in an interesting position.  The County's in an

10 interesting position.  We don't think there's any Article 3

11 jurisdiction at all.  We think we're -- you know, this is a

12 -- this is a big issue, big problem, and we're devoting

13 tremendous amount of resources and effort to address it.

14         So, that's -- that's where we are at the outset.

15 I read the agreement -- the settlement agreement through.

16 There are some parts of it I just didn't understand, and I

17 -- and I read some of the commentary about it.  It seems

18 acknowledged that the 60 percent threshold is going to hit

19 approximately 14 -- 14,000 beds.

20         THE COURT:  I heard 14,000 to 16,000, right?

21         MR. MILLER:  Fourteen to sixteen.  And it seems

22 acknowledged by Council President Martinez.  She made the

23 statement -- and it's in the briefs -- that the -- the beds

24 that are subject to the agreement are already committed, or

25 most of them.  Thirteen, fourteen thousand of them are

26

1 already committed.  So, I don't understand, and I -- you

2 know, I'm in favor of settlements.  We'd like to settle this

3 case.  We -- you know, frankly, we have a mediation set for

4 Monday, for your Honor's information.  But I don't

5 understand how you can make an agreement to do something

6 that's already been committed that you have to do, and --

7 and then there was a payment of a million eight in legal

8 fees.

9        So, I just don't understand that, and I guess your

10 Honor probably saw that and is going to -- going to address

11 that.  So, that's one issue.

12        The other issue is that we raised --

13        THE COURT:  And what did you want the Court to

14 address about the 1.8 million?

15        MR. MILLER:  Well, it just -- it seems like an

16 agreement to commit to something that's already been

17 committed to, plus the payment of a million eight of legal

18 fees that it just -- I don't understand it.  It -- it

19 doesn't make a lot of sense to me.  I don't want to throw

20 stones on their settlement.  We'd like all this litigation

21 to be settled.  We'd like the money to be spent on, you

22 know, helping people that live in the streets and getting

23 shelter, not on lawyers.  That's our position.  That's --

24 that's where the County's coming from.  I just don't

25 understand how you can enter into an agreement based on a

27

1  commitment you've previously made.  It seems illusory or

2  lacking in consideration.

3          The other issue that I wanted to talk about, your

4  Honor, is I read the -- the agreement, and it -- in page 10,

5  paragraph nine, it talks about County obligations.  The

6  County is obligated to do all these things.  The County is

7  obviously not a party to this settlement agreement.  Our

8  position is that the County is more than meeting its

9  obligations.  So, it doesn't seem to be an appropriate part

10 of the settlement or an appropriate thing for the parties to

11 do to try to define or address obligations of the County.

12 We're not part of this deal.  So, I would like to see that

13 paragraph nine excised.

14         If they want to -- you know, if the Alliance and

15 the City want to talk about things and they want to work

16 with the County and so forth, we're -- our door is open.

17 You know, we're willing to listen.  We've been talking to

18 them.  As I said before, we have a media -- another

19 mediation on Monday.  We'd like very much to get out of this

20 litigation, as much as I like being in your Honor's court,

21 not in this lawsuit.

22         So, I don't think paragraph nine belongs in this

23 deal at all, and I'm concerned that if the Court were to

24 approve it, approve the settlement with paragraph nine in

25 it, there would be some kind of a determination of the

28

1  County's "obligations", and that would be totally

2  inappropriate.  So, we would ask that that -- you know, that

3  be clarified.

4         That's -- that's pretty much all I have, your

5  Honor.  We don't -- the Board of Supervisors wants to work

6  on homelessness and helping people that are homeless and

7  living -- living in the streets and need services, need

8  shelter, and that's where we're coming from.  So, I would --

9  I would submit it on that basis and thank you, your Honor.

10        THE COURT:  Thank you very much.  I have no

11 particular preference in response.  So, if the Plaintiffs

12 are comfortable and then the City.

13        MS. MITCHELL:  Thank you, your Honor.

14        We don't have a whole lot of response because

15 there wasn't a whole lot said that wasn't in the objection

16 papers already.

17        THE COURT:  But cover that.  In other words, I

18 want to hear full argument today.

19        MS. MITCHELL:  Thank you.  So, Ms. -- Ms. Myers

20 said, as she was standing up here today, she would not be

21 here from a legal perspective or have legal objections if

22 certain things were true.  But, in her mind, they're not.

23 And the implication of that statement is if those things are

24 true, she would not have a legal argument.  And, so, as we

25 pointed out in our papers, those things are, in fact, true.

29

1  And I think one of the problems is Ms. Myers, as I

2  understand it, is reading ambiguities into the agreement

3  that, one, don't actually exist and, two, can be clarified

4  in other ways.  And one of those discussions is what beds,

5  what creating -- creating beds means as opposed to having

6  beds, and that is a particular concern.

7          That's not a reason to deny the objection.  That's

8  a reason to clarify what creating versus having means.  And

9  I think that we have been very clear.  I think the agreement

10 has been very clear.  The City has been very clear in their

11 response to that objection that they intended to create beds

12 for 60 percent of the unsheltered population for whom the

13 City can reasonably assist, and we have gone back and forth

14 and back and forth on what that definition means, and we're

15 reasonably specific, as specific as can be I think in a 27-

16 page document, what that means.  And, certainly, we expect

17 over the next five years for that to be further, I think,

18 defined as we end up, you know, addressing problems that

19 exist, but that's not a reason to deny the settlement on the

20 front end.  It's a reason to continue to work out problems

21 on the back end.

22          One of the other issues that was raised was the

23 2022 calculation, and this is something that the City

24 certainly addressed, but I think everybody except for this

25 argument here today, expects the 2022 count to actually

30

1  increase.  It has increased in every other jurisdiction that

2  has released a 2022 pit count so far that I have seen except

3  for Orange County, which has seen a 17 percent decrease,

4  which I think, frankly, speaks volumes about the success of

5  this program that we have agreed to enter into.

6          So, the argument I think is that we intentionally

7  didn't use the 2020 count because it's going to be higher

8  based on the tenant protections.  But I think in reality, we

9  expect the 2022 count to be higher than the 2020 count.

10 And, regardless of those expectations which at this point my

11 understanding is nobody knows, and I think certainly Mr.

12 Marcus can clarify that.  We certainly don't know.  But it

13 makes more sense to use today's count than the count from

14 two years ago or the count from 2023 or 2024, 2025, because

15 that results in a shifting target, not only for the City but

16 for the Court and for the Plaintiffs if we have to

17 continuously reassess.

18          Yes, your Honor?

19          THE COURT:  If you're right about that, then I

20 would say to the Intervenors, the County, to you and the

21 City that that argument has virtue for the following reason.

22          If we all believe that the count's going up, it

23 increases the responsibility under this agreement for the

24 City to go up in the number of beds.

25          MS. MITCHELL:  That's correct.

31

1          THE COURT:  And if you go backwards to 2019, you

2   would put yourself in a position where, frankly, this Court

3   would feel uncomfortable with an old number.  Now, if the

4   number goes down, that might be different.  And my question

5   is why haven't we gotten that count in Los Angeles?  We

6   virtually have that count in most other counties.

7          MS. MITCHELL:  I would inquire that of the City

8   and the County, but --

9          THE COURT:  Why ask LAHSA that?

10          MS. MITCHELL:  Yeah.  My understanding is that

11   LAHSA last year took a lot of time -- excuse me -- in 2020

12   took a lot of time.  They didn't release it until the end of

13   June.  And I think, frankly, because the Executive Director

14   recently resigned, there's more complications, but I'm going

15   to have to defer to the City and County and LAHSA on that

16   issue.  So, I don't know if we can do that now or you'd like

17   me to keep going, your Honor.

18          THE COURT:  I want you to be continuous in your

19   argument.  And then if I have questions -- and I apologize

20   for breaking in.

21          MS. MITCHELL:  Thank you, your Honor.

22          So, I think one of the most significant issues for

23   us to address, us being the Plaintiffs, is the standing

24   argument, because that has been raised over and over and

25   over again.  And I think there's a couple of different

32

1  issues here.  One is standing to bring the lawsuit in the

2  first place, which has already been litigated, and one is

3  standing to enter into this agreement.

4        So, I think on the front end I want to clear up

5  some -- some misunderstanding about why we brought this

6  lawsuit in the first place.  There's a lot that has been

7  stated about the LA Alliance's whole goal is just to get to

8  enforcement, and that's just patently untrue, your Honor.

9  We have been very clear.  You can look at the original

10  complaint, Judge.  You can look at the first amended and

11  supplemental complaint and all of our argument.  It is --

12  the goal has never been to get to enforcement.  And, in

13  fact, if that was the sole goal of what we have been trying

14  to achieve, it would be a failure by this agreement because

15  this agreement does not require enforcement.  This agreement

16  permits enforcement if certain things are met.  And we can

17  talk about that in a second, but I just wanted to be very

18  clear.  The goal has always been to mirror the Orange County

19  settlement that was reached, and I'll talk about the 60

20  percent issue in a second, but we -- in looking at this, it

21  was a very balanced approach.  And that is something the LA

22  Alliance has always been fighting for, has always said and

23  its members have been aggrieved by and damaged by, including

24  its unhoused members, of which there are several, is the

25  lack of shelter beds as well as the lack of regulation of

33

1  public spaces as well as the lack of services, including

2  mental health treatment and substance use treatment.  Job --

3  I mean, job training, we can talk about all of those

4  services.  But that has always been the three-pronged

5  approach of the Alliance, and this agreement achieves two of

6  those.

7          So, as far as the increase in shelter, that is the

8  number one goal, and that has been one of the main pillars

9  of this litigation.  And, in fact, your Honor, in the reply,

10  we quoted the main purpose and the intent, which I would

11  like to read into the record at this moment if the Court is

12  looking for a continuous argument.

13          In the first amended and supplemental complaint,

14  on page 23, Plaintiffs state:

15              "While this is not a natural

16          disaster, it is a disaster nonetheless,

17          and it should be treated that way.  The

18          only way to address this crisis with the

19          urgency it deserves is an emergency

20          response providing immediate shelter for

21          all, increasing necessary outreach

22          services and treatment and abating the

23          degradation of our cities and

24          communities for the good of everyone."

25          That has been our goal from the beginning.  That

34

1  is the goal that is to some extent at least as possible

2  achieved with the City.  Obviously, the case against the

3  County for services and treatment continues.

4          But, because the issue of standing has been

5  raised, I want to address both of those issues.  So, one, if

6  we're talking about standing to bring this lawsuit, that

7  issue has already been litigated.  The County has brought

8  this issue.  The City has brought this issue.  This

9  honorable Court found for Plaintiffs already, that

10  Plaintiffs did, in fact, have standing when the original

11  motions to dismiss were litigated.

12          There's no reason to continue litigating that

13  issue again with the County, certainly not with the City at

14  this point.

15          So, as far as standing to bring this, I think the

16  issue has been very clear what our -- what our intent is,

17  what our obligation is, and what we are achieving by this.

18  Now, Los Angeles Community Action Network and other

19  Intervenors that are objecting have a sole goal.  They --

20  they challenge these on certain bases, right.  It is almost

21  always, when we're talking about these sweeps as opposed to

22  property, when we're talking about sweeps under 4118 and

23  other similar ordinances, it's always them challenging the

24  ordinance directly.  They're -- it's not the only way to

25  achieve standing in this case, right.  With this balanced

35

1 approach, which is what we have been arguing for from the

2 beginning, it is both the -- both the lack of enforcement

3 and the lack of beds that has been an issue.  They are two

4 of the three things that we have been attempting to achieve,

5 right, is this balanced approach for the community as well

6 as for the unhoused community, who are desperate for shelter

7 and for assistance, and I hear that almost on a daily basis,

8 "I just need help."  This agreement will give the help that

9 we are so desperate for in Los Angeles.

10            As far as what the -- let me look at my notes,

11 your Honor, if I can have a moment.  Oh, the as of yet

12 written ordinances.  This is another issue that we addressed

13 in our reply, but this -- this agreement is not doing, as

14 the Intervenor suggests, requesting the Court to approve

15 some as of yet unwritten ordinances.  That's not what this

16 is.  This is saying in one -- one way in which the City may

17 be addressing the lack of public regulation at the moment,

18 which is what we see and which is one of the main pillars of

19 this agreement, is by enforcing public regulation

20 ordinances.  And once it hits the 60 percent, which I

21 promised I would address in a minute, and I will, that it

22 may proceed with public regulation ordinances and with

23 enforcement thereof but prior to doing so, must notify the

24 Plaintiffs, must notify the Court, and, so, we will

25 understand exactly what is being done.  But it also doesn't

36

1  prevent anybody from challenging those ordinances.  It

2  doesn't prevent anybody from filing suit.  I do expect such

3  lawsuits may be related to this case and to this Court given

4  this significant case and given the Court's prior statements

5  thereon, but there -- it doesn't prevent anybody from moving

6  in and filing lawsuits or by having standing to do so.

7          And I think one of the other issues that I said I

8  wanted to address was the 60 percent number.  I recognize

9  Ms. Sobel indicated they don't agree to 60 percent.  They've

10 never agreed to 60 percent, and I understand that and

11 recognize that.  But what I did is I went back when we were

12 looking at the 60 percent approach, and I talked to a number

13 of individuals who came from various cities that have used

14 this 60 percent number, and I want to be very clear why we

15 -- we, the LA Alliance, were comfortable with the 60 percent

16 number.

17         So, one of the things we did, talked to a number

18 of cities and said, Hey, I understand you're using this 60

19 percent approach.  And the 60 percent approach is not as has

20 been understood by some people and has been represented by

21 some people that 60 percent of the people get offered

22 shelter and everybody else gets arrested.  That's clearly

23 not what the Court has agreed to and what we've suggested or

24 what the City has agreed to.

25         Any person prior to any type of enforcement or any

37

1  type of enforcement of -- of these sweeps, one, has to be

2  given an option to vacate the premises or an opportunity for

3  appropriate and adequate shelter or housing.

4          So, not a single person under this agreement would

5  ever face enforcement unless that was first met, unless

6  offers were first met.

7          Now, as I understand it, this 60 percent number

8  has been successful in a number of municipalities.  And I

9  want to talk about Bellflower and Whittier specifically

10 because I think they were the two most recent ones to enter

11 into this agreement.  And I talked to two of the civic

12 leaders there as well as the City Manager, and what I was

13 told is that 60 percent across the board has been a very

14 successful number, with about 40 percent of the individuals

15 choosing not to enter into shelter, choosing to reunite with

16 family, which I think should be applauded as a blessing and

17 not a reason to object to this agreement, frankly, but has

18 -- a variety of things, reunite with family, migrate, any

19 number of things.  But approximately 40 percent were not

20 interested in shelter for one reason or another, and

21 approximately 60 percent or less were.

22         So, in some jurisdictions, they were even closing

23 beds because they no longer needed them anymore.  And it was

24 a very successful number, one that has been used across the

25 board successfully.  Therefore, we were comfortable.  I

38

think the Court was comfortable, and the City was comfortable in using the 60 percent as the appropriate number.

And I'll let the City address the objections to the City appropriate shelter, but what that is designed to do is simply explain the -- and, as the -- as the City has -- has said, the -- the on the boots on the streets reality of what the City can reasonably do and reasonably offer without -- for people that don't need clinical beds. But, for people that need clinical beds, they're going to need more assistance than the City can reasonably offer.

And I think one other thing, just to address the County's argument, this 14,000 to 16,000 beds that's been the approximate. I actually think it will be more than that because I think that we'll see the 2022 count go up significantly, both by anecdotal evidence and by what I hear from service providers. But, whatever that number ends up being, the only beds that are in the pipeline right now -- and I think there's between 10,000 and 11,000 beds, most of them or a lot of them, particularly in the last few years, have been added to the stat as a result of this litigation.

The City voted two years ago to enter into settlement negotiations with Plaintiffs and with this Court and with Intervenors with the County. And at that point, you had several council members start actively moving to hit

39

those numbers.  And, because of that, we have an increase in stock I think particularly for the 1500 interim beds, which is exciting and should be lauded.

Now, one concern I do have and I think the City will address is the permanent housing beds.  To the extent that is permanent supportive housing, that's obviously going to go to individuals that have significant mental health, drug dependency issues, physical disability issues, people that need supportive housing, in which case, you have shelter beds opening up and individuals should be offered those shelter beds.  So, I don't think it's a problem as people move through the system.  It should be applauded.

I think that's it, your Honor.  I'm happy to address any other issues that have come up.

THE COURT:  I may have questions later, but thank you.

MS. MITCHELL:  Thank you, your Honor.

THE COURT:  All right.  Counsel, are you comfortable turning to the City or do you need a recess or you're ready?

MR. MARCUS:  It's up to the Court.  I'm happy to go forward.

THE COURT:  Please, let's go forward.

MR. MARCUS:  I agree, your Honor, that the objections stated here today are essentially nothing new.  I

40

1 think the City and the Plaintiffs have addressed the bulk of

2 them in their papers, but I will highlight a few issues, and

3 I will try not to duplicate or repeat anything Ms. Mitchell

4 said.  I think she addressed the majority of them.

5        It's interesting that Ms. Sobel references the

6 Jones settlement here because Jones, in very many ways, is

7 similar to this settlement.  It is an agreement by the City

8 to limit its enforcement of certain public rights of way

9 ordinances, regulations until it constructs certain number

10 of beds.  That's essentially what the City is agreeing to do

11 here with the Plaintiffs.

12        Now, Ms. Sobel may have buyer's remorse with that

13 particular agreement, but that is not a legal challenge to

14 the agreement, and the City here and the Plaintiffs here are

15 doing nothing more than what Ms. Sobel and the City did in

16 Jones.

17        The issue of the count, your Honor, is -- is one

18 that I agree with the Court's statements.  It would not be

19 appropriate for us to use the 2020 count numbers.  Those are

20 old numbers.  The City agreed to bind itself to whatever the

21 2022 count is before it gets released.  I don't know what

22 those numbers are.  We don't know what those numbers are.

23        THE COURT:  But the expectation is on all parties'

24 parts, in the briefing at least, that those numbers are

25 going to go up.  And that's why I was pleased to see you

41

1  take the 2022 count, because if you took the 2019 or 2020

2  count, then in a sense you wouldn't have the present numbers

3  that would be appropriate.

4            MR. MARCUS:  That's right, your Honor.  And --

5  and --

6            THE COURT:  It's actually detrimental to the City

7  in a -- in a sense to take the 2022 count.

8            MR. MARCUS:  We agree.  And -- and we can only

9  rely on the numbers provided to us by LAHSA.  It's not the

10 City's.  It's not the County's.  This is LAHSA's count.

11 We're agreeing to be bound by the third party, LAHSA's,

12 count, whatever that may be.  And if it's a whole lot more,

13 then we're committing to a whole lot more.  If it's a little

14 bit more, then we're committing to a little bit more.  But

15 the important thing is the City is committing to build the

16 number of beds that is needed, whatever that number may be.

17            What we cannot do, as Ms. Mitchell referenced, is

18 have a rolling commitment.  What the City is doing, as any

19 party does when they settle a lawsuit, is buy certainty.

20 Litigation doesn't have certainty.  Litigation has risks.

21 Settlements have certainty.  The City is agreeing to build

22 the required number of beds, whatever that number may be, in

23 the 2022 count.  That is a certainty that the City is

24 bargaining for in this agreement.  And if the -- if, as the

25 Intervenor suggests, there should be a rolling commitment

42

1  when the '23 count comes out, when the '24 count comes out,

2  the City has lost the certainty that is bargained for, and

3  that is not what the agreement states, which is why the

4  agreement sticks with the 2022 count.

5        And, to say that we are -- that there's no new

6  commitment here is -- is simply false.  There are beds that

7  are currently being contemplated in the pipeline, as we call

8  it.  That number of beds, again, needs to be built.  We are

9  going to create those beds because we need to create as many

10 beds as we can.  As has been stated, this is a floor, not a

11 ceiling.  But whatever number comes out of the 2022 count

12 and whatever calculation we make in consultation with the

13 Plaintiffs, approved by this Court, for the required number,

14 those are the number of beds that the City is going to

15 create.  And that's what our commitment is.  We're

16 committing to build that number of beds and get out of the

17 risks of litigation, as any party does in the settlement

18 agreement.

19        Lastly, the County's complaint about paragraph

20 nine of the settlement agreement, it's very clear in the

21 agreement throughout that the agreement is binding on the

22 Plaintiffs and on the City.  It does not bind the County.

23 It does not bind the Intervenors.  They are not party to it.

24        Paragraph nine is a statement, a joint statement

25 of what the City and the Plaintiffs believe the County

43

1  should be doing.  We are hoping that the City -- excuse me.

2  We are hoping that the County steps up to that statement of

3  principles, either in mediation or a settlement agreement or

4  as a result of this litigation or just on their own, because

5  it's the right thing to do.  But that's all that that is.

6  It's a statement of what we think the County should do.  And

7  if the County wants to join this agreement, we are happy to

8  have them.  And if a -- a mediation or future settlement

9  discussions result in such a larger better agreement, we

10  will bring that to the Court to supersede this one.  But

11  right now, you have a firm commitment from the City to build

12  a certain number of beds in five years under this settlement

13  agreement, not a consent decree, settlement agreement.

14      (Pause.)

15          MR. MILLER:  Could I be heard again, your Honor,

16  at some point?

17          THE COURT:  Briefly.

18          MR. MILLER:  Very briefly, your Honor.  The reason

19  I asked to be heard, your Honor, I just haven't heard an

20  answer to my question.  We put in -- quote in our brief from

21  City Council President Martinez, "The City has committed to

22  building a minimum of 14,000 beds and has over 13,000 beds

23  in process already."  And we cite, you know, where she said

24  that.

25          I have not heard anything from Alliance or from

44

1 the City answering my question, and it's a question because

2 I don't know.  How can you have a settlement agreement that

3 requires you to commit to something that you've already

4 committed to?  It seems like a charade.  It just doesn't

5 seem real, and I would like an answer to that issue.  I

6 mean, we want this to work as much as anybody.  We're

7 working very hard on the issue, but it -- it doesn't seem

8 like -- it seems -- it seems paper thin.  Maybe there's

9 another thousand beds, maybe not, depending on the count.

10         If they've already committed to 14,000 beds, as

11 City Council President Martinez says, then what are we

12 getting out of this deal?  They're getting a million eight

13 in legal fees, the Alliance is.  What is the City getting

14 for this commitment?  I don't -- I have not heard an answer

15 this morning at all, and that's the point I wanted to make.

16         Thank you.

17         MS. MYERS:  Your Honor, Intervenors would also

18 like to be heard briefly on just a few specific points.

19         THE COURT:  All right.  Briefly.

20         MS. MYERS:  And I'll try and speak more slowly.  I

21 want to -- I want to address the 2022 homeless count issue

22 because I think that's -- that's been raised by both

23 parties.  It's been raised by your Honor.

24         We appreciate the City's desire for certainty

25 relative to Section 3 of the agreement, and we don't raise

45

1  the objection related to the homeless count numbers with

2  regards to Section 3.  As I said earlier, as we said in our

3  -- in our papers and I reiterated just to -- to make the

4  point clear because I think there's been some misstatements

5  about our papers, if the LA Alliance and the City of Los

6  Angeles want to reach an agreement that provides that the LA

7  Alliance will dismiss the case upon the creation of a

8  certain number of beds, we may object that it's bad policy,

9  that it's not going to do much.  We may be in agreement with

10 AIDS Healthcare Foundation, a lot of service providers, the

11 LA Times, a lot of other people who think this agreement

12 won't do any good, but they can enter into it.  They can use

13 the 2022 count, whether it goes up, whether it goes down,

14 whether it stays exactly the same.  That's not our

15 objection.

16        Our objection is that the City is attempting to

17 get a court approval to enforce public space regulations

18 five years into the future for 60 percent of the shelter

19 beds, for 60 percent of the population based on a count that

20 was done in 2022.

21        That -- your Honor, the constitutional rights of

22 unhoused people related to the enforcement of ordinances

23 against them is not static.  This idea that the City can

24 enter into an agreement today to build a certain number of

25 shelter beds and, in exchange, get certainty about the

46

enforcement of ordinances five years from now based on that number is not -- is not contemplated under the Eight Amendment.  It's not contemplated under existing Ninth Circuit and Supreme Court precedence, and it's certainly not within the Court's jurisdiction.  But we want to be clear that's the objection that we're raising is the use of that 2022 number to calibrate enforcement for some period into the future.

          The other thing -- the other point that I want to make is that Plaintiffs misstate the agreement with regards to who must be notified when certain trigger points are made.  The -- Ms. Mitchell stated that the Plaintiffs and the Court must be notified.  That's not accurate, your Honor.  The agreement explicitly states that the Plaintiffs must be notified, and that's our problem in part with this -- with this agreement.  Putting aside the standing issue -- and we want to be clear, when we say standing, it's what we briefed in the papers.  It's not just LA Alliance's standing.  It's also the standing Article 3 ripeness.

          With regards to this agreement, everything is between the LA Alliance and the City.  For example, section five, Milestones and Deadlines, the City will share with Plaintiffs the City's plans for encampment engagement, cleaning and reduction in each council district, only Plaintiffs.  The City and -- the City and Plaintiffs have

47

1  set up an agreement where they can -- where they can talk

2  about third parties' constitutional rights in private and

3  only if the Plaintiffs disagree with that, the Plaintiffs,

4  who have staked their claim on arguing that the Court is too

5  protective of unhoused people's constitutional rights, only

6  if Plaintiffs disagree do those issues become -- come in

7  front of the Court.  And only then is there a contemplation

8  of whether or not there's any disruption to the heart of

9  this agreement, to be explicitly clear, is permission to

10  enforce public safety regulations.

11        And then the last -- one of the -- just two more

12  quick points, your Honor.  LA Alliance says they talked to

13  City managers about how well the enforcement is going

14  related to the 60 percent rule.  And I think, your Honor,

15  just -- just to point a fine point on it, that's exactly the

16  problem here.  The LA Alliance spoke to the City about

17  whether or not agreements related to unhoused people's

18  constitutional rights were going well.  And when the City

19  said it was going fine, that was enough for them.  The LA

20  Alliance is standing in the shoes and aligning itself with

21  the City, which is exactly what they're doing here.  They're

22  aligning themselves with the City to reach an agreement

23  related to unhoused people's constitutional rights.

24        There is no case or controversy related to where

25  the LA Alliance stands and where the City of Los Angeles

48

1  stands relative to the enforcement of the -- the Municipal

2  Code violations.

3          And then the -- the final point that I will make

4  is that this is not Jones, your Honor.  This is not Jones v.

5  The City of Los Angeles.  Jones was brought by unhoused

6  individuals to challenge the constitutionality of the City's

7  anti-camping ban.  And Ms. Sobel can say this better than I

8  can, but I will just say that the Jones agreement prohibited

9  the City of Los Angeles from enforcing an anti-camping ban

10 based on a lawsuit that was brought with standing pursuant

11 to Article 3 to actually challenge that, similar to The

12 Orange County Catholic Worker case.  Standing is real, your

13 Honor.  The requirement that there be a case or controversy

14 and the requirement that there be an actual injury is to

15 ensure that what is happening here is not -- is not

16 permitted by the courts.  It cannot be the case that

17 advocates for an ordinance can walk into court and agree

18 with the City, who are also advocates of that ordinance,

19 that the City, under certain circumstances, can enforce that

20 ordinance against third parties, including Intervenors, when

21 there are significant constitutional issues at stake.  This

22 is not Jones.  This is not The Orange County Catholic

23 Worker.  This is not Mitchell v. City of Los Angeles.  This

24 is a very different case.  That matters -- the procedural

25 posture of this case matters, and we just want to make that

49

1  point clear given what the -- what the City and what the LA

2  Alliance had invoked in their positions.

3          Thank you.

4          THE COURT:  I'm going to turn back so that there's

5  equality in terms of the argument.  And, so, I'm going to

6  turn back to the Plaintiffs and then the City, and then this

7  is concluded.

8          MS. MITCHELL:  Thank you, your Honor.

9          I agree that this is not <u>Jones</u> because this is not

10  going to take 13,000 -- 13,000 -- this isn't going to take

11  13 years to build the beds.  We have in -- in this agreement

12  a deadline-driven schedule which cannot, obviously, be

13  established until the 2022 count is out, which we are still

14  waiting for.  But the agreement has been reached to the 8th

15  of June.  This agreement was reached back in April as we

16  worked out the details.  But we're still waiting for the

17  2022 count.  So the deadlines and milestones aren't in this

18  agreement.  But, certainly, we anticipate the agreement may

19  be amended to include the deadlines and milestones.  But it

20  is very clear that this cannot take 13 years to accomplish.

21          And, to address Mr. Miller's points, if -- if the

22  Court looks at what is in the pipeline currently, you have,

23  again, less than 11,000 beds.  I recognize that Council

24  President may have misspoke when she said 13,000 beds.  But

25  you have less than 11,000 beds currently in the pipeline.

50

1  And, again, we expect this number to increase to over 16,000

2  beds that the City is committing to.  I would anticipate

3  more like 18,000 or higher.

4           I'm happy to address the -- the financial issue if

5  the Court is interested in that at all.  It is certainly

6  less than half of what we have invested in this case, and it

7  is in par with what other advocates have been paid in these

8  1988 fee cases.  It's not anything that is unusual.  But if

9  the Court has concerns, I'm happy to address them.

10          I think we have said we've beat standing to death

11 at this point.  We have brought a clear lawsuit with

12 standing.  I think that it is certainly under some people's

13 skin that we represent businesses, community members, as

14 well as unhoused individuals who are all interested in

15 pushing these balanced solutions, balanced solutions that

16 work for all cities and communities.  I'm not going to beat

17 that issue to death, but because we represent both unhoused

18 individuals as well as businesses who are all interested in

19 the buildup of shelter and the agreement thereon, I think

20 has been a source of frustration, and we recognize that.

21 But it doesn't take the standing issue away.  If the Court

22 would like more answers on that, we're happy to answer that,

23 but it does not -- I mean, I think we've beat this issue to

24 death at this point.

25          So, I think with that, I will sit down, your

51

1  Honor, unless the Court has additional questions.

2          THE COURT:  Thank you.

3          On behalf of the City, Mr. Marcus?

4          MR. MARCUS:  Thank you, your Honor.  Let me

5  address just two points, one from the County and one from

6  the Intervenors.

7          With respect to the County's reference to Council

8  President Martinez's comments, and with all respect to Ms.

9  Mitchell, the Council President never misspeaks.  She did,

10  however, estimate a number.

11          THE COURT:  She did what?

12          MR. MARCUS:  She estimated a number.  She guessed.

13  When the 2022 count comes out, we'll know what the real

14  number is, but --

15          THE COURT:  And if we're right, if it's going up,

16  you're going to have an additional commitment?  In other

17  words, I'm pleased with the virtuousness of that because if

18  you'd brought me the 2019 or 2020 count, my first question

19  would be why.

20          MR. MARCUS:  And that would --

21          THE COURT:  So, it's got to be the 2022 count, and

22  I think we can all expect it's going up.

23          MR. MARCUS:  Right.  And which is why the 2020

24  count was never a consideration.

25          THE COURT:  Right.

52

1        MR. MARCUS:  With respect to the Intervenors'

2   concerns about future ordinances relating to regulation of

3   public rights of way, as the Intervenors stated in their own

4   papers and as the City has stated in its own papers, nothing

5   in this agreement binds or precludes someone from bringing a

6   legal challenge to some future ordinance, whether a facial

7   challenge or an as-applied challenge.

8        So, the argument that this agreement is somehow

9   going to grant cart blanche to the City to ride roughshod

10  over constitutional rights of people experiencing

11  homelessness is simply false.

12        And, with that, if the Court has any other

13  questions, the City Submits.

14        THE COURT:  No, other than to thank all of you and

15  to make a couple of brief comments and then a recess, but

16  this will be resolved one way or the other today.

17        First of all, you should all compliment yourselves

18  in terms of dealing with this inhumanity because my

19  impression was, right or wrong, when I came here that

20  whatever was happening was not working, that whether it was

21  Jones and 1250 bed spaces in 13 years, with the ever-

22  increasing death rate, with the single-digit but then

23  double-digit rise in homelessness, that whatever the

24  solutions or nonsolutions have been for the last literally

25  20 to 30 years, have landed on all of your laps.

53

1        And if you go back to the April of 2020

2   transcripts and bother looking at it, you'll see that the

3   Court had made the same statement at that time, that if not

4   us, who and if not now, when.  And you can read that in the

5   transcript.  Nothing's changed.  It's fallen on your laps.

6        The second thing I would generally say is that

7   this -- my impression is that this suit started primarily

8   with Skid Row and the Downtown business community.  I want

9   to compliment you because it's now morphed into the entire

10  City and the entire County, which means we have to deal with

11  it.  We're no longer dealing with it in a piecemeal way

12  because now it involves finally the City and the County.

13  So, I'm pleased to see you're entering into additional

14  negotiations on June 13th, however those turn out.  And

15  you're an integral part of this.

16        Third, I'll remind you that this is a judicially

17  created doctrine.  The City Council and the legislature did

18  not bring Boise.  The Ninth Circuit did.  And in that Ninth

19  Circuit opinion, it says "shelter".  And if you can find

20  anything about housing, I want you to quote that to me.

21  It's shelter.  And if it was housing, this Court would

22  enforce housing.

23        But the debate that's taken place has been what

24  does shelter mean, and the Ninth Circuit left that

25  undefined.  So, that ended up being a political decision

54

1 from a housing first model, which was a policy decision, to

2 shelter or to some mix.  And when I was able to communicate

3 with all of you previously, I had warned you that when a

4 Federal Court makes a decision, whether it's <u>Jones</u> or

5 <u>Mitchell</u> or this case, you are stuck with our decision for

6 10 or 15 years until that decision comes back or that same

7 area comes back in front of court.  In other words, we've

8 frozen you.  And it seems to me in the issue of homelessness

9 and house -- houselessness, that there has to be a

10 tremendous amount of flexibility on all of our parts, and we

11 have to be unafraid to make the attempt and sometimes make

12 the mistake and just back up and try to get it right,

13 whatever that is.

14          So, from the Intervenors' standpoint, you are a

15 housing-first model.  From the City's standpoint, there's a

16 growing recognition that there has to be some balance and

17 that there has to be shelter to move thousands of people,

18 and this Court has been critical of HHH.  The reason for

19 that is that so few units were produced at such a great cost

20 that even if that was the best model, we weren't dealing

21 with thousands of people, we were dealing with hundreds of

22 people.  And, so, therefore, the City literally entered into

23 a period of inertia, stagnation, and then not only did it

24 hurt the homeless, it hurt the citizens.

25          So, from the beginning, when I was able to speak

55

1  to both of you, there was no secret that this Court was

2  seeking, when I was actively involved anyway, a better

3  balance.  And if you could produce a housing-first model and

4  if you had 10,000 units, I couldn't be more complimentary.

5       But what has happened is that the costs have risen

6  now to minimally 630,000 to 800,000 dollars a unit.  And,

7  so, we are treating the very few, if you will, and leaving

8  thousands and thousands and thousands of people out on the

9  street.

10      The next thing is, generally speaking, before I

11  come back with a few questions, I became sensitized because

12  of Michele Martinez and other advocates in Orange County,

13  including Brooke Weitzman.  And the blessing was taking me

14  out to communities and realizing that the homeless impact

15  our lesser income areas as much or more than our wealthy

16  areas.  All of you in this room, regardless of any complaint

17  about salary, can probably fly to Europe.  But if you'll

18  come with me on occasion -- and I know you don't like to get

19  up at 4:30 or 5:00 o'clock in the morning, you'll find that

20  our impoverished communities are the most effected, Curren

21  Price's district, Gil Cedillo district, Marqueece Dawson's

22  district, Buscaino's district, Kevin de Leon's district.

23  They can't use their parks.  Yet, because of the power of

24  those who have a voice over those that don't have a voice,

25  we focus on a place like San Vincente.  And when that human

56

1  cry takes place, there seems to be a reaction, which is

2  good, and this Court has constantly asked myself, without

3  asking any of you but being pretty blunt about it, why?  Was

4  it only because of access to City Hall?  Was it only because

5  somebody was affronted because they drove down the west side

6  of Los Angeles?  Was it only because Venice or the L.A.

7  Times decided to go out and cover the Sheriff?  But where

8  the hell was everybody out in Curren's district or Kevin de

9  Leon's district?

10          And I have to tell you I really got concerned with

11  a lot of you folks who wouldn't even come out with us early

12  in the morning.  And, quite frankly, some of you lost a lot

13  of credibility because you just wouldn't come out to the

14  sites.

15          Now, I say that generally because there's

16  exceptions.  There are people who work in the community.

17  This isn't aimed at the Intervenors.  So, therefore, when I

18  came to this City -- and now I'm a citizen.  I'm spending

19  more time here than you can imagine -- you were frozen.

20  There was inertia, an ever spiraling death rate, and why

21  would the Court accept that?  Why would this Court want to

22  become complicit or any court become complicit?  And that's

23  caused quite a bit of controversy from unorthodoxy to

24  whatever.  But if that problem's before you, I don't see how

25  a court or any of us can act with comfort.

57

1          Now, the other day I said to Brooke Weitzman

2    something in a settlement conference that you weren't

3    involved in.  A young lady that we found housing for -- and

4    this is street-by-street fighting.  This is door by door.

5    If we're going to get involved in this business, you will

6    never be successful because no matter what you do today,

7    you'll drive down the street, and you'll see a woman who's

8    babbling or a man running into the street.  You will never

9    be 100 percent successful.  You just -- we just have to be

10   more successful.

11          I have pushed you as hard as I possibly could.  I

12   hope I have affronted every one of you on occasion.  I've

13   literally said to Shayla and I'll say this, I said "I think

14   you're killing people."  I've said to the -- on the other

15   side, "What are you doing?  This involves humanity across

16   the City," to the Plaintiffs.  The Court's constantly said

17   to the City "Quit dabbling in bits and pieces around the

18   City," and the County, "Quit dabbling in bits and pieces."

19   So, if you want to settle with some small portion, the Court

20   doesn't want to spend the time on X amount.  I want to spend

21   the time on the whole amount because it's no solution in

22   this piecemeal wacamole approach.

23          Back to I compliment you.  You're finally there.

24   You're talking about the City.  I want to thank you, thank

25   the City Attorney, thank the Mayor.  You're finally talking

58

1  about the City.  And one of the valuations we made with

2  complete transparency was you were too big and too

3  dysfunctional to ever get a citywide settlement to begin

4  with.  You're really 15 different cities out there with 15

5  different cities.  It's the mosaic of this City.  And, so,

6  therefore, that's why we went district to district to talk

7  to every single councilperson to try to learn what is so

8  unique about Monica Rodriguez versus Gil Cedillo versus

9  Curren Price versus Marqueece, and it was an amazing

10 education.

11         So, I end this part of this kind of from the heart

12 talk to you to say you should be complimented that you're

13 finally at the place as the City and maybe the County of

14 taking this on in a holistic manner.  Where you end up in

15 terms of shelter or where you end up in terms of housing

16 first I could care less.  Just do it.  And you haven't done

17 it.

18         Now, this may present an opportunity, depending on

19 your responses in a few moments.  This settlement is far

20 from perfect.  This settlement will not, if I approve it,

21 solve homelessness.

22         So, the first point is that in the past, a lot of

23 politicians have made a lot of promises, most of those

24 broken, and they tend to be aspirational, "If you elect me,

25 I will do the following."  And once elected, four years,

59

1   what's the number of new housing units that are going to be

2   produced?  Let me repeat that.  That's a really simple

3   question.  Am I dealing with 3,000, 4,000, 14,000?  Because

4   the press has popularly picked up that 14,000 to 16,000

5   units are going to be produced.

6         The problem, Marcus, that we got into it between

7   you and Skip and the County with the 6700 was how we were

8   going to count those, you know, what was in the pipeline,

9   were we going to count one in the pipeline because we got a

10  permit?  Were we going to cause -- were we going to count

11  that because a nail was driven into the wall?  It took four

12  months to reach an MOU just on that.  So, I don't want to

13  get caught on the back side of this tentatively even

14  thinking about approving a settlement unless it has some

15  meaningful number.

16        By the same token, you're the Plaintiff.  You're

17  taking on what the Government should be doing.  Why don't

18  you have the right to settle?  Why is it your responsibility

19  to continue on gratis regardless of the complaint about your

20  fee and take on the burden if you choose to settle.  And if

21  you had produced one new unit, why would the Court intervene

22  and interfere with that?

23        All right.  The second general area is the

24  $1,800,000 is ridiculous.  That is a low figure for the

25  services you've performed, and I'll put that on the record.

60

1  And, Mr. Miller, just produce your paycheck.  And I'm going

2  to say that to you bluntly.  When I hear that argument, I'm

3  affronted by it, frankly.  Just put on the table your

4  contract with the County, along with all of your associates.

5  So, as far as the $1,800,000, happy to accept that number.

6  If that's the agreement between you and the City, I have no

7  concern and no complaint.  Understood?

8          The last area is one of money.  I think Elizabeth

9  Chou, I'm not sure, the last article I read, kind of valued

10 this at $3 billion.  That's a number just thrown out by the

11 press.  What -- what is the value of this settlement,

12 because I can't imagine a court turning down a $3 billion

13 settlement if you move forward on this.  But if this is di

14 minimus and we're just borrowing money from something else,

15 I'd like to hear how much money we're borrowing.  So, I'm

16 not concerned about double counting anymore, and I'll say to

17 LAHSA I got flimflammed by LAHSA to begin with in this

18 double counting and you read those transcripts way back

19 when, and that caused a lot of concern on my part in terms

20 of credibility.

21          We don't have double counting here.  We have 6700.

22 You're representing you're producing new beds.  What you

23 really have is what I call a drawing off of funds

24 potentially from HHH.  And, so, when I was thinking about

25 this, I was saying, Well, why can't we incentivize HHH.  If

61

1  you haven't built the units, you might have a narrow window

2  of time to get these in the pipeline, and let's get you

3  going, and maybe that's a good thing.  So, get me another

4  thousand real quick.  Don't wait until year seven or eight.

5  If you really want these in the pipeline to be counted,

6  let's see the developers step up and do it and the City

7  bureaucracy do it.  Maybe that's a good thing.

8            So, I'll ask the City and I'll ask the Plaintiffs,

9  what's the value of this lawsuit in money?  And step over

10  and have a conference with each other.  That's an order.

11  See if you can come up with a unified number because from

12  the press I read about $3 billion.  I don't know that that's

13  true.  What's the money value?

14            MR. MARCUS:  Your Honor, can I have a moment?

15            THE COURT:  Sure.  And I'm not holding you to the,

16  you know, 100 million mark, but I'd like to kind of have an

17  idea of what we're dealing with.  And you can bring -- I

18  certainly know you.  Come on -- you can come forward, ma'am.

19  What's the estimate here?

20      (Pause.)

21            THE COURT:  Matt, it's good to see you.  Just

22  identify yourself.

23            MR. SZABO:  Sure.  Matt Szabo, City Administrative

24  Law --

25            THE COURT:  And it's a pleasure to have you here,

62

1  by the way.

2          MR. SZABO:  Yeah.  Thank you very much.

3          THE COURT:  What's the value of this?

4          MR. SZABO:  So, we --

5          THE COURT:  I don't know if I'd walk away from 100

6  million.  I don't know if I want to walk away from 3

7  billion.

8          MR. SZABO:  So, we made a -- a rough estimate.

9  That 2.4 billion to 3 billion dollar figure that you read in

10 the Times was --

11         THE COURT:  No.  I read -- I read it from Arosky

12 (phonetic).  I read it from Susan Shelley, and I read it

13 from Elizabeth Chou.  So, any time you get three members of

14 the press together, it must be credible.

15         MR. SZABO:  Right.  Yeah, it -- it was discussed

16 when the -- when the proposed settlement was announced.

17         THE COURT:  Okay.  How did we come up with that

18 number?

19         MR. SZABO:  We came up with that number based on

20 -- there is a -- an average amount of either subsidy for a

21 permanent housing or the actual cost of capital for shelter

22 plus the cost of ongoing services that would be required for

23 each of those.  We -- we looked at what was in the pipeline

24 and as -- as was stated and is stated in the papers, we've

25 -- we estimate that there is between permanent housing and

63

1  shelter a capacity for the City to stand up about 11,000 new

2  units, most of which are permanent.

3          THE COURT:  Okay.

4          MR. SZABO:  And, so, we took the -- what we would

5  be required to subsidize for those 11,000, and then we

6  project it out.  If we needed to do 14,000 units, it would

7  be about 2.4.  If we needed to do  16,000 units, it would be

8  about 3 billion in subsidy and service cost.

9          THE COURT:  Matt, I can't thank you enough.  A

10 couple more questions.  Don't go away.

11         MR. SZABO:  Sit down or --

12         THE COURT:  No.

13         MR. SZABO:  Okay.

14         THE COURT:  What does "in the pipeline" mean?  I

15 got in this debate over the 6700, and the County would say

16 X, and the City would say Y.  And, finally, they worked it

17 out, and if they both say that we produced 6700 units, I'm

18 going to accept that.  But what does "in the pipeline" mean?

19         MR. SZABO:  So, what in the -- "in the pipeline"

20 means is identified projects, projects that have gone

21 through some initial approval.  So, we have a site.  We have

22 a site plan.  We have a rough order of magnitude on the cost

23 of the construction of that project.

24         THE COURT:  Um-hmm.

25         MR. SZABO:  It may not be -- we may not have laid

64

1  out one brick yet or one -- you know, dug at a foundation

2  yet, but we have some idea, and we have some commitment that

3  dollars will be found.  Now, I do want to make an important

4  point, Judge.  In the -- in the documents that you have in

5  front of you, we identified 9400 units of permanent housing

6  that --

7           THE COURT:  Yeah.  It's on page nine.

8           MR. SZABO:  -- that we view -- that we are saying

9  are in the pipeline.  That does not mean, contrary to Mr.

10 Miller's comments, that it's just stuff that's already

11 there, certainly not.  Almost a thousand of those units are

12 permanent housing units that we are going to establish

13 through the State Home Key Program.

14          THE COURT:  Okay.

15          MR. SZABO:  And that is going to require -- those

16 thousand units are going to require the City to come up with

17 over $200 million of match.  And that Home Key Program, by

18 the way, the reason that we're willing to invest that much

19 is that it is an acquisition program of already existing

20 units.  So, we don't have to wait the four plus years, as

21 you had pointed out, to build from the ground up.

22          Do we know where all that money's going to come

23 from?  No.  But the City is willing --

24          THE COURT:  Well, if you're successful, the

25 Governor seems to have a surplus.

65

1          MR. SZABO:  Well --

2          THE COURT:  And I notice Ms. Fudge came by

3   recently.  So I'm sure she has a lot of money she'd like to

4   give you.

5          MR. SZABO:  True, true.  But it still is going to

6   require about a 50/50 match.  And -- and the City is

7   committing on that program to -- to come up with $230

8   million that hasn't been planned for.  So, we're going to

9   make that stretch commitment because we have an opportunity

10  to get a thousand units of housing up this year.  So, we're

11  going to do that, without -- and it's not something that my

12  office does often is to make recommendations to counsel to

13  make commitments without having secured the funding to make

14  good on those commitments, but we're willing to do it

15  because of the nature of the emergency.

16         THE COURT:  Matt, one more question.  I read some

17  place when I could do a lot of investigation that the Mayor

18  had touted and the Council had touted about 7200 units

19  eventually out of the 10,000 from HHH.  And yet I look at

20  the controller, Galperin, and he's got about 1400 units

21  completed in almost five or six years now.

22         This is not double counting, but there's going to

23  be a complaint from the housing first model that funds are

24  being moved from HHH over potentially to shelter.  I don't

25  think that the Court is going to become involved in that.  I

66

1  think that that's a function for the elected officials to

2  decide what the appropriate balance is.  You just have a

3  rising death rate.  Hopefully and aspirationally I would say

4  to you that I hope you get as much shelter as quickly as

5  possible to try to get people out of the rain or out of the

6  heat.  But, by the same token, nobody wants to give up on

7  housing first, but I think that's best for the elected

8  officials to decide that balance.

9         The third thing is that I'll say to the

10 Intervenors, I don't read this agreement the way you do.

11 And, in fact, on page -- and, Sarah, I want you to help me.

12 I think it's page five, isn't it?  Yeah, page five at the

13 last paragraph.  I don't think it needs clarification.

14 You're -- you're stating that enforcing the terms to which

15 the settling parties have agreed and nothing affects any

16 rights of the County or the Intervenors or any other party.

17 So, if somebody wants to sue the City, I would be concerned

18 if you came to me with a settlement as a class action and

19 you were binding all people in the future.

20         Here, I think we've had historically a reduction

21 when we've entered into these kinds of agreements with

22 litigation and saved our cities, 25 cities, huge amounts of

23 money.  That's all I can represent to you.  But as far as

24 taking away the right of the Intervenors to file a lawsuit,

25 if 4118 was amended, et cetera, I think they're perfectly

67

1  able to do that, and I see no reason why the Court would

2  preclude that.

3          Now, if you're of a different impression, either

4  on behalf of the Plaintiffs or the City, I'd like to hear

5  that, but the Court doesn't intend to take away any

6  constitutional right to sue by the Intervenors.  They can

7  file tomorrow or any other group can, but I will say to you

8  as a practical matter we've absolutely flattened the

9  litigation in Orange County.

10         The third thing I'll say to you is I'm pleased to

11 see the 17 percent reduction in Orange County, but that is

12 not being held up as a bright shining light on the hill for

13 Los Angeles.  We're a different community.  But, by the same

14 token, there seems to be an effort -- an increasing effort

15 to get people off the street in the thousands right now

16 instead of just the hundreds and it appears to me that we've

17 been catering to the perfect, and we haven't been able to

18 accomplish the good.

19         So, Matt, take it back to your council, take back

20 to your Mayor my compliments because we've moved from a

21 small lawsuit citywide, and it's bold, and I hope that

22 you're successful in your mediation.  I wish you the best,

23 Mr. Miller.

24         I want to go talk to my law clerks for a moment.

25         MS. SOBEL:  Your Honor, may I just --

68

1          THE COURT:  No.  I'm speaking now.  You're
2   listening.  I've given the courtesy to all the parties.
3   We're done now.
4          About $3 billion, Matt, on the table?  I just want
5   to make sure I'm hearing this.
6          MR. SZABO:  Depending on the number of units,
7   sir --
8          THE COURT:  Matt, about $3 billion on the table?
9          MR. SZABO:  Up to $3 billion.
10          THE COURT:  Okay.  About.  Okay.
11          MR. SZABO:  Yes.
12          THE COURT:  Give or take $100 million, but okay.
13   About 14 to 16 thousand new units depending upon our 2022
14   count?
15          MR. SZABO:  Depending up the count, that's --
16   that's correct.  And we will --
17          THE COURT:  Okay.
18          MR. SZABO:  And we will provide that information.
19          THE COURT:  And here's what I've been weighing.
20   I've heard more promises broken than you can possibly
21   imagine.  And, so, therefore, I don't care what a politician
22   says.  But one of the points that you made in this agreement
23   was that this was something concrete that the Plaintiffs
24   finally have as an agreement.  And the question I had late
25   at night was what I care for, was it a thousand new units or

69

1  14 to 16 thousand new units and when would the Court step in

2  and put a stop to that.  So, as long as there's counting,

3  its not final.  I won't sign this or even consider it unless

4  there's a monitor and you've already stated that there's

5  going to be a monitor.  Right?  I'll point to the -- Sarah,

6  help me, what page?

7           MS. MITCHELL:  Correct, your Honor.

8           THE COURT:  Counsel, point out the page.  I'll

9  just read it to you.

10          MR. MARCUS:  Your Honor, the parties stipulate

11 that the Court --

12          THE COURT:  No, I know.

13          MR. MARCUS:  -- has jurisdiction.

14          THE COURT:  I'm going to read it, though.  I'll

15 find it.

16          Secondly, there's been a lot of criticism about

17 one district getting turned against the other district.  So,

18 let's be completely transparent about that.  I would hope

19 that the City is able to balance out the needs of our more

20 impacted districts, the Curren Price, the de Leons, the

21 Buscainos, the Marqueece Dawson, with the less impacted

22 districts -- and I include Bonin in that impacted district

23 -- because it wouldn't be fair on the 60 percent to have

24 these, you know, huge districts unless you have some

25 equitable distribution of funds to the districts that need

70

1   this the most.  I have to leave that to you, but that's why

2   I need the monitor.  Fair enough?

3          MR. SZABO:  Correct.  And we will be regularly

4   reporting publically on --

5          THE COURT:  Right.

6          MR. SZABO:  -- the funding available for each of

7   the projects in each of the districts.

8          THE COURT:  I'm -- I'm appointing Michele

9   Martinez.  You gave me that ability, and I think you all

10  trust her, although she's growled at you on occasion.

11  You've each called her over the -- the years and talked to

12  her.  But if you have an objection, I'm happy to appoint the

13  law firm.  Do you know what they're going to charge?  Try a

14  thousand dollars an hour with three associates, two senior

15  partners, catching up with this, and you'll be over a

16  million to a million point five just like that.

17         Sit down.  Somehow, you have to work out some

18  compensation with her because she's done working for free.

19  She's been doing this out of the goodness of her heart for

20  three years because she really believes, is one of the few

21  virtuous people who's been involved in this.  So, you're

22  going to go work out some kind of compensation.  She's going

23  to get involved, but I've encouraged her to do the

24  following, not to become involved with you for over more

25  than one year.  If you're not living up to your promises,

71

1  there's no reason for that frustration.  She's going to have

2  to step away from a private practice of some type, and those

3  negotiations I think should be Judge Brotte with Michele

4  Martinez.

5          So, I'd like to see, Scott, you for a moment,

6  Elizabeth, you for a moment.  Let's sit down and talk about

7  that in the back, initially out of my presence, but then if

8  I need to intervene.  But come up with some amount that's

9  reasonable and compensates her for the private practice.

10          I would suggest to you that she work no more than

11  two years, with the option of her stepping away or if you

12  have dissatisfaction with her after one year and then

13  supplementing her with another monitor by agreement if that

14  occurs.  That way, you're not bound to a particular monitor

15  for five years.  Now, if you come up with a different

16  agreement, that's fine.  Okay.

17          And, finally, Matt, let's talk about the 60

18  percent with you and the Intervenors, because there's a lot

19  of concern on Ms. Sobel's part.  I'm not arguing with you,

20  but I'm going to go back to the very beginning of this.  We

21  started trying to imagine the flexibility with a riverbed

22  with 1400 people on it, not a couple hundred people across

23  but 1400 people, and how are we going to clear that.  And,

24  trust me, Orange County had no plan.  They can tell you they

25  had a plan, and the Court laid an injunction on the Sheriff

72

1  and on the County and stopped it.  And pretty soon, the

2  first plan was, Gee, Judge, maybe we're going to come in

3  with some blue shirts, some newly trained kids out of

4  college that, quite frankly, were learning on the job.  And

5  where are we going to put them?  And, so, the Board of

6  Supervisors came up with 400 motel rooms.  You know how

7  long?  Thirty days.  Totally inadequate.  Thirty days.

8       But walking down the river each day with Ms. Sobel

9  and with Brooke, it was readily apparent that we had about

10 801 people ready to take shelter.  In fact, there were more

11 than that.  So, where does this 60 percent come from?  It's

12 an aspirational meaningless number in a sense.  It could be

13 50 percent.  It could be 70 percent.  But you need to

14 understand the basis of it, whether you agree with it or

15 not.

16      Carol, Ms. Sobel, took the decent and good

17 position, Judge, this should be 80 percent, 80 percent.  And

18 the County took the position of, No, this should be 60

19 percent, because what you're really dealing with is you

20 started with about 13 to 14 hundred people, but as the signs

21 went up, people started walking away.  So, if you have a

22 thousand people left on the river, which we did, and 801

23 seat shelter, Carol Sobel's right.  That should be about 80

24 percent, right?  But what happens if you have 1300 people on

25 the river and three or four hundred of them have walked away

73

1  because they're never going to accept shelter?  So, that's

2  how we came up with the 60 percent.  Okay.

3        The second thing is we always had 60 percent plus

4  one.  It wasn't a 60 percent.  It was if we got to 60

5  percent, we were supposed to stop and build the additional

6  shelters so that nobody was going into an enforcement

7  situation, whatever that meant.  But in your document, you

8  have said much more holistically than Orange County and

9  maybe much more humanely that you're not going to enforce

10 this unless a person's offered shelter, and you put that in

11 writing.

12       So, it seems to me that as long as we continue to

13 work together, this Court's going to turn from poking and

14 trying to work with you, quite frankly, but I can only do

15 that through a monitor.

16       And, lastly, I agree with you, Mr. Miller.  I read

17 this agreement.  This seems to be a binding attempt or a

18 good faith effort between the City and the Plaintiffs.  But

19 all of those provisions don't apply to you.  I'm not

20 adopting those.  Those seem to be aspirational, and I don't

21 think that that's the essence of the agreement.  It seems to

22 be a public statement.  You'll litigate that or you'll

23 settle that, et cetera, but I -- I'm not binding myself in

24 the agreement to anything that reflects on the County.

25 That's for future litigation or future settlement.  Seems to

74

1  be a cry out to the County.  I'll leave that in your good

2  hands.

3          Now, I'm not accepting any more input, Counsel.

4  I'll be back with you in about 15 minutes at the most, and

5  I'll have a decision for you one way or the other.  Thank

6  you.

7          (Proceedings recessed briefly.)

8          THE COURT:  On the record.  All the parties are

9  present.  I want to thank you.

10          This Court's inclined to approve the settlement.

11  I'm tentatively approving the settlement now, but I'm going

12  to issue a written order by next week to more address some

13  of the issues raised today.

14          I want to thank all of you for your attendance.

15          We're in recess.

16          (Proceedings concluded.)

17

18

19

20

21

22

23

24

25

75

1          I certify the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5    /s/Jordan Keilty                    6/11/2022
     Transcriber                         Date
6
     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
     /s/L.L. Francisco
9    L.L. Francisco, President
     Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<div align="center">

1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3    **HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

</div>

4

5    LA ALLIANCE FOR HUMAN          )
     RIGHTS, an unincorporated      )
     Association, JOSEPH BURK,      )

6    HARRY TASHDJIAN, KARYN         )
     PINSKY, CHARLES MALOW,         )

7    CHARLES VAN SCOY, GEORGE       )
     FREM, GARY WHITTER, and        )    **Certified Transcript**

8    LEANDRO SUAREZ, individuals,   )
                                    )

9                   Plaintiffs,     )
                                    )

10         vs.                      )    Case No.
                                    )    2:20-cv-02291 DOC (KES)

11   CITY OF LOS ANGELES, a         )
     Municipal entity; COUNTY OF    )

12   LOS ANGELES, a municipal entity; )
     and DOES 1 through 200 inclusive, )

13                                  )
                    Defendants.     )

14   _____)

15

16

17              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                       STATUS CONFERENCE

18              THURSDAY, MARCH 19, 2020
                       10:00 A.M.

19              LOS ANGELES, CALIFORNIA

20

21

22   _____

23              **DEBBIE HINO-SPAAN, CSR 7953, CRR**
                FEDERAL OFFICIAL COURT REPORTER

24              350 WEST 1ST STREET, SUITE 4455
                LOS ANGELES, CA 90012-4565

25              dhinospaan@yahoo.com

<div align="center">

**UNITED STATES DISTRICT COURT**

</div>

```
 1                       APPEARANCES OF COUNSEL:

 2

 3     FOR THE PLAINTIFFS:

 4              SPERTUS LANDES & UMHOFER LLP
                BY:  MATTHEW DONALD UMHOFER, ESQ.
 5                  ELIZABETH ANNE MITCHELL, ATTORNEY AT LAW
                617 West 7th Street
 6              Suite 200
                Los Angeles, California 90017
 7              213-205-6520

 8     FOR THE DEFENDANT CITY OF LOS ANGELES:

 9              LOS ANGELES CITY ATTORNEY'S OFFICE
                BY:  SCOTT D. MARCUS, ESQ.
10              200 North Main Street
                7th Floor, Room 675
11              Los Angeles, California 90012
                213-978-7558
12
       FOR THE DEFENDANT COUNTY OF LOS ANGELES:
13
                FOLEY & LARDNER LLP
14              BY:  BYRON J. McLAIN, ESQ.
                555 South Flower Street
15              Suite 3300
                Los Angeles, California 90071-2411
16              213-972-4500

17     FOR THE INTERVENOR ORANGE COUNTY CATHOLIC WORKER:

18              CAROL A. SOBEL LAW OFFICES
                BY:  CAROL A. SOBEL, ATTORNEY AT LAW
19              725 Arizona Avenue
                Suite 300
20              Santa Monica, California 90401
                310-393-3055
21

22

23

24

25
```

UNITED STATES DISTRICT COURT

3

```
 1                    APPEARANCES OF COUNSEL:
                          (Continued:)
 2

 3   FOR THE INTERVENOR LOS ANGELES CATHOLIC WORKER:

 4           SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP
             BY:  CATHERINE ELIZABETH SWEETSER, ATTORNEY AT LAW
 5           11543 West Olympic Boulevard
             Los Angeles, California 90064
 6           310-396-0731

 7   FOR THE LEGAL AID FOUNDATION OF LOS ANGELES ON
     BEHALF OF INTERVENOR L.A. CATHOLIC WORKER AND LOS ANGELES
 8   COMMUNITY ACTION NETWORK:

 9           LEGAL AID FOUNDATION OF LOS ANGELES
             BY:  SHAYLA RENEE MYERS, ATTORNEY AT LAW
10           7000 South Broadway
             Los Angeles, California 90003
11           213-640-3983

12   ALSO PRESENT:

13           Honorable Judge Andre Birotte, Federal Judge

14           Honorable Judge Philip S. Gutierrez, Federal Judge

15           Honorable Judge James Smith - Special Master

16           Thomas Fawn - Senior Assistant County Counsel, County
             of Los Angeles
17
             Brooke Weitzman - Intervenor Orange County Catholic
18           Worker

19           Scott Marcus - Los Angeles City Attorney's Office

20           Jessica Mariani - Los Angeles City Attorney's Office

21           Mike Feuer - Los Angeles City Attorney's Office

22           Kevin de Leon - Los Angeles City Council

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                    APPEARANCES OF COUNSEL:
                          (Continued:)
 2

 3   ALSO PRESENT:

 4          Michele Martinez - Chief Dot Connector

 5          Juan Garza - Mayor of Bellflower

 6          Miguel A. Pulido - Mayor of Santa Ana

 7          Yvette Ahlstrom - Elimination Foundation

 8          Paul Cho - Elimination Foundation

 9          Paul Leon - CEO of Elimination Foundation

10          Gary Kranker - Whittier City Attorney

11          Joe Vinatieri - Mayor of Whittier

12          Kathryn Barger - Los Angeles County Supervisor

13          Heidi Marsdon - Interim LAHSA

14          Aleen Langton - LAHSA

15          Nury Martinez - Los Angeles City Council President

16          Ken Price

17          Jackie Lacey - Los Angeles County District Attorney

18          Robert Cartwright - Assistant Los Angeles County
            Counsel
19
            Gabriel Dermer - Los Angeles City Attorney's Office
20
            Brandon Young - Manatt, Phelps & Phillips
21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

```
 1                        APPEARANCES:
                          (Continued:)
 2

 3   ALSO PRESENT:

 4          Byron McLain - Foley & Lardner

 5          Rodrigo Castro-Silva - Los Angeles County Counsel

 6          Mark Ridley-Thomas - Los Angeles County Supervisor

 7          Michel Moore - Los Angeles Police Chief

 8          Ralph Terrazas - Los Angeles Fire Chief

 9          Commissioner Kenneth Hodder - The Salvation Army

10          Lieutenant Colonel John Chamness - The Salvation Army

11          Miguel Santiago - California Assemblyman

12          Bill Taormina

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

```
 1   driven by the preservation of the quality of life and life

 2   itself.

 3           Point two, the funding is ready.  We need zero

 4   dollars from any government.  We are ready to buy these

 5   trailers today.  In a moment I'm going to hand my credit card

 6   to Mr. Price for whatever deposit he wants.  We're going to tie

 7   these trailers up today.

 8           Number three, logistics, the shipping and the

 9   installation is ready.  We are ready to move forward.

10           Number four, our nonprofit operators are sitting in

11   the front row.  They're ready to move forward.

12           Number five, what we need -- the gentleman from

13   Whittier just said we need locations.  We need government

14   property.  We need private property.  We need -- we just need

15   locations.  We need to break a few rules relative to zoning and

16   land entitlements.  That should be easy because your other

17   choice is anarchy.  Let's be honest here.  This thing is out of

18   control and we need to fix it.

19           Point six, this is a solution for both homelessness

20   and to control this virus.  Thank you for your time.  I'm going

21   to hand my --

22           THE COURT:  Oh, no, don't go away.  I love this

23   credit card.  Could I -- no, I'm just kidding.

24           MR. TAORMINA:  It has unlimited credit amount, and

25   I'm here to give this to Mr. Price.  I'm going to walk back
```

The timestamps in the left margin: 12:08PM (line 5), 12:08PM (line 10), 12:08PM (line 15), 12:09PM (line 20), 12:09PM (line 25).

```
 1   there and hand him my business card and the credit card number
 2   is on the back.  And I'm dead serious.
 3           THE COURT:  By the way, I know his worth, and he has
 4   got a substantial limit, trust me.
 5           MR. TAORMINA:  It doesn't matter.  It's time for
 6   action.  Thanks to you for this Court for making it happen.  So
 7   let's do it.
 8           THE COURT:  Okay.  Now, here is a strong ally for
 9   some portion of the plaintiffs.  They're your business
10   community.  In my part of the world, before I came to this part
11   of the world and now I'm part of our world here in Los Angeles,
12   I may be getting a shelter up here, okay, I'm going to start
13   living up here thanks to Judge Carney and his being so gracious
14   about maybe getting me some hotel space -- he's what I call the
15   police league side.  He's what I call the business side.
16           If you don't know who he is -- and by the way some
17   of the other major families, who he's going to probably
18   privately disclose to you, trust me, he's probably very much in
19   line with the First Alliance Group, because I perceive you as
20   more business oriented in a sense than maybe some of the other
21   groups that might be -- there's going to be an accord.
22           So he's speaking your language.  Okay?  In fact, he
23   actually sued the railroads to clean up the mess on the
24   railroads behind his multiple properties.  So talk to him.
25   Okay.
```

12:09PM (line 5)
12:09PM (line 10)
12:10PM (line 15)
12:10PM (line 20)
12:10PM (line 25)

**UNITED STATES DISTRICT COURT**

1          Bill, I want to thank you for stepping up.  I had no

2     idea you were going to do that.  I'm actually a little stunned.

3          Okay.  I'm ready to suspend this Court except for my

4     esteemed and incredibly wonderful counsel.  And here's the

12:11PM 5     bottom line.  You've heard today -- and I've asked nothing of

6     you -- if you want the Court not to be involved, that's just

7     great.  We will litigate for the next ten years, and I could

8     care less.

9          And Andre and -- Birotte, thank you for being here

12:11PM 10    for this wonderful opportunity to meet all these good folks.

11         But if you want us involved, we can give you a

12    shelter and parameter to operate within, I hope, with a lot of

13    disagreements on occasion, a lot of disagreements on occasion.

14    Okay?  But the point is we moved forward in our part of the

12:11PM 15    world to an extent that I never expected before I got involved.

16    It's not been pretty.  It's not been perfect.  People have

17    gotten hurt.  But by God we moved forward.

18         And I know that we can move forward on this.  So you

19    tell me what time you want me to be back here.  I'm going to go

12:11PM 20    walk around and get a cup of coffee for a moment and visit with

21    some of the folks who've remained, just because they're friends

22    and I'd like to meet some of the other people in the audience

23    who have been so patiently sitting here with us that I haven't

24    had a chance to talk to.

12:12PM 25         If you want the Court involved, I want you to tell

**UNITED STATES DISTRICT COURT**

1    me that, but you have to give me the following or I won't be

2    involved:  One, I must be able not to gather a group like this

3    again.  I have to be able to reach out to Eric.  I have to get

4    on the phone with the governor's office tonight.  I've got to

12:12PM 5    be able to talk to Bill about trailers or call Ken, you know,

6    and Paul.  I've got to be able to talk to Carol.  I've got to

7    be able talk to you.  And you've got to trust me in those

8    ex parte conversations.  Because they're going to be more

9    valuable, I hope, than litigation.

12:12PM 10           And if you get to litigation, I've got great judges

11   who can litigate.  And they can probably be much more

12   collaborative than even I am.  So I'm reaching out to you

13   choosing two of what I think are the finest colleagues that I

14   could possibly find on the bench to participate in this,

12:12PM 15   because you should have a tremendous -- you should have a

16   tremendous sense of confidence that when you talk about people

17   like Judge Birotte -- in fact, our entire bench here and

18   Judge Gutierrez, that you're talking about people that are the

19   middle of the road, that don't have an axe to grind, liberal or

12:13PM 20   conservative or however you toss those silly labels around, who

21   will get down to work with you, and by God, we're going to get

22   criticized for the lives we didn't save.  We're never going to

23   be accountable or known for the lives we did save.

24           But you have got a chance for us to save an awful

12:13PM 25   lot of lives.  And if we act quickly -- and if not, we came

**UNITED STATES DISTRICT COURT**

112

1   here for the homelessness and COVID, right, the community right

2   now distancing themselves who have that benefit, and God bless

3   them.  Thank you.  It's coming.  It's just going to delay.

4          So what time would you like me to meet?  Because

12:13PM 5   you're going to be ordered to meet and confer.

6          Carol, you've been through this before.  Okay?  And

7   you know that I have to be able to communicate with you early

8   in the morning or late at night and share with the other side.

9   And I've made a lot of mistakes.

12:13PM 10          But you have got to give me an answer today.  And

11   I'm going to sit here until I get "yes" or "no."  And then

12   you're going to sign up and you're going to give me some

13   limited jurisdiction for a limited period of time so you're not

14   trapped.  Because I don't want a three-year consent decree.  I

12:14PM 15   don't want a settlement.  You don't even have to call it a

16   settlement.  You just have to call it an agreement of some kind

17   so you're not trapped.  And then let's get going.  Okay?

18          Now --

19          MR. UMHOFER:  Your Honor, we want you involved.

12:14PM 20          THE COURT:  Wait, wait, wait.  Not so fast.  You

21   talk to those people over there, and you talk to the defendants

22   sitting there.  They're not here, et cetera.  Get on the phone.

23   But I'm going to sit here until I get an answer "yes" or "no."

24   Okay?

12:14PM 25          So get together.  I'll be back at what time?  How

**UNITED STATES DISTRICT COURT**

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3   COUNTY OF LOS ANGELES    )
                             )
 4   STATE OF CALIFORNIA      )

 5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, in and for the United States District Court for

 7   the Central District of California, do hereby certify that

 8   pursuant to Section 753, Title 28, United States Code that the

 9   foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   Date:  March 20, 2020

16

17

18

19                              /S/ DEBBIE HINO-SPAAN

20                              Debbie Hino-Spaan, CSR No. 7953
                                Federal Official Court Reporter
21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

ER 967

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

**Query    Reports ▾    Utilities ▾    Help    Log Out**

ACCO,(KESx),DISCOVERY,MANADR,RELATED-G,SM,VEX

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:20-cv-02291-DOC-KES

| | |
|---|---|
| LA Alliance for Human Rights et al v. City of Los Angeles et al | Date Filed: 03/10/2020 |
| Assigned to: Judge David O. Carter | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Karen E. Scott | Nature of Suit: 440 Civil Rights: Other |
| Related Cases: 8:17-cv-00246-DOC-KES | Jurisdiction: Federal Question |

Related Cases: 8:17-cv-00246-DOC-KES
               2:21-cv-07305-DOC-KES
               2:21-cv-06003-DOC-KES
               2:21-cv-07596-DOC-KES
               2:21-cv-06109-DOC-KES
               2:22-cv-00483-DOC-KES
               2:22-cv-00484-DOC-KES

Case in other court: Ninth Circuit, 21-55395
                         9TH CCA, 21-55404
                         9TH CCA, 21-55408
                         9th CCA, 22-55687
                         9th CCA, 22-55933

Cause: 42:1983 Civil Rights Act

**Plaintiff**

| | | |
|---|---|---|
| **LA Alliance for Human Rights**<br>*an unincorporated association* | represented by | **Elizabeth Anne Mitchell**<br>Umhofer, Mitchell and King LLP<br>767 South Alameda Street, Suite 270<br>Los Angeles, CA 90021<br>213-394-7979<br>Fax: 213-529-1027<br>Email: elizabeth@umklaw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Matthew Donald Umhofer**<br>Umhofer, Mitchell and King LLP<br>767 South Alameda Street, Suite 270<br>Los Angeles, CA 90021<br>213-394-7979<br>Fax: 213-529-1027<br>Email: matthew@umklaw.com<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Joseph Burk**<br>*individual* | represented by | **Elizabeth Anne Mitchell**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Matthew Donald Umhofer**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

**ER 968**

https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

**Harry Tashdjian**                          represented by   **Elizabeth Anne Mitchell**
*individual*                                                 (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Matthew Donald Umhofer**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**
**Karyn Pinsky**                             represented by   **Elizabeth Anne Mitchell**
*individual*                                                 (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Matthew Donald Umhofer**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**
**Charles Malow**                            represented by   **Elizabeth Anne Mitchell**
*individual*                                                 (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Matthew Donald Umhofer**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**
**Charles Van Scoy**                         represented by   **Elizabeth Anne Mitchell**
*individual*                                                 (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Matthew Donald Umhofer**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**
**George Frem**                              represented by   **Elizabeth Anne Mitchell**
*individual*                                                 (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Matthew Donald Umhofer**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**
**Gary Whitter**                             represented by   **Elizabeth Anne Mitchell**
*individual*                                                 (See above for address)
                                                             *TERMINATED: 07/22/2022*
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Matthew Donald Umhofer**
                                                             (See above for address)
                                                             *TERMINATED: 07/22/2022*

**ER 969**

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Leandro Suarez**                   represented by    **Elizabeth Anne Mitchell**
*individual*                                                 (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Matthew Donald Umhofer**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Wenzial Jarrell**                    represented by    **Matthew Donald Umhofer**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Elizabeth Anne Mitchell**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

V.

**Movant**

**AIDS Healthcare Foundation**       represented by    **Jonathan Michael Eisenberg**
                                                       AIDS Healthcare Foundation
                                                       Legal Department
                                                       6255 West Sunset Boulevard 21st Floor
                                                       Los Angeles, CA 90028
                                                       323-860-5361
                                                       Email: jonathan.eisenberg@ahf.org
                                                       *ATTORNEY TO BE NOTICED*

V.

**Intervenor Plaintiff**

**Venice Stakeholders Association**    represented by    **Jeffrey Lewis**
*TERMINATED: 04/15/2020*                                        Jeff Lewis Law, APC
                                                       827 Deep Valley Drive, Suite 209
                                                       Rolling Hills Estates, CA 90274
                                                       310-935-4001
                                                       Fax: 310-872-5389
                                                       Email: jeff@jefflewislaw.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Sean Christopher Rotstan**
                                                       Jeff Lewis Law
                                                       609 Deep Valley Drive Suite 200
                                                       Rolling Hills Estates, CA 90274
                                                       310-935-4001
                                                       Fax: 310-872-5389
                                                       Email: sean@jefflewislaw.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Intervenor Plaintiff**

| | | |
|---|---|---|
| **Latino Coalition of Los Angeles**<br>*TERMINATED: 08/10/2020* | represented by | **Christian M. Contreras**<br>Law Offices of Christian Contreras PLC<br>360 East 2nd Street, 8th Floor<br>Los Angeles, CA 90012<br>323-435-8000<br>Fax: 323-597-0101<br>Email: cc@contreras-law.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Intervenor Plaintiff**

| | | |
|---|---|---|
| **Josue Tiguila** | represented by | **Christian M. Contreras**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **City of Los Angeles**<br>*a municipal entity* | represented by | **Arlene Nancy Hoang**<br>Los Angeles City Attorneys Office<br>City Hall East<br>200 North Main Street Room 675<br>Los Angeles, CA 90012<br>213-978-6952<br>Fax: 213-978-7011<br>Email: arlene.hoang@lacity.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Scott D Marcus**<br>Los Angeles City Attorneys Office<br>200 North Main Street 7th Floor Room 675<br>Los Angeles, CA 90012<br>213-978-7558<br>Fax: 213-978-8216<br>Email: scott.marcus@lacity.org<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Jessica Mariani**<br>Los Angeles City Attorneys Office<br>Business & Complex Litigation<br>200 North Main Street Room 675<br>Los Angeles, CA 90012<br>213-978-6952<br>Fax: 213-978-7011<br>Email: jessica.mariani@lacity.org<br>*ATTORNEY TO BE NOTICED*<br><br>**Ryan Salsig**<br>Los Angeles City Attorney<br>200 North Main Street Room 675<br>Los Angeles, CA 90012<br>213-304-1110<br>Fax: 213-978-7011<br>Email: ryan.salsig@lacity.org<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

**County of Los Angeles**
*a municipal entity*

represented by **Jennifer Mira Hashmall**
Miller Barondess LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, CA 90067
310-552-4400
Email: mhashmall@millerbarondess.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amie S Park**
Los Angeles County Counsel Office
500 West Temple Street 6th Floor
Los Angeles, CA 90012
213-893-5939
Fax: 213-626-2105
Email: apark@counsel.lacounty.gov
*ATTORNEY TO BE NOTICED*

**Ana Wai-Kwan Lai**
Los Angeles County Counsel Office
350 South Figueroa Street Suite 601
Los Angeles, CA 90071
213-974-0061
Fax: 213-617-6785
Email: alai@counsel.lacounty.gov
*ATTORNEY TO BE NOTICED*

**Brandon D Young**
Manatt Phelps and Phillips LLP
2049 Century Park East Suite 1700
Los Angeles, CA 90067
310-312-4181
Fax: 310-996-7081
Email: bdyoung@manatt.com
*ATTORNEY TO BE NOTICED*

**Byron J McLain**
Foley and Lardner LLP
555 South Flower Street Suite 3300
Los Angeles, CA 90071-2411
213-972-4500
Fax: 213-486-0065
Email: bmclain@foley.com
*ATTORNEY TO BE NOTICED*

**Emily A Rodriguez-Sanchirico**
1630 Stewart Street
Santa Monica, CA 90404
310-266-6029
Email: Emily.Rodriguez-Sanchirico@redbull.com
*TERMINATED: 12/15/2021*

**Lauren M Black**
Los Angeles County Counsel Office
500 W Temple Street 6th Floor
Los Angeles, CA 90012-2713
213-974-1943
Email: lblack@counsel.lacounty.gov

*ATTORNEY TO BE NOTICED*

**Louis R. Miller**
Miller Barondess, LLP
2121 Avenue of the Stars Suite 2600
Los Angeles, CA 90067
310-552-4400
Email: smiller@millerbarondess.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Does**
*1 through 200 inclusive*

V.

**Intervenor Defendant**

**Adrian D. Moon**                    represented by **Adrian D. Moon**
*TERMINATED: 05/02/2023*                  955 North Lake Avenue
                              Pasadena, CA 91104
                              626-360-9896
                              *PRO SE*

**Amicus**

**Venice Stakeholders Association**        represented by **Jeffrey Lewis**
*TERMINATED: 04/15/2020*                  (See above for address)
                              *LEAD ATTORNEY*
                              *ATTORNEY TO BE NOTICED*

                              **Sean Christopher Rotstan**
                              (See above for address)
                              *LEAD ATTORNEY*
                              *ATTORNEY TO BE NOTICED*

**Amicus**

**NAACP - Compton Branch**           represented by **David H Martin**
                              Law Office of Mark Ravis and Associates
                              26565 West Agoura Raod Suite 200
                              Calabasas, CA 91302
                              310-295-4145
                              Fax: 310-388-5251
                              *LEAD ATTORNEY*
                              *ATTORNEY TO BE NOTICED*

                              **Mark S Ravis**
                              Law Office of Mark Ravis and Associates
                              1900 Avenue of the Stars Suite 1100
                              Los Angeles, CA 90067
                              310-295-4145
                              Fax: 310-388-5251
                              Email: mravis99@gmail.com
                              *ATTORNEY TO BE NOTICED*

**Amicus**

**CORE-CA**                     represented by **David H Martin**
                              (See above for address)
                              *LEAD ATTORNEY*
                              *ATTORNEY TO BE NOTICED*

                                    **Mark S Ravis**
                                    (See above for address)
                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**Committee for Safe Havens**        represented by **Mark S Ravis**
                                    (See above for address)
                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**Central City Association of Los Angeles**    represented by **Theano Evangelis Kapur**
                                    Gibson Dunn and Crutcher LLP
                                    333 South Grand Avenue
                                    Los Angeles, CA 90071-3197
                                    213-229-7726
                                    Fax: 213-229-6726
                                    Email: tevangelis@gibsondunn.com
                                    *LEAD ATTORNEY*
                                    *ATTORNEY TO BE NOTICED*

                                    **Bradley Joseph Hamburger**
                                    Gibson Dunn and Crutcher LLP
                                    333 South Grand Avenue
                                    Los Angeles, CA 90071
                                    213-229-7000
                                    Fax: 213-229-7520
                                    Email: bhamburger@gibsondunn.com
                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**The Center in Hollywood**

**Amicus**

**Union Rescue Mission**        represented by **Manuel A. Abascal**
                                    Latham and Watkins LLP
                                    355 South Grand Avenue Suite 100
                                    Los Angeles, CA 90071-1560
                                    213-485-1234
                                    Fax: 213-891-8763
                                    Email: manny.abascal@lw.com
                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**Skid Row Housing Trust**

V.

**Special Master**

**Michele Martinez**

**Special Master**

**James L. Smith**

V.

**Interested Party**

**Urban Offerings, Inc.**

**Interested Party**

**Santee Village Homeowner's Association**


V.

**Intervenor**

**Orange County Catholic Worker**                    represented by **Brooke Alyson Weitzman**
                                                     Elder Law and Disability Rights Center
                                                     1535 East 17th Street, Suite 104
                                                     Santa Ana, CA 92705
                                                     714-617-5353
                                                     Email: bweitzman@eldrcenter.org
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Catherine Elizabeth Sweetser**
                                                     Schonbrun Seplow Harris Hoffman and Zeldes
                                                     LLP
                                                     9415 Culver Boulevard Suite 115
                                                     Culver City, CA 90232
                                                     310-396-0731
                                                     Fax: 310-399-7040
                                                     Email: csweetser@sshhzlaw.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Paul L Hoffman**
                                                     Schonbrun Seplow Harris Hoffman and Zeldes
                                                     LLP
                                                     200 Pier Avenue Suite 226
                                                     Hermosa Beach, CA 90254
                                                     310-717-7373
                                                     Fax: 310-399-7040
                                                     Email: hoffpaul@aol.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Weston C Rowland**
                                                     Law Office of Carol Sobel
                                                     2632 Wilshire Boulevard No 552
                                                     Santa Monica, CA 90403
                                                     310-393-3055
                                                     Email: rowland.weston@gmail.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **William R Wise , Jr.**
                                                     Elder Law and Disability Rights Center
                                                     1535 East 17th Strreet Suite 110
                                                     Santa Ana, CA 92705
                                                     714-617-5353
                                                     Email: bwise@eldrcenter.org
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Carol A. Sobel**
                                                     Law Office of Carol A. Sobel
                                                     1158 26th Street Suite 552

Santa Monica, CA 90403
310-393-3055
Email: carolsobellaw@gmail.com
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Los Angeles Catholic Worker**                    represented by    **Catherine Elizabeth Sweetser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shayla Renee Myers**
Legal Aid Foundation of Los Angeles
7000 S Broadway
Los Angeles, CA 90003
213-640-3983
Fax: 213-640-3988
Email: smyers@lafla.org
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Cangress**                                       represented by    **Carol A. Sobel**
*doing business as*                                                  (See above for address)
Los Angeles Community Action Network (LA                            *ATTORNEY TO BE NOTICED*
CAN)

**Catherine Elizabeth Sweetser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shayla Renee Myers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Los Angeles Community Action Network**           represented by    **Carol A. Sobel**
*added re #193*                                                      (See above for address)
*ATTORNEY TO BE NOTICED*

**Shayla Renee Myers**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/10/2020 | 1 | COMPLAINT Receipt No: ACACDC-25670317 - Fee: $400, filed by Plaintiffs Charles Van Scoy, Harry Tashdjian, George Frem, Leandro Suarez, Joseph Burk, Gary Whitter, LA Alliance for Human Rights, Karyn Pinsky, Charles Malow. (Attorney Elizabeth Anne Mitchell added to party Joseph Burk(pty:pla), Attorney Elizabeth Anne Mitchell added to party George Frem(pty:pla), Attorney Elizabeth Anne Mitchell added to party LA Alliance for Human Rights(pty:pla), Attorney Elizabeth Anne Mitchell added to party Charles Malow(pty:pla), Attorney Elizabeth Anne Mitchell added to party Karyn Pinsky(pty:pla), Attorney Elizabeth Anne Mitchell added to party Leandro Suarez(pty:pla), Attorney Elizabeth Anne Mitchell added to party Harry Tashdjian(pty:pla), Attorney Elizabeth Anne Mitchell added to party Charles Van Scoy(pty:pla), Attorney Elizabeth Anne Mitchell added to party Gary Whitter(pty:pla)) (Mitchell, Elizabeth) (Entered: 03/10/2020) |
| 03/10/2020 | 2 | CIVIL COVER SHEET filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Mitchell, Elizabeth) (Entered: 03/10/2020) |

CM/ECF - California Central District        https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 03/10/2020 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening),,, 1 , Civil Cover Sheet (CV-71) 2 filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Mitchell, Elizabeth) (Entered: 03/10/2020) |
| 03/10/2020 | 4 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening),,, 1 , Civil Cover Sheet (CV-71) 2 filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Mitchell, Elizabeth) (Entered: 03/10/2020) |
| 03/10/2020 | 5 | NOTICE of Interested Parties filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter, identifying LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Karyn Pinsky, Charles Malow, Charles Van Scoy, George Frem, Gary Whitter, Leandro Suarez, City of Los Angeles, County of Los Angeles. (Mitchell, Elizabeth) (Entered: 03/10/2020) |
| 03/11/2020 | 6 | NOTICE OF ASSIGNMENT to District Judge Stephen V. Wilson and Magistrate Judge Steve Kim. (ghap) (Entered: 03/11/2020) |
| 03/11/2020 | 7 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (ghap) (Entered: 03/11/2020) |
| 03/11/2020 | 8 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening), 1 as to Defendant City of Los Angeles. (ghap) (Entered: 03/11/2020) |
| 03/11/2020 | 9 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening), 1 as to Defendant County of Los Angeles. (ghap) (Entered: 03/11/2020) |
| 03/11/2020 | 10 | NOTICE of Related Case(s) filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. Related Case(s): 18-cv-00155-DOC-JDE (Mitchell, Elizabeth) (Entered: 03/11/2020) |
| 03/13/2020 | 11 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 19-03-Related Case-filed. Related Case No: 8:17-cv-00246-DOC (KESx). Case transferred from Magistrate Judge Steve Kim and Judge Stephen V. Wilson to Judge David O. Carter and Magistrate Judge Karen E. Scott for all further proceedings. The case number will now reflect the initials of the transferee Judge 2:20-cv-02291-DOC (KESx). Signed by Judge David O. Carter. (ts) (Entered: 03/15/2020) |
| 03/16/2020 | 12 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: STATUS CONFERENCE MARCH 19, 2020. The Court orders Plaintiffs to show proof of service in this action by 12:00PM on Tuesday March 17, 2020. ( Show Cause Response due by 3/17/2020.) ( Status Conference set for 3/19/2020 at 10:00 AM before Judge David O. Carter.) The conference will occur at the FIRST STREET U.S. COURTHOUSE, 350 W 1st Street, Suite 4311, Los Angeles, CA 90012-4565, Courtroom Number 1. (twdb) (Entered: 03/16/2020) |
| 03/16/2020 | 13 | PROOF OF SERVICE Executed by Plaintiff Charles Van Scoy, Harry Tashdjian, George Frem, Leandro Suarez, Joseph Burk, Gary Whitter, LA Alliance for Human Rights, Karyn Pinsky, Charles Malow, upon Defendant City of Los Angeles served on 3/16/2020, answer due 4/6/2020. Service of the Summons and Complaint were executed upon City of Los Angeles, City Clerk in compliance with Federal Rules of Civil Procedure by service on a domestic corporation, unincorporated association, or public entity.Original Summons NOT returned. (Mitchell, Elizabeth) (Entered: 03/16/2020) |
| 03/16/2020 | 14 | PROOF OF SERVICE Executed by Plaintiff Charles Van Scoy, Harry Tashdjian, George Frem, Leandro Suarez, Joseph Burk, Gary Whitter, LA Alliance for Human Rights, Karyn Pinsky, Charles Malow, upon Defendant County of Los Angeles served on 3/16/2020, answer due 4/6/2020. Service of the Summons and Complaint were executed upon County of Los Angeles, Clerk of the Board in compliance with Federal Rules of Civil Procedure by service on a domestic corporation, unincorporated association, or public entity.Original Summons NOT returned. (Mitchell, Elizabeth) (Entered: 03/16/2020) |
| 03/17/2020 | 15 | INITIAL STANDING ORDER FOLLOWING ASSIGNMENT OF CIVIL CASE TO JUDGE CARTER upon filing of the complaint by Judge David O. Carter. (kd) (Entered: 03/17/2020) |
| 03/17/2020 | 16 | EX PARTE APPLICATION to Intervene filed by intervenor Orange County Catholic Worker. (Attachments: # 1 Proposed Order) (Attorney Carol A Sobel added to party Orange County Catholic Worker(pty:intv)) (Sobel, Carol) (Entered: 03/17/2020) |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 03/17/2020 | 17 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: SUPPLEMENTAL IN RE: STATUS CONFERENCE MARCH 19, 2020. Plaintiffs are ORDERED to serve this order on the Defendants. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 03/17/2020) |
| 03/17/2020 | 18 | ORDER by Judge David O. Carter: granting 16 EX PARTE APPLICATION to Intervene and Appearance at the Conference set for 3/19/20. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 03/17/2020) |
| 03/17/2020 | 19 | PROOF OF SERVICE filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Orange County Catholic Worker, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter, re Initial Order upon Filing of Complaint - form only 15 , Order on Motion to Intervene 18 , Minutes of In Chambers Order/Directive - no proceeding held,, Set/Reset Deadlines,, Set/Reset Hearing, 12 , EX PARTE APPLICATION to Intervene 16 , Minutes of In Chambers Order/Directive - no proceeding held 17 served on March 17, 2020. (Mitchell, Elizabeth) (Entered: 03/17/2020) |
| 03/17/2020 | 20 | PROOF OF SERVICE filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Orange County Catholic Worker, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter, re Initial Order upon Filing of Complaint - form only 15 , Order on Motion to Intervene 18 , Minutes of In Chambers Order/Directive - no proceeding held,, Set/Reset Deadlines,, Set/Reset Hearing, 12 , EX PARTE APPLICATION to Intervene 16 , Minutes of In Chambers Order/Directive - no proceeding held 17 *as to Defendant, County of Los Angeles* served on March 17, 2020. (Mitchell, Elizabeth) (Entered: 03/17/2020) |
| 03/17/2020 | 21 | PROOF OF SERVICE filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter, re Initial Order upon Filing of Complaint - form only 15 , Order on Motion to Intervene 18 , Minutes of In Chambers Order/Directive - no proceeding held,, Set/Reset Deadlines,, Set/Reset Hearing, 12 , EX PARTE APPLICATION to Intervene 16 , Minutes of In Chambers Order/Directive - no proceeding held 17 *as to personal service on Defendant, City of Los Angeles* served on March 17, 2020. (Mitchell, Elizabeth) (Entered: 03/17/2020) |
| 03/17/2020 | 22 | PROOF OF SERVICE filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter, re Initial Order upon Filing of Complaint - form only 15 , Order on Motion to Intervene 18 , Minutes of In Chambers Order/Directive - no proceeding held,, Set/Reset Deadlines,, Set/Reset Hearing, 12 , EX PARTE APPLICATION to Intervene 16 , Minutes of In Chambers Order/Directive - no proceeding held 17 *Corrected Proof of Electronic Service on Defendant, County of Los Angeles* served on March 17, 2020. (Mitchell, Elizabeth) (Entered: 03/17/2020) |
| 03/17/2020 | 23 | PROOF OF SERVICE filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter, re Initial Order upon Filing of Complaint - form only 15 , Order on Motion to Intervene 18 , Minutes of In Chambers Order/Directive - no proceeding held,, Set/Reset Deadlines,, Set/Reset Hearing, 12 , EX PARTE APPLICATION to Intervene 16 , Minutes of In Chambers Order/Directive - no proceeding held 17 *Revised Proof of Personal Service on Defendant, City of Los Angeles* served on March 17, 2020. (Mitchell, Elizabeth) (Entered: 03/17/2020) |
| 03/17/2020 | 24 | STATEMENT of Defendant City of Los Angeles re: EX PARTE APPLICATION to Intervene 16 filed by Defendant City of Los Angeles. (Attorney Jessica Mariani added to party City of Los Angeles(pty:dft)) (Mariani, Jessica) (Entered: 03/17/2020) |
| 03/18/2020 | 25 | EX PARTE APPLICATION to Intervene filed by Proposed Intervenors Los Angeles Catholic Worker, Cangress. (Attachments: # 1 Proposed Order) (Attorney Shayla Renee Myers added to party Los Angeles Catholic Worker(pty:intv), Attorney Shayla Renee Myers added to party Cangress(pty:intv)) (Myers, Shayla) (Entered: 03/18/2020) |
| 03/18/2020 | 26 | REQUEST FOR JUDICIAL NOTICE re EX PARTE APPLICATION to Intervene 25 filed by Intervenor Parties Cangress, Los Angeles Catholic Worker. (Attachments: # 1 Exhibit A - D)(Attorney Catherine Elizabeth Sweetser added to party Cangress(pty:intv), Attorney Catherine Elizabeth Sweetser added to party Los Angeles Catholic Worker(pty:intv))(Sweetser, Catherine) (Entered: 03/18/2020) |
| 03/18/2020 | 27 | Notice of Withdrawal of Statement (Motion related) 24 filed by defendant City of Los Angeles. (Mariani, Jessica) (Entered: 03/18/2020) |

https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| 03/18/2020 | 28 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: IN RESPONSE TO REQUEST 27 . The Court is inclined to grant the request, and invites the parties to discuss the removal of Docket No. 24 at the March 19, 2020 hearing. The Clerk shall serve this minute order on the parties. (twdb) (Entered: 03/18/2020) |
|---|---|---|
| 03/18/2020 | 29 | ORDER by Judge David O. Carter: Granting 25 Intervenors' EX PARTE APPLICATION to Intervene AS Of Right. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 03/18/2020) |
| 03/18/2020 | 30 | STATUS REPORT *re: March 19, 2020 Status Conference* filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Umhofer, Matthew) (Entered: 03/18/2020) |
| 03/18/2020 | 31 | PROOF OF SERVICE filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter, re Minutes of In Chambers Order/Directive - no proceeding held, 28 , EX PARTE APPLICATION to Intervene 25 , Request for Judicial Notice, 26 , Status Report 30 , Notice of Withdrawal 27 , Order on Motion to Intervene 29 *as to Defendant, County of Los Angeles* served on March 18, 2020. (Umhofer, Matthew) (Entered: 03/18/2020) |
| 03/18/2020 | 32 | STATEMENT of in Response to LACAN and LACW's Ex Parte Application for Intervention and Appearance EX PARTE APPLICATION to Intervene 25 filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Umhofer, Matthew) (Entered: 03/18/2020) |
| 03/18/2020 | 33 | Report re Developments filed by Intervenor Orange County Catholic Worker (Sobel, Carol) (Entered: 03/18/2020) |
| 03/19/2020 | 34 | STATUS REPORT filed by Intervenor Parties Cangress, Los Angeles Catholic Worker. (Sweetser, Catherine) (Entered: 03/19/2020) |
| 03/19/2020 | 35 | ORDER LIMITING NUMBER OF PEOPLE PERMITTED TO ATTEND EMERGENCY STATUS CONFERENCE by Judge David O. Carter, that the number of people permitted to attend the emergency status conference limited to 50 people and only to those who are necessary to determine and implement the mitigation measures. No more than four representatives from the press will be permitted to attend the emergency status conference and present in the courtroom so the public can be advised of what transpired at the emergency status conference. (see attached for further details) (pj). (Entered: 03/19/2020) |
| 03/19/2020 | 36 | MINUTES OF Status Conference held before Judge David O. Carter: The Honorable James L. Smith (Ret.), various City Officials, Mayors, and Chiefs of Police are present to discuss homeless population of Los Angeles and other cities in the County of Los Angeles. The Court orders the transcript of the Status Conference held on March 19, 2020, be immediately produced at government expense and billed at the daily rate. The transcript shall be prepared forthwith and filed on the docket with immediate release to the public. The Court sets a further Status Conference for MARCH 24, 2020 at 10:00 a.m. Court Reporter: Debbie Hino-Spaan. (kd) (Entered: 03/19/2020) |
| 03/19/2020 | 37 | Notice of Appearance or Withdrawal of Counsel: for attorney Byron J McLain counsel for Defendant County of Los Angeles. Adding Byron J. McLain as counsel of record for County of Los Angeles for the reason indicated in the G-123 Notice. Filed by Defendant County of Los Angeles. (Attorney Byron J McLain added to party County of Los Angeles(pty:dft))(McLain, Byron) (Entered: 03/19/2020) |
| 03/20/2020 | 38 | Notice of Appearance or Withdrawal of Counsel: for attorney Brandon D Young counsel for Defendant County of Los Angeles. Adding Brandon D. Young as counsel of record for County of Los Angeles for the reason indicated in the G-123 Notice. Filed by Defendant County of Los Angeles. (Attorney Brandon D Young added to party County of Los Angeles(pty:dft))(Young, Brandon) (Entered: 03/20/2020) |
| 03/20/2020 | 39 | TRANSCRIPT for proceedings held on 3/19/2020 at 10:100 a.m. ****Transcript may be viewed at the court public terminal or purchased through Court Reporter DEBBIE HINO-SPAAN at: WEBSITE www.debbiehinospaan.com; E-mail, dhinospaan@yahoo.com before the deadline for Release of Transcript restriction. After that date, it may be obtained from the Court Reporter or through PACER. Additional formats of the transcript (ASCII, Condensed, and Word Indexing/Concordance) are also available to be purchased at any time through the Court Reporter. Notice of Intent to Redact due within 7 days of this date.** Redaction Request due 4/10/2020. Redacted Transcript Deadline set for 4/20/2020. Release of Transcript Restriction set for 6/18/2020. (dhs) (Entered: 03/20/2020) |

CM/ECF - California Central District

https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 03/20/2020 | 40 | NOTICE OF FILING TRANSCRIPT filed for proceedings 3/19/2020 at 10:00 a.m. re Transcript 39 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dhs) TEXT ONLY ENTRY (Entered: 03/20/2020) |
| 03/23/2020 | 41 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter. After the Court conducted its initial hearing in this matter on March 19, 2020, the Central District of California issued its Continuity of Operations Plan (COOP), effective March 23, 2020. In order to comply with the COOP and other public health guidance, the parties have agreed to an acceptable off-site location for the March 24 settlement conference. The settlement conference shall be held at the Alexandria Ballrooms, 501 S. Spring St., Los Angeles, CA 90013. The Clerk shall serve this minute order on the parties. (kd) (Entered: 03/23/2020) |
| 03/23/2020 | 42 | Notice of Appearance or Withdrawal of Counsel: for attorney Carol A Sobel counsel for Intervenor Orange County Catholic Worker. Filed by plaintiff Orange County Catholic Worker. (Sobel, Carol) (Entered: 03/23/2020) |
| 03/23/2020 | 43 | STATUS REPORT filed by Defendants City of Los Angeles, County of Los Angeles. (Attachments: # 1 Exhibit A)(Young, Brandon) (Entered: 03/23/2020) |
| 03/24/2020 | 44 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter. After the Court conducted its initial hearing in this matter on March 19, 2020, the Central District of California issued its Continuity of Operations Plan (COOP), effective March 23, 2020. In order to comply with the COOP and other public health guidance, the parties have agreed to an acceptable off-site location for the March 26 status conference. The Status Conference will be held on March 26, 2020, at 10:00 a.m. at the Alexandria Ballrooms, 501 S. Spring St., Los Angeles, CA 90013. In order to be prepared to address this issue at Thursdays status conference, the Court requests and encourages the Los Angeles Police Department and the Los Angeles County Sheriffs Office to continue their joint efforts to establish procedures to be implemented for law enforcement personnel involved in facilitating the placement of homeless persons in appropriate shelter facilities in the City of Los Angeles, contract cities, and the unincorporated areas of Los Angeles County. (kd) (Entered: 03/24/2020) |
| 03/24/2020 | 81 | Text Only Entry: Settlement Conference held before Judge David O. Carter at the Alexandria Ballrooms, 501 S. Spring Street, Los Angeles, California. Court Reporter: None present; Courtroom Deputy: None present. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dgo) TEXT ONLY ENTRY (Entered: 04/28/2020) |
| 03/25/2020 | 45 | EX PARTE APPLICATION to File Amicus Brief filed by Amicus Curae Venice Stakeholders Association. (Attachments: # 1 Declaration Decl. of Mark Ryavec, # 2 Declaration Decl. of Jeffrey Lewis, # 3 Proposed Order Proposed Order) (Attorney Jeffrey Lewis added to party Venice Stakeholders Association(pty:am)) (Lewis, Jeffrey) (Entered: 03/25/2020) |
| 03/25/2020 | 46 | STATUS REPORT filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Umhofer, Matthew) (Entered: 03/25/2020) |
| 03/26/2020 | 47 | STATUS REPORT as of March 26, 2020 filed by Intervenor Parties Cangress, Los Angeles Catholic Worker. (Attachments: # 1 Exhibit A-D)(Myers, Shayla) (Entered: 03/26/2020) |
| 03/26/2020 | 82 | Text Only Entry: Status Conference held before Judge David O. Carter at the Alexandria Ballrooms, 501 S. Spring Street, Los Angeles, California. Court Reporter: None present; Courtroom Deputy: None present. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dgo) TEXT ONLY ENTRY (Entered: 04/28/2020) |
| 04/01/2020 | 48 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: The Court has received information indicating the lack of sufficient sanitary facilities to meet the basic needs of the homeless community generally referred to as Skid Row. The Court, moreover, has personally observed these conditions. In this community, there are very few sanitation facilities available, and it appears that no new toilets or sanitation stations have been installed in this area since the advent of the COVID-19 health crisis. If left unchecked, it is likely that the coronavirus will both devastate the vulnerable homeless population and exacerbate the existing public health crisis more generally. Therefore, the Court hereby ORDERS a status report by Defendants City of Los Angeles and County of Los Angeles to address the timeline for the installation of fifty additional toilets and fifty additional sanitation stations in the Skid Row area. The Special Master has reported that a private-sector entity has reserved these needed toilets and sanitation stations, along with a commitment for their installation. All of the toilets and sanitation stations can be installed by Wednesday, April 8, 2020. Fifty of the toilets and twenty-five of the sanitation stations can be |

https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| | | installed by Friday, April 3, 2020. However, the parties are invited to acquire and install from whatever source they deem appropriate the needed units within the timeline outlined above. Defendants City of Los Angeles and County of Los Angeles shall file the ordered status report, whether separately or jointly, by 4:00 p.m. on April 1, 2020. The Special Master has been ordered to communicate with the parties regarding these issues. (kd) (Entered: 04/01/2020) |
| 04/01/2020 | 49 | STATUS REPORT filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit Exhibit A to Status Report)(McLain, Byron) (Entered: 04/01/2020) |
| 04/01/2020 | 50 | STATUS REPORT *for April 1, 2020* filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 04/01/2020) |
| 04/04/2020 | 51 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter. Since its previous Order in this case 48 issued April 1, 2020, the Court has continued to observe the conditions of the homeless community generally referred to as Skid Row. The Court attempted to use four of the handwashing stations that were in place prior to the COVID-19 outbreak, and found no water in all four of the tested stations. The Court also attempted to use two of the newly delivered handwashing stations; one was fully functional, and one had soap but no water. Although this sample size is small, the Courts observations raise a strong inference that there are inadequate sanitation facilities available in Skid Row. The Court, accompanied by Los Angeles Police Department officers, also encountered an employee from Andy Gump, Inc., who advised that he was working on instructions from his employer to remove fifty of the companys existing handwashing stations from Skid Row. Although Defendant City of Los Angeles represents, in its April 1 Status Report (Dkt. 50), that the City is deploying sixty new handwashing stations to Skid Row, if fifty of the existing handwashing stations are removed, Skid Row will see a net gain of only ten handwashing stations. This minimal increase supports the inference that the sanitation facilities in Skid Row continue to be inadequate to meet the exigencies of the COVID-19 health crisis. The Court therefore ORDERS a hearing in this matter for Tuesday, April 7, 2020, at 2:00 p.m. In order to comply with the Central District of Californias Continuity of Operations Plan and other public health guidance, the hearing shall be held at the Alexandria Ballrooms, 501 S. Spring St., Los Angeles, CA 90013. (kd) (Entered: 04/04/2020) |
| 04/06/2020 | 52 | STATUS REPORT *IN ADVANCE OF APRIL 7 2020 HEARING* filed by Intervenor Orange County Catholic Worker. (Sobel, Carol) (Entered: 04/06/2020) |
| 04/06/2020 | 53 | REQUEST for Order for Status Report filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Attachments: # 1 Proposed Order) (Mitchell, Elizabeth) (Entered: 04/06/2020) |
| 04/06/2020 | 54 | STATUS REPORT *for April 7, 2020 Hearing* filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 04/06/2020) |
| 04/06/2020 | 55 | STATUS REPORT filed by Intervenor Parties Cangress, Los Angeles Catholic Worker. (Myers, Shayla) (Entered: 04/06/2020) |
| 04/06/2020 | 56 | Notice of Appearance or Withdrawal of Counsel: for attorney Brandon D Young counsel for Defendant County of Los Angeles. Adding Lauren Black as counsel of record for County of Los Angeles for the reason indicated in the G-123 Notice. Filed by Defendant County of Los Angeles. (Young, Brandon) (Entered: 04/06/2020) |
| 04/06/2020 | 57 | ORDER by Judge David O. Carter: Denying 45 EX PARTE APPLICATION. DENIED BY COURT. (twdb) (Entered: 04/06/2020) |
| 04/07/2020 | 83 | Text Only Entry: Status Conference held before Judge David O. Carter at the Alexandria Ballrooms, 501 S. Spring Street, Los Angeles, California. Recorded by: Austin Che; Courtroom Deputy: None present; Time in session: 1:33. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dgo) TEXT ONLY ENTRY (Entered: 04/28/2020) |
| 04/07/2020 | 90 | TRANSCRIPT for proceedings held on 4/07/2020, 2:10 p.m. Electronic Court Recorder: Austin Che / Transcriber: Lorie A. Cook with Personal Court Reporters, A Veritext Company, phone number (818) 988-1900. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/28/2020. Redacted Transcript Deadline set for 5/8/2020. Release of Transcript Restriction set for 7/6/2020. (ls) (Entered: 05/05/2020) |

CM/ECF - California Central District　　　　　　　　　https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 04/07/2020 | 91 | NOTICE OF FILING TRANSCRIPT filed for proceedings 4/07/2020, 2:10 p.m. re Transcript 90 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ls) TEXT ONLY ENTRY (Entered: 05/05/2020) |
| 04/08/2020 | 58 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter:In order to address the ostensibly inadequate sanitation facilities in Skid Row and the surrounding area, the Court hereby ORDERS Defendants City of Los Angeles and County of Los Angeles to submit a status report on Defendants plans for maintaining and servicing the sanitation facilities, such that the local community will have sufficient access to functioning sanitation facilities to mitigate the spread of coronavirus. Defendants City of Los Angeles and County of Los Angeles shall file the ordered status report, whether separately or jointly, within 48 hours, i.e., by 12:00 noon on Friday, April 10, 2020. (kd) (Entered: 04/08/2020) |
| 04/09/2020 | 59 | NOTICE filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. *Notice of Transcript of April 7, 2020 Hearing and Instructions to Order Copies* (Mitchell, Elizabeth) (Entered: 04/09/2020) |
| 04/10/2020 | 60 | STATUS REPORT *DEFENDANT COUNTY OF LOS ANGELES APRIL 10, 2020 STATUS REPORT* filed by Defendant County of Los Angeles. (McLain, Byron) (Entered: 04/10/2020) |
| 04/10/2020 | 61 | STATUS REPORT *for April 10, 2020* filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 04/10/2020) |
| 04/10/2020 | 62 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER FOR STATUS REPORT AND HEARING. At the April 7, 2020 hearing, Plaintiffs and Intervenors requested, and the Court ORDERED, a status report, which Defendants shall file either jointly or separately by 7:00 p.m. on Monday, April 13, 2020. See document for detailed information. The Court indicated at the previous hearing that it was going to start settlement discussions immediately. The initial discussion concerned recreational vehicles and focused on Skid Row and the surrounding area, up to and including the 10 Freeway. The Court requests that the parties discuss designated areas for recreational vehicles and present possible options to the Court, beginning with Skid Row and the surrounding area. If the parties wish to present a more comprehensive plan covering more of Los Angeles City and County, they are welcome to do so. While the Court will begin settlement discussions with a focus on Skid Row and the surrounding area, the Court intends to quickly broaden the scope of these discussions to encompass more of the City and County. As such, the parties should also be prepared to indicate to the Court when their respective principals will be available for an in-depth settlement discussion. A hearing to discuss these matters shall be held on Tuesday, April 14, 2020 at 10:00 a.m. In order to comply with the Central District of Californias Continuity of Operations Plan and other public health guidance, the hearing shall be held at the Alexandria Ballrooms, 501 S. Spring St., Los Angeles, CA 90013. (ts) (Entered: 04/10/2020) |
| 04/12/2020 | 63 | STATUS REPORT *RE RVs* filed by Intervenor Orange County Catholic Worker. (Attachments: # 1 Exhibit Exhibits A-H)(Sobel, Carol) (Entered: 04/12/2020) |
| 04/13/2020 | 64 | STATUS REPORT *Defendant County of Los Angeles April 13, 2020 Status Report* filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A)(Young, Brandon) (Entered: 04/13/2020) |
| 04/13/2020 | 65 | STATUS REPORT *for April 14, 2020 Hearing* filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 04/13/2020) |
| 04/14/2020 | 66 | EX PARTE APPLICATION to Intervene filed by Intervenor-Plaintiff Venice Stakeholders Association. (Attachments: # 1 Declaration Decl. iso Ex Parte Application, # 2 Declaration Decl. iso Ex Parte Application, # 3 Proposed Order Proposed Order Granting Ex Parte) (Attorney Jeffrey Lewis added to party Venice Stakeholders Association(pty:intvp)) (Lewis, Jeffrey) (Entered: 04/14/2020) |
| 04/14/2020 | 67 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: Defendant City of Los Angeles is hereby ORDERED to make available those persons responsible for the environmental report concerning Maple and 16th Street by 8:00 p.m. on Tuesday, April 14, 2020 (i.e., this evening). A hearing to discuss this report and related matters shall be held on Tuesday, April 14, 2020 at 8:00 p.m. In order to comply with the Central District of Californias Continuity of Operations Plan and other public health guidance, the hearing shall be held at the Alexandria Ballrooms, 501 S. Spring St., Los Angeles, CA 90013. The Clerk shall serve this minute order on the parties. (kd) (Entered: 04/14/2020) |
| 04/14/2020 | 84 | Text Only Entry: Status Conference held (p.m. session) before Judge David O. Carter at the Alexandria Ballrooms, 501 S. Spring Street, Los Angeles, California. Recorded by: Austin Che; Courtroom Deputy: None present; Time in Session: :21. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS |

| | | ENTRY. (dgo) TEXT ONLY ENTRY (Entered: 04/28/2020) |
|---|---|---|
| 04/14/2020 | 92 | TRANSCRIPT for proceedings held on 4/14/2020, 8:21 p.m. Electronic Court Recorder: Austin Che / Transcriber: Jane W. Gilliam with Veritext Legal Solutions, phone number (866) 299-5127. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/5/2020. Redacted Transcript Deadline set for 5/15/2020. Release of Transcript Restriction set for 7/13/2020. (ls) (Entered: 05/05/2020) |
| 04/14/2020 | 93 | NOTICE OF FILING TRANSCRIPT filed for proceedings 4/14/2020, 8:21 a.m. re Transcript 92 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ls) TEXT ONLY ENTRY (Entered: 05/05/2020) |
| 04/14/2020 | 298 | Text Only Entry: Status Conference held (a.m. session) before Judge David O. Carter at the Alexandria Ballrooms, 501 S. Spring Street, Los Angeles, California. Recorded by: Austin Che; Courtroom Deputy: None present; Time in Session: 2:50. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dgo) TEXT ONLY ENTRY (dgo) (Entered: 05/11/2021) |
| 04/15/2020 | 68 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: During the April 14, 2020 status conference, the parties indicated that they had reached a proposed settlement agreement regarding the use of the site at 16th and Maple as a parking area for recreational vehicles, vans, and cars being resided in by homeless persons. The Court then learned, at the last minute, that the proposed agreement in question was subject to evaluation of any environmental concerns that the site may present. The parties shall file a joint status report on or before 4:00 p.m. on Tuesday, April 21, 2020, addressing the following items: (a) the status of the environmental review, including any tentative findings and conclusions; and (b) any non-environmental issues remaining unresolved, as pertain to the proposed settlement agreement announced to the Court. (kd) (Entered: 04/15/2020) |
| 04/15/2020 | 69 | ORDER by Judge David O. Carter: Denying 66 EX PARTE APPLICATION to Intervene. DENIED BY ORDER OF THE COURT. (twdb) (Entered: 04/15/2020) |
| 04/15/2020 | 70 | AMENDED ORDER FOR STATUS REPORT AND HEARING RE: PROPOSED SETTLEMENT by Judge David O. Carter. During the April 14, 2020 status conference, the parties indicated that they had reached a proposed settlement agreement regarding the use of the site at 16th and Maple as a parking area for recreational vehicles, vans, and cars being resided in by homeless persons. The Court then learned, at the last minute, that the proposed agreement in question was subject to evaluation of any environmental concerns that the site may present. The parties shall file a joint status report on or before 4:00 p.m. on Tuesday, April 21, 2020, addressing the following items: (a)the status of the environmental review, including any tentative findings and conclusions; and (b) any non-environmental issues remaining unresolved, as pertain to the proposed settlement agreement announced to the Court. The Court hereby schedules a hearing for Thursday, April 23 at 10:00 a.m. In order to comply with the Central District of Californias Continuity of Operations Plan and other public health guidance, the hearing shall be held at the Alexandria Ballrooms, 501 S. Spring St., Los Angeles, CA 90013. (kd) (Entered: 04/15/2020) |
| 04/16/2020 | 71 | NOTICE of Transcript of April 14, 2020 Hearing and Instructions to Order Copies filed by Defendant City of Los Angeles. (Hoang, Arlene) (Entered: 04/16/2020) |
| 04/17/2020 | 72 | REQUEST for Hearing Emergency Status Conference filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (McLain, Byron) (Entered: 04/17/2020) |
| 04/19/2020 | 73 | MINUTE ORDER (IN CHAMBERS) Regarding Request for Emergency Status Conference 72 by Judge David O. Carter: The Project Roomkey program -- a joint undertaking by the City of Los Angeles, the County of Los Angeles, and the State of California -- seeks to secure hotel and motel rooms in the local community to provide safe isolation for the vulnerable homeless population during this unprecedented pandemic. As part of this program, over 250 hotel and motel owners have been contacted by City and County officials, and currently the County of Los Angeles has entered into contracts for over 2500 beds. The implementation of the Room Key Program will require cooperation of state and local government at all levels. The Court, recognizes the powers vested in the executive branch of government at all levels, including officials of the cities in which these hotels and motels are located. Concerns have been expressed by the cities of Lawndale and Bell Gardens regarding how this program is to be implemented. These concerns include, but are not necessarily limited to, the perceived lack of notice and an opportunity to be heard by the cities in which the hotels are located.The County of Los Angeles has requested an emergency status conference. Given the time-sensitive nature of the program and the concerns raised, the Court, to facilitate the discussion of these issues, respectfully invites the attendance of the following |

| | | |
|---|---|---|
| | | individuals at the previously scheduled status conference on Thursday April 23, 2020: City of Bell Gardens: Mayor Alejandra Cortez; City of Lawndale: Mayor Robert Pullen-Miles; Chairperson of the Los Angeles County Board of Supervisors, Kathryn Barger; and Not more than one (1) representative from each party in this action. In order to comply with the Central District of Californias Continuity of Operations Plan and other public health guidance, the status conference shall be held at the Alexandria Ballrooms, 501 S. Spring St., Los Angeles, CA 90013. To ensure social distancing and compliance with public health guidelines, the above participants are urged to limit the number persons appearing on their behalf. (dgo) (Entered: 04/19/2020) |
| 04/21/2020 | 74 | Notice of Appearance or Withdrawal of Counsel: for attorney Louis R Miller counsel for Defendant County of Los Angeles. Adding Louis R. Miller as counsel of record for Defendant County of Los Angeles for the reason indicated in the G-123 Notice. Filed by Defendant County of Los Angeles. (Attorney Louis R Miller added to party County of Los Angeles(pty:dft))(Miller, Louis) (Entered: 04/21/2020) |
| 04/21/2020 | 75 | STATEMENT [Status Conference Statement] filed by Defendant County of Los Angeles (Miller, Louis) (Entered: 04/21/2020) |
| 04/21/2020 | 76 | Notice of Appearance or Withdrawal of Counsel: for attorney Jennifer Mira Hashmall counsel for Defendant County of Los Angeles. Adding Mira Hashmall as counsel of record for Defendant County of Los Angeles for the reason indicated in the G-123 Notice. Filed by Defendant County of Los Angeles. (Attorney Jennifer Mira Hashmall added to party County of Los Angeles(pty:dft))(Hashmall, Jennifer) (Entered: 04/21/2020) |
| 04/21/2020 | 77 | STATUS REPORT *Joint Status Report* filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 04/21/2020) |
| 04/23/2020 | 86 | Text Only Entry: Status Conference held before Judge David O. Carter at the Alexandria Ballrooms, 501 S. Spring Street, Los Angeles, California. Recorded by: Austin Che. Courtroom Deputy: None present. Time in Session: 2:52. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ts) TEXT ONLY ENTRY (Entered: 04/30/2020) |
| 04/23/2020 | 94 | TRANSCRIPT for proceedings held on 4/23/2020, 10:03 a.m. Electronic Court Recorder: Austin Che / Transcriber: Lorie A. Cook with Veritext Legal Solutions, phone number (866) 299-5127. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/14/2020. Redacted Transcript Deadline set for 5/26/2020. Release of Transcript Restriction set for 7/22/2020. (ls) (Entered: 05/05/2020) |
| 04/23/2020 | 95 | NOTICE OF FILING TRANSCRIPT filed for proceedings 4/23/2020, 10:03 a.m. re Transcript 94 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ls) TEXT ONLY ENTRY (Entered: 05/05/2020) |
| 04/24/2020 | 78 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER FOR STATUS REPORTThe Court thanks the parties, as well as all of the additional attendees, who participated in the April 23, 2020 Status Conference for their efforts to engage in constructive discussions regarding efforts to house those experiencing homelessness during this pandemic. By this ORDER, the Court is memorializing the participants suggestions as to the process by which this may be accomplished.To that end, the parties shall file a joint status report no later than 4:00 p.m. on Monday, APRIL 27, 2020, regarding the following:(1) The use of property located at 749 S. Los Angeles Street, Los Angeles, California, for safe parking or pallet shelters; and(2) The status of the review and use of the property located at Maple and 16th Street, Los Angeles, California. At the April 23, 2020 Status Conference, the Court perceived what appeared to be a consensus reached among the participants, and on that basis REQUESTS that the parties file a progress report as to each of the following items on or before APRIL 30, 2020:(1) The current status of each location which has previously been identified or is under consideration as a safe parking site. In particular, said report should include how many recreational vehicles, vans, and cars are in each site, as well as the maximum capacity of each site.(2) The current status of the implementation of Governor Newsoms Project Roomkey. In particular, said report should include the number of persons already placed in hotels and motels.(3) The current number of recreational centers being used as shelters, and the number of persons sheltered therein. Finally, the Court notes that the City of Los Angeles is divided into 15 Districts, each represented by a City Councilperson. The Court has been advised that a settlement in this matter will best be achieved by a global settlement implemented on a District-by-District basis. The Court has been informed that, in furtherance of that goal, Nury Martinez, President, Los Angeles City Council, |

| | | |
|---|---|---|
| | | and Joe Buscaino, President Pro Tem, Los Angeles City Council, will be directly involved in the settlement discussions.The Court reiterates its appreciation of the efforts of all of the participants in these settlement discussions. (kd) (Entered: 04/24/2020) |
| 04/24/2020 | 79 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: APPOINTING SPECIAL MASTER. The Court hereby APPOINTS Michele Martinez to serve as a Special Master in this case, alongside the previously appointed Special Master, the Honorable James L. Smith (Ret.). (twdb) (Entered: 04/24/2020) |
| 04/27/2020 | 80 | STATUS REPORT *for April 27, 2020* filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 04/27/2020) |
| 04/28/2020 | 302 | TRANSCRIPT for proceedings held on 4/14/2020, 10:00 a.m. Electronic Court Recorder: Austin Che / Transcriber: Danielle S. Vanriper with Veritext Legal Solutions, phone number (866) 299-5127. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/19/2020. Redacted Transcript Deadline set for 5/29/2020. Release of Transcript Restriction set for 7/27/2020. (ls) (Entered: 05/12/2021) |
| 04/28/2020 | 303 | NOTICE OF FILING TRANSCRIPT filed for proceedings 4/14/2020, 10:00 a.m. re Transcript 302 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ls) TEXT ONLY ENTRY (Entered: 05/12/2021) |
| 04/29/2020 | 85 | Letter from Kathryn Barger, Supervisor re County's Intention to Enter Into Settlement Negotiations. (dgo) (Entered: 04/29/2020) |
| 04/30/2020 | 87 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE TRANSCRIPTS OF HEARINGS HELD ON 4/7/20, 4/14/20 AND 4/23/20. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 04/30/2020) |
| 04/30/2020 | 88 | STATUS REPORT *Defendants Joint Progress Report for April 30 2020* filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 04/30/2020) |
| 05/02/2020 | 89 | MINUTE ORDER (IN CHAMBERS) Scheduling Notice Re: Settlement Negotiations by Judge David O. Carter: The Court REQUESTS that the parties commence settlement negotiations, together with the Court, at 10:00 a.m. on Thursday, May 7, 2020. In order to comply with the Central District of California's Continuity of Operations Plan and other public health guidance, the settlement negotiations shall be held at the Alexandria Ballrooms, 501 S. Spring St., Los Angeles, CA 90013. The Court further REQUESTS that the parties confidentially submit their written settlement positions to the Court in advance of the settlement negotiations.The Clerk shall serve this minute order on the parties. Settlement Conference set for 5/7/2020 at 10:00 AM before Judge David O. Carter. (See Minute Order for further information) (dgo) (Entered: 05/02/2020) |
| 05/05/2020 | 96 | *Letter on behalf of Urban Offerings, Inc. re Objection to Selection of 749 S. Los Angeles Street as Safe Parking Site* (Hallock, Karen) (Entered: 05/05/2020) |
| 05/05/2020 | 97 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: FURTHER ORDER RE TRANSCRIPTS OF HEARINGS HELD ON APRIL 7, 2020, APRIL 14, 2020 AND APRIL 23, 2020. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 05/06/2020) |
| 05/06/2020 | 98 | OBJECTIONS to Status Report 88 *Letter objecting to selection of 749 S. Los Angeles Street as Safe Parking Site* filed by Interested Party Santee Village Homeowner's Association. (Attachments: # 1 Exhibit 1-Map of residential housing surrounding Proposed Site)(Mannion, David) (Entered: 05/06/2020) |
| 05/07/2020 | 100 | MINUTES OF Settlement Conference held before Judge David O. Carter: Settlement Conference held before Judge David O. Carter at the Alexandria Ballrooms, 501 S. Spring Street, Los Angeles, California. Court Reporter: Austin Che. (twdb) (Entered: 05/11/2020) |
| 05/07/2020 | 104 | MINUTES OF Hearing held on May 7, 2020 before Judge David O. Carter: Settlement Conference held before Judge David O. Carter at the Alexandria Ballrooms, 501 S. Spring Street, Los Angeles, California. SEE DOCUMENT FOR FURTHER INFORMATION. Court Reporter: Austin Che. (twdb) (Entered: 05/14/2020) |
| 05/07/2020 | 105 | AMENDED MINUTES held before Judge David O. Carter re: Hearing Held on May 7, 2020 104 . Settlement Conference held before Judge David O. Carter at the Alexandria Ballrooms, 501 S. Spring Street, Los Angeles, California. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 05/14/2020) |

CM/ECF - California Central District                     https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 05/07/2020 | 110 | TRANSCRIPT for proceedings held on 5/07/2020, 10:03 a.m. Electronic Court Recorder: Austin Che / Transcriber: Jane W. Gilliam with Veritext Legal Solutions, phone number (866) 299-5127. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/28/2020. Redacted Transcript Deadline set for 6/8/2020. Release of Transcript Restriction set for 8/5/2020. (ls) (Entered: 05/18/2020) |
| 05/07/2020 | 111 | NOTICE OF FILING TRANSCRIPT filed for proceedings 5/07/2020, 10:03 a.m re Transcript 110 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ls) TEXT ONLY ENTRY (Entered: 05/18/2020) |
| 05/07/2020 | 317 | 2nd AMENDED May 25, 2021 MINUTES held before Judge David O. Carter: HEARING HELD ON MAY 7, 2020. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) Modified on 5/26/2021 (twdb). (Entered: 05/26/2021) |
| 05/09/2020 | 99 | MINUTE ORDER (IN CHAMBERS) by Judge David O. Carter: The Court hereby SCHEDULES a Status Conference for Wednesday, May 13, 2020 at 10:00 a.m. In order to comply with the Central District of California's Continuity of Operations Plan and other public health guidance, the settlement negotiations shall be held at the Alexandria Ballrooms, 501 S. Spring St., Los Angeles, CA 90013, or another location designated and agreed upon by the parties. Status Conference set for 5/13/2020 @ 10:00 AM before Judge David O. Carter. See Minute Order for further information. (dgo) (Entered: 05/09/2020) |
| 05/12/2020 | 101 | STATUS REPORT filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A)(Young, Brandon) (Entered: 05/12/2020) |
| 05/12/2020 | 102 | STATUS REPORT for May 13, 2020 Status Conference filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 05/12/2020) |
| 05/13/2020 | 103 | MINUTE ORDER (IN CHAMBERS): ORDER FOR BRIEFING by Judge David O. Carter. The health risks described above constitute an emergency and demand a swift response, the Court invites the parties input before ordering injunctive relief. To that end, the Court hereby ORDERS that the parties file briefing on the above proposal by 5:00 p.m. on Wednesday, May 20, 2020. Each brief should be no longer than twenty-five pages, and should, at a minimum, discuss the partys position on the legal justification for injunctive relief and the proposed remedy outlined above. The Court further ORDERS the City of Los Angeles and County of Los Angeles to submit an estimate of how many individuals experiencing homelessness would be affected by the proposed relief no later than 10:00 a.m. on Friday, May 15, 2020. (Attachments: # 1 Exhibit A) (kd) (Entered: 05/13/2020) |
| 05/13/2020 | 107 | MINUTES OF HEARING HELD ON MAY 13, 2020 before Judge David O. Carter: Settlement Conference held before Judge David O. Carter at the Alexandria Ballrooms, 501 S. Spring Street, Los Angeles, California. SEE DOCUMENT FOR FURTHER INFORMATION. Court Reporter: Austin Che. (twdb) (Entered: 05/15/2020) |
| 05/13/2020 | 112 | TRANSCRIPT for proceedings held on 5/13/2020, 10:01 a.m. Electronic Court Recorder: Austin Che / Transcriber: Benjamin Graham with Veritext Legal Solutions, phone number (866) 299-5127. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 6/3/2020. Redacted Transcript Deadline set for 6/15/2020. Release of Transcript Restriction set for 8/11/2020. (ls) (Entered: 05/18/2020) |
| 05/13/2020 | 113 | NOTICE OF FILING TRANSCRIPT filed for proceedings 5/13/2020, 10:01 a.m re Transcript 112 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ls) TEXT ONLY ENTRY (Entered: 05/18/2020) |
| 05/13/2020 | 318 | AMENDED May 25, 2021 MINUTES held before Judge David O. Carter: Hearing Held on May 13, 2020. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) Modified on 5/26/2021 (twdb). (Entered: 05/26/2021) |
| 05/14/2020 | 106 | SCHEDULING NOTICE by Judge David O. Carter. The Court hereby SCHEDULES a Status Conference for Friday, May 15, 2020 at 10:00 a.m. In order to comply with the Central District of California's Continuity of Operations Plan and other public health guidance, the status conference shall be held at the Los Angeles Homeless Services Authority, 811 Wilshire Blvd., 5th Floor Conference Room, Los Angeles, CA. Status Conference set for 5/15/2020 @ 10:00 a.m. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kd) TEXT ONLY ENTRY (Entered: 05/14/2020) |

| | | |
|---|---|---|
| 05/15/2020 | 108 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: The Court invites the parties input before this preliminary injunction takes effect. Therefore, the following timeline shall apply: (1) This preliminary injunction shall enter into force at 12:00 noon on Friday, May 22, 2020 (2) Before then, if the parties reach an agreement on an alternative plan, they may submit their plan to the Court by 3:00 p.m. on Tuesday, May 19, 2020. (3) If the parties submit an alternative plan, a hearing will be held to discuss the alternative plan on Wednesday, May 20, 2020 at 10:00 a.m. In order to comply with the Central District of Californias Continuity of Operations Plan and other public health guidance, if such a hearing occurs, it shall be held at the Alexandria Ballrooms, 501 S. Spring St., Los Angeles, CA 90013, or another location designated and agreed upon by the parties. (4) To ensure all parties have an adequate opportunity to be heard, the parties may submit briefingnot to exceed 25 pages on this preliminary injunction by 3:00 p.m. on Thursday, May 21, 2020. The briefing deadlines the Court set from the bench are vacated and superseded by this order. (5) Before or after this preliminary injunction takes effect at 12:00 noon on Friday, May 22, 2020, the Court may modify this preliminary injunction, either on its own motion or upon consideration of the parties input. If modified, the Court will docket a superseding order. (kd) (Entered: 05/15/2020) |
| 05/15/2020 | 109 | MINUTES OF Status Conference held on May 15, 2020 before Judge David O. Carter: Status Conference held before Judge David O. Carter at the Los AngelesHomeless Services Authority, 811 Wilshire Blvd., 5th Floor Conference Room, LosAngeles, CA. SEE DOCUMENT FOR FURTHER INFORMATION. Court Reporter: Austin Che. (twdb) (Entered: 05/18/2020) |
| 05/15/2020 | 117 | TRANSCRIPT for proceedings held on 5/15/2020, 10:12 a.m. Electronic Court Recorder: Austin Che / Transcriber: Sonya Ledanski Hyde with Veritext Legal Solutions, phone number (866) 299-5127. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 6/5/2020. Redacted Transcript Deadline set for 6/15/2020. Release of Transcript Restriction set for 8/13/2020. (ls) (Entered: 05/20/2020) |
| 05/15/2020 | 118 | NOTICE OF FILING TRANSCRIPT filed for proceedings 5/15/2020, 10:12 a.m. re Transcript 117 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ls) TEXT ONLY ENTRY (Entered: 05/20/2020) |
| 05/15/2020 | 319 | AMENDED May 25, 2021 MINUTES held before Judge David O. Carter: Status Conference Held on 5/15/20. re: Status Conference 109 . SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 05/26/2021) |
| 05/19/2020 | 114 | REPORT of Alternative Plan filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 05/19/2020) |
| 05/20/2020 | 115 | STATUS REPORT *re PEH Plan* filed by Defendant County of Los Angeles. (McLain, Byron) (Entered: 05/20/2020) |
| 05/20/2020 | 116 | RESPONSE filed by Plaintiff LA Alliance for Human Rightsto Report 114 , Status Report 115 *RE IMPLEMENTING COURT ORDER DATED MAY 15, 2020* (Mitchell, Elizabeth) (Entered: 05/20/2020) |
| 05/21/2020 | 119 | BRIEF filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. *Plaintiffs' Brief in Support of Preliminary Injunction Dated May 15, 2020* regarding Minutes of In Chambers Order/Directive - no proceeding held,,,,, 108 . (Mitchell, Elizabeth) (Entered: 05/21/2020) |
| 05/21/2020 | 120 | RESPONSE filed by Defendant County of Los Angelesto Minutes of In Chambers Order/Directive - no proceeding held,,,,, 108 (Young, Brandon) (Entered: 05/21/2020) |
| 05/21/2020 | 121 | RESPONSE filed by Defendant City of Los Angeles *TO COURTS PRELIMINARY INJUNCTION TO BE ISSUED MAY 22, 2020 [DOCKET NO. 108]* (Marcus, Scott) (Entered: 05/21/2020) |
| 05/21/2020 | 122 | OBJECTIONS *tto Proposed Injunction* filed by Intervenor Los Angeles Catholic Worker. (Sobel, Carol) (Entered: 05/21/2020) |
| 05/22/2020 | 123 | MINUTE ORDER AND PRELIMINARY INJUNCTION (IN CHAMBERS) by Judge David O. Carter: To facilitate the Courts monitoring of compliance with the terms of this preliminary injunction, the Court will require periodic status reports from the parties as to their progress. The first such report shall be filed with the Court no later than 12:00 noon on Friday, June 12, 2020. At minimum, this report shall detail a plan for establishing shelter and clearing overpasses, underpasses, and ramps in each council district or supervisorial district no later than September 1, 2020. The Court reserves the authority to advance the |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| | | deadline of September 1, 2020 in the event that the interim status reports do not demonstrate satisfactory progress towards compliance with the preliminary injunction. Furthermore, the Court shall conduct additional hearings to monitor compliance as the Court finds necessary. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (kd) (Please see document for details on the Preliminary Injunction) Modified per Judge Carter (Entered: 05/22/2020) |
| 05/28/2020 | 124 | Joint REQUEST for Order for TO MEDIATE filed by Defendant County of Los Angeles. (Attachments: # 1 Proposed Order) (McLain, Byron) (Entered: 05/28/2020) |
| 05/29/2020 | 125 | MINUTES (IN CHAMBERS) by Judge David O. Carter: ORDER APPOINTING MEDIATOR. The Court hereby GRANTS the Request and APPOINTS the Honorable Andr Birotte Jr. to serve as the mediator in this matter. Re: (Dkt. 124 ). SEE DOCUMENT FOR FURTHER INFORMATION (twdb) (Entered: 05/29/2020) |
| 05/29/2020 | 126 | Letter from Nury Martinez, Counsel President, re City's Intention to Enter Into Settlement Negotiations (kd) Modified on 5/29/2020 (dgo). Modified on 6/2/2020 (dgo). (Entered: 05/29/2020) |
| 05/29/2020 | 127 | (IN CHAMBERS) ORDER SETTING BRIEFING SCHEDULE AND MEDIATION FOR DEFENDANTS CITY OF LOS ANGELES AND COUNTY OF LOS ANGELES PURSUANT TO JUDGE CARTER'S ORDER APPOINTING MEDIATOR by Judge Andre Birotte Jr.: Defendants City of Los Angeles and County of Los Angeles shall submit confidential briefs of no more than 20 pages by Tuesday, June 2, 2020, at 5:00 p.m. Defendants City of Los Angeles and County of Los Angeles shall mediate this issue on Thursday, June 4, 2020, at 10:00 a.m. See Order for details. (cb) (Entered: 05/29/2020) |
| 06/02/2020 | 128 | Text Only Order by Judge David O. Carter: On the Court's own motion, docket entry 126 SEALED DOCUMENT is ORDERED unsealed. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dgo) TEXT ONLY ENTRY (Entered: 06/02/2020) |
| 06/02/2020 | 129 | Joint STIPULATION for Order TO CHANGE DATE AND LOCATION FOR MEDIATION filed by Defendant County of Los Angeles. (Attachments: # 1 Proposed Order)(McLain, Byron) (Entered: 06/02/2020) |
| 06/02/2020 | 130 | ORDER GRANTING JOINT STIPULATION OF CITY OF LOS ANGELES AND COUNTY OF LOS ANGELES TO CHANGE DATE AND LOCATION FOR MEDIATION (Dkt. No. 129 ) by Judge Andre Birotte Jr. The mediation currently scheduled for Thursday, June 4, 2020 at 10:00 a.m. will now take place on Thursday, June 11, 2020 at 10:00 a.m. See Order for details. IT IS SO ORDERED. (cb) (Entered: 06/02/2020) |
| 06/10/2020 | 131 | Joint STIPULATION for Order TO EXTEND DEADLINE TO FILE STATUS REPORT filed by Defendant County of Los Angeles. (Attachments: # 1 Proposed Order)(McLain, Byron) (Entered: 06/10/2020) |
| 06/11/2020 | 132 | ORDER by Judge David O. Carter, Granting Joint Stipulation of City of Los Angeles and County of Los Angeles to Extend Deadline to File Status Report 131 . Status Report due by 6/18/2020 at noon.) (twdb) (Entered: 06/11/2020) |
| 06/12/2020 | 133 | (IN CHAMBERS) ORDER RE: MEDIATION by Judge Andre Birotte Jr.: The Court hereby ORDERS Defendants City of Los Angeles and County of Los Angeles to continue the mediation today, Friday, June 12, 2020, at 1:00 p.m. SEE ORDER FOR DETAILS. (cb) (Entered: 06/12/2020) |
| 06/17/2020 | 134 | Joint STIPULATION for Order REQUESTING HEARING TO APPROVE BINDING TERM SHEET filed by Defendant County of Los Angeles. (Attachments: # 1 Proposed Order)(McLain, Byron) (Entered: 06/17/2020) |
| 06/17/2020 | 135 | ORDER RE BINDING TERM SHEET APPROVAL HEARING by Judge David O. Carter.On June 17, 2020, the City of Los Angeles and County of Los Angeles filed a Joint Request for Hearing to Approve Binding Term Sheet (Request) 134 . In this Request, the Defendants indicate that they have reached an agreement as a result of mediation, and have memorialized the terms in a Binding Term Sheet, subject to the Courts approval. The Court, having read and considered the Request, ORDERS the following: A hearing shall be held on Thursday, June 18, 2020 at 9:00 a.m. In order to comply with the Central District of Californias Continuity of Operations Plan and other public health guidance, the hearing shall be held at the Alexandria Ballrooms, 501 S. Spring St., Los Angeles, CA 90013. The Court invites the attendance of the principals involved in the mediation, including Eric Garcetti, Mayor of the City of Los Angeles; Kathryn Barger, Chair of the County Board of Supervisors; Nury Martinez, President of the Los Angeles |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| | | City Council; Joe Buscaino, Member of the Los Angeles City Council; Mark Ridley-Thomas, Member of the County Board of Supervisors and any other member of the Board of Supervisors or City Council who wishes to attend. (kd) (Entered: 06/17/2020) |
| 06/18/2020 | 136 | SETTLEMENT TERM SHEET from Defendants City of Los Angeles, County of Los Angeles. (kd) (Entered: 06/18/2020) |
| 06/18/2020 | 137 | Joint STIPULATION for Order REQUESTING THE COURT APPROVE THE BINDING TERM SHEET AND VACATE THE PRELIMINARY INJUNCTION filed by Defendant County of Los Angeles. (Attachments: # 1 Proposed Order)(McLain, Byron) (Entered: 06/18/2020) |
| 06/18/2020 | 138 | ORDER RE: JOINT STIPULATION REQUESTING THE COURT APPROVE THE BINDING TERM SHEET AND VACATE THE PRELIMINARY INJUNCTION 137 by Judge David O. Carter. The Preliminary Injunction Order dated May 22, 2020 [Dkt. 123 ] is hereby vacated without prejudice subject to the Court's later consideration of reinstatement of the Preliminary Injunction should the parties fail to comply with the Binding Term Sheet. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 06/18/2020) |
| 06/18/2020 | 142 | MINUTES OF SETTLEMENT CONFERENCE HELD ON JUNE 18, 2020 before Judge David O. Carter: SEE DOCUMENT FOR FURTHER INFORMATION. Court Reporter: Austin Che. (twdb) (Entered: 06/24/2020) |
| 06/18/2020 | 161 | AMENDED MINUTES (AMENDED ON 8/12/20) held before Judge David O. Carter re: SETTLEMENT CONFERENCE HELD ON JUNE 18, 2020 142 . SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 08/12/2020) |
| 06/19/2020 | 139 | STATUS REPORT filed by Defendant County of Los Angeles. (McLain, Byron) (Entered: 06/19/2020) |
| 06/19/2020 | 140 | STATUS REPORT filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 06/19/2020) |
| 06/20/2020 | 141 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: Order re: Global Settlement Discussions. The Court hereby ORDERS a Mediation Conference between all parties on Thursday, June 25, 2020 at 10:00 a.m., regarding global settlement discussions for this matter. The Mediation Conference will occur before Judge Andre Birotte Jr. at the First Street U.S. Courthouse, Courtroom 7B, 350 W. 1st Street, Los Angeles, California 90012. The Court commends the City and County of Los Angeles for the settlement they have reached regarding individuals experiencing homelessness on or near highway underpasses and overpasses. The Court now urges the parties to continue these efforts to reach a global settlement of all the remaining disputes in this matter. The Court requests that the following principals be present at the Mediation Conference on Thursday, June 25, 2020, at 10:00 a.m.: Los Angeles Mayor Eric Garcetti; Los Angeles County Supervisor Kathryn Barger, Chair of the Los Angeles County Board of Supervisors; Los Angeles County Supervisor Mark Ridley-Thomas; Los Angeles City Council President Nury Martinez; and Los Angeles City Councilman Joe Buscaino. The presence of the principals was instrumental in reaching the initial settlement in this matter, and the Court is confident that further agreements can be reached with their continued direct participation in mediation. (ts) (Entered: 06/20/2020) |
| 07/08/2020 | 143 | MINUTE ORDER IN CHAMBERS (IN CHAMBERS): ORDER FOR STATUS REPORT AND SCHEDULING STATUS CONFERENCE by Judge David O. Carter. The Court SCHEDULES a Status Conference for 10:00 a.m. on Thursday, July 16, 2020, to be held in the Ceremonial Courtroom at the First Street U.S. Courthouse, 350 W. 1st Street, Los Angeles, CA 90012. The Court will inquire about the central authority tasked with carrying out the parties agreement and such authoritys plans for implementing the agreement. The Court also intends to ask about the implementation of the agreement in each council district and supervisorial district. PLEASE READ COMPLETE ORDER FOR ALL DETAILS. (kd) (Entered: 07/08/2020) |
| 07/09/2020 | 144 | MINUTE ORDER IN CHAMBERS NOTICE OF ERRATA RE: ORDER FOR STATUS REPORT AND SCHEDULING STATUS CONFERENCE 143 by Judge David O. Carter. In its Order for Status Report and Scheduling Status Conference (Order) (Dkt. 143), filed July 8, 2020, the Court erroneously instructed the parties to provide the individuals listed in the Order with a copy thereof by 5:00 p.m. on Friday, June 10, 2020. See Order at 3. The Court intended to set a deadline of 5:00 p.m. on Friday, July 10, 2020. In accordance with this correction, the parties shall ensure that all individuals listed in the Order are provided with a copy of the Order by 5:00 p.m. on Friday, July 10, 2020. The Clerk shall serve this minute order on the parties. (kd) (Entered: 07/09/2020) |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| 07/13/2020 | 145 | Notice of Appearance or Withdrawal of Counsel: for attorney Byron J McLain counsel for Defendant County of Los Angeles. Adding Amie Park as counsel of record for Defendant County of Los Angeles for the reason indicated in the G-123 Notice. Filed by Defendant County of Los Angeles. (McLain, Byron) (Entered: 07/13/2020) |
|---|---|---|
| 07/14/2020 | 146 | SCHEDULING NOTICE by Judge David O. Carter. At the upcoming Status Conference scheduled for 10:00 a.m. on Thursday, July 16, 2020 (see Dkt. 143), the Court REQUESTS the attendance of Los Angeles City Attorney Mike Feuer, LAHSA Commission Chair Sarah Dusseault, Los Angeles Fire Department Chief Ralph M. Terrazas, and Los Angeles County Fire Department Chief Daryl L. Osby. The Court apologizes for their omission from the original order.The parties shall forthwith provide the above individuals with a copy of the Courts original order (Dkt. 143), the first notice of errata (Dkt. 144), and this notice.The Clerk shall serve this minute order on the parties. (kd) (Entered: 07/14/2020) |
| 07/14/2020 | 147 | STATUS REPORT *OF THE COUNTY OF LOS ANGELES PURSUANT TO JULY 8, 2020 ORDER [DKT 143]* filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(McLain, Byron) (Entered: 07/14/2020) |
| 07/14/2020 | 148 | MINUTE ORDER IN CHAMBERS POSTPONING JULY 16,2020 STATUS CONFERENCE by Judge David O. Carter: In the Court's July 8, 2020 Minute Order (the Order) (Dkt. 143), the Court scheduled a Status Conference for 10:00 a.m. on July 16, 2020 (the Status Conference). See Order at 1. However, on Tuesday, July 14, 2020, Los Angeles County public health officials... reported the highest single-day count of COVID-19 cases and related hospitalizations since the pandemic hit. Colleen Shalby, L.A. County Sets Record for COVID-19 Cases, Hospitalizations as Conditions Worsen, L.A. Times (July 14, 2020), https://www.latimes.com/california/story/2020-07-14/threat-level-in-los-angeles-increasing-mayor-warns. There have never been more infections or reported daily positive cases in Los Angeles than there are currently. Id. As the Coronavirus pandemic continues to worsen, the Court cannot in good conscience conduct an in-person hearing on the scale of the planned Status Conference, which numerous public officials, staff members, and community activists planned to attend. The Court recognizes that many prospective attendees have been hard at work preparing presentations for the Status Conference, and the Court regrets that they will not be able to share their knowledge with the Court on July 16, 2020 as planned. The Court, however, must prioritize everyone's health and well-being in these precarious times. As such, the Court will look forward to hearing from all of the individuals expected to attend the Status Conference as soon as it can be safely rescheduled in accordance with prevailing public health conditions. The Court hereby POSTPONES the Status Conference, and will reschedule the Status Conference as soon as public health conditions improve to an extent that the Status Conference can be safely held. The City and County of Los Angeles shall still submit the status report described in the Order by 12:00 noon on Wednesday, July 15, 2020. See Order at 2-3. Finally, the parties shall ensure that all individuals listed in the Order and Notices of Errata (Dkts. 144, 146) are notified of the postponement of the Status Conference. (dgo) (Entered: 07/14/2020) |
| 07/15/2020 | 149 | STATUS REPORT *for July 15, 2020* filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A to City of Los Angeles 7-15-20 Status Report, # 2 Exhibit B to City of Los Angeles 7-15-20 Status Report, # 3 Exhibit C to City of Los Angeles 7-15-20 Status Report, # 4 Exhibit D to City of Los Angeles 7-15-20 Status Report, # 5 Exhibit E to City of Los Angeles 7-15-20 Status Report, # 6 Exhibit F to City of Los Angeles 7-15-20 Status Report, # 7 Exhibit G to City of Los Angeles 7-15-20 Status Report, # 8 Exhibit H to City of Los Angeles 7-15-20 Status Report)(Marcus, Scott) (Entered: 07/15/2020) |
| 07/15/2020 | 150 | NOTICE OF ERRATA filed by Defendant City of Los Angeles. correcting Status Report,, 149 *Exhibit B to the status report* (Attachments: # 1 Exhibit B to City's status report)(Hoang, Arlene) (Entered: 07/15/2020) |
| 07/15/2020 | 151 | REQUEST to Supplement Status Report re Status Report 147 , Status Report,, 149 filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Umhofer, Matthew) (Entered: 07/15/2020) |
| 07/16/2020 | 152 | Text Only Order re Status Report [149-2], Notice of Errata [150-1] by Judge David O. Carter: In response to an emergency ex parte request by the City of Los Angeles, the Court sealed Exhibit B to the City's most recent status reports [149-2], [150-1] in advance of a formal request being filed on the docket. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dgo) TEXT ONLY ENTRY (Entered: 07/16/2020) |
| 07/16/2020 | 153 | NOTICE OF ERRATA filed by Defendant City of Los Angeles. correcting Errata 150 , Status Report,, 149 *(Second Notice of Errata)* (Attachments: # 1 Exhibit Corrected Exhibit B to City of Los Angeles |

CM/ECF - California Central District      https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | 7-15-20 Status Report)(Marcus, Scott) (Entered: 07/16/2020) |
|---|---|---|
| 07/17/2020 | 154 | EX PARTE APPLICATION to Intervene filed by Proposed Intervenor-Plaintiffs Latino Coalition of Los Angeles, Josue Tiguila. (Attachments: # 1 Exhibit Request for Judicial Notice of Exhibits 101 and 102, # 2 Declaration of Latino Coalition of Los Angeles, # 3 Declaration of Josue Tiguila, # 4 Declaration of Christian Contreras, # 5 Proposed Order Granting Ex Parte Application, # 6 Supplement Proof of Electronic Service) (Attorney Christian M Contreras added to party Latino Coalition of Los Angeles(pty:intvp) Attorney Christian M Contreras added to party Josue Tiguila(pty:intvp)) (Contreras, Christian) (Entered: 07/17/2020) |
| 07/17/2020 | 155 | MINUTE ORDER IN CHAMBERS ORDER RE: EX PARTE APPLICATION TO INTERVENE 154 by Judge David O. Carter. The Court is in receipt of Proposed Intervenor-Plaintiffs Latino Coalition of Los Angeless and Jose Tiguilas (Proposed Intervenors) Ex Parte Application to Intervene. [154. The Court extends an invitation to the Proposed Intervenors to attend the next scheduled Status Conference in this matter, which will be calendared as soon as it can be safely scheduled in accordance with prevailing public health conditions. At that time, Proposed Intervenors can present argument in person with all parties present as to why intervention is appropriate and permissible. (kd) (Entered: 07/17/2020) |
| 07/28/2020 | 156 | MINUTE ORDER IN CHAMBERS (IN CHAMBERS): ORDER SCHEDULING STATUS CONFERENCE by Judge David O. Carter. In accordance with the Courts authority to monitor the agreement reached between the parties, the Court hereby SCHEDULES a Status Conference for Friday, AUGUST 7, 2020 at 10:00 A.M. In order to comply with public health guidance, the Status Conference shall be held at Los Angeles City Hall, 200 North Spring Street, Los Angeles, CA 90012. The Court will inquire about the central authority tasked with carrying out the parties agreement and such authoritys plans for implementing the agreement. The Court also intends to ask about the implementation of the agreement in each council district and supervisorial district. In addition, to better understand the effects of the ongoing pandemic, the Court asks that the parties be prepared to give an estimate of how many unsheltered individuals experiencing homelessness died during 2019 in the City and County of Los Angeles. (see minute order for complete details.) (kd) (Entered: 07/28/2020) |
| 08/05/2020 | 157 | MINUTE ORDER (IN CHAMBERS) re Notice of Errata Re: August 7, 2020 Status Conference 156 by Judge David O. Carter: At the upcoming Status Conference scheduled for 10:00 a.m. on Friday, August 7, 2020 (see Dkt. 156), the Court REQUESTS the attendance of LAHSA Commission Chair Wendy Greuel. The Court recently learned that Ms. Greuel is the new chairperson and welcomes her involvement in the upcoming proceedings. The parties shall forthwith provide Commission Chair Greuel with a copy of the Courts original order (Dkt. 156) and this notice. (dgo) (Entered: 08/05/2020) |
| 08/06/2020 | 158 | STATUS REPORT *in Advance of August 7, 2020 Status Conference* filed by Intervenor Parties Cangress, Los Angeles Catholic Worker. (Myers, Shayla) (Entered: 08/06/2020) |
| 08/07/2020 | 160 | MINUTES OF Status Conference (Held at Los Angeles City Hall) before Judge David O. Carter: SEE DOCUMENT FOR FURTHER INFORMATION. Court Reporter: Katherine Stride. (twdb) (Entered: 08/11/2020) |
| 08/07/2020 | 167 | AMENDED MINUTES held before Judge David O. Carter re: Status Conference 160 . SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 09/01/2020) |
| 08/10/2020 | 159 | MINUTES (IN CHAMBERS) by Judge David O. Carter: ORDER DENYING EX PARTE APPLICATION TO INTERVENE 154 . SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 08/11/2020) |
| 08/13/2020 | 162 | TRANSCRIPT for proceedings held on 6/18/20 9:26 a.m. - Alexandria Hotel Ballroom. Court Reporter/Electronic Court Recorder: Veritex Legal Solutions (866) 299-5127, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 9/3/2020. Redacted Transcript Deadline set for 9/14/2020. Release of Transcript Restriction set for 11/12/2020. (ha) Modified on 8/13/2020 (ha). (Entered: 08/13/2020) |
| 08/13/2020 | 163 | NOTICE OF FILING TRANSCRIPT filed for proceedings 6/18/20 9:26 a.m. re Transcript 162 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ha) TEXT ONLY ENTRY (Entered: 08/13/2020) |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| 08/27/2020 | 164 | TRANSCRIPT ORDER as to defendant County of Los Angeles for Court Reporter. Court will contact Angelica Ransom at aransom@millerbarondess.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Miller, Louis) (Entered: 08/27/2020) |
|---|---|---|
| 09/01/2020 | 165 | TRANSCRIPT for proceedings held on 8/07/2020 10:05 a.m. Court Reporter: KATHERINE M. STRIDE, RPR, CSR, email address: katscsr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 9/22/2020. Redacted Transcript Deadline set for 10/2/2020. Release of Transcript Restriction set for 11/30/2020. (ls) (Entered: 09/01/2020) |
| 09/01/2020 | 166 | NOTICE OF FILING TRANSCRIPT filed for proceedings 8/07/2020, 10:05 a.m. re Transcript 165 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ls) TEXT ONLY ENTRY (Entered: 09/01/2020) |
| 09/02/2020 | 168 | NOTICE by Judge David O. Carter re: TRANSCRIPT ORDER as to defendant County of Los Angeles for Court Reporter 164 . The Court refers the parties to docket entry 166 for the Transcript of the August 7,2020 hearing. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kd) TEXT ONLY ENTRY (Entered: 09/02/2020) |
| 09/02/2020 | 169 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER SCHEDULING STATUS CONFERENCE. In order to comply with public health guidance, the Status Conference shall be held at Los Angeles City Hall, 200 North Spring Street, Los Angeles, CA 90012. ( Status Conference set for 9/17/2020 at 10:00 AM before Judge David O. Carter.) SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 09/02/2020) |
| 09/03/2020 | 170 | (IN CHAMBERS) ORDER SETTING MEDIATION TO CONTINUE PRIOR EFFORTS TOWARD SETTLEMENT by Judge Andre Birotte Jr. The Court hereby schedules a mediation for Thursday, September 10, 2020 at 10:00 a.m. SEE ORDER FOR DETAILS. (cb) (Entered: 09/03/2020) |
| 09/03/2020 | 171 | (IN CHAMBERS) NOTICE OF ERRATA RE: ORDER SETTING MEDIATION TO CONTINUE PRIOR EFFORTS TOWARD SETTLEMENT by Judge Andre Birotte Jr. SEE ORDER FOR DETAILS. (cb) (Entered: 09/03/2020) |
| 09/07/2020 | 172 | STATUS REPORT filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Mitchell, Elizabeth) (Entered: 09/07/2020) |
| 09/08/2020 | 173 | MINUTE ORDER (IN CHAMBERS) by Judge David O. Carter re: Status Report 172 . On September 7, 2020, Plaintiffs filed a Status Report (Dkt. 172). While the Status Report refers to Exhibits A, B, C, and D, no such exhibits are attached to the Status Report. Plaintiffs shall attach the exhibits to a notice of errata filed with the Court by 9:00 p.m. this evening, i.e., Tuesday, September 8, 2020. (dgo) (Entered: 09/08/2020) |
| 09/08/2020 | 174 | NOTICE OF ERRATA filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. correcting Status Report 172 *attaching Exhibits A-D* (Mitchell, Elizabeth) (Entered: 09/08/2020) |
| 09/08/2020 | 175 | MINUTE ORDER (IN CHAMBERS) by Judge David O. Carter re: Status Report 172 , Notice of Errata 174 : On September 7, 2020, Plaintiffs filed a Status Report (Dkt. 172), followed by a Notice of Errata with Exhibits A, B, C, and D on September 8, 2020 (Dkt. 174). These filings detail the City of Los Angeles's estimate that 740 pallet shelters, over five years, will cost over $91 million. See Ex. A at 7. Plaintiffs represent that this results in an average per-bed rate of $41,932.83, a significantly higher sum than per-bed rates for similar pallet shelter initiatives in other municipalitiesfor example, per-bed rates of $8,252 in the City of Riverside and $14,875 in the County of Sonoma. Plaintiffs also raise various questions to identify potential cost-cutting options. The Court hereby INVITES the City of Los Angeles to file a response to theStatus Report and Exhibits by 12:00 noon on Tuesday, September 15, 2020. In lieu of additional briefing, the parties shall reserve further discussion of this topic for the Status Conference set for Thursday, September 17, 2020. (dgo) (Entered: 09/08/2020) |
| 09/15/2020 | 176 | STATUS REPORT *in advance of September 17, 2020 status conference (responsive to docket numbers 172, 174 and 175)* filed by Defendant City of Los Angeles. (Hoang, Arlene) (Entered: 09/15/2020) |

CM/ECF - California Central District        https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| 09/16/2020 | 177 | NOTICE TO THE COURT OF PAYMENT FROM COUNTY OF LOS ANGELES PURSUANT TO BINDING TERM SHEET filed by Defendant County of Los Angeles. (McLain, Byron) (Entered: 09/16/2020) |
|---|---|---|
| 09/16/2020 | 178 | NOTICE of Filing Updated Summary of Work in advance of September 17, 2020 Status Conference filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A to City's Notice)(Hoang, Arlene) (Entered: 09/16/2020) |
| 09/17/2020 | 180 | MINUTES OF Status Conference (Held at Los Angeles City Hall) before Judge David O. Carter: SEE DOCUMENT FOR FURTHER INFORMATION. Court Recorder: Fabian Venegas. (dgo) (Entered: 09/21/2020) |
| 09/18/2020 | 179 | (IN CHAMBERS) ORDER SETTING MEETING WITH CITY AND COUNTY OF LOS ANGELES IN CONTINUATION OF SETTLEMENT EFFORTS by Judge Andre Birotte Jr.: The Court hereby schedules a meeting with the City and the County of Los Angeles for Thursday, September 24, 2020, at 10:00 a.m. SEE ORDER FOR DETAILS. (cb) (Entered: 09/18/2020) |
| 09/22/2020 | 181 | TRANSCRIPT for proceedings held on 9/17/20 9:50 a.m.. Court Reporter/Electronic Court Recorder: Veritex Legal Solutions (866) 299-5127, phone number (866) 299-5127. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 10/13/2020. Redacted Transcript Deadline set for 10/23/2020. Release of Transcript Restriction set for 12/21/2020. (ha) (Entered: 09/22/2020) |
| 09/22/2020 | 182 | NOTICE OF FILING TRANSCRIPT filed for proceedings 9/17/20 9:50 a.m. re Transcript 181 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ha) TEXT ONLY ENTRY (Entered: 09/22/2020) |
| 09/28/2020 | 183 | MINUTES (IN CHAMBERS) Order for City and County of Los Angeles to Meet, Confer, and File a Joint Report Re: Status of MOU Pursuant to June 2020 Agreement by Judge Andre Birotte Jr.: In light of the discussion at the 9/24/2020 mediation meeting, and in accordance with the Court's authority to monitor the agreement reached between the parties 136 , the Court hereby ORDERS as follows: (1) The parties shall meet, confer, and file a confidential Joint Report by 10/5/2020 informing the Court of its progress toward developing a Memorandum of Understanding ("MOU") to govern their agreement. The Joint Report shall identify what challenges, if any, the patties face in developing the MOU, and the reasons for those challenges. (2) As represented at the 9/24/2020 mediation meeting, the City, County, and LAHSA shall file lists of all of their available resources for people experiencing homelessness by 10/23/2020. The list shall include the names of the entities/organizations as well as a brief description of the resources available. Court Reporter: N/A. (gk) (Entered: 09/28/2020) |
| 10/06/2020 | 184 | (IN CHAMBERS) ORDER SETTING MEDIATION WITH CITY AND COUNTY OF LOS ANGELES IN CONTINUATION OF SETTLEMENT EFFORTS by Judge Andre Birotte Jr. SEE ORDER FOR DETAILS. (cb) (Entered: 10/06/2020) |
| 10/13/2020 | 185 | NOTICE TO THE COURT REGARDING MEMORANDUM OF UNDERSTANDING FOR 6,700 BED PLAN FROM CITY OF LOS ANGELES AND COUNTY OF LOS ANGELES filed by Defendant County of Los Angeles. (Attachments: # 1 City-County MOU Executed with Binding Term Sheet) (McLain, Byron) (Entered: 10/13/2020) |
| 10/15/2020 | 186 | QUARTERLY MOU STATUS REPORT filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A to City's Quarterly Status Report, # 2 Exhibit B to City's Quarterly Status Report, # 3 Exhibit C to City's Quarterly Status Report, # 4 Exhibit D to City's Quarterly Status Report)(Hoang, Arlene) (Entered: 10/15/2020) |
| 10/16/2020 | 187 | REQUEST for Hearing Status Conference filed by Intervenor Cangress. (Myers, Shayla) (Entered: 10/16/2020) |
| 10/20/2020 | 188 | STATUS REPORT filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Mitchell, Elizabeth) (Entered: 10/20/2020) |
| 10/22/2020 | 189 | REPORT of AVAILABLE RESOURCES FOR PEOPLE EXPERIENCING HOMELESSNESS filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A - List of Services)(McLain, Byron) (Entered: 10/22/2020) |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| 10/23/2020 | 190 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter. In accordance with the Courts authority to monitor the agreement reached between the parties (see Dkt. 136 ), the Court hereby SCHEDULES a Monitoring Status Conference for Thursday, November 5, 2020 at 10:00 a.m. In order to comply with public health guidance, the Monitoring Status Conference shall be held at Los Angeles City Hall, 200 North Spring Street, Los Angeles, CA 90012. In an effort to have a productive discussion, the Court needs to be informed of progress towards the implementation of the agreement, such as newly established deadlines, contracts, or shelter opportunities. The Court accordingly REQUESTS the attendance of city council members, county supervisors, and agency heads to report their progress. (kd) (Entered: 10/23/2020) |
|---|---|---|
| 10/23/2020 | 191 | NOTICE of Filing List of Available Resources for Persons Experiencing Homelessness filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A to City's Notice)(Hoang, Arlene) (Entered: 10/23/2020) |
| 10/23/2020 | 192 | REPORT of LAHSA'S LIST OF AVAILABLE RESOURCES FOR PEOPLE EXPERIENCING HOMELESSNESS filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A - List of Programs)(McLain, Byron) (Entered: 10/23/2020) |
| 10/28/2020 | 193 | OBJECTIONS *Intervenors' Objection to Plaintiffs' Status Report (Docket 188)* filed by Intervenor Congress. (Myers, Shayla) (Entered: 10/28/2020) |
| 10/30/2020 | 194 | REQUEST for Special Hearing *on Plaintiffs Request for Clarification* filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Mitchell, Elizabeth) (Entered: 10/30/2020) |
| 11/02/2020 | 195 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: REQUEST for Special Hearing *on Plaintiffs Request for Clarification* 194 . The following error(s) was/were found: Proposed Document was not submitted as separate attachment. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (twdb) (Entered: 11/02/2020) |
| 11/02/2020 | 196 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter. Plaintiffs Request for Clarification 194 will also be heard on November 5, 2020 at the Monitoring Status Conference at Los Angeles City Hall, 200 North Spring Street, Los Angeles, CA 90012. (kd) (Entered: 11/02/2020) |
| 11/03/2020 | 197 | RESPONSE filed by Defendant County of Los Angelesto Status Report 188 (Hashmall, Jennifer) (Entered: 11/03/2020) |
| 11/04/2020 | 198 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: The Court REQUESTS of the parties explanations and solutions for the rise in homeless deaths. Homeless deaths are now up 36% in Los Angeles County1,141 deaths in the first 10 months of this year, compared to 837 in the same period last year. Thats a rise of nearly four deaths per day. Even accounting for 47 Covid-19 related deaths through October, this means at least a 31% rise of deaths amongst our homeless citizens. The parties are hereby on notice that the Court will expect the parties to address what efforts they have made, particularly with regard to immediately providing shelter, housing and services, to address this horrific figure on November 5, 2020. The Clerk shall serve this minute order on the parties. (kd) (Entered: 11/04/2020) |
| 11/05/2020 | 200 | MINUTES OF STATUS CONFERENCE HELD ON NOVEMBER 5, 2020: Various City Council Members, Mayors and City Officials also present at Los Angeles City Hall, 200 North Spring Street, Los Angeles, California to discuss the progress of settlement regarding the homeless population of Los Angeles and other cities in the County of Los Angeles. The recorder and transcriber are hereby ordered to submit the original transcript and notes to Transcripts_cacd@cacd.uscourts.gov no later than Monday, November 9, 2020. The Court orders the transcript of the Status Conference held on November 5, 2020, be immediately produced at government expense and billed at the 3-day rate. The transcript shall be prepared forthwith and filed on the docket with immediate release to the public. Court Recorder: Fabian Venegas. (bm) (Entered: 11/12/2020) |
| 11/06/2020 | 199 | Parties requests for exhibits and photographs shown at the November 5 monitoring conference by Judge David O. Carter (Attachments: # 1 Exhibit) (kd) (Entered: 11/06/2020) |
| 11/12/2020 | 201 | TRANSCRIPT for proceedings held on 11/5/20 9:45 A.M.. Court Reporter: Veritex Legal Solutions (866) 299-5127, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline TRANSCRIPT for proceedings held on 11/5/20 9:45 A.M.. Court Reporter: Veritex Legal Solutions (866) 299-5127, Transcript may be viewed at the |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| | | court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 12/3/2020. Redacted Transcript Deadline set for 12/14/2020. Release of Transcfor Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 12/3/2020. Redacted Transcript Deadline set for 12/14/2020. Release of Transcript Restriction set for 2/10/2021. (ha) (Main Document 201 replaced on 11/26/2020) (ha).ript Restriction set for 2/10/2021. (ha) (Main Document 201 replaced on 11/26/2020) (ha). (Main Document 201 replaced on 11/26/2020) (ha). (Entered: 11/12/2020) |
| 11/12/2020 | 202 | NOTICE OF FILING TRANSCRIPT filed for proceedings 11/5/20 9:45 A.M. re Transcript 201 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ha) TEXT ONLY ENTRY (Entered: 11/12/2020) |
| 01/07/2021 | 203 | NOTICE TO THE COURT OF PAYMENT FROM COUNTY OF LOS ANGELES PURSUANT TO BINDING TERM SHEET filed by Defendant County of Los Angeles. (McLain, Byron) (Entered: 01/07/2021) |
| 01/15/2021 | 204 | QUARTERLY MOU STATUS REPORT filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A to City's Quarterly Status Report, # 2 Exhibit B to City's Quarterly Status Report, # 3 Exhibit C to City's Quarterly Status Report, # 4 Exhibit D to City's Quarterly Status Report, # 5 Exhibit E to City's Quarterly Status Report)(Mariani, Jessica) (Entered: 01/15/2021) |
| 01/31/2021 | 205 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter. The Court is convening and inviting the parties to appear on Skid Row at the Downtown Womens Center, located at the corner of 5th and San Pedro, on Thursday, February 4, 2021, to present evidence of any actions already taken and completed to address the homelessness crisis from the onset of this litigation in March, 2020, to the present, and provide progress and status reports regarding the agreement of June 18, 2020. Social distancing protocol will be observe as in all prior hearings. [Please see minute order for complete details.] (kd) (Entered: 01/31/2021) |
| 02/03/2021 | 206 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: The Court sets the time for the hearing on Thursday, February 4, 2021 at 10:00 a.m. Some of the preliminary questions that the Court will be asking are attached in this minute order. There have been numerous requests from council or board members to speak. The Court invites these presentations and suggests coordination through Councilman De Leon Offices. In addition to the invitation to have Mayor Eric Garcetti, City Attorney Mike Feuer and Chairman of the Board of Supervisors Hilda Solis address the Court, the following elected officials have already indicated that they would like to speak and will be speaking: Councilmember Kevin De Leon, Councilmember Mike Bonin, and Los Angeles County Board of Supervisor Kathryn Barger. (Please review complete minute order for details) (kd) (Entered: 02/03/2021) |
| 02/04/2021 | 207 | EXHIBIT Filed filed by Defendant City of Los Angeles. *Submission* as to Minutes of In Chambers Order/Directive - no proceeding held,,, 206 . (Attachments: # 1 Exhibit City of Los Angeles Actions to Address Homelessness)(Marcus, Scott) (Entered: 02/04/2021) |
| 02/04/2021 | 208 | STATEMENT Submission to the Court re: the February 4, 2021 hearing. (kd) (Entered: 02/04/2021) |
| 02/04/2021 | 209 | MINUTES OF Status Conference held on February 4, 2021 before Judge David O. Carter: The Court orders the transcripts for the hearing date listed below be made available on the docket forthwith free of charge to all ordering parties: SEE DOCUMENT FOR FURTHER INFORMATION. Court Recorder: Fabian Venegas/Digital Recorder. (twdb) (Entered: 02/05/2021) |
| 02/04/2021 | 210 | STATEMENT of Mark Ridley-Thomas - Council Meeting Remarks - February 3, 2021 (kd) (Entered: 02/05/2021) |
| 02/04/2021 | 211 | STATEMENT of Commissioner Susie Shannon regarding events on Skid Row January 29, 2021 (kd) (Entered: 02/05/2021) |
| 02/04/2021 | 212 | AMENDED STATEMENT Susie Shannon filed by Defendant County of Los Angeles. (kd) (Entered: 02/05/2021) |
| 02/04/2021 | 214 | Motion Center for Inter Agency Policy and Action on Homelessness (introduced January 12, 2021) (kd) (Entered: 02/09/2021) |
| 02/04/2021 | 215 | Policy Brief (December 2020, updated January 2021) (kd) (Entered: 02/09/2021) |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| 02/04/2021 | 216 | Motion LAHSA South LA Outreach and Engagement Hub (introduced January 12, 2021) (kd) (Entered: 02/09/2021) |
|---|---|---|
| 02/04/2021 | 217 | Motion Right to Housing (introduced December 15, 2020) (kd) (Entered: 02/09/2021) |
| 02/08/2021 | 213 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter. The Court would appreciate a response to the following additional questions, as well as the initial nine questions set forth by the Court on February 3, 2021 206 and at the hearing on February 4, 2021. [Please refer to the minute order for complete details.] (kd) (Entered: 02/08/2021) |
| 02/09/2021 | 218 | TRANSCRIPT for proceedings held on 2/4/21 10:02 A.M. Court Reporter/Electronic Court Recorder: Veritex Legal Solutions, phone number (866) 299-5127. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 3/2/2021. Redacted Transcript Deadline set for 3/12/2021. Release of Transcript Restriction set for 5/10/2021. (jlo) (Entered: 02/10/2021) |
| 02/09/2021 | 219 | NOTICE OF FILING TRANSCRIPT filed for proceedings 2/4/21 10:02 A.M. re Transcript 218 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (jlo) TEXT ONLY ENTRY (Entered: 02/10/2021) |
| 02/10/2021 | 220 | Joint REQUEST for Enlargement of Time to File Briefs and Information ordered by the Court filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 02/10/2021) |
| 02/10/2021 | 221 | ORDER by Judge David O. Carter: Granting Joint Stipulation and REQUEST for Enlargement of Time to File Briefs in Response to Court's Request 220 . SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 02/11/2021) |
| 02/11/2021 | 222 | REQUEST for Extension of Time to File Briefs in Response to Court's Request filed by Defendant County of Los Angeles. (Attachments: # 1 Proposed Order) (Hashmall, Jennifer) (Entered: 02/11/2021) |
| 02/12/2021 | 223 | ORDER by Judge David O. Carter: Granting 222 REQUEST for Extension of Time to File Briefs in Response to Court's Request. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 02/12/2021) |
| 02/23/2021 | 224 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: The parties are given five (5) court days, more specifically, March 1, 2021, to lodge any objection to this order and appointment. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 02/23/2021) |
| 03/01/2021 | 225 | NOTICE City of Los Angeles' Response and Objection to Dkt 224 filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 03/01/2021) |
| 03/01/2021 | 226 | OBJECTIONS to Minutes of In Chambers Order/Directive - no proceeding held 224 filed by Defendant County of Los Angeles. (Miller, Louis) (Entered: 03/01/2021) |
| 03/02/2021 | 227 | OBJECTIONS *to Appointment* filed by Intervenor Los Angeles Community Action Network. (Sobel, Carol) (Entered: 03/02/2021) |
| 03/04/2021 | 228 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER REGARDING APPOINTMENT OF THE SOCIAL JUSTICE LEGAL FOUNDATION AND HUESTON HENNIGAN, LLP. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 03/04/2021) |
| 03/04/2021 | 229 | EX PARTE APPLICATION to File Amicus Brief filed by Amicus NAACP - Compton Branch, CORE-CA, Committee for Safe Havens. (Attachments: # 1 Declaration, # 2 Declaration) (Attorney Mark S Ravis added to party NAACP - Compton Branch(pty:am), Attorney Mark S Ravis added to party CORE-CA(pty:am), Attorney Mark S Ravis added to party Committee for Safe Havens(pty:am)) (Ravis, Mark) (Entered: 03/04/2021) |
| 03/04/2021 | 230 | SCHEDULING NOTICE by Judge David O. Carter. Upon review of the Ex Parte Application to File Amicus Brief filed by Amicus NAACP - Compton Branch, CORE-CA, Committee for Safe Havens 229 , the Court GRANTS said request. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kd) TEXT ONLY ENTRY (Entered: 03/04/2021) |
| 03/04/2021 | 231 | Letter from Women's Recovery Center (twdb) (Entered: 03/04/2021) |

CM/ECF - California Central District          https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 03/04/2021 | 232 | NOTICE of Appearance filed by attorney Theano Evangelis Kapur on behalf of Amicus Central City Association of Los Angeles (Attorney Theano Evangelis Kapur added to party Central City Association of Los Angeles(pty:am))(Kapur, Theano) (Entered: 03/04/2021) |
| 03/04/2021 | 233 | Amicus Curiae Brief filed filed by Amicus Central City Association of Los Angeles. RE: Minutes of In Chambers Order/Directive - no proceeding held,, 205 . (Kapur, Theano) (Entered: 03/04/2021) |
| 03/04/2021 | 234 | NOTICE of Appearance filed by attorney Bradley Joseph Hamburger on behalf of Amicus Central City Association of Los Angeles (Attorney Bradley Joseph Hamburger added to party Central City Association of Los Angeles(pty:am))(Hamburger, Bradley) (Entered: 03/04/2021) |
| 03/04/2021 | 235 | RESPONSE filed by Defendant County of Los Angelesto Minutes of In Chambers Order/Directive - no proceeding held,, 205 (Attachments: # 1 Exhibit A - Locations for Temporary Housing, # 2 Exhibit B - Chief Justice Roberts excerpts)(Miller, Louis) (Entered: 03/04/2021) |
| 03/04/2021 | 236 | RESPONSE filed by Defendant County of Los Angeles to Minutes of In Chambers Order/Directive - no proceeding held,,, 206 , Minutes of In Chambers Order/Directive - no proceeding held 213 (Attachments: # 1 Exhibit A - LAHSA Report)(Hashmall, Jennifer) (Entered: 03/04/2021) |
| 03/04/2021 | 237 | RESPONSE filed by Defendant County of Los Angeles to Minutes of In Chambers Order/Directive - no proceeding held,, 205 *[Defendants' Joint Statement of Facts Pursuant to Court's January 31, 2021 Order]* (Hashmall, Jennifer) (Entered: 03/04/2021) |
| 03/04/2021 | 238 | Amicus Curiae Brief filed filed by Amicus The Center in Hollywood. RE: Minutes of In Chambers Order/Directive - no proceeding held,, 205 . (Umhofer, Matthew) (Entered: 03/04/2021) |
| 03/04/2021 | 239 | RESPONSE filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitterto Minutes of In Chambers Order/Directive - no proceeding held,, 205 *Plaintiff's Response to The Court's Request for Briefing* (Attachments: # 1 Declaration of Elizabeth A. Mitchell and Exs. A-D)(Umhofer, Matthew) (Entered: 03/04/2021) |
| 03/04/2021 | 240 | NOTICE of Intent to File Motion for Preliminary Injunction filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Umhofer, Matthew) (Entered: 03/04/2021) |
| 03/04/2021 | 241 | NOTICE OF MOTION AND MOTION to File Amicus Brief *in Response to This Court's January 31, 2021 Order to Appear and Show Cause* filed by Amicus Curiae Union Rescue Mission. Motion set for hearing on 4/5/2021 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Exhibit A, # 2 Proposed Order) (Attorney Manuel A Abascal added to party Union Rescue Mission(pty:am)) (Abascal, Manuel) (Entered: 03/04/2021) |
| 03/04/2021 | 242 | BRIEF filed by Defendant City of Los Angeles. *re: Equitable Remedies and Responses to Requests for Information* regarding Minutes of In Chambers Order/Directive - no proceeding held,, 205 , Minutes of In Chambers Order/Directive - no proceeding held,,, 206 , Minutes of In Chambers Order/Directive - no proceeding held 213 . (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit)(Marcus, Scott) (Entered: 03/04/2021) |
| 03/04/2021 | 243 | REPORT of Intervenors in Response to Court's January 31, 2021 Order filed by Intervenor Cangress. (Myers, Shayla) (Entered: 03/04/2021) |
| 03/04/2021 | 244 | RESPONSE filed by Intervenor Orange County Catholic Worker (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Sobel, Carol) (Entered: 03/04/2021) |
| 03/05/2021 | 245 | EXHIBIT Filed filed by Intervenor Orange County Catholic Worker. *CORRECTED EXHIBIT B* as to Response 244 . (Sobel, Carol) (Entered: 03/05/2021) |
| 03/05/2021 | 246 | SCHEDULING NOTICE by Judge David O. Carter. The Court having considered the Motion of Union Rescue Mission for Leave to File Amicus Curiae Brief in response to this Courts January 31, 2021 Order to Appear and Show Cause, 205 , it is hereby ORDERED that the Motion is GRANTED. 241 It is therefore ORDERED that Amicus Curiae Union Rescue Mission be granted leave to file its brief in this case. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kd) TEXT ONLY ENTRY (Entered: 03/05/2021) |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 03/05/2021 | 247 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Notice of Appearance 232 , Notice of Appearance 234 . The following error(s) was/were found: Incorrect event selected. Correct event to be used is: Notice of Appearance of Withdrawal of Counsel G123.. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (ak) (Entered: 03/05/2021) |
| 03/05/2021 | 248 | RESPONSE filed by Defendant County of Los Angelesto Minutes of In Chambers Order/Directive - no proceeding held,, 205 *[LAHSA's Memorandum in Response to Court's 01-31-2021 Order to Show Cause (Dkt. 205)]* (Attachments: # 1 Exhibit A - LAHSA Memorandum)(Hashmall, Jennifer) (Entered: 03/05/2021) |
| 03/05/2021 | 249 | Notice of Appearance or Withdrawal of Counsel: for attorney Manuel A Abascal counsel for Amicus Union Rescue Mission. Adding Manuel A. Abascal as counsel of record for Union Rescue Mission for the reason indicated in the G-123 Notice. Filed by Amicus Curiae Union Rescue Mission. (Abascal, Manuel) (Entered: 03/05/2021) |
| 03/05/2021 | 250 | Amicus Curiae Brief filed filed by Amicus Union Rescue Mission. RE: Minutes of In Chambers Order/Directive - no proceeding held,, 205 . (Attachments: # 1 Exhibit A - Declaration of Rev. Andrew J. Bales, M.A.T. in Support)(Abascal, Manuel) (Entered: 03/05/2021) |
| 03/23/2021 | 251 | Letter from Los Angeles Business Council (kd) (Entered: 03/23/2021) |
| 03/25/2021 | 252 | Letter from Citizens Preserving Venice (kd) (Entered: 03/25/2021) |
| 03/26/2021 | 253 | Letter from United Way Greater Los Angeles (kd) (Entered: 03/26/2021) |
| 03/29/2021 | 254 | [NOTICE TO THE COURT OF PAYMENT FROM COUNTY OF LOS ANGELES PURSUANT TO BINDING TERM SHEET filed as] NOTICE Notice of Payment filed by Defendant County of Los Angeles. (Hashmall, Jennifer) Modified on 3/29/2021 (lom). (Entered: 03/29/2021) |
| 03/29/2021 | 255 | NOTICE Notice re Stay Lifted filed by Defendant County of Los Angeles. (Hashmall, Jennifer) (Entered: 03/29/2021) |
| 03/29/2021 | 256 | NOTICE OF MOTION AND MOTION to Dismiss Defendant County of Los Angeles filed by Defendant County of Los Angeles. Motion set for hearing on 5/10/2021 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Memorandum) (Hashmall, Jennifer) (Entered: 03/29/2021) |
| 03/29/2021 | 257 | [DECLARATION OF MIRA HASHMALL IN SUPPORT OF DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS filed as] NOTICE OF MOTION AND MOTION to Dismiss Defendant County of Los Angeles *Declaration of Mira Hashmall* filed by Defendant County of Los Angeles. Motion set for hearing on 5/10/2021 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit) (Hashmall, Jennifer) Modified on 3/29/2021 (lom). (Entered: 03/29/2021) |
| 03/29/2021 | 258 | [REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT COUNTY OF LOS ANGELES' MOTION TO DISMISS filed as] NOTICE OF MOTION AND MOTION to Dismiss Defendant County of Los Angeles *Request for Judicial Notice* filed by Defendant County of Los Angeles. Motion set for hearing on 5/10/2021 at 08:30 AM before Judge David O. Carter. (Hashmall, Jennifer) Modified on 3/29/2021 (lom). (Entered: 03/29/2021) |
| 03/29/2021 | 259 | NOTICE OF LODGING filed re NOTICE OF MOTION AND MOTION to Dismiss Defendant County of Los Angeles 256 (Attachments: # 1 Proposed Order)(Miller, Louis) (Entered: 03/29/2021) |
| 03/29/2021 | 260 | NOTICE OF LODGING filed re NOTICE OF MOTION AND MOTION to Dismiss Defendant County of Los Angeles *Request for Judicial Notice* 258 (Attachments: # 1 Proposed Order)(Miller, Louis) (Entered: 03/29/2021) |
| 04/02/2021 | 261 | Letter from Councilmember Curren D. Price, Jr. 9th District (kd) (Entered: 04/02/2021) |
| 04/07/2021 | 262 | EX PARTE APPLICATION to Exceed Page Limitation FOR PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION filed by Plaintiff Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Attachments: # 1 Proposed Order) (Mitchell, Elizabeth) (Entered: 04/07/2021) |

CM/ECF - California Central District                                     https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 04/07/2021 | 263 | ORDER by Judge David O. Carter: Granting 262 Unopposed Ex Parte Application for Leave to File Excess Pages for Plaintiffs' Motion for Preliminary Injunction. The new page limit for Plaintiffs Motion for Preliminary Injunction is thirty-five (35) pages. (twdb) (Entered: 04/07/2021) |
| 04/11/2021 | 264 | Amicus Curiae Brief filed filed by Amicus Committee for Safe Havens. RE: Order on Motion for Extension of Time to File 223 . (Attachments: # 1 Declaration, # 2 Declaration, # 3 Declaration, # 4 Declaration)(Ravis, Mark) (Entered: 04/11/2021) |
| 04/12/2021 | 265 | NOTICE OF MOTION AND MOTION for Preliminary Injunction filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. Motion set for hearing on 5/10/2021 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Declaration of Elizabeth A. Mitchell and Exs. A-F, # 2 Declaration Compilation of LA Alliance Members, et al., # 3 Proposed Order) (Umhofer, Matthew) (Entered: 04/12/2021) |
| 04/13/2021 | 266 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER LIFTING STAY AND SETTING BRIEFING SCHEDULE. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 04/13/2021) |
| 04/15/2021 | 267 | MOU QUARTERLY STATUS REPORT filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Marcus, Scott) (Entered: 04/15/2021) |
| 04/19/2021 | 268 | OPPOSITION re: NOTICE OF MOTION AND MOTION to Dismiss Defendant County of Los Angeles 256 filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Mitchell, Elizabeth) (Entered: 04/19/2021) |
| 04/19/2021 | 269 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION for Preliminary Injunction 265 filed by Defendant City of Los Angeles. (Attachments: # 1 Request for Judicial Notice, # 2 Declaration of Jessica Mariani, # 3 Declaration of Miguel Grajeda, # 4 Declaration of Domingo Orosco) (Mariani, Jessica) (Entered: 04/19/2021) |
| 04/19/2021 | 270 | Opposition re: NOTICE OF MOTION AND MOTION for Preliminary Injunction 265 filed by Defendant County of Los Angeles. (Miller, Louis) (Entered: 04/19/2021) |
| 04/19/2021 | 271 | Evidentiary Objections re: NOTICE OF MOTION AND MOTION for Preliminary Injunction 265 filed by Defendant County of Los Angeles. (Miller, Louis) (Entered: 04/19/2021) |
| 04/19/2021 | 272 | RESPONSE filed by Defendant County of Los Angelesto Amicus Curiae Brief 264 (Miller, Louis) (Entered: 04/19/2021) |
| 04/19/2021 | 273 | DECLARATION of Elise Buik, President and CEO at the United Way of Greater Los Angeles re Response 272 filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A)(Miller, Louis) (Entered: 04/19/2021) |
| 04/19/2021 | 274 | DECLARATION of Cheri Todoroff, head of Los Angeles County Homeless Initiative re Objection/Opposition (Motion related) 270 filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K)(Miller, Louis) (Entered: 04/19/2021) |
| 04/19/2021 | 275 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION for Preliminary Injunction 265 filed by Intervenor Cangress. (Attachments: # 1 Declaration of Gary Blasi, # 2 Declaration of Daniel Flaming, # 3 Declaration of Sam Tsemberis, # 4 Declaration Sara Shortt)(Myers, Shayla) (Entered: 04/19/2021) |
| 04/20/2021 | 276 | DECLARATION of DANIEL FLAMING IN OPPOSITION TO NOTICE OF MOTION AND MOTION for Preliminary Injunction 265 *and Exhibits A-D* filed by Intervenor Cangress. (Sobel, Carol) (Entered: 04/20/2021) |
| 04/20/2021 | 277 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter. The Court acknowledges that it may appear unusual to issue a preliminary injunction without a hearing on the motion. In the Ninth Circuit, however, there is no presumption that the issuance of a preliminary injunction requires an evidentiary hearing; instead, the decision to hold a hearing is left to the sound discretion of the district court. In practical terms, the Court has already held 12 evidentiary hearings, and this preliminary injunction is rooted in the extensive factual record developed through these hearings. After numerous hearings and careful review of the motion and opposition, the Court finds it appropriatein accordance with the emergency conditions of homelessness in Los Angelesto grant preliminary injunctive relief without an |

CM/ECF - California Central District                                   https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

|  |  |  |
|---|---|---|
|  |  | additional hearing. To do so is consistent with Ninth Circuit precedent, the text and spirit of Rule 65, and the urgent need for relief this case presents. PLEASE SEE ORDER FOR COMPLETE DETAILS. (kd) (Entered: 04/20/2021) |
| 04/21/2021 | 278 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Defendant County of Los Angeles. Appeal of Minutes of In Chambers Order/Directive - no proceeding held,,,,, Terminate Deadlines and Hearings,,,, 277 . (Appeal Fee - $505 Fee Paid, Receipt No. ACACDC-31160521.) (Attachments: # 1 Exhibit A - April 20, 2021 Order, # 2 Certificate of Service)(Hashmall, Jennifer) (Entered: 04/21/2021) |
| 04/22/2021 | 279 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter. The Court provides the following two clarifications regarding the Preliminary Injunction issued on April 20, 2021. First, the directives under Accountability and City- and County-Wide Actions pertain to all districts in the City and County and are not limited in any way to Skid Row. Second, the provision regarding the cessation of sales and transfers by lease or covenant under Section 2(a)(ii) does not apply to projects in progress as of the date of the order, April 20, 2021. (kd) (Entered: 04/22/2021) |
| 04/22/2021 | 280 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 21-55395 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 278 as to defendant County of Los Angeles. (lc) (Entered: 04/23/2021) |
| 04/23/2021 | 281 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Defendant City of Los Angeles. Appeal of Minutes of In Chambers Order/Directive - no proceeding held,, 279 , Minutes of In Chambers Order/Directive - no proceeding held,,,, Terminate Deadlines and Hearings,,,, 277 . (Appeal Fee - $505 Fee Paid, Receipt No. ACACDC-31173233.) (Attachments: # 1 Civil Minutes (Injunction) of 04-20-21, # 2 Civil Minutes (Clarification) of 04-22-21, # 3 Representation Statement)(Marcus, Scott) (Entered: 04/23/2021) |
| 04/23/2021 | 282 | EX PARTE APPLICATION to Stay pending Appeal Minutes of In Chambers Order/Directive - no proceeding held,,,,, Terminate Deadlines and Hearings,,,, 277 filed by Defendant County of Los Angeles. (Attachments: # 1 Declaration Declaration of Cheri Todroff, # 2 Declaration Declaration of Mira Hashmall, # 3 Declaration Declaration of Matt McGloin, # 4 Declaration Declaration of Vanessa Moody, # 5 Proposed Order) (Miller, Louis) (Entered: 04/23/2021) |
| 04/23/2021 | 283 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Intervenor Congress. Appeal of Minutes of In Chambers Order/Directive - no proceeding held,, 279 , Minutes of In Chambers Order/Directive - no proceeding held,,,, Terminate Deadlines and Hearings,,,, 277 . (Appeal Fee - $505 Fee Paid, Receipt No. ACACDC-31175978.) (Attachments: # 1 Exhibit Preliminary Injunction Order 4 20 21, # 2 Exhibit Preliminary Injunction Order Modified 4 22 21)(Sobel, Carol) (Entered: 04/23/2021) |
| 04/23/2021 | 284 | EX PARTE APPLICATION to Stay pending Appeal Minutes of In Chambers Order/Directive - no proceeding held,,,,, Terminate Deadlines and Hearings,,,, 277 filed by Defendant City of Los Angeles. (Attachments: # 1 Declaration, # 2 Declaration, # 3 Proposed Order) (Marcus, Scott) (Entered: 04/23/2021) |
| 04/23/2021 | 289 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 21-55404 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 281 as to defendant City of Los Angeles. (mat) (Entered: 04/26/2021) |
| 04/24/2021 | 285 | OPPOSITION re: EX PARTE APPLICATION to Stay pending Appeal Minutes of In Chambers Order/Directive - no proceeding held,,,,, Terminate Deadlines and Hearings,,,, 277 284 filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Mitchell, Elizabeth) (Entered: 04/24/2021) |
| 04/25/2021 | 286 | MINUTES (IN CHAMBERS) Granting in Part and Denying in Part Defendants' Ex Parte Applications to Stay Pending Appeal 282 284 by Judge David O. Carter. (dgo) (Entered: 04/25/2021) |
| 04/26/2021 | 287 | AMENDED MINUTES (IN CHAMBERS) Granting in Part and Denying in Part Defendants' Ex Parte Applications to Stay Pending Appeal 282 , 284 by Judge David O. Carter. (dgo) Modified on 4/26/2021 (dgo). (Entered: 04/26/2021) |
| 04/26/2021 | 288 | STIPULATION Extending Time to Answer the complaint as to City of Los Angeles answer now due 6/3/2021, re Complaint (Attorney Civil Case Opening),,, 1 filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 04/26/2021) |

| | | |
|---|---|---|
| 04/26/2021 | 290 | ORDER from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 281 filed by City of Los Angeles. CCA # 21-55404. The appeal filed April 23, 2021, is a preliminary injunction appeal. Accordingly, Ninth Circuit Rule 3-3 shall apply. [See document for more complete details.](mat) (Entered: 04/26/2021) |
| 04/26/2021 | 291 | RESPONSE IN SUPPORT of NOTICE OF MOTION AND MOTION to Dismiss Defendant County of Los Angeles 256 filed by Defendant County of Los Angeles. (Hashmall, Jennifer) (Entered: 04/26/2021) |
| 04/26/2021 | 292 | NOTICE Notice to the Court of Defendant County of Los Angeles' Emergency Declaration Dated December 6, 2016 filed by Defendant County of Los Angeles. (Hashmall, Jennifer) (Entered: 04/26/2021) |
| 04/26/2021 | 294 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 21-55408 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 283 as to Intervenor Cangress. (mat) (Entered: 04/27/2021) |
| 04/26/2021 | 295 | ORDER from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 283 filed by Cangress. CCA # 21-55408. The appeal filed April 23, 2021, is a preliminary injunction appeal. Accordingly, Ninth Circuit Rule 3-3 shall apply. [See document for complete details.](mat) (Entered: 04/27/2021) |
| 04/27/2021 | 293 | REPORT of to explain why an emergency declaration has not been issued filed by Defendant City of Los Angeles. (Marcus, Scott) (Entered: 04/27/2021) |
| 04/30/2021 | 296 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter. The Court will hold a hearing on Wednesday, May 26, 2021 at 10:00 a.m. to discuss with the parties the status of the Binding Term Sheet Agreement 136 (Exh. A) entered into on June 18, 2020 and the Memorandum of Understanding between the County of Los Angeles and the City of Los Angeles [185-1] (Exh. B) entered into on October 9, 2020. The Court will then consider whether to reinstate its May 22, 2020 preliminary injunction 123 to protect those individuals experiencing homelessness currently living near freeway overpasses, underpasses, and ramps. A hearing to discuss these matters will be held on Wednesday, May 26, 2021 at 10:00 a.m. at the FIRST STREET U.S. COURTHOUSE, 350 W 1st Street, Los Angeles, CA 90012-4565. (kd) (Entered: 04/30/2021) |
| 05/05/2021 | 297 | SCHEDULING NOTICE by Judge David O. Carter. The Court orders the Motion to Dismiss hearing set for 5/10/2021 at 8:30 AM to be held via Zoom. The Court's Zoom information is located at www.cacd.uscourts.gov. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kd) TEXT ONLY ENTRY (Entered: 05/05/2021) |
| 05/10/2021 | 299 | MINUTES OF Motion Hearing via Zoom (Held and Completed) before Judge David O. Carter: Taking under advisement 256 MOTION to Dismiss ; Court Reporter: Deborah Parker. (twdb) Modified on 5/11/2021 (twdb). (Entered: 05/11/2021) |
| 05/11/2021 | 300 | MINUTES (IN CHAMBERS) by Judge David O. Carter. For the reasons set forth, the Court DENIES Defendant County's Motion to Dismiss 256 . Please see Minute Order for complete details. IT IS SO ORDERED. (kd) (Entered: 05/11/2021) |
| 05/12/2021 | 301 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 05/12/2021) |
| 05/13/2021 | 304 | ORDER from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 283 filed by Cangress, Notice of Appeal to 9th Circuit Court of Appeals, 281 filed by City of Los Angeles, Notice of Appeal to 9th Circuit Court of Appeals, 278 filed by County of Los Angeles. CCA # 21-55395, 21-55404, and 21-55408. In this order, we consider only the request for an administrative stay. We find that a brief administrative stay is warranted to preserve the status quo until the district courts May 27, 2021 evidentiary hearing as these further proceedings may impact whether a stay pending appeal is necessary or justified. The district court's April 20, 2021 preliminary injunction is stayed until June 15, 2021. Appeal Nos. 21-55395, 21-55404 and 21-55408 are consolidated. Failure to file timely an opening brief shall result in the automatic dismissal of the appeal by the (9th CCA) Clerk for failure to prosecute. [See document for more complete details.](mat) (Entered: 05/13/2021) |
| 05/21/2021 | 305 | STATEMENT of Support filed by Amicus Skid Row Housing Trust re: Minutes of In Chambers Order/Directive - no proceeding held,,,,, Terminate Deadlines and Hearings,,,, 277 . (Mitchell, Elizabeth) (Entered: 05/21/2021) |
| 05/24/2021 | 306 | Letter from SkidRow Advisory Council. (kd) (Entered: 05/24/2021) |

| | | |
|---|---|---|
| 05/24/2021 | 307 | Letter from SkidRow Stakeholders. (kd) (Entered: 05/24/2021) |
| 05/24/2021 | 308 | BRIEF filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. regarding Minutes of In Chambers Order/Directive - no proceeding held,,,, Set/Reset Deadlines/Hearings,,, 296 . (Mitchell, Elizabeth) (Entered: 05/24/2021) |
| 05/25/2021 | 309 | REQUEST TO CORRECT DOCKET filed by Intervenor Orange County Catholic Worker (Sobel, Carol) (Entered: 05/25/2021) |
| 05/25/2021 | 310 | Letter from Downtown Los Angeles Neighborhood Council. (kd) (Entered: 05/25/2021) |
| 05/26/2021 | 311 | Letter from CENTRAL City Association of Los Angeles (kd) Modified on 5/26/2021 (kd). (Entered: 05/26/2021) |
| 05/26/2021 | 312 | Parties request for powerpoint shown at the May 26, 2021 hearing by Judge David O. Carter. (kd) (Entered: 05/26/2021) |
| 05/26/2021 | 313 | Parties requests for exhibits and photographs shown at the May 26, 2021 hearing. (kd) Modified on 5/28/2021 (kd). refer to 326 for Transcript (Entered: 05/26/2021) |
| 05/26/2021 | 314 | Counsel shall disregard docket entry 312 as the attachment was not made available. Please refer to docket entry 313 .THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kd) TEXT ONLY ENTRY (Entered: 05/26/2021) |
| 05/26/2021 | 315 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter. On 05-26-2021, the Court held a status conference in Los Angeles regarding the Agreement & Binding Term Sheet between the City and County of Los Angeles 136 . The Court is concerned by the parties representations that certain provisions of the agreement are not being met. However, the Court will postpone the decision of whether or not to reinstate its May 22, 2020 preliminary injunction 123 pending the outcome of the freeway audit provided by the County in July 2021. Accordingly, the Court SCHEDULES an additional status conference for August 26, 2021, at which time the Court will receive testimony from the City and County regarding additional progress made towards housing individuals living within 500 feet of freeway overpasses and underpasses and other homeless individuals prioritized in the Agreement & Binding Term Sheet. At that time, the Court will further consider whether to reinstate its May 22, 2020 preliminary injunction. (kd) (Entered: 05/26/2021) |
| 05/26/2021 | 316 | APPLICATION for Default Judgment against Defendant County of Los Angeles filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. Application set for hearing on 6/7/2021 at 08:30 AM before Judge David O. Carter. (Mitchell, Elizabeth) (Entered: 05/26/2021) |
| 05/26/2021 | 320 | ANSWER to Complaint (Attorney Civil Case Opening),,, 1 filed by Defendant County of Los Angeles. (Miller, Louis) (Entered: 05/26/2021) |
| 05/26/2021 | 321 | MINUTES OF Status Conference held before Judge David O. Carter; Judge Andre Birotte, Judge: Status Conference held before Judge David O. Carter at 350 W. First Street, Los Angeles, California. The Court orders the transcript for the hearing date above be made available on the docket forthwith free of charge to all ordering parties. SEE DOCUMENT FOR FURTHER INFORMATION. Court Reporter: Miranda Algorri. (twdb) (Entered: 05/26/2021) |
| 05/27/2021 | 322 | NOTICE OF DEFICIENCY Re: APPLICATION for Default Judgment against Defendant County of Los Angeles 316 . The Clerk cannot enter the requested relief as: Answer and/or Motion for Summary Judgment and/or Motion to Dismiss on file. (twdb) (Entered: 05/27/2021) |
| 05/27/2021 | 323 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter. On Thursday, May 27, 2021, the Court held an evidentiary hearing in Los Angeles. Per the Courts April 25, 2021 order (Dkt. 286) on Defendants Ex Parte Applications to Stay (Dkt 282, 284), the purpose of the May 27th hearing was to 1) determine what properties exist and are available for homelessness relief and 2) receive testimony from the City and County regarding the Courts findings on structural racism in its April 20, 2021 preliminary injunction. Dkt. 286 at 14. SEE MINUTE ORDER FOR COMPLETE DETAILS. (kd) (Entered: 05/27/2021) |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| 05/27/2021 | 324 | MINUTES OF Status Conference (Held and Completed) before Judge David O. Carter, Andre Birotte, Judge: Case called. Also present is Special Master Michele Martinez. Status Conferenceheld before Judge David O. Carter at 350 W. First Street, Los Angeles, California. SEE DOCUMENT FOR FURTHER INFORMATION. Court Reporter: Myra Ponce. (twdb) (Entered: 05/27/2021) |
|---|---|---|
| 05/27/2021 | 325 | Settlement Proposal filed by Amicus Union Rescue Mission (Attachments: # 1 Settlement Proposal) (Abascal, Manuel) (Entered: 05/27/2021) |
| 05/27/2021 | 333 | NOTICE/Filing From Downtown Women's Center filed by Unknown (twdb) (Entered: 06/01/2021) |
| 05/28/2021 | 326 | TRANSCRIPT for proceedings held on 05-26-2021, 10:01 am. Court Reporter/Electronic Court Recorder: Miranda Algorri, phone number/email mirandaalgorri@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 6/18/2021. Redacted Transcript Deadline set for 6/28/2021. Release of Transcript Restriction set for 8/26/2021. (Algorri, Miranda) (Entered: 05/28/2021) |
| 05/28/2021 | 327 | NOTICE OF FILING TRANSCRIPT filed for proceedings 05-26-2021, 10:01 am re Transcript 326 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Algorri, Miranda) TEXT ONLY ENTRY (Entered: 05/28/2021) |
| 05/28/2021 | 328 | STIPULATION for Extension of Time to File Answer to June 17, 2021 re Complaint (Attorney Civil Case Opening),,, 1 filed by Defendant City of Los Angeles. (Attachments: # 1 Proposed Order)(Marcus, Scott) (Entered: 05/28/2021) |
| 05/29/2021 | 329 | SCHEDULING NOTICE by Judge David O. Carter. The Court, having read and considered the joint stipulation filed on behalf of Plaintiffs LA ALLIANCE, et al. (Plaintiffs) and Defendant City of Los Angeles (the City), and finding GOOD CAUSE thereon, hereby GRANTS the stipulated two week extension of time for the City to respond to Plaintiffs Complaint. IT IS HEREBY ORDERED that the Citys response to Plaintiffs Complaint is to be filed on or by June 17, 2021. STIPULATION for Extension of Time to File Answer to June 17, 2021. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kd) TEXT ONLY ENTRY (Entered: 05/29/2021) |
| 05/29/2021 | 330 | Parties requests for exhibits and photographs shown at the May 27, 2021 hearing (kd) Modified on 5/30/2021 (kd). refer to 331 for Transcript (Entered: 05/29/2021) |
| 05/30/2021 | 331 | TRANSCRIPT for proceedings held on 05/27/2021 at 9:02 a.m. Court Reporter/Electronic Court Recorder: Myra L. Ponce, CSR, RDR, CRR, e-mail address myraponce@sbcglobal.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 6/21/2021. Redacted Transcript Deadline set for 6/30/2021. Release of Transcript Restriction set for 8/30/2021. (Ponce, Myra) (Entered: 05/30/2021) |
| 05/30/2021 | 332 | NOTICE OF FILING TRANSCRIPT filed for proceedings 05/27/2021 at 9:02 a.m. re Transcript 331 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Ponce, Myra) TEXT ONLY ENTRY (Entered: 05/30/2021) |
| 06/02/2021 | 334 | TRANSCRIPT ORDER as to Defendant County of Los Angeles for Court Reporter. (Rodriguez-Sanchirico, Emily) (Entered: 06/02/2021) |
| 06/02/2021 | 335 | LETTER from County of Los Angeles Board of Supervisors Chair Hilda Solis. (kd) (Entered: 06/02/2021) |
| 06/16/2021 | 336 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendant City of Los Angeles. Motion set for hearing on 8/9/2021 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order) (Hoang, Arlene) (Entered: 06/16/2021) |
| 06/23/2021 | 337 | Letter from Pacific Palisades Residents Association filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter (Umhofer, Matthew) (Entered: 06/23/2021) |

ER 1003

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| 06/23/2021 | 338 | SCHEDULING NOTICE by Judge David O. Carter. On the Court's own motion, the Motion to Dismiss Case 336 is continued to AUGUST 19, 2021, at 9:00 AM at the Santa Ana Courthouse, Courtreoom 9D, Ninth Floor. IT IS SO ORDERED.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kd) TEXT ONLY ENTRY (Entered: 06/23/2021) |
|---|---|---|
| 07/01/2021 | 339 | *Request for Judicial Notice* (Attachments: # 1 Exhibit Monitor's Interim Report & Ex. 1, # 2 Exhibit Monitor's Supplemental Report, # 3 Exhibit Ex. 2, # 4 Exhibit Exhibit 3, # 5 Exhibit Exhibit 4, # 6 Exhibit Exhibit 5, # 7 Proposed Order)(Sobel, Carol) (Entered: 07/01/2021) |
| 07/11/2021 | 340 | *Letter in Support of Court Intervention* (Ravis, Mark) (Entered: 07/11/2021) |
| 07/13/2021 | 341 | NOTICE Of Payment And Report Regarding Mainstream Services At City Facilities filed by the County of Los Angeles. (Attachments: # 1 Exhibit A - County Mainstream Benefits Quarterly Report)(Hashmall, Jennifer) (Entered: 07/13/2021) |
| 07/15/2021 | 342 | STATUS REPORT *PURSUANT TO THE MOU [DKT. 185]* filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A to City's Quarterly Status Report, # 2 Exhibit B to City's Quarterly Status Report, # 3 Exhibit C to City's Quarterly Status Report, # 4 Exhibit D to City's Quarterly Status Report, # 5 Exhibit E to City's Quarterly Status Report)(Hoang, Arlene) (Entered: 07/15/2021) |
| 07/20/2021 | 343 | STIPULATION to Vacate Hearing and Briefing Schedule for Defendant City of LA's Motion to Dismiss NOTICE OF MOTION AND MOTION to Dismiss Case 336 filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Attachments: # 1 Proposed Order)(Mitchell, Elizabeth) (Entered: 07/20/2021) |
| 07/21/2021 | 344 | ORDER by Judge David O. Carter, Granting Stipulation to Vacate Hearing and Briefing Schedule for Defendant City of LA'S Motion to Dismiss 343 . The current briefing schedule and hearing date of August 19, 2021, of Defendant Citys Motion to Dismiss is vacated; SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 07/21/2021) |
| 08/23/2021 | 345 | STIPULATION to Continue Status Conference from August 26, 2021 to September 30, 2021 filed by Defendants City of Los Angeles, County of Los Angeles. (Attachments: # 1 Proposed Order)(Hashmall, Jennifer) (Entered: 08/23/2021) |
| 08/24/2021 | 346 | ORDER GRANTING DEFENDANTS' STIPULATION TO CONTINUE STATUS CONFERENCE 345 by Judge David O. Carter. Status Conference is hereby continued form August 26, 2021 to September 30, 2021 at 9:00 a.m. (et) (Entered: 08/24/2021) |
| 09/07/2021 | 347 | NOTICE of Association of Counsel associating attorney Ana Wai-Kwan Lai on behalf of Defendant County of Los Angeles. Filed by Defendant County of Los Angeles (Attorney Emily A Rodriguez-Sanchirico added to party County of Los Angeles(pty:dft))(Rodriguez-Sanchirico, Emily) (Entered: 09/07/2021) |
| 09/08/2021 | 348 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Notice of Association of Counsel, 347 . The following error(s) was/were found: Notice of Association not signed by Ana Lai. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (ak) (Entered: 09/08/2021) |
| 09/20/2021 | 349 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER CONTINUING STATUS CONFERENCE. The Court continues the status conference from September 30, 2021 to December 16, 2021 at 9:00 am at the FIRST STREET U.S. COURTHOUSE, 350 W. 1st Street, Los Angeles, CA 90012. ( Status Conference set for 12/16/2021 AT 09:00 AM before Judge David O. Carter.) (twdb) (Entered: 09/21/2021) |
| 09/23/2021 | 350 | NOTICE filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. *Plaintiffs' Notice of Intent to File First Amended Complaint* (Mitchell, Elizabeth) (Entered: 09/23/2021) |
| 09/23/2021 | 351 | ORDER from Ninth Circuit Court of Appeals filed. CCA # 21-55395; 21-55404; 55408; In light of our concurrently filed opinion, the administrative stay issued on May 13 and extended on June 10, 2021, is hereby VACATED. SEE DOCUMENT FOR FURTHER INFORMATION AS TO THE NINTH CIRCUIT COURT OF APPEAL ORDER. (twdb) (Entered: 09/24/2021) |

**ER 1004**

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 09/23/2021 | 352 | OPINION from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 283 filed by Cangress, Notice of Appeal to 9th Circuit Court of Appeals,, 281 filed by City of Los Angeles, Notice of Appeal to 9th Circuit Court of Appeals, 278 filed by County of Los Angeles. CCA # 21-55395; 21-55404; 55408. VACATED and REMANDED. (twdb) (Entered: 09/24/2021) |
| 09/23/2021 | 353 | ORDER from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 283 filed by Cangress, Notice of Appeal to 9th Circuit Court of Appeals,, 281 filed by City of Los Angeles, Notice of Appeal to 9th Circuit Court of Appeals, 278 filed by County of Los Angeles. CCA # 21-55395; 21-55404; 55408. (twdb) (Entered: 09/24/2021) |
| 10/01/2021 | 354 | Notice of Electronic Filing re Notice (Other), 350 , USCA Memorandum/Opinion/Order, 351 , USCA Memorandum/Opinion/Order, 353 , USCA Memorandum/Opinion/Order, 352 e-mailed to david@jtlegalgroup.com bounced due to 5.1.0 - Unknown address error 550-'5.1.1 <david@jtlegalgroup.com>': Recipient address rejected: User unknown in virtual mailbox table'. The primary e-mail address associated with the attorney record has been deleted. Pursuant to Local Rules it is the attorneys obligation to maintain all personal contact information including e-mail address in the CM/ECF system. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ew) TEXT ONLY ENTRY (Entered: 10/01/2021) |
| 10/15/2021 | 355 | MANDATE of Ninth Circuit Court of Appeals filed re: USCA Memorandum/Opinion/Order, 352 , Notice of Appeal to 9th Circuit Court of Appeals, 283 , Notice of Appeal to 9th Circuit Court of Appeals,, 281 , Notice of Appeal to 9th Circuit Court of Appeals, 278 , CCA # 21-55395, 21-55404, 21-55408. The judgment of this Court, entered September 23, 2021, takes effect this date. This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure. Costs are awarded to Appellants. (car) (Entered: 10/15/2021) |
| 10/15/2021 | 356 | STATUS REPORT *Quarterly Report pursuant to the MOU [DKT. 185-1]* filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Hoang, Arlene) (Entered: 10/15/2021) |
| 10/15/2021 | 357 | STATUS REPORT *Annual Report pursuant to the MOU [DKT. 185-1]* filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A)(Hoang, Arlene) (Entered: 10/15/2021) |
| 10/29/2021 | 358 | NOTICE OF MOTION AND MOTION for Leave to file Amended and Supplemental Complaint filed by Plaintiffs Joseph Burk, George Frem, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. Motion set for hearing on 11/29/2021 at 10:00 AM before Judge David O. Carter. (Attachments: # 1 Declaration of Elizabeth A. Mitchell and Ex. A, # 2 Proposed Order) (Mitchell, Elizabeth) (Entered: 10/29/2021) |
| 11/01/2021 | 359 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: NOTICE OF MOTION AND MOTION for Leave to file Amended and Supplemental Complaint 358 . The following error(s) was/were found: Hearing information is missing, incorrect, or not timely. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (twdb) (Entered: 11/01/2021) |
| 11/01/2021 | 360 | ORDER by Judge David O. Carter: Granting 358 MOTION for Leave to File Amended and Supplemental Complaint. Plaintiffs shall file said Amended and Supplemental Complaint forthwith. (twdb) (Entered: 11/01/2021) |
| 11/01/2021 | 361 | Amended and Supplemental AMENDED COMPLAINT against Defendants All Defendants amending Complaint (Attorney Civil Case Opening,,, 1 , filed by Plaintiffs George Frem, Joseph Burk, LA Alliance for Human Rights, Charles Van Scoy, Harry Tashdjian, Leandro Suarez, Gary Whitter, Karyn Pinsky, Charles Malow, Wenzial Jarrell (Attachments: # 1 Exhibit A - Order re Preliminary Injunction)(Attorney Elizabeth Anne Mitchell added to party Wenzial Jarrell(pty:pla))(Mitchell, Elizabeth) (Entered: 11/01/2021) |
| 11/01/2021 | 362 | *Amended* CERTIFICATE of Interested Parties filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter, identifying LA Alliance, Joseph Burk, Harry Tashdijian, Karyn Pinsky, Charles Marlow, Charles Van Scoy, George Frem, Gary Whitter, Leandro Suarez, Wenzial Jarrell, City of Los Angeles, County of Los Angeles. (Mitchell, Elizabeth) (Entered: 11/01/2021) |

| | | |
|---|---|---|
| 11/02/2021 | 363 | NOTICE of Appearance filed by attorney Ryan Salsig on behalf of Defendant City of Los Angeles (Attorney Ryan Salsig added to party City of Los Angeles(pty:dft))(Salsig, Ryan) (Entered: 11/02/2021) |
| 11/02/2021 | 364 | STATUS REPORT *(Quarterly Status Report Pursuant to Memorandum of Understanding Between County of Los Angeles and City of Los Angeles)* filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A - Mainstream Benefits Quarterly Report)(Hashmall, Jennifer) (Entered: 11/02/2021) |
| 11/04/2021 | 365 | STIPULATION Extending Time to Answer the complaint as to County of Los Angeles answer now due 12/3/2021, re Amended Complaint/Petition, 361 filed by Defendant County of Los Angeles. (Attachments: # 1 Proposed Order)(Hashmall, Jennifer) (Entered: 11/04/2021) |
| 11/09/2021 | 366 | ORDER by Judge David O. Carter, Granting Joint Stipulation Extending Time For Defendant County of Los Angeles to Respond to Plaintiffs' First Amended Complaint (30 days or less) 365 . SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 11/09/2021) |
| 11/10/2021 | 367 | STIPULATION for Extension of Time to File Responsive Pleading as to Amended Complaint/Petition, 361 filed by Defendant City of Los Angeles. (Attachments: # 1 Proposed Order)(Hoang, Arlene) (Entered: 11/10/2021) |
| 11/12/2021 | 368 | ORDER by Judge David O. Carter, Granting Stipulation for Extension of Time for Defendant City of Los Angeles to Respond to First Amended and Supplemental Complaint and for a Briefing Schedule 367 . Extended to 12/3/21; SEE DOCMENT FOR FURTHER INFORMATION. (twdb) (Entered: 11/15/2021) |
| 12/03/2021 | 369 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendant City of Los Angeles. Motion set for hearing on 1/24/2022 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order) (Hoang, Arlene) (Entered: 12/03/2021) |
| 12/03/2021 | 370 | NOTICE OF MOTION AND MOTION to Dismiss First Amended Complaint filed by Defendant County of Los Angeles. Motion set for hearing on 1/24/2022 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Request for Judicial Notice, # 3 Notice of Lodging [Proposed] Order Granting Request for Judicial Notice, # 4 Notice of Lodging [Proposed] Order Granting Motion to Dismiss) (Hashmall, Jennifer) (Entered: 12/03/2021) |
| 12/03/2021 | 371 | DECLARATION of Mira Hashmall in Support of NOTICE OF MOTION AND MOTION to Dismiss First Amended Complaint 370 filed by Defendant County of Los Angeles. (Attachments: # 1 Ex. 1 Defendant County's Report of Available Resources for People Experiencing Homelessness, # 2 Ex. 2 Disrupting the Cycle of Chronic Homelessness, # 3 Ex. 3 Statement Of Proceedings, # 4 Ex. 4 Statement Of Proceedings, # 5 Ex. 5 Statement Of Proceedings, # 6 Ex. 6 Statement Of Proceedings, # 7 Ex. 7 Statement Of Proceedings, # 8 Ex. 8 Letter from DHS to Board Transmitting HFH Quarterly Report, # 9 Ex. 9 February 2016 Homeless Initiative Approved Strategies to Combat Homelessness, # 10 Ex. 10 QR1 Full Report, # 11 Measures Appearing on Ballot, # 12 Ex. 12 September 29, 2017 Measure-H-Strategy-Implementation-Plans, # 13 Ex. 13 December 3, 2020 Homeless-Initiative-Quarterly-Report-No.-18, # 14 Ex. 14 February 22, 2021 Report, # 15 Ex. 15 Quarterly Report No. 20 Item 47 A Agenda of February 9, 2016, # 16 Ex. 16 Board of Supervisors Approves LA County Homeless Initiative in FY 2021-2022, # 17 Ex. 17 Statement Of Proceedings, # 18 Ex. 18 136 - Binding Term Sheet (BTS), # 19 Ex. 19 177 - Notice of First Payment on September 1, 2020 Pursuant to BTS, # 20 Ex. 20 185 - Notice to Court re MOU, # 21 Ex. 21 203 - Notice of Second Payment on December 22, 2020 Pursuant to BTS & MOU, # 22 Ex. 22 254 - Notice of Third Payment on March 24, 2021 Pursuant to BTS & MOU, # 23 Ex. 23 341 - Notice of Fourth Payment on July 9, 2021 Pursuant to BTS & MOU, # 24 Ex. 24 364 - November 2, 2021 Report on Mainstream Services Pursuant to BTS & MOU, # 25 Ex. 25 Statement Of Proceedings, # 26 Ex. 26 LAHSA Receives $15 Million Grant From HUD To Address Youth Homelessness, # 27 Ex. 27 Statement Of Proceedings, # 28 Ex. 28 Statement Of Proceedings, # 29 Ex. 29 November 2, 2021 Motion, # 30 Ex. 30 May 12, 2020 Motion re Homelessness Crisis Response Strategy, # 31 Ex. 31 July 2, 2020 CEO COVID Recovery Plan Report Attaching LAHSA Funding Plan, # 32 Ex. 32 May 15, 2020 CEO COVID Recovery Plan Report, # 33 Ex. 33 197 - Status Report re MHSA Funds, # 34 Ex. 34 May 2, 2017 Board Letter, # 35 Ex. 35 MHSA Announcements, # 36 Ex. 36 Letter re County's Motion to Dismiss First Amended Complaint)(Hashmall, Jennifer) (Entered: 12/03/2021) |

| | | |
|---|---|---|
| 12/06/2021 | 372 | MINUTE ORDER (IN CHAMBERS): ORDER RE: STATUS CONFERENCE by Judge David O. Carter: The Court requests that the parties provide the Court with a joint status update on progress made toward completion of the agreement by noon on December 14, 2021. The Status Conference will take place on December 16, 2021 at 9:00 am at the First Street U.S. Courthouse, 350 W 1st Street, Los Angeles, CA 90012. The Court will inform the parties of the specific courtroom in advance of the hearing. The Clerk shall serve this minute order on the parties. (see document for further details) (bm) (Entered: 12/06/2021) |
| 12/14/2021 | 373 | STATUS REPORT *Joint with Defendant County of Los Angeles* filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Hoang, Arlene) (Entered: 12/14/2021) |
| 12/14/2021 | 374 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: STATUS CONFERENCE. The parties are currently scheduled to meet for a Status Conference on December 16, 2021, to discuss progress toward completion of the freeway overpasses and underpasses agreement. The Status Conference will take place at 9:00 am in Courtroom 5B, 350 W. 1st Street, Los Angeles, CA 90012. (twdb) (Entered: 12/14/2021) |
| 12/15/2021 | 375 | Notice of Appearance or Withdrawal of Counsel: for attorney Jennifer Mira Hashmall counsel for Defendant County of Los Angeles. Emily A. Rodriguez-Sanchirico is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Defendant County of Los Angeles. (Hashmall, Jennifer) (Entered: 12/15/2021) |
| 12/16/2021 | 376 | *Submissions of Defendant City of Los Angeles at December 16, 2021 Status Conference* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Hoang, Arlene) (Entered: 12/16/2021) |
| 12/16/2021 | 377 | MINUTES OF Status Conference (Held and Completed) before Judge David O. Carter: The Court Reporter referenced above is hereby ordered to submit the original transcript and notes to transcripts cacd@cacd.uscourts.gov no later than Monday, December 27, 2021, for immediate uploading on the Courts CM/ECF document filing System. SEE DOCUMENT FOR FURTHER INFORMATION. Court Reporter: Court Smart. (twdb) (Entered: 12/20/2021) |
| 12/21/2021 | 378 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: STATUS CONFERENCE. The Court will hear testimony from all parties about the audit results at the Status Conference. The Conference will take place at 9:00 am on Wednesday April 27, 2022 at the First Street U.S. Courthouse, 350 W. 1st Street, Los Angeles, CA 90012. The Court will inform the parties of the specific courtroom in advance of the hearing. ( Status Conference set for 4/27/2022 at 09:00 AM before Judge David O. Carter.) SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 12/21/2021) |
| 12/23/2021 | 379 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Dismiss Case 369 *Plaintiffs' Opposition to Defendant City of Los Angeles' Motion to Dismiss Plaintiffs' Amended and Supplemental Complaint* filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Mitchell, Elizabeth) (Entered: 12/23/2021) |
| 12/23/2021 | 380 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Dismiss First Amended Complaint 370 *Plaintiffs' Opposition to Defendant County of Los Angeles' Motion to Dismiss Plaintiffs' Amended and Supplemental Complaint* filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Mitchell, Elizabeth) (Entered: 12/23/2021) |
| 01/10/2022 | 381 | REPLY in Support of NOTICE OF MOTION AND MOTION to Dismiss Case 369 filed by Defendant City of Los Angeles. (Salsig, Ryan) (Entered: 01/10/2022) |
| 01/10/2022 | 382 | REPLY in Support of NOTICE OF MOTION AND MOTION to Dismiss First Amended Complaint 370 filed by Defendant County of Los Angeles. (Hashmall, Jennifer) (Entered: 01/10/2022) |
| 01/18/2022 | 383 | STATUS REPORT *PURSUANT TO THE MOU [DKT. 185]* filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A to City's Quarterly Status Report, # 2 Exhibit B to City's Quarterly Status Report, # 3 Exhibit C to City's Quarterly Status Report)(Hoang, Arlene) (Entered: 01/18/2022) |
| 01/20/2022 | 384 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: MOTION to Dismiss 369 , 370 . SEE DOCUMENT FOR FURTHER INFORMATION. ( Motion set for hearing on 1/24/2022 at 08:30 AM before Judge David O. Carter.) (twdb) (Entered: 01/20/2022) |
| 01/21/2022 | 385 | REQUEST for Leave of City of Los Angeles, County of Los Angeles, and Plaintiffs L.A. Alliance, et al. to Appear for Remote filed by Defendant City of Los Angeles. (Salsig, Ryan) (Entered: 01/21/2022) |

CM/ECF - California Central District                          https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 01/21/2022 | 386 | REQUEST for Leave of Intervenors Orange County Catholic Worker, CANGRESS, and Los Angeles Catholic Worker to Appear for Remote filed by Intervenors Cangress, Los Angeles Catholic Worker, Los Angeles Community Action Network. (Myers, Shayla) (Entered: 01/21/2022) |
| 01/22/2022 | 387 | Text Only Order: The Court GRANTS the Request for Remote Appearance by Defendants City of Los Angeles and County of Los Angeles and Plaintiffs L.A. Alliance et al. 385 . The Court GRANTS the Request for Remote Appearance by Intervenors Orange County Catholic Worker, CANGRESS, and Los Angeles Catholic Worker 386 . Zoom information for the hearing is located at www.cacd.uscourts.gov/honorable-david-o-carter. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dgo) TEXT ONLY ENTRY (Entered: 01/22/2022) |
| 01/24/2022 | 388 | MINUTES of Motion Hearing held before Judge David O. Carter: CITY OF LOS ANGELES' MOTION TO DISMISS 369 ; CITY OF LOS ANGELES' MOTION TO DISMISS FAC 370 . The Court orders the parties to attend a mandatory settlement conference on Tuesday,February 15, 2022 at 8:30 a.m. at the First Street U.S. Courthouse, 350 W. 1st Street, Los Angeles,CA 90012. SEE DOCUMENT FOR FURTHER INFORMATION. Settlement Conference set for 2/15/2022 AT 08:30 AM before Judge David O. Carter. Court Reporter: Court Smart. (twdb) (Entered: 01/25/2022) |
| 01/25/2022 | 389 | TRANSCRIPT for proceedings held on 1/24/22. Court Reporter/Electronic Court Recorder: EXCEPTIONAL REPORTING SERVICES, INC, phone number (361) 949-2988. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 2/15/2022. Redacted Transcript Deadline set for 2/25/2022. Release of Transcript Restriction set for 4/25/2022. (apr) (Entered: 01/25/2022) |
| 01/25/2022 | 390 | NOTICE OF FILING TRANSCRIPT filed for proceedings 1/24/22 re Transcript 389 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (apr) TEXT ONLY ENTRY (Entered: 01/25/2022) |
| 01/27/2022 | 391 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: MEDIATION SESSEION. The Court ORDERS the parties to a mandatory mediation session before Judge Andr Birotte Jr. on Tuesday, February 15, 2022 at 1:30 pm in the Los Angeles First Street United States Courthouse, or another location, depending on the COVID-19 situation. ( Mediation set for 2/15/2022 at 01:30 PM before Judge Andre Birotte Jr.) SEE DOCUMENT FOR FURTHER INORMATION. (twdb) (Entered: 01/27/2022) |
| 01/31/2022 | 392 | STATUS REPORT *Pursuant to Memorandum of Understanding Between County of Los Angeles and City of Los Angeles [Dkt. 185-1]* filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A - Mainstream Services Quarterly Report)(Hashmall, Jennifer) (Entered: 01/31/2022) |
| 02/14/2022 | 393 | SCHEDULING NOTICE by Judge David O. Carter The MANDATORY SETTLEMENT CONFERENCE 391 scheduled for 2/15/2022 at 1:30 PM will be held at Los Angeles First Street United States Courthouse, Courtroom 5B. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 02/14/2022) |
| 02/15/2022 | 394 | MINUTES OF ORDER RE: SETTLEMENT CONFERENCE held before Judge David O. Carter: Outside the presence of the court reporter, the parties met with Judge Andr Birotte and Special Master Michele Martinez for ongoing settlement discussion. The parties are ordered to return Wednesday, February 16, 2022 at 2pm. Court Reporter: Not Present. (twdb) (Entered: 02/17/2022) |
| 02/17/2022 | 395 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: SETTLEMENT CONFERENCE. In light of ongoing settlement discussions, the Court sets a Settlement Conference on Tuesday, February 22, 2022 at 2:00 pm in Courtroom 5B at the First Street U.S. Courthouse, 350 W 1st Street, Los Angeles, CA 90012. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 02/17/2022) |
| 02/22/2022 | 396 | MINUTES OF Settlement Conference held before Judge David O. Carter: Conference will be continued at a later date to be scheduled by the Court. Court Reporter: Not Reported. (twdb) (Entered: 02/24/2022) |
| 02/24/2022 | 397 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: SETTLEMENT CONFERENCE. SEE DOCUMENT FOR FURTHER INFORMATION. ( Settlement Conference set for 3/1/2022 at 02:00 PM before Judge David O. Carter.) (twdb) (Entered: 02/24/2022) |

CM/ECF - California Central District | https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| 02/28/2022 | 398 | STIPULATION to Continue Status Conference and Related Dates filed by Defendants City of Los Angeles, County of Los Angeles. (Attachments: # 1 Proposed Order)(Hashmall, Jennifer) (Entered: 02/28/2022) |
|---|---|---|
| 03/02/2022 | 399 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: Defendants' Stipulation to Continue Status Conference 398 . By Monday, March 21, 2022, the City and County shall submit a Joint Status Report detailing progress made toward completing the audits. SEE DOCUMENT FOR FURTHER INFORMATION. ( Status Conference continued to 5/20/2022 at 09:00 AM before Judge David O. Carter.) (twdb) (Entered: 03/02/2022) |
| 03/21/2022 | 400 | STATUS REPORT *Defendants County of Los Angeles and City of Los Angeles' Status Report Regarding Audit Progress* filed by Defendant County of Los Angeles. (Hashmall, Jennifer) (Entered: 03/21/2022) |
| 03/23/2022 | 401 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter. ORDER RE: SETTLEMENT CONFERENCE. SEE DOCUMENT FOR FURTHER INFORMATION. (Settlement Conference set for 3/29/2022 at 1:00 PM before Judge David O. Carter.) (dgo) (Entered: 03/23/2022) |
| 03/23/2022 | 402 | AMENDED MINUTE ORDER IN CHAMBERS by Judge David O. Carter. ORDER RE: SETTLEMENT CONFERENCE. SEE DOCUMENT FOR FURTHER INFORMATION. (Settlement Conference set for 3/29/2022 at 1:00 PM before Judge David O. Carter.) (dgo) (Entered: 03/23/2022) |
| 03/25/2022 | 403 | NOTICE Notice of Withdrawal of Consent to Ex Parte Communications filed by Defendant County of Los Angeles. (Miller, Louis) (Entered: 03/25/2022) |
| 03/28/2022 | 404 | NOTICE OF NON-OPPOSITION Notice (Other) 403 filed by Intervenor Parties Los Angeles Catholic Worker, Los Angeles Community Action Network, Orange County Catholic Worker. *[and Notice of Joinder]* (Myers, Shayla) (Entered: 03/28/2022) |
| 03/28/2022 | 405 | RESPONSE filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitterto Notice (Other) 403 *Plaintiff's Response to Defendant County of Los Angeles' Notice of Withdrawal of Consent to Ex Parte Communications* (Mitchell, Elizabeth) (Entered: 03/28/2022) |
| 03/29/2022 | 406 | Text Only Order by Judge David O. Carter: The Court is in receipt of Defendant County of Los Angeles' Notice of Withdrawal of Consent to Ex Parte Communications (Dkt. 403), joined by Intervenors (Dkt. 404), and acknowledges the suspension of ex parte communications in this matter. The Court declines the County's request for reassignment. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dgo) TEXT ONLY ENTRY (Entered: 03/29/2022) |
| 03/30/2022 | 407 | MINUTES OF Settlement Conference held before Judge David O. Carter: Hearing not held. Settlement Conference held off the record. Courtroom Deputy: Teresa Jackson-Terrell. (dgo) (Entered: 03/30/2022) |
| 04/01/2022 | 408 | NOTICE of Settlement *Notice of Preliminary Settlement Agreement and Stipulation to Stay Litigation as to Defendant City of Los Angeles Only* filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Attachments: # 1 LA Alliance-City Term Sheet)(Mitchell, Elizabeth) (Entered: 04/01/2022) |
| 04/04/2022 | 409 | TRANSCRIPT for proceedings held on 12/16/21. Court Reporter/Electronic Court Recorder: EXCEPTIONAL REPORTING SERVICES, phone number (361) 949-2988. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 4/25/2022. Redacted Transcript Deadline set for 5/5/2022. Release of Transcript Restriction set for 7/5/2022. (ha) (Entered: 04/04/2022) |
| 04/04/2022 | 410 | NOTICE OF FILING TRANSCRIPT for proceedings 12/16/21 re Transcript 409 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ha) TEXT ONLY ENTRY (Entered: 04/04/2022) |
| 04/04/2022 | 411 | JOINT REPORT of Audits And Procedures To Document New Beds filed by Defendants City of Los Angeles, County of Los Angeles. (Attachments: # 1 Exhibit A - Joint Report)(Hashmall, Jennifer) (Entered: 04/04/2022) |

ER 1009

CM/ECF - California Central District                          https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 04/07/2022 | 412 | NOTICE of Intent to Seek Leave to File Second Amended Complaint filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Mitchell, Elizabeth) (Entered: 04/07/2022) |
| 04/19/2022 | 413 | NOTICE of Filing Joint Supplemental Audit Report filed by Defendants City of Los Angeles, County of Los Angeles. (Attachments: # 1 Exhibit A - Supplemental Report)(Hashmall, Jennifer) (Entered: 04/19/2022) |
| 04/22/2022 | 414 | QUARTERLY STATUS REPORT of CITY OF LOS ANGELES PURSUANT TO MOU [DKT. 185-1] filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Hoang, Arlene) (Entered: 04/22/2022) |
| 04/29/2022 | 415 | STATUS REPORT *Joint Status Report re Notice of Preliminary Settlement and Stipulation to Stay Litigation as to Defendant City of Los Angeles Only [ECF No. 408]* filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Mitchell, Elizabeth) (Entered: 04/29/2022) |
| 05/02/2022 | 416 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: SETTLEMENT AND/OR SCHEDULING CONFERENCE. SEE DOCUMENT FOR FURTHER INFORMATION. ( Scheduling Conference set for 5/20/2022 at 09:00 AM before Judge David O. Carter.) (twdb) (Entered: 05/02/2022) |
| 05/05/2022 | 417 | STATUS REPORT *(Quarterly Status Report Pursuant to Memorandum of Understanding Between County of Los Angeles and City of Los Angeles [Dkt. 185-1])* filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A - Report)(Hashmall, Jennifer) (Entered: 05/05/2022) |
| 05/10/2022 | 418 | RESPONSE filed by Defendant County of Los Angelesto Minutes of In Chambers Order/Directive - no proceeding held, Set/Reset Hearing 416 *(Defendant County of Los Angeles' Response to Court Order re Scheduling Conference and Request for Rule 16 Conference)* (Attachments: # 1 Exhibit 1 - Correspondence)(Hashmall, Jennifer) (Entered: 05/10/2022) |
| 05/17/2022 | 419 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: HEARING LOCATION 399 , 416 . (twdb) (Entered: 05/17/2022) |
| 05/18/2022 | 420 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: SETTLEMENT AND/OR SCHEDULING CONFERENCE. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 05/18/2022) |
| 05/19/2022 | 421 | NOTICE of LODGING filed of *[Proposed] Stipulated Order of Dismissal as to Defendant City of Los Angeles Only [Fed.R.Civ.P. 41(a)(2)]* re Minutes of In Chambers Order/Directive - no proceeding held, Set/Reset Hearing 416 (Attachments: # 1 [Proposed] Stipulated Order of Dismissal as to Defendant City of Los Angeles Only [Fed.R.Civ.P. 41(a)(2)] and Exhibit 1 - Settlement Agreement)(Mitchell, Elizabeth) (Entered: 05/19/2022) |
| 05/20/2022 | 422 | TRANSCRIPT ORDER as to Defendant County of Los Angeles for Court Smart (CS). (Brody, Lauren) (Entered: 05/20/2022) |
| 05/20/2022 | 423 | MINUTES OF Settlement Conference held before Judge David O. Carter: The Court sets the following dates regarding the settlement agreement: The Court invites any party and the public to submit comments or objections by May 31, 2022. Responses are due June 3, 2022. Hearing regarding settlement agreement is set for June 9, 2022 at 9:00 AM. Status Conference set for 6/9/2022 at 09:00 AM before Judge David O. Carter. Court Reporter: Court Smart. (twdb) (Entered: 05/23/2022) |
| 05/23/2022 | 424 | TRANSCRIPT for proceedings held on 5/20/2022, 9:41 a.m. Court Reporter/Electronic Court Recorder: ECHO REPORTING, INC., phone number (858)453-7590. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 6/13/2022. Redacted Transcript Deadline set for 6/23/2022. Release of Transcript Restriction set for 8/22/2022. (ls) (Entered: 05/23/2022) |
| 05/23/2022 | 425 | NOTICE OF FILING TRANSCRIPT filed for proceedings 5/20/2022, 9:41 a.m re Transcript 424 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ls) TEXT ONLY ENTRY (Entered: 05/23/2022) |
| 05/24/2022 | 426 | NOTICE OF LODGING filed of *Fully Executed [Proposed] Stipulated Order of Dismissal as to Defendant City of Los Angeles Only [Fed.R.Civ.P. 41(a)(2)]* re Minutes of In Chambers Order/Directive - no proceeding held, Set/Reset Hearing 416 (Attachments: # 1 Fully Executed [Proposed] Stipulated Order |

CM/ECF - California Central District | https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | of Dismissal as to Defendant City of Los Angeles Only [Fed.R.Civ.P. 41(a)(2)] and Exhibit 1 - Settlement Agreement)(Mitchell, Elizabeth) (Entered: 05/24/2022) |
|---|---|---|
| 05/24/2022 | 427 | NOTICE of Appearance filed by attorney Jonathan Michael Eisenberg on behalf of Movant AIDS Healthcare Foundation (Attorney Jonathan Michael Eisenberg added to party AIDS Healthcare Foundation(pty:bkmov))(Eisenberg, Jonathan) (Entered: 05/24/2022) |
| 05/24/2022 | 428 | STATEMENT Opposition to Proposed Partial Settlement filed by Movant AIDS Healthcare Foundation re: Notice of Settlement, 408 , Notice of Lodging, 421 , Settlement Conference,, Set/Reset Hearing, 423 . (Eisenberg, Jonathan) (Entered: 05/24/2022) |
| 05/24/2022 | 429 | NOTICE OF LODGING filed of *Amended Fully Executed [Proposed] Stipulated Order of Dismissal as to Defendant City of Los Angeles Only [Fed.R.Civ.P. 41(a)(2)]* re Minutes of In Chambers Order/Directive - no proceeding held,, Set/Reset Hearing 416 (Attachments: # 1 Amended Fully Executed [Proposed] Stipulated Order of Dismissal as to Defendant City of Los Angeles Only [Fed.R.Civ.P. 41(a)(2)] and Exhibit 1 - Settlement Agreement)(Mitchell, Elizabeth) (Entered: 05/24/2022) |
| 05/26/2022 | 430 | PROOF OF SERVICE filed by Non-Party AIDS Healthcare Foundation, re Statement 428 , Notice of Appearance 427 served on May 24, 2022. (Eisenberg, Jonathan) (Entered: 05/26/2022) |
| 05/27/2022 | 431 | NOTICE of Unavailability of Plaintiffs' Counsel filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Mitchell, Elizabeth) (Entered: 05/27/2022) |
| 05/31/2022 | 432 | RESPONSE filed by Defendant County of Los Angelesto Notice of Settlement, 408 , Notice of Lodging, 421 , Settlement Conference,, Set/Reset Hearing, 423 (Miller, Louis) (Entered: 05/31/2022) |
| 05/31/2022 | 433 | APPENDIX filed by Defendant County of Los Angeles. Re: Response 432 *To Settlement Between Plaintiffs And City Of Los Angeles* (Attachments: # 1 Exhibit 01 - Homeless Initiative Approved Strategies, # 2 Exhibit 02 - Homeless Initiative Quarterly Report, # 3 Exhibit 03 - Consolidated Municipal and Special Elections, # 4 Exhibit 04 - Measure H Strategy Implementation Plans, # 5 Exhibit 05 - Report of Available Resources, # 6 Exhibit 06 - Homeless Initiative Quarterly Report, # 7 Exhibit 07 - Disrupting the Cycle of Chronic Homelessness, # 8 Exhibit 08 - Letter from DHS to Board, # 9 Exhibit 09 - July 27, 2021 Statement of Proceedings, # 10 Exhibit 10 - August 10, 2021 Statement of Proceedings, # 11 Exhibit 11 - Homeless Initiative Quarterly Report, # 12 Exhibit 12 - August 31, 2021 Statement of Proceedings, # 13 Exhibit 13 - September 15, 2021 Statement of Proceedings, # 14 Exhibit 14 - November 2, 2021 Statement of Proceedings, # 15 Exhibit 15 - Blue Ribbon Commission on Homelessness Governance Report, # 16 Exhibit 16 - County of Los Angeles Recommended Budget Volume 1, # 17 Exhibit 17 - County of Los Angeles Recommended Budget Volume 2, # 18 Exhibit 18 - Motion re Recommendations on Implementations of Blue Ribbon Commission, # 19 Exhibit 19 - Homeless Initiative Funding Letter) (Miller, Louis) (Entered: 05/31/2022) |
| 05/31/2022 | 434 | OBJECTIONS to Notice of Lodging, 426 , Notice of Lodging, 429 , Notice of Settlement, 408 , Notice of Lodging, 421 filed by Intervenor Parties Cangress, Los Angeles Catholic Worker, Los Angeles Community Action Network, Orange County Catholic Worker. (Attachments: # 1 Declaration of Shayla Myers)(Myers, Shayla) (Entered: 05/31/2022) |
| 05/31/2022 | 435 | REQUEST FOR JUDICIAL NOTICE filed by Intervenor Parties Cangress, Los Angeles Catholic Worker, Los Angeles Community Action Network, Orange County Catholic Worker. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Proposed Order)(Myers, Shayla) (Entered: 06/01/2022) |
| 06/01/2022 | 436 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: HEARING ON SETTLEMENT AGREEMENT 421 , 423 . The Court previously scheduled a hearing on the Settlement Agreement (Dkt. 421) on Thursday, June 9, 2022, at 9:00 am. The hearing will take place in Courtroom 5B at the First Street U.S. Courthouse, 350 W. 1st Street, Los Angeles, CA 90012. The Clerk shall serve this minute order on the parties. (twdb) (Entered: 06/01/2022) |
| 06/03/2022 | 437 | REPLY filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter to Notice of Lodging, 429 *Plaintiff LA Alliance for Human Rights, et al.'s Reply in Support of City-Plaintiff Settlement Agreement [ECF No. 429-1]* (Mitchell, Elizabeth) (Entered: 06/03/2022) |
| 06/03/2022 | 438 | REPLY filed by Defendant City of Los Angeles to Statement 428 , Objection, 434 , Notice of Lodging, 429 , Response 432 *To Its Settlement With Plaintiffs* (Marcus, Scott) (Entered: 06/03/2022) |

CM/ECF - California Central District | https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 06/08/2022 | 439 | ORDER RE: SETTLEMENT HEARING 423 by Judge David O. Carter. The Court previously set a hearing on the Settlement Agreement between Defendant City of Los Angeles and Plaintiffs LA Alliance for Human Rights for June 9, 2022, at 9:00 am in Courtroom 5B at the First Street U.S. Courthouse, 350 W 1st Street, Los Angeles, CA 90012. The Court requests the presence of Los Angeles Mayor Eric Garcetti, Los Angeles City Council President Nury Martinez, and other city officials who wish to attend. (rolm) (Entered: 06/08/2022) |
| 06/09/2022 | 440 | TRANSCRIPT ORDER as to Defendant County of Los Angeles for Court Smart (CS). (Brody, Lauren) (Entered: 06/09/2022) |
| 06/10/2022 | 443 | MINUTES OF Settlement Conference held before Judge David O. Carter: Also present on behalf of intervenor, Carol Sobel and Shayla Meyers. The Court tentatively approves the settlement agreement, written order to issue. Court Reporter: Court Smart. (twdb) (Entered: 06/13/2022) |
| 06/13/2022 | 441 | TRANSCRIPT for proceedings held on 6/09/2022, 9:20 a.m. Court Reporter/Electronic Court Recorder: ECHO REPORTING, INC., phone number (858)453-7590. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 7/5/2022. Redacted Transcript Deadline set for 7/14/2022. Release of Transcript Restriction set for 9/12/2022. (ls) (Entered: 06/13/2022) |
| 06/13/2022 | 442 | NOTICE OF FILING TRANSCRIPT filed for proceedings 6/09/2022, 9:20 a.m. re Transcript 441 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ls) TEXT ONLY ENTRY (Entered: 06/13/2022) |
| 06/13/2022 | 444 | EMERGENCY MOTION for Order UNDER CIRCUIT RULE 27-3 AND SUPREMACY CLAUSE ARTICLE VI PARAGRAPH TWO OF THE UNITED STATES CONSTITUTION FOR ORDERS TO ALLOW LEAVE OF COURT AND GRANTING OF ADRIAN D. MOON TO BE ALLOWED AS AN ADDITIONAL PLAINTIFF-DEFENDANT INTERVENOR ET. SEQ. SEE, READ, AND CONSIDER ATTACHED MOTIONS 1 THROUGH 9 INCORPORATED BY THIS REFERENCE ET. SEQ. filed by Defendant Intervenor Adrian D Moon. (Attachments: # 1 Proposed Order) (twdb) (Entered: 06/14/2022) |
| 06/14/2022 | 445 | ORDER APPROVING STIPULATED DISMISSAL AND PROPOSED SETTLEMENT 421 by Judge David O. Carter, re Notice of Lodging, 421 . SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 06/14/2022) |
| 06/15/2022 | 446 | SUPPLEMENTAL EVIDENCE in support of EMERGENCY MOTION FOR ADDITIONAL ORDER TO THE LOS ANGELES COUNTY PROBATION DEPARTMENT TO PROVIDE THE COMPLETE PROBATION (AB109) CASE FILE OF ADRIAN D. MOON PURSUANT TC THE SUBPOENA ISSUED ON APRIL 26, 2022 SEE READ AND CONSIDER ATTACHED MOTIONS 1 THROUGH 13 INCORPORATED BY THIS REFERENCE (Proposed) ORDER THEREON 444 filed by Intervenor Defendant Adrian D Moon. (twdb) (Additional attachment(s) added on 6/16/2022: # 1 Proposed Order) (twdb). (Entered: 06/16/2022) |
| 06/17/2022 | 447 | PROOF OF SERVICE by mail filed by defendant Adrian D Moon, re Motion Related Document, 446 served on 6/17/22. (twdb) (Entered: 06/17/2022) |
| 06/17/2022 | 448 | SUPPLEMENTAL EVIDENCE IN SUPPORT OF EMERGENCY MOTION FOR ORDERS FOR LEAVE OF COURT TO INTERVENE AS A ADDITIONAL PLAINTIFF DEFENDANT INTERVENOR, SEE READ AND CONSIDER ATTACHED MOTION 10 (20) PAGES AND MOTION 11 (125 PAGES) INCORPORATED BY THIS REFERENCE re Emergency Motion 444 filed by Intervenor Defendant Adrian D Moon. (twdb) (Entered: 06/17/2022) |
| 06/23/2022 | 449 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: AMENDED COMPLAINT. Accordingly, if Plaintiffs intend to file an amended complaint, that filing is due by Friday, July 15, 2022. The Clerk shall serve this minute order on the parties. (twdb) (Entered: 06/23/2022) |
| 07/11/2022 | 450 | EX PARTE APPLICATION to Withdraw as Counsel for Plaintiff Gary Whitter filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter. (Attachments: # 1 Declaration of Elizabeth A. Mitchell, # 2 Declaration of Paul Bonin, # 3 Proposed Order) (Mitchell, Elizabeth) (Entered: 07/11/2022) |

| | | |
|---|---|---|
| 07/13/2022 | 451 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Intervenors Cangress, Los Angeles Catholic Worker, Los Angeles Community Action Network, Orange County Catholic Worker. Appeal of Order, Add and Terminate Parties 445 . (Appeal Fee - $505 Fee Paid, Receipt No. ACACDC-33627779.) (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sweetser, Catherine) (Entered: 07/13/2022) |
| 07/14/2022 | 452 | Stipulation for Plaintiffs Leandro Suarez and Charles Van Scoy to Dismiss All Claims Against Defendant County Without Prejudice [Pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii)] filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandron Suarez, Harry Tashdjian, Charles Van Scoy, Gary Whitter (Mitchell, Elizabeth) (Entered: 07/14/2022) |
| 07/15/2022 | 453 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Miscellaneous Document 452 . The following error(s) was/were found: Incorrect event selected. Correct event to be used is: Stipulation (to dismiss party or dismiss cause). Proposed Document was not submitted as separate attachment. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (twdb) (Entered: 07/15/2022) |
| 07/15/2022 | 454 | Second Amended and Supplemental AMENDED COMPLAINT against Defendants County of Los Angeles amending Amended Complaint/Petition, 361 , filed by Plaintiffs George Frem, Joseph Burk, LA Alliance for Human Rights, Wenzial Jarrell, Harry Tashdjian, Karyn Pinsky, Charles Malow(Mitchell, Elizabeth) (Entered: 07/15/2022) |
| 07/15/2022 | 455 | STATEMENT of Clarification Regarding Gary Whitter filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Harry Tashdjian, Gary Whitter re: Amended Complaint/Petition, 454 . (Mitchell, Elizabeth) (Entered: 07/15/2022) |
| 07/18/2022 | 456 | STIPULATION Extending Time to Answer the complaint as to County of Los Angeles answer now due 8/29/2022, re Amended Complaint/Petition, 454 filed by defendant County of Los Angeles. (Attachments: # 1 Proposed Order [Proposed] Order Granting Joint Stipulation to Extend Time for Defendant County of Los Angeles to Respond to Plaintiffs' Second Amended Complaint)(Hashmall, Jennifer) (Entered: 07/18/2022) |
| 07/18/2022 | 457 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 22-55687 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 451 as to Intervenors Cangress, Los Angeles Catholic Worker, Los Angeles Community Action Network, Orange County Catholic Worker. (car) (Entered: 07/19/2022) |
| 07/21/2022 | 459 | ORDER by Judge David O. Carter, Granting Joint Stipulation Extending Time to Answer for Defendant County of Los Angeles to Respond to Plaintiffs' Second Amended Complaint (30 days or less), 456 . The last day for the County to answer or otherwise respond to Plaintiffs Second Amended and Supplemental Complaint shall be August 29, 2022. (twdb) (Entered: 07/22/2022) |
| 07/22/2022 | 458 | ORDER by Judge David O. Carter: Granting 450 EX PARTE APPLICATION to Withdraw as Counsel for Plaintiff Gary Whitter 450 ; Declarations of Elizabeth Mitchell and Paul Bonin. (twdb) (Entered: 07/22/2022) |
| 07/22/2022 | 460 | QUARTERLY STATUS REPORT of CITY OF LOS ANGELES PURSUANT TO MOU [DKT. 185-1] filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Hoang, Arlene) (Entered: 07/22/2022) |
| 08/02/2022 | 461 | REQUEST to the Honorable David O. Carter for Notice and Ruling Granting Pending Motions to Allow Adrian D. Moon in this Instant Case as a Plaintiff-Defendant Intervenor and Order to Los Angeles County Probation Department to Provide the Complete (AB109) Probation Case File of Adrian D. Moon Pursuant to the Subpoena Issued in Case: Moon vs. Satan the Devil et. al. Case no. BA332095, Local Rule 7.19 ET. SEQ. filed by plaintiff Adrian D Moon. (twdb) (Entered: 08/03/2022) |
| 08/02/2022 | 462 | PROOF OF SERVICE - Acknowledgment of Service filed by intervenor defendant Adrian D Moon, re REQUEST 461 served on 8/2/22. (twdb) (Entered: 08/03/2022) |
| 08/05/2022 | 463 | STATUS REPORT *(Annual) re Payment Pursuant to Memorandum of Understanding Between County of Los Angeles and City of Los Angeles [Dkt. 185-1]* filed by Defendant County of Los Angeles. (Hashmall, Jennifer) (Entered: 08/05/2022) |

CM/ECF - California Central District                                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 08/05/2022 | 464 | STATUS REPORT *(Quarterly) re Mainstream Services Pursuant to Memorandum of Understanding Between County of Los Angeles and City of Los Angeles [Dkt. 185-1]* filed by Defendant County of Los Angeles. (Attachments: # 1 Ex A - Mainstream Services Quarterly Report)(Hashmall, Jennifer) (Entered: 08/05/2022) |
| 08/23/2022 | 465 | Second STIPULATION for Extension of Time to File Answer to September 28, 2022 filed by Defendant County of Los Angeles. (Attachments: # 1 Proposed Order)(Hashmall, Jennifer) (Entered: 08/23/2022) |
| 08/30/2022 | 466 | ORDER GRANTING JOINT STIPULATION TO EXTEND TIME FOR DEFENDANT COUNTY OF LOS ANGELES TO RESPOND TO PLAINTIFFS'SECOND AMENDED COMPLAINT 465 by Judge David O. Carter. The Court hereby grants a second extension of time for the County to file its response to Plaintiffs' Second Amended Complaint as follows: 1. The last day for the County to answer or otherwise respond to Plaintiffs' Second Amended and Supplemental Complaint shall be September 28, 2022. 2. The Court will set a Scheduling Conference once the County files its responsive pleading. (lom) (Entered: 08/30/2022) |
| 09/16/2022 | 467 | Notice of Settlement and Stipulation to Stay Litigation filed by Plaintiffs and Defendant County of Los Angeles. (Miller, Louis) (Entered: 09/16/2022) |
| 09/21/2022 | 470 | REQUEST for Order for TO BE SERVED AND NOTICED OF ANSWER BY COUNTY OF LOS ANGELES; (PROPOSED) ORDER THEREON filed by Intervenor defendant Adrian D Moon. (lom) (Entered: 09/25/2022) |
| 09/22/2022 | 468 | MINUTE ORDER (IN CHAMBERS): ORDER DENYING STIPULATION TO STAY 467 by Judge David O. Carter. Accordingly, the parties' Stipulation is DENIED. Defendant's deadline to respond to Plaintiff's second amended complaint remains on September 29, 2022. The parties may renew their request for a stay upon submitting additional briefing or documents to the Court demonstrating that their requested stay is both warranted and limited to resolving the disputed terms. (lom) (Entered: 09/22/2022) |
| 09/23/2022 | 469 | EMERGENCY MOTION FOR RECUSAL OF THE HONORABLE DAVID O. CARTER, JUDGE PURSUANT TO 28 U.S.C. SECTIONS 441; 455 (a); (b)(1); (b)(5)(i-iv) ; 18 U.S.C. SECTIONS 241 THROUGH 250; RULE 7.19 ET. SEQ. filed by Intervenor Adrian D Moon. (lom) (Entered: 09/23/2022) |
| 09/26/2022 | 471 | STIPULATION to Stay Case pending Settlement filed by defendant County of Los Angeles. (Attachments: # 1 Exhibit Exhibit A - Term Sheet Between Plaintiffs and County of Los Angeles)(Miller, Louis) (Entered: 09/26/2022) |
| 09/26/2022 | 472 | ORDER DENYING MOTION FOR RECUSAL 469 by Judge David O. Carter. Before the Court is Intervenor-Defendant Adrian D. Moons Motion for Recusal. (Dkt. 469). The Court DENIES the Motion. The Clerk shall serve this minute order on the parties. (rolm) (Entered: 09/26/2022) |
| 09/27/2022 | 473 | ORDER GRANTING STAY AND SETTING DATES RESETTLEMENT AGREEMENT 471 by Judge David O. Carter. The Court further GRANTS the request to stay proceedings through November 15, 2022, and SETS the following dates regarding the settlement agreement: The Court invites any party and the public to submit comments or objections to the settlement agreement by October 27, 2022. Responses are due November 2, 2022. Hearing regarding the settlement agreement is set for November 14, 2022, at 9:00 AM. (rolm) (Entered: 09/27/2022) |
| 09/29/2022 | 474 | EMERGENCY MOTION FOR RECONSIDERATION OF RECUSAL MOTION, STAY PRIOR TO DEFENDANT COUNTY OF LOS ANGELES FILING OF ANSWER DUE ON SEPTEMBER 28, 2022 AND GRANTING 'daredeemer's MOTION TO INTERVENE AS PLAINTIFF-DEFENDANT AND ORDER TO LOS ANGELES COUNTY PROBATION DEPARTMENT FOR PRODUCTION OF ADRIAN D. MOON'S (AB109) CASE FILE ET. SEQ. SEE, READ AND CONSIDER ATTACHED MOTIONS 1 THROUGH 14 INCORPORATED BY THIS REFERENCE (Proposed) ORDER THEREON 472 filed by Intervenor Adrian D Moon. (lom) (Entered: 09/29/2022) |
| 09/29/2022 | 475 | NOTICE TO FILER OF DEFICIENCIES in Filed Document RE: NOTICE OF MOTION AND MOTION for Reconsideration re Order on Motion for Recusal 474 . The following error(s) was/were found: Proposed document was not submitted or was not submitted as a separate attachment. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (lom) Modified on 9/29/2022 (lom). (Entered: 09/29/2022) |

ER 1014

CM/ECF - California Central District                                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 09/29/2022 | 476 | MINUTES (IN CHAMBERS): ORDER DENYING REQUESTS TO INTERVENE 444 446 448 461 AND MOTION TO RECONSIDER 469 , AND ORDERING PRE-FILING RESTRICTIONS by Judge David O. Carter. The Court concludes that Mr. Moon has not met the standards for either intervention as of right or permissive intervention under Federal Rule of Civil Procedure 24. The Court thus DENIES Mr. Moon's requests to intervene. Accordingly, all other motions filed by Mr. Moon, including the Motion for Reconsideration, are DENIED as moot. Additionally, for reasons set forth below, the Court ORDERS pre-filing review of any filing action Mr. Moon attempts to take in this action. Accordingly, for any future filings in this action, Adrian D. Moon shall first obtain leave of the Court and: a. shall not exceed three pages, b. shall attach the proposed filing, c. shall explain why the proposed filing is not frivolous, d. shall explain why the proposed filing is not an attack on any previous order entered in this case, and e. shall certify, by affidavit and under the penalty of perjury, that the proposed filing raises a new issue that has not already been rejected by the Court. Failure to comply with any of the above requirements will result in the striking of that filing without further notice. Mr. Moon is forewarned that if he abuses these restricted filing privileges, the Court will take further injunctive action. See minute order for details. (lom) (Entered: 09/30/2022) |
| 09/30/2022 | 477 | NOTICE OF APPEAL to the 9th CCA filed by Intervenor Adrian D Moon. Appeal of Order on Motion for Order, Order on Motion for Reconsideration, 476 , Order on Motion for Recusal 472 , Staying Case, 473 Filed On: 9/26/22, 9/27/22, 9/29/22; Entered On: 9/26/22, 9/27/22, 9/29/22, 9/30/22; Motion and Affidavit for Leave to Appeal In Forma Pauperis is pending. (mat) (Entered: 10/03/2022) |
| 09/30/2022 | 478 | Request to Proceed In Forma Pauperis with Declaration in Support re: Notice of Appeal to 9th Circuit Court of Appeals, 477 filed by Intervenor Adrian D Moon. [Notice of the filing is sent to the 9th Circuit Court of Appeals.] (mat) (Entered: 10/03/2022) |
| 10/05/2022 | 479 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER SCHEDULING STATUS CONFERENCE. All interested parties are also invited to appear. The Status Conference will take place at the Ronald Reagan Federal Building and U.S. Courthouse, 411 W. 4th St, Santa Ana, in Courtroom 10A. The Clerk shall serve this minute order on the parties. ( Status Conference set for 10/7/2022 at 10:00 AM before Judge David O. Carte r.) (twdb) (Entered: 10/05/2022) |
| 10/07/2022 | 480 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 22-55933 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 477 as to Movant Adrian D Moon. (mat) (Entered: 10/07/2022) |
| 10/07/2022 | 481 | MINUTES OF Scheduling Conference held before Judge David O. Carter. Also present, counsel for intervenor, Brooke Weitzman. The case is called. The Court and counsel confer re settlement progress. Court Reporter: Court Smart. (twdb) (Entered: 10/11/2022) |
| 10/14/2022 | 482 | QUARTERLY STATUS REPORT of CITY OF LOS ANGELES PURSUANT TO MOU filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Mariani, Jessica) (Entered: 10/14/2022) |
| 10/14/2022 | 483 | STATUS REPORT of CITY OF LOS ANGELES PURSUANT TO SETTLEMENT AGREEMENT filed by Defendant City of Los Angeles. (Mariani, Jessica) (Entered: 10/14/2022) |
| 10/14/2022 | 484 | Notice to the Honorable David O. Carter, Judge of Civil Subpoena for Personal Appearance at Trial or Hearing filed by Intervenor Defendant Adrian D Moon. (twdb) (Entered: 10/14/2022) |
| 10/17/2022 | 485 | Joint STIPULATION to Dismiss Defendant County of Los Angeles filed by Plaintiffs George Frem, Joseph Burk, LA Alliance for Human Rights, Wenzial Jarrell, Harry Tashdjian, Leandro Suarez, Karyn Pinsky, Charles Malow. (Attachments: # 1 Exhibit A - Settlement Agreement, # 2 Proposed Order) (Mitchell, Elizabeth) (Entered: 10/17/2022) |
| 10/17/2022 | 486 | Joint NOTICE OF MOTION AND MOTION for Order to Show Cause re: Dismissal of Gary Whittier's Claims Pursuant to F.R.C.P. 41(b) and L.R. 41-1, 41-5, and 41-6 filed by Defendants City of Los Angeles, County of Los Angeles. Motion set for hearing on 11/14/2022 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Declaration of Mira Hashmall, # 3 Proposed Order) (Hashmall, Jennifer) (Entered: 10/17/2022) |
| 10/20/2022 | 487 | TRANSCRIPT ORDER re: Court of Appeals case number 22-55687, as to Plaintiffs Cangress, Los Angeles Catholic Worker, Los Angeles Community Action Network for Court Smart (CS). Court will contact Catherine E. Sweetser, Esq. at csweetser@sshhlaw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | company. (Sweetser, Catherine) (Entered: 10/20/2022) |
|---|---|---|
| 10/27/2022 | 488 | STATEMENT OF NON-OPPOSITION TO PLAINTIFFS AND DEFENDANT COUNTY OF LOS ANGELES SETTLEMENT filed by Intervenor Parties Los Angeles Catholic Worker, Los Angeles Community Action Network, Orange County Catholic Worker re: Stipulation to Dismiss Party, 485 . (Myers, Shayla) (Entered: 10/27/2022) |
| 10/31/2022 | 489 | STATUS REPORT *[Quarterly Status Report re Mainstream Services Pursuant to Memorandum of Understanding Between County of Los Angeles and City of Los Angeles]* filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A - Report)(Hashmall, Jennifer) (Entered: 10/31/2022) |
| 11/01/2022 | 490 | NOTICE OF CONTEMPT OF COURT ORDER BY DEFENDANTS COUNTY OF LOS ANGELES-BOARD OF SUPERVISOR TO SIGN STIPULATION AGREEMENT FOR SEVEN BILLION DOLLARS MADE PAYABLE TO ADRIAN DAMICO MOON, 'daredeemer' TO CURE DEFAULT JUDGEMENT IN CASE MOON V. COUNTY OF LOS ANGELES, CASE NO. 22STR003447 ET. AL. filed by Intervenor Adrian D Moon. (lom) (Entered: 11/02/2022) |
| 11/01/2022 | 491 | PROOF OF SERVICE by mail on 11/1/22 re Notice of Contempt 490 filed by Intervenor Adrian D Moon. (lom) (Entered: 11/02/2022) |
| 11/02/2022 | 492 | RESPONSE filed by Defendant County of Los Angelesto Staying Case,, 473 *[County of Los Angeles's Response in Support of Settlement Agreement]* (Hashmall, Jennifer) (Entered: 11/02/2022) |
| 11/04/2022 | 493 | TRANSCRIPT for proceedings held on 10/7/2022. Court Reporter/Electronic Court Recorder: ECHO REPORTING, INC.., phone number (858) 453-7590. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 11/25/2022. Redacted Transcript Deadline set for 12/5/2022. Release of Transcript Restriction set for 2/2/2023. (aa) (Entered: 11/04/2022) |
| 11/04/2022 | 494 | NOTICE OF FILING TRANSCRIPT filed for proceedings 10/7/2022 re Transcript 493 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (aa) TEXT ONLY ENTRY (Entered: 11/04/2022) |
| 11/10/2022 | 495 | MINUTES (IN CHAMBERS) by Judge David O. Carter: The SETTLEMENT CONFERENCE 473 currently scheduled for 11/14/2022 will be held at 9:00 A.M. in Courtroom 5B at First Street U.S. Courthouse, 350 W 1st Street, Los Angeles, CA 90012 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kdu) TEXT ONLY ENTRY (Entered: 11/10/2022) |
| 11/14/2022 | 496 | EX PARTE Emergency Motion to Damned Fool Recused Defendant David O. Carter Et. Al. to Effectuate a Private Citizens Arrest Pursuant to United States Constitution Supremacy Clause Article VI Paragraph Two; SEE DOCUMENT FOR FURTHER INFORMATION. filed by Intervenor Defendant Adrian D. Moon. (twdb) (Entered: 11/14/2022) |
| 11/14/2022 | 497 | SUPPLEMENT to Damned Fools Recused Defendants Elwood Lui and Frances Rothschild Et Al. of the Stipulation Settlement Agreement Between the Parties to Pay daredeemer The Lump Sum of Seven (7) Billions Dollars Et Al (proposed) Order There on RE EX PARTE APPLICATION for Order 496 filed by Intervenor Defendant Adrian D. Moon. (twdb) (Entered: 11/14/2022) |
| 11/14/2022 | 498 | PROOF OF SERVICE filed by Intervenor Defendant Adrian D. Moon, re Supplement(Motion related), 497 , EX PARTE APPLICATION 496 served on 11/14/22. (twdb) (Entered: 11/14/2022) |
| 11/14/2022 | 499 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Document RE: EX PARTE APPLICATION 496 . The following error(s) was/were found: Proposed document was not submitted or was not submitted as a separate attachment. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (twdb) (Entered: 11/14/2022) |
| 11/14/2022 | 500 | AMENDED EX PARTE APPLICATION Emergency Motion to Damned Fool Recused Defendant David O. Carter Et. Al. to Effectuate a Private Citizens Arrest Pursuant to United States Constitution Supremacy Clause Article VI Paragraph Two; SEE DOCUMENT FOR FURTHER INFORMATION, filed by Intervenor Defendant Adrian D. Moon. (twdb) (Additional attachment(s) added on 11/14/2022: # 1 Proposed Order) (twdb). (Entered: 11/14/2022) |

| 11/14/2022 | 501 | AMENDED PROOF OF SERVICE filed by Intervenor Defendant Adrian D. Moon, re EX PARTE APPLICATION 500 served on 11/14/22. (twdb) (Entered: 11/14/2022) |
|---|---|---|
| 11/14/2022 | 502 | MINUTES OF Presentation of Final Settlement Agreement held before Judge David O. Carter: Hearing held in Los Angeles First Street Federal Courthouse, courtroom 5B. Also present, counsel for intervenor, Shayla Myers and Special Master Michelle Martinez. The case is called. The Court and counsel confer re settlement progress. Date to continue to be set by the Court. Court Reporter: Court Smart. (twdb) (Entered: 11/15/2022) |
| 11/15/2022 | 503 | Third STIPULATION to Stay Case pending Settlement filed by Plaintiffs and Defendant County of Los Angeles. (Attachments: # 1 Proposed Order)(Hashmall, Jennifer) (Entered: 11/15/2022) |
| 11/15/2022 | 504 | TRANSCRIPT ORDER as to Defendant County of Los Angeles for Court Smart (CS). (Brody, Lauren) (Entered: 11/15/2022) |
| 11/17/2022 | 505 | TRANSCRIPT for proceedings held on 11/14/22 from 9:03 a.m. to 9:48 a.m. Court Reporter/Electronic Court Recorder: ECHO REPORTING, INC, phone number (858) 453-7590. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 12/8/2022. Redacted Transcript Deadline set for 12/19/2022. Release of Transcript Restriction set for 2/15/2023. (yja) (Entered: 11/17/2022) |
| 11/17/2022 | 506 | NOTICE OF FILING TRANSCRIPT filed for proceedings 11/14/22 re Transcript 505 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (yja) TEXT ONLY ENTRY (Entered: 11/17/2022) |
| 11/22/2022 | 507 | ORDER by Judge David O. Carter, Granting Third Stipulation to Stay Litigation 503 . All proceedings are hereby stayed and all deadlines continued until February 1, 2023. (twdb) (Entered: 11/22/2022) |
| 12/05/2022 | 508 | MINUTES (IN CHAMBERS) ORDER CONTINUING HEARING REGARDING SETTLEMENT AGREEMENT by Judge David O. Carter. During the November 14, 2022 hearing, the Court indicated it would continue the hearing regarding the settlement agreement. (Dkt. 502). Accordingly, the Court CONTINUES the hearing to Tuesday, January 17, 2023, at 9:00 a.m. The Court requests the presence of Mayor-elect Karen Bass, Los Angeles City Council President Paul Krekorian, and Los Angeles County Supervisor Holly Mitchell. (rolm) (Entered: 12/05/2022) |
| 12/28/2022 | 509 | Notice to the Honorable David O. Carter, Judge of the Stipulation Agreement Between the Parties Et. Seq. (Proposed) order Thereon filed by Adrian D. Moon. (twdb) (Entered: 12/29/2022) |
| 12/28/2022 | 510 | NOTICE TO FILER OF DEFICIENCIES in Filed Document RE: Notice (Other) 509 . The following error(s) was/were found: Notice is filed separately defendant demanded to keep all documents together including the order. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (twdb) (Entered: 12/29/2022) |
| 12/28/2022 | 511 | PROOF OF SERVICE by email filed by Adrian D. Moon, served on 12/28/22. (twdb) (Entered: 12/29/2022) |
| 12/28/2022 | 512 | NOTICE TO FILER OF DEFICIENCIES in Filed Document RE: Stipulation 509 . The following error(s) was/were found: Stipulation is filed separately defendant demanded to keep all documents together, judicial determination is required. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (twdb) (Entered: 12/29/2022) |
| 01/06/2023 | 513 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE: HEARING ON JANUARY 17, 2023 508 . The hearing currently scheduled for Tuesday, January 17, 2023 (Dkt. 508) will be held at 9:00 a.m. in Courtroom 5B at the First Street U.S. Courthouse, 350 W 1st Street, Los Angeles, CA 90012. The Court requests the presence of Mayor Karen Bass, Los Angeles City Council President Paul Krekorian, and Los Angeles County Supervisor Janice Hahn. (twdb) (Entered: 01/06/2023) |
| 01/13/2023 | 514 | STATEMENT in Support of Settlement Agreement filed by Defendant County of Los Angeles re: Stipulation to Dismiss Party, 485 . (Miller, Louis) (Entered: 01/13/2023) |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| 01/17/2023 | 515 | QUARTERLY STATUS REPORT of CITY OF LOS ANGELES PURSUANT TO MOU filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Mariani, Jessica) (Entered: 01/17/2023) |
|---|---|---|
| 01/17/2023 | 516 | QUARTERLY STATUS REPORT of CITY OF LOS ANGELES PURSUANT TO SETTLEMENT AGREEMENT filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A)(Mariani, Jessica) (Entered: 01/17/2023) |
| 01/17/2023 | 518 | MINUTE ORDER by Judge David O. Carter: HEARING REGARDING COUNTY SETTLEMENT AGREEMENT 485 . The Courts scheduling order is forthcoming. SEE DOCUMENT FOR FURTHER INFORMATION. Court Reporter: Court Smart (twdb) Modified on 1/20/2023 (twdb). (Entered: 01/20/2023) |
| 01/18/2023 | 517 | TRANSCRIPT ORDER as to Defendant County of Los Angeles for Court Smart (CS). (Brody, Lauren) (Entered: 01/18/2023) |
| 01/20/2023 | 519 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: SCHEDULING ORDER FOLLOWING 01/17/2023 SETTLEMENT HEARING. Accordingly, the parties shall appear before the Court on April 20, 2023. In the interim, the parties shall submit joint status reports, on the dates set forth below, to Judge Andre Birotte and Special Master Michele Martinez regarding the progress of the revised settlement. An amended settlement agreement is due to the Court on or before April 17, 2023. The schedule is as follows: SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 01/20/2023) |
| 01/20/2023 | 520 | TRANSCRIPT for proceedings held on 1/17/2023. Court Reporter/Electronic Court Recorder: ECHO REPORTING, INC., phone number (858) 453-7590. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 2/10/2023. Redacted Transcript Deadline set for 2/21/2023. Release of Transcript Restriction set for 4/20/2023. (aa) (Entered: 01/20/2023) |
| 01/20/2023 | 521 | NOTICE OF FILING TRANSCRIPT filed for proceedings 1/17/2023 re Transcript 520 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (aa) TEXT ONLY ENTRY (Entered: 01/20/2023) |
| 01/24/2023 | 522 | Fourth STIPULATION to Stay Case pending Settlement filed by Plaintiffs LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karen Pinsky, Charles Malow and George Frem and Defendant County of Los Angeles. (Attachments: # 1 Proposed Order)(Hashmall, Jennifer) (Entered: 01/24/2023) |
| 01/26/2023 | 523 | REVISED QUARTERLY STATUS REPORT of CITY OF LOS ANGELES PURSUANT TO MOU [DKT. 185-1] filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A)(Hoang, Arlene) (Entered: 01/26/2023) |
| 02/01/2023 | 524 | STATUS REPORT *[QUARTERLY STATUS REPORT RE MAINSTREAM SERVICES PURSUANT TO MEMORANDUM OF UNDERSTANDING BETWEEN COUNTY OF LOS ANGELES AND CITY OF LOS ANGELES]* filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A - Mainstream Benefits Quarterly Report)(Hashmall, Jennifer) (Entered: 02/01/2023) |
| 02/01/2023 | 525 | NOTICE of Change of Attorney Business or Contact Information: for attorney Matthew Donald Umhofer counsel for Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy. Changing address and firm change to Umhofer, Mitchell & King LLP, 11766 Wilshire Blvd., Suite 900, Los Angeles, CA 90025. Changing email to matthew@umklaw.com. Filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy. (Attorney Matthew Donald Umhofer added to party Wenzial Jarrell(pty:pla))(Umhofer, Matthew) (Entered: 02/01/2023) |
| 02/01/2023 | 526 | NOTICE of Change of Attorney Business or Contact Information: for attorney Elizabeth Anne Mitchell counsel for Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy. Changing address and firm change to Umhofer, Mitchell & King LLP, 11766 Wilshire Blvd., Suite 900, Los Angeles, CA 90025. Changing email to elizabeth@umklaw.com. Filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian, Charles Van Scoy. (Mitchell, Elizabeth) (Entered: 02/01/2023) |

CM/ECF - California Central District                        https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| | | |
|---|---|---|
| 02/03/2023 | 527 | NOTICE of Change of Attorney Business or Contact Information: for attorney Jennifer Mira Hashmall counsel for Defendant County of Los Angeles. Changing address to 2121 Avenue of the Stars, Suite 2600, Los Angeles, CA 90067. Filed by Defendant County of Los Angeles. (Hashmall, Jennifer) (Entered: 02/03/2023) |
| 02/03/2023 | 528 | NOTICE of Change of Attorney Business or Contact Information: for attorney Louis R. Miller counsel for Defendant County of Los Angeles. Changing address to 2121 Avenue of the Stars, Suite 2600, Los Angeles, CA 90067. Filed by Defendant County of Los Angeles. (Miller, Louis) (Entered: 02/03/2023) |
| 03/30/2023 | 529 | ORDER from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 477 filed by Adrian D. Moon. CCA # 22-55933. This court has reviewed the notice of appeal filed September 30, 2022 in the above-referenced district court docket pursuant to the pre-filing review order entered in docket No. 14-80006. Because the appeal is so insubstantial as to not warrant further review, it will not be permitted to proceed. Appeal No. 22-55933 is therefore dismissed. This order, served on the district court for the Central District of California, will constitute the mandate of this court. (mat) (Entered: 03/31/2023) |
| 04/12/2023 | 530 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE SETTLEMENT HEARING. ( Hearing set for 4/20/2023 at 09:00 AM before Judge David O. Carter.) SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) Modified on 4/13/2023 (twdb). (Entered: 04/13/2023) |
| 04/17/2023 | 531 | Joint STIPULATION for Order Extending Time to File Report re Settlement filed by Plaintiffs and Defendant County of Los Angeles. (Attachments: # 1 Proposed Order)(Hashmall, Jennifer) (Entered: 04/17/2023) |
| 04/18/2023 | 532 | ORDER by Judge David O. Carter, Granting Joint Stipulation to Extend time to File Report RE Settlement 531 . The Parties deadline to file and serve their Proposed Settlement Agreement shall hereby be extended one (1) day, from April 17, 2023 to April 18, 2023. (twdb) (Entered: 04/18/2023) |
| 04/18/2023 | 533 | RESPONSE filed by Defendant County of Los Angelesto Minutes of In Chambers Order/Directive - no proceeding held,, 519 *[JOINT SUBMISSION OF ADDENDUM TO SETTLEMENT AGREEMENT]* (Attachments: # 1 Exhibit A - Stipulation for Voluntary Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2) submitted on October 17, 2022 [Dkt. 485], # 2 Exhibit B - Fully Executed Addendum to Settlement Agreement)(Hashmall, Jennifer) (Entered: 04/18/2023) |
| 04/20/2023 | 534 | MINUTES OF Status Conference (Los Angeles First Street) held before Judge David O. Carter: The Court hears the parties terms of stipulated proposed agreement. For reasons as stated on the record, the Court DENIES the parties proposed stipulation. The Court lifts the stay and reinstates proceedings in this case. Answer to Second Amended Complaint (Dkt. 454) is due May 3, 2023. Scheduling Conference is set for May 9, 2023 at L.A. First Street Courthouse. Court Reporter: Court Smart. (twdb) (Entered: 04/20/2023) |
| 04/20/2023 | 535 | TRANSCRIPT ORDER as to Defendant County of Los Angeles for Court Smart (CS). (Hashmall, Jennifer) (Entered: 04/20/2023) |
| 04/20/2023 | 536 | AMENDED MINUTES held before Judge David O. Carter re: Status Conference 534 . (twdb) (Entered: 04/20/2023) |
| 04/20/2023 | 537 | TRANSCRIPT ORDER as to Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian for Court Smart (CS). Court will contact Jon Powell at jon@umklaw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Mitchell, Elizabeth) (Entered: 04/20/2023) |
| 04/21/2023 | 538 | STATUS REPORT *FOR THE QUARTER PURSUANT TO THE MOU BETWEEN THE CITY AND COUNTY OF LOS ANGELES* filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Hoang, Arlene) (Entered: 04/21/2023) |
| 04/21/2023 | 539 | STATUS REPORT *OF CITY OF LOS ANGELES PURSUANT TO SETTLEMENT AGREEMENT* filed by Defendant City of Los Angeles. (Attachments: # 1 Exhibit A)(Mariani, Jessica) (Entered: 04/21/2023) |
| 04/21/2023 | 540 | TRANSCRIPT for proceedings held on 4/20/2023 9:09 AM. Court Reporter: Wil S. Wilcox, email wil.wilcox@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

|  |  |  |
|---|---|---|
|  |  | 5/12/2023. Redacted Transcript Deadline set for 5/22/2023. Release of Transcript Restriction set for 7/20/2023. (Wilcox, Wil) (Entered: 04/21/2023) |
| 04/21/2023 | 541 | NOTICE OF FILING TRANSCRIPT filed for proceedings 4/20/2023 9:09 AM re Transcript 540 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (Wilcox, Wil) TEXT ONLY ENTRY (Entered: 04/21/2023) |
| 04/21/2023 | 542 | MINUTE ORDER IN CHAMBERS re Hearing Transcript by Judge David O. Carter. (Attachments: # 1 Letter) (dgo) (Entered: 04/21/2023) |
| 04/28/2023 | 543 | Notice of Withdrawal of Consent to Ex Parte Communications filed by Defendant County of Los Angeles. (Hashmall, Jennifer) (Entered: 04/28/2023) |
| 04/28/2023 | 544 | NOTICE OF MOTION AND MOTION to Certify This Courts April 20, 2023 Order Pursuant to 28 U.S.C. § 1292(b) filed by Defendant County of Los Angeles. Motion set for hearing on 6/5/2023 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Proposed Order) (Hashmall, Jennifer) (Entered: 04/28/2023) |
| 04/28/2023 | 545 | EX PARTE APPLICATION to Expedite Briefing Schedule and Stay Case filed by Defendant County of Los Angeles. (Attachments: # 1 Proposed Order) (Hashmall, Jennifer) (Entered: 04/28/2023) |
| 04/28/2023 | 546 | DECLARATION of Mira Hashmall in Support of NOTICE OF MOTION AND MOTION to Certify This Courts April 20, 2023 Order Pursuant to 28 U.S.C. § 1292(b) 544 filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit A. Amended Notice of Lodging of Fully Executed [Proposed] Stipulated Order of Dismissal as to Defendant City of Los Angeles Only, ECF Dkt. No. 429, # 2 Exhibit B. County of Los Angeles Response to Settlement Between Plaintiffs and City of Los Angeles, ECF Dkt. No. 432, # 3 Exhibit C. Intervenors Objections to Plaintiffs and Defendant City of Los Angeless Stipulated Order of Dismissal, ECF Dkt. No. 434, # 4 Exhibit D. June 9, 2022 Transcript of Final Settlement Objections and Scheduling Conference, # 5 Exhibit E. Order Approving Stipulated Dismissal and Proposed Settlement, ECF Dkt. No. 445, # 6 Exhibit F. Notice of Settlement and Stipulation to Stay Litigation, ECF Dkt. No. 467, # 7 Exhibit G. Stipulation for Voluntary Dismissal with Prejudice Pursuant to Federal Rule of Civil Procedure 41(a)(2), ECF Dkt. No. 485, # 8 Exhibit H. Intervenors Statement of Non-Opposition to Plaintiffs and Defendant County of Los Angeless Settlement, ECF Dkt. No. 488, # 9 Exhibit I. November 14, 2022 Transcript of Presentation of Final Settlement Agreement, # 10 Exhibit J. December 5, 2022 Minute Order, # 11 Exhibit K. County of Los Angeles Statement in Support of Settlement, ECF Dkt. No. 514, # 12 Exhibit L. January 17, 2023 Transcript of Presentation of Final Settlement Objections and Status Conference, # 13 Exhibit M. January 17, 2023 Minute Order, # 14 Exhibit N. April 12, 2023 Minute Order, # 15 Exhibit O. Joint Submission of Addendum to Settlement Agreement, ECF Dkt. No. 533, # 16 Exhibit P. April 20, 2023 Reporters Transcript of Proceedings, # 17 Exhibit Q. April 20, 2023 Minute Order, ECF Dkt. No. 534, # 18 Exhibit R. Intervenors Supplemental Brief Re: Stay, # 19 Exhibit S. March 14, 2023 Statement of Proceedings of the Board, # 20 Exhibit T. April 25, 2023 Email)(Hashmall, Jennifer) (Entered: 04/28/2023) |
| 04/28/2023 | 547 | DECLARATION of Mira Hashmall in Support of EX PARTE APPLICATION to Expedite Briefing Schedule and Stay Case 545 filed by Defendant County of Los Angeles. (Attachments: # 1 Ex. A April 25, 2023 Email, # 2 Ex. B Stipulation for Voluntary Dismissal with Prejudice, # 3 Ex. C Submission of Addendum to Settlement Agreement, # 4 Ex. D April 20, 2023 Reporter's Transcript of Proceedings, # 5 Ex. E April 20, 2023 Minute Order)(Hashmall, Jennifer) (Entered: 04/28/2023) |
| 04/28/2023 | 548 | JOINDER in EX PARTE APPLICATION to Expedite Briefing Schedule and Stay Case 545 filed by Intervenor Parties Cangress, Los Angeles Catholic Worker, Orange County Catholic Worker. (Myers, Shayla) (Entered: 04/28/2023) |
| 04/29/2023 | 549 | OPPOSITION re: EX PARTE APPLICATION to Expedite Briefing Schedule and Stay Case 545 filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian. (Umhofer, Matthew) (Entered: 04/29/2023) |
| 05/01/2023 | 550 | DECLARATION of Shayla Myers in support of EX PARTE APPLICATION to Expedite Briefing Schedule and Stay Case 545 filed by Intervenor Parties Cangress, Los Angeles Catholic Worker, Los Angeles Community Action Network, Orange County Catholic Worker. (Myers, Shayla) (Entered: 05/01/2023) |
| 05/02/2023 | 551 | MINUTE ORDER (IN CHAMBERS) DENYING 544 Motion to Certify and DENYING 545 Application to Stay by Judge David O. Carter. (dgo) (Entered: 05/02/2023) |

| 05/03/2023 | 552 | NOTICE OF MOTION AND MOTION to Dismiss Second Amended Complaint filed by Defendant County of Los Angeles. Motion set for hearing on 6/5/2023 at 08:30 AM before Judge David O. Carter. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order) (Hashmall, Jennifer) (Entered: 05/03/2023) |
|---|---|---|
| 05/03/2023 | 553 | REQUEST FOR JUDICIAL NOTICE re NOTICE OF MOTION AND MOTION to Dismiss Second Amended Complaint 552 filed by Defendant County of Los Angeles. (Attachments: # 1 Proposed Order) (Hashmall, Jennifer) (Entered: 05/03/2023) |
| 05/03/2023 | 554 | DECLARATION of Mira Hashmall in support of NOTICE OF MOTION AND MOTION to Dismiss Second Amended Complaint 552 filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit 1 - County's Report of Available Resources for People Experiencing Homelessness (Dkt. No. 189), # 2 Exhibit 2 - County Department of Mental Health's Report to the Los Angeles County Board of Supervisors, titled "Disrupting the Cycle of Chronic Homelessness-DMH Homeless Outreach and Mobile Engagement (HOME) Team Pilot (Item 12, Agenda of June 23, 2020)", # 3 Exhibit 3 - July 27, 2021 Statement of Proceedings of the Board, # 4 Exhibit 4 - September 15, 2021 Statement of Proceedings of the Board, # 5 Exhibit 5 - August 10, 2021 Statement of Proceedings of the Board, # 6 Exhibit 6 - September 28, 2021 Statement of Proceedings of the Board, # 7 Exhibit 7 - October 19, 2021 Statement of Proceedings of the Board, # 8 Exhibit 8 - July 19, 2021 Letter from the County Department of Health Services ("DHS") to Board Transmitting HFH Quarterly Report, # 9 Exhibit 9 - February 2016 report published by the Los Angeles County Homeless Initiative, titled "Approved Strategies to Combat Homelessness", # 10 Exhibit 10 - May 9, 2016 Homeless Initiative Quarterly Report No. 1, submitted to the Los Angeles County Board of Supervisors by the Los Angeles County Chief Executive Office, # 11 Exhibit 11 - Measures appearing on the March 7, 2017 Ballot, # 12 Exhibit 12 - September 29, 2017 report submitted to the Board by the CEO, titled "Homeless Initiative Measure H Strategy Implementation Plans", # 13 Exhibit 13 - December 3, 2020 Homeless Initiative Quarterly Report No. 18, # 14 Exhibit 14 - February 22, 2021 Countywide Homeless Initiative's Year Four performance evaluation prepared by Public Sector Analytics, # 15 Exhibit 15 - August 20, 2021 Homeless Initiative Quarterly Report No. 20, # 16 Exhibit 16 - July 13, 2021 Press Release announcing the Homeless Initiative Budget for Fiscal Year 2021-2022, # 17 Exhibit 17 - November 16, 2021 Statement of Proceedings of the Board, # 18 Exhibit 18 - June 26, 2020 Binding Term Sheet between the County and the City of Los Angeles (Dkt. No. 136), # 19 Exhibit 19 - September 16, 2020 Notice to the Court of Payment from County of Los Angeles Pursuant to Binding Term Sheet (Dkt. No. 177), # 20 Exhibit 20 - October 13, 2020 Joint Notice to the Court Regarding Memorandum of Understanding for 6,700 Bed Plan from City of Los Angeles and County of Los Angeles (Dkt. No. 185), # 21 Exhibit 21 - January 7, 2021 Notice to the Court of Payment from County of Los Angeles Pursuant to Binding Term Sheet (Dkt. No. 203), # 22 Exhibit 22 - March 29, 2021 Notice to the Court of Payment from County of Los Angeles Pursuant to Binding Term Sheet (Dkt. No. 254), # 23 Exhibit 23 - July 13, 2021 County of Los Angeles' Notice of Payment and Report Regarding Mainstream Services at City Facilities (Dkt. No. 341), # 24 Exhibit 24 - August 5, 2022 Defendant County of Los Angeles' Annual Status Report Re Payment Pursuant to Memorandum of Understanding Between County of Los Angeles and City of Los Angeles [Dkt. 185-1], filed with this Court at ECF Dkt. No. 463, # 25 Exhibit 25 - August 31, 2021 Statement of Proceedings of the Board, # 26 Exhibit 26 - September 27, 2021 Press Release from LAHSA regarding a $15 million grant from the U.S. Department of Housing and Urban Development, # 27 Exhibit 27 - October 5, 2021 Statement of Proceedings of the Board, # 28 Exhibit 28 - November 2, 2021 Statement of Proceedings of the Board, # 29 Exhibit 29 - November 2, 2021 Motion by Supervisors Hilda L. Solis and Kathryn Barger regarding Interim Housing Services Fund For Cities And Councils Of Governments Combatting Homelessness of the Board, # 30 Exhibit 30 - May 12, 2020 Motion by Los Angeles County Supervisors Sheila Kuehl and Mark Ridley-Thomas, titled "Developing a COVID-19 Recovery Plan Related to People Experiencing Homelessness", # 31 Exhibit 31 - July 2, 2020 report submitted to the Board by the CEO, titled "Developing a COVID-19 Recovery Plan Related to People Experiencing Homelessness (Item No. 4, Agenda of May 12, 2020)", # 32 Exhibit 32 - May 15, 2020 report submitted to the Board by the CEO, titled "Piloting a Comprehensive Crisis Response to Ensure Post-COVID-19 Housing for Homeless Older Adults in Los Angeles County (Item No. 8, Agenda of April 14, 2020)", # 33 Exhibit 33 - November 3, 2020 County of Los Angeles' Response to Plaintiffs' Status Report Dated October 20, 2020 (Dkt. No. 197))(Hashmall, Jennifer) (Entered: 05/03/2023) |
| 05/03/2023 | 555 | DECLARATION of Mira Hashmall in support of NOTICE OF MOTION AND MOTION to Dismiss Second Amended Complaint 552 filed by Defendant County of Los Angeles. (Attachments: # 1 Exhibit 34 - May 2, 2017 report to the Board, titled "Adopt the Department of Mental Health's Mental Health Services Act Three-Year Program and Expenditure Plan for Fiscal Years 2017-18, 2018-19 and 2019-20", |

| | | |
|---|---|---|
| | | # 2 Exhibit 35 - Excerpts from the Los Angeles County Department of Mental Health's website, # 3 Exhibit 36 - March 30, 2022 Blue Ribbon Commission on Homelessness Governance Report, # 4 Exhibit 37 - May 3, 2022 Motion re Recommendations on Implementations of Blue Ribbon Commission, # 5 Exhibit 38 - Stipulation for Voluntary Dismissal with Prejudice Pursuant to Federal Rule of Civil Procedure 41(a)(2), ECF Dkt. No. 485, # 6 Exhibit 39 - January 10, 2023 Proclamation of a Local Emergency for Homelessness in the County of Los Angeles, # 7 Exhibit 40 - January 23, 2023 Report Back on Proclamation of a Local Emergency for Homelessness in the County of Los Angeles, # 8 Exhibit 41 - January 31, 2023 Report Back on Proclamation of a Local Emergency for Homelessness in the County of Los Angeles, # 9 Exhibit 42 - February 7, 2023 Revised Declaration of Local Emergency for Homelessness Implementation Actions, # 10 Exhibit 43 - February 7, 2023 Fiscal Year 2023-24 Homelessness Initiative Funding Recommendations, # 11 Exhibit 44 - Joint Submission of Addendum to Settlement Agreement, ECF Dkt. No. 533, # 12 Exhibit 45 - April 20, 2023 Reporter's Transcript of Proceedings, # 13 Exhibit 46 - April 20, 2023 Homeless Initiative Quarterly Report No. 26, # 14 Exhibit 47 - May 2, 2023 Minute Order, ECF Dkt. No. 551, # 15 Exhibit 48 - May 2, 2023 Board Motion to Authorize Joint Application(s) to and Participation in the Homekey Round 3 Program, # 16 Exhibit 49 - April 25-27, 2023 Meet and Confer Emails)(Hashmall, Jennifer) (Entered: 05/03/2023) |
| 05/03/2023 | 556 | JOINDER in NOTICE OF MOTION AND MOTION to Dismiss Second Amended Complaint 552 filed by Intervenor Parties Cangress, Los Angeles Catholic Worker, Los Angeles Community Action Network, Orange County Catholic Worker. (Myers, Shayla) (Entered: 05/03/2023) |
| 05/05/2023 | 557 | STATUS REPORT *(QUARTERLY RE MAINSTREAM SERVICES PURSUANT TO MEMORANDUM OF UNDERSTANDING [DKT. 185-1]* filed by Defendant County of Los Angeles. (Attachments: # 1 Ex. A - Mainstream Benefits Quarterly Report)(Hashmall, Jennifer) (Entered: 05/05/2023) |
| 05/05/2023 | 558 | NOTICE of Change of Attorney Business or Contact Information: for attorney Matthew Donald Umhofer counsel for Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian. Changing Address to Umhofer, Mitchell & King LLP, 767 S. Alameda St., Suite 270, Los Angeles, CA 90021. Filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian. (Umhofer, Matthew) (Entered: 05/05/2023) |
| 05/05/2023 | 559 | NOTICE of Change of Attorney Business or Contact Information: for attorney Elizabeth Anne Mitchell counsel for Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian. Changing Address to Umhofer, Mitchell & King LLP, 767 S. Alameda St., Suite 270, Los Angeles, CA 90021. Filed by Plaintiffs Joseph Burk, George Frem, Wenzial Jarrell, LA Alliance for Human Rights, Charles Malow, Karyn Pinsky, Leandro Suarez, Harry Tashdjian. (Mitchell, Elizabeth) (Entered: 05/05/2023) |
| 05/05/2023 | 560 | MINUTE ORDER (IN CHAMBERS): ORDER RE SETTLEMENT HEARING by Judge David O. Carter. The scheduling conference set for May 9, 2023 will be held at 9:00 a.m. in Courtroom 5B at the First Street U.S. Courthouse, 350 W 1st Street, Los Angeles, CA 90012. (lom) (Entered: 05/05/2023) |
| 05/09/2023 | 561 | MINUTES OF Scheduling Conference (Los Angeles First Street) held before Judge David O. Carter. Briefing and trial schedule is set as follows: Pretrial Motions: October 10, 2023 at 9:00 AM Final Pretrial Conference: October 24, 2023 at 9:00 AM Jury Trial: November 6, 2023 at 9:00 AM All to be held at the Los Angeles First Street Federal Courthouse. Final Pretrial Conference set for 10/24/2023 at 09:00 AM before Judge David O. Carter. Jury Trial set for 11/6/2023 at 09:00 AM before Judge David O. Carter. Court Reporter: Deborah Parker. (twdb) (Entered: 05/09/2023) |
| 05/09/2023 | 562 | TRANSCRIPT ORDER as to Defendant County of Los Angeles for Court Reporter. (Hashmall, Jennifer) (Entered: 05/09/2023) |
| 05/09/2023 | 563 | SCHEDULING ORDER by Judge David O. Carter. Discovery cut-off 9/8/2023. Motions due by 10/10/2023. Final Pretrial Conference set for 10/24/2023 09:00 AM before Judge David O. Carter. Jury Trial set for 11/6/2023 09:00 AM before Judge David O. Carter. (kdu) (Entered: 05/09/2023) |
| 05/09/2023 | 564 | MINUTE ORDER IN CHAMBERS by Judge David O. Carter: ORDER RE HEARING TRANSCRIPT. The Court orders the transcript of the Scheduling Conference held May 9, 2023, be immediately produced at the government's expense and billed at the daily rate. The transcript shall be prepared forthwith and filed on the docket with immediate release to the public. SEE DOCUMENT FOR FURTHER INFORMATION. (twdb) (Entered: 05/09/2023) |

CM/ECF - California Central District                    https://ecf.cacd.uscourts.gov/cgi-bin/DktRpt.pl?936960264869699-L_1_0-1

| 05/10/2023 | 565 | TRANSCRIPT for proceedings held on 05/09/2023, 9:07 a.m. Court Reporter: Deborah D. Parker,CSR 10342, phone number transcripts@ddparker.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through DEBORAHDPARKER.COM or PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 5/31/2023. Redacted Transcript Deadline set for 6/12/2023. Release of Transcript Restriction set for 8/8/2023. (dpa) (Entered: 05/10/2023) |
|---|---|---|
| 05/10/2023 | 566 | NOTICE OF FILING TRANSCRIPT filed for proceedings 05/09/2023, 9:07 a.m. re Transcript 565 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dpa) TEXT ONLY ENTRY (Entered: 05/10/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/10/2023 14:06:53 | | |
| **PACER Login:** | rickyreis | **Client Code:** | 1034-066 |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-02291-DOC-KES End date: 5/10/2023 |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**ER 1023**

No. _____

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

In re: COUNTY OF LOS ANGELES

*Petitioner,*

v.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(Western Division - Los Angeles)
*Respondent.*

LA ALLIANCE FOR HUMAN RIGHTS, et al.

*Real Parties of Interest.*

_____

On Petition for a Writ of Mandamus in
Case No. 2:20-cv-02291 (C.D.Cal.)

_____

## CERTIFICATE OF SERVICE

_____

OFFICE OF COUNTY COUNSEL
Dawyn R. Harrison (SBN 173855)
*County Counsel*
Katherine M. Bowser (SBN 230626)
*Acting Assistant County Counsel*
Ana Wai-Kwan Lai (SBN 257931)
*Senior Deputy County Counsel*
alai@counsel.lacounty.gov
500 West Temple Street
Suite 468
Los Angeles, California 90012
Telephone:  (213) 974-1830

MILLER BARONDESS, LLP
Louis R. Miller (SBN 54141)
Mira Hashmall (SBN 216842)
mhashmall@millerbarondess.com
Nadia A. Sarkis (SBN 227778)
2121 Avenue of the Stars
Suite 2600
Los Angeles, California 90067
Telephone:  (310) 552-4400

# CERTIFICATE OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 2121 Avenue of the Stars, Suite 2600, Los Angeles, CA 90067.

On May 11, 2023, I served true copies of the following document(s) described as:

1. **PETITION FOR WRIT OF MANDAMUS TO THE UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA AND REQUEST FOR STAY OF PROCEEDINGS IN DISTRICT COURT\***

2. **EXCERPTS OF RECORD – INDEX VOLUME**

3. **EXCERPTS OF RECORD – VOLUME 1**

4. **EXCERPTS OF RECORD – VOLUME 2**

5. **EXCERPTS OF RECORD – VOLUME 3**

6. **EXCERPTS OF RECORD – VOLUME 4**

7. **EXCERPTS OF RECORD – VOLUME 5**

8. **CERTIFICATE OF SERVICE**

on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of Miller Barondess, LLP for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.  The envelope was placed in the mail at Los Angeles, California.\*

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 11, 2023, at Los Angeles, California.

_____

Angelica R. Ransom on behalf of
Mira Hashmall

# SERVICE LIST

*County of Los Angeles v. United States District Court Central District of California (Western Division - Los Angeles)*
No. _____

## BY MAIL

Hon. David O. Carter*
United States District Court Central District of California
(Western Division - Los Angeles)
Ronald Reagan Federal Building and United States Courthouse
411 West Fourth Street
Courtroom 10-A
Santa Ana, CA 92701-4516

## BY E-MAIL OR ELECTRONIC TRANSMISSION

Manuel A. Abascal
manny.abascal@lw.com, manuel-abascal-7112@ecf.pacerpro.com

Christian M. Contreras
cc@contreras-law.com, lc@Contreras-Law.com, cam@Contreras-Law.com
lawclerk@Contreras-Law.com

Jonathan Michael Eisenberg
jonathan.eisenberg@ahf.org

Bradley Joseph Hamburger
bhamburger@gibsondunn.com

Arlene Nancy Hoang
arlene.hoang@lacity.org, evelyn.rodriguez@lacity.org

Paul L Hoffman
hoffpaul@aol.com, sshhwilliam@gmail.com, jwashington@sshhzlaw.com

Theano Evangelis Kapur
tevangelis@gibsondunn.com

Jeffrey Lewis
jeff@jefflewislaw.com, jason@jefflewislaw.com

Scott D Marcus
scott.marcus@lacity.org, guadalupe.lopez@lacity.org, irene.m.perez@lacity.org

Jessica Mariani
jessica.mariani@lacity.org, ava.smith@lacity.org

Byron J McLain
bmclain@foley.com, vhong@foley.com, byron-mclain-5906@ecf.pacerpro.com

Elizabeth Anne Mitchell
elizabeth@umklaw.com, calendaring@umklaw.com

Shayla Renee Myers
smyers@lafla.org, bschultz@lafla.org,amcnair@lafla.org, sbodden@lafla.org,
rmoreno@lafla.org, lschmidt@lafla.org

Michael Martin Walsh
michael.walsh@lacity.org

Brooke Weitzman
bweitzman@eldrcenter.org